**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

REBOTIX REPAIR LLC,

               Plaintiff,

vs.

INTUITIVE SURGICAL, INC.,

            Defendant.

Case No.

## COMPLAINT

Plaintiff Rebotix Repair LLC files this Complaint against Defendant Intuitive Surgical, Inc. for antitrust violations: tying, exclusive dealing, monopolization, and attempted monopolization.

### INTRODUCTION

1.     Defendant Intuitive dominates the market for minimally invasive surgical robots with its da Vinci surgical robots. Through exclusionary and anticompetitive conduct, Intuitive uses this dominance to monopolize a separate market: the market for replacements and repairs of EndoWrists, which are the surgical instruments (e.g., graspers, forceps, scissors, etc.) that are used during the da Vinci robotic surgeries.

2.     Plaintiff Rebotix repairs EndoWrists. Hospitals that perform da Vinci surgeries hire Rebotix to inspect the EndoWrists and repair them, for example by tightening the graspers, realigning the forceps, or sharpening the scissors. Repairs of surgical instruments nearly

identical to EndoWrists have been performed routinely for decades and are standard practice in the health services industry.

3.      Intuitive, however, has engaged in anticompetitive conduct to prevent any repairs of the EndoWrist surgical instruments, thereby harming—in fact almost eradicating—Rebotix's business.   Instead of repairing their EndoWrists, hospitals with da Vinci surgical robots are forced to constantly buy new, unnecessary replacement EndoWrists from Intuitive. For example:

- Intuitive includes a chip in each EndoWrist that counts the number of times the EndoWrist has been used, and then renders the EndoWrist non-functional after a given number of uses, even though the EndoWrist remains in perfect condition.

- Intuitive's standard sales and service agreement for its da Vinci surgical robots expressly requires that customer adhere to the "maximum number of uses" requirement for EndoWrists.

- Intuitive's standard sales and service agreement for its da Vinci surgical robots expressly prohibits its customers from performing repairs on their EndoWrists.

- Intuitive routinely sends cease and desist letters to its customers who elect to repair their EndoWrists (e.g., through Rebotix's repair services) rather than purchase unnecessary replacement EndoWrists.

- Intuitive routinely threatens to deny its customers basic servicing of da Vinci robots if its customers elect to repair their EndoWrists (e.g., through Rebotix's

repair services) rather than purchase unnecessary replacement EndoWrists.  For example, Intuitive has threatened to "paperweight" a hospital's robot, i.e., withhold services and thus make the robot useless for any function other than serving as a large, expensive paperweight.

4.      As a direct result of this illegal conduct, Intuitive earns far more revenue ($2.4 billion in 2019 alone) from sales of simple instruments than it does from sales of the complex multi-million dollar da Vinci robots ($1.34 billion in 2019).  Also, as a direct result of this conduct, Rebotix has suffered enormous harm: it has lost profits, lost its past customers, and has been unable to acquire new customers.

## PARTIES

5.      Plaintiff Rebotix Repair LLC ("Rebotix") is a Florida limited liability company with its principal address at 539 Pasadena Avenue South, St. Petersburg, FL 33707.  Rebotix is in the business of repairing surgical instruments called EndoWrists, which are used in minimally invasive robotic surgeries.

6.      Defendant Intuitive Surgical, Inc. ("Intuitive") is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale, California.  Intuitive is the creator of the da Vinci line of minimally invasive surgical robot devices and the EndoWrist line of surgical instruments.  Intuitive sells da Vinci surgical robots and EndoWrist surgical instruments, as well as related parts and services, to hospitals and surgical centers throughout the United States and the world.  This includes Pinellas County in the Tampa Division of the Middle District of Florida.

**JURISDICTION AND VENUE**

7.     This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22.  Defendant has been engaged in interstate commerce during all relevant times of the complaint.

8.     This Court has personal jurisdiction over Defendant due to its business activities in this district.

9.     Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).  Intuitive transacts business in this district and a substantial part of the events giving rise to all claims occurred in this district.

**GENERAL ALLEGATIONS**

**A.     Intuitive's da Vinci surgical robot and EndoWrists.**

10.     Intuitive's da Vinci robot system is used for minimally invasive soft tissue surgery for areas of the body between the pelvis and the head—primarily in general surgery, cardiac surgery, colorectal surgery, gynecologic surgery, head and neck surgery, thoracic surgery, and urologic surgery.  Aspects of da Vinci robotic surgeries mirror traditional minimally invasive surgeries that have been performed for decades.  Doctors make small incisions in soft tissue and insert surgical instruments—for example, scissors, scalpels, graspers, or needle drivers at the end of long narrow tubes—to manipulate, cut, and sew tissues.

11.     In non-robotic surgeries, doctors manipulate the instruments directly with their hands.  In da Vinci surgeries, doctors attach the instruments to the mechanical arms of the

4

surgical robot.  Intuitive sells more than eighty different types of these surgical instruments, including a variety of scissors, scalpels, graspers, and needle drivers.  These instruments used in da Vinci surgeries (called EndoWrists) are essentially identical to the instruments that doctors have used in traditional, minimally invasive surgeries for decades.  The image below shows various EndoWrists:



12.     The image below shows how, instead of being manipulated directly by the doctors' hands, the EndoWrists are attached to mechanical arms of the surgical robot:



13.     Doctors manipulate the instruments indirectly by moving a controller on the surgical robot, which in turn processes the motion information from the controllers into movement commands for mechanical arms.  The image below shows a doctor manipulating the instruments.



**B.     Intuitive's market power in the minimally invasive surgical robot market.**

14.     Intuitive has monopoly power in the domestic and worldwide markets for minimally invasive surgical robots.  The Intuitive surgical robot, called the da Vinci system, is ubiquitous in hospitals throughout the United States and the world.

15.     Intuitive has at least a 98% market share in the worldwide and domestic markets for minimally invasive surgical robots.  As detailed below, any competition is *de minimus*. Minimally invasive robotic surgeries and da Vinci surgeries are largely considered one and the same.

16.     At the end of 2019, Intuitive had an installed base of 5,582 da Vinci Surgical Systems worldwide, including 3,531 in the U.S. (including in all 50 states), 977 in Europe, 780

in Asia, and 294 in the rest of the world.  In 2019 alone, da Vinci robots were used in over 1,229,000 surgeries worldwide, and Intuitive reported $1.346 billion in revenue for sales and leases of its da Vinci robot systems.

17.    There are significant barriers to entry into the minimally invasive surgical robot market.  First, Intuitive has a large portfolio of patents that have enabled it to block competitors from entering the marketplace.  Second, developing a competing robot system is an expensive and uncertain process.  The research and development required to bring a surgical robot to market is substantial.  And clearance by the FDA, which has a rigorous process for clearing any surgical robot for sale, is uncertain.  Third, even if a competing product were developed and cleared, Intuitive's installed base of da Vinci robots and da Vinci surgeons would preclude the new product from gaining market share.  Intuitive has a substantial installed base of over 5,500 da Vinci robots worldwide.  Intuitive also invests heavily to ensure that doctors and medical students are trained to use, and dependent on, the da Vinci system.  Switching to a different surgical robot would be costly for hospitals, requiring them to purchase expensive new surgical robots.  And it would meet substantial resistance from doctors, who would need to abandon the da Vinci surgical methods they have been performing for years (for some, their entire careers), and re-learn how to perform surgeries with different surgical robots.

18.    The market for minimally invasive surgical robots is distinct from the market for equipment used in traditional laparoscopic surgeries.  Robotic surgeries provide a number of advantages over traditional laparoscopic surgeries, including increased dexterity, improved hand-eye coordination and ergonomic position, and improved visualization.  These advantages are made possible because the robot has more "arms" than a human which allows the surgeon

to hold additional instruments.  The "wrists" of the robot also have a greater range of motion than a human, which allows for greater dexterity.  The movements of the instruments can also be scaled relative to the movements of the controller, which allows for greater precision.  The console from which the surgeon operates is also designed to minimize surgeon fatigue.

19.     Because of the distinct attributes of surgical robots, doctors and hospitals believe robotic surgeries are superior to traditional laparoscopic surgeries.  As Intuitive advertises, da Vinci surgeries provide "improved outcomes" and "fewer complications" than alternative healthcare options.  Thus, according to Intuitive itself, a hospital that lacks a da Vinci robot and only provides traditional laparoscopic surgeries will provide patients with worse outcomes and more complications.

20.     Many doctors prefer to perform—and indeed only have the skills to perform—robotic surgeries and not traditional laparoscopic surgeries.  They learn how to perform robotic surgeries (in particular, da Vinci surgeries) in medical school, and they have been performing only da Vinci surgeries for years.  These doctors will only work at hospitals that have da Vinci surgical robots.

21.     Intuitive and hospitals alike promote the distinction between robotic da Vinci surgeries and traditional surgeries.  They emphasize the superiority of robotic da Vinci surgeries. Intuitive states that "100% of the top-ranked U.S. hospitals for cancer, urology, gynecology and gastroenterology diseases all use da Vinci surgical systems."  And hospitals throughout the country likewise state that "100% of top-ranked U.S. hospitals own at least one da Vinci System."

22.     Because of the perceived superiority of robotic surgeries over traditional laparoscopic surgeries, patients elect for robotic surgeries instead of traditional laparoscopic surgeries regardless of cost differential.  Robotic surgeries generally cost from $3,000 to $6,000 more than traditional laparoscopic surgery.  Despite the much higher cost of robotic surgery, the number of robotic procedures has drastically increased: from 136,000 in 2008 to 877,000 in 2017.

23.      There is a very low cross-elasticity of demand between minimally invasive surgical robots and equipment for traditional laparoscopic surgery.  An increase in the cost of a minimally invasive surgical robot does not lead hospitals to purchase traditional laparoscopic equipment instead.  And a decrease in the cost of a surgical robot does not lead hospitals to forego purchasing traditional laparoscopic equipment.  Similarly, a change in the cost of traditional laparoscopic equipment does not affect the market for minimally invasive surgical robots.  They are two separate markets at two entirely independent price points.  The costs for the surgical instruments in most traditional laparoscopic surgeries are less than $1,000.  In contrast, a surgical robot, like the da Vinci, costs approximately $1.5 million or $2.4 million, depending on the model.  According to one source, the average cost of equipment used in robotic surgery is $3,567 per procedure, which includes $1,855 for instruments and accessories and $1,701 dedicated to purchasing and maintaining the system.  Despite the much higher cost for surgical robots, hospitals continue to purchase da Vinci robots.

24.     Moreover, the industry and the public recognize minimally invasive surgical robots as a separate economic entity, and they specifically refer to the market for surgical robots and competition in surgical robots.

25.     There are several professional and trade associations focused on robotic surgery, including the Society of Robotic Surgery and the Clinical Robotic Surgery Association.  Moreover, manufacturers that make surgical robots specialize in surgical robots. They do not also make equipment for traditional, laparoscopic devices.

26.     Intuitive dominates the domestic and worldwide markets for minimally invasive surgical robots, with a domestic and worldwide market share of at least 98%.  Any potential competitors in the minimally invasive surgical robot market have *de minimus* market share.

27.     Medical device company TransEnterix received FDA clearance for a minimally invasive surgical robot, the Senhance Surgical Robotic System, in October 2017. TransEntrerix's presence in the market remains *de minimus*.  In 2019, TransEnterix shipped 4 Senhance surgical robots worldwide, none of which were shipped domestically.  In contrast, in 2019, Intuitive shipped 1,119 da Vinci surgical robots worldwide, including 728 in the United States.  Other medical device companies have plans to enter the minimally invasive robot market, but their products are in the development stage and they have no market share. For example, Medtronic's Hugo system is in development but Medtronic has not yet sought FDA approval.

28.     Other robotic surgical devices, which are not in the minimally invasive surgery market and do not compete with Intuitive's da Vinci surgical robot, have recently emerged. For example, Medtronic and Stryker make devices for use in orthopedic surgeries.  Medtronic makes the Mazor X Stealth device for use specifically in spinal implant surgery, and Stryker makes the Mako products for use in aligning implants in knee and hip replacement surgeries.

These orthopedic surgery robots are not substitutes for, and do not compete with, Intuitive's da Vinci robots, which are not used for orthopedic surgeries.  The orthopedic surgery robots are not part of the minimally invasive surgical robot market.

29.   As another example, Medrobotics received FDA clearance for its Flex robot for use in natural orifice surgeries.  The Flex robot can only be used for surgeries that involve insertion of instruments through the body's natural orifices.  The Flex instruments cannot be inserted through the small cuts or incisions through which instruments are inserted in da Vinci surgeries and traditional minimally invasive surgeries.  Accordingly, the Flex robots are not substitutes for, and do not compete with, Intuitive's da Vinci robot.  Moreover, Medrobotics' Flex robots have a *de minimus* presence in the marketplace, with even fewer sales than TransEnterix's Senhance robot.

## C.   Intuitive's anticompetitive and exclusionary conduct in the market for EndoWrist repairs and replacements.

30.   Through exclusionary and anticompetitive conduct, Intuitive uses its dominance in the market for minimally invasive surgical robots to monopolize a separate market: the market for replacements and repairs of EndoWrists, i.e., the surgical instruments like graspers, forceps, scissors, etc. that are used during the robotic surgeries.

31.   Intuitive has monopoly power in the worldwide and domestic markets for replacements and repairs of EndoWrist instruments.  And Intuitive acts with clear intent to obtain and retain this monopoly power.

32.   The EndoWrist instruments are necessary to perform surgery with the da Vinci robot system and are only available from Intuitive.  As a result of the anticompetitive conduct detailed below, which includes tying the sale and servicing of its da Vinci surgical robots to

repairs and replacement of EndoWrists, Intuitive is able to exclude competition and maintain prices for the repair and replacement of EndoWrist instruments at supracompetitive levels.

33.     Moreover, Intuitive does not account for the supracompetitive prices of its EndoWrists and the profits it earns from EndoWrists sales when pricing its da Vinci robots. That is, Intuitive does not lower the price of its surgical robots to account for the supracompetitive prices of EndoWrists. Quite the opposite, Intuitive charges supracompetitive prices for both its da Vinci robots and its EndoWrists. For the calendar year 2019, Intuitive reported $2.4 billion in revenue for instruments and accessories and an overall gross margin on product sales of more than 70%.

34.     There are substantial barriers to entry into the repair and replacement of EndoWrist instruments. An EndoWrist instrument cannot work with a da Vinci robot unless it has a serial number from Intuitive. Intuitive's standard sales contract for da Vinci robots prohibits the customer from using the robot with any surgical instruments not made by or approved by Intuitive. The Food and Drug Administration and foreign regulatory agencies have rigorous processes for approving any surgical robot instruments for sale. Moreover, as detailed below, Intuitive undertakes various anticompetitive measures to further its monopoly by prohibiting any EndoWrist repairs.

35.     As a result, Intuitive has at least a 99% market share in the domestic and worldwide markets for replacements and repairs of EndoWrist instruments.

36.     The surgical ends of EndoWrists are essentially identical to the instruments that doctors have used in traditional minimally invasive surgeries for decades. The image on the

left is an EndoWrist and the image on the right is a traditional, manually manipulated instrument.

 

37.     Before releasing its EndoWrists to market, Intuitive told the FDA that the EndoWrists and traditional instruments "are essentially identical … in terms of shape, size, function, and tissue effect;" "are substantially equivalent in intended use and/or method of operation;" and "demonstrate substantial equivalence … in terms of safety and effectiveness." The FDA agreed and "determined the [EndoWrist] device" is "substantially equivalent" to the traditional devices.

38.     The instruments used in traditional minimally invasive surgeries are cleaned and inspected before and after each surgery.  If needed, the instruments are repaired between surgeries—for example, scissors may be sharpened or graspers may be realigned.   The instruments are used for hundreds of surgeries, and often last for years.

39.     Because EndoWrists and the traditional instruments are essentially the same, EndoWrists likewise can be used for hundreds of surgeries and last for years, if inspected and

13

repaired as needed between surgeries.  However, Intuitive takes active measures to preclude this.

40.     Intuitive uses its dominance in the surgical robot market, and acts with clear intent, to coerce hospitals into buying far more EndoWrists than they require (resulting in billions of dollars in undue profits for Intuitive), and to exclude any competitors (like Rebotix) from the market for EndoWrist repair and replacement.

41.     Intuitive does so in several ways detailed below.

**1.     Usage counter.**

42.     Intuitive attempts to use memory chips to force its customers to discard EndoWrists and purchase new ones after a given number of uses, even when the EndoWrists are maintained at or better than their original levels of safety and effectiveness.

43.     Intuitive includes a programmed memory chip in each EndoWrist that counts the number of uses, and then renders the EndoWrist non-functional after the specified number of uses.  After the memory chip reaches the count determined by Intuitive, the memory chip is wiped, preventing the EndoWrist from communicating with the da Vinci device and rendering the instrument inoperable.  For most EndoWrists, ten is the maximum number of allowed uses.

44.     The maximum usage requirement for EndoWrists was not determined based on considerations of safety or effectiveness.  Instead, Intuitive includes the usage requirement to exclude all competition for EndoWrist repairs and to extract additional profits from its customers, who are forced to buy additional, unnecessary EndoWrists at supracompetitive prices.

45.     The usage limits are not based on any regulatory requirements from the FDA. As set forth above, Intuitive's premarket notifications to the FDA for the EndoWrist instruments represented to the FDA that they were "essentially identical" to their precursor traditional instruments, which did not include any usage limits, and which can safely be used for more than 100 surgeries.  And the FDA approved the EndoWrists on that basis.

46.     Intuitive's standard contracts and instrument catalogs do not refer to any regulatory requirements imposing the usage limits.

47.     The usage limits are not based on any clinical or scientific determination of the useful life of the instruments.  Intuitive has not released to the public, nor does it provide to its customers, any clinical data that supports the EndoWrist usage limits.  Also, analogous surgical instruments used by other surgical robots do not have usage limits.  For example, the TransEnterix Senhance robot uses surgical instruments (depicted below) that are substantially the same as Intuitive's EndoWrists.  And the TransEnterix surgical instruments do not have usage limits.



Similarly, the analogous surgical instruments used by the Medrobotics' Flex robot (depicted below) do not have usage limits.



48.     Moreover, doctors and hospitals who have used EndoWrists beyond the maximum use requirement (i.e., after being inspected and repaired by Rebotix) report that the EndoWrists perform as well as, if not better than, when they were new, i.e., when the usage counter was at zero.

49.     Intuitive's own instrument catalogs demonstrate that the useful lives of the instruments are much longer than their usage limits.  The medical industry does not impose different safety or effectiveness standards for surgical instruments depending on whether they are used for training or clinical use.  When a doctor is using an instrument for training purposes, that instrument must be fully functional and safe.  Despite this, when Intuitive sells the same EndoWrists for training and for surgical use, it sets the usage counter substantially higher for those designated for training than those designated for surgical use.  For example, the Potts Scissors EndoWrists sold for use in training has a usage limit of 30, but the same Potts Scissors EndoWrist sold for use in surgery has a usage limit of 10.

50.     Intuitive's 510(k) premarket notification summaries to the FDA do not reference any tests showing that the EndoWrists begin to lose their functionality at the usage limit.  Nor do they refer to any tests showing that servicing the instruments would not maintain the safety and effectiveness of the instrument for additional uses.

51.     Rebotix's business of repairing EndoWrists would be rendered obsolete if EndoWrists must be discarded before they are in need of repairs, as intended by Intuitive's usage counter.  Accordingly, Rebotix invested substantial time, resources, and money (millions of dollars) to develop a workaround.  When Rebotix repairs the EndoWrists, Rebotix includes a Rebotix Interceptor, which resets the counter while maintaining the ability of the da Vinci robot to access the data in the OEM memory and to count uses as usual.  The OEM memory device contains the pertinent operational information for each instrument and this memory chip remains with the instrument following repair. The Interceptor only resets the use count and does not interfere with any other communications the robot makes with the instrument.  The intended use, method of use, functionality, and performance of the instrument are not changed in any way by this service.

52.     However, even with this workaround, Intuitive's anticompetitive practices have still harmed Rebotix's business.  First, Rebotix was forced to expend significant time, resources, and money to develop this workaround.  Second, Rebotix's workaround only works for EndoWrists used with the da Vinci Si model, not the newer Xi model.  Third, as detailed below, Intuitive implements several other anticompetitive practices to ensure its customers buy unnecessary replacement EndoWrists rather than use Rebotix's repair services.

**2.     Anticompetitive contractual terms.**

53.     Intuitive contractually ties the sales of da Vinci systems and maintenance services to the sales of EndoWrists.  Intuitive includes contractual restrictions in the Sales, Service, and License Agreement for its da Vinci system to restrict competition in the market

for Endowrist repairs and replacements and to dramatically increase the number of EndoWrists its customers must buy.

54.     Intuitive's standard agreement ties the purchase of a da Vinci robot to its "maximum number of uses" requirement for EndoWrists.  The agreement expressly requires that the purchaser of a da Vinci robot adhere to the "maximum number of uses" requirement for EndoWrists.  But, as set forth above, the safe and usable life of an instrument far exceeds the maximum number of uses designated by Intuitive.  For example, a forceps that is periodically inspected and, if necessary, aligned or adjusted can still be in perfect condition after well over 100 uses.  It is indistinguishable from a new EndoWrist.  As a result of this contractual provision, hospitals are thus forced to buy many more (10 to 20 times as many) EndoWrists from Intuitive than they actually would need if the restrictive tying clause were eliminated.  And as a result of this provision, hospitals cannot use the services of Rebotix, which is in the business of safely repairing EndoWrists, beyond the maximum uses requirement.

55.     Intuitive's standard agreement also expressly prohibits its customers from performing repairs on the EndoWrists—for example, sharpening the scissors or aligning the graspers.  As set forth above, for decades, hospitals have been performing repairs on substantially identical tools when they are used for manual surgery, without the robot.  But instead of permitting hospitals to perform these basic repairs—which is the standard procedure used for the identical non-robotic versions of these medical instruments—Intuitive requires hospitals to discard scissors that may need sharpening, or graspers that may need aligning.  The

hospitals cannot use Rebotix's repair services.  Instead, they must buy new, replacement EndoWrists from Intuitive.

### 3.   Intuitive's aggressive enforcement.

56.   To maintain this source of massive revenues from its EndoWrist sales, Intuitive actively and fiercely enforces the anticompetitive restrictions in its standard sales agreement. Intuitive has sent cease and desist letters to nearly every Rebotix client.  Intuitive threatens to withhold the contractual maintenance services that are necessary for the continued operations of hospitals' da Vinci robots when hospitals elect to use Rebotix's services to repair their EndoWrists.  In addition, Intuitive representatives verbally repeat and reiterate these threats. For example, Intuitive has threatened to "paperweight" a hospital's robot, i.e., withhold the necessary maintenance services and thus make the robot useless for any function other than serving as a large, expensive paperweight.

57.   When hospitals elect to use Rebotix's services to repair their EndoWrists rather than purchase new ones, Intuitive representatives threaten to withhold maintenance services from the hospital should the hospital continue to make such repairs rather than purchase more EndoWrists from Intuitive.  Or when hospitals elect to use an EndoWrist beyond the limit set by Intuitive, Intuitive representatives threaten to withhold maintenance services for the hospitals' da Vinci robots.

58.   Hospitals are dependent on these robot maintenance services for the continued operation of their essential da Vinci robots.  The services include "provid[ing] and install[ing] Software upgrades," "replac[ing] defective malfunctioning System parts," and "replac[ing] and install[ing] Software, Hardware, and mechanical parts for safety."  Each of these services

can only be obtained from Intuitive.  And if these services are not provided—e.g., if a malfunctioning part is not replaced or the Software is not up to date—the da Vinci system will display a "NEEDS SERVICE" warning message on the display panel.  Doctors will not perform a surgery with a machine indicating that it "NEEDS SERVICE."  Nor will patients allow themselves to be operated upon by a machine that "NEEDS SERVICE."  Accordingly, when service is needed, the da Vinci robot is effectively rendered useless until service is provided.  Hospitals cannot afford to have useless da Vinci robots.  Da Vinci robots are large capital investments, and ongoing da Vinci surgeries are necessary to recoup that investment. Functional da Vinci machines are also necessary to maintain the goodwill of the doctors and patients who have scheduled robotic surgeries.

59.     Accordingly, the hospitals capitulate to Intuitive.  They continue to spend large sums purchasing unnecessary EndoWrists from Intuitive.  And they stop using Rebotix's services.

**4.      Effects of Intuitive's' anticompetitive and exclusionary behavior on Rebotix.**

60.     Rebotix invested substantial time, resources, and money (millions of dollars) to develop the Interceptor workaround that resets the count on the usage counter installed by Intuitive on all EndoWrists.  The Interceptor allowed Rebotix to provide a service that hospitals were craving: the ability to avoid purchasing unnecessary EndoWrists from Intuitive by having their EndoWrists safely repaired.

61.     Rebotix's services are enormously attractive to hospitals.  Rebotix provides hospitals with approximately 40% savings on their EndoWrist expenses, while maintaining the same level of safety and effectiveness.  Hospitals that learned of Rebotix's repair services

uniformly expressed interest.  Those hospitals that declined Rebotix's services explained to Rebotix that they did so because they feared the anticompetitive provisions in their contracts with Intuitive.  As for those hospitals that did retain Rebotix's services, the relationships were universally short-lived because of Intuitive's aggressive enforcement of its anticompetitive provisions.  As a result, Rebotix has lost customers and profits, and it has lost the ability to retain future customers and profits that it was uniquely positioned to acquire.

### COUNT I – TYING

62.     Rebotix incorporates paragraphs 1 through 61.

63.     Intuitive has dominant economic power in the worldwide and domestic markets for minimally invasive surgical robots.  Intuitive has used this economic power to coerce its customers into buying replacement EndoWrists from Intuitive.  Intuitive has conditioned the sale and servicing of its da Vinci surgical robots on customers buying replacement EndoWrists from Intuitive instead of repairing the EndoWrists that the customers already have, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This tying arrangement has anticompetitive effects in the worldwide and domestic markets for EndoWrist repair and replacement, which involves a substantial amount of interstate commerce.

64.     As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supracompetitive prices, and Rebotix has been injured, including through lost profits, lost customers, and damage to its reputation and goodwill.  These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

## COUNT II – EXCLUSIVE DEALING

65.     Rebotix incorporates paragraphs 1 through 61.

66.     Intuitive has taken measures and entered into agreements with its customers that require the customers to service and replace their EndoWrist instruments on an exclusive basis with Intuitive, thus foreclosing competition in the worldwide and domestic markets for repair and replacement of EndoWrist instruments, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

67.     As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supracompetitive prices, and Rebotix has been injured, including through lost profits, lost customers, and damage to its reputation and goodwill.   These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

## COUNT III – MONOPOLIZATION

68.     Rebotix incorporates paragraphs 1 through 61.

69.     Intuitive has willfully obtained and maintains monopoly power in the worldwide and domestic markets for EndoWrist service and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Intuitive maintains at least a 99% market share by excluding competitors.   Intuitive's exclusionary tactics include tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots, prohibiting customers from having their EndoWrists repaired, sending cease and desist letters when customers attempt to repair EndoWrists, and incorporating a usage counter into every EndoWrist instrument to require additional EndoWrist purchases instead of repairs.

70.     As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supracompetitive prices, and Rebotix has been injured in its business and property, including through lost profits, lost customers, and damage to its reputation and goodwill.  These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

COUNT IV – ATTEMPTED MONOPOLIZATION

71.     Rebotix incorporates paragraphs 1 through 61.

72.     Intuitive has acted with the clear intent to obtain monopoly power in the worldwide and domestic markets for EndoWrist repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Intuitive has engaged in anticompetitive conduct including tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots, prohibiting customers from having their EndoWrists repaired, sending cease and desist letters when customers attempt to repair EndoWrists, and incorporating a usage counter into every EndoWrist instrument to require additional EndoWrist purchases instead of repairs. Intuitive has at least a 99% market share and has a high probability of successfully monopolizing the market.

73.     As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supracompetitive prices, and Rebotix has been injured in its business and property, including through lost profits, lost customers, and damage to its reputation and goodwill.  These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

**Prayer for Relief**

Rebotix respectfully requests that the Court enter judgment in its favor and against

Intuitive as follows:

(a) For damages in an amount to be determined at trial and trebled pursuant to 15

U.S.C. § 15(a);

(b) For injunctive relief pursuant to 15 U.S.C. § 26;

(c) For costs and attorney's fees incurred in this action pursuant to 15 U.S.C. § 15(a);

(c) For such other and further relief as the Court deems just and proper.

**Jury Demand**

Plaintiff demands trial by jury for all claims.


Date: September 28, 2020                          Respectfully submitted,



                                                  /s/ *David L. Luikart*
                                                  David L. Luikart III – Trial Counsel
                                                  Florida Bar No. 21079
                                                  dave.luikart@hwhlaw.com
                                                  michelle.armstrong@hwhlaw.com
                                                  HILL, WARD & HENDERSON, P.A.
                                                  101 East Kennedy Blvd., Suite 3700
                                                  Post Office Box 2231
                                                  Tampa, Florida 33601
                                                  (813) 221-3900 (Telephone)
                                                  (813) 221-2900 (Facsimile)

                                                  -AND-

                                                  Richard Lyon**
                                                  CA State Bar No. 229288
                                                  Email: rick@dovellaw.com
                                                  Gregory Dovel**
                                                  CA State Bar No. 135387

24

Email: greg@dovellaw.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: 310-656-7066
Facsimile: 310-657-7069

**Pro Hac Vice Forthcoming*

ATTORNEYS FOR PLAINTIFF
REBOTIX REPAIR, LLC