1    IN THE UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF FLORIDA
2            TAMPA DIVISION

3    REBOTIX REPAIR LLC,              Tampa, Florida

4            Plaintiff,              Case No. 8:20-cv-2274-T-33TGW

5        -vs-                         November 19, 2020

6    INTUITIVE SURGICAL INC.,         9:53 a.m.

7            Defendant.              Via Zoom

8    _____

9            **TRANSCRIPT OF MOTION HEARING**
     BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON
10            UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21   OFFICIAL COURT REPORTER:

22       Shelli Kozachenko, RPR, CRR, CRC
         221 N. Hogan Street, #185
23       Jacksonville, FL  32202
         Telephone:  (904) 301-6842
24
                         (Proceedings reported by stenography;
25                            transcript produced by computer.)

1                          A P P E A R A N C E S

2

COUNSEL FOR PLAINTIFF:

3

4         **Richard Lyon, Esquire**
          Dovel & Luner LLP
5         201 Santa Monica Boulevard, Suite 600
          Santa Monica, CA  90401

6         **David Luikart III, Esquire**
          Hill Ward Henderson, PA
7         101 East Kennedy Boulevard, Suite 3700
          Tampa, FL  33602

8

9

COUNSEL FOR DEFENDANT:

10

11        **Allen Ruby, Esquire**
          Skadden Arps Slate Meagher & Flom LLP
          525 University Avenue, Suite 1400
12        Palo Alto, CA  94301

13        **David McGee, Esquire**
          Beggs & Lane, RLLP
14        501 Commendencia Street
          Pensacola, FL  32502

15

          **Karen Hoffman Lent, Esquire**
16        Skadden Arps Slate Meagher & Flom LLP
          One Manhattan West
17        New York, NY  10001

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2   November 19, 2020                            9:53 a.m.
 3                          -  -  -
 4            THE COURT:  Good morning, everybody.  We're here for
 5   a hearing in Rebotix Repair LLC versus Intuitive Surgical.
 6   It's case 20-cv-2274.
 7            And I ask that unless you're speaking that you keep
 8   your microphone on mute or turned off.  Otherwise sometimes we
 9   get noise in the background.
10            So -- and whenever you do speak, if you could just
11   identify yourself so that it's easier for the court reporter to
12   note who it is who is speaking.
13            So I'll begin by having counsel state their
14   appearances.
15            Who do we have for the plaintiff, Rebotix?
16            MR. RUBY:  Good morning, Your Honor.  My name is
17   Allen Ruby -- I'm sorry.  I'm for defendant, Intuitive
18   Surgical.  I'm used to, in other circumstances, speaking first.
19            I apologize, Counsel.  I'll let you go ahead.
20            THE COURT:  That's okay.  Not a problem.  That
21   happens to all of us, including me sometimes.
22            So who do we have for the plaintiff, then?
23            MR. LYON:  Your Honor, this is Rick Lyon.  I'm
24   counsel -- Dovel & Luner, counsel for Rebotix, the plaintiff.
25            THE COURT:  Okay.
```

1          MR. LUIKART:  And, Judge, this is David Luikart with

2    Hill Ward Henderson, also counsel for the plaintiff.

3          THE COURT:  Okay.  Thank you.

4          And who will be speaking today for the plaintiff?

5    Will it be you, Mr. Lyon?

6          MR. LYON:  Yes, it will, Your Honor.

7          THE COURT:  Okay.  Thank you.

8          And who do I have for the defense?

9          MR. RUBY:  Well, if I've got it right now, I'm Allen

10   Ruby for defendant, Intuitive Surgical.  With me are my

11   colleagues Mike Bailey and Karen Hoffman Lent.

12         If it please the Court, I'll probably do most of the

13   talking, although if there are questions or something of that

14   nature, Ms. Lent may be able to be helpful.

15         THE COURT:  Okay.  Thank you.

16         MS. LENT:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         And then I know you have your local counsel in

19   Tallahassee -- I don't know if you're in Tallahassee or

20   Pensacola, Mr. McGee, remind me.  Are you -- he's on mute.

21         MR. McGEE:  I'm in Pensacola, Beggs & Lane.

22         THE COURT:  Okay.  Very good.  Nice to see you as

23   well.

24         So we're here on -- well, let's just go through a few

25   things and then -- obviously, we're here on the defendant's

1    motion to transfer to the Northern District of Florida.  And
2    we'll probably have a case management hearing afterwards, after
3    I hear argument on that.
4          You know, if I decide to transfer the case, then,
5    well, I guess it will be an exercise that we didn't have to do,
6    but since I've got everybody gathered, I'll do it.  If I decide
7    to keep the case here in Tampa, then the benefit is that I will
8    have that additional information from you.
9          So what I have is that this case was filed on
10   September 28th, and the answer or responsive pleading has not
11   been filed yet.  It's not due until December the 8th.  I think
12   there must have been an extension of time to respond to that.
13         We've got a number of actions that have been pled:  a
14   violation of Section 1 of the Sherman Act; exclusive dealing in
15   violation of Section 1 of the Sherman Act; Count III is
16   monopolization in violation of Section 2 of the Sherman Act;
17   and Count IV is attempted monopolization in violation of
18   Section 2 of the Sherman Act.
19         I'll tell you, my first job out of law school was
20   with the Federal Trade Commission, and I haven't had the chance
21   to do very much antitrust law since 1981 when I left the
22   Federal Trade Commission, so -- but we do periodically get some
23   antitrust type work in the district court.
24         This case, jurisdiction does occur to be appropriate,
25   brought under the federal antitrust laws, so no issue here on

1  jurisdiction.

2        With respect to venue, Rebotix is alleging venue is

3  proper pursuant to 15 U.S.C. Section 22 and 28 U.S.C. Section

4  1391(b) and (c) because Intuitive transacts business in this

5  district, and a substantial part of the events giving rise to

6  all claims occurred in this district.

7        So as I said, we're here on a motion to transfer

8  venue to the Northern District of Florida.  It's docket entry

9  25.  There's a response in opposition.  The defendant asked to

10  file a reply brief, but since it was set for oral argument, I

11  felt that it was something that could be raised here in this

12  matter.

13        So what I'm going to do is I'm going to hear from the

14  defense, then, and you can -- Mr., let's see, Ruby, will you be

15  addressing that motion then?  Is that right?

16        MR. RUBY:  I will, Your Honor.  Thank you.

17        THE COURT:  Okay.  You're welcome.

18        Go ahead.  Tell me why -- and let's focus on the

19  first-to-file rule and tell me why you think it's appropriate

20  that this case be transferred to the Northern District when we

21  have two different plaintiffs?

22        MR. RUBY:  All right, Your Honor.  May I ask, can the

23  Court hear me if I talk about like this?

24        THE COURT:  Uh-huh.

25        MR. RUBY:  And may I -- may I remain seated?

1    THE COURT:  Sure.  Oh, my goodness.  Of course, of
2  course.
3    MR. RUBY:  Okay.  Well, to get right to the point, as
4  Your Honor did, Intuitive believes that this is an appropriate
5  case for action under the first-to-file rule because the case
6  meets all the requirements of first-to-file, and I'll come back
7  to that.  We've checked all the boxes.
8    But beyond that, this is, in our respectful view,
9  exactly the kind of situation that first-to-file contemplated.
10  The similarities among the parties, which actually are
11  contested in the -- well, the opposition doesn't really contest
12  similarity.  As the Court knows, the opposition says that
13  because there is not identity of parties, in other words,
14  they're not all exactly the same parties, that's a
15  disqualifier.
16    THE COURT:  Well, what you have -- and excuse me.
17  You know, sometimes one of the problems is on these video chats
18  that you don't know when it is that I want to say something,
19  so, you know, forgive me if I appear rude to interrupt.
20    But I -- the plaintiffs are different.  And I've
21  spent some time looking at this, and I totally understand what
22  you're saying in terms of your concern about inconsistent
23  rulings.  If -- if a case cries out with the potential for
24  inconsistent rulings, this is it.
25    And you have similar -- you have virtually identical

1    causes of action, maybe a little -- a few differences here and

2    there, but they look what I would call similar.

3         So you have similar causes of action.  You have the

4    concern with inconsistent rulings, which is the whole idea

5    behind the first-to-file.  So in terms of trying to comply with

6    the spirit of the rule, you absolutely have it.

7         Where you don't have it and where I think -- and this

8    is why I really just zeroed in on it.  Where I think it's

9    virtually fatal is the first element.

10        You have the same defendants for sure, but I don't

11   see that similarity between the plaintiffs, and so that's what

12   I'm really hoping that you can address for me because I don't

13   see that at all.

14        MR. RUBY:  In the context of the litigation, which is

15   the only context that would make sense in these circumstances,

16   the plaintiffs, in our view, could scarcely be more similar

17   than they are.

18        Let me explain, if I may, Your Honor.

19        THE COURT:  Uh-huh.

20        MR. RUBY:  Both plaintiffs say that they are small

21   companies that either participate, or hope to participate, or

22   hope to participate more in what they each describe as the same

23   market, that is, what they say is a market worldwide and across

24   the United States for the repair and replacement of certain

25   accessories.

1          And perhaps most telling, they are plaintiffs who
2   claim that they suffered the same injury in the same way.
3          Now, "same" in this context is very similar.  Restore
4   says that it participates more broadly in the market, or wants
5   to participate more broadly than Rebotix, but it's what they
6   describe as the same market.
7          We respectfully submit, Your Honor, that the test of
8   similarity in this context is functional similarity.  What do
9   they do?  What brings them to court?  And what brings them to
10  court is the same complaint about the same injury.
11         Each of them says that they were injured in their
12  business or property by the anticompetitive behavior of
13  Intuitive, and Intuitive denies that.  I won't -- that
14  qualification isn't necessary, I hope.
15         So in this context, similarity doesn't mean fairly
16  construed:  Where did they go to school?  Are they tall or are
17  they not tall?  Do they have red hair or do they have blond
18  hair?  Or do their kids play with each other?  Similarity
19  means, for purposes of the litigation, are they alike.
20         And they say, again and again, that they are indeed
21  alike.  They say it's the same market; it's the same injury;
22  it's the same malefactor; that is, in their pleadings, it's
23  Intuitive.  And those are the hallmarks, if you will, of the
24  kind of similarity that fairly can invoke the first-to-file
25  rule.

1    It's sort of a rhetorical question how could they be

2  more similar, but it's not really that rhetorical.  I mean, the

3  opposition says that, well, they're not really related.

4  They're not strangers, that's for sure, but they're not the

5  same company, and they don't have the same offices.  In fact,

6  their offices are some miles apart.  Okay.

7    But we respectfully submit that those are not

8  disqualifiers.  What are we all in court for?  They've invoked

9  the jurisdiction of the court, they being Rebotix and Restore,

10  to do the same things.

11    And what I'd ask -- I'd ask Your Honor to consider at

12  least one other thing which wasn't talked about too much in the

13  papers, which is maybe good.  I don't like to repeat what the

14  Court has already read.

15    Both of these plaintiffs are seeking an injunction.

16  They want money damages.  They've spoken to that.  They also

17  each want an injunction, and they want an injunction arising

18  from the facts that they have alleged.

19    Again, it's a complete -- to use the language of the

20  cases -- overlap, at least, in the relief they seek, the

21  grounds on which they seek it, and the facts or what they

22  allege to be the facts that cause them to come to court.

23    So for purposes of the first-to-file rule, we submit

24  that they are almost entirely similar, recognizing -- they say

25  that they're not subsidiaries of the same company and they have

1  offices, as they've said, in different places.

2         But beyond that, reading the pleadings, their

3  pleadings, they sound like individual plaintiffs who are trying

4  to tell the same account of what brings them to court.  And

5  that makes them about as similar as they could be in this

6  context.

7         THE COURT:  They're not identical plaintiffs.

8         When I looked through the cases to see what cases I

9  could find where courts had transferred one case to another

10  jurisdiction -- I mean, it's interesting that you talked about

11  injunctive relief because on some of the cases, that is

12  something that's mentioned, is when you do have injunctive

13  relief, the concern with an injunction that's issued by the

14  court impacting on, you know, another group of parties or

15  another group of plaintiffs.  But generally speaking, there's

16  some general overlap.

17         For instance, I looked at a case out of the Middle

18  District of Florida where a magistrate judge had agreed that a

19  case could be transferred; I think it was to Illinois.  And

20  there was -- while there wasn't complete interaction between

21  the two -- or inter- -- yeah, interaction between the two

22  parties in the two cases, what you had was -- I think there was

23  a derivative -- that's right.  It was a derivative case with

24  respect to certain accounts.

25         And so with respect to a fraction of the plaintiffs,

1    there was that overlap.  And that was sufficient to transfer

2    the case from one district to another district under the

3    first-filed rule.  But short of that, I just had a hard time

4    finding any cases that -- where that's what the Court did.

5            Now, I'll tell you, I don't think there's any

6    preclusion on doing this.  I looked at Eleventh Circuit case

7    law.  I don't think there's anything to stop me from doing it

8    if I felt that it was the right thing to do.

9            I think it's one of those things that's within the

10   discretion of the Court, whether to transfer it or not, and I

11   think in the Eleventh Circuit there just isn't a preclusion on

12   doing it.

13           But by the same token, I just couldn't find cases

14   that were squarely on point, on all fours, with what you're

15   arguing.  Now, maybe I've missed it.  Maybe because I didn't

16   let you file a reply, I totally missed out on it.

17           So what court has done that before, I mean, permitted

18   it when you have different plaintiffs?  Has there been a court

19   that's permitted it?

20           MR. RUBY:  Where there are different plaintiffs?

21           THE COURT:  Uh-huh.

22           MR. RUBY:  Well, we -- we looked hard also, Your

23   Honor, for cases that might be helpful in this analysis, and

24   what we found, good and bad, is in our -- is in our papers.

25           THE COURT:  Okay.

 1          MR. RUBY:  We don't claim that we found this case

 2   under another name in this -- in what was submitted to the

 3   Court.

 4          THE COURT:  Uh-huh.

 5          MR. RUBY:  We -- we rely upon the rules that are

 6   consistently stated from case to case about similarity being

 7   the test.

 8          And Your Honor has asked a very specific question

 9   framed in terms of the first-to-file rule, so I won't jump to

10   1404(a) until and unless --

11          THE COURT:  Right.

12          MR. RUBY:  -- there's an invitation from the Court.

13          THE COURT:  Right.

14          MR. RUBY:  But the Court has given -- given us an

15   opportunity now to make our case for the similarity between the

16   two plaintiffs.  And I don't like to repeat what's in the

17   papers, and I frankly don't like -- I don't think I should

18   repeat what I've already said, as we -- we got it the first

19   time.

20          THE COURT:  Let me tell you, your first-filed rule

21   argument is your stronger argument.  And when I analyzed it,

22   let me tell you what I focused on.  I think antitrust cases are

23   different than a slip and fall at Walmart or an FLSA case.

24          The allegations are different, and the risk of

25   inconsistent rulings is different.  The risk is stronger.  And

1   that is what concerns me here.

2        I mean, this is a -- I have to tell you, a really

3   close call.  And I think the concern that I have is that other

4   than cases where injunctive relief was being sought -- there I

5   saw several times where you had different plaintiffs that the

6   Court would follow the first-filed rule and would transfer it

7   someplace else.  That I saw with injunctive relief.

8        And I saw it, for instance, the case that I've

9   described with Judge Jenkins where you have just very small

10  overlap.  That's about it.  I just -- I just wasn't able to

11  find any others.

12       But what you've alleged is -- and what you've said

13  here today is strong, and that is, even though the entities are

14  different, they're similar.  They're both individual -- or

15  companies that want to be competitors in the same market.  They

16  are complaining about the same anticompetitive behavior of the

17  same company.

18       So they are different entities, and I think that

19  hurts the case for transfer.  It does.  But those other issues,

20  I think, are really important that you've mentioned to me.  And

21  primarily it's -- it's the risk of inconsistent rulings and the

22  absolute similarity of arguments, of causes of actions.

23       MR. RUBY:  Your Honor, you know, taking, of course,

24  into account what the Court just said, I wonder if I could

25  briefly return to the question the Court first posed and try to

1   put aside some of the formalities and answer that question --

2            THE COURT:  Okay.

3            MR. RUBY:  -- which is -- and I'm paraphrasing, but

4   the Court's question was, I think, tell me why this -- these

5   cases ought to be put together.  I hope that's a fair

6   paraphrase --

7            THE COURT:  Uh-huh.

8            MR. RUBY:  -- of what the question was.

9            And I think the answer to that, once we get beyond

10  the formal requirements of the law, is that we have two

11  cases -- I've described what they look like from our view.

12           And what would a reasonable person think would be a

13  way to provide the substantial orderly justice to all the

14  litigants in those what are now two cases?

15           And I think, Your Honor, there -- everything about

16  those cases -- everything about those cases says put those

17  cases in a place, in a procedural setting, where one decision

18  maker, a judge, has the tools to decide the innumerable things

19  that come up in the course of antitrust litigation.

20           Maybe the parties will agree to a lot of them and

21  there will be less that lands on the judicial platter, but --

22  but discovery, protective orders, jury selection, if the case

23  is tried, the whole process of the motion practice.  How are

24  motions going to be decided?

25           Perhaps they would -- this one person in charge of

1    the litigation would decide that it made sense for motions to

2    be presented on common issues to the parties all at once so

3    that the court's research capabilities and the court's time and

4    resources could go to them when everything is right in front of

5    the court.

6            I think this hypothetical person would say separate

7    them so that everything is done in its own sequence, in its own

8    time?  That's -- that's not what the -- what's sensible.  That

9    doesn't comport with, in this context, what I would

10   respectfully submit is common sense.

11           THE COURT:  Let me ask --

12           MR. RUBY:  Yeah.

13           THE COURT:  Let me ask you something else, you know,

14   a couple of questions here.

15           First of all, I've always said the plaintiff gets to

16   pick, you know.  When I get cases that are removed to federal

17   court, if it's appropriate to send them back, I send them back

18   to state court, and I really make them cross every T and dot

19   every I if it's going to stay in federal court.

20           Why?  Because the plaintiff gets to pick the forum

21   that he wants to be in.  And this plaintiff picked the Middle

22   District of Florida, Tampa Division.

23           Doesn't that carry a lot of weight?  And I'm going to

24   get to the next question in a second, but doesn't that carry a

25   lot of weight, and shouldn't that carry a lot of weight?

1        In my mind it does.  Why don't you tell me why I

2   shouldn't honor that.

3        MR. RUBY:  Well, I think those are -- those are

4   different questions, if the Court please.

5        Should it carry weight?  Of course it should carry

6   weight.  That's what the law is.  It needs to be considered.  I

7   don't have any doubt at all, before we're done, the Court will

8   have considered that thoroughly.  Sure, they do get to pick.

9        But the plaintiff's right to enforce its selection

10  for all time through the litigation is a qualified right, and,

11  I mean, with respect, I think we're talking about the right

12  things.  Yes, that is a factor.  We haven't said otherwise.

13       But this is one of those cases, not exceedingly rare

14  but still not everyday fare, where the qualification on that

15  right becomes important.  I think that's really the question.

16  It's a balancing test.

17       The Court has pointed out, with which also we

18  entirely agree, that this is a discretionary call.  So on the

19  one hand, the plaintiff made a choice.  They feel there's

20  advantage to them to being in a particular place.  The law

21  respects that choice, but the law is not obedient, necessarily,

22  under all circumstances, to that choice.

23       And this is one of those cases, we believe, Your

24  Honor, where the likelihood -- I'm tempted to say almost a near

25  certainty of some in- -- unharmonious or conflicting rulings is

1   very high, where the similarity among the claims is -- is very

2   high, where the similarity of parties, for the reasons I

3   indicated, we believe, is high.

4          None of these are absolutes, but neither is the

5   retaining and honoring the plaintiff's choice of venue under

6   all circumstances.  It's a -- it's a balancing test, and the

7   Court seems -- seems to be balancing.

8          THE COURT:  One more question for you, and that is

9   this lawsuit, the lawsuit in the Northern District -- let's

10  see -- was filed on -- it looks like sometime -- the amended

11  complaint, first amended complaint that I have in front of me,

12  May 2019.  So this is November of 2020, so that lawsuit has

13  probably a good year -- has a good year on our lawsuit and then

14  some.

15         So what do you envision?  Do you envision -- so if a

16  case is transferred, it doesn't get transferred to a judge.  It

17  gets transferred to the court, to a court, and gets randomly

18  assigned to whatever judge it gets randomly assigned to.  I

19  imagine they do it the same way we do it.  And then somebody

20  needs to make a request that it be transferred to the judge to

21  whom the original case is assigned.

22         Do you envision asking that it be transferred to that

23  judge and that it be consolidated?  What do you envision doing?

24         MR. RUBY:  Yes.  I mean, yes, we envision making

25  every request we can that the case be transferred to a judge,

1    the judge who already is presiding over the Restore case, and

2    that we will ask that judge to take an additional case on and

3    to consolidate them for all purposes, subject to motions in

4    specific areas.

5        But, yes, we see these -- it will be our -- if it

6    happens, it will be our respectful request promptly to bring

7    the cases together so the judge has at his disposal all the

8    tools that the system provides for effective management.

9        THE COURT:  Well, the only thing that I would say is

10   consolidation -- as a judge to whom cases have been transferred

11   and, you know, sometimes I wonder why they've been transferred,

12   and they've either been randomly assigned to me or they're

13   randomly assigned to another judge and then transferred to me,

14   you know, it can -- it can wreak havoc on the train that the --

15   or the track that the original case is on.

16       And so if that case -- has it been set for trial yet,

17   the case in the Northern District?  The Restore Robotics case,

18   has it been set for trial?  Are they still in motions practice?

19       In other words, is this going to wreak havoc on that

20   case in the Northern District?

21       MR. RUBY:  It's two questions, Your Honor.  The first

22   is the case has not been scheduled for trial.  Judge Wetherell,

23   to whom the case has been assigned, has spoken to the parties

24   about wanting to preserve or make sure that we would be able to

25   try the case in February of 2022.

1           THE COURT:  Oh, okay.

2           MR. RUBY:  And so the parties have had that in mind.

3           Just for comparison purposes, I'd indicate to Your

4    Honor that according to one of the exhibits that we've

5    submitted in our motion papers here before Your Honor, Rebotix

6    is advocating for a trial date in April of 2022.

7           And so at least in terms of the prospective trial

8    dates that are under discussion or under consideration, the gap

9    doesn't seem very wide at all.  But there hasn't been an order

10   entered as to either of those dates.

11          THE COURT:  Okay.  I'll give you the opportunity to

12   talk about your other -- your alternate request for transfer,

13   but if you had to tell me what your strongest case is, or only

14   one case that you could rely on, or your strongest argument on

15   why, when there isn't a whole lot of case law out there --

16   okay.  Like I said, I couldn't find one squarely on all fours.

17   I found some close.  I did.  I found some close ones.  And as I

18   said, I don't think there's any preclusion on doing it under

19   Eleventh Circuit law.

20          What would you say is your strongest argument to me

21   for why this ought to be transferred, or your strongest case?

22          MR. RUBY:  The -- the strongest argument, Your Honor,

23   is the plain and simple fact that permitting -- pardon me.

24   Excuse me.

25          Permitting these cases to proceed on entirely

1   separate tracks through the judicial system will end up

2   imposing a cost on the system and on the parties and, most

3   important -- even more important than that, will lead to the

4   possibility, and not a remote possibility, that the outcome

5   could be one which is not consistent with the quality of

6   justice.  That's what we think is the strongest argument here.

7           And may I say, if I may, Your Honor, in the -- in the

8   opposition -- and I'm not at all criticizing anything or

9   anybody, but it was interesting that in the opposition there

10  really wasn't any case made to the contrary.

11          I mean, this isn't a situation where one side says,

12  "It's efficient to put things in a position where they can be

13  processed together," and the other side says, "No, that's very

14  inefficient.  It makes a lot more sense to let's do it on

15  separate tracks."  I mean, that wasn't -- that was the dog that

16  didn't bark.  I mean, that's not -- that's not in the papers.

17          And so we think that our view of the consistency of

18  our motion with the interests of justice is really borne out by

19  the nature of the opposition, which has been on procedural

20  grounds.

21          And, again, I'm not at all criticizing anybody for

22  that, but that's where we're -- what we're fighting about, at

23  least in the papers, when -- you know, I think that our

24  strongest ground is one that, on this record, is not really --

25  not really rebutted, although recognizing that, nevertheless,

1   it is a discretionary call where the Court takes into account

2   what the Court believes is appropriate.

3           THE COURT:  Okay.  All right.  Thank you.

4           Anything you want to say on the other -- your

5   alternate basis for transfer to the Northern District?

6   Anything you'd like to supplement your pleadings on --

7           MR. RUBY:  I --

8           THE COURT:  -- I'm happy for that as well.

9           MR. RUBY:  I'm sorry.  I didn't mean to interrupt.

10          THE COURT:  That's okay.

11          MR. RUBY:  And, Your Honor, I think the Court has

12  given us an opportunity to say what we think is important.  The

13  Court is advised that our best -- our better arguments are

14  under the first-to-file rule.

15          And so, no, there's nothing at this time that I think

16  would be helpful --

17          THE COURT:  Okay.

18          MR. RUBY:  -- to the Court in the decision it has to

19  make if I talk more about --

20          THE COURT:  Okay.

21          MR. RUBY:  -- 1404.

22          THE COURT:  All right.  Well, thank you very much.  I

23  appreciate your argument.

24          And who will be making argument on behalf of the

25  plaintiff?  Is it Mr. Lyon?  Will you be doing that or --

1          MR. LYON:  It is, Your Honor, Mr. Lyon.

2          THE COURT:  Okay.  Go ahead, Mr. Lyon.

3          You know, you heard me -- you heard me ask opposing

4   counsel why I should transfer this case when the cases are

5   not -- when the plaintiffs are not the same plaintiffs, which I

6   think is their weak link.  It's not absolutely fatal -- it's

7   not -- but it's a weakness in their argument.

8          And I'm going to flip that around on you, and I'm

9   going to tell you their strongest.  Their strongest argument is

10  what a big risk of inconsistent rulings on these two cases

11  with, I'm going to tell you, pretty much identical issues

12  pending between two different judges in the same state but in

13  different -- in different courts, Northern District of Florida,

14  Middle District of Florida.

15         Doesn't it just make sense -- and I'm going to put

16  aside judicial economy, because I get paid the same whether I

17  have 500 cases or 100 cases.  Put that aside.

18         It's -- really what concerns me here is the

19  inconsistent rulings when you have, I'm going to say, virtually

20  identical causes of action.  And that is their strongest

21  argument.

22         Why should I -- why should we have two different

23  judges rule on this?

24         MR. LYON:  Your Honor, I'd like to address the

25  similarity of the issues.

1    THE COURT:  Well, okay.  Go ahead.  You can.  Go

2  ahead.

3    MR. LYON:  So we've heard a lot about how the cases

4  are the same.  First off, I don't believe the Court needs to

5  even reach that.  This was the holding of both *Quinteros* and

6  *Fishing Rights* in this district.

7    THE COURT:  Well, those are -- listen, those are

8  people just like me, just like me.  These are district court

9  judges.

10    It's an interesting read, interesting to look to see

11  what other district court judges do; I do it all the time.  But

12  none of the cases are binding on me.

13    MR. LYON:  Certainly.

14    THE COURT:  I'm not --

15    MR. LYON:  And there is certainly overlapping issue

16  between our case and the Restore case, but to call them the

17  identical case, I don't think, is accurate or fair.

18    The core allegations, the thrusts of the case, are

19  actually markedly different.  Restore's primary business and

20  the claims that relate to that business are really wholly

21  irrelevant to Rebotix and to this case.

22    So what Restore does is they repair the actual

23  computer system, the actual robot, the surgical robot that

24  Intuitive makes.

25    We repair just the EndoWrists, which are the tools

1    that the -- the robot uses.  So Rebotix, because they repair

2    the actual robot -- excuse me, Restore, because they repair the

3    actual robot, they need to access the hardware and the software

4    of the robot itself.  And they have a dispute with Intuitive

5    over whether they should be allowed to do that.

6              And these are Restore's primary claims, the first

7    four claims in Restore's case.  They say it's an antitrust

8    violation that Restore [verbatim] doesn't allow them to access

9    the computer.

10             And Intuitive says, in response, Restore has

11   improperly hacked into Intuitive's systems to facilitate this

12   repair process, and they've asserted counterclaims against

13   Intuitive [verbatim] based upon the criminal antihacking

14   statute.

15             None of this has anything to do with our lawsuit.

16   Our lawsuit is solely focused on the EndoWrists.  And here we

17   filed this lawsuit because Intuitive was impeding our business

18   of repairing the EndoWrists.

19             Each time Intuitive -- each time Rebotix would line

20   up a new customer, Intuitive would threaten to withhold

21   services to that hospital if they continued to work with

22   Rebotix.

23             In these hospitals, their interactions with Rebotix,

24   their interactions with Intuitive, that's going to be a core

25   piece of this lawsuit.  That is where Rebotix thinks much of

1  the discovery will be focused, and none of this has anything to

2  do with Restore or the Restore lawsuit.

3  So there's going to be very different discovery

4  proceeding in the two cases and different issues that the

5  judges will need to decide in the two cases.

6  Now, in terms of overlapping issues, there are

7  overlapping issues, but I think what this ignores is that

8  there -- courts routinely resolve overlapping issues, and that

9  in itself is not a basis for transfer.

10 When there are overlapping issues in two cases,

11 courts can go different ways depending on whether the parties

12 have met their burdens in their respective cases --

13 THE COURT:  Let me --

14 MR. LYON:  -- and that's inconsistency.

15 THE COURT:  Let me go back a second.  Aren't there

16 claims in the Restore action about the EndoWrists?  I mean,

17 they may not be the primary claims, but they're there, aren't

18 they?

19 MR. LYON:  Absolutely, Your Honor, yes.  There are

20 similar claims asserted in that case too about the EndoWrists.

21 We both -- there are similarities there, and that's -- when

22 they're talking about the overlapping issues, those would be

23 what they're referring to as the overlapping issues.

24 But there's no problem and it's routine for courts,

25 different courts, to decide these overlapping issues.  The

1    courts can go different ways depending on whether each party

2    has met their burdens in their respective cases.

3         We'll present a different case.  I don't know

4    Restore's counsel.  They don't know me.  We're going to present

5    our own cases.  They may call for different results.

6         If the facts the parties develop and the arguments

7    they present on an issue differ in a material way that affects

8    whether that party has met its burden, then the ruling should

9    differ, and both the rulings are correct for that case, and

10   this happens all the time.

11        It's similar to the *Quinteros* case that we cite

12   throughout our brief.  That was a case where there were two

13   separate groups of plaintiffs.  Both alleged that DynCorp

14   dropped Roundup on them, a chemical, in -- in Colombia.  Two

15   groups of plaintiffs right next to each other alleging

16   identical claims.

17        So certainly there's common issues there that could

18   go different ways.  In one case, DynCorp's Roundup could be

19   proved to be harmful.  In the other case, DynCorp's Roundup

20   could be proved to be not harmful, and that happens in

21   litigation.  Those are different issues, but --

22        THE COURT:  I've looked at those cases that you

23   cited, and, you know, that -- you know, for instance, *Dean

24   versus Dometic Corporation*.  You know, these were all --

25   transfer was declined.  *Schwanke*, *Williams*, you know, you

1  talked about those in -- in your pleadings.

2          But what I said earlier -- I mean, this is an

3  antitrust case.  It's not a products liability case.  They are

4  asking for injunctive relief.

5          Did I get that right?  I think you are in your

6  complaint.

7          MR. LYON:  That's right, yes.

8          THE COURT:  I'm sorry.  Plaintiff has asked for

9  injunctive relief.

10          So even -- I mean, those -- those, to me, are very

11  important distinctions between the cases that have been cited,

12  even if it's, you know, something like a products liability

13  case.

14          MR. LYON:  Respectfully, Your Honor, I believe the

15  same rationale would apply regardless of whether -- the

16  particular relief that is sought.

17          If a party can prove their particular case, given the

18  facts of their case, they could be entitled to that relief.

19  Another party could seek the same relief and, based on the

20  facts that are developed and based on the arguments they

21  present, may not be entitled to that relief.

22          I don't think there's an inconsistency there and

23  certainly not one that would merit overriding all of the other

24  convenience factors, which uniformly weigh strongly against

25  transfer.

1          THE COURT:  Okay.  But you do agree that both

2    entities, both plaintiffs, are wannabe competitors in the same

3    market who are upset about the same allegedly anticompetitive

4    behavior of Intuitive.

5          Isn't that correct?

6          MR. LYON:  Both Rebotix and Restore have complaints

7    about the anticompetitive conduct of Intuitive.  Certainly

8    those complaints differ, and they differ markedly in many

9    respects.

10         THE COURT:  Well, tell me in what ways they differ

11   markedly.

12         MR. LYON:  Our complaint -- the primary focus of our

13   complaint is our interaction with -- or Intuitive's interaction

14   with hospitals.

15         So our -- we have relationships with hospitals where

16   we go out and we provide our service to the hospitals.  Those

17   hospitals, one by one, have been threatened with Intuitive, "If

18   you continue to use Rebotix's repair services, we will cut you

19   off."

20         So we suspect our case will largely -- we expect our

21   case will largely focus on those threats that were given to

22   these hospitals and the resulting losses that we've suffered,

23   the customers that we've lost as a result of that, and the

24   inability -- the viability of our business.

25         THE COURT:  Well, but still, I mean, what's at the

1   heart of the matter are competitors who are upset about

2   anticompetitive behavior of Intuitive.  And however you want

3   to -- whatever, you know, color of paint you want to put on it,

4   that's still at the heart of the matter.

5           MR. LYON:  That's -- that's a fair statement, Your

6   Honor.

7           But I think when you take that and you put it into

8   the context of the law and apply the various factors either in

9   the 1404 analysis or in the first-to-file analysis, it comes

10  out overwhelmingly against transfer.

11          THE COURT:  Well, I think the first-to-file argument

12  is the stronger here.  It's a close call for the reasons I've

13  said.

14          Is there anything else you would like to say?  You

15  know, give me your best case.  Again, it may be a district

16  court.  I didn't mean to pooh-pooh my fellow district courts.

17  It's just that it's not binding.

18          Now, do you agree?  I don't think there's anything

19  in -- that the Eleventh Circuit -- and that court I can't

20  pooh-pooh.  Is there anything the Eleventh Circuit would say

21  that would preclude me from transferring this case to the

22  Northern District of Florida, anything in binding Eleventh

23  Circuit case law that would stop me from doing that?

24          MR. LYON:  The only Eleventh Circuit case, the *Manuel*

25  *v. Convergys* case, that sets forth the actual standard, that

1　one, it doesn't have any language, any explicit holding, that

2　would foreclose this.

3　　　　In that case -- it was a traditional first-to-file

4　case where both the first case and the second case involved the

5　same parties.  There was a DJ, a "race to the courthouse" type

6　situation, a typical case where first-to-file applies.

7　　　　But since that case every single district court case

8　that I came across -- and I think there were about 11 cited

9　throughout the briefs -- all of them interpreted the

10　substantial similarity of parties to require an overlapping

11　plaintiff.

12　　　　I don't believe --

13　　　　THE COURT:  Well, remember that case from Judge

14　Jenkins, there were no overlapping plaintiffs.  Come on.  That

15　was a report and recommendation issued by a magistrate judge.

16　　　　And I looked around the country.  There are others,

17　too, where you don't have -- you had some other -- you had a

18　little hook there one way or the other.  But on that Judge

19　Jenkins report and recommendation, you had two different

20　plaintiffs.

21　　　　Now, you had one -- you had a -- these basically

22　derivative claims, and you had one small group of bank

23　accounts -- or accounts that were a party to both actions, but

24　you had two different plaintiffs.

25　　　　MR. LYON:  That's fair, Your Honor.  When I -- when I

1    say different plaintiffs -- and that case -- I believe you're

2    referring to the *Bankers* case?

3          THE COURT:  Uh-huh, I am.

4          MR. LYON:  There were claims, there were derivative

5    claims, brought on behalf of the trusts.

6          THE COURT:  Right.

7          MR. LYON:  And they were --

8          THE COURT:  I know.

9          MR. LYON:  -- the same --

10         THE COURT:  One little group was the same, one little

11   group.

12         MR. LYON:  That's right, Your Honor.

13         THE COURT:  One little group.

14         MR. LYON:  That's right.  So in all of these cases,

15   the analysis seems to be is there an overlap in plaintiffs, and

16   in that case there was because there was that overlapping

17   group.

18         You see this arise in the context of class actions

19   quite often.  A number of these cases are class action cases.

20   And then when analyzing the similarity of the parties, it looks

21   to see whether there is an overlap in the plaintiffs, like in

22   the *Bankers* case.  If there is an overlap in the plaintiffs,

23   then it proceeds to the next factor, whether there's

24   substantial similarity in the issues.

25         But I did not see any of these cases cited in these

1  briefs where there was no overlap whatsoever in the plaintiffs,

2  and it proceeded to (audio garbled) with the first-to-file

3  rule.

4  In those cases, Your Honor, the correct inquiry in

5  our position is to proceed to the 1404 analysis.

6  THE COURT:  Uh-huh.  Well, still, there isn't

7  anything that precludes me from -- from doing it.

8  First of all, let me tell you, antitrust cases don't

9  come around every day, okay?  I've been a district court judge

10  now, well, 16 years, and I think I've seen a couple, several,

11  but not very many in 16 years, a handful, enough that I notice,

12  as I said, because my first job out of law school was in this

13  area.  So I take note when I see it, and it just hasn't

14  happened very often.

15  So as I said, these cases are different than your

16  routine slip and fall or even your more complicated products

17  liability.  I do think that you do look at the cause of action.

18  What's your best answer as to the concern about

19  inconsistent rulings?  What would be your best answer to me?  I

20  know you went off basically to tell me that the two cases are

21  really not that similar in some respects, but let's just say I

22  don't agree with that analysis.

23  What -- how would you -- what's your comeback to me

24  with respect to the concern about the inconsistent rulings?

25  MR. LYON:  Certainly, Your Honor.  Well, there are

1  issues that are similar in this case, the overlapping issues.

2       And there -- when there are overlapping issues and

3  when there are nonoverlapping issues, the potential for

4  inconsistent rulings is given less weight.  It should be

5  considered, but when all the other factors in the analysis

6  weigh against transfer, it needs to be considered in that

7  context.  It is one consideration.  Also -- it's certainly not

8  the only consideration.

9       Also, both parties have filed in their respective

10 cases, and have the right to prove up, their own claims as they

11 see fit.  They will do so differently.  We will marshal

12 different evidence.  We will bring -- we will make different

13 arguments.  We're not coordinated with Restore.  We are not

14 affiliated with them.

15      And based on the evidence presented and the arguments

16 we plead, they may call for different rulings, and those two

17 rulings may be correct.  And, again, that happens in cases

18 routinely where there's overlapping issues, and they have

19 different rulings, and both are correct based on whether or not

20 that particular party has met their burden on that particular

21 issue.

22      THE COURT:  Okay.  Well, I continue to think that

23 that's -- that's the weak link here.

24      And while I wouldn't necessarily call it judicial

25 economy, because like I said, we -- you know, we're public

1    servants.  We're expected to do our job.

2         What the loss is here, by keeping this case in the

3    Middle District of Florida, as much as I enjoy this type of

4    case -- and I find it very interesting and very challenging --

5    is that the judge in the Northern District of Florida has

6    acquired an expertise in this field.

7         In the time that he's had this case he's acquired an

8    expertise in similar issues.  Maybe not 100 percent identical,

9    although I think they're pretty much identical or very, very

10   close to each other.  And that's an expertise that, you know,

11   is worth a lot.

12        As I said, this is a very close call.  I think it's a

13   case that -- a situation that could go either way.

14        Let me just see if the defendant has anything that he

15   would like to add.  Since it's your motion, I'll give you the

16   opportunity for a very brief rebuttal argument, if there's

17   anything else you'd like to say with respect to that.

18        MR. RUBY:  Only, Your Honor, that -- I mean, the

19   concept of inconsistent rulings doesn't really have to do with

20   whether somebody does or doesn't get to put on the case they

21   want.  Nobody -- nobody's suggesting here that -- that the

22   right of Rebotix, the right of Restore to avail themselves of

23   the law is at risk, and nobody's made a plausible case that it

24   is.

25        All that we're seeking to enforce is the wisdom and

1  good sense of the idea that cases that are similar cases be

2  decided by the same set of rules.  And I'm not talking about

3  the formal rules; that's a given.

4          But the judges go ahead, as the case evolves, and

5  determines what body of law may apply and how to analyze

6  things, and there should be some uniformity in what rules are

7  applied to these cases that counsel wants to put on.  That's

8  all.

9          THE COURT:  Yeah.  Now, I mean, I respect that.  I

10  respect what you're saying.

11          I'm going to -- I'm going to reserve ruling on that.

12  This doesn't happen to me very often.  I normally will just

13  rule from the bench.

14          I just want to think about it a little bit more, and

15  I'll -- if I'm going to transfer it to another district, they

16  deserve -- the judge deserves a written order with my

17  explanation.

18          If I keep it here, I'll -- you know, it doesn't need

19  that kind of a lengthy order.  I just want to think about it a

20  little bit more rather than just ruling right now because I

21  think it's a very close call.

22          But this is something that's going to be decided

23  soon.  I'm not going to keep you here for three months while I

24  decide what's best.  I'm going to -- I'm going to decide fairly

25  soon, and you'll have an order on that.

1    In the meantime, I'm not going to enter an order on

2  the case management report because if I'm going to transfer it,

3  I'm sure as heck not going to enter a case management order.

4    But I did want to know a little bit about these

5  dates, and you can just turn to it if you have it in front of

6  you.  So let's just see about these dates.

7    If the case stays here in the Middle District of

8  Florida, mandatory initial disclosures, that's fine.  That's

9  early December.

10    Both sides have done your certificate of interested

11  persons; is that right?  Everybody's done that?  It says

12  completed.

13    Motions to add parties or amend pleadings, why -- I'm

14  going to ask the plaintiff here, why do you need so long?  Why

15  do you need until March 15th?

16    MR. LYON:  We don't, Your Honor.  That was a -- we

17  initially had an earlier date in there.

18    The way this got completed is we proposed some dates.

19  We basically just reflected what was in your order.  Defendant

20  came back with some other dates that were pushed out.  And ones

21  that we didn't find objectionable -- we necessarily didn't

22  agree.  We just tried to agree to minimize any dispute.

23    We don't need that much time.

24    THE COURT:  Okay.  I appreciate that.  I think it is

25  too long.  I would do -- I mean, it's normally 60 to 90 --

1  normally 60 days from now.

2          So this is the end of November, all of December.  I

3  would say something like January 31st.  If the defendant wishes

4  to be heard, I'm happy to hear you now on that, but that's

5  about what I would be looking at, towards the end of January,

6  and I think that's fairly generous under the circumstances.

7          Okay.  Expert reports, that's fine.  I've had

8  individuals who like doing it this way, the proffering and the

9  rebuttal as opposed to plaintiff and defendant.  So I can't say

10 that I have any objection to that at all.

11         The discovery deadline is a little bit longer than

12 what I normally give, but, my goodness, this is a complicated

13 case.  So I don't have any issues on fact discovery closing in

14 June and expert discovery closing at the end of September 2021

15 and the proffering being in July and rebuttal being in August.

16         Anybody have any concerns or changes or anything with

17 respect to that?

18     (No response.)

19         THE COURT:  Okay.  All right.  So the dispositive

20 motion deadline you've got in mid October.  So normally you

21 have 14 days to respond to a motion for summary judgment.

22 Our -- our local rules are being changed as of January, and so

23 individuals are given greater time to respond to summary

24 judgment.

25         I think what I would do here is I would just give you

1    30 days -- again, given the complexity, 30 days to respond and

2    an automatic right to reply 14 days thereafter, all right?

3            So while those local rules may not exactly call for

4    this result here, it's pretty close.  And I did this for a

5    while on a lot of my cases, and then I realized that on many

6    cases, parties just didn't need 30 days, and I didn't need a

7    reply.  But in this case, given the complexities, I think

8    that's fine and appropriate.

9            So if the dispositive motion deadline -- I may adjust

10   this a little bit so that it's the middle of the month and move

11   this up just a little bit, the ones before the discovery

12   deadline just a little bit because I like to have it be

13   consistent with the dispositive motion deadline, which is a

14   little bit later than I would like.  I'd probably like it a few

15   days earlier than that so that I can set my pretrial conference

16   four months after the dispositive motion deadline, with these

17   expanded deadlines in place.

18           So if the dispositive motion deadline is the middle

19   of October, that's February, right?  February is about when I

20   would have my pretrial conference, and the trial term would be

21   a little bit earlier.  It would be March as opposed to April.

22           So let me -- go back and tell me -- I know you told

23   me this.  When was the -- when is the trial in the Northern

24   District?  Is it April or is it March of 2022?

25           MR. RUBY:  The trial?

1          THE COURT:  Yes.

2          MR. RUBY:  The trial has not yet been scheduled, Your

3    Honor.  The judge -- he was thinking in terms of February of

4    2022.

5          THE COURT:  Okay.  I know you said that.  Right.  I

6    know you said it hadn't been set but that there were dates.  I

7    also heard dates thrown out there.

8          So the tentative -- I won't say -- it hasn't been set

9    yet.  I understand.

10          Tentative date, February, okay.  Well, I would do

11   this after -- I mean, I could probably live with April.  Gosh,

12   the defendant wants June; the plaintiff wants April.

13          No, I think June is too far off.  I mean, I was going

14   to do March, but I could live with April if the trial, in

15   theory, in the Northern District is in -- is in February.

16          You know, keep in mind, like, 98, 99 percent of all

17   cases settle.  In the Middle District of Florida, 98 percent of

18   all civil cases settle, so I'm down to, like, one trial a year

19   maybe, one civil trial a year.

20          So I would suspect that this case would settle too.

21   That's just what I would suspect, but in case it doesn't, I

22   would probably set it for either March or April on that.

23          But it sounds like everybody is okay with those

24   deadlines that we've talked about earlier, with the dispositive

25   motion deadline, which is the one I really care about, being in

1   mid October 2021.

2            Everybody's okay with that?  Okay.

3            MR. LYON:  Yes, Your Honor.

4            THE COURT:  Okay.  All right.  I don't think I have

5   anything else.

6            And I -- oh, I was -- I normally appoint Peter Grilli

7   when -- I've been appointing Peter Grilli to my -- to a lot of

8   these cases.

9            Is there somebody else with a background in antitrust

10  that you'd like to appoint as the mediator in this case, or are

11  you okay with Peter Grilli?  I normally do a mediation -- the

12  deadline is a week after discovery ends.

13           Is that acceptable, or would you like the opportunity

14  to investigate if there's somebody else with a background in

15  antitrust that you'd rather have?

16      (No response.)

17           THE COURT:  I'll just say if you want a national

18  person, the only issue is the person has to be a member of the

19  Middle -- has to be qualified by the Middle District of Florida

20  to serve as a mediator.

21           Sometimes I'll have that.  You know, even if you have

22  somebody different in the Northern District, if they're not a

23  member of the Middle District of Florida list of mediators, it

24  doesn't count.  You can still mediate, and if you settle,

25  terrific, but, you know, you still have to comply with our

1    guidelines.

2            And I know that may seem a little bit unfair, but

3    these mediators, all they have to do is just qualify if they

4    want to work for the Middle District.  I don't think that's

5    that onerous a burden.

6            Is there anybody who you'd like me to appoint?  Is

7    Peter Grilli okay?  And this is assuming the case stays here.

8    You know, I still need to mull it over a little bit more.

9            Is there anyone else that you can think of?

10           MR. LYON:  Your Honor, when we spoke during the --

11   our case management call, we discussed the possibility of a

12   national mediator, but we never got down specifics.

13           THE COURT:  Okay.

14           MR. LYON:  Neither one of us proposed any names.

15           THE COURT:  Okay.  You know what?  What I will do is,

16   if I keep the case here, I'll give you 21 days to come up with

17   somebody.

18           As I said, my default is Peter Grilli because he has

19   a very good track record.  But sometimes on these specialty

20   areas, like, for instance, SEC cases, they like to go with

21   somebody else who's got a national, you know, reputation in

22   that particular field, so I understand that.

23           But just know what I'm limited to, and they've got to

24   be here.  Or you can do two mediations.  I mean, I know nobody

25   wants to do that, but they need to be qualified by our court.

1          Anything else to -- to cover today?  Anything from
2    anybody?
3          MR. LYON:  Nothing from plaintiff, Your Honor.
4          THE COURT:  Okay.  Thank you, Mr. Lyon.
5          Anything from the defense?
6          MR. RUBY:  No.  Thank you, Your Honor.
7          THE COURT:  Okay.  All right.  Okay.  Well, you
8    certainly gave me something very interesting to think about,
9    so -- and there's certainly, you know, pros and cons on both
10   sides on this.
11         So, like I said, I'll mull it over a little bit more,
12   and there will be an order soon on this for either in the
13   Northern District of Florida or in the Middle District of
14   Florida.
15         But it's certainly an interesting case, the kind of
16   cases that we like to see, you know, in federal court because
17   this really is what federal court was meant for, these
18   fascinating cases with issues that are not, you know, "Did you
19   fall down?  Was the floor wet?"  "Who went through the light?"
20   You know, this is really what federal court is all about.
21         So I enjoyed meeting everybody today virtually and
22   look forward either to sending the case to the Northern
23   District or working with you on this case, all right?
24         Well, thank you very much.  Nice talking to
25   everybody.

1          MR. LYON:  Thank you, Your Honor.

2          MR. RUBY:  Thank you, Your Honor.

3          MR. LUIKART:  Thank you, Judge.

4          THE COURT:  We're in recess.  Thank you.

5      (The proceedings were concluded at 11:06 a.m.)

6                         -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   MIDDLE DISTRICT OF FLORIDA    )

 6

 7          I hereby certify that the foregoing transcript is a

 8   true and correct computer-aided transcription of my stenotype

 9   notes taken at the time and place indicated therein.

10

11          DATED this 1st day of December, 2020.

12

13                             s/Shelli Kozachenko_____
                               Shelli Kozachenko, RPR, CRR, CRC
14                             Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```