**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

REBOTIX REPAIR LLC,

      Plaintiff,

v.                                                                    Civil Case No. 8:20-cv-2274-T-33TGW

INTUITIVE SURGICAL, INC.,

      Defendant.

**DEFENDANT'S DISPOSITIVE MOTION TO**
**DISMISS FOR FAILURE TO STATE A CLAIM**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant

Intuitive Surgical, Inc. ("Intuitive") moves to dismiss the Complaint filed by Plaintiff

Rebotix Repairs LLC ("Rebotix") for failure to state a claim.

**MEMORANDUM OF LAW**

**PRELIMINARY STATEMENT**

Rebotix's Complaint acknowledges that Intuitive has innovated, developed and

heavily invested in its da Vinci surgical systems and the EndoWrist instruments used to

perform many surgeries with these systems.  It also recognizes that da Vinci surgeries

provide "improved outcomes" and "fewer complications" than alternative healthcare options.

The Complaint further concedes that Intuitive has a large portfolio of patents protecting its

products and successfully obtained clearance from the Food & Drug Administration ("FDA")

and foreign regulatory agencies to sell them.

Nevertheless, Rebotix brings this lawsuit in an attempt to exploit Intuitive's innovation and investment.  At bottom, Rebotix seeks to profit by "repairing" EndoWrist instruments that Intuitive has designed and sold.  These "repairs" include adulterating the instruments by breaking into their outer casing and adding a chip that renders ineffective a circuit designed to limit the number of uses per instrument (i.e., the usage counter).  While Rebotix purportedly has the ability to use this "workaround" to circumvent the usage counter for EndoWrist instruments used with Intuitive's da Vinci Si model systems, it has been unable to develop such technology for instruments used with Intuitive's newer da Vinci Xi model systems.

Despite these acts, Rebotix alleges that Intuitive has violated Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) by harming competition in a purported market for the "repair and replacement of EndoWrist instruments."  Rebotix does not allege that Intuitive repairs EndoWrist instruments, which Intuitive does not.  Instead, Rebotix alleges that Intuitive designed its EndoWrist instruments with the usage counter to prevent each instrument from being used more than a specified number of times (usually ten).  Rebotix also alleges that Intuitive has violated the Sherman Act by sending cease-and-desist letters to its customers to enforce contracts requiring the customers to adhere to the usage limits for EndoWrist instruments and not to repair those instruments.

Rebotix's antitrust claims fail as a matter of law for three principal reasons.  ***First***, each of Rebotix's claims should be dismissed because Rebotix fails to plausibly allege a relevant antitrust market in which Intuitive purportedly harmed competition.  Rebotix alleges that the relevant antitrust market is the repair and replacement of EndoWrist instruments.

2

Rebotix's only asserted rationale for this artificially narrow market is that da Vinci systems customers require EndoWrist instruments to perform surgery using those systems.  But Rebotix erroneously approaches the market from the perspective of Intuitive's customers, rather than from Rebotix's perspective as an allegedly excluded supplier.  As a matter of law, the relevant market is not the customers to which Intuitive sells its product, but rather all customers to which Rebotix could sell its repair services.  The Complaint lacks plausible allegations as to what this market entails, including which firms (other than Intuitive) compete with Rebotix and why the market should be limited to the repair of EndoWrist instruments, as opposed to a wider market including non-robotic surgical instruments.  Indeed, Rebotix's own allegations undermine a purported market definition limited to EndoWrist repair and replacement.  The Complaint affirmatively suggests that Rebotix could provide its services to customers seeking to repair numerous other instruments used in minimally invasive surgery, which Rebotix characterizes as "essentially identical to" EndoWrist instruments.  As a result, all of Rebotix's claims should be dismissed for failure to plead a plausible relevant antitrust market in which Intuitive allegedly harmed competition.

The Court's dismissal of Rebotix's claims would be consistent with Judge Wetherell's decision in *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19cv55-TKW-MJF, 2019 WL 8063989 (N.D. Fla. Sept. 16, 2019) ("*Restore*").  In that case, unlike here, plaintiffs alleged that EndoWrist instruments are "unique," and Judge Wetherell relied upon that allegation when he ruled that plaintiffs plausibly alleged an aftermarket for repair and replacement of EndoWrist instruments.  *Id.* at *5-6.  While Judge Wetherell's decision did not directly address whether the relevant markets should be defined from plaintiffs'

perspective, he cited precedent—*Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256 (5th Cir. 1978)—supporting Intuitive's argument here that the market should be defined from the perspective of an allegedly excluded supplier—like Rebotix—and must encompass the alternative customers to which its services could be sold.

*Second*, Rebotix fails to state a claim based on Intuitive's incorporation of the usage counter into its EndoWrist instruments. In essence, Rebotix has alleged that by installing a usage counter, Intuitive has prevented Rebotix from servicing EndoWrist instruments. But these "refusal to deal" allegations are not viable absent a prior course of dealing between the parties, which Rebotix does not—and cannot—allege. Indeed, in *Restore*, Judge Wetherell dismissed a substantially similar refusal to deal claim brought by plaintiffs seeking to circumvent the usage limits on EndoWrist instruments. Accordingly, because Intuitive's design of the EndoWrist instruments with usage counters is not anticompetitive, any component of Rebotix's Sherman Act § 2 claims (Counts III and IV) that relies on allegations that the usage counter is anticompetitive is not actionable and must be dismissed.

Moreover, any purported harm that Rebotix attributes to the usage counter cannot constitute antitrust injury, a prerequisite for a viable antitrust claim. Rebotix concedes that the usage counter prevents it from "repairing" the Xi model EndoWrist instruments because Rebotix does not have the ability to circumvent the usage limits for those instruments. Because the usage counter is not anticompetitive, Rebotix's alleged inability to service the Xi instruments cannot constitute antitrust injury. Therefore, all of Rebotix's claims relating to Xi model EndoWrist instruments should be dismissed.

4

***Third***, Rebotix fails to state a claim relating to Intuitive's cease-and-desist letters.  As this Court has recognized, cease-and-desist letters are presumptively immune from antitrust scrutiny under the *Noerr-Pennington* doctrine, and Rebotix does not—and cannot—plead facts to establish any exception to that immunity.

For these reasons, Intuitive respectfully requests that the Court dismiss Rebotix's Complaint.

## BACKGROUND

### I.  THE COMPLAINT'S ALLEGATIONS

#### A.  Intuitive and Its Business

As alleged in the Complaint, "Intuitive is the creator of the da Vinci line of minimally invasive surgical robot devices and the EndoWrist line of surgical instruments.  Intuitive sells da Vinci surgical robots and EndoWrist surgical instruments, as well as related parts and services, to hospitals and surgical centers throughout the United States and the world." (Compl. ¶ 6.)

##### 1.  da Vinci Surgical Systems

Rebotix alleges that Intuitive's "da Vinci system . . . is ubiquitous in hospitals throughout the United States and the world" (*id.* ¶ 14) and that "da Vinci surgeries provide 'improved outcomes' and 'fewer complications' than alternative healthcare options" (*id.* ¶ 19).  Rebotix further alleges that:  "Intuitive has a large portfolio of patents"; "[t]he research and development required to bring a surgical robot to market is substantial"; and "clearance by the FDA, which has a rigorous process for clearing any surgical robot for sale, is uncertain."  (*Id.* ¶ 17.)  "Intuitive also invests heavily to ensure that doctors and medical students are trained to use, and dependent on, the da Vinci system."  (*Id.*)

5

2. **EndoWrist Instruments**

"EndoWrist instruments are necessary to perform surgery with the da Vinci robot system and are only available from Intuitive."  (*Id.* ¶ 32.)  "Intuitive sells more than eighty different types of these surgical instruments, including a variety of scissors, scalpels, graspers, and needle drivers."  (*Id.* ¶ 11.)  EndoWrist instruments have been cleared for sale by "[t]he Food and Drug Administration and foreign regulatory agencies [which] have rigorous processes for approving any surgical instruments for sale."  (*Id.* ¶ 34.)

Rebotix alleges that "Intuitive includes a programmed memory chip in each EndoWrist that counts the number of uses, and then renders the EndoWrist non-functional after the specified number of uses."  (*Id.* ¶ 43.)  "For most EndoWrists, ten is the maximum number of allowed uses."  (*Id.*)

In addition, Rebotix alleges that "Intuitive's standard agreement . . . expressly requires that the purchaser of a da Vinci robot adhere to the 'maximum number of uses' requirement for EndoWrists."  (*Id.* ¶ 54.)  Rebotix further alleges that "Intuitive's standard agreement also expressly prohibits its customers from performing repairs on the EndoWrists—for example, sharpening the scissors or aligning the graspers."  (*Id.* ¶ 55.)

These provisions in Intuitive's contracts allegedly preclude hospitals from using Rebotix's repair services.  (*Id.* ¶¶ 54-55.)  Rebotix alleges that "Intuitive has sent cease and desist letters to nearly every Rebotix client" (*id.* ¶ 56) and that those hospitals subsequently have stopped using Rebotix's services (*id.* ¶ 61).

B.        __Rebotix and Its Business__

The Complaint alleges that the market at issue is "replacements and repairs of EndoWrists, which are the surgical instruments (e.g., graspers, forceps, scissors, etc.) that are used during the da Vinci robotic surgeries."  (*Id.* ¶ 1; *see also id.* ¶ 30.)  It alleges that "Rebotix repairs EndoWrists.  Hospitals that perform da Vinci surgeries hire Rebotix to inspect the EndoWrists and repair them, for example by tightening the graspers, realigning the forceps, or sharpening the scissors."  (*Id.* ¶ 2.)

Rebotix alleges that EndoWrist instruments "are essentially identical to the instruments that doctors have used in traditional, minimally invasive surgeries for decades." (*Id.* ¶ 11; *see also id.* ¶ 36 ("The surgical ends of EndoWrists are essentially identical to the instruments that doctors have used in traditional minimally invasive surgeries for decades."); *id.* ¶ 47 ("[T]he TransEnterix Senhance robot uses surgical instruments . . . that are substantially the same as Intuitive's EndoWrists.").)  According to Rebotix, "[t]he instruments used in traditional minimally invasive surgeries are cleaned and inspected before and after each surgery.  If needed, the instruments are repaired between surgeries—for example, scissors may be sharpened or graspers may be realigned.  The instruments are used for hundreds of surgeries, and often last for years."  (*Id.* ¶ 38.)  Rebotix further asserts that "[b]ecause EndoWrists and the traditional instruments are essentially the same, EndoWrists likewise can be used for hundreds of surgeries and last for years, if inspected and repaired as needed between surgeries."  (*Id.* ¶ 39; *see also id.* ¶ 2 ("Repairs of surgical instruments nearly identical to EndoWrists have been performed routinely for decades and are standard practice. . . .").)

Rebotix alleges that its "business of repairing EndoWrists would be rendered obsolete if EndoWrists must be discarded before they are in need of repairs, as intended by Intuitive's usage counter."  (*Id.* ¶ 51.)  Therefore, Rebotix allegedly "invested substantial time, resources, and money (millions of dollars) to develop a workaround," the "Rebotix Interceptor, which resets the counter while maintaining the ability of the da Vinci robot to access the data in the OEM memory and to count uses as usual."  (*Id.*)  "Rebotix's workaround only works for EndoWrists used with the da Vinci Si model, not the newer Xi model."  (*Id.* ¶ 52.)[1]

## II.   THE *RESTORE* LITIGATION AND MOTION TO DISMISS DECISION

On February 27, 2019, plaintiffs Restore Robotics LLC and Restore Robotics Repair LLC ("Restore") filed suit against Intuitive in the U.S. District Court for the Northern District of Florida.[2]  Restore alleges that it seeks to "repair" EndoWrist instruments—like Rebotix.  *See Restore*, 2019 WL 8063989, at *1.  According to Restore, Intuitive "uses its monopoly power in the primary market for surgical robots to acquire and maintain monopoly power in the aftermarkets for the maintenance and repair of the surgical robots and related

---

[1]  While Intuitive accepts the Complaint's allegations as true for purposes of this motion, Rebotix's characterization of the memory chip inside limited-life EndoWrist instruments, and its purported need to "workaround" the chip, is misleading.  Limited-life EndoWrist instruments include memory chips to assure that the instruments are not used beyond their validated number of uses, as indicated on the labeling required and approved by the FDA.  The chip is located inside the instrument casing; in order to "workaround" it, per Rebotix's apparent business model, one must physically disassemble the instrument.  Limited-life EndoWrist instruments are *not* designed to be disassembled in this fashion by anyone—including Intuitive.  Rather, the instruments are designed to be discarded after reaching their intended maximum number of uses for a number of legitimate business reasons, the most important being patient safety.

[2]  Intuitive provides this overview of the *Restore* litigation in light of this Court's recognition that the causes of action in *Restore* are virtually identical to those asserted here, with "a few differences here and there."  (ECF No. 38, 11/19/20 Hr'g. Tr. at 7:25-8:6.)

[EndoWrist] instruments." *Id.*  Restore is pursuing claims under Sherman Act § 1 and § 2 alleging that Intuitive has engaged in anticompetitive conduct consisting of tying, exclusive dealing and "refus[ing] to provide [Restore] with access to the . . . EndoWrist usage counter." *Id.* at *7.

In its motion to dismiss the Restore complaint, Intuitive argued that plaintiffs failed to plausibly allege their relevant markets because they did not adequately plead the existence of the purported primary market for surgical robots—i.e., a market limited to robotic-assisted surgery, as opposed to other surgical techniques.  *See id.* at *5.  Judge Wetherell disagreed, "find[ing] that [p]laintiffs have plausibl[y] alleged that surgical robots make up a distinct product market."  *Id.*  Relying on *Spectrofuge*, 575 F.2d 256, Judge Wetherell also concluded that plaintiffs plausibly alleged the existence of the purported aftermarkets, including the purported aftermarket for repair and replacement of EndoWrist instruments, because "as alleged, [Intuitive's] products occupy a position ***unique*** and dominant enough in the markets to warrant one-brand market definition."  *See Restore*, 2019 WL 8063989, at *6 (emphasis added) (citing an attachment to plaintiffs' amended complaint stating that "EndoWrist instruments have a ***unique*** articulating design").

With regard to the alleged anticompetitive conduct, Judge Wetherell held that plaintiffs' "refusal to deal allegations, based on [p]laintiffs' being denied access to the . . . usage counter," did not allege anticompetitive conduct.  *Id.* at *7.  Judge Wetherell concluded that plaintiffs "alleged no prior course of dealing with [Intuitive]" that could "overcome the general rule that a private business may refuse to deal with whomever it chooses."  *Id.*  Judge Wetherell also rejected plaintiffs' arguments that the "essential facility"

doctrine and the Supreme Court's decision in *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), provided grounds for a refusal to deal claim, concluding that these precedents, even if viable, could not require Intuitive to provide proprietary technology, like its usage counter, to plaintiffs.  *See Restore*, 2019 WL 8063989, at *7-8 & n.11.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While well-pleaded factual allegations in a complaint must be accepted as true, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (citation omitted).  A complaint based on conclusory allegations should be dismissed because Rule 8 of the Federal Rules of Civil Procedure "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Id.* at 678-79.

## ARGUMENT

Rebotix brings claims under Sherman Act § 1, alleging that Intuitive has engaged in tying (Count I) and exclusive dealing (Count II).  Rebotix also brings claims under Sherman Act § 2, alleging that Intuitive has monopolized (Count III), or attempted to monopolize (Count IV), the putative worldwide and domestic markets for repair and replacement of EndoWrist instruments.

To state a claim under Sherman Act § 1 or § 2, a plaintiff must plausibly allege (i) that the defendant engaged in conduct that harmed competition (i.e., anticompetitive

conduct), (ii) the existence of a well-defined relevant antitrust market in which the anticompetitive conduct occurred and (iii) that plaintiff suffered antitrust injury. *See, e.g.*, *Jacobs v. Tempur-Pedic Int'l, Inc*., 626 F.3d 1327, 1336 (11th Cir. 2010); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073-77 (11th Cir. 2004).

As explained more fully below, all of Rebotix's claims should be dismissed for failure to plausibly allege a relevant product market for the repair and replacement of EndoWrist instruments.  In addition, Rebotix fails to adequately plead that the EndoWrist instrument usage counter is anticompetitive.  As a result, any component of the Sherman Act § 2 claims that relies on this allegation should be dismissed.  Moreover, because Rebotix's alleged inability to service Xi model EndoWrist instruments is directly attributable to the usage counter, that purported harm cannot constitute antitrust injury, and any claim based on Rebotix's efforts to repair the Xi model instruments should be dismissed.  Finally, Intuitive's alleged cease-and-desist letters to its customers are immune from antitrust scrutiny under the *Noerr-Pennington* doctrine and, therefore, cannot provide a basis for any claim.

## I.     ALL OF THE CLAIMS SHOULD BE DISMISSED BECAUSE REBOTIX FAILS TO PLAUSIBLY ALLEGE A RELEVANT PRODUCT MARKET FOR REPAIR AND REPLACEMENT OF ENDOWRIST INSTRUMENTS

Each of Rebotix's claims hinges on the allegation that Intuitive has harmed competition in the purported "worldwide and domestic markets for EndoWrist repair and replacement."  (Compl. ¶¶ 1, 63, 72; *see also id.* ¶¶ 66, 69.)  Because Rebotix fails to plausibly allege the existence of such a relevant product market limited to the repair and replacement of EndoWrist instruments, all of its claims should be dismissed.

In antitrust cases brought by an allegedly excluded supplier (like Rebotix), the

relevant market is defined from the perspective of the supplier and includes all customers to
which the supplier could sell its services.  *See, e.g.*, *Little Rock Cardiology Clinic PA v.
Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009) ("[T]he inquiry in the case of a shut-out
supplier [is]:  to whom can the supplier sell?"); *Campfield v. State Farm Mut. Auto. Ins. Co*.,
532 F.3d 1111, 1118-19 (10th Cir. 2008) (affirming dismissal of Sherman Act § 1 and § 2
claims because plaintiff's alleged relevant market did not include "all of the[] potential
consumers of windshield repair and replacement services" available to him); *Stop & Shop
Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004) ("[T]he
concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available
market *for the supplier*.").

The Eighth Circuit's decision in *Little Rock Cardiology* is instructive.  In that case,
plaintiffs were cardiologists alleging that defendants violated Sherman Act § 1 and § 2 by
excluding plaintiffs from a product market "limited to patients covered by private insurance."
*Little Rock Cardiology*, 591 F.3d at 596-97.  Plaintiffs "argue[d] that the product market
should be limited to patients using private insurance because private insurance and
government insurance—the other primary method of payment—are not reasonably
interchangeable."  *Id.* at 597.  But the Eighth Circuit rejected plaintiffs' argument because "it
analyzes the issue from the wrong side of the transaction. . . . [T]his lawsuit is not about the
options available to patients, it is about the options available to shut-out cardiologists."  *Id.*
"Patients able to pay their medical bill, regardless of the method of payment, are reasonably
interchangeable from the cardiologist's perspective—the correct perspective from which to
analyze the issue in this case."  *Id.*  Accordingly, the Eighth Circuit affirmed the dismissal of

plaintiffs' claims for failure to plead a plausible relevant product market.  *See id.* at 596-97.

Like plaintiffs in *Little Rock Cardiology*, Rebotix approaches the market from the wrong side of the transaction—i.e., the options available to Intuitive's customers.  The Complaint alleges that the relevant market is "replacements and repairs of EndoWrists" (Compl. ¶ 30) because those "instruments are necessary to perform surgery with the da Vinci robot system and are only available from Intuitive" (*id.* ¶ 32).  But as *Little Rock Cardiology* instructs, the correct approach in this case is to analyze market definition from the supplier perspective—i.e., the customers to which a supplier of repair services like Rebotix could sell its services.

When viewed correctly from the supplier perspective, the Complaint fails to plausibly allege a set of facts that could support the existence of a relevant market limited to customers seeking to have their EndoWrist instruments repaired or replaced.  The Complaint lacks allegations concerning critical details about the purported market for EndoWrist repair and replacement.  It does not allege why Intuitive—which only replaces EndoWrist instruments—and Rebotix—which only repairs EndoWrist instruments—participate in the same purported market.  Aside from Rebotix and Intuitive, the Complaint does not allege which other companies participate in this market.  It does not allege why the market should be limited to EndoWrist instrument repairs, as opposed to repairs of other non-robotic surgical instruments used in minimally invasive or open surgeries.

In fact, the Complaint's allegations undermine Rebotix's attempt to narrowly confine the market to EndoWrist repair and replacement.  The Complaint suggests that Rebotix's repair services could be sold to customers seeking repairs of ***any*** instrument used in

minimally invasive surgery—whether robotic or non-robotic—because it repeatedly alleges that EndoWrist instruments are "essentially identical" to those instruments and that the same types of repairs are performed on each.  (*See, e.g.*, *id.* ¶ 2 ("Hospitals that perform da Vinci surgeries hire Rebotix to inspect the EndoWrists and repair them, for example by tightening the graspers, realigning the forceps, or sharpening the scissors.  Repairs of surgical instruments nearly identical to EndoWrists have been performed routinely for decades and are standard practice. . . ."); *id.* ¶ 11 (EndoWrist instruments "are essentially identical to the instruments that doctors have used in traditional, minimally invasive surgeries for decades."); *id.* ¶¶ 38-39 ("If needed, the instruments [used in traditional minimally invasive surgeries] are repaired between surgeries—for example, scissors may be sharpened or graspers may be realigned. . . . EndoWrists and the traditional instruments are essentially the same . . . .").)  As a result, similar to the outcome in *Little Rock Cardiology*, the Complaint should be dismissed for failure to allege a relevant product market that encompasses all of the customers to which Rebotix could sell its repair services.

The *Restore* decision does not compel a different conclusion.  Unlike Rebotix, the *Restore* plaintiffs alleged that EndoWrist instruments are "unique" and different from other surgical instruments.  *See Restore*, 2019 WL 8063989, at *6.  Judge Wetherell's decision relied on those allegations when it concluded that plaintiffs plausibly alleged a relevant aftermarket for repair and replacement of EndoWrist instruments.  *See id.*  As such, Judge Wetherell was not presented with, and his decision did not directly address, Intuitive's argument in this motion that the relevant market must be analyzed from the perspective of an allegedly excluded supplier like Rebotix, which alleges that it provides services that could be

14

used for a host of other products.  Indeed, the *Restore* decision bolsters the position that the relevant market is defined from the position of the supplier, not the customer.  Judge Wetherell's analysis of the relevant market relied in substantial part on the Fifth Circuit's decision in *Spectrofuge*, which held that the plaintiff service organization failed to establish a relevant market limited to repairing defendant's instruments.  *See Spectrofuge*, 575 F.2d at 286.  Significantly, the *Spectrofuge* court analyzed the relevant market from the perspective of the allegedly excluded service organization, including by examining plaintiff's opportunities to service other companies' instruments.  *See id.* at 282-83; *see also id.* at 282 ("The fact that a company limits its competitive activity to a single firm's products (and at only one competitive level) cannot control the definition of the relevant market.").

Thus, because Rebotix fails to plausibly allege that the market for its services is limited to repair and replacement of EndoWrist instruments, it has not satisfied its burden to plead a relevant product market, and all its claims should be dismissed.

## II.   REBOTIX CANNOT STATE A CLAIM BASED ON ALLEGATIONS THAT THE DESIGN OF THE ENDOWRIST INSTRUMENT USAGE COUNTER IS ANTICOMPETITIVE

Rebotix alleges that Intuitive has engaged in anticompetitive conduct because it designed its EndoWrist instruments with "a programmed memory chip [i.e., the usage counter] . . . that counts the number of uses, and then renders the EndoWrist non-functional after the specified number of uses."  (Compl. ¶ 43.)  According to Rebotix, "Intuitive includes the usage requirement to exclude all competition for EndoWrist repairs" (*id.* ¶ 44), and "Rebotix's business of repairing EndoWrists would be rendered obsolete if EndoWrists must be discarded before they are in need of repairs, as intended by Intuitive's usage

15

counter" (*id.* ¶ 51).  Rebotix further alleges that it "invested substantial time, resources, and money (millions of dollars) to develop a workaround" (*id.*), but this "workaround only works for EndoWrists used with the da Vinci Si model, not the newer Xi model" (*id.* ¶ 52).

As explained below, Rebotix's allegations regarding Intuitive's design of its EndoWrist instruments constitute a "refusal to deal" claim.  As such, this claim is facially deficient because Rebotix does not—and cannot—plead any prior course of dealing between the parties.  In turn, those components of Rebotix's Sherman Act § 2 claims (Counts III and IV) that rely on allegations that the usage counter is anticompetitive must be dismissed from this case.  Moreover, because Rebotix concedes that its inability to repair Xi model EndoWrist instruments is attributable to the usage counter, Rebotix's alleged inability to service those instruments cannot constitute antitrust injury; therefore, all of Rebotix's claims relating to the Xi model instruments should be dismissed.

### A. Rebotix's Challenge to Intuitive's Design of the EndoWrist Instruments Is a Facially Deficient Refusal to Deal Claim

Rebotix alleges that Intuitive's design of EndoWrist instruments is anticompetitive because it prevents companies like Rebotix from repairing EndoWrist instruments.  (*See, e.g.*, Compl. ¶¶ 51-52, 54.)  Rebotix does not allege that it competed with Intuitive at some point in time in the purported EndoWrist instrument repair and replacement market, but was "locked out" or excluded from this market as a result of Intuitive's conduct.  Instead, Rebotix is seeking to compete with Intuitive in this market by circumventing Intuitive's own proprietary design of the EndoWrist instruments—which includes the usage counter.

This type of challenge to a defendant's product design is properly analyzed as a claim alleging that Intuitive has refused to deal with a competitor, such as Rebotix.  *See In re*

*Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (analyzing allegations that

defendants engaged in anticompetitive conduct by "designing the[ir] elevators to prevent

servicing by other providers" as a "refusal to deal"); *3Shape Trios A/S v. Align Tech., Inc.*,

C.A. No. 18-1332-LPS, 2019 WL 3824209, at *8 (D. Del. Aug. 15, 2019) (where plaintiff

"contend[ed] that [defendant] should have designed its [product] to make it easier for

[customers] to order . . . from [defendant's] competitors," the court construed the allegations

as "just another refusal to deal claim"), *report and recommendation adopted by* Civ. No. 18-

1332-LPS, 2019 WL 4686614 (D. Del. Sept. 26, 2019).

As a matter of law, Intuitive's refusal to deal with Rebotix cannot violate the

Sherman Act.  Indeed, it is well established that "as a general matter, the Sherman Act 'does

not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely

private business, freely to exercise his own independent discretion as to parties with whom

he will deal.'"  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S.

398, 408 (2004) (alteration in original) (citation omitted).  As the Supreme Court has

explained:

> Firms may acquire monopoly power by establishing an infrastructure that
> renders them uniquely suited to serve their customers.  Compelling such firms
> to share the source of their advantage is in some tension with the underlying
> purpose of antitrust law, since it may lessen the incentive for the monopolist,
> the rival, or both to invest in those economically beneficial facilities.

*Id*. at 407-08; *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448

(2009) ("As a general rule, businesses are free to choose the parties with whom they will

deal, as well as the prices, terms, and conditions of that dealing.").

Accordingly, an alleged refusal to deal cannot violate the antitrust laws absent a

narrow circumstance not alleged here:  when the refusal terminates a prior course of voluntary dealing.  *See Covad Commc'ns Co. v. BellSouth Corp.,* 374 F.3d 1044, 1049 (11th Cir. 2004) ("[T]he unilateral termination of a voluntary course of dealing [is] a requirement for a valid refusal-to-deal claim. . . ."); *In re Adderall XR Antitrust Litig.,* 754 F.3d 128, 135 (2d Cir. 2014) (affirming dismissal of refusal to deal claim because "[defendant] did not terminate any prior course of dealing"); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008) (affirming dismissal of refusal to deal claim because plaintiff "failed to allege either a voluntary arrangement between it and [defendant], or that any such arrangement was profitable to [defendant]").

The Second Circuit's decision in *In re Elevator Antitrust Litigation* is directly on point.  In that case, plaintiffs alleged that elevator manufacturers monopolized, or attempted to monopolize, the "maintenance market[s] for [their] own elevators" by "***designing the elevators to prevent servicing by other providers*** . . . ; refusing to sell competitors the parts, tools, software or diagrams necessary to service the elevators; and obstructing competitors' attempts to purchase elevator parts."  *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (emphasis added).  The Second Circuit affirmed the dismissal of plaintiffs' claims, holding that "because plaintiffs do not allege that defendants terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors—the allegations are insufficient to state a unilateral-monopolization claim."  *Id.*; *see also 3Shape Trios A/S*, 2019 WL 3824209, at *8 (holding that "[defendant's] design of its [product] by itself does not constitute anticompetitive conduct" because "[defendant] never had a deal with its rivals in the [relevant] market governing the terms and conditions under which the

[product] could be used to send them business"); *AIDS Healthcare Found., Inc. v. Gilead Scis. Inc.*, No. C 16-00443 WHA, 2016 WL 3648623, at *7 (N.D. Cal. July 6, 2016) (dismissing Sherman Act § 2 claim alleging that drug manufacturer was required to sell its drug as a standalone product, rather than as a combination treatment with other drugs, finding "[t]here is no legal basis for concluding that [defendant] had a ***duty*** to release [its drug] as a standalone product," and "'[a]s a general rule, any firm, even a monopolist . . . may bring its products to market whenever and however it chooses'" (citation omitted)), *aff'd on other grounds*, 890 F.3d 986 (Fed. Cir. 2018).[3]

Here, Rebotix does not—and cannot—allege that Intuitive ever allowed Rebotix or any other third party to "repair" EndoWrist instruments.  To the contrary, the Complaint suggests that Intuitive has always sought "to prevent any repairs of the EndoWrist surgical instruments" by including the usage counter "in each EndoWrist."  (Compl. ¶ 3.)  Rebotix further alleges that it "was forced to expend significant time, resources, and money to develop this workaround" (*id.* ¶ 52), and that its "workaround only works for EndoWrists used with the da Vinci Si model, not the newer Xi model" (*id.*).  As such, Intuitive's incorporation of the usage counter and alleged refusal to allow repairs of its EndoWrist instruments is consistent with its prior course of dealing and cannot violate the antitrust laws.

Notably, in *Restore*, Judge Wetherell dismissed a substantially similar refusal to deal

---

[3]  As reflected in the *AIDS Healthcare* decision, courts generally are reluctant to entertain antitrust challenges to the manner in which a firm designed its product.  *See Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 369 (9th Cir. 1988) ("A line of 'product innovation' cases has consistently rejected antitrust liability for a monopolist's decision about when or whether to market new products.").

claim brought against Intuitive by plaintiffs seeking to "repair" EndoWrist instruments.  The

*Restore* plaintiffs alleged that Intuitive had unlawfully refused to provide access to the usage

counter so that plaintiffs could circumvent the usage limit, as Rebotix seeks to do in this

case.[4]  Judge Wetherell held that plaintiffs' "refusal to deal allegations, based on [their] being

denied access to the . . . usage counter, do not" constitute anticompetitive acts "because

[p]laintiffs have alleged no prior course of dealing with [Intuitive]."  *Restore*, 2019 WL

8063989, at *7.[5]

Thus, like plaintiffs in *Restore*, Rebotix fails to state an antitrust claim based on its

challenge to Intuitive's EndoWrist instrument usage counter.  Accordingly, those

components of Rebotix's monopolization and attempted monopolization claims (Counts III

and IV) that rely on allegations that the usage counter is anticompetitive must be dismissed.

> **B.  Because Rebotix Fails to State a Claim Regarding the Usage Counter, Its Claims Relating to Xi Model Instruments Should Be Dismissed for Failure to Plausibly Allege Antitrust Injury**

Given Rebotix's failure to plead a viable claim regarding the usage counter, it cannot

establish antitrust injury attributable to its alleged inability to service Xi model EndoWrist

instruments and, therefore, all its claims relating to those instruments should be dismissed.

Courts routinely dismiss antitrust claims for failure to plead antitrust injury when a

---

[4]  To the extent Rebotix argues that the Complaint does not allege a refusal to deal claim, this is a matter of form over substance.  As instructed by *In re Elevator Antitrust Litigation*, 502 F.3d at 52, and *3Shape Trios A/S*, 2019 WL 3824209, at *8, and consistent with the findings in *Restore*, 2019 WL 8063989, at *7, Rebotix's allegations challenging Intuitive's design of EndoWrist instruments to include usage limits are properly construed as a refusal to deal with a competitor.

[5]  Judge Wetherell also rejected plaintiffs' attempts to invoke the "essential facility doctrine" and the Supreme Court's decision in *Otter Tail Power Co.*, 410 U.S. 366, concluding that those precedents—to the extent they remain viable after the Supreme Court's decision in *Trinko*—could not be used to force Intuitive to provide access to the usage counter.  *See Restore*, 2019 WL 8063989, at *7-8 & n.10.

plaintiff does not adequately allege that its purported injury is ***directly attributable*** to anticompetitive conduct by the defendant.  *See, e.g.*, *Spanish Broad. Sys.*, 376 F.3d at 1076 (affirming dismissal of Sherman Act claims because plaintiff failed to allege injury resulted from "practices [that] have harmed competition"); *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998) (explaining that "antitrust injury must be caused by the antitrust violation—not a mere causal link, but a direct effect," while affirming dismissal of claims seeking damages and injunctive relief for failure to plead antitrust injury); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989) (affirming dismissal of antitrust claim because "any injury that [plaintiff] may have suffered did not flow directly from [defendant's] presumably unlawful act").

Here, Rebotix admits that it has been unable to develop a "workaround" to circumvent the usage counter on EndoWrist instruments used with Intuitive's "Xi model." (Compl. ¶ 52.)  Because Rebotix's inability to repair Xi model EndoWrist instruments is attributable to conduct that is not anticompetitive (i.e., Intuitive's designing the instruments with a usage counter), Rebotix cannot establish that it has suffered antitrust injury resulting from its inability to service those instruments; therefore, all of Rebotix's claims relating to Xi model EndoWrist instruments should be dismissed.

## III.   INTUITIVE'S ALLEGED CEASE-AND-DESIST LETTERS ARE IMMUNE FROM ANTITRUST SCRUTINY UNDER *NOERR-PENNINGTON*

Rebotix alleges that Intuitive has engaged in anticompetitive conduct by "sending cease and desist letters when customers attempt to repair EndoWrists."  (Compl. ¶¶ 69, 72.)

As this Court has held, however, "pre-litigative activity such as sending cease-and-desist letters is . . . immunized" from antitrust scrutiny under the *Noerr-Pennington* doctrine.

*PODS Enters., Inc. v. ABF Freight Sys., Inc.*, No. 8:11-cv-84-T-33MAP, 2011 WL 4948397, at \*5 (M.D. Fla. Oct. 17, 2011) (Covington, J.); *see also id.* at \*5-6 (dismissing antitrust counterclaim alleging that plaintiff's "sending of numerous cease-and-desist letters" violated Sherman Act § 2 because counterclaimant "failed to allege sufficient facts to overcome [plaintiff's] *Noerr-Pennington* immunity"); *Marco Island Cable, Inc. v. Comcast Cablevision of South, Inc.*, No. 2:04-CV-26-FTM-29DNF, 2006 WL 1814333, at \*9-10 (M.D. Fla. July 3, 2006) (defendant's letter to contractual counterparty identifying breach of agreement and warning that defendant "would seek to enforce its rights under the contract" was immune under the *Noerr-Pennington* doctrine).

The *Noerr-Pennington* doctrine immunizes a defendant from antitrust liability when the defendant "petition[s] government by resorting to . . . judicial proceedings." *Andrx Pharms., Inc. v. Elan Corp.*, 421 F.3d 1227, 1233 (11th Cir. 2005). The *Noerr-Pennington* doctrine also "protect[s] those acts reasonably and normally attendant upon effective litigation" because "[i]f litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992) (citation omitted).

A petitioner only loses *Noerr-Pennington* immunity if it "engages in 'sham litigation.'" *Andrx*, 421 F.3d at 1233 (citation omitted). To invoke "the sham litigation exception, a litigant must establish that: (1) 'the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits'; and (2) the party bringing the allegedly baseless suit did so with a 'subjective motivation . . . to interfere ***directly*** with the business relationships of a competitor.'" *Id.* at 1234 (quoting *Pro. Real Est.*

*Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (alterations in original)).  With regard to "the first prong of the sham litigation exception test, . . . the existence of probable cause to bring a lawsuit is sufficient to thwart a claim that litigation was objectively baseless."  *Id.*

Here, Intuitive's cease-and-desist letters are immune from antitrust scrutiny under the *Noerr-Pennington* doctrine because Rebotix does not allege that any such letter was "sham." To the contrary, Rebotix's own allegations indicate that the cease-and-desist letters could not have been objectively baseless because the letters were consistent with—and merely sought to enforce—the terms of Intuitive's agreements with its customers.  Indeed, while Rebotix alleges that "Intuitive routinely sends cease and desist letters to its customers who elect to repair their EndoWrists (e.g., through Rebotix's repair services)" (Compl. ¶ 3), the Complaint acknowledges that "Intuitive's standard agreement . . . expressly prohibits its customers from performing repairs on the EndoWrists" (*id.* ¶ 55).  Thus, because Rebotix does not—and cannot—allege facts suggesting that Intuitive's cease-and-desist letters were objectively baseless, those letters are protected by the *Noerr-Pennington* doctrine and cannot form the basis of any antitrust claim.

## CONCLUSION

For the foregoing reasons, Intuitive respectfully requests that the Court dismiss the Complaint.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 3.01(a)

Intuitive certifies this Memorandum complies with the page count limitation set forth in Local Rule 3.01(a) because it contains 24 pages.

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 3.01(j), Intuitive respectfully requests oral argument on the matters set forth herein.  It is estimated no more than one hour will be required for argument.

## **CERTIFICATE OF COMPLIANCE WITH GOOD FAITH CONFERENCE**

Consistent with the Court's Case Management and Scheduling Order, ECF No. 36, Intuitive certifies that its counsel conferred by telephone with Plaintiff's counsel regarding this motion on December 7 and by email on December 8, 2020.  The conferences did not resolve the issues raised in the motion, and counsel agreed to revisit the issue of amendment of the pleadings should it be appropriate.

Dated:  December 8, 2020

Respectfully submitted,

/s/ David L. McGee
DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com

ALLEN RUBY
CA Bar No. 47109 (*Pro Hac Vice*)
LANCE A. ETCHEVERRY
CA Bar No. 199916 (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
Tel: (650) 470-4500
allen.ruby@skadden.com
lance.etcheverry@skadden.com

KAREN HOFFMAN LENT
NY Reg. No. 3058021 (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10036
Tel: (212) 735-3000
karen.lent@skadden.com

Counsel for Defendant Intuitive Surgical, Inc.

## CERTIFICATE OF SERVICE

I CERTIFY that a copy hereof has been filed via CM/ECF for electronic distribution

to the following counsel of record on December 8, 2020:

Allen Ruby (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301
Tel: (650) 470-4500
allen.ruby@skadden.com

David L. Luikart
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida, 33601
Tel: (813) 221-3900
dave.luikart@hwhlaw.com

Richard Lyon
Gregory Dovel
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Tel: (310) 656-7066
rick@dovellaw.com
greg@dovellaw.com

/s/ David L. McGee
DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com