**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

REBOTIX REPAIR LLC,

                     Plaintiff,

vs.

                                    Case No.:  8:20-cv-02274

INTUITIVE SURGICAL, INC.,

                     Defendants.

**<u>Plaintiff Rebotix's Response to Defendant Intuitive's Motion to Dismiss</u>**

I.      **Introduction.**

Rebotix's Complaint presents detailed allegations supporting its antitrust claims of tying, exclusive dealing, monopolization, and attempted monopolization.  Through predatory contracts, technological and contractual tying arrangements, and a campaign of threats, Intuitive uses its dominance in the market for surgical robots (at least 98% market share) to exclude competition and monopolize a separate market for replacements and repairs of the surgical instruments (EndoWrists) used in robotic surgeries.  If a hospital wants to purchase an Intuitive surgical robot (necessary for any top-tier hospital), it must purchase unnecessary replacement EndoWrists from Intuitive instead of repair services for EndoWrists that they own.  As a result, hospitals (the consumers) are forced to spend billions on a product they do not want, and Rebotix (a supplier of competing repair services) is excluded from the market.

Intuitive makes three arguments: a primary argument seeking to dismiss all of Rebotix's claims, and two secondary arguments that seek to carve out allegations relevant to some of Rebotix's claims.

<u>First</u>, Intuitive asserts that the "relevant market" for antitrust claims must be determined based on "the options available to" the competing "supplier" (Rebotix), not the options available to consumers (the hospitals).  Mot. 11-12; 2-4, 11-15.  But Supreme Court law holds the opposite: the "relevant market for antitrust purposes is determined by the choices available to" and "the commercial realities <u>faced by consumers</u>." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481-82 (1992) (emphasis added).

<u>Second</u>, Intuitive seeks to dismiss portions of Rebotix's claims relating to Intuitive's "usage counter" because Rebotix did not plead the requirements of a "refusal to deal" claim.

1

Mot. 15; 15-20.  But Rebotix does not allege a refusal to deal claim.  Rebotix's "usage counter" allegations pertain to Intuitive's improper tying arrangement, which results in anticompetitive harms that Intuitive's motion does not challenge.

Third, Intuitive alleges that the cease-and-desist letters it sent to hospitals are immune from antitrust scrutiny under *Noerr-Pennington*, a doctrine that protects the First Amendment right to petition the government, e.g., by litigation or threats of litigation.  Mot. 21; 21-23.  But Intuitive's letters do not reference, imply, or suggest litigation or any other recourse involving the government.  Complaint ¶56.  Intuitive's letters threaten hospitals with economic recourse: if the hospitals do not capitulate, Intuitive will withhold maintenance services, not file a lawsuit.  *Id.*  Accordingly, *Noerr-Pennington* does not apply.

We address each of Intuitive's arguments in turn.

## II.    Intuitive's challenge to the "Endowrist repair and replacement market" fails.

Intuitive asserts that "Rebotix fails to plausibly allege a proper antitrust market" by defining the market as "the repair and replacement of EndoWrist instruments."  Mot. 2, 11-14.  We demonstrate that (A) Rebotix properly alleges the relevant market and (B) Intuitive's contrary argument is refuted by controlling law.

### A.    Rebotix alleges the contours of the relevant market.

The composition of the "relevant market" is a "question of fact" usually resolved by the jury.  *Thompson v. Metropolitan Multi-List*, 934 F.2d 1566, 1573 (11th Cir. 1991).  At the pleadings stage, plaintiffs "must present enough information in their complaint to plausibly suggest the contours of the relevant … product market[]."  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).  The Complaint exceeds this standard.

"'To define a market is to identify producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services.'" *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1552 (11th Cir. 1996) (quoting 2A Phillip E. Areeda et al., Antitrust Law ¶ 530a, at 150 (1995)).  These alternatives must "have reasonable interchangeability," which is "gauged by [a consumer's] purchase of competing products for similar uses." *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 404, 380 (1956).  The "proper market definition" is thus determined by "a factual inquiry" into "the choices available to" and "the commercial realities faced by consumers" of defendant's product. *Eastman Kodak*, 504 U.S. at 481-82.

For the consumers here—hospitals needing surgical instruments that fit the da Vinci robot—the only alternatives are replacing or repairing EndoWrists.  Complaint ¶¶30-36, 60-61. EndoWrists "necessary to perform surgery with [Intuitive's] da Vinci robot system" are "only available from Intuitive." *Id*. ¶34 ("An EndoWrist cannot work with a da Vinci robot unless it has a serial number from Intuitive.").  The consumer's only alternative interchangeable with purchasing a replacement EndoWrist is repairing an EndoWrist it already owns. *Id*. ¶42 (a repaired EndoWrist is equal to a new EndoWrist in terms of both "safety and effectiveness").

Accordingly, as pleaded, the commercial realities faced by hospitals performing robotic surgeries are limited to two alternatives: purchase new EndoWrists from Intuitive or seek repair services for their existing EndoWrists. *Id*. ¶30.

**B.      Intuitive's arguments concerning the relevant market fail.**

Intuitive asserts that Rebotix's market definition is flawed because (1) the market

should be "defined from the perspective of a supplier" (Rebotix), not from the perspective of a consumer (a hospital), and (2) when defined from the supplier perspective, the market includes repairs of "any instrument used in minimally invasive surgeries," not just EndoWrists.  Mot. 12, 13.  Both parts of this assertion are wrong.

### 1. The relevant market is defined from the perspective of the consumer, not the supplier.

The premise underlying Intuitive's argument—that the relevant market should be "defined from the perspective of a supplier," not the consumer (Mot. 12)—is contrary to controlling Supreme Court precedent.

Antitrust law was not designed to protect one supplier's market for products or services from its competitors.  Rather, it ensures competitive markets for the benefit of consumers.  *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458 (1993) (the "purpose of the [Sherman] Act is not to protect businesses …; it is to protect the public … from … conduct which unfairly tends to destroy competition"); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488 (1977) (the "antitrust laws … were enacted for 'the protection of competition, not competitors'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *Astrotel, Inc. v. Verizon Fla*., LLC, No. 8:11-cv-2224-T-33TBM, 2012 U.S. Dist. LEXIS 63172, at *12 (M.D. Fla. May 4, 2012) ("conduct must harm the competitive process and thereby harm consumers …. Harm to one or more competitors [does] not suffice").

Because the harm must be to consumers, not competitors, the relevant market for evaluating that harm must be defined from the perspective of consumers, not competitors. The Supreme Court has held time and time again that "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make

4

up the part of the trade or commerce" that is the "relevant market." *E. I. Du Pont*, 351 U.S. at 395 (emphasis added); *Eastman Kodak*, 504 U.S. at 482 ("The proper market definition" requires "a factual inquiry into the commercial realities faced by consumers.").

*Eastman Kodak* is dispositive. Like Rebotix, the plaintiffs in *Eastman Kodak* alleged violations under both sections of the Sherman Act. *Eastman Kodak*, 504 U.S. at 456, 459 (plaintiffs "alleg[e] Kodak's policies were unlawful under both § 1 and § 2," alleging "a tying arrangement" under Section 1, and that Kodak "unlawfully monopolized and attempted to monopolize" under Section 2). And just like Rebotix, plaintiffs in *Eastman Kodak* were not consumers of defendant's products; they supplied services to consumers of defendant's products. *Id*. 455 (plaintiffs are "independent service organizations [that] began servicing Kodak copying and micrographic equipment" for companies that had purchased such equipment from Kodak); Complaint ¶1 ("Rebotix repairs EndoWrists" for hospitals that purchased such equipment from Intuitive.).

*Eastman Kodak* answers the question here. Should the relevant market be defined from the "perspective of the [plaintiff] supplier[s]" and include potential customers available to the suppliers (as Intuitive contends)? Mot. 12. Or should the relevant market be defined from the perspective of the consumers and include alternatives available to the consumers of defendant's products (as Rebotix contends)? *Eastman Kodak* confirmed that the "proper market definition in this case can be determined only" by looking to "the commercial realities faced by consumers." *Eastman Kodak*, 504 U.S. at 482 (emphasis added). The customers available to plaintiff are not relevant. The relevant inquiry does not ask, for example, whether the plaintiffs could service other equipment that may be similar to Kodak's

products.  Instead, the "relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners," the consumers of Kodak's product.  *Id.* 481-482.

Similarly here, the relevant market is not determined by the customers to which Rebotix could provide its services.  The relevant market is determined by the choices available to consumers of Intuitive's EndoWrists, i.e., the choices available to hospitals that perform da Vinci surgeries.  From the perspective of these consumers, they must buy replacement EndoWrists from Intuitive or repair their existing EndoWrists—there are no other alternatives.  Complaint ¶¶30-39.  The market is therefore correctly defined as the market for EndoWrist repairs and replacements.

Intuitive relies on out-of-circuit cases to support its "from the perspective of the supplier" argument.  Mot. 11-12.  These cases do not support dismissal for two reasons.

<u>Reason 1</u>:  The premise that Intuitive attributes to its cases—that in "antitrust cases brought by an allegedly excluded supplier (like Rebotix), the relevant market is defined from the perspective of the supplier" (Mot. 11-12)—is contrary to Supreme Court and Eleventh Circuit law.

As noted above, Supreme Court law holds that, in antitrust cases brought by an excluded supplier (like Rebotix), the "proper market definition" is "determined" by looking to the "choices available to" and "the commercial realities faced" "<u>by consumers</u>" of defendant's product, not the excluded supplier who filed the case.  *Eastman Kodak*, 504 U.S. at 482 (emphasis added).  Eleventh Circuit likewise holds that, in antitrust cases brought by an excluded supplier, the "relevant market" is defined from the perspective of the "consumers": the "relevant market is made up of those commodities reasonably

interchangeable <u>by consumers</u> for the same purposes." *Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp.*, 849 F.2d 1336, 1341 (11th Cir. 1987) (emphasis added) (internal quotations and citations omitted); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002) (when determining the "relevant product market" in a case filed by an excluded supplier, "it is necessary to examine both the product at issue and all reasonable substitutes available <u>to consumers</u>") (emphasis added).

For example, in *Ad-Vantage*, Plaintiff Ad-Vantage, an intermediary between advertisers (the consumers) and advertising publishers, sued a yellow pages publisher for antitrust violations. *Ad-Vantage* 1338-1340. In considering the "relevant market," the court did not seek to identify potential alternatives for Ad-Vantage. Instead, it approached the issue from the perspective of the consumer: what would consumers of defendant's yellow page advertising consider "as a suitable substitute for yellow pages advertising." *Id.* 1342.

Following this controlling law, district courts in this Circuit consistently define the market from the perspective of consumers, not the supplier. For example, in *Cal Distrib.*, an allegedly excluded supplier of wine sued another wine supplier for monopolization and attempted monopolization. *Cal Distrib. Co. v. Bay Distribs., Inc.*, 337 F. Supp. 1154, 1159 (M.D. Fla. 1971). To determine the "relevant product market," the court looked to the "commodities reasonably interchangeable by consumers for the same purposes." *Cal Distrib.*, 337 F. Supp. at 1159 (quoting *E. I. Du Pont*, 351 U.S. at 395). [1]

---

[1] *See Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1337 (N.D. Ga. 2015) (excluded supplier case) ("the test for a relevant [product] market is not commodities reasonably interchangeable by a particular plaintiff, but commodities reasonably interchangeable by consumers for the same purpose"); *Kls Martin, Inc. v. Med. Modeling, Inc.*, No. 3:18-cv-233-J-20JBT, 2018 U.S. Dist. LEXIS 225524, at *14 (M.D. Fla. Dec. 14, 2018) (excluded supplier case) ("All goods that can be substituted for one

Reason 2:  If Rebotix had done what Intuitive asserts the out-of-circuit cases require—i.e., disregard the perspective of consumers and instead consider the potential market to which supplier Rebotix "could sell its services" (Mot. 12)—that would have been a potential basis for dismissal.

A pleaded market definition that "ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." *United States v. Bethlehem Steel Corp*., 168 F. Supp. 576, 592 (S.D.N.Y. 1958).  For example, in *Flovac*, a supplier of "vacuum sewer systems" sued a competitor under Sections 1 and 2 of the Sherman Act.  *Flovac, Inc. v. Airvac, Inc*., 817 F.3d 849, 851, 853 (1st Cir. 2016).  Plaintiff attempted to define the relevant market from its own perspective, asserting that the market should be defined as "vacuum sewer systems" because the "vacuum sewer systems" market includes all the customers to which plaintiff could sell its services.  *Id*. 854.  The court held that this approach is incorrect as a matter of law: defining the market from the plaintiff supplier's "view of the relevant product" "does not speak at all to the perspective of consumers" and "has no bearing on the key questions of product interchangeability and cross-elasticity of demand from the perspective of consumers."  *Id*. 854-55.  "It is the consumer's options and the consumer's choices among them on which relevant market analysis ultimately depends."  *Id*.; *see George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc*., 508 F.2d 547, 551-52 (1st Cir. 1974) (supplier plaintiff was on "weak ground in so concentrating on competition among sellers." Instead, the "definition of 'market'" must consider "attitudes and reactions of consumers"

---

another and have the same essential use by consumers comprise a market."); *Clark Mem'ls of Ala., Inc. v. Sci Ala. Funeral Servs*. LLC, 991 F. Supp. 2d 1151, 1161 n.6 (N.D. Ala. 2014) (excluded supplier case) ("well-pleaded product market … defined based on consumer behavior").

and "the extent to which purchasers [i.e., consumers] will accept substitute products" "for the product in question." (citing *E. I. duPont*, 351 U.S. at 586, 593)).

**2.**      **Even from the perspective of the supplier, the relevant market does not include repairs of traditional surgical instruments.**

Intuitive asserts that, when viewed from the perspective of the supplier (i.e., Rebotix), the relevant market encompasses not only "EndoWrist instrument repairs" but also "repairs of other non-robotic surgical instruments." Mot. 13. Intuitive is wrong. Even when (incorrectly) viewed from Rebotix's perspective, the relevant market does not include repairs of traditional, non-robotic instruments.

As pleaded, there has been a long-standing market for repairing traditional non-robotic instruments. Complaint ¶¶36, 38 ("doctors have used [instruments] in traditional minimally invasive surgeries for decades," which are "repaired between surgeries" and "last for years"). But Rebotix never participated in this market. Rebotix's business has always been limited to EndoWrist repair. *Id*. ¶5 ("Rebotix is in the business of repairing surgical instruments called EndoWrists"). Instead of participating in a long-standing market, Rebotix provides a different service, one "that hospitals were craving" even though repairs of traditional instruments had long been available. *Id.* ¶60.

The Complaint identifies key differences in design between EndoWrists and traditional instruments, and thus key differences in the required repairs. Although the "<u>surgical ends</u> of EndoWrists are essentially identical" to the ends of "traditional" non-robotic instruments, the "wrist" design of an EndoWrist is unique. *Id.* ¶¶36, 11-12. While traditional laparoscopic instruments are designed to be "manipulate[ed] directly with [the surgeon's] hands," EndoWrists are specifically designed to be "attached to mechanical arms

9

of surgical robots." *Id.* ¶¶11-12 (photo showing EndoWrist attached to mechanical arm); *id.* ¶18 (pleading "distinct[ions]" from "equipment used in traditional laparoscopic surgeries" including how "the 'wrists' of the robot" are designed to "have a greater range of motion" than traditional instruments). Thus, while the repairs to the ends of traditional instruments and EndoWrists are largely the same, repairs to the wrists of EndoWrists are unique. A supplier of EndoWrist repairs, like Rebotix, would not view these services as "reasonably interchangeable from [the supplier's] perspective." Mot. 12 (internal quotations omitted).

Intuitive's reliance on the *Restore* case confirms this distinction. Mot. 3, 9. There, "Judge Wetherell ruled … plaintiffs plausibly alleged an aftermarket for repair and replacement of EndoWrist instruments." *Id.* 3. Intuitive asserts that the *Restore* allegations withstand scrutiny under Intuitive's "perspective of the supplier" theory because in "that case, unlike here, plaintiffs alleged that EndoWrist instruments are 'unique.'" Mot. 3, 9. But the "uniqueness" allegations in the *Restore* Complaint are also included in Rebotix's Complaint. The *Restore* Complaint included a sentence in an attachment: "The EndoWrist instruments have a unique articulating design at the distal tip that mimics the human wrist." Mot. 9; Ex. B at 4. As explained above, our Complaint identifies this same unique design feature of the EndoWrists. Complaint, ¶18 ("the 'wrists'" are designed to "have a greater range of motion" than traditional instruments); *id.* ¶¶11-12.

Accordingly, the Complaint pleads sufficient facts demonstrating that, even from the perspective of Rebotix as a supplier, the market for EndoWrist repairs is not interchangeable with the market for repairing traditional instruments. This is especially true in this Circuit where "dismissals are particularly disfavored in fact-intensive antitrust cases," *Spanish*

*Broad. Sys. v. Clear Channel Commc'ns*, 376 F.3d 1065, 1070 (11th Cir. 2004), and allegations must merely "nudge the claim across the line from conceivable to plausible." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010). Alternatively, if the Court adopts the supplier perspective approach, Rebotix requests leave to amend its Complaint under Rule 15(a)(2) to add further allegations from the supplier perspective.

### 3. Intuitive's *Spectrofuge* argument fails.

Intuitive quotes from *Spectrofuge* for the proposition that a company's decision to "'limit[] its competitive activity to a single firm's products (and at only one competitive level) cannot control the definition of the relevant market.'" Mot. 15 (quoting *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978)). This proposition does not apply here because Rebotix does not contend that its decisions of where and how to compete control the market definition. Instead, the relevant market should be determined by the substitutes available to Intuitive's customers. This was also true in *Spectrofuge*. *Id*. 283 (relying on "uncontradicted" "evidence … as to those instruments … which provide the customer with substitutes for" defendant's products).

Moreover, *Spectrofuge* confirms that it is "appropriate" "to limit the relevant market to a single firm's products" when the "manufacturer uses his dominant position at one level of competitive activity to eliminate competition at another level" or "if the firm's product is so unique or so dominant in the market in which it competes." *Spectrofuge*, 575 F.2d at 282. This is the exact scenario here. Indeed, the first paragraph of the Complaint alleges: "Intuitive dominates the market for minimally invasive surgical robots with its da Vinci surgical robots" and "uses this dominance to monopolize a separate market: the market for

replacements and repairs of EndoWrists."  Complaint ¶¶1, 15.

### III.    Intuitive's "usage counter" argument fails.

Intuitive alleges that, for Rebotix's Sherman Act § 2 claims (monopolization and attempted monopolization), Rebotix fails to plausibly allege that adding a "usage counter" chip to its EndoWrists is "anticompetitive."  Mot. 16; 15-20.  With this argument, Intuitive does not challenge Rebotix's asserted Sherman Act § 1 claims (tying and exclusive dealing) and only seeks to dismiss those "components of Rebotix's Sherman Act § 2 claims" that allege adding the "usage counter" chip is "anticompetitive."  *Id.*

We demonstrate below that (A) Rebotix's Complaint alleges four different anticompetitive activities under Sherman Act § 2 claims, (B) Intuitive's "usage counter" argument does not address three of the four anticompetitive activities, and (C) Intuitive's "usage counter" argument fails because it attacks a theory that Rebotix does not allege.

### A.    Intuitive engages in "anticompetitive" activity that supports Rebotix's Sherman Act § 2 claims.

A well-pleaded monopolization claim requires pleading "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market."  *Morris Communs. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004).  "Attempted monopolization" requires "predatory or anticompetitive conduct with … a specific intent to monopolize."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  A party can "violate[] § 2 of the Sherman Act in a variety of ways."  *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (2001).  Rebotix pleads four different anticompetitive activities or practices that support its Section 2 claims.

1. <u>Contractual tying</u>: A tying arrangement can be the anticompetitive activity

supporting a Section 2 claim.  *Eastman Kodak*, 504 U.S. 451, 461 (1992) (relying in part on tying arrangement as Section 2 anticompetitive conduct); *Viamedia, Inc. v. Comcast Corp*., 218 F. Supp. 3d 674, 692 (N.D. Ill. 2016) ("tying constitutes a type of anticompetitive conduct that can give rise to Section 2 liability").  One type of tying arrangement, contractual tying, occurs when a party with "economic power in the tying product market" contractually ties its tying product to a tied product in a way that forces "the buyer [to] also purchase[]" the "tied product."  *Eastman Kodak*, 504 U.S. at 464, 461.

For example, Microsoft used its market power in the market for operating systems (the tying product) to monopolize the market for browsers (the tied product) by contractually tying the products together in its operating system license agreement.  *See Microsoft*, 253 F.3d at 63-64 ("license restrictions" for operating system that prevent parties from installing "rival browsers" "violate § 2 of the Sherman Act.").

Intuitive has imposed various contractual tying arrangements to further its monopoly in EndoWrist replacement and repairs.  Complaint ¶¶ 63-64, 53-54.  "[T]he essential characteristic of an invalid tying arrangement lies in the seller[] … forc[ing] the buyer into the purchase of a tied product that the buyer … did not want at all."  *Tic-X-Press, Inc. v. Omni Promotions Co*., 815 F.2d 1407, 1414 (11th Cir. 1987) (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551, 1558 (1984)).  Intuitive, which controls the market for surgical robots, will only sell robots to customers that contractually agree to (a) buy their EndoWrists only from Intuitive and (b) buy more EndoWrists than necessary, EndoWrists that the customers do not want at all.   Complaint ¶¶53-54, 14.  Intuitive's sales contract for robots requires that its customers discard their EndoWrists and purchase new

ones after a given number of uses (usually 10) even though the EndoWrists are in "perfect condition after well over 100 uses." *Id.* As a result, instead of repairing the EndoWrists they already own, buyers of surgical robots from Intuitive are "force[d] … into the purchase of a tied product," replacement EndoWrists, "that the buyer … did not want at all." *Tic-X-Press*, 815 F.2d at 1414. With this contractual tie, Intuitive secures its stranglehold on EndoWrist replacements and forecloses competing EndoWrist repair services. Complaint ¶¶53, 54.[2]

2. <u>Technological tying</u>: A tying arrangement can also be implemented technologically. "The term 'technological tie' … refers to cases where technological interdependence requires the buyer of the initial … product to take … complementary products from the defendant as well." Phillip E. Areeda et al., Antitrust Law ¶1757 (4th and 5th Editions 2013-2020). For example, in the *Microsoft* case discussed above, Microsoft implemented a technological tie in addition to the contractual tie. *Microsoft*, 253 F.3d at 64. "Although Microsoft's license restrictions [i.e., the contractual tie] have a significant [anticompetitive] effect" in the browser market, Microsoft also "set out to bind [its browser] more tightly to [its operating system] as a technical matter." *Id.* By installing software in its products, Microsoft "[t]echnologically" tied the two markets and further "deterred consumers from using [competitors' browsers]." *Id.* 63-64.

Similarly here, although Intuitive's contractual ties have a significant anticompetitive effect in the market for EndoWrist repair and replacement, Intuitive also technologically tied the two markets. Complaint ¶¶3, 41-52, 63. Intuitive installs a memory chip (the usage

---

[2] Intuitive asserts that the "maximum number of uses" is implemented for "legitimate business reasons" like "patient safety." Mot. 8, n. 1. The Complaint pleads facts demonstrating that "considerations of safety or effectiveness" play no role in the "maximum usage requirement;" instead, it is included "to exclude all competition for EndoWrist repairs and to extract additional profits from its customers." Complaint ¶¶44, 44-50.

14

counter) in each EndoWrist that counts the number of times it has been used.  *Id*. ¶43.
Intuitive designs its robots and EndoWrists such that the arms of the robot will not operably
connect to the EndoWrist if the usage counter registers a given number of uses, e.g. ten.  *Id*.

By technologically tying the robot and EndoWrists in this way, Intuitive forces
hospitals to purchase EndoWrist replacements they do not want, and deters them from
seeking repairs for their existing EndoWrists.  Thus, just like the contractual tie, the
technological tie (the usage counter) reinforces Intuitive's monopoly power and improperly
prevents competition in the market for EndoWrist repair and replacement. *Id*.; *see Datel
Holdings Ltd. v. Microsoft Corp*., 712 F. Supp. 2d 974, 998 (N.D. Cal. 2010) (denying
motion to dismiss allegations of "technological tie" where "Plaintiff alleges that the tying
arrangement reinforces Defendant's market power and improperly prevents competition").

3.  <u>Contractual exclusivity</u>:  If a party implements "exclusionary" "service policies as
part of a scheme of willful acquisition or maintenance of monopoly power, it will have
violated § 2." *Eastman Kodak*, 504 U.S. at 483.  Intuitive implements exclusionary service
policies that "expressly prohibit" hospitals from servicing EndoWrists although the hospitals
desire to do so, and know it is entirely safe to do so.  Complaint ¶¶ 55, 48.  Instead of repair
services, they must purchase unnecessary EndoWrists, furthering Intuitive's monopoly.  *Id*.

4.  <u>Threats of economic retaliation</u>:  "[T]hreats of economic retaliation for failure" to
agree to anticompetitive or monopolistic practices are also "violative of Section 2's
prohibition against attempts to monopolize."  *Elder-Beerman Stores Corp. v. Federated
Dep't Stores, Inc*., 459 F.2d 138, 157 (6th Cir. 1972).  When "hospitals elect to use Rebotix's
services to repair their EndoWrists rather than purchase new ones" or "when hospitals elect

to use an EndoWrist beyond the limit set [both contractually and technologically] by Intuitive," "Intuitive threatens to withhold the contractual maintenance services that are necessary for the continued operations of hospitals' da Vinci robots." Complaint ¶¶56-57. Because hospitals' multi-million dollar surgical robots are rendered useless without these maintenance services, which "can only be obtained from Intuitive," these threats force "hospitals [to] capitulate to Intuitive," "continue to spend large sums purchasing unnecessary EndoWrists from Intuitive," and "stop using Rebotix's [repair] services." *Id*. ¶¶58-59.

Accordingly, each of the foregoing pleaded activities or practices satisfies the requisite anticompetitive conduct for a Section 2 claim.

**B.    Rebotix's Section 2 claims stand independent of the allegations concerning the design of the "usage counter."**

Intuitive seeks to dismiss only "those components of Rebotix's Sherman Act § 2 claims … that rely on allegations" concerning the "usage counter." Mot. 16; 15 (Section entitled "Rebotix cannot state a claim based on allegations that the design of the EndoWrist instrument usage counter is anticompetitive."). Three of the four anticompetitive activities and practices described above—contractual tying, contractual exclusivity, and economic threats—do not concern the design of the EndoWrist usage counter. Accordingly, Rebotix's Sherman Act § 2 claims stand independent of Intuitive's "usage counter" argument.

**C.    Intuitive's "usage counter" argument attacks a theory that Rebotix does not allege.**

Intuitive labels Rebotix's allegations concerning the usage counter as a "refusal to deal" claim and then accuses Rebotix of not properly pleading such a claim. Mot. 15.

Intuitive attacks a straw man.  Rebotix does not assert a refusal to deal claim. [3]

The "refusal to deal doctrine targets only a discrete category of section 2 cases attacking a firm's unilateral decisions about with whom it will deal and on what terms." *Tyntec Inc. v. Syniverse Techs*., LLC, No. 8:17-cv-591, 2019 U.S. Dist. LEXIS 231273, at *17 (M.D. Fla. Aug. 19, 2019).  "[R]efusal to deal claim[s]" are those involving a "demand by the plaintiff to deal with the defendants and subsequent refusal by the defendants to deal with plaintiff." *In re Dual-Deck Video Cassette Recorder Antitrust Litig*., Nos. MDL-765, CIV 87-987 PHX RCB, 1990 U.S. Dist. LEXIS 19207, at *66 (D. Ariz. July 25, 1990).

The Complaint does not allege that Intuitive's "usage counter" amounts to a refusal to deal with Rebotix.  The Complaint does not plead that Rebotix sought to deal with Intuitive (or that Intuitive refused to deal with Rebotix) concerning the usage counter or anything else. Instead, as detailed above, the Complaint pleads facts demonstrating that the usage counter implements a technological tying arrangement.

None of the cases cited by Intuitive include anything resembling these allegations. They concern different allegations where the plaintiff sought defendant's cooperation—e.g., access to defendant's information or property—and defendants refused to provide that cooperation.  *See In re Elevator Antitrust Litig*., 502 F.3d 47, 52 (2nd Cir. 2007) (alleging defendants "refus[ed] to sell competitors the parts, tools, software or diagrams necessary to

---

[3]  Intuitive's § 2 "refusal to deal" argument does not concern, and should not be confused with, Rebotix's § 1 exclusive dealing claim, which is unrelated to the usage counter and not challenged by Intuitive.  Complaint, ¶¶55, 66-67.  An "exclusive dealing" claim and "refusal to deal" claim are "different claims involving distinct conduct."  *Viamedia, Inc. v. Comcast Corp*., 218 F. Supp. 3d 674, 699 (N.D. Ill. 2016).  An "exclusive dealing" claim concerns defendant's attempt to "limit the abilities of third parties (here, hospitals) to deal with" plaintiff, whereas a "refusal to deal" claim concerns a defendant's "unilateral refusal to deal" with plaintiff, e.g., "refusing to provide [plaintiff] access to" defendant's information.  *Viamedia* at 699.

service the elevators"). [4]

Intuitive asserts that "Judge Wetherell dismissed a substantially similar" claim in the *Restore* case. Mot. 19-20. Judge Wetherell did no such thing. Instead, Judge Wetherell's decision confirms the relevant distinction here. Unlike this case, Restore asserted a refusal to deal claim, alleging that it sought access to information from Intuitive, and Intuitive denied that access. Ex. A (*Restore* Complaint) ¶¶55-59, 73-75 (alleging that "access" to Intuitive's "distributor toolkit," "service software," and "usage counter" chips is "essential," and yet "Intuitive denies [Restore] access" to this information). Restore then asserted that these "refusals to deal" with Intuitive "give rise to Section 2 liability." Ex. C (*Restore* Dkt 18) at 7. This theory of anticompetitive behavior is not found in Rebotix's Complaint. Rebotix's Complaint never mentions Intuitive's "distributor toolkit" or "service software." And the "usage counter" allegations pertain to Rebotix's tying claim, not a refusal to deal claim.

Judge Wetherell only dismissed the allegations that Rebotix does not assert, and explicitly held that *Restore* properly pleaded the claims that Rebotix does assert. *Restore Robotics, LLC v. Intuitive Surgical, Inc*., No. 5:19cv55-TKW-MJF, 2019 U.S. Dist. LEXIS 228084, at *16 (N.D. Fla. Sep. 16, 2019) ("The tying and exclusive dealing allegations … satisfy the second element of monopolization; however, the refusal to deal allegations, based on Plaintiffs' being denied access to the distributor's toolkit and usage counter, do not.").

---

[4] *Covad Communs. Co. v. BellSouth Corp*., 374 F.3d 1044, 1047 (11ᵗʰ Cir. 2004) (alleging defendant "deni[ed] [plaintiff] access to [its] network and facilities"); *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 410 (2004) (alleging defendant provided "insufficient assistance in the provision of service to rivals"); *3Shape Trios A/S v. Align Tech*., Inc., No. 18-1332, 2019 U.S. Dist. LEXIS 137982, at *15-16 (D. Del. Aug. 15, 2019) ("conduct alleged to be anticompetitive" is defendant's "termination of its agreement" to deal with plaintiff) ("[plaintiff] is asking [defendant] to deal with its rivals").

Intuitive also asserts that "all of Rebotix's claims relating to Xi model EndoWrists should be dismissed" because "Rebotix's inability to repair Xi model … is attributable to conduct that is not anticompetitive (i.e., Intuitive's designing the instruments with a usage counter)." Mot. 21, 8, 11, 20-21. This argument fails because it is premised on the flawed assertion that Intuitive's "usage counter" is not anticompetitive. As detailed above, well-plead facts demonstrate that the usage counter is the lynchpin in an improper technological tying arrangement. Complaint ¶¶43-44, 32, 63, 64.

## IV.  Intuitive's *Noerr-Pennington* argument fails.

Intuitive argues that its "alleged cease-and-desist letters are immune from antitrust scrutiny under *Noerr-Pennington*." Mot. 21. Intuitive does not rely on this assertion as a ground to dismiss any of the four claims asserted by Rebotix. It cannot, because none of Rebotix's claims rely on the letters as the sole anticompetitive activity. Complaint ¶¶62-73. Instead, Intuitive seeks to preclude any reliance on these letters to support Rebotix's claims. Intuitive's preclusion argument fails. The *Noerr-Pennington* doctrine does not apply here.

Whether the *Noerr-Pennington* doctrine immunizes a defendant's activity from antitrust liability turns on whether the defendant is exercising its "First Amendment … right to 'petition the Government for a redress of grievances.'" *Andrx Pharm., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1233 (11th Cir. 2005) (quoting U.S. Const. amend I). For example, "engaging in litigation to seek an anticompetitive outcome … is immune from antitrust liability" because seeking judicial resolution through litigating is a form of petitioning the government and thus protected by the First Amendment. *Andrx*, 421 F.3d at 1234. The doctrine extends to cease and desist letters to the extent they include "threats of litigation"

because such pre-litigation activity is "attendant upon effective litigation" and thus, by extension, can constitute the First Amendment right to petition the government.  *McGuire Oil Co. v. Mapco, Inc*., 958 F.2d 1552, 1560 (11th Cir. 1992).

By contrast, the First Amendment protections of *Noerr-Pennington* do not apply to activities unrelated to seeking redress from the government.  For example, if a defendant sends "cease and desist letters" that threaten to "discontinue business with [the recipient] if it did not discontinue its business relationship with [another]," that activity is wholly unrelated to the First Amendment.  *Christianson v. Colt Indus. Operating Corp*., 766 F. Supp. 670, 683 (C.D. Ill. 1991).  It is an "an assertion of … economic power," not a threat of litigation that involves redress from the government.  *Id*.

That is exactly what is alleged in this case.  As pleaded, Intuitive's "cease and desist letters" do not seek redress from the government.  Complaint ¶56.  They do not threaten litigation, or even allude to any legal claim.  *Id*.  Instead, they "threaten[] to withhold the contractual maintenance services" that hospitals rely upon if the hospitals "elect to use Rebotix's services."  *Id*. ¶¶56, 57-59.  This is a threat asserting economic power, not a threat to litigate or otherwise petition the government.  Accordingly, *Noerr-Pennington* immunity does not apply.  *See Orange Lake Country Club v. Reed Hein & Assocs*., LLC, 367 F. Supp. 3d 1360, 1371 (M.D. Fla. 2019) ( "letters" that do not "assert any legal claims … or threaten to sue" are not "the type of prelitigation activity that is shielded from liability under the *Noerr* doctrine").

## V.    Conclusion.

For the foregoing reasons, Intuitive's motion to dismiss should be denied.

Date: December 22, 2020                    Respectfully submitted,

_/s/ Richard Lyon_

Richard Lyon
California Bar No. 229288 (_pro hac vice_)
rick@dovel.com
Gregory S. Dovel
California Bar No. 135387
greg@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069
David L. Luikart III
Florida Bar No.: 21079
dave.luikart@hwhlaw.com
HILL WARD & HENDERSON, P.A.
101 East Kennedy Blvd.
Tampa, Florida 33602
Telephone: (813) 227-8419
Facsimile: (813) 221-2900


ATTORNEYS FOR PLAINTIFF
REBOTIX REPAIR LLC