# Exhibit A

# Dkt 14 (Amended Complaint) in the *Restore* case

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIR LLC,

                Plaintiffs,

    v.

INTUITIVE SURGICAL, INC.,

                Defendant.

Civil Case No. 5:19-cv-00055-MCR-MJF

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

Pursuant to Fed. R. Civ. Proc. 15(a)(1)(B), Plaintiffs Restore Robotics LLC and Restore Robotics Repair LLC hereby file their First Amended Complaint against Defendant Intuitive Surgical, Inc. for monopolizing trade in the worldwide and domestic aftermarkets for service of da Vinci surgical robots and the worldwide and domestic aftermarkets for service and replacement of EndoWrist surgical robot instruments. Plaintiffs allege the following upon personal knowledge as to their own acts and information and belief and investigation by counsel as to all other allegations.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs Restore Robotics LLC and Restore Robotics Repair LLC ("Restore" collectively) are Florida limited liability companies with their principal address at 7506 Holley Circle, Panama City Beach, Florida.  They are sister companies with common ownership having majority control of both companies. Restore services surgical robots and related instruments.  Restore Robotics is the sales arm.  Restore Robotics Repairs is the operations arm.

2.      Defendant Intuitive Surgical, Inc. ("Intuitive") is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale, California.  Intuitive provides surgical robots, along with related parts, instruments, accessories, and services, to hospitals and surgical centers in Bay County in the Panama City Division of the Northern District of Florida and elsewhere.  Intuitive can be served with process through its registered agent C T Corporation System at 1200 South Pine Island Road, Plantation, FL 33324.

3.      Defendant is subject to the personal jurisdiction of this Court.

4.      This action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22.  The Defendant has been engaged in interstate commerce during all relevant times of the complaint.

5.      Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c)(2).  The Defendant is transacting and carrying on business in this District.

## ROBOTIC SURGERY

6.      With traditional open surgery, the surgeon uses one large incision to perform a procedure.  With laparoscopic surgery, the surgeon makes several small incisions and inserts small tools, including a video camera, to perform the procedure.

7.      Robotic surgery also uses several incisions for the insertion of small tools, including a magnified, high-definition 3D video camera.  The surgeon sits at a computer and uses hand controls to manipulate the instruments, which are attached to the system by robotic arms with joints.



8.    Robotic surgery has a variety of practical advantages over laparoscopic surgery:

- stereoscopic high-definition cameras for 3-D visibility

- additional arm for the surgeon to hold a third instrument

- wrist joints for expanded range of motion compared to human

- scalability to allow for small movements in the arms and instruments

- ergonomic console design to minimize surgeon fatigue.

## DA VINCI ROBOT

9.    Intuitive sells the da Vinci surgical robot (image below).  From 1999 to 2015, the da Vinci robot was the only surgical robot system cleared by the FDA for sale in the market.

  

4

10.     Intuitive also sells all necessary instruments and accessories for the da Vinci robot system.   Intuitive offers more than eighty different instruments, including a variety of forceps, retractors, and scissors, under the EndoWrist brand. They are the only instruments cleared by the FDA and foreign regulatory authorities for use with the da Vinci robot system.

11.     The da Vinci robot system is generally used for minimally invasive soft tissue surgery for areas of the body between the pelvis and the neck – primarily in general surgery, gynecologic surgery, urologic surgery, cardiothoracic surgery, and head and neck surgery.  The da Vinci robot system is indicated for adult and pediatric use.

12.     For the calendar year 2018, Intuitive reported $1,127.1 million in revenue for sales and leases of the da Vinci robot system.  The average sales price was more than $1.5 million.  The purchase represents a significant capital equipment investment for the customer.

13.     As of December 31, 2018, Intuitive had an installed base of 4,986 da Vinci Surgical Systems, including 3,196 in the U.S., 872 in Europe, 651 in Asia, and 267 in the rest of the world.  Less than 10% are installed under an operating lease.

14.     Intuitive sells the da Vinci robot system directly in the United States, Japan, South Korea, India, Taiwan, and most of Europe.  In other countries, Intuitive sells the da Vinci robot system through exclusive distributorships with independent

5

third parties. Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

15.     In its latest annual report, Intuitive estimated that surgeons using the da Vinci robot system completed approximately 1,037,000 surgical procedures of various types in hospitals throughout the world during the year ended December 31, 2018.

## SURGICAL ROBOT MARKET

16.     Intuitive has monopoly power in the worldwide market for the sale of surgical robots. Intuitive is able to exclude competition and maintain prices for the da Vinci robot system at supracompetitive levels.

17.     There is a relevant product market or submarket for surgical robots. Surgical robots have no practical substitute. Even though robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery, hospitals are expected to offer robotic surgery. Moreover, certain procedures, such as prostatectomies, are increasingly performed now by surgeons operating exclusively with surgical robots.

18.     Due to the unique attributes of surgical robots, many hospitals believe that robotic surgery leads to shorter hospital stays and greater patient satisfaction. Many surgeons strongly prefer robotic surgery and require it to work at a given hospital. As a result of perceptions about the reduced pain and scarring and

6

increased safety and effectiveness associated with robotic surgery, many patients insist on robotic surgery and will travel to the closest hospital offering robotic surgery.

19.     There is a very low cross-elasticity of demand between robotic and laparoscopic surgery. The estimated cost per procedure of equipment, instruments, and service is $1,866 for robotic surgery versus less than $1,000 for laparoscopic surgery. (Exhibit 1 (Christopher P. Childers and Melinda Maggard-Gibbons, Research Letter: Estimation of the Acquisition and Operating Costs for Robotic Surgery, 320 Journal of American Medical Association 835, 836 (August 28, 2018)).) In addition, the estimated cost per procedure of acquiring and servicing the surgical robot is an additional $1,701 for robotic surgery. Id. Nevertheless, the estimated procedure volume for robotic surgery increased from 136,000 in 2008 to 877,000 in 2017 for a compounded annual growth rate of 23%. Id.

20.     In response to much higher prices for use of surgical robots, customers are not switching to use of laparoscopic equipment. Id. In fact, they are replacing their laparoscopic equipment with surgical robots at much higher prices. Id. In other words, customers in the surgical robot market strongly prefer surgical robots over laparoscopic surgery and are not sensitive to prices in the laparoscopic equipment market.

7

21.     The industry and the public recognize surgical robots as a separate economic entity.  The financial and healthcare press refer specifically to the market for surgical robots and competition in surgical robots.  There are several professional and trade associations focused on robotic surgery – e.g., the Society for Robotic Surgery and the Clinical Robotic Surgery Association.  Surgical robots have very peculiar characteristics.  Supra at ¶¶ 7-8.  In addition, surgical robots have very distinct prices.  Supra at ¶ 19.  Manufacturers specialize in surgical robots.  Surgeons specialize in robotic surgery.

22.     Orthopedic robots are not part of the surgical robot market.  Orthopedic robots are not a practical substitute for surgical robots.  They are designed for assisting in removal of bone and aligning prosthetics for knee and hip replacement.  They are not indicated for use in minimally invasive soft tissue surgery.

23.     There are significant barriers to entry into the surgical robot market.  The Food and Drug Administration has a rigorous process for clearing any surgical robot for sale in the United States.  The relevant regulatory agencies must also approve any surgical robot for sale in the European Union and elsewhere outside the United States.  Intuitive holds numerous patents blocking development of competing robot systems.  Surgeons already have significant training and extensive experience invested in the da Vinci robot system.  The large hospital systems with significant demand for robot surgery already have a sizable installed base of da Vinci robots.

8

Intuitive secures agreements with customers that they will not purchase any competing robots from other manufacturers.

24.    TransEnterix received clearance from the FDA to market and sell surgical robots on October 13, 2017.  The TransEnterix robot system is sold under the Senhance brand name (image below).  The Senhance Surgical System mounts each of its three arms on a separate patient cart.



25.    TransEnterix is not a direct competitor to Intuitive in surgical robots. The Senhance Surgical System is only intended for use in gynecological surgery, colorectal surgery, cholecystectomy, and inguinal hernia repair.

26.    The Senhance Surgical System is not intended for cardiothoracic surgery, urologic surgery, or most other procedures intended for the da Vinci robot system.  The Senhance Surgical System is not indicated for pediatric use.

27.    Medrobotics received clearance for a natural orifice surgical robot on July 23, 2015.  The Medrobotics natural orifice surgical robot is sold under the Flex brand name.  The Flex Robotic System has a single flexible robotic scope with a camera for insertion in natural body orifices (image below).  The robot can only operate instruments introduced through the tube inserted into the natural body orifice.



28.    Medrobotics is not a direct competitor to Intuitive in surgical robots. Due to its design limitations, it is only indicated for a limited range of procedures. It is not indicated for pediatric use

29.    Intuitive has a 98% to 99% market share in the worldwide and surgical robot markets with or without TransEnterix and Medrobotics.  They are the only three manufacturers of commercially available surgical robots.  Intuitive shipped 926 da Vinci surgical robots worldwide, including 581 domestically, in calendar year 2018.  TransEnterix shipped 15 Senhance surgical robots worldwide, including

10

3 domestically, in calendar year 2018.  Upon information and belief, Medrobotics shipped less than 10 Flex natural orifice surgical robots worldwide, in calendar year 2018.

30.    As a result of its monopoly power in surgical robots, Intuitive is able to, and does, charge supracompetitive prices for its da Vinci robots.  For example, the da Vinci robot typically costs at least 50% more than the published price for the Flex surgical robot of $980,000.

31.    Intuitive is able to charge very high prices relative to costs, which is also indicative of supracompetitive prices and market power.  For calendar year 2018, Intuitive had an overall gross margin on product sales of more than 70%. (Intuitive 2018 Form 10-K at 48.)  The gross margin is likely higher for sales directly to end users.  By comparison, TransEnterix had a gross margin on sales of 32.9%. (TransEnterix 2018 Form 10-K at 48.)  Medrobotics is a private company and does not disclose financial performance.

32.    For calendar year 2018, Intuitive had a net margin of 32.2%.  (Intuitive 2018 Form 10-K at 48.)   By comparison, General Electric, which is a major manufacturer of medical imaging equipment, had a net margin for its healthcare segment operations of 18.7%.  (General Electric 2018 Form 10-K at 28.)  Johnson & Johnson had a net margin for its medical devices segment of 16.3%.  (Johnson & Johnson 2018 Form 10-K at 26.)

11

## AFTERMARKETS: PARTS, SERVICE, AND INSTRUMENTS

33.    Intuitive has also used its monopoly power in the primary market for surgical robots to acquire and maintain monopoly power in the aftermarkets for da Vinci robot parts, da Vinci robot service, and EndoWrist instrument repairs and replacement.

34.    There is a relevant aftermarket for worldwide sale of the cluster of da Vinci robot parts that are specially designed and built for the da Vinci robot system, including the robot arm assemblies, master tool manipulators (MTMs), printed circuit boards (PCBs), and other components (collectively "da Vinci robot parts"). They are unique.  There are no substitutes for da Vinci robot parts.  Intuitive sells da Vinci robot parts to customers around the world.  There may be a relevant submarket for the domestic sale of da Vinci robot parts.

35.    There is a relevant aftermarket for the service of da Vinci robots worldwide.  The da Vinci robot system is very technical and expensive.  Service requires specialized training and experience.  There are da Vinci robot systems installed throughout the world.  Intuitive and Restore specialize in da Vinci robot service to customers inside and outside the United States.  There may be a relevant submarket for the service of da Vinci robots in the United States.

36.    There is a relevant aftermarket for the repair and replacement of EndoWrist instruments worldwide.  There are no substitutes for EndoWrist

12

instruments. They are specially designed and built for the da Vinci robot system. There are da Vinci robot systems installed throughout the world. Intuitive and Restore provide EndoWrist instrument repair or replacement to customers inside and outside the United States. There may be a relevant submarket for the repair and replacement of EndoWrist instruments in the United States.

37. The da Vinci robot parts aftermarket, da Vinci robot service aftermarket, and EndoWrist instrument aftermarket are separate from the surgical robot market. Since Intuitive had and has monopoly power in the surgical robot market, Intuitive has not been, and is not, prevented from acting anticompetitively in the aftermarkets. Since Intuitive had and has monopoly power in the da Vinci robot part market, Intuitive has not been, and is not, prevented from acting anticompetitively in the robot service aftermarket.

38. In addition, Intuitive has an installed base of more than 3,000 da Vinci robot systems acquired by customers when Intuitive was the only manufacturer in the surgical robot market. Those customers face significant switching costs. Surgical robot systems have an average sales price of more than $1.5 million.

39. Even now, customers are unable to calculate lifecycle costs at the time of purchase because they have little or no information for projecting the costs of robot parts and service or instruments. Assuming that the customer has a service agreement at a flat rate, it is still very difficult to project costs on a per use or life

13

cycle basis. In order to forecast the cost per use, the customer must know how often the robot will be used. In order to project the cost over the lifecycle, the customer must know how often the instruments will be used and replaced. Yet the customer typically cannot forecast demand for a surgical robot. Surgeons may have varying degrees of adaption to a surgical robot at a new location or for a new procedure. Competing hospitals may or may not acquire their own robots. The FDA may or may not add new indications for use of the robot system.

40. The costs for instruments are also unpredictable. The customer cannot predict the timing for replacing instruments: Intuitive has complete control over the usage limits on the EndoWrist instruments and has changed the usage limits unilaterally without notice. As the sole manufacturer of EndoWrist instruments, Intuitive also has complete control over the prices for new EndoWrist instruments.

41. If the customer is paying for service on the basis of parts and time after the expiration of the service agreement, the customer also faces unpredictable repair costs. The need for repairs on the robot system is unpredictable. So is the price. Intuitive is the only manufacturer of the da Vinci robot parts. Intuitive does not publish the prices for da Vinci robot parts. There has never been a competitive market with multiple vendors offering competitive prices on the parts or the service. Intuitive also retains control of the decision to repair or replace a part. For example,

14

a customer may face an unexpected cost of more than $100,000 to replace a da Vinci robot arm.

## DA VINCI ROBOT PARTS AFTERMARKET

42.     Intuitive has monopoly power in the worldwide aftermarket for da Vinci robot parts.  Intuitive is able to exclude competition and maintain prices for da Vinci robot parts at supracompetitive levels.

43.     There are significant barriers to entry into the aftermarket for the da Vinci robot parts.  Due to patent protection and development costs, they are not available through other commercial sources.  In addition, the da Vinci robot system requires an Intuitive product serial number for the replacement part in order to restart the robot system.  Intuitive also excludes competition in the sale of the da Vinci robot parts by requiring customers to purchase a parts and service plan from Intuitive with the purchase of the robot.

44.     At this time, Intuitive is the only manufacturer of da Vinci robot parts and has a 100% market share in the sale of da Vinci robot parts.  For calendar year 2018, Intuitive had an overall gross margin on product sales of more than 70%.  Upon information and belief, Intuitive has gross margins in excess of 90% for da Vinci robot parts.

## DA VINCI ROBOT SERVICE AFTERMARKET

45.     Intuitive has monopoly power in the worldwide aftermarket for service of da Vinci robot systems.  Intuitive is able to exclude competition and maintain prices for da Vinci robot service at supracompetitive levels.

46.     For the calendar year 2018, Intuitive reported $635.1 million in revenue and $421.2 million in gross profit for robot services.  Intuitive had an operating margin of 66.3% on robot services.

47.     Restore began to offer service contracts for the da Vinci robot system in 2018.  Restore is the only known competitor to Intuitive in da Vinci robot service domestically or worldwide. Restore typically offers service at effective rates of less than 50% of the effective rates offered by Intuitive.

48.     There are significant barriers to entry into da Vinci robot service.  Given the technical requirements and safety concerns, customers expect and require that the service provider have training, experience, and certification in servicing the da Vinci robot system.  Restore specializes exclusively in the da Vinci robot and only uses da Vinci certified field service engineers with prior training and experience at Intuitive on servicing the da Vinci robot system.  Given the significant capital investment and the critical patient needs, customers require that the service provider have the dedicated capacity to service the machine within a short time frame. Restore has the capacity to service da Vinci robots worldwide.

49.     Intuitive is able to impose additional barriers to entry into the market and maintain its monopoly power, *i.e.*, its ability to raise prices and exclude competition, through various types of exclusionary and predatory conduct: foreclosing access to the market by entering service contracts of five years or more at the time of purchase or lease of a da Vinci robot system, tying da Vinci robot service to da Vinci robot parts, denying access to the essential distributor's toolkit.

50.     For example, Intuitive forces customers to enter long-term service contracts of five years or more to get access to the da Vinci robot system.  Intuitive thereby locks in most of the installed base and forecloses competitors from most of the da Vinci robot service market.  More than 60% of the installed base (3,070) has been shipped in the last five years.

51.     The vast majority of Da Vinci robot systems are sold, rather than leased, to the customer.  The sales agreements require a service contract at the time of purchase.  The standard sales agreement includes a five-year period of service.  The first year of service is free under the product warranty, and the remaining four years are at a stated service price typically in the range of $100,000 to $200,000 per year.

52.     As of December 31, 2018, a total of 350 da Vinci robot systems – or less than 10% of the installed base – had been installed under a lease agreement. (Intuitive 2018 Form 10-K at 41.)  On a lease of the robot system, the customer is responsible for insuring the robot system and for paying the cost of repairs on the

return of the robot system at the termination of the lease. If the customer leases the robot system, Intuitive also requires a service contract at the time of leasing, again typically in the range of $100,000 to $200,000 per year after the free warranty in the first year, for the term of the lease, which is typically four to seven years.

53.    Intuitive also secures long-term contracts for service of two years or more with existing customers rolling off their original service agreement. Intuitive has more than 90% of the installed base locked into long-term service agreements that were executed before Restore began to offer da Vinci robot service in 2018. Intuitive reports that "substantially all" of the installed base has contracts for da Vinci robot service with Intuitive. (Intuitive 2018 Form 10-K at 18.) Intuitive thereby forecloses competitors from access to "substantially all" of the da Vinci robot service market.

54.    Intuitive also forces customers to purchase da Vinci robot service from Intuitive to get access to da Vinci robot parts. Intuitive only sells da Vinci robot parts directly to customers. When Intuitive has learned that a hospital system was using Restore for robot service, Intuitive has informed the customer that its hospitals would not be able to purchase da Vinci robot parts for any service performed by Restore.

55.    In addition, Intuitive denies access to customers and third parties to the distributor's toolkit. Intuitive provides a distributors toolkit on an exclusive basis to

its independent third-party distributors for use in their designated territories with all necessary documentation, software, and passwords to service da Vinci robot systems. Intuitive has exclusive control of the distributor's toolkit and limits each distributor to using the toolkit in its exclusive territory. Intuitive denies access to the toolkit on any terms to any other third party, including potential competitors in robot service.

56.     It is essential to competition in da Vinci robot service that independent service operators ("ISOs") have access to the toolkit to provide complete da Vinci robot service. For example, ISOs need the documentation to know the meaning of the error codes appearing on the da Vinci robot system to perform repairs on the system. The error codes are a number system without any description or explanation.

57.     The error codes cannot be practically duplicated. It is often impossible to identify a system error without knowing the meaning of the error code.

58.     In addition, the service software is necessary to test the robot arms during preventative maintenance. The service software is necessary to input the Intuitive serial number after replacing any da Vinci robot part. The service software is necessary to remove the reminder message after performing preventative maintenance or repairing the robot system.

59.     The service software cannot be practically duplicated by a customer or ISO. The source code is encrypted and hidden from users. The service software is

19

based on the da Vinci robot system design and specifications, which are not available to third parties.

60.     Quality control is not a valid business justification for excluding third parties from servicing da Vinci robots.  Intuitive provides the distributors toolkit to third parties already.  Moreover, Restore uses former Intuitive personnel, *i.e.*, da Vinci certified field service engineers with prior training and experience at Intuitive in servicing da Vinci robot systems, to provide da Vinci robot service.

61.     As a result of the exclusionary conduct, Intuitive, directly and indirectly through its exclusive distributors, has maintained a market share in da Vinci robot service of more than 99% worldwide and domestically for nearly 20 years.  Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

62.     At this time, Restore is the only known competitor to Intuitive and its exclusive distributors for da Vinci robot service.  Restore has less than $1 million in annual revenue in da Vinci robot services.

63.     Intuitive has acted with the clear intent to exclude competitors and impair competition in da Vinci robot service.  On or about February 12, 2019, Intuitive sent a letter to Restore demanding that Restore "immediately cease and desist" from "contacting Intuitive's customers to offer services related to Intuitive's products."

20

64.    As a result of the exclusionary conduct, Intuitive and its exclusive distributors are able to charge supracompetitive prices for da Vinci robot service. Intuitive charges roughly double the rates offered by ISOs for the same services.

65.    Intuitive does not make up the difference to customers on supracompetitive prices for robot service by charging subcompetitive prices on its surgical robots, its robot parts, or its instrument replacements. Intuitive has monopoly power in the primary market and the aftermarkets and is able to charge supracompetitive prices across all markets. Intuitive charges prices relative to costs for the products and services in its line of medical devices at least 20% higher than other major manufacturers of medical devices like General Electric and Johnson & Johnson. Supra at ¶ 32.

## ENDOWRIST INSTRUMENT AFTERMARKET

66.    Intuitive has monopoly power in the worldwide aftermarket for the repair and replacement of EndoWrist instruments. The EndoWrist instruments are necessary to perform surgery with the da Vinci robot system and are only available from Intuitive. Intuitive is able to exclude competition and maintain prices for the repair and replacement of EndoWrist instruments at supracompetitive levels.

67.    For the calendar year 2018, Intuitive reported $1,962.0 million in revenue for instruments and accessories. For calendar year 2018, Intuitive had an overall gross margin on product sales of more than 70%.

21

68.     The FDA permits servicing of approved medical devices by third parties.  The ISO repairs instruments to meet their original intended use.  Third-party service does not affect the safety and effectiveness of the instrument or affect the indications for use.  The instrument is maintained at, or returned to, its original safety and effectiveness.   After undergoing third-party service, EndoWrist instruments have passed ISO simulated life testing to fifty or more additional uses.

69.     Restore began to offer repair services for EndoWrist instruments in 2018.   The customer is able to purchase repair services instead of instrument replacement.   Restore offers repair rates that are at least 25% on average below replacement rates offered by Intuitive.   But for the anticompetitive conduct of Intuitive, Restore would be able to offer even lower repair rates and offer repair services on many more EndoWrist instruments.

70.     There are significant barriers to entry into the repair and replacement of EndoWrist instruments.  In order to work with the Da Vinci robot system, the instrument must have a serial number from Intuitive.   Intuitive holds numerous patents blocking development of competing instruments for use on the da Vinci robot system.  The Food and Drug Administration has a rigorous process for clearing any surgical robot instruments for sale in the United States.  The relevant regulatory agencies must also approve any surgical robot instruments for sale in the European Union and elsewhere outside the United States.  At this time, Intuitive has a 99%

market share in the aftermarket for repair and replacement of EndoWrist instruments.

71.    Intuitive is able to impose additional barriers to entry into the market and maintain its monopoly power, *i.e.*, its ability to raise prices and exclude competition, through various types of exclusionary and predatory conduct: tying EndoWrist instrument replacement to acquisition of the da Vinci robot system, denying access to the essential EndoWrist instrument usage counter, and tying EndoWrist instrument replacement to da Vinci robot service.

72.    Intuitive forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get the da Vinci robot system.  The standard sales and lease contracts provide that the customer "purchases" any instruments for use with the robot system.  Nevertheless, the standard contract requires that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog.  In addition, the standard contract requires that Intuitive must approve any repairs or service during or after that usage limit.

73.    Intuitive enforces these contractual requirements with a usage counter. Intuitive installs a programmed memory chip inside each EndoWrist instrument to prevent the instrument from being used for more than a certain number of procedures regardless of whether the instrument is maintained at, or returned to, its original

23

safety and effectiveness through service. Intuitive has exclusive control over the usage counter and denies access to it: the memory chip is programmed to delete all information on the circuit board necessary for the instrument to operate with the robot system immediately after reaching the usage limit. Intuitive has designed the memory chip to deny access by third parties (including customers and ISOs) to reset the usage counter to zero for additional uses. It is essential to competition in the EndoWrist instrument aftermarket that ISOs have the ability to reset the usage counter after servicing the instrument.

74. The usage counter cannot be practically duplicated on the EndoWrist instruments at this time for use on most of the installed base of da Vinci robot systems. Restore has been unable so far to develop or obtain technology to reset the usage count during repair service of EndoWrist instruments for the da Vinci X and Xi robot systems.

75. In addition, the usage counter cannot be economically duplicated for the remainder of the installed base of da Vinci robot systems. Restore must pay a sizable license fee for technology to reset the usage counter on EndoWrist instruments for the da Vinci Si robot systems. As a result, Restore must charge an additional 20% or more for repair services. Furthermore, the customer faces higher cost per use on the purchase of the original instrument: the customer must obtain the

instrument repair service before exercising the last available use, which would trigger the self-destruct mechanism.

76.     Intuitive has designed the usage counter to extract consumer surplus, i.e., monopoly profits, from its customers.  Instead of simply buying the instruments, the customer is forced to pay a usage fee.  Intuitive is charging a price that is independent of, and far in excess of, the cost. When Intuitive has doubled the maximum number of uses on certain instruments, Intuitive has simply doubled the price of those instruments.

77.     The usage limits are not based on any regulatory requirements from the FDA.  Intuitive's standard contracts and instrument catalogs do not refer to any regulatory requirements imposing the usage limits.  (See, e.g., Exhibits 2 and 3.)

78.     In addition, the usage limits do not appear to be based on any scientific determination of the useful life of the instruments. There does not appear to be any clinical data in the public domain to support the limits on usage for the EndoWrist instruments.  (Ex. 1 at 836.)  There are no usage limits on the reusable instruments for the Senhance or Flex robot systems.

79.     In fact, Intuitive's original premarket notifications to the FDA for the EndoWrist instruments were based on preexisting endoscopic instruments with unlimited uses.  In order to get clearance to market the EndoWrist instruments for use in the United States, Intuitive was required to show that the instruments were

"substantially equivalent" to predicate devices already on the market from other manufacturers of surgical instruments. The predicate devices – forceps, graspers, retractors, shears, etc. – did not have limits on the number of uses.

80.    Intuitive's own instrument catalogs demonstrate that the useful lives of the instruments are much longer than their usage limits. Intuitive offers the exact same instruments (with the exact same materials and specifications) labeled for training. (Ex. 2 at 13. Ex. 3 at 31-32.) Yet Intuitive sets much longer usage limits for the training instruments. (Compare Ex. 2 at 13 with Ex. 2 at 15. Compare Ex. 3 at 31-32 with Ex. 3 at 34-36.) The industry does not distinguish between an instrument sold for clinical use and the same instrument sold for training use. Training instruments, like instruments for clinical use, must retain their functionality for the surgeon during use. The only difference is the generation of revenue for the hospital on a surgical procedure for an instrument in clinical use, which allows Intuitive to set a much lower usage limit and higher price in order to generate a much higher usage fee for the instruments in clinical use.

81.    Plaintiffs cannot find any of the usage limits for the reusable EndoWrist instruments from the da Vinci Si and S instrument catalog (10, 12, 15, 18, 20, or 30 uses or 100 closures) or the da Vinci Xi and X instrument catalog (10 or 15 uses or 100 closures) in any premarket notification 510(k) summary available in the FDA database. (Ex. 3 at 34-36. Ex. 2 at 15.) Moreover, Plaintiffs cannot identify any

26

prohibition in the 510(k) summaries against service of the instruments to extend the useful life of the instruments or against the reset of the usage count after service of the instrument.

82. None of the 510(k) summaries refer to any tests showing that the instruments begin to lose their functionality at the usage limit. Nor do they refer to any tests showing that instrument service cannot maintain the safety and effectiveness of the instrument for additional uses.

83. Notably, Intuitive has apparently not filed any premarket notification for the da Vinci S (also known as IS2000) or the da Vinci Si (also known as IS3000) specifying limits on uses of instruments or endoscopes or any testing in support of such limits in the 510(k) summary.

84. Instead, Intuitive has filed premarket notification for the later da Vinci Xi model (also known as IS4000) to have every instrument limited to 5 uses based on some of those instruments being tested and retaining useful life for 8 uses. (Ex. 4 at 7.) Yet the da Vinci Xi instruments are not actually limited to 5 uses: the usage counters are set to the 10 or 15 uses or 100 closures published in the instrument catalogs. (Ex. 2 at 15.) At the same time, Intuitive has filed premarket notification for the da Vinci Xi to have the endoscope without any limits on uses based on the endoscope being tested and retaining useful life for 9 uses. (Ex. 5 at 4.)

85.     Intuitive also forces customers to purchase EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get da Vinci robot service.  The standard contract removes the obligation of Intuitive to provide robot service under the terms of the service plan if any third parties repair the instruments.  In addition, any third-party service on the EndoWrist instruments voids Intuitive's one-year warranty on the entire da Vinci robot system.

86.     As a result of the exclusionary conduct, Intuitive, directly and indirectly through its exclusive distributors, has maintained a market share in repair and replacement of EndoWrist instruments of more than 99% worldwide and domestically for nearly 20 years.  Roughly 90% of the installed base is located in countries sold and serviced directly by Intuitive.

87.     Intuitive has acted with the clear intent to exclude competitors and impair competition in the repair and replacement of EndoWrist instruments.  On or about February 12, 2019, Intuitive sent a letter to Restore demanding that Restore "immediately cease and desist" from resetting the usage counter after completing servicing an EndoWrist instrument or "contacting Intuitive's customers to offer services related to Intuitive's products."

88.     As a result of the exclusionary conduct, Intuitive and its exclusive distributors are able to charge supracompetitive prices for repair and replacement of EndoWrist instruments.  Intuitive is able to charge approximately 30% higher prices

on average for EndoWrist instrument replacement compared with EndoWrist instrument repairs by ISOs.

89.     Intuitive does not make up the difference to customers on supracompetitive prices for instrument replacement by charging subcompetitive prices on its surgical robots, its robot parts, or its robot service. Intuitive has monopoly power in the primary market and the aftermarkets and is able to charge supracompetitive prices across all markets. Intuitive charges prices relative to costs at least 20% more for the products and services in its line of medical devices than other major manufacturers of medical devices like General Electric and Johnson & Johnson. Supra at ¶ 32.

## COUNT ONE – MONOPOLIZATION
## (DA VINCI ROBOT SERVICE)

90.     The foregoing allegations are expressly incorporated.

91.     Intuitive has willfully acquired and maintained monopoly power in the worldwide and domestic markets for da Vinci robot service in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

92.     As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT TWO – ATTEMPTED MONOPOLIZATION

## (DA VINCI ROBOT SERVICE)

93.     The foregoing allegations are expressly incorporated.

94.     Intuitive has attempted to monopolize the worldwide and domestic markets for da Vinci robot service in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Intuitive has the specific intent to monopolize the worldwide and domestic markets for da Vinci robot service by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

95.     As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT THREE – TYING

## (DA VINCI ROBOT SERVICE)

96.     The foregoing allegations are expressly incorporated.

97.     Intuitive has tied da Vinci robot service to its surgical robots and robot parts, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Intuitive has forced customers to purchase da Vinci robot service to get the da Vinci surgical robot and da Vinci robot parts.  Intuitive has sufficient economic power in the worldwide and domestic surgical robot markets and the worldwide da Vinci robot parts market

to coerce customer acceptance of da Vinci robot service. The tying arrangements have had anticompetitive effects in the worldwide and domestic da Vinci robot service markets, which involves a not insubstantial amount of interstate commerce.

98.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT FOUR – EXCLUSIVE DEALING
## (DA VINCI ROBOT SERVICE)

99.    The foregoing allegations are expressly incorporated.

100.    Intuitive has entered agreements with its customers to provide da Vinci robot service on an exclusive basis that have foreclosed competition in substantially all of the worldwide and domestic markets for da Vinci robot service and have resulted in higher prices and lower service in da Vinci robot service, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

101.    As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

31

## COUNT FIVE – MONOPOLIZATION

## (ENDOWRIST INSTRUMENT AFTERMARKET)

102.   The foregoing allegations are expressly incorporated.

103.   Intuitive has willfully acquired and maintained monopoly power in the worldwide and domestic markets for EndoWrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

104.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT SIX – ATTEMPTED MONOPOLIZATION

## (ENDOWRIST INSTRUMENT AFTERMARKET)

105.   The foregoing allegations are expressly incorporated.

106.   Intuitive has attempted to monopolize the worldwide and domestic markets for EndoWrist instrument repair and replacement in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Intuitive has the specific intent to monopolize the worldwide and domestic markets for EndoWrist instrument repair and replacement by engaging in predatory conduct, has engaged in such conduct, and has a dangerous probability of success in achieving monopoly power.

107.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT SEVEN – TYING

## (ENDOWRIST INSTRUMENT AFTERMARKET)

108.   The foregoing allegations are expressly incorporated.

109.   Intuitive has tied EndoWrist instrument replacement to its surgical robots and robot service, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Intuitive has forced customers to purchase EndoWrist instrument replacements to get the da Vinci surgical robot and da Vinci robot service.  Intuitive has sufficient economic power in the worldwide and domestic surgical robot markets and the worldwide and domestic da Vinci robot service markets to coerce customer acceptance of EndoWrist instrument replacement.  The tying arrangements have had anticompetitive effects in the worldwide and domestic aftermarkets for EndoWrist repair and replacement, which involves a not insubstantial amount of interstate commerce.

110.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## COUNT EIGHT – EXCLUSIVE DEALING

## (ENDOWRIST INSTRUMENT AFTERMARKET)

111.   The foregoing allegations are expressly incorporated.

112.   Intuitive has entered agreements with its customers to provide EndoWrist instrument repair and replacement on an exclusive basis that have foreclosed competition in substantially all of the worldwide and domestic aftermarkets for repair and replacement of EndoWrist instruments and have resulted in higher prices and lower service in the worldwide and domestic EndoWrist repair and replacement aftermarkets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

113.   As a direct and proximate result of the foregoing conduct, Restore has been injured in its business and property, including the loss of profits in the market and damage to its reputation and goodwill.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask that this Court:

(a)   conduct a jury trial of all claims and issues as to which there is a right to jury trial;

(b)   enter judgment awarding damages to Plaintiffs in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15

U.S.C. § 15(a), on its federal antitrust claims;

(c)     award Plaintiffs the cost of this suit, including a reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, on its federal antitrust claims;

(d)     enter injunctive relief in favor of Plaintiffs to prevent the threat of loss or injury by violation of the antitrust laws as provided in Section 16 of the Clayton Act, 15 U.S.C. § 26; and

(e)     order such other and further relief as this Court deems proper and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

Respectfully submitted on May 13, 2019.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800 Telephone
(678) 868-2021 Fax
jeff@berhold.com

**COUNSEL FOR PLAINTIFFS**

*Admitted Pro Hac Vice

35

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.