# Exhibit C

# Dkt 18 (Restore's Opp. to Motion to Dismiss) in the *Restore* case

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

RESTORE ROBOTICS LLC and
RESTORE ROBOTICS REPAIR LLC,

                            Plaintiffs,

            v.

INTUITIVE SURGICAL, INC.,

                            Defendant.

Civil Case No. 5:19-cv-00055-MCR-MJF

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Jeffrey L. Berhold
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, N.E., Suite 1050
Atlanta, Georgia 30309

William G. Harrison
HARRISON RIVARD DUNCAN & BUZZETT
101 Harrison Avenue
Panama City, FL 32401

**COUNSEL FOR PLAINTIFFS**

June 10, 2019

Plaintiffs Restore Robotics LLC and Restore Robotics Repair LLC (collectively "Restore") hereby respond in opposition to the motion to dismiss the First Amended Complaint. Defendant Intuitive Surgical, Inc. ("Intuitive") has a virtually 100% share of surgical robots installed in hospitals worldwide. Restore is an independent service organization (ISO) attempting to compete with Intuitive in the aftermarkets for robot service and instrument service. Restore alleges that Intuitive has used its monopolies in surgical robots and robot parts to monopolize and restrain trade in robot service and instrument service.

Intuitive moves to dismiss the First Amended Complaint under Fed. R. Civ. Proc. 12(b)(6). This Court has set out the Rule 12(b)(6) inquiry in an antitrust case:

> In considering a Rule 12(b)(6) motion, the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). The motion is properly denied if the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). . . . As to the well-pleaded factual allegations, the court will "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Eleventh Circuit has explained that "[p]lausibility is the key, as the well-pled allegations must nudge the claim across the line from conceivable to plausible." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332 (11th Cir. 2010). The court has also cautioned, however, that "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." *Spanish Broadcasting Sys. of Fla., Inc. v. Clear Channel Comm's, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004). The Supreme Court was careful to note in *Twombly* that "we do not require heightened fact pleading of specifics," but that it is necessary to present "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

1

*Offshore Tugs Corp. v. St. Andrew Bay Pilots Ass'n, LLC*, No. 3:12CV252-MCR/EMT, 2012 WL 13032942, at *1 (N.D. Fla. Aug. 31, 2012) (Rodgers, C.J.).

## Facts

Intuitive manufactures and sells the da Vinci brand of surgical robots. Intuitive sells roughly 99% of all surgical robots worldwide. [14] ¶ 9. The robots have an average price of more than $1.5 million. [14] ¶ 12. Intuitive is also the sole manufacturer of da Vinci robot parts and EndoWrist instruments for its robots. [14] ¶¶ 40, 41.

There is a separate product market or submarket for surgical robots. [14] ¶¶ 16-21. Customers do not choose to buy a surgical robot over other surgical equipment based on price. [14] ¶ 19-20. The effective cost per procedure for surgical robots is more than 350% of the effective cost per procedure for laparoscopic equipment. [14] ¶ 19. Yet hospitals are buying and using surgical robots at a compounded annual growth rate of 23%. Id.

Intuitive imposes various restrictions on competition in the aftermarket for da Vinci robot service. [14] ¶¶ 49-59. Intuitive is the sole manufacturer of da Vinci robot parts and tells customers that their ability to purchase da Vinci robot parts is conditioned on the purchase of da Vinci robot service from Intuitive. [14] ¶ 54. Intuitive also includes long-term service contracts of four years or more at prices of $100,000 to $200,000 per year in its sales and leasing agreements and renews customers for service contracts of two years or more at the expiration of the initial

2

Case 5:19-cv-00055-TKW-MJF   Document 118   Filed 06/10/19   Page 4 of 89

service term.  [14] ¶¶ 51-52.  Intuitive reports that "substantially all" of the installed base has service contracts with Intuitive.  [14] ¶ 53.  Intuitive also prevents independent service organizations from competing effectively in da Vinci robot service by denying access to its distributor's toolkit, which has certain documentation, software, and passcodes necessary to perform complete robot service.  [14] ¶¶ 55-60.

In addition, Intuitive imposes various restrictions on competition in the aftermarket for the service or replacement of the robot instruments.  [14] ¶¶ 71-85. The da Vinci robots use proprietary instruments manufactured by Intuitive under the brand name EndoWrist.  [14] ¶ 10.  Unlike instruments for other surgical robots, EndoWrist instruments are not fully reusable.  [14] ¶¶ 72, 78.  The standard sales and leasing agreement requires that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog.  [14] ¶ 72.  Intuitive enforces these contractual requirements with a usage counter.  Id.  Intuitive installs a programmed memory chip inside each EndoWrist instrument to prevent the instrument from being used for more than a certain number of procedures.  [14] ¶ 73.  Intuitive has designed the memory chip to deny access by third parties (including customers and ISOs) to reset the usage counter to zero for additional uses after service.  Id.  The customer must purchase a replacement from Intuitive instead.  See [14] ¶ 69.

In sum, the complaint alleges that Intuitive has used its monopoly in the surgical robot market to create, maintain, and extend its monopolies in the aftermarket for da Vinci robot service and the aftermarket for EndoWrist service and replacement. In the face of the campaign of anticompetitive conduct, Restore is unable to compete effectively against Intuitive in providing robot service or instrument service. By excluding competition, Intuitive has a vertically-integrated monopoly and charges monopolistic prices across the board for its surgical robots and the service and instruments. [14] ¶¶ 65, 89. Intuitive has overall net margins for products and services that are double those of its peers. [14] ¶ 32.

## Argument

In its motion to dismiss, Intuitive argues that it is not required to provide access to the distributor's toolkit or usage counter and that it is not plausible that Restore has suffered any injury arising out of any other conduct alleged in the complaint that may violate the antitrust laws. Intuitive further argues that Restore has not adequately pled facts that plausibly give rise to an aftermarket for da Vinci robot service or an aftermarket for EndoWrist instrument service and replacement. Finally, Intuitive argues that Restore has not adequately alleged facts that plausibly give rise to anticompetitive conduct in those aftermarkets.

# I.    Antitrust Injury

Restore has brought tying claims and exclusive dealing claims under Section 1 of the Sherman Act.  In addition, Restore has brought monopolization claims under Section 2 based on the anticompetitive conduct as a whole – the tying arrangements and exclusive dealing, along with the denial of access to the distributor's toolkit for robot service and the usage counter for instrument service under the essential facilities doctrine.  Intuitive does not dispute that Restore would have antitrust injury from tying and exclusive dealing.  Instead, Intuitive argues that Restore is not entitled to access to the distributor's toolkit or the usage counter under the antitrust laws and any injury here is solely and conclusively attributable at the pleading stage to those allegations rather than the allegations of tying or exclusive dealing.  [16] at 12-16.  In addition, Intuitive argues that the FDA regulatory framework is the cause of any inability of Restore to provide instrument service.  [16] at 16-18.

"Antitrust injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).  For example, a tying claim alleges antitrust injury to a competitor in the tied market.  *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010).  The competitor is prevented from competing in the

5

market for the tied products.  Id.  "As a result, there is less competition for the tied

products, which means higher prices and fewer choices for consumers. This is

precisely the type of harm that we allow plaintiffs to vindicate through the antitrust

laws." Id. Similarly, claims of exclusive dealing, such as exclusive territories, allege

antitrust injury to competitors prevented from competing for those customers. *Mun.*

*Utilities Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1500 (11th Cir.

1991).

### A.     Refusal to Deal

Intuitive does not dispute that tying arrangements or exclusive dealing

plausibly lead to antitrust injury.  [16] at 12-16.  Instead, Intuitive argues that any

anticompetitive harm here is solely attributable to the allegations that Intuitive

denies access to the distributor's toolkit for robot service and denies access to the

usage counter for instrument service.  From its point of view, such factual

allegations, whether proven true or not in discovery, rule out any other cause of

anticompetitive harm in this case.  Furthermore, Intuitive argues that it has never

provided Restore with access to the distributor's toolkit or the usage counter and that

a unilateral refusal to deal is never actionable under Section 2 without an allegation

of a prior course of dealing between the parties.

## 1. Several Viable Theories of Liability for Refusal to Deal

Intuitive is simply wrong about the effect of the factual allegations regarding the distributor's toolkit and the usage counter on antitrust injury. First, Intuitive is not entitled to refuse to deal with Restore under any circumstances. "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim **under *Aspen***." *Covad Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) (emphasis added). Yet *Aspen* is not the only theory of liability for refusing to deal under Section 2. There are a "*few* existing exceptions from the proposition that there is no duty to aid competitors." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) (emphasis added).

The basic question is whether allegations of a refusal to deal "fit within existing exceptions or provide a basis, under traditional antitrust principles, for recognizing a new one." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1265 (11th Cir. 2015). The refusals to deal here give rise to Section 2 liability under at least two other existing exceptions: the essential facilities doctrine and *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973). There is no requirement of a prior course of dealing for either exception.

The Eleventh Circuit recognizes the essential facilities doctrine as a separate basis for antitrust liability for a monopolist refusing to deal with competitors. *Morris*

*Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004). "Under the essential facility test, a company that has exclusive control over a facility essential to effective competition may not deny potential competitors access to that facility on reasonable terms and conditions if to do so would create or maintain monopoly power in the relevant market." *Morris*, 364 F.3d at 1294.

The Supreme Court did not repudiate the essential facilities doctrine in *Trinko*. 540 U.S. at 411. The Supreme Court simply found that the plaintiff had failed to make a claim under the doctrine because the Telecommunications Act compelled access to the facility in question. *Id.* Since *Trinko*, the Eleventh Circuit has continued to recognize the essential facility doctrine as a separate basis for liability under Section 2. *Covad*, 374 F.3d at 1050 (citing *Trinko*), *Morris*, 364 F.3d at 1294 (citing *Trinko*).

Intuitive leaves off the key part in its quote from *Covad*: "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim **under *Aspen*.**" 374 F.3d at 1049 (emphasis added); *see also* [16] at 13. *Aspen* created liability for a monopolist withdrawing from a joint marketing agreement with its competitor. *Trinko,* 540 U.S. at 408–09. The monopolistic intent was inferred from the refusal to continue a prior, and "thus presumably profitable," course of dealing. 540 U.S. at 409.

The essential facilities doctrine is a separate basis of liability for refusal to deal under Section 2. *Covad*, 374 F.3d at 1049-1050. The monopolist is required to provide access to an essential facility on reasonable terms and conditions to potential competitors. *Morris*, 364 F.3d at 1294. The key is whether there is "indeed unavailability of access" to the essential facility. *Covad*, 374 F.3d at 1050; *see also Trinko*, 540 U.S. at 411 ("the indispensable requirement for invoking the doctrine is the unavailability of access to the essential facilities").

Intuitive does not acknowledge the case law on the essential facilities doctrine. Instead, Intuitive points to a decision of the Second Circuit in In re Elevator Antitrust Litigation, 502 F.3d 47 (2d Cir. 2007). In the Elevator Antitrust Litigation, the plaintiffs did not allege the essential facility doctrine as a basis for their claims under Section 2. Nor did the Second Circuit discuss it. Moreover, the courts in that circuit continue to recognize monopolization claims based on the essential facilities doctrine after *Trinko* and the Elevator Antitrust Litigation. *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 229 (E.D.N.Y. 2009), *The Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 395 (S.D.N.Y. 2007), *The New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 568 (S.D.N.Y. 2004). The essential facilities doctrine remains good law in the Second Circuit. More importantly, the essential facilities doctrine remains good law in the Eleventh Circuit.

Furthermore, the Eleventh Circuit recognizes *Otter Tail* as a separate basis for liability for refusing to deal with competitors under Section 2. *Duty Free*, 797 F.3d at 1268; *see also Trinko,* 540 U.S. at 409. "[I]it is unlawful for a monopolist to . . . extend its monopoly power by intentionally engaging in conduct that unnecessarily excludes competitors and impairs competition." *Morris*, 364 F.3d at 1294. A vertically integrated monopolist may not refuse to deal with a customer to foreclose competition in a second market under *Otter Tail*. *Duty Free*, 797 F.3d at 1268. The monopolistic intent is shown by selectively refusing to deal with customers that compete with the monopolist in the second market. *Trinko*, 540 U.S. at 410 (discussing *Otter Tail*). Consequently, the complaint does not need to allege a prior course of voluntary dealing for liability to plausibly give rise to Section 2 liability for refusing to deal with a competitor under various exceptions.

### 2. Complaint Can Allege Contradictory Theories of Liability

Second, Restore can assert alternative and contradictory theories of liability under the plain language of Fed. R. Civ. Proc. 8(d)(2). *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014), *Lee-Bolton v. Koppers Inc*, No. 1:10CV253-MCR/GRJ, 2017 WL 6206198, at *2 (N.D. Fla. July 25, 2017) (Rodgers, C.J.). The Eleventh Circuit recognizes that a plaintiff may allege several theories of causation under Rule 8(d)(2). *Adinolfe*, 768 F.3d at 1176. Moreover, the res judicata doctrine contemplates that a plaintiff brings all claims arising out of the

"same nucleus of operative fact" in a single action to prevent piecemeal litigation. *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1291 (11th Cir. 2004). In each of the aftermarkets here, discovery may show that Intuitive acquired its monopoly power through tying arrangements, exclusive dealing, denial of access, or some combination of those factors. The evidence may or may not show that the distributor's toolkit or the usage counter are essential, or continue to be essential, to competition in the aftermarkets.

### 3. Theories of Liability Here Are Not Mutually Exclusive

Third, the complaint here does not allege that the causes of monopolization are "mutually exclusive." *Adinolfe*, 768 F.3d at 1176. The essential facilities doctrine merely requires that the facility is "essential to effective competition." *Morris*, 364 F.3d at 1294. Assuming that the denial of access creates harm to competition, the tying arrangements or the exclusive dealing may create separate harm. In fact, Restore does not allege that the denial of access has successfully foreclosed all competition. Restore is currently competing, albeit not effectively, in the aftermarkets. [14] ¶¶ 35, 36. Although Restore may not be able to provide "complete robot service" without the distributor's toolkit, Restore is able to provide robot service. [14] ¶¶ 47, 48, 56. Although Restore may not be able to economically duplicate the usage counter, Restore is able to service the EndoWrist instruments for the da Vinci Si model. [14] ¶ 75. In reality, the complaint alleges that the harm to

11

competition allegedly flows from a broad campaign of anticompetitive conduct in various forms.

In sum, the complaint makes factual allegations that give rise to antitrust liability for refusing to provide access to the distributor's toolkit or the usage counter. Even if the denial of access did not give rise to liability, the complaint can allege alternative and contradictory theories of liability based on tying and exclusive dealing. In any event, the complaint does not allege that the causes of anticompetitive harm are mutually exclusive in this case. For any of those three reasons, the complaint alleges facts that plausibly give rise to antitrust injury.

### B.    Regulation of Instrument Service

Restore alleges that Intuitive has restrained competition in the EndoWrist aftermarket by denying access to the usage counter on the instruments. Restore seeks the ability to reset the usage counter to zero after servicing the instrument to allow the customer to use the serviced instrument for another lifecycle based on the usage limits established by Intuitive. [14] ¶¶ 73-75. For example, the current da Vinci X/Xi instrument catalog sets out 10 uses for the 8 mm tenaculum forceps. [14-2] at 7. Restore wants to reset the usage counter for an additional 10 uses after servicing the instrument. Restore is unable to do so for some models of the da Vinci robot. Intuitive argues that the FDA "regulatory framework" precludes Restore from establishing antitrust injury. [16] at 16-18.

12

1.      **Regulatory Framework**

The FDA allows open competition in the service of medical devices.  Intuitive

cites no scheme of regulation to the contrary.  Instead, Intuitive points to a decision

of the Third Circuit in *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 266

(3d Cir. 1998).  In that case, the state had a comprehensive scheme for the regulation

of competition between electric utilities by the state utility commission – delineating

service boundaries, approving utility rates, and reviewing mergers.  The plaintiff

challenged a merger under the antitrust laws, but one of the merging parties had

never competed in the relevant market and would need to obtain certification from

the state utility commission to enter the market through a contested proceeding.

Since the defendant had never competed in the relevant market and never had a

certificate from the state utility commission to compete within the boundaries of the

relevant market, any injury to the plaintiff did not result from a lessening of

competition.

Of course, the FDA is not a utility commission.  The FDA does not delineate

territories, approve rates, or review mergers.  In fact, the FDA allows open

competition by any third party to perform service on medical devices.  See [14] ¶

68.  The FDA does not certify third-party ISOs.  Restore is not awaiting approval

from the FDA to provide instrument service.  In fact, Restore is already competing

in the EndoWrist aftermarket by servicing instruments for the da Vinci Si model.

[14] ¶ 75.  Restore does not need permission from the FDA to service the robots or the instruments.

### 2.    No Need for Additional Clearance

Intuitive does not need to get clearance from the FDA to allow Restore to have access to the usage counter to reset the counter to zero after service of the instrument. Intuitive itself sets the usage limits on the instruments without clearance from the FDA.  [14] ¶¶ 81, 83-84.  In addition, Restore is currently providing service on instruments for the da Vinci Si model for additional cycles of use without clearance from the FDA based on the usage limits established by Intuitive.  [14] ¶ 75.  Restore has verified that the instruments are safe and effective for an additional cycle of use after service.  [14] ¶ 68.  To the extent that Restore is able, or may be able, to reset the counter on instruments without access from Intuitive, there is no longer an argument that antitrust injury in the market is possibly precluded by the need for Intuitive to obtain clearance from the FDA.  Restore is being injured by the tying arrangements and exclusive dealing.  [14] ¶¶ 72, 85.  For that reason alone, the instrument aftermarket claims should proceed to discovery.   Supra at 10-12 (discussing inconsistent and overlapping theories of liability).

Nevertheless, Intuitive argues that it would need to seek and receive clearance from the FDA to manufacture its instruments to allow for an additional cycle of use after service.  Intuitive does not refer to any regulatory requirements in its contracts

and catalogs imposing usage limits. [14] ¶ 77. In fact, the FDA does not require Intuitive to manufacture its instruments with limits on use. The FDA has cleared, rather than approved, the EndoWrist instruments. [14] ¶ 10. Clearance is "by no means comparable" with approval. *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1317 (11th Cir. 2017). The clearance process "is focused on equivalence." *Id.*

The EndoWrist instruments have never been "formally reviewed . . . for safety or efficacy" in the clearance process. *Id.* The FDA only considered "whether the device is indeed the equivalent of a preexisting device—regardless of how unsafe or ineffective the grandfathered device happens to be." *Id.* The EndoWrist instruments are based on preexisting instruments that did not have usage counters or self-destruct mechanisms: "The predicate devices – forceps, graspers, retractors, shears, etc. – did not have limits on the number of uses." [14] ¶ 79. Substantial equivalence did not require any limits on use. In fact, the instruments on other robots are fully reusable. [14] ¶ 78.

In addition, Intuitive has never included a design feature, *e.g.*, a self-destruct applet on the memory chip, in any of its requests for clearance to prevent additional use after service of the instrument. Intuitive points to language in its request for clearance of its latest model: "The instruments are reusable. They are programmed with a maximum number of surgical procedures based upon life testing." [14-4] at 4. The request for clearance does not say that the instruments are not reusable for

15

another cycle of use after service of the instruments. Nor does the request for clearance say that the instrument effectively destroys itself regardless of whether the instrument is serviced after reaching its usage limit. In the requests for clearance, Intuitive has never mentioned any prohibition on service of the instruments for an additional cycle of uses.

Furthermore, Intuitive has never submitted performance data in support of such a feature. The usage limits are only based on the initial life of the instrument before any service. Intuitive has never submitted any performance data that any of the instruments were not fully reusable with service as needed. [14] ¶ 78; see also [14-4] at 7. The testing only included cleaning and sterilization but not service: "Each life cycle consisted of cleaning, sterilizing, performance measurements, and simulated surgical use." [14-7] at 7. Intuitive has never even submitted performance data showing that the instruments lose their safety and effectiveness at any point without service. [14] ¶ 82.

Therefore, Intuitive does not need to obtain clearance from the FDA to allow ISOs to have access to the usage counter to reset it after service. Intuitive is only required to request additional clearance if there is a change in the design from the prior clearance. 21 CFR § 807.81(a)(3). The reset after service would not be a change in the design submitted in the clearances. The clearances only say that the instruments are designed to have a maximum number of surgical procedures without

16

service.  Restore is not asking for an elimination of that usage limit.  Again, Restore is already providing service on instruments for additional cycles of use on some models based on the usage limits established by Intuitive.  [14] ¶ 75.  For all those reasons, it is not necessary for Intuitive to get clearance to allow Restore to reset the usage counter after service of the instrument.

## II.    Product Market Definition

Restore alleges that Intuitive has violated Section 1 and Section 2 of the Sherman Act.  As a preliminary matter, Restore does not need to define a relevant market and establish market power for liability based on a quick look analysis under Section 1 if Restore is able to show actual detrimental effects on competition at summary judgment.  *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016), *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1211 (11th Cir. 2002), *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996).  In this case, Restore alleges that Intuitive controls more than 99% of da Vinci robot service and EndoWrist instrument service and replacement and charges supracompetitive prices for those products through the use of tying arrangements and exclusive dealing in violation of Section 1.  [14] ¶¶ 47, 61, 65, 69, 70, 89.  Therefore, the complaint has alleged facts that plausibly give rise to proof of actual detrimental effects under Section 1.

17

In any event, market definition is "essentially a factual question." *McWane, Inc. v. F.T.C.,* 783 F.3d 814, 825 (11th Cir. 2015). The Eleventh Circuit has found single-brand product markets after trial on several occasions. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995-99 (11th Cir. 1993) (finding single-brand primary market for Danforth brand of premium fluke anchors after trial), *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 977 (5th Cir. 1977) (upholding jury verdict of single-brand aftermarket of air conditioners for Volkswagen automobiles). Restore has alleged facts in great detail to define the relevant product aftermarkets in support of its claims under Section 1 and Section 2.

Nevertheless, Intuitive argues the complaint fails to plead facts to plausibly suggest that competition in the primary market does not adequately check competition in the aftermarkets for service of its equipment. Intuitive effectively concedes that it has no argument if there is a primary market for surgical robots: Intuitive does not dispute for purposes of this motion that the complaint would adequately allege a monopoly in that market.

Instead, Intuitive argues that the complaint does not allege facts to plausibly suggest that there is a relevant primary market for surgical robots. [16] at 22-25. Intuitive also argues that Restore has failed to allege facts to support the allegation in the alternative that customers face significant information or switching costs that

prevent them from engaging in lifecycle pricing as a check on market power in the aftermarkets. [16] at 25-28.

## A.    Primary Product Market Is Surgical Robots

Restore has adequately alleged facts to plausibly suggest that there is a relevant primary market for surgical robots. Restore need only present factual allegations "to plausibly suggest the contours" of the relevant product market. *Offshore Tugs*, 2012 WL 13032942, at *4 (quoting *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010)). The Eleventh Circuit has explained that defining the relevant product market is "a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *U.S. Anchor Mfg.*, 7 F.3d at 995 (citations and quotations omitted). The outer boundary of a relevant product market is the "reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes." *Id.*

Since it is "ordinarily quite difficult" to measure the cross-elasticity of demand accurately, it is "usually necessary" to consider other factors that can serve as useful surrogates at trial. *Id.* For example, a large spread in prices suggests that customers are not shifting their purchases based on changes in price. *Id.* at 997. Here, there is a massive spread between the cost of surgical robots compared to the cost of laparoscopic equipment. The estimated cost per procedure for the surgical

robot is more than 350% of the estimated cost per procedure for laparoscopic equipment. [14] ¶ 19. Yet hospitals are moving increasingly towards robotic surgery at a compound annual growth rate of 23%. Id. They do not view laparoscopic equipment as reasonably interchangeable with surgical robots.

It is much like the shift at law firms from electric typewriters to personal computers in the 1980s. There may have been a single market for legal secretaries, but the $500 typewriter and the $2,000 computer were separate markets. The law firms were replacing $500 electric typewriters with $2,000 personal computers. Not the other way around. It did not matter whether the electric typewriter cost $450 or $500. It did not matter whether the personal computer cost $1,900 or $2,000. You were shopping for one or the other. They were separate product markets.

In the alternative, surgical robots are a relevant product submarket. Within a relevant market, there may be relevant submarkets, which are equivalent to relevant markets for antitrust purposes. Id. "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. at 995 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)). They are known as the Brown Shoe factors. Here, surgical robots are recognized as a separate economic entity and have

peculiar product characteristics, unique production facilities, distinctly higher prices, no price sensitivity, and highly specialized vendors. [14] ¶ 21.

Moreover, the Supreme Court has recognized that two products may have such a large price differential to be put in separate submarkets even though "each does the job equally well" and "the class of customers is the same." *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 276 (1964). Even assuming laparoscopic equipment will perform equally as well as surgical robots, the effective price of the surgical robot is 350% more than the laparoscopic equipment. [14] ¶ 19. Customers are clearly not making their choices between laparoscopic equipment and surgical robots based on price.

Furthermore, the Eleventh Circuit has held that the evidence at trial can ultimately show a relevant market or submarket for a single premium brand of product. *U.S. Anchor*, 7 F.3d at 996-98. In *U.S. Anchor*, the evidence at trial showed that the premium brand of fluke anchors had distinctly higher prices, a distinct group of customers, strongly inelastic demand and limited substitution of supply. *Id.* at 996-97. Furthermore, the Eleventh Circuit noted that a premium brand could constitute its own market based on consumer brand loyalty, such as a steady price differential of "20–25%" for the brand, along with other *Brown Shoe* factors. *Id.* at 997-98.

Intuitive points to antitrust cases in other circuits filed by doctors challenging the denial of hospital staff privileges. [16] at 24-25. The relevant product market in those cases was the market for the sale of services from the physician to the patient, not the market for the sale of equipment from the manufacturer to the hospital. In those cases, the physician is competing with other surgeons to provide a cluster of services, such as emergency surgery, in their area of specialty. Cardiac surgeons are competing with other cardiac surgeons. They are not competing with urologists.

Here, the surgical robot, like a CT scanner or a hospital bed, has the same price regardless of how the hospital chooses to use it day to day in any combination of indicated uses, from gynecologic surgery to urologic surgery, from cardiac surgery to head surgery. At the same time, the hospital pays a very different price for surgical robots compared with equipment for laparoscopic surgery – 350% more in fact. [14] ¶ 19. Moreover, surgical robots are recognized as a separate economic entity and have peculiar product characteristics, unique production facilities, distinctly higher prices, no price sensitivity, and highly specialized vendors. [14] ¶ 21. Furthermore, the hospitals are buying the surgical robots even though they are much more expensive and much less profitable for the hospital: "Even though robotic surgery is significantly more expensive and significantly less profitable than laparoscopic surgery, hospitals are expected to offer robotic surgery." [14] ¶ 17; see also [14] ¶¶ 19-20. In sum, there is a separate product market for surgical robots.

### B. Monopolies in Aftermarkets Not Constrained by Lifecycle Pricing

Even if there was not a primary market for surgical robots, Restore has nevertheless alleged facts that plausibly suggest that Intuitive is able to exploit its monopoly power in the aftermarkets. The Supreme Court has recognized that competition in a primary market may prevent exploitation in an aftermarket. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469–70 (1992). Here, however, the complaint alleges that Intuitive is still able to charge exorbitant prices in the aftermarkets – 100% premium for robot service and 40% premium for instrument replacement. [14] ¶¶ 47, 69, 75.

The seller can charge supracompetitive prices in the aftermarket if customers are unable to engage in "accurate lifecycle pricing" in making their purchasing decision in the primary market. *Kodak*, 504 U.S. at 473. The Eleventh Circuit has observed that "a court need[s] to look at the facts of each case in evaluating whether consumers would realistically use life-cycle pricing when making purchasing decisions." *Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 825 n.5 (11th Cir. 2004) (citing *Kodak*). "Lifecyle pricing of complex, durable equipment is difficult and costly." *Kodak*, 504 U.S. at 473.

Here, in fact, the complaint alleges that "customers are unable to calculate lifecycle costs at the time of purchase because they have little or no information for projecting the costs of robot parts and service or instruments." [14] ¶ 39. Since it is

23

very difficult to predict patient demand for a new robot, it is very difficult to project cost per use for a new robot. Id. It is also very difficult to project lifecycle costs of a new robot because patient demand and instrument costs are unpredictable. [14] ¶ 39-40. Intuitive unilaterally controls the sales prices and usage limits for the instruments. [14] ¶ 40. Since Intuitive does not publish prices for the robot parts, it is virtually impossible to calculate lifecycle pricing if the customer opts for paying for service based on parts and time rather than a flat fee. [14] ¶ 41. For example, a customer may face an unexpected cost of more than $100,000 to replace a da Vinci robot arm. Id.

The seller can also profitably maintain supracompetitive prices in the aftermarket if the cost of switching is high relative to any change in service prices and the size of the installed base is large relative to the number of new purchasers. Kodak, 504 U.S. at 476-77. Such a strategy is even more likely to prove profitable if the seller can discriminate in prices between the installed base and new purchases. Id. The seller can extract higher aftermarket prices from the installed base without any sacrifice to new sales in the primary market. Id.

Here, the cost of switching is roughly ten times the cost of service – $1.5 million for a new robot versus $100,000 to $200,000 for the continuing service. [14] ¶¶ 38, 51-52. Intuitive can extract supracompetitive prices in the aftermarket from a relatively large installed base of nearly 5,000 units compared to new sales of less

than 1,000 units annually.  [14] ¶¶ 13, 29.  Moreover, customers pay individualized prices for the surgical robot and the robot service.  See [14] ¶¶ 38, 51-52.  Therefore, Intuitive can charge supracompetitive prices to its installed base without putting its new sales at risk.  In sum, Intuitive can exercise monopoly power in the aftermarkets because customers have limited lifecycle information and because customers have high switching costs.

## III.    Anticompetitive Conduct

Restore alleges that Intuitive violated Section 1 through tying arrangements and exclusive dealing.  In addition, Restore alleges that Intuitive has monopolized or attempted to monopolize the aftermarkets through a combination of tying, exclusive dealing, and refusing to deal.  In the motion to dismiss, Intuitive renews its argument that Restore cannot adequately allege anticompetitive conduct in the aftermarkets without alleging facts that plausibly give rise to separate aftermarkets by referring back to its argument on market definition.  [16] at 30, 33.  In addition, Intuitive argues that Restore does not allege facts that plausibly give rise to anticompetitive conduct in violation of Section 1 or Section 2 for tying arrangements, exclusive dealing, or refusal to deal.

### A.    Tying Arrangements

Restore alleges that Intuitive has tied its services to the robot and parts in violation of Section 1.  Intuitive argues that Restore has not alleged any facts that

25

Case 5:19-cv-00055-TKW-MJF Document 18 Filed 06/10/19 Page 26 of 35

plausibly give rise to the allegation that customers were compelled to use Intuitive for robot service or instrument replacement to get access to surgical robots or robot parts. [16] at 29. Intuitive also argues that Restore has not alleged any facts that plausibly give rise to the allegation that the combined price for the tying and tied products is supracompetitive. [16] at 31-32.

### 1.    Circumstantial Evidence of Coercion

Circumstantial evidence of coercion is sufficient to prevail in the trial of a tying claim. *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1418 (11th Cir. 1987). "[T]he courts have never required direct evidence of coercive behavior to prove a tying violation. It is well established that coercion may be established by showing that the facts and circumstances surrounding the transaction as a practical matter forced the buyer into purchasing the tied product." *Tic-X-Press*, 815 F.2d at 1418. Here, the service contract is <u>included</u> in the sales and leasing agreements. [14] ¶¶ 51-52.

In addition, the sales and leasing agreements require that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog. Consequently, customers are required to purchase EndoWrist replacements from Intuitive instead of EndoWrist service from ISOs. In addition, the standard contract requires that Intuitive must approve any repairs or service during or after that usage limit. If the contract provides that the buyer may use a source approved

by the seller to purchase the tied product, the courts will look at whether it is manipulated by the seller to force the buyer to purchase the tied product from the seller. *Id.* at 1416. Here, Intuitive prohibits ISOs from performing service on the EndoWrist instruments. ([14] ¶ 87.)

### 2. Anticompetitive Effect

In order to prevail at summary judgment, an antitrust plaintiff must be able to offer evidence that would show that the overall price of the tying and tied products is not competitive. *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 718 (11th Cir. 1984), *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982). In other words, Restore will ultimately have to offer evidence at summary judgment that Intuitive did not make up the difference to customers on supracompetitive prices for the tied product by charging subcompetitive prices on the tying product.

Here, the complaint alleges facts that plausibly give rise to the allegation that the overall price for the tying and tied products is supracompetitive. Intuitive has monopoly power in the tying <u>and</u> tied products and is therefore able to charge supracompetitive prices in the tying <u>and</u> tied products. In other words, Intuitive does not have to charge subcompetitive prices in the primary market or any of the aftermarkets.

More specifically, Intuitive charges prices relative to costs for the products and services in its line of medical devices at least 20% higher than other major manufacturers of medical devices like General Electric and Johnson & Johnson. [14] ¶¶ 65, 89. For calendar year 2018, Intuitive reported a net margin of 32.2%. [14] ¶ 32. By comparison, General Electric, which is a major manufacturer of medical imaging equipment, reported a net margin for its healthcare segment operations of 18.7%. Id. Johnson & Johnson reported a net margin for its medical devices segment of 16.3%. Id. Based on those facts, it is more than plausible that Restore will be able to offer evidence after discovery that the overall price for the robot and services is supracompetitive. It is very likely in fact.

## B. Exclusive Dealing

Restore alleges that Intuitive has engaged in exclusive dealing by preventing customers from using competitors in the aftermarkets in violation of Section 1. Intuitive argues that Restore fails to allege any facts that plausibly give rise to the allegation that the sales and leasing agreements "preclude customers from accepting service from another provider." [16] at 33. The Supreme Court has long recognized that exclusivity can mean a specific agreement not to use the services of a competitor or an agreement that has the practical effect of preventing such use. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961). The Eleventh Circuit continues to follow that admonition to evaluate the "practical effect" of the arrangement.

28

*McWane*, 783 F.3d at 834.  In short, the Eleventh Circuit continues to consider "market realities" rather than "formalistic distinctions" of exclusive dealing arrangements. *Id.* at 835.

Here, the sales and lease contracts include a service agreement of four years or more at a price of $100,000 to $200,000 per year.  [14] ¶¶ 51-52.  Given that the customer is already paying such a large sum for robot service, the customer is not going to pay twice for the same services by hiring an ISO for robot service.  The contracts have the practical effect of preventing customers from using ISOs for robot service.  That is the market reality.

In addition, the sales and lease contracts require that the customer only use the instruments for the maximum number of uses set forth in the instrument catalog and that the customer must obtain approval from Intuitive for any repairs or service upon reaching the usage limit.  [14] ¶ 72.  Intuitive prohibits ISOs from performing service on EndoWrist instruments and resetting the usage counter.  [14] ¶ 87.  They are effectively requiring customers to purchase new EndoWrist instruments from Intuitive after the instruments reach their usage limit.  Of course, the FDA permits service of medical devices.  Supra at 13.  The contractual restrictions have the practical effect of preventing customers from servicing the instrument with an ISO instead of replacing it with Intuitive.

## C.    Refusal to Deal

Restore alleges more broadly that Intuitive has also monopolized or attempted to monopolize the aftermarkets through the same tying arrangements and exclusive dealing, along with refusing to provide access to the distributor's toolkit and the usage counter.  Specifically, Restore alleges that the distributor's toolkit is necessary to provide complete robot service and that the usage counter is necessary to provide instrument service.  Intuitive renews its argument that it has never provided Restore with access to the distributor's toolkit or the usage counter and that a unilateral refusal to deal is never actionable without an allegation of a prior course of dealing between the parties.  [16] at 33.

### 1.    Essential Facility Doctrine

Again, that is simply not the law in this circuit.  The Eleventh Circuit continues to recognize the essential facility doctrine after *Trinko* as a basis for liability apart from *Aspen* under Section 2. Supra at 7-9. "Under the essential facility test, a company that has exclusive control over a facility essential to effective competition may not deny potential competitors access to that facility on reasonable terms and conditions if to do so would create or maintain monopoly power in the relevant market." *Morris*, 364 F.3d at 1294 (citing *Trinko*). "The plaintiff has the burden of proving that the defendant controls an essential facility that cannot be

practically or economically duplicated." Id. "[T]he doctrine is only viable where there is indeed unavailability of access." *Covad*, 374 F.3d at 1050 (citing *Trinko*).

Here, Restore alleges facts in great detail in support of its allegation of monopolistic conduct under the essential facilities doctrine. The complaint alleges the importance of the distributor's toolkit to effective competition in robot service over nearly two full pages. [14] ¶¶ 55-60. The documentation and software in the distributor's toolkit cannot be practically duplicated. Neither can passcodes by definition. Similarly, the complaint alleges the importance of the usage counter to effective competition in the EndoWrist aftermarket over more than a page. [14] ¶¶ 73-75. Moreover, Intuitive refuses to provide access to either the distributor's toolkit or the usage counter on any terms to Restore or other ISOs for the purpose of maintaining its monopolies in the aftermarkets. Restore is unable to practically duplicate the distributor's toolkit or usage counter on the EndoWrist instruments for the da Vinci Xi or X models. Restore is unable to economically duplicate the usage counter on the EndoWrist instruments for the da Vinci Si model. In sum, Restore has adequately pled facts that plausibly give rise to monopolistic conduct based on the essential facilities doctrine. Intuitive does not point to any deficiencies in those factual allegations.

## 2.   *Otter Tail*

The Eleventh Circuit also continues to recognize *Otter Tail* as a separate basis for liability under Section 2.  Supra at 9-10.  A vertically integrated monopolist may not refuse to deal with a customer to foreclose competition in a second market under *Otter Tail*.  *Duty Free*, 797 F.3d at 1268.  The monopolistic intent is shown by a monopolist selectively refusing to deal with competitors.  *Trinko*, 540 U.S. at 409.  Again, Intuitive does not point to any reason why the factual allegations do not give rise to liability for refusing to deal under *Otter Tail*.

Here, Intuitive is a vertically integrated monopolist in surgical robots, robot parts, robot service, and instrument service and replacement.  Intuitive has monopoly power in all four markets.  In addition, Intuitive is not being asked to produce something new.  Intuitive already produces the distributor's toolkit and provides it to certain customers, *i.e.*, its distributors, and refuses to provide it to certain other customers, *i.e.*, ISOs competing in the aftermarket, on any terms.  [14] ¶ 55.  Moreover, the marginal cost of the toolkit – burning disks with documentation, software, and passcodes – is virtually zero.  Intuitive has made the calculation that its monopoly profits in robot service will exceed any profits to be gained from licensing the toolkit to ISOs.

Similarly, Intuitive already produces the EndoWrist instruments for training with higher limits on the usage counter at the same cost.  The industry does not

Case 5:19-cv-00055-TKW-MJF Document 18 Filed 06/10/19 Page 34 of 35

distinguish between an instrument sold for clinical use and the same instrument sold for training use: they must retain their functionality for the surgeon during clinical or training use. [14] ¶ 80. Intuitive knows that customers have a much lower demand curve for training instruments: they do not generate any revenue per procedure. [14] ¶ 80. In other words, customers will pay a much higher price per use – or accept a much lower usage limit – for clinical procedures that generate revenue. Furthermore, Intuitive has made the calculation that it can maximize its monopoly profits from instrument replacement by selling the instruments for clinical use with lower usage limits on the usage counter and denying access to the usage counter to prevent ISOs from providing service on the instruments. This selective refusal to deal is consistent with liability under the "traditional antitrust principles" of *Otter Tail*. In sum, Intuitive is selectively refusing to deal with ISOs to foreclose competition in the aftermarkets for robot service and instruments under the principles of *Otter Tail*.

## Conclusion

For all the foregoing reasons, the motion should be denied.

Respectfully submitted on June 10, 2019.

/s Jeff Berhold
Jeffrey L. Berhold*
Georgia Bar No. 054682
JEFFREY L. BERHOLD, P.C.
1230 Peachtree Street, Suite 1050
Atlanta, GA 30309
(404) 872-3800 (telephone)
jeff@berhold.com

/s William G. Harrison, Jr.
William G. Harrison
HARRISON RIVARD DUNCAN & BUZZETT
FL. Bar No. 0765058
101 Harrison Avenue
Panama City, FL 32401
850-769-1414 (telephone)
wharrison@harrisonrivard.com

**COUNSEL FOR PLAINTIFFS**

*Admitted Pro Hac Vice

Pursuant to Local Rule 5.1(F)(1)(a), a certificate of service is not required.

Pursuant to Local Rule 7.1(F), the memorandum contains 7,909 words.