UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REBOTIX REPAIR LLC,

    Plaintiff,

v.                              Case No. 8:20-cv-2274-VMC-TGW

INTUITIVE SURGICAL, INC.,

    Defendant.

_____/

**ORDER**

This matter comes before the Court pursuant to Defendant Intuitive Surgical, Inc.'s Motion to Dismiss for Failure to State a Claim, filed on December 8, 2020. (Doc. # 40). Plaintiff Rebotix Repair, LLC responded on December 22, 2020. (Doc. # 43). Intuitive replied on January 12, 2021. (Doc. # 46). For the reasons set forth below, the Motion is granted in part and denied in part.

**I.**    **Background**

    **A.**    **Intuitive and the Surgical Robot Market**

Intuitive is a Delaware corporation and the creator of the da Vinci robot, a minimally invasive surgical robot. (Doc. # 1 at ¶ 6). Minimally invasive surgery is a procedure where "[d]octors make small incisions in soft tissue and insert surgical instruments — for example, scissors, scalpels,

graspers, or needle drivers at the end of long narrow tubes — to manipulate, cut, and sew tissues." (Id. at ¶¶ 10-11).

In non-robotic surgeries, doctors directly manipulate these instruments with their hands. (Id.). In da Vinci robotic surgeries, doctors attach the instruments to mechanical arms controlled by the robot. (Id.). Doctors manipulate these arms and the instruments attached to them by "moving a controller on the surgical robot, which in turn processes the motion information from the controllers into movement commands for mechanical arms." (Id. at ¶ 13).

Only surgical instruments made by Intuitive, called "EndoWrists," are compatible with the da Vinci robot. (Id. at ¶¶ 11, 32). Intuitive sells more than eighty types of EndoWrists, "including a variety of scissors, scalpels, graspers, and needle drivers." (Id. at ¶ 11).

The surgical ends of these EndoWrists are "essentially identical to the instruments that doctors have used in traditional minimally invasive surgeries for decades." (Id. at ¶ 36). However, Intuitive advertises that da Vinci surgeries provide "improved outcomes" and "fewer complications" than non-robotic surgeries. (Id. at ¶ 19). This is because robotic surgeries

> provide a number of advantages over traditional laparoscopic surgeries, including increased dexterity, improved hand-eye coordination and ergonomic position, and improved visualization. These advantages are made possible because the robot has more "arms" than a human which allows the surgeon to hold additional instruments. The "wrists" of the robot also have a greater range of motion than a human, which allows for greater dexterity. The movements of the instruments can also be scaled relative to the movements of the controller, which allows for greater precision. The console from which the surgeon operates is also designed to minimize surgeon fatigue.

(Id. at ¶ 18).

Due to these advantages, Intuitive "promote[s] the distinction between robotic da Vinci surgeries and traditional surgeries" and "emphasize[s] the superiority of robotic da Vinci surgeries." (Id. at ¶ 21).

Hospitals generally agree that robotic surgeries are superior to non-robotic surgeries and advertise the availability of robotic surgery to patients. (Id. at ¶¶ 19, 21). Likewise, "[m]any doctors prefer to perform — and indeed only have the skills to perform — robotic surgeries and not traditional laparoscopic surgeries." (Id. at ¶ 20). Doctors learn how to perform da Vinci surgeries in medical school, and, as a result, "have been performing only da Vinci surgeries for years." (Id.). These doctors "will only work at hospitals that have da Vinci surgical robots." (Id.).

Based on this "perceived superiority," patients "elect for robotic surgeries instead of traditional laparoscopic surgeries." (Id. at ¶ 22). This preference persists "[d]espite the much higher cost" of robotic surgery versus traditional surgery. (Id. at ¶¶ 22-23). "Robotic surgeries generally cost from $3,000 to $6,000 more than traditional laparoscopic surgery." (Id. at ¶ 22). For hospitals, the cost for traditional surgical instruments is "less than $1,000," while a da Vinci robot costs between $1.5 million or $2.4 million. (Id. at ¶ 23).

Yet "[t]here is a very low cross-elasticity of demand between minimally invasive surgical robots and equipment for traditional laparoscopic surgery." (Id.). An increase in the cost of surgical robots "does not lead hospitals to purchase traditional laparoscopic equipment instead," nor does a decrease in cost "lead hospitals to forego purchasing traditional laparoscopic equipment." (Id.).

Indeed, the number of robotic procedures has drastically increased from 136,000 in 2008 to 877,000 in 2017. (Id. at ¶ 22). Several professional and trade associations now "focus[] on robotic surgery," and "manufacturers that make surgical robots specialize in surgical robots." (Id. at ¶ 25). These

surgical robot manufacturers "do not also make equipment for traditional, laparoscopic devices." (Id.).

Intuitive "dominates the market[] for minimally invasive surgical robots," holding a "domestic and worldwide market share of at least 98%." Any potential competitors have "de minimus market share[s]." (Id. at ¶ 26).

### B.   **Rebotix and the EndoWrist Repair Market**

Rebotix is a Florida limited liability company that is "in the business of repairing . . . EndoWrists." (Id. at ¶ 5). "Hospitals that perform da Vinci surgeries hire Rebotix to inspect the EndoWrists and repair them, for example by tightening the graspers, realigning the forceps, or sharpening the scissors." (Id. at ¶ 2).

Currently, Intuitive has "at least a 99% market share in the domestic and worldwide markets for replacements and repairs of EndoWrist instruments." (Id. at ¶ 35). Intuitive charges extremely high prices for replacement EndoWrists, earning $2.4 billion in 2019 from the sale of instruments and accessories and reporting "an overall gross margin on product sales of more than 70%." (Id. at ¶¶ 4, 33).

### C.   **Alleged Anticompetitive Behavior**

Rebotix alleges that Intuitive "uses its dominance in the market for minimally invasive surgical robots to

monopolize a separate market: the market for replacements and repairs of EndoWrists." (Id. at ¶ 30). The complaint lists four ways that Intuitive "prevent[s] any repairs of the EndoWrist surgical instruments, thereby harming — in fact almost eradicating — Rebotix's business." (Id. at ¶ 3).

### i.   Contractual Ties

First, Intuitive's standard agreement with hospitals requires all purchasers of a da Vinci robot to adhere to a "maximum number of uses" requirement for EndoWrists. (Id. at ¶ 54). In other words, hospitals agree to only use EndoWrists for a predetermined number of surgeries before replacing them. (Id.).

However, the "usage limits are not based on any regulatory requirements from the FDA," nor are they "based on any clinical or scientific determination of the useful life of the instruments. (Id. at ¶¶ 45-46). EndoWrists that are periodically inspected and repaired "can still be in perfect condition after well over 100 uses." (Id. at ¶ 54). Therefore, this clause forces hospitals to "buy many more (10 to 20 times as many) EndoWrists from Intuitive than they actually would need if the restrictive tying clause were eliminated." (Id.).

### ii.  **Contractual Exclusivity**

Second, "Intuitive's standard agreement also expressly prohibits its customers from performing repairs on the EndoWrists — for example, sharpening the scissors or aligning the graspers." (Id. at ¶ 55). Rather than permitting hospitals to hire Rebotix for repair services, the standard agreement "requires hospitals to discard scissors that may need sharpening, or graspers that may need aligning." (Id.).

Since EndoWrists are "necessary to perform surgery with the da Vinci robot," hospitals are then obligated to "buy new, replacement EndoWrists from Intuitive" if they wish to keep using the robot. (Id. at ¶¶ 32, 55).

### iii. **Aggressive Enforcement**

Third, Intuitive "actively and fiercely enforces the anticompetitive restrictions in its standard sales agreement." (Id. at ¶ 56). Intuitive has sent cease and desist letters to "nearly every Rebotix client," threatening to "withhold the contractual maintenance services that are necessary for the continued operations of hospitals' da Vinci robots when hospitals elect to use Rebotix's services to repair their EndoWrists." (Id.). Intuitive representatives "verbally repeat and reiterate these threats to hospitals." (Id.).

### iv.  **Usage Counter**

Lastly, each EndoWrist includes a programmed memory chip called a usage counter that tracks the number of surgeries an instrument is used for. (Id. at ¶ 43). "After the [usage counter] reaches the count determined by Intuitive, the memory chip is wiped, preventing the EndoWrist from communicating with the da Vinci device and rendering the instrument inoperable." (Id.). For most EndoWrists, the maximum number of allowed uses is ten. (Id.).

To conduct its repair business, Rebotix developed a workaround to this chip. (Id. at ¶ 51). When Rebotix repairs EndoWrists for hospitals, it utilizes the workaround to reset the usage counter. (Id.). This allows hospitals to continue using the repaired EndoWrists beyond the ten intended uses. (Id.). However, this workaround is only effective on older da Vinci Si models, not newer da Vinci Xi models. (Id. at ¶ 52).

### D.  **Instant Action**

Through these behaviors, Intuitive allegedly forces hospitals to "constantly buy new, unnecessary replacement EndoWrists from Intuitive," rather than contracting with competitors like Rebotix to repair old, but still functional, EndoWrists. (Id. at ¶ 3).

Based on this conduct, Rebotix filed the instant complaint alleging: (1) an illegal tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I), (2) an illegal exclusive dealing arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count II), monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count III), and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count IV). (Doc. # 1).

Intuitive moves to dismiss the entire complaint. (Doc. # 40). Rebotix has responded (Doc. # 43), Intuitive replied (Doc. # 46), and the Motion is ripe for review.

## II.  **Legal Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide

> the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court must limit its consideration to well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed. La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

### III. **Analysis**

Intuitive makes three arguments in its motion to dismiss: (1) all claims should be dismissed because Rebotix fails to plausibly allege a relevant market; (2) the Section 2 claims based on the usage counter should be dismissed because the proprietary design of the EndoWrist is not anticompetitive; and (3) Intuitive's cease and desist letters cannot form the basis of an antitrust claim, as they are immune from antitrust scrutiny under the Noerr-Pennington doctrine. (Doc. # 40 at 1, 15, 21).

A.   <u>**Noerr-Pennington Immunity from Antitrust Scrutiny**</u>

The Court first addresses Intuitive's argument that the <u>Noerr-Pennington</u> doctrine immunizes its cease and desist letters from antitrust scrutiny. (<u>Id.</u> at 22).

The <u>Noerr-Pennington</u> doctrine shields a defendant from antitrust liability when the defendant "exercise[s] their right to petition government by resorting to administrative and/or judicial proceedings." <u>Andrx Pharms., Inc. v. Elan Corp.</u>, 421 F.3d 1227, 1233 (11th Cir. 2005). The Eleventh Circuit has held that this doctrine protects threats of litigation as well as the actual initiation of litigation. <u>McGuire Oil Co. v. Mapco, Inc.</u>, 958 F.2d 1552, 1560 (11th Cir. 1992) (finding it "clear that . . .  threats [of litigation], no less than the actual initiation of litigation, do not violate the Sherman Act"). An exception to the <u>Noerr-Pennington</u> doctrine does exist, however, "where the defendant engages in 'sham litigation.'" <u>Andrx Pharm., Inc.</u>, 421 F.3d at 1233 (internal citations omitted).

Intuitive argues that its cease and desist letters to customers are protected by this doctrine because Rebotix does not – and cannot – allege facts suggesting that Intuitive's cease and desist letters were objectively baseless or sham litigation. (Doc. # 40 at 22).

Rebotix responds that the letters do not fall within the doctrine because they do not seek redress from the government or even allude to litigation. (Doc. # 43 at 20).

The Court agrees with Rebotix that, as pleaded, the cease and desist letters are not immune from antitrust scrutiny. Regarding the letters, the complaint states:

> Intuitive threatens to withhold the contractual maintenance services that are necessary for the continued operations of hospitals' da Vinci robots when hospitals elect to use Rebotix's services to repair their EndoWrists. In addition, Intuitive representatives verbally repeat and reiterate these threats. For example, Intuitive has threatened to "paperweight" a hospital's robot, i.e., withhold the necessary maintenance services and thus make the robot useless for any function other than serving as a large, expensive paperweight.

(Doc. # 1 at ¶ 56).

Taking these allegations as true, the letters did not threaten suit. Rather, they made an economic threat to withhold certain services from the hospitals. Such an activity does not allude to redress from the government nor invoke First Amendment concerns. See Christianson v. Colt Indus. Operating Corp., 766 F. Supp. 670, 683 (C.D. Ill. 1991) (holding that a cease and desist letter threatening to discontinue business was not necessarily a threat of litigation under Noerr-Pennington, but "really . . . an assertion of [the defendant's] economic power").

Letters that do not assert "any legal claims against Plaintiffs or threaten to sue" are not "the type of prelitigation activity that is shielded from liability under the Noerr doctrine." See Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC, 367 F. Supp. 3d 1360, 1371 (M.D. Fla. 2019) (finding Noerr-Pennington to be inapplicable where letters did not assert legal claims, but rather instructed the recipient not to communicate with the sender's client and informed the recipient that said client would not be paying certain financial obligations); compare Silverhorse Racing, LLC v. Ford Motor Co., 232 F.Supp.3d 1206 (M.D. Fla. 2017) (holding that letters threatening to sue to enforce an exclusivity contract fell within the scope of Noerr-Pennington immunity). Therefore, at the pleading stage, Rebotix may rely on the cease and desist letters to support its antitrust claims.

**B.   Section 1 Claims**

The Court next examines whether the Section 1 claims are adequately pleaded. Generally, to state a claim under Section 1 of the Sherman Act, a plaintiff must allege that the defendant (1) entered into an anticompetitive agreement (2) proximately causing antitrust injury (3) in a relevant market. Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327,

1336 (11th Cir. 2010); Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1071-72 (11th Cir. 2004).

Intuitive challenges the third element, a relevant market. (Doc. # 40 at 11). According to Intuitive, the "market for EndoWrist repair and replacement" is artificially narrow because in "antitrust cases brought by an allegedly excluded supplier, the relevant market is defined from the perspective of the supplier and includes all customers to which the supplier could sell its services." (Id. at 11-12). Since Rebotix could conceivably sell its repair services to any customer wishing to repair traditional tools, Intuitive argues that Rebotix fails to allege a "relevant product market that encompasses all of the customers to which Rebotix could sell its repair services." (Id.).

Rebotix responds that under Eastman Kodak Co. v. Image Technology Services, 504 U.S. 451, 481-82 (1992), the "relevant market for antitrust purposes is determined by the choices available to . . . consumers." (Doc. # 43 at 2). But, Rebotix continues, even if the market is viewed from Rebotix's perspective, the complaint identifies "key differences in design between EndoWrists and traditional instruments, and thus key differences in the required repairs." (Id. at 10-

14

11). Therefore, "[a] supplier of EndoWrist repairs, like Rebotix, would not view these services as 'reasonably interchangeable from [the supplier's] perspective.'" (Id. at 11).

In its reply, Intuitive reiterates its argument that EndoWrists and traditional surgical tools are essentially the same, "signifying that Rebotix's repair services could be sold to customers seeking repairs of any instrument used in minimally invasive surgery." (Doc. # 46 at 4).

The Court agrees with Rebotix that from either the customer-based or supplier-based point of view, it has alleged a relevant market. "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." Spanish Broad. Sys. of Fla., Inc., 376 F.3d at 1070 (citing Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983)). Rebotix has presented "enough information in their complaint to plausibly suggest the contours of the [EndoWrist repair and replacement] market[]." Jacobs, 626 F.3d at 1336.

According to the complaint, "Intuitive has at least a 99% market share in the domestic and worldwide markets for replacements and repairs of EndoWrist instruments." (Doc. #

15

1 at ¶ 35). Therefore, from a customer perspective, a hospital seeking to repair or replace an EndoWrist has virtually no choice but to purchase from Intuitive.

The complaint also survives under a supplier-based point of view. True, the complaint describes the surgical ends of EndoWrists as "essentially identical" to the ends of traditional, non-robotic instruments. (Doc. # 1 at ¶ 36). But the complaint also details the differences between EndoWrists and traditional surgical tools. (Id. at ¶¶ 10-13, 18). EndoWrists allegedly have a greater range of motion than a human holding traditional instruments, allowing for greater dexterity. (Id. at ¶ 18). The complaint also explains that the movements of the EndoWrist instruments can be scaled relative to the controller, allowing for greater precision and decreased surgeon fatigue. (Id.).

According to the complaint, Intuitive and hospitals promote these distinctions and the overall superiority of robotic surgery. (Id. at ¶ 21). Patients therefore perceive robotic surgery utilizing EndoWrists as safer and leading to fewer complications than surgery with traditional tools, leading patients to elect for these treatments over traditional surgery using manual tools, "regardless of cost differential." (Id. at ¶ 22).

16

Doctors similarly "prefer to perform" — indeed, many "only have the skills to perform" — robotic surgeries using EndoWrists, not manual surgeries using traditional tools. (Id. ¶ 20). As such, the complaint alleges there is a "very low cross-elasticity of demand between minimally invasive surgical robots and equipment for traditional laparoscopic surgery." (Id. at ¶¶ 19, 23).

Furthermore, the complaint alleges professional and trade associations that focus on robotic surgery, as well as manufacturers that specialize in robotic surgery. These manufacturers do not create the instruments used in traditional, manual surgery. (Id. at ¶ 25).

Such allegations "evok[e] the factors of unique production facilities, distinct customers, and specialized vendors." Restore Robotics, LLC v. Intuitive Surgical, Inc., No. 5:19-CV55-TKW-MJF, 2019 WL 8063989, at *5 (N.D. Fla. Sept. 16, 2019). Therefore, accepting the facts of the complaint as true, and drawing all reasonable inferences in Rebotix's favor, the Court agrees that Rebotix has plausibly alleged a distinct market for robotic surgery utilizing EndoWrists, and in turn a distinct market for EndoWrist repairs. See Id. (finding that plaintiffs adequately alleged a distinct market

for surgical robots, and therefore a distinct aftermarket for surgical robot repairs).

Although, generally, a relevant antitrust market will not be limited to just one brand, courts may recognize a one-brand market for antitrust purposes under certain circumstances. Spectrofuge Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 282 (5th Cir. 1978). For example, a limited market is appropriate when (1) "the vertically integrated manufacturer uses his dominant position at one level of competitive activity to eliminate competition at another level," or (2) "the firm's product is so unique or so dominant in the market in which it competes that any action by the manufacturer to increase his control over that product virtually assures that competition in the market will be destroyed." Id.

Both exceptions apply to the current case. Rebotix alleges that Intuitive "uses its dominance in the market for minimally invasive surgical robots to monopolize a separate market: the market for replacements and repairs of EndoWrists." (Doc. # 1 at ¶ 30). This is the sort of vertical integration contemplated by the Fifth Circuit in Spectrofuge Corp.

Furthermore, the complaint alleges that Intuitive has at least a 98% market share in the worldwide and domestic market for minimally invasive surgical robots. (Doc. # 1 at ¶ 15). "EndoWrist instruments are necessary to perform surgery with the da Vinci robot system and are only available from Intuitive," and "Intuitive has at least a 99% market share in the domestic and worldwide markets for replacements and repairs of EndoWrist instruments." (Id. at ¶¶ 32, 35). Therefore, Intuitive's products "occupy a position unique and dominant enough in the markets to warrant one-brand market definition." Spectrofuge Corp., 575 F.2d at 282.

Accordingly, the Court agrees with Rebotix that the complaint plausibly alleges a relevant antitrust market. See Restore Robotics, LLC, 2019 WL 8063989, at *6 (finding the one-brand market definition to apply where the defendant had a 98-99% share of the relevant markets, and "the crux of the entire amended complaint is that the vertically integrated Defendant has used its monopoly power in the primary market of surgical robots to eliminate competition in the related aftermarkets"). Thus, the Motion is denied as to Counts I and II.

**C.**   **Section 2 Claims**

A Section 2 monopolization claim is comprised of two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Morris Communs. Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1293-94 (11th Cir. 2004) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).

"The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market." Id. at 1294 (internal citation omitted). "The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." Id. (internal citation omitted).

Attempted monopolization has three elements, but "the only arguable distinction between monopolization and attempted monopolization in this case is that attempted monopolization requires a plaintiff to show the defendant's specific intent to monopolize." Restore Robotics, LLC, 2019 WL 8063989, at *8.

Intuitive moves to dismiss the portions of Counts III and IV based on the usage counter, arguing that incorporating

20

a memory chip into EndoWrists is not exclusionary behavior. (Doc. # 40 at 16-18). Rather, since a surgery-tracking memory chip is part of EndoWrist's proprietary design, Intuitive claims that Rebotix's argument is really a refusal to deal claim. (Id.). Under a refusal to deal framework, Intuitive argues that it did not terminate any prior course of voluntary dealing, therefore the usage counters cannot violate the Sherman Act. (Id.).

Rebotix responds that the usage counter is not part of a refusal to deal claim, but a fourth example of exclusionary behavior (specifically, technological tying). (Doc. # 43 at 17-18). Rebotix points out that it never sought Intuitive's cooperation, and the complaint does not allege that Rebotix requested access to Intuitive's property or information. According to Rebotix, it does not seek to deal with Intuitive at all. The complaint merely alleges that by including a usage counter, Intuitive technologically tied its da Vinci robots to EndoWrist replacement parts. (Id. at 15-16).

The Court agrees with Intuitive. The complaint states that "incorporating a usage counter" is anticompetitive because Rebotix's "business of repairing EndoWrists would be rendered obsolete if EndoWrists must be discarded before they are in need of repairs, as intended by Intuitive's usage

counter." (Doc. # 1 at ¶¶ 51, 69, 72). Accordingly, Rebotix "invested substantial time, resources, and money (millions of dollars) to develop a workaround." (Id. at ¶ 51). Rebotix contends that (1) forcing it to develop this workaround in the first place was anticompetitive behavior, and (2) developing a newer Xi da Vinci model that is resistant to the workaround is further evidence of anticompetitive behavior. (Id. at ¶¶ 51-52).

These allegations are comparable to the plaintiff's claims in 3Shape Trios A/S v. Align Technology, Inc., No. CV 18-1332-LPS, 2019 WL 3824209 (D. Del. Aug. 15, 2019), report and recommendation adopted, No. CV 18-1332-LPS, 2019 WL 4686614 (D. Del. Sept. 26, 2019). In that case, the plaintiff alleged that a scanner was anticompetitive because it was capable of sending scans directly to the defendant, but a customer had to take additional steps and pay a fee to send a scan to a competitor. Id. at *8. The district court held that this was "just another refusal to deal claim" because the plaintiff was essentially "asking [the defendant] to deal with its rivals in the [relevant] market by designing its [product] to send [competitors] business on favorable terms." Id.

Likewise, by challenging the inclusion of a usage counter, Rebotix is essentially asking Intuitive to "deal with its rivals in the [EndoWrist repair market]" by designing a usage counter that is easier to bypass, or alternatively to exclude a usage counter altogether. Id. This is in essence a refusal to deal claim.

Rebotix cites two cases to support its argument that this is a technological tying claim, but both are distinguishable. In United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001), the defendant believed that contractual restrictions were insufficient to combat an emerging competitor. Id. at 360. "Consequently, in late 1995 or early 1996, [the defendant] set out to bind [an internet browser] more tightly to [its operating system] as a technical matter." Id. at 360. The defendant redesigned several aspects of its already-existent operating system to accomplish this goal, and the district court condemned the decision to bind the products with "technological shackles." Id.

Similarly, in Datel Holdings Ltd. v. Microsoft Corp., 712 F. Supp. 2d 974 (N.D. Cal. 2010), a video game manufacturer developed a software update to its gaming system. The update disabled the use of third-party memory cards, meaning that players could no longer use plaintiffs'

23

larger cards, but had to switch to smaller, "authorized" cards made by the defendant. Id. at 890. The district court held that the plaintiff adequately pleaded a "technological tie" between the two products. Id. at 995, 999.

In both cases, the defendants updated a pre-existing product in a way that made it incompatible with emerging, complementary products made by rivals. But here, Rebotix does not allege that a software update or design change restricted previously unlimited EndoWrists to ten uses. Instead, Rebotix alleges that from the beginning, it had to design a workaround to the usage counter. (Doc. # 1 at ¶ 51).

A predetermined lifespan is a built-in feature of the EndoWrist, not a form of "technological interdependence" with another product. See Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1757(a) (4th ed. 2020) (noting that a technological tie occurs "[w]hen a defendant has market power in a primary product that works better with its complementary product than with rival versions," creating an interdependence between the two products that "may have the practical effect of foreclosing rivals in the complementary market even if the defendant sells the two products separately"). Rebotix takes issue with the very proprietary

24

design of the EndoWrist, and such a challenge is a refusal to deal claim.

Rebotix may not have directly asked Intuitive for access to the usage counter, but the heart of its memory chip argument is that Intuitive "should have designed its [EndoWrists] to make it easier for [competitors to repair their product]." 3Shape Trios, 2019 WL 3824209, at *8. Intuitive has no duty to design its products in a way that makes it easier for Rebotix to provide repairs. See In re Elevator Antitrust Litig., 502 F.3d 47, 52 (2d Cir. 2007) (affirming dismissal of refusal to deal claim where defendant designed its elevators to prevent servicing by competitors, refused to sell competitors parts, tools, software, or diagrams necessary to service elevators, and obstructed competitors' attempts to purchase replacement parts). Intuitive likewise has "no duty to help its competitors survive or expand when introducing an improved product design" like the Xi model. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 1002 (9th Cir. 2010).

Indeed, compelling Intuitive to share the source of its advantage by making EndoWrists easier to repair is in "tension with the underlying purpose of antitrust law," as it may

"facilitate the supreme evil of antitrust: collusion." Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408 (2004). Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [Intuitive] . . . to exercise [its] own independent discretion as to parties with whom [it] will deal." Id.

"[T]he sole exception to the broad right of a firm to refuse to deal with its competitors" is where a plaintiff alleges that defendants terminated a prior course of dealing. In re Elevator Antitrust Litig., 502 F.3d at 52. But, as stated previously, Rebotix alleges that it had to invest "substantial time, resources, and . . . millions of dollars [] to develop a workaround" to the usage counter, indicating that Rebotix has **always** had to work around memory chips without the assistance of Intuitive. (Doc. # 1 at ¶ 51).

Rebotix therefore fails to allege any "preexisting voluntary and presumably profitable course of dealing between the monopolist and the rival." Novell, Inc. v. Microsoft Corp., 731 F.3d 1064, 1074 (10th Cir. 2013). "Absent a duty to deal, antitrust law does not require a firm to lend its competitors a helping hand." Id. at 1072. Therefore, Intuitive's decision to include a usage counter in its EndoWrist design, by itself, does not constitute

anticompetitive conduct. <u>3Shape Trios</u>, 2019 WL 3824209, at *8.

The Court accordingly dismisses the portions of Counts III and IV based on the usage counter. Although the Court is skeptical that Rebotix can plausibly allege a prior course of voluntary dealing, out of an abundance of fairness, the Court grants Rebotix until March 16, 2021, to replead the sections of Counts III and IV that involve the usage counter.

Regardless, even without the refusal to deal allegation, Rebotix has sufficiently pleaded a claim of monopolization and attempted monopolization. Rebotix has plausibly alleged that Intuitive has monopoly power in the relevant market of EndoWrist repairs, explaining that Intuitive has "at least a 99% market share in the domestic and worldwide markets for replacements and repairs of EndoWrist instruments." (Doc. # 1 at ¶ 35).

Rebotix has also plausibly alleged that Intuitive obtained and maintains monopoly power in the EndoWrist repair market through three exclusionary tactics: contractual tying, contractual exclusivity, and threats of economic retaliation. (<u>Id.</u> at ¶¶ 53-55, 57, 69).

Lastly, the complaint sufficiently alleges intent to monopolize. Rebotix alleges extremely high pricing on both

the robots and EndoWrists, amounting to an overall gross margin on product sales of more than 70%. (Id. at ¶¶ 4, 32-33). Rebotix also points to "aggressive enforcement" of anticompetitive contractual terms, including written and verbal threats to withhold maintenance on da Vinci robots should a hospital hire a competitor to repair EndoWrists. (Id. at ¶ 56).

Taking these allegations as true, the Court finds that Rebotix has sufficiently alleged a claim of monopolization and attempted monopolization based on contractual tying, contractual exclusivity, and threats of economic retaliation. The Motion is denied as to the portions of Counts III and IV based on this conduct.

In so holding, the Court declines to dismiss the portions of the complaint based on newer Xi models. (Doc. # 40 at 20). According to Intuitive, if Rebotix fails to plead "a viable claim regarding the usage counter," then Rebotix "cannot establish antitrust injury attributable to its alleged inability to service Xi model EndoWrist instruments." (Id.). Therefore, per Intuitive, "all claims relating to those instruments should be dismissed." (Id.).

The Court disagrees. Separate and distinct from its usage counter argument, Rebotix alleges three anticompetitive

behaviors: contractual tying, contractual exclusivity, and threats of economic retaliation. (Doc. # 1 at ¶¶ 53-55, 57, 69). Taking all inferences in favor of Rebotix, these behaviors could plausibly foreclose Rebotix from repairing EndoWrists for the newer Xi models.

Therefore, only the portions of Counts III and IV based on the usage counter are dismissed. The Motion is denied as to the remainder of Rebotix's claims.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Intuitive Surgical, Inc.'s Motion to Dismiss for Failure to State a Claim (Doc. # 40) is **GRANTED IN PART AND DENIED IN PART.**

(2) The portions of Counts III and IV based on the usage counter are dismissed without prejudice.

(3) If possible, Rebotix may file an amended complaint repleading these claims by **March 16, 2021.**

(4) The Motion is denied as to the remainder of the complaint.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>8th</u>

day of March, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE