**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

REBOTIX REPAIR LLC,

                    Plaintiff,

vs.

                                  Case No.:  8:20-cv-02274

INTUITIVE SURGICAL, INC.,

                    Defendant.

<u>**Rebotix's Motion to Exclude Opinions of Defendant's Expert, Dr. Sara Parikh and Incorporated Supporting Memorandum of Law**</u>

Plaintiff Rebotix Repair respectfully requests the Court to enter an Order excluding the opinions of Intuitive's survey expert, Dr. Sara Parikh.

## I.   Questions Presented.

1. An expert's opinions must be excluded if they are not relevant to the issues presented in the case.  For marketing material to be relevant to a false advertising claim, there must be evidence that the material impacted consumers' purchasing decision.  In support of Intuitive's false advertising claims, Dr. Parikh has conducted a survey and offered opinions about a piece of marketing material (a one-page flyer).  But there is no evidence in the record (from Dr. Parikh or elsewhere) that the flyer had any impact on consumers' purchasing decision. Should Dr. Parikh's opinions be excluded?

2. A survey measuring consumer response to marketing materials that does not replicate how consumers view the marketing material in the real-world is misleading, unreliable, and must be excluded at *Daubert*.  Dr. Parikh's survey does not replicate how consumers view Rebotix's marketing material in the real world.  Dr. Parikh showed survey respondents the one-page flyer in isolation to measure how prospective customers perceive Rebotix's marketing material.  But it is undisputed that, in the real world, Rebotix provided customers with additional materials that included more detailed information than the one-page flyer.  Should Dr. Parikh's survey be excluded?

## II.   Introduction.

Plaintiff Rebotix Repair moves to exclude the opinions of Dr. Sara Parikh.

Intuitive has asserted three counterclaims alleging that Rebotix disseminated marketing materials that include purportedly false and misleading statements about Rebotix's services: a claim under the Lanham Act, a claim under common law unfair competition, and a claim under the Florida Deceptive and Unfair Trade Practices Act.  Counterclaims (Dkt #60), ¶¶77-85, 86-88, 93-96.

Each of those counterclaims requires a showing that false and misleading statements had a material impact on customers' purchasing decisions.  "To succeed on a [Lanham Act] false advertising claim … a [party] must establish" that the false or misleading statement "had a material effect on purchasing decisions."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260-61 (11th Cir. 2004) (internal citations omitted).  And "the legal standards we apply to" "violations of the Lanham Act, FDUTPA, and Florida state common law for … unfair competition" are "the same."  *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012).

In support of these counterclaims, Intuitive intends to present a survey and related testimony from Dr. Sarah Parikh.  Dr. Parikh identified survey participants who were purportedly representative of hospital staff that would play a role in the decision to purchase Rebotix's services.  Dr. Parikh's survey then exposed respondents to a single stimulus, a one-page flyer that provides a rough overview of Rebotix's services.  Ex. 1 (flyer).  Based on this flyer, Dr. Parikh purported to "measure how prospective customers of Rebotix's services perceive Rebotix's advertising." Ex. 2 (Parikh Report), ¶6.

But Dr. Parikh never considered or measured materiality—whether the flyer had any impact on consumers' purchasing decisions—as part of her survey. Ex. 3 (Parikh deposition), 141:23-142:4; 143:15-24.  Dr. Parikh testified that she has not "seen any evidence that a hospital based their decision on whether to purchase Rebotix's services based on the one-page pamphlet shown to [her] survey participants;" and that she could not "identify a single customer of Rebotix who based their purchasing decision on the one-page pamphlet."  Ex. 3 (Parikh deposition), 139:12-23.

Given that Rebotix's services involve expensive medical equipment used in surgery, Dr. Parikh agreed that it would be "unreasonable" for "a hospital to ever make a purchasing decision for Rebotix's services solely on a one-page flyer," and that she "would certainly expect" hospitals to consider "other things" like "conversations with salespeople" and "learn more and study more about Rebotix's services well beyond the information included in the one-page flyer." Ex. 3 (Parikh deposition), 147:17-148:10; *Id.* at 104:10-105:1.

And Intuitive has not separately developed any evidence that the flyer had any impact on the purchasing decisions of hospital customers.  The evidence demonstrates the opposite:  Intuitive deposed two hospitals in this case, and there is no evidence that either hospital even received (much less considered) the flyer before making a purchasing decision.  Moreover, Rebotix's 30(b)(6) marketing deponent testified that "we just stopped using [the flyer] because we noticed people would just leave it on the table and read the other ones."  Ex. 4

3

(Papit deposition), 144:14-145:7.  The "other ones," were the far more detailed "main pieces" of marketing materials: the "statement on quality and reliability and the hospital right to repair."  *Id.*; Ex. 7 (Hospital Right to Repair); Ex. 8 (Statement on Quality and Reliability).

Dr. Parikh admitted that, although she had an "understanding" that "Rebotix shared" these "main pieces" of Rebotix's marketing material "with potential customers," she did not show them to her survey participants.  Ex. 3 (Parikh deposition) 35:10-18, 37:16-38:2.  She further admitted that if she had shown these marketing materials to her survey participants, the conclusions from her survey could have been substantially different.  Ex. 3 (Parikh deposition) 68:22-69:14; 92:10-24; 91:16-25; 103:3-20.

Because there is no evidence that the one-page flyer Dr. Parikh tested was material to the purchasing decisions of Rebotix's customers, Dr. Parikh's survey is legally irrelevant and should be excluded.

Dr. Parikh's survey and her accompanying opinions should also be excluded for the independent reason that they are unreliable.  A survey should be excluded as unreliable if it does not "resemble the way consumers would view the products in the marketplace."  *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, No. 7:10-CV-124 (HL), 2012 U.S. Dist. LEXIS 69715, at *15 (M.D. Ga. May 18, 2012) (quotations omitted).  Here, Dr. Parikh tested respondent's impressions of an overview flyer, without showing them the additional marketing materials that Rebotix provided to potential customers.  These additional materials provided far

4

more detailed information that clarified any confusion allegedly caused by the flyer. Thus, if Dr. Parikh's survey had resembled the way consumers view the flyer—in conjunction with much more detailed additional materials—her conclusions would have been substantially different. Her conclusions based only on the flyer should therefore be excluded as unreliable.

## III.  Argument.

To be admissible evidence under Rule 702 and *Daubert*, expert testimony "must be both relevant and reliable." *Acosta v. Novamed Surgery Ctr. of Orlando, LLC*, No. 6:12-cv-985-Orl-28KRS, 2014 U.S. Dist. LEXIS 63988, at *8 (M.D. Fla. May 8, 2014) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). District courts "must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005). Moreover, "Federal Rule of Evidence 403 permits the exclusion of all testimony—expert or otherwise—if 'its probative value is substantially outweighed by danger of . . . confusing the issues [or] misleading the jury." *United States v. Williams*, 865 F.3d 1328, 1338 (11th Cir. 2017).

We demonstrate below that Dr. Parikh's testimony is both (A) irrelevant and (B) unreliable. We further demonstrate that (C) Dr. Parikh's testimony presents a danger of confusing and misleading the jury, which substantially outweighs its (nonexistent) probative value. We address each of (A), (B), and (C) in turn.

## A.     Dr. Parikh's opinions are inadmissible as irrelevant.

Expert testimony must be "relevant to the task at hand," such that "it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quotations omitted). Here, Dr. Parikh's testimony is being offered to support Intuitive's false advertising claims.  To be relevant, it would have to advance some aspect of those claims.  But the only advertisement that Dr. Parikh analyzed is immaterial and therefore cannot sustain a false advertising claim.  For this reason, Dr. Parikh's analysis of the advertisement does not advance any aspect of Intuitive's claims and is irrelevant.

### 1.   Under both Federal and Florida law, immaterial advertisements cannot be the basis for a false advertising claim.

For Intuitive to assert a valid false advertising claim under the Lanham Act, it must do more than simply identify an advertisement and claim that the advertisement was false or misleading.  "To succeed on a false advertising claim under § 43(a)(1)(B) of the Lanham Act, a plaintiff must establish [*inter alia*] that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) <u>the deception had a material effect on purchasing decisions</u>." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260-61 (11th Cir. 2004) (emphasis added, internal citations omitted).

In other words, to "succeed on a claim of false advertising, the plaintiff

must establish that the defendant's deception is likely to influence the purchasing decision." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) (internal quotations omitted). "[E]ven demonstrably false statements that are irrelevant to consumer purchasing decisions are immaterial and cannot be the basis for a false advertising claim." *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 796-97 (11th Cir. 2020) (citing *Johnson & Johnson Vision, Care, Inc.*).

If there is no evidence that an advertisement had a material effect on a customer's decision to purchase the advertised product, then that advertisement cannot form the basis of a Lanham Act claim. *See Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 6:18-cv-576-Orl-28DCI, 2020 U.S. Dist. LEXIS 210098, at *29-30 (M.D. Fla. Nov. 10, 2020) (holding that a failure to show a "material effect on purchasing decisions" was "fatal" to a Lanham Act claim). Nor can it form the basis of a false advertising claim under FDUTPA or common law unfair competition. *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) ("the legal standards we apply to" "violations of the Lanham Act, FDUTPA, and Florida state common law for infringement and unfair competition" are "the same"); *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1323 (11th Cir. 2011) (holding that a FDUTPA claim "fails because the legal standards we apply to that claim are the same as those we have applied under section 43(a) of the Lanham Act"); *Custom Mfg. & Eng'g, Inc. v. Midway Servs.*, 508 F.3d 641, 652 (11th Cir. 2007) ("the analysis of the Florida statutory

7

and common law claims of . . . unfair competition is the same as under the [Lanham Act]") (quotations omitted).

### 2. Expert testimony based on immaterial advertisements must be excluded as irrelevant.

Expert testimony must be "relevant to the task at hand," such that "it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quotations omitted). Here, Dr. Parikh's testimony is being offered to support Intuitive's false advertising claims. To be relevant, it would have to advance some aspect of those claims.

Dr. Parikh's survey only measures customers' response to a single advertisement—a one-page flyer. For Dr. Parikh's survey and testimony about that flyer to be relevant, the flyer itself would need to be an advertisement capable of sustaining a false advertising claim. That is, there would have to be evidence that the one-page flyer was (1) false or misleading, (2) deceived, or had the capacity to deceive, customers, and (3) had a material effect on purchasing decisions. If, on the other hand, there is no evidence demonstrating that the flyer had a material effect on consumers' purchasing decisions, the flyer is "immaterial," so it "cannot be the basis for a false advertising claim." *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 796-97 (11th Cir. 2020). Expert analysis of an immaterial flyer would not advance any aspect of Intuitive's claims, and must be excluded as irrelevant.

### 3. Intuitive has not shown any evidence that the flyer analyzed by Dr. Parikh was material.

As demonstrated below, Dr. Parikh does not provide, nor has Intuitive otherwise developed, any evidence that the one-page flyer had any effect, much less a material effect, on any customer's purchasing decisions.[1]  Without any evidence of materiality, the entirety of Dr. Parikh's expert report and related testimony deal exclusively with an advertisement that as a matter of law cannot sustain a Lanham Act claim.

### a. Dr. Parikh's survey is not probative of materiality.

If a survey fails to ask about whether a statement would have affected a customer's purchasing decision, that survey is not probative of materiality.  *See Johnson & Johnson*, 299 F.3d at 1250; *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 798 (11th Cir. 2020) ("the survey did not ask respondents whether their conclusions about the presence of steel would have affected their decision to purchase one product or the other.  Without asking that question or something similar, the survey fails to address the critical issue of effect on purchasing decisions, and therefore cannot be probative of materiality.")

Dr. Parikh admitted that her survey "was not a test of purchasing decision[s] or materiality."  Ex. 3 (Parikh deposition), 156:16-157:5.  She did not "test whether [the flyer] impacted [customers'] purchase decision." *Id.*, 157:6-16.

---

[1]       Overwhelming evidence demonstrates that the statements in Rebotix's one-page flyer tested by Dr. Parikh were <u>not</u> false, misleading or deceptive.  However, Rebotix does not address that evidence here, because the lack of evidence for the "material effect on purchasing decision" requirement is dispositive of Dr. Parikh's opinions at *Daubert*.

And she did not perform any analysis or research "to determine what kind of information purchasers of Rebotix's services might base their purchasing decision on." *Id.*, 141:23-142:4.

> ### b. There is no other evidence of materiality for the one-page flyer that Dr. Parikh used as her stimulus.

Intuitive has not developed any evidence that any hospital or other customer of Rebotix considered the flyer in its purchasing decision.  For example, there is no evidence that the hospitals Intuitive deposed in this case even received the flyer.  Ex. 5 (Pullman Hospital deposition), 155:10-156:7; Ex. 6 (Evergreen Hospital deposition), 30:15-18, 109:23-110:2.  Instead, the evidence shows that customers "would just leave [the flyer] on the table and read the other [materials provided]."  Ex. 4 (Papit deposition), 144:11-17.

The lack of evidence that the flyer played any role in hospitals' decision-making is confirmed by Dr. Parikh's review.  Dr. Parikh saw no evidence in her review of the factual record that the one-page flyer played any role in any customer's purchasing decision.

> 23      Have you seen any evidence that a
> 24  one-page pamphlet shown to your survey
> 25  participants even played a role in the
> 1    purchasing decision of any of Rebotix's
> 2     customers?
> 3       MR. FEIRMAN:  Object to form.
> 4   A.  I haven't seen evidence of that one
> 5   way or the other.
>
>    - Ex. 3 (Parikh deposition), 140:23 – 141:5.

And the realities of hospital purchasing decisions do not support any

inference that hospitals would base their decision on a single flyer.  Indeed, Dr.

Parikh conceded that a hospital would not "ever make a purchasing decision" on

the basis of a simple one-page flyer and that it "would be unreasonable" for a

hospital to do so.

> 17        Do you think it would be likely that
> 18  a hospital would ever make a purchasing
> 19  decision for Rebotix's services solely on the
> 20  one-page flyer?
> 21        MR. FEIRMAN:  Object to form.
> 22    A.  Probably not.
> 23    Q.  That would be unreasonable.  Correct?
> 24        MR. FEIRMAN:  Object to form.
> 25    A.  Yeah.  I mean, for a product like
> 1   this, you -- you -- you would take -- you would
> 2   learn more, you would take more time to study
> 3   it.
>
>        - Ex. 3 (Parikh deposition), 147:17-148:3

And Dr. Parikh further testified that customers would consider

"conversations with Rebotix salespeople, other communications they receive,"

and "their own hospital needs" in making the determination on whether or not to

use Rebotix's services.  Ex. 3 (Parikh deposition), 104:19-105:1.  Thus, no

evidence or inference in this case supports a conclusion that the flyer used by

Rebotix played any role in a customer's purchasing decision.

### c. The flyer is not representative of Rebotix's advertising, and there is no evidence of materiality for any Rebotix advertisement.

Dr. Parikh does not offer any opinions that the particular stimulus she

selected is representative of the communications that Rebotix provides to

customers.  Ex. 3 (Parikh deposition), 51:2-10.  And Dr. Parikh did not perform

any analysis comparing the advertisement she used for her survey to other advertisements used by Rebotix.  *Id*., 51:25-52:5.

Dr. Parikh only reviewed two small portions of Mr. Papit's deposition in determining that the flyer that she studied should be used as the marketing material to be tested with a survey.  Ex. 3 (Parikh deposition), 189:2-11.  She was instructed to review those sections by counsel.  Ex. 3 (Parikh deposition), 188:6-10.  Dr. Parikh did not review the rest of the transcript to see whether there was contradictory information, nor did she ask counsel whether there was any additional or contradictory information in the Papit deposition or in any other materials in the case.  Ex. 3 (Parikh deposition), 190:7-191:3.  Such a review would have indicated that Rebotix's "statement on quality and reliability and the hospital right to repair" were the far more detailed "main pieces" of marketing materials used.  Ex. 4 (Papit deposition), 144:14-145:7.

A comparison of the one-page flyer Dr. Parikh tested (i.e., the one Rebotix rejected because its customers "would just leave it on the table") to Rebotix's "main pieces" of marketing materials (i.e., the ones customers actually "read"), Ex. 4 (Papit deposition), 144:11-17, reveals significant differences that Dr. Parikh admitted would materially change the survey results and Dr. Parikh's conclusions.  For example:

(1) Authorized or endorsed: Dr. Parikh attempted to measure the percentage of Rebotix's customers who would be misled into believing that Rebotix "misrepresents itself as authorized, approved or endorsed by Intuitive."

Ex. 2 (Parikh Report), ¶¶5-6, ¶9.  Although the one-page flyer Dr. Parikh showed the participants says nothing about whether Rebotix is authorized, approved, or endorsed by Intuitive (see Exhibit 1, flyer), upon reviewing the flyer, "[f]our in ten respondents (41%)" indicated a belief that "Rebotix is authorized, approved or endorsed by the manufacturer of EndoWrist instruments."  Ex. 2 (Parikh Report), ¶51.  The top reasons for this response included "EndoWrist named in the flyer" and "assume there has to be authorization."  *Id.*

However, these results in no way suggest that 41% of Rebotix customers purchased its services while holding the belief that Rebotix was authorized, approved, or endorsed by Intuitive.  To the contrary, in its detailed marketing materials, Rebotix was crystal clear that it was <u>not</u> authorized, approved or endorsed by Intuitive.  Dr. Parikh's survey results were achieved only by excluding from the survey Rebotix's marketing documents that actually address this issue.  For example, Rebotix's Hospital Right to Repair—which unlike the one-page flyer, was a primary piece of marketing materials distributed to customers—was dedicated solely to refuting unreasonable positions held by Intuitive.  Ex. 3 (Parikh deposition) 87:19-89:16.[2]

Dr. Parikh admitted that the contents of this document are "not the sort of statement[s] that would be made by a company that was authorized, approved, or

---

[2]    For example, the document states, "Intuitive incorrectly fails to recognize that repaired reusable medical devices remain OEM medical devices. They prefer to deny the rights of ownership to hospitals and surgery centers that have purchased EndoWrists.  Intuitive claims the problem is patient safety.  This claim is without basis in medical device history and is undermined by Intuitive's own practice."  Ex. 7 (Hospital Right to Repair).

endorsed by Intuitive." Ex. 3 (Parikh deposition), 88:9-14.  She further admitted
that it would not be reasonable for a customer to draw the conclusion that
Rebotix was authorized, approved, or endorsed by Intuitive after viewing the
marketing materials.

> 16      Q.  Would it be reasonable for a customer
> 17  who read the Hospital Right to Repair document
> 18  to walk away with the belief that Rebotix is
> 19  authorized, approved, or endorsed by Intuitive?
> 20      MR. FEIRMAN:  Object to form.
> 21      A.  Would it be reasonable?  I mean, hate
> 22  to judge them.  I mean, if they read and
> 23  understood it, they -- they probably would not
> 24  believe that -- that Intuitive authorizes,
> 25  endorses Rebotix.
>
> - Ex. 3 (Parikh deposition), 91:16-25

Dr. Parikh also agreed that "the Hospital Right to Repair document
certainly suggests that Rebotix is <u>not</u> authorized, approved by, or endorsed by
Intuitive." Ex. 3 (Parikh deposition), 92:10-14.  But Dr. Parikh elected not show
this document to any of her survey respondents.

(2) Replacement chip: Dr. Parikh attempted to measure whether
respondents would expect that Rebotix's services involved "physical
modifications" to the chip, including replacing the "circuit board" with a new one.
Ex. 2 (Parikh report), ¶11, ¶54.  Again, the flyer itself made no mention of this
process one way or the other (see Exhibit 1).  Upon reviewing the flyer,
"[a]pproximately one-third of participants say that they would not expect Rebotix
to discard the original circuit board and substitute it with a third party one." *Id.*

But again these results were achieved only by excluding from the survey

14

Rebotix's marketing documents that actually address this issue.  For example, the Hospital Right to Repair document that Rebotix provided to potential customers explicitly states that Rebotix's "service provides the resetting of the use counter via a replacement chip (Interceptor), provided by Rebotix, extending the life of the instrument."  Ex. 7 (Hospital Right to Repair).  Dr. Parikh admitted that survey participants were not shown any materials "that included any mention of the interceptor chip." Ex. 3 (Parikh deposition), 67:24-68:6.  And Dr. Parikh further admitted that if she had not withheld this document from her survey participants, the results of her survey could have been "substantially different." Ex. 3 (Parikh deposition), 63:21-64:9; 68:22-69:14.

(3) <u>Sterilizing component parts</u>: Dr. Parikh tested whether respondents that viewed the one-page flyer "would expect the 'repair and reset' process to include . . . sterilizing component parts," and found that 69% of respondents did expect the process to include sterilization.  Ex. 2 (Parikh report), ¶45.  But Dr. Parikh admitted that the flyer "does not explicitly mention" sterilization and "results could be different" if there was an advertisement that "explicitly stated that Rebotix does not sterilize" instruments.  Ex. 2 (Parikh deposition), 99:20-100:20.  And after she was shown a document provided to Rebotix's customers that stated that sterilization was not performed by Rebotix but was instead performed by the hospital, Dr. Parikh concluded that customers could have a different understanding of whether Rebotix sterilizes instruments.

> 12     Rebotix's potential customers, if
> 13   they read this Q&A, would probably have the

14  understanding that Rebotix does not sterilize
15  the EndoWrist or its component parts.  Correct?
16       MR. FEIRMAN:  Object to form.
17    A.  It's possible, yes.
18    Q.  That's not something you tested with
19  your survey.  Correct?
20    A.  That is correct.

-  Ex. 3 (Parikh deposition), 103:12-20.

In sum, the one-page flyer is not representative of the marketing materials that Rebotix provided to potential customers before they made a purchasing decision.  Moreover, Dr. Parikh admitted that if she had shown the survey participants these marketing materials, the results of her survey and her conclusions would have been different.

### d. The use of the word "repair" does not establish materiality.

In certain circumstances, a party may establish that a statement in an advertisement is "material" to the purchasing decision by "proving that the [advertiser] misrepresented an inherent quality or characteristic of the product." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) (internal citations omitted).  However, simply asserting that an element of a product is an essential characteristic is not enough; a party must also show that the characteristic at issue "would matter to a consumer" and "would be material to a consumer's purchasing decision."  *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 798 (11th Cir. 2020).  As the Eleventh Circuit has explained, "the 'inherent quality or characteristic' formulation adopted by this Circuit does not replace the consumer-oriented nature of the materiality inquiry

16

with a scientific one." *Id*. at 797.[3]

For example, in *Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 6:18-cv-576-Orl-28DCI, 2020 U.S. Dist. LEXIS 210098 (M.D. Fla. Nov. 10, 2020), the plaintiff asserted that the defendant had misrepresented an inherent quality or characteristic of its product.  The district court granted summary judgment on materiality because there was no "expert testimony or other evidence to support [the] contention" that the misrepresentation would affect "consumer purchasing decisions."  *Id*. at *30.

Here, Intuitive asserts that Rebotix misrepresented an inherent quality or characteristic of its services by using the word "repair" in the one-page flyer. *See* Ex. 2 (Parikh Report), ¶5, ¶6 (purporting to "measure how prospective customers of Rebotix's services perceive Rebotix's advertising with respect" to Intuitive's assertion that "Rebotix misrepresents its services that override EndoWrist usage limits as 'repairs.'").  Intuitive, however, cannot avoid the "material to a purchasing decision" requirement simply by asserting that the Rebotix's use of the word "repair" misrepresents an inherent quality or characteristic of its service.  Rather, as in *Club Exploria*, Intuitive's assertion cannot establish materiality without evidence that the alleged misrepresentation affected customer purchasing decisions.

---

[3]     This is true even in cases where a statement about a product's inherent quality or characteristic is not just misleading, but literally false.  *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) ("The plaintiff must establish materiality even when the court finds that the defendant's advertisement is literally false.")

Intuitive has no such evidence.  At minimum, to demonstrate that a hospital would alter its purchasing decision based on the use of the word "repair," Intuitive would need to provide evidence that a consumer's decision was affected by the use of that word. *J-B Weld Co. v. Gorilla Glue Co.*, 978 F.3d 778, 798 (11th Cir. 2020) (absent "any showing that these differences would matter to a consumer," mere "speculation cannot sustain [a] claim of materiality").

Intuitive has not provided any evidence that hospitals considered Rebotix's use of the word "repair" as a factor in their purchasing decision.  Neither of the hospitals that were deposed provided any testimony that Rebotix's use of the word "repair" or of its description as a repair service affected the decision by the hospitals to use Rebotix's services.  For example, the hospitals did not indicate that, because Rebotix used the word "repair" in its marketing materials, they understood Rebotix's services to only include repairs and not to override EndoWrists' use limits.  Nor did they indicate that this question would be relevant to their purchasing decision.

To the contrary, Stacy Donovan, the representative for Evergreen Health, made clear that the hospital had "an understanding that Rebotix would repair and add additional lives to the EndoWrists."  Ex. 6 (Evergreen Hospital deposition), 24:21-25:10.  And Edward Harrich, the representative for Pullman Regional, testified that he learned that Rebotix's repair services included extending the lives of the EndoWrist during the very first call he had with a Rebotix sales representative.  Ex. 5 (Pullman Hospital deposition), 34:9-36:4.

Intuitive has not provided any other evidence that any customer would place any weight on Rebotix's description of its service process as a repair. "Without evidence on the issue, it would be pure speculation to hold that . . . consumers are materially deceived" and "[t]his speculation cannot sustain [Intuitive's] claim of materiality." *J-B Weld Co. v. Gorilla Glue Co.,* 978 F.3d 778, 798 (11th Cir. 2020); *Stiefel Labs., Inc. v. Brookstone Pharm., L.L.C,* 535 F. App'x 774, 778 (11th Cir. 2013) (holding that a party cannot establish materiality without evidence "show[ing] that [the] false statements influenced [consumers'] purchasing decisions").

## B. Dr. Parikh's opinions are inadmissible as unreliable because Dr. Parikh's survey fails to reflect real world conditions.

The undisputed facts set forth above demonstrate that Dr. Parikh's survey and testimony should be excluded for a second reason. It does not reflect the way consumers encounter Rebotix's marketing material in the real word, and is therefore unreliable.

"Under Rule 702 and Daubert, district courts must act as 'gatekeepers' which admit expert testimony only if it is ... reliable." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "In order to be considered reliable, a survey must resemble the way consumers would view the products in the marketplace . . . Therefore, [it] must use the proper stimulus, one that tests for confusion by replicating marketplace conditions." *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, No. 7:10-CV-124 (HL), 2012 U.S. Dist. LEXIS 69715, at *15

(M.D. Ga. May 18, 2012) (internal citations and quotations omitted).

For example, in *Hi-Tech Pharm. Inc. v. Dynamic Sports Nutrition, LLC*, No. 1:16-cv-949-MLB, 2021 U.S. Dist. LEXIS 101946 (N.D. Ga. May 28, 2021), plaintiff's survey showed respondents two different trademarks side-by-side to test whether there was a likelihood of confusion between the marks.  But in the real world, one of the marks was "sold at brick-and-mortar mass retailers" while the other was "sold only via the Internet," such that the marks "do not exist in close proximity to one another."  *Id*. at 59.  The court excluded the expert's "survey and testimony as unreliable," because the expert failed to simulate these real-world conditions.  *Id.*

Similarly, in *Native Am. Arts, Inc.*, No. 7:10-CV-124 (HL), 2012 U.S. Dist. LEXIS 69715 (M.D. Ga. May 18, 2012), plaintiff's expert showed survey respondents a single image of defendant's product to test whether consumers were misled by the image.  But as the court noted, "the manner in which Defendant offers for sale, displays for sale, or sells goods encompasses all of the information provided on the website or in the catalogue. A consumer in the marketplace would not view one picture of a product and a few lines of text. Instead, he would see a plethora of additional information - information that [the expert] did not include in the survey for the respondents to view."  *Id*. at *17.  For this reason, the court excluded the survey as "unreliable under Rule 702 and misleading and confusing under Rule 403."  *Id*. at *19.

Dr. Parikh's survey contains the same flaws as the surveys that were

properly excluded in *Hi-Tech Pharm.* and *Native Am. Arts*.  Dr. Parikh made no effort to determine how the flyer she tested was actually used in the marketplace. She admitted that her conclusions on consumer confusion are "based solely" on the measurements of consumer perception of the one flyer she tested, in isolation.  Ex. 3 (Parikh deposition), 48:24-49:1, 50:8-15, 55:14-18, 57:1-6.  She did not have "any understanding of how frequently" Rebotix used the flyer, or how many "potential customers actually viewed the advertisement."  Ex. 3 (Parikh deposition), 116:17-25.  And Dr. Parikh did not so much as look at the depositions of actual customers of Rebotix to determine how those customers made their decisions, or whether they even received the flyer. Ex. 3 (Parikh deposition), 23:5-8 ("Q. Did you review the deposition transcripts from any representatives of hospitals in this case? A. No.").

Had Dr. Parikh made an attempt to determine how Rebotix actually advertised to customers, she would have learned that Rebotix's customers were provided with multiple additional sources of information that provided different and detailed answers to customers' potential questions.  As described above, Glenn Papit, a Rebotix employee, provided testimony about the marketing materials that Rebotix used.  Mr. Papit testified that the "front piece" of Rebotix's marketing was a "statement on quality and reliability."  Ex. 4 (Papit deposition), 143:20-144:1.  Rebotix also "had a statement on the hospital's right to repair." Ex. 4 (Papit deposition), 144:2-6.  Mr. Papit further testified that "[t]here was a flyer that we had that we used early on, but we just stopped using it because we

noticed people would just leave it on the table and read the other ones." Ex. 4 (Papit deposition), 144:11-17.

Dr. Parikh only considered that flyer, even though Mr. Papit testified that the flyer "wasn't a main piece" and that the "main pieces were the statement on quality and reliability and the hospital's right to repair." Ex. 4 (Papit deposition), 144:24-145:7. Dr. Parikh did not make any attempt to test the "main pieces" of Rebotix's marketing material. And Dr. Parikh did not make any attempt to test customers' reaction to the flyer in the context of these additional materials. What's worse, as demonstrated above, Dr. Parikh admitted that her survey results would have been different if she had tested the additional Rebotix marketing materials that consumers encountered in the real world.

Further, Dr. Parikh made no attempt to investigate how group purchasing organizations factored into the decision to use Rebotix's services. As Mr. Papit testified, Rebotix marketed to multiple group purchasing organizations as part of a "systematic" process of reaching out to customers. Ex. 4 (Papit deposition), 166:23-167:4. Dr. Parikh did not review any evidence that Rebotix marketed to group purchasing organizations, and did not perform any analysis of how the decision making of group purchasing organizations would be affected by Rebotix's advertising. Ex.3 (Parikh deposition), 225:19-227:2. And Dr. Parikh did not know how the relationship between a group purchasing organization and a hospital would impact that hospital's purchasing decisions. Ex. 3 (Parikh deposition), 229:17-230:8.

22

When confronted with these facts at deposition, Dr. Parikh ultimately acknowledged that her approach of using the one-page flyer as a stimulus was not representative of real market conditions and that she "would not expect potential customers of Rebotix's service to make their purchasing decision based off of the one-page pamphlet [she] tested" but instead "would take other things into consideration."  Ex. 3 (Parikh deposition), 104:10-105:23.

Because Dr. Parikh failed to test a proper stimulus that was representative of real-world marketing conditions, Dr. Parikh's methodology is unreliable and her survey results are subject to exclusion under Rule 403.

### C.  Dr. Parikh's opinions are inadmissible because they present a danger of confusing the issues and misleading the jury.

"Federal Rule of Evidence 403 permits the exclusion of all testimony— expert or otherwise—if its probative value is substantially outweighed by danger of . . . confusing the issues [or] misleading the jury." *United States v. Williams*, 865 F.3d 1328, 1338 (11th Cir. 2017).  As discussed above, analysis of the flyer is not probative of Intuitive's false advertising claims, because there is no evidence that a single customer made a purchasing decision based off the flyer.  It is also misleading and confusing.

Rebotix supplied hospitals with additional, more detailed materials, which Dr. Parikh failed to analyze.  If Dr. Parikh were allowed to testify about customers' perceptions of the flyer, it would create the misleading impression that her opinions apply to Rebotix's marketing materials as a whole.  Her

testimony should therefore be excluded.  See *Native Am. Arts, Inc.*, No. 7:10-CV-124 (HL), 2012 U.S. Dist. LEXIS 69715 (M.D. Ga. May 18, 2012) (excluding a consumer survey as "misleading and confusing" under Rule 403 because it "faile[ed] to present the complete manner in which Defendant displays, offers to sell, or sells its goods").

For example, Dr. Parikh states in her report that "[f]our in ten respondents (41%)" indicated a belief that "Rebotix is authorized, approved or endorsed by the manufacturer of EndoWrist instruments."  Ex. 2 (Parikh Report), ¶51.  This testimony is confusing and misleading.  It implies that 41% of customers believed that Rebotix was endorsed by Intuitive after reviewing Rebotix's marketing materials.  In reality, Rebotix's primary marketing materials made clear to customers that Rebotix was neither approved nor endorsed by Intuitive.

Dr. Parikh concedes that these additional materials were presented to customers alongside the flyer, that they could have substantially affected those customers' impressions, and that she nevertheless chose not to show these additional materials to survey participants.  Ex. 3 (Parikh deposition), 63:21-64:9; 68:22-69:14.  Her decision to instead focus on one out-of-context page of marketing materials creates the false impression that the flyer is representative of Rebotix's marketing as a whole.  Dr. Parikh's survey should therefore also be excluded as misleading and confusing.

## IV. Conclusion

Dr. Parikh's survey and opinions are not relevant to the issues raised in this

case, and her methodology is unreliable.  As such, Dr. Parikh's survey and related

opinions should be excluded in their entirety.

Date: November 17, 2021                    Respectfully submitted,


                                _/s/ Richard Lyon_____
                                Richard Lyon
                                California Bar No. 229288 (*pro hac vice*)
                                rick@dovel.com
                                Gregory S. Dovel
                                California Bar No. 135387 (*pro hac vice*)
                                greg@dovel.com
                                DOVEL & LUNER, LLP
                                201 Santa Monica Blvd., Suite 600
                                Santa Monica, California 90401
                                Telephone: (310) 656-7066
                                Facsimile: (310) 656-7069
                                David L. Luikart III
                                Florida Bar No.: 21079
                                dave.luikart@hwhlaw.com
                                HILL WARD & HENDERSON, P.A.
                                101 East Kennedy Blvd.
                                Tampa, Florida 33602
                                Telephone: (813) 227-8419
                                Facsimile: (813) 221-2900

                                ATTORNEYS FOR PLAINTIFF
                                REBOTIX REPAIR LLC

## Certificate of Good Faith Conference

Consistent with the Court's Case Management and Scheduling Order, ECF No. 36, Rebotix certifies that its counsel conferred by telephone with Defendant's counsel regarding this motion on November 15, 2021.  The conference did not resolve the issues raised in the motion.

Date: November 17, 2021                     Respectfully submitted,


                                 _/s/ Richard Lyon_____