### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| REBOTIX REPAIR LLC,<br><br>       Plaintiff/Counterclaim<br>       Defendant,<br><br>v.<br><br>INTUITIVE SURGICAL, INC.,<br><br>       Defendant/Counterclaim<br>       Plaintiff. | Civil Case No. 8:20-cv-2274-VMC-TGW |

### INTUITIVE SURGICAL, INC.'S MOTION TO EXCLUDE
### CERTAIN OPINIONS OF DR. LARRY CHIAGOURIS

Pursuant to Rule 702 of the Federal Rules of Evidence, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Defendant and Counterclaim Plaintiff Intuitive Surgical, Inc. ("Intuitive") respectfully submits this motion to exclude certain opinions of Dr. Larry Chiagouris, who has been proffered by Plaintiff and Counterclaim Defendant Rebotix Repair LLC ("Rebotix") to critique the survey methodology of Intuitive's survey expert, Dr. Sara Parikh.

### PRELIMINARY STATEMENT

Although Dr. Chiagouris's expertise purports to be in survey design, and not in hospital instrument procurement and maintenance practices, robotic-surgical instrument marketing, or the law, Dr. Chiagouris has not confined his opinion to

critiquing the design of Dr. Parikh's false advertising survey.  Rather, based on one telephone conversation with Rebotix's vice president, an unverified document apparently compiled by Rebotix's counsel, and two Internet blog posts about hospital marketing written by unknown authors, Dr. Chiagouris opines that (i) certain respondents in Dr. Parikh's survey "likely" were not responsible for purchasing Rebotix's services, (ii) the advertising flyer that Dr. Parikh tested in her survey was not representative of Rebotix's marketing efforts, and (iii) Dr. Parikh's survey is legally irrelevant to the issues in this case, despite the fact that the survey evaluates the deceptive messaging in Rebotix's advertising of its service circumventing use counters in Intuitive EndoWrist instruments ("EndoWrists").

These three opinions should be excluded.  Experts may not offer opinions that exceed their area of expertise, and they may not blindly rely on information provided to them by a party or its counsel without applying their expert analysis and methodology to test the accuracy and reliability of that information.  Dr. Chiagouris has no expertise that would permit him to assess the accuracy of Rebotix's assertions or the two blog posts about which hospital personnel might make the decision to purchase Rebotix's services.  Nor does Dr. Chiagouris have any independent basis to opine about whether the advertising flyer that Dr. Parikh tested in her survey was representative of Rebotix's marketing efforts.  Without conducting any expert analysis or offering any methodology for testing their accuracy and reliability, Dr. Chiagouris simply parrots Rebotix's assertions as his own.  Further, Dr. Chiagouris does not have the requisite expertise to opine about what evidence is legally relevant

to the issues in this litigation.  Accordingly, these opinions should be excluded as unreliable and unhelpful to the factfinder in this case.

## BACKGROUND

### A.    Dr. Parikh's Survey

To support its counterclaim that Rebotix willfully deceived hospitals about its modification of Intuitive's EndoWrists, Intuitive retained Dr. Sara Parikh, president of Willow Research, LLC, a market research and consulting firm (Parikh Rep.[1] ¶ 1), to "measure how prospective customers of Rebotix's services perceive Rebotix's advertising with respect" to particular claims Intuitive challenges as deceptive.  (*Id.* ¶ 6.)  Dr. Parikh surveyed "a mix of decision-makers at hospitals and surgery centers" including "surgeons, nurses, and hospital/administrative professionals, who are involved with and/or responsible for robotic-assisted surgical systems or instruments" (*id.* ¶ 15) about a Rebotix flyer that Rebotix has used to market its services and that contains several representations that Intuitive has challenged as deceptive.  (*Id.* ¶ 18 & n.6.)  Based on that survey, Dr. Parikh concluded that the advertising conveyed (falsely) that Rebotix merely "repairs" EndoWrists rather than makes substantial physical modifications to those instruments; that hospitals realize a cost savings with Rebotix's services; and that Rebotix's services are authorized, approved, or endorsed by Intuitive.  (*Id.* ¶ 54.)  Dr. Parikh also concluded that the advertising is not transparent about the risks of using Rebotix's "repair and reset"

---

[1]  Ex. 1, Expert Report of Dr. Sara Parikh (July 26, 2021) ("Parikh Rep.").

services.  (*Id.*)

**B.    Dr. Chiagouris's Rebuttal Report**

Rebotix retained Dr. Chiagouris, who purports to be a marketing and consumer behavior survey research expert, to determine whether Dr. Parikh's survey was "based on proper methodology and sufficiently valid and reliable data." (Chiagouris Rep.[2] ¶ 1.)  Dr. Chiagouris did not conduct a survey of his own; his relevant opinions relate solely to his critique of Dr. Parikh's survey methodology and whether the design and conduct of Dr. Parikh's survey reliably elicited the respondents' perception of the messages of Rebotix's advertising.  In opinions with which Intuitive disagrees, but which Intuitive does not seek to exclude under Rule 702 or 703, Dr. Chiagouris purports to identify elements of Dr. Parikh's survey methodology that he contends fail to comply with what he believes are survey "best practices."

But Dr. Chiagouris does not confine himself to his critique of Dr. Parikh's survey design.  Instead, based on information purportedly provided by Glenn Papit, Rebotix's vice president, and two Internet blog posts, Dr. Chiagouris offers certain opinions that exceed his expertise and personal knowledge, and are therefore unreliable and unhelpful to the trier of fact.  Dr. Chiagouris opines, for instance, that Dr. Parikh "likely" surveyed the "wrong survey population" because her survey respondents included surgical staff—doctors and nurses who are involved with

---

[2]  Ex. 2, Expert Report of Dr. Larry Chiagouris (August 30, 2021) ("Chiagouris Rep.").

and/or responsible for robotic-assisted surgical systems or instruments—rather than only high-level hospital administrators who, according to Dr. Chiagouris, are the ultimate decision-makers with respect to Rebotix's services.  (Chiagouris Rep. ¶¶ 25-43.)  Dr. Chiagouris further opines that Dr. Parikh's survey "does not reflect the manner in which Rebotix sells its services to hospitals" because, according to Mr. Papit, Rebotix employs other marketing materials in addition to the flyer tested in Dr. Parikh's survey, and, again according to Mr. Papit, the tested flyer "would not be relied upon in the actual purchase decisions made by hospital personnel."  (*Id.* ¶¶ 64, 74-79, 80-85.)  Finally, Dr. Chiagouris offers the legal opinion that Dr. Parikh's survey is "not relevant to the current legal matter" and "fails to generate probative evidence relevant to the legal controversy in this case" or "provid[e] insight as to the matter that is being litigated."  (*Id.* ¶¶ 67, 88.)  These opinions should be excluded as inadmissible.[3]

---

[3]  Dr. Chiagouris halfheartedly lodges another criticism of Dr. Parikh's survey that also should be excluded.  Though he does not know whether (and there is no reason to believe that) Dr. Parikh's survey population included so-called "professional respondents," Dr. Chiagouris seems to fault Dr. Parikh for having failed to screen out such respondents who, according to Dr. Chiagouris in his report, "are purely motivated by financial gain and are generally expected to provide lower quality data."  (Chiagouris Rep. ¶ 58.)  But at his deposition, Dr. Chiagouris equivocated, suggesting that he was not opining that professional respondents actually impair the quality of the survey data, but only that he was merely "identifying the concern" about such impairment.  (Chiagouris Dep. at 270:25-271:14.)  Curiously, the single reference that Dr. Chiagouris cites on this subject—an academic article entitled "Professional Respondents in Online Panels" (Chiagouris Rep. ¶ 58 n.27)—concludes that "professional respondents were *not* a threat to data quality."  (Chiagouris Dep. at 265:6-266:1 (emphasis added).)  Specifically, the article's authors "could not find much empirical support for the common belief that professional respondents pose a threat to the quality of survey data; in fact, we found evidence which suggests the opposite.  Answers given by professional respondents for a series of related questions resulted in slightly higher scale-reliability."  (*Id.* at 266:4-19.)  Thus, to the extent Dr. Chiagouris continues to assert this critique of Dr. Parikh's survey, it is based entirely on his own unsupported *ipse dixit*, and is unreliable.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

*(cont'd)*

## ARGUMENT

Expert testimony is not admissible unless it satisfies the requirements of Rule 702 and *Daubert*. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589-90. As this Court recently explained, "[d]istrict courts are tasked with this gatekeeping function so 'that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation expert testimony.'" *Delta T, LLC v. Dan's Fan City, Inc.*, No. 8:19-cv-1731-VMC-SPF, 2021 WL 2103074, at *2 (M.D. Fla. May 25, 2021) (Covington, J.) (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005)); *accord Simon v. Healthsouth of Sarasota Ltd. P'ship*, No. 12-cv-236, 2021 WL 268496, at *3 (M.D. Fla. Jan. 27, 2021) (Covington, J.).

In the Eleventh Circuit, district courts must engage in a "rigorous three-part inquiry" to determine the admissibility of expert opinions and testimony. *Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010). Specifically, the proponent of the testimony must establish, "by a preponderance of the evidence," that the expert: (i) is "qualified" to testify competently regarding a matter; (ii) reached conclusions based on a "sufficiently reliable" methodology; and (iii) will "assist[] the trier of fact." *Id.* These three requirements—referred to as "qualification, reliability, and helpfulness"—are "distinct concepts" that courts must not "conflate." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

---

("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Moreover, rebuttal experts must "offer[ ] evidence that is 'intended solely to contradict or rebut evidence on the same subject matter identified by' the affirmative expert of another party." *Kroll v. Carnival Corp.*, No. 19-23017-CIV, 2020 WL 4793444, at *4 (S.D. Fla. Aug. 17, 2020) (citations omitted); *see* Fed. R. Civ. P. 26(a)(2)(D)(ii). "Rebuttal testimony is permitted only when it directly addresses an assertion raised by an opponent's experts." *Pods Enters. v. U-Haul Int'l, Inc.*, No. 12-cv-01479-T-27-MAP, 2014 WL 12628606, at *2 (M.D. Fla. July 2, 2014) (quoting *In re Trasylol Prods. Liab. Litig.*, No. 1:09–md–01928, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010)). When "new arguments or new evidence" are advanced through a rebuttal expert, "preclusion is required and mandatory absent some unusual or extenuating circumstances." *Wreal, LLC v. Amazon.com, Inc.*, No. 14-21385-CIV, 2016 WL 8793317, at *3 (S.D. Fla. Jan. 7, 2016) (citations omitted).

## I.   DR. CHIAGOURIS'S OPINIONS ABOUT WHO "LIKELY" MAKES HOSPITAL PROCUREMENT AND MAINTENANCE DECISIONS AND THE SCOPE OF REBOTIX'S MARKETING EFFORTS SHOULD BE EXCLUDED

### A.   Dr. Chiagouris Is Not Qualified To Opine On Hospital Procurement And Maintenance Practices Or The Scope Of Rebotix Marketing Efforts

An expert must be qualified either "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Courts thus examine a proposed expert's credentials in light of "the subject matter of the proposed testimony," *Simon*, 2021 WL 268496, at *3 (citations omitted), and opinions about "subject matters unrelated to the witness's area of expertise [are] prohibited." *Malletier v. Dooney & Bourke, Inc.*,

7

525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007); *see also Martinez v. Rabbit Tanaka Corp.*,

No. 04-cv-61504, 2006 WL 5100536, at \*12 (S.D. Fla. Jan. 6, 2006) (excluding

expert as not qualified on a "wide array" of topics outside his expertise).

    As previously noted, Dr. Chiagouris was retained as a survey research expert

to assess and critique Dr. Parikh's survey methodology and the sufficiency of her

survey data.  (Chiagouris Rep. ¶ 1.)  He was not retained—and does not profess to

possess expertise—as an expert in hospital instrument procurement and maintenance

practices or robotic-surgical instrument marketing.  Dr. Chiagouris conceded that he

does not "advise and counsel hospitals." (Chiagouris Dep.[4] at 24:5-15.)  Prior to this

case, he had never done any work related to robotic surgical equipment. (*Id.* at

24:16-27:12.)  He acknowledged that he has no experience with hospital procurement

or maintenance decision-making with respect to surgical devices or instruments. (*Id.*

at 30:11-15.)  And he conceded that he has no expertise in the marketing, selling, or

advising about robotic surgical devices and instruments. (*Id.* at 30:3-10.)  Indeed,

before his retention in this case, he had never heard of Rebotix, Intuitive, or

EndoWrists, and did not know how Rebotix marketed its services to hospitals. (*Id.*

at 31:24-32:12.)  Dr. Chiagouris thus is demonstrably unqualified to offer reliable or

helpful opinions about hospital instrument procurement and maintenance decision-

making or robotic-surgical instrument marketing practices, and his opinions on those

subjects should be excluded on this basis alone.

---

[4]  Ex. 3, Deposition of Dr. Larry Chiagouris (September 30, 2021) ("Chiagouris Dep.").

**B.    Dr. Chiagouris's Opinions On Hospital Procurement And Maintenance Practices And The Scope Of Rebotix Marketing Efforts Are Not Reliable Or Helpful**

Dr. Chiagouris cannot compensate for his lack of expertise about hospital instrument procurement and maintenance practices or robotic-surgical instrument marketing by simply repeating the untested assertions of Rebotix and its lawyers or by referring to two Internet blogs with whose authors Dr. Chiagouris is unfamiliar. The reliability of an expert's opinion is determined based on four non-exhaustive factors, including:  (i) whether the expert's "methodology" has been, or is capable of, "being tested"; (ii) whether the expert's technique has been subject to "peer review and publication"; (iii) the "known and potential error rate of the methodology"; and (iv) "whether the technique has been generally accepted in the proper scientific community."  *Simon*, 2021 WL 268496, at *4 (citations omitted).[5]  As a matter of law, an expert opinion is unreliable where, as here, the expert "relies on no discernible methodology at all."  *Martinez*, 2006 WL 5100536, at *13; *Valle Del Cibao v. Lama*, No. 07-cv-23066, 2008 WL 11333584, at *4 (S.D. Fla. Oct. 28, 2008).

An expert's opinion is also unreliable where it rests on unsupported and unverified assumptions, amounting "to nothing more than [the expert's] own *ipse dixit*."  *Martinez*, 2006 WL 5100536, at *14.  Such a "superficial analysis" untethered to any discernible methodology is simply "insufficient to satisfy *Daubert*."  *Morrow v.*

---

[5]  If "*any* step" in the analysis is not reliable, the expert's methodology suffers a "fatal defect" that precludes admission of the entire opinion.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005).

*Brenntag Mid-S., Inc.*, 505 F. Supp. 3d 1287, 1291 (M.D. Fla. 2020) (Covington, J.) (excluding expert testimony where expert admitted he did not "verify anything"); *accord Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1286 (11th Cir. 2015). "An expert's opinion should be excluded when it is based on assumptions which are speculative and not supported by the record." *Pods Enters.*, 2014 WL 12628606, at *2 (citations omitted).

Finally, an expert's opinion is not helpful if it merely repeats, without expert analysis, the assertions of plaintiff or other witnesses, and assumes that those assertions are correct. *See*, *e.g.*, *Delta T*, 2021 WL 2103074, at *4 (excluding expert's opinion that "simply repeat[ed] counsel's opinion or analysis" where expert "conducted no research" because "[a]n expert may not present testimony that merely 'parrots' the opinions of others, without providing an independent evaluation of the evidence" (citation omitted)); *Morrow*, 505 F. Supp. 3d at 1291 (excluding expert testimony based primarily on statements from plaintiff and plaintiff's counsel, where expert "took [plaintiff] at his word"); *Cano v. 245 C & C, LLC*, No. 19-cv-21826, 2021 WL 684188, at *7, *13 (S.D. Fla. Feb. 19, 2021) (excluding expert opinion that "simply parrot[ed] back what she was told by Plaintiffs without any attempt to test the validity or veracity of their claims"; expert "relied almost exclusively on interviews with the Plaintiffs" and did not conduct any further investigation to assess issues relevant to her opinion); *Sabal Trail Transmission, LLC v. 0.589 Acres of Land in Hamilton Cty., Fla.*, No. 16-cv-277-J-34JBT, 2018 WL 3655556, at *8 (M.D. Fla. Aug. 2, 2018) (excluding expert opinion based on information from another person,

where expert "simply assumed" that person's information "to be correct"); *Bowe v. Pub. Storage*, No. 14-cv-21559, 2015 WL 10857339, at *8 (S.D. Fla. June 2, 2015) (excluding portions of expert's opinion that were "not based on his expertise," but rather, "an improper presentation of hearsay evidence" under "the guise of an expert opinion"); *Arista Records LLC v. Usenet.com*, 608 F. Supp. 2d 409, 428-29 (S.D.N.Y. 2009) (excluding expert's opinions based on "nothing more than information supplied to [him] by [the party]"; an expert cannot "simply repeat[ ] the hearsay of the client who retained him, without any independent investigation or analysis").

In the instant case, Dr. Chiagouris has not conducted any expert analysis or set forth any testable methodology to assess the reliability of his opinions that the respondents in Dr. Parikh's survey were "likely" the "wrong" population and that the flyer tested in the survey did not "reflect the manner in which Rebotix sells its services." (Chiagouris Rep. ¶¶ 64, 74-79.)[6]  He has merely repeated assertions he has heard from Rebotix and its counsel or has read on two unverified Internet blogs.  Dr. Chiagouris's blind reliance on Rebotix and its counsel to determine "what information might be relevant to [his] report" (Chiagouris Dep. at 83:16-84:2), without any effort to verify its accuracy or completeness, renders his opinions in this

---

[6]  Indeed, Dr. Chiagouris's opinion that Dr. Parikh's survey targeted the wrong population and should not have included hospital surgical staff is curious in light of his acknowledgement that Rebotix marketed its services to that surgical staff (Chiagouris Dep. at 192:17-21) and targeted its advertising to that surgical staff (*id.* at 206:5-207:3).  Because Rebotix intended for doctors and nurses to receive the flyer that Dr. Parikh tested in her survey, it was absolutely appropriate for Dr. Parikh to include them in the survey.  Dr. Chiagouris's proposal to exclude these intended recipients of the flyer would introduce a serious methodological flaw in Dr. Parikh's design.

regard unreliable, unhelpful, and ultimately excludable.  *See, e.g., Delta T*, 2021 WL

2103074, at *12-13 (Covington, J.) (excluding opinion because an expert "may not

simply repeat counsel's opinion or analysis as to what prior art is relevant").

### 1.  *Dr. Chiagouris's Improper Reliance On His Conversation With Mr. Papit*

Dr. Chiagouris bases his opinions primarily on the unverified assertions of

Glenn Papit, Rebotix's vice president.  In a 25-minute telephone conversation on

August 9, 2021, Mr. Papit apparently acknowledged that Rebotix marketed its

services to "surgical staff" (Chiagouris Dep. at 192:17-21), but then told Dr.

Chiagouris that surgeons or nurses "were not involved in the hospital's purchasing

decision," though they "might" be asked to observe a Rebotix demonstration of its

services.  (Chiagouris Rep. ¶¶ 35, 75-79; Chiagouris Dep. at 145:1-147:25.)  Dr.

Chiagouris also claims that Mr. Papit told him that most of Mr. Papit's customer

contacts "were with hospital personnel other than surgeons and rarely with nurses,"

that Rebotix provided "a number of materials to customers" and "engaged in follow

up conversations" with those customers, and that Mr. Papit told customers with

whom he had contact "that Rebotix was not approved, authorized, or endorsed by

Intuitive."  (*Id.*)[7]

As an officer of Rebotix, Mr. Papit is an interested witness, of course, and,

---

[7]  Because the telephone discussion on August 9 was not recorded or transcribed, and Dr. Chiagouris did not take any notes (Chiagouris Dep. at 147:20-25), Dr. Chiagouris could not later be sure whether the references to the discussion in his report reflected Mr. Papit's verbatim statements or Dr. Chiagouris's characterization of those statements.  (*See, e.g., id.* at 150:4-13, 305:23-306:10, 314:10-317:2.)

during his deposition, Dr. Chiagouris acknowledged that Mr. Papit's 25-minute tutorial was quite myopic.  Mr. Papit did not explain (and Dr. Chiagouris did not ask about), for instance, the practices or experiences of any others who have marketed Rebotix's services to potential hospital customers, but expressed only his own personal experience (Chiagouris Dep. at 150:14-23, 151:15-23), and Dr. Chiagouris did not seek to speak with anyone else involved in Rebotix's marketing efforts.  (*Id.* at 18:11-23.)  Mr. Papit did not inform Dr. Chiagouris about the extent to which marketing materials other than the flyer tested in Dr. Parikh's survey were disseminated to potential hospital customers (*id.* at 300:25-305:8), and Dr. Chiagouris therefore does not know when, if ever, any such materials were used or any alleged follow-up conversations occurred as part of Rebotix's marketing efforts. (*Id.* at 298:1-299:2, 300:25-305:8.)  The many gaps in Mr. Papit's explanation of Rebotix's marketing interactions with potential hospital customers ultimately forced Dr. Chiagouris to concede that he could not rule out the possibility that hospital surgical instrument procurement and maintenance practices and Rebotix's marketing efforts might actually have differed from Mr. Papit's characterization of those practices and efforts.  (*See*, *e.g.*, *id.* at 97:14-98:16, 306:11-307:10, 317:16-20.)

Precisely because employees of an interested party, like Mr. Papit, can be motivated to provide the party's expert with a narrow, biased presentation of the facts, courts exclude as unreliable expert opinions that are predicated on the unverified assertions of a party to the litigation.  *See*, *e.g.*, *Stinson Air Ctr., LLC v. XL Specialty Ins. Co.*, No. CIV. SA-03-CA-61-FB, 2005 WL 5979096, at *3 (W.D. Tex.

13

July 8, 2005) (excluding opinion based on conversations with owner of defendant entity as "based solely upon the representations of a party with an interest in the outcome of [the] lawsuit").  To the extent that Dr. Chiagouris has based his opinions about hospital procurement and maintenance practices regarding robotic surgical instruments and robotic-surgical instrument marketing practices on his 25-minute telephone discussion with Mr. Papit, those opinions should be excluded as unreliable.[8]

### 2. *Dr. Chiagouris's Improper Reliance On An Unverified Document Apparently Compiled By Rebotix's Counsel*

Dr. Chiagouris cannot salvage his improper reliance on Mr. Papit's untested assertions by relying on an unverified document seemingly compiled by Rebotix's counsel and "copied and pasted" into Dr. Chiagouris's expert report.  (Chiagouris Rep. Ex. 3; Chiagouris Dep. at 109:6-18, 116:13-117:12, 120:24-121:11, 122:10-127:6, 129:2-21, 134:15-24.)  That document, which counsel purportedly developed

---

[8]  This case is not the first case in which Dr. Chiagouris has improperly relied on unverified assertions by a party to the litigation without independently verifying those assertions.  Indeed, Dr. Chiagouris appears to be a bit of a recidivist in this regard.  Last year, in *Navarro v. Proctor & Gamble Co.*, 501 F. Supp. 3d 482 (S.D. Ohio 2020), the court excluded Dr. Chiagouris's opinion as unreliable where "the foundation for Chiagouris's opinion is nothing more than a recitation of P&G's own statements and conduct, coupled with arguments about the inferences that should arise from such conduct."  *Id.* at 493.  The court further explained that Dr. Chiagouris was "merely offer[ing] 'assumptions' based on the record," and "there is nothing to ensure that Chiagouris's subjective opinions are a sound or expertised interpretation of the facts."  *Id.* at 493-94.  "Chiagouris attempts to draw a conclusion from facts in the record without providing any expertised analytical support for the connection between the two."  *Id.* at 495; *see also Plasti Dip Int'l, Inc. v. Rust-Oleum Brands Co.*, No. 14-cv-1831, 2017 WL 914643, at *5 (D. Minn. Feb. 13, 2017) (court excluded Dr. Chiagouris's opinions as speculative where Dr. Chiagouris "d[id] not personally have knowledge" and his conclusion was based on "testimony, internet posts, and other resources"), *report and recommendation adopted*, 2017 WL 913590 (D. Minn. Mar. 7, 2017).

from an excerpt of Mr. Papit's 2019 weekly planner to list certain of Mr. Papit's sales meetings during the six weeks between March 1, 2019 and April 16, 2019, allegedly "confirms" that hospital "business and finance professionals were more likely to be presented to and consulted regarding the purchase of the services offered by Rebotix." (Chiagouris Rep. ¶ 36, Ex. 3.)  But Dr. Chiagouris had not seen Mr. Papit's weekly planner prior to the preparation of his report and its Exhibit 3 (Chiagouris Dep. at 120:24-121:6), and had no knowledge as to the original source, accuracy, or completeness of the document compiled by counsel (*id.* at 105:15-106:17, 110:11-112:14, 189:17-190:4, 191:21-192:5); he merely "assumed that the information contained within Exhibit 3 is accurate." (Chiagouris Dep. at 92:12-19.)

Furthermore, Dr. Chiagouris has made no independent attempt, other than to check "a couple" of job titles on LinkedIn, to verify the information in the document compiled by counsel. (*Id.* at 89:16-90:1.)  Dr. Chiagouris admitted that Mr. Papit alone "made the determination as to whether or not the information he provided . . . was representative of the meetings that he has had in marketing Rebotix's services," and Dr. Chiagouris "did not independently verify that determination." (*Id.* at 115:19-116:2.)  Dr. Chiagouris acknowledged that he could not know whether Exhibit 3 is "comprehensive" because he has no knowledge of other meetings Mr. Papit may have had with hospital personnel. (*Id.* at 96:6-16.)  Indeed, as Dr. Chiagouris conceded, Mr. Papit and others at Rebotix may actually have met with dozens of surgeons and nurses in addition to the business and financial personnel listed on Exhibit 3. (*Id.* at 96:6-16, 97:13-98:12.)  Dr. Chiagouris simply has no idea.

Confronted with the utter unreliability of the document compiled by counsel and his own resulting Exhibit 3, Dr. Chiagouris admitted that he has insufficient information to rely on Exhibit 3 as a basis for his opinions.  In a remarkable exchange with Intuitive's counsel about whether Dr. Chiagouris would retract his opinions based on Exhibit 3, Dr. Chiagouris testified:

> Not at this moment until I understand more about what—we still don't know what Mr. Papit's source of information was and I don't know how he constructed the material that was conveyed from him to counsel for Rebotix and counsel for Rebotix to me.  So I'm not—I'm not as you ask retracting it, but I do need to know where that material came from and until I know that—I need to know more where that came from.

(*Id.* at 141:7-18.)  There can thus be no dispute that, to the extent that Dr. Chiagouris predicates his opinions on the unverified document compiled by counsel and his own resulting Exhibit 3, those opinions are unreliable and should be excluded.

### 3.    *Dr. Chiagouris's Improper Reliance On Two Unverified Blog Posts*

Dr. Chiagouris also cannot defend his unsupported opinions by relying on two unverified blog posts on private websites, badgermapping.com and definitivehc.com.  Dr. Chiagouris testified that he does not remember exactly how he found these websites, whether by searching on Google or some other database, but testified that he "quickly" located these blogs by entering the query "marketing to hospitals" on some unidentified Internet search engine.  (Chiagouris Dep. at 214:5-12; *see also id.* at 231:9-11.)  And although he euphemistically refers to these blogs as "the relevant literature related to hospital purchasing decisions" (Chiagouris Rep. ¶ 36), Dr. Chiagouris confirmed that he "didn't bother" to investigate the authority or

16

reputation of the websites hosting the blogs (Chiagouris Dep. at 214:19-216:25, 234:12-15) and knows nothing about the blogs' authors.  (*Id.* at 218:3-18, 236:12-25.) Indeed, definitivehc.com does not even attribute its blog post to an author.  (*Id.* at 236:12-25.)  And though he asserted that he recalled seeing that the posts had been cited or "referenced in some fashion" by other online sources, Dr. Chiagouris could not identify a single such cite or reference.  (*Id.* at 216:15-217:10, 232:2-18, 234:8-11, 235:18-25.)  Incredibly, while suggesting that the blogs "seem professional in nature" (*id.* at 234:21-235:17), Dr. Chiagouris knew of no one who had relied on them:

> Q:    [Do these blogs constitute] an established authority in the field of
>       medical sales?
>
> A:    The—I had heard of them before.  I think you have to define for me
>       what you mean by "authority."  They offer up opinions on a topic and
>       they have an interest in the business of selling—supporting field sales.
>       So they—you could say they have a point of view that's worth listening
>       to.
>
> Q:    Well, who says that they have a point of view that's worth listening to?
>
> A:    I say so.
>
> Q:    Do you know of anyone else who has said so?
>
> A:    I have not asked anyone else.

(*Id.* at 215:3-18.)

Dr. Chiagouris's speculation, assumptions, and *ipse dixit* about these two randomly discovered blog posts plainly fail to satisfy the rigors of Rule 702 and *Daubert*.  *See, e.g.*, *In re Trasylol Prod. Liab. Litig.*, No. 08-md-01928, 2010 WL 4053756, at *4 (S.D. Fla. May 17, 2010) (excluding expert who "only reviewed two publications concerning" an issue "that clearly do not provide her with a sufficient

foundation to make the opinion"); *Yazdani v. BMW of N. Am., LLC*, 188 F. Supp. 3d

486, 491 (E.D. Pa. 2016) (expert precluded from testifying about reports consisting of

blogs); *Empress Casino Joliet Corp. v. Johnston*, No. 09 C 3585, 2014 WL 6735529, at

*11 (N.D. Ill. Nov. 28, 2014) (expert precluded from testifying about information

garnered from blog post); *Lin v. KIA Motors Am., Inc.*, No. SACV 11-01662, 2013 WL

12129608, at *5 (C.D. Cal. Jan. 22, 2013) (striking expert testimony relying on

blogs).[9]

### C.    To The Extent That Dr. Chiagouris Opines On The Materiality Of The Misrepresentations In The Rebotix Flyer, That Opinion Does Not Rebut Dr. Parikh's Report And Should Be Excluded

Dr. Chiagouris's assertion that the flyer tested in Dr. Parikh's survey "would

not be relied upon in the actual purchase decisions made by hospital personnel"

(Chiagouris Rep. ¶ 80) addresses *not* the deceptive messaging conveyed by the flyer,

but rather the materiality of that deception and, as such, does not rebut anything in

Dr. Parikh's report.  *See Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*, 299

F.3d 1242, 1250 (11th Cir. 2002) (explaining that the materiality element requires

---

[9]  Curiously, the blog posts *contradict* the proposition for which Dr. Chiagouris cites them.  The badgermapping.com post states, for example, that "[t]he physician is an important prospect, even if she's not the final decision-maker," and that "the most crucial step in your sales cycle is selling your device to the doctor."  (Chiagouris Dep. at 218:21-220:1.)  And the definitivehc.com post refers to physicians as "key opinion leaders" that influence purchasing decisions.  (*Id.* at 239:2-240:18.)  Contrary to Dr. Chiagouris's view, these blog posts support the proposition that the respondents in a survey, like Dr. Parikh's survey, which seeks to discern the messages conveyed by certain advertising, should include all targets of the advertising, including, in this case, surgeons and nurses, and not merely the ultimate administrative decision makers.  When confronted with the blog excerpts contradicting his opinions, Dr. Chiagouris dismissed them as inapplicable to Rebotix while continuing to rely on other portions of the posts that he felt supported his view.  (*See, e.g.*, *id.* at 220:17-221:13.)

showing that "the defendant's deception is likely to influence the purchasing decision of the consumer" (citation omitted)).  While the survey measured how prospective customers of Rebotix's services perceived the advertising claims in the Rebotix flyer, Dr. Parikh did not offer any opinions on the degree to which that deceptive messaging bears on hospital purchasing decisions, nor has she suggested that her study sought to evaluate materiality.  Indeed, Dr. Parikh testified that her survey "was not a materiality study" or an "impact study," and she is not opining on that issue.  (Parikh Dep.[10] at 143:7-24.)  Because Dr. Chiagouris's opinions about the materiality or impact of the flyer do not rebut anything in Dr. Parikh's report, those opinions should be excluded.  *See, e.g., Wreal*, 2016 WL 8793317, at *3 (excluding opinion that "does not 'rebut' anything in [the initial expert's] report"); *Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, No. 6:03-cv-1860, 2005 WL 2465020, at *4-5 (M.D. Fla. Oct. 6, 2005) (striking portions of rebuttal report that offered independent analysis not tied to opposing expert's report).

## II.  DR. CHIAGOURIS'S OPINION THAT DR. PARIKH'S SURVEY IS NOT RELEVANT OR PROBATIVE OF ISSUES IN THIS MATTER IS AN IMPROPER LEGAL CONCLUSION THAT SHOULD BE EXCLUDED

Finally, Dr. Chiagouris's opinions about the relevance of Dr. Parikh's survey should be excluded as improper legal conclusions.  Dr. Chiagouris may not permissibly opine, for instance, that Dr. Parikh's survey is "not relevant to the current legal matter" or that it "fails to generate probative evidence relevant to the

---

[10] Ex. 4, Deposition of Dr. Sara Parikh (September 27, 2021) ("Parikh Dep.").

legal controversy in this case." (Chiagouris Rep. ¶¶ 66, 87.) Likewise, he may not properly express the opinion that the Parikh survey is "of no probative value in providing insight as to the matter that is being litigated." (*Id.* ¶ 88.) As this Court has repeatedly recognized, "testifying experts may not offer legal conclusions." *United States SEC v. Spartan Secs. Grp., Ltd.*, No. 8:19-cv-448, 2020 WL 7024885, at *5 (M.D. Fla. Nov. 30, 2020) (Covington, J.) (citations omitted); *see also Delta T, LLC v. Dan's Fan City, Inc.*, 8:19-cv-1731, 2021 WL 458022, at *5 (M.D. Fla. Feb. 9, 2021) (Covington, J.). "Only the Court may instruct the jury on relevant legal standards," and "expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Clarke v. HealthSouth Corp.*, No. 8:14-cv-778, 2021 WL 129821, at *5 (M.D. Fla. Jan. 14, 2021) (Covington, J.) (excluding opinions as improper legal conclusions (citations omitted)). Dr. Chiagouris's opinion about the legal relevance of Dr. Parikh's survey plainly constitutes a legal conclusion that would usurp the Court's role to instruct the jury on relevant legal standards, and should therefore be excluded.

## CONCLUSION

For the foregoing reasons, Intuitive respectfully requests that this Court exclude Dr. Chiagouris's opinions that the respondents in Dr. Parikh's survey likely were not responsible for purchasing Rebotix's services, the advertising flyer that Dr. Parikh tested in her survey was not representative of Rebotix's marketing efforts, and Dr. Parikh's survey is legally irrelevant to the issues in this case.

## <u>LOCAL RULE 3.01(G) CERTIFICATE OF COMPLIANCE</u>
## <u>WITH GOOD FAITH CONFERENCE</u>

Consistent with the Court's Amended Case Management and Scheduling

Order, ECF No. 90, Intuitive certifies that its counsel conferred by telephone with

Plaintiff's counsel regarding this motion on November 15, 2021.  The parties were

unable to agree on the resolution of the motion.


DATED:  November 17, 2021                Respectfully submitted,

                                         /s/ Karen Lent

KAREN HOFFMAN LENT (*Pro Hac Vice*)      DAVID L. McGEE
MICHAEL H. MENITOVE (*Pro Hac Vice*)     Fla. Bar No. 220000
JORDAN A. FEIRMAN (*Pro Hac Vice*)       BEGGS & LANE, RLLP
SKADDEN, ARPS, SLATE,                    501 Commendencia Street
  MEAGHER & FLOM LLP                     Pensacola, FL 32502
One Manhattan West                       Telephone: (850) 432-2451
New York, NY 10001                       dlm@beggslane.com
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com
jordan.feirman@skadden.com


MICHAEL S. BAILEY (*Pro Hac Vice*)       ALLEN RUBY (*Pro Hac Vice*)
DOUGLAS J. DEBAUGH (*Pro Hac Vice*)      Attorney at Law
1440 New York Avenue, N.W.               15559 Union Ave. #138
Washington, DC 20005                     Los Gatos, CA 95032
Tel: (202) 371-7000                      Tel: (408) 477-9690
michael.bailey@skadden.com               allen@allenruby.com
douglas.debaugh@skadden.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2021, I caused **INTUITIVE SURGICAL, INC.'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. LARRY CHIAGOURIS** to be served on the following counsel of record by email:

| | |
|---|---|
| Gregory Dovel | greg@dovel.com |
| Richard Lyon | rick@dovellaw.com |
| Alexander Erwig | alexander@dovel.com |
| David Luikart, III | dave.luikart@hwhlaw.com |

<u>/s/ Karen Lent</u>
KAREN HOFFMAN LENT (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com

22