## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

REBOTIX REPAIR LLC,

      Plaintiff/Counterclaim
      Defendant,

v.

INTUITIVE SURGICAL, INC.,

      Defendant/Counterclaim
      Plaintiff.

Civil Case No. 8:20-cv-02274-VMC-TGW

## INTUITIVE SURGICAL, INC.'S MOTION TO EXCLUDE
## THE EXPERT OPINIONS OF DR. RUSSELL LAMB

Pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, Defendant and Counterclaim Plaintiff Intuitive Surgical, Inc. ("Intuitive") respectfully submits this motion to exclude the opinions of Dr. Russell Lamb, who has been proffered as an expert by Plaintiff and Counterclaim Defendant Rebotix Repair LLC ("Rebotix"). Specifically, Intuitive moves to exclude Dr. Lamb's opinions that: (i) there is a relevant antitrust product market for surgical robots for minimally invasive soft tissue surgery ("MIST Surgical Robots"); (ii) there is a relevant antitrust product market for replacement and repairs of EndoWrists ("EndoWrist Repair and Replacement"); (iii) Intuitive has possessed and

exercised monopoly power in the purported U.S. markets for MIST Surgical Robots and EndoWrist Repair and Replacement; and (iv) Intuitive's challenged conduct has caused anticompetitive effects.

## MEMORANDUM OF LAW
## PRELIMINARY STATEMENT

Dr. Lamb is an economist who opines that there are relevant antitrust product markets for:  (i) MIST Surgical Robots, which includes three competitors—Intuitive's da Vinci surgical systems ("da Vincis"), Medrobotics' Flex Robot ("Flex") and TransEnterix's Senhance system ("Senhance"); and (ii) EndoWrist Repair and Replacement, a purported market in which Rebotix allegedly offers "repairs" of EndoWrists as a competitive alternative to the new EndoWrists sold by Intuitive.[1]  Dr. Lamb further opines that Intuitive has possessed and exercised monopoly power in both purported markets because it allegedly has (i) very high "market shares" and (ii) charged "supracompetitive" prices.  Finally, Dr. Lamb opines that Intuitive's alleged misconduct (i.e., tying the purchase of EndoWrists to da Vincis) has caused anticompetitive effects.  All these opinions are inadmissible and should be excluded.

*First*, Dr. Lamb's opinion defining a purported relevant product market for MIST Surgical Robots should be excluded because he failed to properly employy

---

[1]  Rebotix's EndoWrist "repair" process involves insertion of a printed circuit board to override Intuitive's use counter and, therefore, allow the EndoWrist to be used beyond the use limit that Intuitive has prescribed.

his chosen methodology:  the small but significant and non-transitory increase in price ("SSNIP") test.  The test analyzes whether a hypothetical monopolist of a group of products could impose a SSNIP (i.e., a sustained price increase of 5-10%) without customers substituting other products outside the group so as to render that price increase unprofitable; if a SSNIP can be imposed, then that group of products constitutes a relevant market.  Dr. Lamb failed to perform the standard SSNIP test, but instead performed his own version that admittedly did not examine any actual pricing data.  Instead, Dr. Lamb purportedly relied on "practical indicia" that Flex and Senhance "discipline" da Vinci prices, but laparoscopic and open surgery do not.  Yet, at deposition, Dr. Lamb admitted that he had no evidence to support this critical proposition.  Thus, his SSNIP analysis is unreliable, and his opinion defining a purported relevant product market for MIST Surgical Robots should be excluded.

*Second*, Dr. Lamb's opinions defining a purported relevant antitrust product market for EndoWrist Repair and Replacement should be excluded.  Dr. Lamb's opinion purporting to define this market from the perspective of hospital customers should be excluded because he admittedly relied on the opinions of Dr. Kim Parnell and Mr. J. Lawrence Stevens—which are inadmissible for the reasons explained in Intuitive's *Daubert* motions concerning those experts.  In addition, Dr. Lamb's opinion purporting to define this market from Rebotix's perspective is inadmissible because it is contrary to law.  While the law holds that the relevant market encompasses all the surgical instruments that Rebotix ***could***

service, Dr. Lamb only considered the products Rebotix has *actually* serviced—i.e., EndoWrists.

*Third*, the Court should exclude Dr. Lamb's opinions that Intuitive has possessed and exercised monopoly power in the purported markets for MIST Surgical Robots and EndoWrist Repair and Replacement.  Dr. Lamb opines that Intuitive's high "market shares" show that it has monopoly power, but those purported market shares are meaningless because Dr. Lamb's opinions defining each "market" are inadmissible.  In addition, Dr. Lamb's opinions that Intuitive has exercised monopoly power by charging "supracompetitive" prices for da Vincis and EndoWrists are inadmissible because they are contrary to law.  The law is clear that proof of supracompetitive pricing requires analysis of a defendant's prices relative to its *total costs* (both marginal and fixed, including research and development), but Dr. Lamb only considered Intuitive's marginal costs—not its fixed costs—and, therefore, failed to conduct a legally cognizable pricing analysis.

*Fourth*, Dr. Lamb's opinion that Intuitive's challenged conduct has caused anticompetitive effects should be excluded because it is contrary to law.  Dr. Lamb opines that Intuitive's alleged tying of EndoWrists to da Vincis is anticompetitive because some customers purportedly would have paid less for EndoWrist "repairs" purchased from Rebotix in the but-for world (i.e., absent the alleged tying arrangement) than they paid to buy new EndoWrists from Intuitive in the actual world.  But to prove anticompetitive effects, the law requires proof

4

that the **combined price** for a da Vinci and EndoWrists was greater in the actual

world than it would have been in the but-for world.  Because Dr. Lamb conceded

that he did not analyze this issue, his opinion is contrary to law and should be

excluded.

## ARGUMENT

Expert testimony is inadmissible unless it satisfies the requirements of

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579 (1993).  *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

As this Court has explained, the district court is empowered to act as a

"gatekeep[er]" and prevent "'speculative, unreliable expert testimony'" from

"'reach[ing] the jury.'"  *Simon v. HealthSouth of Sarasota Ltd. P'ship*, No. 8:12-cv-

236-VMC-AEP, 2021 WL 268496, at *3 (M.D. Fla. Jan. 27, 2021) (Covington,

J.) (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005)).  The

district court must "engage in a 'rigorous three-part inquiry'" to determine the

admissibility of expert testimony.  *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d

1183, 1194 (11th Cir. 2010) (quoting *Frazier*, 387 F.3d at 1260).  Specifically, the

proponent of the testimony must establish "by a preponderance of the evidence"

that the expert:  (i) "'is qualified to testify competently'" regarding a matter; (ii)

reached conclusions based on a "'sufficiently reliable'" methodology; and (iii) will

"'assist[] the trier of fact.'"  *Id.* (quoting *Frazier*, 387 F.3d at 1260).

Reliability is determined based on four non-exhaustive factors, including:

(i) "whether the expert's methodology has been tested, or is capable of being

tested"; (ii) "whether the [expert's] technique has been subject to peer review and publication"; (iii) "the known and potential error rate of the methodology"; and (iv) "whether the technique has been generally accepted in the proper scientific community." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).

To be helpful, an expert opinion must "concern[] matters that are beyond the understanding of the average lay person," and offer something "more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63.

As discussed below, Dr. Lamb's opinions fail to satisfy these requirements.

## I.   DR. LAMB'S OPINION THAT "MIST SURGICAL ROBOTS" IS A RELEVANT PRODUCT MARKET SHOULD BE EXCLUDED

To define his market for "MIST Surgical Robots," Dr. Lamb purports to "conduct *a form of* S[S]NIP analysis based on practical indicia." (Ex. 2, Deposition Transcript of Dr. Russell Lamb ("Lamb Tr.") 92:1-2 (emphasis added).) While the SSNIP is an accepted methodology,[2] Dr. Lamb did not perform the accepted version of the test, but instead performed his own version based on purported "practical indicia" instead of actual pricing data. Because Dr.

---

[2] A SSNIP analysis explores whether "a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ('hypothetical monopolist') likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 987 n.12 (C.D. Cal. 2012). In order to appropriately define a product market under a SSNIP test, an iterative approach must be used, beginning with the narrowest group of potential products and expanding until all reasonable substitutes are included. *Id.* at 987. The product market is expanded until the hypothetical monopolist could profitably impose a SSNIP. *Id.*

Lamb diverged from the accepted version of the SSNIP, and he has no evidence to support his purported analysis based on "practical indicia," his opinion defining a market for "MIST Surgical Robots" is unreliable and should be excluded.

Courts routinely exclude market definition opinions that are based on unreliable applications of the SSNIP test. *See, e.g.*, *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing*, *Inc.*, 588 F.3d 908, 918-19 (6th Cir. 2009) (affirming exclusion of market definition opinion because expert did not properly perform SSNIP test); *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 616 (8th Cir. 2011) (rejecting SSNIP analysis because expert "offer[ed] no market studies to support [his] claim" that customers would not substitute products in response to SSNIP); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 988-89 (expert's "failure to analyze, in a meaningful way, the possibility of a narrower or broader product market render[ed] his purported application of the SSNIP methodology unreliable under Rule 702(d)").

The decision in *Kentucky Speedway* is on point. In that case, the Sixth Circuit affirmed the exclusion of an expert's market definition opinion because he "did not perform the standard SSNIP test." *Ky. Speedway*, 588 F.3d at 918. "Rather than analyzing whether a price increase at a particular point in time would result in consumer substitution of an alternative product," the expert performed his "'own version' of the SSNIP test," which "'has not been tested; has not been subjected to peer review and publication; there are no standards

controlling it; and there is no showing that it enjoys general acceptance within the scientific community.'"  *Id.*  Similarly, here, Dr. Lamb admittedly failed to perform the standard SSNIP test, but instead performed his own version.  Indeed, Dr. Lamb conceded that his SSNIP test did not include any analysis of pricing data.  (*See* Ex. 2, Lamb Tr. 93:20-24 ("Dr. Lamb, in your S[S]NIP test, did you include any analysis of pricing data?  A. No.  It wasn't necessary to do so to reach any of the opinions or conclusions I reached in this matter.").)  While Dr. Lamb testified that there was no pricing data available for him to conduct the standard SSNIP test (*see id.* 102:25-103:4, 107:16-23), he provided no basis for this assertion.

Moreover, Dr. Lamb's purported analysis of "practical indicia" is unreliable because it is devoid of evidentiary support.  Specifically, Dr. Lamb opines that Flex and Senhance compete in the same market as the da Vinci, but laparoscopic and open surgery do not, because "practical indicia" indicate that Flex and Senhance—but not laparoscopic and open surgery—are "able to discipline pricing" for the da Vinci.  (*Id.* 106:9-14, 108:16-21.)  But Dr. Lamb conceded at deposition that he could not identify any evidence to support this conclusion.  (*See id.* 129:2-10 ("Q. So it is your testimony, Dr. Lamb, that the Flex robot has not yet disciplined Intuitive's pricing for da Vinci surgical robots, but that it may do so in the future?  A. Well, I think what I've testified to is it may or may not have.  ***I haven't seen evidence of that.***  I haven't studied evidence of that.  It's not necessary to me in reaching any of the opinions and conclusions I've

reached….." (emphasis added)); *id.* 131:17-132:3 ("Q. Dr. Lamb, have you seen any evidence that the Senhance system has disciplined Intuitive's pricing for its da Vinci surgical robots at any point in the past?  A. I would give the same answer…. I wouldn't necessarily expect to see that.").)

Dr. Lamb's lack of support for his opinion is glaring, given his concessions that:  (i) Flex and Senhance sales are "*de minimis*," as only 13 Flex robots and 7 Senhance systems were installed in the United States in 2020 (whereas 3,720 da Vincis were installed) (Ex. 1, Rep. ¶85 & Table 3); and (ii) laparoscopic and open surgery are more frequently used than the da Vinci to perform the procedures for which the da Vinci is used (*see* Ex. 2, Lamb Tr. 202:25-203:2 ("I think the market penetration for the da Vinci surgical robot is less than 50% for most procedures that it—that it's used for."); *id.* 203:10-23 ("Q. So when you say that the market penetration for the da Vinci surgical robot is less than 50 percent for most of the procedures that it's used for, what accounts for the remaining percentage of the procedures that are performed in those categories where da Vinci is used?…. A. Some would be laparoscopic; some would be open surgery.").)[3]

---

[3]  Based on his purported review of Intuitive documents, Dr. Lamb opines "that Intuitive itself acknowledges that it did not view traditional laparoscopic surgeries as competition for its da Vinci surgical robots."  (Ex. 1, Rep. ¶33.)  But this opinion is inadmissible because Dr. Lamb merely purports to narrate facts in the record, namely the contents of select documents.  *See Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-cv-8645 (KBF), 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018) ("Acting simply as a narrator of the facts does not convey opinions that are based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology."), *aff'd sub nom. ScentSational Techs. LLC v. PepsiCo, Inc.*, 733 F. App'x 607 (Fed. Cir. 2019); *In re Trasylol Prods, Liab. Litig.*, 709 F. Supp. 2d 1323, 1337, 1345 (S.D. Fla. 2010) (excluding expert's opinion in part because "the majority of the [expert's] opinions fall outside the proper scope of expert testimony because they consist of a narrative of selected regulatory

*(cont'd)*

Dr. Lamb further conceded that he did not know the prices at which the Flex or Senhance are sold.  (*See id.* 134:13-16 ("Q. So in your understanding, the price for the Flex robot might be much lower than the price for a da Vinci surgical robot?  A.  It might be higher; it might be lower."); *id.* 139:15-18 ("Q. Dr. Lamb, do you know the prices at which the Senhance system has been sold at any point in the past?  A.  I thought you asked me this already.  I testified that as I sit here today, I don't recall.").)  And while Dr. Lamb repeatedly testified that Flex and Senhance are "nascent" competitors to the da Vinci that might be poised to compete more vigorously in the future (*see id.* 111:16-23), he admitted that he did not know when those products first became commercially available.  In fact, Dr. Lamb suggested that Flex and Senhance were not commercially available until 2019 or 2020,[4] even though they became available in 2015 and 2017, respectively.[5]  In addition, Dr. Lamb admitted that he did not know whether Medrobotics or TransEnterix had any plans to expand the number of procedures for which Flex and Senhance are used.[6]

---

events and a summary of [defendant's] internal documents").

[4]  *See* Ex. 2, Lamb Tr. 111:25-112:15 ("Q. Dr. Lamb, you referred to the Flex robot and Senhance systems as nascent competitors.  Do you know when those two products were first sold commercially in the United States?  A. . . . [I]t may be that they weren't sold until 2020, that they weren't sold at all in 2019, at all, but it's possible that they were.  I'd have to go back and dig in a little deeper….  It's possible that none of them were sold until 2020.  These are really irrelevant for reaching any of the opinions or conclusions I've reached in this matter.")

[5]  *See* Ex. 4, *Medrobotics Corporation Receives FDA Clearance to Market Flex Robotic System*, Businesswire (July 23, 2015); Ex. 3, *TransEnterix Announces US 510(k) FDA Clearance for Senhance Surgical Robotic System*, Businesswire (Oct. 13, 2017).

[6]  *See* Ex. 2, Lamb Tr. 119:14-120:3 ("Q. Have you seen any evidence that Medrobotics, the manufacturer of the Flex robot, is seeking to expand the types of surgical procedures in which

*(cont'd)*

Thus, because Dr. Lamb failed to reliably perform the SSNIP test on which his purported market definition is based, his opinion defining a relevant product market for "MIST Surgical Robots" should be excluded.

## II.   DR. LAMB'S OPINION THAT "ENDOWRIST REPAIR AND REPLACEMENT" IS A RELEVANT PRODUCT MARKET SHOULD BE EXCLUDED

Dr. Lamb purports to define a relevant antitrust product market for "EndoWrist Repair and Replacement" from the perspective of both (i) hospital customers and (ii) Rebotix.  (Ex. 1, Rep. ¶¶53-67.)  Neither opinion is admissible.

*First*, Dr. Lamb's opinion purporting to define the market from the hospital perspective should be excluded because it relies on inadmissible expert testimony. Dr. Lamb's opinion is premised on his understanding that Rebotix's EndoWrist "repairs" are substitutes for new EndoWrists sold by Intuitive, an understanding that he derived by "relying on the opinions offered by Dr. Parnell and Mr. Stevens."  (Lamb Tr. 100:14-18 ("[Y]ou ask, as an economist, are those two products ["repaired" EndoWrists and new EndoWrists] substitutable for each other versus are they functionally substitutable.  Yes, they are.  That's a point of contention.  I mean, I'm relying on the opinions offered by Dr. Parnell and Mr. Stevens.").)  Because Dr. Parnell's and Mr. Stevens' opinions should be excluded

_____

that robot is used?  A. I haven't analyzed that.  It wasn't necessary to do so in reaching any of the opinions or conclusions I've reached.  Q. And have you seen any evidence that the manufacturer of the Senhance system is seeking to expand the types of surgical procedures in which the Senhance system is used?  A.  I haven't looked for any evidence of that.  It wasn't necessary to consider that in reaching any of the opinions or conclusions I've reached in this matter.").

for the reasons explained in Intuitive's accompanying *Daubert* motions, Dr. Lamb's market definition opinion relying on those inadmissible opinions also should be excluded. *See, e.g.*, *Ky. Speedway*, 577 F.3d at 919 (affirming exclusion of expert's testimony "because he based his opinions on [an excluded expert's] market analysis" and "conducted no interchangeability analysis of his own"); *J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (affirming exclusion of expert whose opinions were "inextricably linked" to another expert's inadmissible opinions).

**Second**, Dr. Lamb's opinion purporting to define a market for "EndoWrist repair and replacement" from Rebotix's perspective should be excluded because he admittedly failed to consider all the customers that Rebotix **could** service, as the law requires.  "[E]xpert opinions that are contrary to law are inadmissible" because they are inherently unreliable and unhelpful to the trier of fact.  *Martinez v. Rabbit Tanaka Corp.*, No. 04-61504-CIV, 2006 WL 5100536, at *14 (S.D. Fla. Jan. 6, 2006) (citation omitted); *see also Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1236, 1246 (N.D. Ala. 2000) (excluding expert's market definition opinion that was "contrary to Eleventh Circuit law"), *aff'd*, 284 F.3d 1237 (11th Cir. 2002); *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 4259332, at *7-9 (S.D. Fla. Oct. 21, 2010) (excluding testimony conflicting with controlling precedent).

In antitrust cases brought by an allegedly excluded supplier (like Rebotix), the relevant market must be defined from the perspective of the supplier and

include all customers to which the supplier ***could*** sell its services.  *See, e.g.*, *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009) ("[T]he inquiry in the case of a shut-out supplier [is]:  to whom can the supplier sell?"); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118-19 (10th Cir. 2008) (affirming dismissal of Sherman Act claims because alleged relevant market did not include "all of the[] potential consumers of windshield repair and replacement services" available to plaintiff); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 283-84 (5th Cir. 1978) (analyzing market definition from the perspective of the plaintiff service organization, including by examining its opportunities to service other companies' instruments besides defendant's).  Indeed, it is controlling law in this Circuit that a company's decision to "limit[] its competitive activity to a single firm's products (and at only one competitive level) cannot control the definition of the relevant market." *Spectrofuge*, 575 F.2d at 282.[7]

Dr. Lamb's opinion purporting to define the market from Rebotix's perspective is contrary to law because he admittedly did not consider whether Rebotix ***could*** provide services to other potential customers.  (*See* Lamb Tr. 221:24-222:2 ("[T]here are all sorts of other businesses and markets that Rebotix might have participated in, but that's beyond the scope of the assignment. . . .").)

---

[7]  The Fifth Circuit's 1978 decision in *Spectrofuge* is controlling law because "Fifth Circuit cases decided prior to October 1, 1981 are binding precedent in this circuit."  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 n.9 (11th Cir. 2007) (citing *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

Instead, he impermissibly defined his market based on the fact that Rebotix has chosen to limit its competitive activity to "repairing" EndoWrists. (*See id.* 221:15-19 ("Q. Dr. Lamb, when you rendered that opinion about market definition from Rebotix's perspective, you were only considering the products that Rebotix has actually serviced, correct?  A. That's correct.").)  Accordingly, because Dr. Lamb's opinion purporting to define the relevant market from Rebotix's perspective is contrary to law, including the controlling precedent in *Spectrofuge*, his opinion should be excluded.

## III.   DR. LAMB'S MONOPOLY POWER <u>OPINIONS SHOULD BE EXCLUDED</u>

Dr. Lamb opines that Intuitive has possessed and exercised monopoly power in the purported U.S. markets for MIST Surgical Robots and EndoWrist Repair and Replacement because Intuitive allegedly has (i) large shares of those purported markets and (ii) charged "supracompetitive" prices for da Vincis and EndoWrists.  These opinions are inadmissible and should be excluded.

*First*, Dr. Lamb's opinions that Intuitive has possessed monopoly power in MIST Surgical Robots and EndoWrist Repair and Replacement based on its allegedly high "market shares" should be excluded because Dr. Lamb's opinions defining those purported markets are inadmissible.  It is well established that "[w]ithout a definition of the relevant market, it is impossible to determine market share." *Rebel Oil v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *accord Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*, 349 F. Supp.

14

2d 389, 416 (N.D.N.Y 2004).  While Dr. Lamb opines that Intuitive had a 99.5% share of the "U.S. MIST Surgical Robot Market" in 2020 (Ex. 1, Rep. at 51, Table 3), and projects a 94-96% share for Intuitive of "the EndoWrist Repair and Replacement Market" in 2021 (*id.* ¶114), those shares are unreliable and unhelpful to the trier of fact because Dr. Lamb failed to properly define those purported markets, as explained above.

*Second*, Dr. Lamb's opinions that Intuitive has exercised monopoly power by charging supracompetitive prices for da Vincis and EndoWrists are inadmissible because they are contrary to law.  With regard to proving monopoly power through evidence of supracompetitive pricing, the law is clear that analyzing defendant's prices relative to its marginal costs is insufficient; rather, the analysis must consider defendant's ***total costs***, including fixed costs like research and development.  *See In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 681 n.10 (D.N.J. 2005) ("[W]ithout evidence that sheds light on material factors such as [defendant's] price relative to its ***total costs*** (marginal ***and*** fixed) … , ***monopoly power cannot be found as a matter of law***." (first and third emphasis added)); *United States* v. *Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995) ("Certain deviations between marginal cost and price, such as those resulting from high fixed costs, are not evidence of market power.").[8]

---

[8]  *See also* 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 516g (4th ed. 2014 & Supp. 2021) ("No matter how accurately measured, of course, a substantial excess of price over marginal cost does not necessarily bring
*(cont'd)*

Dr. Lamb's opinions that Intuitive has exercised monopoly power by charging supracompetitive prices for da Vincis and EndoWrists are contrary to law because he simply compared Intuitive's prices relative to its marginal costs, rather than its total costs.  Specifically, Dr. Lamb opines that "one indication of Intuitive's exercise of monopoly power in the market for MIST Surgical Robots is the fact that da Vinci robot prices were set well above marginal costs" (Ex. 1, Rep. ¶102), and "[o]ne indication of Intuitive's exercise of monopoly power in the … EndoWrist Repair and Replacement Market … is the fact that prices for EndoWrist[s] … were set well above marginal costs." (*Id.* ¶124).  Dr. Lamb conceded that he did not consider Intuitive's total costs, including fixed costs like research and development.  (*See* Ex. 2, Lamb Tr. 149:9-17 ("Q. Dr. Lamb, in your analysis of whether Intuitive's da Vinci surgical robot and EndoWrist prices are sup[ra]competitive, you didn't consider Intuitive's fixed costs, correct?  A. Well, sunk costs, as economists refer to, and fixed costs, aren't the appropriate place to look in thinking about whether prices are sup[ra]competitive.").)[9]  Because Dr. Lamb failed to analyze Intuitive's prices relative to its total costs, his opinions

---

excess returns on investment.  A firm generates excess profit *only if price exceeds its average total cost*, including its cost of capital." (emphasis added)).

[9]  *See also* Ex. 2, Lamb Tr. 144:15-20 ("Q. [H]ave you conducted any analysis of Intuitive's research and development regarding its da Vinci surgical robots?  A. No, I haven't done any analysis of that because it wasn't necessary to do so to reach any of the opinions or conclusions I've reached."); *id.* 145:4-11 ("Q. [D]id you conduct any analysis of the extent to which Intuitive has invested in research and development regarding its EndoWrist instruments?  A. No.  It wasn't necessary to do that in reaching any of the opinions or conclusions that I've reached with respect to the relevant markets or Intuitive's market power during the relevant period.").)

that Intuitive exercised monopoly power by charging supracompetitive prices are contrary to law and should be excluded.

## IV.   DR. LAMB'S OPINION THAT INTUITIVE'S CONDUCT HAS CAUSED ANTICOMPETITIVE EFFECTS SHOULD BE EXCLUDED

Dr. Lamb's opinion that Intuitive's alleged tying of EndoWrists (the purported tied product) to da Vincis (the purported tying product) has caused anticompetitive effects (Ex. 1, Rep. ¶¶4, 10(d), 78) also should be excluded because it is contrary to law.

To establish anticompetitive effects of a tying arrangement, "the plaintiff is required to show that 'the ***combined price for the tying and tied products was greater*** than if they had been sold independently.'" *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19cv55-TKW-MJF, 2019 WL 8063989, at *3 (N.D. Fla. Sept. 16, 2019) (emphasis added) (quoting *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998)); *see also Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982).

The Eleventh Circuit's decision in *Kypta* is instructive.  In that case, plaintiff claimed that defendant tied "the lease of its restaurant" (the tied product) to "the sale of its license for the use of its name and trademarks" (the tying product).  *Kypta*, 671 F.2d at 1285.  Plaintiff alleged that he would have paid a lower price for the restaurant lease absent the alleged tying arrangement, but provided no evidence regarding the price for the license absent the alleged tie. See *id*.  The Eleventh Circuit held that plaintiff could not satisfy his burden to

17

prove anticompetitive effects because "[a] determination of *the value of the tied products alone* would not indicate whether the plaintiff indeed suffered any net economic harm, *since a lower price might conceivably have been exacted by the [defendant] for the tying product*." *Id.* (emphasis added).  Thus, by "[f]ailing to address the value of the franchise and to compare that value to the price tag attached to it by [defendant], [plaintiff was] able to offer no proof whatsoever that the entire package was noncompetitive." *Id.* at 1286.

Here, Dr. Lamb opines that Intuitive's alleged tying arrangement caused anticompetitive effects, but he did not analyze whether the combined price for a da Vinci and EndoWrists was greater in the actual world than if they had been sold separately, as they would be in the but-for world.  Indeed, when Dr. Lamb was asked at deposition whether he was "offering any opinion about what the combined price for da Vinci surgical robots and EndoWrist instruments that any customer would pay would be in the but-for world," he testified:

> To the extent that I understand what you mean by "combined price," since those are two products that operate in two separate antitrust – relevant antitrust product markets, I would say that if one took the total of the two prices and added them together across the two markets in the but-for world, *I haven't compared that to what that would – that sum would be in the actual world*.  It wasn't necessary to do so in reaching any of the opinions or conclusions that I've reached.

(Ex. 2, Lamb Tr. 180:19-181:6 (emphasis added).)[10]  Instead, just like plaintiff in

---

[10] Dr. Lamb further conceded that he is offering no opinion as to the prices that Intuitive would charge for da Vincis or da Vinci service in the but-for world.  (*See* Ex. 2, Lamb Tr. 180:12-18

*(cont'd)*

*Kypta*, Dr. Lamb merely addressed the but-for world price of the alleged tied product (i.e., EndoWrists), concluding that Intuitive's alleged tying arrangement "was anticompetitive because it resulted in higher prices for products in the (tied) market than otherwise would have prevailed."  (Ex. 1, Rep. ¶78.)  Because Dr. Lamb failed to analyze the ***combined price*** of a da Vinci and EndoWrists in the but-for world relative to what was charged in the actual world, his opinion is contrary to law—including the Eleventh Circuit's decision in *Kypta*.  Thus, the Court should exclude Dr. Lamb's opinion that Intuitive's challenged conduct has caused anticompetitive effects.

## CONCLUSION

For the foregoing reasons, Intuitive respectfully requests that the Court exclude all of Dr. Lamb's opinions.

---

("Q. Dr. Lamb, you're not offering any opinion about the prices that Intuitive would charge for its da Vinci surgical robots in the but-for world, correct?  A. That's correct.  It's not necessary to do so in order to reach the opinions or conclusions that I've reached."); *id.* 181:7-14 ("Q. And, Dr. Lamb, you're not offering any opinion about the prices Intuitive would charge for servicing the da Vinci surgical robot in the but-for world, correct?  A. No, I'm not offering any opinion with respect to that.  It's not necessary to consider that in reaching any of the opinions or conclusions that I've reached in this matter.").)

## LOCAL RULE 3.01(G) CERTIFICATE OF
## COMPLIANCE WITH GOOD FAITH CONFERENCE

Consistent with the Court's Amended Case Management and Scheduling

Order, ECF No. 90, Intuitive certifies that its counsel conferred by telephone with

Plaintiff's counsel regarding this motion on November 15, 2021.  The parties were

unable to agree on the resolution of the motion.

DATED:  November 17, 2021     Respectfully submitted,

/s/ Karen Lent

DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com

ALLEN RUBY (*Pro Hac Vice*)
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690
allen@allenruby.com

KAREN HOFFMAN LENT (*Pro Hac Vice*)
MICHAEL H. MENITOVE (*Pro Hac Vice*)
MICHAEL W. FOLGER (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com
michael.folger@skadden.com

MICHAEL S. BAILEY (*Pro Hac Vice*)

20

1440 New York Avenue, N.W.
Washington, DC 20005
Tel: (202) 371-7000
michael.bailey@skadden.com

*Counsel for Intuitive Surgical, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2021, I caused **DEFENDANT'S**

**MOTION TO EXCLUDE THE EXPERT OPINIONS OF DR. RUSSELL**

**LAMB** to be served on the following counsel of record by email:

| | |
|---|---|
| Gregory Dovel | greg@dovel.com |
| Richard Lyon | rick@dovellaw.com |
| Alexander Erwig | alexander@dovel.com |
| David Luikart, III | dave.luikart@hwhlaw.com |

<u>/s/ Karen Lent</u>
KAREN HOFFMAN LENT (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com