# Exhibit 3

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 1

1              UNITED STATES DISTRICT COURT

               MIDDLE DISTRICT OF FLORIDA

2                     TAMPA DIVISION

3           Civil Case No. 8:20-cv-2274-T-33TGW

4    _____

5    REBOTIX REPAIR LLC,

6              Plaintiff,

7         vs.

8    INTUITIVE SURGICAL, INC.,

9              Defendant.

     _____

10

11

12

13           REMOTE VIDEOTAPED DEPOSITION OF

                  J. LAWRENCE STEVENS

14

15

16           Thursday, September 23, 2021

17

18

19

20

21

22

23

24

25     Court Reporter:  Michelle M. Boudreaux-Phillips, RPR

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 2

1
2
3
4
5
6                    September 23, 2021
7                    8:36 a.m. CST
8
9
10        Remote videotaped deposition of
11   J. LAWRENCE STEVENS, conducted at the
12   location of the witness in East Alton,
13   Illinois, pursuant to Agreement, before
14   Michelle M. Boudreaux-Phillips, a Registered
15   Professional Reporter in the State of
16   Georgia.
17
18
19
20
21
22
23
24
25

Page 3

1               APPEARANCES
2            (Via Veritext Virtual)
3
4   On behalf of the Plaintiff:
5     RICK LYON, Esq.
      Dovel & Luner
6     201 Santa Monica Boulevard
      Suite 600
7     Santa Monica, California 90401
      310.656.7066
8     rick@dovel.com
9
     On behalf of the Defendant:
10
      KAREN M. LENT, Esq.
11    Skadden, Arps, Slate, Meagher & Flom LLP
      One Manhattan West
12    New York, New York 10001-8602
      212.735.3000
13    karen.lent@skadden.com
14    ANISA A. SOMANI, Esq.
      Skadden, Arps, Slate, Meagher & Flom LLP
15    1440 New York Avenue, N.W.
      Washington, D.C. 20005
16    202.371.7000
      anisa.somani@skadden.com
17
18  Also Present:  Maura M. Norden, J.D.
19  Videographer:  Alan Pokotilow
20  Concierge:  Brad Simms
21
22
23
24
25

Page 4

1               INDEX
2            EXAMINATIONS
3
   By Ms. Lent ................................. 8
4
   By Mr. Lyon ................................. 269
5
   By Ms. Lent ................................. 271
6
7              - - -
7
8            EXHIBITS
8
   Exhibit              Page
9
   Exhibit 1 ........................ 12
10   Expert Report of J. Lawrence Stevens,
     August 30, 2021
11
   Exhibit 2 ........................ 82
12   21 C.F.R.  807.81, When a premarket
     notification submission is required
13   Effective December 28, 2007
14   Exhibit 3 ........................ 92
     Deciding When to Submit a 510(k) for a Change
15   to an Existing Device, Guidance for Industry
     and Food and Drug Administration Staff,
16   Document issued on October 25, 2017
17   Exhibit 4 ........................ 103
     Module (J) Performance Data
18   [REBOTIX170053, etc.]
19   Exhibit 5 ........................ 104
     June 23, 2015 letter to Rebotix from
20   Department of Health and Human Services
     [REBOTIX171030, etc.]
21
   Exhibit 6 ........................ 126
22   EndoWrist Service Procedure, Date Released
     4/25/2019 [REBOTIX162404, etc.]
23
   Exhibit 7 ........................ 155
24   21 C.F.R.  807.20, Who must register and
     submit a device list?
25   Effective October 1, 2012

Page 5

1            INDEX (Cont'd)
2
   Exhibit              Page
3
   Exhibit 8 ........................ 156
4   21 C.F.R.  820.3, Definitions
    Effective December 23, 2013
5
   Exhibit 9 ........................ 174
6   Use of the Rebotix Responsible Reuse Process
    by Hospitals to Reduce Cost and Waste,
7   Overview of Operations and Regulatory Issues
    [REBOTIX068475, etc.]
8
   Exhibit 10 ........................ 196
9   Releasable 510(k) Search Results for
    "General & Plastic Surgery" and "intuitive"
10  [Intuitive-00691802, etc.]
11  Exhibit 11 ........................ 203
    October 12, 2001 letter with enclosures to FDA
12  from Intuitive Surgical
    [Intuitive-00515501, etc.]
13
   Exhibit 12 ........................ 214
14  21 C.F.R.  801.4, Meaning of intended uses
    Effective September 1, 2021
15
   Exhibit 13 ........................ 220
16  Intuitive Surgical, Inc., System
    510k's/K990144 Premarket Application,
17  Volume 7, 11/26/1999 [Intuitive-00694043, etc.]
18  Exhibit 14 ........................ 233
    July 9, 2015 Fwd email to multiple recipients
19  from Ryan Burke [REBOTIX077729, etc.]
20  Exhibit 15 ........................ 246
    12/19/2014 Acknowledgment Letter
21  [REBOTIX128997, etc.]
22  Exhibit 16 ........................ 250
    "Multiple Documents"
23
   Exhibit 17 ........................ 258
24  Deeper Dive on Third Party Risk to I&A
    Segment, 20 February 2020
25  [Intuitive-00566055, etc.]

2 (Pages 2 - 5)

J. Lawrence Stevens                          September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 6

1                    INDEX (Cont'd)
2
     Exhibit                            Page
3
     Exhibit 18 ..................................... 266
4      510(k) Summary [REBOTIX131427, etc.]
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          THE VIDEOGRAPHER:  We're on the record.
2    The time is now 8:36 a.m.  Today's Thursday,
3    September 23rd of 2021.  We're here today at
4    the home office of Larry Stevens, located in
5    East Alton, Illinois, for the video-recorded
6    deposition of Larry Stevens in the matter of
7    Rebotix Repair LLC versus Intuitive Surgical,
8    Incorporated, Case No. 8:20-cv-02274, to be
9    heard before the United States District
10   Court, Middle District of Florida, Tampa
11   Division.
12          I'm Alan Pokotilow, forensic
13   videographer here today on behalf of Veritext
14   Legal Solutions.  Our court reporter today is
15   Michelle Boudreaux-Phillips, also here today
16   on behalf of Veritext Legal Solutions.
17          Will counsel please state your name and
18   affiliation for the record, after which our
19   court reporter will swear the witness and we
20   can proceed.
21          MS. LENT:  Karen Lent from Skadden Arps
22   for defendant, Intuitive Surgical.
23          MR. LYON:  Rick Lyon from Dovel &
24   Luner -- from Dovel & Luner, counsel for
25   Rebotix, the plaintiff.

Page 8

1          MS. SOMANI:  Anisa Somani from Skadden
2    Arps on behalf of defendant, Intuitive
3    Surgical.
4          MS. NORDEN:  Maura Norden with Greenleaf
5    Health on behalf of defendant, Intuitive
6    Surgical.
7                 J. LAWRENCE STEVENS,
8    being first duly sworn, was examined and testified as
9    follows:
10                    EXAMINATION
11   BY MS. LENT:
12      Q   Good morning, Mr. Stevens.  As you just
13   heard, my name is Karen Lent and I'm an attorney for
14   Intuitive Surgical.
15          Could you please state your name for the
16   record?
17      A   Yes.  My name is John Lawrence Stevens.
18      Q   And do I understand correctly that you go by
19   Larry Stevens?
20      A   Yes.
21      Q   Thank you.
22          You've been deposed before, right?
23      A   Yes, I have.
24      Q   Have you been deposed over video format like
25   this?

Page 9

1      A   Yes, I have.
2      Q   Great.  So you understand that you need to
3    give verbal responses to my questions?
4      A   Yes, I understand.
5      Q   And in this remote environment, it's
6    particularly important that we don't talk over each
7    other because the microphones only pick up one person
8    at a time.  So I will do my best to let you finish your
9    answer before I start to ask another question, and can
10   you please try to let me finish my questions before you
11   start an answer?
12      A   Yes.
13      Q   Thank you.
14          If you don't understand a question, will you
15   please ask me to rephrase it?
16      A   Okay.
17      Q   And if I ask a question and you answer it, I
18   will expect that you understood the question.  Is that
19   fair?
20      A   That's fair.
21      Q   I'll try to give us a break periodically so
22   we don't run into the videographer's 90-minute tape
23   issue.  But if you need a break at any time, please
24   just let me know and I'd be happy to take one when we
25   don't have a question pending, okay?

                                          3 (Pages 6 - 9)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 10

1    A   All right.
2    Q   Is there anything you're aware of that would
3  prevent you from giving truthful and accurate testimony
4  today?
5    A   There's nothing that I'm aware that would
6  prevent me.
7    Q   Thank you.
8        And you understand that you're under oath and
9  testifying under penalty of perjury today?
10   A   I understand.
11   Q   What did you do to prepare for the deposition
12  today?
13   A   I reviewed a number of documents.  I prepared
14  an expert report, had some discussions with Mr. Lyon
15  regarding the case.
16   Q   Did you speak with anybody else to prepare
17  for your deposition today?
18   A   There was an individual from Rebotix I spoke
19  with on the phone.  I can't recall his name right now.
20   Q   When did you speak to this --
21   A   I can look at my -- I can refer to -- I can
22  refer to my report, if you would like me to.
23   Q   Sure.  We'll get there.  When did you speak
24  with that individual?
25   A   Approximately three weeks ago.

Page 11

1    Q   So that was after you submitted your report?
2    A   It was during the time the report was being
3  prepared.
4    Q   Okay.  Have you met or talked to
5  Dr. Sharlin?
6    A   No.
7    Q   Have you emailed with Dr. Sharlin?
8    A   I have not emailed with Dr. Sharlin.
9    Q   Have you communicated with him in any way?
10   A   No, I have not.
11   Q   Other than -- I'm sorry, did you hear that?
12   A   Yes.
13   Q   That's coming from above me in my office.
14  Sorry.
15       MS. LENT:  Can we -- can we go off the
16  record for a second until that stops?  Oh,
17  okay, it stopped.
18       THE VIDEOGRAPHER:  The time is now 8:41
19  a.m.  We're going off the record.
20       MS. LENT:  No, it's okay, it stopped.
21       THE VIDEOGRAPHER:  I'm sorry.  We're not
22  off the -- we're back on the record.  The
23  time is now 8:42 a.m.  Please continue.
24       MS. LENT:  Hopefully that won't come
25  back.  I apologize.

Page 12

1    Q   (By Ms. Lent)  Other than Mr. Lyon and this
2  individual from Rebotix that you spoke to about three
3  weeks ago, did you talk to anyone else in connection
4  with preparing your report?
5    A   No, I talked to nobody else.
6    Q   Okay.  No other experts that have been hired
7  by Rebotix?
8    A   No.
9    Q   For example -- go ahead.
10   A   I talked to no other experts hired by
11  Rebotix.
12   Q   Okay.  Let's introduce as Exhibit 1 Tab 1.
13       MS. LENT:  Brad, can you publish that,
14  please?
15       CONCIERGE:  Yes.
16       MS. LENT:  Thank you.
17       (Exhibit 1 marked for identification.)
18       (By Ms. Lent)  While we're publishing that
19  exhibit, Mr. Stevens, do you have access to the exhibit
20  share folder?
21   A   I do not see any access on my current screen
22  to the exhibit folder.
23   Q   I don't think the exhibit has been entered
24  yet, but I just want to make sure that you have access
25  to it, and perhaps we're just going to put it on the

Page 13

1  screen.
2       (Discussion off the written record.)
3       THE VIDEOGRAPHER:  The time is now 8:44
4  a.m.  We're going off the record.
5       (Off the record.)
6       THE VIDEOGRAPHER:  The time is now 8:49
7  a.m.  We're back on the record.  Please
8  continue.
9    Q   (By Ms. Lent)  Mr. Stevens, we've introduced
10  as Exhibit 1 a document entitled "Expert Report of
11  J. Lawrence Stevens, August 30th, 2021."  Do you see
12  that
13   A   Yes, I do.
14   Q   Do you recognize this document as the expert
15  report you submitted in this case?
16   A   Yes, it does appear to be my expert report.
17   Q   Okay.  And is this an accurate representation
18  of the report that you submitted in this case?
19   A   Excuse me, could you repeat that?
20   Q   Sure.  Is it an accurate representation of
21  the report that you submitted in this case?
22   A   I believe so.  I believe it's accurate, yes.
23   Q   Okay.  Can we turn to page 1 of the report,
24  please, paragraph 1?
25       (Discussion off the written record.)

4 (Pages 10 - 13)

J. Lawrence Stevens                September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 14

1    Q   (By Ms. Lent) Okay. In paragraph 1, you
2  write that you have been retained "to provide expert
3  opinions regarding the allegations made by Defendant
4  Intuitive Surgical, Inc. ('Intuitive') that the
5  services Rebotix performs on EndoWrists require FDA
6  approval, as well as other topics related to this
7  allegation." Do you see that?
8    A   Yes, I do.
9    Q   Okay. And you also state that you provide
10  "opinions responsive to the opinions expressed in the
11  expert report of Heather S. Rosecrans submitted on
12  behalf of Intuitive." Do you see that?
13    A   Yes, I see that.
14    Q   Can you please identify for me which parts of
15  your report relate to the first set of opinions you
16  described and which are in rebuttal to Ms. Rosecrans's
17  report?
18       MR. LYON: Objection, form.
19       THE WITNESS: Well, I'd have -- I would
20  have to go back to my report to see. I
21  believe my report is first followed by my
22  comments on Ms. Rosecrans. But I'd have to
23  go back and look to be sure.
24    Q   (By Ms. Lent) Let's -- let's look -- let's
25  start at page 10 of the report, please, Part III. Here

Page 15

1  is where you start your substantive opinions, correct?
2       MR. LYON: Objection, form.
3       THE WITNESS: It needs to be a little
4  larger so I can read it. There we go. Yes,
5  Item III there is where I address whether
6  Rebotix was required to seek approval.
7       MS. LENT: I'm sorry, can we just go off
8  the record for a minute? I'm going to have
9  to get someone to go tell the people upstairs
10  that are doing that.
11       THE VIDEOGRAPHER: The time is now 8:53
12  a.m. We're going off the record.
13       (Recess taken.)
14       THE VIDEOGRAPHER: The time is now 8:54
15  a.m. We're back on the record. Please
16  continue.
17    Q   (By Ms. Lent) Mr. Stevens, I was asking you
18  if you could identify for me which parts of your report
19  relate to the first set of opinions described in
20  paragraph 1 and which were in rebuttal to
21  Ms. Rosecrans. And you said you would need to take a
22  look at your report. So can you do that and answer the
23  question?
24       MR. LYON: Objection, form.
25       MS. LENT: You're welcome to scroll

Page 16

1  through in the exhibit share if that helps.
2       THE WITNESS: It begins -- the
3  opinions -- my comments to Ms. Rosecrans
4  begins on page 11, Item IV.
5    Q   (By Ms. Lent) So is it correct, then, that
6  everything starting from Item IV in your report on page
7  11 through the end is what you would consider to be
8  rebuttal to Ms. Rosecrans?
9       MR. LYON: Objection, form.
10       THE WITNESS: Let me look at my report
11  again just to make sure that that's
12  accurate.
13       MS. LENT: Go ahead.
14       THE WITNESS: Yes, the rest of the
15  report consists of my comments on
16  Ms. Rosecrans' report.
17       MS. LENT: Thank you.
18    Q   (By Ms. Lent) Do you know Ms. Rosecrans?
19    A   No, I do not know her personally, no.
20    Q   Had you heard her name prior to your
21  engagement in this matter?
22    A   Yes. When I was with the FDA, I was aware of
23  various officials around the country and I was aware of
24  Ms. Rosecrans working in the office of device
25  evaluation.

Page 17

1    Q   Did you ever work with Ms. Rosecrans?
2    A   No, I never had any FDA work with her, other
3  work with her.
4    Q   Do you consider her to be an expert in 510(k)
5  clearance?
6       MR. LYON: Objection, form.
7       THE WITNESS: I'm not sure. In other
8  words, I don't know to what extent that she
9  actually reviewed 510(k)s. I know she was an
10  administrator over the 510(k) program, and
11  that -- I don't know what specific experience
12  she had in reviewing actual 510(k)s.
13  Although that may be the case, I don't know
14  that.
15    Q   (By Ms. Lent) Why does -- why does it matter
16  to you in answering my question whether she reviewed
17  510(k)s?
18    A   Well, she makes comments about what would be
19  in a 510(k), and there are certain comments that she
20  makes that I disagree with.
21    Q   Right, my question was whether you consider
22  her to be an expert in 510(k) clearance?
23       MR. LYON: Objection, asked and
24  answered.
25    Q   (By Ms. Lent) You can answer.

5 (Pages 14 - 17)

J. Lawrence Stevens                                              September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 18

1    A    Again, I don't know if I -- I don't have
2  enough information about Ms. Rosecrans to make a
3  determination if she's an expert on 510(k)s and the
4  contents of 510(k)s and the actual review of 510(k)s.
5    Q    Are you aware that counsel for Rebotix
6  approached Ms. Rosecrans about being an expert for
7  Rebotix in this matter?
8    A    I'm not aware that Rebotix had any contact
9  with Ms. Rosecrans.
10   Q    Is there any opinion you intend to offer in
11 this case that isn't stated in Exhibit 1?
12       MR. LYON:  Objection, form.
13       THE WITNESS:  At this point, all of my
14   comments are in my expert report.
15   Q    (By Ms. Lent)  And have you conducted any
16 analysis of issues in this case that is not reflected
17 in Exhibit 1?
18   A    I have performed no additional analyses
19 beyond what's contained in my report.
20   Q    Prior to being retained by Rebotix in this
21 litigation, did you know anyone who was affiliated with
22 Rebotix?
23   A    I don't -- I knew no one affiliated with
24 Rebotix before this case.
25   Q    When did Rebotix first approach you about

Page 19

1  serving as an expert in this case?
2    A    Well, Mr. Lyon contacted me around the first
3  of August, I believe.
4    Q    Do you have an understanding -- well, strike
5  that.
6        What were you asked to do in connection with
7  this case when Mr. Lyon contacted you around August
8  1st?
9    A    Mr. Lyon --
10       MR. LYON:  Larry, for a moment, feel
11   free to explain your role in the case and
12   what you're supposed to do.  In terms of
13   specific of conversations you and I had, I
14   don't want you to get into that because that
15   would be -- you can -- you can answer that
16   question, but just not in the context of
17   exactly the words you and I were actually
18   exchanging.
19       THE WITNESS:  Mr. Lyon gave me the
20   understanding that they were in need of an
21   expert on the FDA regulation of medical
22   devices, and I told him that was my
23   specialty, that I had performed expert
24   witness assignments in that before.
25       He said that there was an expert report

Page 20

1  that had been created that they wanted me to
2  review and make a determination if I could
3  support the conclusions of that expert
4  report.
5        I reviewed Dr. Sharlin's expert report
6  and advised Mr. Lyon that, yes, I agree with
7  his conclusions and could support it, and
8  then he engaged me to work on the case.
9    Q    (By Ms. Lent)  And you were also engaged to
10 provide rebuttal to Ms. Rosecrans' report, correct?
11   A    Yes, I was asked to review Ms. Rosecrans'
12 report and provide rebuttal comments.
13   Q    Do you have an understanding as to why you
14 were brought on to submit a rebuttal report to
15 Ms. Rosecrans even though Dr. Sharlin had been retained
16 to provide expert opinions for Rebotix on FDA issues?
17   A    I don't know any of the specifics.  I just
18 know that Mr. Lyon said they wanted me to move in and
19 take over, that Dr. Sharlin was not available.
20   Q    I'm sorry, did you -- did you say that
21 Dr. Sharlin was not available?
22   A    For -- to work on the case additionally, that
23 he was not available to continue to work on the case.
24   Q    And do you have an understanding as to why he
25 was not available to continue to work on the case?

Page 21

1    A    I have no idea what the reason was.
2    Q    And are you aware that Rebotix withdrew
3  Dr. Sharlin as a testifying expert in this case?
4        MR. LYON:  Objection, form.
5        THE WITNESS:  I'm not aware of any --
6    any decisions that Rebotix made about
7    Dr. Sharlin.
8    Q    (By Ms. Lent)  When did counsel for Rebotix
9  first send you materials to review regarding this case?
10   A    Well, I believe the first document was the
11 Sharlin report, which I got in early August.
12   Q    Can you be any more specific than "early
13 August"?
14   A    Well, it was shortly after the conversation I
15 had with Mr. Lyon, he sent me the report.
16   Q    And are -- was that conversation on August
17 1st?
18       MR. LYON:  Objection, asked and
19   answered.
20       THE WITNESS:  I don't recall the exact
21   date.  I would have to go back and look at my
22   calendar to give you an exact date, but it
23   was certainly, I believe, in the first week
24   of August, close to the 1st.
25       MS. LENT:  Okay.

6 (Pages 18 - 21)

J. Lawrence Stevens                          September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 22

1    Q   (By Ms. Lent)  How much time did you spend
2   reviewing Dr. Sharlin's report in order to be able to
3   tell Mr. Lyon that you -- that you could support
4   Dr. Sharlin's report and that you agreed with its
5   conclusions?
6    A   I don't know exactly how long, but it was
7   certainly a couple of hours at least to go through the
8   entire report.
9    Q   And in reaching the view that you could
10  support and agreed with Dr. Sharlin's conclusions, did
11  you review any of the materials that were cited in his
12  report?
13       MR. LYON:  Objection, form.
14       THE WITNESS:  My initial review was of
15       his report.
16   Q   (By Ms. Lent)  And not of the materials
17  cited, correct?
18   A   There was no additional materials at that
19  time.
20   Q   And at the end of the couple of hours you
21  spent reviewing Dr. Sharlin's report, you reached the
22  conclusion that you agreed with his report, correct?
23   A   Yes, after I reviewed his report, I read his
24  conclusions, and I said I agreed with his conclusions
25  and his logic in reaching those conclusions.

Page 23

1    Q   And you agreed with -- does that mean that
2   you agreed with everything in his report?
3    A   Well, in my -- in my report, I referenced
4   starting on certain pages, but the body of the report,
5   yes, I do concur with it.  There were some other things
6   in there, I'm sure, that -- the technical aspects of
7   his report and his conclusions I agree with completely.
8   It was clear to me that the component was being
9   discussed, and it was not a medical device and did not
10  require a 510(k), and that was the conclusion that he
11  also had.
12   Q   Did you identify anything in Dr. Sharlin's
13  report that you did not agree with?
14   A   No, I did not.  I did not find anything in
15  there that I didn't agree with.
16   Q   After you spent a couple of hours -- strike
17  that.
18       What did you do with respect to forming your
19  opinions in this case after you read Dr. Sharlin's
20  report?
21       MR. LYON:  Objection, form.
22   Q   (By Ms. Lent)  What did you do next?
23   A   The next process was for Mr. Lyon's office to
24  provide me with documents.  That included the Rosecrans
25  report.  It also included copies of the documents cited

Page 24

1   in the Sharlin report, as well as, I believe, the
2   Rosecrans report.  There was a considerable number of
3   electronic documents that I received.
4    Q   Did you receive from counsel all of the
5   documents that were cited in Dr. Sharlin's report?
6    A   I have not compared his list to what I
7   received.  I was under the impression that I had
8   received the documents that he had cited.
9    Q   Did you review all of the documents that were
10  cited in Dr. Sharlin's report?
11   A   I reviewed -- not all in great detail.  I
12  used his report and where I had questions, I would go
13  to a specific document.  And it's possible that I
14  didn't review all of them.
15   Q   And if you didn't review them, does that mean
16  that you didn't consider them in forming your opinions?
17       MR. LYON:  Objection, form.
18       THE WITNESS:  The opinion that I drew
19       was essentially driven by Dr. Sharlin's
20       report, and the associated documentation I
21       could use as needed if I questioned something
22       he had written.  And I -- that did not happen
23       often.
24   Q   (By Ms. Lent)  Approximately how many of the
25  documents cited in Dr. Sharlin's report did you review?

Page 25

1        MR. LYON:  Objection, form.
2        THE WITNESS:  I really can't recall at
3   this point how many.  There were -- there
4   were certainly dozens that I looked at.
5    Q   (By Ms. Lent)  Okay, you said that it didn't
6   happen often that you reviewed associated documents
7   that -- but then you just said you reviewed dozens.  Is
8   that -- which is it?
9    A   Well, he and I --
10       MR. LYON:  Objection, form.
11       Larry, remember to pause after --
12       THE WITNESS:  Okay.
13       MR. LYON:  -- each question so that I
14   can have time to --
15       THE WITNESS:  Okay.
16       MR. LYON:  -- object so we don't speak
17   over one another.
18       Objection, form.
19       THE WITNESS:  When I originally got the
20   electronic file with his documents, I looked
21   at a few of them at that point to get a feel
22   for what kind they were, and then later on, I
23   went back and checked a few more, so perhaps
24   two dozen would be more accurate than
25   multiple dozens.

7 (Pages 22 - 25)

J. Lawrence Stevens                                   September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 26

1    Q   (By Ms. Lent)  Did you -- did counsel for
2  Rebotix provide you all of the documents cited in
3  Ms. Rosecrans' report?
4    A   They provided me with an electronic file that
5  was identified as "Rosecrans Report Documents."
6    Q   And did you review all of those documents?
7    A   No, I didn't.
8    Q   Did you review any of them?
9    A   Yes, I did.
10   Q   Do you know which ones you reviewed?
11   A   I would -- for me to recall specifically, I'd
12  have to go back and look.
13   Q   Did you list the documents cited in
14  Ms. Rosecrans' report that you reviewed in your Exhibit
15  3 to your report?
16   MR. LYON:  Objection, form.
17   THE WITNESS:  I believe they're in that
18  complete list of what I reviewed, yes.
19   Q   (By Ms. Lent)  Let's take a look at Exhibit 3
20  to your report.
21   MS. LENT:  Brad, can you pull that up?
22  It's at the end.
23   Q   (By Ms. Lent)  Mr. Stevens, do you see the
24  first page of Exhibit 3 on the screen?
25   A   Yes, I see the title "Materials

Page 27

1  Covered [sic]."
2    Q   "Materials Considered," right?
3    A   Excuse me, "Materials Considered," yes.
4    Q   How did you determine which materials to
5  include in Exhibit 3?
6    MR. LYON:  Objection, form.
7    THE WITNESS:  The materials listed here
8  are ones that I selected to be able to
9  review.  I can't say with certainty that I
10  reviewed every document completely, but they
11  were all reference documents for me.
12   Q   (By Ms. Lent)  And did you at least review
13  each of the things listed in Exhibit 3 in part?
14   MR. LYON:  Objection, form.
15   THE WITNESS:  Oh, yes.  Yeah.
16   Q   (By Ms. Lent)  And did counsel for Rebotix
17  provide you with all of these materials cited in
18  Exhibit 3?
19   A   The -- some of the materials are materials
20  I'm aware of that are generally available, the laws and
21  the regulations.  The specific company documents were
22  provided to me by Mr. Lyon's office.
23   Q   Did you -- strike that.
24   So you testified that Mr. Lyon's office
25  provided you what you think were the set of materials

Page 28

1  cited in Dr. Sharlin's report and Ms. Rosecrans'
2  report, right?
3    A   Yes.  As I mentioned, they sent me two
4  electronic files, one identified as Rosecrans
5  documents, the other file identified as Sharlin
6  documents.
7    Q   And did you request any additional documents
8  from Rebotix other than those two files you just
9  mentioned?
10   A   No, I made no specific requests.
11   Q   Did you receive any additional documents from
12  Rebotix other than those two files that you just
13  mentioned?
14   A   I received a few additional documents
15  directly from Mr. Lyon that I used in my report when
16  I -- and I think they're referenced in this list.  I'd
17  have to look at the list to see.
18   Q   You can look at the list.
19   MR. LYON:  I'll note for the record that
20  the list for certain documents just includes
21  Bates numbers, so it might not be possible
22  for the witness to determine whether the
23  document corresponds to what he's thinking of
24  based on an identification of Bates numbers.
25   THE WITNESS:  All right, what was the

Page 29

1  question again?
2    MS. LENT:  The question was:  Did you
3  receive any additional documents from Rebotix
4  other than those two files that you just
5  mentioned?
6    THE WITNESS:  I did receive a report
7  from Deutschland Bank.  I received an expert
8  report by another expert.
9    Q   (By Ms. Lent)  Is that all?
10   A   That's all I recall at this point.
11   Q   And who is that other expert?
12   A   I'd have to look and see his name.
13   MR. LYON:  And, Larry, I caution you
14  don't pull up any materials.  If you don't
15  remember, you don't remember.  Unless there's
16  material that's put before you by counsel as
17  an exhibit, you shouldn't be consulting any
18  notes or any other materials.
19   THE WITNESS:  Oh, okay.  I believe the
20  person's name was Pannell or Pinnell.
21   MS. LENT:  Parnell?
22   THE WITNESS:  Parnell.  He was an
23  engineer, yes.
24   Q   (By Ms. Lent)  And was that a report that was
25  in final form that had been submitted in this case, or

8 (Pages 26 - 29)

J. Lawrence Stevens                          September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 30

1  was it a draft report?
2      A   The report that I reviewed looked like a
3  final report.
4      Q   Did you review that report before or after
5  you submitted your report in this case?
6          MR. LYON:  Objection, form.
7          THE WITNESS:  I can't recall exactly
8      when I reviewed it, but it may have been
9      after the report was submitted, just as a
10     reference document for me.
11     Q   (By Ms. Lent) How much time did you spend
12  reviewing documents in connection with forming your
13  opinions in this case?
14         MR. LYON:  Objection, form.
15         THE WITNESS:  Offhand, I couldn't tell
16     you.  I could go back and look at my log and
17     tell you.  I -- at this point, I just can't
18     estimate what the total hours were.
19     Q   (By Ms. Lent) Well, you were hired, you
20  thought, sometime in early August, right?
21     A   Yes, that's correct.
22     Q   And your report was submitted on August 30th,
23  correct?
24     A   That's correct.
25     Q   So at most you worked on this matter for four

Page 31

1  weeks before you finalized your report; is that fair?
2      A   Yes, there was an elapsed -- total elapsed
3  time of about four weeks, yes.
4      Q   Okay.  Were you working on anything else
5  during those four weeks other than this Rebotix case?
6      A   Yes.  I'm a consultant and I fill in my days
7  with work on various projects, including this project.
8      Q   So approximately what percentage of time
9  during the month of August did you spend working on
10  this case versus working on other projects?
11         MR. LYON:  Objection, form.
12         THE WITNESS:  Again, I -- it would -- I
13     would just have to guess, and I'm not sure
14     how accurate that would be.
15     Q   (By Ms. Lent) Well, did you spend more than
16  half of your time in the month of August working on
17  this matter?
18         MR. LYON:  Objection, form.  Asked and
19     answered.
20         THE WITNESS:  Again, I don't -- I would
21     have to guess, and I -- and I don't want to
22     do that.  I'd have to go back and review my
23     records.
24     Q   (By Ms. Lent) So this was a month ago.  You
25  don't recall whether this was your primary scope of

Page 32

1  work during the month of August or whether you worked
2  on other things --
3          MR. LYON:  Objection.
4      Q   -- more than this?
5          MR. LYON:  Objection, asked and
6      answered.
7          THE WITNESS:  This was a major project
8      for me during August, and also I had other
9      projects that I was working on.
10     Q   (By Ms. Lent) And that's the best you can
11  do, sitting here today, to let me know what the
12  percentage of time you worked on this report versus
13  other projects in August?  Is that your testimony?
14     A   Again, I can't tell you with any accuracy
15  what percentage of my time was spent on this case
16  versus other work.
17     Q   I was asking for an estimate, so you can't
18  provide an estimate; is that right?
19         MR. LYON:  Objection, asked and answered
20     several times.
21         THE WITNESS:  Again, I'm not in a
22     position to offer up an estimate at this
23     point.
24     Q   (By Ms. Lent) Okay, understanding that you
25  worked on this engagement for approximately -- or no

Page 33

1  more than four weeks from hiring to report and that you
2  had some other consulting work that you did during that
3  same time period, with those things in mind, can you
4  tell me approximately how many hours you spent
5  reviewing documents in connection with forming the
6  opinions in your report?
7          MR. LYON:  Objection, asked and
8      answered.
9          THE WITNESS:  Again, I would have to go
10     back to my logs to give you an accurate
11     assessment of how much time.
12     Q   (By Ms. Lent) Do you think it was more than
13  a hundred hours that you spent reviewing materials in
14  connection with forming your opinions in this case?
15         MR. LYON:  Objection, asked and
16     answered.
17         THE WITNESS:  Again, I can't make an
18     accurate estimate without my logs.
19     Q   (By Ms. Lent) I'm not asking you to make an
20  accurate estimate.  I'm just asking you whether you
21  think it was more than a hundred hours.
22         MR. LYON:  Objection.
23     Q   (By Ms. Lent) It's a different question.
24         MR. LYON:  Objection, asked and
25     answered.

9 (Pages 30 - 33)

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 34

1      THE WITNESS: Again, I -- total number
2  of hours, I just can't estimate at this
3  time.
4      Q   (By Ms. Lent) Do you think it was more than
5  200 hours?
6      MR. LYON: Objection, asked and
7  answered.
8      THE WITNESS: Again, I'm not in a
9  position to estimate how many hours I
10  spent.
11     Q   (By Ms. Lent) You think you spent -- it's
12  possible that you spent more than 200 hours reviewing
13  documents in the month of August in connection with
14  your report?
15     MR. LYON: Objection, asked and
16  answered.
17     THE WITNESS: I said I'm not in a
18  position to estimate the total number of
19  hours.
20     Q   (By Ms. Lent) That's not what I'm asking you
21  to do, though. I'm asking you whether it's your
22  position that it's possible you spent more than 200
23  hours in the month of August reviewing materials in
24  connection with forming your opinion in this case?
25     MR. LYON: Objection, asked and

Page 35

1  answered.
2      THE WITNESS: Again, I'm not in a
3  position, without referring to my logs, to
4  estimate how much time I spent reviewing
5  documents.
6      Q   (By Ms. Lent) Okay, I didn't ask you to
7  estimate how much time. Do you typically work -- do
8  you typically work more than 200 hours on your
9  consulting work in a month?
10     A   This -- the month of August was a very, very
11  busy month for me, not my typical month, because of
12  this case.
13     Q   So you recall that it was a busy month, you
14  just don't recall how much time you spent working on
15  it?
16     MR. LYON: Objection, asked and
17  answered.
18     THE WITNESS: No, I don't have a -- an
19  estimate.
20     MS. LENT: Okay.
21     Q   (By Ms. Lent) Did you draft your report?
22     A   Yes, I created my first draft of the report
23  and then sent it to Mr. Lyon for review and comment.
24     Q   Uh-huh. How long did it take you to draft
25  the initial draft of your report?

Page 36

1      MR. LYON: Objection, form.
2      THE WITNESS: Again, I can't give you an
3  accurate estimate on that. I don't --
4  without further information, I can't do
5  that.
6      Q   (By Ms. Lent) Do you recall when in the
7  month of August you sent the report, the draft report,
8  to Mr. Lyon?
9      A   No, I don't. I could go back and look at my
10  email communication and make a determination, but I
11  don't remember exactly when I sent it to him.
12     Q   Exhibit 3 lists a number of different
13  deposition transcripts. Can we turn to page 5 of
14  Exhibit 3 and take a look at that, please.
15     Do you see the three bullets at the top of
16  page 5 of Exhibit 3 that list depositions?
17     A   Yes, I see the listing of three depositions,
18  yes.
19     Q   Did you review those -- it's actually four
20  depositions because there are two of Mark Johnson,
21  right?
22     A   On the page that I'm looking at, there's Joe
23  Morrison, Mark Johnson and Stan Hamilton.
24     Q   And Mark Johnson has some dates in
25  parentheses after it, right?

Page 37

1      A   Yes, I see those two dates, yes, I see two
2  dates, yes.
3      Q   Did you review all four of those deposition
4  transcripts?
5      A   I reviewed them -- not in -- not in complete
6  detail. In other words, I used them as references for
7  my report.
8      Q   How did you use them as references for your
9  report?
10     A   Again, I'd have to go back and look at my
11  report to see where I may have referenced one of these
12  depositions.
13     Q   How did you determine which parts of the
14  deposition to review?
15     A   My general approach is looking for
16  information relative to the questions I was trying to
17  answer regarding the FDA requirements for Rebotix and
18  their product.
19     Q   And how would you determine which information
20  is relevant to the questions you were trying to answer?
21     MR. LYON: Objection, form.
22     THE WITNESS: Well, if there was a
23  reference to Rebotix and the operation going
24  on at Rebotix, that was something that I
25  would look at. Anything that mentioned FDA,

10 (Pages 34 - 37)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 38

1    I would look at.
2    Q   (By Ms. Lent)  And how did you determine
3  where there were references to Rebotix, the operations
4  going on at Rebotix, or the FDA?
5    A   I would do that by scanning the document,
6  basically, going through it quickly.
7    Q   Can we turn to page 8 of this Exhibit 3,
8  please.  Or, sorry -- yeah, the materials considered.
9  And do you see listed on this page a number of
10 depositions, Mr. Stevens?
11   A   Yes, I do.
12   Q   Now, do you see that these say "with
13 accompanying exhibits," whereas the depositions that we
14 looked at on the prior page didn't include that
15 notation?  Is that correct?
16   A   I do see the parenthetical notation on these
17 depositions "with accompanying exhibits."
18   Q   And would you agree that that parenthetical
19 isn't present on the -- for the four depositions that
20 were listed on page 5?
21   A   I agree.
22   Q   Why not?
23       MR. LYON:  Objection, form.
24       THE WITNESS:  I'm not sure -- I would
25   assume because they did not have accompanying

Page 39

1    exhibits, although I don't know that for
2    sure.  I just -- all I know is what it says
3    on the list here.
4    Q   (By Ms. Lent)  Did you prepare this list of
5  materials considered that is Exhibit 3 of your report?
6    A   I prepared it in conjunction with Mr. Lyon.
7    Q   What does that mean?
8    A   That means he reviewed -- reminded me of
9  documents that had been provided and available.  And
10 rather than leaving anything out, I put the entire list
11 here with the -- with the explanation that not
12 everything on that list was reviewed in great detail.
13   Q   Uh-huh.  So was it -- did you decide to put
14 the parenthetical "with accompanying exhibits" next to
15 these deposition references?
16   A   I don't recall why I made the differentiation
17 because -- perhaps because the list was compared -- was
18 prepared not all at the same time and the second ones,
19 I omitted that.
20   Q   Did you review all of the exhibits that
21 accompanied all of the deposition transcripts that you
22 cite in Exhibit 3 to your report?
23   A   I don't recall reviewing all of the exhibits,
24 no.
25   Q   Do you -- do you recall reviewing any of the

Page 40

1  exhibits to the deposition transcripts that you cite in
2  Exhibit 3 to your report?
3        MR. LYON:  Objection, form.
4        THE WITNESS:  I can't recall specific
5    exhibits that I reviewed.
6        MS. LENT:  Uh-huh.
7    Q   (By Ms. Lent)  So my question was whether you
8  recall reviewing any exhibits to the depositions cited
9  in Exhibit 3.
10       MR. LYON:  Objection, form.
11       THE WITNESS:  I did review exhibits to
12   depositions, but I can't specifically say it
13   was these depositions.
14   Q   (By Ms. Lent)  How did you determine which
15 exhibits to review and which exhibits not to review?
16   A   Generally there would be exhibits that
17 related to a statement in the deposition that I wanted
18 more information about.
19   Q   You testified earlier that you recall having
20 a conversation with someone from Rebotix before you
21 submitted your report, right?
22   A   That's correct.
23   Q   Was that gentleman's name Greg Fiegel?
24   A   I believe that was the person that I spoke
25 with, yes.

Page 41

1    Q   And why did you speak with him?
2        MR. LYON:  Objection, form.
3        THE WITNESS:  I spoke with him because
4    he was identified as a source of information
5    that was important for my report, so I was --
6    it was arranged that I could speak with him
7    directly to get his comments directly so that
8    I can use his comments in my report.
9    Q   (By Ms. Lent)  Okay, you just said that he
10 was identified as a source of information that was
11 important for your report.  What do you mean by that?
12   A   I mean he had information regarding the
13 procedures used at Rebotix for servicing the EndoWrist
14 and he also had information about some of the
15 historical issues relating to an earlier submission of
16 a 510(k) and why it was submitted and why it was
17 decided not to pursue it.  Those were issues that were
18 important, I think, to my report.
19   Q   How many conversations did you have with
20 Mr. Fiegel?
21   A   Just -- I believe there was just one
22 conversation, a telephone conversation.
23   Q   How long was that telephone conversation?
24   A   I don't recall.
25   Q   Was it a -- was it a conversation you would

11 (Pages 38 - 41)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 42

1  consider to be a short conversation or a long
2  conversation?
3         MR. LYON: Objection, form.
4         THE WITNESS: It was certainly long
5  enough for me to get the information that I
6  needed.
7     Q   (By Ms. Lent) Did it last more than an hour?
8         MR. LYON: Objection, form. Asked and
9  answered.
10        THE WITNESS: Again, I can't recall the
11  exact length of the call.
12    Q   (By Ms. Lent) Did it last a full day?
13    A   No, the phone call did not last a whole day.
14    Q   Did it last half a day?
15    A   No, it did not last half a day.
16    Q   Do you think it lasted more than an hour?
17        MR. LYON: Objection, asked and
18  answered.
19        THE WITNESS: Again, the exact time of
20  it, length of time, I don't recall right at
21  this moment.
22    Q   (By Ms. Lent) So the best you can recall is
23  that it was less than half a day, but you don't know
24  anything else about the length of it?
25    A   At this point, without going back and looking

Page 43

1  at my notes, I can't say how long I talked to him.
2     Q   Do you recall when you had this conversation
3  with him?
4     A   It was during the time of preparing my report
5  and all that -- that's all I can recall at this time.
6     Q   Was it before or after you completed the
7  first draft of your report?
8         MR. LYON: Objection, form.
9         THE WITNESS: I believe it was after my
10  first draft.
11    Q   (By Ms. Lent) And it was after when you had
12  reviewed Mr. -- Dr. Sharlin's report and made the
13  determination that you agreed with everything in
14  Dr. Sharlin's report, correct?
15    A   Yes, I believe the phone call occurred after
16  that. Yes.
17    Q   Did you prepare a list of questions to ask
18  Mr. Fiegel?
19    A   I had questions in mind. I did not have a
20  formal written list.
21    Q   Was there anyone besides Mr. Fiegel who
22  participated in that conversation?
23    A   Yes.
24    Q   Who?
25    A   Mr. Lyon participated in the conversation.

Page 44

1     Q   Anyone else?
2     A   No.
3     Q   Did you take any notes during the
4  conversation with Mr. Fiegel?
5     A   I did not keep separate notes.
6     Q   What does that mean?
7     A   I mean, I included his comments in my report.
8     Q   Does that mean that you were typing things
9  that he was saying in your report during the
10  discussion?
11    A   Again, it was a chance for me to get
12  information and put it in my report. There was no -- I
13  didn't keep formal notes.
14    Q   Why did you modify notes with "formal" there?
15  Did you keep something other -- something -- some kind
16  of notes that were not formal?
17    A   It's possible that I wrote on a scratch pad
18  certain reminder statements or something like that. I
19  don't recall specifically.
20    Q   Do you have in your possession any notes on a
21  scratch pad that you made from a conversation with
22  Mr. Fiegel?
23    A   No, I don't.
24    Q   Did you throw away the scratch pad that had
25  notes from the conversation with Mr. Fiegel?

Page 45

1         MR. LYON: Objection, form.
2         THE WITNESS: Again, I don't recall
3  keeping it. And I do dispose of notes,
4  informal notes, that I no longer have use
5  for.
6     Q   (By Ms. Lent) I just want to make sure that
7  the court reporter took down your testimony right. You
8  said -- did you say I recall keeping it and I do
9  dispose of informal notes that I no longer have use
10  for? Is that what you said?
11        MR. LYON: Objection, form. Misstates
12  prior testimony.
13    Q   (By Ms. Lent) Just literally reading from
14  the transcript and trying to make sure that it's
15  written right.
16        MR. LYON: Oh. I think it was
17  mistranscribed, then.
18        MS. LENT: Yeah, that's why I -- that's
19  exactly why I asked.
20    Q   (By Ms. Lent) So let me just say it again.
21  Sorry for the commentary, Mr. Stevens. The court
22  reporter took down that you said, "I recall keeping it,
23  and I do dispose of notes, informal notes, that I no
24  longer have use for." Was that what you said?
25    A   I believe that's what I said, yes.

12 (Pages 42 - 45)

J. Lawrence Stevens                                            September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 46

1      Q   Okay.  Okay.  So you recall having notes on a
2   scratch pad from your conversation with Mr. Fiegel, but
3   then those would have been discarded because you didn't
4   need them anymore; is that right?
5      MR. LYON:  Objection, form.  Misstates
6   prior testimony.
7      THE WITNESS:  Again, it's my normal
8   practice to make notes during phone
9   conversations, and I assume that I did it
10   with him.  I don't remember specifically what
11   I wrote or what -- I did use that information
12   in my report.
13      Q   (By Ms. Lent)  You did use the information in
14   the report, correct?
15      A   Yes, that's correct.
16      Q   Mr. Fiegel wasn't under oath when he had this
17   conversation with you like you are today, right?
18      A   It was a normal phone conversation that we
19   had.
20      Q   Is there anything else you considered in
21   forming your opinion in this case that is not included
22   on Exhibit 3, "Materials Considered"?
23      A   At this point in time, I can't recall any
24   additional information other than what we have already
25   discussed.

Page 47

1      Q   Can we turn to page 6 of your report,
2   paragraph 22.  Do you see this paragraph 22 on your
3   screen?
4      A   Yes, I do.
5      Q   Okay.  The last paragraph -- the last
6   sentence of this paragraph says, "They do not represent
7   the only materials considered or relied upon in
8   reaching my conclusions.  This document would be unduly
9   long if I were to cite every such piece of evidence in
10   each place it played a role in my analysis."  Do you
11   see that?
12      A   Yes, I see that.
13      Q   Does that mean that there are materials that
14   you considered that you did not cite in your report?
15      A   I think what I'm saying here is I have 50
16   years of experience regarding compliance with the
17   Federal Food, Drug and Cosmetic Act both in FDA and in
18   the industry, and I have a lot of personal knowledge
19   that I use when I form opinions, and that's what I'm
20   saying here, is that it would be impossible for me to
21   go back and list all of the knowledge that I have and
22   use as a -- as an input.
23      Q   What you write is that it would be unduly
24   long if you were to cite every such piece of evidence,
25   right?  What did you mean by "evidence"?

Page 48

1      MR. LYON:  Objection, asked and
2   answered.
3      THE WITNESS:  Well, again, I'm referring
4   to information that I have that has
5   applicability to my opinions.  That's what I
6   meant.
7      Q   (By Ms. Lent)  Information that you have that
8   has applicability to your opinions.  Did you mean
9   evidence in this case?
10      MR. LYON:  Objection, asked and
11   answered.
12      THE WITNESS:  Again, I'm speaking kind
13   of in general when I'm talking about evidence
14   being knowledge.  That's what I'm referring
15   to.
16      Q   (By Ms. Lent)  In paragraph 23 of your
17   report, in the last sentence, you say, "All of the
18   opinions expressed herein are offered to a reasonable
19   degree of professional certainty."  Do you see that?
20      A   Yes, I see that.
21      Q   What does that mean?
22      A   I mean that I call up -- I call upon my
23   experience in both industry and FDA training, which is
24   considerable, and that my statements that I make are
25   ones that reflect my professional standing as an

Page 49

1   expert, and that's what I mean, "professional
2   certainty."
3      Q   How did you measure what is a reasonable
4   degree of professional certainty?
5      MR. LYON:  Objection, form.
6      THE WITNESS:  Well, degree, I guess what
7   I'm stating here is that I'm not perfect.  I
8   don't consider myself all-knowing and that my
9   expertise is considerable, but, you know,
10   someone could point out something perhaps I
11   don't know that could have been important.  I
12   don't know.  I just -- I can't say an
13   absolute degree because I'm not absolute.
14   I'm -- but I am providing what I consider a
15   reasonable degree of professional certainty.
16      Q   (By Ms. Lent)  Did you have a percentage in
17   mind when you used the word "reasonable," like not a
18   hundred percent, but some other percentage of
19   certainty?
20      MR. LYON:  Objection, asked and
21   answered.
22      THE WITNESS:  I have never thought of it
23   in that perspective.
24      Q   (By Ms. Lent)  Does it mean a higher
25   percentage than 50 percent?

13 (Pages 46 - 49)

J. Lawrence Stevens                    September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 50

1        MR. LYON: Objection, asked and
2    answered.
3        THE WITNESS: Again, I'm not in a
4    position to give a number that would be
5    associated with that.
6    Q   (By Ms. Lent) I'm just trying to understand
7    what you meant by "reasonable" and if I can under --
8    how I would know what that means. Is there anything
9    else you can tell me to help me understand what you
10   meant by "reasonable" rather than absolute?
11       MR. LYON: Objection, asked and
12   answered.
13       THE WITNESS: I believe I explained
14   that, that I -- that I know a lot, but I may
15   not know everything, and therefore, I can't
16   say it's absolute, but it's certainly a
17   reasonable degree of professional certainty
18   based on my experience and background.
19   Q   (By Ms. Lent) You mentioned that one of the
20   documents that counsel sent you was a Deutsche Bank
21   report. Do you remember that?
22   A   Yes. Yes.
23   Q   You've been an expert, a litigation expert,
24   numerous times, right?
25   A   Yes, I have.

Page 51

1    Q   How many times have you offered expert
2    testimony in a litigation?
3    A   Well, testimony would be either deposition or
4    trial.
5    Q   Or a report. I'm sorry, that wasn't clear.
6    How many times have you offered an expert opinion in a
7    litigation?
8    A   Okay, I -- again, this is only an estimate,
9    but I would say anywhere from 30 to 40 different cases.
10   Q   Do you recall in any of those matters relying
11   on an analyst report for purposes of forming an opinion
12   about an FDA issue?
13       MR. LYON: Objection, form.
14       THE WITNESS: The analyst report that I
15   reviewed, what I looked at was the reference
16   to FDA experts, well-qualified FDA experts,
17   and that's what I was looking at. The source
18   of it wasn't really my concern in the sense
19   of the -- I've seen other types of reports.
20   I don't know if they're analyst reports, but
21   other reports of other experts, and that's
22   what this was. This was a report of FDA
23   experts analyzing a situation and giving an
24   opinion.
25   Q   (By Ms. Lent) Well, wasn't it, in fact, the

Page 52

1    report from an analyst mentioned FDA experts? They're
2    a -- Deutsche Bank is a financial analyst, right?
3    A   Right. I believe that's the case, yes.
4    Q   And it was a report by a Deutsche Bank
5    analyst, right?
6    A   I'm not sure who wrote the report. I know
7    what the report said, and that's what I was looking at.
8    Q   Did you think that the report was written by
9    an FDA expert?
10   A   I don't know the background of the person
11   that wrote the report. I know the report referenced
12   talking to several FDA experts.
13   Q   And in any of your prior expert engagements,
14   do you recall relying on a financial analyst report to
15   support opinions about FDA matters?
16       MR. LYON: Objection, asked and
17   answered.
18       THE WITNESS: Again, I at this point
19   can't say if I have or haven't, but I have
20   reviewed technical reports that reference FDA
21   expertise, and I know -- I've seen them
22   from -- from financial reports, annual
23   reports, various documents that talk about
24   FDA and referencing actions that are taken in
25   compliance with FDA rules.

Page 53

1    Q   (By Ms. Lent) You don't have a recollection
2    sitting here today of ever relying on a financial
3    analyst report in reaching an expert opinion in a prior
4    case, right?
5        MR. LYON: Objection, asked and
6    answered.
7        THE WITNESS: Again, this is a report
8    that was identified as a Deutsche Bank
9    report. I don't know who wrote it. I don't
10   want -- the information that was in that
11   report is what I was interested in.
12   Q   (By Ms. Lent) I understand. I understand.
13   I'm asking a slightly different question, which is why
14   I'm asking it again. My question is: You don't have a
15   recollection, do you, of relying on a financial analyst
16   report in reaching an opinion in any of the prior
17   litigations you've worked on; isn't that right?
18       MR. LYON: Objection, asked and
19   answered.
20       Remember, Larry, to give me a moment to
21   get my objections before you respond.
22       THE WITNESS: Yes, okay.
23       As I stated, the -- I don't know who
24   wrote the report. I know what the report
25   said and what the FDA experts quoted in the

14 (Pages 50 - 53)

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 54

1    report said. And I -- and it was useful
2    information for me because it -- it agreed
3    with what I had concluded also.
4        Q    (By Ms. Lent) I understand your answer, and
5    I was asking you about prior engagements, not this
6    engagement. So one of the -- any of the prior
7    engagements that you worked on, you don't recall,
8    sitting here today, of having relied on a report from a
9    financial analyst, do you?
10       MR. LYON: Objection, form. Asked and
11       answered.
12       THE WITNESS: In my past, I have
13       reviewed many types of reports. I can't
14       recall who the -- who the sources who wrote
15       them were or what their backgrounds were.
16       Q    (By Ms. Lent) And you can't recall that any
17   of them were by financial analysts, right?
18       MR. LYON: Objection, form. Asked and
19       answered.
20       THE WITNESS: I don't know the
21       backgrounds of the people who write -- of all
22       the people who write reports.
23       Q    (By Ms. Lent) We'll go a lot faster today if
24   you listen to the question that I'm asking and answer
25   that question as opposed to the question you want to

Page 55

1    answer.
2        MR. LYON: Karen, I believe --
3        MS. LENT: Why don't we -- why don't we
4        take a break -- I'm sorry, why don't we take
5        a break right now. I think we're coming on
6        the time limit for the tape. Let's take 10
7        minutes, okay?
8        THE WITNESS: Okay.
9        THE VIDEOGRAPHER: The time is now 9:55
10       a.m. and we are going off the record.
11       (Recess taken.)
12       THE VIDEOGRAPHER: The time is now 10:09
13       a.m. We're back on the record. This is the
14       beginning of Media Unit 2. Please continue.
15       Q    (By Ms. Lent) Mr. Stevens, you had two
16   different periods of time that you worked at the FDA,
17   correct?
18       A    That's correct.
19       Q    And combined, those totaled about 20 years at
20   the FDA; is that right?
21       A    Twenty-one years, to be exact.
22       Q    During those 21 years, while you were
23   employed by the FDA, did you ever work at FDA
24   headquarters?
25       A    I had some temporary assignments for 30 or 60

Page 56

1    days a couple of times at the Center for Devices and
2    Radiological Health, but I never worked full time in
3    Washington.
4        Q    What was the subject of those temporary
5    assignments?
6        A    Well, one assignment was to work in the
7    Office of Device Evaluation in the Biomedical Research
8    Division, which is the part that watches over clinical
9    trials done by companies. And another time was in the
10   Office of Device Evaluation, the compliance branch,
11   reviewing reports from district offices. They actually
12   offered me a position there, but at the time, I was a
13   California resident and working in Washington didn't
14   seem too exciting to me, so I went back to my field
15   job.
16       Q    You could probably do it remotely today.
17       Did any of those temporary assignments
18   involve reviewing 510(k) submissions?
19       A    No. My experience with 510(k)s came from my
20   industry experience where I wrote, I would estimate,
21   six to eight 510(k)s myself. As a consultant now, I
22   work with companies on 510(k) strategy. I've actually
23   written a 510(k) recently that's currently under review
24   by FDA, and I'm interacting with FDA over that.
25       So I do have 510(k) experience, but it's a

Page 57

1    practical experience in the sense of working with my
2    company, getting the information necessary to put the
3    510(k) together, writing the 510(k), sending it in,
4    negotiating with FDA, and ultimately getting marketing
5    authorization for that.
6        I also have experience with investigational
7    device exemptions and with pre-market approval
8    applications. So my experience with those kinds of
9    regulatory issues come from my time -- most of my time
10   in private industry. I have limited FDA experience in
11   those areas.
12       Q    So the experience that you're relying on in
13   forming your opinions in this case does not relate to
14   your time at FDA; is that what you're saying?
15       MR. LYON: Objection, form. Misstates
16       prior testimony.
17       THE WITNESS: Again, I have combination
18       experience. My 510(k) experience with FDA
19       has to do with what I call data integrity
20       inspections. A company would submit a 510(k)
21       and the district office would get an
22       assignment to go out and review their design
23       history files and look at their various data
24       to make sure that the data in the 510(k) was
25       accurate.

15 (Pages 54 - 57)

J. Lawrence Stevens                        September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 58

1    I also would investigate issues where
2  companies were potentially marketing a
3  product without a 510(k).  I was an
4  enforcement guy, so I would go out and deal
5  with the company and talk to them about their
6  product and gather information and then make
7  a recommendation to the headquarters' offices
8  that the product was either legally marketed
9  or not legally marketed.  And the
10 headquarters took it from there.
11     Q    (By Ms. Lent)  Other than those two examples
12 that you just mentioned, the experience that you're
13 relying on in forming your opinions for this case don't
14 rely on work you did while at FDA; is that right?
15     MR. LYON:  Objection, form.  Misstates
16 prior testimony.
17     THE WITNESS:  It's a combination of
18 experience.  I certainly have a lot of
19 experience with FDA as an industry person
20 working with them, getting products through.
21 The FDA work is -- was -- is -- was
22 enforcement-minded, where I would review what
23 companies were doing and make determinations
24 of whether or not they were following the FDA
25 rules.

Page 59

1     Q    (By Ms. Lent)  During the 21 years that you
2  were at FDA, what work did you do that related to
3  510(k) clearance?
4     A    Okay, well, I was with the FDA from '72 to
5  '82.  And in 1976, the medical device amendments were
6  passed, and that established the first requirements for
7  various things, including pre-market notifications.
8        I applied for and was selected by FDA to be
9  what they call a small business representative, and
10 that was for the medical device industry.  And when
11 companies needed help with the new medical device
12 regulations, I was the guy in FDA they called.  And
13 many of them had questions about the 510(k) process
14 because it was new.
15        I -- FDA -- I went back to FDA headquarters
16 for 30 days and worked with the Center for Devices and
17 Radiological Health, people training me on the new
18 requirements of putting the 510(k) process in the
19 quality system for regulations and such.  And so I was
20 dealing with industry, and my experience there was
21 helping companies putting a 510(k) together and help --
22 basically being their liaison when the 510(k)
23 authorization letter came.
24        This predated scanning and emailing.  They
25 had something called a facsimile machine or a fax and I

Page 60

1  would get the headquarters' office to fax me the 510(k)
2  letter and I would personally deliver it to the
3  company, giving them the good news.  But -- so I do
4  have very, very early experience with the 510(k)
5  process, and I can tell you having -- it's evolved a
6  lot since the original regulation was written.  The
7  amount of technical data in the 510(k)s is much more --
8  much more intensive now and FDA is getting a lot more
9  information than they used to get.  So like everything
10 else, over time the 510(k) process has matured.
11     Q    During what period of time were you involved
12 as a small business representative at FDA?
13     A    Well, I started in 1966 -- excuse me, 1976.
14 And as it would be, I learned all about the new FDA
15 medical device rules and I also was dealing with
16 companies on a friendly basis, which was a lot better
17 than on the enforcement basis.
18        And that led me, in 1982, to take that
19 knowledge and go into industry, medical device
20 industry, and so in -- so from '76 to '82, I was a
21 small business representative.  In 1982, I left FDA and
22 became a regulatory affairs manager for a medical
23 device company.
24     Q    Now, you testified that part of what you did
25 at FDA was to do inspections of companies who may have

Page 61

1  been marketing a product without a 510(k).  Is that --
2  do I have that right?
3     A    That's correct.
4     Q    And who would make the decision as to whether
5  the company you were inspecting was, in fact, marketing
6  a product without a 510 -- without 510(k) clearance
7  when such clearance was required?
8     A    Okay.
9     MR. LYON:  Objection, form.
10 Remember, Larry, to let me object.
11 Objection, form.
12     THE WITNESS:  The involvement I had
13 came -- I went back to FDA in November of
14 2000, and that's when I got involved in the
15 data integrity 510(k)-type issues for FDA.
16        When I would visit a firm that there was
17 a question about, I would get the assignment
18 from FDA headquarters, I would go out and I
19 would look at their product, I would look at
20 their labeling, I would look at what their
21 operation was, what they were actually doing,
22 and I would write a report.
23        And the report would have the evidence
24 that either confirmed that they needed a
25 510(k) or it would confirm that what I

16 (Pages 58 - 61)

J. Lawrence Stevens                          September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 62

1    observed did not indicate they would need a
2    510(k). So I didn't make the final decision,
3    but my report was the basis of the final
4    decision.
5        Q    (By Ms. Lent)  And at what time during your
6    employment at FDA did you conduct these inspections
7    regarding 510(k)s?
8        A    It would be in the early 2000s, when I went
9    back to FDA, I was an FDA investigator device
10   specialist. And I did that for a few years and then
11   started working my way up in the organization.
12       Q    Paragraph 5 of your expert report states that
13   you were an investigator (medical device specialist) in
14   Los Angeles from November 2000 to June 2002; is that
15   correct?
16       A    I believe -- I don't have my resume right in
17   front of me, but that sounds correct, yes.
18       Q    And that would be the time period when you
19   were engaged in the activity you just testified about?
20       A    Well, specific active--
21           MR. LYON:  Objection, form.
22       Larry, remember --
23           THE WITNESS:  I'm sorry.
24           MR. LYON:  -- after each question, you
25       need to pause so we don't speak over each

Page 63

1    other.
2            THE WITNESS:  I'm sorry.
3            MR. LYON:  Objection, form.
4            THE WITNESS:  Okay, in 2002, I became an
5    FDA compliance officer, which is the next
6    level up. And in that position, I would
7    review inspection reports and sample
8    collections done by the investigators, and I
9    would make a legal recommendation to the
10   Center for Devices in their compliance
11   office. So I still had involvement.
12           I don't recall a specific case involving
13   510(k) or not 510(k), but that's the kind of
14   case I would get as a compliance officer,
15   which I did for a couple more years.
16       Q    (By Ms. Lent)  Your -- paragraph 5 of your
17   expert report says that you held the compliance officer
18   position in Los Angeles from June 2002 to November
19   2003. Do you see that?  It's right there in the middle
20   of the page.
21       A    Right. Right.
22       Q    And then after that, after November 2003,
23   were any of those positions that you had at FDA
24   involving making a recommendation as to whether a
25   company was marketing a product that needed a 510(k),

Page 64

1    but did not have that clearance?
2        A    Well, as the director of the import
3    operations branch, which was my next job after, I had a
4    branch of around a hundred employees, and they would
5    review products coming into the countries from outside
6    the United States offered for import in the United
7    States.
8            One of the considerations that my employees
9    had to consider was the status of the product that was
10   being offered for import. And that involved, then,
11   getting information about the product, looking in the
12   FDA database on 510(k)s registration, and making a
13   determination as to whether the product was a legal
14   product and could be brought in or in the case where
15   there were deficiencies, the product would be detained
16   and potentially refused entry. And sometimes those
17   were 510(k) issues on products.
18       Q    And were those issues that your employees
19   handled, or were those issues that you personally
20   handled?
21       A    Well, again, I was the -- I was the boss, I
22   was the go-to guy when it came to technical questions
23   about compliance of products and 510(k) and what
24   requires a 510(k) and what doesn't require a 510(k). I
25   had compliance officers working for me who would make

Page 65

1    the decisions on pretty straightforward things, but I
2    -- they would come to me if they had something that was
3    rather not clear to them and I'd personally get
4    involved. So it was a combination of both me and my
5    employees.
6        Q    And during that time period as director of
7    import operations, did you make any final decisions as
8    to whether companies needed 510(k) clearance for their
9    products?
10       A    Well, we would make decisions supporting
11   either needing one or not needing one, but the final
12   decision was always made by the Center of Devices and
13   Radiological Health compliance branch.
14       Q    And what we've been talking about here during
15   your second stint at the FDA is when you were acting
16   as -- acting in compliance; is that fair to say?
17       A    Well, I was the director of import
18   operations branch till December -- September of 2008.
19   At that point, the district director asked me to fill
20   in for a vacancy, which was the director of compliance
21   for FDA in Los Angeles. So for a few months, I --
22   well, actually for about a year, I was supervising the
23   domestic compliance branch in Los Angeles and
24   overseeing the same kinds of things I did as a
25   compliance officer.

17 (Pages 62 - 65)

J. Lawrence Stevens                  September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 66

1    Q   Can we go down to paragraph 9 of your report.
2   In the first sentence, it says, "As a compliance
3   officer, my work assignments were almost exclusively
4   complex Class III medical devices and pharmaceutical
5   inspections and required both risk and legal
6   assessments to formulate regulatory enforcement plans."
7   Do you see that?
8    A   Yes.
9    Q   What is a Class III medical device?
10    A   Well, the FDA -- the law classifies devices
11   into three categories, I, II and III.  Most devices are
12   Class II devices, and those are -- it's a risk-based
13   assessment.  The Class I devices are the least risky.
14   The Class III devices are the most risky from a patient
15   perspective.  And because of my background in the
16   industry, I have a tremendous amount of knowledge about
17   Class III medical devices and medical devices in
18   general.
19       Companies that make Class III devices usually
20   also make Class II devices that are subject to 510(k).
21   So their portfolio can include both.  So I have that
22   experience.  But that's -- the FDA used me in those
23   cases where my technical knowledge served them the
24   best.
25    Q   Class III devices do not require 510(k)

Page 67

1   clearance, right?
2    A   Right, a Class III device requires something
3   called pre-market approval application, and the process
4   is much more complex than a 510(k).
5    Q   You mentioned running socks in your report.
6   Do you remember that?
7    A   Yes.  Well, just a practical example.
8    Q   Great.  Running socks aren't medical devices,
9   are they?
10    A   Well, it depends.  If the medical [sic] socks
11   make a medical claim of curing, treating, preventing,
12   or diagnosing disease, or affecting body structure,
13   then the socks can be considered medical devices.
14   Generally they're not because they don't make medical
15   claims.
16    Q   Are you aware of any running socks that have
17   510(k) clearance?
18    A   No, no.  It was -- it was -- it was put in as
19   an example of a feature of socks, is that they wear out
20   and they don't label the socks for the number of uses.
21   It's known that socks are examined and determined if
22   they need to be mended or repaired.  In other words,
23   it's a practical example of the issue with repairing a
24   medical device and bringing it back to its original
25   condition.  That can also happen with socks, but yet

Page 68

1   the socks are not labeled with any usage limits because
2   it's not practical or needed, I guess.
3    Q   Now, you testified a little while ago that
4   when you were working in compliance as a compliance
5   officer, you would have been involved in making at
6   least preliminary determinations as to whether
7   companies needed 510(k) clearance, right?
8    A   Yes, that was an issue that I dealt with,
9   many issues that I would deal with as a compliance
10   officer.
11    Q   So if you dealt almost exclusively with Class
12   III medical devices as a compliance officer, then how
13   were you dealing with 510(k) issues?
14    A   Well, again, I handled Class II devices also,
15   in other words, the more technical reports would tend
16   to go to me because of my background.  But I certainly
17   have very in-depth knowledge of the FDA requirements
18   for Class II and -- devices and 510(k)s.
19    Q   What background are you referring to that
20   gives you this extra technical knowledge?
21    A   Well, it was my 18 years in the medical
22   device industry.  I was a very unique FDA investigator
23   when I went back to FDA because I had this in-depth
24   experience in the industry, and it served me very well
25   as an FDA enforcement person because I could understand

Page 69

1   what was going on in the companies and I understood the
2   business world and I added that -- those types of
3   skills were looked favorably upon by the FDA in the
4   sense of my assignments.
5    Q   I'm assuming you have a college degree,
6   right?
7    A   Yes, I have a degree in biological science
8   from Cal. State Fullerton -- Cal. State University in
9   Fullerton, and I completed one year of an MBA program
10   at Golden Gate University.
11    Q   What is biological science?  What is it that
12   you studied for your undergrad?
13    A   Well, it was general biology from the
14   standpoint of science of life.  I took plant taxonomy
15   courses, I took entomology courses, I took human
16   physiology and anatomy.  It was a general science
17   background in life, so to speak.
18    Q   Have you studied engineering?
19    A   No, I have not -- I don't have a background
20   in engineering.
21    Q   In either of the two -- well, strike that.
22       In the 21 years that you spent working at the
23   FDA, did you have any particular training in how to
24   determine substantial equivalence for purposes of
25   510(k) clearance?

18 (Pages 66 - 69)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 70

1     A   I don't recall receiving any FDA training for
2   that.  That would -- that type of training would be
3   given to FDA people in headquarters.
4     Q   Is it true that you primarily worked with
5   cardiovascular devices during your career at FDA and as
6   a regulatory consultant?
7     A   Well, my industry experience was primarily
8   with cardiovascular device companies, although I did
9   work for orthopedic companies.  I worked for one
10  gastroenterology company.  But cardiovascular devices
11  was my specialty in the industry.  In the FDA, it is
12  broader than that, is I was assigned, as an
13  investigator, all kinds of different Class III devices,
14  including surgical equipment, for example, orthopedic
15  implants, neurological catheters.  I dealt with all
16  those things with -- as an FDA person.
17    Q   Have you ever worked with companies that make
18  laparoscopic instruments?
19    A   No, I've had no -- I've had no contact with a
20  company like that.
21    Q   During your time as a regulatory consultant,
22  I think you mentioned that you advised companies on the
23  510(k) submission process, right?
24    A   That's correct.  That's one of the areas that
25  I assist companies with.

Page 71

1     Q   And about how many 510(k) submissions have
2   you advised on?
3     A   As a consultant, I've advised and actually
4   created three 510(k)s.
5     Q   Three, did you say three?
6     A   Three, yes.
7     Q   Okay.  And what did those three 510(k)s
8   relate to?
9     A   Okay.  Well, one of them -- the recent one
10  has -- are surgical gowns.  There's a lot of companies
11  that want to get surgical gowns on the market because
12  of the COVID situation.  This is a foreign company that
13  I'm helping.  The other two were laser devices that
14  were offered for laser surgery.
15    Q   Are you currently working with this company
16  that's seeking 510(k) clearance for surgical gowns?
17    A   Yes.
18    Q   Were you working with that company in August?
19    A   Most of the work was before August.  It's
20  under review by FDA right now, so I'm kind of in limbo.
21    Q   Have you been engaged by any clients as a
22  consultant to determine whether it's necessary for them
23  to seek 510(k) clearance for a medical device?
24    A   Yes.
25    Q   How many times?

Page 72

1     A   I would say three or four times.
2     Q   Are those in addition to the three times you
3   mentioned that you actually prepared 510(k)
4   submissions?
5     A   Yes.
6     Q   So --
7     A   Those were additional -- I'm sorry.  Those --
8   they're additional clients.  The usual interaction is
9   this is my product, this is what I'm using it for, is
10  this something that FDA would be concerned about, and
11  if so, what should I do.  I provide them advice on
12  where I think they should be, and then I never hear
13  from them again.  So I don't know if they complied or
14  not.
15    Q   In those three to four times that you
16  mentioned, did you advise the companies they did need
17  to get 510(k) clearance or that they did not?
18    A   In all three, I advised them they did need
19  to.
20    Q   They did?
21    A   Yes.
22    Q   It was just three, not three or four?
23    A   It could be three or four.  I can't recall
24  specifically how many.
25    Q   Okay.  But whether it's three or four, for

Page 73

1   each of them, you advised the company that they needed
2   to get 510(k) clearance, right?
3     A   Yes.
4     Q   Has there ever been a time where you were
5   engaged as a consultant where you advised a company
6   that it did not need to get 510(k) clearance for a
7   medical device?
8     A   Well, yes, in a sense.  In other words, many
9   times, the 510(k) requirement is based on claims of
10  what the device can do, and the removing of the claims
11  and offering the product as a general consumer product
12  will remove the 510(k) requirement.  So I -- and I tell
13  companies that, "Your labeling is your problem, you
14  can't make those claims without a 510(k)."  Whether or
15  not they remove the labeling or have somebody else do a
16  510(k) for them, I don't know.
17    Q   And how many times have you advised companies
18  in the way that you just described, that is, that they
19  should remove claims from their labeling so that they
20  don't need 510(k) clearance?
21    A   That's a subset, I would say maybe two or
22  three of the -- of the ones that I talked to.  In some
23  cases, the design of the product itself and its
24  features would render it not useful for anything other
25  than a medical pump, and that -- those cases, the

19 (Pages 70 - 73)

J. Lawrence Stevens                      September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 74

1 labeling -- changing the labeling doesn't help.
2     Q   Do you recall what devices those were in the
3 two to three times you mentioned that you advised
4 someone to change a label in order to avoid 510(k)
5 clearance requirements?
6     A   One in particular I remember.  It was a
7 massage device that was designed to be placed on the
8 body and provide massaging.
9     Q   I should have asked you this before, but in
10 the three to four times that you advised a client that
11 they did need to seek 510(k) clearance, do you recall
12 what medical devices those were?
13     A   Not all of them.  I remember a few.
14     Q   Can you tell me what they were?
15     A   One of them was a -- an ozone generating
16 device.  Another was a blood purification system.  And
17 the third one was the massaging device.
18     Q   So the massaging device is one where you said
19 you do need 510(k) clearance unless you change the
20 label?
21     A   That's correct.
22     Q   Have you ever heard of the company AJW
23 Technologies?
24     A   No, I don't recognize that name.
25     Q   Do you know a gentleman named -- know or are

Page 75

1 you familiar with a gentleman named Ryan Burke?
2     MR. LYON:  Objection, form.
3     THE WITNESS:  It sounds somewhat
4 familiar, but I can't recall right offhand.
5     Q   (By Ms. Lent)  Are you -- have you ever heard
6 of someone named Jeff Bua, B-U-A?
7     A   I don't know that name.
8     Q   How about Jon Ward, W-A-R-D?
9     A   That name does not sound familiar.  Again, I
10 could go back to my report and look at the documents,
11 because I can't remember every name that's associated
12 with every document.  If you want me to do that, I can
13 go back and look at my report and make sure that I
14 didn't overlook something.
15     Q   No, that's okay.  I was really asking the
16 question in the context of your career as opposed to,
17 you know, for purposes of this case.  But --
18     A   Okay.
19     Q   So at least outside of this case, you
20 don't -- you have not heard of that company or those
21 names?
22     A   They don't sound familiar to me.
23     Q   Okay.  Let's turn back to your report,
24 Exhibit 1, and paragraph 30.
25     MS. LENT:  Brad, can you pull that up,

Page 76

1 please.  Thank you.
2     Q   (By Ms. Lent)  In paragraph 30, you say that
3 you "fully adopt the opinions set forth in these
4 paragraphs in Dr. Sharlin's report as my own opinions
5 and expressly incorporate these opinions into my
6 report."  Do you see that?
7     A   Yes, that's what I've said.
8     Q   And by "these paragraphs," you mean paragraph
9 20 through 199 of Dr. Sharlin's report, correct?
10     A   That's what I've stated in my report, yes.
11     Q   Why did you adopt his report?
12     MR. LYON:  Objection, form.  Asked and
13 answered.
14     Q   (By Ms. Lent)  These portions of his report?
15     MR. LYON:  Objection, form.  Asked and
16 answered.
17     THE WITNESS:  Well, I know Dr. Sharlin's
18 bio.  I read it with the report.  He appears
19 to have the background that would give him
20 the knowledge of FDA law.  And I read his
21 conclusions regarding the fact that the
22 interceptor board was not a medical device
23 and that Rebotix was a servicing company, not
24 a medical device manufacturer, and that they
25 would not -- they didn't require -- in other

Page 77

1 words, the opinions, Dr. Sharlin's opinions,
2 are the exact same opinions I have.
3     Q   (By Ms. Lent)  Well, then why didn't you just
4 express those opinions in your report yourself as
5 opposed to adopting his?
6     MR. LYON:  Objection, form.
7     THE WITNESS:  Again, I was -- I was
8 given his report and asked to review it, and
9 I did.  So that's how I got a connection with
10 it.
11     Q   (By Ms. Lent)  Understood.  But is there --
12 is there any reason why you didn't express those
13 opinions yourself in your report?
14     MR. LYON:  Objection, form.
15     THE WITNESS:  Well, again, this is the
16 way the report -- the format of the report,
17 this seemed like the best way to format the
18 report, was to reference his report as an
19 attachment, saying that I accepted those
20 conclusions, and then provide my own
21 conclusions in addition to that in my written
22 report.
23     Q   (By Ms. Lent)  So it's just a matter of
24 formatting; is that what you're saying?
25     A   Yeah, again, I -- in putting my report

20 (Pages 74 - 77)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 78

1  together, I was asked to review Dr. Sharlin's report,
2  see if I concurred with his conclusions, write my
3  report, and then write my assessment of the Rosecrans
4  report.  And that's the way my report is formatted.
5      Q    And it's your testimony that Dr. Sharlin
6  concluded that the intercept -- interceptor board was
7  not a medical device; is that right?
8          MR. LYON:  Objection, form.
9          THE WITNESS:  I'm not sure he
10     specifically addressed that.  I can't recall
11     where that first came up, but clearly his
12     assessment that Rebotix was a servicing
13     company and was not introducing a new device
14     to the market, therefore no 510(k) was
15     required, that's one of the bases of what I
16     looked at in his report.
17     Q    (By Ms. Lent)  Are there any portions of your
18  report that depend on Dr. Sharlin's conclusions?
19         MR. LYON:  Objection, form.
20         THE WITNESS:  Well, I believe -- I've
21     restated in my report some of his conclusions
22     and that his report is incorporated by
23     reference rather than repeating it in my
24     report.
25     Q    (By Ms. Lent)  In any other time when you

Page 79

1  have served as an expert in a litigation, have you
2  adopted another expert's opinion?
3      A    Well, I'm not sure what you mean by that
4  question.  I use expert resources for -- in virtually
5  all my expert reports.
6      Q    So I mean like you did here, you have adopted
7  the -- strike that.
8          I mean like you did here by adopting 179
9  paragraphs of Dr. Sharlin's report and incorporating
10 those as your own.  Have you ever done that any other
11 time that you've served as an expert in a litigation?
12         MR. LYON:  Objection, form.
13         THE WITNESS:  I've not had a case where
14     there was a previous expert report written on
15     the case which I was going to be also writing
16     an expert report.  That's the first time
17     that's happened to me.  So this situation
18     emerged and this is how I handled it.
19     Q    (By Ms. Lent)  So does that mean that you
20 have not adopted full scale the way you did here
21 another expert's report in any of your prior expert
22 engagements?
23         MR. LYON:  Objection, form.
24         THE WITNESS:  When I prepare an expert
25     report, I reference a lot of sources from

Page 80

1  experts, and that's the normal process.  In
2  this particular case, I'm referencing
3  Dr. Sharlin as an expert and incorporating
4  his conclusions in my report.
5      Q    (By Ms. Lent)  I understand that you may cite
6  to an expert report from someone else when forming your
7  opinions, but really my question is whether you've
8  adopted opinions rather than restating them as your
9  own.  Have you done that before?
10         MR. LYON:  Objection, asked and
11     answered.
12         THE WITNESS:  As I said, this case was
13     the first one where an expert report had been
14     written on the specific issues that I was
15     going to be addressing.  And so in that case,
16     this is how I handled it.
17     Q    (By Ms. Lent)  Now, Dr. Sharlin opined that
18 Rebotix is not significantly changing the safety or
19 performance specifications of EndoWrist instruments and
20 therefore has not engaged in remanufacturing, right?
21     A    Yes, I believe that's what he said.
22     Q    And do you agree with that opinion?
23     A    Yes, I do.
24     Q    That was -- that was not something that
25 Ms. Rosecrans addressed in her July 26th expert report,

Page 81

1  right?
2      A    I'm not sure if that specific issue was
3  except that I know she addressed changing the device
4  and the need for a 510(k) and the addition of the
5  interceptor board as a -- as a change in the device
6  that would require 510(k), and that was the issue I
7  addressed in her report.
8      Q    Right, but you don't recall her addressing
9  the -- a change in the safety or performance
10 specifications, do you?
11     A    I don't -- I can't say that I recall that.  I
12 know that was in the documents that I reviewed.  There
13 were a number of other documents that referenced the
14 operations that were going on at Rebotix.  I saw a
15 movie that Rebotix had prepared showing how they
16 refurbish the device and repair it and return it to its
17 original state.  So that -- that information is in my
18 report.
19         MR. LYON:  Larry, let me remind you that
20     if you need particular information to answer
21     a question, if the question is asking you if
22     something is in Ms. Rosecrans' report, you
23     don't have to go off your memory.  You're
24     welcome to ask --
25         THE WITNESS:  Okay, all right.

21 (Pages 78 - 81)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 82

1        MR. LYON: -- to see Ms. Rosecrans'
2    report to confirm that for you.
3        THE WITNESS: Okay.
4    Q    (By Ms. Lent) Are you familiar with 21 CFR
5    807.81(a)(3)?
6    A    I believe so. If I can see where it's
7    referenced in my report, it will refresh my memory.
8        MS. LENT: Well, let's -- why don't we
9    take a look at it. That's Tab 4. Can we
10   pull up Tab 4 and mark that as Exhibit 2?
11       (Exhibit 2 marked for identification.)
12       MS. LENT: Okay, we've marked as Exhibit
13   2 the text of 21 CFR Section 807.81.
14   Q    (By Ms. Lent) Do you see that on the screen,
15   Mr. Stevens?
16   A    I see it, yes, I do.
17       MS. LENT: Can we scroll down so that we
18   can see paragraph A and then 1, 2, and 3
19   under it. Great.
20   Q    (By Ms. Lent) Now, Mr. Stevens, are you
21   familiar with this regulation?
22   A    Yes, I am.
23   Q    Do you agree that subparagraph (a)(3) is only
24   applicable to the holder of a cleared 510(k)?
25   A    Yes, that's the context on which it's

Page 83

1    written. It says a person has in commercial
2    distribution or reintroducing a device that's about to
3    be significantly changed. That's what that section is
4    referring to.
5    Q    So that section is only applicable to the
6    holder of a cleared 510(k)?
7        MR. LYON: Objection, form. Misstates
8    prior testimony.
9        THE WITNESS: Well, it's a criteria that
10   is applied in the business -- in the
11   regulatory business world as a method of
12   evaluating product changes and determining
13   whether or not they're significant enough to
14   require a new 510(k). That's how this is
15   applied in a practical sense.
16   Q    (By Ms. Lent) Are you saying it's applied in
17   a practical sense more broadly than it's written?
18       MR. LYON: Objection, form. Asked and
19   answered.
20       THE WITNESS: Again, it's applied in a
21   practical sense to looking at a change made
22   to a device and trying to determine whether
23   or not that change would be of concern to FDA
24   and require an FDA submission.
25   Q    (By Ms. Lent) Well, let's look at

Page 84

1    subparagraph 3. Well, strike that.
2        Subparagraph (a) says that "Each person who
3    is required to register his establishment pursuant to
4    Section 807.20 must submit a premarket notification
5    submission to the Food and Drug Administration at least
6    90 days before he proposes to begin introduction or
7    delivery for introduction into interstate commerce for
8    commercial distribution of a device intended for human
9    use which meets any of the following criteria," right?
10   Do you see that?
11   A    Yes.
12   Q    Okay. And then subparagraph (c) says, "The
13   device is one that the person currently has in
14   commercial distribution or is reintroducing into
15   commercial distribution." Do you see that?
16   A    I see that, yes.
17   Q    And by "the person," doesn't that mean the
18   person that has 510(k) clearance for the device?
19       MR. LYON: Objection, form.
20       THE WITNESS: Well, again, I know the
21   practical use of this criteria is to evaluate
22   changes. Where it says, "the following
23   constitutes significant changes requiring
24   premarket notification," that's the criteria
25   that is used to deter -- to evaluate a change

Page 85

1    and whether or not it's so significant that
2    FDA needs to be notified.
3    Q    (By Ms. Lent) My question wasn't the
4    practical use. My question was about the words of the
5    regulation. So the words of the regulation, under
6    those words, subparagraph (a)(3) only applies to the
7    holder of a cleared 510(k); is that right?
8        MR. LYON: Objection, form. Asked and
9    answered.
10       THE WITNESS: Again, it's written as a
11   requirement for existing medical devices, and
12   it's addressing devices that a company has
13   that are being modified. That's the way the
14   regulation is written. But it also is a fact
15   that it does contain criteria which are used
16   in the industry of looking at changes and
17   whether or not changes are significant.
18   Q    (By Ms. Lent) What is your basis for
19   asserting that 807.81(a)(3) is used to assess conduct
20   by anyone other than the holder of a 510(k)?
21   A    Well, as a consultant, I work with companies
22   that may be looking at acquiring a technology or
23   investing in a company. And I will be asked to offer
24   an opinion as to whether or not the device, as it's
25   currently configured, has been modified in such a way

22 (Pages 82 - 85)

J.  Lawrence Stevens                                September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 86

1   that FDA should have been notified.  That's always the
2   concern, that a change was made and FDA wasn't told
3   about it.
4          And so I help companies make a determination
5   using this criteria, and a company with risk assessment
6   and testing and other things that go with it, that
7   either shows it is a significant change or it's not a
8   significant change.
9      Q   And the devices that you're analyzing as a
10  consultant that you were just referring to, those would
11  have a cleared 510(k), right?
12         MR. LYON:  Objection, form.  Misstates
13  prior testimony.
14         THE WITNESS:  I think in most cases, it
15  is a product that's legally on the market via
16  the 510(k) process.  And there's something in
17  the industry we call design evolution, in
18  other words, that small changes are made, and
19  multiple small changes can cause you to end
20  up with a device that's quite a bit different
21  than what was in the original 510(k).
22         And so it's important for companies
23  to -- and that's what I advise them, is to
24  look at the -- look at the history of the
25  design changes to the product and make a

Page 87

1   determination in each case was there an
2   evaluation done like -- using these criteria.
3          So it's one of those areas that, from a
4   business perspective, can be quite risky if
5   you're thinking of acquiring a business and
6   their product, to find out that there's a
7   510(k) issue at the last moment is something
8   you don't want to find out.
9          And so there's been at least once or
10  twice that I've helped companies who are
11  thinking of investing to get information and
12  advise them as to whether or not the device
13  needed a new 510(k) or it didn't need a new
14  510(k).
15     Q   (By Ms. Lent)  And in those examples that you
16  are testifying about, the changes to the device have
17  been made by the holder of the 510(k); isn't that
18  right?
19     A   Yes.  In this case, it was existing devices
20  being modified by the holder of the 510(k).
21     Q   Uh-huh.  So this provision, (a)(3), is used
22  to analyze whether a change in a legally marketed
23  device that's made by the holder of the 510(k) requires
24  a new 510(k), right?
25         MR. LYON:  Objection, form.  Asked and

Page 88

1   answered.
2          THE WITNESS:  Again, in this particular
3   case, I used it, as did Dr. Sharlin, to look
4   at the operations that were going on at
5   Rebotix and making a determination did they
6   do anything during their repair of their
7   device, did they do anything that changed it
8   in a way that would require an FDA
9   submission.  That's how it was applied in
10  this case.
11     Q   (By Ms. Lent)  Does Rebotix hold a 510(k)
12  with respect to any products that you're aware of?
13     A   I'm not aware of them -- they're not -- from
14  my -- from my estimation and what I observed, they're a
15  repair company.
16     Q   Uh-huh.  So does that mean that you aren't
17  aware that Rebotix holds a 510(k) for any product?
18     A   I'm not personally aware of any 510(k) that
19  Rebotix has.
20     Q   Well, are you aware of any 510(k) that
21  Rebotix has that relates to any -- an EndoWrist?
22     A   I'm not aware of any 510(k) that Rebotix has
23  related to the endo -- it's not their product.  It's
24  a -- the product is an Intuitive product.  It's
25  purchased by Intuitive customers.  Those customers

Page 89

1   maintain ownership of it and provide it to Rebotix to
2   repair.  They repair it and send it back.  So that --
3   that particular operation does not require an FDA
4   submission.
5      Q   Your understanding is that Rebotix doesn't
6   have a 510(k) for the interceptor either, right?
7      A   The interceptor is not a medical device and
8   as such would not meet the basic criteria to require a
9   510(k).
10     Q   My question was:  Are you aware of whether or
11  not Rebotix has a 510(k) for the interceptor?
12         MR. LYON:  Objection, asked and
13  answered.
14     Q   (By Ms. Lent)  Not whether you think it's
15  necessary, but whether you know whether they have one
16  or not.
17         MR. LYON:  Objection, asked and
18  answered.
19         THE WITNESS:  Again, the --
20         MS. LENT:  It's really a yes or no.  Do
21  they have one or do they not have one?
22         MR. LYON:  That's not right, Karen.  If
23  it doesn't make sense for them to have one,
24  he's allowed to explain that in his answer
25  question, doesn't make sense.

23 (Pages 86 - 89)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 90

1    Q   (By Ms. Lent)  Mr. Stevens, can you answer
2  the question, does Rebotix have a 510(k) for the
3  interceptor or not?
4    A   I --
5        MR. LYON:  Objection, asked and
6  answered.
7        MS. LENT:  No.
8        MR. LYON:  Larry, remember, give me a
9  moment to --
10        THE WITNESS:  I'm sorry.
11        MR. LYON:  -- object before you answer
12  the question.
13        Objection, form.  Asked and answered.
14        You can -- I'm just stating my objection
15  for the record.
16        THE WITNESS:  Okay.
17        MR. LYON:  If you don't remember the
18  question, you can ask her to restate.
19        THE WITNESS:  Yeah, okay, ask the
20  question one more time.
21    Q   (By Ms. Lent)  Does Rebotix have a 510(k) for
22  the interceptor?
23        MR. LYON:  Objection, asked and
24  answered.
25        THE WITNESS:  The interceptor board does

Page 91

1  not require a 510(k), so I would have no
2  reason to believe that Rebotix would have a
3  510(k).
4        MS. LENT:  Thank you.
5    Q   (By Ms. Lent)  Are you familiar with the
6  FDA's 2017 guidance entitled "Deciding when to submit a
7  510(k) for a change to an existing device"?
8    A   Yes, I'm familiar with that document.
9    Q   Do you agree that the 2017 guidance is only
10  applicable to the holder of a cleared 510(k)?
11        MR. LYON:  Objection, form.  Vague as to
12  "applicable."
13        THE WITNESS:  Well, the guidance
14  document was designed --
15        THE COURT REPORTER:  Mr. Lyon, I'm sorry,
16  excuse me.  You said, "Objection, form."  What was --
17        MR. LYON:  I said vague as to
18  "application."
19        THE COURT REPORTER:  Okay, thank you.
20        THE WITNESS:  The guidance as it was
21  written was guidance for the industry in
22  evaluating changes to 510(k) products and
23  making a determination as to what the FDA
24  requirements would be for it.
25        MS. LENT:  Can we introduce Tab 5 as the

Page 92

1  next exhibit, please.
2        (Discussion off the written record.)
3        (Exhibit 3 marked for identification.)
4    Q   (By Ms. Lent)  So we've introduced as Exhibit
5  3 a document entitled "Deciding when to submit a 510(k)
6  for a change to an existing device."  And it says it
7  was issued on October 25th, 2017.  Do you see that?
8    A   Yes.
9    Q   And you're familiar with this guidance,
10  correct?
11    A   Yes, I am.
12    Q   Did you review this guidance in connection
13  with forming your opinions in this case?
14    A   My knowledge of this guidance certainly
15  played a factor in my opinion, yes.
16    Q   Okay.
17        MS. LENT:  Can we please turn to page 6
18  of the guidance.  And scroll down to "Scope,"
19  please, that first paragraph under "Scope."
20    Q   (By Ms. Lent)  On page 6 under Roman numeral
21  III, "Scope," the guidance says, "This guidance will
22  aid manufacturers of medical devices subject to
23  premarket notification requirements who intend to
24  modify a 510(k)-cleared device (or group of devices) or
25  other device subject to 510(k) requirements."  Do you

Page 93

1  see that?
2    A   Yes.
3    Q   Okay.  Would you agree that the scope --
4  pursuant to the scope of this guidance, it applies to
5  manufacturers who hold 510(k) clearance on their
6  devices?
7        MR. LYON:  Objection, form.
8        THE WITNESS:  Again, the guidance
9  document was written clearly for companies
10  who have their own 510(k)s that are going to
11  be making modifications, but it's also very
12  practical to use for me as a consultant to
13  evaluate potential changes and advise the
14  company as to whether or not they require a
15  new submission.
16        MS. LENT:  Can we turn to the next page,
17  please, at the bottom of page 7.
18    Q   (By Ms. Lent)  Do you see there the paragraph
19  that is labeled "Remanufactured or Reprocessed
20  Single-Use Devices"?  Do you see that?
21    A   Yes.
22    Q   And it says, "This guidance is not intended
23  to address whether submission of 510(k)s are required
24  from remanufacturers of existing devices who do not
25  hold the 510(k) for the device, such as reprocessors of

24 (Pages 90 - 93)

J. Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 94

1  single-use devices."  Do you see that?
2      A   I see that.
3      Q   So is it your testimony that despite what
4  this paragraph says, you think it's appropriate to
5  apply this guidance for companies that don't hold a
6  510(k) on a product?
7          MR. LYON:  Objection, form.  Misstates
8      the document.
9          THE WITNESS:  As I said, this can be
10  used -- this document can be used as an
11  evaluation that -- a document that guides the
12  evaluation of changes to any product that's
13  gone through the 510(k) process.  In most
14  cases, that's the holder of the 510(k) that's
15  making the change.  That doesn't necessarily
16  limit it to that.
17      Q   (By Ms. Lent)  What do you think is the
18  reason why FDA said in this paragraph we're looking at
19  that the guidance "is not intended to address whether
20  submissions of 510(k)s are required from
21  remanufacturers of existing devices who do not hold the
22  510(k) for the device"?
23      A   Well, again, this -- remanufacturing is not a
24  term that can be applied to Rebotix.
25      Q   Well, I wasn't asking you about Rebotix.  I'm

Page 95

1  just asking you about the guidance.
2      A   Again, remanufactured products, if it's truly
3  a remanufactured product, may be required to have a
4  510(k) from the remanufacturer.  I think that's what
5  they're talking about here.
6      Q   Uh-huh.  And so under those circumstances,
7  you can't apply this guidance because that
8  remanufacturer does not hold the 510(k) for the device;
9  is that right?
10      A   Well, it's a -- they're talking about a
11  remanufacturer here.
12      Q   That was what I --
13      A   As I read --
14      Q   Go ahead.
15      A   As I read this, this is a company that gets a
16  device off of the market and modifies it and
17  remanufactures it in a way that changes it and it's no
18  longer the device that was through the 510(k).  And
19  this guidance helps them determine when that device
20  would require a new 510(k).
21      Q   Well, this guidance tells them that it does
22  not apply under that circumstance, right?
23          MR. LYON:  Objection, form.
24          THE WITNESS:  I'm having a little
25      problem because the screen that I've got on

Page 96

1  the right part of my screen, the little
2  picture, so to speak, is covering up the
3  right part of the -- the last page of the
4  document, so...
5      Q   (By Ms. Lent)  Is that better?
6      A   Where I -- let me see if I can go into the --
7  to the shared file and pull it up and look at it.
8          (Discussion off the written record.)
9          THE WITNESS:  Okay, the guidance does
10  not apply to reprocessors who hold their own
11  510(k) or are addressing changes that are --
12  well, if you -- if you own a 510(k) for a
13  product and you modify it, you need to make a
14  determination if any modification requires a
15  510(k).  So I'm not sure how that reads into
16  this here.
17          See, it says that if you have your own
18  510(k), if you're a remanufacturer and have
19  your own 510(k), that's the document you use,
20  your own 510(k), to evaluate your changes to
21  see if it's deviating from your own 510(k).
22      Q   (By Ms. Lent)  Uh-huh.  Right.  But the
23  guidance doesn't address whether a company needs to
24  submit a 510(k) -- a remanufacturer needs to submit a
25  510(k) if it -- that company doesn't hold the 510(k) on

Page 97

1  the original device, right?
2      A   If you're a remanufacturer, by definition,
3  it's your product, you will have to submit a 510(k).
4  And that says it does apply to reprocessors who hold
5  their own 510(k).
6      Q   But if they don't hold a 510(k), then the
7  guidance doesn't apply, right?
8      A   If they're a remanufacturer --
9          MR. LYON:  Larry, hold on, pause.
10          THE WITNESS:  I'm sorry.  I'm sorry.
11          MR. LYON:  Objection, form.
12          THE WITNESS:  Again, as I read this
13  guidance, if you're a remanufacturer, you
14  don't have your own 510(k), then you can't
15  use this guidance.  But if you're a
16  remanufacturer and you're selling the
17  remanufactured product commercially, you will
18  need your own 510(k).  And that's -- says it
19  does apply in that case.
20          MS. LENT:  Right.
21          THE WITNESS:  And, again, none of
22  this -- this is -- we're talking about the
23  guidance documents.  It does not apply to
24  Rebotix in this condition.  They are not
25  modifying the device significantly.  That's

25 (Pages 94 - 97)

J.  Lawrence Stevens                          September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 98

1    the clear determination.
2    Q    (By Ms. Lent)  And they don't hold a 510(k)?
3    A    And they're not a remanufacturer.  They're
4    repair.  This is not talking about repair services.
5    This is talking about remanufacturing, which is not
6    Rebotix.
7    Q    In your report, you say that "Rebotix has
8    performed substantial extended life feasibility testing
9    confirming that the additional processing cycles for
10   the additional uses after servicing will not affect the
11   performance or reliability of the EndoWrist," right?
12   A    That's correct.
13   Q    Okay.  And let's go back to Exhibit 1,
14   paragraph 178 where you say that.  Okay, do you see
15   that on your screen?  That's the last sentence of
16   paragraph 178.
17   A    Right.
18   Q    Okay.  And you cite there to Exhibit 1,
19   paragraphs 106 to 108.  Is that Dr. Sharlin's report?
20       MR. LYON:  Objection to form.
21   Dr. Sharlin's report as opposed to Exhibit 1
22   of Mr. Stevens' report.
23   Q    (By Ms. Lent)  Exhibit 1 of your report is
24   Dr. Sharlin's report, right?
25   A    Yes.

Page 99

1    Q    Okay.  So in this paragraph 178, you cite, as
2    support for the last sentence, paragraphs 106 to 108 of
3    Dr. Sharlin's report, right?
4    A    Yes.
5    Q    Okay.  Can we turn to those paragraphs?
6    They'll be much farther down in the report.
7       (Discussion off the written record.)
8    Q    (By Ms. Lent)  Okay, do you see on the screen
9    where -- paragraph 106 of the Sharlin report?
10   A    It's page 38 that we're looking at?
11   Q    Yes, paragraph 106.
12   A    Okay.  Yes.
13   Q    Okay.  And this is the -- one of the
14   paragraphs that you cite in your report that we were
15   just looking at, right?
16   A    Yes.
17   Q    Okay.  Now, if we look at what Dr. Sharlin
18   cites, there are a bunch of Rebotix documents cited at
19   the end of this paragraph, right?
20   A    That's correct.
21   Q    Okay.  Did you look at those documents?
22   A    Yes.  Some of those documents.  I don't know
23   if I've looked at all of them, but the documents detail
24   the type of testing that was done by Rebotix.  And the
25   conclusion was, and I agree, the conclusion was they

Page 100

1    did appropriate evaluation on the re -- the repaired
2    product to show that it performed adequately as a
3    repaired device.
4    Q    So did you analyze the extended life
5    feasibility testing that Rebotix did to assure yourself
6    that the additional processing cycles for the
7    additional uses after servicing will not affect the
8    performance or reliability of the EndoWrist?
9    A    The documents that I reviewed confirmed that
10   the -- Rebotix did appropriate testing.
11   Q    Well, I wasn't asking about whether it was
12   appropriate testing.  I was asking whether it confirmed
13   for you personally that the additional processing
14   cycles for the additional uses after servicing will not
15   affect the performance or reliability of the EndoWrist?
16       MR. LYON:  Objection, form.  Asked and
17   answered.
18       THE WITNESS:  Again, this information
19   that I reviewed tells me that Rebotix did
20   valid studies that confirmed that the
21   processing that they were using did not
22   change or degrade in any way the performance
23   of the serviced EndoWrists.
24   Q    (By Ms. Lent)  So you can only testify that
25   Rebotix did valid studies, you can't testify to the

Page 101

1    results of those studies; is that what you're saying?
2    A    No, no, I -- let me rephrase it.  If I were
3    an FDA person, and I was, I would ask for data that the
4    company had that would confirm that whatever they've
5    done to the device didn't degrade it.  This is the kind
6    of data that I would expect to see, and thus I can use
7    it as a consultant to say I can conclude from this
8    testing that it was appropriate and Rebotix verified
9    that their servicing technique does not degrade the
10   product.
11   Q    Do you know whether Dr. Sharlin has any
12   experience at the FDA evaluating whether data like this
13   is sufficient to demonstrate the performance and
14   reliability of a medical device?
15   A    I'm not that familiar with Dr. Sharlin's
16   background with FDA.  I know he worked for FDA and I
17   did look at his resume, but I can't recall any specific
18   of what he did with FDA.  But he's a scientist and he's
19   an expert, he's been around, he knows data, and I
20   believe he was qualified to do this.
21   Q    You believe he was qualified to do this even
22   though you don't know or are not familiar with
23   Dr. Sharlin's background with the FDA; is that right?
24   A    Again, I reviewed his background, I reviewed
25   his report, I reviewed his CV.  I can't recall the

26 (Pages 98 - 101)

J.  Lawrence Stevens                    September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 102

1  details of it.  But in total, I was convinced that his
2  report was valid and his conclusions were valid and I
3  could adopt them into my report and that's what I did.
4      Q   Are you aware that this same type of testing
5  that Dr. Sharlin cites in paragraph 106 of his report
6  was submitted to FDA as part of Rebotix's 510(k)
7  submission?
8      MR. LYON:  Objection, form.
9      THE WITNESS:  Again, I'm not familiar
10   with that 510(k) submission.  I know it was
11   made.  I didn't actually evaluate it, so I
12   don't know if FDA reviewed this testing or
13   not.  I don't know.
14     Q   (By Ms. Lent)  Did you review Rebotix's
15  510(k) submission to FDA?
16     MR. LYON:  Objection, form.
17     THE WITNESS:  At this point, I'd have to
18   go back and look at -- look at -- look at it
19   to refresh my memory if I did or not.  I
20   know -- I know about the 510(k).  I know why
21   they did it and I know why they withdrew it.
22     Q   (By Ms. Lent)  But you can't recall whether
23  you actually reviewed the 510(k); is that right?
24     A   Again, I -- if you would let me go back into
25  my report, I can certainly look and see where I may

Page 103

1  have referenced that.
2      Q   Well, let's look at -- let's mark as the next
3  Exhibit Tab 6.
4      MR. LYON:  Karen, just a clear record,
5   this is Tab 6, I believe, in your internal
6   documents, but this will be Exhibit 4 for
7   this deposition?
8      MS. LENT:  I believe so.  We'll see that
9   once it's marked.
10     MR. LYON:  Thank you.
11     (Discussion off the written record.)
12     (Exhibit 4 marked for identification.)
13     Q   (By Ms. Lent)  We've marked as Exhibit 4 a
14  document with Rebotix Bates number 11 -- I'm sorry,
15  170053 through 170420, and the title on the first page
16  is "Module J Performance Data."  Have you seen this
17  document before, Mr. Stevens?
18     A   I don't recall seeing it, no.  I'm not saying
19  I didn't.  I just don't recall at this point.  I've
20  looked at a lot of documents in a short period of time.
21     Q   Can we turn to the fourth page of the exhibit
22  and look -- let's look at the paragraph under
23  "Purpose."  It says, "The purpose of this document is
24  to describe the steps for conducting simulated life
25  testing on remanufactured EndoWrists.  The resulting

Page 104

1  data from this testing will be used to demonstrate that
2  the remanufactured devices can be safely and
3  effectively used for an additional 11 uses by the
4  end-user past the OEM intended use."  Do you see that?
5      A   I see that, yes.
6      Q   Okay.  Does reviewing that help you recall
7  whether you've seen this document before?
8      A   No, I didn't -- it's not jumping to my mind,
9  no.
10     Q   Okay.
11     A   I question the word "remanufactured" in there
12  in the sense of whoever wrote this was probably
13  speaking in a practical sense rather than a legal
14  sense.
15     MS. LENT:  Okay, let's mark as Exhibit 5
16   Tab 7, please.
17     (Exhibit 5 marked for identification.)
18     Q   (By Ms. Lent)  While that's being marked,
19  Mr. Stevens, is it your understanding that Exhibit 4 is
20  the verification and life testing records that Rebotix
21  submitted to FDA as part of its 510(k) submission?
22     A   I don't know that as a fact.  It's the kind
23  of data that would be concluded [sic] in a 510(k)
24  submission.
25     Q   And you've seen documents entitled "Module J

Page 105

1  Performance Data" before, right?
2      A   It seems familiar, but, again, I can't recall
3  anything specific about it.
4      Q   Yeah, I just mean "Module J Performance
5  Data," that's a requirement for a 510(k) submission,
6  right?
7      A   I don't know that term, "Module J."
8      Q   But performance -- performance data is
9  something that would need to be submitted in a 510(k),
10  right?
11     A   Yes.  Performance data is a -- is a component
12  of the 510(k)
13     Q   Okay.  We've marked as Exhibit 5 a document
14  from the Department of Health and Human Services dated
15  June 23rd, 2015, bearing Rebotix Bates number 171030.
16  Have you seen this document before, Mr. Stevens?
17     A   I don't -- I can't recall if I have.  I may
18  have, but I don't recall it.
19     Q   Okay.  Can we scroll down a little bit to the
20  middle of the first page under the heading
21  "Remanufacturing."  It says, "The following
22  deficiencies refer to the procedures you have
23  identified to collect used devices from users and
24  modify those devices to accommodate additional uses
25  (defined as remanufacturing for purposes of this

27 (Pages 102 - 105)

J.  Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 106

1   letter)."  Do you see that?
2       A    Yes, I see where it says that.
3       Q    And do you understand that this document is a
4   deficiency letter sent from FDA to Rebotix regarding
5   Rebotix' 510(k) submission?
6       A    Yes, this is the kind of letter that almost
7   every 510(k) submitter gets from FDA.  The FDA's own
8   data shows that a majority of the 510(k)s get what's
9   called an additional information letter, and that's
10   what this is, where the company is told in addition to
11   what you've given us, we need additional information.
12   And that's what this is.  So it's -- this kind of
13   letter is not uncommon.
14      Q    And this is the letter that FDA sent Rebotix
15   asking for additional information with respect to
16   Rebotix' 510(k), right?
17      A    It appears to be that letter, yes.
18      Q    Based on this letter that FDA sent Rebotix,
19   FDA determined that there were deficiencies with
20   respect to the information that Rebotix provided in its
21   F -- 510(k), right?
22      A    In this letter, the FDA delineates additional
23   information that they will need from the company.
24      Q    And that is because the information that FDA
25   has to date from the company is not sufficient for FDA

Page 107

1   to make a 510(k) determination, right?
2       A    Right, and that's -- you understand that
3   this -- this is the statement of the reviewer of the
4   510(k).  Now, reviewers of 510(k)s are people with
5   different backgrounds and some are very, very cautious
6   and very, very hesitant and ask for a lot of
7   information.  Others, based on their experience and
8   knowledge, may not ask for any information or -- so
9   it's really more of an indication of the reviewer, the
10   FDA reviewer, and their background and what information
11   they need as an FDA employee to rule it substantially
12   equivalent and allow it to be sold.
13          So that -- that's the variable here that has
14   nothing to do necessarily with the people submitting
15   the document.  And I know because I've been through
16   this experience.  You submit everything you believe you
17   need to to tell FDA what you're doing is okay.  And at
18   that point, FDA may say thank you very much, it all
19   looks great, you're fine, or they may say no, we
20   need -- and that's -- this letter, as I've said, I've
21   seen the same kind of letter other places, not with the
22   same information, but the same format.
23      Q    Do you know who the reviewer was for Rebotix'
24   510(k)?
25      A    Excuse me?  What was the question?

Page 108

1       Q    Do you know who the FDA reviewer was for
2   Rebotix' 510(k)?
3       A    I don't recall right now, no.
4       Q    Do you have any understanding as -- as to
5   whether that reviewer is cautious, as you described?
6       A    I don't know that, no.
7       Q    Let's turn to page 24 of this document.  And
8   you see the heading there "Performance Testing"?
9       A    Yes.
10      Q    Under that, it says, "The following
11   deficiencies refer to the general performance testing
12   that you have conducted to validate your
13   remanufacturing process."  Do you see that?
14      A    Right.
15      Q    And then there's a series of paragraphs under
16   this heading, correct?
17      A    Right.
18      Q    Do you see that paragraph 41 references
19   Module J of the original submission?  Do you see that?
20      A    I see that, yes.
21      Q    And Module J is what we looked at in Exhibit
22   4, correct?
23      A    That's the terminology that was used for that
24   document, yes.
25      Q    Uh-huh.  Let's just scroll through this.

Page 109

1   Paragraph 42 also references Module J, correct?
2       A    It says, "in Module J of your original
3   submission," yes.
4       Q    Yes.  Okay.  Let's continue to scroll down to
5   paragraph 44.  Do you see that also references Module
6   J?
7       A    Yes, I see that.
8       Q    Okay.  And 45 also references Module J.  Do
9   you see that?
10      A    Yes.
11      Q    46 references Module J.  Do you see that?
12      A    Yes.
13      Q    Let's turn to the next page.  Forty-seven,
14   forty-eight, forty-nine, and fifty on the next page all
15   reference Module J, right?
16      A    Yes, they all reference attachment J -- or
17   Module J, I should say.
18      Q    Okay.  So that -- I think, if I counted
19   correctly, that was nine enumerated paragraphs under
20   "Performance Testing" that identify efficiencies with
21   respect to Module J, correct?
22      A    I did not count them, so I don't know.
23      Q    Okay, well, we've got 41, 42, 44, 45, 46, 47,
24   48, 49, and 50.  So that's nine.
25      A    Okay.  I counted your fingers.

28 (Pages 106 - 109)

J. Lawrence Stevens                                September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 110

1    Q   We're making it easy math, we're using, you
2   know, 10 fingers.
3       Okay, so what's the basis that you have for
4   asserting that Rebotix' data is sufficient to establish
5   that there were no changes in the safety or performance
6   specifications when FDA previously told Rebotix that
7   its data was insufficient for at least nine reasons?
8       MR. LYON:  Objection, form.
9       THE WITNESS:  Again, this is an another
10  unusual thing for FDA to do, is to look at
11  performance data and then, in their own
12  minds, identify additional information that
13  they need.  And that's what I see here, is
14  they're not saying any of the existing data
15  was invalid, they're saying we want more
16  data.
17   Q   (By Ms. Lent)  So they're saying that the
18  existing data that they have is not enough?
19   A   For that reviewer.
20      MR. LYON:  Objection, form.
21      THE WITNESS:  Yes, for that FDA reviewer
22  who's reviewing that 510(k), there needs to
23  be additional information.
24   Q   (By Ms. Lent)  Uh-huh.  And do you know
25  whether the documents that Dr. Sharlin cited to to

Page 111

1   support his opinion in paragraphs 106 and 108 that you
2   cite include the additional information that the FDA
3   reviewer said it needed?
4    A   I have no idea if any additional information
5   required by this letter was put into that report.  I
6   don't know.
7    Q   Okay.
8       MS. LENT:  I think we've probably been
9       going for about 90 minutes again, and it
10      would be a good time for us to take a
11      break.
12      THE VIDEOGRAPHER:  The time is now 11:41
13      a.m.  We're going off the record.
14      (Recess taken.)
15      THE VIDEOGRAPHER:  The time is now 11:53
16      a.m.  We're back on the record.  This is the
17      beginning of Media Unit 3.  Please continue.
18   Q   (By Ms. Lent)  Mr. Stevens, I think you
19  testified earlier that other than Ms. Rosecrans's
20  report, you did not review any of the other expert
21  reports submitted by Intuitive.  Is that right?
22      MR. LYON:  Objection, form.
23      THE WITNESS:  No, I did -- I did see an
24      expert report from an engineer -- I can't
25      recall his name -- that provided an

Page 112

1   assessment of the type of testing that
2   Rebotix had done.
3    Q   (By Ms. Lent)  Are you referring to
4   Dr. Howell?
5    A   I believe that's it.  I can't recall.  But he
6   was a professional engineer.
7    Q   You didn't cite that in your -- you didn't
8   cite to Dr. Howell's report in your Exhibit 3, did you?
9    A   I don't recall, no.
10   Q   Why not?
11   A   I may have overlooked it.  I'm sorry.
12   Q   But you believe you considered his report in
13  forming your opinions?
14      MR. LYON:  Objection, form.  Misstates
15      prior testimony.
16      THE WITNESS:  Again, I can't say it was
17      specifically him.  It was an engineer
18      consultant who wrote the report.
19      MS. LENT:  Okay.
20   Q   (By Ms. Lent)  You also mentioned -- well,
21  you thought it was Parnell?
22   A   Parnell, that's the one I'm referring to,
23  yeah.  Yeah.
24   Q   Okay.  So not -- not a Dr. Howell?
25   A   No, I saw Dr. Howell's name --

Page 113

1    Q   Got it.
2    A   -- in the other report, yeah.
3    Q   Thank you for clearing that up.  That was my
4   mistake.
5       Are you aware that Dr. Howell has offered an
6   opinion that Rebotix's life-testing EndoWrist
7   instruments is flawed and did not realistically
8   simulate the clinical use of the device?
9    A   I did see comments in -- I don't know if it
10  was in Sharlin's report, I don't know -- about that
11  opinion, and, of course, engineers can have difference
12  of opinions in the sense of what their background is,
13  what their motivation is, and I don't think he would
14  have been seen as an objective evaluator of Rebotix'
15  testing as he worked for the company.
16   Q   So you -- your testimony is that you don't
17  think that Dr. Howell is objective as an expert?
18   A   Again, I don't know Dr. Howell.  I believe he
19  is employed by Intuitive, though.  Is that -- is that
20  correct?
21   Q   Dr. Howell is a hired independent expert,
22  just as you are a hired independent expert.
23   A   Oh, okay.  Well, then my comment was
24  inappropriate because I thought he was an Intuitive
25  employee.  But, again, I don't know his background or

29 (Pages 110 - 113)

J. Lawrence Stevens                                  September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 114

1   what his basis for making these statements are.

2       Q   But you are -- are you or are you not aware

3   that he opined that Rebotix' life testing of EndoWrist

4   instruments is flawed and didn't realistically simulate

5   clinical use of the device?

6       A   I do recall that was his opinion, yes.

7       Q   Okay.  And did you -- were you made aware of

8   that opinion of Dr. Howell before you finalized your

9   report containing your own opinions?

10      A   I don't know what the timing was of reading

11  that.  I think -- I think it was.  I think it was in

12  the background information that I read as I was

13  creating my report.

14      Q   Uh-huh.  Uh-huh.  How was that in the

15  background information that you read as you were

16  preparing your report if you don't think that you read

17  his report?

18      A   Well, again, I don't -- I don't -- I don't --

19  I can't recall all the documents that I had.  I listed

20  as many as I could recall and even those, going back

21  and recollecting specific things is not easy when

22  there's so many documents over such a short period of

23  time.

24      Q   Uh-huh.  Did Dr. Howell's opinion impact in

25  any way your view that Rebotix' life testing was

Page 115

1   sufficient?

2       A   Not that I -- no, I don't believe so.

3       Q   Why not?

4       A   What I saw, the actual test summaries and

5   discussions I saw told me otherwise.  Now, that's my

6   opinion.

7       Q   Did you consider or analyze the particular

8   critiques that Dr. Howell had of Rebotix's life

9   testing?

10      A   No, I did not evaluate that in detail.

11      Q   Did you evaluate it at all?

12      A   Other than seeing his name mentioned or

13  quoting him in other documents, that's all.

14      Q   Let's look at paragraph 163 of your report.

15  It's Exhibit 1.  In paragraph 163, you state --

16          MS. LENT:  Oh, I'm sorry, can you please

17      go up to the main body of the report.  This

18      is the exhibit to the report.  It's on page

19      49.  There we go.

20      Q   (By Ms. Lent)  In paragraph 163 of your

21  report, you say, "Ms. Rosecrans also ignores the

22  extensive reverse engineering and testing of EndoWrists

23  that Rebotix has performed to verify its component

24  parts and materials."  Do you see that?

25      A   Yes.

Page 116

1       Q   And the support that you cite, the basis you

2   cite for that opinion is paragraphs 100 to 103 of

3   Dr. Sharlin's report, correct?

4       A   That's correct.

5       Q   Okay.  Now, let's go to those paragraphs of

6   Dr. Sharlin's report.

7           MS. LENT:  Can you scroll down, please,

8       Brad.  It's paragraph -- starting at

9       paragraph 100 of the attachment.

10      Q   (By Ms. Lent)  So looking at paragraphs 100

11  to 103 of Dr. Sharlin's report, have you personally

12  reviewed the testing documents that he cites in those

13  paragraphs?

14      A   I reviewed documents.  I don't know if I

15  reviewed all of those documents.

16          MS. LENT:  Can we scroll down to the

17      next page that would show 102 and 103.

18      Q   (By Ms. Lent)  Did you review the documents

19  in those paragraphs, 102 and 103?

20      A   Again, I can't specifically say that I

21  reviewed all of those documents.

22      Q   Well, if you can't, then how can you verify

23  that Dr. Sharlin's conclusion is correct?

24      A   Well, I read his conclusion, he's an expert,

25  he's qualified to make that discussion, and I looked at

Page 117

1   some of these reports and saw that they, in fact, had

2   done extensive testing.

3       Q   Did you do anything else to verify

4   Dr. Sharlin's conclusion about Rebotix's life testing?

5       A   Other than -- other than what I just said, I

6   looked at reports.  I can't remember all of them, but

7   there was enough there to convince me that Rebotix had

8   a well-thought-out test plan and they completed the

9   testing and the testing showed that there was no

10  significant deviation from the original product

11  specifications.

12      Q   I'm sorry, your voice dropped for the last

13  part of your answer.

14      A   Oh, I'm sorry.

15      Q   And I -- so I heard, "and the testing showed

16  that," and then I lost you.

17      A   Okay, well, again, I looked at enough

18  documents to convince me that Rebotix had a

19  well-thought-out test plan and that he had the

20  completed testing and the testing demonstrated that the

21  repaired EndoWrist was satisfactorily repaired and

22  functioned as intended.

23      Q   But you didn't analyze the critiques that you

24  saw of that opinion that the testing was satisfactory,

25  did you?

30 (Pages 114 - 117)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 118

1      MR. LYON: Objection, form.
2      THE WITNESS: Again, I know there were
3    alternate opinions out there from other
4    engineers. The FDA had an alternate opinion
5    in their letter. It doesn't negate the
6    validity of the data.
7      Q   (By Ms. Lent) My question was whether you
8    analyzed the critiques that you saw of the opinion that
9    the testing was satisfactory.
10     MR. LYON: Objection, form.
11     THE WITNESS: Again, I -- the -- I'm not
12   an engineer, and I wasn't hired to do
13   critical assessments of engineering work. I
14   was hired to look at basic information that
15   existed and come to a conclusion, based on my
16   experience, as to whether or not it was
17   valid, and that's what I was saying in my
18   report.
19     Q   (By Ms. Lent) Do you know whether
20   Dr. Sharlin is an engineer?
21     A   I -- again, I don't -- I can't recall his
22   specific background.
23     Q   Do you have any reason to believe that
24   Dr. Sharlin is an engineer?
25     A   I don't know Dr. Sharlin.

Page 119

1      Q   Is it your understanding that the Rebotix --
2    well, let's actually look at this report. Let's go to
3    paragraph 96 in the Sharlin report.
4      MS. LENT: So it's just up a few pages,
5    Brad. Okay.
6      Q   (By Ms. Lent) Dr. Sharlin says in paragraph
7    26 that "The Rebotix Repair process includes an
8    inspection of the cables 'under magnification' to
9    determine if there are any 'broken or frayed
10   manipulation cables or broken or damaged electrocautery
11   cables' (electrosurgical EndoWrist models only)." Do
12   you see that?
13     A   I see that, yes.
14     Q   And he cites a Rebotix document --
15     A   Right.
16     Q   -- for that, right?
17     A   Right.
18     Q   Did you do anything to verify this
19   description of the Rebotix repair process?
20     A   Well, I was provided with a video, a fairly
21   detailed video, of the actual repairing process, and it
22   did demonstrate magnification examination of the
23   products that would be consistent with looking for worn
24   or damaged cables. That's the only thing I have in
25   addition to the statement right here.

Page 120

1      Q   Did you look at the document that Dr. Sharlin
2    cites?
3      A   I don't recall. I might have, but I just
4    don't recall at this point.
5      MS. LENT: Let's introduce as the next
6    exhibit Tab 51, please.
7      CONCIERGE: Sorry, it's currently
8    distributing files.
9      MS. LENT: I'm sorry?
10     CONCIERGE: It's currently distributing
11   file.
12     MS. LENT: Brad, are you having a
13   technical issue with this exhibit?
14     CONCIERGE: Yes, it's just spinning.
15   It's saying, "Loading file. Large files may
16   take longer to introduce and distribute."
17     MS. LENT: This one is not that long, so
18   I don't want to waste time on the record if
19   you've got a technical issue.
20     Q   (By Ms. Lent) While that's loading, I'm
21   going to move on and ask you another question.
22   Mr. Stevens, you refer throughout your report to
23   Intuitive's usage counter as being a component of the
24   EndoWrist; is that right?
25     A   It was a feature that Intuitive added to

Page 121

1    the -- to the device.
2      Q   And it's a component of the device?
3      A   Well, I assume that if there's something
4    physical about the part, that it would be a component
5    that did that. I don't know if -- you know, what
6    component part, it was software or not software, but it
7    had that feature, I know.
8      Q   What is your understanding of what the usage
9    counter does in an EndoWrist instrument?
10     A   Well, it automatically -- my understanding of
11   it is that it automatically tracks the uses, and when
12   it reaches the limit, it doesn't work.
13     Q   What do you mean, "it doesn't work"?
14     A   Well, as -- I believe it was explained to me
15   that there's an error message given on the piece of
16   surgical -- the main surgical device.
17     Q   Who explained that to you?
18     A   It might have been -- it might have been a
19   conversation with Mr. Lyon. I just -- I know talking
20   about the case in general, that the usage counter
21   served the purpose of assuring that the devices didn't
22   get used more than 10 times.
23     Q   So the basis of your understanding of how it
24   works --
25     MS. LENT: You can take that down right

31 (Pages 118 - 121)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 122

1    now, please.
2        Q    (By Ms. Lent)  The basis for your
3    understanding for how the usage counter works is -- you
4    think it's a conversation you had with Mr. Lyon?
5            MR. LYON:  Objection, form.  Misstates
6        prior testimony.
7            THE WITNESS:  Well, again, I know in the
8        sense of just the practical sense, that the
9        usage counter counts the number of uses and
10       that it's electronic and there was some way
11       that the system would assure that the user
12       knew that it was time to not use the device
13       anymore.
14       Q    (By Ms. Lent)  And do you know what that way
15   is that the system -- or sorry -- that the system would
16   assure that the user couldn't use the device anymore?
17       A    Again, I don't know specifically, but the
18   assumption was that somehow the system stopped it.
19       Q    Uh-huh.  Are you aware that it is an --
20   actually an integrated circuit inside the EndoWrist
21   instrument, the usage counter?
22       A    Again, I don't know the design specifically,
23   but that certainly would not be inconsistent with what
24   I believe, yeah.
25       Q    Have you ever heard of a Dallas chip?

Page 123

1        A    No.
2        Q    Did you review any documents or testimony
3    describing the functionality of the usage counter?
4            MR. LYON:  Objection, form.
5            Feel free to reference your report if
6        you're asking him everything he reviewed.
7            THE WITNESS:  Again, I don't recall
8        specifically anything that related to the
9        function of the usage counter.
10       Q    (By Ms. Lent)  You didn't think it was
11   important to understand how the usage counter functions
12   in order to form your opinions?
13           MR. LYON:  Objection, form.
14           THE WITNESS:  Again, from my
15       perspective, a usage counter counts uses and
16       that that was a feature of the device that
17       would be put into it to assure that the user
18       did not use it more than 10 times.
19       Q    (By Ms. Lent)  Do you have any understanding
20   that the usage counter actually communicates with the
21   da Vinci robotic surgical equipment?
22       A    Again, I don't know the specifics of it, but
23   that would make sense in the sense of the system
24   talking to each other.
25       Q    And are you aware that the da Vinci robotic

Page 124

1    surgical system will not activate if the usage counter
2    on an EndoWrist indicates that there are zeros uses
3    left?
4        A    Again, I seem to have heard that, but I
5    don't -- I can't take you the source in the sense as to
6    whether I read it or heard it in discussion or
7    something.  But it just made sense to me that that's
8    the way it would work.
9        Q    And was that concept important to your
10   opinion, "that concept" being that the da Vinci
11   surgical robot doesn't work when the usage counter
12   indicates that there are zeros uses left?
13           MR. LYON:  Objection, form.
14           THE WITNESS:  No, that doesn't really
15       impact my opinion.  My observation in this
16       case was -- had to do with the interceptor
17       board and the use of that to reset the
18       counter, so to speak, and how that was
19       qualified by Rebotix and was it done as a
20       repair function on the device to return it to
21       its original operating parameters, and that's
22       how I understood it was, and I thought
23       that -- for me, that was what a servicing
24       function does.  They look at the device and
25       fix whatever part of it may not be working

Page 125

1    correctly to allow it to be used again and
2    used within original specifications, and they
3    do that.
4        Q    (By Ms. Lent)  Do you know whether the chip
5    that contains the usage counter ceases to function when
6    it's removed from the EndoWrist?
7            MR. LYON:  Objection, form.
8            THE WITNESS:  I'm not familiar with
9        anything regarding that.
10       Q    (By Ms. Lent)  Uh-huh.  Do you know whether
11   Rebotix uses the Intuitive chip in any way as part of
12   its repair process?
13           MR. LYON:  Objection, form.
14           THE WITNESS:  Again, I don't know the
15       specifics of the repair process.  I know the
16       whole concept of it and how it's evaluated
17       and how the device is returned to the
18       hospital fully functional.
19       Q    (By Ms. Lent)  What do you mean by "I know
20   the whole concept of it"?
21       A    The repair function of companies, servicing
22   companies, is typically what Rebotix does, they get a
23   product returned to them -- or not returned to them,
24   sent to them by a hospital and says, "Hey, this thing
25   may not be working correctly, can you take a look at it

32 (Pages 122 - 125)

J.  Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 126

1   for us and service it and do whatever you need to do to
2   make it work correctly again?"
3        And that's what Rebotix does.  In this
4   particular case, they reset the counter, so to speak,
5   by the inclusion of the interceptor board, and that was
6   part of their repair process.
7        Q   Uh-huh.  You don't know how the interceptor
8   board works, right?
9        A   No.
10       Q   And you don't know how the original usage
11  counter works, right?
12       A   No, I don't.
13       (Exhibit 6 marked for identification.)
14       Q   (By Ms. Lent)  Uh-huh.  Let's -- the exhibit
15  that I wanted to look at is now available.  So let's go
16  back to Tab 51, which was marked as Exhibit 6.  This is
17  a document with the title "EndoWrist Service
18  Procedure," dated 4/25/19, and the Bates number is
19  Rebotix 162404.
20       Mr. Stevens, have you seen this document
21  before?
22       A   I don't recall seeing this document.  I might
23  have, but it doesn't come to mind right now.
24       Q   Okay.  And do you see under 1.1, "Intended
25  Use," it says, "This work instruction describes the

Page 127

1   installation and testing of an interceptor PCB
2   assembly.  It is intended to ensure proper installation
3   and functionality of an interceptor PCB assembly in an
4   EndoWrist instrument"?  Do you see that?
5        A   I see that, yes.
6        Q   Okay.  Let's turn to page 10 of this
7   document.  Do you see the Bates number at the bottom of
8   this document, it ends in 413?
9        A   Yes, I see 413, yes.
10       Q   Okay.  And that's the same page that
11  Dr. Sharlin cited in paragraph 96 of his report that we
12  were just looking at, right?
13       A   I don't recall that.
14       MS. LENT: Can we quickly, Brad, go to
15  Exhibit 1, to the page that we had up for
16  Exhibit 1.  We were on paragraph 96 of the
17  attached report.  Great, okay.  And -- there
18  you go.
19       Q   (By Ms. Lent)  Do you see that in the middle
20  of paragraph 96 about the Rebotix repair process for
21  worn or damaged cables, it cites Rebotix 162413?
22       A   That's what it cites, yes.
23       Q   Okay, so let's go back to that page, which is
24  in Exhibit 6, and let's look at 5.2.7.
25       MS. LENT: Can we make that part bigger?

Page 128

1        Great.
2        Q   (By Ms. Lent)  This says, "Inspect the
3   instrument tool end under magnification."  What is the
4   tool end?
5        A   Again, I'm interpreting it the way it's
6   written, it's the end of the tool.
7        Q   Do you know what that means with respect to
8   an EndoWrist instrument?
9        A   Well, I know it has a distal end with a
10  couple cutters on it, so somewhere down that end is
11  what he's talking about.
12       Q   Okay.  And there's another part of the
13  EndoWrist that isn't the tool end, is that your
14  understanding?
15       A   Well, yeah, there's a -- the -- what we call
16  the proximal end or the back end is a small piece of
17  a -- of instrument.
18       Q   Do you know what is in the proximal end of
19  the EndoWrist?
20       A   It's the electronics that go with it.
21       Q   Just electronics?
22       MR. LYON:  Objection, form.
23       THE WITNESS:  Well, I -- again, I
24  haven't seen any diagrams or drawings or
25  pictures of it or anything like that.  I've

Page 129

1        seen the whole picture device, so...
2        Q   (By Ms. Lent)  Uh-huh.  But this page that
3   Dr. Sharlin cites to talks about inspecting the tool
4   end under magnification, correct?
5        A   Right.  That particular citation that he has
6   has to do with the cables, and that's what this section
7   here is talking about, cables.
8        Q   The cables that he would be looking at in the
9   tool end --
10       A   Right, but that --
11       Q   -- right?
12       A   Yeah, but that document number, as I
13  understand it, applies to this entire 21-page document.
14  There may be another section in here that specifically
15  matches what he was referring to.
16       Q   Well, we're looking at page 10 of the
17  document --
18       A   Right.
19       Q   -- which has the Bates number ending in 13.
20  And that's the only page number that Dr. Sharlin cites,
21  right?
22       A   Help me out.  I'm not an expert.  Are Bates
23  numbers specific to a page in the document?
24       Q   Yes, they are.  I apologize.  I shouldn't --
25       A   Okay.

33 (Pages 126 - 129)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 130

1    Q   -- have assumed that you knew these crazy
2  terms that we use as lawyers.
3    A   I learn new stuff all the time.
4    Q   Well, this one is going to be great for
5  cocktail parties.  Right?
6        This document starts out at Bates number 404.
7  And the page we're looking at --
8    A   Excuse me, in this visual inspection, 5.2.7.1
9  is the cable examination.
10    Q   Right, let's -- but the lead-in sentence
11  says, "Inspect the instrument tool end under
12  magnification for," and then it lists four things,
13  right?
14    A   Right.
15    Q   So those four things that are listed would be
16  inspected on the instrument tool end, correct?
17    A   Right.  That's how I read it.
18    Q   Uh-huh.  This page doesn't say anything about
19  a visual inspection of the inside of the proximal end
20  of the EndoWrist, right?
21    A   I don't see any -- I don't see that on this
22  page, no.
23    Q   Uh-huh.  And do you know whether the proximal
24  housing contains elements of the cable drive system for
25  the EndoWrist?

Page 131

1    A   I'm not familiar with the design of it to
2  know where the cables originate from or go to.  I...
3    Q   So if we look back to Dr. Sharlin's report on
4  paragraph 96, when he cites this page of this document
5  as support for his assertion that the repair process
6  includes an inspection of the cables, it's your
7  understanding that the document really just refers to
8  the cables that he can see -- that you can see from a
9  visual inspection of the tool end, right?
10    A   Well, under magnification, yeah.
11    Q   Uh-huh.
12    A   That's how it reads.
13        MS. LENT:  Okay, we can take that down.
14    Q   (By Ms. Lent)  What is your understanding of
15  what the interceptor board does?
16    A   My general overall understanding of the
17  interceptor board is it allows the ability to reset the
18  use counter in the device so that when it's returned to
19  the hospital, they can use it for 10 uses at least.  I
20  think that's what the intent was, that it's the
21  adaption to allow it to continue to be used within its
22  original specification.
23    Q   And what's the factual basis for that
24  understanding of how the interceptor works?
25        MR. LYON:  Mr. Stevens, feel free to

Page 132

1  refer to your report if you're trying to
2  determine factual bases you're relying upon.
3  I know you said you've seen a lot of
4  documents.  You're free to look at your
5  report at any time.
6        MS. LENT:  Rick, I have told him
7  numerous times he's entitled to look at his
8  report.  I'd appreciate it if you didn't
9  coach him about when to do it.  I'm just
10  going to ask him questions and if he needs to
11  do anything to answer the questions, he knows
12  what he can do.  So let's not coach the
13  witness.
14    Q   (By Ms. Lent)  My question was:  What's the
15  factual basis for your understanding of how the
16  interceptor works?
17    A   Well, to the extent that I address that in my
18  report, I can certainly look at my report and refresh
19  my mind as to how I describe my understanding.
20    Q   Go right ahead.
21    A   Okay.
22    Q   If it helps, I can tell you that it looks
23  like you start to talk about the interceptor board on
24  page 11 of your report where you talk about what it is
25  not.

Page 133

1    A   Right.  And I'm on that page right now.
2    Q   Great.  So we've been paused for about five
3  minutes while you're looking at your report.  Have you
4  found anything in your report that would help you
5  answer the question of what the factual basis is for
6  your understanding of how the interceptor works?
7    A   No, I don't -- again, I don't know the
8  mechanism by which the interceptor board works.  I
9  know, and I talk about it as part of the use -- user
10  counting function in there, that's -- but I don't -- I
11  don't -- I don't -- I don't address specifically, I
12  think, in my report how it works.  I don't know that.
13    Q   Okay, let's turn to paragraph 38 of your
14  report, of Exhibit 1.
15    A   Okay.
16    Q   While they're pulling it up, my question is:
17  What's the basis for your conclusion that the
18  interceptor is not intended to affect the structure or
19  any function of the body of man or other animals?
20        MR. LYON:  I think we've got the wrong
21  page up there.
22        (Discussion off the written record.)
23    Q   (By Ms. Lent)  Mr. Stevens, can you look at
24  it in your exhibit share because it seems to be stuck
25  on the screen?  And I'm looking at page 13 of your

34 (Pages 130 - 133)

J. Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 134

1  report, paragraph 38.
2      A   Okay.  Page 13.  Paragraph 38, you say?
3      Q   Correct.
4      A   Okay.  All right.
5      Q   And my question was:  What is the basis for
6  your conclusion that the interceptor is not intended to
7  affect the structure or any function of the body of a
8  man or other animal?
9      A   Okay.  Well, the interceptor clearly does not
10  touch the body of the person that the device is being
11  used on.  It has no interaction with the body of the
12  person; therefore, it cannot affect the structural
13  function of the body of the man.
14      Q   So it's your understanding that in order to
15  affect the structure or function -- or any function of
16  the body of a man or other animal, it would need to
17  touch the body of the person?
18      A   Well, again, it can -- it can -- a device
19  that -- the surgical tool we've been talking about --
20  there are other devices which take readings from the
21  body and translate those into -- those are -- those are
22  diagnostic devices.  But the interceptor is clearly not
23  a diagnostic device, it doesn't get any input at all
24  from the patient and consequently cannot be considered
25  a medical device.  It performs no diagnostic or

Page 135

1  therapeutic function.
2      Q   My question was whether it's your
3  understanding that in order to affect the structure or
4  function of the body of a man or other animal, a device
5  needs to touch the body?
6      A   Well, again --
7      MR. LYON:  Let me -- let me object, so
8  you've got to pause after each question.
9      THE WITNESS:  I'm sorry.
10      MR. LYON:  Objection, asked and
11  answered.
12      THE WITNESS:  The description of
13  affecting structure or function of the body
14  includes diagnostic usage that may or may not
15  touch the body.  But the point is, is the
16  function of the interceptor has no medical
17  function at all.  It does not provide any
18  diagnostic or therapeutic effect on the
19  patient.  Consequently, it's not a device.
20      Q   (By Ms. Lent)  What are you relying on to
21  interpret the language "intended to affect the
22  structure or any function of the body of a man"?
23      A   I believe that's the definition in the Food
24  and Drug Act of a medical device.
25      Q   And you're putting your own -- well, strike

Page 136

1  that.
2      You're interpreting that definition that you
3  quote here to mean that either it needs to touch the
4  body or it needs to have a diagnostic function?
5      A   Well --
6      MR. LYON:  Objection.  Objection, form.
7  Misstates prior testimony.
8      THE WITNESS:  Perhaps rather than saying
9  it has to touch, it has to affect the
10  structure or function.  It can do that by
11  touching or gathering information, either
12  way, but somehow it provides either a
13  diagnostic or a therapeutic use, and it does
14  not do either of those; therefore, it's not a
15  medical device.
16      Q   (By Ms. Lent)  Can something affect the
17  structure of a body by providing -- well, strike that.
18      Are you aware that the interceptor board gets
19  soldered onto the usage counter chip that Intuitive has
20  installed in the EndoWrist?
21      A   I'm not aware of the specific way that it's
22  added to the device.  I don't know that.
23      Q   Well, are you aware that with the interceptor
24  in the device, that the interceptor facilitates
25  communications between the chip that Intuitive

Page 137

1  installed and the da Vinci system?
2      MR. LYON:  Objection, form.
3      THE WITNESS:  Again, I don't know
4  that.
5      MS. LENT:  You don't.
6      THE WITNESS:  I know its effect is to
7  reset the usage counter.  That's all I know
8  about it.
9      Q   (By Ms. Lent)  Do you know that if the usage
10  counter of an EndoWrist decrements to zero, then the
11  EndoWrist will not function with the da Vinci surgical
12  system?  Do you know that?
13      A   Again, I -- I've heard that.  I don't know if
14  I read it in a document or it was in conversation, but
15  I'm aware of that, yes.
16      Q   So do you -- based on that, do you have an
17  understanding that the interceptor prevents the
18  Intuitive chip from decrementing to zero so that the da
19  Vinci system will not stop communicating with the
20  EndoWrist?
21      MR. LYON:  Objection, form.
22      THE WITNESS:  Again, I don't know that
23  kind of detail about it.  I know what --
24  how it was -- how I read when it was
25  described to me that the interceptor board

35 (Pages 134 - 137)

J.  Lawrence Stevens                                      September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 138

1     was an addition to the device that allowed it
2     to be taken back to its original
3     specification, and the hospital then could
4     use it for a period of time that the system
5     allowed it to.
6         Q    (By Ms. Lent)  So if an EndoWrist usage
7     counter is set for 10 uses by Intuitive and no
8     interceptor board is installed, can that EndoWrist be
9     used for more than 10 uses?
10        A    I don't know that.
11        Q    You don't know?
12        A    No.
13        Q    If an EndoWrist that had a usage counter set
14    for 10 could be used for more than 10 uses without an
15    interceptor board installed, then why would Rebotix
16    install an interceptor?
17        A    I'm not sure I understand that question.
18    Could you repeat that to me?
19        Q    Well, you just testified that you didn't know
20    whether an EndoWrist could be used for more than 10
21    uses, if that's where the usage counter limit was set,
22    and no -- I'm sorry, no interceptor board had been
23    installed, right?  That's what you said?
24           MR. LYON:  Objection, form.  Misstates
25    prior testimony.

Page 139

1           THE WITNESS:  The usage counter is -- as
2     originally in the device would allow for 10
3     uses and then the device couldn't be used.
4     That's way I understood it.
5         Q    (By Ms. Lent)  Right, so such an instrument
6     couldn't be used for 11 uses in the way that it was
7     manufactured by Intuitive?
8         A    That's my understanding, yes.
9         Q    Okay.  So in order to be able to have that
10    instrument be used for more than 10 uses, Rebotix
11    installs the interceptor board, right?
12        A    As part of their repair process of repairing
13    the device back to its original condition with
14    obviously other things besides the interceptor board.
15    The interceptor board was used to allow it to be
16    continued to use as was originally intended to.
17        Q    And without the -- without the interceptor
18    board being installed, then the 10-use EndoWrist would
19    not be able to be used for use 11, 12, 13, et cetera,
20    right?
21        A    Again, that's not something that I addressed
22    in my report.  It's just conjecture on my part to
23    answer that question because it's not something I've
24    addressed.
25        Q    Isn't it important for you to understand

Page 140

1     whether the interceptor board is allowing the EndoWrist
2     to function beyond the original set usage limits?
3         A    Again --
4            MR. LYON:  Objection, form.
5            THE WITNESS:  Again, my understanding is
6     that Rebotix, as a service company, has
7     endo -- the products are -- the EndoWrists
8     are -- they get sent to them by the hospital
9     saying, "Repair this," okay?  And they --
10    part of their repair function is to do a lot
11    of stuff we've already talked about.  Part of
12    that repair function is to -- once it's been
13    repaired back to its original state is to
14    reset the counter so that the hospital can
15    use it, and that is the function of the
16    interceptor board as I understand it.
17        Q    (By Ms. Lent)  Right, so without the
18    interceptor board, then that instrument couldn't be
19    used past the 10 uses, right?
20        A    Again, I don't know how -- in other words,
21    the user of the product, which is the hospital, I'm not
22    sure if they -- how they're prevented from using it
23    more.  My understanding was that if it reached 10 uses,
24    they couldn't use it anymore.
25        Q    Right, because the usage counter in the

Page 141

1     EndoWrist communicates to the da Vinci surgical system
2     that the -- there are no uses left on the -- on the
3     instrument and therefore it won't recognize the
4     instrument, right?
5         A    Again, that's how I understand it.  I didn't
6     address it in my report.
7         Q    Right, but based on that understanding, then,
8     the interceptor installation is necessary in order to
9     allow that da Vinci surgical system to recognize the
10    EndoWrist past the 10 original programmed uses, right?
11        A    Well, it's -- the serviced EndoWrist that
12    Rebotix has performed, the servicing of it essentially
13    returns it to its original condition and therefore the
14    first 10 uses don't really apply to that refurbished
15    product.  I mean, it's a -- it's a new -- well, not
16    new, but it's an EndoWrist that's been restored to its
17    original operating parameters.  That's what the
18    interceptor board does.
19        Q    Okay.  And without the interceptor board, my
20    question is:  Without the interceptor board, then the
21    EndoWrist that had reached its original 10 uses would
22    not function in a da Vinci surgical system, right?
23        A    Again, I have not studied that to know
24    specifically except that I know that part of the repair
25    function that Rebotix was doing was addressing the need

36 (Pages 138 - 141)

J.  Lawrence Stevens                          September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 142

1   to reset the usage counter.
2        Q   Uh-huh.  Because without the usage counter
3   installed -- the interceptor reset to the usage counter
4   installed, the EndoWrist wouldn't function with the da
5   Vinci surgical system, right?
6        A   Rebotix would not be doing its total repair
7   function if they were not able to repair it in a way
8   that allowed the hospital to continue to use it.
9   That's the whole idea of the repair function.
10       Q   Uh-huh.  So the hospital couldn't continue to
11  use it if Intuitive -- sorry, strike that.
12           So the hospital couldn't continue to use the
13  EndoWrist unless the interceptor chip was installed to
14  help bypass the original usage counter, right?
15       A   Again, that's part of the total servicing
16  that Rebotix does, is to return the product to its
17  original operating parameters, and it includes the
18  intercept chip -- interceptor chip to allow the
19  hospital to use it as it was intended to be used.
20       Q   I think you're agreeing with me, but you're
21  using a lot of words, so I just want to be sure, that
22  you're agreeing that a hospital couldn't continue to
23  use an EndoWrist that had reached its usage limit
24  unless the interceptor chip was installed to bypass
25  that original usage counter, right?

Page 143

1        A   Again --
2        Q   I understand there are other lots of repair
3   parts done and --
4        A   Right, but the hospital -- in my
5   understanding, the hospital doesn't say -- send it to
6   them to get an interceptor chip.  They're sending that
7   device, the EndoWrist, to a servicing company to -- for
8   them to perform the servicing necessary so that the
9   hospital can continue to use the device as it was
10  intended to be used, and that's -- the interceptor chip
11  is part of that whole process that Rebotix is doing.
12       Q   Were a hospital to send an EndoWrist to
13  Rebotix and Rebotix did everything in its repair
14  process except install the interceptor and then it sent
15  that EndoWrist back to the hospital, would the hospital
16  be able to use the EndoWrist beyond the usage limit set
17  by Intuitive?
18       A   That's kind of a hypothetical situation that
19  I hadn't -- haven't considered and it's not in my
20  report and I don't know how I can answer that.
21       Q   Right, because in your understanding, part of
22  the repair process is always putting an interceptor
23  chip in, right?
24       A   The repair process is to restore the
25  EndoWrist to its original operating parameters, and

Page 144

1   that's what Rebotix is doing.
2        Q   Including by installing the interceptor?
3        A   Yes, the interceptor chip can be part of that
4   repair, yes.
5        Q   It can be or is it part of the repair?
6        A   I don't know.  I haven't looked at it in that
7   kind of detail to know.
8        Q   I'm sorry, Mr. Stevens, I'm getting really
9   confused by your answers.
10           So I thought that you said that the repair
11  process that Rebotix goes through is to return the
12  EndoWrist back to its original specifications, which
13  would include resetting the usage counter through the
14  EndoWrist.  Is that what you said?
15       A   That's what I said, yes.
16       Q   Okay.
17           MR. LYON:  Karen, if we've got that
18  cleared up and you're reaching a natural
19  breaking point, it might be a decent time for
20  lunch.
21           MS. LENT:  Give me two minutes, yes.
22       Q   (By Ms. Lent)  Can we go to paragraph 114 of
23  your report.  And in paragraph 114, you say that, "When
24  Rebotix services an EndoWrist, it does not increase the
25  use counter to a number beyond that at which it was

Page 145

1   originally set."  Do you see that?
2        A   Let me get to that paragraph.  114?
3        Q   Yes.
4        A   Yes, okay, I see that, yes.
5        Q   Okay.  And you see that the citation you have
6   there is your conversation with Greg Fiegel?
7        A   Yes.  He told me that in our conversation,
8   yes.
9        Q   Okay.  Do you have any other factual basis
10  for that statement other than your conversation with
11  Greg Fiegel?
12       A   I have looked at no other documents that
13  address this.
14       Q   Okay.  And then you say, "Instead, it returns
15  the counter to its original specification."  Do you see
16  that?
17       A   Yes.
18       Q   And again, your citation there is to the
19  conversation with Greg Fiegel, right?
20       A   That's correct.
21       Q   Okay.  Then you go on to say, "For example,
22  EndoWrists typically have an original use limit of 10
23  and EndoWritsts are typically sent to Rebotix when they
24  only have one use left on the counter.  After receiving
25  the EndoWrist, Rebotix inspects and repairs the

37 (Pages 142 - 145)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 146

1   EndoWrist to ensure that it maintains the performance
2   specifications of a new EndoWrist.  Rebotix then
3   likewise sets the counter to its original
4   specification, 10 uses."  Do you see that all of that?
5       A   Yes.
6       Q   And what is your factual basis for those
7   statements other than the conversation with Greg
8   Fiegel?
9       A   That's my source.  He explained to me --
10      Q   Uh-huh.
11      A   -- the process that they use and how it's
12  done.  That's what I related here.
13      Q   Uh-huh.  So if a hospital uses an EndoWrist
14  with a usage limit of 10 nine times, leaves one use
15  left, right, and then sends it to Rebotix, which resets
16  the counter to allow for 10 uses, how many times in
17  total can the hospital use that one EndoWrist?
18      A   Well, once the EndoWrist gets repaired, it's
19  returned to its original performance specifications.
20  Beyond that, I don't know what they would do with it.
21  You know, I could always hypothetically say they could
22  send it back --
23      Q   Uh-huh.
24      A   -- to get it repaired again.  I don't know if
25  that's what they would do.

Page 147

1       Q   Okay, so let's just assume for purposes of my
2   question that it just reset once.
3       A   Okay.
4       Q   Okay, so it's used nine times, it's sent to
5   Rebotix, Rebotix installs the interceptor, sends it
6   back.  How many total times under that circumstance can
7   the hospital use that particular EndoWrist?
8       A   Well, it's not -- in other words, the first
9   10 uses really were on the device before it was
10  serviced.
11      Q   Uh-huh.
12      A   It's sent in for servicing, it's serviced,
13  not only just the addition of the interceptor board,
14  they're also checking the cables and all the other
15  stuff they do, so when it's sent back to the hospital,
16  it's not the same -- the usage is -- the first 10 uses
17  don't really apply at that point because they've got
18  essentially a device that's in its original
19  specification form that can be used 10 times.
20      Q   It was used nine times, right, isn't that
21  what you said, it had to be with one left, right?
22      A   Typically that's what -- that's what he said,
23  they sent it back when it has nine.
24      Q   So they used it nine types and then the usage
25  counter was reset to 10, they could use it 10 more,

Page 148

1   right?
2       A   Again, it's not -- you can't say it's the
3   same device being used 10 more times because it's not
4   the same device.  The EndoWrist has been reserviced --
5   has been serviced and renewed to its original
6   specifications.  And it's -- there's no reason to say
7   that there's anything wrong with them continuing then
8   to use it.
9       Q   So it's not the same device after Rebotix
10  services it?
11      MR. LYON:  Objection, form.
12      Q   (By Ms. Lent)  That's what you just said,
13  right?
14      MR. LYON:  Hold on, Larry.  Pause.
15      Objection, form.  Misstates prior
16  testimony.
17      THE WITNESS:  Okay.  What I'm saying is
18  that it's the same EndoWrist device --
19      MS. LENT:  Uh-huh.
20      THE WITNESS:  -- but the condition is
21  not the same.  They send it to Rebotix,
22  it's -- it's a used device and Rebotix then
23  takes that device and refurbishes it, so to
24  speak, repairs it, adds a new counter and
25  sends it back.  So --

Page 149

1       Q   (By Ms. Lent)  It's the same EndoWrist,
2   right?
3       A   Yes, it's the same device.
4       Q   Uh-huh.
5       A   Yeah, you know, and I -- perhaps I spoke in
6   error if I said it -- but it's not in the same
7   condition.
8       Q   Okay.  But that same EndoWrist was used nine
9   times --
10      A   Right.
11      Q   -- serviced and now it's going to be used 10
12  more?  In whatever condition it is in, it's going to be
13  used 19 times, right, up to 19 times after Rebotix
14  services it once?
15      A   But again, that's -- from a practical
16  standpoint, that's not 19 uses on a device that has not
17  been serviced.
18      Q   I didn't say that.  I was asking you how many
19  times that particular device would be used?
20      A   Again, that's not something that I've
21  considered and I'm not really prepared to offer a
22  comment on it because I see it as I just described it.
23      Q   You're not prepared to offer testimony on
24  whether an EndoWrist that has a usage count limit of 10
25  that is used nine times and then has the usage counter

38 (Pages 146 - 149)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 150

1  reset and is used the additional -- for the additional
2  uses would be used 19 times?  You're not in a position
3  to know that?
4      A   I don't --
5          MR. LYON:  Larry, Larry.
6          Objection, form.
7          THE WITNESS:  I don't think that's a --
8          MR. LYON:  Misstates prior testimony.
9          THE WITNESS:  That's not a complete
10  statement, what you said, because it's not
11  returned with just the counter reset.  It's
12  returned as a serviced device.
13         MS. LENT:  Uh-huh.
14         THE WITNESS:  That changes the
15  perspective on its use.
16      Q   (By Ms. Lent)  But it's being used again,
17  right?  I mean, I'm not talking about the condition of
18  the device.  I haven't said one thing about that.  What
19  I've asked you is how many times that particular
20  EndoWrist could be used by the hospital.
21      A   It can be used for up to 10 times in the
22  condition that it's supplied to them by Intuitive.
23  Okay?
24      Q   Uh-huh.
25      A   When it's sent to EndoWrist [sic], who

Page 151

1  repairs it and puts the condition back to where it
2  should be, it can be used for 10 more times.
3      Q   Uh-huh.  So are you saying that it could
4  be -- that's 20 times that that instrument could be
5  used?
6      A   Again, the consideration is that the device
7  used 10 times is serviced and returned to its original
8  state and it's used for 10 more times.  And I think
9  that's the way -- the perspective that I have on it.
10      Q   Uh-huh.  And understanding that there's
11  servicing that goes on in the middle there, your
12  testimony is that if Rebotix does its servicing, then
13  the EndoWrist could be used 20 times?
14      A   It can be used 10 times after it's repaired.
15      Q   And simple arithmetic would tell you that if
16  it's used 10 times and then it can be used 10 more,
17  that's 20, right?
18      A   Again, I'm not looking at as it's a device
19  that's being used 20 times.  I'm looking at it as a
20  device that's used 10 that was originally designed --
21      Q   Uh-huh.
22      A   -- it's repaired and refurbished and a new
23  counter added so you can use it 10 more times.  That's
24  how I see it.
25      Q   Uh-huh.  So the device can be used 10 times

Page 152

1  and then 10 more times, that's how you see it?
2      A   A refurbished device can be used 10 more
3  times, yes.
4          MS. LENT:  Okay, we can take a break for
5  lunch now.
6          THE VIDEOGRAPHER:  The time is now 1:03
7  p.m.  We're going off the record.
8          (Lunch recess taken.)
9          THE VIDEOGRAPHER:  The time is now 1:37
10  p.m.  We're back on the record.  This is the
11  beginning of Media Unit 4.  Please
12  continue.
13      Q   (By Ms. Lent)  Mr. Stevens, what regulation
14  governs when 510(k) clearance is necessary?
15      A   Well, I would have to refer -- I don't have
16  the law memorized.  I'm not a lawyer, but I think we
17  looked at 807 this morning, didn't we?
18      Q   807, is that the regulation that --
19      A   I'd have to look myself to find out.
20      Q   That's not something you know off the top of
21  your head?
22      A   No.  I know -- I know the practical part of
23  it.  I know when a 510(k) is necessary and I can
24  certainly find the law when I -- or regulation when I
25  need to, but I don't have it memorized.

Page 153

1      Q   Can we look at paragraph 44 of your report?
2      A   Okay.
3          MS. LENT:  That's Exhibit 1, Brad.
4      Q   (By Ms. Lent)  On this -- in this paragraph,
5  you see in the middle you say, "21 CFR Section 820,
6  i.e., the regulation that sets forth the 510(k)
7  requirements."  Do you see that part of that paragraph?
8      A   What paragraph are we on?
9      Q   Forty-four.
10      A   Forty-three, forty-four, okay.
11      Q   The one on the screen.
12      A   Okay, that -- 820 is the quality system
13  regulation.
14      Q   Uh-huh.
15      A   And I think that's probably what the
16  reference is that the quality system does not apply to
17  manufacturers of components.
18      Q   Is it --
19      A   In other words, I'd have to -- that's my
20  initial take on it.  But the fact is that what I'm
21  talking about here is that the interceptor board is not
22  a medical device.  It's exempted from the 510(k)
23  requirements, but it's also exempted from a lot of
24  other requirements regarding device manufacturing.
25      Q   Mr. Stevens, could you keep your voice up.

39 (Pages 150 - 153)

J.  Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 154

1  I'm having a very hard time hearing you.  I don't know
2  if anybody else is having a difficult time, but I
3  keep -- if you see, I'm scooching closer to the
4  computer because I can't quite hear --
5      A   Yeah.  Well, I'm using the computer
6  microphone.  And I have a tendency, my wife reminds me,
7  of kind of drifting off when I'm talking.
8      Q   Okay.
9      A   So I'll try and keep my volume up.
10      Q   I appreciate that.  I was --
11      A   Okay.
12      Q   -- I was asking you about the part of
13  paragraph 44 where you say that "21 CFR Section 820 is
14  the regulation that sets forth 510(k) requirements."
15  Do you see that part --
16      A   I see --
17      Q   -- of that paragraph?
18      A   Yeah, I see that, I see that.
19      Q   Okay.  And is that right, that 820 --
20      A   I'd need to --
21      Q   Give me a second to finish the question.
22      A   I'm sorry.
23      Q   Is it correct that 820 is the regulation that
24  sets forth 510(k) requirements?
25      A   Again, as I say, I may have stated it in a

Page 155

1  way that wasn't clear because 820 is the quality system
2  regulations.  And the quality system regulations do not
3  apply to manufacturers of devices.  So it's possible
4  that I made an error in the report.  Heaven forbid.
5      Q   Okay.
6          MS. LENT:  Let's introduce 21 CFR 807.20
7  as the next exhibit.  That's Tab 16.
8          (Discussion off the written record.)
9          (Exhibit 7 marked for identification.)
10      Q   (By Ms. Lent) We've marked as Exhibit 7 21
11  CFR 807.20, which is entitled "Who must register and
12  submit a device list."  Do you see that?
13      A   Okay.  That's the registration requirement,
14  yes.
15      Q   Right, right.  And according to this
16  regulation, a manufacturer of a device intended for
17  human use is required to register and list with FDA,
18  right?
19      A   That is correct, yes.
20      Q   Okay.
21          MS. LENT:  Let's take that down and
22  introduce as Exhibit 8 Tab -- oh, I'm
23  sorry -- actually, you can leave that.  I'm
24  sorry.  I did not mean to take that down.
25          (Discussion off the written record.)

Page 156

1          MS. LENT:  I apologize, I did mean to
2  take this down and introduce as Exhibit 8 Tab
3  17.
4          THE WITNESS:  Okay.
5          (Exhibit 8 marked for identification.)
6      Q   (By Ms. Lent) Exhibit 8 is 21 CFR 820.3.  Do
7  you see that?
8      A   Yes.
9      Q   OKay.  And that's entitled "Definitions"?
10      A   Right.
11      Q   Right.  Okay.  Let's go down to 820.3(o).
12  And this is the definition for manufacturer, correct?
13      A   Right.
14      Q   It says, "Manufacturer means any person who
15  designs, manufactures, fabricates, assembles, or
16  processes a finished device."  Do you see that?
17      A   Right.
18      Q   And then let's look at the definition of
19  finished device, which is in (l).  "Finished device
20  means any device or accessory to any device that is
21  suitable for use or capable of functioning, whether or
22  not it is packaged, labeled, or sterilized."  Do you
23  see that?
24      A   Yes, I see that.
25      Q   Okay.  So under 21 CFR 820.3, in determining

Page 157

1  whether a product is a finished device, it does not
2  matter whether it is packaged, does it?
3          MR. LYON:  Objection, form.
4          THE WITNESS:  I think the key is it's
5  capable of functioning.
6      Q   (By Ms. Lent) Well, the question was:  Does
7  it matter -- it doesn't matter whether it is packaged,
8  right?
9          MR. LYON:  Objection to form.
10          THE WITNESS:  Paragraph (l) there says
11  it's a "device or accessory suitable or
12  capable of functioning."  Okay, and whether
13  it's packaged, labeled, or sterilized, it's
14  still -- it's still a device.
15      Q   (By Ms. Lent) Right, so, a finished
16  device -- strike that.
17          A product is a finished device whether or not
18  it is packaged?  The product can be a finished device
19  whether or not it is packaged, correct?
20          MR. LYON:  Objection to form.
21          THE WITNESS:  I believe that is correct,
22  yes.
23      Q   (By Ms. Lent) Let's look at paragraph 48 of
24  your report.
25      A   Okay.

40 (Pages 154 - 157)

J. Lawrence Stevens                    September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 158

1   Q   And here four lines from the bottom of this
2   paragraph, you say -- well, strike that.
3        You say that, "Components of EndoWrist that
4   are not suitable for use or capable of functioning
5   before they are packaged together with other components
6   of an EndoWrist are not finished devices."  Do you see
7   that?
8   A   That's what it says, yes.
9   Q   Okay.  So why do you opine that the
10  interceptor is not suitable for use or capable of
11  functioning until it is packaged with other components
12  of the EndoWrist instrument?
13  A   Well, the term "packaged" here is kind of a
14  generic term, meaning put together.
15  Q   Uh-huh.
16  A   In other words, in this case, we're talking
17  about the cables, but the interceptor board is the same
18  way, that when they're packaged together into a device,
19  then you have the medical device.  But the components
20  themselves are not regulated as devices.
21  Q   And what regulation are you relying on to
22  make that determination?
23  A   Oh, gosh, you're testing me right now.  I can
24  tell you what the -- what the regulation says.  It says
25  that components of medical devices are not regulated --

Page 159

1   Q   Uh-huh.
2   A   -- by FDA.  And I think that's probably the
3   registration, it's certainly the 510(k).  There are
4   several sections of the regulations that address that.
5   Q   Isn't the interceptor capable of functioning
6   without further manufacturing steps?
7   A   No.  The interceptor board itself can do
8   nothing.  It's not a medical device.  It's a component
9   that -- let's use the term "packaged," where inserted
10  and used in the device, it performs a function within
11  the device, but it's not the medical device function
12  that it performs.  And, again, it's strictly a
13  component.  It's not a finished device.  And it's not
14  capable of doing anything until it's packaged into an
15  EndoWrist.
16  Q   Uh-huh.  You're aware that Rebotix sold the
17  interceptor board on its own to others to install
18  themselves in the EndoWrist instruments, right?
19  A   I've seen that, yes.  And I think I
20  understand it was still sold as a component.  In other
21  words, it was not a functioning medical device.
22  Q   Uh-huh.
23  A   And if they sold it to other companies to use
24  in repair, that was a business decision they made, and
25  I think they decided not to do that anymore, but the

Page 160

1   point is it was never a medical device.
2   Q   And one of the companies that Rebotix sold
3   the interceptor board to was Restore Robotics.  Does
4   that ring a bell?
5   A   I believe I saw that, yes, somewhere in my
6   report.
7   Q   Okay.  Is it your understanding that Restore
8   was not further manufacturing the interceptor chip?
9        MR. LYON:  Objection, form.
10       THE WITNESS:  I have no idea what they
11  were doing with it.  It's -- the interceptor
12  chip or board, as you call it, has no
13  function unto itself except as a component of
14  another device.  How they were using it, I
15  have no idea.
16       It's similar to a transistor or a
17  capacitor or a printed circuit board.  None
18  of those devices have any medical use
19  themselves, but they can be included in
20  finished products which are medical
21  devices.
22  Q   (By Ms. Lent)  Uh-huh.  And then it's your
23  opinion that things like -- strike that.
24       MS. LENT:  I'm missing a whole line of
25  his answer here in the transcript,

Page 161

1   Michelle.
2        (Discussion off the written record.)
3   Q   (By Ms. Lent)  So is it your opinion that a
4   transistor or a capacitor would never require 510(k)
5   clearance?
6        MR. LYON:  Objection, form.
7        THE WITNESS:  As -- sold as components,
8   they would not require a 510(k).
9   Q   (By Ms. Lent)  And what about as a battery,
10  what about a battery, is it your view that a battery
11  would never require 510(k) clearance?
12  A   It depends on the claim for the battery.  If
13  it's a normal battery that's placed in a piece of
14  equipment to provide power, it's not a medical device.
15  If they're claiming the battery puts out energy that
16  cures cancer, it would be a medical device.
17  Q   So if a battery that provides power to a
18  medical device was designed for a particular instrument
19  and that battery was sold to hospitals to replace in
20  that instrument, is it your testimony that that battery
21  would not require 510(k) clearance?
22       MR. LYON:  Objection, form.  Calls for a
23  hypothetical.
24       THE WITNESS:  Again, I would need to
25  know much more about the whole situation as

41 (Pages 158 - 161)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 162

1    to who was making the battery, what their
2    labeling was for it, what the hospital's
3    intentions were with it.  Based on what you
4    say, I really can't comment.
5        Q   (By Ms. Lent)  Why would you need to know
6    those other things?
7        A    Because all of those things are critical in
8    the sense of a medical device.
9        Q    So it's possible that the battery could be a
10   medical device depending on the answers to the
11   questions you posed?
12           MR. LYON:  Pause a second.  Let me get
13       my objections in.
14           THE WITNESS:  Okay.
15           MR. LYON:  Objection, form.
16           THE WITNESS:  Anybody can make any item
17       a medical device by making a medical claim
18       for it that it cures, treats, prevents, or
19       diagnose disease.  So the product itself, for
20       example, the interceptor board, there's no
21       claims for that, for doing anything medical,
22       it provides no benefit to the patient's
23       health in any way.  It's clearly a component
24       of the EndoWrist.  And that's the context of
25       what I'm talking about.

Page 163

1        Q   (By Ms. Lent)  So the question I asked was
2    about a battery and a battery that would be used to
3    power a surgical device, right?  So you said you would
4    need more information to understand whether such a
5    battery that was used to power a medical device and was
6    purchased by a hospital as a replacement battery would
7    need a 510(k), right?
8        A    Well, again, I really want to address what's
9    in my report here today rather than doing
10   hypotheticals.  This -- we're talking about --
11       Q    Yeah, no, I understand.
12       A    -- the interceptor board and the EndoWrist,
13   and that's the context in which this discussion is what
14   I want to participate in.
15       Q    Right, but I get to ask the questions,
16   Mr. Stevens, and this question is relevant to your
17   opinions, so you're under oath and required to answer
18   it to the best of your ability.
19       A    Well, I think my comment --
20           MR. LYON:  Objection, form.
21           Larry, do you remember the question?
22       There was a lot of back and forth.
23           THE WITNESS:  Okay, try me again.
24           MS. LENT:  Sure.
25           THE WITNESS:  Okay.

Page 164

1        Q   (By Ms. Lent)  I asked you a question about a
2    battery that would be used to power a surgical
3    diagnosis and a hospital would purchase that battery to
4    replace a different battery in a surgical device.  I
5    asked you whether that battery that the hospital
6    purchased would require 510(k) clearance.
7            MR. LYON:  Objection, form.  Incomplete
8        hypothetical.
9            THE WITNESS:  Okay, again, you don't
10       give me enough information to know if it
11       would be considered a medical device or not.
12       In other words, there's many more
13       applications in the sense of the battery,
14       what it does, how it works, what's the claims
15       made for it.  I don't know any of that
16       information, so I can't really answer your
17       question.
18       Q   (By Ms. Lent)  Well, I answered one of those
19   questions in a hypothetical, which is it powers a
20   device.
21       A   Right.
22       Q   Right?
23       A   Right.
24       Q    So what else would you need to know to figure
25   out whether it requires a 510(k)?

Page 165

1            MR. LYON:  Objection, form.  Calls for a
2        hypothetical.
3            THE WITNESS:  Again, I hesitate to
4        comment because I don't know all the
5        conditions involved and what the transaction,
6        the device it was used in, what the hospital
7        was told about it.  There's no way I can know
8        that.
9        Q   (By Ms. Lent)  So -- but without additional
10   information, you're unable to say that a battery sold
11   to a hospital used to power a piece of surgical
12   equipment would not require a 510(k), right?
13       A   Again --
14           MR. LYON:  Objection, form.
15           THE WITNESS:  -- the description of what
16       you put in does not tell me enough
17       information to know if it could be a medical
18       device or not.
19           MS. LENT:  Uh-huh.  Okay.
20       Q   (By Ms. Lent)  Now, do you know whether
21   Rebotix takes any additional manufacturing steps with
22   regard to the EndoWrist chip before it installs that
23   chip into the -- I'm sorry.  I misspoke.  Let me start
24   over.
25           Do you know whether Rebotix takes any

42 (Pages 162 - 165)

J.  Lawrence Stevens                                      September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 166

1  additional manufacturing steps with regard to the
2  interceptor before it installs the interceptor into an
3  EndoWrist?
4        MR. LYON:  Objection, form.
5        THE WITNESS:  I'm not familiar with the
6  entire operation of installing the
7  interceptor board -- interceptor board.
8  That's not something that I looked at.  I did
9  see a video of the overall process.  But the
10  point is, is that I know what the intention
11  of the interceptor board is, I know what it
12  was designed to do, and it's not a medical
13  device.
14     Q   (By Ms. Lent)  Does the inter -- does the
15  interceptor -- does Rebotix modify the interceptor chip
16  in any way before installing it into an EndoWrist?
17     A   I have no idea.
18     Q   Okay.  Can we look at paragraph 56 of your
19  report.  Here you say, "A hospital or a surgeon cannot
20  make use of an interceptor board standing alone any
21  more than it can make use of the cables of an EndoWrist
22  standing alone."  Do you see that?
23     A   Yes.
24     Q   Okay.  Are you aware that Rebotix sold
25  interceptors to hospitals directly for them to install

Page 167

1  themselves into EndoWrists?
2     A   I'm not aware of that, no.
3     Q   Do you know who Chris Gibson is?
4     A   It's possible.  I don't recall it right now.
5     Q   Did you review testimony from Chris Gibson's
6  deposition?
7     A   I'd have to look in my files to see.
8     Q   It says on page 8 of your Exhibit 3 that you
9  reviewed the June 22nd deposition of Chris Gibson with
10  exhibits.  Do you recall that?
11     A   No, the details I can't recall at this point.
12  Again, I reviewed a lot of documents and trying to
13  recall specific things is not easy for me on the spot
14  like this.  I could certainly go back and look at it
15  and tell you.
16     Q   Well, so do you understand that Rebotix sold
17  interceptor boards to Baylor Scott & White for the
18  hospital to install itself into EndoWrist instruments?
19        MR. LYON:  Objection, form.
20        THE WITNESS:  That is not something that
21  I recall.
22     Q   (By Ms. Lent)  Uh-huh.  And if -- assume with
23  me that that's true.  Would you say that that is
24  similar to a hospital installing a battery into a piece
25  of surgical equipment on its own?

Page 168

1        MR. LYON:  Objection, vague.  Calls for
2  a hypothetical.
3        THE WITNESS:  Yeah, I don't see the
4  relationship of that at all.
5     Q   (By Ms. Lent)  You don't see any relationship
6  between a hospital taking an interceptor and sticking
7  it in an instrument versus a hospital taking a battery
8  and sticking it in an instrument?
9     A   Again, I know what the interceptor board is,
10  I know what it does, I know a lot about that.  This
11  battery situation, I have no idea.
12     Q   You don't -- Have you ever changed a battery
13  in something, sir?
14     A   Yes, I have.
15     Q   Yeah, yeah.  So that's what I'm talking
16  about.  Having a hospital take a battery and put it
17  into something.  Does that -- do you -- does that make
18  sense to you?
19        MR. LYON:  Objection, form.
20        THE WITNESS:  Again, I understand the
21  concept.  I'm not sure how it relates to
22  this.
23     Q   (By Ms. Lent)  What's the purpose of putting
24  a battery in something?
25        MR. LYON:  Objection, incomplete

Page 169

1  hypothetical.
2        THE WITNESS:  Again, I really prefer to
3  stick to my report and answer questions about
4  what I wrote.
5     Q   (By Ms. Lent)  It's not -- that's -- I'm
6  sorry, sir, but that's not the way this works.  I get
7  to ask the questions.
8     A   Okay, all right.  Again, I don't have an
9  answer for you.
10     Q   So when you have put a battery -- when you
11  changed a battery in something, why did you do that?
12        MR. LYON:  Objection, form.
13        THE WITNESS:  Again, I'm not sure how
14  that's pertinent --
15        MS. LENT:  It doesn't --
16        THE WITNESS:  -- to my testimony.
17        MS. LENT:  Yeah, it's not --
18        THE WITNESS:  I'm here to testify about
19  my report and I don't address that in my
20  report, so...
21        MR. LYON:  Larry, if you understand the
22  question and you understand all parameters of
23  the question, you need to answer the
24  question.  If you don't understand the
25  question, if there's something that you

43 (Pages 166 - 169)

J. Lawrence Stevens                           September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 170

1  haven't considered or you need information to
2  consider, you're not able to do that analysis
3  on the fly, that's perfectly acceptable, too.
4      THE WITNESS: Okay. Well, I've already
5  commented --
6      MR. LYON: [Indiscernible].
7      THE WITNESS: -- I've already commented
8  about the battery and the unknowns about it
9  from my perspective. So I don't know what
10  else I can say.
11      Q   (By Ms. Lent) My question was that when you
12  have changed the battery in something yourself, why did
13  you do it?
14      A   I'll use the example of a flashlight. The
15  battery itself provides power to the light bulb, so it
16  becomes a component of the flashlight and you can shine
17  the light because you've replaced a component that was
18  not operational.
19      Q   And the flashlight wouldn't work without the
20  battery, right?
21      A   That's theoretically, yes, the idea, yeah.
22      Q   Uh-huh. The same way that an EndoWrist won't
23  work if the uses are expired, right?
24      A   I'm not sure I see the analogy there. The
25  EndoWrist is designed with usage limits in it.

Page 171

1      Q   Uh-huh.
2      A   It's sent out for servicing. Rebotix -- they
3  do the servicing, Rebotix does the servicing, and does
4  many things to it, including putting in an interceptor
5  board, which they return in the device that allows the
6  hospital to use the device as it was originally
7  intended. That's the analogy that I see there.
8      Q   We've been through that already.
9          In your opinion, does Rebotix have a
10  commercial relationship with its customers?
11      MR. LYON: Objection to form.
12      THE WITNESS: Again, I know how -- as I
13  understand it, hospitals choose to use
14  Rebotix for a repair service for their
15  devices --
16      MS. LENT: Uh-huh.
17      THE WITNESS: -- and Rebotix charges
18  them for the repairs that they make and then
19  return it to the hospital. The hospital --
20  it's always the hospital's device. Rebotix
21  is merely a servicing function. And they
22  pay -- they -- I'm sure they charge the
23  hospital something for their service. That's
24  the business world.
25      Q   (By Ms. Lent) Okay, let's look at paragraph

Page 172

1  65 and 66 of your report. In 65, you say, "Rebotix's
2  business is not selling interceptor boards or any other
3  component parts to end-users as part of Rebotix's
4  services." Do you see that?
5      A   Yes.
6      Q   What is the factual basis for that statement
7  in your report?
8      A   That's -- Mr. Fiegel explained to me the
9  business and how it operates.
10      Q   Anything other than your conversation with
11  Mr. Fiegel?
12      A   No, I've seen no other evidence related to
13  this.
14      Q   I'm sorry, can you keep your voice up? I'm
15  having trouble.
16      A   I'm sorry. I said I've seen -- the
17  information --
18      MR. LYON: Objection, form.
19      THE WITNESS: -- that I got from
20  Mr. Fiegel confirms what I say in here is
21  true.
22      Q   (By Ms. Lent) What information did you get
23  from Mr. Fiegel?
24      A   He explained to me what the operations at
25  Rebotix were, what function they performed, and their

Page 173

1  business model in the sense of being a repair service
2  for devices, in this case the EndoWrist, sent to them
3  by hospitals saying, "This device needs to be
4  repaired." And that's what they do, and they repair it
5  and send it back to the hospital.
6      Q   So the sole basis for that understanding is
7  your conversation with Mr. Fiegel, correct?
8      MR. LYON: Objection, form.
9      THE WITNESS: Right.
10      MR. LYON: Report speaks for itself.
11      Q   (By Ms. Lent) Okay. And do you know whether
12  Rebotix repaired any EndoWrist instruments in which it
13  did not install an interceptor?
14      A   I have no information on that.
15      Q   Okay. So you don't know whether Rebotix
16  charged a different price when it installed an
17  interceptor versus when it did not?
18      A   I have no information on how they charge for
19  their work.
20      Q   If Rebotix was specifically marketing the
21  interceptor board as part of its service, wouldn't the
22  cost of the service also include the cost of the
23  interceptor?
24      MR. LYON: Objection, form.
25      THE WITNESS: I don't know that. That's

44 (Pages 170 - 173)

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 174

1    a question I didn't explore.
2        Q   (By Ms. Lent) Uh-huh. Are you aware that
3    Rebotix marketed the interceptor chip to hospitals as
4    part of the EndoWrist service?
5        A   I'm not aware of that. I have not seen the
6    evidence of that. That's what I say in my report.
7    Ms. Rosecrans says that, the -- it doesn't -- I don't
8    know that that's the case. That's not what Mr. Fiegel
9    told me. He told me they put in the interceptor board
10   into the product as part of the servicing, as well as
11   sharpening and whatever else they would do, and when
12   they send it back, they charge one price to the
13   hospital for the repair. That's all I know.
14       MS. LENT: Can we introduce as the next
15   Exhibit Tab 19.
16       (Exhibit 9 marked for identification.)
17       Q   (By Ms. Lent) We've marked as Exhibit 9 a
18   document bearing Bates number Rebotix 068475 through
19   489, entitled "Use of the Rebotix Responsible Reuse
20   Process by Hospitals to Reduce Cost and Waste." Do you
21   see that?
22       A   Yes.
23       Q   Have you seen this document before?
24       A   I may have. I don't recall at this point
25   having seen it, but I would have to look back to see if

Page 175

1    it was one of the things that I reviewed.
2        Q   You would have to look to see if it's
3    included in your Exhibit 3, is that what you mean?
4        A   Certainly that would be a place to look, yes.
5        Q   I don't see it on your Exhibit 3. Would that
6    be an indication that you didn't review it?
7        A   Well, again, I tried to make that as
8    inclusive as I could. There may be other things, but,
9    again, it doesn't look -- it doesn't look familiar to
10   me, although it doesn't mean I haven't seen it.
11       Q   Do you know what this document is?
12       A   No, I don't.
13       Q   Let's turn to the second page of it, please,
14   and look at the third bullet on the second page. It
15   says, "The Rebotix interceptor facilitates
16   repair/service of the wrists by providing a factory
17   resettable use counter while maintaining the ability of
18   the da Vinci surgical robot to access all data in the
19   OEM memory and to count uses as usual." Do you see
20   that?
21       A   I see where it says that, yes, I do.
22       Q   Uh-huh. And so if this document was shared
23   with potential customers of Rebotix, would you agree
24   that Rebotix marketed the interceptor chip to
25   hospitals?

Page 176

1        MR. LYON: Objection, form.
2        THE WITNESS: No, I would not agree with
3    that. The way I read this, they're talking
4    about Rebotix repair as a specialized
5    service.
6        MS. LENT: Uh-huh.
7        THE WITNESS: And they're mentioning the
8    interceptor as a part of that service.
9        Q   (By Ms. Lent) Uh-huh. Let's look at the
10   page ending in Bates label 482. Do you see the
11   flowchart on this page?
12       A   I see a flowchart, yes.
13       Q   Have you seen this flowchart before in your
14   work on this case?
15       A   It does not look familiar to me, no, sorry.
16   I may have seen it, but I don't recall it.
17       Q   Okay. And do you see in the second square on
18   the left from the top, it says, "Use counter reset
19   (interceptor installation)"? Do you see that?
20       A   Right.
21       Q   Does that indicate to you that part of the
22   process that Rebotix was marketing to its customers was
23   installing the interceptor?
24       MR. LYON: Objection, form.
25       THE WITNESS: I look at this and I see

Page 177

1    this as a flowchart of the servicing
2    operations provided by Rebotix.
3        MS. LENT: Uh-huh.
4        THE WITNESS: I see it -- all of it in
5    there, yeah, the tool refurbishing, outdoor
6    evaluation. This is what goes on. They're
7    telling -- I believe telling someone this is
8    how we do our business.
9        Q   (By Ms. Lent) When a hospital sends an
10   EndoWrist to Rebotix, does the EndoWrist have an
11   interceptor in it?
12       A   I have no way of knowing that.
13       Q   Does it -- does Intuitive put an interceptor
14   in its EndoWrist?
15       A   Not that I'm aware of.
16       Q   Okay. So if a hospital uses an EndoWrist
17   nine times, out of the package nine times, and then
18   sends it to Rebotix, does it have an interceptor in it?
19       A   As you describe it, the product has been
20   shipped by Intuitive as a brand-new products that has
21   been used for nine times, it would not have -- I don't
22   believe have an interceptor chip in it.
23       Q   And then when Rebotix sends it back to the
24   hospital after going through the process outlined on
25   this flowchart in Exhibit 9, the EndoWrist that an

45 (Pages 174 - 177)

J. Lawrence Stevens September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 178

1 interceptor in it, correct?
2 A As it was explained to me, that's part of the
3 servicing process in there. They're showing it to you
4 right here.
5 Q So the answer is yes, the EndoWrist returned
6 to the hospital contains an interceptor, right?
7 A The interceptor chip was part of the
8 servicing operation that Rebotix performs as indicated
9 by this flowchart.
10 Q And in the bottom of this flowchart, when it
11 says "instrument return," that instrument has an
12 interceptor in it, right?
13 A Well, as flowcharts go, I would interpret
14 this meaning that that is at the point it's ready to
15 return to the hospital as fully serviced.
16 Q And has an interceptor in it, right?
17 A According to this flowchart, yes, and
18 according to what has been explained to me, yes.
19 Q So what is it about the transaction between
20 Rebotix and its customers that causes you to say the
21 interceptor is not being held or offered for sale if
22 the hospital receives the interceptor as part of
23 Rebotix's service offering?
24 MR. LYON: Objection, form.
25 THE WITNESS: Again, I don't know the

Page 179

1 cost structure of Rebotix and how they
2 structure their costs to the hospital. I
3 just know that they're performing a service
4 and they charge the hospital for it.
5 Q (By Ms. Lent) What does it matter -- to
6 answer my question, you know, what about the cost
7 structure between the hospital and Rebotix, why does
8 that matter?
9 A Well, I don't know if they -- what -- how
10 they structure their charges. I just -- I don't -- I
11 never evaluated that. That's something that I'm not
12 aware of.
13 Q So if there was an itemized line in the
14 invoice that Rebotix sends a hospital that said X
15 dollars, intercept -- for the interceptor, would that
16 cause you to say that the interceptor is being held or
17 offered for sale to the hospital?
18 MR. LYON: Objection, form.
19 THE WITNESS: Again, I -- that's a
20 hypothetical situation that I really can't
21 address because that's not what I'm here
22 for.
23 Q (By Ms. Lent) Why can't you address that?
24 I'm asking a question and you're an expert in this
25 area. Why can't you answer?

Page 180

1 A I'm an expert in the FDA requirements for
2 medical devices.
3 Q Uh-huh.
4 A And what I'm concerned about is that the
5 Rebotix operation is not an -- it's my estimation it's
6 not a manufacturing or remanufacturing process. It's a
7 service provider. And they provide a service to
8 hospitals who have the device that needs to be serviced
9 and they're showing the hospital this is how we do it,
10 they do that, they test it, they approve -- they show
11 that it's working correctly and they return it to the
12 hospital, and the hospital pays them for what they did.
13 That's the only details I know.
14 Q Part of the analysis that you need to engage
15 in is to go through the step-wise requirements in FDA
16 regulations to determine whether a 510(k) is required,
17 right?
18 A Yes, I mean, there are several conditions
19 that would necessitate a 510(k), and I know what those
20 are.
21 Q Okay. And one of the conditions relates to
22 whether the device is being held or offered for sale,
23 right?
24 A That is a condition, yes.
25 Q Okay. And I am focusing my questions right

Page 181

1 now on that particular condition that necessarily has
2 to be a portion of your analysis. My question is: If
3 there was an itemized line in the invoice from Rebotix
4 to the hospital saying here are the costs of the
5 repairs, this part -- this cost is X dollars for the
6 interceptor, would that satisfy the condition of being
7 held or offered for sale?
8 A No, it would not.
9 Q Why not?
10 A Because it's not a medical device.
11 Q No, no, no. I was not asking you whether it
12 was a medical device. I was asking you whether it was
13 held or offered for sale. We're focused solely on that
14 one requirement.
15 A But that held and offered for sale is coupled
16 with the device definition.
17 Q But each part needs to be analyzed itself,
18 right?
19 MR. LYON: Objection.
20 THE WITNESS: No. Again, my perception
21 of this is that Rebotix is a servicing
22 organization, they have something called the
23 interceptor chip or interceptor board that is
24 part of their servicing, that they put that
25 in the device and return it to the hospital

46 (Pages 178 - 181)

J. Lawrence Stevens                           September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 182

1    in a mode that allows it to function as it
2    was originally designed and intended to be
3    used. And the economics of that really don't
4    matter to FDA, you know, what they charge the
5    hospital or how they charge the hospital, it
6    has nothing to do with it because no devices
7    are being sold.
8        Q    (By Ms. Lent) Uh-huh. So if the interceptor
9    were a medical device, it still would need to satisfy
10   the criteria that it's being held or offered for sale,
11   correct?
12           MR. LYON: Objection, form.
13           THE WITNESS: The interceptor is not a
14       medical device, so that hypothetical doesn't
15       make any sense to me.
16       Q    (By Ms. Lent) Okay, if something is a
17   medical device, anything, it still needs to satisfy the
18   condition that it's being held or offered for sale,
19   right?
20       A    The general definition of a medical device is
21   what it is, it is for cure, treatment, diagnosing, and
22   it has to be offered for sale and it has to travel in
23   interstate commerce for FDA to have jurisdiction.
24       Q    And it has to meet each of those
25   requirements, right?

Page 183

1        A    Right.
2        Q    Okay.
3        A    To be a medical device.
4        Q    What does that mean to be held or offered for
5    sale, just that part of the requirement?
6        A    That part applies to a medical device. If
7    it's not offered for sale, FDA doesn't regulate it.
8        Q    I'm not --
9        A    And that's what they're saying. The
10   condition of offering for sale is a component of FDA's
11   authority over the device.
12       Q    And what does it mean?
13       A    It means this would --
14           MR. LYON: Objection, form.
15           THE WITNESS: I'm sorry. Again, I'm not
16       sure -- I know about this because I've been
17       in the business world, you know, and I understand
18       business transactions and what they are. In
19       this particular case, the key issue here is
20       that the product -- service being provided is
21       not providing a medical device, it's
22       providing a repair service. Rebotix repairs
23       it, uses an -- the interceptor board as part
24       of their repair and returns it to the
25       hospital, who compensates them for repairing

Page 184

1    their device. That's the situation that
2    exists here.
3        Q    (By Ms. Lent) Okay, so you can't define for
4    me what it means when a medical device is "held or
5    offered for sale"?
6        A    I don't see --
7            MR. LYON: Objection, form.
8            THE WITNESS: I'm sorry. I don't see
9        how -- what application it has here. I
10       don't --
11       Q    (By Ms. Lent) Is that -- Mr. Stevens, we
12   have to stop that. It's not your business to decide
13   whether the question is relevant.
14       A    All right.
15       Q    It's your job to answer the question.
16       A    Well, again --
17           MR. LYON: Hold on, Larry. There's no
18       question pending. Wait and listen to the
19       question.
20       Q    (By Ms. Lent) Right. So the question is:
21   Can you define for me what it means when a medical
22   device is "held or offered for sale"?
23           MR. LYON: Objection, form.
24           THE WITNESS: Okay. In the general
25       sense, it means that the company is offering

Page 185

1    it for sale, that the company who makes the
2    medical device is manufacturing it, putting
3    it in a warehouse, has a catalog, takes
4    orders for it, and ships the product. That's
5    held for sale, consummated by a sale.
6        Q    (By Ms. Lent) And why -- what is the factual
7    basis for your opinion that the interceptor is not
8    being held or offered for sale by Rebotix? And I don't
9    want the answer to be that it's not a medical device
10   because that's a different question.
11           MR. LYON: Objection, asked and
12       answered.
13       Q    (By Ms. Lent) What is the factual basis for
14   your opinion that the interceptor is not being held or
15   offered for sale by Rebotix?
16           MR. LYON: Objection, asked and
17       answered.
18           THE WITNESS: I don't know what the
19       relevance to that is to this situation
20       because it's part of the servicing operation.
21       Q    (By Ms. Lent) Mr. Stevens, you are
22   continuing to waste time on the deposition because
23   you -- you don't get to tell me that my questions
24   aren't relevant. You just need to answer the question.
25   So --

47 (Pages 182 - 185)

J. Lawrence Stevens                    September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 186

1      MR. LYON: Karen, that's not fair.
2      Q   (By Ms. Lent) -- can you answer that
3   question or not?
4      MR. LYON: Karen, that's not fair. He
5      just said it is part of the servicing. He
6      just did answer your question.
7      MS. LENT: No, I don't think he did.
8      Q   (By Ms. Lent) What is your factual basis for
9   your opinion that the interceptor is not being held or
10  offered for sale?
11     MR. LYON: Objection, asked and
12     answered.
13     THE WITNESS: I've seen no evidence that
14     would indicate that that was the case.
15     Q   (By Ms. Lent) Your factual basis is a lack
16  of evidence?
17     MR. LYON: Objection, form. Asked and
18     answered.
19     Q   (By Ms. Lent) You have to answer audibly,
20  sir.
21     A   My understanding, as I've said before, is
22  that the interceptor board is part of the servicing and
23  that servicing operation is completed by Rebotix and
24  the hospital pays them for that business. That's the
25  situation as I see it.

Page 187

1      Q   If Intuitive's business model was not to sell
2   EndoWrists, but to give them away for free, is it your
3   view that Intuitive would not have to get 510(k)
4   clearance for EndoWrist?
5      MR. LYON: Objection, form. Incomplete
6      hypothetical.
7      THE WITNESS: Yeah, I don't understand
8      what that has to do with --
9      MS. LENT: No, you've got to stop saying
10     that, sir. You've got to stop.
11     THE WITNESS: I know what -- I am an
12     expert witness on the FDA regulation of
13     medical devices, and I'm not prepared to
14     discuss business aspects of the medical
15     device business and who charges what or
16     anything like that. There are other experts
17     who can address that.
18     Q   (By Ms. Lent) One of the requirements for
19  needing 510(k) clearance is if a medical device is held
20  or offered for sale. You've agreed with that, right?
21     A   A medical device, yes.
22     Q   Okay. Is an EndoWrist a medical device?
23     A   It is a medical -- EndoWrist is a medical
24  device, yes.
25     Q   And if Intuitive gave away EndoWrists for

Page 188

1   free, would they be held or offered for sale?
2      MR. LYON: Objection, incomplete
3      hypothetical.
4      THE WITNESS: I just -- that situation
5      doesn't make any sense. I mean, they're not
6      going to give away devices, so why -- it's
7      not -- it's not an issue that has ever come
8      up for me.
9      Q   (By Ms. Lent) Sure, they might -- they very
10  well might. They might charge more money for their da
11  Vinci and give the instruments away for free.
12     A   Okay.
13     Q   So I am asking you to answer that question.
14  If they gave away EndoWrists for free, would you be of
15  the opinion that they were not held or offered for
16  sale?
17     MR. LYON: Objection, asked and
18     answered.
19     THE WITNESS: The da Vinci is an
20     approved system. What components the
21     manufacturer wants to include with their
22     system is their prerogative and they sell the
23     whole system then.
24     Q   (By Ms. Lent) Oh, so they sell the system,
25  the da Vinci and EndoWrist together, it's one system?

Page 189

1      MR. LYON: Objection, form.
2      THE WITNESS: They can choose to do
3      that. It's still a medical device.
4      Q   (By Ms. Lent) Okay, but if they gave away
5   the EndoWrist for free -- you still haven't answered my
6   question -- is that being held or offered for sale?
7      MR. LYON: Objection, asked and
8      answered.
9      Q   (By Ms. Lent) This is a requirement of the
10  FDA regulations. And you, sir, are saying that you are
11  an expert in 510(k) requirements.
12     A   Right.
13     Q   Right? So I'm asking you about this
14  particular requirement, and you need to answer the
15  question.
16     MR. LYON: Karen, you're posing a
17     hypothetical that doesn't exist. He doesn't
18     have to answer to that question if it doesn't
19     make sense.
20     MS. LENT: He has to try and answer the
21     question.
22     MR. LYON: If he's answered to the best
23     of his ability, then so be it. But he
24     doesn't need to be sit there and be
25     harassed.

48 (Pages 186 - 189)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 190

1    Q   (By Ms. Lent)  Are you refusing to answer the
2    question?
3         MR. LYON:  He's not refusing to answer
4    the question.  It's asked and answered.
5         MS. LENT:  No, I didn't ask -- I didn't
6    ask you, Rick.  I asked Mr. Stevens if he was
7    refusing to answer that question.
8         THE WITNESS:  I'll answer the -- I'll
9    answer the question again.  The interceptor
10   board is not a medical device.
11        MS. LENT:  Sir, that wasn't my question,
12   so let's not waste time on it.
13        THE WITNESS:  Okay.
14        MR. LYON:  He can answer the question as
15   he sees fit.
16        MS. LENT:  No, my question was not about
17   the interceptor board.
18        THE WITNESS:  Okay.
19        MS. LENT:  My question was whether he
20   would consider an EndoWrist to be held for --
21   held or offered for sale if Intuitive gave
22   them away for free.
23        MR. LYON:  Objection, form.  Asked and
24   answered several times.  Hypothetical.
25        THE WITNESS:  Again, I -- that -- an

Page 191

1    FDA -- an FDA lawyer -- if that situation
2    existed, I would not be the guy to make the
3    decision of -- and I don't know that that
4    situation would ever exist, so I don't know
5    what to say.
6    Q   (By Ms. Lent)  Let's look at paragraph 73 of
7    your report.
8    A   Okay.
9    Q   Here you say, "In most cases" -- in quotes --
10   "the FDA considers a device to be 'adulterated' if it
11   includes any filthy, putrid, or decomposed substance or
12   if it is prepared, packaged, or held under unsanitary
13   conditions."  Do you see that?
14   A   Yes.
15   Q   Okay.  Is this the only definition of
16   adulterated that the FDA uses with respect to medical
17   devices?
18   A   No.  It's one of the definitions that they
19   use.  If the device has been produced in noncompliance
20   with the FDA quality system regulation, Part 820, FDA
21   would consider that device adulterated --
22   Q   Uh-huh.
23   A   -- or not being used under proper conditions.
24   Q   As a former compliance officer, wouldn't you
25   agree that if a medical device manufacturer is

Page 192

1    marketing a nonexempt device without either 510(k)
2    clearance or PMA approval, then that device is
3    considered to be adulterated and misbranded under the
4    FDCA?
5    A   Again, that's not an issue that I really
6    faced in the sense of if a device is being marketed
7    without a 510(k), the -- a legal charge that would be
8    made is something that I'm not that familiar with in
9    the sense of what they would be charged with, other
10   than not complying with the 510(k) regulation.
11   Q   So you're not familiar with that -- with the
12   FDA using the term "adulterated" under those
13   circumstances?
14        MR. LYON:  Objection, form.  Misstates
15   prior testimony.
16        THE WITNESS:  Again, that -- that's not
17   something that I addressed in my report.
18   Q   (By Ms. Lent)  Uh-huh.  Is that something
19   that you're familiar with?
20   A   I'm familiar with violations, yes, that --
21   other than filthy, putrid, and decomposed, I just
22   mentioned about the quality system regulation that --
23   Q   Are you -- are you familiar with the FDA's
24   use of the term "adulterated" to describe a medical
25   manufacturer -- medical device manufacturer marketing a

Page 193

1    nonexempt device without 510(k) clearance or PMA
2    approval?
3    A   Again, I'm not -- that may be true.  I just
4    haven't researched that.
5    Q   Uh-huh.  But in paragraph 73, you criticize
6    Ms. Rosecrans for not considering your -- the
7    definition of "adulterated" that you offer, right?
8         MR. LYON:  Hold on.  Hold on, Larry.
9    Objection, form.  Misstates the document.
10        THE WITNESS:  Okay.  What I objected to
11   was Ms. Rosecrans' definition of the
12   interceptor board as a medical device that
13   required 510(k).  And that would
14   undoubtedly -- she may have used that term,
15   "adulterated."  I don't remember that, if she
16   used that or not.  But the fact is this is
17   not a device, the board is not a device, so
18   this is really a moot point other than just
19   for general discussion.
20   Q   (By Ms. Lent)  Why are you talking about the
21   word "adulterated" in your rebuttal report?
22        MR. LYON:  Objection, form.
23        THE WITNESS:  Again, it's kind of a
24   general thing that is talked about and
25   Ms. Rosecrans, in her report, I recall,

49 (Pages 190 - 193)

J. Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 194

1    referred to the interceptor board as
2    adulterated. I don't -- I'd have to go look
3    at Rosecrans, 103-105, to see exactly what
4    she said.
5        Q   (By Ms. Lent) And in reading those portions
6    of her report, that didn't cause you to go see how else
7    adulterated could be used besides as meaning filthy or
8    putrid?
9        A   No. No, I -- I kind of dropped it at this
10   point, just left it as this.
11       Q   Can you cite to any guidance, regulations, or
12   FDA regulations that stand for the proposition that the
13   FDA doesn't have oversight over a device unless
14   ownership changes hands?
15           MR. LYON:  Objection, form.
16           THE WITNESS:  I'm not sure I understand
17   your question.
18       Q   (By Ms. Lent) Well, Dr. Sharlin claims that
19   when ownership of a device never changes hands,
20   regulatory requirements are not applicable and FDA
21   oversight ends. Do you remember that from his report?
22       A   Yeah, I do recall that. I believe what he's
23   referring to is that the FDA regulates the sale
24   of medical devices across state line. And so if a
25   person manufacturers a medical device or has it

Page 195

1    manufactured for them and they never sell it, there's a
2    question of whether or not FDA has jurisdiction over
3    it.
4            MR. LYON:  And I'd ask you if you're
5        asking him about particular language in his
6        report, that you provide him context of that
7        language and show him what you're looking
8        at.
9        Q   (By Ms. Lent) In paragraph 89 of your
10   report, you refer to two of the 510(k) summaries for
11   Intuitive's EndoWrist. Do you see that?
12       A   Yes.
13       Q   Do you have an understanding as to how the
14   FDA uses 510(k) summaries?
15       A   Yes, I do.
16       Q   And what is that?
17       A   Well, they -- when you submit a 510(k), one
18   of the elements in the 510(k) is your 510(k) summary.
19   The company prepares that summary and then when FDA
20   releases the letter authorizing the 510(k), they'll
21   release the summary with that. So it's something that
22   the company prepares and includes in the 510(k) that
23   ultimately is provided to the public with the actual
24   510(k) letter.
25       Q   Does the FDA require companies to submit a

Page 196

1    510(k) summary?
2        A   Yes.
3        Q   In your report, you rely on Intuitive's
4    K965110 510(k) summary to support your opinion that
5    EndoWrist intended use to not include usage limits,
6    correct?
7        A   Yes.
8        Q   Okay.
9            MS. LENT:  Let's introduce as the next
10       exhibit Tab 42, please.
11           (Exhibit 10 marked for identification.)
12       Q   (By Ms. Lent) Okay. We've marked as Exhibit
13   10 a document bearing Intuitive 00691802.
14           Have you seen this document before,
15   Mr. Stevens?
16       A   I believe I have. It looks familiar to me,
17   yes.
18       Q   Can we go to the page ending in Bates number
19   808, please. Is this the 510(k) summary that you
20   relied on?
21       A   Yes.
22       Q   Can you look at -- take a look at the device
23   information section on this page and in particular
24   "Tradename." Do you see that?
25       A   Right.

Page 197

1        Q   It says, "Intuitive Surgical endoscopic
2    instrument control system accessories 'reposable' [sic]
3    (limited use) instruments consisting of retractors and
4    blunt dissectors." Do you see that?
5        A   Yes.
6        Q   What does reposable [sic] mean? Resposable.
7    Excuse me. Resposable.
8        A   I'm not sure. This -- again, this summary
9    was created by the sponsor of the 510(k), Intuitive, so
10   it's their wording and I don't -- I'm not sure what
11   resposable means.
12       Q   You reviewed this page when you were forming
13   your opinions?
14       A   Well, I was looking at the indications for
15   use, that's what I was looking at.
16       Q   And did you look at anything else on this
17   page other than the indications for use?
18       A   I'm sure I did, but I didn't do a critical
19   assessment of it. I was looking to see what the
20   indications were for the device when it went through
21   21 [sic]. Uh-huh.
22       Q   Uh-huh. Do you recall reading the word
23   resposable --
24       A   No, I don't.
25       Q   -- in this document?

50 (Pages 194 - 197)

J.  Lawrence Stevens                                September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 198

1     A   I don't recall reading that, no.
2     Q   Do you know what "limited reuse" means?
3     A   It's not a term that FDA uses, so I can guess
4   what it means.  But devices are either disposable or
5   reusable.
6     Q   What was your understanding of the term -- of
7   the phrase "limited reuse" when you read this document?
8     A   Well, as I'm reading it now, I believe that
9   was put in there by Intuitive with the idea that the
10   instruments would have limited usage lives and they
11   were saying that.
12     Q   Okay, let's turn to the next page and go to
13   the device description paragraph, please.
14        (Discussion off the written record.)
15     Q   (By Ms. Lent)  Do you see here that it says,
16   "The Intuitive Surgical endoscopic instrument control
17   system is an electromechanical device consisting of a
18   surgical console including master manipulators,
19   articulated instrument control arms for slave
20   manipulators, and limited reuse tools or end
21   effectors."  Do you see that?
22     A   Yes, I see that.
23     Q   And did you see the phrase "limited reuse
24   tools" or "end effectors" when you reviewed this?
25     A   I don't recall seeing that.  I wasn't looking

Page 199

1   for that.
2     Q   Uh-huh.
3     A   The next -- the intended use is what I was
4   looking for.
5     Q   Did you review the entire 510(k) or PMA
6   submission associated with K990144 510(k)s?
7        MR. LYON:  Objection, form.
8        THE WITNESS:  I don't recall reviewing
9   the entire 510(k).
10     Q   (By Ms. Lent)  Why didn't you review the
11   entire 510(k)?
12     A   It wasn't pertinent to what I was doing as
13   far as my expert opinion regarding Rebotix and their
14   operation, and that's what I concentrated on and not
15   510(k) information about the original system.
16     Q   About what?  I'm sorry, I missed that.
17     A   510(k) information on the original system was
18   not part of my review.
19     Q   Well, this is a 510(k) about the EndoWrist,
20   right?
21        MR. LYON:  Objection, form.  Are we
22   talking now -- which 510(k)?  I know that
23   we've got one up there and we're talking
24   about a different one.  There might be some
25   confusion.

Page 200

1        MS. LENT:  I'm talking about either of
2   them, which are the -- they are both 510(k)
3   summaries that you cited in your report.
4        THE WITNESS:  Right.  Right.  As I read
5   it, that 510(k) was for the entire system,
6   meaning the console as well as the surgical
7   tools.  The control system, as they say, and
8   the laparoscopic instruments.
9     Q   (By Ms. Lent)  Did you read any portion of
10   the 510(k)s for K965001, K990144 other than the
11   summary?
12        MR. LYON:  Objection, form.
13        THE WITNESS:  My -- the summaries are
14   where I -- what I referenced in my report.
15     Q   (By Ms. Lent)  My question was whether you
16   read any more of the 510(k)s for those two submissions
17   other than the summaries?
18     A   My review did not include reviewing 510(k)
19   submissions.
20     Q   Why not?
21     A   It was beyond the scope of what I was asked
22   to comment on.
23     Q   You were asked to comment on what the
24   intended use of an EndoWrist is, right?
25     A   Right.

Page 201

1     Q   And in your view, you didn't need to do
2   anything other than look at the 510(k) summary to
3   determine that; is that right?
4        MR. LYON:  Objection, form.  Misstates
5   prior testimony.
6        THE WITNESS:  Again, the review is for
7   looking at intended use to confirm what
8   Intuitive described as the intended use of
9   their instruments.
10     Q   (By Ms. Lent)  So my question was:  In your
11   view, did you need to do anything other than look at
12   the 510(k) summary to determine the intended use of the
13   EndoWrist?
14        MR. LYON:  Objection, form.
15        THE WITNESS:  To me, the 510(k) summary
16   is sufficient, it's an official document and
17   can be used for reference.
18     Q   (By Ms. Lent)  In clearing -- providing
19   clearance for these two 510(k)s that you discuss in
20   paragraph 89, would the FDA just look at the summary,
21   or would the FDA look at the whole 510(k) submission?
22     A   I'm sure the FDA reviewed the entire
23   submission because that's what their job is, is to look
24   at the technical information and determine as much as
25   they can about the device and how it's constructed and

51 (Pages 198 - 201)

J. Lawrence Stevens                                   September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 202

1  how it's tested and how it performs, the performance.
2  All of that is the function of the Office of Device
3  Evaluation when reviewing the 510(k)s.
4      So clearly they would -- the summary document
5  is created as part of the 510(k) for release to the
6  public. The 510(k) itself is not a publicly releasable
7  document. So this 510(k) description is the one that
8  is available for the public to look at, including me.
9      Q   You had access to the entire 510(k)
10 submissions for these two 510(k)s that you discuss in
11 paragraph 89, right?
12     A   I'd have to go back and look at my list in my
13 report to see if those were something that was in
14 there.
15         MR. LYON: Mr. Stevens --
16     Q   (By Ms. Lent) In fact, you cite those --
17         MR. LYON: -- you are able to look
18 through your report to aid in your memory in
19 answering these questions.
20         MS. LENT: Rick, he understands that.
21 It's been said many times. I really wish you
22 would stop telling him when to do it.
23         MR. LYON: I'm not telling him. You're
24 asking him questions about the contents of
25 his report and he doesn't have his report in

Page 203

1  front of him.
2      Q   (By Ms. Lent) Isn't it true, Mr. Stevens,
3  that you cite to the complete 510(k)s for these two
4  510(k) summaries that you mention in paragraph 89 of
5  your report?
6      A   Again -- oops.
7      Q   You include them in your Exhibit 3?
8      A   I'm trying to look.
9      Q   You know what, I withdraw the question
10 because I think the report speaks for itself.
11         MS. LENT: And I'd like to introduce as
12 the next exhibit Tab 49.
13         (Exhibit 11 marked for identification.)
14     Q   (By Ms. Lent) Mr. Stevens, have you seen
15 this document that we've marked as Exhibit 11?
16     A   It's possible. Like I say, it looks
17 familiar, but I can't comment in any detail on it.
18     Q   Can we look at Exhibit 3 to Exhibit 1, which
19 is your materials considered.
20     A   Right.
21     Q   If you'd go to page 6 of that.
22         MS. LENT: No, not of this, Brad, of
23 Exhibit 1. Let's go all the way to the end
24 and then just go up to page -- yeah. Okay,
25 you can stop there.

Page 204

1      Q   (By Ms. Lent) The document that we just
2  marked starts with the Bates number Intuitive 00515501.
3      A   Uh-huh. I see.
4      Q   Do you see that on this page?
5      A   Yes. Right in the middle, yeah.
6      Q   Okay, great. So that's -- this is a document
7  that you reviewed in forming your opinions, right?
8      A   Well, again, I -- yes, if it's on my list, I
9  reviewed it. I just, again, have a difficult time with
10 so many documents --
11     Q   Sure.
12     A   -- recalling them specifically.
13     Q   Let's go back to Exhibit 11, and can you tell
14 me what this is?
15     A   Well, that's the 510(k) cover letter as it's
16 terminized.
17     Q   Okay. And if we go to page 6 of the
18 document. What is the page?
19     A   What is it? As it says, it's the 510(k)
20 summary which I said is required to be a part of every
21 510(k).
22     Q   Uh-huh. And if you look at the bottom of the
23 page, "Device Description," the last sentence on this
24 page which starts, "The instruments are reusable for a
25 limited number of uses," do you see that?

Page 205

1      A   I see that, yes.
2      Q   And then if we look over at the end of the
3  same paragraph on page 7, it says, "The instruments are
4  programmed for a limited number of uses to ensure
5  reliability and consistent performance and have
6  nonvolatile add-only memory that the instrument control
7  system decrements after each use." Do you see that?
8      A   Yes.
9      Q   Do you recall reading this portion of the
10 510(k) summary when you were preparing your opinions in
11 this case?
12     A   Again, I remember reviewing it and I'm
13 familiar with the features of the reliability and
14 consistent performance, the add-only memory.
15     Q   Could you speak up? I'm starting to lose you
16 again.
17     A   I'm sorry, yes. I said I'm familiar with
18 these features, yes.
19     Q   Let's turn to page 12 of the document, and
20 this -- at the bottom under the heading "EndoWrist
21 Endoscopic Instruments," the second sentence says, "The
22 instruments are reusable for a limited number of uses."
23 And then it goes on in the next sentence to say, "The
24 instruments are programmed for a limited number of uses
25 to ensure reliability and consistent performance and

52 (Pages 202 - 205)

J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 206

1 have nonvolatile add-only memory that the instrument
2 control system decrements after each use." Do you see
3 that?
4    A   I see that.
5    Q   Did you review that portion of this 510(k)
6 when forming your opinions?
7    A   Well, again, yes, I did review this and I'm
8 familiar with all this, and these are features that
9 Intuitive decided to include in their device. They're
10 not things FDA necessarily would require because this
11 limited number of uses is a determination made by
12 Intuitive, not by FDA. And they obviously, I think for
13 business reasons, decided that they wanted to have a
14 limited number of uses and they put that in their
15 description so that anybody that read it would
16 understand that's how they were manufacturing, that's
17 the features that they have.
18    Q   Can we turn to page 15, please. In the
19 paragraph above the figure, it says, "The housing also
20 contains electronics on a resposable tool interface
21 (RTI) printed circuit board (Item 11) that is powered
22 from low voltage, secondary circuit, 5-volt logic
23 levels. These electronics consist of an add-only
24 memory that allows the system to recognize the specific
25 tool attached to the arm and to decrement the number of

Page 207

1 uses available for the tool." Do you see that?
2    A   Right.
3    Q   Did you consider this portion of the 510(k)
4 in forming your opinions in the case?
5    A   In other words, the -- this is a document
6 that the company has prepared to submit to FDA, not for
7 public review, to submit to the FDA, and they're giving
8 a description here of how the system works, including
9 the memory, and that's -- FDA would review it, okay,
10 that's how they designed it, that's how it works, thank
11 you very much, now let's move on with the review.
12    Q   Can we turn to page 33, please? Do you --
13 what is depicted on page 33?
14    A   It looks to me like labels.
15    Q   Right. And do you see the left side of this
16 label where it says, "20 clinical uses"?
17    A   I see written on the very left side -- on the
18 side in -- the handwriting -- or, excuse me, the
19 printing says, "20 clinical uses," yes, I see that.
20    Q   And that is on the proposed label that
21 Intuitive submitted to FDA in this 510(k), right?
22    A   This label is for an investigational device,
23 okay, and that's -- would be required on something that
24 was being studied under approved investigational device
25 exemption. This is not the label that would be used on

Page 208

1 a commercial device.
2    Q   Okay, let's turn to page 38. Is this another
3 label that Intuitive submitted with its 510(k)?
4    A   It says -- the label -- the identity says,
5 "Master Label Carton" [sic] -- something -- "Cichon
6 Tissue Forceps."
7    Q   Right.
8    A   So that appears to be a case label, yes.
9    Q   Okay. And do you see in the middle of the
10 page where it says, "10 procedures"? It's a little
11 small, but do you see that?
12    A   Yes, I see that, yes.
13    Q   Okay. And that was part of the labeling that
14 Intuitive submitted to FDA, right?
15    A   Yes, this is part of their 510(k) submission,
16 yes.
17    Q   Okay, let's turn to page 33. Actually, we
18 can keep going to page 38. This is another label,
19 right?
20    A   It looks like the one we just looked at,
21 "Master Label Carton [sic], Cichon Tissue Forceps,"
22 it's a carton label, yes.
23    Q   Here again, this label contains the words "10
24 procedures," correct?
25    A   Yes. I see the small print says it, yes.

Page 209

1    Q   Then let's -- finally, let's turn to page 44.
2 This is another label submitted by Intuitive, correct?
3    A   Yes. The long tip forceps, yes.
4    Q   It says, "10 procedures," correct?
5    A   It has the same small print, "10 procedures,"
6 yes.
7    Q   I'll represent to you that there are a number
8 of other labels in here that indicate 10 procedures as
9 well. My question to you is: Is it your understanding
10 that the FDA reviewed all of these references to
11 resposable instruments, limited reuse instruments, and
12 usage limits in this 510(k)?
13    A   They are reviewing the information that the
14 company gave them about how they intended to market the
15 product, how they intended to label it, what kind of
16 controls it would have in it. FDA is reviewing what
17 the company is proposing. FDA does not require use
18 limits on reusable devices. That's something that
19 Intuitive decided they wanted to do. And this is
20 evidence they did it, they put it in their 510(k), and
21 they're telling FDA this is how the products are going
22 to be labeled. So it seems pretty straightforward.
23    Q   What is the purpose of the FDA reviewing the
24 information in a 510(k)?
25    A   They're reviewing it to see if the device is

53 (Pages 206 - 209)

J.  Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 210

1  constructed according to a well-documented way,
2  drawings, they look at the manufacture, they look at
3  all the materials on it, they look at performance where
4  they actually -- the company tests the products and
5  show how they use.  In some cases, there will be
6  clinical data in it, and the labeling that they're
7  reviewing is what the company tells them they want to
8  label the product as.  That's what this is.
9      Q   Isn't the FDA reviewing a 510(k) submission
10  in part to ensure that the device sought to be
11  introduced into commerce is safe?
12      A   The law requires them to be safe and
13  effective, okay, and while the 510(k) is not a specific
14  review of that, that's an overall consideration they
15  have.  If Intuitive wanted to market these as
16  disposable devices, one use only, FDA would have been
17  fine with that, because there's minimal risk to the
18  patient that way.  It doesn't violate any laws.  If you
19  want to use them for 10 uses, the FDA is fine with
20  that.  If you don't want to label them with any
21  limitation of uses, FDA is okay with that.
22      Q   But the FDA has to be satisfied that the
23  instrument or the device is safe and effective for the
24  number of uses that the company has indicated it for,
25  correct?

Page 211

1      MR. LYON:  Objection, form.
2      THE WITNESS:  Again, what happens is if
3  you tell the FDA, "We're going to label it
4  for 10 uses," FDA says, "Well, give us the --
5  give us the data that shows us how you
6  established that since you're making that
7  claim."  They have to verify their label
8  claims, and that's why the FDA would ask them
9  for test data showing -- if they didn't have
10  the 10 -- limitation of 10, FDA wouldn't ask
11  them for that data.  If they make the claim,
12  they've got to back up the claim.
13      Q   (By Ms. Lent)  And if the -- if Intuitive had
14  decided that these should be disposable, single-use
15  instruments, then they wouldn't be allowed to be used
16  again, right?
17      A   Absolutely.  There are many devices that are
18  marketed as single use only.
19      Q   Uh-huh.  So if they were marketed as
20  single-use devices, Rebotix would not be able to do
21  what it's doing to make them reusable, right?
22      MR. LYON:  Objection, form.
23      THE WITNESS:  I hadn't -- I hadn't
24  really thought of that.  The hospitals
25  request Rebotix to do what they do and that's

Page 212

1  the service they provide to the hospitals,
2  so...
3      Q   (By Ms. Lent)  I asked a different question.
4  If these were single-use devices and FDA cleared them
5  on that basis, is it your understanding that Rebotix
6  wouldn't be able to reset them back to being single-use
7  instruments and to be used again?
8      A   I'm not sure what that means, reset.  There
9  would be nothing in the device that would be reset.
10  There would be no use counter, there would be nothing.
11  It would be a disposable device.  And the key is that
12  very few electronic devices are disposable because of
13  the costs associated with them and because of the
14  business model.  They give them to the FDA as reusable
15  devices and they have to put cleaning instructions in
16  them, and the hospitals know that and they use them and
17  when they need service, they call Rebotix and say, "Hey
18  we've got some devices here that aren't working,
19  something seems to not be what it should be, service it
20  for us," that's what they do.  That's the model that
21  we're looking at with the current situation.
22      Q   In paragraph 86 of your report, you cite to
23  21 CFR 801.4, right?
24      A   Right.
25      Q   And that's the regulation governing how to

Page 213

1  determine the intended use of a device; is that right?
2      A   I have to go back to my report and look at
3  that.
4      Q   You don't know that without looking at your
5  report?
6      A   No.  I always like to check on myself.
7      Q   Paragraph 86, please.
8      A   Okay.  The 801 is the labeling requirement.
9      Q   So my question was whether 21 CFR 801.4 is
10  the operative regulation governing how to determine the
11  intended use of a device?
12      A   Well, yes, it does.  I expressed how the
13  intent is determined, and it's determined by the
14  creators of the device and the creators of the
15  labeling.
16      Q   Okay, let's look at --
17      MS. LENT:  Sorry, let's introduce as the
18  next exhibit Tab 26.
19      MR. LYON:  Karen, if we're coming up to
20  a natural breaking point, I think we've been
21  going about an hour and a half.
22      MS. LENT:  Yeah, in a couple minutes,
23  after I ask some questions about this
24  document, we can take a break.
25      MR. LYON:  Okay.

54 (Pages 210 - 213)

J. Lawrence Stevens                        September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 214

1      (Exhibit 12 marked for identification.)
2      Q   (By Ms. Lent)  We have on the screen marked
3  as Exhibit 12, 21 CFR 801.4, which is entitled "Meaning
4  of Intended Use."  Do you see that?
5      A   Yes, I do.
6      Q   And this is the regulation that you cite
7  in --
8      A   Right.
9      Q   -- paragraph 86 of your report, right?
10     A   Right.
11     Q   If you look at the fourth line of the
12  definition, it says, "This objective intent may, for
13  example, be shown by labeling claims, advertising
14  matter, or oral or written statements by such persons
15  or their representatives."  Do you see that?
16     A   Yes.
17     Q   So this FDA regulation indicates that the
18  intended use encompasses the objective intent as based
19  on the labeling of the device, right?
20     A   Right.
21         MR. LYON:  Objection, form.
22         MS. LENT:  Okay, we can take a break and
23  come back in 10 minutes, please.
24         THE WITNESS:  Okay.
25         THE VIDEOGRAPHER:  The time is now 3:09

Page 215

1  p.m.  We're going off the record.
2      (Recess taken.)
3         THE VIDEOGRAPHER:  We're on the record.
4  The time is now 3:23 p.m.  Please -- oh, this
5  is the beginning of Media Unit 5.  Please
6  continue.
7      Q   (By Ms. Lent)  Mr. Stevens, let's take a look
8  at paragraph 120 of your report.
9      A   Okay.
10     Q   This is Exhibit 1, page 36 of the report.
11     A   Thirty-six, okay.
12     Q   There we go.  In paragraph 120, you claim
13  that Intuitive's setting of usage limits was determined
14  by marketing and not product safety.  Do you see that?
15     A   I -- yeah, I talked -- the deposition of the
16  marketing team confirmed that.
17     Q   And for that opinion, you rely on the
18  deposition of Mr. McGrogan, correct?
19     A   That's correct.
20     Q   Did you review anything other than the
21  deposition of Mr. McGrogan in forming that opinion that
22  the limits were set based on marketing and not product
23  safety?
24         MR. LYON:  Objection, form.
25         THE WITNESS:  This is the only part that

Page 216

1  I recall reviewing related to the source of
2  the use limits.
3      Q   (By Ms. Lent)  Can you -- can you repeat
4  that?  I'm sorry, I couldn't hear you.
5      A   I said this -- his deposition was the only
6  evidence that I saw regarding the source of the usage
7  limits.
8      Q   Did you ask anyone whether there was
9  additional evidence regarding the source of the usage
10  limits?
11     A   No, I didn't go any farther except as, you
12  know, you can certainly say that it was -- it might be
13  a safety thing, that the less it's used, the less
14  likely it's going to fail.  That's what usage limits
15  are usually for, are to limit the use of the product to
16  keep it from going to a point where it may become
17  unusable.
18         Now, in the EndoWrist, there's no evidence
19  that 10 uses is going to -- that 11 uses might be
20  dangerous to a patient.  I don't think anybody argued
21  that.  And that made sense.  Then, "We'll have this set
22  up with 10," and Mr. McGrogan confirmed that the
23  marketing team said, "Hey, 10, that would be good.
24  Let's make them buy new ones after 10 uses."  That was,
25  I think, a business decision.

Page 217

1      Q   So I think your answer was that you did not
2  ask for any additional information regarding how the
3  usage limits were set, you just relied on the McGrogan
4  testimony?
5         MR. LYON:  Objection, form.
6         THE WITNESS:  Well, there was no
7  additional information that I can recall.
8      Q   (By Ms. Lent)  Are you aware that Intuitive
9  conducted life testing on its EndoWrist instrument to
10  arrive at the usage limits?
11     A   I did --
12         MR. LYON:  Objection, form.
13         THE WITNESS:  I did see some data that I
14  looked at somewhere in my search of documents
15  where there was testing on -- I don't know if
16  it was called life testing, but it was use
17  testing to test the product.
18         In the world of device development, the
19  story is test it until it breaks.  In other
20  words, I don't think anyone knows, that I
21  saw, what limits there were on an EndoWrist
22  that absolutely would require you to get it
23  serviced.  The 10 seemed very conservative
24  and nobody would argue with that as being a
25  good -- a good number to use.

55 (Pages 214 - 217)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 218

1    Q    (By Ms. Lent)  Do you recall reviewing use
2  testing that Intuitive conducted with respect to some
3  of its newer EndoWrist instruments that it relied on in
4  extending those usage limits?
5      MR. LYON:  Objection, form.
6      THE WITNESS:  I don't recall that.  It's
7  not something I addressed in my report.
8    Q    (By Ms. Lent)  Are you aware that in 1999,
9  Intuitive submitted to FDA the life cycle testing data
10  in its K990144 PMA converted 510(k)?
11    A    Well, again, I know that they would be
12  required to submit testing data relative to the -- to
13  the labeling for 10 uses, use data showing that the
14  devices consistently would go beyond 10 without
15  failing.
16      MS. LENT:  Let's mark as the next
17  exhibit Tab 30, please.
18      (Discussion off the written record.)
19    Q    (By Ms. Lent)  Okay, we've put on the screen
20  as Exhibit 13 a document entitled "Intuitive Surgical,
21  Inc. System 510(k)s/K990144 Premarket Application,
22  Volume 2."  And the Bates number is Intuitive 00692643.
23      Do you recognize this document, Mr. Stevens?
24    A    I'd have to go back to my report to see if it
25  was one that was provided to me.

Page 219

1    Q    This is a document that you cited in your
2  materials considered.
3    A    Okay.  Okay.  All right.  Well, then I have
4  seen it.
5    Q    And did you review this document in forming
6  the opinions in your report?
7    A    I believe I looked at the specific labeling
8  part of it.
9    Q    The labeling part of it.  Anything else?
10    A    Not that I can recall.
11    Q    Okay.  Let's turn to the Bates numbered page
12  694248.
13      MR. LYON:  I'm sorry, Karen, what was
14  that number?
15      MS. LENT:  694248.
16      MR. LYON:  Thank you.
17      MS. LENT:  Sure.
18      (Discussion off the written record.)
19      MS. LENT:  Can we go off the record one
20  moment to try and figure this out?
21      MR. LYON:  Sure.
22      MS. LENT:  Okay.  I think it's the wrong
23  tab.  Alan, can you take us off the record,
24  please.
25      THE VIDEOGRAPHER:  The time is now 3:33

Page 220

1  p.m.  We're going off the record.
2      (Off the record.)
3      (Exhibit 13 marked for identification.)
4      THE VIDEOGRAPHER:  The time is now 3:40
5  p.m.  We're back on the record.  Please
6  continue.
7    Q    (By Ms. Lent)  All right, Mr. Stevens, we've
8  marked as Exhibit 13 a document entitled "Intuitive
9  Surgical, Inc., System 510k's/K990144 Premarket
10  Application, Volume 7," dated 11/26/1999.  Do you see
11  that document?
12    A    Yes, I see it.
13    Q    Okay.  Is this a document that you are
14  familiar with?
15    A    Again, I'd have to look at my expert report
16  to see if it was one that was in my portfolio.
17    Q    This is a document, I will represent to you,
18  that's listed on your Exhibit 3.
19    A    Okay.  All right.  Well, then, I am familiar
20  with it, then.
21    Q    Okay.  And did you review this report -- I
22  mean, sorry, this exhibit, in forming your opinions in
23  this case?
24    A    I looked at the labeling for sure and the
25  intended use.  That's what I was -- indications for use

Page 221

1  and intended use, that's what I was most concerned
2  about.
3    Q    Why did you look at the labeling?
4    A    Well, because the concern was whether or not
5  single use -- or not single use, use limitations were
6  included in the indications for use or not, and they
7  weren't.
8    Q    And then -- and so why did you look at the
9  labeling?
10    A    Because that's where the indications for use
11  is.
12    Q    Okay.  Let's turn to the page with the Bates
13  number 694251, so it's page 205 of the PDF.
14      (Discussion off the written record.)
15    Q    (By Ms. Lent)  Okay, Mr. Stevens, have you
16  seen this page of Exhibit 13 before?
17    A    I don't -- I don't recall at this point, but
18  I may have seen it.
19    Q    Okay.  Do you have an understanding of what's
20  being reported on this page?
21      MR. LYON:  Larry, take your time to look
22  at the document and refamiliarize yourself.
23      THE WITNESS:  Can you enlarge it for me?
24  There we go.
25      Okay, I see it's evaluating the scissors.

56 (Pages 218 - 221)

J.  Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 222

1    Q    (By Ms. Lent)  Okay.  And what is it
2  evaluating about the scissors?
3    A    Well, it looks like in an animal model,
4  they're evaluating the ability to perform a simulated
5  surgical procedure.
6    Q    For 10 uses, right?
7    A    I didn't see that, but -- oh, here, down at
8  the bottom, it says, "four cycles" -- "for four cycles,
9  plus evaluation, 10 uses."  So that -- obviously, the
10  conclusion, despite some initial problems they had,
11  they got over that, and this document says that the
12  scissors have been validated for 10 uses.  I'm not --
13  Potts scissors, I'm not sure if that's another product.
14    Q    So when you say they got over -- "despite
15  some initial problems they had, they got over that," do
16  you mean where it's indicated in 2.1.2 that the unit
17  failed?
18    A    Right.
19    Q    Uh-huh.  Okay.  And then do you see below --
20  below those first two bullets where it says "corrective
21  action was taken"?
22    A    Right.
23    Q    Right.  So what does that mean to you?
24    A    It means they identified what caused the
25  failure and they redesigned the unit and built new

Page 223

1  units and it passed the validation.
2    Q    So the initial design that was tested here
3  failed before it got to 10 uses, right?
4    A    I didn't -- I will just -- I just said what I
5  said, the unit failed the evaluation.  Okay?
6    Q    It failed the evaluation after Cycle 4,
7  right?
8    A    Oh, I see.  Passed Cycles 1-4, then -- okay,
9  so, yeah.
10    Q    Right, so the initial design that was tested,
11  the initial design of the Potts scissors EndoWrist that
12  was tested here failed before it was used 10 times,
13  right?
14    A    It appears that way, yes.
15    Q    And then Intuitive had to implement certain
16  design changes in order to get this Potts scissors
17  EndoWrist to be validated for 10 uses, right?
18    A    It appears -- it says, "A new redesigned unit
19  was constructed," and it goes on to say "to redesign"
20  and shows it went through what they call 10 uses.
21    Q    Uh-huh.  Now, Intuitive didn't submit data
22  that you're aware of in its 510(k) to support usage
23  limits higher than 10, right?
24    A    I don't know -- don't know the answer to
25  that.  But if they're claiming 10 uses in their

Page 224

1  labeling, FDA would ask them for data showing that the
2  device can survive 10 uses and still be functional, so
3  that would explain why they did this test.
4    Q    Have you seen any data submitted by Intuitive
5  to FDA in order to support a usage limit higher than 10
6  for any particular EndoWrist?
7    A    I don't recall seeing anything like that, no.
8    Q    Uh-huh.  Does the data -- strike that.
9      Does the testing done and described on this
10  page for the Potts scissors EndoWrist, would that
11  validate that EndoWrist could be safely used 19
12  times?
13      MR. LYON:  Objection, form.
14      THE WITNESS:  The results here say they
15  validated it for 10 uses, that's what it
16  says.
17    Q    (By Ms. Lent)  And would that data that was
18  submitted here, in your expert opinion, support a
19  conclusion that the Potts scissors had been validated
20  for 19 uses?
21      MR. LYON:  Objection, form.
22      THE WITNESS:  It says it was validated
23  for 10 uses.  That's all I can say.
24    Q    (By Ms. Lent)  Wouldn't you agree that if
25  Intuitive submitted this data with its 510(k) for

Page 225

1  EndoWrist --
2    A    Right.
3    Q    -- and the FDA reviewed and cleared the
4  510(k) after having reviewed these validated usage
5  limits, that the usage limits become an important
6  aspect of the legally marketed device?
7      MR. LYON:  Objection, form.
8      THE WITNESS:  The usage limits are a --
9  an indication to the customer that it can
10  only be used 10 times.  That's the purpose of
11  it.
12    Q    (By Ms. Lent)  Now, if Intuitive decided to
13  convert its EndoWrist for Potts scissors that's
14  described on this page we're looking at from a limited
15  reuse device to a reusable device with no usage limits,
16  would Intuitive need to file a new 510(k)?
17      MR. LYON:  Objection, form.
18      THE WITNESS:  I don't know the answer to
19  that.  I would have to study that from the
20  standpoint of --
21      MS. LENT:  So --
22      THE WITNESS:  -- [indiscernible]
23  modification.
24    Q    (By Ms. Lent)  If Intuitive only submitted
25  validation data to support 10 uses, would the FDA be

57 (Pages 222 - 225)

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 226

1  able to clear the device based on that data as a
2  reusable device with no limits?
3        MR. LYON:  Objection, form.
4        THE WITNESS:  The FDA allows the company
5  to label the product any way they want to
6  label it regarding uses.  Single-use devices,
7  it's quite obvious, single-use disposable, or
8  reusable devices, the company can choose to
9  put whatever limitations they have on it, but
10 then the FDA says if you say it's for 10
11 uses, you need to validate it for 10 uses, in
12 other words, you need to prove what you said.
13 Q   (By Ms. Lent)  And if it's reusable with no
14 limits, what sort of validation would be required then?
15       MR. LYON:  Objection, form.
16       THE WITNESS:  Again, the only time FDA
17 asks for specific expiration dating or
18 something like that is where there's an
19 indication that the device itself will fail,
20 you know, unexpectedly and maybe cause a
21 problem.
22    For reusable devices, there's -- it's
23 known that there are servicing organizations
24 that process the devices and check them out
25 and fix them as needed to fix and then return

Page 227

1  them to the hospital.  So they don't require
2  for reusable devices to have a limitation if
3  it's known that by servicing it, it will
4  continue to work.  That's what usually
5  happens.
6  Q   (By Ms. Lent)  So it's your testimony that
7  based on validation for 10 uses, the FDA might clear a
8  device as completely reusable with no usage limits?  Is
9  that your testimony?
10 A   I'm saying for devices that are reusable
11 devices, there's no requirement that the FDA has that
12 you limit the number of uses on it.  You have to define
13 cleaning procedures and maintenance procedures, and
14 hospitals are well aware of that and they know for
15 those reusable devices, that they have servicing
16 organizations that when the device itself appears to
17 not be working perfectly, they can go to the service
18 organization, an organization like Rebotix will service
19 it and send it back and there would be no limitations
20 in the sense of predetermined limits on use.  The
21 company can choose to do that, which they did, and the
22 FDA then said, okay, show us your testing for that and
23 they showed them the tests.
24 Q   My question was whether FDA would clear an
25 EndoWrist as a completely reusable device with no

Page 228

1  limits based on testing data that only validated the
2  devices to 10 limits.
3        MR. LYON:  Objection, form, asked and
4  answered.
5        THE WITNESS:  I -- the normal way to
6  develop a reusable device is to design it in
7  a way that it can be cleaned and maintained
8  for some period of time.  All devices wear
9  out, and that's the way FDA reviews them.
10 Does it function well?
11    Sometimes companies will do live testing
12 until failure and they'll say we used it for
13 2,000 times and it finally broke in a way
14 that couldn't be fixed.  They may tell FDA
15 that, but FDA knows that reusable devices are
16 only reusable for a period of time until they
17 have to be replaced.  And that's the market
18 that FDA regulates, the reusable devices.
19    As I said, a company can choose, as it's
20 done here, to limit the 10 uses, and FDA
21 won't prevent that.  But yet that's not an
22 FDA requirement.  It's a -- it's a company --
23 the company has placed that restriction upon
24 themselves.
25 Q   (By Ms. Lent)  What sort of usage data --

Page 229

1  what sort of validation data, in terms of number of
2  uses for a device, would you expect the FDA to require
3  for a medical device like an EndoWrist that had no
4  usage limits or was fully reusable?
5        MR. LYON:  Objection, form.
6        THE WITNESS:  That's beyond --
7        MR. LYON:  Hold on.  Objection, form.
8  Asked and answered.
9        THE WITNESS:  Oh, okay.
10    That's beyond my expertise.  In other
11 words, I'm not a mechanical engineer, I'm not
12 a metallurgist, I'm not a catheter engineer,
13 I'm not a surgical instrument engineer.
14 Those are engineering questions regarding
15 reliability that go beyond my expertise, so I
16 couldn't tell you what FDA would require.
17 Q   (By Ms. Lent)  Let's talk a little bit about
18 the Rebotix 510(k) submission.  You've said earlier
19 today and in your report that Rebotix sought 510(k)
20 clearance at a time when it was employing a different
21 business model, right?
22 A   That's correct.
23 Q   And that business model was that it had plans
24 to market and sell remanufactured EndoWrists; is that
25 correct?

58 (Pages 226 - 229)

J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 230

1    A   That's -- as it was explained, that was the
2    plan.
3    Q   Okay. Let's look at paragraph 78 of your
4    report. And you're discussing that in this paragraph,
5    correct?
6    A   Right.
7    Q   Okay. And you cite the Papit deposition
8    transcript and the Morrison deposition transcript and
9    your conversation with Greg Fiegel, right?
10   A   Right.
11   Q   Do you have any other basis for -- factual
12   basis for your understanding of Rebotix' business model
13   at the time it sought 510(k) clearance other than those
14   three sources?
15   A   I'm not aware of any additional. The
16   information that I got is what I put here.
17   Q   And the conversation that you had with
18   Mr. Fiegel and the depositions that you relied on,
19   those were things that occurred in 2021, right, this
20   year?
21   A   What conversations are you referring to?
22   Q   The conversation that you cite with
23   Mr. Fiegel --
24   A   Oh, yeah.
25   Q   -- and the depositions that you cite, those

Page 231

1    things occurred this year, in 2021, correct?
2    A   The conversations surely did. The deposition
3    dates I assume were also that, but I -- without looking
4    at them, I can't tell you for sure what dates they
5    were.
6    Q   Yes, okay. Do you know when Rebotix
7    submitted that 510(k)?
8    A   If you scroll up a little higher up, it may
9    mention that. Okay. I can't recall right now when
10   that submission was done.
11   Q   It was at least several years ago, right?
12   A   Yes. It was sometime past, yes.
13   Q   None of the facts -- none of the evidence
14   that you rely on for your assertion that the business
15   model has changed for Rebotix since it sought 510(k)
16   clearance are from the time period when you say that
17   business model actually changed, right?
18   A   I don't know the timing. I know that they at
19   some point withdrew the 510(k), and as it was explained
20   to me, that was because they decided that that wasn't
21   the direction they were going to go as a business.
22   Q   Uh-huh.
23   A   That's how it was explained.
24   Q   Did you ask for any documents or evidence
25   from the time when Rebotix withdrew the 510(k) that

Page 232

1    would explain why it was withdrawing it?
2    A   No. I think that primary information came
3    from the depositions and from my conversations with the
4    gentleman.
5    Q   Are you aware that Rebotix received a
6    significant deficiency letter for its 510(k)?
7       MR. LYON:  Objection, form.
8       THE WITNESS:  I believe we discussed
9    that this morning in the sense of information
10   the FDA sent back to them saying they needed
11   additional testing data and they outlined
12   what that was. The fact is they chose not to
13   respond to that and they chose to not be in
14   that particular business model, so they never
15   responded.
16      MR. LYON:  Karen, I hate to be the one
17   to do this, but my afternoon coffee is
18   catching up with me.
19      MS. LENT:  No problem.
20      MR. LYON:  Short restroom break.
21      MS. LENT:  Absolutely.
22      MR. LYON:  I apologize.
23      MS. LENT:  That's okay. Let's go off
24   the record.
25      THE VIDEOGRAPHER:  The time is now 4

Page 233

1    p.m. We're going off the record.
2       (Recess taken.)
3       THE VIDEOGRAPHER:  The time is now 4:07
4    p.m. We're back on the record. Please
5    continue.
6       MS. LENT:  Let's introduce as our next
7    exhibit Tab 35, please.
8       (Exhibit 14 marked for identification.)
9    Q   (By Ms. Lent) Okay, we've marked as Exhibit
10   14 an email from Ryan Burke to Joe Morrison, Jeff Bua,
11   and Jon Ward on July 9th, 2015. Do you see that,
12   Mr. Stevens?
13   A   Yes, I'm looking at it right now, yes.
14   Q   Okay. And this is a document that you
15   include on your Exhibit 3. Do you recall reviewing
16   this document?
17   A   Yeah, I believe I have seen this, yes.
18   Q   What is this document?
19   A   Well, it's forwarding on an email from the
20   FDA to Ryan Burke, and it says -- it says -- it's about
21   Rebotix AI, or whatever that's called, follow-up.
22   Q   Do you know --
23   A   AI, I believe, would probably be additional
24   information.
25   Q   Do you know who Mary Wen is?

59 (Pages 230 - 233)

J.  Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 234

1    A   No, I do not know who Mary Wen is.
2    Q   But she is someone who worked at the FDA at
3   this time, according to her signature?
4    A   Well, yeah, her email address would tell you
5   that she's an FDA employee, as well as her title.  She
6   was in Office of Device Evaluation.
7    Q   And she says to Ryan on -- in that first
8   forwarded email, "Please find our responses to your
9   questions below.  If you'd like further clarification
10   on these responses, please let me know if you'd like to
11   set up a teleconference to discuss."  Do you see that?
12    A   Right.
13    Q   Okay.  And then let's go to the next page,
14   where we can see Ryan's email to Mary.  In that first
15   paragraph of his email, do you see -- there we go --
16   where he says, "Despite the apparent magnitude of the
17   deficiency letter, we were encouraged by your
18   willingness to work with us interactively through the
19   process"?  Do you see that?
20    A   Yes.
21    Q   What do you interpret him to mean there by
22   saying "the apparent magnitude of the deficiency
23   letter"?
24        MR. LYON:  Objection, form.
25        THE WITNESS:  I have no idea what he

Page 235

1   meant.  What's magnitude to him may not be to
2   other people.  He obviously felt there was
3   something there that needed to be
4   addressed.
5        MS. LENT:  Can we scroll to the top of
6   the next page of this document, please.
7    Q   (By Ms. Lent)  Ryan writes, "Below I have
8   detailed our concerns over certain stated deficiencies
9   that we believe threaten the feasibility of moving
10   forward."  Do you see that?
11    A   Yes.
12    Q   Did you review that language in forming your
13   opinions in this case?
14    A   I was aware that -- this was the decision
15   that it probably wasn't worth going forward with, yes.
16    Q   Can you repeat that?  You're aware of what,
17   that it wasn't worth moving forward?
18    A   Well, the writer of this, who -- AJW
19   Technology Consultants is making the observation that
20   whatever information FDA wants might not be -- make it
21   worthwhile to move forward with it.
22    Q   Okay.  And let's turn to two more pages in,
23   to page 5 of the document and that paragraph in the
24   first half of the page that starts "Response."  Do you
25   understand that the paragraph -- in the context of this

Page 236

1   document, the paragraph that starts with "Response" was
2   something that Mary Wen sent back to Ryan?
3    A   I don't know that except the way it's written
4   would imply that it was somebody from -- no, I really
5   don't know.  I can't tell who wrote this.
6    Q   Well, do you think that this is Ryan or
7   someone from AJW, or do you think that it is from FDA?
8        MR. LYON:  Objection, form.
9        THE WITNESS:  Well, again, the email
10   below this was a regulatory consultant, and
11   this is something that a regulatory
12   consultant would write as guidance to their
13   client.
14    Q   (By Ms. Lent)  And we -- when we looked at
15   the first page of this document, Ms. Wen from FDA said,
16   "Please find our responses to your questions below,"
17   right?
18    A   Right.
19    Q   Right.  So FDA in this communication is
20   providing responses, right?
21    A   Again, I don't know in what context this was
22   written.  I can't tell.
23    Q   Did you -- did you review this document in
24   forming your opinions?
25    A   Well, I -- it certainly was one of the

Page 237

1   documents I reviewed, but it really -- it wasn't
2   pertinent to anything I was really concerned with in
3   the sense regarding the issues of the case.
4    Q   Did you understand what was happening in this
5   document when you reviewed it?
6    A   I mean, I understand that someone made a
7   solicitation to FDA.  I don't know 510(k) or whatever,
8   they got something back and looked at it and they hired
9   a consultant who looked at it and said, "Well, this is
10   the implications of it," and that's what this document
11   represents.
12    Q   And the consultant told FDA, "I'm sending you
13   our concerns," and then the FDA said, "We've given you
14   responses," right?
15        MR. LYON:  Objection, form.
16        THE WITNESS:  I'm not sure where you see
17   that at.
18        MS. LENT:  We just read the language.
19   We literally just read those two back and
20   forths.
21        THE WITNESS:  Well, the first email is
22   what you're talking about in this chain --
23        MS. LENT:  Uh-huh.
24        THE WITNESS:  -- where it's from the
25   FDA.

60 (Pages 234 - 237)

J.  Lawrence Stevens                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 238

1     MS. LENT:  Yep.
2     MR. LYON:  You have to wait until
3  there's a question pending.
4     THE WITNESS:  Okay.
5     MR. LYON:  You're kind of just talking
6  back and forth.  I don't think there's
7  currently a question posed to you.
8     THE WITNESS:  Okay.  All right.
9     Q    (By Ms. Lent)  Do you not understand that the
10  paragraphs in the document that start with "Response"
11  were what Mary Wen described in her email as responses
12  to the consultant's questions?
13     A    It's possible.
14     Q    Okay.
15     A    Yeah.
16     Q    Now let's look at the response from FDA that
17  is on the screen right now on page 5 of the email
18  exchange.  The first line, towards the end, the second
19  sentence starts, "The recommendations to perform a
20  native soil characterization study stem from the fact
21  that the device is not simply a reusable device, but it
22  is a third-party reprocessed/remanufactured device.
23  Similar to third-party reprocessors, who reprocess
24  single-use devices, our expectation is that Rebotix
25  would have an understanding of the native soil present

Page 239

1  on incoming devices and that only devices with soil
2  levels that had been used in validation studies are
3  accepted at incoming inspection."  Do you see that?
4     A    Yes.
5     Q    Okay.  And in that paragraph, FDA is
6  characterizing Rebotix's process as remanufacturing,
7  right?
8     A    Again, I don't know if this is an FDA
9  document.  I don't see the necessary tie-in.
10     Q    If this were what FDA was saying to Rebotix
11  about the 510(k) that it submitted --
12     A    Right.
13     Q    -- would it be relevant to your analysis that
14  the FDA told Rebotix it was engaging in
15  remanufacturing?
16     MR. LYON:  Objection, form.  Vague as to
17  "Rebotix."
18     THE WITNESS:  Again, I don't see the --
19  the name of the people, the communicators,
20  was not Rebotix.  It was somebody else.
21     Q    (By Ms. Lent)  Sir, my question to you was:
22  If this were what the FDA was saying to Rebotix about
23  the 510(k) it submitted, would it be relevant to your
24  analysis that the FDA told Rebotix it was engaging in
25  remanufacturing?

Page 240

1     MR. LYON:  Objection, form.
2     Q    (By Ms. Lent)  I understand that you don't --
3  you haven't studied this document enough to understand
4  what it's saying.
5     A    Right.
6     Q    So I'm telling you to assume with me that FDA
7  gave Rebotix this response to a question about the
8  510(k) deficiency letter FDA sent Rebotix.
9     MR. LYON:  Objection, vague --
10     Q    (By Ms. Lent)  Are you there with me?
11     MR. LYON:  Objection, vague as to
12  "Rebotix."  It's unclear --
13     MS. LENT:  It wasn't a -- the question
14  was:  Do you understand what I just said?
15     MR. LYON:  Which included Rebotix.  And
16  it's unclear if you're talking about Rebotix
17  or Rebotix's predecessors Rebotix LLC.
18     MS. LENT:  Doesn't matter.
19     Q    (By Ms. Lent)  Are you -- are you with me,
20  Mr. Stevens?
21     MR. LYON:  Objection, form.
22     THE WITNESS:  I -- I'm listening and
23  looking.
24     MS. LENT:  Okay.
25     Q    (By Ms. Lent)  So if it were the case that

Page 241

1  this communication was from FDA to Rebotix about
2  Rebotix's 510(k) and Rebotix -- and FDA called Rebotix
3  a remanufacturer, is that relevant to your analysis?
4     A    Again --
5     MR. LYON:  Excuse me.  Objection, vague
6  as to "Rebotix".
7     THE WITNESS:  I don't know who wrote
8  this device and what their -- wrote this --
9  if it's an FDA document.  I don't know who --
10  I do not know who wrote it or who -- what
11  their qualifications are.  Although it's
12  saying -- whoever wrote this is saying the
13  device is not simply a reusable device.
14  Third-party reprocessed or manufactured
15  device, in other words, it's tying that all
16  together, and it may not be referring
17  specifically to what Rebotix was doing.
18     Q    (By Ms. Lent)  So, Mr. Stevens, I asked you
19  to assume that it related to what Rebotix was doing and
20  that FDA was saying --
21     A    I don't --
22     Q    -- to Rebotix --
23     MR. LYON:  Hold on.
24     Q    (By Ms. Lent)  -- about what it was doing --
25  don't interrupt.  That was my question.  Because I know

61 (Pages 238 - 241)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 242

1  that you haven't studied this document enough to fully
2  understand it.  So I'm asking you to assume that this
3  is the FDA telling Rebotix that its device for which
4  it's seeking a 510(k) is not simply a reusable device,
5  but it is a third-party reprocessed, remanufactured
6  device.
7       A   Okay.
8       Q   Is that relevant -- would that be relevant to
9  your analysis?
10      MR. LYON:  Objection, form.  Asked and
11  answered.  Hypothetical.
12      THE WITNESS:  In the context --
13      MR. LYON:  Hold on, Larry, let me
14  finish.
15      THE WITNESS:  Okay, all right.
16      MR. LYON:  Vague as to "Rebotix."
17      THE WITNESS:  Okay.  In the context this
18  is written, I could see FDA thinking Rebotix
19  was going to get in used devices, they were
20  going to reprocess them somehow, including
21  cleaning and sterilizing whatever and then --
22  and then reselling them.  And so their
23  perception of what Rebotix was going to be
24  doing is not what Rebotix is doing now.
25      Q   (By Ms. Lent)  Tell me where in this document

Page 243

1  you see FDA saying that they understand that Rebotix
2  will be selling these EndoWrists to --
3       A   Well, that's what --
4       Q   -- others?  Where do you see that?
5       A   That's what a 510(k) says.  You're saying in
6  a 510(k) that you are going to be selling a device and
7  telling them what the device is, what the source of the
8  devices are, what you're going to be doing with them,
9  and FDA would look at your proposal and then send you
10  something back with the assumption that that was what
11  was behind it.
12      And it's -- what Rebotix is doing now is not
13  that.  They're doing servicing, and that's all they're
14  doing.  And I don't think FDA would ever call that
15  remanufacturing or reprocessed because they know
16  clean -- they -- well, I don't know what --
17      Q   You haven't looked at Rebotix's 510(k) --
18      MR. LYON:  Wait, wait, Karen, he has not
19  finished his answer.
20      Larry, were you done?
21      THE WITNESS:  No, I was -- I was -- I
22  was going to say the picture is changed now.
23  FDA does not see Rebotix as a reprocessor.
24  They -- when they told FDA what they were
25  doing just recently, they explained what they

Page 244

1  were doing, the whole operation, and FDA took
2  the information and said, "Thank you very
3  much," and they never heard another word,
4  which tells me that there's no -- FDA has no
5  concerns over what Rebotix is doing now.  And
6  this document, I don't think, relates to the
7  current situation.
8       Q   (By Ms. Lent)  You haven't seen -- you told
9  me earlier today you didn't review Rebotix's 510(k),
10 right?
11      MR. LYON:  Objection, form.  That
12  misstates prior testimony.  After he said
13  that, he cleaned that up, and you know that,
14  Karen.
15      MS. LENT:  Stop, Rick.  Stop.  Okay?
16  Let him answer the question.  That's really
17  inappropriate.
18      THE WITNESS:  It was among the documents
19  that I reviewed.  The depth of my review is
20  not -- I don't recall how in-depth I reviewed
21  it, but it was definitely one of the
22  documents I reviewed.
23      Q   (By Ms. Lent)  How much time did you spend
24  reviewing it?
25      A   I cannot remember that at all.

Page 245

1       Q   Can you tell me anything about it?
2       MR. LYON:  Objection, form.
3       THE WITNESS:  The only thing I know
4  about it is they sent in a 510(k) for the
5  device and received back from FDA an
6  additional information request.  Okay?
7       MS. LENT:  Let's introduce Tab 36 as the
8  next exhibit.
9       THE WITNESS:  One of the things that has
10  to be in a 510(k) is the labeling on the
11  product.
12      MS. LENT:  Mr. Stevens, I didn't -- I
13  didn't have a question pending.  I'm trying
14  to introduce --
15      THE WITNESS:  Oh, okay.
16      MS. LENT:  -- another exhibit, Tab 36,
17  please.
18      THE WITNESS:  I'm sorry.  I was going to
19  explain more about 510(k).
20      MS. LENT:  That's okay.  Just answer the
21  questions that I ask.
22      MR. LYON:  Hold on.  Let her say a
23  complete question, pause, give me time to get
24  my objections in, and then you can answer the
25  question asked.

62 (Pages 242 - 245)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 246

1    THE WITNESS:  Okay.
2    (Exhibit 15 marked for identification.)
3    Q   (By Ms. Lent)  We've introduced as Exhibit 15
4  a letter from FDA to Ryan Burke dated December 19th,
5  2014.
6    Mr. Stevens, have you reviewed this document
7  in connection with forming your opinions in this case?
8    A   Well, I probably did.  I say that because
9  this is part of the whole package of the 510(k), the
10  acknowledgment that it was sent in.  And the key thing
11  is it says the applicant is Rebotix LLC.  Now --
12    Q   All I asked you is whether you reviewed this
13  document.
14    MR. LYON:  Karen, let him answer the
15  question as he sees fit.
16    MS. LENT:  No, no.  He's trying to run
17  the clock out.  So I asked him if he reviewed
18  the document, yes or no.
19    MR. LYON:  Karen, you asked a question.
20  He can give you the answer that he thinks is
21  appropriate to the question asked.  He's not
22  running the clock out.
23    You can -- you can complete your answer,
24  Larry.
25    THE WITNESS:  Well, I was going to say

Page 247

1    is the applicant is Rebotix LLC.  FDA would
2    see them as the responsible firm for the
3    product and they would have to provide
4    labeling showing that they are the
5    responsible firm.  And that makes it their
6    product, and that's a different situation
7    than they ended up in.
8    Q   (By Ms. Lent)  Mr. Stevens, did you review
9  this document in forming your opinions in this case,
10  yes or no?
11    A   It was part of the documents that I reviewed.
12    Q   It's not listed.
13    A   Well --
14    Q   Does that change your opinion?
15    A   -- again, if it was in the -- does it have a
16  separate Bates number?
17    Q   The Bates number of this document is not
18  listed as part of your materials you reviewed.
19    A   Okay.  Well, then, I was -- that was perhaps
20  in error.  These are the kinds of documents that I
21  reviewed, though.
22    Q   Okay.  In the middle of the page --
23    MS. LENT:  Can we scroll down?
24    Q   (By Ms. Lent)  -- it says under the --
25    MS. LENT:  Up a little bit more.  Sorry.

Page 248

1    Yes, right there.
2    Q   (By Ms. Lent)  Under the first set of
3  indented text, it says, "We will notify you when the
4  processing of your 510(k) has been completed or if
5  additional information is required."  And then it says
6  in all caps, "YOU MAY NOT PLACE THIS DEVICE INTO
7  COMMERCIAL DISTRIBUTION UNTIL YOU RECEIVE A LETTER FROM
8  FDA ALLOWING YOU TO DO SO."  Do you see that?
9    A   Yes.
10    Q   Now, in your experience, would FDA have sent
11  this sort of letter if it did not believe that 510(k)
12  clearance was necessary?
13    MR. LYON:  Objection, form.
14    THE WITNESS:  When someone submits a
15  510(k) to the FDA, the FDA assumes that
16  they're doing it because they have to, and
17  this is a form letter that FDA sends back
18  with that prohibition against commercial
19  distribution that they send back to the
20  person who submitted the 510(k).
21    Q   (By Ms. Lent)  And you would say the same
22  thing if the -- with respect to the FDA giving that
23  message after it reviewed the additional information
24  Rebotix submitted as well?
25    MR. LYON:  Objection, form.

Page 249

1    THE WITNESS:  Again, I -- all I know is
2    that they never pursued the 510(k) and --
3    Q   (By Ms. Lent)  Well, they dropped it, right,
4  because the deficiency letter was too onerous?
5    A   Well, I don't know all the --
6    MR. LYON:  Larry, Larry, pause --
7    THE WITNESS:  Sorry.
8    MR. LYON:  -- pause so I can object.
9    Objection, form.
10    THE WITNESS:  Okay.  The -- there
11    were -- I'm not sure of all the reasons why
12    they decided to withdraw the 510(k), but they
13    gave up on the idea of marketing their own
14    product, their own Potts scissors, so to
15    speak.  And that went away when Rebotix LLC
16    went away and it doesn't relate anything to
17    what Rebotix is doing now.
18    Q   (By Ms. Lent)  You said a little while ago
19  that -- something to the effect of, you know, because
20  the FDA has been silent for more than a year after
21  learning about Rebotix' services and hasn't acted, that
22  FDA determined that Rebotix' services do not violate
23  regulation -- FDA regulations, right?
24    A   Yes, that's the way FDA operates.  I know
25  because that's how I operated when I was in FDA.

63 (Pages 246 - 249)

J. Lawrence Stevens                     September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 250

1    Q   You testified -- or, I'm sorry, you submitted
2  an expert opinion in a case called Nevro versus Boston
3  Scientific, correct?
4    A   That was some time back, yes.
5    Q   Okay.
6       MS. LENT:  Let's mark as the next
7    exhibit Tab 40.
8       (Exhibit 16 marked for identification.)
9    Q   (By Ms. Lent)  Can we turn to the second page
10 of Exhibit 16, please.  Okay, Exhibit 16 appears to be
11 the "Declaration of J. Lawrence Stevens in Support of
12 Boston Scientific's Reply in Support of Motion for
13 Summary Judgment."  Do you see that?
14   A   Yes.
15   Q   Let's turn to page 19 of the PDF, which
16 should be page 18 -- sorry, page 17 --
17   A   I'm smiling because this is from five years
18 ago, so I --
19   Q   Okay.  I see on this page 17 of the
20 declaration that this says it was executed on May 23rd,
21 2018, right?
22   A   Right.
23   Q   Okay, about three and a half years ago?
24   A   Three years, three and a half years ago,
25 yeah.  I exaggerated.

Page 251

1    Q   Okay.  Is that your signature on the page?
2    A   That appears to be my signature, yes.
3    Q   And this is a declaration that you submitted
4  on May 23rd, 2018, to a Federal District Court in
5  California?
6    A   It appears to be that.
7    Q   Okay, let's go back one page, please, in the
8  exhibit to paragraph 61.  It says, "Dr. Schiff asserts
9  that the FDA apparently disagreed with Boston
10 Scientific's complaints on the basis that BSC lodged
11 its complaint about Nevro's generalized superiority
12 claims nearly three years ago, but that because FDA has
13 apparently taken no action, that he can only conclude
14 that the FDA's lack of action in this case indicates
15 that the FDA does not object to Nevro's claims of
16 Senza's superiority over traditional SCS systems."  Do
17 you see that?
18   A   Yes.
19   Q   And you say that you strongly disagree with
20 that statement, right?
21   A   Apparently I did because --
22   Q   Yes.
23   A   -- and I explain why.
24   Q   Okay.  And then you say, "The FDA releases
25 guidance materials and recommendations on compliance

Page 252

1  with its regulations and expects companies to police
2  themselves accordingly," right?  Do you -- do you still
3  agree with that statement?
4    A   Yes.
5    Q   Then you say, "The fact that the FDA has yet
6  to take official action against Nevro for its
7  advertising violations does not, as Dr. Schiff
8  concludes, reflect that the FDA deems Nevro's conduct
9  to be permissible or that it disagrees with any of the
10 points raised in BSC's communications to the FDA
11 concerning the impropriety of Nevro's claims."
12   A   Right.
13   Q   Do you see that?
14   A   Yes.
15   Q   That was a truthful and accurate reflection
16 of your opinions at that time?
17   A   Yes.
18   Q   Okay, then you say, "Based on my experience
19 as an FDA official, due to significant backlogs caused
20 by constraints on the agency's limited resources, there
21 are often violations which are not addressed until
22 years after they occur and others that evade FDA
23 oversight altogether."  Do you see that?
24   A   Yes.
25   Q   And that was an accurate -- an accurate

Page 253

1  representation of your opinion at the time?
2    A   That's an accurate statement.  And I can
3  explain why.
4    Q   Okay.
5    A   Would you like me to explain?
6    Q   I didn't ask you to.
7    A   Okay.
8    Q   You submitted this declaration under penalty
9  of perjury to a federal court, right?
10   A   Yes.
11   Q   And you said that at this time, in 2018,
12 the -- there was a significant backlog at FDA, right?
13   A   Right.
14   Q   And this was prior to the COVID pandemic,
15 right?
16   A   Right.  There's always a backlog at FDA.
17   Q   Uh-huh.  How do you reconcile your opinions
18 in this declaration with the opinion you offer
19 regarding Rebotix' 2020 communications with FDA,
20 specifically that if FDA had not taken action by now,
21 the only conclusion that could be reached is that it
22 does not believe that Rebotix requires 510(k)
23 clearance?
24   A   I can explain.  Would you like me to explain?
25   Q   You can answer the question.

64 (Pages 250 - 253)

J. Lawrence Stevens                September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 254

1    A  Well, the reason it's an accurate statement
2  is something I've said before, is that the FDA does not
3  issue you're okay type documents.  In other words, they
4  get a complaint.  If it's a significant public health
5  issue, they'll move on it right away.  But if it's not,
6  they'll put it in a file and send it to the district
7  office where they're located and it may get followed up
8  on the next inspection by an FDA person.
9        So the bottom line is you're never -- you're
10  never out of FDA jeopardy.  Every company that operates
11  is operating with a potential of FDA coming down on
12  them for something that they're not aware of or
13  something they did wrong.  And that's the environment
14  that all companies work in.
15        So I can say with all honesty that if you --
16  if you've been visited by FDA or you sent information
17  to FDA and you haven't heard anything, the best thing
18  you can say is that they're not prepared to take any
19  action.
20        Does that preclude them from taking action in
21  the future?  Of course not.  They can get additional
22  information, they can finally get to something that's
23  been on a lower shelf for a while.  And that's what I'm
24  talking about here.
25    Q  Let's look at paragraph 151 of your report

Page 255

1  please, back to Exhibit 1.  Okay.  In the third line,
2  you say, "If the FDA had concluded that Rebotix'
3  services violated FDA regulations, the FDA would have
4  acted by now.  From the FDA's silence, it is safe to
5  conclude that after learning more about Rebotix's
6  services, the FDA determined that Rebotix's services do
7  not violate FDA regulations."  Do you see that?
8    A  Right.
9    Q  How can you say that it is safe to conclude
10  that the FDA determined that Rebotix' services do not
11  violate FDA regulations given the testimony, the sworn
12  testimony, that you submitted in the Nevro case?
13    A  Again, I don't -- I don't see an
14  inconsistency there.  What I'm saying is that you can
15  conclude that FDA doesn't have any immediate concerns,
16  that they haven't seen anything obviously illegal that
17  represents a public health risk, or they would have
18  taken action.  And the longer the time goes, the more
19  indication is that they don't see a problem that they
20  need to deal with.
21        And that's what I'm talking about here.  If
22  it's going silent after what they've done and there's
23  nothing that I've seen about Rebotix' services that
24  would raise any public health issues, then I -- my
25  feeling is that FDA has put it on a back burner and is

Page 256

1  not prepared to do anything.
2    Q  That's your feeling?
3    A  Yeah.
4    Q  But you had a different feeling in the Nevro
5  case, right?
6        MR. LYON:  Objection, form.
7        THE WITNESS:  Well, again, the
8    consistency is there, is once you've dealt
9    with FDA, you never get anything that tells
10    you you're out of FDA jeopardy in the future.
11    That was what I was -- that's what I was
12    saying in the Nevro case.
13        In this case, what I'm saying is that if
14    you haven't heard from FDA, then you can
15    be -- you can conclude that they're not
16    immediately concerned about you and that
17    they're not going to do anything at least for
18    now.
19        It doesn't mean at some point in the
20    future, they couldn't.  I mean, so that's
21    kind of the life that you live in when you
22    make medical devices regulated by FDA.
23        MS. LENT:  Let's take a break and I'm
24    going to organize myself for the last few
25    minutes.

Page 257

1        THE WITNESS:  Okay.
2        THE VIDEOGRAPHER:  The time is now 4:38
3    p.m. and we are going off the record.
4        (Recess taken.)
5        THE VIDEOGRAPHER:  The time is now 4:49
6    p.m.  We're back on the record.  Please
7    continue.
8    Q  (By Ms. Lent)  Mr. Stevens, can you please
9  look at paragraph 61 of your expert report, please,
10  Exhibit 1.
11    A  Hang on a second here.  Let me bring it up.
12  Page 61?
13    Q  It's right on the screen, paragraph 61.
14    A  Okay, paragraph 61.
15    Q  What is the basis for your conclusion that
16  the opinion represented in the Deutsche Bank report is
17  the "consensus opinion held by FDA experts"?
18    A  Well, as I read the report, I saw a
19  consistent conclusion.
20    Q  And is it your view that the opinion
21  represented in the Deutsche Bank report is the
22  consensus opinion held by all FDA experts or just those
23  that were interviewed for the Deutsche Bank report?
24    A  Well, we know that not all experts have the
25  same background and not all experts can comment from

65 (Pages 254 - 257)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 258

1  the same perspective, and that's why it's always a good
2  idea to talk to more than one FDA expert to kind of get
3  the consensus, because there will be people who
4  disagree.
5      Q   How many FDA experts did the authors of the
6  Deutsche Bank report rely on?
7      A   I'd have to go back and look at the report to
8  see.
9          (Exhibit 17 marked for identification.)
10     Q   (By Ms. Lent)  Luckily, we've marked that as
11  the next exhibit.
12         MS. LENT:  So, Brad, could we pull that
13     up, please.
14     Q   (By Ms. Lent)  Exhibit 17 is a Deutsche Bank
15  research report on Intuitive Surgical dated February
16  20th, 2020.  Is this the Deutsche Bank report that
17  you're referring to in your expert opinion?
18     A   Yes, it is.
19     Q   Okay.  So do you know what FDA experts were
20  interviewed as part of this report?
21     A   We could look at the report.  I don't recall
22  that they specifically identified them, but they might
23  have.  I mean, I -- like I say, this is one of many
24  documents that I reviewed and I -- we can go through it
25  if you want to look and see if they identified them.

Page 259

1      Q   Do you recall that the FDA experts were
2  identified in this report?
3      A   I can't recall that kind of detail from my
4  memory.
5      Q   So you said that some FDA experts have
6  different backgrounds or perspectives, right?
7      A   That's true.
8      Q   Do you know the backgrounds or perspectives
9  of the FDA experts that were interviewed for this
10  report?
11     A   I -- no, I don't.  I just know that there was
12  a consensus among them.
13     Q   Among those who were interviewed?
14     A   Yes.
15     Q   Okay.  Do you know what facts the experts
16  that were interviewed for this report were given?
17     A   I think it's in the report if you want to
18  scroll down.
19     Q   Do you think that the experts that were
20  interviewed as part of this report had access to the
21  extent of facts that you had access to in this case?
22     A   I don't -- I don't know how much information
23  they were given.
24     Q   And it matters to how reliable their opinions
25  are --

Page 260

1      A   Right.
2      Q   -- what they reviewed, right?
3      A   Right.  But as I read it, they were talking
4  about a company that was replacing a component in
5  the -- in the device and whether or not that would be a
6  510(k) issue or not.
7      Q   Uh-huh.
8      A   And the consensus was that it was not the
9  kind of change that would require a 510(k).
10     Q   Do you know what standard Deutsche Bank used
11  to qualify these people as experts?
12     A   No, I don't.
13         MS. LENT:  Can we turn to page 8 of the
14     report, please.
15     Q   (By Ms. Lent)  Okay.  And at the top of this
16  page, it says, "510(k) premarket notification does not
17  appear applicable."  Do you see that?
18     A   Right.
19     Q   Right.  And then it says, "The immediate
20  feedback to our downgrade note was that Restore
21  Robotics is subject to 510(k) approval requirement and
22  that because the company does not have 510(k)
23  clearance, it is therefore in clear violation of FDA
24  regulations."  Do you see that?
25     A   I see that statement, yes.

Page 261

1      Q   Do you know anything about Restore Robotics?
2      A   No, I don't.
3      Q   So that means you don't know whether Restore
4  Robotics -- strike that.
5          You don't have an opinion as to whether
6  Restore Robotics is subject to 510(k) requirements, do
7  you?
8      A   No.  I know nothing about them or their
9  products.
10     Q   And then the next sentence in this document
11  says, "However, most of our regulatory experts we spoke
12  to suggested that this argument is fundamentally
13  misplaced."  Do you see that?
14     A   Okay.
15     Q   Okay.  It says, "most of our regulatory
16  experts," right?
17     A   Right.
18     Q   Do you know which ones thought that the
19  argument was misplaced?
20     A   No, I don't.
21     Q   Do you know which -- when you read this, does
22  it suggests to you that not all of the regulatory
23  experts suggested that the argument was misplaced?
24     A   The wording says, "most of our regulatory
25  experts suggested the argument was fundamentally

66 (Pages 258 - 261)

J. Lawrence Stevens                                   September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 262

1  misplaced."
2      Q   Uh-huh.  Doesn't say all, right?
3      A   No, it does not say all.
4      Q   What does consensus view mean to you in terms
5  of whether it's all, most, some?
6      A   To me, a consensus means that a majority of
7  the people you talk to feel one way even though there
8  are outliers.
9      Q   Majority?
10     A   Yeah.
11     Q   Let's turn to paragraph 129 of your report.
12  Okay.  And in paragraph 129 of your report, you say,
13  "The FDA addresses two categories of devices:
14  Single-use devices and reusable devices," correct?
15     A   That's correct.
16     Q   And it's your opinion that there is no other
17  category of device other than these two; is that right?
18     A   Well, there are individual devices where FDA
19  might have more requirements, but these are the general
20  requirements that they fall into.  And that's how they
21  view the products out there.  You can see in 130 it
22  says that reusable devices are those that can be used
23  on multiple patients and cleaned and serviced.
24     Q   Let's look at paragraph 135.
25     A   Okay.

Page 263

1      Q   And you note in paragraph 135 that "A
2  single-use device is intended for use on one patient
3  during a single procedure.  It is not intended to be
4  reprocessed," right?
5      A   That's correct.
6      Q   Are you aware of the 2006 FDA guidance on
7  reprocessed single-use medical device?
8      A   Yes, I am.
9      Q   Okay.  And doesn't that guidance identify
10  another category of devices that is comprised of
11  single-use devices that can be reprocessed for another
12  single use?
13         MR. LYON:  Objection, form.
14         THE WITNESS:  The reality of the
15  situation is that single-use devices, some --
16  the hospitals believe should not be thrown
17  away because it's a waste of money, so to
18  speak, that they could be used on other
19  patients.  Hospitals -- many hospitals will
20  clean and resterilize the single-use device
21  themselves.  FDA doesn't regulate that.
22         However, companies emerged years ago
23  specifically advertising to hospitals, "We
24  can reprocess your single-use devices," and
25  that's why FDA had to get active, because it

Page 264

1  was a commercial venture, and that's the
2  situation that they addressed in their
3  guidance documents:  Reprocessing of
4  single-use device.
5      Q   (By Ms. Lent)  And the FDA requires
6  validation data to demonstrate that each single-use
7  device would remain substantially equivalent to a
8  predicate device after the maximum number of times the
9  device is reprocessed as intended by the -- by the
10  reprocessor, right?
11     A   I believe that's what the guidance document
12  says, yes.
13     Q   And that the reprocessor needs to submit a
14  510(k) in order to reprocess single-use devices,
15  correct?
16     A   Right.
17     Q   So this is another category of devices that
18  the FDA recognizes and regulates --
19         MR. LYON:  Objection, form.
20     Q   (By Ms. Lent)  -- besides the two you
21  identified, right?
22         MR. LYON:  Objection, form.
23         THE WITNESS:  Well, again, it's a
24  special --
25         MR. LYON:  Larry, the court reporter

Page 265

1  doesn't get my objections if you don't pause
2  and let me object.
3         THE WITNESS:  I'm sorry.
4         MR. LYON:  So objection, form.
5         THE WITNESS:  Okay.
6         MR. LYON:  I'm sorry if I disrupted your
7  flow.  If you want to repeat the question if
8  you don't remember it.
9      Q   (By Ms. Lent)  Do you remember the question,
10  Mr. Stevens?
11     A   Go ahead and repeat it so I make sure I do.
12     Q   Doesn't that guidance identify another
13  category of devices that is comprised of single-use
14  devices that can be reprocessed for another single use?
15         MR. LYON:  Objection, form.
16         THE WITNESS:  Okay, as I said, this was
17  a situation that the FDA was forced to
18  address because it was becoming more and more
19  common for single-use devices, which were
20  never intended by the manufacturers to be
21  reprocessed.  And so FDA's guidance says if
22  you're going to reprocess a single-use
23  device, you need to do it under FDA review
24  and concurrence.  And that's where the
25  registration and the 510(k) comes in.

67 (Pages 262 - 265)

J. Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 266

1   Q   (By Ms. Lent)  You didn't talk about
2   single-use reprocessed devices in your report, did you?
3   A   No, not in the context of anything going on
4   at Rebotix.
5   Q   Okay.  Or in your analysis at all, right?
6   A   No, other than what I've stated right here --
7   Q   Uh-huh.
8   A   -- the difference between single-use devices
9   and reusable devices.
10   Q   Other than what you've stated right here in
11   your deposition today, you mean?
12   A   Right.
13   Q   Okay.
14      MS. LENT:  Can we please mark as the
15   next exhibit Tab 32.
16      (Exhibit 18 marked for identification.)
17   Q   (By Ms. Lent)  Mr. Stevens, have you seen
18   this document before?
19   A   Well, I need to see more of it --
20      MS. LENT:  Can we -- can we turn to the
21   third page, please.
22   Q   (By Ms. Lent)  Okay.  Now that you're looking
23   at this page, can you identify this document that we've
24   marked as Exhibit 18?
25   A   Yes.  This was -- this appears to be the

Page 267

1   510(k) summary submitted with the Rebotix LLC 510(k).
2   Q   And have you reviewed this 510(k) summary in
3   forming your opinions in this case?
4   A   I'm not sure.  I'm not sure, but I know what
5   it says.
6   Q   You're not sure that you know what it says?
7   A   No, I'm sure I do know what it says.  I can
8   see they call it remanufactured EndoWrists.
9   Q   Uh-huh.
10   A   And that's why the 510(k) was felt necessary,
11   they called it that.  I believe that terminology was
12   incorrect in the sense of what was going on at Rebotix.
13   But their regulatory consultant apparently convinced
14   them they should send in a 510(k).
15   Q   Was Rebotix under an obligation to be
16   truthful and accurate in its 510(k) submission to the
17   FDA?
18   A   Any information submitted to the government
19   in any way has to be honest and truthful.
20   Q   Uh-huh.  Turn to the next page of this
21   document.  At the top, Roman numeral IV, "Device
22   Description."  And let's look at the first sentence,
23   which says, "The remanufactured EndoWrists are multiple
24   use endoscopic instruments to be used in conjunction
25   with the Intuitive Surgical endoscopic instrument

Page 268

1   control system."  Do you see that?
2   A   Yes.
3   Q   Okay.  And then let's skip down a few lines.
4      MS. LENT:  Stay on the screen.
5   Q   (By Ms. Lent)  The fourth line from the
6   bottom of that first paragraph says, "The instruments
7   are reusable (for a limited number of uses), are
8   provided nonsterile, and must be cleaned and sterilized
9   before used (prevacuum autoclave).  The instruments are
10   programmed for a limited number of uses to ensure
11   reliability and consistent performance."  Do you see
12   that?
13   A   Yes.
14   Q   So were you aware, in forming your opinions,
15   that Rebotix acknowledged that there was a category of
16   limited use devices when it submitted its 510(k) to
17   FDA?
18   A   Again, the companies are free to place
19   limitations on their devices if they choose to do so,
20   and that's what this submission says.  They're
21   programmed for a limited number of uses to ensure
22   reliability and consistent performance.  FDA goes,
23   okay, if that's what you want to do, program them for a
24   limited number of uses.  It's still considered a
25   reusable device.

Page 269

1   Q   Reusable for a limited number of uses,
2   correct?
3   A   The manufacturer has placed limitations on
4   it, much as we've seen in this case.
5   Q   And in this case, it's Rebotix who has placed
6   the limitations on the number of uses, right?
7   A   That's what it appears, yes.
8   Q   Do you have any understanding as to why
9   Rebotix placed limitations on the number of uses for
10   the remanufactured EndoWrists?
11   A   I have no idea.  If they -- if they contained
12   the interceptor board, it was a feature that was
13   already there and they obviously intended to continue
14   to use that.
15      MS. LENT:  I have no further questions
16   for you, Mr. Stevens.  Thank you for your
17   time today.
18      MR. LYON:  I've got a -- I've got just a
19   couple of questions for Mr. Stevens.
20      THE WITNESS:  Okay.
21      MS. LENT:  Okay.
22      EXAMINATION
23   BY MR. LYON:
24   Q   Mr. Stevens, you were asked some questions
25   about the validation testing that Intuitive provided in

68 (Pages 266 - 269)

J. Lawrence Stevens                                    September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 270

1   connection with its EndoWrists 510(k) submissions. Do
2   you recall that testimony?
3       A   Yes.
4       Q   And I believe you testified that Intuitive
5   provided validation data for 10 uses because Intuitive
6   included the 10-use limit in its EndoWrist 510(k)
7   submissions. Was that accurate?
8       A   Yes, that's what I said, yes.
9       Q   Would the FDA have imposed any requirement at
10  all to provide validation testing to a particular
11  number of uses Intuitive had not included in maximum
12  use restrictions in its 510(k) submission?
13      MS. LENT:   Objection, vague, improper
14  hypothetical.
15      THE WITNESS:   Well, it's my belief that
16  the FDA does not require a limited number of
17  uses on reusable devices and therefore would
18  not ask for data if there's no claim.
19  Essentially if you claim something on your
20  label, FDA is going to ask you to prove that
21  it's true. If you put 10 uses, you've got to
22  prove it.
23      Q   (By Mr. Lyon) Do you have the experience and
24  expertise with 510(k) submissions to offer that
25  opinion?

Page 271

1       A   Absolutely.
2       MS. LENT:   Objection.
3       MR. LYON:   That's all I have, Karen.
4       THE WITNESS:   Okay.
5           FURTHER EXAMINATION
6   BY MS. LENT:
7       Q   (By Ms. Lent) Mr. Stevens, I just have one
8   follow-up question to that. Did you talk to Mr. Lyon
9   about that question during the break before we came
10  back on?
11      MR. LYON:   You can -- you can talk
12  generally if we spoke, but you can't get into
13  the specifics of what you and I said to one
14  another.
15      MS. LENT:   Actually, if you speak to the
16  witness during a break, it's fair game for me
17  to ask about it, and so I am entitled to know
18  what you talked about.
19      MR. LYON:   I don't believe that's --
20  hold on, Larry.
21  That's not correct under the rules in
22  this District, but I'm happy to let it happen
23  anyway.
24      THE WITNESS:   Okay, well, That's fine.
25  We speak a lot about a lot of things.

Page 272

1       Q   (By Ms. Lent) I'm specifically asking you
2   about during a break in this deposition today. Did you
3   speak to Mr. Lyon about the subject of the question he
4   just asked you?
5       A   Again, I don't recall that that specifically
6   was discussed on our last discussion.
7       Q   Do you recall that it was generally discussed
8   with him on a break today?
9       A   Well, no, we have discussed the FDA
10  requirements for labeling uses and the fact that it's
11  not really an FDA requirement. That's been an issue
12  that we've talked about a lot in the case. So it's
13  a -- it's something that I was prepared to discuss.
14      MR. LYON:   Larry, I don't want you to
15  get in details of things we've talked a lot
16  about this case between you --
17      THE WITNESS:   What? I'm sorry, what was
18  that?
19      MR. LYON:   The conversations between you
20  and me, I don't want you revealing substances
21  of what you and I talked about over the
22  course of this case.
23      THE WITNESS:   No, no, no, I realize that
24  it's confidential information.
25      Q   (By Ms. Lent) I'm really -- I'm asking about

Page 273

1   things that you discussed during a break in the
2   deposition.
3       Is it your opinion that if a company
4   submitted a 510(k) for a reusable device, that it would
5   not have to submit validation testing demonstrating
6   that the device was -- could be used safely and
7   effectively in a reusable fashion?
8       A   Well, the performance data that's included
9   with the 510(k) includes testing of the product,
10  durability testing is what they call it, and all
11  manufacturers will do what's called durability testing,
12  and it's a basic design requirement. You can't design
13  a reusable device that's going to break, so you have to
14  design it in a way that's going to be, you know,
15  reliable and then test it -- you test -- reliability
16  testing and show that, yes, it's a durable device and
17  it can last. And that's what FDA would ask for in the
18  510(k). Nothing specific about uses, but just general
19  durability.
20      Q   And do you have the expertise to offer an
21  opinion on what would qualify as acceptable durability
22  testing for an EndoWrist if it were deemed a fully
23  reusable device without usage limits?
24      A   The designing of a -- of the testing protocol
25  would be an engineering responsibility, not me. I

69 (Pages 270 - 273)

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 274

1   would tell the engineer, look, you need to design a
2   reliability test for me, and they would write up a
3   protocol and I would say, okay, that looks good to me,
4   go ahead and do it.  So I can't get into the specifics
5   because that's not an area that I have expertise in.  I
6   know the general requirements.
7       Q    And the reliability testing would need to
8   involve some number of attempts to use the device,
9   right?
10      A    That would --
11          MR. LYON:  Objection, form.
12          THE WITNESS:  That would be -- I think
13      that would be the kind of data that a company
14      would send in, yes.
15      Q   (By Ms. Lent)  And do you know how an expert
16  in reliability testing would determine the number of
17  attempts to use the device that would be necessary in
18  order to conduct an appropriate reliability study?
19      A    Yeah.
20          MR. LYON:  Objection, form.
21          THE WITNESS:  That's a well-defined
22      science, yes.
23      Q   (By Ms. Lent)  It's a well-defined science in
24  which you are not an expert, correct?
25      A    Right.  Right.

Page 275

1           MS. LENT:  Okay, thank you.  I have no
2   more questions.
3           THE WITNESS:  Well, thank you.
4           (Discussion off the written record.)
5           THE VIDEOGRAPHER:  The time is now 5:14
6   p.m.  This concludes the videotaped
7   deposition of Mr. Stevens.  We are going off
8   the record.
9           (Deposition concluded at 5:15 p.m. CST.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 276

1               C E R T I F I C A T E
2
3   STATE OF GEORGIA
4   COUNTY OF COBB
5
6       I, MICHELLE M. BOUDREAUX-PHILLIPS, do hereby
7   certify that J. LAWRENCE STEVENS, the witness whose
8   deposition is hereinbefore set forth, was duly sworn by
9   me and that such deposition is a true record of the
10  testimony given by such witness.
11
12      I further certify that I am not related to
13  any of the parties to this action by blood or marriage
14  and that I am in no way interested in the outcome of
15  this matter.
16
17      IN WITNESS WHEREOF, I have hereunto set my
18  hand this 24th day of September 2021.
19
20
21
22      _Michelle M. Boudreaux_
23      MICHELLE M. BOUDREAUX-PHILLIPS, RPR
24
25

Page 277

1   Rick Lyon Esq.
2   rick@dovel.com
3           September 24th, 2021
4   RE: Rebotix Repair LLC v. Intuitive Surgical, Inc.
5   9/23/2021, J. Lawrence Stevens (#4802907)
6       The above-referenced transcript is available for
7   review.
8       Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  litsup-ga@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

70 (Pages 274 - 277)

J.  Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 278

1 Rebotix Repair LLC v. Intuitive Surgical, Inc.

2 J.  Lawrence Stevens (#4802907)

3      E R R A T A  S H E E T

4 PAGE_____ LINE_____ CHANGE_____

5 _____

6 REASON_____

7 PAGE_____ LINE_____ CHANGE_____

8 _____

9 REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____   _____

24 J.  Lawrence Stevens                Date

25

Page 279

1 Rebotix Repair LLC v. Intuitive Surgical, Inc.

2 J.  Lawrence Stevens (#4802907)

3     ACKNOWLEDGEMENT OF DEPONENT

4   I, J.  Lawrence Stevens, do hereby declare that I

5 have read the foregoing transcript, I have made any

6 corrections, additions, or changes I deemed necessary as

7 noted above to be appended hereto, and that the same is

8 a true, correct and complete transcript of the testimony

9 given by me.

10

11 _____   _____

12 J.  Lawrence Stevens                Date

13 *If notary is required

14     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15 _____ DAY OF _____, 20___.

16

17

18     _____

19     NOTARY PUBLIC

20

21

22

23

24

25

71 (Pages 278 - 279)

J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[& - 205]**

Page 1

| & |
|---|
| **&**   3:5,11,14 5:9 |
| 7:23,24 167:17 |

| 0 |
|---|
| **00515501**   5:12 |
| 204:2 |
| **00566055**   5:25 |
| **00691802**   5:10 |
| 196:13 |
| **00692643**   218:22 |
| **00694043**   5:17 |
| **02274**   7:8 |
| **068475**   174:18 |

| 1 |
|---|
| **1**   4:9,25 5:14 |
| 12:12,12,17 13:10 |
| 13:23,24 14:1 |
| 15:20 18:11,17 |
| 75:24 82:18 98:13 |
| 98:18,21,23 |
| 115:15 127:15,16 |
| 133:14 153:3 |
| 203:18,23 215:10 |
| 255:1 257:10 |
| **1-4**   223:8 |
| **1.1**   126:24 |
| **10**   5:8 14:25 55:6 |
| 110:2 121:22 |
| 123:18 127:6 |
| 129:16 131:19 |
| 138:7,9,14,14,20 |
| 139:2,10,18 |
| 140:19,23 141:10 |
| 141:14,21 145:22 |
| 146:4,14,16 147:9 |
| 147:16,19,25,25 |
| 148:3 149:11,24 |
| 150:21 151:2,7,8 |
| 151:14,16,16,20 |
| 151:23,25 152:1,2 |

196:11,13 208:10
208:23 209:4,5,8
210:19 211:4,10
211:10 214:23
216:19,22,23,24
217:23 218:13,14
222:6,9,12 223:3
223:12,17,20,23
223:25 224:2,5,15
224:23 225:10,25
226:10,11 227:7
228:2,20 270:5,6
270:21
**100**   116:2,9,10
**10001-8602**   3:12
**102**   116:17,19
**103**   4:17 116:2,11
116:17,19
**103-105**   194:3
**104**   4:19
**106**   98:19 99:2,9
99:11 102:5 111:1
**108**   98:19 99:2
111:1
**11**   5:11 16:4,7
103:14 104:3
132:24 139:6,19
203:13,15 204:13
206:21 216:19
**11/26/1999**   5:17
220:10
**114**   144:22,23
145:2
**12**   4:9 5:11,13
139:19 205:19
214:1,3
**12/19/2014**   5:20
**120**   215:8,12
**12067**   276:22
**126**   4:21

**129**   262:11,12
**13**   5:15 129:19
133:25 134:2
139:19 218:20
220:3,8 221:16
**130**   262:21
**135**   262:24 263:1
**14**   5:18 233:8,10
**1440**   3:15
**15**   5:20 206:18
246:2,3
**151**   254:25
**155**   4:23
**16**   5:3
**16**   5:22 155:7
250:8,10,10
**162404**   126:19
**162413**   127:21
**163**   115:14,15,20
**17**   5:23 156:3
250:16,19 258:9
258:14
**170053**   103:15
**170420**   103:15
**171030**   105:15
**174**   5:5
**178**   98:14,16 99:1
**179**   79:8
**18**   6:3 68:21
250:16 266:16,24
**19**   149:13,13,16
150:2 174:15
224:11,20 250:15
**196**   5:8
**1966**   60:13
**1976**   59:5 60:13
**1982**   60:18,21
**199**   76:9
**1999**   218:8
**19th**   246:4

**1st**   19:8 21:17,24

| 2 |
|---|
| **2**   4:11 55:14 82:10 |
| 82:11,13,18 |
| 218:22 |
| **2,000**   228:13 |
| **2.1.2**   222:16 |
| **20**   5:24 55:19 76:9 |
| 151:4,13,17,19 |
| 207:16,19 279:15 |
| **200**   34:5,12,22 |
| 35:8 |
| **2000**   61:14 62:14 |
| **20005**   3:15 |
| **2000s**   62:8 |
| **2001**   5:11 |
| **2002**   62:14 63:4,18 |
| **2003**   63:19,22 |
| **2006**   263:6 |
| **2007**   4:13 |
| **2008**   65:18 |
| **201**   3:6 |
| **2012**   4:25 |
| **2013**   5:4 |
| **2014**   246:5 |
| **2015**   4:19 5:18 |
| 105:15 233:11 |
| **2017**   4:16 91:6,9 |
| 92:7 |
| **2018**   250:21 251:4 |
| 253:11 |
| **202.371.7000**   3:16 |
| **2020**   5:24 253:19 |
| 258:16 |
| **2021**   1:16 2:6 4:10 |
| 5:14 7:3 13:11 |
| 230:19 231:1 |
| 276:18 277:3 |
| **203**   5:11 |
| **205**   221:13 |

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 74 of 128 PageID 18832

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[20th - 510]                                                        Page 2

**20th** 258:16
**21** 4:12,24 5:4,14
  55:22 59:1 69:22
  82:4,13 129:13
  153:5 154:13
  155:6,10 156:6,25
  212:23 213:9
  214:3
**212.735.3000** 3:12
**214** 5:13
**22** 47:2,2
**220** 5:15
**2274** 1:3
**22nd** 167:9
**23** 1:16 2:6 4:19
  5:4 48:16
**233** 5:18
**23rd** 7:3 105:15
  250:20 251:4
**24** 108:7
**246** 5:20
**24th** 276:18 277:3
**25** 4:16
**250** 5:22
**258** 5:23
**25th** 92:7
**26** 119:7 213:18
**266** 6:3
**269** 4:4
**26th** 80:25
**271** 4:5
**28** 4:13

**3**

**3** 4:14 26:15,19,24
  27:5,13,18 36:12
  36:14,16 38:7
  39:5,22 40:2,9
  46:22 82:5,18,23
  84:1 85:6,19
  87:21 92:3,5
  111:17 112:8

167:8 175:3,5
  203:7,18 220:18
  233:15
**30** 4:10 51:9 55:25
  59:16 75:24 76:2
  218:17 277:17
**30th** 13:11 30:22
**310.656.7066** 3:7
**32** 266:15
**33** 207:12,13
  208:17
**33tgw** 1:3
**35** 233:7
**36** 215:10 245:7,16
**38** 99:10 133:13
  134:1,2 208:2,18
**3:23** 215:4

**4**

**4** 4:17 82:9,10
  103:6,12,13
  104:19 108:22
  152:11 223:6
  232:25
**4/25/19** 126:18
**4/25/2019** 4:22
**40** 51:9 250:7
**404** 130:6
**41** 108:18 109:23
**413** 127:8,9
**42** 109:1,23 196:10
**44** 109:5,23 153:1
  154:13 209:1
**45** 109:8,23
**46** 109:11,23
**47** 109:23
**48** 109:24 157:23
**4802907** 277:5
  278:2 279:2
**482** 176:10
**489** 174:19

**49** 109:24 115:19
  203:12

**5**

**5** 4:19 36:13,16
  38:20 62:12 63:16
  91:25 104:15,17
  105:13 206:22
  215:5 235:23
  238:17
**5.2.7.** 127:24
**5.2.7.1** 130:8
**50** 47:15 49:25
  109:24
**51** 120:6 126:16
**510** 4:14 5:9 6:4
  17:4,9,10,12,17,19
  17:22 18:3,4,4
  23:10 41:16 56:18
  56:19,21,22,23,25
  57:3,3,18,20,24
  58:3 59:3,13,18,21
  59:22 60:1,4,7,10
  61:1,6,6,15,25
  62:2,7 63:13,13,25
  64:12,17,23,24,24
  65:8 66:20,25
  67:4,17 68:7,13,18
  69:25 70:23 71:1
  71:4,7,16,23 72:3
  72:17 73:2,6,9,12
  73:14,16,20 74:4
  74:11,19 78:14
  81:4,6 82:24 83:6
  83:14 84:18 85:7
  85:20 86:11,16,21
  87:7,13,14,17,20
  87:23,24 88:11,17
  88:18,20,22 89:6,9
  89:11 90:2,21
  91:1,3,7,10,22
  92:5,24,25 93:5,10

93:23,25 94:6,13
94:14,20,22 95:4,8
95:18,20 96:11,12
96:15,18,19,20,21
96:24,25,25 97:3,5
97:6,14,18 98:2
102:6,10,15,20,23
104:21,23 105:5,9
105:12 106:5,7,8
106:16,21 107:1,4
107:4,24 108:2
110:22 152:14,23
153:6,22 154:14
154:24 159:3
161:4,8,11,21
163:7 164:6,25
165:12 180:16,19
187:3,19 189:11
192:1,7,10 193:1
193:13 195:10,14
195:17,18,18,20
195:22,24 196:1,4
196:19 197:9,21
199:5,6,9,11,15,17
199:19,22 200:2,5
200:10,16,18
201:2,12,15,19,21
202:3,5,6,7,9,10
203:3,4 204:15,19
204:21 205:10
206:5 207:3,21
208:3,15 209:12
209:20,24 210:9
210:13 218:10,21
223:22 224:25
225:4,16 229:18
229:19 230:13
231:7,15,19,25
232:6 237:7
239:11,23 240:8
241:2 242:4 243:5

J. Lawrence Stevens                                   September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[510 - additional]**                                            Page 3

243:6,17 244:9
245:4,10,19 246:9
248:4,11,15,20
249:2,12 253:22
260:6,9,16,21,22
261:6 264:14
265:25 267:1,1,2
267:10,14,16
268:16 270:1,6,12
270:24 273:4,9,18
**510k's**  5:16 220:9
**56**  166:18
**5:15**  275:9

**6**

**6**  4:21 47:1 92:17
92:20 103:3,5
126:13,16 127:24
203:21 204:17
**60**  55:25
**600**  3:6
**61**  251:8 257:9,12
257:13,14
**65**  172:1,1
**66**  172:1
**694248**  219:12,15
**694251**  221:13

**7**

**7**  4:23 5:17 93:17
104:16 155:9,10
205:3 220:10
**72**  59:4
**73**  191:6 193:5
**76**  60:20
**78**  230:3

**8**

**8**  4:3 5:3 38:7
155:22 156:2,5,6
167:8 260:13
**801**  213:8

**801.4**  5:14 212:23
213:9 214:3
**807**  152:17,18
**807.20**  4:24 84:4
155:6,11
**807.81**  4:12 82:5
85:19
**807.81.**  82:13
**808**  196:19
**82**  4:11 59:5 60:20
**820**  153:5,12
154:13,19,23
155:1 191:20
**820.3**  5:4 156:11
156:25
**820.3.**  156:6
**86**  212:22 213:7
214:9
**89**  195:9 201:20
202:11 203:4
**8:20**  1:3 7:8
**8:36**  2:7 7:2
**8:42**  11:23

**9**

**9**  5:5,18 66:1
174:16,17 177:25
**9/23/2021**  277:5
**90**  9:22 84:6 111:9
**90401**  3:7
**92**  4:14
**96**  119:3 127:11,16
127:20 131:4
**9th**  233:11

**a**

**a.m.**  2:7 7:2 11:19
11:23 13:4,7
15:12,15 55:10,13
111:13,16
**ability**  131:17
163:18 175:17

189:23 222:4
**able**  22:2 27:8
139:9,19 142:7
143:16 170:2
202:17 211:20
212:6 226:1
**absolute**  49:13,13
50:10,16
**absolutely**  211:17
217:22 232:21
271:1
**acceptable**  170:3
273:21
**accepted**  77:19
239:3
**access**  12:19,21,24
175:18 202:9
259:20,21
**accessories**  197:2
**accessory**  156:20
157:11
**accommodate**
105:24
**accompanied**
39:21
**accompanying**
38:13,17,25 39:14
**accuracy**  32:14
277:9
**accurate**  10:3
13:17,20,22 16:12
25:24 31:14 33:10
33:18,20 36:3
57:25 252:15,25
252:25 253:2
254:1 267:16
270:7
**acknowledged**
268:15
**acknowledgement**
279:3

**acknowledgment**
5:20 246:10
277:12
**acquiring**  85:22
87:5
**act**  47:17 135:24
**acted**  249:21
255:4
**acting**  65:15,16
**action**  222:21
251:13,14 252:6
253:20 254:19,20
255:18 276:13
**actions**  52:24
**activate**  124:1
**active**  62:20
263:25
**activity**  62:19
**actual**  17:12 18:4
115:4 119:21
195:23
**adaption**  131:21
**add**  205:6,14
206:1,23
**added**  69:2 120:25
136:22 151:23
**addition**  72:2
77:21 81:4 106:10
119:25 138:1
147:13
**additional**  18:18
22:18 28:7,11,14
29:3 46:24 72:7,8
98:9,10 100:6,7,13
100:14 104:3
105:24 106:9,11
106:15,22 110:12
110:23 111:2,4
150:1,1 165:9,21
166:1 216:9 217:2
217:7 230:15

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 76 of 128 PageID 18834

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[additional - answered]                                              Page 4

232:11 233:23
245:6 248:5,23
254:21
**additionally**  20:22
**additions**  279:6
**address**  15:5
93:23 94:19 96:23
132:17 133:11
141:6 145:13
159:4 163:8
169:19 179:21,23
187:17 234:4
265:18
**addressed**  78:10
80:25 81:3,7
139:21,24 192:17
218:7 235:4
252:21 264:2
**addresses**  262:13
**addressing**  80:15
81:8 85:12 96:11
141:25
**adds**  148:24
**adequately**  100:2
**administration**
4:15 84:5
**administrator**
17:10
**adopt**  76:3,11
102:3
**adopted**  79:2,6,20
80:8
**adopting**  77:5
79:8
**adulterated**
191:10,16,21
192:3,12,24 193:7
193:15,21 194:2,7
**advertising**  214:13
252:7 263:23

**advice**  72:11
**advise**  72:16 86:23
87:12 93:13
**advised**  20:6 70:22
71:2,3 72:18 73:1
73:5,17 74:3,10
**affairs**  60:22
**affect**  98:10 100:7
100:15 133:18
134:7,12,15 135:3
135:21 136:9,16
**affiliated**  18:21,23
**affiliation**  7:18
**afternoon**  232:17
**agency's**  252:20
**ago**  10:25 12:3
31:24 68:3 231:11
249:18 250:18,23
250:24 251:12
263:22
**agree**  20:6 23:7,13
23:15 38:18,21
80:22 82:23 91:9
93:3 99:25 175:23
176:2 191:25
224:24 252:3
**agreed**  22:4,10,22
22:24 23:1,2
43:13 54:2 187:20
**agreeing**  142:20
142:22
**agreement**  2:13
**ahead**  12:9 16:13
95:14 132:20
265:11 274:4
**ai**  233:21,23
**aid**  92:22 202:18
**ajw**  74:22 235:18
236:7
**alan**  3:19 7:12
219:23

**allegation**  14:7
**allegations**  14:3
**allotted**  277:20
**allow**  107:12
125:1 131:21
139:2,15 141:9
142:18 146:16
**allowed**  89:24
138:1,5 142:8
211:15
**allowing**  140:1
248:8
**allows**  131:17
171:5 182:1
206:24 226:4
**alternate**  118:3,4
**altogether**  252:23
**alton**  2:12 7:5
**amendments**  59:5
**amount**  60:7
66:16
**analogy**  170:24
171:7
**analyses**  18:18
**analysis**  18:16
47:10 170:2
180:14 181:2
239:13,24 241:3
242:9 266:5
**analyst**  51:11,14
51:20 52:1,2,5,14
53:3,15 54:9
**analysts**  54:17
**analyze**  87:22
100:4 115:7
117:23
**analyzed**  118:8
181:17
**analyzing**  51:23
86:9

**anatomy**  69:16
**angeles**  62:14
63:18 65:21,23
**animal**  134:8,16
135:4 222:3
**animals**  133:19
**anisa**  3:14 8:1
**anisa.somani**  3:16
**annual**  52:22
**answer**  9:9,11,17
15:22 17:25 19:15
37:17,20 54:4,24
55:1 81:20 89:24
90:1,11 117:13
132:11 133:5
139:23 143:20
160:25 163:17
164:16 169:3,9,23
178:5 179:6,25
184:15 185:9,24
186:2,6,19 188:13
189:14,18,20
190:1,3,7,8,9,14
217:1 223:24
225:18 243:19
244:16 245:20,24
246:14,20,23
253:25
**answered**  17:24
21:19 31:19 32:6
32:19 33:8,16,25
34:7,16 35:1,17
42:9,18 48:2,11
49:21 50:2,12
52:17 53:6,19
54:11,19 76:13,16
80:11 83:19 85:9
88:1 89:13,18
90:6,13,24 100:17
135:11 164:18
185:12,17 186:12

J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[answered - assuring]**

Page 5

186:18 188:18
189:5,8,22 190:4
190:24 228:4
229:8 242:11
**answering** 17:16
202:19
**answers** 144:9
162:10
**anybody** 10:16
154:2 162:16
206:15 216:20
**anymore** 46:4
122:13,16 140:24
159:25
**anyway** 271:23
**apologize** 11:25
129:24 156:1
232:22
**apparent** 234:16
234:22
**apparently** 251:9
251:13,21 267:13
**appear** 13:16
260:17
**appearances** 3:1
**appears** 76:18
106:17 208:8
223:14,18 227:16
250:10 251:2,6
266:25 269:7
**appended** 279:7
**applicability** 48:5
48:8
**applicable** 82:24
83:5 91:10,12
194:20 260:17
277:8
**applicant** 246:11
247:1
**application** 5:16
67:3 91:18 184:9

218:21 220:10
**applications** 57:8
164:13
**applied** 59:8 83:10
83:15,16,20 88:9
94:24
**applies** 85:6 93:4
129:13 183:6
**apply** 94:5 95:7,22
96:10 97:4,7,19,23
141:14 147:17
153:16 155:3
**appreciate** 132:8
154:10
**approach** 18:25
37:15
**approached** 18:6
**appropriate** 94:4
100:1,10,12 101:8
246:21 274:18
**approval** 14:6
15:6 57:7 67:3
192:2 193:2
260:21
**approve** 180:10
**approved** 188:20
207:24
**approximately**
10:25 24:24 31:8
32:25 33:4
**area** 179:25 274:5
**areas** 57:11 70:24
87:3
**argue** 217:24
**argued** 216:20
**argument** 261:12
261:19,23,25
**arithmetic** 151:15
**arm** 206:25
**arms** 198:19

**arps** 3:11,14 7:21
8:2
**arranged** 41:6
**arrive** 217:10
**articulated** 198:19
**asked** 17:23 19:6
20:11 21:18 31:18
32:5,19 33:7,15,24
34:6,15,25 35:16
42:8,17 45:19
48:1,10 49:20
50:1,11 52:16
53:5,18 54:10,18
65:19 74:9 76:12
76:15 77:8 78:1
80:10 83:18 85:8
85:23 87:25 89:12
89:17 90:5,13,23
100:16 135:10
150:19 163:1
164:1,5 185:11,16
186:11,17 188:17
189:7 190:4,6,23
200:21,23 212:3
228:3 229:8
241:18 242:10
245:25 246:12,17
246:19,21 269:24
272:4
**asking** 15:17
32:17 33:19,20
34:20,21 53:13,14
54:5,24 75:15
81:21 94:25 95:1
100:11,12 106:15
123:6 149:18
154:12 179:24
181:11,12 188:13
189:13 195:5
202:24 242:2
272:1,25

**asks** 226:17
**aspect** 225:6
**aspects** 23:6
187:14
**assembles** 156:15
**assembly** 127:2,3
**asserting** 85:19
110:4
**assertion** 131:5
231:14
**asserts** 251:8
**assess** 85:19
**assessment** 33:11
66:13 78:3,12
86:5 112:1 197:19
**assessments** 66:6
118:13
**assigned** 70:12
**assignment** 56:6
57:22 61:17
**assignments** 19:24
55:25 56:5,17
66:3 69:4
**assist** 70:25
**associated** 24:20
25:6 50:5 75:11
199:6 212:13
**assume** 38:25 46:9
121:3 147:1
167:22 231:3
240:6 241:19
242:2
**assumed** 130:1
**assumes** 248:15
**assuming** 69:5
**assumption**
122:18 243:10
**assure** 100:5
122:11,16 123:17
**assuring** 121:21

**[attached - believe]**

**attached** 127:17
206:25 277:11
**attachment** 77:19
109:16 116:9
**attempts** 274:8,17
**attorney** 8:13
277:13
**audibly** 186:19
**august** 4:10 13:11
19:3,7 21:11,13,16
21:24 30:20,22
31:9,16 32:1,8,13
34:13,23 35:10
36:7 71:18,19
**authority** 183:11
**authorization** 57:5
59:23
**authorizing**
195:20
**authors** 258:5
**autoclave** 268:9
**automatically**
121:10,11
**available** 20:19,21
20:23,25 27:20
39:9 126:15 202:8
207:1 277:6
**avenue** 3:15
**avoid** 74:4
**aware** 10:2,5
16:22,23 18:5,8
21:2,5 27:20
67:16 88:12,13,17
88:18,20,22 89:10
102:4 113:5 114:2
114:7 122:19
123:25 136:18,21
136:23 137:15
159:16 166:24
167:2 174:2,5
177:15 179:12

217:8 218:8
223:22 227:14
230:15 232:5
235:14,16 254:12
263:6 268:14

**b**

**b** 75:6
**back** 11:22,25
13:7 14:20,23
15:15 21:21 25:23
26:12 30:16 31:22
33:10 36:9 37:10
42:25 47:21 55:13
56:14 59:15 61:13
62:9 67:24 68:23
75:10,13,23 89:2
98:13 102:18,24
111:16 114:20
126:16 127:23
128:16 131:3
138:2 139:13
140:13 143:15
144:12 146:22
147:6,15,23
148:25 151:1
152:10 163:22
167:14 173:5
174:12,25 177:23
202:12 204:13
211:12 212:6
213:2 214:23
218:24 220:5
227:19 232:10
233:4 236:2 237:8
237:19 238:6
243:10 245:5
248:17,19 250:4
251:7 255:1,25
257:6 258:7
271:10

**background** 50:18
52:10 66:15 68:16
68:19 69:17,19
76:19 101:16,23
101:24 107:10
113:12,25 114:12
114:15 118:22
257:25
**backgrounds**
54:15,21 107:5
259:6,8
**backlog** 253:12,16
**backlogs** 252:19
**bank** 29:7 50:20
52:2,4 53:8
257:16,21,23
258:6,14,16
260:10
**based** 28:24 50:18
66:12 73:9 106:18
107:7 118:15
137:16 141:7
162:3 214:18
215:22 226:1
227:7 228:1
252:18
**bases** 78:15 132:2
**basic** 89:8 118:14
273:12
**basically** 38:6
59:22
**basis** 60:16,17
62:3 85:18 110:3
114:1 116:1
121:23 122:2
131:23 132:15
133:5,17 134:5
145:9 146:6 172:6
173:6 185:7,13
186:8,15 212:5
230:11,12 251:10

257:15
**bates** 28:21,24
103:14 105:15
126:18 127:7
129:19,22 130:6
174:18 176:10
196:18 204:2
218:22 219:11
221:12 247:16,17
**battery** 161:9,10
161:10,12,13,15
161:17,19,20
162:1,9 163:2,2,5
163:6 164:2,3,4,5
164:13 165:10
167:24 168:7,11
168:12,16,24
169:10,11 170:8
170:12,15,20
**baylor** 167:17
**bearing** 105:15
174:18 196:13
**becoming** 265:18
**beginning** 55:14
111:17 152:11
215:5
**begins** 16:2,4
**behalf** 3:4,9 7:13
7:16 8:2,5 14:12
**belief** 270:15
**believe** 13:22,22
14:21 19:3 21:10
21:23 24:1 26:17
29:19 40:24 41:21
43:9,15 45:25
50:13 52:3 55:2
62:16 78:20 80:21
82:6 91:2 101:20
101:21 103:5,8
107:16 112:5,12
113:18 115:2

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 79 of 128 PageID 18837
J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[believe - cardiovascular]

Page 7

118:23 121:14
122:24 135:23
157:21 160:5
177:7,22 194:22
196:16 198:8
219:7 232:8
233:17,23 235:9
248:11 253:22
263:16 264:11
267:11 270:4
271:19
**bell** 160:4
**benefit** 162:22
**best** 9:8 32:10
42:22 66:24 77:17
163:18 189:22
254:17
**better** 60:16 96:5
**beyond** 18:19
140:2 143:16
144:25 146:20
200:21 218:14
229:6,10,15
**bigger** 127:25
**bio** 76:18
**biological** 69:7,11
**biology** 69:13
**biomedical** 56:7
**bit** 86:20 105:19
229:17 247:25
**blood** 74:16
276:13
**blunt** 197:4
**board** 76:22 78:6
81:5 90:25 124:17
126:5,8 131:15,17
132:23 133:8
136:18 137:25
138:8,15,22
139:11,14,15,18
140:1,16,18

141:18,19,20
147:13 153:21
158:17 159:7,17
160:3,12,17
162:20 163:12
166:7,7,11,20
168:9 171:5
173:21 174:9
181:23 183:23
186:22 190:10,17
193:12,17 194:1
206:21 269:12
**boards** 167:17
172:2
**body** 23:4 67:12
74:8 115:17
133:19 134:7,10
134:11,13,16,17
134:21 135:4,5,13
135:15,22 136:4
136:17
**boss** 64:21
**boston** 250:2,12
251:9
**bottom** 93:17
127:7 158:1
178:10 204:22
205:20 222:8
254:9 268:6
**boudreaux** 1:25
2:14 7:15 276:6
276:23
**boulevard** 3:6
**brad** 3:20 12:13
26:21 75:25 116:8
119:5 120:12
127:14 153:3
203:22 258:12
**branch** 56:10 64:3
64:4 65:13,18,23

**brand** 177:20
**break** 9:21,23 55:4
55:5 111:11 152:4
213:24 214:22
232:20 256:23
271:9,16 272:2,8
273:1,13
**breaking** 144:19
213:20
**breaks** 217:19
**bring** 257:11
**bringing** 67:24
**broader** 70:12
**broadly** 83:17
**broke** 228:13
**broken** 119:9,10
**brought** 20:14
64:14
**bsc** 251:10
**bsc's** 252:10
**bua** 75:6 233:10
**built** 222:25
**bulb** 170:15
**bullet** 175:14
**bullets** 36:15
222:20
**bunch** 99:18
**burke** 5:19 75:1
233:10,20 246:4
**burner** 255:25
**business** 59:9
60:12,21 69:2
83:10,11 87:4,5
159:24 171:24
172:2,9 173:1
177:8 183:17,18
184:12 186:24
187:1,14,15
206:13 212:14
216:25 229:21,23
230:12 231:14,17

231:21 232:14
**busy** 35:11,13
**buy** 216:24
**bypass** 142:14,24

**c**

**c** 84:12 276:1,1
**c.f.r.** 4:12,24 5:4
5:14
**cable** 130:9,24
**cables** 119:8,10,11
119:24 127:21
129:6,7,8 131:2,6
131:8 147:14
158:17 166:21
**cal** 69:8,8
**calendar** 21:22
**california** 3:7
56:13 251:5
**call** 42:11,13 43:15
48:22,22 57:19
59:9 86:17 128:15
160:12 212:17
223:20 243:14
267:8 273:10
**called** 59:12,25
67:3 106:9 181:22
217:16 233:21
241:2 250:2
267:11 273:11
**calls** 161:22 165:1
168:1
**cancer** 161:16
**capable** 156:21
157:5,12 158:4,10
159:5,14
**capacitor** 160:17
161:4
**caps** 248:6
**cardiovascular**
70:5,8,10

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 80 of 128 PageID 18838

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[career - claim]**                                                Page 8

career  70:5 75:16
carton  208:5,21,22
case  1:3 7:8 10:15
　13:15,18,21 17:13
　18:11,16,24 19:1,7
　19:11 20:8,22,23
　20:25 21:3,9
　23:19 29:25 30:5
　30:13 31:5,10
　32:15 33:14 34:24
　35:12 46:21 48:9
　52:3 53:4 57:13
　58:13 63:12,14
　64:14 75:17,19
　79:13,15 80:2,12
　80:15 87:1,19
　88:3,10 92:13
　97:19 121:20
　124:16 126:4
　158:16 173:2
　174:8 176:14
　183:19 186:14
　205:11 207:4
　208:8 220:23
　235:13 237:3
　240:25 246:7
　247:9 250:2
　251:14 255:12
　256:5,12,13
　259:21 267:3
　269:4,5 272:12,16
　272:22
cases  51:9 66:23
　73:23,25 86:14
　94:14 191:9 210:5
catalog  185:3
catching  232:18
categories  66:11
　262:13
category  262:17
　263:10 264:17

265:13 268:15
catheter  229:12
catheters  70:15
cause  86:19
　179:16 194:6
　226:20
caused  222:24
　252:19
causes  178:20
caution  29:13
cautious  107:5
　108:5
ceases  125:5
center  56:1 59:16
　63:10 65:12
certain  17:19 23:4
　28:20 44:18
　223:15 235:8
certainly  21:23
　22:7 25:4 42:4
　50:16 58:18 68:16
　92:14 102:25
　122:23 132:18
　152:24 159:3
　167:14 175:4
　216:12 236:25
certainty  27:9
　48:19 49:2,4,15,19
　50:17
certify  276:7,12
cetera  139:19
cfr  82:4,13 153:5
　154:13 155:6,11
　156:6,25 212:23
　213:9 214:3
chain  237:22
chance  44:11
change  4:14 74:4
　74:19 81:5,9
　83:21,23 84:25
　86:2,7,8 87:22

91:7 92:6 94:15
　100:22 247:14
　260:9 278:4,7,10
　278:13,16,19
changed  83:3 88:7
　168:12 169:11
　170:12 231:15,17
　243:22
changes  83:12
　84:22,23 85:16,17
　86:18,19,25 87:16
　91:22 93:13 94:12
　95:17 96:11,20
　110:5 150:14
　194:14,19 223:16
　277:10 279:6
changing  74:1
　80:18 81:3
characterization
　238:20
characterizing
　239:6
charge  171:22
　173:18 174:12
　179:4 182:4,5
　188:10 192:7
charged  173:16
　192:9
charges  171:17
　179:10 187:15
check  213:6
　226:24
checked  25:23
checking  147:14
chip  122:25 125:4
　125:11 136:19,25
　137:18 142:13,18
　142:18,24 143:6
　143:10,23 144:3
　160:8,12 165:22
　165:23 166:15

174:3 175:24
　177:22 178:7
　181:23
choose  171:13
　189:2 226:8
　227:21 228:19
　268:19
chose  232:12,13
chris  167:3,5,9
cichon  208:5,21
circuit  122:20
　160:17 206:21,22
circumstance
　95:22 147:6
circumstances
　95:6 192:13
citation  129:5
　145:5,18
cite  39:22 40:1
　47:9,14,24 80:5
　98:18 99:1,14
　111:2 112:7,8
　116:1,2 194:11
　202:16 203:3
　212:22 214:6
　230:7,22,25
cited  22:11,17
　23:25 24:5,8,10,25
　26:2,13 27:17
　28:1 40:8 99:18
　110:25 127:11
　200:3 219:1
cites  99:18 102:5
　116:12 119:14
　120:2 127:21,22
　129:3,20 131:4
civil  1:3
claim  67:11
　161:12 162:17
　211:7,11,12
　215:12 270:18,19

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 81 of 128 PageID 18839

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[claiming - compliance]                                          Page 9

claiming 161:15
223:25
claims 67:15 73:9
73:10,14,19
162:21 164:14
194:18 211:8
214:13 251:12,15
252:11
clarification 234:9
class 66:4,9,12,13
66:14,17,19,20,25
67:2 68:11,14,18
70:13
classifies 66:10
clean 243:16
263:20
cleaned 228:7
244:13 262:23
268:8
cleaning 212:15
227:13 242:21
clear 23:8 51:5
65:3 98:1 103:4
155:1 226:1 227:7
227:24 260:23
clearance 17:5,22
59:3 61:6,7 64:1
65:8 67:1,17 68:7
69:25 71:16,23
72:17 73:2,6,20
74:5,11,19 84:18
93:5 152:14 161:5
161:11,21 164:6
187:4,19 192:2
193:1 201:19
229:20 230:13
231:16 248:12
253:23 260:23
cleared 82:24 83:6
85:7 86:11 91:10
92:24 144:18

212:4 225:3
clearing 113:3
201:18
clearly 78:11 93:9
134:9,22 162:23
202:4
client 74:10
236:13
clients 71:21 72:8
clinical 56:8 113:8
114:5 207:16,19
210:6
clock 246:17,22
close 21:24
closer 154:3
coach 132:9,12
cobb 276:4
cocktail 130:5
coffee 232:17
collect 105:23
collections 63:8
college 69:5
combination
57:17 58:17 65:4
combined 55:19
come 11:24 57:9
65:2 118:15
126:23 188:7
214:23
comes 265:25
coming 11:13 55:5
64:5 213:19
254:11
comment 35:23
113:23 149:22
162:4 163:19
165:4 200:22,23
203:17 257:25
commentary
45:21

commented 170:5
170:7
comments 14:22
16:3,15 17:18,19
18:14 20:12 41:7
41:8 44:7 113:9
commerce 84:7
182:23 210:11
commercial 83:1
84:8,14,15 171:10
208:1 248:7,18
264:1
commercially
97:17
common 265:19
communicated
11:9
communicates
123:20 141:1
communicating
137:19
communication
36:10 236:19
241:1
communications
136:25 252:10
253:19
communicators
239:19
companies 56:9,22
58:2,23 59:11,21
60:16,25 65:8
66:19 68:7 69:1
70:8,9,17,22,25
71:10 72:16 73:13
73:17 85:21 86:4
86:22 87:10 93:9
94:5 125:21,22
159:23 160:2
195:25 228:11
252:1 254:14

263:22 268:18
company 27:21
57:2,20 58:5 60:3
60:23 61:5 63:25
70:10,20 71:12,15
71:18 73:1,5
74:22 75:20 76:23
78:13 85:12,23
86:5 88:15 93:14
95:15 96:23,25
101:4 106:10,23
106:25 113:15
140:6 143:7
184:25 185:1
195:19,22 207:6
209:14,17 210:4,7
210:24 226:4,8
227:21 228:19,22
228:23 254:10
260:4,22 273:3
274:13
compared 24:6
39:17
compensates
183:25
complaint 251:11
254:4
complaints 251:10
complete 26:18
37:5 150:9 203:3
245:23 246:23
279:8
completed 43:6
69:9 117:8,20
186:23 248:4
277:17
completely 23:7
27:10 227:8,25
complex 66:4 67:4
compliance 47:16
52:25 56:10 63:5

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 82 of 128 PageID 18840

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[compliance - contact]                                         Page 10

63:10,14,17 64:23
64:25 65:13,16,20
65:23,25 66:2
68:4,4,9,12 191:24
251:25
**complied** 72:13
**complying** 192:10
**component** 23:8
105:11 115:23
120:23 121:2,4,6
159:8,13,20
160:13 162:23
170:16,17 172:3
183:10 260:4
**components**
153:17 158:3,5,11
158:19,25 161:7
188:20
**comprised** 263:10
265:13
**computer** 154:4,5
**concentrated**
199:14
**concept** 124:9,10
125:16,20 168:21
**concern** 51:18
83:23 86:2 221:4
**concerned** 72:10
180:4 221:1 237:2
256:16
**concerning** 252:11
**concerns** 235:8
237:13 244:5
255:15
**concierge** 3:20
12:15 120:7,10,14
**conclude** 101:7
251:13 255:5,9,15
256:15
**concluded** 54:3
78:6 104:23 255:2

275:9
**concludes** 252:8
275:6
**conclusion** 22:22
23:10 99:25,25
116:23,24 117:4
118:15 133:17
134:6 222:10
224:19 253:21
257:15,19
**conclusions** 20:3,7
22:5,10,24,24,25
23:7 47:8 76:21
77:20,21 78:2,18
78:21 80:4 102:2
**concur** 23:5
**concurred** 78:2
**concurrence**
265:24
**condition** 67:25
97:24 139:13
141:13 148:20
149:7,12 150:17
150:22 151:1
180:24 181:1,6
182:18 183:10
**conditions** 165:5
180:18,21 191:13
191:23
**conduct** 62:6
85:19 252:8
274:18
**conducted** 2:11
18:15 108:12
217:9 218:2
**conducting** 103:24
**confidential**
272:24
**configured** 85:25
**confirm** 61:25
82:2 101:4 201:7

**confirmed** 61:24
100:9,12,20
215:16 216:22
**confirming** 98:9
**confirms** 172:20
**confused** 144:9
**confusion** 199:25
**conjecture** 139:22
**conjunction** 39:6
267:24
**connection** 12:3
19:6 30:12 33:5
33:14 34:13,24
77:9 92:12 246:7
270:1
**consensus** 257:17
257:22 258:3
259:12 260:8
262:4,6
**consequently**
134:24 135:19
**conservative**
217:23
**consider** 16:7 17:4
17:21 24:16 42:1
49:8,14 64:9
115:7 170:2
190:20 191:21
207:3
**considerable** 24:2
48:24 49:9
**consideration**
151:6 210:14
**considerations**
64:8
**considered** 27:2,3
38:8 39:5 46:20
46:22 47:7,14
67:13 112:12
134:24 143:19
149:21 164:11

170:1 192:3
203:19 219:2
268:24
**considering** 193:6
**considers** 191:10
**consist** 206:23
**consistency** 256:8
**consistent** 119:23
205:5,14,25
257:19 268:11,22
**consistently**
218:14
**consisting** 197:3
198:17
**consists** 16:15
**console** 198:18
200:6
**constitutes** 84:23
**constraints** 252:20
**constructed**
201:25 210:1
223:19
**consultant** 31:6
56:21 70:6,21
71:3,22 73:5
85:21 86:10 93:12
101:7 112:18
236:10,12 237:9
237:12 267:13
**consultant's**
238:12
**consultants**
235:19
**consulting** 29:17
33:2 35:9
**consumer** 73:11
**consummated**
185:5
**cont'd** 5:1 6:1
**contact** 18:8 70:19

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 83 of 128 PageID 18841

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[contacted - customers]                                          Page 11

**contacted** 19:2,7
**contain** 85:15
**contained** 18:19
269:11
**containing** 114:9
**contains** 125:5
130:24 178:6
206:20 208:23
**contents** 18:4
202:24
**context** 19:16
75:16 82:25
162:24 163:13
195:6 235:25
236:21 242:12,17
266:3
**continue** 11:23
13:8 15:16 20:23
20:25 55:14 109:4
111:17 131:21
142:8,10,12,22
143:9 152:12
215:6 220:6 227:4
233:5 257:7
269:13
**continued** 139:16
**continuing** 148:7
185:22
**control** 197:2
198:16,19 200:7
205:6 206:2 268:1
**controls** 209:16
**conversation**
21:14,16 40:20
41:22,22,23,25
42:1,2 43:2,22,25
44:4,21,25 46:2,17
46:18 121:19
122:4 137:14
145:6,7,10,19
146:7 172:10

173:7 230:9,17,22
**conversations**
19:13 41:19 46:9
230:21 231:2
232:3 272:19
**convert** 225:13
**converted** 218:10
**convince** 117:7,18
**convinced** 102:1
267:13
**copies** 23:25
277:14
**correct** 15:1 16:5
20:10 22:17,22
30:21,23,24 38:15
40:22 43:14 46:14
46:15 55:17,18
61:3 62:15,17
70:24 74:21 76:9
92:10 98:12 99:20
108:16,22 109:1
109:21 113:20
116:3,4,23 129:4
130:16 134:3
145:20 154:23
155:19 156:12
157:19,21 173:7
178:1 182:11
196:6 208:24
209:2,4 210:25
215:18,19 229:22
229:25 230:5
231:1 250:3
262:14,15 263:5
264:15 269:2
271:21 274:24
279:8
**corrections** 279:6
**corrective** 222:20
**correctly** 8:18
109:19 125:1,25

126:2 180:11
**corresponds** 28:23
**cosmetic** 47:17
**cost** 5:6 173:22,22
174:20 179:1,6
181:5
**costs** 179:2 181:4
212:13
**counsel** 7:17,24
18:5 21:8 24:4
26:1 27:16 29:16
50:20 277:14
**count** 109:22
149:24 175:19
**counted** 109:18,25
**counter** 120:23
121:9,20 122:3,9
122:21 123:3,9,11
123:15,20 124:1
124:11,18 125:5
126:4,11 131:18
136:19 137:7,10
138:7,13,21 139:1
140:14,25 142:1,2
142:3,14,25
144:13,25 145:15
145:24 146:3,16
147:25 148:24
149:25 150:11
151:23 175:17
176:18 212:10
**counting** 133:10
**countries** 64:5
**country** 16:23
**counts** 122:9
123:15
**county** 276:4
**couple** 22:7,20
23:16 56:1 63:15
128:10 213:22
269:19

**coupled** 181:15
**course** 113:11
254:21 272:22
**courses** 69:15,15
**court** 1:1,25 7:10
7:14,19 45:7,21
91:15,19 251:4
253:9 264:25
**cover** 204:15
**covered** 27:1
**covering** 96:2
**covid** 71:12
253:14
**crazy** 130:1
**created** 20:1 35:22
71:4 197:9 202:5
**creating** 114:13
**creators** 213:14,14
**criteria** 83:9 84:9
84:21,24 85:15
86:5 87:2 89:8
182:10
**critical** 118:13
162:7 197:18
**criticize** 193:5
**critiques** 115:8
117:23 118:8
**cst** 2:7 275:9
**cure** 182:21
**cures** 161:16
162:18
**curing** 67:11
**current** 12:21
212:21 244:7
**currently** 56:23
71:15 84:13 85:25
120:7,10 238:7
**customer** 225:9
**customers** 88:25
88:25 171:10
175:23 176:22

J. Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

178:20
cutters 128:10
cv 1:3 7:8 101:25
cycle 218:9 223:6
cycles 98:9 100:6
   100:14 222:8,8
   223:8

**d**

d 75:8
d.c. 3:15
da 123:21,25
   124:10 137:1,11
   137:18 141:1,9,22
   142:4 175:18
   188:10,19,25
dallas 122:25
damaged 119:10
   119:24 127:21
dangerous 216:20
data 4:17 57:19,23
   57:24 60:7 61:15
   101:3,6,12,19
   103:16 104:1,23
   105:1,5,8,11 106:8
   110:4,7,11,14,16
   110:18 118:6
   175:18 210:6
   211:5,9,11 217:13
   218:9,12,13
   223:21 224:1,4,8
   224:17,25 225:25
   226:1 228:1,25
   229:1 232:11
   264:6 270:5,18
   273:8 274:13
database 64:12
date 4:22 21:21,22
   106:25 278:24
   279:12
dated 105:14
   126:18 220:10

246:4 258:15
dates 36:24 37:1,2
   231:3,4
dating 226:17
day 42:12,13,14
   42:15,23 276:18
   279:15
days 31:6 56:1
   59:16 84:6 277:17
deal 58:4 68:9
   255:20
dealing 59:20
   60:15 68:13
dealt 68:8,11
   70:15 256:8
december 4:13 5:4
   65:18 246:4
decent 144:19
decide 39:13
   184:12
decided 41:17
   159:25 206:9,13
   209:19 211:14
   225:12 231:20
   249:12
deciding 4:14 91:6
   92:5
decision 61:4 62:2
   62:4 65:12 159:24
   191:3 216:25
   235:14
decisions 21:6
   65:1,7,10
declaration
   250:11,20 251:3
   253:8,18
declare 279:4
decomposed
   191:11 192:21
decrement 206:25

decrementing
   137:18
decrements
   137:10 205:7
   206:2
deemed 273:22
   279:6
deems 252:8
deeper 5:24
defendant 1:9 3:9
   7:22 8:2,5 14:3
deficiencies 64:15
   105:22 106:19
   108:11 235:8
deficiency 106:4
   232:6 234:17,22
   240:8 249:4
define 184:3,21
   227:12
defined 105:25
   274:21,23
definitely 244:21
definition 97:2
   135:23 136:2
   156:12,18 181:16
   182:20 191:15
   193:7,11 214:12
definitions 5:4
   156:9 191:18
degrade 100:22
   101:5,9
degree 48:19 49:4
   49:6,13,15 50:17
   69:5,7
delineates 106:22
deliver 60:2
delivery 84:7
demonstrate
   101:13 104:1
   119:22 264:6

demonstrated
   117:20
demonstrating
   273:5
department 4:20
   105:14
depend 78:18
depending 162:10
depends 67:10
   161:12
depicted 207:13
deponent 277:13
   279:3
deposed 8:22,24
deposing 277:13
deposition 1:13
   2:10 7:6 10:11,17
   36:13 37:3,14
   39:15,21 40:1,17
   51:3 103:7 167:6
   167:9 185:22
   215:15,18,21
   216:5 230:7,8
   231:2 266:11
   272:2 273:2 275:7
   275:9 276:8,9
depositions 36:16
   36:17,20 37:12
   38:10,13,17,19
   40:8,12,13 230:18
   230:25 232:3
depth 68:17,23
   244:19,20
describe 103:24
   132:19 177:19
   192:24
described 14:16
   15:19 73:18 108:5
   137:25 149:22
   201:8 224:9
   225:14 238:11

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 85 of 128 PageID 18843

J.  Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

[describes - devices]
Page 13

describes   126:25
describing   123:3
description   119:19
   135:12 165:15
   198:13 202:7
   204:23 206:15
   207:8 267:22
design   57:22 73:23
   86:17,25 122:22
   131:1 223:2,10,11
   223:16 228:6
   273:12,12,14
   274:1
designed   74:7
   91:14 151:20
   161:18 166:12
   170:25 182:2
   207:10
designing   273:24
designs   156:15
despite   94:3
   222:10,14 234:16
detail   24:11 37:6
   39:12 99:23
   115:10 137:23
   144:7 203:17
   259:3
detailed   119:21
   235:8
details   102:1
   167:11 180:13
   272:15
detained   64:15
deter   84:25
determination
   18:3 20:2 36:10
   43:13 64:13 86:4
   87:1 88:5 91:23
   96:14 98:1 107:1
   158:22 206:11

determinations
   58:23 68:6
determine   27:4
   28:22 37:13,19
   38:2 40:14 69:24
   71:22 83:22 95:19
   119:9 132:2
   180:16 201:3,12
   201:24 213:1,10
   274:16
determined   67:21
   106:19 213:13,13
   215:13 249:22
   255:6,10
determining   83:12
   156:25
deutsche   50:20
   52:2,4 53:8
   257:16,21,23
   258:6,14,16
   260:10
deutschland   29:7
develop   228:6
development
   217:18
deviating   96:21
deviation   117:10
device   4:15,24
   16:24 23:9 56:7
   56:10 57:7 59:5
   59:10,11 60:15,19
   60:23 62:9,13
   66:9 67:2,24
   68:22 70:8 71:23
   73:7,10 74:7,16,17
   74:18 76:22,24
   78:7,13 81:3,5,16
   83:2,22 84:8,13,18
   85:24 86:20 87:12
   87:16,23 88:7
   89:7 91:7 92:6,24

92:25 93:25 94:22
95:8,16,18,19 97:1
97:25 100:3 101:5
101:14 113:8
114:5 121:1,2,16
122:12,16 123:16
124:20,24 125:17
129:1 131:18
134:10,18,23,25
135:4,19,24
136:15,22,24
138:1 139:2,3,13
143:7,9 147:9,18
148:3,4,9,18,22,23
149:3,16,19
150:12,18 151:6
151:18,20,25
152:2 153:22,24
155:12,16 156:16
156:19,19,20,20
157:1,11,14,16,17
157:18 158:18,19
159:8,10,11,11,13
159:21 160:1,14
161:14,16,18
162:8,10,17 163:3
163:5 164:4,11,20
165:6,18 166:13
171:5,6,20 173:3
180:8,22 181:10
181:12,16,25
182:9,14,17,20
183:3,6,11,21
184:1,4,22 185:2,9
187:15,19,21,22
187:24 189:3
190:10 191:10,19
191:21,25 192:1,2
192:6,25 193:1,12
193:17,17 194:13
194:19,25 196:22

197:20 198:13,17
201:25 202:2
204:23 206:9
207:22,24 208:1
209:25 210:10,23
212:9,11 213:1,11
213:14 214:19
217:18 224:2
225:6,15,15 226:1
226:2,19 227:8,16
227:25 228:6
229:2,3 234:6
238:21,21,22
241:8,13,13,15
242:3,4,6 243:6,7
245:5 248:6 260:5
262:17 263:2,7,20
264:4,7,8,9 265:23
267:21 268:25
273:4,6,13,16,23
274:8,17
devices   19:22 56:1
   59:16 63:10 65:12
   66:4,10,11,12,13
   66:14,17,17,19,20
   66:25 67:8,13
   68:12,14,18 70:5
   70:10,13 71:13
   74:2,12 85:11,12
   86:9 87:19 92:22
   92:24 93:6,20,24
   94:1,21 104:2
   105:23,24 121:21
   134:20,22 155:3
   158:6,20,25
   160:18,21 171:15
   173:2 180:2 182:6
   187:13 188:6
   191:17 194:24
   198:4 209:18
   210:16 211:17,20

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 86 of 128 PageID 18844

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[devices - domestic]**                                                    Page 14

212:4,12,15,18
218:14 226:6,8,22
226:24 227:2,10
227:11,15 228:2,8
228:15,18 238:24
239:1,1 242:19
243:8 256:22
262:13,14,14,18
262:22 263:10,11
263:15,24 264:14
264:17 265:13,14
265:19 266:2,8,9
268:16,19 270:17
**diagnose** 162:19
**diagnosing** 67:12
182:21
**diagnosis** 164:3
**diagnostic** 134:22
134:23,25 135:14
135:18 136:4,13
**diagrams** 128:24
**difference** 113:11
266:8
**different** 33:23
36:12 51:9 53:13
55:16 70:13 86:20
107:5 164:4
173:16 185:10
199:24 212:3
229:20 247:6
256:4 259:6
**differentiation**
39:16
**difficult** 154:2
204:9
**direction** 231:21
**directly** 28:15
41:7,7 166:25
**director** 64:2 65:6
65:17,19,20

**disagree** 17:20
251:19 258:4
**disagreed** 251:9
**disagrees** 252:9
**discarded** 46:3
**discuss** 187:14
201:19 202:10
234:11 272:13
**discussed** 23:9
46:25 232:8 272:6
272:7,9 273:1
**discussing** 230:4
**discussion** 13:2,25
44:10 92:2 96:8
99:7 103:11
116:25 124:6
133:22 155:8,25
161:2 163:13
193:19 198:14
218:18 219:18
221:14 272:6
275:4
**discussions** 10:14
115:5
**disease** 67:12
162:19
**disposable** 198:4
210:16 211:14
212:11,12 226:7
**dispose** 45:3,9,23
**disrupted** 265:6
**dissectors** 197:4
**distal** 128:9
**distribute** 120:16
**distributing** 120:8
120:10
**distribution** 83:2
84:8,14,15 248:7
248:19
**district** 1:1,1 7:9
7:10 56:11 57:21

65:19 251:4 254:6
271:22
**dive** 5:24
**division** 1:2 7:11
56:8
**document** 4:16
13:10,14 21:10
24:13 27:10 28:23
30:10 38:5 47:8
75:12 91:8,14
92:5 93:9 94:8,10
94:11 96:4,19
103:14,17,23
104:7 105:13,16
106:3 107:15
108:7,24 119:14
120:1 126:17,20
126:22 127:7,8
129:12,13,17,23
130:6 131:4,7
137:14 174:18,23
175:11,22 193:9
196:13,14 197:25
198:7 201:16
202:4,7 203:15
204:1,6,18 205:19
207:5 213:24
218:20,23 219:1,5
220:8,11,13,17
221:22 222:11
233:14,16,18
235:6,23 236:1,15
236:23 237:5,10
238:10 239:9
240:3 241:9 242:1
242:25 244:6
246:6,13,18 247:9
247:17 261:10
264:11 266:18,23
267:21

**documentation**
24:20
**documented** 210:1
**documents** 5:22
10:13 23:24,25
24:3,5,8,9,25 25:6
25:20 26:2,5,6,13
27:11,21 28:5,6,7
28:11,14,20 29:3
30:12 33:5 34:13
35:5 39:9 50:20
52:23 75:10 81:12
81:13 97:23 99:18
99:21,22,23 100:9
103:6,20 104:25
110:25 114:19,22
115:13 116:12,14
116:15,18,21
117:18 123:2
132:4 145:12
167:12 204:10
217:14 231:24
237:1 244:18,22
247:11,20 254:3
258:24 264:3
**doing** 15:10 58:23
61:21 107:17
141:25 142:6
143:11 144:1
159:14 160:11
162:21 163:9
199:12 211:21
241:17,19,24
242:24,24 243:8
243:12,13,14,25
244:1,5 248:16
249:17
**dollars** 179:15
181:5
**domestic** 65:23

**dovel** 3:5 7:23,24
**dovel.com** 3:8
  277:2
**downgrade**
  260:20
**dozen** 25:24
**dozens** 25:4,7,25
**dr** 11:5,7,8 20:5,15
  20:19,21 21:3,7
  22:2,4,10,21 23:12
  23:19 24:5,10,19
  24:25 28:1 43:12
  43:14 76:4,9,17
  77:1 78:1,5,18
  79:9 80:3,17 88:3
  98:19,21,24 99:3
  99:17 101:11,15
  101:23 102:5
  110:25 112:4,8,24
  112:25 113:5,17
  113:18,21 114:8
  114:24 115:8
  116:3,6,11,23
  117:4 118:20,24
  118:25 119:6
  120:1 127:11
  129:3,20 131:3
  194:18 251:8
  252:7
**draft** 30:1 35:21
  35:22,24,25 36:7
  43:7,10
**drawings** 128:24
  210:2
**drew** 24:18
**drifting** 154:7
**drive** 130:24
**driven** 24:19
**dropped** 117:12
  194:9 249:3

**drug** 4:15 47:17
  84:5 135:24
**due** 252:19
**duly** 8:8 276:8
**durability** 273:10
  273:11,19,21
**durable** 273:16

**e**

**e** 276:1,1 278:3,3,3
**earlier** 40:19
  41:15 111:19
  229:18 244:9
**early** 21:11,12
  30:20 60:4 62:8
**east** 2:12 7:5
**easy** 110:1 114:21
  167:13
**economics** 182:3
**effect** 135:18
  137:6 249:19
**effective** 4:13,25
  5:4,14 210:13,23
**effectively** 104:3
  273:7
**effectors** 198:21
  198:24
**efficiencies** 109:20
**eight** 56:21 109:14
**either** 51:3 58:8
  61:24 65:11 69:21
  86:7 89:6 136:3
  136:11,12,14
  192:1 198:4 200:1
**elapsed** 31:2,2
**electrocautery**
  119:10
**electromechanical**
  198:17
**electronic** 24:3
  25:20 26:4 28:4
  122:10 212:12

**electronics** 128:20
  128:21 206:20,23
**electrosurgical**
  119:11
**elements** 130:24
  195:18
**email** 5:18 36:10
  233:10,19 234:4,8
  234:14,15 236:9
  237:21 238:11,17
**emailed** 11:7,8
**emailing** 59:24
**emerged** 79:18
  263:22
**employed** 55:23
  113:19
**employee** 107:11
  113:25 234:5
**employees** 64:4,8
  64:18 65:5
**employing** 229:20
**employment** 62:6
**enclosures** 5:11
**encompasses**
  214:18
**encouraged**
  234:17
**ended** 247:7
**endo** 88:23 140:7
**endoscopic** 197:1
  198:16 205:21
  267:24,25
**endowrist** 4:22
  41:13 80:19 88:21
  98:11 100:8,15
  113:6 114:3
  117:21 119:11
  120:24 121:9
  122:20 124:2
  125:6 126:17
  127:4 128:8,13,19

130:20,25 136:20
137:10,11,20
138:6,8,13,20
139:18 140:1
141:1,10,11,16,21
142:4,13,23 143:7
143:12,15,16,25
144:12,14,24
145:25 146:1,2,13
146:17,18 147:7
148:4,18 149:1,8
149:24 150:20,25
151:13 158:3,6,12
159:15,18 162:24
163:12 165:22
166:3,16,21
167:18 170:22,25
173:2,12 174:4
177:10,10,14,16
177:25 178:5
187:4,22,23
188:25 189:5
190:20 195:11
196:5 199:19
200:24 201:13
205:20 216:18
217:9,21 218:3
223:11,17 224:6
224:10,11 225:1
225:13 227:25
229:3 270:6
273:22
**endowrists** 14:5
100:23 103:25
115:22 140:7
145:22 167:1
187:2,25 188:14
229:24 243:2
267:8,23 269:10
270:1

J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

endowritsts
  145:23
ends   127:8 194:21
energy   161:15
enforcement   58:4
  58:22 60:17 66:6
  68:25
engage   180:14
engaged   20:8,9
  62:19 71:21 73:5
  80:20
engagement   16:21
  32:25 54:6
engagements
  52:13 54:5,7
  79:22
engaging   239:14
  239:24
engineer   29:23
  111:24 112:6,17
  118:12,20,24
  229:11,12,13
  274:1
engineering   69:18
  69:20 115:22
  118:13 229:14
  273:25
engineers   113:11
  118:4
enlarge   221:23
ensure   127:2
  146:1 205:4,25
  210:10 268:10,21
entered   12:23
entire   22:8 39:10
  129:13 166:6
  199:5,9,11 200:5
  201:22 202:9
entitled   13:10 91:6
  92:5 104:25 132:7
  155:11 156:9

174:19 214:3
  218:20 220:8
  271:17
entomology   69:15
entry   64:16
enumerated
  109:19
environment   9:5
  254:13
equipment   70:14
  123:21 161:14
  165:12 167:25
equivalence   69:24
equivalent   107:12
  264:7
errata   277:11,13
  277:17
error   121:15
  149:6 155:4
  247:20
esq   3:5,10,14
  277:1
essentially   24:19
  141:12 147:18
  270:19
establish   110:4
established   59:6
  211:6
establishment
  84:3
estimate   30:18
  32:17,18,22 33:18
  33:20 34:2,9,18
  35:4,7,19 36:3
  51:8 56:20
estimation   88:14
  180:5
et   139:19
evade   252:22
evaluate   84:21,25
  93:13 96:20

102:11 115:10,11
evaluated   125:16
  179:11
evaluating   83:12
  91:22 101:12
  221:25 222:2,4
evaluation   16:25
  56:7,10 87:2
  94:11,12 100:1
  177:6 202:3 222:9
  223:5,6 234:6
evaluator   113:14
evidence   47:9,24
  47:25 48:9,13
  61:23 172:12
  174:6 186:13,16
  209:20 216:6,9,18
  231:13,24
evolution   86:17
evolved   60:5
exact   21:20,22
  42:11,19 55:21
  77:2
exactly   19:17 22:6
  30:7 36:11 45:19
  194:3
exaggerated
  250:25
examination   8:10
  119:22 130:9
  269:22 271:5
examinations   4:2
examined   8:8
  67:21
example   12:9 67:7
  67:19,23 70:14
  145:21 162:20
  170:14 214:13
examples   58:11
  87:15

exchange   238:18
exchanging   19:18
exciting   56:14
exclusively   66:3
  68:11
excuse   13:19 27:3
  60:13 91:16
  107:25 130:8
  197:7 207:18
  241:5
executed   250:20
exempted   153:22
  153:23
exemption   207:25
exemptions   57:7
exhibit   4:8,9,11,14
  4:17,19,21,23 5:2
  5:3,5,8,11,13,15
  5:18,20,22,23 6:2
  6:3 12:12,17,19,19
  12:22,23 13:10
  16:1 18:11,17
  26:14,19,24 27:5
  27:13,18 29:17
  36:12,14,16 38:7
  39:5,22 40:2,9
  46:22 75:24 82:10
  82:11,12 92:1,3,4
  98:13,18,21,23
  103:3,6,12,13,21
  104:15,17,19
  105:13 108:21
  112:8 115:15,18
  120:6,13 126:13
  126:14,16 127:15
  127:16,24 133:14
  133:24 153:3
  155:7,9,10,22
  156:2,5,6 167:8
  174:15,16,17
  175:3,5 177:25

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 89 of 128 PageID 18847

J. Lawrence Stevens                                September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[exhibit - fda]                                              Page 17

196:10,11,12
203:7,12,13,15,18
203:18,23 204:13
213:18 214:1,3
215:10 218:17,20
220:3,8,18,22
221:16 233:7,8,9
233:15 245:8,16
246:2,3 250:7,8,10
250:10 251:8
255:1 257:10
258:9,11,14
266:15,16,24
**exhibits** 4:7 38:13
38:17 39:1,14,20
39:23 40:1,5,8,11
40:15,15,16
167:10
**exist** 189:17 191:4
**existed** 118:15
191:2
**existing** 4:15
85:11 87:19 91:7
92:6 93:24 94:21
110:14,18
**exists** 184:2
**expect** 9:18 101:6
229:2
**expectation**
238:24
**expects** 252:1
**experience** 17:11
47:16 48:23 50:18
56:19,20,25 57:1,6
57:8,10,12,18,18
58:12,18,19 59:20
60:4 66:22 68:24
70:7 101:12 107:7
107:16 118:16
248:10 252:18
270:23

**expert** 4:10 10:14
13:10,14,16 14:2
14:11 17:4,22
18:3,6,14 19:1,21
19:23,25 20:3,5,16
21:3 29:7,8,11
49:1 50:23,23
51:1,6 52:9,13
53:3 62:12 63:17
79:1,4,5,11,14,16
79:21,24 80:3,6,13
80:25 101:19
111:20,24 113:17
113:21,22 116:24
129:22 179:24
180:1 187:12
189:11 199:13
220:15 224:18
250:2 257:9 258:2
258:17 274:15,24
**expert's** 79:2,21
**expertise** 49:9
52:21 229:10,15
270:24 273:20
274:5
**experts** 12:6,10
51:16,16,21,23
52:1,12 53:25
80:1 187:16
257:17,22,24,25
258:5,19 259:1,5,9
259:15,19 260:11
261:11,16,23,25
**expiration** 226:17
**expired** 170:23
**explain** 19:11
89:24 224:3 232:1
245:19 251:23
253:3,5,24,24
**explained** 50:13
121:14,17 146:9

172:8,24 178:2,18
230:1 231:19,23
243:25
**explanation** 39:11
**explore** 174:1
**express** 77:4,12
**expressed** 14:10
48:18 213:12
**expressly** 76:5
**extended** 98:8
100:4
**extending** 218:4
**extensive** 115:22
117:2
**extent** 17:8 132:17
259:21
**extra** 68:20

## f

**f** 106:21 276:1
**fabricates** 156:15
**faced** 192:6
**facilitates** 136:24
175:15
**facsimile** 59:25
**fact** 51:25 61:5
76:21 85:14
104:22 117:1
153:20 193:16
202:16 232:12
238:20 252:5
272:10
**factor** 92:15
**factory** 175:16
**facts** 231:13
259:15,21
**factual** 131:23
132:2,15 133:5
145:9 146:6 172:6
185:6,13 186:8,15
230:11

**fail** 216:14 226:19
**failed** 222:17
223:3,5,6,12
**failing** 218:15
**fails** 277:19
**failure** 222:25
228:12
**fair** 9:19,20 31:1
65:16 186:1,4
271:16
**fairly** 119:20
**fall** 262:20
**familiar** 75:1,4,9
75:22 82:4,21
91:5,8 92:9
101:15,22 102:9
105:2 125:8 131:1
166:5 175:9
176:15 192:8,11
192:19,20,23
196:16 203:17
205:13,17 206:8
220:14,19
**far** 199:13
**farther** 99:6
216:11
**fashion** 273:7
**faster** 54:23
**favorably** 69:3
**fax** 59:25 60:1
**fda** 5:11 14:5
16:22 17:2 19:21
20:16 37:17,25
38:4 47:17 48:23
51:12,16,16,22
52:1,9,12,15,20,24
52:25 53:25 55:16
55:20,23,23 56:24
56:24 57:4,10,14
57:18 58:14,19,21
58:24 59:2,4,8,12

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 90 of 128 PageID 18848

J.  Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[fda - florida]                                                    Page 18

59:15,15 60:8,12
60:14,21,25 61:13
61:15,18 62:6,9,9
63:5,23 64:12
65:15,21 66:10,22
68:17,22,23,25
69:3,23 70:1,3,5
70:11,16 71:20
72:10 76:20 83:23
83:24 85:2 86:1,2
88:8 89:3 91:23
94:18 101:3,12,16
101:16,18,23
102:6,12,15
104:21 106:4,7,14
106:18,19,22,24
106:25 107:10,11
107:17,18 108:1
110:6,10,21 111:2
118:4 155:17
159:2 180:1,15
182:4,23 183:7
187:12 189:10
191:1,1,10,16,20
191:20 192:12
194:12,13,20,23
195:2,14,19,25
198:3 201:20,21
201:22 206:10,12
207:6,7,9,21
208:14 209:10,16
209:17,21,23
210:9,16,19,21,22
211:3,4,8,10 212:4
212:14 214:17
218:9 224:1,5
225:3,25 226:4,10
226:16 227:7,11
227:22,24 228:9
228:14,15,18,20
228:22 229:2,16

232:10 233:20
234:2,5 235:20
236:7,15,19 237:7
237:12,13,25
238:16 239:5,8,10
239:14,22,24
240:6,8 241:1,2,9
241:20 242:3,18
243:1,9,14,23,24
244:1,4 245:5
246:4 247:1 248:8
248:10,15,15,17
248:22 249:20,22
249:23,24,25
251:9,12,15,24
252:5,8,10,19,22
253:12,16,19,20
254:2,8,10,11,16
254:17 255:2,3,3,6
255:7,10,11,15,25
256:9,10,14,22
257:17,22 258:2,5
258:19 259:1,5,9
260:23 262:13,18
263:6,21,25 264:5
264:18 265:17,23
267:17 268:17,22
270:9,16,20 272:9
272:11 273:17
**fda's** 91:6 106:7
183:10 192:23
251:14 255:4
265:21
**fdca** 192:4
**feasibility** 98:8
100:5 235:9
**feature** 67:19
120:25 121:7
123:16 269:12
**features** 73:24
205:13,18 206:8

206:17
**february** 5:24
258:15
**federal** 47:17
251:4 253:9
**feedback** 260:20
**feel** 19:10 25:21
123:5 131:25
262:7
**feeling** 255:25
256:2,4
**felt** 235:2 267:10
**fiegel** 40:23 41:20
43:18,21 44:4,22
44:25 46:2,16
145:6,11,19 146:8
172:8,11,20,23
173:7 174:8 230:9
230:18,23
**field** 56:14
**fifty** 109:14
**figure** 164:24
206:19 219:20
**file** 25:20 26:4
28:5 96:7 120:11
120:15 225:16
254:6
**files** 28:4,8,12 29:4
57:23 120:8,15
167:7
**fill** 31:6 65:19
**filthy** 191:11
192:21 194:7
**final** 29:25 30:3
62:2,3 65:7,11
**finalized** 31:1
114:8
**finally** 209:1
228:13 254:22
**financial** 52:2,14
52:22 53:2,15

54:9,17
**find** 23:14 87:6,8
152:19,24 234:8
236:16
**fine** 107:19 210:17
210:19 271:24
**fingers** 109:25
110:2
**finish** 9:8,10
154:21 242:14
**finished** 156:16,19
156:19 157:1,15
157:17,18 158:6
159:13 160:20
243:19
**firm** 61:16 247:2,5
**first** 8:8 14:15,21
15:19 18:25 19:2
21:9,10,23 26:24
35:22 43:7,10
59:6 66:2 78:11
79:16 80:13 92:19
103:15 105:20
141:14 147:8,16
222:20 234:7,14
235:24 236:15
237:21 238:18
248:2 267:22
268:6
**fit** 190:15 246:15
**five** 133:2 250:17
**fix** 124:25 226:25
226:25
**fixed** 228:14
**flashlight** 170:14
170:16,19
**flawed** 113:7
114:4
**flom** 3:11,14
**florida** 1:1 7:10

J.  Lawrence Stevens

Rebotix Repair LLC v Intuitive Surgical, Inc.

September 23, 2021

**flow**   265:7

**flowchart**   176:11
   176:12,13 177:1
   177:25 178:9,10
   178:17

**flowcharts**   178:13

**fly**   170:3

**focused**   181:13

**focusing**   180:25

**folder**   12:20,22

**follow**   233:21
   271:8

**followed**   14:21
   254:7

**following**   58:24
   84:9,22 105:21
   108:10

**follows**   8:9

**food**   4:15 47:17
   84:5 135:23

**forbid**   155:4

**forced**   265:17

**forceps**   208:6,21
   209:3

**foregoing**   279:5

**foreign**   71:12

**forensic**   7:12

**form**   14:18 15:2
   15:24 16:9 17:6
   18:12 21:4 22:13
   23:21 24:17 25:1
   25:10,18 26:16
   27:6,14 29:25
   30:6,14 31:11,18
   36:1 37:21 38:23
   40:3,10 41:2 42:3
   42:8 43:8 45:1,11
   46:5 47:19 49:5
   51:13 54:10,18
   57:15 58:15 61:9
   61:11 62:21 63:3

75:2 76:12,15
77:6,14 78:8,19
79:12,23 83:7,18
84:19 85:8 86:12
87:25 90:13 91:11
91:16 93:7 94:7
95:23 97:11 98:20
100:16 102:8,16
110:8,20 111:22
112:14 118:1,10
122:5 123:4,12,13
124:13 125:7,13
128:22 136:6
137:2,21 138:24
140:4 147:19
148:11,15 150:6
157:3,9,20 160:9
161:6,22 162:15
163:20 164:7
165:1,14 166:4
167:19 168:19
169:12 171:11
172:18 173:8,24
176:1,24 178:24
179:18 182:12
183:14 184:7,23
186:17 187:5
189:1 190:23
192:14 193:9,22
194:15 199:7,21
200:12 201:4,14
211:1,22 214:21
215:24 217:5,12
218:5 224:13,21
225:7,17 226:3,15
228:3 229:5,7
232:7 234:24
236:8 237:15
239:16 240:1,21
242:10 244:11
245:2 248:13,17

248:25 249:9
256:6 263:13
264:19,22 265:4
265:15 274:11,20

**formal**   43:20
   44:13,14,16

**format**   8:24 77:16
   77:17 107:22

**formatted**   78:4

**formatting**   77:24

**former**   191:24

**forming**   23:18
   24:16 30:12 33:5
   33:14 34:24 46:21
   51:11 57:13 58:13
   80:6 92:13 112:13
   197:12 204:7
   206:6 207:4
   215:21 219:5
   220:22 235:12
   236:24 246:7
   247:9 267:3
   268:14

**formulate**   66:6

**forth**   76:3 153:6
   154:14,24 163:22
   238:6 276:8

**forths**   237:20

**forty**   109:13,14,14
   153:9,10,10

**forward**   235:10,15
   235:17,21

**forwarded**   234:8

**forwarding**
   233:19

**found**   133:4

**four**   30:25 31:3,5
   33:1 36:19 37:3
   38:19 72:1,15,22
   72:23,25 74:10
   130:12,15 153:9

153:10 158:1
222:8,8

**fourth**   103:21
   214:11 268:5

**frayed**   119:9

**free**   19:11 123:5
   131:25 132:4
   187:2 188:1,11,14
   189:5 190:22
   268:18

**friendly**   60:16

**front**   62:17 203:1

**full**   42:12 56:2
   79:20

**fullerton**   69:8,9

**fully**   76:3 125:18
   178:15 229:4
   242:1 273:22

**function**   123:9
   124:20,24 125:5
   125:21 133:10,19
   134:7,13,15,15
   135:1,4,13,16,17
   135:22 136:4,10
   137:11 140:2,10
   140:12,15 141:22
   141:25 142:4,7,9
   159:10,11 160:13
   171:21 172:25
   182:1 202:2
   228:10

**functional**   125:18
   224:2

**functionality**
   123:3 127:3

**functioned**   117:22

**functioning**
   156:21 157:5,12
   158:4,11 159:5,21

**functions**   123:11

J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**fundamentally**
 261:12,25
**further**  36:4 159:6
 160:8 234:9
 269:15 271:5
 276:12
**future**  254:21
 256:10,20
**fwd**  5:18

**g**

**ga**  277:15
**game**  271:16
**gastroenterology**
 70:10
**gate**  69:10
**gather**  58:6
**gathering**  136:11
**general**  5:9 37:15
 48:13 66:18 69:13
 69:16 73:11
 108:11 121:20
 131:16 182:20
 184:24 193:19,24
 262:19 273:18
 274:6
**generalized**
 251:11
**generally**  27:20
 40:16 67:14
 271:12 272:7
**generating**  74:15
**generic**  158:14
**gentleman**  74:25
 75:1 232:4
**gentleman's**  40:23
**georgia**  2:16 276:3
**getting**  57:2,4
 58:20 60:8 64:11
 144:8
**gibson**  167:3,9

**gibson's**  167:5
**give**  9:3,21 21:22
 33:10 36:2 50:4
 53:20 76:19 90:8
 144:21 154:21
 164:10 187:2
 188:6,11 211:4,5
 212:14 245:23
 246:20
**given**  70:3 77:8
 106:11 121:15
 237:13 255:11
 259:16,23 276:10
 279:9
**gives**  68:20
**giving**  10:3 51:23
 60:3 207:7 248:22
**go**  8:18 11:15 12:9
 14:20,23 15:4,7,9
 16:13 21:21 22:7
 24:12 26:12 30:16
 31:22 33:9 36:9
 37:10 47:21 54:23
 57:22 58:4 60:19
 61:18 64:22 66:1
 68:16 75:10,13
 81:23 86:6 95:14
 96:6 98:13 102:18
 102:24 115:17,19
 116:5 119:2
 126:15 127:14,18
 127:23 128:20
 131:2 132:20
 144:22 145:21
 156:11 167:14
 178:13 180:15
 194:2,6 196:18
 198:12 202:12
 203:21,23,24
 204:13,17 213:2
 215:12 216:11

 218:14,24 219:19
 221:24 227:17
 229:15 231:21
 232:23 234:13,15
 251:7 258:7,24
 265:11 274:4
**goes**  144:11
 151:11 177:6
 205:23 223:19
 255:18 268:22
**going**  11:19 12:25
 13:4 15:8,12
 37:23 38:4,6
 42:25 55:10 69:1
 79:15 80:15 81:14
 88:4 93:10 111:9
 111:13 114:20
 120:21 130:4
 132:10 149:11,12
 152:7 177:24
 188:6 208:18
 209:21 211:3
 213:21 215:1
 216:14,16,19
 220:1 231:21
 233:1 235:15
 242:19,20,23
 243:6,8,22 245:18
 246:25 255:22
 256:17,24 257:3
 265:22 266:3
 267:12 270:20
 273:13,14 275:7
**golden**  69:10
**good**  8:12 60:3
 111:10 216:23
 217:25,25 258:1
 274:3
**gosh**  158:23
**governing**  212:25
 213:10

**government**
 267:18
**governs**  152:14
**gowns**  71:10,11,16
**great**  9:2 24:11
 39:12 67:8 82:19
 107:19 127:17
 128:1 130:4 133:2
 204:6
**greenleaf**  8:4
**greg**  40:23 145:6
 145:11,19 146:7
 230:9
**group**  92:24
**guess**  31:13,21
 49:6 68:2 198:3
**guidance**  4:15
 91:6,9,13,20,21
 92:9,12,14,18,21
 92:21 93:4,8,22
 94:5,19 95:1,7,19
 95:21 96:9,23
 97:7,13,15,23
 194:11 236:12
 251:25 263:6,9
 264:3,11 265:12
 265:21
**guides**  94:11
**guy**  58:4 59:12
 64:22 191:2

**h**

**h**  278:3
**half**  31:16 42:14
 42:15,23 213:21
 235:24 250:23,24
**hamilton**  36:23
**hand**  276:18
**handled**  64:19,20
 68:14 79:18 80:16
**hands**  194:14,19

**[handwriting - hundred]**

handwriting
207:18
hang 257:11
happen 24:22 25:6
67:25 271:22
happened 79:17
happening 237:4
happens 211:2
227:5
happy 9:24 271:22
harassed 189:25
hard 154:1
hate 232:16
head 152:21
heading 105:20
108:8,16 205:20
headquarters
55:24 58:7,10
59:15 60:1 61:18
70:3
health 4:20 8:5
56:2 59:17 65:13
105:14 162:23
254:4 255:17,24
hear 11:11 72:12
154:4 216:4
heard 7:9 8:13
16:20 74:22 75:5
75:20 117:15
122:25 124:4,6
137:13 244:3
254:17 256:14
hearing 154:1
heather 14:11
heaven 155:4
held 63:17 178:21
179:16 180:22
181:7,13,15
182:10,18 183:4
184:4,22 185:5,8
185:14 186:9

187:19 188:1,15
189:6 190:20,21
191:12 257:17,22
help 50:9 59:11,21
74:1 86:4 104:6
129:22 133:4
142:14
helped 87:10
helping 59:21
71:13
helps 16:1 95:19
132:22
hereinbefore
276:8
hereto 279:7
hereunto 276:17
hesitant 107:6
hesitate 165:3
hey 125:24 212:17
216:23
higher 49:24
223:23 224:5
231:8
hired 12:6,10
30:19 113:21,22
118:12,14 237:8
hiring 33:1
historical 41:15
history 57:23
86:24
hold 88:11 93:5,25
94:5,21 95:8
96:10,25 97:4,6,9
98:2 148:14
184:17 193:8,8
229:7 241:23
242:13 245:22
271:20
holder 82:24 83:6
85:7,20 87:17,20
87:23 91:10 94:14

holds 88:17
home 7:4
honest 267:19
honesty 254:15
hopefully 11:24
hospital 125:18,24
131:19 138:3
140:8,14,21 142:8
142:10,12,19,22
143:4,5,9,12,15,15
146:13,17 147:7
147:15 150:20
163:6 164:3,5
165:6,11 166:19
167:18,24 168:6,7
168:16 171:6,19
171:19,23 173:5
174:13 177:9,16
177:24 178:6,15
178:22 179:2,4,7
179:14,17 180:9
180:12,12 181:4
181:25 182:5,5
183:25 186:24
227:1
hospital's 162:2
171:20
hospitals 5:6
161:19 166:25
171:13 173:3
174:3,20 175:25
180:8 211:24
212:1,16 227:14
263:16,19,19,23
hour 42:7,16
213:21
hours 22:7,20
23:16 30:18 33:4
33:13,21 34:2,5,9
34:12,19,23 35:8

housing 130:24
206:19
howell 112:4,24
113:5,17,18,21
114:8 115:8
howell's 112:8,25
114:24
huh 35:24 39:13
40:6 87:21 88:16
95:6 96:22 108:25
110:24 114:14,14
114:24 122:19
125:10 126:7,14
129:2 130:18,23
131:11 142:2,10
146:10,13,23
147:11 148:19
149:4 150:13,24
151:3,10,21,25
153:14 158:15
159:1,16,22
160:22 165:19
167:22 170:22
171:1,16 174:2
175:22 176:6,9
177:3 180:3 182:8
191:22 192:18
193:5 197:22
199:2 204:3,22
211:19 222:19
223:21 224:8
231:22 237:23
253:17 260:7
262:2 266:7 267:9
267:20
human 4:20 69:15
84:8 105:14
155:17
hundred 33:13,21
49:18 64:4

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 94 of 128 PageID 18852

J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[hypothetical - information]                                                        Page 22

hypothetical
143:18 161:23
164:8,19 165:2
168:2 169:1
179:20 182:14
187:6 188:3
189:17 190:24
242:11 270:14
hypothetically
146:21
hypotheticals
163:10

**i**

i&a 5:24
i.e. 153:6
idea 21:1 111:4
142:9 160:10,15
166:17 168:11
170:21 198:9
234:25 249:13
258:2 269:11
identification
12:17 28:24 82:11
92:3 103:12
104:17 126:13
155:9 156:5
174:16 196:11
203:13 214:1
220:3 233:8 246:2
250:8 258:9
266:16
identified 26:5
28:4,5 41:4,10
53:8 105:23
222:24 258:22,25
259:2 264:21
270:11
identify 14:14
15:18 23:12
109:20 110:12
263:9 265:12

266:23
identity 208:4
ignores 115:21
ii 66:11,12,20
68:14,18
iii 14:25 15:5 66:4
66:9,11,14,17,19
66:25 67:2 68:12
70:13 92:21
illegal 255:16
illinois 2:13 7:5
immediate 255:15
260:19
immediately
256:16
impact 114:24
124:15
implants 70:15
implement 223:15
implications
237:10
imply 236:4
import 64:2,6,10
65:7,17
important 9:6
41:5,11,18 49:11
86:22 123:11
124:9 139:25
225:5
imposed 270:9
impossible 47:20
impression 24:7
improper 270:13
impropriety
252:11
inappropriate
113:24 244:17
include 27:5 38:14
66:21 111:2
144:13 173:22
188:21 196:5

200:18 203:7
206:9 233:15
included 23:24,25
44:7 46:21 160:19
175:3 221:6
240:15 270:6
273:8
includes 28:20
119:7 131:6
135:14 142:17
191:11 195:22
273:9
including 31:7
59:7 70:14 144:2
171:4 198:18
202:8 207:8
242:20
inclusion 126:5
inclusive 175:8
incoming 239:1,3
incomplete 164:7
168:25 187:5
188:2
inconsistency
255:14
inconsistent
122:23
incorporate 76:5
incorporated 7:8
78:22
incorporating
79:9 80:3
incorrect 267:12
increase 144:24
indented 248:3
independent
113:21,22
index 4:1 5:1 6:1
indicate 62:1
176:21 186:14
209:8

indicated 178:8
210:24 222:16
indicates 124:2,12
214:17 251:14
indication 107:9
175:6 225:9
226:19 255:19
indications 197:14
197:17,20 220:25
221:6,10
indiscernible
170:6 225:22
individual 10:18
10:24 12:2 262:18
industry 4:15
47:18 48:23 56:20
57:10 58:19 59:10
59:20 60:19,20
66:16 68:22,24
70:7,11 85:16
86:17 91:21
informal 45:4,9,23
information 18:2
36:4 37:16,19
40:18 41:4,10,12
41:14 42:5 44:12
46:11,13,24 48:4,7
53:10 54:2 57:2
58:6 60:9 64:11
81:17,20 87:11
100:18 106:9,11
106:15,20,23,24
107:7,8,10,22
110:12,23 111:2,4
114:12,15 118:14
136:11 163:4
164:10,16 165:10
165:17 170:1
172:17,22 173:14
173:18 196:23
199:15,17 201:24

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 95 of 128 PageID 18853

J. Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

[information - introducing]

Page 23

209:13,24 217:2,7
230:16 232:2,9
233:24 235:20
244:2 245:6 248:5
248:23 254:16,22
259:22 267:18
272:24
**initial** 22:14 35:25
153:20 222:10,15
223:2,10,11
**input** 47:22
134:23
**inserted** 159:9
**inside** 122:20
130:19
**inspect** 128:2
130:11
**inspected** 130:16
**inspecting** 61:5
129:3
**inspection** 63:7
119:8 130:8,19
131:6,9 239:3
254:8
**inspections** 57:20
60:25 62:6 66:5
**inspects** 145:25
**install** 138:16
143:14 159:17
166:25 167:18
173:13
**installation** 127:1
127:2 141:8
176:19
**installed** 136:20
137:1 138:8,15,23
139:18 142:3,4,13
142:24 173:16
**installing** 144:2
166:6,16 167:24
176:23

**installs** 139:11
147:5 165:22
166:2
**instruction** 126:25
**instructions**
212:15
**instrument** 121:9
122:21 127:4
128:3,8,17 130:11
130:16 139:5,10
140:18 141:3,4
151:4 158:12
161:18,20 168:7,8
178:11,11 197:2
198:16,19 205:6
206:1 210:23
217:9 229:13
267:25
**instruments** 70:18
80:19 113:7 114:4
159:18 167:18
173:12 188:11
197:3 198:10
200:8 201:9
204:24 205:3,21
205:22,24 209:11
209:11 211:15
212:7 218:3
267:24 268:6,9
**insufficient** 110:7
**integrated** 122:20
**integrity** 57:19
61:15
**intend** 18:10 92:23
**intended** 5:14 84:8
93:22 94:19 104:4
117:22 126:24
127:2 133:18
134:6 135:21
139:16 142:19
143:10 155:16

171:7 182:2 196:5
199:3 200:24
201:7,8,12 209:14
209:15 213:1,11
214:4,18 220:25
221:1 263:2,3
264:9 265:20
269:13
**intensive** 60:8
**intent** 131:20
213:13 214:12,18
**intention** 166:10
**intentions** 162:3
**inter** 166:14
**interacting** 56:24
**interaction** 72:8
134:11
**interactively**
234:18
**intercept** 78:6
142:18 179:15
**interceptor** 76:22
78:6 81:5 89:6,7
89:11 90:3,22,25
124:16 126:5,7
127:1,3 131:15,17
131:24 132:16,23
133:6,8,18 134:6,9
134:22 135:16
136:18,23,24
137:17,25 138:8
138:15,16,22
139:11,14,15,17
140:1,16,18 141:8
141:18,19,20
142:3,13,18,24
143:6,10,14,22
144:2,3 147:5,13
153:21 158:10,17
159:5,7,17 160:3,8
160:11 162:20

163:12 166:2,2,7,7
166:11,15,15,20
167:17 168:6,9
171:4 172:2
173:13,17,21,23
174:3,9 175:15,24
176:8,19,23
177:11,13,18,22
178:1,6,7,12,16,21
178:22 179:15,16
181:6,23,23 182:8
182:13 183:23
185:7,14 186:9,22
190:9,17 193:12
194:1 269:12
**interceptors**
166:25
**interested** 53:11
276:14
**interface** 206:20
**internal** 103:5
**interpret** 135:21
178:13 234:21
**interpreting** 128:5
136:2
**interrupt** 241:25
**interstate** 84:7
182:23
**interviewed**
257:23 258:20
259:9,13,16,20
**introduce** 12:12
91:25 120:5,16
155:6,22 156:2
174:14 196:9
203:11 213:17
233:6 245:7,14
**introduced** 13:9
92:4 210:11 246:3
**introducing** 78:13

[introduction - k]                                                                Page 24

**introduction** 84:6
84:7
**intuitive** 1:8 5:9
5:10,12,12,16,17
5:25 7:7,22 8:2,5
8:14 14:4,4,12
88:24,25 111:21
113:19,24 120:25
125:11 136:19,25
137:18 138:7
139:7 142:11
143:17 150:22
177:13,20 187:3
187:25 190:21
196:13 197:1,9
198:9,16 201:8
204:2 206:9,12
207:21 208:3,14
209:2,19 210:15
211:13 217:8
218:2,9,20,22
220:8 223:15,21
224:4,25 225:12
225:16,24 258:15
267:25 269:25
270:4,5,11 277:4
278:1 279:1
**intuitive's** 120:23
187:1 195:11
196:3 215:13
**invalid** 110:15
**investigate** 58:1
**investigational**
57:6 207:22,24
**investigator** 62:9
62:13 68:22 70:13
**investigators** 63:8
**investing** 85:23
87:11
**invoice** 179:14
181:3

**involve** 56:18
274:8
**involved** 60:11
61:14 64:10 65:4
68:5 165:5
**involvement** 61:12
63:11
**involving** 63:12,24
**issue** 9:23 51:12
67:23 68:8 81:2,6
87:7 120:13,19
183:19 188:7
192:5 254:3,5
260:6 272:11
**issued** 4:16 92:7
**issues** 5:7 18:16
20:16 41:15,17
57:9 58:1 61:15
64:17,18,19 68:9
68:13 80:14 237:3
255:24
**item** 15:5 16:4,6
162:16 206:21
**itemized** 179:13
181:3
**iv** 16:4,6 267:21

**j**

**j** 1:13 2:11 4:10,17
8:7 13:11 103:16
104:25 105:4,7
108:19,21 109:1,2
109:6,8,11,15,16
109:17,21 250:11
276:7 277:5 278:2
278:24 279:2,4,12
**j.d.** 3:18
**jeff** 75:6 233:10
**jeopardy** 254:10
256:10
**job** 56:15 64:3
184:15 201:23

**joe** 36:22 233:10
**john** 8:17
**johnson** 36:20,23
36:24
**jon** 75:8 233:11
**judgment** 250:13
**july** 5:18 80:25
233:11
**jumping** 104:8
**june** 4:19 62:14
63:18 105:15
167:9
**jurisdiction**
182:23 195:2

**k**

**k** 4:14 5:9 6:4 17:4
17:9,10,12,17,19
17:22 18:3,4,4
23:10 41:16 56:18
56:19,21,22,23,25
57:3,3,18,20,24
58:3 59:3,13,18,21
59:22 60:1,4,7,10
61:1,6,15,25 62:2
62:7 63:13,13,25
64:12,17,23,24,24
65:8 66:20,25
67:4,17 68:7,13,18
69:25 70:23 71:1
71:4,7,16,23 72:3
72:17 73:2,6,9,12
73:14,16,20 74:4
74:11,19 78:14
81:4,6 82:24 83:6
83:14 84:18 85:7
85:20 86:11,16,21
87:7,13,14,17,20
87:23,24 88:11,17
88:18,20,22 89:6,9
89:11 90:2,21
91:1,3,7,10,22

92:5,24,25 93:5,10
93:23,25 94:6,13
94:14,20,22 95:4,8
95:18,20 96:11,12
96:15,18,19,20,21
96:24,25,25 97:3,5
97:6,14,18 98:2
102:6,10,15,20,23
104:21,23 105:5,9
105:12 106:5,7,8
106:16,21 107:1,4
107:4,24 108:2
110:22 152:14,23
153:6,22 154:14
154:24 159:3
161:4,8,11,21
163:7 164:6,25
165:12 180:16,19
187:3,19 189:11
192:1,7,10 193:1
193:13 195:10,14
195:17,18,18,20
195:22,24 196:1,4
196:19 197:9,21
199:5,6,9,11,15,17
199:19,22 200:2,5
200:10,16,18
201:2,12,15,19,21
202:3,5,6,7,9,10
203:3,4 204:15,19
204:21 205:10
206:5 207:3,21
208:3,15 209:12
209:20,24 210:9
210:13 218:10,21
223:22 224:25
225:4,16 229:18
229:19 230:13
231:7,15,19,25
232:6 237:7
239:11,23 240:8

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 97 of 128 PageID 18855

J. Lawrence Stevens
September 23, 2021

Rebotix Repair LLC v Intuitive Surgical, Inc.

[k - larry]

Page 25

241:2 242:4 243:5
243:6,17 244:9
245:4,10,19 246:9
248:4,11,15,20
249:2,12 253:22
260:6,9,16,21,22
261:6 264:14
265:25 267:1,1,2
267:10,14,16
268:16 270:1,6,12
270:24 273:4,9,18
**k965001** 200:10
**k965110** 196:4
**k990144** 5:16
199:6 200:10
218:10,21 220:9
**karen** 3:10 7:21
8:13 55:2 89:22
103:4 144:17
186:1,4 189:16
213:19 219:13
232:16 243:18
244:14 246:14,19
271:3
**karen.lent** 3:13
**keep** 44:5,13,15
153:25 154:3,9
172:14 208:18
216:16
**keeping** 45:3,8,22
**key** 157:4 183:19
212:11 246:10
**kind** 25:22 44:15
48:12 63:13 71:20
101:5 104:22
106:6,12 107:21
137:23 143:18
144:7 154:7
158:13 193:23
194:9 209:15
238:5 256:21

258:2 259:3 260:9
274:13
**kinds** 57:8 65:24
70:13 247:20
**knew** 18:23
122:12 130:1
**know** 9:24 16:18
16:19 17:8,9,11,13
18:1,21 20:17,18
22:6 26:10 32:11
39:1,2 42:23 49:9
49:11,12 50:8,14
50:15 51:20 52:6
52:10,11,21 53:9
53:23,24 54:20
72:13 73:16 74:25
74:25 75:7,17
76:17 81:3,12
84:20 89:15 99:22
101:11,16,22
102:10,12,13,20
102:20,20,21
104:22 105:7
107:15,23 108:1,6
109:22 110:2,24
111:6 113:9,10,18
113:25 114:10
116:14 118:2,19
118:25 121:5,5,7
121:19 122:7,14
122:17,22 123:22
125:4,10,14,15,19
126:7,10 128:7,9
128:18 130:23
131:2 132:3 133:7
133:9,12 136:22
137:3,6,7,9,12,13
137:22,23 138:10
138:11,19 140:20
141:23,24 143:20
144:6,7 146:20,21

146:24 149:5
150:3 152:20,22
152:22,23 154:1
161:25 162:5
164:10,15,24
165:4,7,17,20,25
166:10,11 167:3
168:9,10,10 170:9
171:12 173:11,15
173:25 174:8,13
175:11 178:25
179:3,6,9 180:13
180:19 182:4
183:16 185:18
187:11 191:3,4
198:2 199:22
203:9 212:16
213:4 216:12
217:15 218:11
223:24,24 225:18
226:20 227:14
231:6,18,18
233:22,25 234:1
234:10 236:3,5,21
237:7 239:8 241:7
241:9,10,25
243:15,16 244:13
245:3 249:1,5,19
249:24 257:24
258:19 259:8,11
259:15,22 260:10
261:1,3,8,18,21
267:4,6,7 271:17
273:14 274:6,15
**knowing** 49:8
177:12
**knowledge** 47:18
47:21 48:14 60:19
66:16,23 68:17,20
76:20 92:14 107:8

**known** 67:21
226:23 227:3
**knows** 101:19
132:11 217:20
228:15

**l**

**l** 156:19 157:10
**label** 67:20 74:4
74:20 176:10
207:16,20,22,25
208:3,4,5,8,18,21
208:22,23 209:2
209:15 210:8,20
211:3,7 226:5,6
270:20
**labeled** 68:1 93:19
156:22 157:13
209:22
**labeling** 61:20
73:13,15,19 74:1,1
162:2 208:13
210:6 213:8,15
214:13,19 218:13
219:7,9 220:24
221:3,9 224:1
245:10 247:4
272:10
**labels** 207:14
209:8
**lack** 186:15
251:14
**language** 135:21
195:5,7 235:12
237:18
**laparoscopic**
70:18 200:8
**large** 120:15
**larger** 15:4
**larry** 7:4,6 8:19
19:10 25:11 29:13
53:20 61:10 62:22

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 98 of 128 PageID 18856

J. Lawrence Stevens                                        September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[larry - letter]                                                           Page 26

81:19 90:8 97:9
148:14 150:5,5
163:21 169:21
184:17 193:8
221:21 242:13
243:20 246:24
249:6,6 264:25
271:20 272:14
**laser** 71:13,14
**lasted** 42:16
**law** 66:10 76:20
152:16,24 210:12
**lawrence** 1:13
2:11 4:10 8:7,17
13:11 250:11
276:7 277:5 278:2
278:24 279:2,4,12
**laws** 27:20 210:18
**lawyer** 152:16
191:1
**lawyers** 130:2
**lead** 130:10
**learn** 130:3
**learned** 60:14
**learning** 249:21
255:5
**leave** 155:23
**leaves** 146:14
**leaving** 39:10
**led** 60:18
**left** 60:21 124:3,12
141:2 145:24
146:15 147:21
176:18 194:10
207:15,17
**legal** 7:14,16 63:9
64:13 66:5 104:13
192:7 277:23
**legally** 58:8,9
86:15 87:22 225:6

**length** 42:11,20,24
**lent** 3:10 4:3,5
7:21,21 8:11,13
11:15,20,24 12:1
12:13,16,18 13:9
14:1,24 15:7,17,25
16:5,13,17,18
17:15,25 18:15
20:9 21:8,25 22:1
22:16 23:22 24:24
25:5 26:1,19,21,23
27:12,16 29:2,9,21
29:24 30:11,19
31:15,24 32:10,24
33:12,19,23 34:4
34:11,20 35:6,20
35:21 36:6 38:2
39:4 40:6,7,14
41:9 42:7,12,22
43:11 45:6,13,18
45:20 46:13 48:7
48:16 49:16,24
50:6,19 51:25
53:1,12 54:4,16,23
55:3,15 58:11
59:1 62:5 63:16
75:5,25 76:2,14
77:3,11,23 78:17
78:25 79:19 80:5
80:17 82:4,8,12,14
82:17,20 83:16,25
85:3,18 87:15
88:11 89:14,20
90:1,7,21 91:4,5
91:25 92:4,17,20
93:16,18 94:17
96:5,22 97:20
98:2,23 99:8
100:24 102:14,22
103:8,13 104:15
104:18 110:17,24

111:8,18 112:3,19
112:20 115:16,20
116:7,10,16,18
118:7,19 119:4,6
120:5,9,12,17,20
121:25 122:2,14
123:10,19 125:4
125:10,19 126:14
127:14,19,25
128:2 129:2
131:13,14 132:6
132:14 133:23
135:20 136:16
137:5,9 138:6
139:5 140:17
144:21,22 148:12
148:19 149:1
150:13,16 152:4
152:13 153:3,4
155:6,10,21 156:1
156:6 157:6,15,23
160:22,24 161:3,9
162:5 163:1,24
164:1,18 165:9,19
165:20 166:14
167:22 168:5,23
169:5,15,17
170:11 171:16,25
172:22 173:11
174:2,14,17 176:6
176:9 177:3,9
179:5,23 182:8,16
184:3,11,20 185:6
185:13,21 186:2,7
186:8,15,19 187:9
187:18 188:9,24
189:4,9,20 190:1,5
190:11,16,19
191:6 192:18
193:20 194:5,18
195:9 196:9,12

198:15 199:10
200:1,9,15 201:10
201:18 202:16,20
203:2,11,14,22
204:1 211:13
212:3 213:17,22
214:2,22 215:7
216:3 217:8 218:1
218:8,16,19
219:15,17,19,22
220:7 221:15
222:1 224:17,24
225:12,21,24
226:13 227:6
228:25 229:17
232:19,21,23
233:6,9 235:5,7
236:14 237:18,23
238:1,9 239:21
240:2,10,13,18,19
240:24,25 241:18
241:24 242:25
244:8,15,23 245:7
245:12,16,20
246:3,16 247:8,23
247:24,25 248:2
248:21 249:3,18
250:6,9 256:23
257:8 258:10,12
258:14 260:13,15
264:5,20 265:9
266:1,14,17,20,22
268:4,5 269:15,21
270:13 271:2,6,7
271:15 272:1,25
274:15,23 275:1
**letter** 4:19 5:11,20
59:23 60:2 106:1
106:4,6,9,13,14,17
106:18,22 107:20
107:21 111:5

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 99 of 128 PageID 18857

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[letter - looking]                                                    Page 27

118:5 195:20,24
204:15 232:6
234:17,23 240:8
246:4 248:7,11,17
249:4
**level** 63:6
**levels** 206:23
239:2
**liaison** 59:22
**life** 69:14,17 98:8
100:4 103:24
104:20 113:6
114:3,25 115:8
117:4 217:9,16
218:9 256:21
**light** 170:15,17
**likewise** 146:3
**limbo** 71:20
**limit** 55:6 94:16
121:12 138:21
142:23 143:16
145:22 146:14
149:24 216:15
224:5 227:12
228:20 270:6
**limitation** 210:21
211:10 227:2
**limitations** 221:5
226:9 227:19
268:19 269:3,6,9
**limited** 57:10
197:3 198:2,7,10
198:20,23 204:25
205:4,22,24
206:11,14 209:11
225:14 252:20
268:7,10,16,21,24
269:1 270:16
**limits** 68:1 140:2
170:25 196:5
209:12,18 215:13

215:22 216:2,7,10
216:14 217:3,10
217:21 218:4
223:23 225:5,5,8
225:15 226:2,14
227:8,20 228:1,2
229:4 273:23
**line** 160:24 179:13
181:3 194:24
214:11 238:18
254:9 255:1 268:5
278:4,7,10,13,16
278:19
**lines** 158:1 268:3
**list** 4:24 24:6
26:13,18 28:16,17
28:18,20 36:16
39:3,4,10,12,17
43:17,20 47:21
155:12,17 202:12
204:8
**listed** 27:7,13 38:9
38:20 114:19
130:15 220:18
247:12,18
**listen** 54:24
184:18
**listening** 240:22
**listing** 36:17
**lists** 36:12 130:12
**literally** 45:13
237:19
**litigation** 18:21
50:23 51:2,7 79:1
79:11
**litigations** 53:17
**litsup** 277:15
**little** 15:3 68:3
95:24 96:1 105:19
208:10 229:17
231:8 247:25

249:18
**live** 228:11 256:21
**lives** 198:10
**llc** 1:5 7:7 240:17
246:11 247:1
249:15 267:1
277:4 278:1 279:1
**llp** 3:11,14
**loading** 120:15,20
**located** 7:4 254:7
**location** 2:12
**lodged** 251:10
**log** 30:16
**logic** 22:25 206:22
**logs** 33:10,18 35:3
**long** 22:6 35:24
41:23 42:1,4 43:1
47:9,24 120:17
209:3
**longer** 45:4,9,24
95:18 120:16
255:18
**look** 10:21 14:23
14:24 15:22 16:10
21:21 26:12,19
28:17,18 29:12
30:16 36:9,14
37:10,25 38:1
57:23 61:19,19,20
75:10,13 82:9
83:25 86:24,24
88:3 96:7 99:17
99:21 101:17
102:18,18,18,25
103:2,22,22
110:10 115:14
118:14 119:2
120:1 124:24
125:25 126:15
127:24 131:3
132:4,7,18 133:23

152:19 153:1
156:18 157:23
166:18 167:7,14
171:25 174:25
175:2,4,9,9,14
176:9,15,25 191:6
194:2 196:22,22
197:16 201:2,11
201:20,21,23
202:8,12,17 203:8
203:18 204:22
205:2 210:2,2,3
213:2,16 214:11
215:7 220:15
221:3,8,21 230:3
238:16 243:9
254:25 257:9
258:7,21,25
262:24 267:22
274:1
**looked** 25:4,20
30:2 38:14 51:15
69:3 78:16 99:23
103:20 108:21
116:25 117:6,17
144:6 145:12
152:17 166:8
208:20 217:14
219:7 220:24
236:14 237:8,9
243:17
**looking** 36:22
37:15 42:25 51:17
52:7 64:11 83:21
85:16,22 94:18
99:10,15 116:10
119:23 127:12
129:8,16 130:7
133:3,25 151:18
151:19 195:7
197:14,15,19

J. Lawrence Stevens                                      September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[looking - manipulators]**                                      Page 28

198:25 199:4
201:7 212:21
213:4 225:14
231:3 233:13
240:23 266:22
**looks**   107:19
132:22 196:16
203:16 207:14
208:20 222:3
274:3
**los**   62:14 63:18
65:21,23
**lose**   205:15
**lost**   117:16
**lot**   47:18 50:14
54:23 58:18 60:6
60:8,16 71:10
79:25 103:20
107:6 132:3
140:10 142:21
153:23 163:22
167:12 168:10
271:25,25 272:12
272:15
**lots**   143:2
**low**   206:22
**lower**   254:23
**luckily**   258:10
**lunch**   144:20
152:5,8
**luner**   3:5 7:24,24
**lyon**   3:5 4:4 7:23
7:23 10:14 12:1
14:18 15:2,24
16:9 17:6,23
18:12 19:2,7,9,10
19:19 20:6,18
21:4,15,18 22:3,13
23:21 24:17 25:1
25:10,13,16 26:16
27:6,14 28:15,19

29:13 30:6,14
31:11,18 32:3,5,19
33:7,15,22,24 34:6
34:15,25 35:16,23
36:1,8 37:21
38:23 39:6 40:3
40:10 41:2 42:3,8
42:17 43:8,25
45:1,11,16 46:5
48:1,10 49:5,20
50:1,11 51:13
52:16 53:5,18
54:10,18 55:2
57:15 58:15 61:9
62:21,24 63:3
75:2 76:12,15
77:6,14 78:8,19
79:12,23 80:10
81:19 82:1 83:7
83:18 84:19 85:8
86:12 87:25 89:12
89:17,22 90:5,8,11
90:17,23 91:11,15
91:17 93:7 94:7
95:23 97:9,11
98:20 100:16
102:8,16 103:4,10
110:8,20 111:22
112:14 118:1,10
121:19 122:4,5
123:4,13 124:13
125:7,13 128:22
131:25 133:20
135:7,10 136:6
137:2,21 138:24
140:4 144:17
148:11,14 150:5,8
157:3,9,20 160:9
161:6,22 162:12
162:15 163:20
164:7 165:1,14

166:4 167:19
168:1,19,25
169:12,21 170:6
171:11 172:18
173:8,10,24 176:1
176:24 178:24
179:18 181:19
182:12 183:14
184:7,17,23
185:11,16 186:1,4
186:11,17 187:5
188:2,17 189:1,7
189:16,22 190:3
190:14,23 192:14
193:8,22 194:15
195:4 199:7,21
200:12 201:4,14
202:15,17,23
211:1,22 213:19
213:25 214:21
215:24 217:5,12
218:5 219:13,16
219:21 221:21
224:13,21 225:7
225:17 226:3,15
228:3 229:5,7
232:7,16,20,22
234:24 236:8
237:15 238:2,5
239:16 240:1,9,11
240:15,21 241:5
241:23 242:10,13
242:16 243:18
244:11 245:2,22
246:14,19 248:13
248:25 249:6,8
256:6 263:13
264:19,22,25
265:4,6,15 269:18
269:23 270:23
271:3,8,11,19

272:3,14,19
274:11,20 277:1
**lyon's**   23:23 27:22
27:24

**m**

**m**   1:25 2:14 3:10
3:18 276:6,23
**machine**   59:25
**magnification**
119:8,22 128:3
129:4 130:12
131:10
**magnitude**   234:16
234:22 235:1
**main**   115:17
121:16
**maintain**   89:1
**maintained**   228:7
**maintaining**
175:17
**maintains**   146:1
**maintenance**
227:13
**major**   32:7
**majority**   106:8
262:6,9
**making**   63:24
64:12 68:5 88:5
91:23 93:11 94:15
110:1 114:1 162:1
162:17 211:6
235:19
**man**   133:19 134:8
134:13,16 135:4
135:22
**manager**   60:22
**manhattan**   3:11
**manipulation**
119:10
**manipulators**
198:18,20

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**manufacture**
  210:2
**manufactured**
  139:7 195:1
  241:14
**manufacturer**
  76:24 155:16
  156:12,14 188:21
  191:25 192:25,25
  269:3
**manufacturers**
  92:22 93:5 153:17
  155:3 194:25
  265:20 273:11
**manufactures**
  156:15
**manufacturing**
  153:24 159:6
  160:8 165:21
  166:1 180:6 185:2
  206:16
**mark**  36:20,23,24
  82:10 103:2
  104:15 218:16
  250:6 266:14
**marked**  12:17
  82:11,12 92:3
  103:9,12,13
  104:17,18 105:13
  126:13,16 155:9
  155:10 156:5
  174:16,17 196:11
  196:12 203:13,15
  204:2 214:1,2
  220:3,8 233:8,9
  246:2 250:8 258:9
  258:10 266:16,24
**market**  57:7 59:7
  67:3 71:11 78:14
  86:15 95:16
  209:14 210:15

228:17 229:24
**marketed**  58:8,9
  87:22 174:3
  175:24 192:6
  211:18,19 225:6
**marketing**  57:4
  58:2 61:1,5 63:25
  173:20 176:22
  192:1,25 215:14
  215:16,22 216:23
  249:13
**marriage**  276:13
**mary**  233:25
  234:1,14 236:2
  238:11
**massage**  74:7
**massaging**  74:8,17
  74:18
**master**  198:18
  208:5,21
**matches**  129:15
**material**  29:16
**materials**  21:9
  22:11,16,18 26:25
  27:2,3,4,7,17,19
  27:19,25 29:14,18
  33:13 34:23 38:8
  39:5 46:22 47:7
  47:13 115:24
  203:19 210:3
  219:2 247:18
  251:25
**math**  110:1
**matter**  7:6 16:21
  17:15 18:7 30:25
  31:17 77:23 157:2
  157:7,7 179:5,8
  182:4 214:14
  240:18 276:15
**matters**  51:10
  52:15 259:24

**matured**  60:10
**maura**  3:18 8:4
**maximum**  264:8
  270:11
**mba**  69:9
**mcgrogan**  215:18
  215:21 216:22
  217:3
**meagher**  3:11,14
**mean**  23:1 24:15
  39:7 41:11,12
  44:6,7,8 47:13,25
  48:8,21,22 49:1,24
  76:8 79:3,6,8,19
  84:17 88:16 105:4
  121:13 125:19
  136:3 141:15
  150:17 155:24
  156:1 175:3,10
  180:18 183:4,12
  188:5 197:6
  220:22 222:16,23
  234:21 237:6
  256:19,20 258:23
  262:4 266:11
**meaning**  5:14
  158:14 178:14
  194:7 200:6 214:3
**means**  39:8 50:8
  128:7 156:14,20
  183:13 184:4,21
  184:25 197:11
  198:2,4 212:8
  222:24 261:3
  262:6
**meant**  48:6 50:7
  50:10 235:1
**measure**  49:3
**mechanical**
  229:11

**mechanism**  133:8
**media**  55:14
  111:17 152:11
  215:5
**medical**  19:21
  23:9 59:5,10,11
  60:15,19,22 62:13
  66:4,9,17,17 67:8
  67:10,11,13,14,24
  68:12,21 71:23
  73:7,25 74:12
  76:22,24 78:7
  85:11 89:7 92:22
  101:14 134:25
  135:16,24 136:15
  153:22 158:19,25
  159:8,11,21 160:1
  160:18,20 161:14
  161:16,18 162:8
  162:10,17,17,21
  163:5 164:11
  165:17 166:12
  180:2 181:10,12
  182:9,14,17,20
  183:3,6,21 184:4
  184:21 185:2,9
  187:13,14,19,21
  187:22,23,23
  189:3 190:10
  191:16,25 192:24
  192:25 193:12
  194:24,25 229:3
  256:22 263:7
**meet**  89:8 182:24
**meets**  84:9
**memorized**  152:16
  152:25
**memory**  81:23
  82:7 102:19
  175:19 202:18
  205:6,14 206:1,24

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 102 of 128 PageID
139960
J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[memory - needs]                                                    Page 30

207:9 259:4
**mended** 67:22
**mention** 203:4
231:9
**mentioned** 28:3,9
28:13 29:5 37:25
50:19 52:1 58:12
67:5 70:22 72:3
72:16 74:3 112:20
115:12 192:22
**mentioning** 176:7
**merely** 171:21
**message** 121:15
248:23
**met** 11:4
**metallurgist**
229:12
**method** 83:11
**michelle** 1:25 2:14
7:15 161:1 276:6
276:23
**microphone** 154:6
**microphones** 9:7
**middle** 1:1 7:10
63:19 105:20
127:19 151:11
153:5 204:5 208:9
247:22
**mind** 33:3 43:19
49:17 104:8
126:23 132:19
**minded** 58:22
**minds** 110:12
**minimal** 210:17
**minute** 9:22 15:8
**minutes** 55:7
111:9 133:3
144:21 213:22
214:23 256:25
**misbranded** 192:3

**misplaced** 261:13
261:19,23 262:1
**missed** 199:16
**missing** 160:24
**misspoke** 165:23
**misstates** 45:11
46:5 57:15 58:15
83:7 86:12 94:7
112:14 122:5
136:7 138:24
148:15 150:8
192:14 193:9
201:4 244:12
**mistake** 113:4
**mistranscribed**
45:17
**mode** 182:1
**model** 173:1 187:1
212:14,20 222:3
229:21,23 230:12
231:15,17 232:14
**models** 119:11
**modification**
96:14 225:23
**modifications**
93:11
**modified** 85:13,25
87:20
**modifies** 95:16
**modify** 44:14
92:24 96:13
105:24 166:15
**modifying** 97:25
**module** 4:17
103:16 104:25
105:4,7 108:19,21
109:1,2,5,8,11,15
109:17,21
**moment** 19:10
42:21 53:20 87:7
90:9 219:20

**money** 188:10
263:17
**monica** 3:6,7
**month** 31:9,16,24
32:1 34:13,23
35:9,10,11,11,13
36:7
**months** 65:21
**moot** 193:18
**morning** 8:12
152:17 232:9
**morrison** 36:23
230:8 233:10
**motion** 250:12
**motivation** 113:13
**move** 20:18
120:21 207:11
235:21 254:5
**movie** 81:15
**moving** 235:9,17
**multiple** 5:18,22
25:25 86:19
262:23 267:23

**n**

**n.w.** 3:15
**name** 7:17 8:13,15
8:17 10:19 16:20
29:12,20 40:23
74:24 75:7,9,11
111:25 112:25
115:12 239:19
**named** 74:25 75:1
75:6
**names** 75:21
**native** 238:20,25
**natural** 144:18
213:20
**nearly** 251:12
**necessarily** 94:15
107:14 181:1
206:10

**necessary** 57:2
71:22 89:15 141:8
143:8 152:14,23
239:9 248:12
267:10 274:17
279:6
**necessitate** 180:19
**need** 9:2,23 15:21
19:20 46:4 62:1
62:25 67:22 72:16
72:18 73:6,20
74:11,19 81:4,20
87:13 96:13 97:18
105:9 106:11,23
107:11,17,20
110:13 126:1
134:16 141:25
152:25 154:20
161:24 162:5
163:4,7 164:24
169:23 170:1
180:14 182:9
185:24 189:14,24
201:1,11 212:17
225:16 226:11,12
255:20 265:23
266:19 274:1,7
**needed** 24:21 42:6
59:11 61:24 63:25
65:8 68:2,7 73:1
87:13 111:3
226:25 232:10
235:3
**needing** 65:11,11
187:19
**needs** 15:3 85:2
96:23,24 110:22
132:10 135:5
136:3,4 173:3
180:8 181:17
182:17 264:13

[negate - objection]                                                      Page 31

**negate** 118:5
**negotiating** 57:4
**neurological** 70:15
**never** 17:2 49:22
    56:2 72:12 160:1
    161:4,11 179:11
    194:19 195:1
    232:14 244:3
    249:2 254:9,10
    256:9 265:20
**nevro** 250:2 252:6
    255:12 256:4,12
**nevro's** 251:11,15
    252:8,11
**new** 3:12,12,15
    59:11,14,17 60:14
    78:13 83:14 87:13
    87:13,24 93:15
    95:20 130:3
    141:15,16 146:2
    148:24 151:22
    177:20 216:24
    222:25 223:18
    225:16
**newer** 218:3
**news** 60:3
**nine** 109:14,19,24
    110:7 146:14
    147:4,20,23,24
    149:8,25 177:17
    177:17,21
**noncompliance**
    191:19
**nonexempt** 192:1
    193:1
**nonsterile** 268:8
**nonvolatile** 205:6
    206:1
**norden** 3:18 8:4,4
**normal** 46:7,18
    80:1 161:13 228:5

**notary** 279:13,19
**notation** 38:15,16
**note** 28:19 260:20
    263:1 277:10
**noted** 279:7
**notes** 29:18 43:1
    44:3,5,13,14,16,20
    44:25 45:3,4,9,23
    45:23 46:1,8
**notification** 4:12
    84:4,24 92:23
    260:16
**notifications** 59:7
**notified** 85:2 86:1
**notify** 248:3
**november** 61:13
    62:14 63:18,22
**number** 10:13
    24:2 34:1,18
    36:12 38:9 50:4
    67:20 81:13
    103:14 105:15
    122:9 126:18
    127:7 129:12,19
    129:20 130:6
    144:25 174:18
    196:18 204:2,25
    205:4,22,24
    206:11,14,25
    209:7 210:24
    217:25 218:22
    219:14 221:13
    227:12 229:1
    247:16,17 264:8
    268:7,10,21,24
    269:1,6,9 270:11
    270:16 274:8,16
**numbered** 219:11
**numbers** 28:21,24
    129:23

**numeral** 92:20
    267:21
**numerous** 50:24
    132:7

**o**

**o** 156:11
**oath** 10:8 46:16
    163:17
**object** 25:16 61:10
    90:11 135:7 249:8
    251:15 265:2
**objected** 193:10
**objection** 14:18
    15:2,24 16:9 17:6
    17:23 18:12 21:4
    21:18 22:13 23:21
    24:17 25:1,10,18
    26:16 27:6,14
    30:6,14 31:11,18
    32:3,5,19 33:7,15
    33:22,24 34:6,15
    34:25 35:16 36:1
    37:21 38:23 40:3
    40:10 41:2 42:3,8
    42:17 43:8 45:1
    45:11 46:5 48:1
    48:10 49:5,20
    50:1,11 51:13
    52:16 53:5,18
    54:10,18 57:15
    58:15 61:9,11
    62:21 63:3 75:2
    76:12,15 77:6,14
    78:8,19 79:12,23
    80:10 83:7,18
    84:19 85:8 86:12
    87:25 89:12,17
    90:5,13,14,23
    91:11,16 93:7
    94:7 95:23 97:11
    98:20 100:16

102:8,16 110:8,20
    111:22 112:14
    118:1,10 122:5
    123:4,13 124:13
    125:7,13 128:22
    135:10 136:6,6
    137:2,21 138:24
    140:4 148:11,15
    150:6 157:3,9,20
    160:9 161:6,22
    162:15 163:20
    164:7 165:1,14
    166:4 167:19
    168:1,19,25
    169:12 171:11
    172:18 173:8,24
    176:1,24 178:24
    179:18 181:19
    182:12 183:14
    184:7,23 185:11
    185:16 186:11,17
    187:5 188:2,17
    189:1,7 190:23
    192:14 193:9,22
    194:15 199:7,21
    200:12 201:4,14
    211:1,22 214:21
    215:24 217:5,12
    218:5 224:13,21
    225:7,17 226:3,15
    228:3 229:5,7
    232:7 234:24
    236:8 237:15
    239:16 240:1,9,11
    240:21 241:5
    242:10 244:11
    245:2 248:13,25
    249:9 256:6
    263:13 264:19,22
    265:4,15 270:13
    271:2 274:11,20

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 104 of 128 PageID 13962

J. Terrance Stevens                                September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[objections - operation]                                    Page 32

**objections** 53:21
162:13 245:24
265:1
**objective** 113:14
113:17 214:12,18
**obligation** 267:15
**observation**
124:15 235:19
**observed** 62:1
88:14
**obvious** 226:7
**obviously** 139:14
206:12 222:9
235:2 255:16
269:13
**occur** 252:22
**occurred** 43:15
230:19 231:1
**october** 4:16,25
5:11 92:7
**oem** 104:4 175:19
**offer** 18:10 32:22
85:23 149:21,23
193:7 253:18
270:24 273:20
**offered** 48:18 51:1
51:6 56:12 64:6
64:10 71:14 113:5
178:21 179:17
180:22 181:7,13
181:15 182:10,18
182:22 183:4,7
184:5,22 185:8,15
186:10 187:20
188:1,15 189:6
190:21
**offering** 73:11
178:23 183:10
184:25
**offhand** 30:15
75:4

**office** 7:4 11:13
16:24 23:23 27:22
27:24 56:7,10
57:21 60:1 63:11
202:2 234:6 254:7
**officer** 63:5,14,17
65:25 66:3 68:5
68:10,12 191:24
**officers** 64:25
**offices** 56:11 58:7
**official** 201:16
252:6,19
**officials** 16:23
**oh** 11:16 27:15
29:19 45:16
113:23 115:16
117:14 155:22
158:23 188:24
215:4 222:7 223:8
229:9 230:24
245:15
**okay** 9:16,25 11:4
11:17,20 12:6,12
13:17,23 14:1,9
21:25 25:5,12,15
29:19 31:4 32:24
35:6,20 41:9 46:1
46:1 47:5 51:8
53:22 55:7,8 59:4
61:8 63:4 71:7,9
72:25 75:15,18,23
81:25 82:3,12
84:12 90:16,19
91:19 92:16 93:3
96:9 98:13,14,18
99:1,5,8,12,13,17
99:21 104:6,10,15
105:13,19 107:17
109:4,8,18,23,25
110:3 111:7
112:19,24 113:23

114:7 116:5
117:17 119:5
126:24 127:6,10
127:17,23 128:12
129:25 131:13
132:21 133:13,15
134:2,4,9 139:9
140:9 141:19
144:16 145:4,5,9
145:14,21 147:1,3
147:4 148:17
149:8 150:23
152:4 153:2,10,12
154:8,11,19 155:5
155:13,20 156:4,9
156:11,25 157:12
157:25 158:9
160:7 162:14
163:23,25 164:9
165:19 166:18,24
169:8 170:4
171:25 173:11,15
176:17 177:16
180:21,25 182:16
183:2 184:3,24
187:22 188:12
189:4 190:13,18
191:8,15 193:10
196:8,12 198:12
203:24 204:6,17
207:9,23 208:2,9
208:13,17 210:13
210:21 213:8,16
213:25 214:22,24
215:9,11 218:19
219:3,3,11,22
220:13,19,21
221:12,15,19,25
222:1,19 223:5,8
227:22 229:9
230:3,7 231:6,9

232:23 233:9,14
234:13 235:22
238:4,8,14 239:5
240:24 242:7,15
242:17 244:15
245:6,15,20 246:1
247:19,22 249:10
250:5,10,19,23
251:1,7,24 252:18
253:4,7 254:3
255:1 257:1,14
258:19 259:15
260:15 261:14,15
262:12,25 263:9
265:5,16 266:5,13
266:22 268:3,23
269:20,21 271:4
271:24 274:3
275:1
**omitted** 39:19
**once** 87:9 103:9
140:12 146:18
147:2 149:14
256:8
**onerous** 249:4
**ones** 26:10 27:8
39:18 48:25 73:22
216:24 261:18
**oops** 203:6
**operated** 249:25
**operates** 172:9
249:24 254:10
**operating** 124:21
141:17 142:17
143:25 254:11
**operation** 37:23
61:21 89:3 166:6
178:8 180:5
185:20 186:23
199:14 244:1

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[operational - paragraph]**                                            Page 33

**operational**
170:18
**operations** 5:7
38:3 64:3 65:7,18
81:14 88:4 172:24
177:2
**operative** 213:10
**opine** 158:9
**opined** 80:17
114:3
**opinion** 18:10
24:18 34:24 46:21
51:6,11,24 53:3,16
79:2 80:22 85:24
92:15 111:1 113:6
113:11 114:6,8,24
115:6 116:2
117:24 118:4,8
124:10,15 160:23
161:3 171:9 185:7
185:14 186:9
188:15 196:4
199:13 215:17,21
224:18 247:14
250:2 253:1,18
257:16,17,20,22
258:17 261:5
262:16 270:25
273:3,21
**opinions** 14:3,10
14:10,15 15:1,19
16:3 20:16 23:19
24:16 30:13 33:6
33:14 47:19 48:5
48:8,18 52:15
57:13 58:13 76:3
76:4,5 77:1,1,2,4
77:13 80:7,8
92:13 112:13
113:12 114:9
118:3 123:12

163:17 197:13
204:7 205:10
206:6 207:4 219:6
220:22 235:13
236:24 246:7
247:9 252:16
253:17 259:24
267:3 268:14
**opposed** 54:25
75:16 77:5 98:21
**oral** 214:14
**order** 22:2 74:4
123:12 134:14
135:3 139:9 141:8
223:16 224:5
264:14 274:18
**orders** 185:4
**organization**
62:11 181:22
227:18,18
**organizations**
226:23 227:16
**organize** 256:24
**original** 60:6
67:24 81:17 86:21
97:1 108:19 109:2
117:10 124:21
125:2 126:10
131:22 138:2
139:13 140:2,13
141:10,13,17,21
142:14,17,25
143:25 144:12
145:15,22 146:3
146:19 147:18
148:5 151:7
199:15,17
**originally** 25:19
139:2,16 145:1
151:20 171:6
182:2

**originate** 131:2
**orthopedic** 70:9
70:14
**outcome** 276:14
**outdoor** 177:5
**outliers** 262:8
**outlined** 177:24
232:11
**outside** 64:5 75:19
**overall** 131:16
166:9 210:14
**overlook** 75:14
**overlooked** 112:11
**overseeing** 65:24
**oversight** 194:13
194:21 252:23
**overview** 5:7
**ownership** 89:1
194:14,19
**ozone** 74:15

**p**

**p.m.** 152:7,10
215:1,4 220:1,5
233:1,4 257:3,6
275:6,9
**package** 177:17
246:9
**packaged** 156:22
157:2,7,13,18,19
158:5,11,13,18
159:9,14 191:12
**pad** 44:17,21,24
46:2
**page** 4:8 5:2 6:2
13:23 14:25 16:4
16:6 26:24 36:13
36:16,22 38:7,9,14
38:20 47:1 63:20
92:17,20 93:16,17
96:3 99:10 103:15
103:21 105:20

108:7 109:13,14
115:18 116:17
127:6,10,15,23
129:2,13,16,20,23
130:7,18,22 131:4
132:24 133:1,21
133:25 134:2
167:8 175:13,14
176:10,11 196:18
196:23 197:12,17
198:12 203:21,24
204:4,17,18,23,24
205:3,19 206:18
207:12,13 208:2
208:10,17,18
209:1 215:10
219:11 221:12,13
221:16,20 224:10
225:14 234:13
235:6,23,24
236:15 238:17
247:22 250:9,15
250:16,16,19
251:1,7 257:12
260:13,16 266:21
266:23 267:20
278:4,7,10,13,16
278:19
**pages** 23:4 119:4
235:22
**pandemic** 253:14
**pannell** 29:20
**papit** 230:7
**paragraph** 13:24
14:1 15:20 47:2,2
47:5,6 48:16
62:12 63:16 66:1
75:24 76:2,8
82:18 92:19 93:18
94:4,18 98:14,16
99:1,9,11,19 102:5

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 106 of 128 PageID
13964
J. Lawrence Stevens                                        September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[paragraph - personally]                                              Page 34

103:22 108:18
109:1,5 115:14,15
115:20 116:8,9
119:3,6 127:11,16
127:20 131:4
133:13 134:1,2
144:22,23 145:2
153:1,4,7,8 154:13
154:17 157:10,23
158:2 166:18
171:25 191:6
193:5 195:9
198:13 201:20
202:11 203:4
205:3 206:19
212:22 213:7
214:9 215:8,12
230:3,4 234:15
235:23,25 236:1
239:5 251:8
254:25 257:9,13
257:14 262:11,12
262:24 263:1
268:6
**paragraphs** 76:4,8
79:9 98:19 99:2,5
99:14 108:15
109:19 111:1
116:2,5,10,13,19
238:10
**parameters**
124:21 141:17
142:17 143:25
169:22
**parentheses** 36:25
**parenthetical**
38:16,18 39:14
**parnell** 29:21,22
112:21,22
**part** 14:25 27:13
56:8 60:24 96:1,3

102:6 104:21
117:13 121:4,6
124:25 125:11
126:6 127:25
128:12 133:9
139:12,22 140:10
140:11 141:24
142:15 143:11,21
144:3,5 152:22
153:7 154:12,15
172:3 173:21
174:4,10 176:8,21
178:2,7,22 180:14
181:5,17,24 183:5
183:6,23 185:20
186:5,22 191:20
199:18 202:5
204:20 208:13,15
210:10 215:25
219:8,9 246:9
247:11,18 258:20
259:20
**participate** 163:14
**participated** 43:22
43:25
**particular** 69:23
74:6 80:2 81:20
88:2 89:3 115:7
126:4 129:5 147:7
149:19 150:19
161:18 181:1
183:19 189:14
195:5 196:23
224:6 232:14
270:10
**particularly** 9:6
**parties** 130:5
276:13
**parts** 14:14 15:18
37:13 115:24
143:3 172:3

**party** 5:24 238:22
238:23 241:14
242:5
**passed** 59:6 223:1
223:8
**patient** 66:14
134:24 135:19
210:18 216:20
263:2
**patient's** 162:22
**patients** 262:23
263:19
**pause** 25:11 62:25
97:9 135:8 148:14
162:12 245:23
249:6,8 265:1
**paused** 133:2
**pay** 171:22
**pays** 180:12
186:24
**pcb** 127:1,3
**pdf** 221:13 250:15
**penalty** 10:9 253:8
**pending** 9:25
184:18 238:3
245:13
**people** 15:9 54:21
54:22 59:17 70:3
107:4,14 235:2
239:19 258:3
260:11 262:7
**percent** 49:18,25
**percentage** 31:8
32:12,15 49:16,18
49:25
**perception** 181:20
242:23
**perfect** 49:7
**perfectly** 170:3
227:17

**perform** 143:8
222:4 238:19
**performance** 4:17
80:19 81:9 98:11
100:8,15,22
101:13 103:16
105:1,4,8,8,11
108:8,11 109:20
110:5,11 146:1,19
202:1 205:5,14,25
210:3 268:11,22
273:8
**performed** 18:18
19:23 98:8 100:2
115:23 141:12
172:25
**performing** 179:3
**performs** 14:5
134:25 159:10,12
178:8 202:1
**period** 33:3 60:11
62:18 65:6 103:20
114:22 138:4
228:8,16 231:16
**periodically** 9:21
**periods** 55:16
**perjury** 10:9
253:9
**permissible** 252:9
**person** 9:7 40:24
52:10 58:19 68:25
70:16 83:1 84:2
84:13,17,18 101:3
134:10,12,17
156:14 194:25
248:20 254:8
**person's** 29:20
**personal** 47:18
**personally** 16:19
60:2 64:19 65:3
88:18 100:13

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 107 of 128 PageID 13963

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[personally - prevented]                                        Page 35

116:11
**persons** 214:14
**perspective** 49:23
  66:15 87:4 123:15
  150:15 151:9
  170:9 258:1
**perspectives** 259:6
  259:8
**pertinent** 169:14
  199:12 237:2
**pharmaceutical**
  66:4
**phillips** 1:25 2:14
  7:15 276:6,23
**phone** 10:19 42:13
  43:15 46:8,18
**phrase** 198:7,23
**physical** 121:4
**physiology** 69:16
**pick** 9:7
**picture** 96:2 129:1
  243:22
**pictures** 128:25
**piece** 47:9,24
  121:15 128:16
  161:13 165:11
  167:24
**pinnell** 29:20
**place** 47:10 175:4
  248:6 268:18
**placed** 74:7
  161:13 228:23
  269:3,5,9
**places** 107:21
**plaintiff** 1:6 3:4
  7:25
**plan** 117:8,19
  230:2
**plans** 66:6 229:23
**plant** 69:14

**plastic** 5:9
**played** 47:10
  92:15
**please** 7:17 8:15
  9:10,15,23 11:23
  12:14 13:7,24
  14:14,25 15:15
  36:14 38:8 55:14
  76:1 92:1,17,19
  93:17 104:16
  111:17 115:16
  116:7 120:6 122:1
  152:11 175:13
  196:10,19 198:13
  206:18 207:12
  213:7 214:23
  215:4,5 218:17
  219:24 220:5
  233:4,7 234:8,10
  235:6 236:16
  245:17 250:10
  251:7 255:1 257:6
  257:8,9 258:13
  260:14 266:14,21
**plus** 222:9
**pma** 192:2 193:1
  199:5 218:10
**point** 18:13 25:3
  25:21 29:10 30:17
  32:23 42:25 46:23
  49:10 52:18 65:19
  102:17 103:19
  107:18 120:4
  135:15 144:19
  147:17 160:1
  166:10 167:11
  174:24 178:14
  193:18 194:10
  213:20 216:16
  221:17 231:19
  256:19

**points** 252:10
**pokotilow** 3:19
  7:12
**police** 252:1
**portfolio** 66:21
  220:16
**portion** 181:2
  200:9 205:9 206:5
  207:3
**portions** 76:14
  78:17 194:5
**posed** 162:11
  238:7
**posing** 189:16
**position** 32:22
  34:9,18,22 35:3
  50:4 56:12 63:6
  63:18 150:2
**positions** 63:23
**possession** 44:20
**possible** 24:13
  28:21 34:12,22
  44:17 155:3 162:9
  167:4 203:16
  238:13
**potential** 93:13
  175:23 254:11
**potentially** 58:2
  64:16
**potts** 222:13
  223:11,16 224:10
  224:19 225:13
  249:14
**power** 161:14,17
  163:3,5 164:2
  165:11 170:15
**powered** 206:21
**powers** 164:19
**practical** 57:1
  67:7,23 68:2
  83:15,17,21 84:21

85:4 93:12 104:13
  122:8 149:15
  152:22
**practice** 46:8
**pre** 57:7 59:7 67:3
**preclude** 254:20
**predated** 59:24
**predecessors**
  240:17
**predetermined**
  227:20
**predicate** 264:8
**prefer** 169:2
**preliminary** 68:6
**premarket** 4:12
  5:16 84:4,24
  92:23 218:21
  220:9 260:16
**prepare** 10:11,16
  39:4 43:17 79:24
**prepared** 10:13
  11:3 39:6,18 72:3
  81:15 149:21,23
  187:13 191:12
  207:6 254:18
  256:1 272:13
**prepares** 195:19
  195:22
**preparing** 12:4
  43:4 114:16
  205:10
**prerogative**
  188:22
**present** 3:18 38:19
  238:25
**pretty** 65:1 209:22
**prevacuum** 268:9
**prevent** 10:3,6
  228:21
**prevented** 140:22

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 108 of 128 PageID
13969
J. Lawrence Stevens                                        September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[preventing - purposes]                                              Page 36

**preventing** 67:11
**prevents** 137:17
162:18
**previous** 79:14
**previously** 110:6
**price** 173:16
174:12
**primarily** 70:4,7
**primary** 31:25
232:2
**print** 208:25 209:5
**printed** 160:17
206:21
**printing** 207:19
**prior** 16:20 18:20
38:14 45:12 46:6
52:13 53:3,16
54:5,6 57:16
58:16 79:21 83:8
86:13 112:15
122:6 136:7
138:25 148:15
150:8 192:15
201:5 244:12
253:14
**private** 57:10
**probably** 56:16
104:12 111:8
153:15 159:2
233:23 235:15
246:8
**problem** 73:13
95:25 226:21
232:19 255:19
**problems** 222:10
222:15
**procedure** 4:22
126:18 222:5
263:3
**procedures** 41:13
105:22 208:10,24

209:4,5,8 227:13
227:13
**proceed** 7:20
**process** 5:6 23:23
59:13,18 60:5,10
67:3 70:23 80:1
86:16 94:13
108:13 119:7,19
119:21 125:12,15
126:6 127:20
131:5 139:12
143:11,14,22,24
144:11 146:11
166:9 174:20
176:22 177:24
178:3 180:6
226:24 234:19
239:6
**processes** 156:16
**processing** 98:9
100:6,13,21 248:4
**produced** 191:19
**product** 37:18
58:3,6,8 61:1,6,19
63:25 64:9,11,13
64:14,15 72:9
73:11,11,23 83:12
86:15,25 87:6
88:17,23,24,24
94:6,12 95:3
96:13 97:3,17
100:2 101:10
117:10 125:23
140:21 141:15
142:16 157:1,17
157:18 162:19
174:10 177:19
183:20 185:4
209:15 210:8
215:14,22 216:15
217:17 222:13

226:5 245:11
247:3,6 249:14
273:9
**products** 58:20
64:5,17,23 65:9
88:12 91:22 95:2
119:23 140:7
160:20 177:20
209:21 210:4
261:9 262:21
**professional** 2:15
48:19,25 49:1,4,15
50:17 112:6
**program** 17:10
69:9 268:23
**programmed**
141:10 205:4,24
268:10,21
**prohibition**
248:18
**project** 31:7 32:7
**projects** 31:7,10
32:9,13
**proper** 127:2
191:23
**proposal** 243:9
**proposed** 207:20
**proposes** 84:6
**proposing** 209:17
**proposition**
194:12
**protocol** 273:24
274:3
**prove** 226:12
270:20,22
**provide** 14:2,9
20:10,12,16 23:24
26:2 27:17 32:18
72:11 74:8 77:20
89:1 135:17
161:14 180:7

195:6 212:1 247:3
270:10
**provided** 26:4
27:22,25 39:9
106:20 111:25
119:20 177:2
183:20 195:23
218:25 268:8
269:25 270:5
**provider** 180:7
**provides** 136:12
161:17 162:22
170:15
**providing** 49:14
136:17 175:16
183:21,22 201:18
236:20
**provision** 87:21
**proximal** 128:16
128:18 130:19,23
**public** 195:23
202:6,8 207:7
254:4 255:17,24
279:19
**publicly** 202:6
**publish** 12:13
**publishing** 12:18
**pull** 26:21 29:14
75:25 82:10 96:7
258:12
**pulling** 133:16
**pump** 73:25
**purchase** 164:3
**purchased** 88:25
163:6 164:6
**purification** 74:16
**purpose** 103:23,23
121:21 168:23
209:23 225:10
**purposes** 51:11
69:24 75:17

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 109 of 128 PageID
13067

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[purposes - rebotix]                                                    Page 37

105:25 147:1
**pursuant** 2:13
84:3 93:4
**pursue** 41:17
**pursued** 249:2
**put** 12:25 29:16
39:10,13 44:12
57:2 67:18 111:5
123:17 158:14
165:16 168:16
169:10 174:9
177:13 181:24
198:9 206:14
209:20 212:15
218:19 226:9
230:16 254:6
255:25 270:21
**putrid** 191:11
192:21 194:8
**puts** 151:1 161:15
**putting** 59:18,21
77:25 135:25
143:22 168:23
171:4 185:2

**q**

**qualifications**
241:11
**qualified** 51:16
101:20,21 116:25
124:19
**qualify** 260:11
273:21
**quality** 59:19
153:12,16 155:1,2
191:20 192:22
**question** 9:9,14,17
9:18,25 15:23
17:16,21 19:16
25:13 29:1,2
33:23 40:7 53:13
53:14 54:24,25,25

61:17 62:24 75:16
79:4 80:7 81:21
81:21 85:3,4
89:10,25 90:2,12
90:18,20 104:11
107:25 118:7
120:21 132:14
133:5,16 134:5
135:2,8 138:17
139:23 141:20
147:2 154:21
157:6 163:1,16,21
164:1,17 169:22
169:23,24,25
170:11 174:1
179:6,24 181:2
184:13,15,18,19
184:20 185:10,24
186:3,6 188:13
189:6,15,18,21
190:2,4,7,9,11,14
190:16,19 194:17
195:2 200:15
201:10 203:9
209:9 212:3 213:9
227:24 238:3,7
239:21 240:7,13
241:25 244:16
245:13,23,25
246:15,19,21
253:25 265:7,9
271:8,9 272:3
**questioned** 24:21
**questions** 9:3,10
24:12 37:16,20
43:17,19 59:13
64:22 132:10,11
162:11 163:15
164:19 169:3,7
180:25 185:23
202:19,24 213:23

229:14 234:9
236:16 238:12
245:21 269:15,19
269:24 275:2
**quickly** 38:6
127:14
**quite** 86:20 87:4
154:4 226:7
**quote** 136:3
**quoted** 53:25
**quotes** 191:9
**quoting** 115:13

**r**

**r** 75:8 276:1 278:3
278:3
**radiological** 56:2
59:17 65:13
**raise** 255:24
**raised** 252:10
**reached** 22:21
140:23 141:21
142:23 253:21
**reaches** 121:12
**reaching** 22:9,25
47:8 53:3,16
144:18
**read** 15:4 22:23
23:19 76:18,20
95:13,15 97:12
114:12,15,16
116:24 124:6
130:17 137:14,24
176:3 198:7 200:4
200:9,16 206:15
237:18,19 257:18
260:3 261:21
277:9 279:5
**reading** 45:13
114:10 194:5
197:22 198:1,8
205:9

**readings** 134:20
**reads** 96:15
131:12
**ready** 178:14
**realistically** 113:7
114:4
**reality** 263:14
**realize** 272:23
**really** 25:2 51:18
75:15 80:7 89:20
107:9 124:14
131:7 141:14
144:8 147:9,17
149:21 162:4
163:8 164:16
169:2 179:20
182:3 192:5
193:18 202:21
211:24 236:4
237:1,2 244:16
272:11,25
**reason** 21:1 77:12
91:2 94:18 118:23
148:6 254:1
277:11 278:6,9,12
278:15,18,21
**reasonable** 48:18
49:3,15,17 50:7,10
50:17
**reasons** 110:7
206:13 249:11
**rebotix** 1:5 4:19
5:6 7:7,25 10:18
12:2,7,11 14:5
15:6 18:5,7,8,20
18:22,24,25 20:16
21:2,6,8 26:2
27:16 28:8,12
29:3 31:5 37:17
37:23,24 38:3,4
40:20 41:13 76:23

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 110 of 128 PageID
130969
J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[rebotix - reduce]
Page 38

78:12 80:18 81:14
81:15 88:5,11,17
88:19,21,22 89:1,5
89:11 90:2,21
91:2 94:24,25
97:24 98:6,7
99:18,24 100:5,10
100:19,25 101:8
103:14 104:20
105:15 106:4,5,14
106:16,18,20
107:23 108:2
110:4,6 112:2
113:14 114:3,25
115:23 117:7,18
119:1,7,14,19
124:19 125:11,22
126:3,19 127:20
127:21 138:15
139:10 140:6
141:12,25 142:6
142:16 143:11,13
143:13 144:1,11
144:24 145:23,25
146:2,15 147:5,5
148:9,21,22
149:13 151:12
159:16 160:2
165:21,25 166:15
166:24 167:16
171:2,3,9,14,17,20
172:25 173:12,15
173:20 174:3,18
174:19 175:15,23
175:24 176:4,22
177:2,10,18,23
178:8,20 179:1,7
179:14 180:5
181:3,21 183:22
185:8,15 186:23
199:13 211:20,25

212:5,17 227:18
229:18,19 230:12
231:6,15,25 232:5
233:21 238:24
239:10,14,17,20
239:22,24 240:7,8
240:12,15,16,17
241:1,2,2,6,17,19
241:22 242:3,16
242:18,23,24
243:1,12,23 244:5
246:11 247:1
248:24 249:15,17
249:21,22 253:19
253:22 255:2,10
255:23 266:4
267:1,12,15
268:15 269:5,9
277:4 278:1 279:1
**rebotix's** 102:6,14
113:6 115:8 117:4
172:1,3 178:23
239:6 240:17
241:2 243:17
244:9 255:5,6
**rebotix068475** 5:7
**rebotix077729**
5:19
**rebotix128997**
5:21
**rebotix131427** 6:4
**rebotix162404**
4:22
**rebotix170053**
4:18
**rebotix171030**
4:20
**rebuttal** 14:16
15:20 16:8 20:10
20:12,14 193:21

**recall** 10:19 21:20
25:2 26:11 29:10
30:7 31:25 35:13
35:14 36:6 39:16
39:23,25 40:4,8,19
41:24 42:10,20,22
43:2,5 44:19 45:2
45:8,22 46:1,23
51:10 52:14 54:7
54:14,16 63:12
70:1 72:23 74:2
74:11 75:4 78:10
81:8,11 101:17,25
102:22 103:18,19
104:6 105:2,17,18
108:3 111:25
112:5,9 114:6,19
114:20 118:21
120:3,4 123:7
126:22 127:13
167:4,10,11,13,21
174:24 176:16
193:25 194:22
197:22 198:1,25
199:8 205:9 216:1
217:7 218:1,6
219:10 221:17
224:7 231:9
233:15 244:20
258:21 259:1,3
270:2 272:5,7
**recalling** 204:12
**receipt** 277:18
**receive** 24:4 28:11
29:3,6 248:7
**received** 24:3,7,8
28:14 29:7 232:5
245:5
**receives** 178:22
**receiving** 70:1
145:24

**recess** 15:13 55:11
111:14 152:8
215:2 233:2 257:4
**recipients** 5:18
**recognize** 13:14
74:24 141:3,9
206:24 218:23
**recognizes** 264:18
**recollecting**
114:21
**recollection** 53:1
53:15
**recommendation**
58:7 63:9,24
**recommendations**
238:19 251:25
**reconcile** 253:17
**record** 7:1,18 8:16
11:16,19,22 13:2,4
13:5,7,25 15:8,12
15:15 28:19 55:10
55:13 90:15 92:2
96:8 99:7 103:4
103:11 111:13,16
120:18 133:22
152:7,10 155:8,25
161:2 198:14
215:1,3 218:18
219:18,19,23
220:1,2,5 221:14
232:24 233:1,4
257:3,6 275:4,8
276:9
**recorded** 7:5
**records** 31:23
104:20
**redesign** 223:19
**redesigned** 222:25
223:18
**reduce** 5:6 174:20

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 111 of 128 PageID
133069
J. Lawrence Stevens                                        September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[refamiliarize - remember]                                              Page 39

**refamiliarize**
221:22
**refer** 10:21,22
105:22 108:11
120:22 132:1
152:15 195:10
**reference** 27:11
30:10 37:23 51:15
52:20 77:18 78:23
79:25 109:15,16
123:5 153:16
201:17
**referenced** 23:3
28:16 37:11 52:11
81:13 82:7 103:1
200:14 277:6
**references** 37:6,8
38:3 39:15 108:18
109:1,5,8,11
209:10
**referencing** 52:24
80:2
**referred** 194:1
**referring** 35:3
48:3,14 68:19
83:4 86:10 112:3
112:22 129:15
194:23 230:21
241:16 258:17
**refers** 131:7
**reflect** 48:25 252:8
**reflected** 18:16
**reflection** 252:15
**refresh** 82:7
102:19 132:18
**refurbish** 81:16
**refurbished**
141:14 151:22
152:2
**refurbishes**
148:23

**refurbishing**
177:5
**refused** 64:16
**refusing** 190:1,3,7
**regard** 165:22
166:1
**regarding** 10:15
14:3 21:9 37:17
41:12 47:16 62:7
76:21 106:4 125:9
153:24 199:13
216:6,9 217:2
226:6 229:14
237:3 253:19
**register** 4:24 84:3
155:11,17
**registered** 2:14
**registration** 64:12
155:13 159:3
265:25
**regulate** 183:7
263:21
**regulated** 158:20
158:25 256:22
**regulates** 194:23
228:18 264:18
**regulation** 19:21
60:6 82:21 85:5,5
85:14 152:13,18
152:24 153:6,13
154:14,23 155:16
158:21,24 187:12
191:20 192:10,22
212:25 213:10
214:6,17 249:23
**regulations** 27:21
59:12,19 155:2,2
159:4 180:16
189:10 194:11,12
249:23 252:1
255:3,7,11 260:24

**regulatory** 5:7
57:9 60:22 66:6
70:6,21 83:11
194:20 236:10,11
261:11,15,22,24
267:13
**reintroducing**
83:2 84:14
**relate** 14:15 15:19
57:13 71:8 249:16
**related** 14:6 40:17
59:2 88:23 123:8
146:12 172:12
216:1 241:19
276:12
**relates** 88:21
168:21 180:21
244:6
**relating** 41:15
**relationship** 168:4
168:5 171:10
**relative** 37:16
218:12
**releasable** 5:9
202:6
**release** 195:21
202:5
**released** 4:22
**releases** 195:20
251:24
**relevance** 185:19
**relevant** 37:20
163:16 184:13
185:24 239:13,23
241:3 242:8,8
**reliability** 98:11
100:8,15 101:14
205:5,13,25
229:15 268:11,22
273:15 274:2,7,16
274:18

**reliable** 259:24
273:15
**relied** 47:7 54:8
196:20 217:3
218:3 230:18
**rely** 58:14 196:3
215:17 231:14
258:6
**relying** 51:10
52:14 53:2,15
57:12 58:13 132:2
135:20 158:21
**remain** 264:7
**remanufactured**
93:19 95:2,3
97:17 103:25
104:2,11 229:24
238:22 242:5
267:8,23 269:10
**remanufacturer**
95:4,8,11 96:18,24
97:2,8,13,16 98:3
241:3
**remanufacturers**
93:24 94:21
**remanufactures**
95:17
**remanufacturing**
80:20 94:23 98:5
105:21,25 108:13
180:6 239:6,15,25
243:15
**remember** 25:11
29:15,15 36:11
46:10 50:21 53:20
61:10 62:22 67:6
74:6,13 75:11
90:8,17 117:6
163:21 193:15
194:21 205:12
244:25 265:8,9

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[remind - reprocessed]**                                    Page 40

**remind** 81:19
**reminded** 39:8
**reminder** 44:18
**reminds** 154:6
**remote** 1:13 2:10
9:5
**remotely** 56:16
**remove** 73:12,15
73:19
**removed** 125:6
**removing** 73:10
**render** 73:24
**renewed** 148:5
**repair** 1:5 7:7
81:16 88:6,15
89:2,2 98:4,4
119:7,19 124:20
125:12,15,21
126:6 127:20
131:5 139:12
140:9,10,12
141:24 142:6,7,9
143:2,13,22,24
144:4,5,10 159:24
171:14 173:1,4
174:13 175:16
176:4 183:22,24
277:4 278:1 279:1
**repaired** 67:22
100:1,3 117:21,21
140:13 146:18,24
151:14,22 173:4
173:12
**repairing** 67:23
119:21 139:12
183:25
**repairs** 145:25
148:24 151:1
171:18 181:5
183:22

**repeat** 13:19
138:18 216:3
235:16 265:7,11
**repeating** 78:23
**rephrase** 9:15
101:2
**replace** 161:19
164:4
**replaced** 170:17
228:17
**replacement** 163:6
**replacing** 260:4
**reply** 250:12
**report** 4:10 10:14
10:22 11:1,2 12:4
13:10,15,16,18,21
13:23 14:11,15,17
14:20,21,25 15:18
15:22 16:6,10,15
16:16 18:14,19
19:25 20:4,5,10,12
20:14 21:11,15
22:2,4,8,12,15,21
22:22,23 23:2,3,4
23:7,13,20,25 24:1
24:2,5,10,12,20,25
26:3,5,14,15,20
28:1,2,15 29:6,8
29:24 30:1,2,3,4,5
30:9,22 31:1
32:12 33:1,6
34:14 35:21,22,25
36:7,7 37:7,9,11
39:5,22 40:2,21
41:5,8,11,18 43:4
43:7,12,14 44:7,9
44:12 46:12,14
47:1,14 48:17
50:21 51:5,11,14
51:22 52:1,4,6,7,8
52:11,11,14 53:3,7

53:9,11,16,24,24
54:1,8 61:22,23
62:3,12 63:17
66:1 67:5 75:10
75:13,23 76:4,6,9
76:10,11,14,18
77:4,8,13,16,16,18
77:18,22,25 78:1,3
78:4,4,16,18,21,22
78:24 79:9,14,16
79:21,25 80:4,6,13
80:25 81:7,18,22
82:2,7 98:7,19,21
98:22,23,24 99:3,6
99:9,14 101:25
102:2,3,5,25 111:5
111:20,24 112:8
112:12,18 113:2
113:10 114:9,13
114:16,17 115:14
115:17,18,21
116:3,6,11 118:18
119:2,3 120:22
123:5 127:11,17
131:3 132:1,5,8,18
132:18,24 133:3,4
133:12,14 134:1
139:22 141:6
143:20 144:23
153:1 155:4
157:24 160:6
163:9 166:19
169:3,19,20 172:1
172:7 173:10
174:6 191:7
192:17 193:21,25
194:6,21 195:6,10
196:3 200:3,14
202:13,18,25,25
203:5,10 212:22
213:2,5 214:9

215:8,10 218:7,24
219:6 220:15,21
229:19 230:4
254:25 257:9,16
257:18,21,23
258:6,7,15,16,20
258:21 259:2,10
259:16,17,20
260:14 262:11,12
266:2
**reported** 221:20
**reporter** 1:25 2:15
7:14,19 45:7,22
91:15,19 264:25
**reports** 51:19,20
51:21 52:20,22,23
54:13,22 56:11
63:7 68:15 79:5
111:21 117:1,6
**reposable** 197:2,6
**represent** 47:6
209:7 220:17
**representation**
13:17,20 253:1
**representative**
59:9 60:12,21
**representatives**
214:15
**represented**
257:16,21
**represents** 237:11
255:17
**reprocess** 238:23
242:20 263:24
264:14 265:22
**reprocessed** 93:19
238:22 241:14
242:5 243:15
263:4,7,11 264:9
265:14,21 266:2

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 113 of 128 PageID
1397
J. Lawrence Stevens                                              September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[reprocessing - review]                                                  Page 41

**reprocessing**
264:3
**reprocessor**
243:23 264:10,13
**reprocessors**
93:25 96:10 97:4
238:23
**request** 28:7
211:25 245:6
**requests** 28:10
**require** 14:5 23:10
64:24 66:25 76:25
81:6 83:14,24
88:8 89:3,8 91:1
93:14 95:20 161:4
161:8,11,21 164:6
165:12 195:25
206:10 209:17
217:22 227:1
229:2,16 260:9
270:16
**required** 4:12 15:6
61:7 66:5 78:15
84:3 93:23 94:20
95:3 111:5 155:17
163:17 180:16
193:13 204:20
207:23 218:12
226:14 248:5
279:13
**requirement** 73:9
73:12 85:11 105:5
155:13 181:14
183:5 189:9,14
213:8 227:11
228:22 260:21
270:9 272:11
273:12
**requirements**
37:17 59:6,18
68:17 74:5 91:24

92:23,25 153:7,23
153:24 154:14,24
180:1,15 182:25
187:18 189:11
194:20 261:6
262:19,20 272:10
274:6
**requires** 64:24
67:2 87:23 96:14
164:25 210:12
253:22 264:5
**requiring** 84:23
**research** 56:7
258:15
**researched** 193:4
**reselling** 242:22
**reserviced** 148:4
**reset** 124:17 126:4
131:17 137:7
140:14 142:1,3
147:2,25 150:1,11
176:18 212:6,8,9
**resets** 146:15
**resettable** 175:17
**resetting** 144:13
**resident** 56:13
**resources** 79:4
252:20
**respect** 23:18
88:12 106:15,20
109:21 128:7
191:16 218:2
248:22
**respond** 53:21
232:13
**responded** 232:15
**response** 235:24
236:1 238:10,16
240:7
**responses** 9:3
234:8,10 236:16

236:20 237:14
238:11
**responsibility**
273:25
**responsible** 5:6
174:19 247:2,5
**responsive** 14:10
**resposable** 197:6,7
197:11,23 206:20
209:11
**rest** 16:14
**restate** 90:18
**restated** 78:21
**restating** 80:8
**resterilize** 263:20
**restore** 143:24
160:3,7 260:20
261:1,3,6
**restored** 141:16
**restriction** 228:23
**restrictions**
270:12
**restroom** 232:20
**resulting** 103:25
**results** 5:9 101:1
224:14
**resume** 62:16
101:17
**retained** 14:2
18:20 20:15
**retractors** 197:3
**return** 81:16
124:20 142:16
144:11 171:5,19
178:11,15 180:11
181:25 226:25
277:13,17
**returned** 125:17
125:23,23 131:18
146:19 150:11,12
151:7 178:5

**returns** 141:13
145:14 183:24
**reusable** 198:5
204:24 205:22
209:18 211:21
212:14 225:15
226:2,8,13,22
227:2,8,10,15,25
228:6,15,16,18
229:4 238:21
241:13 242:4
262:14,22 266:9
268:7,25 269:1
270:17 273:4,7,13
273:23
**reuse** 5:6 174:19
198:2,7,20,23
209:11 225:15
**revealing** 272:20
**reverse** 115:22
**review** 18:4 20:2
20:11 21:9 22:11
22:14 24:9,14,15
24:25 26:6,8 27:9
27:12 30:4 31:22
35:23 36:19 37:3
37:14 39:20 40:11
40:15,15 56:23
57:22 58:22 63:7
64:5 71:20 77:8
78:1 92:12 102:14
111:20 116:18
123:2 167:5 175:6
199:5,10,18
200:18 201:6
206:5,7 207:7,9,11
210:14 215:20
219:5 220:21
235:12 236:23
244:9,19 247:8
265:23 277:7

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 114 of 128 PageID

13072

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[reviewed - running]                                                        Page 42

**reviewed** 10:13
17:9,16 20:5
22:23 24:11 25:6
25:7 26:10,14,18
27:10 30:2,8 37:5
39:8,12 40:5
43:12 51:15 52:20
54:13 81:12 100:9
100:19 101:24,24
101:25 102:12,23
116:12,14,15,21
123:6 167:9,12
175:1 197:12
198:24 201:22
204:7,9 209:10
225:3,4 237:1,5
244:19,20,22
246:6,12,17
247:11,18,21
248:23 258:24
260:2 267:2
**reviewer** 107:3,9
107:10,23 108:1,5
110:19,21 111:3
**reviewers** 107:4
**reviewing** 17:12
22:2,21 30:12
33:5,13 34:12,23
35:4 39:23,25
40:8 56:11,18
104:6 110:22
199:8 200:18
202:3 205:12
209:13,16,23,25
210:7,9 216:1
218:1 233:15
244:24
**reviews** 228:9
**rick** 3:5,8 7:23
132:6 190:6
202:20 244:15

277:1,2
**right** 8:22 10:1,19
17:21 27:2 28:2
28:25 30:20 32:18
36:21,25 40:21
42:20 45:7,15
46:4,17 47:25
50:24 52:2,3,5
53:4,17 54:17
55:5,20 58:14
61:2 62:16 63:19
63:21,21 67:1,2
68:7 69:6 70:23
71:20 73:2 75:4
78:7 80:20 81:1,8
81:25 84:9 85:7
86:11 87:18,24
89:6,22 95:9,22
96:1,3,22 97:1,7
97:20 98:11,17,24
99:3,15,19 101:23
102:23 105:1,6,10
106:16,21 107:1,2
108:3,14,17
109:15 111:21
119:15,16,17,25
120:24 121:25
126:8,11,23
127:12 129:5,10
129:11,18,21
130:5,10,13,14,17
130:20 131:9
132:20 133:1,1
134:4 138:23
139:5,11,20
140:17,19,25
141:4,7,10,22
142:5,14,25 143:4
143:21,23 145:19
146:15 147:20,21
148:1,13 149:2,10

149:13 150:17
151:17 154:19
155:15,15,18
156:10,11,13,17
157:8,15 158:23
159:18 163:3,7,15
164:21,22,23
165:12 167:4
169:8 170:20,23
173:9 176:20
178:4,6,12,16
180:17,23,25
181:18 182:19,25
183:1 184:14,20
187:20 189:12,13
193:7 196:25
199:20 200:4,4,24
200:25 201:3
202:11 203:20
204:5,7 207:2,15
207:21 208:7,14
208:19 211:16,21
212:23,24 213:1
214:8,9,10,19,20
219:3 220:7,19
222:6,18,22,23
223:3,7,10,13,17
223:23 225:2
229:21 230:6,9,10
230:19 231:9,11
231:17 233:13
234:12 236:17,18
236:19,20 237:14
238:8,17 239:7,12
240:5 242:15
244:10 248:1
249:3,23 250:21
250:22 251:20
252:2,12 253:9,12
253:13,15,16
254:5 255:8 256:5

257:13 259:6
260:1,2,3,18,19
261:16,17 262:2
262:17 263:4
264:10,16,21
266:5,6,10,12
269:6 274:9,25,25
**ring** 160:4
**risk** 5:24 66:5,12
86:5 210:17
255:17
**risky** 66:13,14
87:4
**robot** 124:11
175:18
**robotic** 123:21,25
**robotics** 160:3
260:21 261:1,4,6
**role** 19:11 47:10
**roman** 92:20
267:21
**rosecrans** 14:11
14:22 15:21 16:3
16:8,16,18,24 17:1
18:2,6,9 20:10,11
20:15 23:24 24:2
26:3,5,14 28:1,4
78:3 80:25 81:22
82:1 115:21 174:7
193:6,11,25 194:3
**rosecrans's** 14:16
111:19
**rpr** 1:25 276:23
**rti** 206:21
**rule** 107:11
**rules** 52:25 58:25
60:15 271:21
**run** 9:22 246:16
**running** 67:5,8,16
246:22

**[ryan - see]**

| | | | |
|---|---|---|---|
| **ryan** 5:19 75:1 | **saw** 81:14 112:25 | 233:20,20 234:7 | 116:7,16 231:8 |
| 233:10,20 234:7 | 115:4,5 117:1,24 | 234:16 243:5 | 235:5 247:23 |
| 235:7 236:2,6 | 118:8 160:5 216:6 | 246:11 247:24 | 259:18 |
| 246:4 | 217:21 257:18 | 248:3,5 250:20 | **scs** 251:16 |
| **ryan's** 234:14 | **saying** 44:9 47:15 | 251:8 260:16,19 | **search** 5:9 217:14 |

**s**

| | | | |
|---|---|---|---|
| | 47:20 57:14 77:19 | 261:11,15,24 | **second** 11:16 |
| **s** 14:11 17:9,12,17 | 77:24 83:16 101:1 | 262:22 264:12 | 39:18 65:15 |
| 18:3,4,4 56:19,21 | 103:18 110:14,15 | 265:21 267:5,6,7 | 154:21 162:12 |
| 60:7 62:7 64:12 | 110:17 118:17 | 267:23 268:6,20 | 175:13,14 176:17 |
| 68:18 71:4,7 | 120:15 136:8 | **scale** 79:20 | 205:21 238:18 |
| 93:10,23 94:20 | 140:9 148:17 | **scanning** 38:5 | 250:9 257:11 |
| 106:8 107:4 199:6 | 151:3 173:3 181:4 | 59:24 | **secondary** 206:22 |
| 200:10,16 201:19 | 183:9 187:9 | **schiff** 251:8 252:7 | **section** 82:13 83:3 |
| 202:3,10 203:3 | 189:10 198:11 | **science** 69:7,11,14 | 83:5 84:4 129:6 |
| 218:21 278:3 | 227:10 232:10 | 69:16 274:22,23 | 129:14 153:5 |
| **safe** 210:11,12,23 | 234:22 239:10,22 | **scientific** 250:3 | 154:13 196:23 |
| 255:4,9 | 240:4 241:12,12 | **scientific's** 250:12 | **sections** 159:4 |
| **safely** 104:2 | 241:20 243:1,5 | 251:10 | **see** 12:21 13:11 |
| 224:11 273:6 | 255:14 256:12,13 | **scientist** 101:18 | 14:7,12,13,20 |
| **safety** 80:18 81:9 | **says** 39:2 47:6 | **scissors** 221:25 | 26:23,25 28:17 |
| 110:5 215:14,23 | 63:17 66:2 83:1 | 222:2,12,13 | 29:12 36:15,17 |
| 216:13 | 84:2,12,22 92:6,21 | 223:11,16 224:10 | 37:1,1,11 38:9,12 |
| **sale** 178:21 179:17 | 93:22 94:4 96:17 | 224:19 225:13 | 38:16 47:2,11,12 |
| 180:22 181:7,13 | 97:4,18 103:23 | 249:14 | 48:19,20 63:19 |
| 181:15 182:10,18 | 105:21 106:2 | **scooching** 154:3 | 66:7 76:6 78:2 |
| 182:22 183:5,7,10 | 108:10 109:2 | **scope** 31:25 92:18 | 82:1,6,14,16,18 |
| 184:5,22 185:1,5,5 | 119:6 125:24 | 92:19,21 93:3,4 | 84:10,15,16 92:7 |
| 185:8,15 186:10 | 126:25 128:2 | 200:21 | 93:1,18,20 94:1,2 |
| 187:20 188:1,16 | 130:11 156:14 | **scott** 167:17 | 96:6,17,21 98:14 |
| 189:6 190:21 | 157:10 158:8,24 | **scratch** 44:17,21 | 99:8 101:6 102:25 |
| 194:23 | 158:24 167:8 | 44:24 46:2 | 103:8 104:4,5 |
| **sample** 63:7 | 174:7 175:15,21 | **screen** 12:21 13:1 | 106:1,2 108:8,13 |
| **santa** 3:6,7 | 176:18 178:11 | 26:24 47:3 82:14 | 108:18,19,20 |
| **satisfactorily** | 197:1 198:15 | 95:25 96:1 98:15 | 109:5,7,9,11 |
| 117:21 | 204:19 205:3,21 | 99:8 133:25 | 110:13 111:23 |
| **satisfactory** | 206:19 207:16,19 | 153:11 214:2 | 113:9 115:24 |
| 117:24 118:9 | 208:4,4,10,25 | 218:19 238:17 | 119:12,13 126:24 |
| **satisfied** 210:22 | 209:4 211:4 | 257:13 268:4 | 127:4,5,7,9,19 |
| **satisfy** 181:6 182:9 | 214:12 222:8,11 | **scroll** 15:25 82:17 | 130:21,21 131:8,8 |
| 182:17 | 222:20 223:18 | 92:18 105:19 | 145:1,4,5,15 146:4 |
| | 224:16,22 226:10 | 108:25 109:4 | 149:22 151:24 |

J. Lawrence Stevens
September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[see - setting]**

Page 44

152:1 153:5,7
154:3,15,16,18,18
155:12 156:7,16
156:23,24 158:6
166:9,22 167:7
168:3,5 170:24
171:7 172:4
174:21,25 175:2,5
175:19,21 176:10
176:12,17,19,25
177:4 184:6,8
186:25 191:13
194:3,6 195:11
196:24 197:4,19
198:15,21,22,23
202:13 204:3,4,25
205:1,7 206:2,4
207:1,15,17,19
208:9,11,12,25
209:25 214:4,15
215:14 217:13
218:24 220:10,12
220:16 221:25
222:7,19 223:8
233:11 234:11,14
234:15,19 235:10
237:16 239:3,9,18
242:18 243:1,4,23
247:2 248:8
250:13,19 251:17
252:13,23 255:7
255:13,19 258:8
258:25 260:17,24
260:25 261:13
262:21 266:19
267:8 268:1,11
**seeing**  103:18
115:12 126:22
198:25 224:7
**seek**  15:6 71:23
74:11

**seeking**  71:16
242:4
**seen**  51:19 52:21
103:16 104:7,25
105:16 107:21
113:14 126:20
128:24 129:1
132:3 159:19
172:12,16 174:5
174:23,25 175:10
176:13,16 186:13
196:14 203:14
219:4 221:16,18
224:4 233:17
244:8 255:16,23
266:17 269:4
**sees**  190:15 246:15
**segment**  5:24
**selected**  27:8 59:8
**sell**  187:1 188:22
188:24 195:1
229:24
**selling**  97:16 172:2
243:2,6
**send**  21:9 89:2
143:5,12 146:22
148:21 173:5
174:12 227:19
243:9 248:19
254:6 267:14
274:14
**sending**  57:3
143:6 237:12
**sends**  146:15
147:5 148:25
177:9,18,23
179:14 248:17
**sense**  51:18 57:1
69:4 73:8 83:15
83:17,21 89:23,25
104:12,13,14

113:12 122:8,8
123:23,23 124:5,7
162:8 164:13
168:18 173:1
182:15 184:25
188:5 189:19
192:6,9 216:21
227:20 232:9
237:3 267:12
**sent**  21:15 28:3
35:23 36:7,11
50:20 106:4,14,18
125:24 140:8
143:14 145:23
147:4,12,15,23
150:25 171:2
173:2 232:10
236:2 240:8 245:4
246:10 248:10
254:16 277:14
**sentence**  47:6
48:17 66:2 98:15
99:2 130:10
204:23 205:21,23
238:19 261:10
267:22
**senza's**  251:16
**separate**  44:5
247:16
**september**  1:16
2:6 5:14 7:3 65:18
276:18 277:3
**series**  108:15
**served**  66:23
68:24 79:1,11
121:21
**service**  4:22 126:1
126:17 140:6
171:14,23 173:1
173:21,22 174:4
175:16 176:5,8

178:23 179:3
180:7,7 183:20,22
212:1,17,19
227:17,18
**serviced**  100:23
141:11 147:10,12
148:5 149:11,17
150:12 151:7
178:15 180:8
217:23 262:23
**services**  4:20 14:5
98:4 105:14
144:24 148:10
149:14 172:4
249:21,22 255:3,6
255:6,10,23
**servicing**  41:13
76:23 78:12 98:10
100:7,14 101:9
124:23 125:21
141:12 142:15
143:7,8 147:12
151:11,12 171:2,3
171:3,21 174:10
177:1 178:3,8
181:21,24 185:20
186:5,22,23
226:23 227:3,15
243:13
**serving**  19:1
**set**  14:15 15:19
27:25 76:3 138:7
138:13,21 140:2
143:16 145:1
215:22 216:21
217:3 234:11
248:2 276:8,17
**sets**  146:3 153:6
154:14,24
**setting**  215:13

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 117 of 128 PageID 139079
J. Lawrence Stevens                                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[seven - sought]                                                              Page 45

**seven** 109:13
**share** 12:20 16:1
  133:24
**shared** 96:7
  175:22
**sharlin** 11:5,7,8
  20:15,19,21 21:3,7
  21:11 24:1 28:5
  78:5 80:3,17 88:3
  99:9,17 101:11
  102:5 110:25
  118:20,24,25
  119:3,6 120:1
  127:11 129:3,20
  194:18
**sharlin's** 20:5 22:2
  22:4,10,21 23:12
  23:19 24:5,10,19
  24:25 28:1 43:12
  43:14 76:4,9,17
  77:1 78:1,18 79:9
  98:19,21,24 99:3
  101:15,23 113:10
  116:3,6,11,23
  117:4 131:3
**sharpening** 174:11
**sheet** 277:11
**shelf** 254:23
**shine** 170:16
**shipped** 177:20
**ships** 185:4
**short** 42:1 103:20
  114:22 232:20
**shortly** 21:14
**show** 100:2 116:17
  180:10 195:7
  210:5 227:22
  273:16
**showed** 117:9,15
  227:23

**showing** 81:15
  178:3 180:9 211:9
  218:13 224:1
  247:4
**shown** 214:13
**shows** 86:7 106:8
  211:5 223:20
**sic** 27:1 67:10
  104:23 150:25
  197:2,6 208:5,21
**side** 207:15,17,18
**sign** 277:12
**signature** 234:3
  251:1,2 276:22
**signed** 277:20
**significant** 83:13
  84:23 85:1,17
  86:7,8 117:10
  232:6 252:19
  253:12 254:4
**significantly** 80:18
  83:3 97:25
**silence** 255:4
**silent** 249:20
  255:22
**similar** 160:16
  167:24 238:23
**simms** 3:20
**simple** 151:15
**simply** 238:21
  241:13 242:4
**simulate** 113:8
  114:4
**simulated** 103:24
  222:4
**single** 93:20 94:1
  211:14,18,20
  212:4,6 221:5,5
  226:6,7 238:24
  262:14 263:2,3,7
  263:11,12,15,20

  263:24 264:4,6,14
  265:13,14,19,22
  266:2,8
**sir** 168:13 169:6
  186:20 187:10
  189:10 190:11
  239:21
**sit** 189:24
**sitting** 32:11 53:2
  54:8
**situation** 51:23
  71:12 79:17
  143:18 161:25
  168:11 179:20
  184:1 185:19
  186:25 188:4
  191:1,4 212:21
  244:7 247:6
  263:15 264:2
  265:17
**six** 56:21 215:11
**skadden** 3:11,14
  7:21 8:1
**skadden.com** 3:13
  3:16
**skills** 69:3
**skip** 268:3
**slate** 3:11,14
**slave** 198:19
**slightly** 53:13
**small** 59:9 60:12
  60:21 86:18,19
  128:16 208:11,25
  209:5
**smiling** 250:17
**socks** 67:5,8,10,13
  67:16,19,20,21,25
  68:1
**software** 121:6,6
**soil** 238:20,25
  239:1

**sold** 107:12 159:16
  159:20,23 160:2
  161:7,19 165:10
  166:24 167:16
  182:7
**soldered** 136:19
**sole** 173:6
**solely** 181:13
**solicitation** 237:7
**solutions** 7:14,16
  277:23
**somani** 3:14 8:1,1
**somebody** 73:15
  236:4 239:20
**somewhat** 75:3
**sorry** 11:11,14,21
  15:7 20:20 38:8
  45:21 51:5 55:4
  62:23 63:2 72:7
  90:10 91:15 97:10
  97:10 103:14
  112:11 115:16
  117:12,14 120:7,9
  122:15 135:9
  138:22 142:11
  144:8 154:22
  155:23,24 165:23
  169:6 172:14,16
  176:15 183:15
  184:8 199:16
  205:17 213:17
  216:4 219:13
  220:22 245:18
  247:25 249:7
  250:1,16 265:3,6
  272:17
**sort** 226:14 228:25
  229:1 248:11
**sought** 210:10
  229:19 230:13
  231:15

**sound**  75:9,22
**sounds**  62:17 75:3
**source**  41:4,10
  51:17 124:5 146:9
  216:1,6,9 243:7
**sources**  54:14
  79:25 230:14
**speak**  10:16,20,23
  25:16 41:1,6
  62:25 69:17 96:2
  124:18 126:4
  148:24 205:15
  249:15 263:18
  271:15,25 272:3
**speaking**  48:12
  104:13
**speaks**  173:10
  203:10
**special**  264:24
**specialist**  62:10,13
**specialized**  176:4
**specialty**  19:23
  70:11
**specific**  17:11
  19:13 21:12 24:13
  27:21 28:10 40:4
  62:20 63:12 80:14
  81:2 101:17 105:3
  114:21 118:22
  129:23 136:21
  167:13 206:24
  210:13 219:7
  226:17 273:18
**specifically**  26:11
  40:12 44:19 46:10
  72:24 78:10
  112:17 116:20
  122:17,22 123:8
  129:14 133:11
  141:24 173:20
  204:12 241:17

253:20 258:22
  263:23 272:1,5
**specification**
  131:22 138:3
  145:15 146:4
  147:19
**specifications**
  80:19 81:10 110:6
  117:11 125:2
  144:12 146:2,19
  148:6
**specifics**  20:17
  123:22 125:15
  271:13 274:4
**spend**  22:1 30:11
  31:9,15 244:23
**spent**  22:21 23:16
  32:15 33:4,13
  34:10,11,12,22
  35:4,14 69:22
**spinning**  120:14
**spoke**  10:18 12:2
  40:24 41:3 149:5
  261:11 271:12
**sponsor**  197:9
**spot**  167:13
**square**  176:17
**staff**  4:15
**stan**  36:23
**stand**  194:12
**standard**  260:10
**standing**  48:25
  166:20,22
**standpoint**  69:14
  149:16 225:20
**start**  9:9,11 14:25
  15:1 132:23
  165:23 238:10
**started**  60:13
  62:11

**starting**  16:6 23:4
  116:8 205:15
**starts**  130:6 204:2
  204:24 235:24
  236:1 238:19
**state**  2:15 7:17
  8:15 14:9 69:8,8
  81:17 115:15
  140:13 151:8
  194:24 276:3
**stated**  18:11 53:23
  76:10 154:25
  235:8 266:6,10
**statement**  40:17
  107:3 119:25
  145:10 150:10
  172:6 251:20
  252:3 253:2 254:1
  260:25
**statements**  44:18
  48:24 114:1 146:7
  214:14
**states**  1:1 7:9
  62:12 64:6,7
**stating**  49:7 90:14
**status**  64:9
**stay**  268:4
**stem**  238:20
**step**  180:15
**steps**  103:24 159:6
  165:21 166:1
**sterilized**  156:22
  157:13 268:8
**sterilizing**  242:21
**stevens**  1:13 2:11
  4:10 7:4,6 8:7,12
  8:17,19 12:19
  13:9,11 15:17
  26:23 38:10 45:21
  55:15 82:15,20
  90:1 98:22 103:17

104:19 105:16
  111:18 120:22
  126:20 131:25
  133:23 144:8
  152:13 153:25
  163:16 184:11
  185:21 190:6
  196:15 202:15
  203:2,14 215:7
  218:23 220:7
  221:15 233:12
  240:20 241:18
  245:12 246:6
  247:8 250:11
  257:8 265:10
  266:17 269:16,19
  269:24 271:7
  275:7 276:7 277:5
  278:2,24 279:2,4
  279:12
**stick**  169:3
**sticking**  168:6,8
**stint**  65:15
**stop**  137:19
  184:12 187:9,10
  202:22 203:25
  244:15,15
**stopped**  11:17,20
  122:18
**stops**  11:16
**story**  217:19
**straightforward**
  65:1 209:22
**strategy**  56:22
**strictly**  159:12
**strike**  19:4 23:16
  27:23 69:21 79:7
  84:1 135:25
  136:17 142:11
  157:16 158:2
  160:23 224:8

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 119 of 128 PageID
13997
J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[strike - systems]                                                    Page 47

261:4
**strongly** 251:19
**structural** 134:12
**structure** 67:12
133:18 134:7,15
135:3,13,22
136:10,17 179:1,2
179:7,10
**stuck** 133:24
**studied** 69:12,18
141:23 207:24
240:3 242:1
**studies** 100:20,25
101:1 239:2
**study** 225:19
238:20 274:18
**stuff** 130:3 140:11
147:15
**subject** 56:4 66:20
92:22,25 260:21
261:6 272:3
**submission** 4:12
41:15 70:23 83:24
84:5 88:9 89:4
93:15,23 102:7,10
102:15 104:21,24
105:5 106:5
108:19 109:3
199:6 201:21,23
208:15 210:9
229:18 231:10
267:16 268:20
270:12
**submissions** 56:18
71:1 72:4 94:20
200:16,19 202:10
270:1,7,24
**submit** 4:14,24
20:14 57:20 84:4
91:6 92:5 96:24
96:24 97:3 107:16

155:12 195:17,25
207:6,7 218:12
223:21 264:13
273:5
**submits** 248:14
**submitted** 11:1
13:15,18,21 14:11
29:25 30:5,9,22
40:21 41:16 102:6
104:21 105:9
111:21 207:21
208:3,14 209:2
218:9 224:4,18,25
225:24 231:7
239:11,23 248:20
248:24 250:1
251:3 253:8
255:12 267:1,18
268:16 273:4
**submitter** 106:7
**submitting** 107:14
**subparagraph**
82:23 84:1,2,12
85:6
**subscribed** 279:14
**subset** 73:21
**substance** 191:11
**substances** 272:20
**substantial** 69:24
98:8
**substantially**
107:11 264:7
**substantive** 15:1
**sufficient** 101:13
106:25 110:4
115:1 201:16
**suggested** 261:12
261:23,25
**suggests** 261:22
**suitable** 156:21
157:11 158:4,10

**suite** 3:6
**summaries** 115:4
195:10,14 200:3
200:13,17 203:4
**summary** 6:4
195:18,19,21
196:1,4,19 197:8
200:11 201:2,12
201:15,20 202:4
204:20 205:10
250:13 267:1,2
**superiority** 251:11
251:16
**supervising** 65:22
**supplied** 150:22
**support** 20:3,7
22:3,10 52:15
99:2 111:1 116:1
131:5 196:4
223:22 224:5,18
225:25 250:11,12
**supporting** 65:10
**supposed** 19:12
**sure** 10:23 12:24
13:20 14:23 16:11
17:7 23:6 31:13
38:24 39:2 45:6
45:14 52:6 57:24
75:13 78:9 79:3
81:2 96:15 138:17
140:22 142:21
163:24 168:21
169:13 170:24
171:22 183:16
188:9 194:16
197:8,10,18
201:22 204:11
212:8 219:17,21
220:24 222:13
231:4 237:16
249:11 265:11

267:4,4,6,7
**surely** 231:2
**surgeon** 166:19
**surgery** 5:9 71:14
**surgical** 1:8 5:12
5:16 7:7,22 8:3,6
8:14 14:4 70:14
71:10,11,16
121:16,16 123:21
124:1,11 134:19
137:11 141:1,9,22
142:5 163:3 164:2
164:4 165:11
167:25 175:18
197:1 198:16,18
200:6 218:20
220:9 222:5
229:13 258:15
267:25 277:4
278:1 279:1
**survive** 224:2
**swear** 7:19
**sworn** 8:8 255:11
276:8 279:14
**system** 5:16 59:19
74:16 122:11,15
122:15,18 123:23
124:1 130:24
137:1,12,19 138:4
141:1,9,22 142:5
153:12,16 155:1,2
188:20,22,23,24
188:25 191:20
192:22 197:2
198:17 199:15,17
200:5,7 205:7
206:2,24 207:8
218:21 220:9
268:1
**systems** 251:16

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 120 of 128 PageID 13978

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[t - thank]                                                      Page 48

**t**

**t** 1:3 276:1,1 278:3
278:3
**tab** 12:12 82:9,10
91:25 103:3,5
104:16 120:6
126:16 155:7,22
156:2 174:15
196:10 203:12
213:18 218:17
219:23 233:7
245:7,16 250:7
266:15
**take** 9:24 15:21
20:19 26:19 35:24
36:14 44:3 55:4,4
55:6 60:18 82:9
111:10 120:16
121:25 124:5
125:25 131:13
134:20 152:4
153:20 155:21,24
156:2 168:16
196:22 213:24
214:22 215:7
219:23 221:21
252:6 254:18
256:23
**taken** 15:13 52:24
55:11 111:14
138:2 152:8 215:2
222:21 233:2
251:13 253:20
255:18 257:4
**takes** 148:23
165:21,25 185:3
**talk** 9:6 12:3 52:23
58:5 132:23,24
133:9 229:17
258:2 262:7 266:1
271:8,11

**talked** 11:4 12:5
12:10 43:1 73:22
140:11 193:24
215:15 271:18
272:12,15,21
**talking** 48:13
52:12 65:14 95:5
95:10 97:22 98:4
98:5 121:19
123:24 128:11
129:7 134:19
150:17 153:21
154:7 158:16
162:25 163:10
168:15 176:3
193:20 199:22,23
200:1 237:22
238:5 240:16
254:24 255:21
260:3
**talks** 129:3
**tampa** 1:2 7:10
**tape** 9:22 55:6
**taxonomy** 69:14
**team** 215:16
216:23
**technical** 23:6
52:20 60:7 64:22
66:23 68:15,20
120:13,19 201:24
**technique** 101:9
**technologies** 74:23
**technology** 85:22
235:19
**teleconference**
234:11
**telephone** 41:22
41:23
**tell** 15:9 22:3
30:15,17 32:14
33:4 50:9 60:5

73:12 74:14
107:17 132:22
151:15 158:24
165:16 167:15
185:23 204:13
211:3 228:14
229:16 231:4
234:4 236:5,22
242:25 245:1
274:1
**telling** 177:7,7
202:22,23 209:21
240:6 242:3 243:7
**tells** 95:21 100:19
210:7 244:4 256:9
**temporary** 55:25
56:4,17
**tend** 68:15
**tendency** 154:6
**term** 94:24 105:7
158:13,14 159:9
192:12,24 193:14
198:3,6
**terminized** 204:16
**terminology**
108:23 267:11
**terms** 19:12 130:2
229:1 262:4
**test** 115:4 117:8,19
180:10 211:9
217:17,19 224:3
273:15,15 274:2
**tested** 202:1 223:2
223:10,12
**testified** 8:8 27:24
40:19 60:24 62:19
68:3 111:19
138:19 250:1
270:4
**testify** 100:24,25
169:18

**testifying** 10:9
21:3 87:16
**testimony** 10:3
32:13 45:7,12
46:6 51:2,3 57:16
58:16 78:5 83:8
86:13 94:3 112:15
113:16 122:6
123:2 136:7
138:25 148:16
149:23 150:8
151:12 161:20
167:5 169:16
192:15 201:5
217:4 227:6,9
244:12 255:11,12
270:2 276:10
277:9,18 279:8
**testing** 86:6 98:8
99:24 100:5,10,12
101:8 102:4,12
103:25 104:1,20
108:8,11 109:20
112:1 113:6,15
114:3,25 115:9,22
116:12 117:2,4,9,9
117:15,20,20,24
118:9 127:1
158:23 217:9,15
217:16,17 218:2,9
218:12 224:9
227:22 228:1,11
232:11 269:25
270:10 273:5,9,10
273:11,16,22,24
274:7,16
**tests** 210:4 227:23
**text** 82:13 248:3
**thank** 8:21 9:13
10:7 12:16 16:17
76:1 91:4,19

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 121 of 128 PageID
138079
J.   Lawrence Stevens                           September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[thank - touch]                                                    Page 49

103:10 107:18
113:3 207:10
219:16 244:2
269:16 275:1,3
**theoretically**
170:21
**therapeutic** 135:1
135:18 136:13
**thing** 110:10
119:24 125:24
150:18 193:24
216:13 245:3
246:10 248:22
254:17
**things** 23:5 27:13
32:2 33:3 44:8
59:7 65:1,24
70:16 86:6 114:21
130:12,15 139:14
160:23 162:6,7
167:13 171:4
175:1,8 206:10
230:19 231:1
245:9 271:25
272:15 273:1
**think** 12:23 27:25
28:16 33:12,21
34:4,11 41:18
42:16 45:16 47:15
52:8 55:5 70:22
72:12 86:14 89:14
94:4,17 95:4
109:18 111:8,18
113:13,17 114:11
114:11,11,16
122:4 123:10
131:20 133:12,20
142:20 150:7
151:8 152:16
153:15 157:4
159:2,19,25

163:19 186:7
203:10 206:12
213:20 216:20,25
217:1,20 219:22
232:2 236:6,7
238:6 243:14
244:6 259:17,19
274:12
**thinking** 28:23
87:5,11 242:18
**thinks** 246:20
**third** 5:24 74:17
175:14 238:22,23
241:14 242:5
255:1 266:21
**thirty** 215:11
**thought** 30:20
49:22 112:21
113:24 117:8,19
124:22 144:10
211:24 261:18
**threaten** 235:9
**three** 10:25 12:2
36:15,17 66:11
71:4,5,5,6,7 72:1,2
72:15,18,22,22,23
72:25 73:22 74:3
74:10 153:10
230:14 250:23,24
250:24 251:12
**throw** 44:24
**thrown** 263:16
**thursday** 1:16 7:2
**tie** 239:9
**till** 65:18
**time** 7:2 9:8,23
11:2,18,23 13:3,6
15:11,14 22:1,19
25:14 30:11 31:3
31:8,16 32:12,15
33:3,11 34:3 35:4

35:7,14 39:18
42:19,20 43:4,5
46:23 55:6,9,12,16
56:2,9,12 57:9,9
57:14 60:10,11
62:5,18 65:6
70:21 73:4 78:25
79:11,16 90:20
103:20 111:10,12
111:15 114:23
120:18 122:12
130:3 132:5 138:4
144:19 152:6,9
154:1,2 185:22
190:12 204:9
214:25 215:4
219:25 220:4
221:21 226:16
228:8,16 229:20
230:13 231:16,25
232:25 233:3
234:3 244:23
245:23 250:4
252:16 253:1,11
255:18 257:2,5
269:17 275:5
277:19
**timeframe** 277:8
**times** 32:20 50:24
51:1,6 56:1 71:25
72:1,2,15 73:9,17
74:3,10 121:22
123:18 132:7
146:14,16 147:4,6
147:19,20 148:3
149:9,13,13,19,25
150:2,19,21 151:2
151:4,7,8,13,14,16
151:19,23,25
152:1,3 177:17,17
177:21 190:24

202:21 223:12
224:12 225:10
228:13 264:8
**timing** 114:10
231:18
**tip** 209:3
**tissue** 208:6,21
**title** 26:25 103:15
126:17 234:5
**today** 7:3,13,14,15
10:4,9,12,17 32:11
46:17 53:2 54:8
54:23 56:16 163:9
229:19 244:9
266:11 269:17
272:2,8
**today's** 7:2
**told** 19:22 86:2
106:10 110:6
115:5 132:6 145:7
165:7 174:9,9
237:12 239:14,24
243:24 244:8
**tool** 128:3,4,6,13
129:3,9 130:11,16
131:9 134:19
177:5 206:20,25
207:1
**tools** 198:20,24
200:7
**top** 36:15 152:20
176:18 235:5
260:15 267:21
**topics** 14:6
**total** 30:18 31:2
34:1,18 102:1
142:6,15 146:17
147:6
**totaled** 55:19
**touch** 134:10,17
135:5,15 136:3,9

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 122 of 128 PageID 13930

J. Lawrence Stevens                                            September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[touching - unique]                                                    Page 50

**touching**  136:11
**tracks**  121:11
**tradename**  196:24
**traditional**  251:16
**training**  48:23
  59:17 69:23 70:1
  70:2
**transaction**  165:5
  178:19
**transactions**
  183:18
**transcript**  45:14
  160:25 230:8,8
  277:6,20 279:5,8
**transcripts**  36:13
  37:4 39:21 40:1
**transistor**  160:16
  161:4
**translate**  134:21
**travel**  182:22
**treating**  67:11
**treatment**  182:21
**treats**  162:18
**tremendous**  66:16
**trial**  51:4
**trials**  56:9
**tried**  175:7
**trouble**  172:15
**true**  70:4 167:23
  172:21 193:3
  203:2 259:7
  270:21 276:9
  279:8
**truly**  95:2
**truthful**  10:3
  252:15 267:16,19
**try**  9:10,21 154:9
  163:23 189:20
  219:20
**trying**  37:16,20
  45:14 50:6 83:22

132:1 167:12
  203:8 245:13
  246:16
**turn**  13:23 36:13
  38:7 47:1 75:23
  92:17 93:16 99:5
  103:21 108:7
  109:13 127:6
  133:13 175:13
  198:12 205:19
  206:18 207:12
  208:2,17 209:1
  219:11 221:12
  235:22 250:9,15
  260:13 262:11
  266:20 267:20
**twenty**  55:21
**twice**  87:10
**two**  25:24 28:3,8
  28:12 29:4 36:20
  37:1,1 55:15
  58:11 69:21 71:13
  73:21 74:3 144:21
  195:10 200:16
  201:19 202:10
  203:3 222:20
  235:22 237:19
  262:13,17 264:20
**tying**  241:15
**type**  61:15 70:2
  99:24 102:4 112:1
  254:3
**types**  51:19 54:13
  69:2 147:24
**typical**  35:11
**typically**  35:7,8
  125:22 145:22,23
  147:22
**typing**  44:8

**u**

**u**  75:6
**uh**  35:24 39:13
  40:6 87:21 88:16
  95:6 96:22 108:25
  110:24 114:14,14
  114:24 122:19
  125:10 126:7,14
  129:2 130:18,23
  131:11 142:2,10
  146:10,13,23
  147:11 148:19
  149:4 150:13,24
  151:3,10,21,25
  153:14 158:15
  159:1,16,22
  160:22 165:19
  167:22 170:22
  171:1,16 174:2
  175:22 176:6,9
  177:3 180:3 182:8
  191:22 192:18
  193:5 197:22
  199:2 204:3,22
  211:19 222:19
  223:21 224:8
  231:22 237:23
  253:17 260:7
  262:2 266:7 267:9
  267:20
**ultimately**  57:4
  195:23
**unable**  165:10
**unclear**  240:12,16
**uncommon**  106:13
**undergrad**  69:12
**understand**  8:18
  9:2,4,14 10:8,10
  50:6,9 53:12,12
  54:4 68:25 80:5
  106:3 107:2

123:11 129:13
138:17 139:25
140:16 141:5
143:2 159:20
163:4,11 167:16
168:20 169:21,22
169:24 171:13
183:17 187:7
194:16 206:16
235:25 237:4,6
238:9 240:2,3,14
242:2 243:1
**understanding**
  19:4,20 20:13,24
  32:24 89:5 104:19
  108:4 119:1 121:8
  121:10,23 122:3
  123:19 128:14
  131:7,14,16,24
  132:15,19 133:6
  134:14 135:3
  137:17 139:8
  140:5,23 141:7
  143:5,21 151:10
  160:7 173:6
  186:21 195:13
  198:6 209:9 212:5
  221:19 230:12
  238:25 269:8
**understands**
  202:20
**understood**  9:18
  69:1 77:11 124:22
  139:4
**undoubtedly**
  193:14
**unduly**  47:8,23
**unexpectedly**
  226:20
**unique**  68:22

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[unit - versus]**                                              Page 51

| | | | |
|---|---|---|---|
| **unit** 55:14 111:17 152:11 215:5 222:16,25 223:5 223:18 | 122:12,16 123:18 124:17 126:25 130:2 131:18,19 133:9 136:13 138:4 139:16,18 139:19 140:15,24 142:8,11,12,19,23 143:9,16 144:25 145:22,24 146:11 146:14,17 147:7 147:25 148:8 150:15 151:23 155:17 156:21 158:4,10 159:9,23 160:18 166:20,21 170:14 171:6,13 174:19 175:17 176:18 191:19 192:24 196:5 197:3,15,17 199:3 200:24 201:7,8,12 205:7 206:2 209:17 210:5,16 210:19 211:14,18 211:20 212:4,6,10 212:16 213:1,11 214:4,18 216:2,15 217:16,25 218:1 218:13 220:25,25 221:1,5,5,5,6,10 226:6,7 227:20 238:24 262:14 263:2,2,7,11,12,15 263:20,24 264:4,6 264:14 265:13,14 265:19,22 266:2,8 267:24 268:16 269:14 270:6,12 274:8,17 **useful** 54:1 73:24 | **user** 104:4 122:11 122:16 123:17 133:9 140:21 **users** 105:23 172:3 **uses** 5:14 67:20 98:10 100:7,14 104:3 105:24 121:11 122:9 123:15 124:2,12 125:11 131:19 138:7,9,14,21 139:3,6,10 140:19 140:23 141:2,10 141:14,21 146:4 146:13,16 147:9 147:16 149:16 150:2 170:23 175:19 177:16 183:23 191:16 195:14 198:3 204:25 205:4,22 205:24 206:11,14 207:1,16,19 210:19,21,24 211:4 216:19,19 216:24 218:13 222:6,9,12 223:3 223:17,20,25 224:2,15,20,23 225:25 226:6,11 226:11 227:7,12 228:20 229:2 268:7,10,21,24 269:1,6,9 270:5,11 270:17,21 272:10 273:18 **usual** 72:8 175:19 **usually** 66:19 216:15 227:4 | **v** |
| **united** 1:1 7:9 64:6 64:6 | | | **v** 277:4 278:1 279:1 |
| **units** 223:1 | | | **vacancy** 65:20 |
| **university** 69:8,10 | | | **vague** 91:11,17 168:1 239:16 240:9,11 241:5 242:16 270:13 |
| **unknowns** 170:8 | | | **valid** 100:20,25 102:2,2 118:17 |
| **unsanitary** 191:12 | | | **validate** 108:12 224:11 226:11 |
| **unusable** 216:17 | | | **validated** 222:12 223:17 224:15,19 224:22 225:4 228:1 |
| **unusual** 110:10 | | | **validation** 223:1 225:25 226:14 227:7 229:1 239:2 264:6 269:25 270:5,10 273:5 |
| **upstairs** 15:9 | | | **validity** 118:6 |
| **usage** 68:1 120:23 121:8,20 122:3,9 122:21 123:3,9,11 123:15,20 124:1 124:11 125:5 126:10 135:14 136:19 137:7,9 138:6,13,21 139:1 140:2,25 142:1,2,3 142:14,23,25 143:16 144:13 146:14 147:16,24 149:24,25 170:25 196:5 198:10 209:12 215:13 216:6,9,14 217:3 217:10 218:4 223:22 224:5 225:4,5,8,15 227:8 228:25 229:4 273:23 | | | **variable** 107:13 |
| **use** 5:6 24:21 37:8 41:8 45:4,9,24 46:11,13 47:19,22 79:4 84:9,21 85:4 93:12,20 94:1 96:19 97:15 101:6 104:4 113:8 114:5 | | | **various** 16:23 31:7 52:23 57:23 59:7 |
| | | | **venture** 264:1 |
| | | | **verbal** 9:3 |
| | | | **verification** 104:20 |
| | | | **verified** 101:8 |
| | | | **verify** 115:23 116:22 117:3 119:18 211:7 277:9 |
| | | | **veritext** 3:2 7:13 7:16 277:14,23 |
| | | | **veritext.com** 277:15 |
| | | | **versus** 7:7 31:10 32:12,16 168:7 173:17 250:2 |

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 124 of 128 PageID 13832

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[video - witness]                                                    Page 52

**video** 7:5 8:24
119:20,21 166:9
**videographer** 3:19
7:1,13 11:18,21
13:3,6 15:11,14
55:9,12 111:12,15
152:6,9 214:25
215:3 219:25
220:4 232:25
233:3 257:2,5
275:5
**videographer's**
9:22
**videotaped** 1:13
2:10 275:6
**view** 22:9 114:25
161:10 187:3
201:1,11 257:20
262:4,21
**vinci** 123:21,25
124:10 137:1,11
137:19 141:1,9,22
142:5 175:18
188:11,19,25
**violate** 210:18
249:22 255:7,11
**violated** 255:3
**violation** 260:23
**violations** 192:20
252:7,21
**virtual** 3:2
**virtually** 79:4
**visit** 61:16
**visited** 254:16
**visual** 130:8,19
131:9
**voice** 117:12
153:25 172:14
**volt** 206:22
**voltage** 206:22

**volume** 5:17 154:9
218:22 220:10
**vs** 1:7

**w**

**w** 75:8
**wait** 184:18 238:2
243:18,18
**want** 12:24 19:14
31:21 45:6 53:10
54:25 71:11 75:12
87:8 110:15
120:18 142:21
163:8,14 185:9
210:7,19,20 226:5
258:25 259:17
265:7 268:23
272:14,20
**wanted** 20:1,18
40:17 126:15
206:13 209:19
210:15
**wants** 188:21
235:20
**ward** 75:8 233:11
**warehouse** 185:3
**washington** 3:15
56:3,13
**waste** 5:6 120:18
174:20 185:22
190:12 263:17
**watches** 56:8
**way** 11:9 62:11
73:18 77:16,17
78:4 79:20 85:13
85:25 88:8 95:17
100:22 114:25
122:10,14 124:8
125:11 128:5
136:12,21 139:4,6
142:7 151:9 155:1
158:18 162:23

165:7 166:16
169:6 170:22
176:3 177:12
203:23 210:1,18
223:14 226:5
228:5,7,9,13 236:3
249:24 262:7
267:19 273:14
276:14
**we've** 13:9 65:14
82:12 92:4 103:13
105:13 109:23
111:8 133:2,20
134:19 140:11
144:17 155:10
171:8 174:17
196:12 199:23
203:15 212:18
213:20 218:19
220:7 233:9
237:13 246:3
258:10 266:23
269:4 272:12,15
**wear** 67:19 228:8
**week** 21:23
**weeks** 10:25 12:3
31:1,3,5 33:1
**welcome** 15:25
81:24
**wen** 233:25 234:1
236:2,15 238:11
**went** 25:23 56:14
59:15 61:13 62:8
68:23 197:20
223:20 249:15,16
**west** 3:11
**whereof** 276:17
**white** 167:17
**wife** 154:6
**willingness** 234:18

**wise** 180:15
**wish** 202:21
**withdraw** 203:9
249:12
**withdrawing**
232:1
**withdrew** 21:2
102:21 231:19,25
**witness** 2:12 7:19
14:19 15:3 16:2
16:10,14 17:7
18:13 19:19,24
21:5,20 22:14
24:18 25:2,12,15
25:19 26:17 27:7
27:15 28:22,25
29:6,19,22 30:7,15
31:12,20 32:7,21
33:9,17 34:1,8,17
35:2,18 36:2
37:22 38:24 40:4
40:11 41:3 42:4
42:10,19 43:9
45:2 46:7 48:3,12
49:6,22 50:3,13
51:14 52:18 53:7
53:22 54:12,20
55:8 57:17 58:17
61:12 62:23 63:2
63:4 75:3 76:17
77:7,15 78:9,20
79:13,24 80:12
81:25 82:3 83:9
83:20 84:20 85:10
86:14 88:2 89:19
90:10,16,19,25
91:13,20 93:8
94:9 95:24 96:9
97:10,12,21
100:18 102:9,17
110:9,21 111:23

Case 8:20-cv-02274-VMC-TGW   Document 116-4   Filed 12/01/21   Page 125 of 128 PageID
13983
J. Lawrence Stevens                                           September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

[witness - years]                                                              Page 53

112:16 118:2,11
122:7 123:7,14
124:14 125:8,14
128:23 132:13
135:9,12 136:8
137:3,6,22 139:1
140:5 148:17,20
150:7,9,14 156:4
157:4,10,21
160:10 161:7,24
162:14,16 163:23
163:25 164:9
165:3,15 166:5
167:20 168:3,20
169:2,13,16,18
170:4,7 171:12,17
172:19 173:9,25
176:2,7,25 177:4
178:25 179:19
181:20 182:13
183:15 184:8,24
185:18 186:13
187:7,11,12 188:4
188:19 189:2
190:8,13,18,25
192:16 193:10,23
194:16 199:8
200:4,13 201:6,15
211:2,23 214:24
215:25 217:6,13
218:6 221:23
224:14,22 225:8
225:18,22 226:4
226:16 228:5
229:6,9 232:8
234:25 236:9
237:16,21,24
238:4,8 239:18
240:22 241:7
242:12,15,17
243:21 244:18

245:3,9,15,18
246:1,25 248:14
249:1,7,10 256:7
257:1 263:14
264:23 265:3,5,16
269:20 270:15
271:4,16,24
272:17,23 274:12
274:21 275:3
276:7,10,17 277:8
277:10,12,19
**word** 49:17 104:11
193:21 197:22
244:3
**wording** 197:10
261:24
**words** 17:8 19:17
37:6 67:22 68:15
73:8 77:1 85:4,5,6
86:18 140:20
142:21 147:8
153:19 158:16
159:21 164:12
207:5 208:23
217:20 226:12
229:11 241:15
254:3
**work** 17:1,2,3 20:8
20:22,23,25 31:7
32:1,16 33:2 35:7
35:8,9 55:23 56:6
56:22 58:14,21
59:2 66:3 70:9
71:19 85:21
118:13 121:12,13
124:8,11 126:2,25
170:19,23 173:19
176:14 227:4
234:18 254:14
**worked** 30:25 32:1
32:12,25 53:17

54:7 55:16 56:2
59:16 70:4,9,17
101:16 113:15
234:2
**working** 16:24
31:4,9,10,16 32:9
35:14 56:13 57:1
58:20 62:11 64:25
68:4 69:22 71:15
71:18 124:25
125:25 180:11
212:18 227:17
**works** 121:24
122:3 126:8,11
131:24 132:16
133:6,8,12 164:14
169:6 207:8,10
**world** 69:2 83:11
171:24 183:17
217:18
**worn** 119:23
127:21
**worth** 235:15,17
**worthwhile**
235:21
**wrists** 175:16
**write** 14:2 47:23
54:21,22 61:22
78:2,3 236:12
274:2
**writer** 235:18
**writes** 235:7
**writing** 57:3 79:15
**written** 13:2,25
24:22 43:20 45:15
52:8 56:23 60:6
77:21 79:14 80:14
83:1,17 85:10,14
91:21 92:2 93:9
96:8 99:7 103:11
128:6 133:22

155:8,25 161:2
198:14 207:17
214:14 218:18
219:18 221:14
236:3,22 242:18
275:4
**wrong** 133:20
148:7 219:22
254:13
**wrote** 44:17 46:11
52:6,11 53:9,24
54:14 56:20
104:12 112:18
169:4 236:5 241:7
241:8,10,12

| x |
|---|

**x** 179:14 181:5

| y |
|---|

**yeah** 27:15 38:8
45:18 77:25 90:19
105:4 112:23,23
113:2 122:24
128:15 129:12
131:10 149:5
154:5,18 163:11
168:3,15,15
169:17 170:21
177:5 187:7
194:22 203:24
204:5 213:22
215:15 223:9
230:24 233:17
234:4 238:15
250:25 256:3
262:10 274:19
**year** 65:22 69:9
230:20 231:1
249:20
**years** 47:16 55:19
55:21,22 59:1

J. Lawrence Stevens                                    September 23, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

**[years - zero]**                                              Page 54

| |
|---|
| 62:10 63:15 68:21<br>69:22 231:11<br>250:17,23,24,24<br>251:12 252:22<br>263:22<br>**yep**  238:1<br>**york**  3:12,12,15 |
| **z** |
| **zero**  124:2,12<br>137:10,18 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.