# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| REBOTIX REPAIR LLC,<br><br>     Plaintiff/Counterclaim<br>     Defendant,<br><br>v.<br><br>INTUITIVE SURGICAL, INC.,<br><br>     Defendant/Counterclaim<br>     Plaintiff. | Civil Case No. 8:20-cv-2274-VMC-TGW |

## INTUITIVE SURGICAL INC.'S
## DISPOSITIVE MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff Intuitive Surgical, Inc. ("Intuitive") respectfully moves for summary judgment (i) dismissing all claims filed by Plaintiff and Counterclaim Defendant Rebotix Repair LLC ("Rebotix") (ECF No. 1 ("Compl."), Counts I-IV) and (ii) ruling that Rebotix is liable for tortious interference with Intuitive's customer contracts (ECF No. 60 ("Counterclaims"), Count III).

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

Intuitive designs, manufactures and sells da Vinci Surgical Systems ("da Vincis"), surgical instruments, including "EndoWrists," and accessories, which

attach to the da Vinci.  Da Vincis have been used in almost ten million surgeries worldwide, resulting in improved outcomes and fewer complications compared to alternative healthcare options.  Intuitive has sold four generations of da Vincis—the Standard, the S, the Si and the Xi.  Intuitive has always marketed and sold its system, instruments and accessories as an integrated product.  Indeed, the da Vinci cannot perform surgery without Intuitive's proprietary instruments and accessories, which are designed and sold solely for use with the da Vinci.

Because of their complex architecture, and because they are used in surgeries where the consequence of instrument failure could be catastrophic, EndoWrists are tested, validated and sold as limited use or "resposable" instruments.  Intuitive has submitted its validation protocols and test results to the U.S. Food and Drug Administration ("FDA"), which has cleared the marketing and sale of EndoWrists with use limits under Section 510(k) of the Federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. § 360(k) (i.e., 510(k) clearance).

All EndoWrists include a programmed memory chip that communicates with the da Vinci and counts each time an EndoWrist is used in surgery (the "use counter").  To ensure patient safety, and consistent with validation testing and FDA clearance, after an EndoWrist is used the specified, maximum number of times, the use counter causes the EndoWrist to be non-operational.  The EndoWrist is designed to be discarded at this point.  Intuitive has never offered a "repair" service to extend the number of times an EndoWrist may be used.  Instead, it sells customers new EndoWrists to replace old ones that have been used the maximum number of times.

Rebotix offers a service—which it deceptively calls EndoWrist "repair"—that involves the insertion into S or Si EndoWrists of the "Interceptor," a printed circuit board ("PCB"), that disables Intuitive's use counter, allowing the EndoWrists to be used beyond their prescribed use limits. Rebotix has never obtained 510(k) clearance even though FDA officials have stated on multiple occasions that Rebotix's "repair" process requires such clearance. Indeed, in response to Rebotix's 510(k) application submitted in 2014 for its Interceptor, FDA responded: "YOU MAY NOT PLACE THIS DEVICE INTO COMMERCIAL DISTRIBUTION UNTIL YOU RECEIVE A LETTER FROM FDA ALLOWING YOU TO DO SO."

Despite never having received 510(k) clearance, Rebotix brings antitrust claims alleging that Intuitive's customer contracts constitute unlawful tying and exclusive dealing arrangements and have caused Rebotix injury in the form of lost "repair" sales. All of Rebotix's antitrust claims against Intuitive fail as a matter of law and should be dismissed for at least three independent reasons:

*First*, because Rebotix cannot meet its burden to establish that its EndoWrist "repair" business was lawful, it cannot establish antitrust injury. It is undisputed that (i) FDA has stated that 510(k) clearance is required for Rebotix's EndoWrist "repair" process, (ii) Rebotix filed a 510(k) application regarding EndoWrist "repairs" and (iii) FDA has never cleared EndoWrist "repair." Thus, Rebotix cannot meet its burden to prove that its purported injury is directly attributable to Intuitive's alleged misconduct, as opposed to regulatory requirements. Rebotix's claims relating to X and Xi EndoWrists also should be dismissed because Rebotix never developed

3

technology to "repair" X and Xi EndoWrists and, therefore, cannot prove that its purported injury is attributable to Intuitive, much less that it has standing as an "efficient enforcer" of the antitrust laws as to those claims.

*Second*, Rebotix cannot satisfy its burden to define a relevant antitrust market in which Intuitive purportedly has harmed competition. Rebotix and its economist, Dr. Russell Lamb, allege harm to a market for "EndoWrist repair and replacement," but Dr. Lamb's opinions defining that purported market are inadmissible, which itself prevents Rebotix from meeting its burden. Further, and in any event, the relevant market should be defined from Rebotix's perspective as a matter of law, and it must encompass the plethora of surgical instruments Rebotix or its closely related companies currently repair or could repair. Moreover, even if the market were defined from the perspective of da Vinci customers (as Rebotix has argued), Rebotix could not establish a market for EndoWrists distinct from da Vincis. If anything, the record illustrates that the da Vinci and EndoWrists are a single, integrated product.

*Third*, Rebotix cannot meet its burden to prove that Intuitive engaged in anticompetitive conduct. Rebotix alleges that Intuitive has tied the purchase of EndoWrists to its (i) service performed on da Vincis and (ii) sale of da Vincis. But Rebotix cannot prove its first tying theory because Dr. Lamb did not define a relevant market for da Vinci service (i.e., the purported tying product). Rebotix cannot prove its second tying theory for multiple reasons, including that it cannot meet its burden to establish anticompetitive effects. Rebotix has no evidence that customers would pay lower combined prices for EndoWrists and da Vincis absent

the challenged conduct—another issue that Dr. Lamb admittedly failed to analyze. In addition, Rebotix alleges that Intuitive engaged in unlawful exclusive dealing, but this claim—which Dr. Lamb also did not analyze—fails for multiple reasons too.

*Finally*, summary judgment should be granted on Intuitive's counterclaim for tortious interference. The undisputed facts show that Rebotix knowingly induced 17 Intuitive customers to use Rebotix's "repair" services in breach of their contracts with Intuitive, causing damage to Intuitive in an amount to be proven at trial.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### The da Vinci and EndoWrists

1. Intuitive sells the da Vinci and accompanying instruments and accessories to hospitals and surgical centers worldwide. (ECF No. 61 ("RBX Answer") at 1-2, 6.) Instruments used in da Vinci surgeries are called "EndoWrists" and have wristed joints for dexterity. (ECF No. 1 ("Compl.") ¶¶11, 18.)

2. EndoWrists attach to the da Vinci's mechanical arms, and doctors use hand controls at the surgeon's console to manipulate EndoWrists to perform surgery. (*Id.* ¶¶12-13.)

3. Da Vinci surgeries provide improved outcomes and fewer complications than alternative healthcare options. (*Id.* ¶19.)

4. Intuitive has developed and commercialized four generational platforms of the da Vinci. (Ex. 53 at 5.)

---

[1] Intuitive's supporting materials are attached along with an index. Documents filed on the Court's docket are referred to with their corresponding ECF Number.

5.   Intuitive has a large patent portfolio, including patents on the da Vinci and parts of the EndoWrist design.  (Compl. ¶17; Ex. 10, DeSantis Tr. 26:16-21.)

6.   All EndoWrists include a programmed memory chip that communicates with the da Vinci and counts each time an EndoWrist is used in surgery (the "use counter").  (Compl. ¶43.)  After an EndoWrist is used the specified, maximum number of times, the use counter causes the EndoWrist to be nonoperational.  (*Id.*)

**Da Vincis and EndoWrists Are Sold as a Single Product**

7.   Intuitive's historical filings explain that the da Vinci platform is a product with multiple components, including a "surgeon's console, a patient-side cart, a high performance vision system and [Intuitive's] proprietary instruments." (Ex. 1 at 1; Ex. 2 at 1.)

8.   Intuitive's marketing and sales materials describe the da Vinci as an "integrated system" including surgical systems, instruments, software and other components.  (Ex. 3 at Intuitive-00001247; Ex. 4 at Intuitive-00010880; Ex. 5 at Intuitive-00071294.)

9.   When acquiring a da Vinci, customers sign Sales, Licensing and Service Agreements ("SLSAs") acknowledging that:  (i) EndoWrists will be purchased via "separate orders placed by Customer to Intuitive from time to time in accordance with the terms and conditions in the then current Instrument and Accessory Catalog"; and (ii) customers will use EndoWrists consistent with Intuitive's "Documentation" (e.g., manuals, labeling and instructions for use) and will not

allow instruments to be repaired, refurbished or reconditioned in a manner inconsistent with that documentation without Intuitive's approval.  The SLSAs require customers to adhere to EndoWrist use limits.  (Ex. 6 at §§ 2.6, 8.)

10.     Intuitive's SLSAs provide customers a system warranty, assuring the da Vinci "will be free from defects in material and workmanship and will conform in all material respects to the Documentation when used in accordance with the Documentation and Intuitive's instructions."  (*Id.* § 10.)



13.     Intuitive's system warranty "is void with respect to any claims (1) due to any … misuse of the System … (2) to the extent Customer has not operated, repaired, or maintained the System in accordance with the Documentation [and] (3) to the extent Customer has used the System with surgical instruments … that are not Instruments."  (Ex. 6 at § 10.)

14.     "Intuitive doesn't want anybody to adulterate our [da Vinci] platform in

any way that can't be assured that it's a sufficient quality level … [Intuitive] feel[s] that defending the quality and the brand and the reputation of [its] entire platform is paramount to patients/people but also to the company." (Ex. 10, DeSantis Tr. 265:9-11, 279:6-9.)

**Other Robotic-Assisted Surgical System Manufacturers Sell Bundled Products**



17.    Medrobotics has sold the Flex Robotic System for use in minimally invasive surgeries as a single product with accessories, internal software, warranty and support services included and may terminate its agreement with a customer if the customer "uses the system with any accessory not made or approved by Medrobotics." (Ex. 13 at 36-37.)

**EndoWrists Have Received 510(k) Clearance**

18.    Intuitive's EndoWrists are classified as a Class II device by the FDA.[2]

---

[2] The FDA has the authority under FDCA to regulate medical devices. 21 U.S.C. §§ 301-392. If a product meets the definition of "device" in the FDCA, it will be regulated by FDA as a medical device and be subject to premarket and postmarket regulatory controls. 21 U.S.C. § 321(h). Unless exempt, Class II devices require 510(k) clearance. *See* 21 U.S.C. §§ 360(k)-(m), 360c(a)(1)(A), 360c(f)(1), 360c(i). A "manufacturer" of new, non-exempt, Class II medical device must obtain

*(cont'd)*

(Ex. 14 at Intuitive-00691205.)

19.     Intuitive has obtained 510(k) clearance from the FDA for all of its EndoWrist models.  (*See, e.g.*, *id*. at Intuitive-00691205.)  Intuitive's EndoWrist 510(k) submissions describe EndoWrists as "resposable" or "limited use" instruments with use counters that cause the EndoWrists to cease functioning after reaching the prescribed use limits.  (*See, e.g.*, *id*. at Intuitive-00691203; Ex. 15 at Intuitive-00691208-09; Ex. 16 at Intuitive-00515508-09, Intuitive-00515514-15; Ex. 17 at Intuitive-00493505.)  In its 510(k) submissions, Intuitive includes draft carton labeling for EndoWrists denoting their use limits.  (*See, e.g.*, Ex. 18 at Intuitive-00694586-93.)

**Rebotix and Its "Repair" Services**

20.     Rebotix markets its ability to "repair" and extend the useful life of an EndoWrist using the "Interceptor."  (Compl. ¶¶2, 51; *see also* Counterclaims, Ex. 3.)

21.     ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████

22.     ████████████████████████████████████

---

510(k) clearance before introducing its device into commercial distribution in the U.S.  *See* 21 C.F.R. § 807.81(a)(2); 21 C.F.R. § 807.20(a).



24.     "Rebotix admits that its repairs include installation of an Interceptor so that customers' EndoWrist instruments can continue to be used … after they reach the maximum use limit imposed by Intuitive."  (RBX Answer at 3.)

25.     In addition to installing the Interceptor, Rebotix's "repair" procedure aligns and sharpens EndoWrist jaws and blades.  (Ex. 19 at REBOTIX162421-422). This process affects the surgical end of the EndoWrists, which Rebotix describes as "essentially identical between EndoWrist Instruments and traditional laparoscopic instruments."  (Compl. ¶36; *see also* Ex. 21, Parnell Rep. ¶23.)  Dr. Kim T. Parnell, Rebotix's engineering expert, opines that "traditional laparoscopic instruments are routinely repaired.  EndoWrists can be similarly repaired" because the surgical ends of EndoWrists and traditional laparoscopic instruments can be similarly aligned and sharpened.  (Ex. 21, Parnell Rep. ¶¶23-35.)

26.     Rebotix has a self-described "close relationship" with Benjamin Biomedical.  (Ex. 22, Hamilton Tr. 50:18-25.)  David Mixner owns both companies, and the companies have overlapping personnel, including Greg Fiegel, Chris Gibson and Glenn Papit.  (*Id.*; Ex. 23, Papit Tr. 32:7-21.)  Benjamin Biomedical has been in

business for over 15 years and services a range of medical devices, including Ethicon Harmonic scalpels, Phaco handpieces and surgical cameras. (*See* Ex. 24; Ex. 25, Gibson Tr. 19:6-9; Ex. 26, Mixner Tr. 19:17-20:3.)

**Rebotix, LLC Seeks 510(k) Clearance for Remanufactured EndoWrists**

27.    In 2014, a predecessor company for Rebotix, Rebotix, LLC, submitted a 510(k) to FDA for "Re-manufactured EndoWrist instruments" (hereinafter "Rebotix LLC 510(k)"). (Ex. 27; Ex. 28 (excerpts of 510(k) submission).)

28.    In response, FDA told Rebotix, LLC: "YOU MAY NOT PLACE THIS DEVICE INTO COMMERCIAL DISTRIBUTION UNTIL YOU RECEIVE A LETTER FROM FDA ALLOWING YOU TO DO SO." (Ex. 29 at REBOTIX077547.)

29.    The Rebotix LLC 510(k) sought clearance for installation of the same Interceptor technology that Rebotix has used to "repair" EndoWrists. (Ex. 20 at REBOTIX169950.)

30.    On June 23, 2015, FDA sent a deficiency letter to Rebotix, LLC requesting additional information and placing the 510(k) application on hold pending a complete response. (Ex. 30; Ex. 31.)

31.    When transmitting the deficiency letter, FDA reiterated that Rebotix, LLC could not market the remanufactured EndoWrist without FDA clearance, and if it did so, it would violate the FDCA. (*Id.*)

32.    On July 9, 2015, FDA informed Rebotix, LLC that certain testing was required "stem[ming] from the fact that the device is not simply a reusable device,

but is a third party reprocessed/*remanufactured* device." (Ex. 32 at REBOTIX 171062 (emphasis added).) Rebotix, LLC noted the "magnitude of the deficiency letter" and how it "threatened the feasibility of moving forward." (*Id.* at REBOTIX171060.)

33.     On December 15, 2015, Rebotix, LLC withdrew its 510(k) submission, noting that it "require[d] additional time in order to address the requests for additional information dated June 23, 2015" and that "it is our intent to resubmit the 510(k) at a later date once the data has been collected and compiled." (Ex. 33.)

34.     Since then, neither Rebotix, LLC nor Rebotix has resubmitted a 510(k) for the Interceptor technology. (*See* Ex. 22, Hamilton Tr. 34:23-36:7.)

35.     Rebotix does not have 510(k) clearance for the "repaired" EndoWrists that include an installed Interceptor. (*See Id.* 89:19-90:11.)

**Rebotix Panama Is Enjoined From "Repairing" EndoWrists in Europe**

36.     In 2016, Rebotix, LLC moved its operations to the Panamanian company Rebotix Panama. (Ex. 26, Mixner Tr. 110:17-111:14; Ex. 34.)

37.     Rebotix Panama provided EndoWrist "repairs" involving installation of the Interceptor to customers in Europe, Asia, Australia and South America. (Ex. 26, Mixner Tr. 115:6-117:1.)

38.     Rebotix Panama was enjoined from providing EndoWrist "repair" service in both Denmark and Germany. (Ex. 35 at Intuitive-00552758.) The German court found that Rebotix Panama required a CE mark for its service due to "essential modifications to [the EndoWrist] by resetting the use counter and by re-

placing the modified medical device on the market." (*Id.* at Intuitive-00552759.)

39.    Rebotix Panama was dissolved "when [Rebotix] moved everything back to the U.S. and focused on U.S." (Ex. 22, Hamilton Tr. 166:3-8.)

**FDA Tells Rebotix Twice More That 510(k) Clearance Is Required**

40.    Beginning in early 2019, Rebotix began to sell its EndoWrist "repair" service to U.S. customers, including through the use of distributors. (Ex. 36.) These sales continued through at least February 2021. (*Id.*)

41.    Rebotix sold its EndoWrist "repair" service to at least 17 customers with then-existing contracts with Intuitive. (*See id.*; Ex. 37 at 15-16.) Rebotix knew the customers had contracts with Intuitive and would breach them by using Rebotix's "repair" services. (Compl. ¶¶53-55; Ex. 38.)

42.    Rebotix arranged for hospitals to ship used EndoWrists to Rebotix's facility in St. Petersburg, FL, where the Interceptor was installed in the EndoWrists. (*See, e.g.*, Ex. 39; Ex. 26, Mixner Tr. 133:10-16.) The "repaired" EndoWrists were then shipped to the hospitals in the different states from which they came. (*See* Ex. 39.)

43.    BPI Medical ("BPI") was a distributor for Rebotix. (Ex. 40, Overmars Tr. 11:21-12:2, 19:9-13.)

44.    Bob Overmars, the President and CEO of BPI, struggled selling Rebotix's "repair" service to hospitals because they insisted that 510(k) clearance was required for the service. (Ex. 41 at BPI000337; Ex. 40, Overmars Tr. 28:13-29:3.)

45.    In May 2018, BPI reached out to Dr. Cal Rabang at FDA to inquire

whether 510(k) clearance was needed for EndoWrist "repairs." (Ex. 41 at

BPI000336.) Dr. Rabang is FDA's lead reviewer for the da Vinci. (Ex. 40,

Overmars Tr. 47:3-47:5, 47:18-47:24.)

46.     In a phone conversation between Dr. Rabang and Mr. Overmars,

during which Mr. Overmars took contemporaneous notes, Dr. Rabang, after being

informed of the "repair" service, stated that a "510(k) [is] required." (Ex. 42; Ex. 40,

Overmars Tr. 48:6-50:14.)

47.     On June 6, 2018, Dr. Rabang wrote to BPI, stating that "if the use-life

counter is reset or extended past the number of available use lives, then the device

specifications are changed," which would make BPI a "remanufacturer." (Ex. 41 at

BPI000335.) Dr. Rabang stated that because remanufacturers "meet the definition of

'manufacturer' specified in 21 CFR 820.3(o) and are required to register and list

according to 21 CFR 807.20," and because EndoWrists are classified as Class II

devices, BPI "would be subject to premarket notification (510(k)) requirements

defined in 21 CFR 807.81." (*Id.*)

48.     Mr. Overmars forwarded Dr. Rabang's position to Rebotix, asking it to

"work the response" to Dr. Rabang. (*Id.* at BPI000334.) Rebotix acknowledged Dr.

Rabang's position, but told BPI not to engage with FDA further because instead of

"revisiting the [510(k)] path that Rebotix went down in some agonizing detail 2 years

ago," it stated it "believed" FDA was wrong about the regulatory requirements for

Rebotix's "repair" service. (*Id.* at BPI000331-BPI00334.)

49.     On February 28, 2020, Dr. Je Hi An from FDA emailed Rebotix that

based on information on Rebotix's website, its "technology allows authorized service centers to inspect and recondition instruments when the original manufacturers attempts to force a new purchase," and FDA "believe[d] that a 510(k) [was] needed before [Rebotix] continue[s] your operation." (Ex. 43 at REBOTIX146954-55.)

50.    Rebotix and FDA exchanged further emails about Rebotix's "repair" process, including an email from Rebotix on March 9 in which it described its "repair" process. (*Id.* at REBOTIX146952-53.) On March 19, 2020, Cdr. Jit Virani from FDA acknowledged receipt of the submission. (*Id.* at REBOTIX146948-52.)

51.    Rebotix's rebuttal regulatory expert, Mr. J. Lawrence Stevens, testified that the lack of a response by FDA means that "you can conclude that [FDA is not] immediately concerned about you and that [FDA is] not going to do anything at least for now. It doesn't mean at some point in the future, they couldn't. I mean, so that's kind of the life that you live [] when you make medical devices regulated by FDA." (Ex. 44, Larry Stevens Tr. 256:13-22.)

**Rebotix Is Unable To Override Use Counters for X or Xi EndoWrists**

52.    "The Interceptor PCB assembly is only compatible with the da Vinci S and da Vinci Si Surgical Systems." (Ex. 19 at REBOTIX162405.) It is not compatible for the newer X or Xi models. (Compl. ¶51; *see also* Ex. 25, Gibson Tr. 61:13-15; Ex. 23, Papit Tr. 73:17-25, 100:5-11.)

53.    In January 2015, G5 Engineering Solutions performed an analysis for Rebotix "to determine the feasibility" of extending the number of lives on Xi EndoWrists. (Ex. 45 at REBOTIX171287, REBOTIX171292.)

54.   In April 2015, Rebotix "instructed [G5 Engineering Solutions] to hold off on Xi development while we finish up [the] original project." (Ex. 46 at REBOTIX110981.)

55.   

56.

**Rebotix Is Claiming Damages Based on "Repairs" of X and Xi EndoWrists**

57.   In calculating Rebotix's alleged lost profits, Mr. Robert Mills (Rebotix's damages expert) includes "sales for additional EndoWrist instruments that [he] understand[s] Rebotix would have been capable of repairing with minimal additional development effort aside from efforts necessary to develop an Interceptor process for the da Vinci X/Xi." (Ex. 50, Mills Rep. ¶34, Table 3.)

58.   Mr. Mills asserts that "Rebotix determined that it could develop an Interceptor process for da Vinci X/Xi systems but refrained from doing so due to the

anticompetitive conduct of Intuitive." (*Id.* ¶38.)

**Rebotix Cannot Establish Its Tying or Exclusive Dealing Claims**

59.　Dr. Lamb (Rebotix's economic expert) admitted that he has "not defined a relevant antitrust product market for servicing the da Vinci robots." (Ex. 51, Lamb Tr. 73:13-19, 84:18-85:3; Ex. 52, Lamb Rep. ¶10.)

60.　In defining a market for "EndoWrist Repair and Replacement," Dr. Lamb only considered the instruments that Rebotix has *actually* serviced, rather than the instruments it *could* service. (Ex. 52, Lamb Rep. ¶67; Ex. 51, Lamb Tr. 221:15-223:11.)

61.　In analyzing whether there are distinct markets for the da Vinci and EndoWrists, Dr. Lamb did not consider how other providers of robotic-assisted surgery model their businesses. (Ex. 51, Lamb Tr. 214:11-215:10 ("There may be other firms that operate in those markets that have similar policies, but that's not the challenged conduct at issue here.  That doesn't form part of the challenged conduct at issue here, so I—it doesn't inform my analysis of the challenged conduct itself.").)

62.　Dr. Lamb testified that "the history of how Intuitive has sold its EndoWrist instruments since the company started selling them" did not affect any of his opinions in the case. (*Id.* 228:23-229:4.)

63.　Dr. Lamb does not opine regarding the combined price of da Vincis and EndoWrists that any customer would pay in the but-for world.  He testified: "[I]f one took the total of the two prices [for da Vincis and EndoWrists] and added them together across the two markets in the but-for world, I haven't compared that to

what … that sum would be in the actual world." (*Id.* 180:19-181:6.)

64.     The only expert opinion in the record regarding the combined price of da Vincis and EndoWrists that any customer would pay in the but-for world is from Intuitive's expert economist, Dr. Loren Smith, who opines that "[i]f Intuitive were unable to sell an integrated system and thereby deter third parties from intervening with (and adulterating) system components [such as EndoWrists], then the overall price of the system likely would increase or the quality of the product—measured by patient safety and clinical outcomes or by innovation—would suffer." (*Id.*, Ex. 2, Smith Rep. ¶161.)

65.     Dr. Lamb does not offer any opinion "as to the merit of Intuitive's position that its usage limits are justified by patient safety concerns," but instead relies on Dr. Parnell for any opinions related to patient safety. (*Id.* 183:9-24.)

66.     Dr. Lamb did not analyze whether Intuitive has engaged in anticompetitive exclusive dealing. (*Id.* 88:7-89:16.)

## ARGUMENT

## I.      REBOTIX CANNOT ESTABLISH ANTITRUST STANDING

To establish antitrust standing, a plaintiff must establish that it (i) has suffered "antitrust injury," and (ii) is "an 'efficient enforcer' of the antitrust laws." *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013).

Rebotix's claims suffer from two sets of standing deficiencies. *First*, Rebotix cannot meet its burden to establish that its business was lawful; therefore, it cannot prove antitrust injury—i.e., that its harm was directly caused by Intuitive's alleged

misconduct, as opposed to FDA regulations. *Second*, Rebotix's claims relating to X and Xi EndoWrists also should be dismissed because Rebotix's inability to develop technology to override the use counter on X and Xi EndoWrists precludes any claim.

## A.     Rebotix Cannot Meet Its Burden To Prove That Its Business Was Lawful, and, Therefore, Cannot Establish Antitrust Injury

To establish antitrust injury, Rebotix must prove that its purported injury is *directly attributable* to anticompetitive conduct. *See, e.g., Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19cv55-TKW-MJF, 2019 WL 8063989, at *4 (N.D. Fla. Sept. 16, 2019); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1076 (11th Cir. 2004) (affirming dismissal of Sherman Act claims because plaintiff failed to allege injury resulted from "practices [that] have harmed competition"). Rebotix cannot meet this burden because its claimed injury "is caused by a regulatory scheme rather than by the defendant's actions," as it is "beyond fair dispute" that "a regulatory or legislative bar can break the chain of causation in an antitrust case." *See In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163-65 (3d Cir. 2017); *see also RSA Media, Inc. v. AK Media Grp. Inc.*, 260 F.3d 10, 15 (1st Cir. 2001). To withstand summary judgment, Rebotix "must point to evidence *affirmatively showing* that [it had satisfied the legal requirements to engage in the business at issue]." *See In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 165-66; *see also In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791-92 (8th Cir. 2006) (no antitrust injury because plaintiff's inability to import prescription drugs was "caused by the federal statutory and regulatory scheme

adopted by the [FDA]" and "not by the conduct of the defendants"); *Modesto Irrigation Dist. (MID) v. Pac. Gas & Elec. Co.,* 158 F. App'x 807 (9th Cir. 2005) (no antitrust injury because plaintiff failed to obtain approval from a local commission to provide electricity, and therefore, was "not a lawful competitor" of defendant).

Rebotix cannot establish that its injury is directly attributable to Intuitive's alleged misconduct because it cannot affirmatively show that its business was legal. It is undisputed that Rebotix never obtained 510(k) clearance for its "repair" process involving the Interceptor. (SOF ¶¶27-35, 43-51.) Yet, the undisputed facts demonstrate that both Rebotix and the FDA recognized that Rebotix's business of installing the Interceptor into EndoWrists requires 510(k) clearance.

*First*, Rebotix, LLC's 510(k) seeking clearance for use of the Interceptor acknowledges that installing the chip is "remanufacturing," which indisputably requires 510(k) clearance.[3] *Second*, during the review process for the Rebotix LLC 510(k), FDA informed Rebotix, LLC multiple times that it could not market its remanufactured device without 510(k) clearance, and if it did so, it would violate the FDCA. (*Id.* ¶¶27-33, 43-50.) *Third*, in June 2018, in response to an inquiry from one of Rebotix's distributors, FDA's lead reviewer for the da Vinci stated that a 510(k) would be required "if the use-life counter is reset or extended past the number of

---

[3] A "remanufacturer" of a non-exempt, Class II medical device is required to obtain 510(k) clearance before introducing its remanufactured device into commercial distribution in the U.S. 21 C.F.R. § 807.81(a)(2); 21 C.F.R. § 820.3(o); 21 C.F.R. § 807.20(a). A "remanufacturer" is anyone who significantly changes the intended use of a medical device or its safety or performance specifications. 21 C.F.R. § 820.3(w).

available lives" of EndoWrists. (*Id.* ¶¶43-47.) This information was forwarded to Rebotix, and in response, Rebotix acknowledged FDA's position, but instead of "revisiting the [510(k)] path that Rebotix went down in some agonizing detail 2 years ago," decided that FDA was wrong and that Rebotix's "repair" process was not subject to FDA oversight. (*Id.* ¶48.) ***Fourth***, in February and March 2020, FDA informed Rebotix that the agency believed Rebotix needed a 510(k) before continuing its operations. (*Id.* ¶¶49-50.) Without evidence that FDA would reach a conclusion contrary to what its various representatives stated in 2014, 2015, 2018 and 2020, Rebotix cannot demonstrate that its EndoWrist "repair" business is lawful.

Rebotix may argue that its business is lawful because FDA apparently has not initiated an enforcement action against Rebotix, but that is a red herring. Courts routinely reject the argument that absence of an enforcement action is evidence that the conduct at issue was lawful. *See, e.g., In re Canadian Import Antitrust Litig.*, 470 F.3d at 792 (dismissing antitrust claims alleging defendants conspired to prevent importation of prescription drugs because such importation was illegal, despite allegation that FDA refused to enforce the importation prohibition); *JEM Mktg., LLC v. Cellular Telecommunications Indus. Ass'n,* 308 N.J. Super. 160, 799 (N.J. App. Div. 1998) (plaintiffs were engaged in an illegal enterprise and thus could not prove antitrust injury even though regulatory agency was aware of plaintiffs' activities and declined to take enforcement action). Thus, FDA's lack of action against Rebotix cannot create a fact dispute as to the legality of Rebotix's business. (SOF ¶51.)

Rebotix also may argue that its business was lawful because "servicing"

hospital-owned instruments is not "commercial distribution" subject to FDA jurisdiction. This argument is meritless. A device is considered to be in "commercial distribution" if it is "held or offered for sale." 21 C.F.R. § 807.3(b). The fact that a hospital maintains ownership of a device is irrelevant to whether it was "held or offered for sale" under the FDCA. Courts have held that the FDCA should be construed liberally in line with its "overriding purpose to protect the public health." *United States v. Article of Drug (BactoUnidisk)*, 394 U.S. 784, 798 (1969). Accordingly, courts have interpreted "held for sale" language broadly in the context of other FDCA provisions. *See United States v. Sullivan*, 332 U.S. 689, 696 (1948). For example, courts have routinely held that doctors' use of drugs and devices for treatment is "held for sale" even though there is no sale of the product to the patient. *See United States v. Evers,* 643 F.2d 1043, 1050 (5th Cir. 1981); *United States v. Diapulse Corp. of Am.*, 514 F.2d 1097, 1098 (2d Cir. 1975) (per curiam).

The Ninth Circuit recently rejected the argument that an adulteration provision of the FDCA did not apply to a physician's reuse of single-use guides for prostate biopsies because they were not "held for sale." *United States v. Kaplan,* 836 F. 3d 1199, 1209-10 (9th Cir. 2016). In *Kaplan,* the physician argued that "title and possession of the guides were not transferred to patients" and therefore "there was no sale." *Id. at* 1209. The court rejected this argument because the physician was "a commercial actor in a commercial setting, using a commercial product," and thus reuse of the guides meant they were "held for sale." *Id.* at 1210; *see also United States v. Rhody Dairy, L.L.C.*, 812 F. Supp. 2d 1239, 1242-44 (W.D. Wash. 2011) (farmer

administering drugs to cattle met "held for sale" requirement); *United States v. 10 Cartons, Labeled in Part "Hoxsey,"* 152 F. Supp. 360, 364-65 (W.D. Pa. 1957) (rejecting argument that prescribing a drug did not constitute being "held for sale," reasoning that "it is not the holding for sale in a technical legal sense which gives rise to federal jurisdiction in cases arising under 21 U.S.C. § 334(a) but the fact that the channels of commerce have been used").

Rebotix's EndoWrist "repairs" indisputably involved commercial transactions, commercial actors and commercial products. Specifically, it is undisputed that: (i) Rebotix marketed installation of the Interceptor as part of its EndoWrist "repair" activities (SOF ¶¶20, 40); (ii) hospitals sent EndoWrists across state lines to Rebotix, and Rebotix sent the EndoWrists back to the hospitals after installing the Interceptor (*id.* ¶42); and (iii) hospitals paid Rebotix for this service (*id.* ¶41). Thus, Rebotix "held or offered for sale" in commercial distribution EndoWrists with installed Interceptors, subjecting Rebotix to FDA oversight.

In sum, Rebotix cannot meet its burden to establish that its EndoWrist "repair" business was lawful. Thus, Rebotix cannot prove antitrust injury, and all its claims should be dismissed for this reason alone.

**B.    Rebotix's Claims Relating to X/Xi EndoWrists Also Should Be Dismissed Because Rebotix Lacks the Ability To Perform X or Xi "Repairs" and Is Not Prepared To Launch That Service**

Rebotix seeks damages for "repairs" of X/Xi EndoWrists based on the assumption that in the but-for world Rebotix "would have been capable" of developing an "Interceptor process" for repairs of those types of instruments. (SOF

¶57.) But Rebotix does not allege in its Complaint that Intuitive interfered with its ability to develop the technology to override use limits for X or Xi EndoWrists. Instead, Rebotix raised this theory for the first time during expert discovery through its damages expert. (*Id.* ¶¶57-58.) Because Rebotix omitted these allegations from its Complaint, it should be barred from pursuing this theory for this reason alone. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (affirming dismissal of claims first raised at summary judgment, explaining that "the proper procedure for plaintiffs to assert a new claim is to amend the complaint").[4] Regardless, Rebotix lacks standing to pursue this theory of damages.

*First*, Rebotix cannot prove antitrust injury arising from its inability to develop the technology to override use limits for X/Xi EndoWrists because there is no allegation, let alone evidence, that Intuitive's alleged misconduct caused that outcome.[5] To the contrary, the record establishes that Rebotix was able to develop the Interceptor—which overrides use limits on S/Si EndoWrists—in the face of the *same* purported anticompetitive conduct that Rebotix now (apparently) asserts

---

[4] Although the Court declined to dismiss Rebotix's X/Xi-related claims because the anticompetitive conduct alleged in Rebotix's Complaint "could plausibly foreclose Rebotix from ***repairing*** EndoWrists for the newer Xi models," Rebotix nowhere alleges that Intuitive's conduct precluded Rebotix from ***developing the technology*** required to perform such "repairs." *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2021 WL 1227593, at *9-10 (M.D. Fla. Mar. 8, 2021) (emphasis added). Further, Rebotix did not amend its Complaint following the Court's ruling on the motion to dismiss to include this allegation, nor could Rebotix plausibly do so because such a claim is belied by the record evidence set forth above.

[5] The Court previously dismissed Rebotix's claims alleging that Intuitive's "'incorporating a usage counter' is anticompetitive" and that "developing a newer Xi da Vinci model that is resistant to the workaround [enabling Rebotix to 'repair' S/Si EndoWrists] is further evidence of anticompetitive behavior." *Rebotix*, 2021 WL 1227593, at *8.

prevented it from developing a similar "workaround" for X/Xi EndoWrists.  (SOF ¶¶20-24, 52, 54-55.)  Further, Rebotix *attempted* to develop an "Interceptor" for X/Xi EndoWrists in 2015, but abandoned that project in order to focus on Interceptor development for S/Si EndoWrists.  (*Id.* ¶¶53-54.)  ███████████████

███████████████████████████████████

█████████████████ (*Id.* ¶56.)  Thus, Rebotix cannot show that its inability to develop technology to "repair" X/Xi EndoWrists was "directly attributable" to Intuitive's alleged misconduct.  *Restore*, 2019 WL 8063989, at *4.

   *Second*, Rebotix cannot prove that it is an "efficient enforcer" of the antitrust laws regarding its claim for damages based on the X/Xi EndoWrist "repair" business it has not launched.  To meet its burden, Rebotix "must prove [it is] willing and able to enter the relevant market, but for the exclusionary conduct of [Intuitive]."  *See Sunbeam*, 711 F.3d at 1273.  Merely intending to enter the business is insufficient to establish standing.  *See Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1255 (10th Cir. 2003); *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562-63 (11th Cir. 1987) (plaintiff was unprepared to enter market because it had not prepared cash-flow estimates and financial statements, or obtained necessary permits).  Instead, Rebotix must make "a showing of *preparedness* to enter the business."  *Cable Holdings*, 825 F.2d at 1562 (emphasis added) (citation omitted).

   Here, it is undisputed that Rebotix cannot override use limits on X/Xi EndoWrists because it lacks the technological capability.  As Rebotix has conceded,

the "workaround" that it uses to override use limits on S/Si EndoWrists does not work on X/Xi models.  (SOF ¶52.) ████████████████████████████

████████████████████████████████████████████████████

████████████████████ it is still unable to offer "repairs" of X/Xi EndoWrists and does not have a planned date to come to market for this service.  (*Id.* ¶56.) Accordingly, Rebotix lacks standing to pursue claims based on X/Xi "repairs."

## II.   REBOTIX CANNOT PROVE A RELEVANT ANTITRUST MARKET FOR ENDOWRIST REPAIR AND REPLACEMENT

Rebotix bears the burden to define a relevant antitrust market in which Intuitive's alleged misconduct has harmed competition.  *See, e.g., Spanish Broad. Sys.,* 376 F.3d at 1074 ("Like claims under Section One, Section Two claims require harm to competition that must occur within a 'relevant', that is, a distinct market … .").

Rebotix's claims turn on the allegation that there is a purported relevant market "for EndoWrist repair and replacement."  (Compl. ¶¶1, 63, 72; *see also id.* ¶¶66, 69.)  Rebotix cannot establish the existence of that market for three reasons. *First*, market definition must be based on expert testimony, and Dr. Lamb's opinions are inadmissible for the reasons set forth in Intuitive's accompanying *Daubert* motion. *Second,* because the relevant market must be defined from Rebotix's perspective (not the perspective of da Vinci customers) as a matter of law, the market must encompass all surgical instruments that Rebotix *could* repair and, therefore, cannot be limited to EndoWrists.  *Third*, even if defined from the perspective of da Vinci customers, Rebotix cannot prove the existence of a market for EndoWrists that is

distinct from the da Vinci.  Thus, because Rebotix cannot establish a relevant market

for EndoWrist repair and replacement, all its claims should be dismissed.

**A.    Rebotix Has No Admissible Expert Testimony Defining
        <u>A Relevant Market for "EndoWrist Repair and Replacement"</u>**

"Construction of the relevant market and a showing of monopoly power must

be based on expert testimony."  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir.

2002); *see also Astro Tel, Inc. v. Verizon Fla., LLC,* 979 F. Supp. 2d 1284, 1293 (M.D.

Fla. 2013) (Covington, J.) ("[T]he absence of expert testimony by a plaintiff alleging

Sherman Act monopoly claims is fatal.")

Rebotix cannot meet its burden to provide expert testimony in support of its

purported market for "EndoWrist repair and replacement" for the reasons explained

in Intuitive's accompanying *Daubert* motion.  Specifically, Dr. Lamb's opinion

defining the market from Rebotix's perspective is contrary to law because he only

considered the instruments that Rebotix has *actually* serviced, rather than the

instruments it *could* service.  (SOF ¶60.)  In addition, his opinion that Rebotix's

EndoWrist "repairs" are reasonable substitutes for new EndoWrists purchased from

Intuitive depends on the opinions of Mr. Stevens and Dr. Parnell—which should be

excluded for reasons set forth in those accompanying *Daubert* motions.

**B.    The Market Should Be Defined From Rebotix's Perspective and
        <u>Encompass All Surgical Instruments That Rebotix Could Repair</u>**

In antitrust cases brought by an allegedly excluded supplier, the relevant

market is defined from the perspective of the supplier and includes any customer to

which the supplier could sell its services.  *See, e.g., Little Rock Cardiology Clinic PA v.*

*Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009) ("[T]he inquiry in the case of a shut-out supplier [is]:  to whom can the supplier sell?"); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118-19 (10th Cir. 2008) (affirming dismissal of Sherman Act claims because alleged relevant market did not include "all of the[] potential consumers of windshield repair and replacement services" available to plaintiff); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004) ("[T]he concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market for the supplier.").[6]

Here, a properly defined relevant market must encompass all customers to which Rebotix *could* sell repair services, and Rebotix cannot prove that its services are limited to da Vinci customers.  To the contrary, the record establishes that Rebotix *could* repair numerous other surgical instruments whose customers must be included in any properly defined relevant market.  It is undisputed that, in conjunction with installing the Interceptor, Rebotix offers repairs to EndoWrists that are similar to those performed on laparoscopic instruments by other firms, including Benjamin Biomedical with which Rebotix has a self-described "close relationship" and which has the same owner as Rebotix and employs several of the same individuals.  (SOF ¶26.)  Thus, a properly defined relevant market encompassing all customers to which Rebotix *could* sell repairs must include (at least) customers using

---

[6] *See also Spectrofuge Corp. v. Beckman Instr., Inc.*, 575 F.2d 256, 283-84 (5th Cir. 1978) (analyzing market definition from plaintiff's perspective, including by examining its opportunities to service instruments of companies besides defendant).

those laparoscopic instruments and, therefore, cannot be limited to EndoWrist customers.

At the motion to dismiss stage, the Court held that Rebotix adequately pled an EndoWrist repair and replacement market from Rebotix's perspective because of alleged differences between EndoWrists and traditional laparoscopic instruments. *Rebotix*, 2021 WL 1227593, at *5-7. But Rebotix cannot offer any evidence that differences between EndoWrists and traditional laparoscopic instruments prevent Rebotix from repairing those instruments. Outside of installing the Interceptor, which circumvents the use counter and is unnecessary for repairing traditional laparoscopic instruments, Rebotix's "repair" process focuses on aligning and sharpening jaws and blades of EndoWrists. (SOF ¶25.) These repair activities affect the surgical ends of EndoWrist, which Rebotix alleges are essentially identical to traditional laparoscopic instruments. (*Id.*) Indeed, Rebotix has submitted an expert report by Dr. Parnell opining that "traditional laparoscopic instruments are routinely repaired. EndoWrists can be similarly repaired." (*Id.*)

**C.   Even if Defined From Intuitive's Customers' Perspective, Rebotix Cannot Establish That EndoWrists Occupy a Relevant Product Market Distinct From the da Vinci**

"For [two items] to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide [one item] separately from [the other]." *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992). "Relevant evidence of separate and distinct consumer demand … is, *inter alia*, the history of the products being, or not being, sold separately, … or the

sale of the products separately in similar markets." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) (citation omitted); *see also id.* at 140, 144-45 (affirming dismissal of tying claim for failure to plausibly allege premium cable services and set-top boxes were separate products because there was no "allegation that there has ever been separate sales of cable boxes and cable services in the United States").

Consistent with this precedent, courts have recognized that essential components of a product cannot constitute separate products as a matter of law. For example, in *Kentmaster Manufacturing Co. v. Jarvis Products Corporation*, 146 F.3d 691 (9th Cir. 1998), *amended*, 164 F.3d 1243 (9th Cir. 1999), the court held that plaintiff could not establish a relevant market for spare parts used with defendant's slaughterhouse equipment because those spares were essential to the operation of the equipment, were only manufactured by defendant, and customers were apprised that they would need to purchase them from defendant. *Id.* at 694. Plaintiff similarly sold its equipment and spares as part of a single product. *Id.* Accordingly, the court concluded that the "product is of a unit made of equipment and of spares—a unit sold over a period where the purchaser of what might be called section A knows that eventually he will be buying complementary section B." *Id.*; *see also Rick-Mik Enters., Inc. v. Equilon Enters.*, LLC, 532 F.3d 963, 966-67, 975 (9th Cir. 2008) (affirming dismissal of tying claim alleging that defendant's franchises were tied to credit-card processing services because "[defendant's] credit card services are an essential part of its franchise," demonstrating that "[t]he franchise and the method of processing credit transactions are not separate products, but part of a single product (the

franchise)"); *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 274, 277 (N.D. Ill. 2019) (plaintiff failed to plausibly allege defendant's initial certification product was separate from its maintenance of said product because "adding a new component to the product that will cause customers to incur ongoing costs does not make the component a new product").

Similarly, here, EndoWrists are essential components of the da Vinci that customers agree to purchase over time from Intuitive. Both the history of how Intuitive has sold the da Vinci and EndoWrists and the practices of other robotic-assisted surgery providers confirm that the da Vinci and EndoWrists constitute a single, integrated product. This evidence is undisputed because Dr. Lamb conceded that he neither considered (i) the history of how Intuitive has sold the da Vinci and EndoWrists (SOF ¶62), nor (ii) how other robotic-assisted surgical companies sell their products (*id.* ¶61).

*First*, Intuitive has always bundled the sale of da Vincis and EndoWrists (along with service for da Vincis). (*Id.* ¶¶7-9.) The da Vinci is promoted to customers as a single product for which there are ongoing costs to service the system and replace instruments. (*Id.* ¶¶8-9.) Likewise, Intuitive's historical public filings describe the da Vinci as an integrated product consisting of multiple parts, accessories and instruments. (*Id.* ¶7.)

Intuitive's historical practice of selling the da Vinci and EndoWrists as a single product is apparent from the SLSA that each da Vinci customer signs. The SLSA governs not only the purchase and use of the da Vinci, but also the purchase and use

of EndoWrists.  (*Id.* ¶¶9-10.)  By signing the SLSA, customers acknowledge that they will purchase EndoWrists via separate orders, adhere to EndoWrist use limits and not allow EndoWrists to be repaired, refurbished or reconditioned in a manner inconsistent with Intuitive's documentation.  (*Id.*)

Intuitive's rationale for selling the da Vinci and EndoWrists as a single product, which long predates Rebotix's business, is obvious.  █████████████

████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████  Through this testing and experience, Intuitive can represent and warrant to its customers that its product will operate safely and reliably—which it could not do if third parties could adulterate the da Vinci platform.  (*Id.* ¶13.)  Moreover, the adulteration could create risk to the brand and reputation of the entire da Vinci platform.  (*Id.* ¶14.)[7]

*Second*, other robotic-assisted surgical companies similarly bundle the components of their platforms.  █████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

---

[7]  As it relates to Rebotix, those concerns are particularly well-founded given that it is undisputed that both Denmark and Germany have enjoined Rebotix's predecessor company, Rebotix Panama, from providing EndoWrist "repair" service in those nations.  (SOF ¶¶36-39.)

██████████████████████████████████

██████████████████████████████████

████ In addition, Medrobotics has sold its Flex Robotic System as a single product with accessories, internal software, warranty and support services included, while maintaining the contractual right to terminate customer contracts if the customer "uses the system with any accessory not made or approved by Medrobotics." (*Id.* ¶17.) This evidence illustrates that Intuitive's bundling is not an abuse of purported market power but rather a method of achieving strong net efficiencies for customers.

Given this undisputed evidence, Rebotix cannot prove any relevant market for EndoWrists that is separate from the da Vinci.

## III. REBOTIX CANNOT ESTABLISH THAT INTUITIVE HAS ENGAGED IN ANTICOMPETITIVE CONDUCT

Rebotix alleges that Intuitive has engaged in anticompetitive tying and exclusive dealing, but it cannot establish any such alleged misconduct.[8]

### A. Rebotix Cannot Establish Any Unlawful Tying Arrangement

To prove an illegal tying arrangement under the rule of reason,[9] a plaintiff must establish:

(1) "a tying and a tied product"; (2) "evidence of actual coercion by the

---

[8] In addition to tying and exclusive dealing (Counts I and II of the Complaint), Rebotix brings claims for monopolization and attempted monopolization (Counts III and IV). These latter claims are based on the same alleged tying and exclusive dealing arrangements as Counts I and II—coupled with actions that allegedly enable Intuitive to "enforce" those arrangements. (Compl. ¶¶56-57.) Accordingly, if Rebotix's tying and exclusive dealing claims fail, all of its claims must be dismissed.

[9] Because the da Vinci and EndoWrists are patented products (SOF ¶5), Rebotix's tying claims are evaluated under the rule of reason. *See Ill. Tool Works v. Indep. Ink*, 547 U.S. 28, 42 (2006) ("Tying arrangements involving patented products should be evaluated under the [rule of reason] rather than under the per se rule.").

> seller that in fact forced the buyer to [purchase] the tied product"; (3)
> that the seller ha[s] sufficient market power in the tying product market
> to force the buyer to accept the tied product; (4) "anticompetitive effects
> in the tied market"; and (5) "involvement of a 'not insubstantial'
> amount of interstate commerce in the tied product market."

*Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502-03 (11th Cir. 1985) (first

alteration in original) (citation omitted).

Rebotix alleges that Intuitive has engaged in two unlawful tying arrangements

by conditioning: (i) the servicing of da Vincis on customers buying EndoWrists from

Intuitive; and (ii) the sale of da Vincis on customers buying EndoWrists from

Intuitive. (*See, e.g.*, Compl. ¶63.)  Rebotix cannot establish either theory.

> 1.   Because Rebotix Cannot Define a Relevant
>      Market for da Vinci Service, It Cannot Prove
>      <u>That Intuitive Tied EndoWrists to da Vinci Service</u>

To prove that a defendant has sufficient market power in the tying market to

force customers to buy the tied product, a plaintiff must define the alleged tying

market. *See Ill. Tool Works*, 547 U.S. at 43 (tying claim "must be supported by proof

of power in the relevant market"); *Teradata Corp. v. SAP SE,* No. 18-cv-03670-WHO,

2021 WL 5178828, at *26 (N.D. Cal. Nov. 8, 2021) ("[B]ecause [plaintiff] has failed

to properly define a tying market, there is no triable issue of fact whether [defendant]

has market power in a properly-defined tying market.").  And as discussed in Section

II.A above, both the definition of the relevant market and proof of market power

must be based on expert testimony.

Here, it is undisputed that Rebotix has no expert testimony defining a

purported relevant market for da Vinci service.  Dr. Lamb conceded: "I have not

defined a relevant antitrust product market for servicing the da Vinci robots." (SOF ¶59.) For this reason alone, summary judgment should be granted on Rebotix's claim that Intuitive tied EndoWrists to its sale of da Vinci service.

> ### 2. Rebotix Cannot Establish That Intuitive Has Unlawfully Tied EndoWrists to da Vinci Sales

Rebotix cannot establish at least three elements of its claim that Intuitive has tied EndoWrists to da Vinci sales: (i) the existence of separate tying and tied products; (ii) that Intuitive had market power in the purported tying product market; and (iii) anticompetitive effects in the purported tied market. Each of these failures independently warrants summary judgment dismissing this tying claim.

> #### (a) Rebotix Cannot Meet Its Burden To Establish That da Vincis and EndoWrists Constitute Separate Products

As discussed above (*see supra* § II.B), Rebotix cannot establish that the da Vinci and EndoWrists are separate products, which dooms any tying claim.

> #### (b) Rebotix Cannot Meet Its Burden To Establish That Intuitive Has Market Power In the Purported Relevant Market for MIST Surgical Robots

A plaintiff must define the alleged tying market to establish that a defendant has power in that market, and expert testimony is required to prove both a relevant market and market power. (*See supra* § II.A.) Here, Dr. Lamb's opinions defining the purported market for MIST Surgical Robots in which the da Vinci allegedly is sold should be excluded for the reasons set forth in Intuitive's accompanying *Daubert* motion. And without expert testimony, Rebotix cannot prove a relevant market for MIST Surgical Robots or that Intuitive has power in that purported market.

(c)   Rebotix Cannot Establish
Anticompetitive Effects in the Purported
Tied Product Market for EndoWrist Repair and Replacement

To establish anticompetitive effects of a tying arrangement, "the plaintiff is

required to show that 'the combined price for the tying and tied products was greater

than if they had been sold independently.'" *Restore*, 2019 WL 8063989, at *3

(quoting *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1361 (S.D. Fla.

1998); *see also Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982)).

Accordingly, summary judgment should be granted if a plaintiff cannot establish that

the combined price of the tying and tied products would be lower in the but-for

world. *See, e.g.*, *Metzler*, at 1361-62 (granting summary judgment on tying claim

because "even if the defendants had unreasonably restricted the availability of their

parts, causing high prices for parts," plaintiff could not "show that the defendants'

service rates were supracompetitive, resulting in a higher package price for parts and

service"); *Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 672-73 (7th Cir. 1985)

("Plaintiffs did not claim, let alone offer evidence to show, that the price they paid

for the franchise-computation package is higher than the price for those two products

purchased in separate markets. ... *Kypta* ... holds that unless the plaintiff shows that

the package price was elevated the suit must be dismissed without further ado.")

Here, Rebotix cannot establish that the combined price for da Vincis and

EndoWrists was greater than if they had been sold separately.  Indeed, Dr. Lamb

failed to analyze what the ***combined price*** of da Vincis and EndoWrists would be in

the but-for world (absent the challenged conduct).  (SOF ¶63.)  This failure is

36

particularly glaring because Intuitive's economist, Dr. Smith, opined that the challenged conduct has enabled Intuitive to charge lower total prices for the da Vinci and EndoWrists and that the "the overall price of the system likely would increase" in the but-for world. (*Id.* ¶64.) Thus, Rebotix cannot meet its burden to prove anticompetitive effects, and its tying claim should be dismissed for this reason alone.

Moreover, Rebotix cannot establish the absence of procompetitive justifications for Intuitive's challenged conduct. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (plaintiff must prove "(1) an anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the conduct has no pro-competitive benefit or justification"); *Spanish Broad. Sys.*, 376 F.3d at 1071 (11th Cir. 2004) (same). As explained in Section II.B above, selling the da Vinci and EndoWrists as an integrated platform allows Intuitive to (i) test the entire system to assess and minimize clinical risk to patients and (ii) provide guarantees to customers about the reliability and safety of systems, including through warranties. These benefits are procompetitive, and Rebotix does not dispute their existence or identify a less restrictive means through which they could be obtained.[10] This deficiency is also fatal to Rebotix's tying claim.

### B.     Rebotix Cannot Establish Any Unlawful Exclusive Dealing

Exclusive dealing arrangements are permissible "unless the court believes it

---

[10] Dr. Lamb also does not offer any opinion about whether Intuitive's patient safety concerns justify the challenged conduct, but instead relies on Dr. Parnell (SOF ¶65), whose opinions should be excluded for the reasons set forth in Intuitive's accompanying *Daubert* motion.

probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  "[I]n order to determine whether a substantial share of the competition has been foreclosed, the relevant product and geographic markets must first be determined." *E.T. Barwick Indus., Inc. v. Walter E. Heller & Co.*, 692 F. Supp. 1331, 1344 (N.D. Ga. 1987), *aff'd sub nom. Barwick Indus. v. Heller & Co.*, 891 F.2d 906 (11th Cir. 1989) (table).  Further, a plaintiff must prove both the exclusion of a significant competitor and "that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984).

Rebotix's Complaint alleges that Intuitive has entered into unlawful exclusive arrangements by forcing customers to purchase new EndoWrists from Intuitive, rather than Rebotix's "repairs."  But Dr. Lamb did not analyze whether Intuitive has engaged in anticompetitive exclusive dealing.  (SOF ¶66.)  For this reason alone, summary judgment is warranted on Rebotix's exclusive dealing claim.

Moreover, summary judgment is also warranted with regard to Rebotix's exclusive dealing claim because Rebotix cannot establish:  (i) a relevant product market in which a substantial share of competition has been foreclosed because it has not defined a cognizable market for EndoWrist repair and replacement (*see supra* § II); and (ii) that the probable effect of the purported exclusion will be to raise prices for the same reasons it cannot establish the price of the alleged tying and tied

38

products would be lower in the but-for world (*see supra* § II.A.2.c).

## IV.  INTUITIVE SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS TORTIOUS INTERFERENCE CLAIM

To prove a tortious interference claim under Florida law, a party must

establish: "(1) the existence of a business relationship or contract; (2) the defendant's

knowledge of the relationship; (3) an intentional and unjustified interference with

that relationship by the defendant which induces or otherwise causes

nonperformance; and (4) damages resulting from the tortious interference." *Border*

*Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1343 (M.D. Fla. 2006) (citing *Ethan*

*Allen, Inc. v. Georgetown Manor*, Inc., 647 So.2d 812, 814 (Fla. 1994)).

The undisputed facts show that Rebotix is liable as a matter of law for

tortiously interfering with at least 17 Intuitive hospital contracts.  Rebotix knew these

customers had existing contracts with Intuitive and that these contracts prevented

them from using Rebotix to purchase modified or altered EndoWrists.  (SOF ¶41.)

Nevertheless, Rebotix intentionally interfered with these customer contracts,

inducing the hospitals to break the contractual terms by using Rebotix's "repair"

services, thereby resulting in damages to Intuitive.  (*Id.*)  Hence, Intuitive is entitled

to summary judgment with respect to the liability component.

## CONCLUSION

For the foregoing reasons, Intuitive respectfully requests that the Court grant

summary judgment (i) dismissing all of Rebotix's claims and (ii) ruling that Rebotix

is liable for tortious interference with Intuitive's customer contracts.

DATED:  November 17, 2021            Respectfully submitted,

                                               /s/ Karen Lent          

KAREN HOFFMAN LENT (*Pro Hac Vice*)
MICHAEL H. MENITOVE (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com

MICHAEL S. BAILEY (*Pro Hac Vice*)
1440 New York Avenue, N.W.
Washington, DC 20005
Tel: (202) 371-7000
michael.bailey@skadden.com

DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com

ALLEN RUBY (*Pro Hac Vice*)
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690
allen@allenruby.com

*Counsel for Intuitive Surgical, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I caused the foregoing document to be served on the following counsel of record by email:

Gregory Dovel                   greg@dovel.com
Richard Lyon                    rick@dovellaw.com
Alexander Erwig                 alexander@dovel.com
David Luikart, III              dave.luikart@hwhlaw.com


/s/ Karen Lent
KAREN HOFFMAN LENT (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com