# Exhibit 26

Case 8:20-cv-02274-VMC-TGW   Document 117-29   Filed 12/01/21   Page 2 of 9 PageID 19525

David Mixner
June 10, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 1

1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
2                TAMPA DIVISION
3        Civil Case No. 8:20-cv-2274-T-33TGW
4    _____
5    REBOTIX REPAIR LLC,
6         Plaintiff,
7       vs.
8    INTUITIVE SURGICAL, INC.,
9         Defendant.

     _____

13         REMOTE VIDEOTAPED DEPOSITION OF
                    DAVID MIXNER

15              Greensboro, Georgia
16            Thursday, June 10, 2021

25    Court Reporter:  Michelle M. Boudreaux-Phillips, RPR

Page 17

1   Q   Tab 1 appears to be sent to -- from somebody
2   named Jonathan Ward to somebody named Joe Morrison with
3   copies to David Mixner and Jeff Bua, B-U-A.  Do you see
4   that?
5   A   Yes, sir.
6   Q   Who is Jonathan Ward?
7   A   Jonathan Ward works for a company called RMS,
8   I do believe.  He is an outside regulatory firm, I do
9   believe.
10  Q   Who is Joe Morrison?
11  A   Joe Morrison is an employee of Benjamin
12  Biomedical.
13  Q   Was he one of the first employees of Benjamin
14  Biomedical?
15  A   No.
16  Q   Who is Jeff Bua?
17  A   Jeff Bua is an employee of Benjamin
18  Biomedical.
19  Q   Was he one of the first employees of Benjamin
20  Biomedical?
21  A   No.
22  Q   Do you know why Mr. Ward would be sending
23  this Tab 1 document to you, among other people, in
24  April of 2012?
25      MR. ERWIG:  Objection to form.

Page 18

1       THE WITNESS:  I have no idea.
2   Q   (By Mr. Ruby)  When you got this document,
3   did you read it?
4   A   I did not.
5   Q   Did you talk about this document with anybody
6   after you got it?
7   A   I did not.
8   Q   Now, it says that the subject of Mr. Ward's
9   email, according to him, was "Audit/Da Vinci."  Do you
10  see that?
11  A   Yes.
12  Q   In April of 2012, did you have any idea what
13  Mr. Ward was talking about in sending you an email that
14  he says was about "Audit/Da Vinci"?
15      MR. ERWIG:  Objection to form.  Lack of
16      foundation.
17      THE WITNESS:  I do not.
18  Q   (By Mr. Ruby)  In April of 2012, did you have
19  any responsibilities at Benjamin Biomedical that
20  concerned the da Vinci?
21      MR. ERWIG:  Objection to form.
22      THE WITNESS:  I don't understand the
23      question.
24  Q   (By Mr. Ruby)  Well, in April of 2012, were
25  you still employed at Benjamin Biomedical?

Page 19

1   A   Yes.
2   Q   What was your job there?
3   A   I was president of Benjamin Biomedical.
4   Q   And when did you become president of Benjamin
5   Biomedical?
6   A   I'd say approximately 1993.
7   Q   Between 1993 and 2012, had Benjamin
8   Biomedical grown in size in terms of the number of
9   employees that they had?
10  A   Yes.
11  Q   Approximately how many employees did Benjamin
12  Biomedical have in 2012?
13  A   I'd approximately say 40.
14  Q   In April of 2012, did Benjamin Biomedical
15  have any customers?
16  A   Yes.
17  Q   What was the main business of the company,
18  Benjamin Biomedical, in April of 2012?
19      MR. ERWIG:  Objection to form.
20      THE WITNESS:  Benjamin Biomedical
21  specializes in the repair of mostly handheld
22  surgical instruments such as the Harmonic
23  scalpel made by Ethicon Surgical, surgical
24  video cameras made by various manufacturers
25  such as Stryker, Karl Storz, Olympus.  And we

Page 20

1   also specialize in the repair of Phaco
2   Handpieces that are manufactured by Alcon,
3   Bausch & Lomb, and AMO Surgical.
4   Q   (By Mr. Ruby)  As of April of 2012, did
5   Benjamin Biomedical have any customers who used the
6   services of your company in respect to any robotic
7   devices?
8       MR. ERWIG:  Objection to form.
9       THE WITNESS:  I'm not aware of that.
10  Q   (By Mr. Ruby)  As of April of 2012, had you
11  yourself ever seen a da Vinci surgical system?
12  A   I'm not sure of the dates of 2012.  I know
13  that in the beginning of our process in determining if
14  it was going to be a viable repair, we purchased a
15  surgical robot, and I -- so I don't know the exact
16  timeline on that.
17  Q   Now, you just referred to a process for
18  determining whether the da Vinci system would be
19  suitable for repair services.  Is that what you just
20  told me?
21      MR. ERWIG:  Objection to form.
22      THE WITNESS:  Yes, sir.
23  Q   (By Mr. Ruby)  And when did you start that
24  analysis of whether or not the da Vinci system would be
25  a viable candidate for your repair services?

Page 21

1    MR. ERWIG: Objection to form.
2    THE WITNESS: I don't understand the
3  question.
4    Q   (By Mr. Ruby) Well, as of April of 2012,
5  there was attention within Benjamin Biomedical to
6  whether or not the da Vinci would be a suitable
7  candidate for the repair services of the company; is
8  that right?
9    A   Yes.
10   Q   When did that analysis or process of analysis
11 begin?
12   A   I'd approximately say 2011.
13   Q   And within Benjamin Biomedical, who brought
14 up the idea of looking at da Vinci products as a
15 possible customer?
16   A   What happened was, in approximately 2011, we
17 were repairing another item called a rigid scope
18 through Benjamin Biomedical, and it was brought --
19 Glenn brought to my attention that there was a
20 considerable interest from customers that the --
21 there's a -- there is a rigid scope that is attached to
22 a surgical robot made by Intuitive Surgical called the
23 da Vinci robot. And so he -- we looked -- we started
24 the process to figure out if this was something that
25 we'd be interested in servicing.

Page 22

1    Q   When you use the term "service" or
2  "servicing," what do you mean?
3    A   Repair.
4    Q   When you use the term "repair," what does
5  that mean to you?
6    A   I don't understand the question.
7    Q   Well, you used the term "repair." I want to
8  know what you consider to be repair generally. What
9  does that mean?
10   A   Generally, a hospital sends a product through
11 a distributor to us to repair. We send it back
12 repaired to the distributor, who then takes it into the
13 hospital.
14   Q   But when you use the term "repair," does it
15 mean that you restore to its original state a tool that
16 in some way has deviated from its original condition?
17   MR. ERWIG: Objection to form.
18   THE WITNESS: I do not know that.
19   Q   (By Mr. Ruby) When you use the term
20 "repair" -- strike that.
21       Your company, Benjamin Biomedical, offered
22 repair services to certain customers; is that true?
23   A   Yes, sir.
24   Q   And you marketed the firm as offering repair
25 services; is that right?

Page 23

1    MR. ERWIG: Objection to form.
2    THE WITNESS: I did not market the
3  product, sir.
4    Q   (By Mr. Ruby) When your -- strike that.
5        When the company of which you were president,
6  Benjamin Biomedical, marketed its services in
7  approximately 2011, 2012, did Benjamin Biomedical offer
8  to prospective customers repair services?
9    A   Yes, sir.
10   Q   And when the company offered repair services
11 to customers, what did your company mean by the term
12 "repair"?
13   MR. ERWIG: Objection to form.
14   THE WITNESS: That's not something I get
15 involved with, sir.
16   Q   (By Mr. Ruby) So you don't know; is that a
17 fair statement?
18   A   Yes.
19   Q   Would you look, please, at the third page of
20 Tab 1. And, Mr. Mixner, to find pages, I'll be
21 referring to -- sometimes to what's called Bates
22 numbers in the lower right-hand corner.
23       So we're literally on the same page, I'd like
24 you to look, please, at the Bates number with the last
25 five digits 73948. Would you do that, please?

Page 24

1    MR. ERWIG: Mr. Mixner, you're entitled
2  to read the entire document before you're
3  required to answer any questions about it.
4  So if you want to take the time to do that,
5  now would be the time.
6    THE WITNESS: Okay, I did not see the
7  number you were referring to.
8    CONCIERGE: It's at the bottom right
9  where I'm circling my mouse.
10   THE WITNESS: Thank you.
11   (Discussion off the written record.)
12   Q   (By Mr. Ruby) Mr. Mixner, if you'd look at
13 the bottom of the third page of this tab, Mr. Ward has
14 written, "For the new da Vinci repairs we discussed, I
15 would estimate approximately 10 hours," et cetera. Do
16 you see that?
17   A   I do.
18   Q   When you received this email, did you know
19 what he was talking about?
20   MR. ERWIG: Objection to form. Lack of
21 foundation.
22   THE WITNESS: I've never read this email
23 until now.
24   Q   (By Mr. Ruby) In approximately April of
25 2012, did you know whether or not the company of which

Page 109

1  EndoWrist instruments, was there any person employed by
2  your company, by Rebotix, who had any experience in the
3  repair of EndoWrist instruments?
4        MR. ERWIG: Object to form.
5        THE WITNESS: I -- so I do not
6     understand the question, sir.
7     Q    (By Mr. Ruby) Well, as of the time of your
8  conversation with Mr. Hamilton about starting to repair
9  EndoWrist instruments, was there anyone employed by
10 your company as a repair person who had any experience
11 in servicing or repairing EndoWrist instruments?
12    A    I don't know.
13    Q    Did you believe, at the time of your talk
14 with Mr. Hamilton, that prior experience of repairing
15 EndoWrists was necessary for the kinds of service and
16 repair work that you had in mind doing on EndoWrists?
17       MR. ERWIG: Objection to form.
18       THE WITNESS: I do not know that.
19    Q    (By Mr. Ruby) You do not know that?
20    A    I do not know. I do not know.
21    Q    At the time you had your discussion with
22 Mr. Hamilton about his recommendation to begin, as you
23 put it, to repair EndoWrists, did you believe that
24 Rebotix had the human resources and other resources
25 that would be necessary to provide a skilled service

Page 110

1  and repair to these EndoWrist instruments?
2        MR. ERWIG: Objection to form.
3        THE WITNESS: Yes.
4     Q    (By Mr. Ruby) And what was the basis for
5  your belief that Rebotix had the necessary resources to
6  do that work?
7        MR. ERWIG: Object to form.
8        THE WITNESS: We have extremely
9     experienced technicians that could offer the
10    service of repair on these instruments.
11    Q    (By Mr. Ruby) Had -- to your knowledge, had
12 any of your extremely experienced technicians ever
13 repaired a single EndoWrist instrument ever in their
14 working careers?
15    A    I do not know that.
16    Q    When -- strike that.
17       Do you know whether or not Rebotix ever moved
18 its business operations to Panama?
19       MR. ERWIG: Objection to form, the
20    characterization of "Rebotix."
21       THE WITNESS: I do know we moved Rebotix
22    to Panama. I do not remember the year.
23    Q    (By Mr. Ruby) And why did you move Rebotix
24 to Panama?
25    A    That was a time in my personal life where my

Page 111

1  mom was struggling with Alzheimer's disease and my dad
2  was diagnosed with cancer, and I felt -- I spent a lot
3  of time with them. And Mr. Hamilton was aware of that,
4  and he asked if he could take a little more charge of
5  the -- of the company. And he said he had residence in
6  Panama and thought that it would be the best thing,
7  that he could, you know, watch over the company in
8  Panama.
9        And he explained to me that Panama was a
10 very, very pro-business country, easy to ship in and
11 out of, he knew the language, his family lived down
12 there, and he thought it would be best to -- thought it
13 would be a good opportunity to repair the instruments
14 out of Panama.
15    Q    Did you have any family in Panama at the time
16 of this decision to move?
17    A    I did not.
18    Q    So it was Mr. Hamilton who first expressed
19 the merits of moving the business to Panama; is that
20 right?
21    A    Yes, sir.
22    Q    And was it the plan that all the services and
23 repairs that Rebotix would undertake for EndoWrist
24 instruments would take place in Panama?
25       MR. ERWIG: Objection to form.

Page 112

1        THE WITNESS: That is my understanding,
2     yes.
3     Q    (By Mr. Ruby) In connection with the move to
4  Panama, was it the plan that any business operations of
5  Rebotix would remain within the United States?
6     A    I don't think we had any business operations
7  with Rebotix. I do believe that Rebotix -- once we
8  went down to Panama, we opened up a corporation called
9  Rebotix Panama. And from my understanding, Rebotix LLC
10 was terminated.
11    Q    Immediately before the formation of Rebotix
12 Panama, did Rebotix LLC have employees, for example,
13 these skilled service technicians that you referred to
14 a minute ago, who were employed in the United States?
15    A    Rebotix LLC had no employees.
16    Q    Okay. For what entity did the skilled
17 service technicians work for?
18    A    Benjamin Biomedical.
19    Q    Did the formation of Rebotix Panama have any
20 effect on the employment status of the technicians at
21 Benjamin Biomedics -- Biomedical?
22    A    No, sir.
23    Q    Are the Benjamin Biomedical technicians still
24 employed at that company, at Benjamin Biomedical?
25    A    I don't understand the question.

Page 113

1    Q   Okay.  There was a time -- strike that.
2        Was there a time when Benjamin Biomedical
3    employed individuals, among them, service
4    technicians?
5    A   Yes.
6    Q   Does Benjamin Biomedical still employ service
7    technicians?
8    A   Yes.
9    Q   Did the establishment of Rebotix Panama have
10   any significant effect on the employees of Benjamin
11   Biomedical?
12           MR. ERWIG:  Objection to form and asked
13       and answered.
14           THE WITNESS:  No.
15   Q   (By Mr. Ruby)  Did Rebotix Panama ever hire
16   full-time employees to service medical devices?
17   A   No.
18   Q   Did Rebotix Panama ever receive from any
19   hospitals EndoWrist instruments that the hospital
20   wanted to be repaired or serviced?
21          MR. ERWIG:  Objection to form.
22          THE WITNESS:  We received the EndoWrists
23       down in Panama.  I do believe -- I do believe
24       that most of them were received through
25       distributorship, which came from the

Page 114

1    hospital.  I don't remember any time or know
2    anything about a hospital sending in the
3    product directly because that was never a
4    business plan of ours.  We've always worked
5    through distribution.
6    Q   (By Mr. Ruby)  Well, if a hospital wanted the
7    repairs and service offered by Rebotix Panama, tell me
8    again how the instrument that was going to be, as you
9    put it, repaired would actually get to the repair
10   facility.  I didn't understand what you said about a
11   distributor and that pathway.  That's what I'm looking
12   for.  Who was -- who was the distributor?
13   A   We patterned Rebotix Panama after the format
14   of how we have always done things at Benjamin
15   Biomedical.  We work exclusively through distribution.
16   The distributor or sales rep, sometimes a company, an
17   individual or a company, will go in and market the
18   product to the hospital.  And then the hospital will
19   let the sales rep take the product out of the hospital,
20   send it to us for repair, and we send it back.
21   Q   At the time you made the decision to start
22   repairing EndoWrists, did Rebotix Panama have
23   contractual relationships with one or more distributors
24   that you were looking to to provide a flow of
25   instruments to have, among other things, the

Page 115

1    interceptor installed?
2           MR. ERWIG:  Objection to form.
3           THE WITNESS:  I'm not aware of Rebotix
4       having contracts or formal contracts with any
5       distributor.
6    Q   (By Mr. Ruby)  Rebotix moved to Panama and
7    was it your expectation, at the time of this move, that
8    in Panama Rebotix would provide repairs and service for
9    EndoWrist instruments?
10   A   Yes.
11   Q   And what was your plan as far as the route
12   that would be followed by those instruments before they
13   got to Panama?
14          MR. ERWIG:  Objection to form.
15          THE WITNESS:  The business was that
16      we -- Stan and Glenn marketed our repair
17      services to Europe, I do believe Asia, and I
18      do believe Australia, and I do believe South
19      America also, and they had a relationship
20      with customers there, distribution there,
21      that would pick up the -- the broken
22      EndoWrists from the hospitals in those
23      countries, the distributor would receive
24      them, ship them to Panama, and then we would
25      repair them and ship them back to the

Page 116

1    distributor in that foreign country.
2           It was a very -- from what I
3       understand -- I've never been to Panama, but
4       Stan is telling me that it was a place that
5       was very good for business and tax friendly
6       and it was easy to get in and out of customs
7       and shipping.
8    Q   (By Mr. Ruby)  In respect to hospitals in the
9    United States, what was your plan as to how and when
10   hospitals in the United States would transmit their
11   EndoWrist instruments to Panama if they wanted to have
12   the interceptor technology installed?
13          MR. ERWIG:  Objection to form.
14          THE WITNESS:  I don't think we ever had
15      that plan because Glenn and Stan exclusively
16      marketed to overseas customers.
17   Q   (By Mr. Ruby)  Are you saying that you never
18   had a plan to provide the interceptor technology to
19   EndoWrist customers in the United States?
20          MR. ERWIG:  Objection to form, misstates
21      prior testimony.
22          THE WITNESS:  Rebotix Repair only
23      repaired product that came in from Europe,
24      Asia, Australia, and South America.  To the
25      best of my knowledge, we never even marketed

Page 117

1    the service of repair in the United States.
2        Q   (By Mr. Ruby)  Why not?
3        A   From what I understand, it had something to
4    do with this Lexmark ruling, which was the reason that
5    Stryker Sustainability decided not to go forth with
6    their bid on the business, and so we decided that --
7    Stan was -- told me our best move would be to go to
8    Panama, since he has residency, and repair the products
9    from overseas customers.
10       Q   So it was not part of your plan, was it, to
11   offer the interceptor technology to hospitals in the
12   United States, right?
13           MR. ERWIG:  Objection to form.
14           THE WITNESS:  That was Rebotix' plan
15   for -- that was Rebotix' plan, yes, sir.
16       Q   (By Mr. Ruby)  It was Rebotix' plan to offer
17   the interceptor to hospitals in the United States, or
18   was it -- was it Rebotix' plan not to offer the
19   interceptor technology to EndoWrist -- hospitals in the
20   U.S.?
21           MR. ERWIG:  Objection to form.
22           THE WITNESS:  It sounds like I either
23   misspoke or misunderstood or maybe you
24   misunderstood.  I'm not sure.  But Rebotix
25   Panama never marketed the product of the

Page 118

1    EndoWrist repair in the United States.  We
2    only marketed to Europe, Asia, Australia, and
3    South America.
4        Q   (By Mr. Ruby)  Did Rebotix Panama at some
5    point enter into a distributorship agreement with
6    Restore and/or Restore Robotics?
7        A   I don't know that answer.
8        Q   Did you personally have any discussions or
9    communications like emails with anyone whom you
10   understood to be speaking on behalf of Restore?
11       A   I had limited conversation with -- from what
12   I understand to be the owner of Restore, which is Clif
13   Parker.  From what I understand, he also had a partner
14   named Kevin May.  I don't think I ever had any
15   communication with him.  And so Clif and I -- I met
16   Clif one time in the -- in the Benjamin
17   Biomedical/Rebotix facility in St. Petersburg, Florida.
18       Q   And when you met Mr. Parker that one time,
19   were the two of you alone together, or were there other
20   people that were at the meeting?
21       A   I do not remember that.
22       Q   What did the two of you talk about?
23       A   Clif was interested in buying the interceptor
24   chip from us.
25       Q   And did you agree to sell it to him?

Page 119

1        A   I don't know if I agreed to sell it to him.
2    I know that I only met with Clif one time, and we had
3    limited conversations.  I thought it would be best to
4    pass all communication over to Glenn Papit since he is
5    our sales and marketing director.  So I do believe that
6    Glenn had a lot more communication with Mr. Parker than
7    I have.
8        Q   Well, did anyone ever tell you that Restore
9    signed a distributorship agreement with Rebotix Panama?
10       A   No.
11           MR. RUBY:  Let's take a 10-minute break.
12   Is that convenient for you, Mr. Mixner?
13           THE WITNESS:  Yes, sir.
14           MR. RUBY:  Okay, let's take 10.
15           THE VIDEOGRAPHER:  The time is now --
16   bear with me a second.  The time is now 2:57
17   p.m.  We're going off the record.
18           (Recess taken.)
19           THE VIDEOGRAPHER:  The time is now 3:10
20   p.m.  We're back on the record.  This is the
21   beginning of Media Unit 4.  Please continue.
22           MR. RUBY:  Could we please give
23   Mr. Mixner Tab 65?
24           CONCIERGE:  Sure.  Please stand by.
25   Tab 65 has been introduced as Mixner

Page 120

1    Exhibit 16.
2            (Exhibit 16 marked for identification.)
3        Q   (By Mr. Ruby)  Mr. Mixner, would you please
4    look at that document?  That's the only document in the
5    exhibit, so would you take a look at that, please.
6        A   Yes, sir.
7        Q   Is that your signature on Exhibit 65 [sic]?
8        A   Yes, sir.
9        Q   And this -- I'm looking at the second
10   paragraph.  It says, "This will serve as written notice
11   of termination by Rebotix Repair, LLC ('Rebotix') of
12   the Distributor Agreement between Rebotix (as Assignee
13   from Rebotix Panama) and Restore Robotics Repairs, LLC
14   dated October 13, 2018 ('Agreement')."  Do you see
15   that?  Do you see that, Mr. Mixner?
16       A   Yes.  Yes, I do.  Yes, I do.
17       Q   All right.  Do we agree that this paper seems
18   to say that there was a distribution agreement between
19   Rebotix Repair on the one hand and Restore Robotics
20   Repairs on the other hand?  That's what it seems to
21   say; do you agree with that?
22       A   I do.
23       Q   Was there such an agreement?
24       A   Yes.  I do -- if I may add, I thought when we
25   went back to the question before the break, you were

Page 129

1  repair, a repair service.
2      Q   (By Mr. Ruby)  Well, I'm not intending to ask
3  you any expert questions about clearance.  The question
4  instead is:  Do you attribute your experience that you
5  had and your company had in trying to sell and market
6  its service, including repairs and the interceptor
7  technology, do you attribute the experience you had
8  with that to the company's absence/lacking of FDA
9  clearance?
10         MR. ERWIG:  Objection to form.  Asked
11  and answered.
12         THE WITNESS:  I -- sir, I don't even
13  know understand what the FDA and offering our
14  repair has to do with anything.  We offer
15  repair service on other products, and we do
16  not have FDA clearance.  I don't even know if
17  that's even something that could even happen.
18  So I would have to say that I think it has no
19  bearing at all on our ability to repair and
20  sell this product as a repair.
21         The difficulty we had is with Intuitive
22  Surgical, you know, stopping our services,
23  you know, in the hospital by threatening the
24  hospitals that if they used our repair
25  services, they would discontinue their

Page 130

1  services, and the hospital had to -- at that
2  time, they had to stop using our services
3  because if not, they were going to be cut off
4  from Intuitive Surgical completely.
5      Q   (By Mr. Ruby)  Did you personally have any
6  communication with anyone from Intuitive Surgical ever
7  about anything?
8      A   No, sir.
9      Q   Did -- strike that.
10         Is it your belief -- I don't want to get into
11  lawyers' communications, but based on your experience
12  trying to market your company's services and product,
13  did you ever encounter what you believe to be any false
14  or misleading statements made about Rebotix by
15  Intuitive Surgical?
16         MR. ERWIG:  Objection to form.
17         THE WITNESS:  I did not.  Glenn informed
18  me that the Intuitive representatives would
19  claim that our repair process needed FDA
20  clearance, which as Stan explained over and
21  over again, this is not true.
22      Q   (By Mr. Ruby)  Who did Stan explain that to
23  over and over again?
24      A   Stan explained that to Glenn and to myself,
25  that a repair does not require clearance through the

Page 131

1  FDA, just like Benjamin Biomedical, for the last 30
2  years, has repaired 3-, 400,000 surgical instruments,
3  and we've done it all without FDA clearance because
4  it's a simple service.  A hospital sends in a repair
5  that is broken, we repair it and send it back.
6      Q   Has Stan, Mr. Hamilton, ever spoken to you
7  about whether or not remanufacturing of a medical
8  device requires a 510(k) clearance?
9          MR. ERWIG:  Objection to form.
10         THE WITNESS:  I do not know anything
11  about remanufacturing.  I do not remember
12  Stan ever saying anything to me about
13  remanufacturing.  We've always been a repair
14  company, and so I don't think Stan would have
15  ever brought up the word "remanufacturing" to
16  me involving the EndoWrist repair.
17     Q   (By Mr. Ruby)  In light of the opinions
18  you've just explained, why did Rebotix seek clearance
19  from the FDA in connection with the interceptor
20  project?
21         MR. ERWIG:  Objection to form and lack
22  of foundation.
23         THE WITNESS:  I do not know.
24         MR. RUBY:  Could we have, please,
25  Exhibit -- or Tab 39?

Page 132

1          CONCIERGE:  Sure.  Please stand by.
2          Tab 39 has been introduced as Mixner
3  Exhibit 18.
4          (Exhibit 18 marked for identification.)
5      Q   (By Mr. Ruby)  Would you have a look at that,
6  please, Mr. Mixner.  It's just the one page.
7      A   Okay.
8      Q   Have you ever seen this document before?
9      A   I have not.
10     Q   Did anyone tell you ever before today about
11  this document and what it says?
12     A   Not to my knowledge.
13     Q   Now, returning to your testimony a few
14  minutes ago about your -- is it Glenn, the -- your
15  salesperson -- Papit?
16     A   I'm sorry, I did not hear you.
17     Q   Yeah.  What is Glenn's -- your salesperson
18  who you delegate sales matters to, what's his first
19  name?
20     A   Glenn.
21     Q   Glenn.  All right.  I'm going to call him by
22  his first name because you are.  No disrespect to
23  anybody.
24         Glenn was -- explained to you that he was
25  close to making some sales to distributors and the

Page 133

1   sales didn't go through, in substance; is that right?
2   A   We had sales go through of the repair of the
3   wrists. We were repairing wrists, from what I
4   understand, for, you know, numerous hospitals in the
5   United States. And then as Glenn told me, once we got
6   to a number, which he did not know an exact number, but
7   Intuitive became aware of this and they went in and
8   threatened the hospitals that if they used our repair
9   service, they would discontinue all service to them.
10  Q   As to those customers for whom Rebotix Repair
11  actually did what you're calling service, where
12  geographically were those services performed?
13  A   If I understand the correct -- the question
14  correctly, the services were -- of the repair of the
15  EndoWrist was -- they were repaired in St. Petersburg,
16  Florida.
17  Q   Was there any other facility in the United
18  States where, to your knowledge, the interceptor
19  technology was applied to EndoWrist instruments?
20       MR. ERWIG:  Objection to form.
21       THE WITNESS:  Yes. At one time, we had
22  a contract with Clif Parker of Restore
23  Robotics to purchase the interceptor chip
24  from us and for him to do the repairs in his
25  facility.

Page 134

1   Q   (By Mr. Ruby)  And where was his facility?
2   A   Sir, I do not know.
3       MR. RUBY:  All right, let's take --
4   let's take 10 minutes now, come back at 5
5   after -- I guess it's 5 after 4 for you.
6   Okay?
7       THE VIDEOGRAPHER:  The time is now 3:53
8   p.m. We're going off the record.
9       (Recess taken.)
10      THE VIDEOGRAPHER:  The time is now 4:07
11  p.m. We're back on the record. Please
12  continue.
13  Q   (By Mr. Ruby)  Mr. Mixner, did Mr. Hamilton
14  ever tell you anything about any injunctions that had
15  been obtained against Rebotix Panama in Europe?
16  A   He did.
17  Q   What did he tell you?
18  A   From my understanding, Rebotix Panama
19  received an injunction from -- the country of origin
20  was Denmark. I do not know -- that's about what I know
21  about that.
22  Q   Did he tell you about any other injunctions?
23  A   I do not recall that, no, sir.
24  Q   Were United States patents issued in
25  connection with the interceptor technology?

Page 135

1   A   Yes, sir.
2   Q   There were two patents, weren't there?
3   A   Yes.
4   Q   Who owns them today?
5   A   A company called F21.
6   Q   And what's the ownership of F21?
7   A   I do believe I own that.
8   Q   Has F21 given permission to any company or
9   individual to practice the two patents in the United
10  States?
11      MR. ERWIG:  Objection to form.
12      THE WITNESS:  Sir, I don't understand
13  that question.
14  Q   (By Mr. Ruby)  Well, F21 owns some patents;
15  is that right? Yes?
16  A   Yes, sir.
17  Q   And there are two patents, aren't there?
18  A   I'm sorry, I did not hear you.
19  Q   There are two patents, aren't there?
20      MR. ERWIG:  Objection. Asked and
21  answered.
22      THE WITNESS:  Yes, sir.
23  Q   (By Mr. Ruby)  Has F21 given permission to
24  any individual or company to -- it's called practice --
25  to use the intellectual property in those patents for

Page 136

1   any purpose?
2       MR. ERWIG:  Objection to form.
3       THE WITNESS:  From what I understand,
4   F21 has given the ability -- to Rebotix
5   Repair LLC the ability to use the patent.
6   Q   (By Mr. Ruby)  Other than giving the
7   permission to Rebotix Repair LLC, to your knowledge,
8   has F21 given permission, which is currently in effect,
9   to any entity, any other entity or person?
10      MR. ERWIG:  Objection to form.
11      THE WITNESS:  I do not believe so, sir.
12  Q   (By Mr. Ruby)  In particular, has F21 given
13  any kind of permission or license to any Restore entity
14  to practice the patents owned by F21?
15      MR. ERWIG:  Objection to form.
16      THE WITNESS:  I do not know that.
17  Q   (By Mr. Ruby)  Well, you would know if they
18  had, wouldn't you?
19  A   I know that we had given Restore the ability
20  to purchase the interceptor chips. I don't know -- I
21  guess I don't completely understand when you say do
22  they -- did we give them the patents. I don't know
23  what that means.
24  Q   As far as you know, has F21 given or sold or
25  rented out the right to any Restore entity to use the