Exhibit 1

Expert Report of Dr. Larry Chiagouris

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| REBOTIX REPAIR LLC, | § |
| | § |
| Plaintiff, | § |
| | § Case No.: 8:20-cv-02274 |
| v. | § |
| | § |
| INTUITIVE SURGICAL, INC., | § |
| | § |
| Defendant. | § |

---

## EXPERT REPORT OF DR. LARRY CHIAGOURIS

---

August 30, 2021

# TABLE OF CONTENTS

I.    Scope of Retention and Assignment .................................................................................. 2

II.   Background and Qualifications ....................................................................................... 3

III.  Standards for Survey Evidence ...................................................................................... 5

IV.  Overview of the Parikh Report ...................................................................................... 6

V.   Summary of Opinions .................................................................................................... 7

VI.  Opinions ........................................................................................................................ 8

     A.   The conclusions in the Parikh Report are based on an unspecified and likely wrong survey population and a wrong sample. The sample is both overinclusive and underinclusive. ........................................................................................................ 9

     B.   Dr. Parikh failed to document and disclose other relevant information and this likely decreased the represenativeness of the sample. ............................................ 16

     C.   Dr. Parikh failed to pretest her survey, resulting in the potential use of biased and misleading questions or questions which were likely to be not completely understood by respondents. ................................................................................................... 17

     D.   The Parikh report includes respondents whose responses indicate that they did not provide valid answers due to the failure to use appropriate quality controls in conducting the survey. ...................................................................................... 18

     E.   The Parikh report is based on a flawed design which is not representative of the characteristics of the marketplace and not relevant to the current legal matter and is also inconsistent with widely accepted understanding of relevant consumer behvaior ...... 22

VII.  Conclusions .................................................................................................................. 27

## I.      Scope of Retention and Assignment.

1.      I have been retained by the attorneys for the Plaintiff in the above-captioned action, as a marketing and consumer behavior survey research expert. I have been engaged to analyze the opinions proffered by Dr. Sara Parikh in her July 26, 2021 report (the "Parikh Report").[1] Specifically, I have been asked to determine whether the opinions in the Parikh Report are based on proper methodology and sufficiently valid and reliable data.

2.      The statements in this report, except as otherwise noted, are based on my decades of experience with survey research projects and other marketing initiatives which focused on branding and advertising issues in addition to the information that I have obtained from reviewing materials pertaining to this engagement. The materials on which I have relied are commonly relied upon by experts in my field.

3.      The statements in my opinion are consistent with the scientific method and related reasoning as commonly used in both the academic and managerial marketing profession. I have formed these opinions based on my consideration of widely accepted theories and concepts and best practices in marketing and survey research, information I have reviewed in this matter, my expertise, and my experience.

4.      A complete list of sources on which I considered in formulating my opinions is attached hereto as Exhibit 1.

5.      My opinions are based upon my independent analysis and review of relevant information available to date. I reserve the right to review and consider any additional information that may be produced by the parties in this litigation or otherwise provided to me, and I may supplement my opinions based upon the review of any such materials, if it is appropriate to do so.

---

[1] Expert report by Dr. Sara Parikh, July 26, 2021.

## II.    <u>Background and Qualifications.</u>

6.    I am currently the president of the marketing, branding, and advertising consulting firm BrandMarketing Services, Ltd., as well as a tenured full professor at the Lubin School of Business, Pace University, in New York. I began my career in marketing-related matters in 1977 while employed at AT&T, where I was responsible for market research regarding customer satisfaction, product development and marketing communications.

7.    Following my employment at AT&T, I assumed executive positions at major communications and advertising agencies, directing marketing planning and consulting engagements at Grey Advertising, Bozell Jacobs Kenyon and Eckardt Advertising, Backer Spielvogel Bates Advertising and Creamer Dickson Basford public relations agency.

8.    During my business career, I worked on brand-related issues for a wide variety of businesses and organizations, including many Fortune 500 companies. A partial list of the companies and brands that I have provided advice and counsel to includes Arby's, A&P Retail Food Stores, BMW, Canon, Fabergé, General Motors, McDonald's, Mercedes Benz, Pizza Hut, Procter & Gamble, the United States Department of Defense, the United States Department of State, Vanity Fair, and Visa Credit Cards.

9.    More specifically with regard to healthcare-related issues, I have been engaged to conduct commercial or litigation related assignments for a wide variety of companies and brands, including Amgen, Carter Wallace, Guthrie Health and Hospital Group, the Health Insurance Association of American, Long Island Jewish Hospital, Lucid Health (a national brand of radiologists), Merck, National Foundation for Infectious Disease, Nutramax, Reactine, Sandoz, Orasure, Pfizer, San Diego Clinic of Integrative Medicine, Smith Kline, Society for Microbiologists, Stemgenex, Stericycle, Varilux and Visene.

10.    I also held industry leadership positions at leading professional associations and societies. These positions included serving as Chairman of the Advertising Research Foundation and as a member of its research quality council.

11.     At the Advertising Research Foundation, I served on the committee that created the ARF David Ogilvy Awards for Excellence in Advertising Research. I also served as co-editor of its 50th Anniversary edition of *The Journal of Advertising Research* that was a compendium of leading managers and scholars discussing the most recent advances in advertising and advertising research theory and practice.

12.     In addition, I served as a member of the Board of Directors of the American Marketing Association ("AMA"). As part of that service, I was appointed as the AMA representative to the United States Census Bureau on its plans for conducting the census. I also served as a member of the faculty of the AMA's Advanced School of Marketing Research and taught the Brand Equity course. Concerning Brand Equity, I also created the Brand Equity course for the H. Wayne Huizenga Graduate School of Business doctoral program at Nova Southeastern University in Florida. In addition, I authored one of the earliest articles on the topic of branding with regard to Internet marketing titled "Branding on the Internet."

13.     My academic career extends more than 25 years, including academic appointments, teaching courses, and providing lectures concerning marketing, branding, advertising, and survey research methods at the doctoral, graduate, and undergraduate levels for leading business schools, including the Lubin School of Business at Pace University, the Stern School of Business at New York University, the Baruch Graduate School of Business of the City University of New York, and the H. Wayne Huizenga Graduate School of Business, Nova Southeastern University.

14.     My current responsibilities at the Lubin School of Business, Pace University, where I am a full-time tenured professor, include lecturing on branding and brand protection, and survey research issues as applied to marketing problems and evaluations of marketing initiatives. I currently serve on the Editorial Review Board of the Advertising Research Foundation's publication *The Journal of Advertising Research* and also, *The Journal of Internet Commerce*. I have also served on the Editorial Review Board of the *Journal of Consumer Marketing* and the publication *Marketing Management* (published by the American Marketing Association).

15.     Relevant to this case, I authored the sections of the Wiley Encyclopedia of Marketing titled "Marketing Functions on the Internet" and "Comparative Advertising," both published in 2011, and both of which are still in print.

16.     My compensation for work on this case is at the rate of $750 per hour. My compensation is not dependent on the outcome of this case or on any opinions I express in this matter. My complete curriculum vitae, list of publications, and cases in which I have provided testimony in the form of a deposition or appearance at a trial or hearing appear as Exhibit 2 of this report. I reserve the right to supplement or amend my report as new information becomes available.

## III.     Standards for Survey Evidence.

17.     It is important to be guided by a set of relevant and widely accepted best practices and standards when preparing or evaluating a survey. I have formed my opinions with reference to standards typically used and cited in my field with regard to the admissibility of surveys (including the underlying data, analysis, and conclusions). These standards are found in the *Manual for Complex Litigation*, 4th ed., 2004 and the "Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., Federal Judicial Center, 2011.

18.     In addition, I was guided by long-established and widely accepted industry practices, which are described in the Advertising Research Foundation publication "Guidelines for Market Research", The Advertising Research Foundation, August 2003 and also by the International Organization for Standardization (ISO) Standard 20252 which is a set of standards developed and published to address market, opinion and social research, including insights and data analytics.

19.     Surveys for litigation must comport with the standards in the industry for designing and implementing survey research. These various standards (as seen in the sources

identified above) all converge on the following essential set of conditions that define a proper survey:

- The _proper population universe_ must be identified and examined.

- A _representative sample_ must be drawn from that universe.

- The study design must be _scientifically sound and unbiased with proper and probative control mechanisms_ to be able to arrive at valid and meaningful conclusions.

- The stimulus or _stimuli and questions should reflect marketplace conditions_

- The _questions must be clear, precise, and non-leading_, and the instrument for data collection must be properly designed to be _free of design-induced biases_.

- The _interview must be conducted properly_; respondents must not be given knowledge of any pending litigation or purposes for which the data would be used _and_ the questionnaire must be administered properly and in accordance with the study directions.

- Once gathered, the data must be _accurately and fully analyzed and reported_.

20.     If a survey does not meet any of the above standards, the survey results are not considered valid or reliable.[2]

## IV.     Overview of the Parikh Report.

21.     Dr. Parikh issued a report on July 26, 2021, in this matter. In her report, she states that she has been retained to design and conduct a survey to measure how prospective customers

---

[2] _Manual for Complex Litigation_, 4th ed., distributed by the Federal Judicial Center, 2004, page 102-104; Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the _Reference Manual on Scientific Evidence_, 3d ed., Federal Judicial Center, 2011, page 359-417; Advertising Research Foundation publication "Guidelines for Market Research", The Advertising Research Foundation, August 2003; International Organization for Standardization (ISO) Standard 20252.

of Rebotix's services perceive Rebotix's advertising.[3] To assess the reaction of what she refers to as Rebotix advertising, Dr. Parikh used as a stimulus a flyer that was briefly used by Rebotix and exposed to some prospective customers of Rebotix. She limited her research to the exposure of this flyer to respondents and no other form of advertising or marketing materials of information exchanges that may have occurred between Rebotix and its prospective customers.

22.     The sample size of her survey consisted of 200 respondents. The majority of the respondents that Dr. Parikh used to respond to her questions in the survey consisted of surgeons and nurses. Her conclusions related to the Rebotix marketing material were only based on this sample.

## V.     <u>Summary of Opinions.</u>

23.     I have reviewed the Parikh Report. I conclude that the opinions included in the Parikh Report are not based on proper methodology and sufficiently valid and reliable data. There are several fatal flaws in Dr. Parikh's methods and analyses of the survey data.  These flaws have produced highly unreliable responses from survey participants and do not provide valid insight as to the matters for which the Parikh Report survey was designed.

24.     The flaws include the following:

- The conclusions in the Parikh report are based on an unspecified and likely wrong survey population and a wrong sample. The sample is both overinclusive and underinclusive

- Dr. Parikh failed to document and disclose other relevant information and this likely decreased the representativeness of the sample

- Dr. Parikh failed to pretest her survey, resulting in the potential use of biased and misleading questions or questions which were likely to be not completely understood by respondents

---

[3] Parikh Report, paragraph 6.

Highly Confidential Attorneys' Eyes Only

- The Parikh report includes respondents whose responses indicate that they did not provide valid answers due to the failure to use appropriate quality controls in conducting the survey

- The Parikh report is based on a flawed design which is not representative of the characteristics of the marketplace and is not relevant to the current legal matter

## VI.   Opinions.

### A.   The conclusions in the Parikh Report are based on an unspecified and likely wrong survey population and a wrong sample. The sample is both overinclusive and underinclusive.

25.     The Reference Guide on Survey Research states that the definition of the relevant population chosen for a survey is crucial because there may be systematic differences in the response of members of the population and nonmembers.[4]  Stated another way, some members of the population may be more important than other members and as such, the sample should reflect the proper proportion of the relevant member groups.

26.     Even if a survey is well designed and the questions are carefully crafted and unbiased, if the survey is not conducted among the appropriate population or mix of the population, the survey is of no value.  In fact, such surveys can be very misleading. Surveys that include answers from respondents who are not relevant will obscure the findings with the answers that they provide and possibly lead to incorrect conclusions. Thus, respondents whose opinions are not relevant to the matter that is being litigated should not be included in the survey population

27.     The Parikh Report was based on a sample of 200 respondents. However, in her report, Dr. Parikh never provided a definition of the appropriate universe as recommended by the Reference Guide on Survey Research, distributed by the Federal Judicial Center. We can guess what Dr. Parikh believes is the appropriate universe by examining the characteristics of the

---

[4] Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., Federal Judicial Center, 2011, page 377.

sample respondents but guessing what she thinks is an appropriate population universe introduces a serious flaw in her work due to the absence of her specifically and explicitly defining the population universe.

28.     More importantly, in addition to understanding and stating what the proper population universe is, Dr. Parikh needed to provide information that supports her opinion as to the definition of the appropriate population universe. Dr. Parikh cannot simply assert a definition. She needs to provide a rationale for her definition of the population universe. Dr. Parikh does not provide any valid rationale and support for any definition of a population universe. She states that her rationale is based on testimony provided by Mr. Glenn Papit.[5] However, Dr. Parikh then concludes from that testimony that healthcare professionals are the most important set of respondents given that the majority of her sample was comprised of healthcare respondents. As will be discussed below, Glenn Papit did not testify that healthcare professionals are the most important segment of prospects. In fact, the evidence I have reviewed indicates that healthcare professionals are less important than business and administrative staff at hospitals. More on this topic will be discussed later in this section.

29.     Moreover, we cannot be certain that Dr. Parikh accessed a valid sample given that she provides no rationale for the sample selected. A valid sample consists of a sample of respondents who are among the target population universe. A sample is not a valid sample if the respondents are not among the target population universe. Furthermore, if the sampling frame does not include a representative sample of important groups in the target population, there is generally no way to know how the unrepresented members or less represented members of the target population would have responded."[6]

30.     Dr. Parikh's sample included primarily healthcare providers rather than the hospital personnel actually responsible for purchase decisions. A variety of industry observers

[5] Parikh Report, paragraph 15.
[6] "Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., distributed by the Federal Judicial Center, page 379.

and consultants note the importance of the business and finance professionals related to hospital purchase decisions. For example, a sales consulting firm notes that "Medical devices are usually a huge investment and, consequently, most hospitals hesitate to replace their existing devices. Only devices that are certain to save the hospital money or provide them with invaluable help will survive the finance department. Deals can spend up to two months in the finance department for evaluation." In addition, it is noted and recommended that "Administrators combine the physician and financial department's concerns into one. They want your medical device to improve patient care and reduce cost on a long-term basis. If you get the opportunity to pitch to the administrators, create a tailored presentation that focuses on their needs. They want a high value, high impact, and low-cost medical device."[7]

31.    Another industry observer discusses the titles of relevant decision-makers for purchases of medical devices. Included in those titles, it is noted that decision-makers, occasionally known as "budget-holders," are executives of hospitals who may hold titles such as CEO, CFO, or COO.[8] Of note, illustrative titles were incorporated into the Parikh Report. Those titles include:

- C-Suite (e.g., CFO, CMO)
- Chief/Chairman/Director
- Medical Director
- Director of Supply Chain/Materials Management/Purchasing/Procurement
- Manager/Supervisor
- Medical Equipment Planner

32.    The greater importance of business and finance professionals at hospitals compared to healthcare providers such as surgeons and nurses is further supported in the

---

[7] https://www.badgermapping.com/blog/how-to-win-over-decision-makers-at-hospitals/
[8] https://www.definitivehc.com/blog/influencing-healthcare-purchasing-key-opinion-leaders-vs.-decision-makers

testimony provided in connection with the depositions of Mr. Edward Harrich and Mr. Glenn Papit.

33.     During his deposition, Edward Harrich, the Director of Surgical Services at Pullman Regional Hospital, provided an overview of the personnel involved in making the decision to purchase a da Vinci surgical robot. He referenced the need to inform the hospital's CEO, CFO and chief nursing officer and the hospital's board prior to a purchase.[9] He referenced having communicated with "probably the entire administrative – every leader".[10] He observed that he also communicated with physicians. However, those were not formal documented discussions. Those conversations were characterized as "…verbal hallway conversation between surgical cases."[11]

34.     Mr. Harrich also provided information regarding the specific services of Rebotix. When asked during his deposition as to whether any physicians were involved in the decision to use Rebotix's services, his answer was "no". He did indicate his interaction with physicians was limited to some conversations with physicians, but none were important enough to remember which physicians he spoke to regarding Rebotix's services. Mr. Harrich's testimony suggests that the relevant decision-makers are not physicians, but rather hospital administrators.[12]

35.     Glenn Papit, an executive who has served as a marketing representative on behalf of the Plaintiff testified that in addition to surgical staff, he met with purchasing and contracting to sell the Rebotix services to hospitals.[13] He also testified he would contact the group purchasing organizations.[14] These group purchasing organizations are almost always populated by business and finance and purchasing professionals. Indeed, in a telephone conversation I had with Mr. Papit, he informed me that the surgical staff might be involved in decisions only to

---

[9] Harrich depo. tr., 101:9-14.
[10] Harrich depo. tr., 106:3-4.
[11] Harrich depo. tr., 108:24-25.
[12] Harrich depo. tr., 165:3-11.
[13] Papit depo. tr., 166:1-2.
[14] Papit depo. tr., 167:3-4.

observe a demonstration of the Rebotix service offering. However, most of his contacts were with hospital personnel other than surgeons and rarely with nurses.[15]  And when Mr. Papit did have contact with surgeons or nurses, those individuals were not involved in the hospital's purchasing decision.

36.     Exhibit 3 was developed from an excerpt of Mr. Papit's planner and his documentation of the titles of people he met with to sell Rebotix's services during the period March 1, 2019, through April 16, 2019. It clearly confirms that the business and finance professionals at hospitals were more likely to be presented to and consulted regarding the purchase of the services offered by Rebotix.

37.     Based on my review of the relevant literature related to hospital purchasing decisions discussed above combined with my review of the material in Exhibit 3 and the answers provided by the 200 respondents represented in the Parikh Report, I have concluded that only 58 of the respondents provided answers that would classify them as acceptable respondents. I arrived at the number 58 in the following manner:

- In response to question S3b answer option, "Selecting or procuring the systems/instrument", respondents had to indicate "yes" as to the nature of their job regarding involvement or responsibilities with respect to robotic-assisted surgical systems.
- In response to the second answer option in question S3b, "Selecting or procuring servicing of the systems/instruments" respondents had to indicate "yes" that they select or procure servicing of the systems/instruments
- In response to question C2, respondents had to indicate that they had one of the following titles or roles:
  - C-Suite
  - Chief/chairman/director

---

[15] Papit conversation.

- o   Manager/Supervisor
- o   Director of Supply Chain
- o   Medical Director

38.    Of 200 respondents, only 29% were valid respondents whose opinions on the topics related to Rebotix's actions were potentially valid. There are other reasons to indicate that even some of these 58 respondents may not be valid respondents.

39.    A review of the Parikh Report in conjunction with the material presented in this section of my opinion reveals that business and finance professionals were grossly underrepresented in the set of respondents. Conversely, healthcare providers were grossly overrepresented in the set of respondents. Dr. Parikh did not provide any rationale for doing this skewed population selection.

40.    To summarize, the population universe was not specified in the Parikh Report. In terms of the sample of respondents that was used, it is both overinclusive and underinclusive.

41.    The sample was overinclusive because the majority of respondents were healthcare providers such as surgeons and nurses. Dr. Parikh did not provide any evidence that these respondents represent the majority of decision-makers when purchasing robotic systems and should thus represent such a large portion of the survey respondents. Furthermore, whatever role that they have in the initial purchasing process of robotic systems, there is no evidence provided by Dr. Parikh that healthcare providers are as involved in the maintenance-related purchase decisions as they might be in the initial decisions to initially purchase robotic systems. In discussing overinclusive samples, which it notes are overbroad and thus diluting the opinions of members of the relevant population, the Reference Guide on Survey Research notes that such samples decrease the value of a survey. Furthermore, in discussing overinclusive samples, the Reference Guide on Survey Research states that a survey that provides information about an

irrelevant population is itself irrelevant. The Reference Guide on Survey Research notes that courts are likely to exclude an overinclusive survey or accord it little weight.[16]

42.       The sample of respondents surveyed by Dr. Parikh was also underinclusive. This is reflected in the much smaller set of respondents in the sample who were business or purchasing personnel and involved in the relevant purchasing decisions. Indeed, as noted above, only 58 respondents, or 29% of the sample of 200 respondents, were included in the set of 200 respondents. Note that an underinclusive sample produces invalid and unreliable data because the opinions represented in the sample are obtained from respondents whose opinions are far less important and relevant compared to what should be the appropriate target population The Reference Guide on Survey Research notes that underinclusive surveys are not reliable.  It notes that one should not exclude a crucial relevant population.[17]  Samples that exclude or do not fully account for the opinions of the crucial relevant population are considered underinclusive samples. universe.

43.       Furthermore, the initial sample of 200 respondents would be considered on the low end of what is sufficient to address the issues in this case. That said, the sample of 58 respondents is completely inadequate to address the issues in this case. In my experience, most samples used in surveys to support litigation exceed sample sizes of 200. Furthermore, as sample sizes become smaller, the confidence we can attribute to the results decreases,[18] while the bias likely introduced in the sample increases.[19] Because of the insufficient sample size, the conclusions articulated in the Parikh Report are not based on valid and reliable information.

---

[16] Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., Federal Judicial Center, 2011, page 377.

[17] "Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., distributed by the Federal Judicial Center, page 377.

[18] Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., distributed by the Federal Judicial Center, page 381.

[19] https://sciencing.com/what-does-results-mean-in-science-12755102.html

**B.**    **Dr. Parikh failed to document and disclose other relevant information and this likely decreased the representativeness of the sample.**

44.    The Reference Manual on Scientific Evidence states that Rule 26 of the Federal Rules of Civil Procedure, published by the Federal Judiciary requires extensive disclosure of the basis of opinions offered by testifying experts.[20]  To be clear, if the testifying expert does not provide sufficient documentation of the work that is used as the basis for his or her opinion, then there is no way to test the validity of the testifying expert's opinion. Dr. Parikh does not provide sufficient documentation of the methods used to recruit the 200 respondents whose answers are reported in the survey.

45.     For example, the Parikh Report notes it obtained its sample of respondents from an online panel provided by M3.[21] However, there is a significant absence of documentation if M3 provided the sample. The first problem is that M3 only provides a sample for two kinds of respondents. In its public-facing materials, M3 claims to provide samples of physicians and it also claims to provide samples of patients.[22] It does not claim to provide samples of other types of respondents. This raises a question: where did the respondents who were not physicians – the nurses and hospital business staff -- sourced from? Dr. Parikh does not provide any documentation regarding that necessary information.

46.    Furthermore, it is understood that people who agree to participate in online survey research panels receive compensation for their participation. Dr. Parikh does not provide any information regarding how the respondents were compensated for their participation in the survey that Dr. Parikh conducted.  This makes it impossible to determine whether participants were influenced by their compensation, or whether participants were adequately incentivized to provide accurate answers.

---

[20] "Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., distributed by the Federal Judicial Center, page 414.
[21] Parikh Report, paragraph 40.
[22] https://www.m3global.com/

**C.    Dr. Parikh failed to pretest her survey, resulting in the potential use of biased and misleading questions or questions which were likely to be not completely understood by respondents.**

47.     Pretests are highly important to the research process. Pretests are used to confirm that respondents understand the language used in the questionnaire and that questions posed to respondents and related language are clear and do not lead the respondents to a particular answer. If respondents do not understand the language in a questionnaire or it is found that the language leads respondents to particular answers, the data generated by a survey is of no value as it is unreliable and invalid.

48.     The Reference Guide on Survey Research provides guidance on this subject. It recommends that pretests are used to assure a valid survey. It states that "a variety of pretest activities may be used to improve the clarity of communication with respondents."[23] It notes that courts have recognized the value of pretests. It further notes that texts on survey research generally recommend pretests to increase the likelihood that questions are clear and unambiguous.

49.     For example, a textbook that is now in its 6th edition describes the process and its value.[24] A pretest usually includes questions used to probe pretest respondents after the pretest is completed, to include such items as "tell me what, if anything, you did not understand" or "tell me what, if anything, was not clear" or "tell me what, if anything, would lead you to think I was looking for a particular answer."  Usually, respondents participating in a pretest volunteer that something was not clear or that something was biased in some fashion.  When respondents volunteer that something was not clear or was biased, the questionnaire is altered and pretested again until there are no consumers who find anything unclear or biased. Then, and only then, is the revised questionnaire used to conduct the survey.

---

[23] Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., distributed by the Federal Judicial Center, 2011, page 388

[24] Marketing Research: An Applied Orientation, Naresh K. Malhotra, 2010, Pearson/Prentice- Hall: Upper Saddle   River, New Jersey, page 322.

50.     In the Parikh Report, there is no reference to the survey research having been pretested and this is a serious flaw. Evidence regarding the lack of clarity and understanding of the questions is documented in the survey results. For example, we can refer to question 7b, which asks respondents if respondents believe that the company referenced in the flyer is "authorized, approved, or endorsed by the manufacturer of EndoWrist instrument."
A large number of respondents – 32% -- provided a response "don't know" which indicates the lack of clarity of the question. It has been my experience that when a question generates "don't know responses from more than 15% to 20% of the respondents, the question is likely to be one that is not clear or one that does not easily lend itself to answers. It indicates that respondents were unable to form an opinion regarding whether the flyer is authorized, approved or endorsed by the manufacturer.  The problem with this question could have been identified in a pretest but given that a pretest was not conducted, it resulted in responses that could not be relied upon.

### D.     **The Parikh report includes respondents whose responses indicate that they did not provide valid answers due to the failure to use appropriate quality controls in conducting the survey.**

51.     Dr. Parikh used a panel of respondents provided by M3 as discussed earlier. However, using panels requires the use of important quality control steps. There are important quality control steps that need to be taken to exclude respondents whose identity or answers are not included in the analysis of survey respondents. Dr. Parikh failed to perform these important steps.

52.     For example, Dr. Parikh failed to remove respondents who are not panel members or whose identity is not valid. To elaborate on this point, it is important to remember that Dr. Parikh relied on a panel whose members served as the pool of people to be recruited to respond to her survey. It is customary and usual for panels, such as the one provided by M3, to ask newly added panel members to provide highly relevant information about themselves. This information, at a minimum, includes their gender and age for most panels. In this particular matter, it would likely also include some other information such as the nature of the physician's medical practice

area. Asking newly recruited panel members who have joined a panel to share information related to their demographic or professional profile is done for a variety of purposes. One purpose is to know in advance which panel members to contact regarding a new survey. Knowing the age or gender or professional title of a panel member allows the panel to be more selective regarding which panel members to invite to respond to a new survey and to complete a questionnaire.

53.     Having initially acquired information during registration about panel members, it is also a customary and usual practice for the panel to verify that the individual responding to a new survey is the person who initially registered to become a member of the panel. The verification process includes asking the respondents, during a subsequent screening interview, questions as to their demographic identity to include their gender and their age or, in this case, their practice area. These are demographic data points that are not likely to change over time in the case of gender and will change in a manner that is predictable as in the case of age.

54.     Research companies that provide respondent panels customarily and usually remove respondents from the pool of respondents in a subsequent survey whose answers to a subsequent survey are not consistent with the information that they provided about themselves when they initially registered to become a member of the panel. This provides additional assurance that the person responding to questions regarding a subsequent survey is the panel member and not a friend or relative of the panel member. This verification process contributes to a higher quality set of respondents. Dr. Parikh should have requested that the panel conduct this verification process.

55.     Another important step not taken by Dr. Parikh is removing respondents who are either taking too much time to complete the survey or too little time to complete the survey. To elaborate, "Speeders" are individuals who complete their interviews in substantially less time than it takes on average to complete a survey.  These individuals are assumed to have given perfunctory answers and answers accompanied without much thought.  One industry observer notes that speeders are likely to be professional respondents solely motivated by incentives

offered for survey completion and unconcerned with the survey itself or with the answers they provide. Speeders may also be well-intentioned respondents who react to frustration with a survey by completing it very quickly. In either case, speeding is considered problematic survey behavior. [25] "Exceeders" (sometimes referred to as "extenders") are individuals who take too long to complete their interviews. These individuals are assumed to have discussed the answers to questions with someone else or to have provided answers based on outside research rather than their own perceptions or opinions.

56.    It is customary and usual to remove speeders and exceeders from the set of respondents so that answers from speeders and exceeders, which are not likely to be valid responses, are removed when conducting an analysis.[26] However, Dr. Parikh did not engage in this removal of speeders and exceeders.

57.    Furthermore, it should be noted that the time that each respondent spends completing a survey is customarily provided in the data map with all of the other responses. This allows others who are reviewing the work of a survey researcher to conduct an independent assessment and removal of speeders and exceeders.  Dr. Parikh did not provide information related to the amount of time each respondent spent completing the survey. This is a serious omission as I was not able to conduct a review of this data so that I could analyze the data after removing speeders and exceeders.

58.    Dr. Parikh also did not conduct a validation stage at the end of the survey process to assure that Dr. Parikh did not have any of what are often referred to as "professional respondents" included in the sample.  Professional respondents are survey respondents that are purely motivated by financial gain and are generally expected to provide lower quality data.[27]

---

[25] https://www.insightsassociation.org/article/speeders-multi-mode-mobile-and-online-survey

[26] ISO Standards 20252, 2019

[27] Professional Respondents in Online Panels | Insights Association (https://www.insightsassociation.org/article/professional-respondents-online-panels)

Highly Confidential Attorneys' Eyes Only                           19

59.     Professional respondents and other survey-related problems can invalidate the survey data. To prevent such events from occurring, validation is supposed to occur after the completion of data collection in order to ensure the data were collected as presented.  Validation is a procedure that attempts to recontact a sample of the respondents to verify that respondents were qualified to participate in the study and actually had been interviewed. This is usually a separate, independent validation study.

60.     Validation should be done by a third party not affiliated with the data collection service or the survey expert. A sample of respondents is randomly assigned to be recontacted to obtain a few answers to questions that they have already answered to assure that the answers provided on the subsequent step are consistent with answers attributed to the respondent in the original survey. If a respondent has asked someone else to respond on behalf of the respondent in order to receive the promised compensation for responding, validation can be used to detect this form of behavior and remove the respondent. Dr. Parikh did not perform any form of validation to ensure that the data produced by the survey were valid.

61.     Quality control practices in survey design and implementation require the removal of survey responses deemed invalid for reasons discussed in this section. Dr.  Parikh failed to do this important quality check. Thus, there is every indication that the aggregate data, with the inclusion of these potentially invalid respondents, is misleading and is not reflective of reliable data that can be relied upon.

62.     In addition to the quality control problems noted above, there are other instances in which Dr. Parikh failed to incorporate important quality control procedures. Based upon my review of the materials Dr. Parikh submitted with her report, Dr. Parikh did not perform the following quality control procedures:

   a.  Dr. Parikh did not exclude respondents not agreeing to take the time necessary to take the survey in one session.
   b.  Dr. Parikh did not exclude respondents not agreeing to take the survey on their own with no guidance from anyone else or referring to reference materials or the Internet.

    c.   Dr. Parikh did not exclude respondents not living in the United States as required for a survey that is used to address the current legal matter.

    d.   Dr. Parikh did not exclude respondents who reported they were "in a hurry and would rather end the survey now."

    e.   Dr. Parikh did not exclude respondents at the end of the survey who had any difficulty viewing the images of the flyer that was presented to the respondents on two occasions during the survey. In fact, Dr. Parikh never asks respondents if they had any problem viewing the flyer.

63.    Given that Dr. Parikh included responses from a variety of respondents who should have been screened out and removed from the dataset, there is every indication that the aggregate data reflected in the Parikh Report, with the inclusion of these respondents, is misleading and is not reflective of data that can be relied upon.

**E.**    <u>**The Parikh report is based on a flawed design which is not representative of the characteristics of the marketplace and not relevant to the current legal matter and is also inconsistent with widely accepted understanding of relevant consumer behavior.**</u>

64.    The Parikh Reports presents a variety of findings concerning the interpretation of responses from survey participants regarding the potential communications effects of the flyer that served as the only stimulus in the survey. All of the findings are invalid for several reasons noted below.

65.    The Parikh Report did not include a valid control question when deriving "net confusion".

66.    The Reference Guide on Survey Research states that "…one indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy."[28]   As discussed below, Dr. Parikh's survey design fails to generate probative evidence relevant to the legal controversy in this case.

67.    The survey conducted by Dr. Parikh does not include an appropriate control question. An appropriate control question is one that is comparable to the actual question in the

---

[28] Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., Federal Judicial Center, 2011, page 373.

survey. For example, if asked about a particular brand of milk, an appropriate control question would involve a different brand of milk. It would typically not involve a brand of orange juice. An appropriate control question screens for "noise" in a survey. Dr. Parikh uses an invalid control when seeking to, as Dr. Parikh refers to it "to control for noise".[29] Noise is a surrogate term for the word "guessing".

68.     Here is what she did. First, Dr. Parikh attempted to measure the percentage of respondents who believed that Rebotix is authorized, approved, or endorsed by the manufacturer of EndoWrists (41%). Second, Dr. Parikh attempted to measure potential survey noise by determining the percentage of respondents who believed that Rebotix is authorized, approved, or endorsed by Walgreens (10%). This question was Dr. Parikh's attempted control question. Third, Dr. Parikh subtracted that purported 10% of noise from the 41% number to suggest a net likelihood of confusion of 31% that Rebotix is authorized, approved or endorsed by the manufacturer of EndoWrist instruments. Because Dr. Parikh did not use an appropriate control question, this conclusion is unreliable. Using a brand such as Walgreens to determine noise is misleading because it is not a comparable brand. It results in a net likelihood of confusion that is substantially inflated. In other words, with an appropriate control question, the net likelihood of confusion that Rebotix was sponsored by the manufacturer of EndoWrist devices would be substantially lower.

69.     If Dr. Parikh truly were interested in deriving a realistic net likelihood of confusion, Dr. Parikh should have used an appropriate control question that did not use Walgreens. Walgreens does not develop, market, or sell robotic surgical systems or devices for use in surgery. Dr. Parikh could have chosen from several other leading medical device brands that do market to hospitals to use in her control question and if Dr. Parikh had done so, my opinion is that the result of the net likelihood of confusion would have been different and more likely than not, it would have substantially decreased. There are several easy-to-access and

---

[29] Parikh Report, paragraph 14.

publicly available lists Dr. Parikh could have referred to in order to select her control of a medical device brand.[30] Instead, Dr. Parikh chose an irrelevant and invalid control brand in the form of Walgreens.

70.     Furthermore, Dr. Parikh's approach for estimating confusion does not adequately establish the actual level of confusion. I discuss the additional flaws in Dr. Parikh's survey that increase the likelihood of confusion below.

71.     The Parikh Report did not include a valid control group and thus, it does not provide any documentation as to the materiality of the words in the flyer "repair and reset".

72.      To understand the impact of the words "repair and reset" when these words appear on the flyer used as a stimulus in the Parikh Report, a control group must be used and compared with a test group. This is a serious omission in her design given the manner in which the Parikh Report might be used in the litigation. To better understand this assertion, it is important to note that Dr. Parikh's survey was designed to test a causal proposition. That causal proposition is focused on the impact or materiality of the words "repair and reset".

73.     Testing of causal propositions is discussed in the Reference Guide on Survey Research. It states one must use an appropriate control group to test a causal proposition.[31] Dr. Parikh does not provide an appropriate design. Dr. Parikh does not identify the impact on respondents in terms of their purchase interest in Rebotix services based on their exposure to the words "repair and reset". This first group of respondents could be considered the test group. Dr. Parikh does not compare this test group with a matched group of respondents and the impact of the absence of the words "repair and reset" on this second group of respondents. This second

---

[30] Several lists of potential competitors appears at the following URLs: https://craft.co/intuitive-surgical/competitors, https://idataresearch.com/top-robotic-surgery-companies-in-the-united-states/

[31] Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference Manual on Scientific Evidence*, 3d ed., distributed by the Federal Judicial Center, 2011, pages 397 to 401.

group would be considered a control group.  Dr. Parikh could have exposed two versions of the flyer. The test group would have seen the flyer with the words "repair and reset" on the flyer and the control group could have been exposed to the same flyer but with the words "repair and reset" removed. Not having conducted this comparison is a serious design flaw. This flaw means Dr. Parikh has not established and documented the impact and materiality of the words "repair and reset".

74.     To generate answers from respondents, the Parikh Report relied upon a stimulus that did not and does not reflect the manner in which Rebotix sells its services to hospitals.

75.     As already discussed, the Parikh Report only exposed respondents to a single Rebotix flyer.  Respondents' attitudes, perceptions, and reactions were based entirely on exposure to the flyer and nothing else. This is not reflective of the sales process used by Rebotix to engage prospective customers. Rebotix provided a number of materials to customers, engaged in follow up conversations, and answered any questions that a prospective customer would have.[32] Because Dr. Parikh's survey failed to accurately capture the manner in which Rebotix advertised to customers, her survey does not provide relevant data on how potential customers would respond to Rebotix's advertising practices.

76.     Glenn Papit provided a detailed explanation as to how Rebotix conducted its go-to-market activities. In his deposition, he noted that the flyer that was used by Dr. Parikh as a stimulus was used "…early on, but we just stopped using it because we noticed people would just leave it on the table and read the other ones".[33] I asked Mr. Papit about the time period in which the flyer was used. He informed me it was used for about 4 months or so between late 2018 and early 2019.[34]

77.     His reference to "other ones" includes more substantial and detailed materials that, in my opinion, are the types of materials that are relied upon by prospects for services

---

[32] Papit conversation.
[33] Papit depo. tr., 144:14-17.
[34] Papit conversation.

purchased by prospects in what are business-to-business transactions. These other materials, described in Mr. Papit's deposition, included an electronic or hard copy of materials titled "Rebotix Instrument Service: Summary of Quality and Reliability Measures", "Hospital Right to Repair", and a "Price List".[35]

78.     These materials noted here and in Mr. Papit's deposition are the types of materials that are shared with prospective customers in business-to-business transactions. They are often accompanied by verbal communications in person or over the telephone or electronic communications, all of which explain the details in these kinds of documents. This is consistent with customary and usual business-to-business transactions. Flyers do not play any meaningful role because of the substantial details needed by a customer in order to evaluate a potential purchase. These other materials referenced by Mr. Papit should have been reflected in the survey stimuli used by Dr. Parikh. However, Dr. Parikh chose to ignore those materials and rely only on the flyer, which of course, does not reflect the nature of the communications exchanges that occurred between Rebotix and its prospects.

79.     Dr. Parikh's ignorance of those materials and the conversations between Mr. Papit and potential customers is significant. For example, Mr. Papit (and the underlying materials he provided) would inform prospective customers that Rebotix was not approved, authorized, or endorsed by Intuitive.[36] And Mr. Papit would explain how Rebotix goes about resetting the usage counter, including the insertion of the Interceptor.[37] These interactions are not reflected in any way in Dr. Parikh's survey. Dr. Parikh did not attempt to assess prospective customers' understanding of Rebotix's services after follow-up conversations with Mr. Papit. Dr. Parikh made no attempt to expose respondents to any other stimulus or ask what questions the respondents would want to ask of Rebotix to gain further information.  Because the survey tested advertising in a manner wholly unreflective of the real-world advertising by Rebotix, it does not

---

[35] Papit depo. tr., 143:22-25, 144:1-10.

[36] Papit conversation.

[37] Papit conversation.

provide information about how prospective Rebotix customers would respond to Rebotix's advertising.

80.     Literature on consumer behavior related to purchase decisions further confirms that the flyer used as a stimulus in the Parikh Report would not be relied upon in the actual purchase decisions made by hospital personnel.

81.     The consequences of a buying decision to consumers vary with the nature of the purchase. In the discipline of consumer behavior, this concept is referred to as "perceived risk." A detailed discussion of perceived risk is presented in most consumer behavior textbooks.[38] Perceived risk concerns potential undesirable consequences that consumers want to avoid when they buy and use products, *i.e.*, the uncertainty that consumers face when they cannot foresee, with complete certainty, the consequences of their purchase decisions.[39]

82.     Products vary in uncertainty or risk on a variety of related considerations.[40] Risk-related considerations include but are not limited to physical (the risk to self and others that the product may pose), functional (the risk that the product will not perform as expected), and financial (the risk that the product will not be worth the cost).

83.     Consequences of perceived risk will vary based on the nature of the consumer's purchase. Some products present very little to almost no risk. Some products present very high levels of risk. Searching for services related to surgical equipment or the repair of such equipment can be expected to be associated with a high level of information search given that it presents a high level of perceived risk. This is not only because of the high cost of the equipment. Perhaps just as importantly, the risk will also be high due to concerns over the effective functioning of the equipment.

84.     Equipment used in surgical procedures presents high levels of perceived risk and high levels of involvement in the purchase decisions given the price points at which they are sold

---

[38]LEON SCHIFFMAN AND LESLIE KANUK, CONSUMER BEHAVIOR (2010).
[39] J. PAUL PETER AND JERRY C. OLSON, CONSUMER BEHAVIOR & MARKETING STRATEGY (2010).
[40] SCHIFFMAN AND KANUK, *supra* note 38.

and the consequences associated with the equipment's use if that use does not result in preferred outcomes. Customers making high-risk/high involvement purchases are likely to expend more time and effort during the search and evaluation process because they will search for information and spend time reviewing alternatives in the arrival of a final purchase decision. Therefore, it is unlikely that the purchasers of the Rebotix repair services would be relying on a single flyer in making a purchasing decision.

85.    As a result of all of the design flaws described above, the Parikh Report does not provide any valid or reliable data that indicates that customers were misled by Rebotix's marketing materials.

## VII.    Conclusions.

86.    I applied commonly used survey research standards to examine the validity and reliability of the Parikh Report. I noted earlier in the section discussing these standards that if a survey does not meet any of these standards the survey results are not considered valid or reliable.

87.    I find that there were several fatal flaws in the design and implementation of the survey discussed in the Parikh Report. These fatal flaws include the following:

- The conclusions in the Parikh report are based on an unspecified and likely wrong survey population and a wrong sample. The sample is both overinclusive and underinclusive.

- Dr. Parikh failed to document and disclose other relevant information and this likely decreased the representativeness of the sample.

- Dr. Parikh failed to pretest her survey, resulting in the potential use of biased and misleading questions or questions which were likely to be not completely understood by respondents.

- The Parikh report includes respondents whose responses indicate that they did not

provide valid answers due to the failure to use appropriate quality controls in conducting the survey.

- The Parikh report is based on a flawed design which is not representative of the characteristics of the marketplace and is not relevant to the current legal matter.

88.    The flaws noted above and described in detail throughout this report have generated responses from survey participants that are not valid or reliable and that are of no probative value in providing insight as to the matter that is being litigated.

89.    These flaws in the survey could have been prevented if Dr. Parikh had developed a report based on survey research practices that meet the various industry standards and the guidelines distributed by the Federal Judiciary. Dr. Parikh 1) should have clearly specified the relevant population universe and provided a rationale to support it as being appropriate; 2) should have sampled respondents that reflect that population; 3) should have more fully documented her methods; 4) should have pretested her survey; 5) should have removed respondents who did not meet relevant quality control procedures and; 6) should have used an acceptable research design which reflects the relevant characteristics of the marketplace and which incorporates a control group to test any causal related propositions presented in her research.

Respectfully submitted,

*Larry Chiagouris*

Larry Chiagouris, Ph.D.
8/30/2021

**EXHIBITS**

**EXHIBIT 1: Documents Considered**

**In addition to material referenced in the body of the report and the exhibits and in the footnotes of the report, the following sources were considered in the development of this report and opinions provided within it:**

Expert report by Dr. Sara Parikh, July 26, 2021.

Deposition transcript of Edward Harrich, May 24, 2021

Deposition transcript of Glenn Papit, June 2, 2021

Deposition transcript of Stacey Donovan, May 27, 2021

Deposition transcript of Chris Gibson, June 22, 2021

Rebotix's First Set of Interrogatories to Intuitive, December 23, 2020

Rebotix's Second Set of Interrogatories to Intuitive, April 19, 2021

Rebotix's Third Set of Interrogatories to Intuitive, April 28, 2021

Intuitive's Affirmative Defenses and Counterclaims, April 2, 2021

REBOTIX175327

REBOTIX001180

REBOTIX001192

REBOTIX001300

REBOTIX038247

REBOTIX039025

REBOTIX043129

REBOTIX051600

REBOTIX053608

REBOTIX053877

REBOTIX166973

REBOTIX171549

REBOTIX171634

REBOTIX173209

REBOTIX046925

REBOTIX001306 - REBOTIX001311

REBOTIX046905 - REBOTIX046907

ADLER000001 - ADLER000032

ALPIN000001

ALPIN000027

ALPIN000032

HE_000516

HE_001358

Intuitive-00048766

Intuitive-00615131

Intuitive-00698577

NORTHFIELD000031

NORTHFIELD000015

BARTOW000013

BARTOW000033

BARTOW000118

BPI000013

BPI000277

BPI000280

BPI000295

BPI000301

BPI000331

BPI000341

MEASE000004

NRHA-000881

NRHA-000885

NRHA-000886

PREREB0060

SCL SKADDEN 00021

SCL SKADDEN 00048

SCL SKADDEN 00049

SCL SKADDEN 00084

SCL SKADDEN 00122

SCL SKADDEN 00137

STEPHENSON000003

STEPHENSON000234

STEPHENSON000250

Telephone conversation with Glenn Papit on August 9, 2021

*Manual for Complex Litigation*, 4th ed., distributed by the Federal Judicial Center, 2004

Reference Guide on Survey Research" by Shari S. Diamond, J.D., Ph.D., in the *Reference*
*Manual on Scientific Evidence*, 3d ed., Federal Judicial Center, 2011

Advertising Research Foundation publication "Guidelines for Market Research", The
Advertising Research Foundation, August 2003.

https://www.badgermapping.com/blog/how-to-win-over-decision-makers-at-hospitals/

https://www.definitivehc.com/blog/influencing-healthcare-purchasing-key-opinion-leaders-vs.-decision-makers

https://sciencing.com/what-does-results-mean-in-science-12755102.html

https://www.m3global.com/

Marketing Research: An Applied Orientation, Naresh K. Malhotra, 2010, Pearson/Prentice- Hall: Upper Saddle  River, New Jersey

LEON SCHIFFMAN AND LESLIE KANUK, CONSUMER BEHAVIOR (2010).

J. PAUL PETER AND JERRY C. OLSON, CONSUMER BEHAVIOR & MARKETING STRATEGY (2010).

https://www.insightsassociation.org/article/speeders-multi-mode-mobile-and-online-survey

ISO Standards 20252, 2019

https://www.sigmavalidation.com/about.html

https://craft.co/intuitive-surgical/competitors

https://idataresearch.com/top-robotic-surgery-companies-in-the-united-states/

**EXHIBIT 2: CV of Dr. Larry Chiagouris**

**Larry Chiagouris**
**BrandMarketing Services, Ltd.**
**Lubin School of Business, Pace University**
**917.902.2610; lchiagouris@aol.com**

**Summary Statement:**

Experience in connection with several federal, state and county courts, multiple arbitration venues, the Trademark Trial and Appeal Board (TTAB) and the Consumer Financial Protection Bureau (CFPB) in the United States. Experience includes Canadian litigation in Ontario Superior Court of Justice. Have provided testimony in the form of trials, hearings and depositions on more than 70 occasions. Testimony has been provided to support litigation related to matters pertaining to class actions, consumer fraud, false adverting and intellectual property matters, defamation, trade secret and business disputes, including cases related to legal issues associated with Lanham Act, Truth in Lending, Equal Credit Opportunity Act and Fair Housing Act, the Food and Drug Act, the Telephone Consumer Protection Act and the New Jersey Franchise Practices Act.

## EDUCATION

- Ph.D. – Marketing and Buyer Behavior, The City University of New York
- M.Phil. – Business, The City University of New York
- A.P.C. – Marketing, New York University Stern School of Business
- M.B.A. – Industrial Psychology, Baruch Graduate School of Business, City University of New York
- B.S. – Economics, Magna Cum Laude, New York University Stern School of Business

## WORK EXPERIENCE

**Industry Experience**

President, BrandMarketing Services, Ltd., 1994 to present, Marketing, branding and advertising consulting firm organized to provide expert witness services to law firms and strategic consultation to Fortune 500 and emerging growth companies. Key litigation support has involved class actions suits representing both plaintiff and defendant. Provision of expert opinion for cases involving Coors Brewing, Avis Rental Car, Sprint and Fruit of the Loom. Key industry consultation has involved Merrill Lynch, McDonald's, Marriott, Prudential, AT&T, JP Morgan Chase, L-3 Communications, Grey Advertising, US Army National Guard, TMP Worldwide and Visa International.

Vice President and Chief Marketing Officer, eCode.com, 2000-2001, responsible for all marketing, business development and marketing communications related initiatives for Silicon Valley startup focused on brand building Internet initiatives.

Vice President and Director of Strategic Planning and Research, Starz Encore Movie Group, 1998-2000, responsible for all strategic development business issues, marketing, and marketing communications related initiatives for international media company.

Executive Vice President of Creamer Dickson Basford Public Relations and President of CDB Research and Consulting, a subsidiary of Creamer Dickson Basford, 1994-1998. Served in the capacity of Executive Vice President and Director of Client Services of top ten public relations firm and also President of its subsidiary, CDB Research & Consulting. In this dual capacity, directed client PR programs in a wide variety of industries and also directed client consulting engagements with Fortune 500 companies. Co-developed the service WebDiagnostics, an approach to assessing Internet marketing programs.

Executive Vice President, Backer Spielvogel Bates (now organized as Bates Worldwide Advertising), 1991 to 1994. Served in the capacity of head of strategic planning and research services for the agency and its clients.

Senior Vice President, Bozell Jacobs Kenyon and Eckhardt Advertising, 1989 to 1991. Served in the capacity of head of strategic services and research for the agency and its clients.

Vice President, Grey Advertising, 1983 to 1989. Directed group of account planners and market researchers. Served in the capacity of head of strategic services and research for several agency clients.

Manager, AT&T, 1975 to 1983. Hired on the fast track high-risk high reward program, progressing through wide variety of functional assignments, including econometrics, finance, technology planning (working with Bell Labs), manufacturing and marketing planning related to product demand and cross elasticity of demand.

**Academic Experience**

Professor of Marketing, Lubin School of Business, Pace University
in New York City, 2002-Present.  Full-time tenured Professor.
Courses and lectures include: New Product Development,
Survey Research, Advertising and Promotion (Including
Intellectual Property and Trademark/Copyright Issues), Media
Planning and Buying, Advanced Marketing Management, and
Marketing Strategy and eCommerce at the graduate level.

Adjunct Professor of Marketing, Nova Southeastern University, H.
Wayne Huizenga School of Business Doctoral Program, 1991
- 2007

Adjunct Professor of Marketing, New York University Graduate
Stern Graduate School of Business, 1989 - 1991

## PROFESSIONAL RECOGNITION

- Award Recipient from the US State Department: Requested to deliver lectures to business leaders of other countries on "Branding in the New Media Environment"
- Selected to attend Harvard University Annual AMA Doctoral Consortium
- Voted by *Agency Magazine* as one of the ten "all stars" in advertising research
- Current or Previous Editorial Review Boards: Marketing Management, Journal of Advertising Research, Journal of Internet Commerce, Journal of Consumer Marketing, Journal of Segmentation in Marketing
- Inducted into Beta Gamma Sigma National Honors Society
- Appointed AMA representative to U.S. Bureau of the Census for Census 2000
- Former Chairman of the Board of the Advertising Research Foundation
- Former Member of the Board of Directors of the American Marketing Association and President, New York Chapter
- Winner of three Effie Awards for advertising effectiveness
- Appointed industry judge at Public Relations Society of America Silver Anvil Awards
- Served as faculty member for American Marketing Association's Advanced School of Marketing Research
- Presenter at numerous proceedings and conferences to include American Psychological Association Consumer Psychology Division, Consumer Electronics Show, Comdex, American Marketing Association, Direct Marketing Association, Public Relations Society of America, Institute for Broadcasting and Technology, Pharmaceutical Marketing Research Association, Advertising Research Foundation

## PUBLICATIONS

**Refereed Articles**

1. Schapsis, Claudio; Chiagouris, Larry, Ngoc Cindy Pham
   **Are Consumers Ready for Augmented Reality? Factors Influencing Online Footwear Purchasing Intentions Using AR Technology**
   Journal of Marketing Development and Competitiveness, 15(2), 2021

2. Cerulli, Angela; Chiagouris, Larry
   **Multitasking in an Age of Multiple Screens: Key Demographic Changes and Differences**
   Journal of Applied Business & Economics, 22(3), 2020

3. Girardi, Paula; Chiagouris, Larry
   **The Digital Marketplace: Early Adopters Have Changed**
   Journal of Marketing Development and Competitiveness, 12(1), 2018

4. Kirk, Colleen; Chiagouris, Larry; Thomas, Jennifer; Lala, Vishal
   **How Do Digital Natives and Digital Immigrants Respond Differently to Interactivity Online: A Model for Predicting Consumer Attitudes and Intentions to Use Digital Information Products**
   Journal of Advertising Research, 55(1), 2015

5. Chiagouris, Larry and Williams, Michelle,
   **If We Build It Will They Stay?: User Generated Content and Website Effectiveness**
   Journal of Marketing Management, 2(3&4), 2014

6. Brusseau, James; Chiagouris, Larry; and Brusseau, Rocio Fernandez
   **Corporate Social Responsibility: To Yourself Be True**
   Journal of Global Business and Technology, Vol. 9, No. 1, 2013

7. Kirk, Colleen; Chiagouris, Larry; and Gopalakrishna, Pradeep
   **Some People Just Want to Read: The Roles of Age, Interactivity, and Perceived Usefulness of Print in the Consumption of Digital Information Products**
   Journal of Retailing and Consumer Services, Vol. 20, No. 1, 2012

8. Cole, Michael; Long, Mary; Chiagouris, Larry; and Gopalakrishna, Pradeep
   **Transitioning from Traditional to Digital Content: An Examination of Opinion Leadership and Word-of-Mouth Communication across Various Media Platforms**
   Journal of Internet Commerce, Vol. 10, No. 1, 2011

9. Chiagouris, Larry; Ray, Ipshita
   **Customers on the Web Are Not All Created Equal: The Moderating Role of Internet Shopping Experience**
   The International Review of Retail, Distribution and Consumer Research, Vol. 20, No. 2, 2010

10. Chiagouris, Larry; Lala, Vishal
    **Beauty is in the Eye of the Tech Manager: How Technology Orientation and Interactive-Media Knowledge Can Drive (or Stall) Change**
    Journal of Advertising Research, Vol. 49, No. 3, 2009

11. Lantieri, Tara; Chiagouris, Larry
    **Brand Trust in an Age Without Trust: Expert Opinions**

Journal of Consumer Marketing: Vol. 26, No. 2, 2009

12. Ray, Ipshita; Chiagouris, Larry

**Consumer Retention: Examining the Roles of Store Affect and Store Loyalty as Mediators in the Management of Retail Strategies**

Journal of Strategic Marketing: Vol. 17, No. 1, 2009

13. Chiagouris, Larry; Long, Mary; Plank, Richard

**The Consumption of Online News: The Relationship of Attitudes Toward the Site and Credibility**

Journal of Internet Commerce: Vol. 7, No. 4, 2008

14. Moffit, Timothy; Chiagouris, Larry

**What Would Richard Branson Do?**

Marketing Management: May/Jun 2008

15. Chiagouris, Larry; Ray, Ipshita

**Saving the World with Cause Related Marketing**

Marketing Management: July/August 2007

16. Chiagouris, Larry; Long, Mary

**Will Your Online Retailing Be a Site for Sore Eyes**

Marketing Management: March/April 2007

17. Gonzalez, Jose; Chiagouris, Larry

**The Market Orientation of Internet Support Companies**

Journal of Internet Commerce: January 2007

18. Chiagouris, Larry

**New Media Power**

Marketing Management: November/December 2006

19. Long, Mary; Chiagouris, Larry

**The Role of Credibility in Shaping Attitudes Toward Nonprofit Websites**

International Journal of Nonprofit and Voluntary Sector Marketing: August 2006

20. Johnson, William; Chiagouris, Larry

**So Happy Together (The Link Between Employee and Customer Satisfaction)**

Marketing Management: March/April 2006

21. Gonzalez, Jose; Chiagouris, Larry

**Internet Support Companies: The Impact of Marketing Orientation**

Journal of Internet Banking and Commerce: April 2006, Vol. 11, No. 1

22. Topol, Martin; Chiagouris, Larry

**To Dream the Impossible Dream (Customer Loyalty)**

Marketing Management: November/December 2005

23. Chiagouris, Larry

**Non-Profit Brands**

Marketing Management: September/October 2005

*24.* Mohr, Iris; Chiagouris, Larry

**Get the Word Out (SPREADING WORD OF MOUTH)**

Marketing Management: July/August 2005

25. Chiagouris, Larry; Mohr, Iris

**An Evaluation of the Effectiveness of Internet Advertising Tools**

Journal of Internet Commerce: Volume 3, Number 3 2004

26. Chiagouris, Larry; Wansley, Brant

**How To Turn New Companies Into Large Companies at the Speed of Light**
Marketing Management: September/October 2003

27. Chiagouris, Larry; Farinelli, Jean
**Staying Safe in a Dangerous World (GLOBAL MARKETING ISSUES)**
Marketing Management: March/ April 2002; 11, 2

28. Chiagouris, Larry; Wansley, Brant
**Branding on the Internet**
Marketing Management: Summer 2000; 9, 2

29. Chiagouris, Larry; Middleman, Ann
**Research For Ink: How To Get Opinion-Driving Publicity From Market Research**
Public Relations Quarterly: Winter 1998/1999: 43, 4

30. Plank, Richard E.; Chiagouris, Larry
**Perceptions of Quality of Higher Education: An Exploratory Study of High School Guidance Counselors**
Journal of Marketing for Higher Education: Volume 8, Number 1 1997

31. Chiagouris, Larry
**Advertising Decision Making In The Year 2020**
Journal of Advertising Research: February/March 1990

32. Kahle, Lynn R.; Chiagouris, Larry
**Values, Lifestyles and Psychographics**
Mahwah, New Jersey: Lawrence Erlbaum Associates, Inc., Publishers, 1997

33. Chiagouris, Larry; Mitchell, Leeann E.
**The New Materialists**
Values, Lifestyles and Psychographics New Jersey: Lawrence Erlbaum Associates, Inc., Publishers, 1997

**Trade Publications and Non-Refereed Articles**

1. Chiagouris, L. & Kaplan, L.B. (2020) **Uses of Survey Research in Damages Estimation**. In N. Fannon & J. M. Dunitz (Eds.), The Comprehensive Guide to Economic Damages Vol. 1 (pp. 669-686). Portland, OR: BVR. 6th edition

2. Chiagouris, Larry, **The Secret is in the Data: Delivering What Customers Need & Desire**. The Robin Report, January 2012

3. West, Douglas; Chiagouris, Larry; Precourt, Geoffrey. **Editorial: 50 Years of Advertising Research: What Have We Learned?** Special 50th Anniversary Issue of the Journal of Advertising Research, March 2011

4. Chiagouris, Larry; Verniere Alexis. **Marketing Functions on the Internet**. Wiley Encyclopedia of Marketing, December 2010

5. Chiagouris, Larry. **Comparative Advertising**. Wiley Encyclopedia of Marketing, December 2010

6. Chiagouris, Larry. **Survey Research to Support Litigation.** HG Experts, 2009

7. Chiagouris, Larry. **Viral Communications**. Kitchen & Bath Business, November 2006

8. Chiagouris, Larry. **Nonprofits Can Take Cues from Biz World**. Marketing News, 6/15/2006, Vol. 40 Issue 12, p20

9.  Chiagouris, Larry; Nankin, Conrad. **Strategic Plans Solidify Branding On Net**. Marketing News, 6/1/2004, Vol. 38 Issue 10, p28
10. Chiagouris, Larry; Wansley, Brant. **Teach Your Children.** Adweek: September 27, 1999
11. Chiagouris, Larry. **Utility Companies of Market Research**. Quirk's marketing research review: February 1999, Vol. XIII, No. 2
12. Chiagouris, Larry. **Confessions of a Silver Anvil Judge**. Public Relations Strategist: Winter 1998
13. Chiagouris, Larry. **Wall Street's Wireless Influence**. Wireless Reviews: Dec 1, 1998; 15, 24
14. Chiagouris, Larry. **Eight Steps To Improved Investor Relations**. Electrical World: September 1998, Vol.212, Iss. 9
15. Farinelli, Jean; Chiagouris, Larry. **Communicating Your Company's Hidden Value**. IR Update: July 1998
16. Chiagouris, Larry; Plank, Richard. **Raising the Bar**. Electric Perspectives: March/April 1998
17. Chiagouris, Larry; Plank, Richard. **Marketing Research In The Utility Industry: The State of the Art**. American Gas: February 1998
18. Chiagouris, Larry. **Hidden Value Index**. The Annual Report of the Global Public Network: November 15, 1997
19. Chiagouris, Larry. **Marketing Encyclopedia**. Illinois:  NTC Business Books, 1996

**Book:** The Secret to Getting a Job After College: Marketing Tactics to Turn Degrees into Dollars, Brand New World Publishing: New York; June 2010 (first edition); March 2011 (second edition)

## LEGAL AND REGULATORY CASES AND TESTIMONY
## PROVIDED DURING THE PREVIOUS FOUR YEARS
## DATES NOTED ARE DATES THAT ENGAGEMENT WAS INITIATED

Summary of Relevant Case Experience:

- Experience divided between plaintiff and defendant engagements over 80 cases
- Several cases include elements of intellectual property issues
- Several cases involve false and misleading advertising issues
- Several cases involve branding or brand management issues
- Majority of cases involve elements of consumer behavior or survey research
- Majority of cases involve elements of advertising related strategies and tactics
- Majority of cases involve elements of Internet related tactics
- Majority of cases involve written opinions and depositions
- Written and oral testimony in several Federal District Court jurisdictions
- Engaged by both large multinational law firms and small boutique firms
- Class action cases divided between plaintiffs and defendants

JUNE 2021
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 06-cv-00605-PAB-KMT
(Consolidated with Civil Action No. 16-cv-02004-PAB-KMT)
U.S.A. DAWGS, INC. et al.,
Plaintiff,
Against
CROCS, INC.
Working for Defendant/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Arnold & Porter Kaye Scholer LLP

MAY 2021
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CIVIL ACTION NO. 1:19-cv-01262-LGS
SOLID 21, INC.,
Plaintiff,
Against
RICHEMONT NORTH AMERICA, INC.'
RICHIMONT INTERNATIONAL S.A., and
MONTBLANC-SIMPLO GMBH,
Working for Defendant/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Fross Zelnick Lehrman and Zissu, P.C.

November 2020
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Case No. 5:18- cv-1882
MONSTER ENERGY COMPANY, a
Delaware corporation,
Plaintiff,
Against
VITAL PHARMACEUTICALS, INC.,
d/b/a VPX Sports, a Florida corporation;
and JOHN H. OWOC a.k.a JACK OWOC,
an individual,
Working for Defendant/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Gordon Rees Scully Mansukhani

January 2021
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION
Case No. 5:19- cv-00257

MGFB PROPERTIES, INC., *et al.*
Plaintiff,
Against
VIACOMCBS INC., *et al.*
Working for Defendant/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Jenner & Block

December 2020
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
CIVIL ACTION NO. 4:20-cv-01981
ZELMA M. LOEB-DEFEVER, *et al.*,
Plaintiffs,
Against
STRATEGIC CONSTRUCTION, LTD.
d/b/a FCI MULTI-FAMILY, *et al.*,
Working for Defendants/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Edmonds & Schlather PLLC


November 2020
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
DZ Reserve and Cain Maxwell (d/b/a Max Martialis)
individually and on behalf of others similarly situated,
Case No.: 3:18-cv-04978
Plaintiff,
Against
Facebook, Inc.
Working for Plaintiff/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Cohen Milstein Sellers & Toll PLLC


October 2020
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civ. Action No. 19-cv-581
ENCHANTE ACCESSORIES, INC.,
Plaintiff,
Against
TURKO TEXTILE, LLC, d/b/a Enchante Home
Working for Plaintiff/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Notaro, Michalos & Zaccaria P.C.


April 2020

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 15-cv-2688 (DSD/BRT)
WATKINS INCORPORATED
Plaintiff,
Against
McCORMICK AND COMPANY, INCORPORATED.,
Working for Plaintiff/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Maslon

March 2020
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Civil Action No.: 2:18-CV-6043-GW-AFM
BILL SCHEPLER and AMRIAN GARCIA,
On Behalf of Themselves and All Others
Similarly Situated,
Plaintiffs,
Against
AMERICAN HONDA MOTOR CO., INC.
Working for Defendant/Written opinion, deposed and expected to provide testimony at trial
Engaged by: Shook Hardy and Bacon L.L.P.

April 2019
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Case No.: 2:15-cv-08009 (MCA) (LDW)
DAVID AFZAL and ANDY DECHARTIVONG, on behalf of themselves and all others
similarly situated
Plaintiff,
against
BMW OF NORTH AMERICA, LLC
Worked for Defendant/Written opinion and deposed
Engaged by: Buchanan Ingersoll & Rooney PC

February 2019
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MISSOURI
AT KANSAS CITY
Case No.: 4:17-CV-01069-SRB
GDM ENTERPRISES, LLC, a Missouri limited
liability company, d/b/a The Lano Company,
Plaintiff,
against
ASTRAL HEALTH & BEAUTY, INC.,
a Pennsylvania corporation registered in Georgia,
and ASTRAL BRANDS, INC., a Delaware
corporation registered in Georgia,
Worked for Defendants/Written opinion and deposed
Engaged by: Barnes & Thornburg LLP

January 2019
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
Knoxville Division
Case No.: 3:18-CV-379-JRG-DCP
HOME FEDERAL BANK OF TENNESSEE,
Plaintiff,
against
HOME FEDERAL BANK CORPORATION
a Pennsylvania corporation registered in Georgia,
Worked for Plaintiff/Written opinion
Engaged by: Egerton, McAfee, Armstead & Davis, P.C.


November 2018
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Case No.: 2:16-CV-07619
NESTLE USA, INC.,
Plaintiff,
Against
CREST FOODS, INC.,
Worked for Defendant/Written opinion and deposed
Engaged by: Locke Lord, LLP

Highly Confidential Attorneys' Eyes Only

September 2018
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
Case No.: 3:16-cv02816 AJB NLS
SELENA MOORER, individually and on behalf of all others similarly situated
Plaintiff,
against
STEMGENEX MEDICAL GROUP, INC., a California Corporation; STEMGENEX, INC., a
California Corporation; STEM CELL RESEARCH CENTRE, INC., a California Corporation;
ANDRE P. LALLANDE, DO, an Individual; SCOTT SESSIONS, M.D., an individual; RITA
ALEXANDER, an individual; and DOES 1-100,
Worked for Defendant/Written opinion
Engaged by:
Rosenberg, Shpall & Zeigen
Neil, Dymott, Frank, McCabe and Hudson
Farnaes & Lucio


June 2018
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
Case No.: 2:17-cv-13109-MOB-MKM
ABIGAIL RATCHFORD, et al.,
Plaintiffs,
Against
YESTOFFLO, LLC d/b/a THE
LANDING STRIP LOUNGE,
Worked for Defendant/Written opinion
Engaged by: Curley and Berkal, P.C.


June 2018
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
Case No.: 2:17-cv-14035-PDB-DRG
JENNIFER ZHARINOV A, JAIME EDMONDSON LONGORIA, ARIANNY LOPEZ,
CAMILA DAVALOS, MARIANA DAVALOS, MEGAN DANIELS, VIDA GUERRA,
URSULA MAYES, and DANIELLE RUIZ,
Plaintiffs,
Against
BOHERED CORPORATION, d/b/a TOY CHEST BAR,
Worked for Defendant/Written opinion
Engaged by: Curley and Berkal, P.C.

June 2018
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
Case No.: 2:17-cv-13761-DML-EAS
JESSICA BURCIAGA, BROOKE MARRIN, EVA PEPAJ, CIELO JEAN GIBSON, HILLARY
HEPNER, KATARINA VAN DERHAM, CAMILA DAVALOS, MEGAN DANIELS, ROSIE
JONES, JOANNA KRUPA, SARA UNDERWOOD, TIFFANY TOTH GRAY, LUCY
PINDER, KHLOE TERAE, ROSIE ROFF, DENISE TRLICA, JESSICA HINTON, MARIANA
DAVALOS, and RHIAN SUGDEN,
Plaintiffs,
Against
PLAYER'S ENTERPRISES, INC., d/b/a PLAYER'S DETROIT,
Worked for Defendant/Written opinion
Engaged by: Curley and Berkal, P.C.


January 2018
UNITED STATES PATENT AND TRADEMARK OFFICE
TRADEMARK TRIAL AND APPEAL BOARD
Application Serial Nos. 86/765,738 and 86/765,750
SANDOZ INC.,
Opposer,
Against
GLAXO GROUP LIMITED,
Worked for Opposer/Written opinion and deposed
Engaged by: Pattishall, McAuliffe, Newbury, Hilliard & Geraldson LLP,


October 2017
SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: BERGEN COUNTY
Docket No.: BER-L-8093-14
ALAN MARCUS,
Plaintiff,
Against
DENNIS MCNERNEY, ET AL.,
Worked for Defendant/Written opinion and deposed
Engaged by: Methfessel & Werbel, P.C.

Highly Confidential Attorneys' Eyes Only

September 2017
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No.: Case No. 16-cv-06593-JSR
FINCH ET AL.,
Plaintiffs,
Against
AMLA (L'OREAL)
Worked for Defendant/Written opinion and deposed
Engaged by: Gordon & Rees

August 2017
STATE OF NEW MEXICO
BERNALILLO COUNTY
SECOND JUDICIAL DISTRICT COURT
Case No.: D-202-CV-2013-06321
BRUCE PUMA and KATHLEEN PUMA,
for themselves and all others similarly situated,
Plaintiffs,
against
WAL-MART STORES, INC., APPLICA
CONSUMER PRODUCTS, INC. and
THE BLACK & DECKER CORPORATION,
Worked for Defendants/Provided testimony at trial
Engaged by: Mitchell Silberberg & Knupp LLP

July 2017
UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
Case No.:  4:14-CV-02025-TUC-CKJ
Joshua David Mellberg, LLC, d/b/a J.D.
Mellberg Financial, an Arizona limited
liability company; and Joshua David
Mellberg, an individual.
Plaintiffs
against
Jovan Will, an individual. Tree Fine, an
individual. The Impact Partnership, LLC, a
Georgia limited liability company, John
Steve Arceo and Jane Doe Arceo, husband
and wife, Fernando Godinez and Jane Doe
Godinez, husband and wife, Patricia Latham
and John Doe Latham, husband and wife,
Carly Uretz and John Doe Uretz, husband
and wife,
Worked for Defendant/Written opinion and deposed

Engaged by: Dickinson Wright


July 2017
UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
Case No.:  4:14-CV-02025-TUC-CKJ
Joshua David Mellberg, LLC, d/b/a J.D.
Mellberg Financial, an Arizona limited
liability company; and Joshua David
Mellberg, an individual.
Plaintiffs
against
Jovan Will, an individual. Tree Fine, an
individual. The Impact Partnership, LLC, a
Georgia limited liability company, John
Steve Arceo and Jane Doe Arceo, husband
and wife, Fernando Godinez and Jane Doe
Godinez, husband and wife, Patricia Latham
and John Doe Latham, husband and wife,
Carly Uretz and John Doe Uretz, husband
and wife,
Worked for Defendant/Written opinion and deposed
Engaged by: Dickinson Wright


March 2017
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No.: 1:16-cv-01267-AT
CODENAME ENTERPRISES, INC. (d/b/a BUZZR),
Plaintiff,
against
FREMANTLEMEDIA, NORTH AMERICA, INC., USDC
Worked for Defendant/Written opinion and deposed
Engaged by: ShephardMullin

Highly Confidential Attorneys' Eyes Only

January 2017
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES, CENTRAL DISTRICT
LASC Case No.: BC 569584
BEHINDTHECHAIR.COM,
Plaintiff
against
DEAN CHRISTAL, an individual; OLAPLEX LLC, a California limited liability company;
LIQWD, Inc., a California corporation; and DOES 1-10, INCLUSIVE
Worked for Defendant/Written opinion and deposed
Engaged by: Quinn Emanuel; (originally by McKool, Smith Hennigan, P.C.)


December 2016
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No.: 16-CV-2716
NOAH BANK, a banking institution chartered under the laws of the Commonwealth of
Pennsylvania, Plaintiff
against
NOA BANK, a banking institution chartered
under the laws of the State of Georgia, JUNG
HO KIM, a citizen of the State of Georgia,
DAVID SUH (Byung Chan Suh), a citizen of the
Commonwealth of Pennsylvania and DOES
I through X, inclusive,
Worked for Plaintiff/Written opinion and deposed
Engaged by: Stevens & Lee


September 2016
SUPERIOR COURT OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA
CASE NO. RG15770490
THE PEOPLE OF THE STATE OF CALIFORNIA
Plaintiff,
against
NATIONWIDE BIWEEKLY ADMINISTRATION, INC., an Ohio Corporation; LOAN
PAYMENT ADMINISTRATION LLC, an Ohio limited liability company; DANIEL LIPSKY,
an individual; and DOES 1 through 25, inclusive,
Worked for Defendant/Written opinion and deposed
Engaged by: Law Offices of Sean Ponist P.C

Highly Confidential Attorneys' Eyes Only

September 2016
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINIOS
Case No.: 12-cv-04069
BIRCHMEIER ET AL.
Plaintiffs,
Against
CARIBBEAN CRUISE LINE, INC. ET AL.
Worked for Plaintiff/Written opinion/survey research submitted to court
Engaged by: Edelson PC


September 2016
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Civil Action: 3:15-cv-02106-RS
CONSUMER FINANCIAL PROTECTION BUREAU
Plaintiff,
against
NATIONWIDE BIWEEKLY ADMINISTRATION, INC., LOAN PAYMENT
ADMINISTRATION LLC, AND DANIEL S. LIPSKY,
Worked for Defendant/Written opinion, deposed and provided testimony at trial
Engaged by: Law Offices of Sean Ponist P.C.


April 2016
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
Case No. 1:14-cv-00206
TOYO TIRE & RUBBER CO., LTD., a Japanese corporation,
and TOYO TIRE U.S.A. CORP., a California corporation,
Plaintiffs,
against
ATTURO TIRE CORPORATION, et al.
Worked for Plaintiff/Written opinion and deposed
Engaged by: Foley & Lardner LLP

April 2016
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION
Case 8:15-sac-00246-DOC(Dam)
TOYO TIRE & RUBBER CO., LTD., a Japanese corporation,
and TOYO TIRE U.S.A. CORP., a California corporation,
Plaintiffs,
against
CIA WHEEL GROUP, a California Corporation,
DOUBLESTAR DONG FENG TYRE CO., LTD., a Chinese corporation,
QINGDAO DOUBLESTAR TIRE INDUSTRIAL CO, LTD., a Chinese corporation,
DOUBLESTAR GROUP CORP., a Chinese corporation,
HONG KONG TRI-ACE TIRE CO., LTD., a Chinese corporation;
and JINLIN MA, an individual.
Worked for Plaintiff/Written opinion and deposed
Engaged by: Foley & Lardner LLP


September 2015
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
Case 9:15-cv-80463-RLR
INFINITY SALES GROUP, LLC a Florida
limited liability company,
Plaintiff
against
VALASSIS COMMUNICATION, INC., a
Delaware corporation, and VALASSIS DIRECT
MAIL, INC. a Delaware corporation
Worked for Plaintiff/Written opinion and deposed
Engaged by: Baker & McKenzie LLP


June 2015
STATE OF MINNESOTA DIVISION
COUNTY OF HENNEPIN
Case No.:  27-CV-14-12558
State of Minnesota by its Attorney General, Lori Swanson,
Plaintiff
against
Minnesota School of Business, Inc. d/b/a Minnesota School of Business and Globe University,
Inc. d/b/a Globe University,
Worked for Defendants/Written opinion and provided testimony at trial
Engaged by: Anthony Ostlund Baer & Louwagie P.A.

Highly Confidential Attorneys' Eyes Only