**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

REBOTIX REPAIR LLC,

                Plaintiff,

vs.

                           Case No.:  8:20-cv-02274

INTUITIVE SURGICAL, INC.,

                Defendant.

**Rebotix's opposition to Intuitive's motion to exclude
the expert opinions of J. Lawrence Stevens**

## I.     Introduction

J. Lawrence Stevens is an FDA regulatory consultant retained by Rebotix.

Mr. Stevens has offered expert opinions about regulatory issues relating to Rebotix's

EndoWrist servicing business in response to the opinions offered by Intuitive's

expert, Heather Rosecrans.  Stevens's opinions concern whether Rebotix was

required to obtain 510(k) clearance for its EndoWrist servicing business.

The Eleventh Circuit has laid out a "three-part inquiry" to determine the

admissibility of expert testimony: "qualification, reliability, and helpfulness."  *United*

*States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  Also, a rebuttal expert must

confine his testimony to the "same subject matter" as the expert he is rebutting.

*Adacel, Inc. v. Adsync Techs.*, No. 6:18-cv-1176-Orl-78EJK, 2020 U.S. Dist. LEXIS

148455, at *7 (M.D. Fla. July 9, 2020) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)).

As discussed below, Stevens's testimony satisfies all four requirements.

## II.     Stevens is qualified to opine on the topics he addresses in his expert report.

An expert may be qualified "by knowledge, skill, experience, training, or

education."  *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129

(M.D. Fla. 2007) (citing Fed. R. Evid. 702).  Stevens is qualified based on his

specialized knowledge and experience regarding the 510(k) clearance process.

### A.     Stevens has extensive experience with the 510(k) clearance process.

Stevens has four decades of experience dealing with FDA regulatory issues,

both at the FDA and in the private sector, including the approval process for new

1

medical devices.  Ex. 1 (Stevens report), ¶3.  Stevens's FDA career includes a considerable amount of experience dealing specifically with the 510(k) clearance process.  For example, Stevens: (1) has personally prepared several 510(k) submissions, *id.*, ¶15; (2) has advised companies navigating the 510(k) clearance process, *id.*, ¶14; (3) has authored Warning Letters to medical device firms for failure to submit a 510(k) Premarket Notification, which required him to determine whether a 510(k) was required for the medical devices at issue.  *Id.*, ¶9.

Stevens's relevant knowledge and experience, detailed more fully in his expert report, *id.*, ¶¶3-20, qualify him to opine on FDA regulatory issues in general and on the 510(k) clearance process in particular. [1]

### B.   Stevens is qualified to opine on whether Rebotix has introduced serviced Endowrists into "commercial distribution."

Stevens opines that "510(k) authorization is not required when devices are not introduced into commercial distribution, and Rebotix has not introduced serviced EndoWrists into commercial distribution."  Ex. 1, ¶31.  An FDA expert may opine on whether a device has entered commercial distribution based on their "experience or knowledge in FDA decision-making."  *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, Civil Action No. 10-cv-02139-MSK-BNB, 2015 U.S. Dist. LEXIS 162359, at

---

[1] Stevens has also served as an expert witness in multiple cases involving 510(k) clearance and has never been excluded for any reason, including his qualifications.  Ex. 1 ¶26.  In one recent case, Stevens rendered an opinion "related to a change in a 510(k) product and whether that change required a new 510(k) for the modification."  *Id.*, ¶26.  In another case, Stevens "was asked to offer [his] expert opinions on subject matter related to the FDA approval of class 3 medical devices."  *Id.*

\*43 (D. Colo. Dec. 3, 2015).  Intuitive's own expert relied on her FDA experience to opine on the same issue.  Ex. 2 (Rosecrans report), ¶1.

Stevens has experience advising companies on whether they are required to obtain 510(k) authorization.  Ex. 1, ¶14.  To do so, Stevens had to determine whether the FDA would view the product or service as commercially distributed.  Stevens also worked in enforcement at the FDA, which required him to determine whether 510(k) approval was required.  *Id.*, ¶9.  One aspect of that process is determining whether the product qualifies as commercially distributed.  Here, Stevens used the same methodology he learned during his FDA career to determine that Rebotix's services do not place any device in commercial distribution.  He was qualified to make that determination.

## C.   Stevens's experience is not "too general" to opine on 510(k) clearance.

Intuitive argues that Stevens's experience is "'too general' to permit him to opine on 510(k) clearance issues."  Mot. at 8.  This argument fails at two levels.

First, highly-specific knowledge and experience are not required under *Daubert*'s "lenient standard." *Delta T, LLC v. Dan's Fan City, Inc.*, No. 8:19-cv-1731-VMC-SPF, 2021 U.S. Dist. LEXIS 24422, at \*6 (M.D. Fla. Feb. 9, 2021).  An expert need only show "some reasonable indication of qualifications," at which point "qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity." *Martinez v. Altec Indus.*, No. 3:02-cv-1100-J-32TEM, 2005

3

U.S. Dist. LEXIS 46451, at *9 (M.D. Fla. Aug. 3, 2005) (internal citations and quotations omitted).

For example, in another case brought against Intuitive, the district court excluded the plaintiff's causation expert because he was only an expert in laparoscopic surgery generally, rather than robotically-assisted laparoscopic surgery. *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021). The Eleventh Circuit reversed, holding that by requiring overly-specific experience, "the district court imposed an admissibility standard on expert qualifications that was too high." *Id.*

Second, Stevens does have qualifications specific to the 510(k) clearance process. As Intuitive concedes, Stevens has experience drafting 510(k) submissions, investigating whether a company operated without 510(k) clearance, and advising clients on whether or not to seek 510(k) clearance. Mot. at 8. Indeed, one of Stevens's key responsibilities at the FDA was to decide whether the products he investigated required 510(k) clearance. Ex. 1, ¶9. That his determinations were later reviewed by others within the FDA does not change the fact that the agency entrusted Stevens with making the initial determination, and considered him qualified to do so.

The two cases Intuitive cites to support its assertion that Stevens's experience is "too general" are inapposite, because the experts in both cases had no experience—none whatsoever—with the subject on which they opined. In *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 7507848,

at *7 (S.D. Fla. Aug. 1, 2016), a marine engineer was asked to opine on mechanical failures at a diesel power plant, despite having "no experience with diesel power plants." In *In re Trasylol Prods. Liab. Litig. - MDL-1928 v. Bayer Corp.*, No. 1:08-MD-01928, 2010 U.S. Dist. LEXIS 140204, at *159 (S.D. Fla. May 17, 2010), a medical expert was found unqualified to opine on the drug Trasylol because she had no experience with it and "admitted that she is not an expert on Trasylol."

### D.    Stevens's opinions do not require engineering expertise.

Intuitive argues that Stevens does not have the "engineering background" necessary to opine on "technical issues" regarding "EndoWrists' performance or safety specifications." Mot. at 10. This mischaracterizes the nature of Stevens's testimony. Stevens is not being proffered as a technical expert on the safety of EndoWrist instruments, and none of his opinions require engineering expertise. Rather, Stevens opines that Rebotix's services do not constitute a "change or modification in the device that could significantly affect the safety or effectiveness of the device." 21 CFR 807.81(a)(3). His opinions are based on how the agency determines whether a significant change has been made "in the context of FDA guidelines," not on technical analysis of the devices themselves. Ex. 3 (Sharlin report) ¶79.

Specialized engineering knowledge is not required to opine on how the FDA determines whether a significant change has been made to a device's safety specifications—what *is* required is "experience or knowledge in FDA decision-making." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, Civil Action No. 10-cv-

02139-MSK-BNB, 2015 U.S. Dist. LEXIS 162359, at *43 (D. Colo. Dec. 3, 2015).

As a Compliance Officer, Stevens was trained to determine whether a significant change had been made to a product's safety specifications. He applied that experience and knowledge to determine that Rebotix did not significantly change EndoWrists' safety specifications in the context of FDA guidelines.

For example: (1) Stevens referenced FDA guidance documents that establish what constitutes a significant change to safety specifications. Ex. 3, ¶73. (2) Stevens compared the failure rate of new and serviced EndoWrists using the FDA's Manufacturer and User Facility Device Experience (MAUDE) database. Ex. 3, ¶160-161. He knew from his specialized knowledge and experience that a product's failure rate is an important metric that the FDA considers in assessing safety and that the MAUDE database collects information on device failures. Ex. 3, ¶80. (3) Stevens reviewed testimony by Intuitive executives to confirm that Intuitive never initiated a CAPA investigation into the safety of EndoWrists serviced by Rebotix. Ex. 3, ¶166. This suggests that there were no significant safety concerns with EndoWrists serviced by Rebotix. Ex. 3, ¶159.

Engineering experience is not required to draw conclusions from the above facts. Rather, experience and knowledge of FDA regulations and decision-making are required.

### E.   Intuitive's critiques of Stevens's deposition responses mischaracterize his testimony.

Intuitive argues that Stevens's opinions "demonstrate his lack of qualifications, as they reflect a fundamental misunderstanding of basic FDCA provisions."  Mot. at 9.  But none of the testimony highlighted by Intuitive reflects a misunderstanding of any FDCA provision.

<u>Whether 510(k) submissions require summaries</u>

An expert does not misunderstand a regulation simply because he omits irrelevant information.  Yet Intuitive argues that Stevens fundamentally misunderstands the 510(k) process based on the following exchange:

> 25   Q.   Does the FDA require companies to submit a
> 1     510(k) summary?
> 2     A.   Yes.
>
> Ex. 4 (Stevens Deposition), 195:25-196:1

The relevant regulation provides that 510(k) submissions must include a summary unless the company instead includes a 510(k) statement.  21 CFR 807.87(h).  But regardless of which option the manufacturer chooses, the FDA must be provided with the required complete information.  21 CFR 807.90.

This distinction is irrelevant to this case, which is why Stevens omitted it in his deposition answer.  Every 510(k) submission that Rosecrans and Stevens opined upon in their reports included a summary, and his answer came during a line of questioning about two 510(k) submissions that both included summaries.  Intuitive's counsel did not follow up by asking whether a company can submit a 510(k) statement in lieu of a 510(k) summary (likely because this question would be

irrelevant).  This testimony does not indicate any misunderstanding of the relevant regulation, let alone a fundamental one.

<u>Whether components qualify as medical devices</u>

Intuitive also argues that Stevens "incorrectly opines that components of medical devices are not regulated as devices."  Mot. at 9.  But this mischaracterizes both Stevens's testimony and the law.  As Stevens accurately explains in his report, under 21 U.S.C. § 321(h)(1), *some* components are regulated as devices.  Ex. 1, ¶39.

Stevens did not testify that all components are unregulated by the FDA, as Intuitive claims.  On the contrary, he understood that if any of three exceptions apply, then the component qualifies as a device.  For example, the intended use of an MRI scanning device's monitor is to diagnose an ailment, so under 21 U.S.C. § 321(h)(1), the monitor is both a device and a component of a device.  Ex. 1, ¶40.  By contrast, Stevens opined that the interceptor chip, along with other components such as "screws" and "cables", are not devices because they do not meet the criteria set out by the FDA.  *Id.*, ¶43.

<u>Whether Rebotix marketed an "adulterated" device</u>

Intuitive asserts that Stevens's "report reflects a complete lack of awareness of the statute as he refers to 'misbranding' in the context of 'false or misleading labeling' and 'adulterated' in the context of 'any filthy, putrid, or decomposed substance.'"  Mot. at 9.  These portions of Stevens's report do not reflect a lack of awareness of the relevant statutes—rather, they are *direct quotes* from the statutes that define misbranded and adulterated devices.  *See* 21 U.S.C. § 352(a) ("A drug or device shall

8

be deemed to be misbranded . . . [i]f its labeling is *false or misleading*") (emphasis added); 21 U.S.C. § 351(a) ("A drug or device shall be deemed to be adulterated . . . [i]f it consists in whole or in part of *any filthy, putrid, or decomposed substance*") (emphasis added).  An expert does not demonstrate a lack of awareness of a statute by directly quoting that statute.

Intuitive asserts that Stevens is unaware that the FDA also uses the term "adulterated" to describe devices that are marketed without the necessary 510(k) clearance.  Mot. at 9.  But Stevens directly considered this definition of "adulterated" in his expert report and concluded it does not apply because "Rebotix was not required to seek clearance or approval from the FDA."  Ex. 1, ¶74.  Stevens then reiterated in his deposition that Rebotix did not commit adulteration because it was not required to seek 510(k) clearance.  Ex. 4, 193:10-19.  Thus, Intuitive's assertion that Stevens was unaware of that definition of "adulterated" is false.

In sum, Intuitive has failed to identify a single misunderstanding by Stevens of the relevant law and regulations—let alone a misunderstanding so fundamental that it would negate Stevens's 40-year career dealing with FDA regulatory issues.

## III.   Steven's testimony is reliable.

To be admissible, expert testimony must have "a reliable basis in the knowledge and experience of [the relevant] discipline."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  The focus of the court's inquiry is on the "reasonableness of using [the expert's] approach."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 154 (1999).  Relevant factors include "whether… a method is generally accepted in the

relevant . . . community," *id.* at 151, and "whether a theory or technique… can be (and has been) tested." *Daubert,* 509 U.S. at 593-94.

A.   **Stevens reliably applied his forty years of experience dealing with FDA regulatory issues to the facts of the case.**

Stevens used a reliable methodology to determine whether Rebotix's EndoWrist servicing complies with FDA regulations.  For each of his opinions, Stevens determined the relevant standards for compliance as laid out in statutes, regulations, and FDA guidance documents.  Ex. 1, ¶¶ 34, 49, 59, 103, 117.  Stevens analyzed Rebotix's EndoWrist repair operations by reading internal company documents and statements by company executives.  *Id.*, ¶¶ 55-56, 65, 78, 163. Where applicable, he also reviewed evidence indicative of the FDA's views on EndoWrist servicing, including the agency's correspondence with Rebotix and Intuitive.  *Id.*, ¶¶ 115, 135, 139.  Finally, he applied his specialized knowledge and experience in FDA decision-making to the facts upon which he relied.  *Id.*, ¶¶ 60, 136, 143.

Stevens's methodology is generally accepted among experts in FDA regulatory issues, including experts at the FDA itself.  In fact, Stevens applied the same methodology and level of scrutiny that he employed over his four decades of FDA experience, including as an FDA compliance officer.  *Id.*, ¶21.  The methodology also can be objectively tested.  Stevens cites all of the facts and data that he "relied upon in forming [his] opinions," and explained all his reasoning.  *Id.*, ¶23.  Thus, the data and reasoning can be scrutinized to test whether Stevens's

conclusions are well-founded.  Because Stevens consistently applied a generally-accepted and testable methodology, his testimony is reliable.

**B.    Incorporating Dr. Sharlin's opinions does not render Stevens's testimony unreliable.**

In his expert report, Stevens incorporates the opinions of a withdrawn expert, Dr. Joshua Sharlin.  Ex. 1, ¶22.  Intuitive argues that these adopted opinions constitute improper parroting and must be excluded.  This argument fails because every one of Stevens's opinions (including those incorporated from the Sharlin report) was based on Stevens's independent analysis, which Stevens was qualified to conduct.

"Inappropriate parroting occurs when an expert adopts another expert's opinion wholesale, *without reaching independent conclusions in reliance on that opinion*."  *McHale v. Crown Equip. Corp.*, No. 8:19-cv-707-T-27SPF, 2021 U.S. Dist. LEXIS 16595, at *6 (M.D. Fla. Jan. 28, 2021) (emphasis added).  By contrast, when an expert applies his own skill and knowledge to independently reach the same conclusions as another expert, the testimony should not be excluded.  *McHale v. Crown Equip. Corp.*, No. 8:19-cv-707-T-27SPF, 2021 U.S. Dist. LEXIS 16595, at *7 (M.D. Fla. Jan. 28, 2021) (finding that an expert did not "'parrot' another expert" because his "report demonstrates that he reached independent conclusions").

For example, in *Bahr v. NCL (Bah.) Ltd.*, No. 19-cv-22973-BLOOM/Louis, 2021 U.S. Dist. LEXIS 199658, at *13 (S.D. Fla. Oct. 16, 2021), an expert witness died before trial.  The court allowed another expert to "substitute in and review [the

deceased expert's] data," because the new expert was independently qualified and used reliable methods. *Id.* at *13. For purposes of a *Daubert* analysis, Stevens's adoption of a withdrawn expert's testimony is the same as a substitute expert's adoption of the initial expert's report.

Stevens applied his own skill and knowledge to corroborate every opinion he adopted in his report. Only after this independent analysis did Stevens incorporate Dr. Sharlin's report as Exhibit 1 of his own report. As Stevens makes clear, "Exhibit 1 . . . is a part of this report" and the materials cited in Exhibit 1 are materials that Stevens independently "considered and relied upon in forming [his] opinions." Ex. 1, ¶22. In his deposition, Stevens was asked, "And did you at least review each of the things listed in Exhibit 3 in part?" And Stevens responded, "Oh, yes. Yeah." Ex. 4, 27:12-15. After his deposition, Stevens re-reviewed each piece of evidence cited in his report and re-confirmed that they support each of his conclusions. Ex. 5 (Stevens Declaration), ¶2.

The cases cited by Intuitive to support excluding Stevens's adopted opinions are all inapposite. In each case, an expert adopted another expert's report (1) without independently verifying the other expert's opinions, and (2) without being qualified to give those opinions. For example, in *Riverside Apartments of Cocoa, LLC v. Landmark Am. Ins. Co.*, No. 6:18-cv-1639-Orl-40DCI, 2020 U.S. Dist. LEXIS 247982 (M.D. Fla. Dec. 4, 2020), an expert was excluded because he based his opinions on another expert's report which he "made no effort to independently verify" and "cannot provide an opinion concerning its accuracy." *Id.* at *8. Likewise, in *Sabal*

*Trail Transmission, LLC v. 0.589 Acres of Land*, No. 3:16-cv-277-J-34JBT, 2018 U.S. Dist. LEXIS 129709 (M.D. Fla. Aug. 2, 2018), the expert "simply assumed" that another expert was correct despite having no "familiarity with the reasoning, methods, or data used." *Id.* at *25.  And in *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007), the court excluded an expert for relying on another expert "on a matter outside his field of expertise." *Id.* at 666.  Here, by contrast, Stevens reached the opinions in his report based on an independent analysis, which he was qualified to conduct.

Intuitive further argues that incorporating Dr. Sharlin's report is improper because Intuitive did not depose Dr. Sharlin and because Dr. Sharlin is allegedly unqualified to give some of the opinions in his report.  These assertions are irrelevant.  When an expert reaches the same conclusions as another expert based on his independent analysis, only the proffered expert's qualifications and reliability are relevant.  And here, Stevens, not Dr. Sharlin, is Rebotix's proffered expert.

## C.   Stevens reasonably relied on his conversation with Greg Fiegel and on the Deutsche Bank report.

Intuitive argues that Stevens's testimony is unreliable because he considered a conversation with Rebotix's Director of Operations Greg Fiegel and a report published by Deutsche Bank in reaching his conclusions.  Mot. at 15, 20.  These arguments fail because Stevens reasonably relied on these two sources.

There is no rule against considering facts provided by an interested party or an outside source.  On the contrary, "[e]xperts can base their opinion on facts or data in

the case 'that the expert has been made aware of." *St. Louis Condo. Ass'n v. Rockhill Ins. Co.*, 5 F.4th 1235, 1245 n.8 (11th Cir. 2021) (quoting Fed. R. Evid. 703).  Here, Stevens spoke to Greg Fiegel and reviewed a report published by Deutsche Bank in rendering his opinions.  Stevens's reliance on both sources was reasonable.

<u>Conversation with Greg Fiegel</u>

Mr. Fiegel is Rebotix's Director of Operations.  Intuitive asserts that "adopting Fiegel's biased arguments is *ipse dixit* reasoning that is inadmissible." Mot. at 15.  But Stevens did not rely on Fiegel for any of the arguments in his report. Rather, he relied on Fiegel only to provide certain background facts about Rebotix's operations.

For example, Fiegel informed Stevens that: (1) Rebotix does not sell component parts to end users, Ex. 1, ¶65; (2) Rebotix's servicing does not increase the use count in EndoWrists beyond their original specifications, *id.*, ¶114;[2] (3) Rebotix withdrew its 510(k) after it changed its business model to servicing EndoWrists (in lieu of selling its EndoWrists as new products) *id.*, ¶78.  These are facts, not arguments.  Stevens applied his own knowledge and experience to these facts to reach his conclusions.  It is reasonable for an expert to rely on a company's director of operations for general background of this kind on a company's

---

[2] Intuitive asserts that because Stevens relied on Fiegel, Stevens was unaware that an EndoWrists's use counter "causes the EndoWrist to be nonoperational when used the specified maximum number of times."  Mot. at 18.  This is refuted by Stevens's deposition testimony.  When asked whether the usage counter "would assure that the user couldn't use the device anymore" after its maximum number of uses, Stevens responded, "Again, I don't know specifically, but the assumption was that somehow the system stopped it."  Ex. 4, 122:14-18.

operations, as Stevens did here.  Moreover, there is no contrary evidence in the record for the propositions that Rebotix does not sell component parts to end-users and does not increase the use count in Endowrists beyond their original specifications.

Intuitive argues that by relying on Fiegel's representations, Stevens failed to consider the possibility that Rebotix may have withdrawn its 510(k) because of "deficiency letters" sent to Rebotix by the FDA.  Mot. at 17.  This is incorrect. Stevens did consider this evidence and explicitly addressed it in his report.  Ex. 1, ¶¶143-144.

At trial, Intuitive is free to argue that Fiegel was a biased source or that the largely undisputed information he supplied to Stevens is somehow false.  But "the identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination," not exclusion by the court.  *McGarity v. FM Carriers Inc.*, No. CV410-130, 2012 U.S. Dist. LEXIS 41356, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012) (citing *Daubert*, 509 U.S. at 596).

Deutsche Bank Report

Stevens also cited a report published by Deutsche Bank.  *See* Ex. 6 (Deutsche Bank Report).  The Deutsche Bank report surveyed "four regulatory consultants with experience and expertise in the area of third party servicing medical devices," including a "[r]egulatory expert" who has worked on "hundreds of 510(k) and PMA submissions," two regulatory affairs personnel "with significant presence in device refurbishing/reprocessing," and a "[f]ormer staffer within the DCRF division of the

FDA."  Ex. 3, ¶193.  Based on their insights, the report concluded that "510(k) clearance does not seem to be required for independent service organizations refurbishing used da Vinci instruments so long as they are returned to that same hospital and not re-sold to other centers."  Ex. 1, ¶61.  This corroborates Stevens's own opinions.

Intuitive argues that an analyst report surveying unnamed experts is unreliable.   This argument fails because it is reasonable for an expert to rely on a published report that surveys experts in the same field.  Indeed, courts look to whether an expert's theory has been "subjected to peer review and publication" as a hallmark of reliability.  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

Moreover, "to serve as the basis of the expert's opinion, evidence need not meet any specific standard of reliability—or even be admissible on its own—so long as experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  *Christiansen v. Wright Med. Tech., Inc. (In re Wright Med. Tech., Inc.)*, 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2015) (internal citations and quotations omitted).  For example, in *United States v. Allen*, 190 F. App'x 785, 787 (11th Cir. 2006), an expert witness testified "as to where [a] pistol was manufactured . . . based in part on the statement of another ATF special agent— who had consulted the records the manufacturer of the pistol had placed on file with the ATF."  The Eleventh Circuit found no error in admitting this testimony because "it was reasonable for [the expert] to rely on what the other agent told him."  *Id.*

Here, Deutsche Bank surveyed peers in Stevens's field, and those experts subscribed to the same theory as Stevens with respect to the regulatory issues in this case.  Just like it was reasonable for the expert in *Allen* to rely in part on another agent's opinion, it was reasonable for Stevens to consider the Deutsche Bank Report, which corroborates his conclusions and is contrary to those of Rosecrans.

### D.   Stevens's opinions regarding EndoWrists' intended use are reliable and not *ipse dixit*.

In his report, Stevens opines that overriding the use limits on an EndoWrist does not change the device's intended use.  Ex. 1, ¶57.  Intuitive asserts that this argument is based on *ipse dixit*.  But an expert's analysis is not *ipse dixit* if he identifies what sources of information he relied on and explains how he relied on them.  *Ivy v. Ford Motor Co.*, No. 1:08-cv-2078-TCB, 2010 U.S. Dist. LEXIS 143426, at *14 (N.D. Ga. Jan. 22, 2010) (an expert's "explanation of what information he relies on and how he used that information eliminates the Court having to take a leap of faith and rely on [the expert's] ipse dixit").

Here, Stevens outlines all of the facts and data upon which he based his conclusion that changing an EndoWrist's usage limit does not affect its intended use. Ex. 1, ¶¶52-71.[3]  All of these sources supported the conclusion that changing the

---

[3] For example: (1) When Intuitive submitted a 510(k) application to the FDA, Intuitive represented that EndoWrists are "substantially equivalent in intended use" to other devices that do not have a usage limit. Ex. 1 ¶63. (2)  The FDA then approved Intuitive's 510(k) based on this understanding.  *Id.*, ¶63.  If the FDA had not agreed that EndoWrists are substantially equivalent to other instruments without a usage limit, it would not have approved 510(k) clearance.  *Id.*, ¶55.  (3) Intuitive's own definition of the Intended Use in its 510(k) submission, and the definition adopted by the FDA, included no mention of a maximum use limitation.  *Id.*, ¶59.  (4)  Intuitive's own internal analysis found that a new 510(k) submission is not required (and thus the EndoWrist's intended use is not changed) when Intuitive changes the usage limit.  *Id.*, ¶64.

usage limit does not change the intended use of EndoWrists. *Id.* Based on these facts, and applying his own knowledge and experience, Stevens concluded that servicing EndoWrists does not change their intended use. Because Stevens identified and explained the information that he relied on in his analysis, his conclusions regarding EndoWrists' intended use is not *ipse dixit*.

## IV.   Stevens's testimony is helpful to the trier of fact.

Expert testimony assists the jury if it helps them "understand and synthesize [information] beyond the understanding of the average layperson." *United States SEC v. Big Apple Consulting U.S.A., Inc.*, No. 6:09-cv-1963-Orl-28GJK, 2011 U.S. Dist. LEXIS 95292, at *12 (M.D. Fla. Aug. 25, 2011). Intuitive asserts, without any elaboration, that Stevens's testimony would not be helpful. Rebotix maintains that Intuitive's allegations that Rebotix violated FDA regulations are pre-empted by the FDA's exclusive enforcement authority. *See* Rebotix's Motion for Summary Judgment (Dkt. 108) at 10. If summary judgment is granted on issues pertaining to the FDA, Rebotix will withdraw Stevens's corresponding opinions.

But if FDA issues are before the jury, then the jury will need to understand the complicated FDA regulations and procedures at issue. Testimony by an FDA expert like Stevens, who is well-versed in the relevant regulations, terminology, and decision-making process, helps the jury "understand and synthesize [information] beyond the understanding of the average layperson." *Big Apple Consulting*, 2011 U.S. Dist. LEXIS 95292, at *12. Thus, it is helpful.

## V.   Stevens confined his opinions to the same subject matter as Rosecrans.

Intuitive argues that Section III of Stevens's report "constitutes affirmative testimony" not offered in rebuttal to Rosecrans and must therefore be excluded. Mot. at 22.  This argument fails because a rebuttal expert "need only be addressing the 'same subject matter' discussed by the underlying expert." *Adacel, Inc. v. Adsync Techs.*, No. 6:18-cv-1176-Orl-78EJK, 2020 U.S. Dist. LEXIS 148455, at *7 (M.D. Fla. July 9, 2020) (quoting Fed. R. Civ. P. 6(a)(2)(D)(ii)).  Section III of Stevens's report addresses "the same subject matter" as the Rosecrans report—namely, whether or not Rebotix was required to seek 510(k) clearance.  *Id.*  Thus, it is a direct rebuttal to Rosecrans.

Intuitive is correct that Rosecrans "did not opine on whether the Interceptor significantly changes the safety or performance specifications of EndoWrists," Mot. at 22, whereas Stevens did consider this factor.  But a rebuttal expert "is not limited to the terms discussed and addressed by the initial expert." *Adacel, Inc. v. Adsync Techs.*, No. 6:18-cv-1176-Orl-78EJK, 2020 U.S. Dist. LEXIS 148455, at *7 (M.D. Fla. July 9, 2020).  Thus, Stevens was permitted to consider relevant factors that Rosecrans had failed to address.  The only requirement is that his rebuttal testimony addresses the same subject matter as Rosecrans's testimony—whether Rebotix was required to obtain 510(k) authorization—which it does.

## VI.    Conclusion

For the above reasons, the Court should deny Intuitive's motion to exclude Stevens's opinions.

Date: December 8, 2021          Respectfully submitted,

 /s/ *Richard Lyon*
Richard Lyon
California Bar No. 229288 (*pro hac vice*)
rick@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066

COUNSEL FOR PLAINTIFF
REBOTIX REPAIR LLC