Exhibit 2

Expert Report of Heather Rosecrans

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

REBOTIX REPAIR LLC,

       Plaintiff/Counterclaim Defendant,

v.                                                         Civil Case No. 8:20-cv-2274-T-33TGW

INTUITIVE SURGICAL, INC.,

       Defendant/Counterclaim Plaintiff.

**<u>EXPERT REPORT OF HEATHER S. ROSECRANS</u>**

**HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

**July 26, 2021**

## TABLE OF CONTENTS

I.    QUALIFICATIONS ....................................................................................................1

    A.    FDA Career .........................................................................................1

    B.    Professional Publications and Presentations ...................................5

    C.    Present Position ..................................................................................6

II.   OVERVIEW OF FDA REGULATION OF MEDICAL DEVICES AND
    RELEVANT BACKGROUND .................................................................................6

    A.    FDA Regulatory Authorities, Mission, and Structure ................6

    B.    Regulation of Medical Devices .......................................................7

    C.    Device Classification ........................................................................8

        1.    Class I Devices ......................................................................9

        2.    Class II Devices ...................................................................10

        3.    Class III Devices .................................................................10

    D.    Device-Related Activities and Functions Regulated by FDA ..............11

    E.    Premarket Notification Submission (510(k)).................................13

        1.    Valid Scientific Evidence ..................................................14

        2.    Substantial Equivalence ....................................................16

        3.    Performance Data Requirements ......................................17

        4.    Labeling Requirements ......................................................18

        5.    510(k) Review Process .......................................................19

        6.    510(k) Decisions .................................................................21

    F.    Other Pathways to Market for Medical Devices...........................22

        1.    510(k)-Exempt Devices ......................................................22

        2.    *De Novo* Classification ......................................................22

        3.    Premarket Approval Application ("PMA") ....................23

    G.    Prohibition on Sale of a Device Prior to 510(k) Clearance or PMA
        Approval .........................................................................................23

    H.    FDA Postmarket Regulation of Medical Devices.........................24

    I.    FDA's Approach to Remanufacturing, Refurbishing, and Servicing ..................25

    J.    Relevant Background on Rebotix's Business Related to EndoWrist
        Instruments.....................................................................................29

III.  EXPERT OPINIONS.............................................................................................30

A.    Usage Limits Cannot be Removed Without 510(k) Clearance Because FDA Cleared the EndoWrist Instruments as Limited Use Devices ..................... 30

B.    Rebotix's Argument that FDA's "Substantial Equivalence" Determination Means EndoWrist Instruments Can Be Treated the Same Way as Traditional Laparoscopic Instruments is Flawed .................................... 33

    1.    The Term "Substantial Equivalence" Does Not Mean "Identical" Under the FDCA ................................................................................. 33

    2.    Rebotix Improperly Relies on FDA's "Substantial Equivalence" Determination to Bypass Usage Limits .................................... 35

C.    Intuitive's Marketing and Sale of EndoWrist Instruments with Usage Limits Is Consistent With FDA's Regulatory Requirements ............................... 36

    1.    FDA's 510(k) Clearance of EndoWrist Instruments Requires Intuitive to Market and Sell EndoWrist Instruments in a Manner Consistent with the Usage Limits Cleared by FDA in the 510(k) ............ 36

    2.    Intuitive's Marketing and Sale of EndoWrist Instruments with Usage Limits Is Consistent with FDA's Labeling Requirements .............. 37

D.    Rebotix Is a Manufacturer of a Medical Device (the Interceptor Board) and, Without 510(k) Clearance, Is Selling a Device That Is Misbranded and Adulterated ........................................................................................ 39

    1.    The Interceptor Board Is a Medical Device ................................. 39

    2.    Rebotix Introduced the Interceptor Board Into Interstate Commerce ........................................................................................ 41

    3.    Because the Interceptor Board Is a Device That Moves in Interstate Commerce, Rebotix Is a Manufacturer Required to Obtain 510(k) Clearance ........................................................................................ 44

    4.    The Interceptor Board Is Misbranded and Adulterated Under the FDCA ............................................................................................... 46

    5.    Rebotix Must Be Responsible For Compliance with Medical Device Reporting Requirements ................................................. 47

E.    In the Alternative, Rebotix Was Required to Obtain 510(k) Clearance as A Remanufacturer .......................................................................................... 48

    1.    Rebotix Significantly Changed the Intended Use of the EndoWrist Instrument by Bypassing FDA-Cleared Usage Limits ............................. 49

    2.    Rebotix's Insertion of the Interceptor Board Did Not Constitute a "Repair" of EndoWrist Instruments ............................................. 53

    3.    Rebotix's Position on the Type of Reusable Medical Devices That Qualify for 510(k) Clearance is Incorrect .................................... 55

    4.    Intuitive was not Required to Obtain 510(k) Clearance Before Increasing the Usage Limits of Certain EndoWrist Instruments .............. 56

ii

F.   FDA's Interactions With Rebotix and BPI Supports My Opinion that the Interceptor Board Needed 510(k) Review and a Clearance Determination ..........57

G.   Intuitive's Customer Communications Noting That Rebotix Needed 510(k) Clearance for the Interceptor Were Appropriate and Based on a Reasonable Interpretation of FDA Law .................................................................63

H.   Rebotix Failed to Adequately Investigate Whether a 510(k) Was Needed Prior to Making Representations to Customers .....................................65

IV.   CLOSING ....................................................................................................67

APPENDIX A  Curriculum Vitae of Heather S. Rosecrans .........................................68

APPENDIX B  Materials Relied Upon by Heather S. Rosecrans ................................87

APPENDIX C  Heather Rosecrans's Expert Testimony and Deposition Experience ...................95

1.      I am a Food and Drug Administration ("FDA" or "agency") regulatory affairs consultant with expertise in matters concerning premarket regulation of [medical][1] devices.  My career includes more than thirty years of public health and medical device experience at FDA. The knowledge and experience obtained during my three-decade career at FDA—specifically while serving on the 510(k) Staff—provide me with the expertise necessary to offer expert opinions in this case.  A copy of my curriculum vitae is attached as Appendix A.

2.      I have been engaged as an employee of Greenleaf Health, Inc. ("Greenleaf"), by Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Defendant/Counterclaim Plaintiff Intuitive Surgical, Inc. ("Intuitive"), to opine on issues relating to 510(k) clearance and related regulatory requirements in connection with Case No. 8:20-cv-02274, *Rebotix Repair v. Intuitive Surgical*.  I am being compensated at the hourly rate of $850, plus reimbursable expenses, to prepare this report.  My compensation is in no way dependent on the outcome of this matter.

# I.      QUALIFICATIONS

## A.      FDA Career

3.      In 1976, I was awarded a Bachelor's Degree from Pfeiffer College where I majored in Biology.  Shortly after graduation, I began a 33-year career at FDA—the majority of which was spent working in what is now known as the Center for Devices and Radiological Health ("CDRH").  CDRH is responsible for regulating firms who manufacture, repackage, re-label, and/or import medical devices for commercial distribution in the United States.

4.      From 1978 to 1980, I held the position of Biologist in the Division of Clinical Laboratory Devices in the premarket review office at the FDA's Bureau of Medical Devices

---

[1]      Section 201(h) of the Federal Food, Drug, and Cosmetic Act ("FDCA") uses the term "device" to define "medical devices" regulated by FDA.  This document uses the term "medical device," which is the term used in FDA regulations located at Title 21 of the Code of Federal Regulations.

(now CDRH).  My principal responsibilities included reviewing and tracking premarket

notification submissions ("510(k)s") and Premarket Approval Applications ("PMAs").

Additionally, I was responsible for researching, interpreting, and drafting proposed and final

microbiology device classification regulations.[2]  In 1980, I was assigned to the PMA Section in

the premarket review office where I served as a Consumer Safety Officer.  The PMA Section

(later renamed "PMA Staff" and now called Division of Regulatory Programs 1 (Submission

Support)) oversees and coordinates the administrative and regulatory review of PMAs, product

development protocols ("PDPs"), Humanitarian Device Exemptions ("HDEs") and associated

submissions such as Environmental Assessments, Color Additive Petitions, Device Master Files,

patent term extension petitions, and post-approval reports under Section 515 of the Federal Food,

Drug, and Cosmetic Act ("FDCA" or "the Act").[3]

     5.     The CDRH PMA Section was in the newly organized Program Management Staff

("PMS" and later called the Program Operations Staff ("POS") in the Office of Device

Evaluation ("ODE"), now called the Office of Product Evaluation and Quality ("OPEQ"), at

CDRH).  I held the position of Consumer Safety Officer in the PMA Section from 1980 until

1987.  In this role, I was responsible for overseeing the review of PMAs and PDPs to ensure that

they were reviewed in accordance with statutory criteria and established regulations, procedures,

policies, and timeframes, as well as participating in the development of related regulations,

procedures, policies, and timeframes.  During this time, I was also responsible for developing

appropriate educational materials and other guidance regarding PMA-related activities for use by

---

[2]    *See* 21 C.F.R. Part 866 (final regulations).

[3]    *See* FDCA § 515; 21 U.S.C. § 360e.

CDRH, including the review staff, other FDA medical product Centers, and other stakeholders.  I also provided training on PMAs and PDPs for the agency as well as for external stakeholders.

6.     In 1987, I joined the 510(k) Section of POS in ODE.  The 510(k) Section in ODE (later known as the "510(k) Staff" and now called the 510(k), *De Novo*, 513(g), Device Determinations and Custom Devices Lifecycle Team in the Division of Regulatory Programs 1 (Submission Support, OPEQ)) is responsible for overseeing and coordinating the regulatory and administrative review of 510(k) submissions in CDRH, assisting other Centers at FDA with 510(k)s, and providing information on the 510(k) Program to other regulatory agencies and stakeholders.

7.     From 1987 until 1992, I served as a Consumer Safety Officer in the 510(k) Section, where I provided regulatory, administrative, and policy oversight of CDRH's review of 510(k)s. While serving in the 510(k) Section, I also assisted in writing the interim and final rules titled, "Medical Devices; Substantial Equivalence; 510(k) Summaries and 510(k) Statements, Class III Summary and Certification; Confidentiality of Information."[4]  Additionally, I established the process for the rescission of 510(k) substantial equivalence decisions and worked on a published proposed rule for the process.[5]

8.     From 1992 to 2010, although my titles changed several times, my basic job responsibilities remained the same, and varied at times as new statutory requirements were implemented.  These titles included: (1) Acting Section Chief of the 510(k) Section; (2) Supervisory Consumer Safety Officer of the 510(k) Staff; and (3) Director of the 510(k) Staff. During this timeframe, I was the primary contact on issues related to the implementation of the

---

[4]     *See* 59 Fed. Reg. 64,295 (Dec. 14, 1994) (final rule); 57 Fed. Reg. 18,062 (April 28, 1992) (interim rule).

[5]     66 Fed. Reg. 3,523 (proposed Jan. 16, 2001).

510(k) requirements under the Safe Medical Devices Act of 1990 ("SMDA")[6], 510(k)

Summaries, 510(k) Statements, and Class III Certifications and Summaries to ensure the uniform

interpretation of the law.  I supervised the programmatic review of 510(k) submissions and

513(g) requests, device classification processes, petitions for reclassification, and product codes.

Following the enactment of the Food and Drug Modernization Act of 1997 ("FDAMA"), my

responsibilities expanded to include the implementation of certain exemptions for Class I and II

type devices, petitions for Class II exemption from 510(k), the evaluation of automatic Class III

designation (*De Novo* Program), and other regulatory requirements.  Additionally, I was

responsible for drafting regulations and guidance regarding the above areas.  I also trained

CDRH and FDA's Center for Biologics Evaluation and Research ("CBER") staff on statutory

and regulatory requirements as well as procedures and policies—including any new regulations,

guidance, policies, or procedures.  Examples of training sessions where I served as an FDA

Instructor can be found in my curriculum vitae, attached as Appendix A.

9.    In addition, during this time period, I coordinated the regulatory review process of

510(k) submissions, including device determinations, between the CDRH premarket review staff

and the CDRH Office of Compliance staff.  I also managed any necessary coordination with the

Office of Combination Products ("OCP") (prior to 2002 when OCP was established, FDA's

Ombudsman handled combination products), the Center for Drug Evaluation and Research

("CDER"), and CBER for these programs.

10.   In 2009, I served as the CDRH lead in responding to the Government

Accountability Office's ("GAO") study of the 510(k) Program.  Also, in 2009 I served as a point

of contact when FDA commissioned the Institute of Medicine ("IOM") to undertake an

---

[6]    *See* Pub. L. No. 101-629 (1990).

assessment of the 510(k) Program to determine what, if any, changes should be made to the program.

11.     During the IOM's 18-month review of the 510(k) Program, I provided training to the IOM review committee to educate members on the 510(k) Program.  I gave a presentation to the IOM at its first public meeting in March 2010 titled, "Understanding the Premarket Notification (510(k)) Process: History from 1976 to 2010."  As a member of the CDRH 510(k) Working Group, I also participated in the internal evaluation of the 510(k) Program and subsequent "Plan of Action for Implementation of 510(k) and Science Recommendations," which was published in draft in August 2010.

12.     Additionally, while serving as Director of the 510(k) Staff, I was responsible for identifying and resolving precedent-setting issues arising from reviews.  I also provided expert consultation for the CDRH premarket review staff concerning the administrative and regulatory review of 510(k) submissions, determinations regarding substantial equivalence (including review of unique decisions and all not substantially equivalent decisions), exemption from 510(k) requirements, 510(k) proposed and final decisions, not actively regulated device decisions, enforcement discretion decisions, classification, product codes, and reclassification for a device type, as well as 513(g) requests.

     **B.     Professional Publications and Presentations**

13.     During my time at FDA, I co-authored numerous guidance documents intended to provide FDA's current thinking on issues relating to the 510(k) Program and submissions to FDA staff and all stakeholders.  In addition, I have spoken on behalf of FDA in multiple forums, including national conferences, FDA advisory committee meetings, and international symposiums.  Additional details concerning the publications that I authored or co-authored and

the events where I gave presentations regarding the FDA 510(k) program can be found in my curriculum vitae, attached as Appendix A.

### C.      Present Position

14.      I joined Greenleaf in September 2010 as Senior Regulatory Advisor.  I presently serve as Executive Vice President of Medical Devices and Combination Products at Greenleaf.  I am responsible for providing strategic regulatory consulting services for Greenleaf clients, advising on issues related to the review of 510(k) submissions, CDRH regulatory policies, and FDA's regulation of combination products.  During my tenure at Greenleaf, I have kept abreast of developments at the FDA concerning the 510(k) Program, including reviewing and consulting on applicable statutes, regulations, and guidance and speaking on those issues.

15.      In addition to my work at Greenleaf, I presently serve as Vice President of Regulatory Affairs at the Medical Device Manufacturers Association ("MDMA").  In this role, I offer overall policy advice to MDMA and its members regarding FDA device regulation.

16.      During my time at Greenleaf and MDMA, I have spoken at industry and other stakeholder events where I provide insight and guidance regarding FDA's 510(k) Program.  Additional details concerning the events I have spoken at can be found in my curriculum vitae, attached as Appendix A.

## II.      OVERVIEW OF FDA REGULATION OF MEDICAL DEVICES <u>AND RELEVANT BACKGROUND</u>

### A.      FDA Regulatory Authorities, Mission, and Structure

17.      FDA is a scientific, regulatory, and public health agency.  FDA's statutory authority is derived from the FDCA.  Its jurisdiction encompasses most food products (other than meat and poultry), including dietary supplements; human and animal drugs; therapeutic agents of biological origin; medical devices; radiation-emitting products for consumer, medical, and

occupational use; cosmetics; animal feed; and, most recently, tobacco products. The FDCA confers jurisdiction over such products, including devices, when they are in "interstate commerce."[7] "Interstate commerce" applies to each step in a device's manufacture, packaging, and distribution. It is very rare that a device on the market is not in "interstate commerce" under the law. For example, at least some part of device or its packaging will likely originate from out of state or out of the country. Likewise, it is foreseeable that a finished device will move from state to state. Based on my experience working at FDA, it is common knowledge that medical devices are presumed to be in interstate commerce, and therefore subject to FDA jurisdiction.

18.     FDA prides itself on being a "science-based, science-led" regulatory agency. The agency has a strong regulatory and scientific staff. These resources ensure that FDA decisions are based on up-to-date science and applicable statutory and regulatory provisions.

19.     FDA includes six product Centers: (1) CDRH; (2) Center for Food Safety and Applied Nutrition ("CFSAN"); (3) CDER; (4) CBER; (5) Center for Veterinary Medicine ("CVM"); and (6) Center for Tobacco Products ("CTP"). These Centers review premarket applications, develop scientific and regulatory policy, work with FDA's Office of Regulatory Affairs (ORA) and its district offices, as well as the National Center for Toxicological Research, to ensure industry compliance with regulatory requirements, and proactively and reactively address issues of potential public health concern.

**B.     Regulation of Medical Devices**

20.     If a product meets the definition of "device" in the FDCA, it will be regulated by FDA as a medical device and be subject to premarket and postmarket regulatory controls. The statutory definition of a "device" is:

---

[7]     *See, e.g.*, FDCA § 301(a)-(c), 21 U.S.C. § 331(a)-(c).

[A]n instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component part, or accessory, which is—

    (A)    recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,

    (B)    intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

    (C)    intended to affect the structure or any function of the body of man or other animals, and

which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes. The term "device" does not include software functions excluded pursuant to section 360j(o) of this title.[8]

21.    CDRH is responsible for regulating firms who manufacture, repackage, re-label, and/or import medical devices sold in the United States.

22.    The FDA recently reorganized CDRH to integrate its premarket and postmarket programs along product lines, allowing the Center's experts to leverage their knowledge to optimize decision-making across the product life cycle.

**C.    Device Classification**

23.    Medical devices are classified into one of three classes: Class I, II, or III. Regulatory control increases from Class I to Class III. Most Class I devices are exempt from the 510(k) requirements of the Act; most Class II devices require 510(k) review and a determination by FDA of substantial equivalence prior to commercial distribution in the U.S.; and Class III devices require PMA review and approval prior to commercial distribution in the U.S.

---

[8]    FDCA § 201(h)(1), 21 U.S.C. § 321(h)(1).

### 1.  Class I Devices

24.    Class I devices are generally subject only to "general controls," because the risks are well understood and general controls are sufficient to provide reasonable assurance of safety and effectiveness.[9]  General controls include: 510(k), banning, misbranding, adulteration, compliance with the applicable portions of the Quality System Regulation ("QSR") for manufacturing and recordkeeping, requirements for issuing notices about repair, replacing or refunding money for devices presenting an unreasonable risk of substantial harm, facility registration and product listing, adverse event reporting, and labeling.[10]

25.    The FDAMA, under Section 510(l), exempted Class I devices from FDA's 510(k) premarket requirement unless the device is intended for a use that is of substantial importance in preventing impairment of human health or presents a potential unreasonable risk of illness or injury.[11]  For those device types falling in the exception as requiring 510(k) submission, the FDA, using valid scientific evidence that there is reasonable assurance of safety and effectiveness, must determine that the device is substantially equivalent to a legally marketed predicate device prior to commercial distribution in the U.S.  FDA also has regulations on limitations of exemptions from the 510(k) requirements of the Act.[12]  Examples of Class I devices include elastic bandages, examination gloves, non-prescription sunglasses, and certain hand-held surgical instruments.

---

[9]    *See* 21 C.F.R. § 860.3(c)(1).

[10]    All classes of devices are subject to general controls.  General controls are the baseline requirements of the FDCA that apply to all medical devices – Class I, II, or III.

[11]    FDCA § 510(l), 21 U.S.C. § 360(l).

[12]    *See* 21 C.F.R. § 8xx.9.

### 2. Class II Devices

26.     Class II devices are devices for which general controls alone are insufficient to provide reasonable assurance of their safety and effectiveness.  However, the risks of the device are well understood, and in addition to the general controls, special controls can be identified to address the risks.  Special controls include performance standards, FDA guidance documents, special labeling requirements, tracking of implantable devices, clinical data, and other actions the agency deems necessary to provide reasonable assurance of safety and effectiveness.[13]

27.     In addition to general and special controls, Class II devices require 510(k) review (unless specifically exempted from the 510(k) requirements of the Act subject to limitations of exemptions) and a determination by FDA, using valid scientific evidence,[14] that there is reasonable assurance of safety and effectiveness that demonstrates the device is substantially equivalent to a legally marketed predicate device prior to commercial distribution in the U.S. Most devices, most new indications for use, and most new technologies go to market in the U.S. under the 510(k) requirements of the FDCA.  Moreover, many significant-risk devices go to market via the 510(k) route, including most implants and life-sustaining and life-supporting devices.  Examples of Class II devices include powered wheelchairs, bone cement, knee implants, ventilators, dialysis systems, and surgical drapes.

### 3. Class III Devices

28.     In addition to general controls, Class III devices are those that must go through the PMA process and receive approval by FDA to provide reasonable assurance of their safety and effectiveness prior to commercial distribution in the U.S.  The risks for this generic type of

---

[13]   *See* 21 C.F.R. § 860.3(c)(2).

[14]   21 C.F.R. § 860.7.

device are not well understood, and therefore special controls cannot be identified to address the risks.[15]  Examples of Class III devices that require a PMA are mechanical heart valves, breast implants, drug-eluting coronary stents, most pacemakers, intraocular lenses, extended wear contact lenses, certain in vitro diagnostics, and new devices that have been found not to be substantially equivalent to legally marketed devices because of lack of a predicate device, a new intended use, or a new technology raising a different type of safety and effectiveness question.

### D.    Device-Related Activities and Functions Regulated by FDA

29.    FDA's regulations apply to a wide range of roles and activities related to medical devices.  If a firm engages in any of these activities, it would be subject to varying levels of FDA regulation.  Depending on its role in the development, manufacture, processing, or distribution of a medical device, a firm may be considered to be, among other things, a manufacturer, a specification developer, a repackager/relabeler, an initial importer, or a distributor.  *See* Table 1, *infra*.  Regulatory roles are not mutually exclusive.  For example, a firm may be an initial importer that also repackages devices.  A firm that assumes multiple roles is held to the regulatory obligations of each role.

**Table 1.**

| ROLE | ACTIVITIES | 21 C.F.R. § __ |
|---|---|---|
| **Manufacturer** | • A person who designs, fabricates, manufactures, remanufactures, prepares, propagates, compounds, assembles, or processes a device is a "manufacturer"<br>• A person who relabels, repacks, repackages, or reprocesses is considered a "manufacturer" for purposes of certain regulatory requirements | 803.3, 806.2(g), 807.3(d), 820.3(o), 821.3(c), 822.3(g) |

---

[15]    A "[g]eneric type of device" is defined in FDA regulations as "a grouping of devices that do not differ significantly in purpose, design, materials, energy source, function, or any other feature related to safety and effectiveness, and for which similar regulatory controls are sufficient to provide reasonable assurance of safety and effectiveness."  21 C.F.R. § 860.3(i).

| ROLE | ACTIVITIES | 21 C.F.R. § __ |
|------|-----------|----------------|
| | • A person who initiates specifications for a device that is manufactured by a second party is considered a "manufacturer" for purposes of certain regulatory requirements<br>• An initial importer of a foreign manufacturer is considered a "manufacturer" for purposes of certain regulatory requirements | |
| **Specification Developer** | • A person who initiates specifications for devices that are manufactured by a second party (*i.e.*, a contract manufacturer) for subsequent distribution by the person initiating the specifications is a "specification developer"<br>• A "specification developer" is considered a "manufacturer" for purposes of certain regulatory requirements | 803.3, 806.2(g), 807.3(d), 820.3(o), 821.3(c), 822.3(g) |
| **Repacker, Repackager, or Relabeler** | • A person who repackages or in any way changes the container, wrapper, or labeling of a device in furtherance of the distribution of the device from the place of original manufacture is a "repacker, repackager, or relabeler"<br>• A person is not considered a "repacker, repackager, or relabeler" if it merely packs previously packaged/labeled individual devices into packages for the convenience of the user<br>• A "repacker, repackager, or relabeler" is considered a "manufacturer" for purposes of certain regulatory requirements | 803.3, 806.2(g), 807.3(d), 820.3(o), 821.3(c), 822.3(g) |
| **Distributor** | • A person (other than the manufacturer or importer) who furthers the marketing of a device from the original place of manufacture to the person who makes final delivery or sale to the ultimate user, but who does not repackage or otherwise change the container, wrapper, or labeling of the device or device package is a "distributor" | 803.3, 807.3(b), 807.3(s), 821.3(h), |

30.     The FDCA and FDA regulations primarily focus, and impose the most burdensome requirements, on entities involved in the manufacture of medical devices.  As noted above, a manufacturer includes any person who designs, fabricates, manufactures, remanufactures, prepares, propagates, compounds, assembles, or processes a medical device.

Generally, manufacturers must comply with the premarket notification requirements and submit a 510(k), unless the device is exempt, or a *de novo* classification request or a PMA is required.[16]

31.     When a manufacturer is required to file a 510(k), it must receive an FDA determination of substantial equivalence prior to: (i) initial marketing of a device; (ii) making a change or modification to a cleared device that could significantly affect the safety or effectiveness of the device; or (iii) making a major change or modification to the intended use of its previously cleared device.[17]

### E.     Premarket Notification Submission (510(k))

32.     As noted in Section I, my regulatory expertise is focused on the 510(k) Program. While at FDA, I played a pivotal role in the 510(k) Program's development and evolution.  This section will provide details on the 510(k) Program as it relates to Intuitive's EndoWrist instruments and the claims in the litigation.

33.     The 510(k) process refers to Section 510(k) of the FDCA and is used for devices that are required to be reviewed by FDA for a determination, using valid scientific evidence for reasonable assurance of safety and effectiveness, regarding substantial equivalence to a legally marketed Class I or Class II device, unless the device type has been exempted from the 510(k) requirements of the Act.  More than 90 percent of medical devices fall within FDA's 510(k)

---

[16]    In addition, manufacturers must generally comply with other provisions of the FDCA, including (i) registering their establishments and listing their devices (FDCA § 510, 21 U.S.C. § 360; 21 C.F.R. Part 807); (ii) complying with good manufacturing practice (GMP)/Quality System Regulation (QSR) requirements (unless device type is exempt) (FDCA § 520(f)(1), 21 U.S.C. § 360j(f)(1); 21 C.F.R. Part 820); (iii) complying with medical device reporting requirements (FDCA § 519, 21 U.S.C. § 360(i); 21 C.F.R. Part 803); (iv) providing public notification of unreasonable risk of substantial harm from a marketed device, and repairing, replacing, or refunding (FDCA § 518, 21 U.S.C. § 360h); (v) conducting postmarketing surveillance (FDCA § 522, 21 U.S.C. § 360l; 21 C.F.R. Part 822); (vi) complying with FDA's mandatory recall authority (FDCA § 518(e), 21 U.S.C. § 360h(e); 21 C.F.R. Part 810); (vii) tracking certain device types (FDCA § 519(e), 21 U.S.C. § 360i(e); 21 C.F.R. Part 821); and (viii) reporting removals and corrections (FDCA § 519(f), 21 U.S.C. § 360i(f); 21 C.F.R. Part 806).

[17]    21 C.F.R. § 807.81(a).

authority.[18]  The FDCA requires FDA to review a 510(k) in 90 calendar days, but also requires that a submitter receive an order from FDA allowing one to market the device.  The FDA review requirements for a 510(k) are to determine: (1) that there is a predicate device;[19] (2) that the new device has the same intended use; (3) that the new device is of the same technology, or a different technology that does not raise a new type of safety and effectiveness question as compared to the predicate; and (4) that performance data demonstrate that the new device is at least as safe and effective as the predicate.[20]  A device that requires 510(k) clearance may not be marketed until the applicant receives an "order" from the FDA, which states that the new device has been determined to be substantially equivalent ("SE") through the 510(k) decision-making process, that it is at least as safe and effective as the legally marketed predicate device.  Marketing a device that requires 510(k) clearance prior to obtaining such clearance is a violation of Section 502(o) of the FDCA (misbranding of a device), Section 501(f)(1)(B) of the FDCA (adulteration of a device), and Section 502(f)(1) of the FDCA (required new device to have labeling with adequate directions for use).

### 1.    Valid Scientific Evidence

34.    During the 510(k) process, FDA relies on valid scientific evidence to make a determination of substantial equivalence to a predicate device.[21]  Submitters are required to

---

[18]   *See* U.S. General Accounting Office, *Report to the Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, Medical Devices: FDA's 510(k) Operations Could Be Improved* 2 (Aug. 1988), http://archive.gao.gov/d16t6/136821.pdf.

[19]   Any legally U.S. marketed device, which does not require a PMA, may be used as a predicate.  This includes: a device that has been cleared through the 510(k) process; a device that was legally marketed prior to May 28, 1976 that does not require PMA (a preamendment device); a device that was on the U.S. market after May 28, 1976 as a Class III device (Premarket Approval); later downclassified to Class II or I; a 510(k) exempt device; or a device type that has been classified through the *de novo* petition process.

[20]   *See* 21 C.F.R. § 807.92(a)(3).

[21]   *See* 21 C.F.R. § 860.7(g)(1).

provide such evidence in their 510(k) application.[22]  The evidence required may vary according to the characteristics of the device type, its conditions of use, the existence and adequacy of warnings and other labeling, and the extent of experience with its use.  The submitter of a 510(k) for a Class II type device must also demonstrate to FDA's satisfaction how any specified special controls have been met/addressed in order to receive a determination of substantial equivalence.

35.     Although a 510(k) submitter may provide any form of evidence to substantiate the safety and effectiveness of its device, the agency relies upon only valid scientific evidence to determine whether there is reasonable assurance regarding safety and effectiveness to demonstrate equivalence. Valid scientific evidence is defined as:

> Evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device under its conditions of use.[23]

36.     Almost every 510(k) includes performance data.[24]  These data consist of bench, animal, and/or clinical data, as well as reports of significant human experience based on the marketing of the predicate device(s).  According to FDA/CDRH policy, required information that has already been submitted to the agency by a firm, such as in the instance of its previous 510(k), need not be resubmitted in the new 510(k), but may be incorporated by reference.[25]  For example, Intuitive provided data to the FDA on January 4, 2002, to support specific usage limits

---

[22]   *See id*. § 860.7.

[23]   *Id*. § 860.7(c)(2).

[24]   Only 510(k)s for devices that are identical in every aspect do not require any performance data.

[25]   *Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1)* (Jan. 10, 1997); *see also* FDA, *Guidance for Industry and FDA Staff: The Least Burdensome Provisions: Concept and Principles* (Feb. 5, 2019), https://www.fda.gov/media/73188/download.

when FDA reviewed the first 510(k) for the EndoWrist® Endoscopic Instruments (K013416).[26] After initially providing this data for K013416, Intuitive did not need to provide the data again in subsequent 510(k) submissions for the EndoWrist, because the data was incorporated by reference in future submissions.

### 2.   Substantial Equivalence

37.    For a new device to be determined to be "substantially equivalent" by FDA to one or more legally marketed predicate devices, it must have the same intended use as the predicate device and either the same technological characteristics as the predicate or, if different technological characteristics, the information submitted must demonstrate that the device is as safe and effective as the predicate and does not raise different questions of safety and effectiveness than the predicate.[27]   Again, performance data is required to demonstrate that the new device is at least as safe and effective as the predicate (unless it is identical to the predicate, then a comparison of specifications is adequate).[28]   The majority of 510(k)s received by FDA for review has some differences in the indication for use and/or technological characteristics when compared to the predicate, and therefore include performance data.   Any device legally marketed in the U.S. that does not require a PMA may be used as a predicate.

38.    The content of a 510(k) basically includes: the device name and class; an establishment registration number (if one has been received); an "Indications for Use Statement"; directions for use; photographs or engineering drawings, where applicable; a 510(k) summary or 510(k) statement; proposed labeling; substantial equivalence comparison with the predicate;

---

[26]    Intuitive-00481167.

[27]    *See* FDCA § 513(i), 21 U.S.C. § 360c(i).

[28]    *See* 21 C.F.R. § 807.92(b).

supporting performance data (bench, animal, and/or clinical); and "[a]ny additional information regarding the device requested by FDA that is necessary to make a finding as to whether or not the device is substantially equivalent to a [predicate] device.[29]

39.     In addition to the above-mentioned requirements, a 510(k) must include a statement that all data and information submitted are truthful and accurate and that no material fact has been omitted.[30]  The truthful and accurate statement requirement carries significant legal implications, which may result in judicial action should FDA determine that false information was provided or material facts were omitted.

### 3.     Performance Data Requirements

40.     It is a common misperception that 510(k)s do not contain performance data.  If there are any differences in the indications for use between a new device and a predicate and/or there are any different technological characteristics, the submission will need to contain the descriptive characteristics as well as performance data, including bench, animal, and/or clinical data for FDA to review to determine if the new device can be found substantially equivalent to the predicate device or not.[31]  A clinical study generally must be conducted in accordance with FDA's Investigational Device Exemption (as previously defined, "IDE") regulations.[32]

---

[29]   21 C.F.R. § 807.87; *see also* FDA, *Guidance for Industry and FDA Staff: Refuse to Accept Policy for 510(k)s* (Sep. 13, 2019), https://www.fda.gov/media/130647/download.

[30]   21 C.F.R. § 807.87(l).

[31]   *See* FDA, *Evaluating Substantial Equivalence in Premarket Notifications [510(k)]: Guidance for Industry and Food and Drug Administration Staff: The 510(k) Program* 23 (July 28, 2014), https://www.fda.gov/media/82395/download.

[32]   21 C.F.R. Part 812.  *See also* FDCA § 520(g), 21 U.S.C. § 360j(g).  Clinical studies conducted in the United States also must comply with FDA's Good Clinical Practices regulations, including 21 C.F.R. Part 50, "Protection of Human Subjects, and 21 C.F.R. Part 56, "Institutional Review Boards."  *See also* Guidance for Industry: E6(R2) Good Clinical Practice: Integrated Addendum to ICH E6(R1) (March 2018), available at https://www.fda.gov/downloads/Drugs/Guidances/UCM464506.pdf (accessed July 1, 2021).

41.     FDA regulations require a manufacturer to submit any "additional information regarding the device requested by [FDA] that is necessary for the [FDA] to make a finding as to whether or not the device is substantially equivalent."[33]  This regulation thus gives the agency the ability to request whatever data is needed in conducting its review of substantial equivalence, subject to least burdensome principles.

### 4.     Labeling Requirements

42.     FDA regulations require that all 510(k)s include "proposed labels, labeling and advertisements sufficient to describe the device, its intended use, and the directions for its use."[34] Where applicable, photos or engineering drawings should be supplied.  The purpose of the submission of the proposed labeling in the 510(k) is to provide adequate information to FDA so that all language needed to sufficiently describe the device, including its intended use and instructions for use, are included in the FDA review process.[35]  To be found "substantially equivalent," a device must either have the same "indications for use" as a predicate device, or any differences in the indications for use between the device and the predicate must not constitute a new intended use (*i.e.*, the device's intended therapeutic/diagnostic effect) as determined by FDA review.[36]  The indications for use are normally found in the indications

---

[33]     21 C.F.R. § 807.87(m).

[34]     *Id.* § 807.87(e).

[35]     FDA has regulatory authority over the labeling, including promotional materials, for all medical devices. However, FDA's regulation of device advertising is limited to a subset of medical devices.  The Federal Trade Commission (FTC) regulates the advertising, as opposed to the labeling, of most devices under Sections 12-15 of the Federal Trade Commission Act, which prohibit false or misleading advertising.  15 U.S.C. §§ 52-55. Sections 502(q) and 502(r) of the FDCA authorize FDA to regulate the advertising of certain devices, which are known as restricted devices.  21 U.S.C. § 352(q) and (r). Section 502(r) also states that restricted devices are not subject to Sections 12-15 of the Federal Trade Commission Act.  *Id.* § 352(r).  Thus, FDA regulates the advertising of restricted devices while the FTC regulates the advertising of non-restricted devices.

[36]     FDA, *Indications for Use Statement* (Feb. 6, 1996), http://www.lb7.uscourts.gov/documents/15cv9986.pdf.

section of the labeling, but indications may also be inferred from other parts of the labeling, such as the precautions, warnings, and contraindications.[37]

### 5.      510(k) Review Process[38]

43.      Reviewers at FDA's CDRH include engineers (biomedical, chemical, material, electrical, etc.), physicians, microbiologists, biologists, physiologists, chemists, toxicologists, statisticians, etc. who perform scientific reviews of 510(k) submissions as well as other premarket applications.

44.      Once the appropriate review group is selected, a lead reviewer is selected by OHT management based on the specialty and experience with the type of device to be reviewed.  Upon receipt of the 510(k) submission, the lead reviewer follows procedures and applies certain criteria in determining whether the 510(k) meets a minimum threshold of acceptability and should be accepted for substantive review.[39]  If the submission is determined to be administratively incomplete, the 510(k) submitter will receive a "Refuse to Accept" notification, which details omissions and inadequacies.

45.      Once the 510(k) submission is determined to be administratively complete, the reviewer begins his or her review.  If the reviewer needs additional information to complete the review, he or she will either telephone or email the submitter with a request or prepare a letter requesting additional information, which will detail the additional information needed.[40]  Prior to

---

[37]  *Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1)* (Jan. 10, 1997).

[38]  The personnel titles used in this section reflect the titles used prior to the recent reorganization of CDRH.

[39]  *See* FDA, *Guidance for Industry and Food and Drug Administration Staff: Refuse to Accept Policy for 510(k)s* (Sep. 13, 2019), https://www.fda.gov/media/83888/download.

[40]  Requests for Additional Information may also be requested by a CDRH supervisor per the delegations on authority.  *See FDA Staff Manual Guide* 1410.406 (Nov. 13, 2018), https://www.fda.gov/media/80114/download.

requesting any information from the 510(k) submitter and placing the 510(k) on hold, the reviewer will compile all information received via internal consultations.  A 510(k) may not be placed on hold without supervisory concurrence.  The reviewer may also work interactively with a 510(k) submitter to obtain additional information and not place the 510(k) on hold for that additional information.[41]

46.     It is the lead reviewer's responsibility to present a final recommendation on the 510(k) through the supervisory review chain.  The lead reviewer's recommendation addresses whether a new device should be found substantially equivalent or not.  Following receipt of the lead reviewer's recommendation, the supervisory review chain will make a determination on the 510(k) submission to find the 510(k) for the device to be "substantially equivalent" or not.

47.     The FDCA states that the Commissioner will make decisions on submissions. FDA has delegated through the proper administrative procedures, the authority for decision-making at certain supervisory levels.[42]  Once a recommendation regarding substantial equivalence is made by the lead reviewer, it is then forwarded, as part of the 510(k) submission, to the supervisor for concurrence/final determination and signature by the supervisor.  Should a supervisor disagree on a lead reviewer's recommendation, the supervisor must submit an "override memo," which begins a process for reaching a resolution.[43]  Once a decision is made, a "decision letter" is sent to the submitter.  There is also an appeals process under 21 C.F.R. § 10.75.[44]

---

[41]   *See* FDA, *Guidance for Industry and Food and Drug Administration Staff: FDA and Industry Actions on Premarket Notification (510(k)) Submissions: Effect on FDA Review Clock and Goals* (Oct. 2, 2017), https://www.fda.gov/media/73507/download.

[42]   21 C.F.R. § 10.75.

[43]   *See id.*

[44]   *See* FDCA § 517A, 21 U.S.C. § 360g-1.

### 6.     510(k) Decisions

48.     FDA responds to a 510(k) application in one of three ways.  FDA can decide that a device is substantially equivalent to a legally marketed device that does not require a PMA; decide that it is not substantially equivalent; or notify the 510(k) submitter that additional information is required to determine whether the device is, in fact, substantially equivalent (this includes a refusal to accept decision which will not start the review clock).[45]

49.     If FDA determines that a device is not substantially equivalent (for reasons other than lack of performance data), the 510(k) holder may submit a request for Class I or Class II designation through the *de novo* petition process, file a reclassification petition, or submit a PMA.  If FDA determines the device is not substantially equivalent for lack of performance data, the submitter may provide more performance data for FDA review in a new 510(k) submission.

50.     If FDA determines that the 510(k) for a device is substantially equivalent, the 510(k) holder may proceed to market the device in the U.S. and will also need to comply with the other general controls under the Act and any special controls if it is classified as a Class II device.

51.     FDA regularly publishes documents aimed at providing guidance to FDA staff, industry, and other stakeholders to assist in reviewing and developing medical devices. Guidance documents are also used to outline specific review and enforcement approaches so as to ensure that the agency acts in an effective, fair, and consistent manner.  Guidance documents do not establish legally enforceable rights or responsibilities and are not legally binding on the public or the agency.  Rather, they explain how the agency believes relevant statutes and regulations apply to certain regulated activities.

---

[45]   21 C.F.R. § 807.100(a).

## F.      Other Pathways to Market for Medical Devices

52.     Aside from 510(k) clearance, there are several other pathways to market for medical devices.

### 1.      510(k)-Exempt Devices

53.     Section 510(l) of the Act has exempted almost all Class I device types.[46]  If a manufacturer's device falls into a generic category of exempted Class I type devices, a 510(k) submission and FDA determination of substantial equivalence are not required before marketing the device in the U.S.[47]  Under Section 510(m) of the FDCA, FDA exempted certain Class II device types, subject to certain limitations, from the 510(k) requirements.[48]  If a device falls into a generic category of exempted Class I or Class II devices, a 510(k) submission and FDA determination of substantial equivalence are not required before marketing the device.

54.     If a Class I or Class II device is not exempt, a 510(k) is required and the substantial equivalence standard applies.

### 2.      *De Novo* Classification

55.     Devices not otherwise classified by regulation in Class I, II or preamendment type yet still unclassified, by default, are Class III devices. Until 1997, such devices required a PMA, regardless of the product's level of risk. Mandating PMA review for low and moderate risk devices made little sense; as a result, Congress attempted to remedy the problem in 1997 with the passage of FDAMA.  The law gave FDA the authority to automatically downclassify a new Class III device if the device is low to moderate risk, and if general controls are sufficient, to place the device into Class I, and if general controls in combination with special controls (when

---

[46]    FDCA § 510(l), 21 U.S.C. § 360(l).

[47]    *Id.*; *see also* 21 C.F.R. § 876.9.

[48]    FDCA § 510(m), 21 U.S.C. § 360(m).

special controls for the type device can be developed) are sufficient to place the device into Class II, to provide a reasonable assurance of safety and effectiveness.

### 3.    Premarket Approval Application ("PMA")

56.    A PMA is required for Class III devices and must contain information on safety and effectiveness related to the specific device.

57.    As outlined in Section 513 of the FDCA, devices are subject to PMA approval "to provide reasonable assurance of [their] safety and effectiveness."[49]  PMAs typically include the results of extensive clinical trials, bench tests, laboratory studies, animal studies, and references to any standards relevant to a device's safety or effectiveness.[50]  FDA can only approve a PMA if, after considering all of this information, it finds reasonable assurance that the device is safe and effective.[51]

### G.    Prohibition on Sale of a Device Prior to 510(k) Clearance or PMA Approval

58.    The linchpin of device regulation under the FDCA is the requirement that FDA clear or approve the submission for the device (unless exempt) before it may be introduced or delivered for introduction into interstate commerce.  There are a couple of theories of liability under the FDCA that FDA asserts for improperly distributing a device that has not received requisite FDA 510(k) clearance or PMA approval.

59.    FDA contends that the marketing of a medical device prior to clearance violates Section 510(k) of the FDCA, which states that "[e]ach person who is required to register under

---

[49]    FDCA § 513(a)(1)(C), 21 U.S.C. § 360c(a)(1)(C).  Relevant FDA procedures implementing Section 513 of the FDCA are found at 21 C.F.R. Part 814.

[50]    FDCA § 515(c)(1), 21 U.S.C. § 360e(c)(1) .  FDA regulations describe in greater detail the required content of a PMA.  *See* 21 C.F.R. § 814.20.

[51]    FDCA § 515(c), 21 U.S.C. § 360e(c); *see also* 21 C.F.R. § 860.7(c).

this section and who proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery, report [certain information to FDA]."[52]  A device that lacks required 510(k) clearance is misbranded under Section 502(o) of the FDCA.[53]

60.     Sale of a device prior to approval may also trigger the statutory requirement that a manufacturer obtain premarket approval.[54]  A device is considered adulterated under Section 501(f)(1)(B) of the FDCA when a firm fails to obtain PMA approval.[55]

### H.     FDA Postmarket Regulation of Medical Devices

61.     FDA's mandate under the FDCA to assess "reasonable assurance of safety and effectiveness" for medical devices marketed in the United States extends to the postmarket period as well.  This mandate is implemented through a complex and comprehensive regulatory system prescribed by the FDCA and FDA regulations.

62.     Ensuring the safety and effectiveness of medical devices in the United States throughout the product lifecycle is at the core of FDA's mission.  Responsibility for ensuring compliance with all regulatory requirements falls to CDRH and FDA's Office of Regulatory Affairs ("ORA").

63.     CDRH employs a cadre of scientific and technical professionals, including engineers, scientists, physicians, and statisticians, to review information provided for marketed

---

[52]   FDCA § 515(k), 21 U.S.C. § 360e(k).

[53]   21 U.S.C. § 352(o).

[54]   FDCA § 515(a), 21 U.S.C. § 360e(a).

[55]   FDCA § 501(f)(1)(B), 21 U.S.C. § 351(f)(1)(B).  For an example of the FDA enforcing this statute, see Warning Letter to Tenderneeds Fertility LLC (Apr. 13, 2020), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/tenderneeds-fertility-llc-603383-04132020.  For a device requiring a PMA, the notification required by Section 510(k) of the FDCA is deemed satisfied when a PMA is pending before the agency.  21 C.F.R. § 807.81(b).

devices, including information related to design specifications, pre-clinical and clinical performance data, manufacturing processes, and postmarket surveillance.  CDRH experts evaluate, approve, and monitor postmarket studies, including Section 522 studies, and also review, assess, and trend adverse event reports from health care providers, health care facilities, and manufacturers.  Each of these individuals performs a vital role in helping to ensure the safety and effectiveness of a medical device in the postmarket period.

64.     The function of ORA is to serve as the "eyes and ears" of medical product Centers, including CDRH.  FDA investigators, based in district offices around the United States, and more recently around the world, are tasked with performing on-site inspections of manufacturing and other corporate facilities as well as clinical trial sites, to provide first-hand verification of the activities at those facilities and assess whether regulated activities are performed in accordance with the FDCA and FDA regulations.  Information procured during inspections is then evaluated by compliance experts in the field office and shared with the appropriate Center's scientific, technical, and regulatory experts.  The findings of the investigator, typically in "483 notices," and assessments made by the field offices provide key information to assist FDA as it considers the safety and effectiveness of marketed medical devices.

65.     The following are postmarket regulations that all device manufacturers must comply with: (i) medical device reports (MDRs)s; (ii) reports of corrections and removals; (iii) Section 522 Studies; (iv) device tracking; (v) routine and for-cause inspections; (vi) regulatory communications; and (vii) mandatory recalls.

**I.     FDA's Approach to Remanufacturing, Refurbishing, and Servicing**

66.     As noted above, a remanufacturer is considered to be a manufacturer under 21 C.F.R. Part 807, and thus subject to premarket notification requirements, including 510(k)

requirements.[56]  The determination of whether the activities a firm performs are remanufacturing affects the applicability of regulatory requirements under the FDCA and FDA regulations.[57] FDA has consistently enforced requirements under the FDCA and implementing regulations with respect to entities engaged in remanufacturing, including but not limited to registration and listing, adverse event reporting, the QSR, and marketing submissions (including 510(k) premarket notifications).[58]

67.     A remanufacturer is "any person who processes, conditions, renovates, repackages, restores or does any other act to a finished device that significantly changes the finished device's performance and safety specifications, or intended use."[59]  FDA distinguishes "remanufacturing," which requires 510(k) clearance, from "refurbishment" and "servicing" of medical devices, which would not require 510(k) clearance.[60]

---

[56]   FDA's website indicates that remanufacturers are required to register and list with FDA, and has as long as I can remember.  *See Who Must Register, List and Pay the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee (last updated Sept. 27, 2018).

[57]   86 Fed. Reg. 33305 (June 24, 2021), https://www.govinfo.gov/content/pkg/FR-2021-06-24/pdf/2021-13360.pdf (accessed July 26, 2021).

[58]   *Id.*

[59]   21 C.F.R. § 820.3(w). Although the definition of "remanufacturer" comes from the QSR, FDA has historically relied on this definition more broadly.  *See, e.g.,* FDA, *Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administration Staff*  5 & n.20, (June 24, 2021), https://www.fda.gov/media/150141/download (relying on the same regulation to define "[r]emanufacture"); Compliance Program Guidance Manual (CPGM) 7382.845, "Inspection of Medical Device Manufacturers," at 17 (Feb. 2, 2015), available at https://www.fda.gov/media/80195/download (accessed July 18, 2021) ("Remanufacturers are persons who process, condition, renovate, repackage, restore or do any other act to a finished device that significantly changes the finished device's performance or safety specifications or intended use [21 CFR 820.3(w)].").

[60]   FDA has never required "refurbishers" or "servicers" of medical devices to register and list with the FDA and obtain 510(k) clearance.  As it stands as of the date of this report, FDA's website clearly indicates that servicers/refurbishers are not required to register or list with FDA.  *See Who Must Register, List and Pay the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee (last updated Sept. 27, 2018).

68.     An example of the agency's thinking on the differences between these activities is an Advance Notice of Rulemaking that FDA published in the Federal Register in 1997.[61]  There, FDA proposed to define "servicers," as opposed to "remanufacturers," as "persons who repair a device to return it to the manufacturer's fitness for use specifications, and perform the manufacturer's recommended scheduled preventive maintenance" and who "do not significantly change a finished device's performance or safety specifications, or intended use."[62]  FDA proposed to define "refurbishers" as "persons who, for the purpose of resale or redistribution, visually inspect, functionally test and service devices, as may be required, to demonstrate that the device is in good repair and performing all the functions for which it is designed."[63]  In addition, FDA stated that refurbishers may or may not cosmetically enhance a device and preventive maintenance procedures may or may not be performed.[64]  FDA stated that "[r]efurbishers do not significantly change a finished device's performance or safety specifications, or intended use."[65]

69.     It is clear from the regulatory history that any act that results in a significant change to a finished device's performance and safety specifications, or intended use, is remanufacturing, and thus requires 510(k) clearance.  In recent years, FDA has attempted to identify in FDA reports and draft guidance certain guidelines concerning the differences between

---

[61]  FDA's statements in the Federal Register are more binding than those made in guidance documents.  FDA regulations state that "[a] statement of policy or interpretation made in . . . [a]ny portion of a Federal Register Notice . . . , e.g., a notice to manufacturers or a preamble to a proposed or final regulation" binds FDA as an advisory opinion "unless subsequently repudiated by the agency or overruled by a court."  21 C.F.R. § 10.85(d)(1); *see also id.* § 10.85(e) ("The Commissioner may not recommend legal action against a person or product with respect to an action taken in conformity with an advisory opinion which has not been amended or revoked.").

[62]  62 Fed. Reg. at 67012.

[63]  *Id.*

[64]  *Id.*

[65]  *Id.*

remanufacturing, refurbishment, and servicing.[66]  These reports and draft guidance reflect FDA's more detailed understanding of what is encompassed within each type of activity, but they are not binding.  They are relevant for purposes of this report insofar as they reinforce the FDA's established views concerning remanufacturing, refurbishment, and servicing.[67]  They are further relevant in that the Remanufacturing Draft Guidance analyzes what constitutes a significant change in intended use.  It defines intended use as "[t]he general purpose of the device or its function, which encompasses the indications for use."[68]  It adds that, "[g]iven that the purpose of servicing is to return the device to the safety and performance specifications established by the OEM and to meets its original intended use, any change to the intended use should be evaluated to determine whether the activity is remanufacturing."

---

[66]   *See* FDA, *FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices: In accordance with Section 710 of the Food and Drug Administration Reauthorization Act of 2017 (FDARA)* ("FDARA Report") (May 2018), https://www.medequipusa.com/wp-content/uploads/2018/05/FDARA-710-3rd-Party-Servicing-Report.pdf; FDA, *White Paper: Evaluating Whether Activities Are Servicing or Remanufacturing" (2018)*, https://www.fda.gov/media/117238/download; FDA, *Draft Guidance for Industry and FDA Staff: Remanufacturing of Medical Devices (Remanufacturing Draft Guidance)* (June 2021), https://www.fda.gov/media/150141/download; *see also* "Remanufacturing of Medical Devices; Draft Guidance for Industry and Food and Drug Administration Staff; Availability," 86 Fed. Reg. 33305 (June 24, 2021), https://www.govinfo.gov/content/pkg/FR-2021-06-24/pdf/2021-13360.pdf.

[67]   *See, e.g.*, FDARA Report at 24 ("Servicing returns or maintains a finished device's safety and performance specifications and intended use whereas remanufacturing significantly changes the finished device's performance, safety specifications, or intended use. Because remanufacturing can have a significant impact on the safety and effectiveness of the device, FDA has interpreted regulatory requirements such as those under the [QSR] to apply to remanufacturers and has actively regulated them as manufacturers.  FDA is currently and will continue to enforce existing requirements for those third parties engaged in remanufacturing.") (footnotes omitted); Remanufacturing Draft Guidance at 3 (citing 21 CFR 820(w)) (noting that remanufacturing is "the processing, conditioning, renovating, repackaging, restoring, or any other act done to a finished device that significantly changes the finished device's performance or safety specifications, or intended use"); *id.* at 3-4 (noting that the designations of servicer and remanufacturer are not mutually exclusive and that the same entity may meet the definition of either designation based on their activities on one or multiple devices).

[68]   *Id.* at 4; *see also* 21 C.F.R. § 801.4 (definition of "intended use").

**J.   Relevant Background on Rebotix's Business Related to EndoWrist Instruments**

70.     My understanding is that Plaintiff/Counterclaim Defendant Rebotix Repair LLC ("Rebotix") offers a service to hospitals in which it inserts its own proprietary "Interceptor" circuit board (the "Interceptor board") into EndoWrist instruments.[69]  The Interceptor board introduces technology to the EndoWrist instrument that bypasses the original usage limits set and enforced by a separate chip that Intuitive installs in its FDA-cleared EndoWrist instruments. Through the insertion of the Interceptor board, Rebotix causes the EndoWrist instruments to function beyond the predetermined number of uses for which Intuitive has programmed the instruments.  Rebotix performs this service both through direct engagement with hospitals and through third-party distributors, including BPI Medical ("BPI").

71.     In addition to inserting the Interceptor board to bypass the usage counter in the EndoWrist instruments, Rebotix also claims that it evaluates the instruments and provides any necessary maintenance, akin to the types of repairs performed on non-robotic, multiple use laparoscopic instruments, such as grasper alignment and scissor sharpening, etc.[70]  Rebotix claims that the instruments then receive final inspections and safety testing.[71]  My understanding is that hospitals ship their instruments to Rebotix's facility in St. Petersburg, Florida, where the

---

[69]   *See* REBOTIX162404. ███████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████.

[70]   REBOTIX146948 at REBOTIX-146949.

[71]   *Id.*

Interceptor board is added and all of the purported repairs take place,[72] after which Rebotix ships the instruments with the newly installed board back to the respective hospitals.[73]  Rebotix claims that the hospitals maintain ownership of the instruments at all times.  Rebotix also claims that it is not selling any product, only "repairing" its customers' instruments.[74]

## III.   **EXPERT OPINIONS**

72.     To develop opinions for this case, I referenced relevant parts of the following items: the FDCA; U.S. Code of Federal Regulations, Title 21; FDA guidance documents; and FDA reports and other statements.  I also reviewed the factual record, including the parties' ordinary-course documents; the testimony of Stan Hamilton, Joe Morrison, Bob Overmars, Chris Gibson, Glenn Papit, David Mixner, and Mark Johnson, documents produced by third parties, and other publicly available information.  A list of materials I considered in forming my opinions in this report is attached as Appendix B.  Provided with this information, I hold the following expert opinions, based on my training, experience, education, and review of the documents.

### A.     **Usage Limits Cannot be Removed Without 510(k) Clearance Because FDA Cleared the EndoWrist Instruments as Limited Use Devices**

73.     The original 510(k) for Intuitive's EndoWrist family of instruments as well as subsequent 510(k)s repeatedly demonstrate that the instruments were intended for limited use as cleared by FDA.  For example, FDA cleared the original 510(k) (K965001) for the Intuitive

---

[72]  Mixner Tr. 133:10-133:16 ("Q   As to those customers for whom Rebotix Repair actually did what you're calling service, where geographically were those services performed? A   If I understand the correct – the question correctly, the services were – of the repair of the EndoWrist was – they were repaired in St. Petersburg, Florida.").

[73]  *See, e.g.*, HE_001322,(informing Evergreen Hospital that BPI would pick up and ship the instruments to Rebotix's repair facility and that Rebotix will then ship it back to BPI for delivery back to Evergreen).

[74]  REBOTIX146948 at REBOTIX-146954.

Surgical Endoscopic Instrument Control System on July 31, 1997, with the following indications for use:

> The Intuitive Surgical Endoscopic Instrument Control System is intended for accurate control of selected endoscopic instruments including, rigid endoscopes, blunt endoscopic dissectors and endoscopic retractors during thoracoscopic and laparoscopic surgical procedures. It is intended to be used by professionals in operating room environments.[75]

The device description included in the 510(k) Summary for K965001 states that the system's accessories are "resposable" and "limited use" instruments.[76] Similarly, the device description in the 510(k) Summary for K990144 states that the instruments are "resposable" and "limited use."[77] The fact that the "indications for use" in the 510(k) Summaries do not specifically state that EndoWrist instruments are subject to limited use makes no difference, as the usage limitations were clearly indicated in the device descriptions.

74. Moreover, the record shows that FDA required and reviewed the usage limits as part of its 510(k) clearance of the EndoWrist® Endoscopic Instruments. FDA cleared the K013416 510(k) for the EndoWrist® Endoscopic Instruments in January 2002.[78]

75. During the review of K013416, FDA asked specifically about the limited use feature for the instruments.[79] In a deficiency letter dated December 12, 2001, FDA writes:

> [Y]ou state that the instruments are re-usable for a limited number of uses. The instruments are programmed for a limited number of uses to ensure reliability and consistent performance, and have non-volatile, "add-only" memory that the system decrements after each use. Please specify the number of uses for each instrument and

---

[75]   Intuitive-00691212.

[76]   Intuitive-00691208.

[77]   Intuitive-00691203.

[78]   Intuitive-00481178.

[79]   Intuitive-00481166.

> describe how the numbers were determined.  Please provide data to
> support the claim.[80]

To address this submission deficiency identified by FDA, Intuitive provided data to support the

programed number of uses.[81]  On January 4, 2002, in response to the FDA's deficiency letter,

Intuitive explained to FDA:

> The number of uses is determined by testing instruments under
> conditions that replicate actual clinical use, and cycling these
> instruments for wear expected during the specified number of
> procedures.  Each cycle includes cleaning, sterilization, connection
> / disconnection with the system, and exercising the instruments with
> representative motions (duration and loading) expected during a
> procedure.  Performance measurements are made periodically (e.g.,
> at the end of each cycle or set of cycles) to confirm that the
> instrument is still performing as intended, and the life testing is
> continued until failure or a specified number of cycles are
> successfully completed.[82]

It was only after Intuitive provided this rationale and data to support the programmed number of

uses, along with other required information/data, that FDA determined that it could clear the

510(k).

76.     Given that FDA issued a deficiency letter that sought the details and data

concerning the reusable feature of these instruments, it is my opinion that FDA clearance was

dependent upon FDA's acceptance of this data.  Further, in my opinion, based on my experience,

FDA viewed the EndoWrist instruments in K013416 and any future versions of the EndoWrists

as being subject to usage limits.  In the event that Intuitive or any third party attempted to market

an EndoWrist that allowed the limits to be bypassed, a new 510(k) would be required as this is a

change that could significantly affect safety and effectiveness.[83]

---

[80]   *Id.*

[81]   Intuitive-00481168.

[82]   *Id.*

[83]   21 C.F.R. § 801.4

**B.     Rebotix's Argument that FDA's "Substantial Equivalence" Determination Means EndoWrist Instruments Can Be Treated the Same Way as Traditional Laparoscopic Instruments is Flawed**

**1.     The Term "Substantial Equivalence" Does Not Mean "Identical" Under the FDCA**

77.     Rebotix alleges in its complaint and certain Rebotix personnel have taken the position in deposition testimony that because FDA determined that the EndoWrist was "substantially equivalent" to traditional laparoscopic instruments,[84] the EndoWrist and traditional laparoscopic instruments are "essentially identical."[85]  This allegation is clearly wrong and reflects a complete lack of understanding of the meaning of substantial equivalence and the regulatory terms.  "Substantially equivalent" in the FDA regulatory context has a specific meaning; an FDA finding that a medical device is "substantially equivalent" to a predicate in no way implies that the medical device is "essentially the same" as the predicate.  As a result, Rebotix's claim that, because the EndoWrist and traditional laparoscopic instruments are "essentially the same," a surgeon should be able to use the EndoWrist instruments "for hundreds of surgeries" and they should "last for years, if inspected and repaired as needed between surgeries"[86] has no basis in fact.  Again, it is FDA that makes a determination regarding substantial equivalence to a predicate and not a manufacturer.[87]

---

[84]     My understanding is that Rebotix refers to legally marketed instruments classified by FDA under 21 C.F.R. 876.1500 as "traditional" laparoscopic instruments.  I will use Rebotix's terminology referring to such instruments as traditional laparoscopic instruments even though it is a term FDA does not use.

[85]     Hamilton Tr. 206:22-207:10 ("Q.  So you think they are identical? A.  I think with respect to the – the mechanical end, how the instruments work, the actual functioning of the instruments, clearly there is – the robot is turning the wheels.  But in terms of everything – the steel, the cables, you know, the electrosurgical connections, yes, their 510(k)s that say that they're essentially identical.  And they don't claim any new materials or anything.  I mean, so – and we – we can – we don't count on that being identical.  That's not an assumption that we make.  But I believe it's essentially true because they said it was true and we confirmed with our analysis.").

[86]     Rebotix Complaint ¶ 39.

[87]     21 C.F.R. § 807.92(a)(3).

78.     The term "substantial equivalence" is defined by the FDCA and addressed by

FDA in regulations and further in guidance.  Although Congress did not define "substantial

equivalence" when enacting the Medical Device Amendments Act of 1976, an excerpt from a

House Committee Report provides insight into Congress's thinking with respect to the term:

> The term "substantially equivalent" is not intended to be so narrow
> as to refer only to devices that are identical to marketed devices nor
> so broad as to refer to devices which are intended to be used for the
> same purposes as marketed products.  The Committee believes that
> the term should be construed narrowly when necessary to assure the
> safety and effectiveness of a device but not so narrowly where
> differences between a new device and a marketed device do not
> relate to safety and effectiveness.[88]

It appears that Congress wished to give FDA discretion to interpret the meaning of substantial

equivalence, and intended that safety and effectiveness be considered.

79.     In 1990, the Safe Medical Devices Act of 1990 (SMDA) amended the FDCA to

include a statutory definition for substantial equivalence.[89]  The SMDA provided:

> (i)(1)(A)  For  purposes  of  determinations  of  substantial
> equivalence . . . , the term "substantially equivalent" or "substantial
> equivalence" means, with respect to a device being compared to a
> predicate device, that the device has the same intended use as the
> predicate device and that the Secretary by order has found that the
> device—
>
> (i) has the same technological characteristics as the predicate device,
> or
>
> (ii)(I) has different technological characteristics and the information
> submitted that the device is substantially equivalent to the predicate
> device  contains  information,  including  clinical  data  if  deemed
> necessary by the Secretary, that demonstrates that the device is *as
> safe and effective as a legally marketed device*, and (II) *does not*

---

[88]   H.R. Rep. No. 94-853 at 36-37 (1976).

[89]   *See* Safe Medical Devices Act of 1990, Pub. L. No. 101-629, 104 Stat. 4511 (1990); FDCA § 513(i); 21 U.S.C.
§ 360c(i).  This definition was already being implemented in practice and was based on the definition of
"substantial equivalence" as provided for in Guidance on the CDRH Premarket Notification Review Program,
510(k) Memorandum K86-3 (June 30, 1986).

> *raise different questions of safety and efficacy than the predicate device*.
>
> (B) For purposes of subparagraph (A), the term "different technological characteristics" means, with respect to a device being compared to a predicate device, that there is a significant change in the materials, design, energy source, or other features of the device from those of the predicate device.[90]

Clearly, the statutory definition of "substantial equivalence" does not require or even contemplate that a new and predicate device be identical as Rebotix argues.  Moreover, as the statute makes clear, it is for FDA alone to make a determination of "substantial equivalence," not a submitter or entity seeking to market a medical device.

### 2. Rebotix Improperly Relies on FDA's "Substantial Equivalence" Determination to Bypass Usage Limits

80.     The fact that Intuitive's original 510(k)s for EndoWrist instruments (K965001 and K990144) relied in part on Class 1 and Class 2 traditional laparoscopic instruments—which do not have usage limits and are either single or multi-use instruments—as predicate devices does not mean they are identical to EndoWrists, and therefore that the EndoWrist usage limits can be bypassed.  Indeed, the regulatory history of the EndoWrist instruments establishes just the opposite: although Intuitive identified certain laparoscopic instruments with either single use or multi-use as "predicate devices," FDA plainly cleared the EndoWrist instruments as limited-use devices.  I understand from reviewing documents in the litigation that the functionality of EndoWrist instruments as used with the da Vinci system is not the same as that of earlier, legally marketed laparoscopic instruments.[91]  Indeed, based on diagrams and descriptions contained in

---

90    SMDA, § 12, Pub. L. No. 101-629, 104 Stat. 4511 (1990) (emphasis added).

91    *See* Intuitive-00018120; Intuitive-00082056.

the 510(k)s, it appears that although the distal ends of the EndoWrist instruments are similar to traditional laparoscopic instruments, the proximal ends are very different.[92]

### C. Intuitive's Marketing and Sale of EndoWrist Instruments with Usage Limits Is Consistent With FDA's Regulatory Requirements

#### 1. FDA's 510(k) Clearance of EndoWrist Instruments Requires Intuitive to Market and Sell EndoWrist Instruments in a Manner Consistent with the Usage Limits Cleared by FDA in the 510(k)

81.     Rebotix alleges in its complaint that the usage limits for EndoWrist instruments "are not based on any regulatory requirements from the FDA."[93]  This assertion is wrong.  As explained previously in Section III.A, FDA reviewed the usage limits identified by Intuitive and supporting data as part of FDA's review of the first 510(k) for the EndoWrist® Endoscopic Instruments (K013416).  It was only after Intuitive provided this data to support Intuitive's usage limits, along with other required information/data, that FDA cleared the 510(k).  The EndoWrist instruments in K013416 included usage limits.  The FDA cleared the 510(k) with such limits, and any future versions of the EndoWrists had to be subject to usage limits absent a new 510(k).

82.     Because the EndoWrist instruments are subject to usage limits that were reviewed and cleared by FDA, Intuitive's regulatory obligation was to sell the device with these limits, consistent with the EndoWrist's 510(k) clearance.  For Intuitive or a third party like Rebotix to market these devices without a predetermined number of uses, FDA would need to clear a new 510(k) for such a device.

---

[92]   *See, e.g.*, Intuitive-00692643 at Intuitive-00692664-Intuitive-00692668.

[93]    Rebotix Complaint ¶ 45.

2. **Intuitive's Marketing and Sale of EndoWrist Instruments with Usage Limits Is Consistent with FDA's Labeling Requirements**

83.     Part of the regulatory obligation to sell EndoWrist instruments consistent with the 510(k) clearance (including the cleared usage limits) is the need to comply with applicable labeling requirements.  Pursuant to applicable regulations, device labeling for prescription type devices must present detailed information about the risks and benefits of the product in the manner dictated by FDA.  Under Section 502(f)(1) of the FDCA, a device "shall be deemed to be misbranded . . . .(f) [u]nless its labeling bears (1) adequate directions for use[.]"[94]  FDA has defined "adequate directions for use" to mean "directions under which the layman can use a device safely and for the purposes for which it is intended."[95]  Because prescription devices are, by definition, safe for use only under health care practitioner supervision, FDA has "exempted" such prescription devices from the requirement of adequate directions for use for a lay person if, among other conditions, its labeling complies with certain requirements.[96]  These requirements include providing "information for use, including indications, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and for the purpose for which it is intended . . . ."[97]  Basically, this means that the labeling must bear adequate directions for use for healthcare practitioners licensed by the state in which they practice to use the device.

84.     Additionally, because instructions on how to adequately reuse a prescription device are critical to ensuring that licensed practitioners can reuse the device safely and

---

[94]   FDCA § 502(f); 21 U.S.C. § 352(f).

[95]   21 C.F.R. § 801.5.

[96]   21 C.F.R. § 801.109.

[97]   *Id.* § 801.109(c).

effectively, FDA in guidance applicable to reprocessing medical devices in health care settings interprets adequate reprocessing instructions to be part of providing adequate directions for use under 21 C.F.R. § 801.5 and a condition for exemption from adequate directions for use under 21 C.F.R. § 801.109.[98]  The guidance document provides six criteria for "clear reprocessing instructions, which will ensure users understand and correctly follow the reprocessing instructions."[99]

85.     Criterion 5 identifies a number of elements that should be included in the label to make sure the reprocessing instructions are comprehensive.  One of these elements—Reuse Life—specifies that the labeling should either (1) inform the user of how many times the device can be reused, based on testing; or (2) provide the user with a mechanism or method to ascertain whether the device has exceeded its use life.[100]  Specifically, the guidance states:

> Reuse life may also be addressed by validating the number of times the product can be reprocessed and reused, and providing this specification in the labeling. If the reuse life of a device is limited to a specific number of use/reprocessing cycles, the labeling should also describe a specific tracking method for the number of reuse cycles. It may be appropriate for labeling to remind the user that the specific number of reuse cycles is dependent on full compliance with the directions for use of the device.[101]

86.     Further, FDA has recognized as a consensus standard ISO17664, Second edition 2017-10, Processing of health care products – Information to be provided by the medical device manufacturer for the processing of medical devices.[102]  ISO17664 governs the information to be

---

[98]   *See* FDA, *Guidance for Industry and FDA Staff: Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling* (May 17, 2015), https://www.fda.gov/media/80265/download.

[99]   *Id.* at 8.

[100]  *Id.* at 20.

[101]  *Id.*

[102]  *See Recognized Consensus Standards*, FDA https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfstandards/search.cfm (last updated Dec. 21, 2020).

provided by a medical device manufacturer for the reprocessing of medical devices.  This standard provides: "If the service life of the medical device is limited by the number of processing cycles or some other end of life indicator(s) this information shall also be provided in the labeling."

87.     These criteria/requirements for labeling are not met by Rebotix's purported "repair" process to bypass usage limits on the EndoWrist instruments.  Rebotix's insertion of the Interceptor board overrides the mechanism Intuitive put in place to ensure that the user knows when the device has exceeded its use life determined by appropriate testing that was reviewed and cleared by FDA.  The addition of the Interceptor board does not return the instrument to its original state, rather it extends the life of the instrument beyond Intuitive's predetermined usage limits and changes the intended use of those instruments.

**D.     Rebotix Is a Manufacturer of a Medical Device (the Interceptor Board) and, Without 510(k) Clearance, Is Selling a Device That Is Misbranded and Adulterated**

88.     Based on my understanding of the record, Rebotix manufactures and introduces into commerce a board—called the "Interceptor"—that is to be inserted into the EndoWrist instruments to bypass the Intuitive validated and FDA-cleared usage limits.  The Rebotix Interceptor board is a medical device under the FDCA that required 510(k) clearance prior to its introduction into interstate commerce.  Because Rebotix failed to obtain 510(k) clearance, the Interceptor is misbranded and adulterated under the FDCA.

**1.     The Interceptor Board Is a Medical Device**

89.     The Rebotix Interceptor board is a "device" as defined by the FDCA.  The statutory definition of a "device" includes device components.  The FDCA defines "device" as:

> [A]n instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, ***including a component***, part, or accessory, which is—

(1)      recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,

(2)      intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

(3)      intended to affect the structure or any function of the body of man or other animals, and

which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of any of its primary intended purposes. The term "device" does not include software functions excluded pursuant to section 360j(o) of this title.[103]

90.      I understand that Rebotix has argued that it does not need 510(k) clearance for the Interceptor board, because it claims to be a "manufacturer[ ] of components or parts of finished devices" under 21 C.F.R. § 820.1.  This argument is unavailing.  The Interceptor board, as installed in an EndoWrist instrument that Rebotix markets and sells to end users, is a finished device component (as opposed to a component of a finished device) in finished form for sale to an end user.  FDA has defined and distinguished these concepts in the QSR, guidance, and on its website, among other places:

- The QSR defines a "finished device" as "any device . . . that is suitable for use or capable of functioning, whether or not it is packaged, labeled, or sterilized."[104]

- FDA guidance has explained that "a finished device component" is "a device in finished form held for sale to an end user that is suitable for use or capable of functioning, whether or not it is packaged, labeled or sterilized."[105]

- When explaining that 510(k)s may be submitted for "finished components" on its website, FDA distinguishes between finished and unfinished device

---

[103]   FDCA § 201(h), 21 U.S.C. § 321(h) (emphasis added).

[104]   21 C.F.R. § 820.3(l).

[105]   FDA, *Final Guidance for Industry: Sterilized Convenience Kits for Clinical and Surgical Use* 3-4 (Jan. 7, 2002), https://www.fda.gov/media/71358/download.

components.  FDA stated: "A finished component is sold to the end user while an unfinished component cannot be used by the end user until further manufacturing steps occur . . . .  Finished components are packaged and labeled for use and are for general sale while unfinished components are usually only sold to other device manufacturers for inclusion in another medical device."[106]

91.  Rebotix is not selling the Interceptor board to another device manufacturer as an unfinished component to ultimately be incorporated into a finished device.  Rather, Rebotix itself installs the Interceptor board directly into the Intuitive EndoWrist instrument and then provides the altered EndoWrist instrument with this new finished device directly to end users as part of the Rebotix service.  As installed in the EndoWrist by Rebotix, the Interceptor board is suitable for use and capable of functioning[107] without further manufacturing steps,[108] and is sold to end users as such.[109]  The Interceptor board thus satisfies the definition of a finished device component as set forth above.  Accordingly, Rebotix is a manufacturer as that term is defined in the FDCA, and thus required to comply with the premarket notification requirements.

## 2.  Rebotix Introduced the Interceptor Board Into Interstate Commerce

92.  FDA's jurisdiction extends to the Interceptor board (a medical device), because the Interceptor board moved in interstate commerce.  The FDCA confers jurisdiction on FDA to regulate devices when they are in "interstate commerce."[110]  Based on my experience working at

---

[106]   *Content of a 510(k)*, FDA, https://www.fda.gov/medical-devices/premarket-notification-510k/content-510k (last updated Apr. 26, 2019).

[107]   *See*, *e.g.,* REBOTIX162404_001 at REBOTIX162404 (describing the functionality of Interceptor board).

[108]   *See* Gibson Tr. 90:20-92:8 (discussing Rebotix's plans to sell the Interceptor board to a company in Indiana); *id.* at 93:20-94:11 (noting that Rebotix sold Interceptor boards to Baylor Scott & White—a hospital—for them to implement the EndoWrist repair process in their own labs).

[109]   *See*, *e.g.*, REBOTIX146948 at REBOTIX146954 (noting that repaired EndoWrist instruments are returned to hospitals for their use).

[110]   *See*, *e.g*., FDCA § 301(a)-(c), 21 U.S.C. § 331(a)-(c).

FDA, it is common knowledge that medical devices are presumed to be in interstate commerce and therefore subject to FDA jurisdiction.

93.     The record is replete with evidence that the Interceptor board, both before and after it was installed in EndoWrist instruments, moved in interstate commerce.  I understand from the record that Rebotix or an affiliated entity owns the intellectual property for the Interceptor board, and paid for the board to be built by a third-party entity.[111]  It is fair to presume that the parts Rebotix used to manufacture the Interceptor board (including that build by a third-party entity) moved in interstate commerce.  Rebotix then arranged for hospitals, whether by itself or through third-party distributors authorized to market the Interceptor board, to ship EndoWrist instruments to a Rebotix facility in St. Petersburg, Florida.[112]  In St. Petersburg, Rebotix inserted its Interceptor boards into the hospitals' EndoWrist instruments, and then shipped the EndoWrist instruments with the Rebotix boards installed back to hospitals in the different states from which they came.[113]  The record literally shows the new Endowrist Instruments with the Interceptor boards crossing state lines and moving through interstate commerce.

94.     I have reviewed record evidence where Rebotix claims it is merely "repairing" the EndoWrist instruments, but this is not the case.  As support for its position, Rebotix draws from

---

[111]   *See* Gibson Tr. 39:12-41:19 (discussing that Rebotix contracted with G5 to develop the interceptor technology and another third party (Quality Contract Manufacturing Services) to actually manufacture the interceptors for purchase by Rebotix).

[112]    *See*, *e.g.*, HE_001322 (informing Evergreen Hospital that BPI would pick up and ship the instruments to Rebotix's repair facility and that Rebotix will then ship it back to BPI for delivery back to Evergreen); *see also* Mixner Tr. 133:10-133:16 ("Q    As to those customers for whom Rebotix Repair actually did what you're calling service, where geographically were those services performed? A    If I understand the correct – question correctly, the services were – of the repair of the EndoWrist was – they were repaired in St. Petersburg, Florida.").

[113]   *See*, *e.g.*, HE_001322,

FDA's proposed approach to "servicing," as reflected in the FDARA Report and the FDA white paper titled "Evaluating Whether Activities Are Servicing or Remanufacturing."[114]  Rebotix argues that its advertised "repair" process returns the instruments to the manufacturer's fitness for use specifications[115] and "denies that it performs any modification to EndoWrist that could significantly affect its safety or effectiveness, or that would constitute a major change in its intended use."[116]  But Rebotix is not simply "repairing" a component of the EndoWrist instruments, and returning the instruments to their original state.  Rather, Rebotix is manufacturing its own board for use in EndoWrist instruments.  Rebotix is placing a brand new finished device component—the Interceptor—into interstate commerce for the first time.

95.    Rebotix has argued that unlike a manufacturer that repackages and sells EndoWrist instruments, it never takes ownership of the instruments, and thus does not require a 510(k).[117]  This argument is not persuasive, because the Interceptor board, which is suitable for use and functions within the EndoWrist instrument, is sold to end users as part of Rebotix's service.  The new finished device then moves in interstate commerce, thus subjecting it to FDA jurisdiction.  The fact that Rebotix did not take ownership of the EndoWrist instruments and repackage them for sale is not relevant.

96.    In sum, Rebotix's argument that it is not subject to FDA jurisdiction because it is not engaged in interstate commerce is not credible.

---

[114]  *See supra* Section II.J.

[115]  Gibson Tr. 35:5-9 (claiming Rebotix's repair process "bring[s] the EndoWrist instrument back to original specifications").

[116]  Rebotix's Answer and Affirmative Defenses to Intuitive's Counterclaims ¶ 35.

[117]  *See* Papit Tr. 210:14-210:21 ("Early on when we were deciding on the business model, we did not know if we wanted to repair these instruments and return them to the owning customer or if we wanted to refurbish these instruments and sell them, so we investigated both avenues, one that would require a 510(k), and one that would not.  So there were times when we discussed this at length.").

### 3. Because the Interceptor Board Is a Device That Moves in Interstate Commerce, Rebotix Is a Manufacturer Required to Obtain 510(k) Clearance

97. Because Rebotix is introducing a completely new finished device component into commerce for the first time to be used directly by an end user, it is required to obtain 510(k) clearance under Section 510(k) of the FDCA and 21 C.F.R. § 807.81(a)(2) prior to marketing the Interceptor board. There is no ambiguity about this. This is not a repair of an Intuitive device/component, but rather introduction into commerce of a new finished device component manufactured by Rebotix for the EndoWrist instrument.

98. Section 510(k) of the FDCA requires "[e]ach person who is required to register . . . and who proposes to begin introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery," to submit a notification to FDA.[118]  Similarly, 21 C.F.R. § 807.81(a) and (a)(2) state that:

> [E]ach person who is required to register his establishment pursuant to § 807.20 must submit a premarket notification submission to [FDA] at least 90 days before he proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use which meets . . . the following criteria: . . . (2) [t]he device is being introduced into commercial distribution for the first time by a person required to register . . . ."[119]

Rebotix's sale of the Interceptor board in EndoWrist instruments plainly falls under Section 510(k) and the relevant regulations.

---

[118]  FDCA § 510(k), 21 U.S.C. § 360(k),

[119]  21 C.F.R. § 807.81(a), (a)(2).

99.     *First,* Rebotix is a "person" as defined by the FDCA.  The FDCA states that the term "person" includes an "individual, partnership, corporation, and association."[120]

100.     *Second*, Rebotix was required to register its establishment pursuant to 21 C.F.R. § 807.20.  Section 807.20 addresses who must register its device establishment and list its devices.[121]  Section 807.20(a) states that "[a]n owner or operator of an establishment . . . who is engaged in the manufacture, preparation, propagation, compounding, assembly, or processing of a device intended for human use shall register and submit listing information for those devices in commercial distribution."  Section 807.20(a) and (a)(6) further state that:

> The registration and listing requirements shall pertain to any person who is engaged in the manufacture, preparation, propagation, compounding, assembly, or processing of a device intended for human use, including any person who . . . . (6) [m]anufactures components or accessories that are ready to be used for any intended health-related purpose and are packaged or labeled for commercial distribution for such health-related purpose . . . .[122]

101.     Rebotix engaged in the "manufacture, preparation, propagation, compounding, assembly, or processing of a device."  FDA regulations at 21 C.F.R. § 807.3(d) define "[m]anufacture, preparation, propagation, compounding, assembly, or processing" as "the making by chemical, physical, biological, or other procedures of any article that meets the definition of a device in section 201(h) of the [FDCA]."  Rebotix made the Interceptor board, which as explained in Section III.D.I is a finished device component, and thus a device.  Rebotix was thus required to register its establishment and apply for 510(k) clearance as a manufacturer.

---

[120]   FDCA § 201(e), 21 U.S.C. § 321(e).

[121]   *See also Who Must Register, List and Pay the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee(last updated Sept. 27, 2018).

[122]   21 C.F.R. § 807.20(a), (a)(6).

102.    I understand from the record that Rebotix acknowledged at one point that it needed a cleared 510(k) for the Interceptor board and submitted a 510(k) to FDA.[123]  Rebotix withdrew this 510(k) after FDA identified a number of deficiencies with its submission that Rebotix was unwilling or unable to remedy.[124]  It is not clear to me why Rebotix now believes that it no longer requires a 510(k) submission and a clearance decision from FDA to market its Interceptor board, and I have seen no evidence in the record of a credible argument distinguishing Rebotix's current Interceptor board from the one described in the previously submitted 510(k).

### 4.    The Interceptor Board Is Misbranded and Adulterated Under the FDCA

103.    The key tenet of device regulation under the FDCA is the requirement that FDA clear or approve the submission for the device (unless 510(k) exempt) before it may be introduced or delivered for introduction into interstate commerce.  There are multiple theories of liability under the FDCA that FDA may rely upon to assert that an entity has improperly distributed a device that has not received requisite FDA 510(k) clearance or PMA approval.

104.    FDA might assert that the marketing of a medical device prior to clearance violates Section 510(k) of the FDCA, which states that "[e]ach person who is required to register under this section and who proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery, report [certain information to

---

[123]    *See* REBOTIX170421, REBOTIX169947, REBOTIX169926, REBOTIX169588, REBOTIX169504, REBOTIX169166, REBOTIX169683, REBOTIX169168, REBOTIX169360, REBOTIX170053, REBOTIX169167.

[124]    *See* REBOTIX171073.

FDA]."[125]  A device that lacks required 510(k) clearance is misbranded under Section 502(o) of the FDCA.[126] Because Rebotix did not obtain 510(k) clearance prior to introducing the Interceptor board into interstate commerce, the Interceptor is misbranded and in violation of the FDCA.

105.    All devices under the FDCA are considered to be in Class III until otherwise classified via the 510(k) classification process (to include 510(k) exempt) or approved via the PMA process.  Sale of a device prior to approval (without PMA approval or having been classified into Class I or II under the 510(k) process) may also trigger the statutory requirement that a manufacturer obtain premarket approval.  A device would be considered adulterated under Section 501(f)(1)(B) of the FDCA when an entity fails to obtain PMA approval.  Because Rebotix did not obtain PMA approval prior to introducing the Interceptor board into interstate commerce, the Interceptor is also adulterated and in violation of the FDCA.

### 5.    Rebotix Must Be Responsible For Compliance with Medical Device Reporting Requirements

106.    Moreover, it is critical from a patient and user safety perspective that Rebotix comply with the device reporting requirements, along with the other general controls under the FDCA.  One of the general controls under the FDCA is that a device manufacturer is responsible for compliance with the medical device reporting requirements in 21 C.F.R. Part 803.  Given that Rebotix was the manufacturer of the Interceptor board and introduced the device into commerce, it is the only entity, practically speaking, situated to receive and address any complaints and track issues related to the Interceptor.  As the manufacturer of a device, Rebotix is also required to file medical device reports as required under 21 C.F.R. Part 803.

---

[125]   FDCA § 510(k), 21 U.S.C. § 360(k).
[126]   FDCA § 510(o), 21 U.S.C. § 352(o).

### E.   In the Alternative, Rebotix Was Required to Obtain 510(k) Clearance as A Remanufacturer

107.   As explained in Section III.D, Rebotix's insertion of the brand-new Interceptor board into the EndoWrist instruments constituted manufacturing of a new finished device component and Rebotix was therefore required to obtain 510(k) clearance prior to marketing the device in the United States.  My understanding from the record is that when Rebotix submitted its 510(k) on December 8, 2014, it described the addition of the Interceptor board as "remanufacturing."[127]  Similarly, I understand that FDA communications in the record state that third-party repairs of EndoWrist instruments constituted "remanufacturing" if they bypassed usage limits on the instruments, and thus required a 510(k).[128]

108.   Even under this alternative paradigm and the back and forth exchanges with the FDA, it is my opinion that by bypassing the FDA-cleared usage limits for the EndoWrist instruments through use of the new added Rebotix-board, Rebotix engaged in remanufacturing under 21 C.F.R. Part 807.  FDA defines "[r]emanufacturer" in the QSR as "any person who processes, conditions, renovates, repackages, restores or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use."[129]  As explained below, when looking at the Intuitive 510(k) submissions, it is clear that the

---

[127]   REBOTIX170421; REBOTIX171030.

[128]   BPI000331; REBOTIX146948.

[129]   21 C.F.R. § 820.3(w). Although the definition of remanufacturer comes from the set of regulations related to QSR regulations, FDA has historically relied on the definition of remanufacturer more broadly.  *See, e.g.*, Remanufacturing Guidance at 5 & n.20 (relying on the same regulation to define "[r]emanufacture").  Such a definition is consistent with how the FDA has historically made the distinction between remanufacturers and services.  *See, e.g.*, 62 Fed. Reg. at 67.011, 67.012 (proposed Dec. 23, 1997) ("Servicers do not significantly change a finished device's performance or safety specifications, or intended use."); FDA, *Compliance Program Guidance Manual 7382.845, Inspection of Medical Device Manufacturers* pt. III at 17 (Feb. 2, 2015), https://www.fda.gov/media/80195/download ("Remanufacturers are persons who process, condition, renovate, repackage, restore or do any other act to a finished device that significantly changes the finished device's performance or safety specifications or intended use [21 CFR 820.3(w)]"); *cf. Who Must Register, List and Pay*

intended use of the EndoWrist instrument included usage of the instrument for a limited number of uses which Intuitive has defined through its testing process and which FDA reviewed and cleared in the 510(k).  By bypassing the FDA-cleared usage limits, Rebotix causes a significant change in the intended use of EndoWrist instruments.[130]  Accordingly, Rebotix has assumed the status of a remanufacturer of the EndoWrist instruments.  As such, these remanufactured instruments require 510(k) submission and clearance by FDA before they may be introduced into interstate commerce.[131]  Thus, regardless of what framework is used—whether from the perspective of a manufacturer for the Interceptor board or as a remanufacturer of the EndoWrist instrument—in both cases Rebotix was required to obtain a 510(k) clearance.

### 1.  Rebotix Significantly Changed the Intended Use of the EndoWrist Instrument by Bypassing FDA-Cleared Usage Limits

109.    In the recent Remanufacturing Guidance, the FDA refers to "[i]ntended use" as the "general purpose of the device or its function, which encompasses the indications for use."[132] The Remanufacturing Draft Guidance also specifically notes that the "FDA uses [the term "intended use"] consistent with the meaning of intended uses in 21 CFR 801.4,"[133] which states that "

> [T]he words intended uses or words of similar import in §§ 801.5,
> 801.119, 801.122 and 1100.5 of this chapter refer to the *objective intent of*

---

*the Fee*, FDA, https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee (last updated Sept. 27, 2018) (requiring a remanufacturer to register and pay the fee).

[130]  Intuitive argues that by bypassing usage limits through the Interceptor board, Rebotix substantially changed the EndoWrist instruments' performance and safety specifications, and that this activity also constitutes remanufacturing.  *See, e.g.*, Intuitive-005552744.  This may well be true, but lacking the necessary technical expertise, I am not in a position to opine on whether or not this occurs.  Should it be proven that a substantial change has occurred in the EndoWrist instruments' performance or safety specifications as a result of the insertion of the Rebotix Interceptor board, this could be yet another ground to find that Rebotix engaged in remanufacturing.

[131]  *See* 21 C.F.R. § 807.81(a)(2).

[132]  Remanufacturing Draft Guidance at 4.

[133]  *Id.* at 4 n.19.

> *the persons legally responsible for the labeling of devices*. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by *labeling claims, advertising matter, or oral or written statements by such persons or their representatives*.[134]

Additionally, in guidance related to determining substantial equivalence, FDA has defined intended use to mean the "general purpose of the device or its function, and [which term] encompasses the indications for use," and relies on Section 513(i)(1)(E)(i) of the FDCA to note that "the FDA's determination of intended use of a device 'shall be based upon the proposed labeling' submitted in a 510(k)."[135] The intended use can be determined from the "four corners" of the 510(k) in the case the submitter states uses outside of the indications for use section.

110. Under both definition interpretations, it is clear that when looking at Intuitive's 510(k) submissions, the company's objective intent is that EndoWrists were designed to be used for a limited number of times based on performance testing demonstrating reasonable assurance of safety and effectiveness. The 510(k)s submitted by Intuitive for its EndoWrist instruments (1) clearly state that EndoWrist instruments are intended for a limited number of uses and (2) explicitly identify those usage limits in the device architectural requirements/specifications, in the device user manual, and on the label. FDA reviewed these specific data and determined these 510(k)s to be "substantially equivalent" and therefore cleared for the devices as described in the 510(k)s.

---

[134]   21 C.F.R. § 801.4 (emphases added).

[135]   FDA, *The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]: Guidance for Industry and Food and Drug Administration Staff* 16 (July 28, 2014), available at https://www.fda.gov/media/82395/download. The term "indications for use … describes the disease or condition the device will diagnose, treat, prevent, cure or mitigate, including a description of the patient population for which the device is intended." *Id.* (citing 21 C.F.R. § 814.20 (b)(3)(i)).

111.    For example, Intuitive's very first 510(k) for EndoWrist instruments (blunt dissectors and retractors) received clearance on July 31, 1997 (K965001), and the accompanying 510(k) summary noted (in both the device information and the device description) that the tools or instruments would only be intended for "limited reuse."[136]  When Intuitive sought to expand the 510(k) clearance to encompass the first series of EndoWrist® Endoscopic Instruments (K013416) (also known as the IS 1000 series), it noted in the EndoScopic Instrument Control System architectural specifications that the da Vinci system was designed for "resposable instruments," and that these instruments "may only be used a limited number of times."[137] Intuitive submitted a 510(k) for these instruments and then was told by FDA staff to submit a PMA for these instruments, which was subsequently converted back to a 510(k) (K990144) by FDA.[138]  That converted submission includes all information submitted in the PMA and clearly denotes in the device description that the "instruments are programmed for a limited number of uses to ensure the reliability and consistent performance, and have non-volatile 'add-only' memory that the [da Vinci surgical system] decrements after each use."[139]  It further contains a sketch of the EndoWrist instrument noting where the "Tool ID/End of use electronics" are to be installed which contain "a printer circuit board wired to connector 'pins' in the housing . . . [that] store[s] number of uses remaining in memory."[140]  The da Vinci Surgical Guide, which was incorporated into the instrument instructions for use, also makes clear that all Intuitive

---

[136]   Intuitive-00691208 to Intuitive-00691209.

[137]   Intuitive-00692310 at Intuitive-00692312 and Intuitive-00692417.

[138]   Intuitive initially submitted a 510(k) for the core set of IS 1000 instruments (K990144) on January 19, 1999. Intuitive-00692310. On May 19, 1999, the FDA informed Intuitive that it must file a PMA instead.  Intuitive-00692185.  The FDA then reversed course and converted the PMA back to that 510(k) and cleared the 510(k) on July 11, 2001. Intuitive-00691205.

[139]   Intuitive-00692643 at Intuitive-00692662.

[140]   Intuitive-00692643 at Intuitive-00692668.

instruments can only be used for a limited number of procedures and that they cannot be used after they have expired.[141]  The carton label identified the actual number of uses for the core instruments—10 each.[142]  The life testing results submitted to the FDA as part of that file also established both the usage limits for each instrument and how Intuitive arrived at those numbers.[143]

112.    Following the FDA's clearance of the IS 1000 series of surgical instruments in K013416, Intuitive submitted numerous 510(k) submissions for new types of EndoWrist instruments and for new da Vinci system models.  These 510(k) submissions are replete with similar evidence in device descriptions, architectural specifications, device sketches, user instruction manuals, carton labels and life testing records that Intuitive intended for EndoWrist instruments to be used a limited number of times, up to the limit set by Intuitive according to its internal testing process, and which FDA again cleared.[144]  This conclusion is further buttressed

---

[141]   Intuitive-00692643 at Intuitive-00692710 (Instruction manual submitted with K990144 PMA noting that "[a]ll ISI Instruments can be used for a limited number of procedures to ensure reliability and consistent performance. . . .  When Instruments expire, they can no longer be used.").

[142]   For the labels submitted with the PMA that was converted to a 510(k) (K990144), *see* Intuitive-00694522 at Intuitive-00694586- Intuitive-00694593.

[143]   *See* Intuitive-00694043 at Intuitive-00694248-Intuitive-00694301 (containing the tool cycle test submitted with the PMA converted to K990144).

[144]   For device descriptions, *see, e.g.*, Intuitive-00515501 at Intuitive-00515508-09, Intuitive-00515514-15 (noting that the device description for K013416 submission covering round-tooth forceps, long tip forceps, cadiere forceps, and chichon tissue forceps, atraumatic fenestrated graspers, needle drivers, scissors, and scalpels stated that "[t]he instruments are re-usable (for a limited number of uses) . . . [and] are programmed for a limited number of uses to ensure reliability and consistent performance, and have non-volatile 'add-only' memory that the Instrument Control System decrements after each use."); Intuitive-00493504 at Intuitive-00493505 (noting that the device description in Intuitive's K131861 submission for instruments compatible with the Model IS 4000 surgical system stated that "[EndoWrist instruments] are programmed with a maximum number of surgical procedures based upon life testing."); Intuitive-00510907 at Intuitive-00510954 (noting that the substantial equivalence rationale in Intuitive's K131861 submission also noted that "[e]ach instrument is reusable for a fixed number of procedures. . . .  The system electronically records the number of uses on each instrument and will not operate an instrument that has exceeded the maximum number of specified uses.").  For instruction manuals, *see, e.g.*, Intuitive-00515501 at Intuitive-00515581 (Instructions for use submitted with K013416 510(k) noting that the instrument "is provided pursuant to a limited license [and] . . . [u]pon expiration of the instrument's programmed lifetime, this limited license expires); Intuitive-00492204 at Intuitive-00492211 (Instructions for use submitted with K131861 510(k) containing similar disclaimer on limited use license).  For

by the product catalogs, which constitute labeling, available on Intuitive's website, which clearly indicate the usage limit for each individual EndoWrist instrument.[145]  The fact that the FDA explicitly reviewed interactively with Intuitive in 2001 to clarify the number of uses for each instrument and a description of how the numbers were determined reflects the importance of usage limits to the design of EndoWrist instruments to provide reasonable assurance of safety and effectiveness to demonstrate substantial equivalence.[146]

113.    I thus conclude that the intended use of EndoWrist instruments, as revealed in the four corners of the 510(k)s that FDA cleared, including the device labeling, was to be limited to a predetermined number of uses per instrument as set by Intuitive pursuant to its testing protocols. The usage limits would be enforced by a chip Intuitive manufactured and included in the 510(k)s, and which itself was cleared as part of the 510(k) review.  The insertion of the Interceptor board by Rebotix manufactured to its own specifications, which bypasses the FDA-cleared usage limits for the EndoWrist instruments and allows reuse of the instruments, is thus a significant change to the intended use of the instruments.

## 2.  Rebotix's Insertion of the Interceptor Board Did Not Constitute a "Repair" of EndoWrist Instruments

114.    Rebotix claims that it is not remanufacturing the EndoWrist instruments, and instead is merely repairing them, and therefore does not require 510(k) clearance to add the Interceptor board to EndoWrist instruments.  Rebotix claims that EndoWrist instruments are akin

---

carton labels, *see, e.g.,* Intuitive-00515501 at Intuitive-00515535, Intuitive-00515540, Intuitive-00515546, Intuitive-00515550, Intuitive-00515556 (K013416); Intuitive-00496155 (K131861).  For life testing results, *see, e.g.*, Intuitive-00493612 at Intuitive-00493651-Intuitive-00493670 (summarizing the life test results submitted in the K131861 510(k) for Model IS4000 instruments).

[145]    *See generally* Intuitive Surgical, Inc., *Da Vinci X/Xi Instrument & Accessory Catalog*, (Nov. 2020), https://www.intuitive.com/en-us/-/media/Project/Intuitive-surgical/files/pdf/xi-x-ina-catalog-no-pricing-us-1052082.pdf?la=en&hash=189164507BDFEC40E9DAB44BA10731A5.

[146]    *See* Intuitive-00481167 (Intuitive's response to FDA deficiency letter for K013416 510(k)).

to the traditional laparoscopic instruments Intuitive relied on as predicate devices in its K990144

510(k), and that hospitals have been repairing such laparoscopic instruments for decades without

needing to submit a 510(k).  Such a comparison between previously FDA-cleared laparoscopic

instruments and EndoWrist instruments is flawed for a number of reasons, including the fact that

the Intuitive instruments are operated by a chip that allows the instruments to only be used for a

number of times that has been shown to provide reasonable assurance of safety and effectiveness

to demonstrate substantial equivalence, as opposed to other legally marketed laparoscopic

instruments.

115.    The traditional laparoscopic instruments that hospitals repair without requiring

510(k) clearance are reusable instruments—they are not labeled for a predetermined number of

uses and FDA did not review data supporting the specified number of uses.  In contrast,

EndoWrist instruments are intended for limited reuse up to a predetermined number of lives

based on safety and effectiveness, the data which was submitted to and reviewed by FDA as part

of the 510(k) process.  Therefore, extending the number of useful lives of other types of legally

marketed laparoscopic instruments does not change their intended use and I believe the

hospitals/users have their own way of determining the useful life of an individual instrument.  As

I explained in Section III.B, the fact that Intuitive relied on some of these other types of legally

marketed laparoscopic instruments within FDA's classification of 21 CFR 876.1500 to establish

substantial equivalence does not mean the EndoWrist instruments are identical to such

instruments, and therefore are also considered to be reusable devices.  FDA determined the

Intuitive instruments to be substantially equivalent to predicate laparoscopic instruments based

on a review of the information submitted in the 510(k) on the predicate, the intended use, the

54

technology and performance data to provide reasonable assurance of safety and effectiveness to demonstrate substantial equivalence to allow the devices to be marketed in the U.S.

116.    Moreover, Rebotix's argument that a change in ownership of the EndoWrist instrument is necessary for its action to constitute remanufacturing is incorrect.  No such distinction exists in the FDA regulations and guidance to distinguish whether a certain activity is considered to be remanufacturing as opposed to repair.  As I explained in Section III.D.2, the fact that the instruments are shipped from St. Petersburg, Florida, to hospitals located in other states is sufficient for the instruments to be "in commerce" and therefore subject to FDA's jurisdiction; there is no requirement that a transfer of money must occur for a device considered to be in commercial distribution in the U.S.

### 3.    Rebotix's Position on the Type of Reusable Medical Devices That Qualify for 510(k) Clearance is Incorrect

117.    Rebotix asserts that FDA "approves 510(k) applications for either single-use devices or reusable devices" and that "[t]he decision to validate a reusable device for limited life would be at the sole discretion of the manufacturer."[147]  Moreover, Rebotix has told customers that:

> Intuitive has assumed a category of approved medical device that does not exist within the FDA approval process; a limited reusable medical device (see Hospital Right to Repair attached). The FDA approves two categories and only two; single use medical device and reusable. Intuitive cannot have it both ways.[148]

Rebotix's assertion that FDA only approves two categories of devices—single use and reusable at the manufacturer's discretion—is incorrect.  Rebotix does not cite a specific regulation to support this assertion because no regulatory scheme exists that divides medical devices into these

---

[147] REBOTIX061186_001.

[148]   REBOTIX061659_001 at Intuitive-061660.

two categories.  The FDA reviews a 510(k) as it was submitted and makes a determination on whether or not to clear it on that basis—which can include the agency asking for additional information prior to making a final determination.

118.    Furthermore, Rebotix is incorrect in stating that "[i]t is not within the scope of FDA practice to regulate business practices such as Intuitive's decision to limit a reusable medical device."[149]  As I previously discussed in Section III.A, Intuitive's device was cleared as a limited reuse device and FDA followed up to inquire about how usage limits were set.  Thus, any attempt to remove usage limits by Intuitive would require 510(k) clearance as a change that could significantly affect safety and effectiveness as per 21 CFR 807.81(a)(3).

### 4.    Intuitive was not Required to Obtain 510(k) Clearance Before Increasing the Usage Limits of Certain EndoWrist Instruments

119.    FDA's *Deciding When to Submit a 510(k) for a Change to an Existing Device: Guidance for Industry and Food and Drug Administration Staff* specifically permits 510(k) holders to make certain changes to their own cleared 510(k)s without submitting a new 510(k) for the change.[150]  One such type of change is a change in expiration dating, which is analogous to a change in usage limits.  The guidance specifically states:

> Generally, . . . changes in the expiration date for use of a device do not require submission of a new 510(k).  FDA relies on the QS regulation (21 CFR Part 820) to reasonably assure the safety and effectiveness of devices with these types of changes.  This is true whether or not the manufacturer applies an expiration date because of package integrity considerations, e.g., sterility, or because of a finite shelf-life of the device.  However, where methods or protocols that are not described in a previously cleared 510(k) are used to support new package integrity or shelf-life claims, submission of a new 510(k) is likely required.  FDA recognizes that methods or

---

[149]    REBOTIX061186_001.

[150]    *See* FDA, *Deciding When to Submit a 510(k) for a Change to an Existing Device: Guidance for Industry and Food and Drug Administration Staff* (Oct. 25, 2017), https://www.fda.gov/media/99812/download.

protocols may be updated to reflect newly recognized versions of consensus standards.  Submission of a new 510(k) is likely not required in such circumstances.[151]

120.    In 2020, Intuitive announced the Extended Life Program in which certain instrument models would have their usage limits increased slightly (i.e., from 10 lives to 14, 15, or 18 lives, depending on the instrument model).  In Non-Filing Justifications ("NFJs"), Intuitive documented in their files that are subject to FDA inspection that the increases to the usage limits were derived using the same testing methods and protocols that were described in previously cleared 510(k)s and met the same specifications.[152]

121.    In contrast, Rebotix does not hold a previously cleared 510(k) and therefore has not yet supported the usage limits for a cleared device using testing methods or protocols to FDA's satisfaction.  In addition, unlike Intuitive, Rebotix has not relabeled the EndoWrist devices for a new, specified limited number of uses (as supported by testing data), but apparently simply tells its customers to ignore the Intuitive labeling specifying the appropriate number of uses for the device.

**F.    FDA's Interactions With Rebotix and BPI Supports My Opinion that the Interceptor Board Needed 510(k) Review and a Clearance Determination**

122.    My conclusion that Rebotix engaged in manufacturing of a new device by inserting its new Interceptor board into Intuitive's EndoWrist instruments, and therefore needed 510(k) clearance,[153] is consistent with and reinforced by the interactions between Rebotix (or its distributors marketing and selling the same so-called "repair" process involving the Interceptor

---

[151]  *Id*. at 27-28.

[152]  *See* Intuitive-00552632; Intuitive-00552652; Intuitive-00552665; Intuitive-00552682; Intuitive-00552697; Intuitive-00552716; Intuitive-00552728.

[153]  Or in the alternative, Rebotix was also remanufacturing the EndoWrist instruments and required 510(k) clearance on this basis as well, as I outline in Section III.E.

board) and the FDA on three separate occasions: (1) Rebotix's submission of a 510(k) titled "Remanufactured EndoWrist" instruments on December 18, 2014,[154] (2) the 2018 email exchange between BPI (an authorized Rebotix distributor) and Dr. Cal Rabang at the FDA, and (3) email correspondence between Rebotix and two individuals at the FDA (Dr. Je Hi An and Commander Jitendra Virani) in February and March 2021.

123.    *First*, on December 18, 2014, Rebotix submitted a 510(k) to the FDA for remanufactured EndoWrist instruments,[155] utilizing a process that is identical to the so-called "repair" process it markets today—inserting its Interceptor board to bypass usage limits and extend the life of the EndoWrist instrument.[156]   Rebotix chose to withdraw this 510(k), not because it disputed whether a 510(k) was necessary, but rather because it did not believe it could address all of the deficiencies listed in the FDA's request for additional information within the 180-day allotted hold time frame.[157]   Thus, by filing this 510(k), Rebotix explicitly acknowledged that a 510(k) submission was necessary for any EndoWrist instrument "repair" process that involves the insertion of the Interceptor board.   The fact that Rebotix purports not to take ownership of the instrument now, as opposed to at the time it submitted its 510(k), is of no

---

[154]   I understand that a predecessor of Rebotix called Rebotix, LLC filed the 510(k).  Given that the same installation process is at issue – the addition of an Interceptor board to the EndoWrist instrument – and given the overlap in ownership and control between Rebotix and Rebotix, LLC, I am comfortable treating the companies as the same for purposes of this analysis.

[155]   *See* REBOTIX170421, REBOTIX169947, REBOTIX169926, REBOTIX169588, REBOTIX169504, REBOTIX169166, REBOTIX169683, REBOTIX169168, REBOTIX169360, REBOTIX170053, REBOTIX169167.

[156]   The device description section of Rebotix's 510(k) states that the "Rebotix Re-Manufactured EndoWrists are identical to the OEM versions with the exception of the following modifications: · Addition of a PCB assembly internal to the device to extend the uses to an addition 11 uses as displayed on the host system. · The Tool End is polished. · Where applicable, blade is sharpened.  ·Re-manufacturer information is added to the device housing." REBOTIX169947 at REBOTIX169950.

[157]   *See* REBOTIX171073.

moment.  As I explained in Section III.D.2, this rationale is flawed and does not obviate the need

for Rebotix to obtain 510(k) clearance.

124.    My conclusion that Rebotix was required to submit a 510(k) is supported by the

fact that the FDA received Rebotix's 510(k) submission and determined through its review that

the 510(k) was necessary (regardless of whether they concluded Rebotix engaged in

manufacturing or remanufacturing).  FDA sent a letter to Rebotix after reviewing the 510(k)

identifying numerous deficiencies with Rebotix's 510(k) submission, requesting additional

information, and placing the 510(k) on hold pending a complete response from Rebotix to FDA's

letter.[158]  In this deficiency letter, FDA specifically told Rebotix it could not market its device

without FDA clearance and if it did so, it would be in violation of the FDCA.[159]  Rebotix

eventually withdrew its 510(k) submission, noting that it would "not be able to respond to the

deficiencies within the [maximum] 180-day allotted timeframe," and that it was its "intent to

resubmit the 510(k) at a later date once the data has been collected and compiled."[160]  Rebotix

never did resubmit its 510(k) but eventually continued its EndoWrist manufacturing and

remanufacturing activities in which it introduced a new manufactured component, the Interceptor

board, into commercial distribution without first obtaining that 510(k) clearance and

remanufactured the EndoWrist instruments to include extending beyond their Intuitive cleared

life.

---

[158]    *See* REBOTIX171058.  The FDA identified deficiencies related to device description, Rebotix's procedures for remanufacturing, labeling, cleaning validation, sterilization validation, biocompatibility testing, electromagnetic compatibility and electrical safety testing, and general performance testing conducted to validate the remanufacturing process. *See* REBOTIX171030.

[159]    *See id*.

[160]    REBOTIX171076.

125.     *Second*, Robert Overmars, the CEO of BPI, reached out to Dr. Cal Rabang at the FDA (the lead reviewer responsible for the da Vinci surgical system[161]) to ask him whether a 510(k) would be required for third-party repairs of EndoWrist instruments.[162]  At the time, BPI was acting as a distributor for Rebotix, marketing and selling Rebotix's EndoWrist "repair" process without 510(k) clearance.  Mr. Overmars took contemporaneous notes of his phone conversation with Dr. Rabang, in which Dr. Rabang told him that a "510(k) would be required," noting that the "cleared 510(k) validated proven # of cycles" and that the repairs would be "doubling the life."[163]

126.     Mr. Overmars followed up via email with Dr. Rabang to gain further clarification as to why a 510(k) would be necessary for the repair of EndoWrist instruments, to which Dr. Rabang replied that "if the use-life counter is reset or extended past the number of available use lives, then the device specifications are changed," which would make BPI a "remanufacturer." Dr. Rabang reasoned because remanufacturers "meet the definition of 'manufacturer' specified in 21 CFR 820.3(o) and are required to register and list according to 21 CFR 807.20," and because EndoWrist instruments are classified as Class II devices, BPI "would be subject to premarket notification (510(k)) requirements defined in 21 CFR 807.81."[164]  These statements are consistent with my opinion as outlined in Section III.E that Rebotix engaged in remanufacturing of the EndoWrist instruments and required 510(k) clearance prior to commercial distribution in the U.S.

---

[161]   *See* Overmars Tr. 47:1-25.

[162]   *See id.* at 48:10-20; BPI000331 at BPI000336.

[163]   BPI000221.

[164]   BPI000331 at BPI000335.

127.    Although Dr. Rabang's email contains a disclaimer that the communication represents an informal communication and does not represent FDA's formal position, I find the email response to be notable and an expression of FDA's views on the issue.  Based on my 33 years of experience at the FDA, it is not uncommon for the FDA to weigh in on certain issues in answers to questions submitted via email, particularly when the answer is clear cut and uncontroversial.  In my experience, the FDA typically weighs in with responses via phone or email if the question is a "no-brainer."  This is what Dr. Rabang's response appears to be here.  Indeed, Dr. Rabang would have been well situated to weigh in on the 510(k) issue given that he was the lead reviewer at the time for Intuitive's 510(k) submissions.  The fact that Dr. Rabang copied Long Chen, his supervisory Branch Chief, gives even greater weight to his response.

128.    Mr. Overmars passed this communication from Dr. Rabang to the key business people at Rebotix asking for assistance in providing a response to the FDA.  He was told by both Glenn Pappit and Stan Hamilton from Rebotix to not further engage with the FDA on the basis that they disagreed with the FDA's position and thought the FDA was wrong.[165]  I find this decision to ignore the FDA and knowingly continue with business operations that FDA said would require 510(k) clearance to be irresponsible and in violation of the law.  They certainly had the ability to follow up further if they disagreed with the answer they received from FDA at that level of supervisor – as per 21 C.F.R. § 10.75.

129.    *Third*, Rebotix received an email from Dr. Je Hi An from the FDA on February 28, 2020, who noted that "[b]ased on [the information on Rebotix's website], we believe that a 510(k) is needed before you continue your operation."[166]  Rebotix provided a response on March

---

[165]   BPI000331 at BPI000332-BPI000334.

[166]   REBOTIX146948_001 at REBOTIX146954-REBOTIX146955.

6, 2020, outlining its position that it is simply repairing the instruments and noting that "[t]here is never any sale or resale of surgical instruments or any other medical device associated with our repair service," and arguing that no 510(k) was necessary.[167]  CDR Jitendra Virani, the Team Lead for the Robotic Assisted Surgical Devices Team, followed up to Rebotix's response on March 9, 2020, requesting additional information to make sure Rebotix's activities "do not significantly change the performance or safety specifications, or intended use as described in 21 CFR 820.3(w)," the definition for remanufacturing.[168]  Rebotix's response was not forthright with respect to the fact that its "repair" service entailed the insertion of a new board into the EndoWrist instrument and that the board would extend the life of the EndoWrist instrument as cleared by FDA.[169]  Instead, Rebotix represented to the FDA that "a PCB inside of the instrument that contains a memory device (off-the-shelf DS2505 IC) . . . *is replaced by our functional equivalent component*."[170]  It is not clear to me what Rebotix meant when it described its Interceptor chip as a "functional equivalent component"—"functional equivalent component" is not a term that FDA uses in comparing components unless perhaps in their review of a new required 510(k) comparing it to its predicate device.  Further, Rebotix inaccurately describes its "service" process.  Rebotix does not *replace* an Intuitive component in the EndoWrist instrument with the Interceptor board, but rather *adds* the Interceptor to the EndoWrist's existing components to permit the bypassing of Intuitive's predetermined usage limits.

130.    As of the time of this report, I am unaware of any further response from FDA to Rebotix's submission.  Or of Rebotix reaching out to FDA to seek clarification of FDA's

---

[167]  *Id.* at REBOTIX146953-REBOTIX146954.

[168]  *Id.* at REBOTIX146952-REBOTIX146953.

[169]  *Id.* at REBOTIX146949.

[170]  *Id.* at REBOTIX146949 (emphasis added).

position.  Even if FDA has not responded, any perceived delay should not support an inference that FDA has concluded that Rebotix can engage in its business of "repairing" EndoWrist instruments without 510(k) clearance.  To begin with, such an inference would fly in the face of Dr. Je Hi An's previous suggestion that a 510(k) was needed before Rebotix continued its operations.  Moreover, the last FDA-Rebotix exchange occurred in March 2020, right at the time that the Covid-19 pandemic started to spread in the U.S. and caused the FDA to shift resources and reorient its priorities.  In light of the strain placed on the FDA by the Covid-19 pandemic, any attempt to infer that FDA's silence is somehow a blessing of Rebotix's "repair" services, particularly given Dr. Je Hi An's explicit statement that 510(k) clearance was needed, would be inappropriate.  As set forth above, FDA's general position is that a device must receive clearance before it can be legally marketed.  While there could be many reasons for the delay in FDA's response to Rebotix's March 2020 email, I am not aware of any communication from FDA deviating from its consistent position that Rebotix's activities required a 510(k).  Nor am I aware of any attempt by Rebotix to clarify with FDA that FDA agreed no 510(k) was necessary.  I am not aware of any evidence in the record that would even suggest that FDA supports the position that Rebotix's activities do not require regulatory clearance.

### G.   Intuitive's Customer Communications Noting That Rebotix Needed 510(k) Clearance for the Interceptor Were Appropriate and Based on a Reasonable Interpretation of FDA Law

131.   For all the reasons previously explained in Section III.D, it is my expert opinion that Rebotix manufactured a finished device component and placed it in interstate commerce without 510(k) clearance as required by the FDCA and FDA regulations.  Therefore, I fully agree with Intuitive's position as voiced to its customers that Rebotix was selling a finished device to the end user without required 510(k) clearance in violation of the FDCA.

132.     In addition, because Intuitive had legitimate concerns about patient safety upon learning that the Rebotix Interceptor evaded the usage limits that had been reviewed and cleared by FDA, it was reasonable and perhaps a moral responsibility for Intuitive to attempt to notify its customers regarding its patient safety concerns.

133.     In fact, FDA issued a draft guidance responding to "stakeholder requests for specific guidance regarding a firm's voluntary correction of misinformation when that misinformation is created or disseminated by an independent third party."[171]  Recognizing that the internet and social media in particular have made it much easier for independent third parties to disseminate misinformation, the draft guidance addresses how manufacturers can address misinformation in the context of the internet and social media specifically.  However, the very existence of the draft guidance indicates how widespread the practice of manufacturers correcting third-party misinformation actually is.

134.     Moreover, several of the recommendations in the draft guidance are applicable outside the internet and social media context.  The "draft guidance sets forth approaches a firm may use once it decides to voluntarily correct misinformation about its own product that is created or disseminated by an independent third party who is not under the firm's control or influence."[172]  The draft guidance recommends, among other things, that a firm's voluntary corrective information:

- "Be relevant and responsive to the misinformation"

- "Be limited and tailored to the misinformation"

---

[171]   FDA, *Guidance for Industry: Internet/Social Media Platforms: Correcting Independent Third-Party Misinformation About Prescription Drugs and Medical Devices: Draft Guidance*  1 (June 2014), https://www.fda.gov/media/88545/download.

[172]   *Id.* at 5.

- "Be non-promotional in nature, tone, and presentation"

- "Be accurate"

- "Be consistent with the FDA-required labeling for the product"

- "Be supported by sufficient evidence"

- "Disclose that the person providing the corrective information is affiliated with the firm that manufactures, packs, or distributes the product"[173]

I reviewed examples of documents that Intuitive sent to hospital customers regarding third-parties extending the usage limits of Intuitive devices.[174]  The documents appear to be consistent with FDA's recommendations related to correcting third-party misinformation.

### H.   Rebotix Failed to Adequately Investigate Whether a 510(k) Was Needed Prior to Making Representations to Customers

135.   I understand that Rebotix made representations to customers that it did not need 510(k) clearance and that Intuitive has alleged that Rebotix made these representations without adequately vetting the issue of 510(k) clearance internally.  Based on my experience and the review of documents in the record, I conclude that Rebotix did not adequately investigate whether a 510(k) was needed before making representations to customers that none was needed.

136.   Rebotix repeatedly touted to customers that no 510(k) clearance was needed.  For example, even after receiving the guidance from FDA in 2018 via the Mr. Overmars email conversation with Dr. Rabang that a 510(k) would be required, Rebotix shared documents with BPI sales representatives in 2019 that told hospitals that "[t]he FDA does not regulate, nor certify repairs," and that "FDA only classifies devices as single-use or reusable (multiple use).  By these

---

[173]   *Id.* at 5-6.

[174]   *See, e.g.,* Intuitive-00478591-Intuitive-00478592; NRHA-002274; WTH00029; SCL REBOTIX 00002; HE_001379.

definitions the EndoWrist® instruments are classified as multiple-use instruments, servicing these instruments does not meet the definition of a reprocess."[175]  In another document Rebotix provided to Premier (a group-purchasing organization), Rebotix makes similar arguments and claims that the FDA "rejected any requests to alter the longstanding right of hospitals to have reusable medical devices repaired at their discretion," which is not the case.[176]  The Remanufacturing Guidance that stemmed from the FDA's Public Workshop on Medical Device Servicing and Remanufacturing Activities[177] makes no such assertion and instead aims to clarify what constitutes remanufacturing as opposed to repair.

137.    Notably, these representations fail to mention anything about the fact that (1) Rebotix inserts a brand-new Interceptor board manufactured by Rebotix into the Intuitive EndoWrist instrument; (2) Rebotix bypasses the usage limits set and validated by Intuitive and cleared by the FDA, changing the intended use of the instruments, (3) Rebotix submitted a 510(k) for the same service and withdrew its 510(k) on its own and never refiled, and (4) Rebotix and BPI received a response from the FDA otherwise indicating that a 510(k) was required for a determination regarding substantial equivalence.

138.    I would have expected to see some form of analysis in Rebotix's records addressing these issues before concluding that it was permissible for Rebotix to represent to customers that FDA 510(k) clearance was not necessary and that FDA was wrong. However, I saw no such analysis.  Instead, Rebotix drew a false equivalence on its own between previously

---

[175]   REBOTIX063656 at REBOTIX063657.

[176]   PREREB0060.

[177]   *Public Workshop - Medical Device Servicing and Remanufacturing Activities*, December 10-11, 2018, FDA, https://wayback.archive-it.org/7993/20201222125933/https://www.fda.gov/medical-devices/workshops-conferences-medical-devices/public-workshop-medical-device-servicing-and-remanufacturing-activities-december-10-11-2018-12102018 (last updated Oct. 23, 2018).

FDA-cleared (predicate) reusable laparoscopic instruments and EndoWrist instruments, which were cleared as limited-use devices, and hid key facts about their services to customers that could potentially raise flags that Rebotix would need a 510(k).  Once again, the FDCA requires FDA to make determinations regarding substantial equivalence and not a manufacturer on their own unless the device type meets the 510(k) exemption criteria under the FDCA and regulations on limitations to exemption. Even under the exemption situation, FDA does have the final determination when there is a question.

## IV.    CLOSING

139.    I hold the opinions expressed in this report to a reasonable degree of regulatory certainty. I reserve the right to supplement my opinions if I acquire additional information.

_____                        _____
                                                                                July 26, 2021
Heather S. Rosecrans                                                      Date
Executive Vice President, Medical Devices and Combination Products
Greenleaf Health, Inc.

67

**APPENDIX A**

**Curriculum Vitae of Heather S. Rosecrans**

# Heather S. Rosecrans, F.R.A.P.S.

## Contact Information

**Address:** 13012 Mimosa Farms Ct. Rockville, MD 20850

**Phone:** 240-401-0604 (Mobile)

---

## Professional Experience

### Greenleaf Health, Inc.
*Executive Vice President, Medical Devices and Combination Products*
*Washington, DC*
*9/2010 – present*

As an Executive Vice President at Greenleaf Health, I am responsible for providing strategic consulting services for Greenleaf clients. These services include strategic consultation on issues related to the Food and Drug Administration's (FDA's) regulation of medical devices and combination products including regulatory and policy guidance, training and review of submissions.

### Medical Device Manufacturers Association (MDMA)
*Vice President, Regulatory Affairs*
*Washington, DC*
*9/2010 – present*

In my role as Vice President, Regulatory Affairs at the Medical Device Manufacturers Association I offer policy advice to MDMA and its members regarding FDA device regulation.

### Regulatory Affairs Professional Society (RAPS)
In 2016 I was selected as a Fellow of the Regulatory Affairs Professional Society (F.R.A.P.S.)

### FDA/Center for Devices and Radiological Health (CDRH)
*Section Chief/Expert Supervisory Consumer Safety Officer*
*White Oak, MD*
*6/2008 – 9/2010*

As Director of the 510(k), in addition to what is noted in the section on 7/2006 to 1/2008, I developed and implemented administrative and regulatory policy for the Premarket Notification Program (510(k)), the Evaluation of Automatic Class III Designation (De Novo), 513(g) Program, Classification and Reclassification, Device Product Codes, as well as citizens petitions and other regulatory requirements.

- During the Institute of Medicine's (IOM's) 18-month review of the 510(k) Program, I provided training to the IOM review committee to educate members on the 510(k) Program at their first public meeting in March 2010. My presentation to the IOM committee was titled, "Understanding the Premarket Notification (510(k)) Process: History from 1976 to 2010."

- In 2009, the Government Accountability Office (GAO) Study of the 510(k) Program was completed and reported upon to Congress. I was the lead in responding to GAO on this study and have spoken at many conferences on this topic as well as briefing for FDA.

- I prepared the Office of Management and Budget (OMB) paperwork for documents related to the above referenced programs including addition of any new forms or requirements.

# Heather S. Rosecrans, F.R.A.P.S.

- In 2009 I briefed the new Commissioner and Deputy Commissioner several times on the 510(k) Program.

- In 2009 I was quite honored to have received a Certificate of Appreciation for Outstanding Service from the U.S. Military Special Operations Command (SOCOM) Ground Application Program Office for outstanding support to the United States' SOCOM Medical Research and Development Program for playing a critical role in the success of SOCOM's Medical Research and Development program. I was recognized for directly contributing to the successful fielding of mission essential medical devices that had a direct impact on improved lifesaving capabilities within SOCOM and have enhanced the combat casualty care to our first line Soldiers.

## FDA/CDRH

*Acting Division Director/Program Operations Staff*
*Rockville, MD*
*1/2008 – 6/2008*

I served as Acting Director of the Program Operations Staff within the Office of Device Evaluation (the current director was on a 6-month detail and returned). I supervised the staff and the administrative and regulatory policy review of all CDRH premarket programs including: the Investigational Device Exemption (IDE) Program; the Humanitarian Device Exemption (HDE) Program; the Premarket Approval Application (PMA) Program; as well as the 510(k) Program, 513(g) Program, De Novo and Classification and Reclassification Programs. This included day to day oversight and quality assurance for all programs as well as involved long range planning and strategic initiatives for these programs. With the passage of the Food and Drug Administration Amendments Act of 2007 (FDAAA), there were many programmatic strategies and initiatives to develop and expand for these programs.

- In 2008 I implemented the public health program for CDRH, and became the CDRH contact, for the Center for Medicaid and Medicare Services' (CMS) HCPCS Program for CMS coding of new devices and/or new device indications. In this capacity I provided oversight and ensured compliance with all CDRH regulations governing public health. If there were any problems, I resolved those problems with the involved parties throughout the organizations. I spoke to the American Medical Association (AMA) on this process to help them understand in relation to their procedural coding. I helped AMA identify questions and issues that arose with new devices going to market and how the codes related.

## FDA/CDRH

*Section Chief/Expert Supervisory Consumer Safety Officer*
*Rockville, MD US*
*7/2006 – 12/2007*

As Director of the 510(k) Staff, I supervised the administrative and policy review of 510(k) submissions, 513(g) requests, classification, petitions for reclassification, petitions for exemption from 510(k) and other regulatory requirements. I coordinated the regulatory review and process decisions of these submissions that includes:

- Oversight of the review/decision of these submissions to assure consistency, completeness, and conformance with established procedures, policies, and applicable laws and regulations;

- Identifying precedent setting issues arising from the reviews and resolving these issues through consistent interpretation of policies or instituting new policies, as needed;

# Heather S. Rosecrans, F.R.A.P.S.

- Coordinating the regulatory review process, including classification and equivalence decisions, between the CDRH premarket review staff (ODE and OIVD) and the Office of Compliance, CDER, and CBER;

- Providing expert consultation for the CDRH premarket review staff for the administrative and regulatory review of 510(k) submissions including unique substantially equivalent decisions, rescissions, 513(g) requests, not-a-device, not actively regulated decisions, and classification and reclassification for a device type;

- Coordinating the responses for 510(k) submissions submitted for products regulated by the Consumer Product Safety Commission, (e.g., exercise equipment), the Environmental Protection Agency, (e.g., pesticide detection kits), or the Occupational Safety and Health Administration (e.g., embalming equipment), including responding to firms where FDA and the other regulatory entities have dual authorities;

- Leading the CDRH 510(k) Quality Review Team that meets quarterly to retrospectively discuss and review 510(k) decisions. This team was established based on recommendation from the Inspector General, HHS to ensure consistency in the review and determinations of substantial equivalence for 510(k)s. The impact of this review has led to better documentation in 510k reviews and consistent interpretation of the 510(k) regulations, guidance and policies;

- Providing CDRH premarket review expertise in the development of a combination product session for the FDA Science Forum; and

- Developing and implementing policy for 510(k) reviews in unique situations with great public health consequences (e.g., unique clearances for devices needed for the U.S. Military during Desert Shield and Storm (awarded FDA Group Recognition Award 1992), the War in Iraq, the War on Terror and Hurricane Katrina).

## FDA/CDRH

*Section Chief/Supervisory Consumer Safety Officer*
*Rockville, MD US*
*4/1993 – 7/2006*

In 1993 I was promoted to the position of Chief of the 510(k) Staff. As stated above, I was often called upon to deal with overarching issues encountering FDA. Specific examples included participating on working groups such as the CDRH Office of Compliance (OC) 510(k)/Good Manufacturing Practice (GMP) Program Development Group, FDA Desert Shield/Storm Task Force, the 510(k) Reengineering Team (under the Reengineering Government Initiative of Vice President Al Gore), and the Supplemental Data Validation Team for single use and disposable reprocessed devices.

- I drafted regulations, and I was the contact person, on implementation of the 510(k) requirements under the Safe Medical Devices Act of 1990 (SMDA) to the Federal Food, Drug, and Cosmetic Act (the Act) on 510(k) Summaries, 510(k) Statements, Class III Certifications and Summaries to ensure uniform and consistent interpretation of the law. I also trained CDRH and CBER Staff on these new laws.

- I drafted regulations and guidance and I was the contact person, for implementation of the new 510(k) requirements under the Food and Drug Administration Modernization Act of 1997 (FDAMA) (Class I and II Exemption Regulations from the 510(k) Requirements of the Act, Class II Petitions for Exemption Guidance, and Limitations of Exemption from the 510(k)

# Heather S. Rosecrans, F.R.A.P.S.

Requirements of the Act Regulation) to ensure uniform and consistent interpretation of the law. I also trained CDRH and CBER Staff.

- I drafted guidance and I was the contact person, and I trained CDRH and CBER staff, to implement the Medical Device User Fee Modernization Act of 2002 (MDUFMA) for theindustry and the agency to ensure uniform and consistent interpretation of the law for 510(k) review actions, goals, including user fees and refund policies impacting every 510(k) submitted to the agency and to ensure uniform and consistent interpretation of thelaw.

- I was the CDRH representative developing the agency Standard Operating Procedures forInter-Center review of combination products and Inter- Agency consults along with representatives from the FDA Office of the Commissioner, the Center for Drug Evaluation Research (CDER), and the Center for Biologic Evaluation and Research (CBER) including the Inter-Center training for the newly established Office of Combination Products

- I represented CDRH on the inter-agency working group for the co-packaging guidancedocument for agency regulated products (device/drug, drug/biologic, biologic/device).

**FDA/CDRH**

*Consumer Safety Officer/510k Staff*
*Rockville, MD*
*10/1987 – 4/1993*

In 1987 I joined the 510(k) Section of the Program Operations Staff (POS) within the Director'sOffice of CDRH's Office of Device Evaluation. By way of background, the 510(k) Section oversaw and coordinated the regulatory and administrative review of 510(k) submissions to CDRH, by which the vast proportion of new medical devices entering the US market undergo premarket evaluation by FDA. My primary responsibilities on this staff were:

- Served as a key contact person for the CDRH and FDA on 510(k) matters;

- Provided regulatory and policy oversight of the ODE divisions' scientific review of 510(k)s to assure that they were in accordance with established procedures, policies, time frames;

- Provided regulatory guidance regarding application of Sections 510(k), 513(f)(1), and 513(g) of the Act, the 510(k) implementing regulations, and ODE policy;

- Drafted text and provided training and guidance for preparation of routine and nonroutine correspondence with manufacturers regarding their 510(k) submissions;

- Provided authoritative guidance to other CDRH and FDA components including FDA field offices, other federal, state and foreign government agencies as well as the device industry, health care professionals and consumers;

- Reviewed 510(k)-related correspondence and related documents prepared by the ODE divisions to assure consistency, completeness and conformance with applicable laws, regulations, procedures, and policies;

- Coordinated 510(k) submissions where consultations were needed by other Centers within FDA (i.e. CDER and CBER);

# Heather S. Rosecrans, F.R.A.P.S.

- ▪ Conducted studies as needed to identify and define problems in the review of 510(k)s-- compile the background, analyze the issues, discuss with other offices in CDRH, and provide recommendations to the ODE Director for corrective action;

- ▪ Represented FDA at professional meetings and FDA-sponsored or co-sponsored educational programs;

- ▪ Prepared and participated in a briefing for the Office of Management and Budget, the Health and Human Services' Office of the Inspector General, and the GAO on the 510(k) program;

- ▪ Assisted in writing the regulation, proposal and final, entitled "Medical Devices; Substantial Equivalence; 510(k) Summaries and 510(k) Statements, Class III Summaries; Confidentiality of Information"; and

- ▪ Established the process for the rescission of 510(k) substantial equivalence decisions based on fraud or total lack of data for an indication for use or technology, followed byproposed rule to rescind 510(k) substantial equivalent decisions.

### FDA/CDRH

*Consumer Safety Officer/ Premarket Approval Staff (PMA Staff)*
*Silver Spring, MD*
*12/1980 – 10/1987*

I worked on the PMA Staff within the Office of Device Evaluation (ODE) of the FDA's CDRH. The PMA Staff oversaw and coordinated the administrative and regulatory review of Premarket Approval Applications (PMAs), product development protocols (PDPs) and associated submissions such as Environmental Assessments, Color Additive Petitions, Device Master Files,patent term extension petitions, and PMA post approval reports. While a member of the PMA Staff, I handled PMA matters for four of seven ODE reviewing divisions as follows:

- ▪ Oversaw the four ODE Divisions' administrative and regulatory review of PMAs andPDPs to assure that the applications were reviewed in accordance with established procedures, policies and time frames;

- ▪ Provided administrative and regulatory guidance regarding the PMA process to the ODE and other CDRH staff, other FDA staff, the device industry, health care professionals andproviders, and other federal, state and foreign government agencies;

- ▪ Maintained the PMA database and tracking system and biweekly provided each review branch within each of the ODE divisions with detailed printouts to assist in managing thereview of pending submissions for quality assurance and to provide information/data for publication in each of the ODE's Annual Reports;

- ▪ Coordinated the statistical review of PMAs by CDRH's Office of Science and Technology, the required good manufacturing review by CDRH's OC, and the PMA approval decision review, when appropriate, by FDA's Office of General Counsel forconsistency of FDA review and policy;

- ▪ Represented FDA at professional meetings and FDA-sponsored or cosponsorededucational and training programs;

# Heather S. Rosecrans, F.R.A.P.S.

▪ Reviewed all PMA-related correspondence and related documents prepared by four ODE divisions for filing decisions, requests for additional information and approval, approvable, not approvable or denial decisions to assure consistency, completeness and conformance with applicable laws, regulations, procedures and policies;

▪ Coordinated, for CDRH, with the Office of the Associate Commissioner for Regulatory Affairs, the FEDERAL REGISTER announcements of approval or denial decisions to assure consistency, completeness and conformance with applicable laws, regulations, procedures and policies;

▪ Developed appropriate educational materials and other guidance regarding PMA related activities for use by ODE reviewers and the device industry; -developed needed PMA- related data and other information in response to inquiries by congressional offices, ODE and other CDRH Staff, FDA, device trade associations and other stakeholders; and

▪ Conducted studies as needed to identify and define problems in the review of PMAs and PDPs; complied the necessary background data and other information; analyzed the issues; and provided recommendations for corrective action. I supervised the PMA Staff and its activities whenever the Director of the PMA Staff was on travel or leave.

**FDA/CDRH (known as the FDA/Bureau of Medical Devices at that time)**
*Biologist/Division of Clinical Laboratory Devices*
*Silver Spring, MD*
*12/1978 – 12/1980*

While a reviewer in the Microbiology Branch, I performed the following:

▪ Reviewed and tracked 510(k)s and PMAs in the Microbiology Branch within the Division of Clinical Laboratory Devices, Office of Device Evaluation;

▪ Researched, interpreted and wrote proposed microbiology classification device regulations (21 CFR 866), and coordinated them through CDRH and the FDA Office of General Counsel and the FDA Office of the Associate Commissioner for Regulatory Affairs, prior to their publication in the Federal Register;

▪ Arranged, organized, participated and wrote minutes for the Microbiology Advisory Panel Meetings to discuss the proposed classification regulations and microbiology premarket applications presented before the agency for review;

▪ Arranged and participated in internal meetings with the microbiological industry to discuss questions on their applications; and

▪ Prepared letters to the device industry regarding questions on their applications and /or telephoned to request additional information, as well as prepared final decision letters to notify of clearance, approval, non-clearance or not approval to market.

# Heather S. Rosecrans, F.R.A.P.S.

## Education

### Pfeiffer College

*Bachelor of Science in Biology, May 1976*

---

## FDA/CDRH Job-Related Training

- A Case Study in Leadership-Lincoln (Vision), Sept. 2009

- CDRH Leadership Forum: Case Study in Leadership – Teddy Roosevelt, March 2009

- Advanced Topics in Regulatory Issues, January 2009

- Guidance Prioritization and Development, January 2009

- FDA EEO Training, July 2008

---

## Professional Publications

### FDA/CDRH Guidance Documents

Issuance Date: 1/10/1997
Guidance Name: Deciding When to Submit a 510(k) for a Change to an Existing Device
Contact: Heather Rosecrans

Issuance Date: 5/20/1997
Guidance Name: Convenience Kits Interim Regulatory Guidance
Contact: Heather Rosecrans

Issuance Date: 2/19/1998
Guidance Name: Procedures for Class II Device Exemptions from Premarket Notification
Contact: Heather Rosecrans

Issuance Date: 10/22/1998
Guidance Name: Frequently Asked Questions on the New 510(k) Paradigm
Contact: Heather Rosecrans

Issuance Date: 3/12/2000
Guidance Name: Use of Standards in Substantial Equivalence Determinations
Contact: Heather Rosecrans

Issuance Date: 12/3/2002
Guidance Name: Determination of Intended Use for 510(k) Devices; (Update to K98-1)
Contact: Heather Rosecrans

# Heather S. Rosecrans, F.R.A.P.S.

Issuance Date: 5/21/2004
Guidance Name: FDA and Industry Actions on Premarket Notification (510(k)) Submissions:
Effect on FDA Review Clock and Performance Assessment – Guidance for Industry and FDA Staff
Contact: Heather Rosecrans

Issuance Date: 5/28/2004
Guidance Name: User Fees and Refunds for Premarket Notification Submissions (510(k)s)-Guidance for
Industry and FDA Staff
Contact: Heather Rosecrans

Issuance Date: 8/12/2005
Guidance Name: Format for Traditional and Abbreviated 510(k)s
Contact: Heather Rosecrans

Issuance Date: 8/29/2009
Guidance Name: User Fees and Refunds for Premarket Notification Submissions (510(k)s)-Guidance for
Industry and FDA Staff
Contact: Heather Rosecrans

## FDA/CDRH Regulations

Regulation on 510(k) Summaries, 510(k) Statements, Class III Summaries and Certification
Published Proposal: April 28, 1992
Finalized: December 14, 1994

Draft Rule: Medical Devices; Rescission of Substantially Equivalent Decisions and Rescission
Appeal Procedures
Published Proposal: 2001

## Post-FDA Publications

Issuance Date: 1/2021
Book Title: Diagnostics at a Crossroads: Navigating IVD Regulation in a Changing Environment
Chapter: Trying to Fit a Square Peg into a Round Hole: Perspectives on the Regulation of In Vitro
Diagnostic Devices at the Center for Devices and Radiological Health
Authors: Maura Norden, Heather Rosecrans, and Dan Schultz, Greenleaf Health, Inc.

## Additional Information

### Training for FDA Staff

Date: 1/1998
Title: Food and Drug Administration Modernization Act (FDAMA) Priority Premarket Implementation
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/1998
Title: Preamendment Status Determinations
Location: FDA, Rockville, MD
Role: FDA Instructor

76

# Heather S. Rosecrans, F.R.A.P.S.

Date: 6/1998
Title: 510(k) Intended Use Workshop
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/2002
Title: Medical Device Tracking Seminar (21 CFR 821)
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/2002
Title: 1st Annual CBER/CDRH Reviewer Best Practices Workshop University of MD
Shady Grove Conference Center
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 10/2002
Title: 510(k) Medical Device User Fee Modernization Act (MDUFMA) Premarket Training
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 1/2003
Title: Medical Device Tracking (21 CFR Part 821)
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/2003
Title: 2nd Annual CBER/CDRH Reviewer Best Practices Workshop University of MD
Shady Grove Conference Center
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 10/2003
Title: Summary of Technical Documents (STED) – An Internationally Harmonized Format for
Review of Device Safety and Effectiveness – Training
Location: FDA, Rockville, MD
Role: FDA Instructor

Title: AMDM/FDA Office of In Vitro Diagnostic Devices (OIVD) Workshop:
Practical Considerations in Preparing 510(k)s
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 6/2004
Title: 3rd Annual CBER/CDRH Reviewer Best Practices Workshop University of MD
Shady Grove Conference Center
Location: FDA, Rockville, MD
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 4/2005
Title: AMDM/FDA OIVD Workshop: Practical Considerations in Preparing 510(k)s
Location: FDA, Rockville, MD
Role: FDA Instructor

Date: 1/2006
Title: 510(k) Training for CBER and CDER with the Office of Combination Products
Location: FDA, White Oak, MD
Role: FDA Instructor

Date: 4/2006
Title: FDA Science Forum/CDRH Premarket Regulation with Combination Products
Location: Washington, DC
Role: FDA Instructor

Dates: 1990-2006
Title: 510(k), Reclassification, Classification, & 513g – New Reviewer Training
Location: FDA, Rockville, MD
Role: FDA Instructor

**Training for Stakeholders while at FDA**

Date: 3/2003
Title: 510(k) Update
Location: San Francisco, CA
Organization: Regulatory Affairs Professional Society (RAPS) International Symposium
Role: FDA Instructor

Date: 3/2003
Title: 510(k) Submissions
Location: Rockville, MD
Organization: Canadian Institute for Health Care Professionals (CIHCP)
Role: FDA Instructor

Date: 6/2003
Title: 510(k) Update
Location: Washington, DC
Organization: AdvaMed's 13th Annual Device Submissions Workshop
Role: FDA Instructor

Date: 8/2003
Title: 510(k) Update
Location: Washington, DC
Organization: RAPS Role: FDA Instructor

Date: 10/2003
Title: US & EU Medical Device Classification and Regulatory Pathways
Location: Baltimore, MD
Organization: RAPS 2003 Annual Conference Exhibition
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 11/2003
Title: 510(k) Webcast
Location: 48 Registered Sites Across the US
Organization: RAPS
Role: FDA Instructor

Date: 3/2004
Title: 510(k) Update and Training
Location: Rockville, MD
Organization: Food and Drug Law Institute (FDLI)/CDRH In-House Training
Role: FDA Instructor

Date: 5/2004
Title: 510(k) Third Party Review Program
Location: Santa Clara, CA
Organization: RAPS Conference West Coast Symposium
Role: FDA Instructor

Date: 6/2004
Title: 510(k) Update
Location: Irvine, CA
Organization: 7th Annual FDA – Orange County Regulatory Affairs (OCRA)
Educational Conference
Role: FDA Instructor

Date: 6/2004
Title: New Medical Device User Fee Modernization Act 510(k) Guidance
Location: Crystal City, VA
Organization: AdvaMed's 14th Annual Device Submissions Workshop
Role: FDA Instructor

Date: 9/2004
Title: What Every Medical Technology Company Should Know About the 510(k) Process
Location: Washington, DC
Organization: Latham & Watkins LLP with the Medical Device Manufacturers Association (MDMA)
Role: FDA Instructor

Date: 9/2004
Title: U.S. FDA Seminars 510(k) Update, IDE Update, PMA Update
Location: United Kingdom (London, Leeds, Edinburgh)
Organization: British Medical Device & Diagnostic Manufactures – UK Trade & Investment (UKTI)
Role: FDA Instructor

Date: 9/2004
Title: 510(k) Update and Medical Device Appeals
Location: Washington, DC
Organization: Medical Device Industry Initiatives Grassroots Task Force Meeting
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 11/2004
Title: Regulatory Affairs and 510(k)
Location: Seattle, WA
Organization: University of Washington, Graduate School
Role: FDA Instructor

Date: 11/2004
Title: 510(k) Program
Location: Seattle, WA
Organization: Organization of Regulatory and Clinical Associates (ORCA) Meeting
Role: FDA Instructor

Date: 2/2005
Title: How to Plan for Premarket Meetings with CDRH
Location: Rockville, MD
Organization: AdvaMed (Audio conference to 50 sites)
Role: FDA Instructor

Date: 3/2005
Title: 510(k) Update
Location: Seattle, WA
Organization: Medical Device Industry Initiatives Grassroots Task Force Meeting
Role: FDA Instructor

Date: 3/2005
Title: 510(k) Update and Appeals
Location: Kirkland, WA
Organization: ORCA Washington State Meeting
Role: FDA Instructor

Date: 3/2005
Title: Device Premarket Update
Location: Durham, NC
Organization: International Society for Pharmaceutical Engineers/Educational Forum
Role: FDA Instructor

Date: 5/2005
Title: What a Great 510(k) Should Look Like
Location: Arlington, VA
Organization: AdvaMed's 15th Annual Device Submissions Workshop
Role: FDA Instructor

Date: 5/2005
Title: Medical Device Regulatory Update
Location: Triangle Park, NC
Organization: North Carolina Medical Device Organization (NCMD)
Role: FDA Instructor

Date: 9/2005
Title: New Guidance in 510(k)
Location: Washington, DC

# Heather S. Rosecrans, F.R.A.P.S.

Organization: Medical Device Industry Initiatives Grassroots Task Force Meeting
Role: FDA Instructor

Date: 9/2005
Title: 510(k) Update and Training
Location: Boston, MA
Organization: MassMedic and MDMA
Role: FDA Instructor

Date: 10/2005
Title: Today's 510(k) – An Update and Q&A with FDA & Industry
Location: Baltimore, MD
Organization: RAPS
Role: FDA Instructor

Date: 10/2005 Title: Software Summit
Location: Arlington, VA
Organization: AdvaMed International Meetings FDA Training
Role: FDA Instructor

Date: 10/2007
Title: US FDA Product Codes
Location: Washington, DC
Organization: Global Harmonization Task Force (GHTF) Meeting
Role: FDA Instructor

Date: 10/2007
Title: Device Reclassification
Location: Alexandria, VA
Organization: Orthopedic Surgical Manufacturers Association (OSMA)
Role: FDA Instructor

Date: 10/2007
Title: FDA's Device Premarket Review
Location: Santa Clara, CA
Organization: University of California Santa Clara School of Law
Role: FDA Instructor

Date: 10/2007
Title: Premarket Notification (510(k))
Location: Rockville, MD
Organization: AdvaMed Audioconference
Role: FDA Instructor

Date: 11/2007
Title: What Should Every Medical Device Company Know About the Regulations Governing
Market Approval in the United States
Location: Stockholm, Sweden
Organization: SwedenBIO
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 11/2007
Title: How to Enter and Succeed in the US Marketplace
Location: Stockholm, Sweden Organization: SYNERGUS
Role: FDA Instructor

Date: 3/2008
Title: The 510(k) Program, The Past, Present, & Future
Location: Washington, DC
Organization: Food and Drug Law Institute (FDLI) Annual Conference
Role: FDA Instructor

Date: 4/2008
Title: Premarket Notification
Location: Bethesda, MD
Organization: Office of In Vitro Diagnostic-AMDM Annual Workshop
Role: FDA Instructor

Date: 4/2008
Title: Premarket Notification
Location: Boston, MA
Organization: Association of Clinical Research Professionals (ACRP)
Role: FDA Instructor

Date: 6/2008 Title: 510(k) Update
Location: Irvine, CA
Organization: Orange County Regulatory Association (OCRA)
Role: FDA Instructor

Date: 10/2008
Title: FDA's Center for Devices and Radiological Health
Location: Oakland, MI
Organization: Beaumont Seminar, Oakland University
Role: FDA Instructor

Date: 10/2008
Title: 510(k) Process Review Considerations
Location: Mt. View, CA
Organization: Medical Device Manufacturers' Association
Role: FDA Instructor

Date: 10/2008
Title: Process for FDA Approval
Location: Chicago, IL
Organization: American Medical Association's (AMA's) CPT/HCPAC Advisory Committee
Role: FDA Instructor

Date: 10/2008
Title: 510(k) Submissions – The Course for Beginning Regulatory Affairs Professionals for Preparing a 510(k)
Location: Rockville, MD Organization: AdvaMed MTLI
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 10/2008
Title: Interactive Review Process for 510(k)s and PMAs
Location: Rockville, MD
Organization: RAPS, Webcast
Role: FDA Instructor

Date: 3/2009
Title: 510(k) Program Update
Location: Seattle, WA
Organization: Organization of Regulatory and Clinical Associates (ORCA)
Role: FDA Instructor

Date: 3/2009
Title: CDRH and Premarket Review
Location: Ann Arbor, MI Organization: University of Michigan
Role: FDA Instructor

Date: 3/2009
Title: CDRH and 510(k) Program Update
Location: Ann Arbor, MI Organization: BioArbor
Role: FDA Instructor

Date: 3/2009
Title: CDRH
Location: Ann Arbor, MI
Organization: University of Michigan's Medical Innovation Center
Role: FDA Instructor

Date: 3/2009
Title: PMA and 510(k) Review Process Seminar
Location: Boston, MA
Organization: Medical Device Manufacturer's AssociationRole: FDA Instructor

Date: 4/2009
Title: CDRH and Premarket Review
Location: Bethesda, MD
Organization: Uniformed Services University for Health Sciences (USUHS)
Role: FDA Instructor

Date: 4/2009
Title: What is a 510(k)? What is Reclassification?
Organization: Association of Clinical Research Professionals (ACRP)

Date: 6/2009
Title: Discussion of the 510(k) Program for Venture Capitalists
Location: Boston, MA
Organization: The Gray Sheet
Role: FDA Instructor

# Heather S. Rosecrans, F.R.A.P.S.

Date: 6/2009
Title: 510(k) Hot Topics and 510(k) Orientation
Location: Rockville, MD
Organization: Regulatory Affairs Professional Society
Role: FDA Instructor

Date:  6/2009
Title: 510(k) Hot Topics
Location: Irvine, CA
Organization: FDA-Orange County Regulatory Affairs (OCRA) Annual Meeting
Role: FDA Instructor

Date:  9/2009
Title: What is a 510(k)?
Location: Rockville, MD
Organization: 2009 CDRH Forum for International Regulatory Authorities
Role: FDA Instructor

Date: 9/2009
Title: Hot Topics in 510(k) Today
Location: Philadelphia, PA
Organization: RAPS Annual Conference and Exhibition
Role: FDA Instructor

Date: 10/2009
Title: The 510(k) Reform: FDA, Hill and Industry Perspectives
Location: Washington, DC
Organization: AdvaMed 2009 – The MedTech Conference
Role: FDA Instructor

Date: 3/2010
Title: Navigating the 510(k) Process
Location: Washington, DC
Organization: FDA Training for Institute of Medicine (IOM)
Role: FDA Instructor
Post-FDA Conferences/Trainings

Date: 2010
Title: 510(k) Requirements and Guidance
Organization: Regulatory Affairs Professional Society (RAPS) San Francisco

Date: 2011
Title: A Historical Perspective of the 510(k) Program
Organization: Xavier MedCon

Date: 2012
Title: The 510(k) Program—Update One Year After FDA Internal Study Report
Organization: RAPS Webcast

Date: 2012
Title: The 510(k) Program One Year Later Organization: Annual Medical Devices Summit East

# Heather S. Rosecrans, F.R.A.P.S.

Date: 2012
Title: Update on the 510(k) Program Organization: Drug Information Association (DIA) Conference

Date: 2013
Title: The 510(k) Process
Organization: 22nd Annual Society of Clinical Research Associates (SOCRA) Conference

Date: 2013
Title: 510(k) Requirements and GuidanceOrganization: RAPS San Francisco

Date: 2014
Title: The 510(k) Process Organization: 23rd Annual SOCRA Conference

Date: 2014
Title: Principles of Premarket Classification
Organization: American Bar Association (ABA) Webinar
on FDA Medical Device Law Fundamentals

Date: 2015
Title: Navigating Today's 510(k) Program
Organization: Medical Device Manufacturers Association (MDMA) FDA Forum

Date: 2015
Title: Navigating FDA's Premarket Pathway for Medical Devices Organization:
University of Miami Concept to Commercialization (C2C) Series

Date: 2015
Title: Peeling the 510(k) Onion from Fundamentals to Latest Topics
Organization: RAPS Workshop

Date: 2016
Title: Peeling the 510(k) Onion from Fundamentals to Latest Trends
Organization: RAPS Workshop

Date: 2016
Title: A Look at Today's 510(k) Organization: SOCRA Conference

Date: 2017
Title: 510(k) Modifications: To Submit or Not Submit…That Is the Question!
Organization: Xavier MedCon

Date: 2017
Title: 510(k) Updates: When and How to Work with FDA on Device Modifications
Organization: Florida Medical Manufacturers Consortium, Inc.

Date: 2017
Title: Medical Devices and FDA: What, When, and How
Organization: OCRA Conference

Date: 2017
Title: 510(k) Regulatory Framework Organization: RAPS Conference

# Heather S. Rosecrans, F.R.A.P.S.

Date: 2017
Title: Picking the Right Predicate Organization: RAPS European Union (EU) Conference

Date: 2018
Title: 510(k) Update
Organization: MDMA FDA Forum

Date: 2018
Title: When Things Go Wrong Organization: RAPS (EU) Conference

Date: 2018
Title: How Best to Interact with CDRH Premarket
Organization: Xavier MedCon 2018

Date: 2019
Title: 510(k) Update
Organization: MDMA FDA Forum

Date: 2019
Title: FDA CDRH Director Breakout Session Organization:
Food and Drug Law Institute Annual Meeting

Date: 2020
Title: Navigating the 510(k) Program
Organization: MDMA FDA Forum

Date: 2020
Title: Xavier 510(k) Workshop
Organization: Xavier Health

Date: 2021
Title: Navigating the 510(k), De Novo and 513(g) Programs
Organization: MDMA FDA Forum

Date: 2021
Title: Xavier 510(k) Workshop
Organization: Xavier Health

Date: 2021
Title: What's New with Premarket Submissions and EUAs?
Organization: Xavier Health

# APPENDIX B

## Materials Relied Upon by Heather S. Rosecrans

BPI000221
BPI000331
HE_001317
HE_001322
HE_001379
Intuitive-00018120
Intuitive-00082056
Intuitive-00478591
Intuitive-00481165
Intuitive-00481167
Intuitive-00481176
Intuitive-00481839
Intuitive-00485158
Intuitive-00490612
Intuitive-00490649
Intuitive-00490685
Intuitive-00491017
Intuitive-00491018
Intuitive-00491019
Intuitive-00491901
Intuitive-00492204
Intuitive-00492277
Intuitive-00492705
Intuitive-00492739
Intuitive-00492744
Intuitive-00492768
Intuitive-00492786
Intuitive-00492796
Intuitive-00493504
Intuitive-00493507
Intuitive-00493508
Intuitive-00493612
Intuitive-00494533
Intuitive-00496074
Intuitive-00496109
Intuitive-00496110
Intuitive-00496132
Intuitive-00496138
Intuitive-00496501
Intuitive-00510907
Intuitive-00515501
Intuitive-00552632
Intuitive-00552652
Intuitive-00552665
Intuitive-00552682
Intuitive-00552697

Intuitive-00552716
Intuitive-00552728
Intuitive-00552744
Intuitive-00552745
Intuitive-00691203
Intuitive-00691208
Intuitive-00691213
Intuitive-00691613
Intuitive-00691658
Intuitive-00691659
Intuitive-00691660
Intuitive-00691662
Intuitive-00691666
Intuitive-00691667
Intuitive-00691710
Intuitive-00691802
Intuitive-00691837
Intuitive-00691839
Intuitive-00691840
Intuitive-00691842
Intuitive-00691843
Intuitive-00691847
Intuitive-00691848
Intuitive-00691857
Intuitive-00691980
Intuitive-00692027
Intuitive-00692185
Intuitive-00692230
Intuitive-00692310
Intuitive-00692313
Intuitive-00692314
Intuitive-00692316
Intuitive-00692320
Intuitive-00692321
Intuitive-00692363
Intuitive-00692411
Intuitive-00692433
Intuitive-00692451
Intuitive-00692611
Intuitive-00692643
Intuitive-00693535
Intuitive-00694043
Intuitive-00694522
Intuitive-00694607
Intuitive-00694608
NRHA-002274

PREREB0060
REBOTIX061186_001
REBOTIX061659_001
REBOTIX077238_001
REBOTIX077440_001
REBOTIX077446_001
REBOTIX077536_001
REBOTIX077545_001
REBOTIX077549_001
REBOTIX077597_001
REBOTIX077601_001
REBOTIX077611_001
REBOTIX077617_001
REBOTIX077671_001
REBOTIX077729_001
REBOTIX077735_001
REBOTIX079746
REBOTIX080925_001
REBOTIX089521_001
REBOTIX101000
REBOTIX122260_001
REBOTIX131417_001
REBOTIX131427_001
REBOTIX131433_001
REBOTIX131437_001
REBOTIX131480_001
REBOTIX131484_001
REBOTIX131488_001
REBOTIX131493_001
REBOTIX131514_001
REBOTIX146948_001
REBOTIX155864
REBOTIX155894
REBOTIX157893
REBOTIX162404
REBOTIX162889
REBOTIX169166
REBOTIX169167
REBOTIX169168
REBOTIX169360
REBOTIX169504
REBOTIX169588
REBOTIX169683
REBOTIX169926
REBOTIX169947
REBOTIX170053

REBOTIX170421
REBOTIX171030
REBOTIX171058
REBOTIX171073
REBOTIX171076
SCL REBOTIX 00002
WTH000295

Deposition of Bob Overmars (June 15, 2021)
Deposition of Chris Gibson (June 22, 2021)
Deposition of David Mixner (June 10, 2021)
Deposition of Glenn Papit (June 2, 2021)
Deposition of Joe Morrison (June 14, 2021)
Deposition of Mark Johnson (April 29, 2021; June 4, 2021)
Deposition of Stan Hamilton (June 4, 2021)

Rebotix Complaint
Rebotix's Answer and Affirmative Defenses to Intuitive's Counterclaims

1 C.F.R. § 801.109
21 C.F.R. § 10.75
21 C.F.R. § 801.4
21 C.F.R. § 801.5
21 C.F.R. § 803.3
21 C.F.R. § 806.2
21 C.F.R. § 807.100
21 C.F.R. § 807.3
21 C.F.R. § 807.81
21 C.F.R. § 807.87
21 C.F.R. § 807.92
21 C.F.R. § 814.20
21 C.F.R. § 820.3
21 C.F.R. § 821.3
21 C.F.R. § 822.3
21 C.F.R. § 860.3
21 C.F.R. § 860.7
21 C.F.R. § 888.9
21 C.F.R. § 8xx.9
21 C.F.R. Part 50
21 C.F.R. Part 803
21 C.F.R. Part 806
21 C.F.R. Part 807
21 C.F.R. Part 810
21 C.F.R. Part 812
21 C.F.R. Part 820
21 C.F.R. Part 821
21 C.F.R. Part 822

21 C.F.R. Part 866

FDCA § 201
FDCA § 301
FDCA § 502
FDCA § 510
FDCA § 513
FDCA § 515
FDCA § 517
FDCA § 518
FDCA § 519
FDCA § 520
FDCA § 522

57 Fed. Reg. 18 (April 28, 1992) (interim rule)
59 Fed. Reg. 64
62 Fed. Reg. 67012
66 Fed. Reg. 3 (Jan. 16, 2001)
81 Fed. Reg. 11477
81 Fed. Reg. 46696
86 Fed. Reg. 33305

H.R. Rep. No. 94-853

Pub. L. No. 101-629 (1990)

15 U.S.C. §§ 52-55
21 U.S.C. § 321
21 U.S.C. § 331
21 U.S.C. § 351
21 U.S.C. § 352
21 U.S.C. § 360
21 U.S.C. § 360c
21 U.S.C. § 360e
21 U.S.C. § 360g-1
21 U.S.C. § 360h
21 U.S.C. § 360i
21 U.S.C. § 360j
21 U.S.C. § 360l

Compliance Program Guidance Manual (CPGM) 7382.845, "Inspection of Medical Device Manufacturers," (Feb. 2, 2015), available at https://www.fda.gov/media/80195/download

*Da Vinci X/Xi Instrument & Accessory Catalog*, Intuitive Surgical, Inc. (Nov. 2020), available at https://www.intuitive.com/en-us/-/media/Project/Intuitive-surgical/files/pdf/xi-x-ina-catalog-no-pricing-us-1052082.pdf?la=en&hash=189164507BDFEC40E9DAB44BA10731A5

Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1) (January 10, 1997)

Draft Guidance for Industry: Internet/Social Media Platforms: Correcting Independent Third-Party Misinformation About Prescription Drugs and Medical Devices (June 2014), available at https://www.fda.gov/media/88545/download

FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices: In accordance with Section 710 of the Food and Drug Administration Reauthorization Act of 2017 (FDARA), available at https://www.medequipusa.com/wp-content/uploads/2018/05/FDARA-710-3rd-Party-Servicing-Report.pdf

FDA Staff Manual Guide 1410.406 (November 13, 2018), available at https://www.fda.gov/media/80114/download

FDA Website, *Content of a 510(k)* (updated Apr. 26, 2019), available at https://www.fda.gov/medical-devices/premarket-notification-510k/content-510k

FDA Website, *Who Must Register, List and Pay the Fee*, available at https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee

FDA, *Public Workshop- Medical Device Servicing and Manufacturing Activities* (Dec. 10-11. 2018), available at https://wayback.archive-it.org/7993/20201222125933/https://www.fda.gov/medical-devices/workshops-conferences-medical-devices/public-workshop-medical-device-servicing-and-remanufacturing-activities-december-10-11-2018-12102018

FDA, *Recognized Consensus Standards*, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfstandards/search.cfm

FDA, *White Paper: Evaluating Whether Activities Are Servicing or Remanufacturing* (2018), available at https://www.fda.gov/media/117238/download

FDA, *Final Guidance for Industry: Sterilized Convenience Kits for Clinical and Surgical Use* (Jan. 7, 2002), available at https://www.fda.gov/media/71358/download

FDA, *Guidance for Industry and FDA Staff: Deciding When to Submit a 510(k) for a Change to an Existing Device* (Oct. 25, 2017), available at https://www.fda.gov/media/99812/download

FDA, *Guidance for Industry and FDA Staff: Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling* (May 17, 2015), available at https://www.fda.gov/media/80265/download

FDA, *Guidance for Industry and Food and Drug Administration Staff: FDA and Industry Actions on Premarket Notification (510(k)) Submissions: Effect on FDA Review Clock and Goals* (October 2, 2017), available at https://www.fda.gov/media/73507/download

FDA, *Guidance for Industry and Food and Drug Administration Staff: Refuse to Accept Policy for 510(k)s* (September 13, 2019), available at https://www.fda.gov/media/83888/download

FDA, Guidance for Industry and Food and Drug Administration Staff: The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] (July 28, 2014), available at https://www.fda.gov/media/82395/download

FDA, *Guidance for Industry: E6(R2) Good Clinical Practice: Integrated Addendum to ICH E6(R1)* (March 2018), available at https://www.fda.gov/downloads/Drugs/Guidances/UCM464506.pdf

FDA, *Indications for Use Statement* (February 6, 1996), available at http://www.lb7.uscourts.gov/documents/15cv9986.pdf

FDA, Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administration Staff U.S. Food & Drug Admin. (June 24, 2021), available at https://www.fda.gov/media/150141/download

FDA, Warning Letter to Tenderneeds Fertility LLC (Apr. 13, 2020), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/tenderneeds-fertility-llc-603383-04132020

U.S. General Accounting Office, *Report to the Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, Medical Devices: FDA's 510(k) Operations Could Be Improved* (Aug. 1988), available at http://archive.gao.gov/d16t6/136821.pdf

# APPENDIX C

**Heather Rosecrans's Expert Testimony and Deposition Experience**

**HEATHER ROSECRANS'S EXPERT TESTIMONY/DEPOSITION EXPERIENCE**

***Rhododendron Holdings, LLC, et al. v. Thomas Bradley Harris, et al.***

- Provided testimony at a deposition on December 18, 2019