Exhibit 3

Expert Report of Dr. Joshua Sharlin

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

REBOTIX REPAIR LLC,

      Plaintiff,

      v.

INTUITIVE SURGICAL, INC.,

      Defendant.

Case No.:  8:20-cv-02274

HIGHLY CONFIDENTIAL
INFORMATION - ATTORNEYS'
EYES ONLY

**<u>Expert Report by Joshua S. Sharlin, Ph. D.</u>**

## Table of Contents

Summary of Opinions ..................................................................................................1

Section 1 – About Dr. Sharlin. ....................................................................................1

   1.1  Introduction. ..................................................................................... 1

   1.2 Qualifications and Experience. ........................................................ 2

   1.3. Materials considered in forming opinions. ..................................... 4

   1.4 Prior expert testimony. .................................................................... 5

   1.5  Compensation. ................................................................................. 6

Section 2 – Rebotix was not required to seek approval from the FDA (via a 510(k) submission or otherwise) for the services Rebotix performs on EndoWrists. ................6

   2.1     Overview of the FDA. ...................................................................... 6

   2.2     History of the 510(k) review process and the development of
          substantial equivalence. .................................................................. 8

   2.3     Rebotix was not required to submit a 510(k) because Rebotix has
          not introduced serviced EndoWrists into commerce. ........................... 10

   2.4     Rebotix was not required to submit a 510(k) because Rebotix does
          not significantly change EndoWrists' intended use or EndoWrists'
          performance and safety specifications. ............................................. 15

        2.4.1   Rebotix's services do not significantly change the intended
               use of EndoWrists. ...................................................................... 18

        2.4.2   Rebotix's services do not significantly change the safety
               and performance specifications of EndoWrists. ....................... 24

                2.4.2.1 Intuitive's allegations of a significant effect on effectiveness and
                        safety. ......................................................................... 26

                2.4.2.2 No evidence demonstrating that Rebotix's services significantly
                        increase the likelihood of the failures alleged by Intuitive. .......... 27

                      2.4.2.2.1  No tests demonstrate that Rebotix-serviced
                              EndoWrists introduce or increase the likelihood of
                              the failures alleged by Intuitive. ........................................ 28

i

2.4.2.2.2  Rebotix has performed substantial testing to ensure that Rebotix-serviced EndoWrists do not introduce or increase the likelihood of the failures alleged by Intuitive. ......................................................... 33

2.4.2.2.3 Hospitals and Intuitive acknowledge that the EndoWrist failures that Intuitive falsely attributes to Rebotix are commonplace in EndoWrists provided directly from Intuitive that have not been serviced by Rebotix. ....................................................................... 39

2.4.2.2.4  The failures alleged by Intuitive are commonplace in analogous laparoscopic instruments that are routinely repaired. ........................... 43

2.4.2.3  No evidence that Rebotix's services significantly affect product safety. ................................................................. 49

2.5     The FDA already considered whether Rebotix's services require 510(k) approval, and the FDA took no action. .................................... 64

2.6 Additional opinions................................................................. 67

2.6.1   Intuitive's reliance on Cal Rabang's email to support its allegation is unfounded. ............................................................ 67

2.6.2.  The process of adding the Interceptor during servicing does not require Rebotix to submit a 510(k). .................................... 69

2.7     Other FDA experts, and Intuitive's own analysis of FDA requirements, agree with my opinion that FDA clearance is not required for refurbished EndoWrists. ................................................ 71

**Summary of Opinions**

1.      I have been asked to evaluate Intuitive's assertion that the service performed by Rebotix on EndoWrists requires 510(k) approval from the FDA, as well as address several related issues.  In my opinion, Intuitive's assertion is unfounded.  Rebotix's service does not require 510(k) approval from the FDA for three reasons.

- First, 510(k) approval is not required when devices are not introduced into commercial distribution, and Rebotix has not introduced serviced EndoWrists into commercial distribution.  Rebotix is a service provider, and servicing is not regulated by the FDA.

- Second, 510(k) approval is not required when an entity does not significantly change the device's performance or safety specifications, or its intended use.  And Rebotix has not significantly changed the device's performance or safety specifications, or intended use.

- Third, at Intuitive's request, the FDA investigated Rebotix's services to determine whether a 510(k) was required.  Because the FDA took no action, it can be concluded the agency determined that a 510(k) was not required.

**Section 1 – About Dr. Sharlin.**

**1.1  Introduction.**

2.      I am Joshua S. Sharlin, Ph.D. I have been retained by the firm of Dovel & Luner, LLP on behalf of the Plaintiff, Rebotix Repair LLC ("Rebotix"), to provide my expert opinions regarding the allegations made by Defendant Intuitive Surgical Inc. ("Intuitive") that the services Rebotix performs on EndoWrists require FDA approval, specifically a cleared 510(k) submission from the FDA, as well as other topics related to this allegation.  I have written this report to

1

summarize the subject matter and opinions to which I expect to testify.

**1.2 Qualifications and Experience.**

3.      The opinions in this report are based on my education, training, and experience working as an FDA reviewer and as a consultant to FDA-regulated industries for more than 20 years.  I worked at the FDA from 1992 to 1994 as a statistical reviewer and a primary reviewer in the Center for Veterinary Medicine.  For 27 years, I have worked as a consultant to FDA-regulated companies and applied my hands-on experience to all aspects of regulatory compliance regarding clinical trials, including regulatory strategy, study design, trial execution, data collection, database construction, statistical analysis, interpretation of results, preparing drug and device submissions, and finally conducting an FDA review.

4.      I have traveled to ten countries (England, France, Sweden, Germany, Belgium, Switzerland, Italy, Hungary, India, and China) to provide FDA regulatory support to companies in those locations.

5.      I received a B.S. degree in zoology from the University of Iowa in 1972, an M.S. degree in physiology from the University of Maryland in 1976 and a Ph.D. in physiology from the University of Georgia in 1981.  My Ph.D. thesis investigated the effects of aflatoxin, a naturally occurring carcinogen in the food supply, on reproduction in animals.

6.      In 2006, I was one of two former FDA reviewers hired by Booze Allen to work on a 6-month contract sourced by the FDA to evaluate over 125 New Drug Application submissions to determine why some companies were more efficient than others in preparing drug submissions and why some companies were more proficient than others in working with the FDA to expedite the drug approval process.

7.      I recently finished a 3-year contract with the Department of Defense (DOD), under which I advised senior DOD leadership on the most effective regulatory strategies to obtain FDA

2

approval in 18 projects involving drugs, biologics, and medical devices intended as defenses against biological and chemical weapons. This work included critiquing and improving the regulatory strategy for several vaccines against viruses including Venezuelan equine encephalitis virus, Filovirus, and Adeno Associated virus.

8.     I have audited FDA-regulated companies for Good Clinical Practice (GCP), Good Laboratory Practice (GLP), and Good Manufacturing Practice (GMP) compliance.

9.     I have assisted FDA-regulated drug, biologic, and medical device companies with a range of FDA-related services to support their submissions.  For example, I have audited CROs, sponsors, software vendors and clinical sites for GCP compliance and prepared them for outside audits by either the FDA or potential customers.

10.     I am an expert in writing instructions and procedures for an FDA-regulated environment.  I have written over 40 standard operating procedures (SOPs) on a wide variety of FDA-related technical and regulatory topics.  I have audited companies, CROs and vendors for SOP compliance, and have identified and closed compliance gaps in written instructions and procedures.

11.     I have written or reviewed 14, 510(k) submissions and have attended meetings at the FDA to discuss device submissions and present results of medical device studies.

12.     I have trained tens of thousands of employees from hundreds of FDA-regulated companies on 45 technical and regulatory topics which I developed, including regulatory compliance, drug labeling, and drug safety reporting.

13.     Medical device-related classes I have developed and taught include:

- Writing SOPs Part I: An Introduction

- What Needs to Be in a Product Submission: An FDA Reviewer's Perspective

3

- Survey of FDA Reviewer Training: Understanding Reviewer Strategies, Tools, & Techniques for Approving Your Paper or Electronic Submission

- Good Review Management: FDA's Internal Standards and Expectations of Industry

- Annual Reports: SOPs for Developing Content That Meets FDA Requirements

- Avoiding Statistical Errors in Clinical Trials: Preparing for FDA Review

- New Trends in Clinical Trial Design That Encourage FDA Approval

- Adaptive Design: Why is FDA so Enthusiastic?

- 510(k)s: The 70 Changes FDA Wants

- Annual Reports: SOPs for Developing Content That Meets FDA Criteria

- Adverse Event Reporting SOPs for Medical Devices

14.     My classes on FDA regulatory and technical topics, which have been attended by staff from Intuitive, include:

- What Needs to Be in a Product Submission: An FDA Reviewer's Perspective

- Internal Standards for FDA Reviewers

- Building a Better 510(k): Suggestions from Inside FDA

- Survey of FDA Reviewer Training: Understanding Reviewer Strategies, Tools, & Techniques

- 510(k)s: 70 Changes FDA Wants

**1.3. Materials considered in forming opinions.**

15.     Within this report I cite materials I have considered and relied upon in forming my opinions.  I also identify those materials in Exhibit 1 (which is intended to be inclusive of what is cited in the body of the report although it is possible that I inadvertently omitted certain materials cited in my report).  The citations in this report are provided as examples of evidence I have reviewed and that support my opinions and the basis for my opinions.  They do not represent the only materials considered or relied upon in reaching my conclusions – this document would be

4

unduly long if I were to cite every such piece of evidence in each place it played a role in my analysis.

16.     If called upon to testify, I expect to utilize demonstrative exhibits relating to the opinions disclosed in this report, and the documents and information that I have reviewed or considered in preparing my report.

17.     If new information becomes known to me, I may modify the content of this report and/or my opinions.

**1.4 Prior expert testimony.**

18.     In the past four years, I have testified as an expert witness at trial or by deposition in the following cases:

- Case 24-C-14-002465 in circuit court of Baltimore City.  Deposed on FDA medical device regulatory and submission issues associated with a failed hip implant.

- Case 6:14-cv-01953-ORL28-TBS in United States District Court, Middle District of Florida, Orlando Division.  Deposed on FDA medical device regulatory and submission issues associated with a failed hip implant

- Case 46-1-2014-0319.  State of New York Supreme Court.  Testified on the FDA drug approval process and the predictability of FDA's decisions regarding approval of a new drug.

- Case 07-15624 (14) in the Circuit Court of the 17th Judicial Circuit, In and For Broward County, Florida.  Deposed on the role of an Institutional Review Board (IRB) and the responsibilities of IRB members regarding conduct of a clinical trial and the safety of clinical trial subjects.

- Case 16-2362 in the US District Court, Eastern District of Pennsylvania.  Deposed

on the regulatory responsibilities of drug manufacturers to provide Medication

Guides to patients when they receive a prescription.

- Case 3:16-cv-536-JE in US District Court for the District of Oregon.  Deposed on

  the regulatory issues involving patent infringement of a medical device.

- Case 2017-0459-JRS in the Court of the Chancery of the State of Delaware.

  Deposed on regulatory issues regarding meeting milestones in a merger

  agreement between a small biotech company and a large pharmaceutical company

- Case No 17 CV 5184.  U.S. District Court of Minnesota.  Deposed on regulatory

  issues regarding a home medical device that caused a death.

- Case No 37-2018-00040727-CU-BC-CTL, Superior Court of the State of

  California.  Testified on the regulatory issues associated with a theft of trade

  secrets case.

### 1.5  Compensation.

19.     I am being compensated for my time in this matter at the rate of $475 per hour, and

my compensation is not dependent on the outcome of this litigation.

**Section 2 – Rebotix was not required to seek approval from the FDA (via a 510(k) submission or otherwise) for the services Rebotix performs on EndoWrists.**

### 2.1     Overview of the FDA.

20.     The mission of the FDA is to protect public health by ensuring the safety and

efficacy of human and animal drugs, biological products (e.g., vaccines), and medical devices.

The agency also regulates food and cosmetics.

21.     Three laws that have had a significant impact on the FDA's activities and actions

are:

- The Federal Food, Drug, and Cosmetic Act of 1938, which established the

6

requirement for companies to present evidence for drug safety.

- The Kefauver-Harris Amendments of 1962, which were motivated by the thalidomide tragedy and strengthened drug safety rules and established the requirement for drugs to be effective.

- The Medical Device Amendments of 1976, which applied safety and effectiveness requirements for new medical devices.

22.     There are six centers at the FDA that are mainly responsible for reviewing products.

- Center for Biologics Evaluation and Research;

- Center for Devices and Radiological Health;

- Center for Drug Evaluation and Research;

- Center for Food Safety & Applied Nutrition;

- Center for Tobacco Products; and,

- Center for Veterinary Medicine

23.     The Center for Devices and Radiological Health (CDRH) regulates firms that manufacture, repackage, relabel, and/or import medical devices sold in the United States.

24.     The CDRH organizational structure is subject to change.

- Office of Commissioner

  o   Center for Devices and Radiological Health

  o   Office of Product Evaluation and Quality

25.     The Office of Product Evaluation and Quality and the underlying organizational units are responsible for the following programs that evaluate or clear medical devices for clinical investigations or marketing.

- Premarket Notification (510(k));

- Premarket Approval Applications (PMA);

- Investigational Device Exemptions (IDE);

- Humanitarian Device Exemption (HDE);

- De Novo program; and,

- Product Development Protocol program.

**2.2    History of the 510(k) review process and the development of substantial equivalence.**

26.    While an FDA drug submission must include data and information that shows the drug is safe and effective, most medical devices are approved through the 510(k) process which has a standard of substantial equivalence.

27.    The original FDA statute, the Pure Food and Drug Act of 1906, did not cover medical devices. The replacement of the 1906 law, the Federal Food, Drug, and Cosmetic Act of 1938 specified the same treatment for medical devices and drugs.

28.    The Medical Device Amendments of 1976, passed by Congress on May 28, 1976, established the regulatory framework FDA applies today to medical devices.  It created three classes of medical devices (I, II, and II), added section 510(k), and introduced the term substantially equivalent to the Federal Food, Drug, and Cosmetic Act of 1938.

---

Section 510(k)
Reprinted in this box is section 510(k) of the Federal Food, Drug, and
Cosmetic Act of 1938 added by the Medical Device Amendments of 1976

Each person who is required to register under this section and who proposes to
begin the introduction or delivery for introduction into interstate commerce for
commercial distribution of a device intended for human use shall, at least
ninety days before making such introduction or delivery, report to [FDA]…
(1) the class in which the device is classified under section 513 or if such
person determines that the device is not classified under such section, a

---

> statement of that determination and the basis for such person's determination that the device is or is not so classified, and
>
> (2) action taken by such person to comply with requirements under section 514 or 515 which are applicable to the device.

> First use of the term substantially equivalent:
>
> Reprinted in this box is section 513(f)(1) of the Federal Food, Drug, and Cosmetic Act of 1938 added by the Medical Device Amendments of 1976
>
> Any device intended for human use which was not introduced or delivered for introduction into interstate commerce for commercial distribution before the date of enactment of this section is classified in class III unless —
>
> (A) the device —
>
> (i) is within a type of device (I) which was introduced or delivered for introduction into interstate commerce for commercial distribution before such date and which is to be classified pursuant to subsection (b), or (II) which was not so introduced or delivered before such date and has been classified in class I or II, and
>
> (ii) is substantially equivalent to another device within such type….

29.    The 510(k) clearance process was not designed in 1976 to evaluate the safety and effectiveness of new medical devices but only to assess their similarity to pre-amendment devices.

30.    When the 510(k) approval process was created in 1976 with the passage of the Medical Device Amendments Act, it was intended to serve as a short-term solution for the review and approval of medical devices.  Because the 510(k) process was used for a longer period and for a greater variety of medical devices than originally intended, its consistent use became problematic. In 1986, the FDA published a guidance (Guidance on the CDRH Premarket Notification Review Program 6/30/86 (K86-3) that explained how to determine substantial equivalence in a 510(k) review.  The K86-3 guidance from 1986 identified three questions to answer when determining if a new device is substantially equivalent to its predicate device:

- Does the new device have the same intended use as a predicate device?

- Does the new device have the same technological characteristics, i.e., same

9

materials, design, energy source, etc.?

- If it has new technological characteristics, could they affect safety or effectiveness?

31.    In November 1990 with the passage of the Safe Medical Devices Act of 1990, substantial equivalence was given a statutory definition.

---

Statutory definition of the term "substantially equivalent":
Reprinted in this box is section 513(i)(1)(A) of the Federal Food, Drug, and Cosmetic Act of 1938 added by the Safe Medical Devices Act of 1990

For purposes of determinations of substantial equivalence under subsection (f) and section 520(l), the term "substantially equivalent" or "substantial equivalence" means, with respect to a device being compared to a predicate device, that the device has the same intended use as the predicate device and that [FDA] by order has found that the device—

(i) has the same technological characteristics as the predicate device, or

(ii) (I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device contains information, including appropriate clinical or scientific data if deemed necessary by [FDA] or a person accredited under section 523, that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and effectiveness than the predicate device.

---

32.    In the sections below, I set forth several reasons why Rebotix was not required to seek FDA clearance by submitting a 510(k) for its EndoWrist services.

### 2.3    Rebotix was not required to submit a 510(k) because Rebotix has not introduced serviced EndoWrists into commerce.

33.    Rebotix was not required to submit a 510(k) premarket notification for its serviced EndoWrists to the FDA because the evidence demonstrates that it has not introduced or reintroduced its serviced EndoWrists into commercial distribution.  Instead, the healthcare establishments (i.e., the hospitals) own the EndoWrists at all times, and Rebotix performs a service for those hospitals.

34.    The FDA recognizes a distinction between providing services on instruments that a

hospital already owns and selling new serviced instruments to the hospital.  When a hospital

maintains ownership of the device, and a third party performs a service on that device, 510(k)

approval is not required.  This is made explicit in the controlling FDA regulations and is

commonly understood among FDA consultants and experts.

     35.    The regulatory criteria for when a 510(k) premarket notification should be

submitted is set forth in 21 CFR § 807.81.  As relevant here, 21 CFR 807.81(a) sets forth the

criteria for when a party must submit a premarket notification:

    § 807.81 When a premarket notification submission is required.

    (a) Except as provided in paragraph (b) of this section, each person who is required to register his establishment pursuant to § 807.20 must submit a premarket notification submission to the Food and Drug Administration at least 90 days before he proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use which meets any of the following criteria:

        (1) The device i**s being introduced into commercial distribution** for the first time; that is, the device is not of the same type as, or is not substantially equivalent to, (i) a device in commercial distribution before May 28, 1976, or (ii) a device introduced for commercial distribution after May 28, 1976, that has subsequently been reclassified into class I or II.

        (2) The device **is being introduced into commercial distribution** for the first time by a person required to register, whether or not the device meets the criteria in paragraph (a)(1) of this section.

        (3) The device is one that the person currently **has in commercial distribution or is reintroducing into commercial distribution**, but that is about to be significantly changed or modified in design, components, method of manufacture, or intended use. The following constitute significant changes or modifications that require a premarket notification:

            (i) A change or modification in the device that could significantly affect the safety or effectiveness of the device, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process.

            (ii) A major change or modification in the intended use of the device.

     36.    Accordingly, under 21 CFR § 807.81, a person is required to submit a 510(k)

premarket notification only when the "device is being introduced into commercial distribution"

or when the "device is one that the person currently has in commercial distribution or is reintroducing into commercial distribution."

37.    21 CFR §807.3(b) defines "commercial distribution" as "distribution of a device intended for human use which is held or offered for sale."[1]

38.    Accordingly, if a company purchased EndoWrists, performed services on those EndoWrists, then held or offered those serviced EndoWrists for sale, then that company would be introducing or reintroducing EndoWrists for commercial distribution.  However, if hospitals maintain ownership of their EndoWrists and a company services the EndoWrists that the hospitals own, then that company is never holding or offering EndoWrists for sale.  It is therefore not introducing or reintroducing EndoWrists into commercial distribution.

39.    Instead, the hospital is servicing instruments it already owns.  And the FDA is clear that "Healthcare establishments may directly employ professionals (biomedical and clinical

---

[1] The complete definition, as set forth in 21 CFR §807.3(b), is as follows:

(b) Commercial distribution means any distribution of a device intended for human use which is held or offered for sale but does not include the following:

(1) Internal or interplant transfer of a device between establishments within the same parent, subsidiary, and/or affiliate company;

(2) Any distribution of a device intended for human use which has in effect an approved exemption for investigational use under section 520(g) of the act and part 812 of this chapter;

(3) Any distribution of a device, before the effective date of part 812 of this chapter, that was not introduced or delivered for introduction into interstate commerce for commercial distribution before May 28, 1976, and that is classified into class III under section 513(f) of the act: Provided, That the device is intended solely for investigational use, and under section 501(f)(2)(A) of the act the device is not required to have an approved premarket approval application as provided in section 515 of the act; or

(4) For foreign establishments, the distribution of any device that is neither imported nor offered for import into the United States."

12

engineers, healthcare technology management professionals, etc.) that perform servicing

activities, including maintenance and repair." FDA Report on the Quality, Safety, and

Effectiveness of Servicing of Medical Device, May 2018, pages 1-2.

(https://www.fda.gov/media/113431/download).

40.     This same distinction was deemed "important" in an analyst report, discussed

below in Section 2.7, that relied on input from several FDA/regulatory experts. The report

states: "Importantly, the serviced instruments are always shipped back to the original hospital

(i.e., no reselling) and the instruments are shipped back to the hospital only after verification that

there has been no deviation from the original 'performance or safety specifications.'" Intuitive-

00566060 (emphasis added). "[O]ur takeaway from these consultants is that 510(k) clearance

does not seem to be required for independent service organizations refurbishing used da Vinci

instruments so long as they are returned to that same hospital and not re-sold to other centers."

Intuitive-00566057.

41.     The report further states: "FDA consultant underscored that ownership is a key

determinant of regulatory requirements and FDA oversight broadly. … When a hospital

purchases an instrument from Intuitive, the hospital takes ownership of the device. … So when

the hospital sends the instrument to a third party like Restore Robotics for refurbishment, the

third party is … acting as a contractor providing a service for the hospital. … That is, ownership

of the device never actually changes hands." Intuitive-00566061. "Another FDA expert we

consulted fully concurred, noting that once an instrument is purchased it becomes property of the

hospital which is free to 'do whatever it wants with it." Intuitive-00566061. "All of our

consultants emphasized that a used instrument that is sent to a third party for repair must be

shipped back only to that same hospital such that there is no change in ownership. We

13

confirmed with both hospitals and Restore that such is indeed the case here."[2]  Intuitive-00566061.

42.     The evidence in this case demonstrates that Rebotix does not sell serviced EndoWrists.  Ownership of the device never changes hands.  See Papit depo. tr., 153:17-154:2; conversation with Greg Feigel of Rebotix ("Feigel conversation"); REBOTIX068469-REBOTIX068470 (Rebotix marketing document entitled, "Hospital Right to Repair," discussing Rebotix's service of "repairing instruments which [hospitals] purchased and owned").  Hospitals maintain ownership of EndoWrists at all times.  Id.  Rebotix services the EndoWrists that a hospital owns and then ships back the serviced EndoWrists to the same hospital.  Id.; Gibson depo. tr. 66:25-67:7 ("The repair process is you send us serial number, for example, 123, and we ship you back serial number 123 after the repair process has been performed").  Rebotix is therefore not introducing or reintroducing those EndoWrists into commercial distribution.  And there is thus no requirement that Rebotix seek FDA clearance.

43.     Moreover, the definition of a 510(k) provided by the FDA further demonstrates why there is no need for Rebotix to seek 510(k) approval.  The FDA states: "A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent, to a legally marketed device (section 513(i)(1)(A) FD&C Act) that is not subject to premarket approval."  https://www.fda.gov/medical-devices/premarket-submissions/premarket-notification-510k.

44.     Accordingly, 510(k) submissions are required when there is a "device" that will be "marketed," i.e., a device that will be put on the market.  Here, Rebotix is not putting any device

---

[2] I understand that Restore Robotics was formerly licensed by Rebotix to use Rebotix's technology for EndoWrist repairs and followed the same procedure for repairs as Rebotix. Feigel conversation.  Statements in the Deutsche Bank report about Restore Robotics' EndoWrist repair process are therefore applicable to Rebotix.

on the market.  Instead, it is servicing devices hospitals already own.

45.     This opinion is shared by other regulatory experts.  The same analyst report referenced above concludes that "regulatory experts" view Intuitive's argument that companies like Rebotix require "510(k) approval" as "fundamentally misplaced."  Intuitive-00566062. "One consultant noted that the non-applicability of 510(k) approval is made quite clear by simply considering the FDA's official definition of this process."  Intuitive-00566062 (referring to the same definition for a 510(k) that I quoted above).  "The agency's definition explicitly qualifies application of 510(k) standards to devices intended to be <u>marketed</u>.  Because third parties are providing a <u>service</u> to the hospital and not commercially marketing the repaired instruments, by definition this precludes the obligation of having 510(k) clearance."  Intuitive-00566062 (emphasis original).[3]

### 2.4     Rebotix was not required to submit a 510(k) because Rebotix does not significantly change EndoWrists' intended use or EndoWrists' performance and safety specifications.

46.     In my opinion, Rebotix was not required to submit a 510(k) premarket notification for its services for a second reason: the evidence demonstrates that Rebotix's services do not significantly change EndoWrists' intended use, or performance or safety specifications.

47.     The same section of the CFR quoted above provides in relevant part that "a premarket notification submission is required" when the "device …  that the person currently has in commercial distribution or is reintroducing into commercial distribution … is about to be significantly changed or modified in design, components, method of manufacture, or intended

---

[3] My understanding is that Rebotix's predecessor company Rebotix LLC did explore the possibility of commercial distribution for serviced EndoWrists and therefore sought 510(k) clearance in an abundance of caution.  Papit depo. tr., 210:9-211:22; Feigel conversation.  After the business model changed and the decision was made not to sell serviced EndoWrists, the 510(k) was deemed unnecessary and Rebotix withdrew its application.  *Id.*

use.  The following constitute significant changes or modifications that require a premarket notification: (i) <u>A change or modification in the device that could significantly affect the safety or effectiveness of the device</u>, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process[,] [or] (ii) <u>A major change or modification in the intended use of the device</u>."   21 CFR 807.81(a)(3).

48.    Accordingly, a company that sells a device in the U.S. market could require 510(k) approval if its process significantly changes (1) the original device's intended use or (2) its performance or safety specifications.  If the process does not significantly change either the device's intended use or its performance or safety specifications, then a 510(k) submission is not required.

49.    This distinction was most recently addressed by the FDA in a document entitled: Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administrative Staff, issued on June 18, 2021 ("2021 FDA Guidance").[4]  The guidance draws a distinction between "servicing" and "remanufacturing," where only the latter can be subject to oversight by the FDA.  2021 FDA Guidance at 3.  "The critical distinction is the categorization [i.e., 'service' vs. 'remanufacture'] of used instruments serviced by third parties for additional use given the significant implications vis-a-vis regulatory oversight."  Intuitive-00566060.  The FDA defines "servicing" and "remanufacturing" as follows:

- "<u>Servicing</u> is the repair and/or preventative or routine maintenance of one or more parts in

---

[4] This document stated that it is a "draft guidance document is being distributed for comment purposes only."  2021 FDA Guidance at 1.  It further states that the "contents of this document do not have the force and effect of law" and "should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited."   2021 FDA Guidance at 2.  Although this document merely provides guidance and is not controlling like the CFR regulations, it is nevertheless a description of the agency's current thinking on the topic.

a finished device, after distribution, for purposes of <u>returning it to the safety and</u>

<u>performance specifications</u> established by the original equipment manufacturer (OEM)

and <u>to meet its original intended use</u>."   2021 FDA Guidance at 3 (emphasis mine).

- "<u>Remanufacturing</u> is processing, conditioning, renovating, repackaging, restoring, or any

  other act done to a finished device that <u>significantly changes the finished device's</u>

  <u>performance or safety specifications, or intended use.</u>"  2021 FDA Guidance at 3

  (emphasis mine).

    50.    Intuitive agrees that an entity cannot be a remanufacturer, under the FDA's

definition, if it does not significantly change the device's safety specifications or intended use

> 20      If a person or entity performs a process
> 21  on a device that does not significantly change the
> 22  finished device's performance or safety
> 23  specifications or intended use, then that person or
> 24  entity is not a remanufacturer; correct?
> …
> 1      THE WITNESS:  Yes, by FDA's definition.

       -Johnson depo. tr., 108:20-109:1 (objection omitted).

> 12    Q  If Rebotix demonstrated that its services
> 13  do not significantly change an EndoWrist performance
> 14  for safety specifications or intended use, then
> 15  Rebotix's would not be a remanufacturer, per the
> 16  FDA's definition; correct?
> …
> 20      THE WITNESS:  Yes.

       -Johnson depo. tr., 109:12-20 (objection omitted).

    51.    As detailed below, based on my review of the evidence and prevailing FDA

standards, it is my opinion that Rebotix's services do not significantly change the intended use or

the performance and safety specifications.  Moreover, I note that my opinions are consistent with

other experts: "We believe da Vinci instruments currently refurbished by Restore Robotics

clearly fall under the definition of 'service' as the process these used instruments undergo are intended to return them to 'the safety and performance specifications established by the OEM and to meet its original intended use' and do not involve 'activities that change the intended use.'" Intuitive-00566060 (analyst report based on input from regulatory experts).   In Section 2.4.1 below, I address intended use.  And in Section 2.4.2, I address performance and safety.

### 2.4.1   Rebotix's services do not significantly change the intended use of EndoWrists.

52.      The "intended use" of a device is "the general purpose of the device or its functions, which encompasses the indications for use."  2021 FDA Guidance at 4.

53.      An important source for determining the intended use of a device is looking to how the manufacturer and the FDA described the intended use when the manufacturer first presented the device to the FDA.

54.      Intuitive sought approval for its EndoWrists by submitting a 510(k) premarket notification to the FDA in 1999.  Intuitive's 510(k) included a definition of "Intended Use."[5]

> **Intended Use:**
>
> The Intuitive Surgical™ Endoscopic Instrument Control System is intended to assist in the accurate control of Intuitive Surgical™ Endoscopic Instruments including, rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, clip appliers, endoscopic retractors, stabilizers, electrocautery and accessories during laparoscopic surgical procedures.  It is intended to be used by professionals in operating room environments.

55.      Based on the contents of Intuitive's 510(k) submission, the FDA approved EndoWrists for entry to the market.   Intuitive-00512045-00512407; Johnson depo. tr., 36:19-23. In its letter approving EndoWrists, the FDA reiterated Intuitive's definition of EndoWrists'

---

[5] Along with its 510(k) submission, and as required by the FDA, Intuitive submitted a signed statement attesting that the contents of the submission are truthful and accurate and that no material fact was omitted.  Intuitive-512056; Johnson depo. tr., 18:7-16; 45:1-18.

intended use in the FDA's description of "Indications for Use."

> **Indications for Use:**
>
> The Intuitive Surgical™ Endoscopic Instrument Control System (hereinafter referred to as the "da Vinci™ System") is intended to assist in the accurate control of Intuitive Surgical™ endoscopic instruments including: rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, endoscopic retractors, stabilizers, electrocautery and accessories during laparoscopic surgical procedures such as cholecystectomy or Nissen fundoplication.  It is intended for use by trained physicians in an operating room environment.
>
> Intuitive Surgical™ Endoscopic Instruments including scissors, scalpels, forceps/pick-ups, needle holders, clip appliers, and electrocautery are intended for endoscopic manipulation of tissue, including: grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery and suturing.

Intuitive-00512047.  Intuitive confirmed that the second paragraph quoted above pertains to
Intuitive's EndoWrists.  Johnson depo. tr., 37:22-39:17.

56.    Accordingly, both Intuitive and the FDA's definitions of the intended use of
EndoWrists were the same as traditional non-robotic surgical instruments used in endoscopic
surgery.  As the FDA stated:

> "Intuitive Surgical Endoscopic Instruments [i.e., EndoWrists] including scissors,
> scalpels, forceps/pickups, needle holders, clip appliers, and electrocautery are intended
> for endoscopic manipulation of tissue, including: grasping, cutting, blunt and sharp
> dissection, approximation, ligation, electrocautery and suturing."  Intuitive-00512047.

57.    I understand that, in this litigation, Intuitive contends that by resetting the
maximum use counter on EndoWrists back to its original number of uses, Rebotix's services
significantly change the intended use of EndoWrists.  I disagree.

58.    Extending the number of lives an EndoWrist can be used does not significantly
change the intended use of EndoWrists.  This is confirmed by Intuitive's own submissions to the
FDA concerning the intended use of EndoWrists, the FDA's formal statements on the intended

19

use of EndoWrists, the testimony of Intuitive's own regulatory team, and Intuitive's own internal

analysis.

59.     As set forth above, Intuitive's own definition of the Intended Use in its 510(k)

submission, and the definition adopted by the FDA, included no mention of a maximum use

limitation.  This was confirmed by Mark Johnson, Intuitive's Senior Vice President for

Regulatory, who Intuitive designated to provide 30(b)(6) testimony on behalf of Intuitive:

> 25     Q   The Intended Use, as defined by Intuitive
> 1  in this FDA submission, makes no mention of maximum
> 2  use restrictions; correct?
> 3      A   Correct.

-Johnson depo. tr., 30:25-31:3.

> 15     Q   Understood.  Turning back to the
> 16  Indications for Use Statement in the enclosure, the
> 17  indications for use for EndoWrists adopted by the
> 18  FDA does not reference any maximum use restrictions;
> 19  correct?
> 20        MS. LENT:  Object to the form.
> 21        THE WITNESS:  Correct.
> 22  BY MR. LYON:
> 23     Q   The Indications for Use Statement
> 24  references scissors; correct?
> 25      A   It does.
> Page 41
> 1      Q   The Indications for Use Statement does not
> 2  state that scissors can be used a maximum number of
> 3  10 times; correct?
> 4      A   Correct.
> 5      Q   The Indications for Use Statement
> 6  references scalpels; correct?
> 7      A   It does.
> 8      Q   Indications for Use Statement does not
> 9  state that scalpels can be used a maximum of 10
> 10  times; correct?
> 11      A   It does not say that, no.
> 12      Q   The Indications for Use Statement does not
> 13  put any limitations on the number of times that the
> 14  scalpels, the scissors, the forceps, the needle
> 15  holders, the clip appliers can be used; correct?
> 16      A   Correct.

20

-Johnson depo. tr., 40:15-41:16.

60.     I have reviewed the details of Rebotix's services set forth in Rebotix's summary

document "EndoWrist Service Procedure" at REBOTIX162404-REBOTIX162424.  I have also

watched a video showing an exemplary servicing.  REBOTIX 175327.  And I have spoken to

Greg Feigel of Rebotix about Rebotix's services.  Based on my review of Rebotix's services, I

have seen nothing that affects the intended use of the EndoWrists.

61.     Instead, Rebotix inspects the EndoWrists, makes the necessary repairs, and adds

an Interceptor chip to restore the original use count.  These steps ensure that the EndoWrists can

continue to be used for their intended use of endoscopic manipulation of tissue.

62.     For example, Rebotix does not change the intended use of EndoWrist scissors in a

way that precludes them from cutting tissue.  Instead, Rebotix, adjusts, and sharpens the scissors

so that they can continue to cut tissue.  Similarly, Rebotix does not change the intended use of

EndoWrist graspers in a way that precludes them from grasping tissue.  Instead, Rebotix inspects

and adjusts the graspers to ensure that they can continue to grasp tissue.  This is shown, for

example, in Rebotix's EndoWrist Procedure document, which includes the following steps

> **6.4.2.** Aligning and Sharpening:
> **6.4.2.1.** Under magnification inspect the alignment of jaws or blades. Each type will have specific ways they mesh and interact. Verify that they perform their grasping or cutting motions fully and correctly. If adjustments are needed, use a small pair of pliers to make the required adjustments.
> **6.4.2.2.** Files can be used to correct any misaligned or damaged grasper teeth.
> **6.4.2.3.** For scissors, make three cuts, in close proximity, on the TheraBand material. The scissors should cut at least the distal 2/3 of the cutting edges. If insufficient cutting is occurring the cutting edges may be dull. If any of the cuts to not complete cleanly or fully, the cutting edges may be dull or there may be a nick in the cutting edge. If sharpening is needed, use the #6 and #10 cut files to hone the cutting edges as needed. Always remove burs created from sharpening by closing the jaws in a cutting motion on the TheraBand a few times. Always recheck for sharpness on the TheraBand following any sharpening.

REBOTIX162422.[6]

63.     Moreover, in its submission to the FDA, Intuitive represented that its EndoWrists

"are substantially equivalent in intended use" to other endoscopic devices that do not require any

maximum use restrictions.   Intuitive-00512043 (510k summary).  In particular, Intuitive

represented that its EndoWrists "are substantially equivalent in intended use" to predicate

devices including the Baxter Healthcare and Deknatel Snowden Pencer Diamond Touch

endoscopic instruments:

---

**Predicate Devices:**

The Intuitive Surgical™ Endoscopic Instruments and Tools are substantially equivalent in intended use and/or method of operation to the following predicate devices:

1.      Various Class I Exempt and Class II endoscopic electrocautery surgical instruments including the Baxter Healthcare Endoscopic Instruments (K931340) and the Deknatel Snowden Pencer Diamond Touch™ Brand of Endoscopic Instruments (K960400).
2.      The Intuitive Surgical™ Endoscopic Instrument Control System and selected instruments (K975001).

---

Intuitive-00512043 (510k summary); Johnson, 24:21-25:18.  And these endoscopic instrument

predicate devices are traditional laparoscopic devices that do not have any maximum use

restrictions.  Johnson, 26:20-27:23.

64.     Moreover, the analysis conducted by Intuitive's own regulatory team confirms

that changing the maximum number of uses for an EndoWrist is not a significant change in an

EndoWrists' intended use that would require a 510(k) submission.

65.     Each time Intuitive makes a change to its EndoWrists, Intuitive performs an

analysis of whether a 510(k) submission is required.  Johnson depo. tr., 66:3-20.  When Intuitive

---

[6] I understand that Rebotix repairs the following EndoWrists: scissors, graspers, needle drivers, forceps, cautery hooks, and cautery spatulas.  See REBOTIX068497 (price list for Rebotix's service by EndoWrist type); REBOTIX166019 (sales data for Rebotix's service by EndoWrist type).

determines that a 510(k) submission is not required for a particular change, it creates a Non-Filing Justification (NFJ) that sets forth the reasons why a 510(k) is not required.   Johnson depo. tr., 66:3-20.

66.     Recently, for certain EndoWrists, Intuitive changed the maximum use restrictions for the EndoWrists.  In doing so, Intuitive addressed the question of whether extending the maximum use requirement (i.e., increasing the number of lives for an EndoWrist) constitutes a change in an EndoWrists' intended use.

67.     Intuitive concluded that it does not.  In its Non-Filing Justifications, Intuitive repeatedly wrote: "Extending the number of lives does not involve any changes to the intended use(s) or instrument design." Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552635; Ex. 15 (Non-Filing Justification) at Intuitive-00552700 (same); Ex. 16 (Non-Filing Justification) at Intuitive-00552718 (same); Ex. 17 (Non-Filing Justification) at Intuitive-00552729 (same); Ex. 18 (Non-Filing Justification) at Intuitive-00552654 (same); Ex. 19 (Non-Filing Justification) at Intuitive-00552666 (same).

68.     And Intuitive confirmed this conclusion at deposition:

> 11     Q   Intuitive concluded that extending the
> 12  number of lives does not involve any changes to the
> 13  intended use or instrument design; correct?
> 14     A   Correct.
>                         - Johnson depo, tr. 73:11-14.

69.     Accordingly, the intended use of an EndoWrist is not affected by an increase in the maximum number of uses specified for the EndoWrist.

70.     Moreover, even if the number of uses as set forth in the use counter were part of the intended use for the devices (which they are not), the intended use still would not be significantly changed by Rebotix's services.  When Rebotix services an EndoWrist, it does not increase the use counter to a number beyond that at which it was originally set.  Feigel

conversation.  Instead, it returns the counter to its original specification.  *Id*.  For example, EndoWrists typically have an original use limit of ten.  *Id*.  And EndoWrists are typically sent to Rebotix when they only have one use left on the counter.  *Id*.  Upon receiving the EndoWrist, Rebotix inspects and repairs the EndoWrist to ensure that it maintains the performance specifications of a new EndoWrist.  Rebotix then likewise sets the counter to its original specification: 10 uses.  It does not eliminate the use counter, or set it to a different number than the original specifications.  It returns the EndoWrist's use counter back to its original setting so it can continue to be used as intended:  for the endoscopic manipulation of tissue.  After the EndoWrist has been used for ten additional uses, it can then be returned to Rebotix for possible additional servicing.

71.     Accordingly, this process falls squarely within the definition of "servicing," which, as set forth above, is intended to return the device to "its original intended use":

> "Servicing is the repair and/or preventative or routine maintenance of one or more parts in a finished device, after distribution, for purposes of underlining returning it to the safety and performance specifications established by the original equipment manufacturer (OEM) and to meet its original intended use."

2021 FDA Guidance at 3

### 2.4.2   Rebotix's services do not significantly change the safety and performance specifications of EndoWrists.

72.     Intuitive alleges that Rebotix's services constitute a change or modification that significantly affects the performance and safety specifications of EndoWrists, as set forth in 21 CFR 807.81(a)(3) (reproduced above).  Johnson depo. tr., 114:5-25; Intuitive-00552745- 00552759 (Curet letter to FDA).  As set forth below, I disagree.

73.     FDA Guidance makes clear that when evaluating whether there have been any significant changes to the performance or safety specifications, the "key issue in the interpretation of 21 CFR 807.81(a)(3) is that the phrase 'could significantly affect the safety or

effectiveness of the device.'"  Deciding When to Submit a 510(k) for a Change to an Existing

Device; Guidance for Industry and Food and Drug Administration Staff, issued on October 25,

2017 ("2017 FDA Guidance").  That is, the relevant question does not turn on the details of the

specifications of the device, but on whether there have been any changes to the device that would

significantly affect its safety or effectiveness. [7]

74.    I understand that Intuitive applies this same standard when determining whether it

should submit a 510(k) after making a change to one of its EndoWrists:

> 7    Q   If Intuitive determines that performance
> 8  specifications of an EndoWrist are changed, but
> 9  those changes are not expected to significantly
> 10  affect the safety or effectiveness of the device,
> 11  Intuitive believes that a 510(k) is not necessary;
> 12  correct?
> 13        MS. LENT:  Objection.
> 14        THE WITNESS:  That could be correct, yes.

-Johnson depo. tr., 78:7-14.

> 10        So changing performance specifications is
> 11  permissible without submitting a 510(k), so long as
> 12  Intuitive can demonstrate that that change is not
> 13  expected to significantly affect the safety or the
> 14  effectiveness of the device; correct?
> 15    A   Each change has to be evaluated, but in
> 16  this particular instances, yes.

-Johnson depo. tr., 79:10-16.

---

[7] I understand that Intuitive has also suggested that Rebotix cannot ensure that it is maintaining original device specifications for EndoWrists because Intuitive does not publish the specifications for its devices.  This suggestion is unfounded.  First, the FDA is not concerned with maintaining exact device specifications.  The focus is on maintaining safety and effectiveness, as set forth in consensus standards.  See above.  Second, it is not necessary to have published specifications from a company to know its specifications.  Instead, this is routinely determined by product analysis, reverse engineering, and consensus standards.  For example, in Intuitive's 510(k) showing substantial equivalence to the predicate device Snowden-Pencer endoscopic instruments, Intuitive did not reference the original specifications published by Snowden-Pencer.  Instead, it analyzed the Snowden-Pencer instruments and relied on its own analysis.  See e.g. Intuitive-00512077- Intuitive-00512083.

75.     For example, for certain EndoWrists, Intuitive itself changed the "performance specifications" from "10 lives to 14 lives," from "10 lives to 15 lives," or from "10 lives to 18 lives."  Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552638; Ex. 16 (Non-Filing Justification) at Intuitive-00552720; Ex. 17 (Non-Filing Justification) at Intuitive-00552732. Despite making these changes, Intuitive concluded that it was not required to submit a 510(k) because "increasing the number of lives for these instruments is not expected to significantly affect the safety or effectiveness of the device."  Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552638; Ex. 15 (Non-Filing Justification) at Intuitive-00552703 (same); Ex. 16 (Non-Filing Justification) at Intuitive-00552720 (same); Ex. 17 (Non-Filing Justification) at Intuitive-00552732 (same); Ex. 18 (Non-Filing Justification) at Intuitive-00552656 (same); Ex. 19 (Non-Filing Justification) at Intuitive-00552669 (same).

76.     Similarly, if Rebotix's services (including resetting the usage counter to increase the number of lives for the instrument) do not significantly affect the safety or effectiveness of the EndoWrist, then a 510(k) would not be required.  As discussed below, the evidence I have reviewed demonstrates that Rebotix's services do not affect the safety and effectiveness of the EndoWrists.

### 2.4.2.1 Intuitive's allegations of a significant effect on effectiveness and safety.

77.     I understand that Intuitive has alleged that, during its servicing, Rebotix makes two changes to EndoWrists that significantly affect the safety and effectiveness of the device: (a) the change to the number of times a Rebotix-serviced EndoWrist can be used and (b) the physical addition of the Interceptor chip that allows the Rebotix-serviced EndoWrist to be used additional times.  Johnson depo. tr., 111:12-17; 114:5-115:1.

78.     Intuitive alleges that these changes can significantly affect the safety and

26

effectiveness of EndoWrists in four different ways, i.e., by causing the following four failures "[1] Unintuitive motion (i.e., instruments do not track well with master manipulators; unexpected motion or stalls); [2] Insufficient grip force; [3] Dull or damaged scissor blades; and [4] Worn/damaged cables." Intuitive-00552745-00552759 (Intuitive letter sent to FDA) at Intuitive-00552748; Pullman depo. tr. Ex. 6 (letter Intuitive sends to hospitals using Rebotix's services) at p. 1; Curet depo. tr., 142:12-143:14.

79.     For Rebotix's services to constitute a significant change to the performance of EndoWrists, as alleged by Intuitive, the Rebotix service would, at minimum, need to introduce or significantly increase the likelihood that these failures occur.  And for Rebotix's services to constitute a significant change to the safety of EndoWrists, as alleged by Intuitive, these newly introduced or increased failures would need to adversely affect patient safety.  I address performance and safety issues, in the context of the FDA guidelines, in the sections that follow.

### 2.4.2.2 No evidence demonstrating that Rebotix's services significantly increase the likelihood of the failures alleged by Intuitive.

80.     Sources of information that the FDA could use to determine whether Rebotix's services significantly increase the likelihood of the four identified failures include any testing demonstrating that Rebotix-serviced EndoWrists introduce or increase the likelihood of these failures, or any reports demonstrating that Rebotix-serviced EndoWrists introduce or increase the likelihood of these failures.

81.     This case presents none of that.  Instead, the evidence shows that:

   a)  Intuitive has performed no testing to demonstrate that Rebotix-serviced EndoWrists introduce or increase the likelihood of EndoWrist failures.

   b)  Rebotix has performed substantial testing to ensure that Rebotix-serviced EndoWrists do not introduce or increase the likelihood of EndoWrist failures.

27

c) Hospitals and Intuitive acknowledge that the EndoWrist failures that Intuitive falsely attributes to Rebotix are commonplace in EndoWrists provided directly from Intuitive that have not been serviced by Rebotix.

d) The failures identified by Intuitive are not unique to EndoWrists; they are commonplace in analogous laparoscopic instruments that are routinely repaired with no oversight from the FDA.

### 2.4.2.2.1  No tests demonstrate that Rebotix-serviced EndoWrists introduce or increase the likelihood of the failures alleged by Intuitive.

82.     Although Intuitive has alleged that Rebotix serviced EndoWrists increase the likelihood of EndoWrist failures, Intuitive has been unable to identify any actual testing of Rebotix-serviced EndoWrists to support these allegations.

83.     For example, Intuitive wrote a letter to the FDA complaining about Rebotix's services and alleging that Rebotix-serviced EndoWrists could significantly affect the performance of EndoWrists because of the following failures: "[1] unintuitive motion (i.e., instruments do not track well with master manipulators; unexpected motion or stalls); [2] Insufficient grip force; [3] Dull or damaged scissor blades; and [4] Worn/damaged cables." Johnson Ex. 21 (Curet letter to FDA) at Intuitive-00552748.  Dr. Myriam Curet, Intuitive's Chief Medical Officer, was the signatory for the letter.

84.     Dr. Curet testified that she understood the contents of the letter and was confident in its accuracy.  Curet depo. tr., 104:15-24.  When deciding what to include in the letter, Dr. Curet conferred with Mark Johnson, who is Intuitive's head of regulatory.  Curet depo. tr., 123:19-124:6.

85.     Deposition testimony from both Mr. Johnson and Dr. Curet revealed that, despite making these allegations to the FDA, Intuitive was unaware of any testing (or basis) to make

these allegations.

86.    Mr. Johnson testified that, although Intuitive was in "possession [of] certain EndoWrists that have been serviced by Rebotix," he was unaware if "Intuitive perform[ed] any testing on the Rebotix serviced EndoWrists."  Johnson depo. tr., 115:3-22; 115:24-116:10; 118:5-12; 119:11-120:9.

87.    Moreover, despite alleging in their letter to the FDA that Rebotix-serviced EndoWrists may exhibit (1) unintuitive motion, (2) insufficient grip force, (3) dull or damaged scissor blades, and (4) worn or damaged cables, Dr. Curet and Mr. Johnson acknowledged that they were unaware of any supporting testing and had no basis to make these allegations.

(1) Unintuitive motion:

        18    Q.   Are you aware of any investigation or
        19  analysis by Intuitive to determine whether Rebotix's
        20  services caused EndoWrists to have unintuitive
        21  motion?
        22    A.   I am not aware.

                        -Johnson depo. tr., 119:18-22.

        15      Q.   You have no basis to assert that
        16  Rebotix is unable to ensure intuitive motion
        17  in EndoWrists based on the services it
        18  performs, correct?
        19        MS. LENT:  Object to the form.
        20        THE WITNESS:  That's correct.

                        -Curet depo. tr., 151:15-20.

(2) Insufficient grip force:

        23      Q.  Are you aware of any investigation or
        24  analysis by Intuitive that Rebotix's services caused
        25  EndoWrist to have insufficient grip force?
        1     A.   I am not aware.

                        -Johnson depo tr., 119:23-120:1.

        6          You have no basis to assert that

                                29

7    Rebotix is unable to implement measures in its
8    servicing of EndoWrists to ensure that those
9    EndoWrists have sufficient grip force,
10   correct?
11          MS. LENT:  Object to the form --
12          THE WITNESS:  That's correct.
13       That's correct.

-Curet depo. tr., 151:6-13.


(3) <u>Dull or damaged scissor blades</u>:


6    Q.   Are you aware of any investigation or
7    analysis by Intuitive that Rebotix's services result
8    in EndoWrists having dull or damaged scissor blades?
9    A.   Nope, no.

-Johnson depo. tr., 120:6-9.

11       Q.   Has Intuitive performed any tests
12   of Rebotix repaired EndoWrist to determine if
13   they had dull or damaged scissor blades?
14       MS. LENT:  Object to the form.
15       THE WITNESS:  I don't know.

-Curet depo. tr. 153:11-15.

22       Q.   You don't have any basis to assert
23   that Rebotix can likewise take measures to
24   ensure that its serviced EndoWrists have
25   sufficiently sharp and nondamaged scissor
1    blade, correct?
2       MS. LENT:  Object to the form.
3       THE WITNESS:  That's correct.

-Curet depo. tr., 153:22-154:3.

(4) <u>worn/damaged cables</u>:


2    Q.   Are you aware of any investigation or
3    analysis that Rebotix's services caused EndoWrists
4    to have worn or damaged cables?
5    A.   I am not aware of that.

-Johnson depo. tr., 120:1-5.

30

20      You have no basis to assert that
21   Rebotix does not also take measures to ensure
22   that the cables are not worn, not damaged, and
23   have sufficient tension, correct?
24      MS. LENT:  Object to the form.
25      THE WITNESS:  Correct.

-Curet depo. tr., 163:20-25.

88.      Moreover, Bob DeSantis, Executive Vice President and Chief Product Officer of

Intuitive, admitted at deposition that Intuitive has not done any life-testing of Rebotix-serviced

EndoWrists to determine whether they perform to Intuitive's specifications and can be safely

used in surgery.

19      Intuitive has not performed any instruments
20   refurbished by Rebotix to determine whether or not
21   they perform to in Intuitive's specifications; right?
22      A   We have not done V&V or life testing on their
23   instruments, no.

-DeSantis depo. tr., 244:19-23.

6      Intuitive has not done testing of any kind to
7   determine whether Rebotix's refurbished EndoWrists can
8   safely be used with the da Vinci robot in surgery;
9   true?
10      A   True.  We've not done V&V testing, life
11   testing on their instruments, no.

-DeSantis depo. tr., 245:6-11.

89.      Intuitive's letter to the FDA also alleged that Rebotix's services could "disrupt[]

the traceability of these devices, which could make it difficult to identify all affected instruments

in a recall situation."  Intuitive-00552749.  But Intuitive revealed during deposition that this

allegation is also unfounded.

90.     The Rebotix service does not alter the serial numbers of EndoWrists in any way. Gibson depo. tr. 66:25-67:7 ("The repair process is you send us serial number, for example, 123, and we ship you back serial number 123 after the repair process has been performed").

91.     And as Dr. Curet testified at deposition: "Intuitive can trace its instruments by their serial numbers" and "a hospital that has purchased an Endowrist from Intuitive ha[s] access to the serial number of that particular EndoWrist." Curet depo. tr., 169:21-23; 171:11-14. Ms. Scoville from Intuitive also testified that Intuitive maintains "system logs [that] include device information, I believe, at the serial number level" and "the information that is provided to Intuitive as part of this traceability process include the identity of the hospital that was using an EndoWrist beyond its maximum designated usages." Scoville depo. tr. 124:5-125:3. Accordingly, Intuitive's "traceability" concerns are unfounded, and not something that would cause the FDA to question the safety of Rebotix's services.

92.     Intuitive's letter also attached two foreign injunctions—one from a Danish court and one from a German court—precluding the sale of serviced EndoWrists in those respective countries. These foreign orders would have no impact on any decision by the FDA. The FDA enforces the regulations set forth in the United States. Germany and Denmark operate under different legal systems with different laws and different regulatory frameworks. Indeed, that these foreign orders did not impact the FDA's view of Rebotix is confirmed by the fact that, after Intuitive sent these orders to the FDA and the FDA followed up with Rebotix, the FDA took no action against Rebotix. See Section 2.5 below. Moreover, I understand that the orders did not concern Rebotix Repair LLC (the Plaintiff in this case) but instead Rebotix Panama, a now defunct predecessor entity. Feigel conversation. It also appears that, unlike the FDA, the foreign courts were not presented with the facts of Rebotix's services. For example, the Denmark order

32

was under the misimpression that Rebotix Panama was selling EndoWrists.  See Intuitive-

00552752 (translation of Denmark Order) ("with a view to sale in Denmark").

> **2.4.2.2.2  Rebotix has performed substantial testing to ensure that Rebotix-serviced EndoWrists do not introduce or increase the likelihood of the failures alleged by Intuitive.**

93.     In contrast to the lack of testing of Rebotix-serviced EndoWrists by Intuitive, the

record demonstrates that Rebotix has performed substantial testing to ensure that Rebotix-

serviced EndoWrists perform just as safely and effectively as new EndoWrists, and do not

introduce or increase the likelihood of the four identified failures.

94.     Rebotix's testing includes (1) testing of each EndoWrist during the repair process;

(2) material analysis to ensure the materials Rebotix uses in any repair process match the

materials used by Intuitive in new EndoWrists; and (3) extended life-feasibility testing to

confirm that additional cleaning and autoclaving beyond the designated use count did not cause

Rebotix-serviced EndoWrists to fail or perform worse than new EndoWrists.  See, e.g.,

REBOTIX068498-REBOTIX0685121 ("Rebotix Instrument Service: Summary of Quality and

Reliability Measures"); conversation with Greg Feigel.  I address each of (1), (2), and (3) below.

95.     (1) testing during EndoWrist repair process: Before returning an EndoWrist to a

hospital, Rebotix inspects each EndoWrist under magnification and repairs the components as

necessary to ensure the EndoWrist remains as safe and effective as a new EndoWrist.

REBOTIX162404- REBOTIX162424 (EndoWrist Service Procedure); Feigel conversation.  A

typical EndoWrist would be expected to pass the inspection process, and be a candidate for

repair multiple times.  Feigel conversation.  As part of this process, Rebotix takes steps to ensure

that the repaired EndoWrist is no more likely than a new EndoWrist to suffer one of the four

purported failures identified by Intuitive, which I address in (A)-(D) below:

96.     A. worn or damaged cables: The Rebotix repair process includes an inspection of

33

the cables "under magnification" to determine if there are any "Broken or frayed manipulation cables" or "Broken or damaged Electrocautery cables (Electrosurgical EndoWrist Models Only).") REBOTIX162413. Rebotix does not repair EndoWrists with worn or damaged cables. Feigel conversation. If any wear or damage is observed, Rebotix informs the hospital and the EndoWrist is discarded. Feigel conversation.

97.     B. <u>dull or damaged scissor blades</u>: The Rebotix repair process "Inspects the instrument tool end under magnification for ... scissor cutting efficiency." REBOTIX162413 (Repair Service Procedure). The repair service procedure further specifies:

> 6.4.2.3. For scissors, make three cuts, in close proximity, on the TheraBand material. The scissors should cut at least the distal 2/3 of the cutting edges. If insufficient cutting is occurring the cutting edges may be dull. If any of the cuts to not complete cleanly or fully, the cutting edges may be dull or there may be a nick in the cutting edge. If sharpening is needed, use the #6 and #10 cut files to hone the cutting edges as needed. Always remove burs created from sharpening by closing the jaws in a cutting motion on the TheraBand a few times. Always recheck for sharpness on the TheraBand following any sharpening.

162422 (Repair Service Procedure). If an EndoWrist is in a condition where repairs cannot be made to ensure that the scissors are not dull or damaged, Rebotix informs the hospital and the EndoWrist is discarded. Feigel conversation

98.     C. <u>unintuitive motion</u>; D. <u>insufficient grip force</u>: Unintuitive motion refers to the scenario when the instruments do not track well with the master manipulators, i.e. the instruments do not feel right to the surgeon operating the instruments. Johnson Ex. 21 (Curet letter to FDA) at Intuitive-00552748. This is caused by misalignments in the manipulation wheels or by cables that lack sufficient tension. Feigel conversation. Similarly, insufficient grip force (i.e., when the jaws of the tool end do not grip tight enough) is likewise caused by misalignments in the manipulation wheels or by cables with insufficient tension. Feigel conversation.

34

99.    Rebotix's repair process inspects both the wheel alignment and the cable tension. See REBOTIX162413 ("5.2.4 Verify that the manipulation wheels move freely in each direction throughout its full intended range of motion. … 5.2.7 Inspect the instrument tool end under magnification for: 5.2.7.1. Broken or frayed manipulation cables. 5.2.7.2. Broken or damaged Electrocautery cables (Electrosurgical EndoWrist® Models Only). And, when necessary, Rebotix makes adjustments to restore the wheel alignment and cable tension to the original specifications, as determined by analysis of new EndoWrists. Feigel conversation; REBOTIX162421- REBOTIX162422 (setting forth steps for "Cable Tension Adjustments," including "Align[ment] [of] the 4 manipulation wheels."). If an EndoWrist is in a condition where repairs cannot be made to ensure intuitive motion and sufficient grip force, Rebotix informs the hospital and the EndoWrist is discarded. Feigel conversation.

100.    (2) <u>material analysis testing</u>: When considering whether a change or modification could significantly affect the safety or effectiveness," it is important to consider whether there was a "significant change or modification in design, material, chemical composition, energy source, or manufacturing process." See 21 CFR 807.81(a)(3) ("premarket notification submission" can be required when there is a "change or modification that could significantly affect the safety or effectiveness of the device, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process.").

101.    Rebotix performed tests to ensure that there are no significant changes to the "design, material, and chemical composition" of the materials used in its repairs from the materials used in new EndoWrists. [8]  The purpose of this language is to ensure that the structural

---

[8] The additional modifications identified in the regulations are not relevant here. The EndoWrists that Rebotix repairs do not include an energy source and therefore Rebotix does not make any changes to an energy source. REBOTIX162404-REBOTIX162424 (EndoWrist

integrity of the medical device is not significantly affected (for example, by replacing a steel component with a plastic component) and, in the case of materials that come in direct contact with the skin, to ensure that the materials remain biocompatible (i.e., not harmful to living tissue).

102.    When developing its services, Rebotix sent the components that it used in its repair process to IMR Labs to undergo material analysis.  E.g., REBOTIX151919-REBOTIX151922, REBOTIX151966-REBOTIX152018; Feigel conversation. The analysis confirmed that the components Rebotix used were consistent with the materials used by Intuitive in its EndoWrists, which are commonplace in the medical repair industry.  *Id.*  For example, IMR Report Number 201310250E confirmed that the sample sent to IMR was "meets the chemical requirements of UNS-S-17400 for a 17-4 precipitation hardenable chromium-nickel-copper stainless steel."  REBOTIX151919; Feigel conversation.

103.    Moreover, I understand that the only addition to the EndoWrist in the Rebotix service is the Interceptor chip that enables the count reset.  Because the Interceptor is enclosed in the housing of the EndoWrist and does not come into contact with the patient's skin, there was no need to perform biocompatibility testing on the Interceptor.  See Use of International Standard ISO 10993-1, "Biological evaluation of medical devices - Part 1: Evaluation and testing within a risk management process" (if "the device does not have any direct or indirect tissue contact," then "no further biocompatibility information would be needed").  Nonetheless, Rebotix performed biocompatible tests on all components of the Rebotix-serviced device, including the Interceptor in accordance with International Standard ISO 10993-1.  See REBOTIX124432-REBOTIX124447, REBOTIX124467-REBOTIX124705, REBOTIX124718-

Service Procedure); Feigel conversation.  Moreover, Rebotix's services do not include any new "manufacturing" but are instead directed to restoring an EndoWrist to its original condition.  *Id.*

REBOTIX124756.

104.   Accordingly, Rebotix reasonably concluded that its services do not make any significant change or modification in design, material, chemical composition, energy source, or manufacturing process for EndoWrists.

105.   The reasonableness of Rebotix's conclusion is illustrated by comparison to Intuitive's own analysis of whether to submit a 510(k) upon adding or changing components of its EndoWrists.  For example, as shown in its Non-Filing Justifications, Intuitive has concluded that the following changes to EndoWrists do not constitute a significant change or modification in design, material, or chemical composition to the device and therefore a 510(k) submission is not required.  See Johnson depo., Exs. 14-19 (Non-Filing Justifications):

change to the housing material:

> 10     Q   Changing the housing material did not
> 11  require 510(k) approval for this EndoWrist; correct?
> 12          MS. LENT:  Objection.
> 13          THE WITNESS:  Correct.

> -Johnson depo. tr., 82:10-13.

> 2      Q   If you go two rows further, it indicates
> 3  for the EndoWrist that is the subject of this
> 4  non-filing justification, that the housing material
> 5  was previously changed from polycarbonate to
> 6  polyphenylsulfone; correct?
> 7      A   Yes.
> 8      Q   The change in material did not require
> 9  510(k) approval; correct?
> 10     A    Correct.

> -Johnson depo. tr., 83:2-10.

change to the pulley component material:

> 2      Q.   The pulley component material was changed;
> 3  correct?
> 4      A.   Yes.
> 5      Q.   That did not require 510(k) approval;

37

6 correct?
7    A.   Correct.

-Johnson depo. tr., 84:2-7.

change to the grip configuration:

4    Q   Changing the grip cable configuration in
5  this EndoWrist did not require 510(k) approval;
6  correct?
7        MS. LENT:  Objection.
8        THE WITNESS:  That's correct.

-Johnson depo. tr., 82:4-8.

change to the cable construction:

20     Q.   Document also indicates that new grip and
21  yaw cable construction with updated nominal tension
22  parameters was changed; correct?
23    A   Correct.
24    Q   That did not require 510(k) approval;
25  correct?
1    A.   Correct.

-Johnson depo. tr., 83:20-84:1.

addition of a new indicator:

16        Adding an end of life indicator to this
17  EndoWrist did not require 510(k) approval; correct?
18        MS. LENT:  Objection.
19        THE WITNESS:  Correct.

-Johnson depo. tr., 82:16-19.

change to the RFID:

21     Q   Updating the RFID did not require 510(k)
22  approval; correct?
23        MS. LENT:  Objection.
24        THE WITNESS:  Agreed, yes.

-Johnson depo. tr., 82:21-24

106.    (3) extended life feasibility testing:  Rebotix also performed several rounds of

38

extended life-feasibility tests to ensure that EndoWrists could safely be used beyond the

maximum number of sues designated by Intuitive.  REBOTIX156431- REBOTIX156446

(EndoWrist Extended Life Feasibility Study); REBOTIX146770-REBOTIX146781 (Life Test

Worst Case Model Analysis); REBOTIX124268-REBOTIX124431 (Life Testing Protocol and

Report); REBOTIX126238-REBOTIX126390 (Life Testing Protocol and Report);

REBOTIX126788-REBOTIX127430 (Life Testing Protocol and Report); Feigel conversation.

107.    For example, in 2014, Rebotix performed a "study … to determine the feasibility

of safely extending the useful life of EndoWrists to a minimum of 20 uses."  REBOTIX156431-

REBOTIX156446 (EndoWrist Extended Life Feasibility Study). "The devices used for this study

will only be subjected to the stresses of cleaning and autoclaving past the original use of 10 for

OEM expired EndoWrists."  REBOTIX156431; Feigel conversation.  I understand that the

devices were cleaned and autoclaved a total of 22 times.  *Id*.  And there was nothing to indicate

that the Rebotix-serviced instruments performed differently from new EndoWrists from

Intuitive.  *Id*.

108.    In sum, Rebotix has repeatedly tested its serviced-EndoWrists to ensure they

remain as effective as new EndoWrists from Intuitive—both during the early stages when

designing its repair protocol and during each actual repair.

> ### 2.4.2.2.3 Hospitals and Intuitive acknowledge that the EndoWrist failures that Intuitive falsely attributes to Rebotix are commonplace in EndoWrists provided directly from Intuitive that have not been serviced by Rebotix.

109.    The evidence shows that the four EndoWrists failures that Intuitive attributes to

Rebotix are in fact not introduced by Rebotix's services but are instead commonplace in

EndoWrists received directly from Intuitive.

110.    Representatives from hospitals testified that failures occur regularly in EndoWrists received directly from Intuitive, i.e., EndoWrists that have not yet reached their maximum use limit.  These failures include (1) unintuitive motion, (2) insufficient grip force, (3) dull or damaged scissor blades, and (4) worn or damaged cables.  Moreover, hospital representatives also testified that they were not aware of any of these failures occurring with EndoWrists that had been serviced by Rebotix.

Pullman Regional Hospital:

12    Q.  Does Pullman Regional sometimes use
13  EndoWrists for less than a maximum number of uses?
14    A.  Yes.
15    Q.  Do EndoWrists sometimes fail before they
16  reach their maximum usage limit?
17    A.  Yes.
                              -Pullman depo. tr., 41:12-17.

6    Q.  Has your hospital ever rejected an EndoWrist
7.  because the surgeon perceived it to have dull or
8   damaged scissor plates?
9    A.  Yes.
10    Q.  Has your hospital ever rejected an EndoWrist
11  because a surgeon perceived it to have unintuitive
12  motion?
13    A.  Yes.
14    Q.  Has your hospital ever rejected an EndoWrist
15  because a surgeon perceived it to have insufficient
16  grip force?
17    A.  Yes.
18    Q.  Has your hospital ever rejected an EndoWrist
19  because the wires were frayed?
20    A.  Yes.
21    Q.  In any of these instances where you rejected
22  an EndoWrist, for example, for unintuitive motion,
23  dull or damaged scissors, insufficient grip force, or
24  any other reason, had the EndoWrist been used beyond
25  the maximum number of uses imposed by Intuitive?
Page 43
1    A.  No.
2    Q.  Had any of these rejected EndoWrists been
3  serviced by Rebotix?
4    A.  No.

40

5    Q.  Did your hospital or your surgeons ever
6  reject a Rebotix-repaired EndoWrist because of
7  perceived unintuitive motion?
8    A.  No.
9    Q.  Did your hospital or surgeons ever reject a
10  Rebotix-repaired EndoWrist because of perceived dull
11  or damaged scissor blades?
12    A.  No.
13    Q.  Did your hospital or your surgeons ever
14  reject a Rebotix-repaired EndoWrist because of
15  insufficient grip force?
16    A.  No.
17    Q.  Did your hospital or surgeons ever reject a
18  Rebotix-repaired EndoWrist for any reason?
19    A.  No.

-Pullman depo. tr., 42:6-43:19.

111.    The Pullman hospital representative also testified that the hospital tested Rebotix-repaired EndoWrists, and neither the scrub techs (who are responsible for the EndoWrist set-up) nor the surgeons (who used the EndoWrists) could perceive any difference between EndoWrists that had been serviced by Rebotix and new EndoWrists received directly from Intuitive.  See Pullman depo. tr., 37:1-40:25 ("Everybody said they worked just fine.  There was no difference than the non-reprocessed instruments").

Evergreen Hospital

20    Q.  Does Evergreen always use its EndoWrists
21  for the maximum number of uses as imposed by
22  Intuitive, or do EndoWrists sometimes fail before
23  they reach their maximum usage?
24    A.  We do not always use them to their maximum
25  usage due to instrument failures.

-Evergreen depo. tr., 34:20-25.

15    Q.  Has Evergreen Hospital ever rejected an
16  EndoWrist because the surgeon proceeded to have
17  insufficient grip force?
18    A.  Yes.

-Evergreen depo. tr., 37:15-18.

41

> 25        Has Evergreen Hospital ever rejected an
> 1  EndoWrist because a surgeon perceived it to not
> 2  respond or feel right in the movements that he is
> 3  trying to provide to the EndoWrist?
> 4        MR. BAILEY:  Objection to form.
> 5        THE WITNESS:  Yes.
> 6  BY MR. LYON:
> 7     Q.  Has Evergreen Hospital ever rejected an
> 8  EndoWrist because a surgeon perceived there to be a
> 9  problem with the EndoWrist's cables?
> 10     A.  Yes.
> 11     Q.  In each of these instances where Evergreen
> 12  rejected an EndoWrists, have the EndoWrists been
> 13  used beyond the maximum number of uses imposed by
> 14  Intuitive?
> 15     A.  No.

-Evergreen depo. tr., 37:25-38:15.

112.    Moreover, even Intuitive's own Chief Medical Officer testified that she herself

has rejected a failed EndoWrist in the middle of surgery due to the jaws not closing properly.

> 7     Q.  Once you have begun a da Vinci
> 8  surgery, have you ever replaced one of the
> 9  EndoWrists mid surgery?
> 10     A.  Yes.
> 11     Q.  How many times has that happened?
> 12     A.  At the most, a handful of times.
> 13     Q.  The handful of times you have
> 14  replaced an EndoWrist during a da Vinci
> 15  surgery, why did you do so?
> 16     A.  Several times it was because the
> 17  lives were used up so I couldn't use the -- I
> 18  couldn't use it.
> 19     Q.  What else?
> 20     A.  There is one time where I couldn't
> 21  get the -- one of the jaws, one of the parts
> 22  of the jaws to close completely.

-Curet depo tr. 90:7-22.

113.    This failure occurred at "Stanford" or the "VA," where Rebotix has never

serviced EndoWrists.  Curet depo tr. 92:25-93:13; Feigel conversation.

114.    Intuitive's head of regulatory, Mark Johnson, estimates that Intuitive opens approximately "3000 complaint files" per month for its EndoWrists.  Johnson depo. tr., 94:14-18.  And the failures that give rise to these complaints include "frayed cables," "nonintuitive motion," and "insufficient grip force."  Johnson depo. tr., 94:22-95:10.

115.    Accordingly, the evidence indicates that the failures identified by Intuitive are commonplace in EndoWrists that Rebotix has never serviced.  And nothing indicates these failures are either introduced by, or occur at a greater rate after, Rebotix's services.  Moreover, as I discuss below, the evidence shows that the FDA would not view these sorts of device failures as presenting a safety concern.

### 2.4.2.2.4  The failures alleged by Intuitive are commonplace in analogous laparoscopic instruments that are routinely repaired.

116.    As detailed below, the evidence in this case demonstrates that:

- the four failures identified by Intuitive are not unique to EndoWrists, but are commonplace in traditional laparoscopic devices;

- EndoWrists are essentially identical to these traditional laparoscopic instruments in terms of shape, size, function, tissue effect, functional characteristics, intended use, safety and effectiveness; and

- these traditional laparoscopic instruments are routinely repaired and used hundreds of times without oversight from the FDA.

117.    When Intuitive first received clearance from the FDA for its EndoWrists, Intuitive represented to the FDA that EndoWrists are essentially identical in terms of shape, size, function, and tissue effect to the endoscopic devices cited as predicate devices:

43

> **Comparison to Predicate Device(s):**
>
> The Intuitive Surgical™ Instruments are essentially identical in terms of shape, size, function and tissue effect to the standard Class I and II endoscopic instruments cited.

Intuitive-00512044 (Intuitive EndoWrist 510k summary).

> 18    Q    Is it a truthful and accurate statement
> 19  that the EndoWrists are essentially identical in
> 20  terms of shape, size and function and tissue effect
> 21  to the endoscopic instruments cited as predicate
> 22  devices in this FDA submission?
> 23    A   Yes.

-Johnson depo. tr., 31:18-23.

118.    Intuitive also represented to the FDA that design analysis and comparisons, as well as in vitro studies, confirm that the basic functional characteristics of the EndoWrists are substantially equivalent to the predicate devices:

> **_In Vitro_ Test Data:**
>
> Design analysis and comparison as well as in vitro testing confirm that basic functional characteristics are substantially equivalent to the predicate devices cited.

Intuitive-00512044 (Intuitive EndoWrist 510k summary).

> 12    Q    Is it truthful and accurate that design
> 13  analysis and comparisons, as well as in vitro
> 14  studies, confirm that the basic functional
> 15  characteristics of the EndoWrists are substantially
> 16  equivalent to the predicate devices cited in this
> 17  510(k) summary?
> 18    A   Yes.

-Johnson depo. tr., 32:12-18.

119.    Intuitive also represented to the FDA that clinical studies confirmed that EndoWrists are substantially equivalent to predicate devices in terms of safety and effectiveness.

> **Clinical Study Data:**
>
> An extensive prospectively randomized and concurrently controlled clinical study was performed to demonstrate substantial equivalence to the predicate devices cited in terms of safety and effectiveness.

Intuitive-00512044 (Intuitive EndoWrist 510k summary).

> 19    Q   Is it truthful and accurate that clinical
> 20  studies were performed to demonstrate substantial
> 21  equivalence between the EndoWrists and the predicate
> 22  devices cited in the 510(k) summary in terms of
> 23  safety and effectiveness?
> 24    A   Yes.
> 25    Q   And it's truthful and accurate that the
> 1  EndoWrists in these production devices has
> 2  substantial equivalence in terms of safety and
> 3  effectiveness?
> 4    A   Yes.

-Johnson depo. tr., 33:19-34:4.

120.    Moreover, predicate endoscopic devices referenced in Intuitive's 510(k) as substantially equivalent to EndoWrists—the Baxter Healthcare Endoscopic Instruments and the Deknatel Snowden-Pencer Endoscopic Instruments—are traditional laparoscopic devices that do not include any maximum use requirements.

> 5    Q   Sure.  Sure.  And the referenced predicate
> 6  devices do not have any maximum use restrictions;
> 7  correct?
> 8       MS. LENT:  Objection.
> 9       THE WITNESS:  Correct.

-Johnson depo. tr., 29:5-9.

121.    Intuitive's 510(k) submission includes numerous images of the traditional laparoscopic devices, like the Snowden-Pencer device, to illustrate how the EndoWrists have

substantially equivalent shape and dimensions to the EndoWrists.  Johnson depo. tr., 46:24-50:2;

Johnson depo., Ex. 4.[9]

122.    I understand that these traditional laparoscopic devices—like the Snowden-Pencer

device—can be repaired hundreds of times.  For example, BPI Medical is in the business of

repairing traditional laparoscopic devices, like the predicate devices cited by Intuitive.  Bob

Overmars, the President of BPI, testified as follows:

> 14     Q.  One of the instruments you indicated you
> 15   repaired is laparoscopic instruments; is that right?
> 16     A.  That's correct.
> 17     Q.  When did you first start repairing
> 18   laparoscopic instruments?
> 19     A.  Over 20 years ago.
> 20     Q.  What is your best estimate of how many
> 21   laparoscopic instruments BPI Medical has repaired?
> 22     A.  Tens of thousands.
> …
> 4     Q.  Is one of the laparoscopic instruments that
> 5   BPI Medical repairs the Deknatel Snowden-Pencer
> 6   Diamond-Touch?
> 7   MR. FOLGER:  Objection to form.
> 8   BY MR. LYON:
> 9     Q.  I didn't hear your response.
> 10     A.  Yes, we do.
>
> -Overmars depo. tr., 96:14-97:10.

---

[9]  Mr. Johnson noted that Intuitive's 510(k) also identifies the "Intuitive Endoscopic Control System and selected instruments" as "predicate devices."  Johnson depo tr. 126:24-127:17; Intuitive-00512043.  Intuitive suggests that the statements of substantial equivalence may be directed to these Intuitive "predicate devices," previously cleared under 510(k) number K965001, which Mr. Johnson testified did have maximum use restrictions.  *Id*.; Intuitive-00512073.  However, the foregoing statements of substantial equivalence in the 510(k) summary—in the statement of Intended Use, Comparison to Predicate Devices, In Vitro Test Data, all of which must be true and accurate—were not restricted to the Intuitive predicate devices but referred generally to the "predicate devices cited," which includes the traditional endoscopic devices with no use restrictions.  Moreover, the Intuitive predicate devices (identified under K965001) likewise did not reference any maximum use restrictions in the description of Intended Use in their own 510(k).  Johnson depo. Ex. 22 at Intuitive-00595700.  Nor did the FDA reference any maximum use restrictions in its Indications for Use, allowing the market entry of these devices. Johnson depo. Ex. 22 Intuitive-00595697.

10      Q.  How many times is a typical laparoscopic
11   instrument used before it's sent to you for repairs?
12      A.  It could be dozens to hundreds.

-Overmars depo. tr., 98:10-12..

123.    Moreover, just like the four failures Intuitive attributes to Rebotix are not caused by repairs of EndoWrists, the same four failures are not caused by repairs of traditional devices. Instead, as with EndoWrists, traditional devices routinely suffer these failures, and the purpose of repair is to prevent these failures from occurring.

10      Q.  How many times is a typical laparoscopic
11   instrument used before it's sent to you for repairs?
12      A.  It could be dozens to hundreds.
13      Q.  What determines if it's dozens or hundreds?
14      A.  There will be lack of grip of the
15   instrument jaws.  There will be dull scissors.
16   There will be broken or failed components.
17      Q.  Are these some of the problems you see in a
18   laparoscopic instrument in need of repair?
19      A.  Absolutely.
20      Q.  Is unintuitive motion one of the problems
21   you commonly see in a laparoscopic instrument in
22   need of repair?
23      A.  Correct.
24      Q.  Is insufficient grip force one of the
25   problems you typically see in a laparoscopic
Page 99
 1   instrument in need of repair?
 2      A.  Correct.
 3      Q.  Is dull or damaged scissor blades one of
 4   the problems you typically see in a laparoscopic
 5   instrument in need of repair?
 6      A.  Correct.
 7      Q.  Is worn or damaged cables one of the
 8   problems you typically see in a laparoscopic
 9   instrument in need of repair?
10        MR. FOLGER:  I'll just object to the form.
11   BY MR. LYON:
12      Q.  Again, I didn't get your answer.  Remember
13   to pause.  Could you repeat your answer for me.  The
14   court reporter may have got it, but I didn't hear
15   it.

47

16      A.  Correct.
17      Q.  Are these the sort of prob -- withdrawn.
18          Do you consider these common problems in
19   laparoscopic instruments that you repair?
20      A.  Yes.

-Overmars depo. tr., 98:10-99:20.

124.    Moreover, although traditional laparoscopic instruments are substantially similar to EndoWrists and suffer the same problems that Intuitive identifies, the FDA does not regulate the repair of traditional laparoscopic instruments.

23      Q.  Did BPI Medical ever apply for clearance to
24   repair the laparoscopic instruments?
25      A.  No.
1       Q.  Why not?
2       A.  It's not required.  It's not regulated by
3    the FDA.

-Overmars depo. tr., 96:23-97:3

125.    Mr. Overmars, who I understand has familiarity with both EndoWrists and traditional laparoscopic instruments, testified that EndoWrists are far more robust and well-made than traditional instruments.

22          How would you compare how well made
23   EndoWrists are relative to traditional laparoscopic
24   instruments?
25          MR. FOLGER:  I'll still object to the form.
Page 102
1       A.  In our 25 years of experience of repairing
2    endo laparoscopic instruments, the EndoWrist is
3    built like a Hummer and the majority of all other
4    laparoscopic instruments are like Ikea.  The
5    Intuitive EndoWrist is much more robust, much more
6    uniquely designed, and just simply a way better,
7    longer lasting instrument than a traditional
8    laparoscopic instrument.

-Overmars depo tr. 101:22-102:8

126.    Accordingly, EndoWrists would be expected to withstand more uses (not substantially less uses) than traditional instruments.

48

127.     In sum, this evidence—that predicate devices relied on by Intuitive in its EndoWrist 510(k) as substantially equivalent to EndoWrists are less robust than EndoWrists and yet still repaired hundreds of times without oversight by the FDA—further supports the conclusion that allowing EndoWrists to be used more than the maximum limit designated by Intuitive would not be perceived as providing an increased risk of performance failure by the FDA. This is especially true because the EndoWrists are inspected and repaired as necessary each time the maximum use limit is reset.

### 2.4.2.3  No evidence that Rebotix's services significantly affect product safety.

128.     As demonstrated in Section 2.4.2.2 above, the evidence indicates that Rebotix's services do not diminish the performance or effectiveness of EndoWrists or increase the likelihood of the purported failures identified by Intuitive.  Accordingly, for all of the same reasons identified above, the evidence indicates that Rebotix's services do not present a safety risk.

129.     Moreover, the record demonstrates that the sort of EndoWrists failures that Intuitive attributes to Rebotix's services—which are in fact commonplace in new EndoWrists from Intuitive—would not be viewed by the FDA as presenting a significant safety risk.

130.     For example, when an EndoWrist is exhibiting unintuitive motion, poor grip force, or dull scissors, the surgeon simply swaps out the EndoWrist for another, just like a surgeon would do with a traditional laparoscopic instrument that was exhibiting the same problem.  This was acknowledged by Intuitive's own Chief Medical Officer:

> 23      Q.  When you were performing a da Vinci
> 24   surgery and one of the jaws on the EndoWrist
> 25   were not closed completely, did you stop the
> Page 91
>  1   surgery and replace the EndoWrist?

2     A.  It's part of the surgery.  So I
3   just exchanged it like I would if I was
4   exchanging it for another instrument.

-Curet depo. tr., 90:23-91:4.

14     Q.  If a surgeon did perceive an
15   EndoWrist as having unintuitive motion, it
16   could replace that EndoWrist with another one,
17   like you yourself did when a jaw was not
18   closing properly on an EndoWrist, correct?
19          MS. LENT:  Objection.  Form.
20          THE WITNESS:  Yes.

-Curet depo. tr., 145:14-20.

6     Q.  If a particular EndoWrist did have
7   insufficient grip force, a surgeon could
8   replace that EndoWrist with a new EndoWrist
9   like you yourself did when the jaw was not
10   closing properly on an EndoWrist, correct?
11          MS. LENT:  Object to the form.
12          THE WITNESS:  Yes.

-Curet depo. tr., 147:6-12

10     Q.  Have you ever rejected a
11   traditional laparoscopic device, a scissors,
12   because you perceived them to have dull or
13   damaged scissor blades?
14     A.  Yes.
15     Q.  How did you determine that the
16   scissors had dull or damaged scissor blades
17   and decide not to use them in your surgery?
18     A.  I tried to use them, and they
19   didn't work.
20     Q.  What did you do when that happened?
21     A.  I asked for some new ones.
22     Q.  If you were using an EndoWrist and
23   the scissor blades were dull and damaged and
24   did not work, would you likewise replace them
25   with an EndoWrist that had sharp and
Page 153
1   nondamaged scissor blades?
2          MS. LENT:  Objection.
3      Hypothetical.
4          THE WITNESS:  Yes.  Yes.

50

-Curet depo. tr., 152:10-153:4

131.    This was also confirmed during hospital depositions.  For example:

10        If an EndoWrist is not performing properly,
11   for example, it's showing unintuitive motion,
12   insufficient grip force, or dull blades, is it your
13   hospital's practice to simply replace that EndoWrist?
14      A.  Yes.
15      Q.   Similarly, if a traditional nonrobotic
16   laparoscopic instrument is not performing properly, is
17   it your hospital's practice to simply replace that
18   instrument?
19      A.  Yes.
20      Q.   Are traditional, nonrobotic laparoscopic
21   instruments also sometimes rejected by surgeons?
22      A.  Yes.

-Pullman depo. tr., 44:10-22.

16        Q.   When the cable breaks in an EndoWrist from
17   Intuitive, what does the surgeon do?
18      A.   I -- generally, it doesn't make it to the
19   surgeon.  That is something that's usually
20   discovered when the instrument is inspected prior to
21   the case beginning.
22        If it made it into a patient, at that
23   point we would remove the instrument from the field
24   and open -- open a replacement.

-Evergreen depo. tr., 34:16-24.

132.    Intuitive's head of regulatory, Mark Johnson, estimates that Intuitive opens

approximately "3000 complaint files" "on an average month" for its EndoWrists.  Johnson depo.

tr. 94:14-18.  And the failures that give rise to these complaint files include "frayed cables,"

"nonintuitive motion," and "insufficient grip force."  Johnson depo. tr. 94:22-95:10.  Of these

3,000 monthly complaint files for EndoWrists, Mr. Johnson estimates that approximately "50 or

60" get reported to the FDA.  Johnson depo. tr., 95:20-96:2.  If the FDA considered these events

to constitute a safety risk, the FDA would have taken action against Intuitive.  However, I have seen no evidence that the FDA has initiated any such action against Intuitive.

133.    I discuss Medical Device Reporting regulations in the following paragraphs:

Medical Device Reporting, MDR: (21 CFR 803)

134.    Reprinted text from the FDA's 2013 guidance, "Medical Device Reporting for Manufacturers".

> 1.2 What is the purpose of the MDR regulation?
> The MDR regulation provides a mechanism that allows us (the FDA), as well as you (the device manufacturer), to identify and monitor adverse events (deaths and serious injuries) and certain malfunctions involving your medical devices. The goal is to detect and correct problems in a timely manner.  The requirements of the MDR regulation are enforced under the authority of the Food Drug & Cosmetic Act. The enforcement mechanisms include seizure, injunction, civil money penalties, and criminal prosecution.

135.    The three basic requirements of the Medical device Reporting regulations are:

- Submit what are known as MDR reportable events to the FDA for tracking in FDA's MAUDE database.

- Develop, maintain, and implement written procedures for the identification and evaluation of all medical device events (e.g., malfunctions, serious injuries and deaths) to determine whether the event is an MDR reportable event 21 CFR 803.17

- Establish and maintain complete files for all complaints concerning medical device events [21 CFR 803.18]

136.    Intuitive must have written procedures for implementing all requirements in the Medical Device Reporting regulations, 21 CFR 803.

> Reprinted text from 21 CFR 803.17
>
> Sec. 803.17 What are the requirements for developing, maintaining, and implementing written MDR procedures that apply to me?
>
> If you are a user facility, importer, or manufacturer, you must develop, maintain, and implement written MDR procedures for the following:
>
> (a) Internal systems that provide for:
>
>     (1) Timely and effective identification, communication, and evaluation of events that

52

| Reprinted text from 21 CFR 803.17 |
|---|
| may be subject to MDR requirements, |
| (2) A standardized review process or procedure for determining when an event meets the criteria for reporting under this part; and |
| (3) Timely transmission of complete medical device reports to manufacturers or to us, or to both if required. |

137.    The definition of an MDR reportable event, i.e., an event that Intuitive, as a manufacturer, must report to the FDA, is set forth as follows:

| Reprinted text from 21 CFR 803.10(c) |
|---|
| (c) If you are a manufacturer, you must submit reports (described in subpart E of this part) to us, as follows: |
| (1) Submit reports of individual adverse events no later than <u>30 calendar days</u> after the day that you become aware of a reportable <u>death, serious injury, or malfunction</u>. |
| (2) Submit reports of individual adverse events no later than <u>5 work-days</u> after the day that you become aware of: |
| (i) A reportable event that requires <u>remedial action to prevent</u> an unreasonable risk of substantial harm to the public health or |
| (ii) A reportable event for which we made a written request. |

| Reprinted text from 21 CFR 803.50 |
|---|
| Sec. 803.50 If I am a manufacturer, what reporting requirements apply to me? |
| (a) If you are a manufacturer, you must report to us the information required by § 803.52 in accordance with the requirements of § 803.12(a), no later than <u>30 calendar days</u> after the day that you <u>receive</u> or otherwise <u>become aware of</u> information, from <u>any source</u>, that <u>reasonably suggests</u> that a device that you market: |
| (1) May have caused or contributed to a death or <u>serious injury</u> or |
| (2) <u>Has malfunctioned</u> and this device or a similar device that you market would be likely to <u>cause or contribute to</u> a death or serious injury, if the malfunction <u>were to recur</u>. |

138.    Below are important regulatory definitions that help determine when Intuitive must submit information about an MDR reportable event to the FDA:

| Reprinted text from 21 CFR 803.3(w) |
|---|

| |
|---|
| Reprinted text from 21 CFR 803.3(w) |
| (w) <u>Serious injury</u> means an injury or illness that:<br><br>    (1) Is life-threatening,<br><br>    (2) Results in <u>permanent impairment</u> of a body function or permanent damage to a body structure, or<br><br>    (3) <u>Necessitates medical or surgical intervention</u> to preclude permanent impairment of a body function or permanent damage to a body structure. Permanent means irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage. |

| |
|---|
| Reprinted text from 21 CFR 803.3(k) |
| (k) <u>Malfunction</u> means the failure of a device to <u>meet its performance specifications</u> or otherwise perform as intended. Performance specifications include all claims made in the labeling for the device. The intended performance of a device refers to the intended use for which the device is labeled or marketed, as defined in § 801.4 of this chapter. |

| |
|---|
| Reprinted text from 21 CFR 803.3(w) |
| (c) <u>Caused or contributed</u> means that a death or serious injury <u>was or may have been attributed to</u> a medical device, or that a medical device <u>was or may have been a factor</u> in a death or serious injury, including events occurring as a result of:<br><br>    (1) Failure,<br><br>    (2) Malfunction,<br><br>    (3) Improper or inadequate design,<br><br>    (4) Manufacture,<br><br>    (5) Labeling, or<br><br>    (6) User error. |

| |
|---|
| Reprinted text from 21 CFR 803.3(b) |
| (b) <u>Become aware</u> means that an <u>employee of the entity</u> required to report has acquired information that reasonably suggests a reportable adverse event has occurred. |

139.    Intuitive is required to collect information that is reasonably known.

| |
|---|
| Reprinted text from 21 CFR 803.50 |
| (b) What information does FDA consider "reasonably known" to me?<br><br>(1) You must submit all information required in this subpart E that is reasonably known to you. We consider the following information to be <u>reasonably known</u> to you: |

| Reprinted text from 21 CFR 803.50 |
|---|
| (i) Any information that you can obtain by contacting a user facility, importer, or other initial reporter, |
| (ii) Any information in your possession; or |
| (iii) Any information that you can obtain <u>by analysis, testing, or other evaluation</u> of the device. |

<u>FDA Regulations Require Intuitive to Analyze and Interpret Information from Complaints
About of their EndoWrist Medical Device</u>

140.    A Complaint Handling is required.  The FDA has a broad definition of a medical device complaint.   Intuitive must report, investigate, and evaluate complaints about their medical devices.

| Reprinted text from 21 CFR 820.3(b) |
|---|
| (b) <u>Complaint</u> means any written, electronic, or oral communication that <u>alleges deficiencies</u> related to the identity, quality, durability, reliability, safety, effectiveness, or performance of a device after it is released for distribution. |

141.    Intuitive must review all complaints about the EndoWrist device to determine if the complaint is reportable under the Medical Device Reporting regulations (21 CFR 803), i.e., the device malfunctioned or caused a death or serious injury.

| Reprinted text from 21 CFR 820.198, Complaint files |
|---|
| (a) Each manufacturer shall maintain complaint files. Each manufacturer shall establish and maintain procedures for <u>receiving, reviewing, and evaluating</u> complaints by a formally designated unit. Such procedures shall ensure that: |
| (1) All complaints are processed in a uniform and timely manner, |
| (2) Oral complaints are documented upon receipt; and |
| (3) <u>Complaints are evaluated to determine</u> whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting. |

<u>FDA Regulations Require Intuitive to Conduct a Complaint
Investigations if a Device Failure Possibly Occurred</u>

55

142.   Intuitive must review and evaluate all complaints about their EndoWrist devices.

| Reprinted text from 21 CFR 820.198(b) |
|---|
| (b) Each manufacturer shall review and evaluate <u>all complaints</u> to <u>determine</u> whether an <u>investigation is necessary</u>. When no investigation is made, the manufacturer shall maintain a record that includes the <u>reason no investigation</u> was made and the name of the individual responsible for the decision not to investigate. |

143.   Intuitive must investigate all possible failures of their EndoWrist device.

| Reprinted text from 21 CFR 820.198(c) |
|---|
| (c) Any complaint involving the <u>possible failure</u> of a device, labeling, or packaging to meet <u>any of its specifications</u> shall be reviewed, evaluated, and <u>investigated</u>, unless such investigation has already been performed for a similar complaint and another investigation is not necessary. |

<u>FDA Requires Intuitive to Collect Specific Information in a
Medical Device Complaint Investigation</u>

144.   Intuitive's complaint investigation must determine if there is a connection between the adverse event (e.g., a serious injury) and the performance of their EndoWrist.

| Reprinted text from 21 CFR 820.198(d) |
|---|
| (d) Any complaint that represents an event which must be reported to FDA under part 803 (Medical Device Reporting) of this chapter shall be <u>promptly reviewed, evaluated, and investigated</u> by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by § 820.198(e), records of investigation under this paragraph shall include a <u>determination of</u>: |
| (1) Whether the device <u>failed to meet specifications,</u> |
| (2) Whether the device was being used for treatment or diagnosis; and |
| (3) The <u>relationship</u>, if any, <u>of the device to the reported incident</u> or adverse event. |

145.   The FDA requires specific information to be recorded in a medical device complaint investigation.

| Reprinted text from 21 CFR 820.198(e) |
| --- |
| e) When an investigation is made under this section, a record of the investigation shall be maintained by the formally designated unit identified in paragraph (a) of this section. The <u>record of investigation shall include</u>:<br><br>   (1) The name of the device,<br><br>   (2) The date the complaint was received,<br><br>   (3) Any unique device identifier (UDI) or universal product code (UPC), and any other device identification(s) and control number(s) used,<br><br>   (4) The name, address, and phone number of the complainant,<br><br>   (5) The <u>nature and details</u> of the complaint,<br><br>   (6) The dates and <u>results of the investigation</u>,<br><br>   (7) Any <u>corrective action taken</u>; and<br><br>   (8) Any reply to the complainant. |

146.    To fix the problems with its EndoWrist devices, FDA's Corrective and Preventive Action (CAPA) regulations require Intuitive to (1) analyze data, (2) investigate cause, (3) identify action, and (4) verify effectiveness.

<u>FDA Requires Intuitive's Corrective and Preventive Action Procedures Used to Fix any EndoWrist Problems to Have Four Parts</u>

147.    Establish has a precise meaning in FDA regulations.

| Reprinted text from 21 CFR 820.3 Quality System Regulations, Definitions |
| --- |
| (k) <u>Establish</u> means define, document (in writing or electronically), and <u>implement</u>. |

148.    <u>#1 of 4</u>: Analyze data: the FDA requires Intuitive to explore a wide variety of information and employ statistical procedures to conduct an unbiased examination of data.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
| --- |
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>   (1) <u>Analyzing</u> processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data |

57

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| to <u>identify existing and potential causes</u> of nonconforming product, or other quality problems. Appropriate <u>statistical methodology</u> shall be employed where necessary to detect recurring quality problems; |

149.    <u>#2 of 4</u>: Investigate cause: the FDA requires Intuitive to examine to look beyond the EndoWrist itself for a cause.  Intuitive's rationale for determining if a corrective or preventive action is necessary must be quantitively convincing and based on unbiased facts.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>    (2) Investigating the cause of nonconformities relating to product, processes, and the quality system; |

150.    Typical investigation steps:

- Identify problem and characterize.
- Determine scope and impact.
- Investigate data, process, operations, and other sources of information.
- Determine root cause

151.    Examples of root causes

- Training
- Design
- Manufacturing
- Management
- Change Control
- Purchasing/Supplier Quality
- Testing
- Documentation
- Maintenance

152.    <u>#3 of 4</u>: Identify action: the FDA expects Intuitive to correct the problem and stop it from happening again. The corrective action should describe all parties and processes that are changed.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>    (3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems; |

153.    <u>#4 of 4</u>:  Verify effectiveness: the FDA wants Intuitive to confirm their solution worked. Consider collecting additional data after the change(s) are implemented and comparing the before change vs after change data.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>    (4) Verifying or validating the corrective and preventive action to ensure that such action is <u>effective</u> and does not adversely affect the finished device; |

| Reprinted text from 21 CFR 820.3 Quality System Regulations, Definitions |
|---|
| (z) <u>Validation</u> means confirmation by examination and provision of objective evidence that the particular requirements for a specific intended use can be <u>consistently fulfilled</u>. |
| (aa) <u>Verification</u> means confirmation by examination and provision of objective evidence that specified requirements <u>have been fulfilled</u>. |

<u>FDA Requires Intuitive's Corrective and Preventive Action (CAPA) Output to have Four Parts</u>

154.    <u>#1 of 4</u>: Intuitive must implement changes identified to correct the nonconformance and fix the quality problems. Changes in the EndoWrist can include methods and procedures and must solve the problem.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective |

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| and preventive action. The procedures shall include requirements for: <br><br> (5) <u>Implementing and recording</u> changes in methods and procedures needed to correct and prevent identified quality problems; |

155.     <u>#2 of 4</u>: Intuitive must disseminate the changes internally.  Intuitive's required procedures include communicating the changes to internal staff responsible for their implementation.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action (CAPA) |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for: <br><br> (6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; |

156.     <u>#3 of 4</u>: Intuitive's management must review and approve changes originating from the CAPA Process.

157.     Management review is a required part of the CAPA process.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for: <br><br> (7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for management review. |

158.     <u>#4 of 4</u>: The entire CAPA process must be documented.  Documentation is necessary for Intuitive to pass a regulatory audit of their CAPA process used to solve any EndoWrist problems.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (b) All activities required under this section, and their results, shall be documented. |

159.     In accordance with the foregoing regulations, if there were adverse events relating to EndoWrists serviced by Rebotix, I would expect there to be submitted MDRs documenting these adverse events.  Moreover, I would expect the MDR to include analysis of whether the adverse event was attributable to Rebotix's services.

160.     As set forth above, the FDA accumulates MDRs in the MAUDE (Manufacturer and User Facility Device Experience) database.  "Each year, the FDA receives several hundred thousand medical device reports (MDRs) of suspected device-associated deaths, serious injuries and malfunctions. The FDA uses MDRs to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of these products. The MAUDE database houses MDRs submitted to the FDA by mandatory reporters (manufacturers, importers and device user facilities) and voluntary reporters such as health care professionals, patients and consumers."  https://www.fda.gov/science-research/data-mining/data-mining-center-devices-and-radiological-health.

161.     I understand that Rebotix has serviced almost 600 EndoWrists for U.S. hospitals, beginning in March 2019.  REBOTIX165988; Feigel conversation.  Both the evidence from this case and my independent investigation show that none of these Rebotix-serviced EndoWrists has resulted in an adverse event reported to the FDA.  For example, I searched the MAUDE database and discovered that there were 131 adverse event records involving EndoWrist devices since 2019 (the first year Rebotix serviced EndoWrists). None of the lengthy narrative descriptions of the 131 adverse events included any content about Rebotix or a refurbished device.

162.     Moreover, my findings are consistent with the testimony of Intuitive's VP of regulatory who I understand was designated to provide testimony on behalf of Intuitive on "Any

determination by Intuitive or the FDA that any repairs or modifications that reset or extend the number of uses of an EndoWrist instrument violate FDA requirements." Johnson depo., tr. 11:7-13; Johnson depo., Ex. 1.  Mr. Johnson testified that, although Intuitive regularly submits MDRs related to EndoWrists failures, he was "unaware" of any "MDR report[s] related to Rebotix instruments." Johnson depo. tr., 98:13-20; 102:11-21.

163.    Intuitive's letter to the FDA further corroborates my findings.  Rebotix service records show that the vast majority of its serviced EndoWrists were provided to hospitals prior to Intuitive's January 29, 2020 letter to the FDA about the purported "public safety concern" arising from Rebotix's services.  REBOTIX165988; Intuitive-00552745-Intuitive-00552759.  If there had been any significant safety events (or MDRs) concerning these Rebotix-serviced EndoWrists, Intuitive would have identified them in its letter.  Both Dr. Curet and Mr. Johnson testified to this:

> 6     Q   Did Intuitive have any information showing
> 7  that Rebotix's services were unsafe that Intuitive
> 8  decided not to share with the FDA in this letter?
> 9         MS. LENT:  Objection.
> 10        THE WITNESS:  No, I don't believe so.

-Johnson depo. tr., 106:6-10.

> 19         To your knowledge, Intuitive did
> 20  not withhold any information about potential
> 21  public safety concerns caused by Rebotix's
> 22  services from the FDA in preparing this
> 23  letter, correct?
> 24         MS. LENT:  Object to the form.
> 25         THE WITNESS:  Not to my knowledge.

-Curet depo. tr., 110:19-25.

164.    Intuitive's letter to the FDA, however, does not identify any significant safety events or MDRs.

> 12        Q.  Intuitive's letter to the FDA does

62

```
13   not identify any specific adverse event
14   submissions attributable to Rebotix's
15   EndoWrist services submitted to the FDA,
16   correct?
17          MS. LENT:  Object to the form.
18          THE WITNESS:  That's correct.
```

-Curet depo. tr., 115:12-18

165.    Instead, the letter indicates that it has "received EndoWrist Instruments" that have

been serviced by Rebotix through its "complaint process."  Intuitive-00552747.  It later refers

back to these complaints as relating to "dull blades."  Intuitive-00552749 ("Intuitive has seen

firsthand examples of some of the problems described above. For instance, remanufactured

EndoWrist scissors have been returned to Intuitive with dull blades in conjunction with feedback

from the customer that the device did not cut properly.").  As I discussed above, dull blades

appear to be a common problem with EndoWrists and with laparoscopic devices generally.  The

evidence shows that instruments with dull blades are typically replaced, and generally do not

present a significant safety concern.

166.    Moreover, if Intuitive were made aware of a serious safety issue with an

EndoWrist, I would expect there to be a CAPA investigation.  And if the EndoWrist that

prompted the investigation had been serviced by Rebotix, I would expect that to be well

documented in the CAPA investigation.  I understand that Intuitive has initiated several CAPA

investigations for its EndoWrists, but none of these investigations involved an EndoWrist

serviced by Rebotix:

```
16     Q.   What is your best estimate of the number
17   of CAPAs that Intuitive initiates for its EndoWrists
18   in a given year?
19          MS. LENT:  Objection.
20          THE WITNESS:  Maybe a dozen, something
21   like that.
22   BY MR. LYON:
23     Q.   Has Intuitive ever initiated a CAPA
```

63

24  investigation for EndoWrists serviced by Rebotix?
25      A.   I don't believe we have launched a CAPA on
1    that, no.

-Johnson depo. tr., 101:5-102:1.

167.    Accordingly, I have not seen any evidence that the FDA would consider to be a
significant safety risk arising from Rebotix's services.

**2.5    The FDA already considered whether Rebotix's services require 510(k) approval, and the FDA took no action.**

168.    When the FDA becomes aware that a company is engaging in activity that
purportedly violates FDA regulations, the FDA can conduct an inspection to collect information
about that activity to determine if the activity indeed runs afoul of its regulations.  If the FDA
concludes that the company is violating FDA regulations, it will initiate enforcement activities.
As the FDA explains: "The objective of FDA regulatory programs is to assure compliance with
the Federal Food, Drug, and Cosmetic Act (the Act). Specific enforcement activities include
actions to correct and prevent violations, remove violative products or goods from the market,
and punish offenders."   https://www.fda.gov/animal-veterinary/resources-you/types-fda-
enforcement-actions.  "The type of enforcement activity FDA uses will depend on the nature of
the violation. The range of enforcement activities include issuing a letter notifying the individual
or firm of a violation and requesting correction, to criminal prosecution of the individual or
firm." *Id.*

169.    Alternatively, if the FDA concludes that an activity does not run afoul of its
regulations, it takes no further action.  In these instances, the FDA does not provide the company
with any sort of notice of its conclusion.  Generating notices describing what the FDA will <u>not</u>

64

do are considered unnecessary.  Instead, the FDA's silence implicitly informs the company that the FDA concluded that the company's activities do not run afoul of FDA regulations.

170.    In my experience, if the FDA does not initiate any sort of enforcement action within 90 days of being made aware of an allegedly violative activity, it is safe to conclude that that the FDA concluded the activity is compliant with FDA regulations and it will not initiate any sort of enforcement activity.

171.    Here, Intuitive wrote to the FDA on January 29, 2020, to inform the FDA that it believed Rebotix's activities were not compliant with FDA regulations.  Intuitive-00552745-Intuitive-00552759 (Curet letter).

172.    A few weeks after receiving Intuitive's letter, the FDA contacted Rebotix.  I understand that on February 20, 2020, and February 28, 2020, Rebotix representatives spoke on the telephone with Je Ji An of the FDA, during which the FDA requested further information about Rebotix's services.  Feigel conversation.

173.    On March 6, 2020, and March 19, 2020, Rebotix sent emails to Jitendra Virani, who was the FDA contact person for this investigation.  *Id*.; REBOTIX174749-REBOTIX174756.  In the emails, Rebotix explained its view that the term "remanufacturer" in 21 CFR 820.3(w) does not apply to its services.  *Id*.  Rebotix also provided detailed responses to four questions posed by the FDA.  *Id*.  Rebotix explained that hospitals use Rebotix's services "to operate the instrument beyond the manufacturer's original recommendation," i.e. to "extend the lives of the device beyond the original equipment manufacturer (OEM) stated limit."  *Id*.  Rebotix explained that, to do so, Rebotix removes the housing and adds a new functional equivalent to the usage counter.  Rebotix explained that it evaluates the mechanical components to determine if the EndoWrist is a candidate for repair.  *Id*.  And Rebotix provided a high-level overview of the sort of repairs it makes.  *Id*.  Rebotix also agreed to make themselves available

for any follow-up calls to discuss its responses and any other questions the FDA may have about

its service.  *Id.*  The FDA confirmed receipt of Rebotix's emails.  *Id.*

174.     I understand that, after receiving Rebotix's emails explaining their services, the

FDA did not seek any further information from Rebotix and did not initiate any sort of

enforcement proceedings.  Feigel conversation.  The FDA took no further action.  *Id.*

175.     It has now been almost 17 months since Intuitive wrote the FDA, encouraging it

to institute enforcement proceedings against Rebotix, and over 15 months since Rebotix

provided the FDA with the information that the FDA requested.   If the FDA had concluded that

Rebotix's services violate FDA regulations, the FDA would have acted by now.  From the

FDA's silence, it is safe to conclude that, after learning more about Rebotix's services, the FDA

determined that Rebotix's services do not violate FDA regulations.

176.     Moreover, my opinion is consistent with the views of both Myriam Curet of

Intuitive, who wrote the letter to the FDA encouraging the FDA to investigate Rebotix, and with

other FDA experts.  Dr. Curet testified as follows:

> 18      Q.  Some point after the FDA reached
> 19   out to Rebotix, asked for information about
> 20   Rebotix's services, received information from
> 21   Rebotix and then declined to pursue the matter
> 22   further, you would conclude that the FDA
> 23   determined Rebotix's services do not require
> 24   FDA clearance, correct?
> 25      MS. LENT:  Object to the form.
>  1   THE WITNESS:  Yes.

-Curet depo. tr., 192:18-193:1.

177.     And, as set forth in the Deutsche Bank analyst report discussed below, it is "safe

to believe that Intuitive has brought this to FDA's attention" and according to "our [FDA and

regulatory] consultants, if the FDA doesn't act on this information within 3-6 months, it is

unlikely the FDA ever will."  Intuitive-00566064.  The analyst report was from February 20,

2020.  No action has been taken by the FDA since.

### 2.6 Additional opinions.

#### 2.6.1 Intuitive's reliance on Cal Rabang's email to support its allegation is unfounded.

178.     I understand that, in May 2018, Bob Overmars of BPI Medical reached out to Cal Rabang of the FDA to inquire about Intuitive's assertion that a 510(k) is required for repairing EndoWrists.  BPI000331- BPI000337.  Mr. Overmars is in the business of repairing laparoscopic instruments and was concerned that, if Intuitive could establish use limits that precluded repairs, then potentially other traditional laparoscopic instruments manufacturers could follow suit. Overmars depo. tr., 51:13-52:11.

179.     Dr. Rabang informed Mr. Overmars that "for the reusable EndoWrist Instruments, if the use-life counter is reset or extended past the number of available use lives, then the device specifications are changed. As such, you would be considered a remanufacturer per 21 CFR 820.3(w)" and "As such, you would be subject to premarket notification (510(k)) requirements defined in 21 CFR 807.81."  BPI000331- BPI000337.

180.     In my opinion, any attempt by Intuitive to rely on Cal Rabang's email to support its 510(k) allegation is unfounded.

181.     First, I note that Dr. Rabang was not providing an opinion on behalf of the FDA. As he wrote in his email to Mr. Overmars, his communication "constitutes an informal communication that represents [his] best judgment at this time but does not constitute an advisory opinion, does not necessarily represent the formal position of the FDA, and does not bind or otherwise obligate or commit the agency to the view expressed."  BPI000335- BPI000336.  Informal opinions, like the view expressed by Mr. Rabang, are often performed without all relevant information and without any detailed analysis.  This is why such views are

accompanied by the statement that it does not represent the opinion of the FDA.

182.    Second, the cursory opinion provided by Dr. Rabang fails to apply the correct standard.   Dr. Rabang states that "if the use-life counter is reset or extended past the number of available use lives, then the device specifications are changed" and a 510(k) is required. BPI000335.  But the test does not turn on whether "device specifications are changed."  The definition of "remanufacturer" makes no mention of changes to device specifications.   Instead, to be a "remanufacturer," a person must "significantly change[] the finished device's performance or safety specifications, or intended use."  21 CFR 820.3(w).  That is, a 510(k) can only be required when a person makes a "change or modification in the device that could significantly affect the safety or effectiveness of the device" or a "major change or modification in the intended use."  21 CFR 807.81(a).

183.    Dr. Rabang expressed no opinion on whether extending the number of lives could significantly affect the safety or effectiveness of an EndoWrist.  And, as demonstrated above, the evidence demonstrates it does not.  For example, Intuitive concluded that "increasing the number of lives for these instruments is not expected to significantly affect the safety or effectiveness of the device."  Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552638.

184.    Similarly, Dr. Rabang expressed no opinion on whether extending the number of lives is a major change or modification to an EndoWrist's intended use.  And, as demonstrated above, the evidence demonstrates it is not.  For example, Intuitive concluded that "Extending the number of lives does not involve any changes to the intended use(s) or instrument design." Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552635.

185.    Third, Dr. Rabang lacked basic information about Rebotix's services necessary to perform a proper analysis.  For example, the evidence indicates that Mr. Overmars did not provide Dr. Rabang with any details of the repairs Rebotix performs or the measures Rebotix

takes to ensure Rebotix-serviced EndoWrists are just as safe and effective as new EndoWrists. Overmars depo. tr., 111:7-114:19. Nor did he have any reason to believe that Dr. Rabang knew this information. *Id.* Similarly, Mr. Overmars did not inform Dr. Rabang that hospitals maintain ownership of the EndoWrists during the repair process. *Id.* Nor did have any reason to believe that Dr. Rabang knew this information. *Id.*[10]

186. Fourth, when the FDA was actually provided with information about Rebotix services, the evidence demonstrated that the FDA concluded that Rebotix's services do not require a 510(k). See Section 2.5 above.

### 2.6.2.  The process of adding the Interceptor during servicing does not require Rebotix to submit a 510(k).

187. Intuitive also asserted to the FDA that the physical process of removing the housing of the EndoWrist to add the Interceptor chip could significantly affect the performance and safety of the EndoWrist, and thus subject Rebotix to 510(k) submissions. Intuitive-00552745-00552759 (Curet letter to FDA) at Intuitive-00552747. In my opinion, the FDA would reject this assertion based on all of the same reasons expressed in my report.

188. First, the process of adding the Interceptor chip does not significantly change the intended use as defined by Intuitive and accepted by the FDA. After the EndoWrist service is complete ███████████████████████████████████████████████████████
███████████████████████████████████████████, the intended use of the EndoWrist remains

---

[10] Dr. Rabang's lack of information on the Rebotix repair process is further illustrated by his statement that, if "the device is cleaned, disinfected and/or sterilized, then you would be considered a 3rd party reprocessor." BPI000335. If Dr. Rabang were knowledgeable about the Rebotix's services, he would have known that this is not part of the Rebotix process. Hospitals, not Rebotix, are responsible for cleaning and sterilization of EndoWrists. REBOTIX162405; Gibson depo. tr., 35:21. Notably, Intuitive expressed the same lack of knowledge about Rebotix's process when it raised the same flawed sterilization allegation in its letter to the FDA. Intuitive-00552745-00552759 (Curet letter to FDA) at Intuitive-00552749 ("EndoWrist Remanufacturers also may be using non-validated or incompatible cleaning agents and/or disinfection/sterilization processes, which have the potential to damage the instruments.").

the same: endoscopic manipulation of tissue, including grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery and suturing. See Intuitive-00512047; Intuitive-00512044.

189.    Second, the process of adding the Interceptor chip does not significantly change the safety and performance of the EndoWrist. All Rebotix-serviced EndoWrists have had the Interceptor added. And Rebotix has performed substantial testing to ensure the safety and performance of these Rebotix-serviced EndoWrists, while Intuitive appears not to have performed any testing on Rebotix-serviced EndoWrists. For example, although Dr. Curet asserted in her letter to the FDA that Rebotix's removal of the housing to add components (i.e., the Interceptor) "could harm certain components and cause danger to the patient," Intuitive-00552747, she admitted at deposition that she "do[esn't] know whether there's been any testing to analyze whether the act of removing the housing or adding a component by Rebotix harms the EndoWrist device." Curet depo. tr., 141:14-142:10. This stands in contrast to the testing by Rebotix (discussed above) demonstrating that it does not cause any harm.

190.    Third, as discussed above, Rebotix informed the FDA about this process, and the FDA subsequently determined that Rebotix's services do not violate FDA regulations. In its email to the FDA, Rebotix wrote:

> "The devices have their proximal housing removed to allow inspection and repair of the simple cable-pulley system inside. There is a PCB inside of the instrument that contains a memory device (off-the-shelf DS2505 IC). This memory device contains the usage counter. The DS2505, which no longer functions for the devices under repair, is replaced by our functional equivalent component." REBOTIX174750.

191.    After learning this information, the FDA took no action, indicating that this process did not run afoul of any FDA regulations.

**2.7    Other FDA experts, and Intuitive's own analysis of FDA requirements, agree with my opinion that FDA clearance is not required for refurbished EndoWrists.**

192.    In the sections above, I set forth several reasons why Rebotix was not required to seek FDA clearance for its EndoWrist services.  In this section, I show that my opinions are shared by experts in the field and confirmed by Intuitive's own regulatory team.

193.    Through discovery, Intuitive produced an analyst report from Deutsche Bank that analyzes whether EndoWrist repair services, like Rebotix's service, require approval from the FDA.  Intuitive-00566055–Intuitive-00566082.  The report relies on "insights from four regulatory consultants with experience and expertise in the area of third party servicing medical devices" including a "Former staffer within the DCRF division of the FDA," a "Regulatory expert who has worked with various medtech companies in managing hundreds of 510(k) and PMA submissions over decades of industry experience" and "Two regulatory affairs personnel at large medtech companies with significant presence in device refurbishing/reprocessing." Intuitive-00566059.

194.    The conclusions of these experts agree with my own opinions expressed throughout my report.  For example: "Our takeaway from speaking with these consultants is that 510(k) clearance is not [] required for independent service organizations (ISOs) such as Restore Robotics in repairing limited-use da Vinci instruments for hospitals and returning them to the hospital for continued usage."   Intuitive-00566059.  "[A]ll experts agreed that any regulatory action/enforcement is highly unlikely given the FDA's clear comfort around the safety of refurbished devices broadly and the fact that there has been no signal of incremental patient risk to date with repaired da Vinci instruments."  Intuitive-00566057.

195.    Moreover, when Intuitive was investigating implementing a refurbished EndoWrist

71

project of its own, called Project Dragon, Intuitive's regulatory team also reached the conclusion that FDA approval was not required for refurbished EndoWrists.  Scoville depo. tr., 59:24-25; 57:4-22; Scoville depo., Ex. 3 (January 30, 2017, presentation entitled "Instrument eX: I&A Refurbishment Feasibility Update") at Intuitive-00423572-Intuitive-00423576.

196.   As part of its diligence for Project Dragon, Intuitive performed a "regulatory assessment" where it performed a "country by country assessment on ability to sell refurbished instruments, and requirements to do so."  Intuitive-00423573; Scoville depo. tr., 50:21-53:2.

197.   Earle Canty, a "regulatory leader at Intuitive," who oversaw a team with "knowledge for working with the FDA and other medical regulatory bodies around the globe," provided Intuitive's conclusions on the regulatory requirements for refurbished EndoWrists. Scoville depo. tr., 47:24-48:24.

198.   As Mr. Canty reported, Intuitive concluded that it was permissible to sell refurbished EndoWrists anywhere in the United States and clearance or registration with the FDA is <u>not</u> required:

> 25      Q.   And the United States does not require
> 1    clearance or registration for refurbished
> 2    EndoWrists; correct?
> 3       A.   As I'm seeing on this slide, that appears
> 4    to be Earle's assessment at the time this slide was
> 5    created.
>                           -Scoville depo tr., 51:25-52:5

# Regulatory Assessment

| Country | Allows sale of refurbished product made anywhere? | Only allow sale of refurbished product if refurbishing done in country? | Clearance/ registration required? | Time to complete registration |
|---|---|---|---|---|
| US | Yes | No | No | NFI; no timeline. |
| Canada | Yes | No | Yes | Amendment- 6 months. |
| France | Yes | No | Yes | Must be CE Marked; notification after placing on the market. |
| Germany | Yes | No | Yes | Must be CE Marked. |
| India | Yes | No | No | Can change depending on 1. New regulation for medical devices and 2. restriction on importation of used devices ( attempted in summer 2015). |
| China | No | No | | Hospitals are allowed to purchase and use used devices from other hospitals within China. However, companies are not allowed to sell refurbished products. |
| Japan | Yes | No | Yes | Registration required only if facility has not been registered. 1 year or so. |
| Korea | Yes | No | Yes | 6-12 months. Only products with the same information that have been authorized in the Sanitary register (PN and Country). It does not matter if it is remanufactured. |
| Mexico | Yes | No | Yes | N/A |
| Singapore | Yes | No | No | N/A |
| Malaysia | Yes | No | No | N/A |

4 | da Vinci Surgery

Intuitive-00423574.[11]

199.   If called upon to testify at trial, I expect to prepare additional demonstrative materials reflecting the opinion set forth herein.

Executed on July 25, 2021, at Stevensville, Maryland.

Joshua Sharlin

Joshua Sharlin, Ph.D.

---

[11] As part of Project Dragon, Intuitive also concluded that, for certain EndoWrists clinical utility was equivalent or better than new instruments after they had been refurbished.  Scoville depo. tr. 105:10-14; Scoville depo., Ex. 7 at Intuitive-00103439.

**Exhibit 1**

- May 7th, 2021, Deposition of Myriam Curet (with accompanying exhibits)
- May 27th, 2021, Deposition of Bob DeSantis (with accompanying exhibits)
- May 27th, 2021, Deposition of Stacey Donovan (with accompanying exhibits)
- June 22nd, 2021, Deposition of Chris Gibson (with accompanying exhibits)
- May 24th, 2021, Deposition of Edward W. Harrich (with accompanying exhibits)
- June 4th, 2021, Deposition of Mark Johnson (with accompanying exhibits)
- June 15th, 2021, Deposition of Bob Overmars (with accompanying exhibits)
- June 2nd, 2021, Deposition of Glenn Papit (with accompanying exhibits)
- May 26th, 2021, Deposition of Katie Scoville (with accompanying exhibits)
- Deciding When to Submit a 510(k) for a Change to an Existing Device; Guidance for Industry and Food and Drug Administration Staff, issued on October 25, 2017
- Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administrative Staff, issued on June 18, 2021
- 1906 Pure Food and Drugs Act
- 21 CFR § 803
- 21 CFR § 807.3
- 21 CFR § 807.81
- 21 CFR § 820
- 21 CFR § 820.198
- 21 CFR § 830
- 2018 FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices
- Medical Device Amendments of 1976
- Premarket Notification 510(k)
- Safe Medical Devices Act of 1990
- Medical Device Reporting for Manufacturers – Guidance for Industry and Food and Drug Administration Staff
- Intuitive-00103429-Intuitive-00103451
- Intuitive-00423534-Intuitive-00423578
- Intuitive-00512043-Intuitive-00512047
- Intuitive-00512044
- Intuitive-00512045-Intuitive-00512407
- Intuitive-00512048-Intuitive-00512158
- Intuitive-00552632-Intuitive-00552651
- Intuitive-00552652-Intuitive-00552664
- Intuitive-00552665-Intuitive-00552681
- Intuitive-00552697-Intuitive-00552715
- Intuitive-00552716-Intuitive-00552727
- Intuitive-00552728-Intuitive-00552743
- Intuitive-00552745-Intuitive-00552759

- Intuitive-00566055-Intuitive-00566082
- Intuitive-00595696-Intuitive-00595700
- REBOTIX175327
- REBOTIX174749-REBOTIX174756
- REBOTIX166019
- REBOTIX165979-REBOTIX165998
- REBOTIX162404-REBOTIX162424
- REBOTIX156431-REBOTIX156446
- REBOTIX151966-REBOTIX152018
- REBOTIX151921-REBOTIX151922
- REBOTIX151919-REBOTIX151920
- REBOTIX146770-REBOTIX146781
- REBOTIX126788-REBOTIX127430
- REBOTIX126336-REBOTIX126390
- REBOTIX126294-REBOTIX126335
- REBOTIX126240-REBOTIX126293
- REBOTIX126238-REBOTIX126239
- REBOTIX124718-REBOTIX124756
- REBOTIX124268-REBOTIX124705
- REBOTIX068498
- REBOTIX068497
- REBOTIX068469
- BPI000331-BPI000337