Exhibit 6

Modern Industrial Organization 4th ed. 2015

GLOBAL EDITION



# Modern Industrial Organization

**FOURTH EDITION**

Dennis W. Carlton • Jeffrey M. Perloff

Exhibit 3

ALWAYS LEARNING

**PEARSON**



# Modern Industrial Organization

**Fourth Edition**

**Global Edition**

## Dennis W. Carlton

*University of Chicago*

## Jeffrey M. Perloff

*University of California, Berkeley*



PEARSON

Boston  San Francisco  New York  Hoboken
London  Toronto  Sydney  Tokyo  Singapore  Madrid
Mexico City  Munich  Paris  Cape Town  Hong Kong  Montreal

*To Janie and Jackie*

Editor in Chief: Denise Clinton
Acquisitions Editor: Adrienne D'Ambrosio
Director of Development: Sylvia Mallory
Managing Editor: Jim Rigney
Senior Production Supervisor: Nancy Fenton
Senior Media Producer: Melissa Honig
Senior Acquisitions Editor, Global Edition: Steven Jackson
Assistant Project Editor, Global Edition: Amrita Kar
Manager, Media Production, Global Edition: Vikram Kumar
Senior Manufacturing Controller, Production,

Global Edition: Trudy Kimber
Marketing Manager: Deborah Meredith
Design Supervisor: Regina Kolenda
Interior Designer: Leslie Haimes
Cover Designer: Shree Mohanambal Inbakumar, Lumina Datamatics
Illustrator: Jim McLaughlin
Senior Prepress Supervisor: Caroline Fell
Senior Manufacturing Buyer: Hugh Crawford
Compositor: Cenveo Publisher Services
Cover Image: (c)somchai rakin/Shutterstock

Pearson Education Limited
Edinburgh Gate
Harlow
Essex CM20 2JE
England

and Associated Companies throughout the world

Visit us on the World Wide Web at:
www.pearsonglobaleditions.com

© Pearson Education Limited 2015

The rights of Dennis W. Carlton and Jeffrey M. Perloff to be identified as the authors of this work have been asserted by them in accordance with the Copyright, Designs and Patents Act 1988.

*Authorized adaptation from the United States edition, entitled* Modern Industrial Organization, 4th edition, *ISBN 978-0-321-18023-0, by Dennis W. Carlton and Jeffrey M. Perloff, published by Pearson Education © 2016.*

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without either the prior written permission of the publisher or a license permitting restricted copying in the United Kingdom issued by the Copyright Licensing Agency Ltd, Saffron House, 6–10 Kirby Street, London EC 1N 8TS.

All trademarks used herein are the property of their respective owners. The use of any trademark in this text does not vest in the author or publisher any trademark ownership rights in such trademarks, nor does the use of such trademarks imply any affiliation with or endorsement of this book by such owners.

ISBN-10:1-292-08785-4
ISBN-13: 978-1-292-08785-6

British Library Cataloguing-in-Publication Data
A catalogue record for this book is available from the British Library

10 9 8 7 6 5 4 3 2 1

Typeset by Cenveo Publishing Services
Printed and bound by Courier Westford

The left-hand side of Equation 4.3 is the **price-cost margin**: the difference between price and marginal cost as a fraction of price, $[p - MC]/p$. As the equation shows, the price-cost margin depends on only the elasticity of demand the monopoly faces. The price-cost margin is also called the **Lerner Index** of market power (Lerner 1934).

Equation 4.3 shows that the monopoly's price is close to $MC$ when the demand is very elastic, and the price increasingly exceeds $MC$ as the demand becomes less elastic. For example, if the elasticity of demand is $-2$, price is twice marginal cost. If the elasticity is $-100$ (very elastic), price equals $1.01 MC$. The higher the elasticity of demand, the closer is the monopoly price to the competitive price. Therefore, the key element in an investigation of market power is the price elasticity of demand. Where the elasticity of demand is relatively inelastic, a monopoly markup may be substantial, as Example 4.1 illustrates.

## Market and Monopoly Power

In contrast to a price-taking competitive firm, a monopoly knows that it can set its own price and that the price chosen affects the quantity it sells. A monopoly can set its price above its marginal cost but does not necessarily make a supracompetitive profit. For example, if a monopoly incurs a fixed cost, its profit may be zero (the competitive level) even if its price exceeds its marginal cost.

It is common practice to say that whenever a firm can profitably set its price above its marginal cost without making a loss, it has *monopoly power* or *market power*. One might usefully distinguish between the terms by using *monopoly power* to describe a firm that makes a profit if it sets its price optimally above its marginal cost, and *market power* to describe a firm that earns only the competitive profit when it sets its price optimally above its marginal cost. However, people do not always make this distinction, and generally use the two terms interchangeably, sometimes creating confusion.

---

**EXAMPLE 4.1** *Monopoly Newspaper Ad Prices*

When the *Houston Post* shut down in April 1995, the managing editor of the sole surviving paper, the *Houston Chronicle*, received dozens of calls from concerned *Post* readers worried about one thing: Would the *Chronicle* pick up the *Post's* comics? Local advertisers also were very concerned: What would happen to newspaper advertising prices?

Ad rates skyrocketed by nearly 62 percent from January 1995 (before the *Post* folded) to December 1996. The rate for a one-column inch ad in a daily paper rose from $252.64 to $409.00 per day, and Sunday rates jumped from $294.84 to $477.28. These rates increased by much more than readership, which rose 32 percent on weekdays and 23 percent on Sunday. Thus, a loss of competition resulted in a substantial increase in price.

*Source:* Iver Peterson, "New Realities of Life in a One-Paper Town," *New York Times*, December 30, 1996:C5.

This observation, however, applies only in the context of a simple, timeless model. In actual markets, demand curves shift over time. As a result, a rational monopoly changes its price over time.

Consumers may have a more inelastic demand curve in the short run than in the long run. In the short run there are limitations on how fast consumers can substitute away from a product in the face of a price increase. Therefore, if a monopoly takes advantage of an inelastic portion of its short-run demand curve and raises its price, its consumers are more likely to substitute away from its product in subsequent periods. Thus, a monopoly may operate in the inelastic portion of its short-run demand curve to avoid long-run substitution.

The oil market provides an excellent example of the time it takes to substitute away from a product. When the Organization of Petroleum Exporting Countries (OPEC) raised the price of oil in the early 1970s, total consumption of energy changed very little in the first year. However, the quantity of oil demanded fell sharply over the next several years as consumers adjusted to the increased price and began to take energy-saving measures.

## The Costs and Benefits of Monopoly

*A monopoly is socially reprehensible in the hands of others.*

If a monopoly restricts its output and raises its price above marginal cost, society suffers a deadweight loss. We first examine why such behavior leads to a deadweight loss. Then we use our understanding of how monopolies arise to show that, in certain circumstances, there are benefits associated with monopolies. Indeed, in certain situations, monopoly may be preferable to competition.

### The Deadweight Loss of Monopoly

In order to maximize its profit, a monopoly sets its output where its marginal revenue curve intersects its marginal cost curve, as Figure 4.2a shows. The gap between the monopoly's price and marginal cost represents the difference between the value (price) that buyers place on the product and the marginal cost of producing it. This gap is similar to the one caused by a tax on a competitive market (Chapter 3). In both cases, price and output differ from their competitive levels, and there is a deviation between the demand price (as given by the demand curve) and the supply price (as given by the marginal cost curve).

If consumers must pay a monopoly price $p_m$ that is above the competitive price $p_c$, they lose consumer surplus equal to the sum of the monopoly profits and the deadweight loss in Figure 4.2a. The monopoly profit is less than the consumer surplus loss. Thus, society suffers a deadweight loss (the *DWL* triangle in Figure 4.2a) that equals the consumers' loss less the monopoly's gain. This *DWL* triangle is the area below the demand curve, above the marginal cost curve, and to the right of the equilibrium monopoly quantity.

Thus, both monopoly and an inefficient tax cause a deadweight loss. However, who keeps the transfer from consumers differs: Tax revenues go to the government, whereas

$MR_d$ curve, the price is $\bar{p}$, and the competitive fringe meets some of the market's de-
mand. At this price, each fringe firm makes zero economic profits (because its average
cost equals $\bar{p}$) and is indifferent between staying in business and leaving the market.
How much is produced by the competitive fringe depends on the dominant firm's cost
structure (that is, where $MC_d$ intersects the horizontal marginal revenue curve), which
determines the dominant firm's output, $Q_d$. Collectively, the fringe firms produce an
output level $Q_f = Q - Q_d$, as Figure 4.7b shows.[19] It is possible that $Q_f = 0$ even
though the presence of the fringe constrains price to equal $\bar{p}$.

Thus, if fringe firms flood into a market whenever positive profits can be made, the
dominant firm cannot charge a price above the minimum average cost of a fringe firm.
Although a dominant firm can make positive profits, competitive-fringe firms just
break even. If the dominant firm's price would be above $\bar{p}$ in the absence of entry, con-
sumers are better off if entry is possible because it results in lower prices.

The second type of equilibrium occurs if the dominant firm's marginal cost is lower
($MC_d^*$ in Figure 4.7b), so that it hits the marginal revenue curve in the downward-
sloping portion. Here, the price is so low that no fringe firm stays in the market when
the dominant firm's costs are lower than the fringe firms' costs. This equilibrium
($Q_d^*, p^*$) is the same as discussed previously in the second no-entry equilibrium and is
shown in Figures 4.6b and 4.7b. The dominant firm is a monopoly, and the potential
supply of fringe firms is irrelevant.

## SUMMARY

Monopoly or market power is the ability to price profitably above marginal cost. A sin-
gle seller of a product, a monopoly, faces a downward-sloping demand curve and sets
its price above marginal cost. As a result, less is purchased than if the market were per-
fectly competitive and society suffers a deadweight loss.

In some markets, however, there are benefits to monopoly. For example, the
promise of future monopoly profits can spur a firm to develop new products or more
efficient production techniques.

Not all firms that earn profits are monopolies, and not all monopolies earn profits.
Just like a competitive firm, a monopoly can make either profits or losses in the short
run. However, unlike a competitive firm, a monopoly can earn positive profits in the
long run. A natural monopoly exists when it is efficient to have only one firm produce
the market's output.

---

[19]Why don't fringe firms meet the entire demand at $\bar{p}$, instead of splitting it with the dominant firm?
The answer is that the dominant firm has lower costs and can force some of the fringe firms out of the
industry. Suppose that the dominant firm is producing its desired output of $Q_d$, and $n$ fringe firms are
producing $Q_f = Q - Q_d$. Now, if additional fringe firms enter this market, output exceeds market de-
mand at $\bar{p}$. For the market to clear, the price must fall. Since the dominant firm is making positive
profits, it stays in the industry. The fringe firms, however, start making losses (because they just break
even at $\bar{p}$). Thus, some of the fringe firms must drop out of the industry until the price again rises to $\bar{p}$.
Alternately stated, the dominant firm can always charge slightly below $\bar{p}$ to sell as much as it wants.

## Conditions for Price Discrimination

Even though all firms would like to price discriminate, many are not able to do so. Three conditions are needed for successful price discrimination.[3]

1. A firm must have some *market power* (the ability to set price above marginal cost profitably); otherwise, it can never succeed in charging any consumer more than the competitive price.

2. The firm must know or be able to infer consumers' willingness to pay for each unit, and this willingness to pay must vary across consumers or units. That is, the firm must be able to *identify* whom to charge the higher price. Similarly, if each individual's demand curve slopes down, the firm may be able to charge a different price for the different units any one consumer purchases (such as $10 for the first unit and $5 for the second unit).

3. A firm must be able to *prevent or limit resales* by customers who pay the lower price to those who pay the higher price. Any attempt to charge one group a higher price than another is doomed to fail if resales are easy. If the group charged the lower price can resell to the other group at a lower price than the monopoly charges them, no one in the latter group would buy directly from the monopoly. Limiting resales is necessary for all types of price discrimination.

## Resales

If a firm charges nonuniform prices, consumers who buy at a relatively low price may resell to those facing a relatively high price and thereby render useless the attempt to charge different prices. Similarly, if a firm offers quantity discounts for a product, it must ensure that the discount is not so great as to encourage high-volume purchasers to buy the product and then resell it to those who demand fewer units. There are at least seven reasons why reselling the good may be difficult or impossible for consumers:

**Services.** Most services cannot be resold. For example, a dentist may charge Lisa a very high price and Jackie a very low price, but it is impossible for Lisa to gain by having Jackie purchase the dentist's services for her. For that reason, price discrimination in services is more likely than price discrimination in industries with tradeable products (Kessel 1958). See Example 9.2.

Similarly, having seen an art show, one cannot transfer the experience to others. In 2001, when Steve Martin's art collection went on display in Las Vegas, the gallery in the Bellagio Hotel charged art lovers a hefty $12 per ticket unless they were Nevada residents, who were charged only $6.

---

[3]Price discrimination can be practiced by a single firm or a group of firms, such as a cartel. To keep the exposition simple, we discuss the actions of a single firm.

That is, the percentage markup of each Group $i$'s price over its marginal cost, $[p_i - m]/p_i$, is inversely proportional to its elasticity of demand. The higher the group's elasticity of demand, the lower the price and the closer the price is to marginal cost. As a result, the group whose demand is relatively sensitive to price is charged a lower price. Equations 9.2a and 9.2b can be combined to show that the price ratio to the two groups depends on their relative elasticities:

$$\frac{p_1}{p_2} = \frac{1 + 1/\epsilon_2}{1 + 1/\epsilon_1}. \qquad (9.4)$$

For example, if Group 1 has a nearly perfectly elastic demand ($\epsilon_1 \approx -\infty$) and Group 2 has a demand elasticity of $-2$, then $p_1/p_2 = 1/2$. Group 2, the group with the relatively inelastic demand, is charged twice as much as Group 1. Alternatively stated, a profit-maximizing discriminating monopoly provides a discount to the group that has the higher elasticity of demand. See Examples 9.1, 9.3, and 9.4.

Still another method of price discrimination is to make the price that the consumer pays depend on whether the consumer turns in a previous version of the product, as well as the identity of the manufacturer of that previous version (Fudenberg and Tirole 1998). For example, the price of the latest version of Microsoft's word-processing software, Word, may depend on whether the consumer's previous word-processing software was an earlier version of Word.

## Other Methods of Third-Degree Price Discrimination

Firms can practice third-degree price discrimination in other, subtle ways. For example, in many markets some consumers are better informed than others about prices. One way a firm can charge different prices to consumers is to set a high list price (the price at which an item is marked or listed to sell). The firm charges the list price unless a customer complains that it exceeds the price of the product at other stores. In the event of a complaint, the store matches the lower price. This method of pricing causes uninformed consumers to pay higher prices than knowledgeable ones.[9]

Another example of third-degree price discrimination involves exploiting differences in the value customers place on time. High-wage, high-income people typically value their time more than low-wage, low-income people (and may have a more inelastic demand for certain goods). One clever way to price discriminate between these two groups is to make a special offer that requires consumers to spend time to take advantage of the offer. For example, suppose a store is willing to sell an item over the telephone at the regular price and mail the item to the consumer. The store runs a sale, but only gives the low price to consumers who take the time to come in and pick the item up at the store. This is an effective method of price discrimination in which consumers who place a high value on time receive the item by mail and pay the regular price, and consumers who place a low value on time pick the item up at the store and pay the low price.

---

[9]The moral of this story is don't be afraid to complain about high prices. Department stores often have a policy that they will not be underpriced by their rivals. Chapter 13 analyzes how a firm's behavior is affected by the presence of both informed and uninformed consumers.

cret by selling a product at the oligopoly price but tying that sale to another product with a very low price. For example, a firm can give a 10 percent discount on a $100 price by giving as a gift to purchasers of the product another product that is worth $10. Alternatively, the firm could charge customers $10 less than they would have to pay if they purchased the tied product in the competitive market.

**Assure Quality.** Tie-in sales can assure quality. For example, Kodak claimed that it tied the development of its film to its film sales because it did not believe that independent developers could develop Kodak film as skillfully as could Kodak.[4] Kodak could have reasoned that if an independent developer made a mistake and produced poor pictures, the consumer would be unable to distinguish whether the film was bad or the developer was bad. The consumer might then be reluctant to purchase film from Kodak in the future.

Generally, a firm may assure quality by forcing customers to buy another of its products or services or to not use substitutes. When Searle introduced NutraSweet, a nonsugar sweetener, it claimed that it was natural and better tasting than other less expensive sugar substitutes, such as saccharin. Beverage manufacturers began using a blend of saccharin and NutraSweet in their diet sodas. Searle felt that the taste of the blend was not as good as NutraSweet alone, and, fearing that NutraSweet would be improperly judged, required that users of NutraSweet not use it as a blend.[5] Of course, both Kodak and NutraSweet may have had other motivations for their actions.

## Tie-in Sales as a Method of Price Discrimination

A final reason for tie-in sales—the focus of the rest of this chapter—is to increase monopoly profit. That is, if a firm has a monopoly in a product, it may be able to increase its profits by tying another good to the sale of the monopolized good. Tie-in sales can be used to price discriminate in a variety of circumstances, and the way they work is analyzed differently depending on the circumstances. Therefore, after reviewing some general reasons for using tie-in sales as a method of price discrimination, we discuss their use in a variety of different circumstances.

There are two common types of tie-in sales. One is **bundling** (Adams and Yellen 1976) or a **package tie-in sale** and occurs when two or more products are sold only in fixed proportions. For example, a store requires that, if you buy one jar of coffee, you must buy one bag of sugar. Everyone who buys these products consumes them in these fixed proportions, or else they must dispose of part of one or the other product.

The other common type is a **requirements tie-in sale**, where customers who purchase one product from a firm are required to make all their purchases of another product from that firm. For example, IBM used to require that purchasers of its machines that used tabulating cards buy all of their tabulating cards, no matter how

---

[4]Kodak film was once sold only with development included. Purchasers simply mailed the film to Kodak for developing at no additional charge.
[5]*Newsweek,* January 28, 1985:57.

must be impossible for the consumer, in this case the car manufacturer, to purchase steel secretly on the open market; that is, the consumer must not be able to undo the package tie-in.[12]

**Requirements Tie-ins with Interrelated Demands.** Perhaps the most common type of tie-in is a requirements tie-in in which consumers buy one good and are then required to make all their purchases of some other related good from the same manufacturer. Chapter 19 examines several examples that have arisen in litigation. One famous case involved the A. B. Dick Company, which had a patent monopoly to sell mimeograph machines.[13] A. B. Dick required that customers who bought mimeograph machines also buy all their ink from A. B. Dick, which did not have a monopoly in ink. Another famous tie-in case was mentioned earlier: the IBM tabulating card case, in which IBM required purchasers of its machines to buy all their tabulating cards from IBM.

In the typical requirements tie, the firm sets a price for the first good and charges a high price (above the competitive price) for the related good. Consumers with large demands effectively pay more for the first good than consumers with small demands. For example, a person who bought a tabulating machine and 100 tabulating cards effectively paid a higher price for the machine than someone who bought only 10 cards. Therefore, a critical element for a requirements tie to maximize profit is that consumers differ in their demand for the related good. We now examine in more detail why requirements ties may be profitable.

Suppose that a firm develops a new machine that automatically sews buttons on shirts. Prior to the development of the machine, buttons were sewn by hand onto shirts, and the labor cost was 1¢ per button. There are many shirt manufacturers. Suppose a large manufacturer sews on 10,000 buttons per year. That manufacturer is willing to pay $100 per year for the machine because its saves $100 from reduced labor costs. Another manufacturer that uses only 1,000 buttons would pay at most $10 for the machine per year.

To keep the example simple, suppose that a machine lasts for only a year and that the total number of buttons that each manufacturer sews on shirts during a year is unchanged by this invention. The demand curve for the machine, $D_M(p_M, p_B)$, depends on the price of the machine, $p_M$, and the price of buttons, $p_B$. The price of buttons is 5¢ for the solid demand curve in Figure 10.7a.

Suppose that the monopoly of the machine decides to allow firms to use the machine for free provided they purchase all their buttons from the machine monopoly for

---

[12]An alternative approach is for the aluminum monopoly to take over the automobile industry (vertically integrate) so as to eliminate this inefficiency in production and increase the demand for aluminum and its profit (see Chapter 12). With interrelated demands, a package tie-in sale enables a monopoly to achieve the same increase in profit that it could achieve through vertical integration. Note also that the monopoly could achieve the same result as with the package tie-in by using a requirements tie-in in which the relative prices charged for aluminum and steel were in the same ratio as their marginal costs. Such prices will lead to an efficient use of aluminum and steel.

[13]*Henry v. A. B. Dick Co.*, 224 U.S. 1 (1912). A mimeograph machine produced copies of an original stencil using ink.

**EXAMPLE 15.5**  *Sales Versus Rentals*

A monopoly has an incentive to rent to avoid problems due to consumer expecta-
tions about future prices (the Coase Conjecture problem). In contrast, a firm with ri-
vals may want to sell. Increased sales, like greater durability, allow the firm to lock up
consumers today (prevents them from buying from rivals in the future). Thus, we
would expect that the more competition a firm faces, the greater its sales/rental ratio.

Both IBM and Xerox substantially increased their sales/rental ratios (where rental
includes returns from both renting and services) from 1968 to 1983 as their compe-
tition apparently increased. This ratio for IBM rose from 0.46 in 1966 to 1.38 in
1983. The ratio for Xerox rose from 0.28 in 1968 to 0.85 in 1983. Various factors in
addition to increased competition may have contributed to the increased use of sales.

*Source:* Bulow (1986), Carlton and Gertner (1989).

choose a less efficient technology with a steeper marginal cost curve (Karp and Perloff
1996). In the extreme case where the monopoly's marginal cost curve is vertical, it can
produce at most a fixed number of units. For example, an artist may commit to pro-
ducing only a limited number of a particular lithograph (each explicitly numbered) by
destroying the plate used to produce it.

Third, if the firm cannot explicitly contract to control its future production, it may
attempt to acquire a *reputation* for never lowering price. For example, De Beers, the
South African diamond monopoly, claimed it had a policy of never reducing the
nominal price of its diamonds (although it apparently has on occasion). See **www.aw-
bc.com/carlton_perloff** "A Diamond Price Is Forever?"

Fourth, because the problem of expectations arises only for durable goods, the
monopoly can produce *less durable* goods. The monopoly can use **planned obsoles-
cence**—purposely making a durable good short-lived—as a way of limiting its ability
to lower its price in the future (Bulow 1986, Waldman 1993, Fishman and Rob 2000,
and Kumar 2002). Having new models each year, as with automobiles or high-fashion
dresses, may be examples of planned obsolescence; however, the costs of redesigning
products frequently limit the monopoly's ability to use this technique. Microsoft and
other software firms can relatively easily upgrade their products. See Example 15.6.

Fifth, the monopoly can *guarantee* to buy back products from any consumers at the
price they paid for it. This *buy-back* provision protects the consumer in case the mo-
nopoly expands output and thereby lowers price in the future. This policy is not feasi-
ble where consumer abuse may lower the value of a product, as with automobiles, or if
the products cannot be easily transferred, as with railroad tracks. Similarly, a monop-
oly may use other contractual clauses, such as best-price or most-favored-nation provi-
sions to reassure customers about future prices (Butz 1990).

Thus, there are a number of ways in which a durable goods manufacturer may pre-
commit itself to assure consumers that goods purchased today will not drop in value
tomorrow. A durable good monopoly can maintain its market value by renting or by

In 2002, of the 36 individuals sentenced in antitrust cases, 19 were sentenced to incarceration time for a cumulative total of 10,501 days (16 individuals were sentenced to other confinement such as house arrest or a halfway house for a total of 3,607 days).

### Private Litigation

Private actions brought by individuals or firms harmed by anticompetitive behavior were rare for price-fixing cases until the electrical conspiracy of the early 1960s (see Example 5.1). In the next two decades, private actions, including class-action suits, increased substantially. These private actions, which often follow federal suits, can substantially increase the cost of conspiracy, because treble damages plus attorneys' fees may be collected.[14] For the period from 1937 to 1954, there was an average of 104 private cases per year; for the period from 1955 to 1959, the average increased to 229 cases per year. From 1960 to 1964, 1,919 cases were filed concerning electrical equipment, causing the yearly average to rise to 671 cases. For fiscal years ending June 30th, the number of private civil antitrust suits fell from 1,457 in 1980 to 1,100 in 1984 to 638 in 1989 (Salop and White 1986, Abere 1991).

 ## Market Power and the Definition of Markets

The antitrust laws concentrate on controlling the creation and maintenance of market power. This section defines market power, discusses how to measure it, and points out that it is sometimes difficult to measure market power accurately. Some economists and lawyers argue that one should define a market and then calculate the market share of the firm under analysis as an approximation of its market power, where a high market share is interpreted as an indicator of market power. This section describes the principles that should be used to define a market and provides a background against which cases can be interpreted.

### Market Power

A firm (or group of firms acting together) has market power if it is profitably able to charge a price above that which would prevail under competition, which is usually taken to be marginal cost. This ability to set price above marginal cost implicitly uses the model of perfect competition as a benchmark against which to measure the behavior of firms. If this definition is applied literally, probably every firm in the United States has at least a tiny bit of market power. The model of perfect competition is an extreme one that describes few, if any, actual industries. Therefore, presumably, when courts find that a firm has market power, they must mean the firm has a substantial

---

[14]According to Posner (1970, 372), in the period from 1956 to 1960, at least 278 private cases were preceded by a Department of Justice judgment, while in the period from 1961 to 1963, 880 cases followed such judgments.

**The Extent of the Product Market.** A proper definition of the product dimension of a market should include all those products that are close demand or supply substitutes.[17] Product B is a *demand substitute* for A if an increase in the price of A causes consumers to use more B instead. Product B is a *supply substitute* for A if, in response to an increase in the price of A, firms that are producing B switch some of their production facilities to the production of A.[18] In both cases, the presence of B significantly constrains the pricing of A, provided that an increase in the price of A would result in either a significant decline in the quantity of A consumed as consumers switch from A to B or a significant increase in the supply of A as firms switch production from B to A.

The degree of substitution between products depends on the current prices of the two products. For example, A and B may be highly substitutable at a high price for A, but not at a low price for A. Even a monopoly may raise its price sufficiently above competitive levels so that eventually it faces some competition from other products. Just because a monopolized product faces close demand substitutes at the monopoly price, it does *not* follow that the firm producing the product has no market power (though it may not be able to raise its price further). It is only if the substitution possibilities are so large as to generate a highly elastic residual demand that the monopoly has no significant market power. Because it is difficult to determine which products to include in the market definition, market shares may be only a crude indicator of market power.

The *Cellophane* case illustrates these difficulties in defining a market.[19] The Court investigated whether du Pont had market power in the pricing of cellophane. The Court reasoned that du Pont lacked market power because, at the current market prices, a user of cellophane had many substitutes, such as paper bags, and du Pont's share of the market including these substitutes was not large. There was also evidence, however, that price substantially exceeded marginal cost. Based on the foregoing discussion, it was an error to include other wrapping materials in the market definition because they did not prevent the exercise of market power and constrain the price of

---

[17] The relevant economic market is not necessarily the same as the *market* that a salesperson might refer to. Substantial confusion has sometimes resulted when market definition is based on memos written by marketing personnel. For that reason, some antitrust lawyers advise companies to instruct marketing personnel to avoid the use of the word *market* in memos.

[18] The relationship between the demand elasticity facing a firm and supply and demand substitutes can be illustrated using the model of a dominant firm facing a competitive fringe (see **www.aw-bc .com/carlton_perloff** "Dominant Firm and Competitive Fringe Model" and Landes and Posner 1981). One can derive that

$$\epsilon_d = \frac{Q}{Q_d}\epsilon - \frac{Q_f}{Q_d}\eta_f$$

where $\epsilon_d$ is the residual demand elasticity facing the dominant firm, $\epsilon$ is the market demand elasticity, $Q$ is the market quantity, $Q_d$ is the quantity sold by the dominant firm, $Q_f$ is the quantity supplied by the fringe, and $\eta_f$ is the supply elasticity of the fringe. As the absolute value of $\epsilon$ increases (more demand substitutes) and as $\eta_f$ increases (more supply substitutes), and as the dominant firm's share $(Q_d/Q)$ falls, $\epsilon_d$ rises in absolute value and the dominant firm has less market power.

[19] *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956).