**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

REBOTIX REPAIR LLC,

                 Plaintiff,

vs.

                               Case No.:  8:20-cv-02274

INTUITIVE SURGICAL, INC.,

                 Defendant.

**Rebotix's opposition to Intuitive's motion to exclude the expert opinions of Gwen Mandel and Kurt Humphrey**

## I.     Introduction.

Gwen Mandel and Kurt Humphrey are two experts retained by Rebotix to demonstrate the feasibility of Rebotix's repairs of Intuitive's X/Xi EndoWrists.  One part of Rebotix's repair process involves resetting the usage counter on EndoWrist instruments to the original number of uses.  Rebotix has implemented that step on S/Si EndoWrist models but not on X/Xi EndoWrist models.  The X/Xi usage counter reset is "in process." Ex. 1 (Papit depo.), 100:14-21.

Rebotix retained two experts, Gwen Mandel and Kurt Humphrey, to offer opinions on the feasibility of completing the X/Xi workaround.  Mandel offers opinions on data extraction from the chip that implements the use counter on the X/Xi EndoWrists.  And Humphrey offers opinions about Rebotix's ability to reset the usage counter after obtaining access to the memory image on the chip.

"[E]xpert testimony may be admitted if three requirements are met. First, the expert must be qualified to testify competently regarding the matter he or she intends to address. Second, the methodology used must be reliable as determined by a Daubert inquiry. Third, the testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010).  The opinions offered by Mandel and Humphrey satisfy each of these three requirements.

It is undisputed that Mandel and Humphrey are qualified to render their respective opinions about cybersecurity and cryptography.

Further, both Mandel and Humphrey used reliable methodologies.  Mandel used generally accepted tools and methods in her field to perform a hands-on analysis of the chip (the Atmel CryptoRF) that contains the usage counter in the da Vinci X/Xi EndoWrists.  Humphrey applied generally accepted methods in the field of reverse engineering and cybersecurity to assess Rebotix's ability to reset the usage counter.  Humphrey applied those principles to the factual record and provided detailed explanations supporting his conclusions.

Finally, Humphrey and Mandel provide opinions that will be helpful to the trier of fact.  Humphrey and Mandel's opinions are relevant to assessing Rebotix's preparedness to service the EndoWrist repair and replacement market.  And they assist the trier of fact in determining the appropriate damages to award Rebotix.

## II.   Mandel and Humphrey are qualified to testify on the subjects of their reports.

An expert may be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Civ. Evid. 702.  Intuitive does not object to either Mandel or Humphrey as being unqualified to offer opinions.  Nor could it, because each has extensive experience with cybersecurity and reverse engineering.  Mandel has "over ten years of experience with medical software, coding and programming" and her specific area of expertise "includes cybersecurity analysis specific to medical devices."  Ex. 2 (Mandel report), ¶4.  Humphrey is an expert in reverse engineering, has familiarity with encryption and security used in RFID communications, and developed this expertise over a 20-year career working with integrated circuits.  Ex. 3

(Humphrey report), ¶¶2-5.  As such, both Humphrey and Mandel are qualified to offer opinions about cryptography and the security of the Atmel CryptoRF chip.

## III.   Mandel and Humphrey use reliable methodologies.

In a court's evaluation of the reliability prong of expert testimony, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).  "It is sufficient that each expert's reasoning and methodology had a reliable foundation in the knowledge and experience of his discipline, regardless of claimed errors of interpretation."  *Allapattah Servs. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1354 (S.D. Fla. 1999).  When an expert uses a methodology to draw a conclusion, "absolute certainty is not required" and "weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility."  *Jones v. Otis Elevator Co.,* 861 F.2d 655, 662-663 (11th Cir. 1988).  "[A]fter *Daubert*, 'the rejection of expert testimony is the exception rather than the rule.'"  *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments).

### A.   Mandel used generally accepted principles and tools in her field.

Mandel was retained by Rebotix to assess the cybersecurity on the chip present in the da Vinci X/Xi EndoWrist.  To perform this assessment, Mandel conducted a hands-on examination of the chip using tools typically used in her field of work.  Ex. 2, ¶11.  She then analyzed the findings from her own examination using the method of analysis used by experts in the field of cybersecurity.  Mandel

describes each of the tools that she used to analyze the chip (pages 3-5) and then lays out the steps that she took to analyze the chip in a seven-page section titled "Description of Methodology." (pages 7-13). Throughout each of those sections, Mandel explains how her tools and methods are commonly employed by other cybersecurity experts in her field.

Mandel used tools typically used in the field of cybersecurity. ██████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Mandel explained that she used those tools in a manner generally accepted in the field of cybersecurity. ███████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

The approach used by Mandel comported with "████████████████████████

█████████" Ex. 4 (Mandel depo.), 18:15-21; 186:23-187:12 ("████████████

████████████"). Mandel confirmed that each approach she used "████

████████████████" and pointed to the sources that she cited in her

report to demonstrate how her "███████████████████████████"

*Id.* 133:25-134:20.

Mandel testified that her method of "███████████████████████"

was typical and supported by the "████████████████" that she cited. Ex.

4, 124:3-20. Those sources contain additional "████████████████████

███████████████████" and support her application of that

general approach. *Id.* 132:13-133:10. For example, Mandel relied on "███████

██████████████████████████████" which "█████████

████████████████████████████" "███████████████

████████████████████" *Id.* 74:25-75:14.

Mandel listed all of the tools she used, sources she referenced, and each step of

the specific methodology she employed. Her results are based on data derived from

the chip using a method that can be tested and empirically verified. Indeed, Mandel

"████████████████████████████████████." *Id.* 121:11-

24. And she explained how she made each of the observations about the chip as well

as the link between those observations and her conclusions. Accordingly, Mandel's

opinions are subject to cross-examination and satisfy the *Daubert* standard.

**B.    Humphrey used a generally accepted methodology to evaluate data about Rebotix's usage counter reset.**

Humphrey was retained to " ███████████████████████████ ███████████████ " so that he could " ████████████████████ ████████████████████████████ " Ex. 5 (Humphrey depo.), 9:2-10.

To do so, Humphrey used an accepted methodology in the field of cryptography: evaluating " ██████████████████████████ ████████████████████████████████████████ ████████████████████ ." *Id.* 140:24-141:4.  In projects where a cryptography expert is not tasked with " ████████████████████ " a product, the generally accepted method is to " █████████████████████████████████ ████████████████ " and to " ████████████████ " of the products at issue.  *Id.* 48:4-17.  That methodology involves considering technical documentation and reported results to evaluate (1) encryption and security measures present on a chip, (2) whether accepted techniques are being used to extract data from the chip, and (3) whether the party attempting to extract data has experience with similar chips.  Ex. 6 (Humphrey declaration), ¶5.

Humphrey formed his expert opinions by reviewing, among other things, "deposition testimony, documents produced in this action, publicly available documents, and Mandel's expert report."  Ex. 3, ¶7.  In total, Humphrey reviewed 43 sources including deposition testimony, Intuitive internal documents, Rebotix internal documents, publicly available sources, and specific chip data sheets.  Ex. 6,

(Humphrey Report, Revised List of Materials Considered).

First, Humphrey evaluated whether encryption and security measures were present on the chip.  He did this by assessing commonly recognized factors that can make image extraction more difficult: whether "██████████████████████" whether "███████████████████████████," and whether "█████████████████████████" are employed.  Ex. 3, ¶50.  By contrast, "██████████████████████████████████████████████████████████████████████████."  *Id.* ¶58.  In the field of cryptography, the "████████████████████████████████████████████████████████████████████."  *Id.* ¶62.

To evaluate whether any cybersecurity was present on the chip, Humphrey examined Mandel's approach and results, and evaluated and compared Mandel's results to other sources.  Humphrey compared Mandel's work to the CryptoRF data sheet to verify that her opinions were accurate.  *Id.* ¶25.  He further confirmed that Mandel's opinions about chip security "████████████████████████████████████████ █████████████████" and his own "█████████████████████████."  *Id.* ¶28.  He further engaged in an extensive evaluation of the "████████████████████████," the "█████████████████████████████" and the "██████████████████████████████████████████"  *Id.* ¶92.

Second, Humphrey evaluated whether the approaches employed by Rebotix comported with commonly accepted methods to extract and analyze data from chips.  Comparing the technical approach used by Rebotix to other methods that

have been successful in extracting data from chips allows a technical expert to

evaluate whether the appropriate method is being employed.  Referencing related

literature, Humphrey confirmed that Rebotix's "████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████." *Id.* ¶77.

Humphrey considered the Hard Wire method that Rebotix investigated for the

extraction of the image, and compared that method to other accepted methods.  *Id.*

¶60.  He determined that Rebotix's method "██████████████████████

█████████████████████████████████." *Id.*  In sum,

Humphrey's comparison revealed "██████████████████████

████████████████████" with "██████████████████████

████████████" Ex. 5, 21:11-18.

 <u>Third</u>, it is generally accepted in the field of cryptography that a company's

█████████████████████████████████████████████

████████████████████" Ex. 3, ¶70.  As part of this step in his

methodology, Humphrey evaluated Rebotix's past experience in analyzing the image

of the usage counter.  Because Rebotix had "██████████████████████

█████████████████," and because of the "███████████████

████████" of the chip in the X/Xi, Humphrey determined that image analysis for the

X/Xi would be "█████████████████." *Id.* ¶¶73-76.

 Humphrey set forth each source he considered and provided a thorough

explanation for how those sources factored into his analysis and led him to the

conclusions he reached.  Each step of that analysis and the underlying sources can be tested and subjected to cross-examination.  For example, Humphrey identified the data he used to support his determination of the features of the Atmel chip and the manner in which they are implemented.  His identification, therefore, can be checked and shown to be correct or incorrect.  *See* Ex. 5, 184:12-186:20.  Thus, the bases for his opinions can be challenged and satisfy the *Daubert* standard.

## IV.   Intuitive's arguments on reliability fail.

### A.   Intuitive's general argument that "Mandel and Humphrey are offering imprecise and unspecific testimony that could mislead the jury" fails.

Intuitive asserts that "Mandel's and Humphrey's opinions are the type of 'imprecise and unspecific' expert testimony that courts routinely exclude."  Mot. at 10 (quoting *United States v. Frazier*, 387 F.3d 1244, 1266 (11th Cir. 2004)).  But Mandel and Humphrey's opinions are exactly opposite to the ones excluded in *Frazier*.  In *Frazier*, the court reasoned that "[an expert's] opinion was imprecise and unspecific" because "the members of the jury could not readily determine whether the 'expectation' of finding hair or seminal fluid was a virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a possibility." *Frazier*, 387 F.3d at 1266.  The rationale for exclusion was that the expert failed to opine as to the likelihood of the result.

By contrast, Humphrey's did expressly opine on the likelihood of the result, i.e. the extraction of the image and the reset of the X/Xi usage counter.  Humphrey's opinion is that Rebotix "███████████████████████████████████

████████████████" through either the RFID or Hard Wire method he describes. Ex. 5, 155:9-15.  And when pressed on whether he was "████████████████," Humphrey responded that "████████████████."  *Id.* 155:16-20.

Further, Humphrey opined that it is certain that Rebotix will be able to reset the usage counters on the X/Xi EndoWrists.  *Id.* 13:13-21.  To try to undercut this opinion, Intuitive selectively excerpts a piece of the following answer:



This answer merely reflects the fact that "absolute certainty" is not possible, but it does not demonstrate that Humphrey was equivocal in his opinion as to Rebotix's future success.  His opinion is thus the exact opposite of the "imprecise and unspecific" testimony excluded in *Frazier.*

Intuitive's criticism of Mandel on the grounds that her opinions are imprecise and unspecific is similarly flawed.  Mandel was tasked purely with an analysis of the chip contained in the X/Xi EndoWrists.  She did not analyze whether Rebotix could override the use counter or what Rebotix's repair process was because that was not part of her assignment. Ex. 4, 100:25-101:15.  Merely because her task (and thus her

opinions) did not extend to the ultimate conclusion (that Rebotix can reset the usage counter) does not render Mandel's opinions imprecise or unspecific.

### B. Intuitive's arguments that Mandel's methodology is unreliable do not warrant exclusion.

Intuitive does not raise any claim that the approach that Mandel took in analyzing the Atmel CryptoRF chip was flawed or unreliable.  Intuitive does not assert that Mandel's analysis of the chip was flawed, or used improper methods.  Intuitive does not claim that any of the methods used by Mandel to analyze the chip tend to produce unreliable results, or are not commonly employed by experts in the field.  Instead, Intuitive claims that the methodology that Mandel *should* have used is to "attempt[] a 'full' image extraction" and that because she did not do so, her opinion "that the data 'can be copied' should be excluded lacks any support."  Mot. at 15.  Simply because she was not tasked with and has not completed a full data extraction does not render her methodology for examining the chip or the conclusions that she reached based on that examination unreliable.

Intuitive also asserts that because Mandel does not have experience with Rebotix's repair process or the actual method that Rebotix might use to reset the EndoWrists, her opinion is unreliable.  Mot. at 15.  But Mandel was not asked to develop, and did not develop, opinions on either of these subjects.  Indeed, when Mandel was retained, she "██████████████████████████████████████████████ ████████████████████████████████████████"  Ex. 4, 100:25-101:15.  In fact, she requested "█████" "████████████████████████████████████" because she "███████████████

███████████████████████████████████████████████████

██." *Id.* 71:13-72:1.  Mandel's lack of familiarity with Rebotix's repair process was an intentional decision to allow her to render neutral opinions based on the chip's architecture; this is a feature, rather than a flaw, in her methodology.  And it is consistent with the generally accepted methodology in her field.

Intuitive's criticisms all go to the weight of Mandel's conclusions, rather than the reliability of her methodology, and thus do not render her opinions inadmissible. "To the extent [Intuitive] argues that [Mandel's] opinion is incomplete or biased, cross-examination will provide ample opportunity to highlight any alleged inadequacies."  *United States SEC v. Spartan Sec. Grp., Ltd.*, No. 8:19-cv-448-T-33CPT, 2020 U.S. Dist. LEXIS 222318, at *12 (M.D. Fla. Nov. 30, 2020).

### C.   Intuitive's arguments that Humphrey's opinions are not based on a reliable methodology fail.

#### 1.   Response to the "Humphrey failed to perform reverse engineering" argument.

Intuitive asserts that "Humphrey's failure to perform any reverse engineering is inconsistent with the very standards that he typically adheres to as an expert." Mot. at 19.  Intuitive cites to Humphrey's testimony that when he is performing a "reverse engineering project" it would "never" be unnecessary to examine the product.  *Id.*  For this argument to be relevant, Humphrey would have to have been retained on a "reverse engineering project."  But he was not engaged to reverse engineer anything.  Humphrey was not "████████████████" a "██████████ ████████████" Ex. 5, 140:14-23.  Rather, he was engaged to "████████

████████████████████████████████████████████████ " so that he could

"████████████████████████████████████████████████ " *Id.* 9:2-

10.  And as detailed above, Humphrey performed a thorough assessment of those

investigations that comported with generally accepted methods in his field.

>    **2.   Response to the "Humphrey's opinion on RFID method
>    success based entirely on Mandel report" argument.**

Intuitive asserts that Humphrey should have "sought to verify" the opinions

expressed by Mandel in her report.  Mot. at 16.  But this "assertion is not backed up

by a citation to any precedent holding that an expert must independently verify the

tests administered by … other expert witnesses."  *Rodriguez v. GEICO Gen. Ins. Co.,*

No. 6:19-cv-1862-Orl-40GJK, 2021 U.S. Dist. LEXIS 54103, at *12-13 (M.D. Fla.

Feb. 4, 2021).  Indeed, an expert "may rely upon the work of … fellow experts in

rendering an opinion." *Id.* at *12.

Humphrey uses the results of Mandel's detailed investigation of the chip as a

source in forming his opinion about data extraction.  He cites four features of the

chip that Mandel established, none of which are disputed by Intuitive or challenged

as unreliable. Ex. 3, ¶39.  And he evaluated those results in the context of other data

to arrive at his own opinions.  *Id.* ¶¶56-57.

>    **3.   Response to the "Humphrey just parroting Hamilton for hard
>    wire" argument.**

Intuitive asserts that Humphrey is "serving as mouthpiece for Rebotix

regarding the Hard Wire Method."  Mot. at 18, n7.  Humphrey's opinions on

Rebotix's Hard Wire method are based in part on his communication with Stan

Hamilton, but they are also supported by other sources and Humphrey's application

of a methodology accepted in his field.  For example, to form his opinions on the

likelihood of success of the Hard Wire method, Humphrey obtained and examined

"███████████████."  Ex. 5, 163:9-15.  He relied on his own examination of the

chip image to evaluate the chip's security features and concluded that the

"██████████████████████████" that can allow Rebotix to

"████████████████."  *Id.* 164:3-17.  The chip image provided "████

█████████████████" that Humphrey learned from Hamilton and

Mandel's report.  *Id.* 165:1-11.

The cases that Intuitive cites illustrate that Humphrey's opinions are not

"parroting."  In *Delta*, the expert at issue merely "repeat[ed] counsel's opinion or

analysis" on a narrow topic (specific prior art for a patent) in which he had "no

specific background" and had "conducted no research."  *Delta T, LLC v. Dan's Fan

City, Inc.*, No. 8:19-cv-1731-VMC-SPF, 2021 U.S. Dist. LEXIS 98131, at *12-13

(M.D. Fla. May 25, 2021).  But the court also noted that each of the expert's other

opinions was admissible because the expert "relied on his experience and expertise"

and opposing counsel had not "attack[ed] the reliability of the literature or sources"

upon which the expert relied.  *Id.* at *10-11.

Here, Humphrey relied on his experience and expertise in assessing the

current state of Rebotix's investigation of the X/Xi usage counter reset.  He based his

opinions on his review of the factual record, including documents produced by

Rebotix and Intuitive, and publicly available documents.  Ex. 6.  This research and

independent consideration of available information demonstrates that Humphrey's opinions are his own, and not mere "parroting."

### 4. Response to the "relies on erroneous data" argument.

Intuitive contends that Humphrey "lacks sufficient facts or data and relies on erroneous data and false assumptions." Mot. at 21. "[T]he identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination and does not render expert testimony inadmissible under *Daubert*." *McGarity v. FM Carriers, Inc.*, No. CV410-130, 2012 U.S. Dist. LEXIS 41356, at *21 (S.D. Ga. Mar. 26, 2012). Intuitive can cross-examine Humphrey on each of the perceived defects in the data that he relied upon, or the manner in which he used those data to form his conclusions.

Moreover, each of Intuitive's claims about the flaws in Humphrey's analysis is incorrect.

First, an expert is permitted, indeed expected to consider facts presented from witnesses, and Hamilton is a witness with firsthand knowledge of the S/Si usage counter reset. Intuitive fails to identify how Humphrey's reliance on Hamilton for these facts in any way affects the veracity of Humphrey's conclusions. Experts are permitted to offer opinions "that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579, 592 (1993). To the extent that Intuitive claims that Humphrey's reliance on Hamilton's statements improperly biases his opinions, such "allegations of bias are attacks against credibility. And a witness's credibility goes to the weight of the evidence — not

admissibility." *Kleiman v. Wright*, No. 18-cv-80176-BLOOM/Reinhart, 2020 U.S. Dist. LEXIS 213482, at *103 (S.D. Fla. Nov. 16, 2020) (internal citation omitted).

Second, Intuitive argues that Humphrey "fails to acknowledge" that Rebotix cannot currently reset the usage counter and thus he merely accepts "Hamilton's hearsay that Rebotix will be able to override use limits on X/Xi EndoWrists." Mot. at 22. This argument makes no sense. Humphrey was retained to offer an opinion on the feasibility of resetting the X/Xi EndoWrist usage counter precisely because Rebotix does not currently do so. Humphrey acknowledges that Rebotix cannot do so in his report. Ex. 3, ¶11.

Third, Intuitive asserts that because Humphrey did not consider Rebotix's brief investigation of the X/Xi usage counter in 2015, his opinions are based on erroneous data and must be excluded. This argument fails at the threshold—merely because an expert's opinion "is inconsistent with other facts of this case is not a proper basis for exclusion." *Cameron v. Teeberry Logistics*, LLC, No. 3:12-cv-181-TCB, 2013 U.S. Dist. LEXIS 186036, at *10 (N.D. Ga. May 21, 2013). Moreover, for Intuitive's argument to have any persuasive force, Intuitive would need to demonstrate that Humphrey's failure to consider this past investigation had some impact on his opinions. But Intuitive has not made any such showing. *See, e.g.*, *Rodriguez v. GEICO Gen. Ins. Co.*, No. 6:19-cv-1862-Orl-40GJK, 2021 U.S. Dist. LEXIS 54103, at *12-13 (M.D. Fla. Feb. 4, 2021) ("Defendants fail to submit a cogent argument on how [an expert's] opinions … are rendered unreliable because he was unaware that Plaintiff reported headaches due to a sinus infection four-years

before the subject accident.")

Humphrey did not base any of his opinions on the assumption that Rebotix never investigated the usage counter before 2019.  In fact, Humphrey "█████ █████████" whether "████████████████████████████."  Ex. 5, 177:23-178:2.  Intuitive fails to explain how Rebotix's efforts before 2019 relate in any way to Humphrey's opinions, or undermine their credibility.

In sum, none of the criticisms Intuitive raises about Humphrey's methodology warrant exclusion. Rather, such criticism of "an expert is precisely the role of cross-examination and does not render expert testimony inadmissible under *Daubert*." *McGarity v. FM Carriers, Inc.*, No. CV410-130, 2012 U.S. Dist. LEXIS 41356, at *21 (S.D. Ga. Mar. 26, 2012).

## V.   Mandel and Humphrey will assist the trier of fact to determine facts in issue.

"Under Rule 702, properly qualified experts may testify in a given field if their testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' An expert's testimony will assist the trier of fact when it offers something 'beyond the understanding and experience of the average citizen.'" *Hetrick v. Ideal Image Dev. Corp.*, No. 8:07-cv-871-T-33TBM, 2011 U.S. Dist. LEXIS 20498, at *9-10 (M.D. Fla. Feb. 17, 2011) (internal citations omitted).  Humphrey and Mandel provide opinions that are relevant to two facts in issue: (1) evaluating Rebotix's preparedness to service the market for EndoWrist repairs and replacements and (2) determining the amount of damages Rebotix has suffered as a result of

17

Intuitive's anticompetitive conduct.

## A.    Humphrey and Mandel's opinions are relevant to preparedness.

To show preparedness to enter a market, a party must show that it "has take[n] some affirmative steps to enter the business." *Sunbeam TV Corp. v. Nielsen Media Research*, Inc., 711 F.3d 1264, 1273 (11th Cir. 2013) (*quoting Gas Utils. Co. of Ala., Inc. v. So. Natural Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993)). "[C]ompetitors need not pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture." *Lucasys Inc. v. Powerplan, Inc.*, No. 1:20-cv-2987-AT, 2021 U.S. Dist. LEXIS 219702, at *28 (N.D. Ga. Sep. 30, 2021) (internal quotations omitted).  Whether certain "actions and circumstances are sufficient to show preparedness presents a question of fact precluding summary judgment" based on a purported "inability to prove antitrust injury." *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 572 F. Supp. 482, 491-92 (N.D. Ga. 1983).

The relevant market for Rebotix's repair services, as defined by Rebotix's antitrust expert, Russell Lamb, is an "EndoWrist Repair and Replacement Market." Ex. 8 (Lamb report), ¶53.  Undisputed evidence demonstrates that Rebotix was not only prepared to, but did in fact enter that market before Intuitive's anticompetitive conduct.  As detailed in Rebotix's summary judgment opposition, whether Rebotix's sales, ability to obtain regulatory clearance, patents, millions of dollars in research and development, and experienced staff meet the preparedness standard cannot be decided at summary judgment.

Moreover, it is undisputed that Rebotix was not only able to repair X/Xi

EndoWrists, but Rebotix had already performed "some repairs on the Xi EndoWrists," Ex. 9 (Gibson depo.), 61:16-62:4.  Further, Rebotix's development of the usage counter reset was "in process" but "hasn't been completed."  Ex. 1, 100:14-25.  Whether these facts satisfy the preparedness standard cannot be decided as a matter of law.  *See Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 572 F. Supp. 482, 491-92 (N.D. Ga. 1983).  Rather, the trier of fact will need to evaluate whether all of the circumstances support a showing of preparedness.

Mandel and Humphrey's opinions are directly relevant to assessing Rebotix's preparedness.  The ease with which Rebotix can implement a reset of the X/Xi usage counter is one element that can assist the trier of fact in determining whether Rebotix has taken affirmative steps to enter the market for EndoWrist repairs and replacements.  Humphrey and Mandel provide opinions about the ease with which Rebotix could reset the X/Xi usage counter. *See, e.g.,* Ex. 2, ¶¶19-26; Ex. 3, ¶¶44-47. And those opinions are beyond the "understanding and experience of the average citizen." *Hetrick v. Ideal Image Dev. Corp.*, No. 8:07-cv-871-T-33TBM, 2011 U.S. Dist. LEXIS 20498, at *9-10 (M.D. Fla. Feb. 17, 2011).  Therefore, Mandel and Humphrey's opinions assist the trier of fact in assessing preparedness.

### B.   Humphrey and Mandel's opinions are relevant to establishing the amount of damages Rebotix has suffered from Intuitive's anticompetitive conduct.

Mandel and Humphrey's opinions help the finder of fact assess "the projected expansion of [Rebotix's] business" to allow Rebotix to be compensated "for the additional business [Rebotix] would have had but for [Intuitive's] unlawful conduct."

*Consol. Gas Co. v. City Gas Co.*, 665 F. Supp. 1493, 1543-44 (S.D. Fla. 1987).  The finder of fact will need to assess whether the "events that might have happened but for [Intuitive's] unlawful conduct" include Rebotix developing a workaround to the X/Xi usage counter and offering that service to customers.  *Malcolm v. Marathon Oil*, 642 F.2d 845, 864 (5th Cir. 1981).  Mandel and Humphrey provide opinions as to the likelihood of that result—that "█████████████████████████████████

██████████████████████."  Ex. 5, 13:18-21.  These opinions assist the trier of fact in determining whether Rebotix should be awarded damages for repairs to X/Xi EndoWrist instruments.

## VI.    Conclusion

Mandel and Humphrey are qualified, utilize reliable methodologies, and assist the trier of fact.  Because their opinions meet the standard for admissible expert testimony, they should not be excluded under *Daubert*.

Date: December 8, 2021                  Respectfully submitted,


                                        */s/ Richard Lyon*
                                        Richard Lyon
                                        California Bar No. 229288 (*pro hac vice*)
                                        rick@dovel.com
                                        DOVEL & LUNER, LLP
                                        201 Santa Monica Blvd., Suite 600
                                        Santa Monica, California 90401
                                        Telephone: (310) 656-7066


                                        COUNSEL FOR PLAINTIFF
                                        REBOTIX REPAIR LLC