**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

REBOTIX REPAIR LLC,

              Plaintiff,

vs.

                    Case No.:  8:20-cv-02274

INTUITIVE SURGICAL, INC.,

              Defendant.

**Rebotix's opposition to Intuitive's motion for summary judgment**

# I.      Rebotix's responses to Intuitive's statement of facts.[1]

5.      Intuitive's fundamental patents covering the da Vinci robot and EndoWrists have expired.  *See, e.g.* P29, P30 (expired patents).  Patents are limited to 20-year terms, and Intuitive patented its products back in the late 1990's.  P32.  Intuitive's current patent portfolio is made up of patents covering small features and incremental advances in its products.  *See, e.g.* P31.

## A.      da Vincis and EndoWrists are not sold as a single product.

7.      Intuitive's historical filings explain that the da Vinci system and EndoWrists are <u>separate</u> products.  D2 at 5-6 ("Our principal products include the *da Vinci* Surgical system and a variety of … EndoWrist instruments."); P2, ¶¶74-76.

8.      Intuitive <u>separately</u> markets EndoWrist instruments and the da Vinci robot.  P2, ¶¶74-76; P42 (EndoWrist catalogue); P43.

11/12. Intuitive performs safety evaluations of EndoWrist instruments separate from da Vinci robots.  P44.  This includes "life testing" to validate a pre-set number of uses determined by Intuitive's marketing department, rather than test the true life of an EndoWrist.  P25, 64:5-19; 65:19-25; 59:9-15; 62:10-16; P45.

14.      Rebotix does not adulterate the da Vinci.  Hospitals recognize that Rebotix's services provide the same quality level as new EndoWrists and pose no greater risks to patients.  P8, ¶¶60-64, 167-169; P26, 37:1-38:1; 40:2-8, 43:5-19.

---

[1] For purposes of this motion only, Rebotix (a) does not dispute the contents of paragraphs in Intuitive's Statement of Facts that Rebotix does not address, and (b) disputes the contents of each paragraph addressed to the extent set forth in Rebotix's corresponding paragraphs.  Rebotix's responses also include certain clarifying details to address misleading implications.

**B.     Intuitive's surgical robot competitors have not adopted Intuitive's anticompetitive practices.**

15/16.   CMR Surgical's Versius robot has never been used in the United States and is not subject to U.S. antitrust laws.  D11 at 2.

17.     Medrobotics and TransEnterix (Intuitive's two U.S. surgical robot competitors) do not impose contractual requirements tying their robots to purchases of instruments.   P69, ¶75, n.207, n.208; P65 at Intuitive-00237036; P66 at Intuitive-00085017.  And no evidence indicates that CMR, Medrobotics, or TransEnterix prohibits repairs of their instruments.

**C.     Intuitive misrepresents Intuitive's FDA clearance, Rebotix's repair process, and FDA correspondence.**

19.     The Intended Use of EndoWrists set forth in Intuitive's 510(k) does not impose use limits; it is the same Intended Use as traditional laparoscopic instruments that are used and repaired as hospitals see fit.  P6, ¶¶52-71; P21, 30:25-31:3; 40:15-41:16; 73:11-14; P46 at Intuitive-00512059.  The "limited use" restriction was imposed by Intuitive, not the FDA.  P5, ¶¶115-138.  Under applicable FDA guidelines, EndoWrists are reusable medical devices.  *Id*.

25.     Rebotix developed the capability to repair EndoWrists through a reverse engineering process "completed over the course of twelve to eighteen months."  P8, ¶37.  "[E]stablish[ing] the baseline specifications for EndoWrists" required assessing "cable tension, wheel torque values, scissor sharpness, grasper alignment, insulation strength, and motion handling."  *Id*.; E.g., P47, P48, P49. Rebotix has not established specifications or performed testing for traditional

2

laparoscopic instruments or for any other surgical robotic instruments. P16, ¶3.

27.     Rebotix LLC prepared and submitted a 1,300-page 510(k) application to the FDA in December 2014.  P16, D27, D28.  As is the case with the vast majority of 510(k) applications (approximately 75%, P28 at 164), the FDA cited deficiencies with Rebotix LLC's initial application, and provided a letter requesting additional data from Rebotix LLC.  D30, D31, P5 at 144.

28.     The referenced "DEVICE" in the quoted boilerplate language refers to devices that Rebotix LLC intended to sell.  D27.  Rebotix LLC's model was "to buy, service, and resell EndoWrists."  P17, 35:3-18; D23, 210:9-211:22.  Rebotix Repair is "a different entity operating under a different business model that's providing repair service."  P17, 118:22-119:13; P5, ¶¶133-136.  And "a repair business model or repair company is not required to register with the FDA or receive 510(k) approval."  P17, 118:4-21; P6, ¶¶33-45.

29.     The 510(k) sought clearance for the device referenced in ¶28 above, not the Interceptor component.  D27.  The Interceptor component is not itself a medical device and does not require 510(k) clearance.  P5, ¶¶34-56.

31, 32, 35.  *See* ¶28 above.

38.     Denmark and Germany have regulatory frameworks different from the United States, and orders issued in the EU have no impact on FDA decisions.  P6, ¶92.  Intuitive informed the FDA about the foreign orders, and the FDA did not respond by telling Rebotix to stop marketing its service.  D35 at Intuitive-00552749; P6, ¶¶168-169; D43; P33.

3

41.     Rebotix believed Intuitive's contracts were void and unenforceable, but told hospitals' legal counsel to form their own conclusions as to whether its services would constitute a breach.  D23, 98:14-99:8.

44.     Overmars struggled to sell Rebotix's services because "Intuitive reps use[] their tool bag to lock us out."  D41 at BPI000337.  Hospitals followed up about 510(k) clearance because "[t]he Intuitive rep is telling them that."  D40, 29:9-30:17.

46-48. Overmars never provided Rabang with any information about Rebotix's repairs, the safety measures it takes, or that hospitals maintain ownership of the EndoWrists during the repair process.  D40, 111:7-114:19.  Nor did Overmars have any reason to believe Rabang knew this information.  *Id*.  Overmars "[n]ever mentioned the word 'Rebotix' to Cal Rabang."  *Id.*, 53:1-5.  Rabang's response to Overmars was "an informal communication" that "does not constitute an advisory opinion" and "does not bind or otherwise obligate or commit" the FDA.  D41 at BPI000335-336.  Evidence demonstrates that Rabang lacked a basic understanding of Rebotix's service.  *Id.* at BPI000333-334.  For example, Rebotix does not "do any sterilization" and does "not alter the instrument specifications."  *Id*.

49.     Dr. An confirmed that the FDA lacked necessary information to make a determination and requested information "to better understand the activities Rebotix Repair performs" so that the FDA can determine whether Rebotix requires FDA approval.  D43 at REBOTIX146954-146955.

51.     The most recent communication from the FDA, sent November 16, 2021, confirmed that the FDA has <u>not</u> made a determination and requested that

4

Rebotix "provide … [t]he basis for [its] determination of whether or not [it] [is] required to obtain FDA clearance or approval." *Id.*

### D. Intuitive misrepresents Rebotix's development of X/Xi repairs.

54.    G5 concluded that there was "confidence in success" and that the "initial analysis shows" that the usage counter on the Xi instruments could be reset. D45 at REBOTIX171287.  Rebotix halted the initial investigation that G5 undertook to focus on Si repairs.  P16, ¶6.  Rebotix concluded that an additional investment would not be worthwhile so long as Intuitive's conduct foreclosing Rebotix from competing in the market continues.  *Id.*, ¶8-9; P18, 97:1-9.

55.    Rebotix is currently able to repair all aspects of X/Xi EndoWrists except for re-setting the usage counter.  Rebotix "offers tool-end repairs currently for the X and Xi" (D25, 61:16-62:4) and its reset for the X/Xi usage counter is "in process." D23, 100:14-21; D25, 61:13-15.  "Rebotix absolutely will be able to reset the usage counters on X and Xi EndoWrists."  P19, 13:18-21; P10, ¶¶45-47.

56.    Rebotix has not spent $5 million dedicated to the X/Xi usage counter reset, but for <u>total</u> R&D efforts for EndoWrist repairs, including both S/Si and X/Xi. P16, ¶¶4-5.  Those costs included the purchase of two da Vinci robots, reverse engineering costs, hiring experienced staff, and Interceptor development costs.  *Id.*; D26, 40:14-24, 42:4-24.  Rebotix did not invest additional resources into the Xi usage counter reset because Intuitive's actions stopped Rebotix from being able to access customers. P16, ¶9; P18, 38:19-39:2.

5

E.   **Intuitive misstates facts concerning relevant antitrust markets and Intuitive's anticompetitive behavior.**

59.   The relevant antitrust markets in this case, as defined by Dr. Lamb with detailed analysis, are the market for minimally invasive soft tissue surgical robots and the market for EndoWrist replacement and repair.  P2, Sections II and III.

60.   The market that Rebotix *actually* services is the same as the market it *could* service.   EndoWrists and traditional laparoscopic instruments have several differences (P7, ¶¶66-70; P22, 234:24-235:2), and Rebotix has invested heavily in developing the capability to offer a repair service specific to EndoWrists.  *Id.*, D23, 38:22-39:11; D26, 42:4-24; P16, ¶¶2-4.[2]  Dr. Lamb performed an alternative analysis from the perspective of the supplier and concluded that the relevant antitrust market is still the EndoWrist repair and replacement market.  P2, ¶67.

62.   Dr. Lamb considered Intuitive's historical practices of sales and its descriptions of sales in his analysis of whether da Vinci robots and EndoWrists were separate products.  P2, ¶¶74-76.

63.   Dr. Lamb opined that in the tied market, "customers paid more for the products in that market than they otherwise would have paid."  D51, 222:6-23.  In comparing the but-for to the actual world, Dr. Lamb determined that "customers

---

[2] To understand the function and specifications of EndoWrists, Rebotix engaged in extensive reverse engineering efforts.  D23, 38:22-39:11; P20, 57:22-58:15; P8, ¶¶36-39; P48; P49; P50; P51; P52. Rebotix performed life testing to validate the safety of its repairs. P54 at REBOTIX170067.  And Rebotix trained technicians to follow a precise series of steps only applicable to the EndoWrist.  P53. Rebotix has not engaged in the extensive reverse engineering and verification efforts required to offer repairs on instruments for other laparoscopic instruments. P16, ¶¶2-3.

would pay less for EndoWrist repair and replacement." *Id.* 178:12-179:3.[3]

64.     Dr. Lamb opined that Intuitive's anticompetitive behavior allowed it to price both its da Vinci and its EndoWrists at supracompetitive prices.  P2, ¶¶99-107, ¶¶133-147.  Dr. Lamb relied on Intuitive's data showing that Intuitive has

████████████████████████████████████████████████████████████

████████████████████████████████████████[4]

65.     Dr. Lamb addressed Intuitive's safety claims in his report.  P2, ¶¶127-132.  Like Dr. Smith, Dr. Lamb is not a safety expert and cannot opine on the technical merits of the claims.  Instead, he analyzed this information "with respect to profit-maximizing behavior and how it relates to the usage limits."  D51, 184:7-17.

66.     Dr. Lamb analyzed each of the elements of an exclusive dealing claim: (1) a relevant product and geographic market, P2, ¶¶16, 53; (2) the exclusion of a significant competitor, *id.*, ¶¶120-123; and (3) the probable effect of exclusion injures

---

[3] Dr. Lamb relies on evidence that, in responding to the competitive threat from third party repair companies, Intuitive's proposed response was not to consider raising the price of the robot; instead, Intuitive proposed offering refurbished EndoWrists at a 20% discount.  P2, ¶¶60-61, 137.  As a result, the prices of robots would not have increased and the prices of EndoWrists would be lower, resulting in a lower overall price for the consumers in the bur-for world.

[4] P2, ¶102. Intuitive's internal calculation of its "contribution margin" was based on marginal cost (all incremental costs of producing an additional unit), including materials, scrap & rework, labor, royalties, excise taxes, warranty costs, freight & packaging, and sales commissions.  P61 (native excel), Tab 2; P2, n.296. Intuitive calculated that its profit margin on da Vinci robots was ████████████████████████ P61, Tab 2; ████ (native excel), Tab 1 (███████████████████████; P63 at 8     A ████ profit margin translates to a price that is ████████ marginal cost [percentage above cost = profit margin / (100 – profit margin)]. █████████████ ██████████████████████ P2, ¶124, n. 296. ████████████████ █████████████████████ which "accounts for any research and development costs" is "in excess of 20 percent, quite high."  D51, 149:9-150:3.  And as Intuitive's own expert admitted, "if Intuitive possess monopoly power, it already should be pricing as a monopolist would."  P41, 110:25-111:7.

competition, *id.*, ¶¶133, 134, 139-141.

## II.   Additional material facts.

### A.   The da Vinci robot and EndoWrists are separate products.

67.   Intuitive's sales of EndoWrist instruments to U.S. hospitals generate hundreds of millions of dollars in annual revenues.  P14 at Ex. 7; P55 at Intuitive-00319952.  Intuitive makes a profit on each sale.  P22, 53:13-16.

68.   The sales price of a da Vinci surgical system is between $.5 million and $2.5 million.  P55 at Intuitive-00319951-952.  An EndoWrist repair or replacement costs between $650 and $3200.  P56; P57 at Intuitive00279928.  A da Vinci robot is purchased once, and the purchase only includes training EndoWrists, which cannot be used in surgery.  D6 at 00005144-5145; P58 at 00311533; P23, 129:15-130:6.

69.   Hospitals "have to keep buying EndoWrists over time" if they want "to continue to do da Vinci surgery."  P22, 190:2-6; P41, 182:5-11.  "[D]ifferent hospital systems … require different numbers of instruments to meet their surgical needs."  P41, 243:8-15; P2, ¶¶70-77; P27, 82:8-13; P22, 51:3-9.

70.   Only Intuitive "sells instruments that can be attached to the da Vinci robot and used for minimally invasive surgery."  P23, 25:15-19; P22, 57:17-58:1.  When hospitals need surgical instruments for the da Vinci robot, their only options are replacing or repairing their EndoWrists.  P23, 25:1-19; 23:21-24:4; P22, 55:6-16.

71.    Dr. Lamb defined both a tying market (minimally invasive soft tissue robots) and a tied market (EndoWrist repair and replacement). P2 ¶¶ 27-77. Intuitive has market power in the tying market.  *Id.* ¶¶99-105, 124-125.

8

**B.     Intuitive has engaged in anticompetitive conduct.**

72.     Rebotix's EndoWrist repairs provide customers with a "savings of 45%" over buying replacement EndoWrists from Intuitive.  D23, 179:6-16; P59; Rebotix sold over 400 EndoWrist repairs to customers.  P60.

73.     Intuitive's Sales, License, and Service Agreements for da Vincis include provisions prohibiting customers from repairing their EndoWrists and requiring customers to dispose of their EndoWrists (and buy new replacement EndoWrists) once they reach the maximum use limit imposed by Intuitive.  D6 at §2.6, §3.4, §8; P22, 194:19-195:16, 196:24-197:23; 199:8-200:3; 202:17-203:9; 204:5-11.

74.     As Rebotix's lower-priced offering entered the market, Intuitive reacted.  Intuitive "[did] not want hospitals to use Rebotix to repair EndoWrists." P23, 279:10-17.   Each new Rebotix customer "received notices from Intuitive that if they used [Rebotix's EndoWrist services], [Intuitive] would cancel the service" for the robots and void the robot warranties.  D23, 33:7-12; P24, 126:21-127:1; P22, 224:11-19.   Without ongoing service from Intuitive (e.g. ongoing software updates), a da Vinci robot is rendered nonoperational.  P26, 76:22-77:24; D22, 227:13-228:1.

75.     Intuitive's response ensured that "customers stopped using Rebotix's services."  P22, 226:3-22; D23, 129:2-130:4.  No hospital continued using Rebotix's services after receiving Intuitive's threats.  P22, 226:3-22; P2, ¶120.  Absent Intuitive's contractual restrictions and threats, hospitals would "use Rebotix's services to the full extent that Rebotix was willing to provide."  P26, 62:6-12; D23, 33:17-23.  "Intuitive's abuse of its monopoly power resulted in harm to competition

9

as hospitals had little choice but to pay higher prices for replacement EndoWrist[s] from Intuitive in order to use their da Vinci surgical robots." P2, ¶133.

**C.   Rebotix's repair services do not require FDA clearance.**

76.   FDA defines "Refurbish" as "Restores a medical device to the OEM's original specifications or to be 'like new.' The device may be brought to current specifications if the change(s) made to the device do not significantly change the finished device's performance or safety specifications, or intended use." P34 at 2.

77.   Intuitive investigated entering the refurbishment business itself and concluded that "the United States does not require clearance or registration for refurbished EndoWrists." P24, 51:25-52:5; 47:24-48:24; P35 at Intuitive-00423574; P36 at Intuitive-00102947; P6, ¶¶196-198.  Intuitive's FDA expert agreed that "servicers do not" "require 510(k) clearance." P37, 31:7-12.

78.   Independent third party analyst reports indicate that 510(k) approval is not required for Rebotix's repair service.  P38 at Intuitive-00566057. ("[O]ur takeaway from these [FDA] consultants is that 510(k) clearance does not seem to be required for independent service organizations refurbishing used da Vinci instruments so long as they are returned to that same hospital and not re-sold.").

79.   FDA statistics show that approximately 85% of 510(k) applications are ultimately approved and less than 5% are denied.  P5, ¶144; P28 at 170.

III.   **Rebotix has antitrust standing.**

Both prongs of "antitrust standing"—"antitrust injury" and "efficient

enforcer," *Sunbeam TV Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th

Cir. 2013)—are satisfied here.

A.   **Rebotix has suffered an antitrust injury.**

"[E]xclusion from the relevant market … satisfie[s] the requirement of

demonstrating antitrust injury" because it "denies consumers the benefit" of

competition.  *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967-68

(11th Cir. 2006); *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291,

1303 (11th Cir. 2010) (finding antitrust injury because "tying" arrangement "prevents

[plaintiff] from competing … in the market for the tied products").  The evidence

demonstrates that the tying arrangement set forth in Intuitive's da Vinci robot sales

agreement (requiring purchasers of robots to also purchase unnecessary EndoWrists

from Intuitive and to forego any repairs of their EndoWrists, SOF, ¶73) and

Intuitive's threats to render hospitals' robots non-operational if they used Rebotix's

services (*id.*, ¶74) succeeded in excluding Rebotix from the market for EndoWrist

replacement and repair.  *Id.*, ¶75.  "[C]ustomers stopped using Rebotix's [repair]

services" and returned to buying EndoWrist replacements from Intuitive.  P22,

226:3-22.   Accordingly, Rebotix has demonstrated antitrust injury.

B.   **Rebotix is an efficient enforcer of the antitrust laws.**

"[T]o meet the [efficient enforcer] prong [for standing], the plaintiff must

11

prove the existence of a competitor willing and able to enter the relevant market."
*Sunbeam TV Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013).  This is also sometimes referred to as a "preparedness requirement."  *Id.*  To establish "preparedness," a "party must take some affirmative step to enter the business."  *Gas Utils. Co. v. S. Nat. Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993). Whether certain "actions and circumstances are sufficient to show preparedness presents a question of fact."  *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 572 F. Supp. 482, 491-92 (N.D. Ga. 1983).

"Preparedness has … four elements: (1) The ability of the plaintiff to finance the business and to purchase the necessary facilities and equipment; (2) the consummation of contracts by the plaintiff; (3) affirmative action by plaintiff to enter the business; and (4) the background and experience of plaintiff in the prospective business."  *Id.* at 491 (internal citations and quotations omitted).  Rebotix has substantial evidence for each element.

(1), (2): Rebotix has demonstrated its ability to finance (and secure the necessary contracts to operate) an EndoWrist repair business.  SOF, ¶¶55, 56, 60. The facilities, equipment, and team of technicians are already in place.  *Id.*  Rebotix was and is operational.  It has sold over 400 EndoWrist repairs, generating substantial revenue, and it remains ready to repair EndoWrists.  SOF, ¶72.

(3), (4): Rebotix took affirmative actions to enter into the business for EndoWrist repair and replacement, including: staffing its team with experienced medical device repair professionals, reverse-engineering to determine the

12

specifications of EndoWrists, spending $5 million on research and development, extensive safety validation and certification, and obtaining two patents on its method for resetting the usage counter.  SOF, ¶¶56, 60, n.2; P16, ¶¶2-4.

This evidence of preparedness far exceeds what is required at summary judgment.  *See Sanger Ins. Agency v. Hub Int'l, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015) ("sufficient [preparedness] evidence" precludes "summary judgment"); *Cable Holdings*, 572 F. Supp. at 491-92 (N.D. Ga. 1983) (same).

### C.     Intuitive's "no FDA approval" standing arguments fails.

Intuitive argues that Rebotix cannot "establish antitrust injury" because its services do not have regulatory approval from the FDA and are thus not "lawful." Mot. 19-20.  This argument fails for four reasons.

**Reason 1: Antitrust standing does not require FDA clearance.**  A "finding of antitrust injury cannot be tied to the status of FDA approval."  *In re Neurontin Antitrust Litig.*, 2009 U.S. Dist. LEXIS 77475, at *55 (D.N.J. Aug. 27, 2009).  This is because "the absence of FDA approval" does not "create[] a barrier to establishing the element of causation." *Takeda Pharm. Co. v. Zydus Pharm. (USA) Inc.*, 358 F. Supp. 3d 389, 398 (D.N.J. 2018) (rejecting argument that "alleged injuries actually stem from … statutory framework as opposed to the instant dispute" because Plaintiff "failed to obtain regulatory … FDA approval").

Instead, "all that is necessary is demonstration of intent and preparedness to enter a market." *Amgen, Inc. v. F. Hoffmann-La Roche*, Ltd., 480 F. Supp. 2d 462, 468

(D. Mass. 2007) (rejecting argument that "FDA approval is a necessary requisite to antitrust standing"); *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 540, 545 (D.N.J. 2000) (same); *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807 (2001) (reversing dismissal of antitrust claims because standing turns on "intent and preparedness to enter the market," not FDA approval).

None of the cases cited by Intuitive hold that the absence of FDA approval precludes antitrust standing where, like here, there is an available avenue for obtaining approval if required. In *In re Canadian* (Mot. 19, 21), the claimant's pharmaceuticals were "manufactured and distributed in Canada" and "the importation of drugs from Canada is prohibited by federal law." *In re Canadian Imp. Antitrust Litig. Eileen Iverson*, 470 F.3d 785, 788-89, 791 (8th Cir. 2006). In *JEM Mktg*, claimant's business was cloning telephones, which "violates federal law." *JEM Mktg., LLC v. Cellular Telecomms. Indus. Ass'n*, 308 N.J. Super. 160, 166 (N.J. App. Div. 1998). There is no available avenue for these activities to acquire FDA approval. They are illegal.

**Reason 2: Rebotix will acquire FDA clearance if needed.** Rebotix has an available avenue to acquire, and will acquire, FDA clearance if needed: through the 510(k) process. FDA statistics show that approximately 85% of 510(k) applications are ultimately approved and less than 5% are denied. SOF, ¶79. Rebotix has already completed most of the legwork needed for 510(k) clearance because its predecessor prepared and submitted a 1,300 page 510(k) application to the FDA. SOF, ¶¶27-29.

*Id*.  After the FDA requested additional data, it withdrew its application, expressing its "intent to resubmit the 510(k) at a later date once the data has been collected." D33.  Rebotix has not resubmitted its 510(k) because its current business model does not require 510(k) clearance.  SOF, ¶28, 78.  If, however, the FDA determines a 510(k) is necessary, Rebotix will collect the additional data and resubmit its 510(k). P16, ¶11.

**Reason 3:  Rebotix's services do not require FDA clearance.**  Although "[r]emanufacturers are overseen by the Federal Food and Drug Administration … refurbishers … are not."  *Nuclear Cardiology Sys. v. Hai, Civil Action No*. 06-cv-00044-EWN-CBS, 2007 U.S. Dist. LEXIS 58227, at \*17 (D. Colo. Aug. 9, 2007). Intuitive itself concluded that "the United States does not require clearance or registration for refurbished EndoWrists." P24, 51:25-52:5; 47:24-48:24; P35 at 00423574 ████████████████████████████████████████████ ███████████████████████████████████████; SOF ¶¶77-78.  Intuitive's own FDA expert agreed that, unlike "remanufacturers," "servicers do not" "require 510(k) clearance."  P37, 31:7-12.

        In contrast to its predecessor, which planned to sell EndoWrists, Rebotix provides a refurbishing service: "We do not sell any product.  We only repair instruments for the hospital, with no change of ownership." P39 at REBOTIX068471; SOF, ¶28.  The FDA defines "Refurbish" as "[r]estores a medical device to the OEM's original specifications or to be 'like new' … [without] significantly chang[ing] the finished device's performance or safety specifications, or

intended use."  SOF, ¶76.

This is precisely the service that Rebotix offers.  Hospitals hire Rebotix to perform a "complete repair of the da Vinci EndoWrist" that "provides the resetting of the use counter via a replacement chip" and returns it to "original specifications." P39 at REBOTIXO68471; P40.  And substantial evidence demonstrates that this process does not change the intended use or performance and safety specifications of the EndoWrists.  SOF, ¶19; P6, ¶¶ 52-71; SOF, ¶14; P8.  Independent FDA consultants agree that "510(k) clearance is not [] required for independent service organizations (ISOs) such as [Rebotix] in repairing limited-use da Vinci instruments for hospitals … for continued usage."  SOF, ¶78.

Intuitive alleges that, by refurbishing EndoWrists, Rebotix has "held or offered for sale" a medical device.  Mot. 22.  But none Intuitive's cases have anything to do with the relevant activity here: refurbishing medical devices.  In *Evers*, a doctor "misbrand[ed] drugs and then distribute[d] them to [his] patients."  *United States v. Evers*, 643 F.2d 1043, 1050 (5th Cir. 1981).  In *Sullivan*, a doctor put drugs "in a pill box" to "sell them … to a retail purchaser."  *United States v. Sullivan*, 332 U.S. 689, 690, (1948).  In *Kaplan*, a doctor "reus[ed] single-use plastic needle guides" on multiple patients with no "procedures for cleaning" them between patients. *United States v. Kaplan*, 836 F.3d 1199, 1204, 1210, n.7 (9th Cir. 2016).   Also, *Kaplan* expressly "decline[d] to consider … whether … an item that can be properly and safely reused [like an EndoWrist] could be considered 'held for sale.'"  *Id*. 1210 n.7.

**Reason 4:  The FDA has exclusive enforcement authority.**  The ruling that Intuitive seeks—that Rebotix requires 510(k) clearance to operate—is not only irrelevant to the issue of standing (because Rebotix could renew its 510(k) application if necessary), but it is also not a ruling this Court can make.  As demonstrated in Rebotix's own summary judgment motion, only the FDA itself can make this determination, and the FDA has not done so.  Dkt. 108.  As recently as November 16, 2021, the FDA wrote to Rebotix and confirmed that it has not yet made a determination.  SOF, ¶51.

Intuitive's contrary assertion—that "FDA officials have stated … that Rebotix's 'repair' process requires [510(k)] clearance," Mot. 3—is misleading and false.  Intuitive first relies on boilerplate language from an FDA letter addressing Rebotix LLC's old plan to <u>sell</u> its own EndoWrists, not Rebotix's current business of servicing EndoWrists hospitals own.  SOF, ¶¶27-29.  Intuitive then relies on an email stating that it does <u>not</u> constitute the formal position of the FDA and that was drafted by someone with no knowledge of Rebotix's repair process.  SOF, ¶¶46-48.  Moreover, these communications all pre-date the most recent statements from the FDA confirming it has <u>not</u> determined Rebotix requires a 510(k).  SOF, ¶51.

## D.    Intuitive's X/Xi EndoWrist standing argument fails.

Intuitive asserts that Rebotix cannot make a showing of "preparedness" to enter the X/Xi repair and replacement market and is therefore not an "efficient enforcer."  Mot. 24-25.  This argument fails from the outset because there is no separately defined X/Xi market in this case.  The defined tied market is for all

EndoWrist repairs and replacements. SOF, ¶71.   Moreover, Rebotix's preparedness to repair X/Xi EndoWrists far exceeds what is required.  The only step of the X/Xi repair process that remains is development is the reset of the X/Xi usage counter. D23, 100:14-21; SOF, ¶55.  Rebotix's premarket efforts have provided Rebotix with all of the existing knowledge and facilities to repair all other parts of the X/Xi EndoWrists.  SOF, ¶¶55-56.  Indeed, Rebotix has already performed "tool-end repairs" for the X/Xi EndoWrists without resetting the usage counter.  *Id.*

Intuitive's argument therefore rests on the premise that, to demonstrate preparedness, Rebotix must have completed its X/Xi usage counter reset.  But that is not the law.  "The degree to which a business must take affirmative steps is mitigated by the impact of the antitrust violation … [N]ascent competitors need not pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture."  *Sanger Ins. Agency v. Hub Int'l, Ltd.*, 802 F.3d 732, 740 (5th Cir. 2015) (internal citations and quotations omitted); *Lucasys Inc. v. Powerplan, Inc.*, 2021 U.S. Dist. LEXIS 219702, at *28 (N.D. Ga. Sep. 30, 2021). This is what happened here.  Rebotix has not completed the X/Xi Interceptor because expending the resources to do so would be a futile gesture so long as Intuitive's antitrust violation is allowed to continue.  SOF, ¶56.  And expert testimony demonstrates that, once Rebotix elects to expend the requisite resources, it "absolutely will be able to reset the usage counters on X and Xi EndoWrists."  P19, 13:18-21; P10 ¶¶45-47.

Moreover, Intuitive's preparedness cases (Mot. 25) undermine its argument.[5]

Intuitive argues that Rebotix "cannot prove antitrust injury" because Intuitive is not responsible for Rebotix's "inability to develop the technology to override use limits for X/Xi EndoWrists." Mot. 24-25. But Rebotix has never alleged that Intuitive has prevented Rebotix from developing its X/Xi reset. Instead, the antitrust injury Rebotix alleges, and demonstrates with substantial evidence, is exclusion from the market for EndoWrist repair and replacement. SOF, ¶¶72-75. And it is precisely because of that antitrust injury that Rebotix elected not to devote additional resources to bring the X/Xi reset technology to market. SOF, ¶56.

## IV.   Rebotix has defined a relevant antitrust market.[6]

### A.   Intuitive's "perspective of the supplier" argument fails.

Intuitive repeats the same flawed argument from its motion to dismiss: that the "relevant market" for antitrust claims must be determined based on "the options available to" the competing "supplier" (Rebotix), not the options available to consumers (the hospitals). Mot. 27-28. But controlling law holds the opposite: the

---

[5] *Cable Holdings* addressed the sufficiency of "evidence to support the jury's conclusion that Cable Holdings was unprepared to enter the … market." *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562-63 (11th Cir. 1987). The issue reached the jury because "preparedness presents a question of fact precluding summary judgment." *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 572 F. Supp. 482, 491-92 (N.D. Ga. 1983). And *Ashley Creek* re-confirmed the principle that "to show preparation … an antitrust plaintiff need not take those steps which would have been rendered futile by an alleged monopolist." *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1258 (10th Cir. 2003).

[6] Throughout its motion, Intuitive argues that Rebotix lacks expert testimony for "the reasons set forth in Intuitive's accompanying *Daubert* motion." Mot. 26, 27, 35. These arguments fail for the reasons set forth in Rebotix's *Daubert* response.

"relevant market for antitrust purposes is determined by the choices available to" and "the commercial realities faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481-82 (1992); Dkt. 43 (Rebotix MTD Response) at 2-9 (detailing relevant law).[7] It is undisputed that, for the consumers here—hospitals needing surgical instruments that fit the da Vinci robot—the only available options are replacing or repairing their EndoWrists. SOF, ¶70, 71.

Intuitive's argument also fails under the incorrect supplier perspective approach. The Court already held: "from either the customer-based or supplier-based point of view," Rebotix has "alleged a relevant market," i.e., the "EndoWrist repair and replacement market." Dkt. 52 at 15. Dr. Lamb alternatively analyzed the "antitrust product market from Rebotix's perspective" and concluded the relevant market "was also the EndoWrist Repair and Replacement Market." P2, ¶61.

Intuitive argues that, under the incorrect supplier perspective approach, the market should include all laparoscopic instruments because Rebotix "could repair"

---

[7] Intuitive's reliance on *Little Rock* and *Campfield*, as supporting its supplier-side theory, is misplaced. *See* Rebotix's Lamb Daubert Opp. at 15 (distinguishing *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) and *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 595 (8th Cir. 2009)). In these cases, the plaintiff alleged a monopsony. And in the monopsony context, where market power allegedly resides with a buyer, the market definition question examines whether other buyers should be included in the market, i.e. are there reasonable substitutes available to suppliers. Lamb Daubert Opp. at 15. But Intuitive is not a monopsonistic buyer; it is a monopolistic supplier. Accordingly, the market definition must be based on reasonable substitutes available to buyers (consumers). The plaintiff in *Stop & Shop* also alleged a monopsony. In the market for prescription drug sales, the health care insurer defendants were monopsonistic buyers who restricted purchases of prescription drugs to a few drug store chains, not including plaintiffs. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 59-60 (1st Cir. 2004). Intuitive's reliance on *Stop & Shop* therefore fails for the same reason. Moreover, *Spectrofuge* never suggested that the market must be defined from supplier-side. Instead, the court considered which "instruments or systems… provide the customer with substitutes." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 283 (5th Cir. 1978).

such instruments.  Mot. 28-29.  The Court rejected this argument because "a supplier of EndoWrist repairs, like Rebotix, would not view [EndoWrist repair and traditional laparoscopic repair] services as reasonably interchangeable."  Dkt. 52 at 15 (internal quotations omitted).  And substantial evidence confirms this. EndoWrists and traditional laparoscopic instruments have several key structural and functional differences.  P7, ¶¶66-70.  And before Rebotix could launch its EndoWrist repair business, it made substantial investments specific to repairing EndoWrist. SOF, ¶60 n.2.  Rebotix has not performed any of the necessary reverse engineering, materials analysis, protocol development, or training that would enable it to repair other laparoscopic instruments.  *Id.* [8]

### B.   The market for minimally invasive surgical robots is distinct from the market for EndoWrists repair and replacement.

"[T]he answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items."  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984).  That is, are the "products … distinguishable in the eyes of buyers" or "separately priced and purchased from the buyer's perspective"?  *Id.* at 19, 20.

The evidence overwhelmingly demonstrates that repair and replacement of EndoWrists has separate demand (and is a separate product from) the surgical robots.  SOF, ¶¶67-71.  While Intuitive's da Vinci robots are priced between

---

[8] Intuitive also asserts that Benjamin Biomedical could repair EndoWrists.  Mot. 28.  But this is doubly irrelevant because Benjamin is not the relevant party here.  Also, the record demonstrates that all Benjamin Biomedical did was scissor sharpening, many years ago.  D25, 22:2-4.

$500,000 and $2,500,000, EndoWrist repairs and replacements are priced between $650 and $3,200.  SOF, ¶68.  And they are always purchased separately.  When a buyer purchases a surgical robot, the purchase does not include any EndoWrists for surgeries.  *Id*.  Instead, hospitals "have to place an order for [EndoWrist] instruments as they need them," and "different hospital systems are going to require different numbers of instruments to meet their surgical needs."  P41 (Smith), 182:5-11, 243:8-15; SOF, ¶69.  Hospitals therefore recognize "that EndoWrists are a separate product from the … surgical robot itself."  P27 (Evergreen), 82:8-13.  In sum, the "record amply supports the conclusion that consumers differentiate between" two distinct products.  *Jefferson Parish*, 466 U.S. at 23 (1984).

Intuitive argues that EndoWrists are an "essential component" of a da Vinci system, and "cannot constitute separate products as a matter of law."  Mot. 30-31.  This is incorrect.  "By that logic, we would be forced to conclude that there can never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires."  *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 463 (1992).  Instead, "[w]e have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."  *Jefferson Parish*, 466 U.S. at 19 n.30 (1984).  "[T]he mere fact that two items are complements, that one . . . is useless without the other does not make them a single product for purposes of tying law."  *United States v. Microsoft Corp.*, 346 U.S. App. D.C. 330, 253 F.3d 34, 86 (D.C. Cir. 2001) (internal citations and quotations omitted).  "In fact, in some situations the functional link between the two items may

22

enable the seller to maximize its monopoly return on the tying item as a means of charging a higher rent or purchase price to a larger user of the tying item." *Jefferson Par.*, 466 U.S. 2, 19 n.30 (1984).

Intuitive relies on *Kentmaster Manufacturing Co. v. Jarvis Products Corporation*, 146 F.3d 691 (9th Cir. 1998).  Mot. 30.  "But *Kentmaster* cannot stand for the proposition that product complements can never make up separate product markets—such a holding would conflict with controlling Supreme Court precedent." *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, No. 3:21-cv-03496-VC (N.D. Cal.) (Dkt. 70), *7 (P64) (rejecting identical argument that Intuitive makes here).  Instead, "the complaint [in *Kentmaster*] had not alleged any consumer demand for one product apart from the other: 'on the face of the complaint, [the] equipment and spares are described so that they necessarily constitute a single product.' ... *Kentmaster* is thus an example of a complaint failing to adequately allege consumer demand for the items as distinct products.  The complaint here does not have this deficiency."  *Id.* (quoting *Kentmaster* at 695).

Moreover, "the various franchise cases cited by Intuitive Surgical," including *Rick-Mik Enterprises* and *Siva*, (Mot. 30-31), "are not analogous to the facts here." *Surgical Instrument Service*, No. 3:21-cv-03496-VC (N.D. Cal.) (P64) at *7.  A "franchise" is a "method of doing business" and a "method of doing business is not sold separately from the ingredients that go into the method of business." *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 274, 277 (N.D. Ill. 2019).

23

Intuitive asserts that it "has always bundled the sale of da Vincis and EndoWrists." Mot. 31.   This is demonstrably false.  Intuitive never sells da Vinci robots and EndoWrists together.  They are always purchased separately—in separate orders, with different prices and different quantities, reflecting the different demand for each product.  SOF, ¶¶68, 69.  This is how Intuitive's own materials describe these two products.  SOF, ¶8.  How "other robotic-assisted surgical companies" design their systems (Mot. 32-33) also undermines Intuitive's position.  Medrobotics and TransEnterix (Intuitive's only two U.S. competitors) do not impose a contractual tying requirement.  SOF, ¶17.  Instead, they have an "open architecture that allows third-party instruments to be used with their systems." P69, ¶75.

In sum, far more than "[e]nough doubt is cast on [Intuitive's] claim of a unified market" and therefore "it should be resolved by the trier of fact." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 463 (1992).

## V.   Rebotix has substantial evidence of an unlawful tying arrangement.

### A.   Intuitive's tying arrangement.

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461 (1992) (internal quotation omitted). "[T]o prove that a tying arrangement is illegal per se" requires proof of "four elements": 1) that there are two separate products, a 'tying' product and a 'tied' product; 2) that those products are in fact 'tied' together -- that is, the buyer was

forced to buy the tied product to get the tying product; 3) that the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and 4) involvement of a 'not insubstantial' amount of interstate commerce in the market of the tied product." *Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1414 (11th Cir. 1987). The Eleventh Circuit has "added a fifth requirement that the tying company have an economic interest in the tied product." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1579 (11th Cir. 1991). When a plaintiff "place[s] into the record sufficient evidence" of the "prima facie elements of a per se tying violation," summary judgment is inappropriate. *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1574 (11th Cir. 1991).

Substantial evidence supports all five elements: (1) EndoWrists (and the market their repair and replacement) are separate from the da Vinci robot (and the market for minimally invasive soft tissue surgical robots). SOF, ¶¶67-71.

(2) Intuitive ties these two product markets together. Intuitive requires "each hospital that purchases a da Vinci surgical robot to sign" a contract that requires the hospital to purchase new EndoWrists from Intuitive after a certain number of uses established by Intuitive (usually ten) and "prohibits hospitals from repairing, refurbishing, or reconditioning their EndoWrist[s]." P22, 194:7-10; 197:19-23; SOF, ¶73. Accordingly, if hospitals want to purchase a surgical robot from Intuitive, they have no choice but to purchase unnecessary replacement EndoWrists from Intuitive (and forego EndoWrist repairs from Rebotix). SOF, ¶74.

(3) Rebotix has provided substantial evidence of market power. "[T]he

25

principal judicial device for measuring actual or potential market power remains market share." *U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 994 (11th Cir. 1993). Intuitive's expert admits that "under the market that [Rebotix's expert] Dr. Lamb defines," "Intuitive has a share beyond 99 percent," which is sufficient to have "monopoly power."  P41, 122:3-11; P2, ¶¶80-107.

(4), (5) The sale of EndoWrists involves a substantial amount of interstate commerce, and Intuitive has an economic interest in EndoWrists.  SOF, ¶67.

### B.   Intuitive's additional tying arguments fail.

(1) <u>Intuitive's "da Vinci service' argument fails</u>:  Intuitive alleges that Rebotix failed to allege a tying market because its expert did not define a "market for da Vinci service."  Mot. 34-35.  This argument fails because the identified tying market is <u>not</u> the service of da Vincis.  It is the "market for minimally invasive soft tissue surgical robots," and Rebotix's expert included detailed analysis defining this market.  P2, Section IIIA ("The market for MIST [minimally invasive soft tissue] Surgical Robots is a Relevant Antitrust Market"), ¶¶27-52.  Rebotix's allegations discuss service of da Vinci systems not as an antitrust market, but as one of the anticompetitive acts Intuitive implements to coerce purchasers of its surgical robot to purchase unnecessary EndoWrist replacements from Intuitive.   SOF, ¶73.  That is, Intuitive forces purchasers of robots to purchase unnecessary EndoWrists by withholding service (and thus rendering useless) the robot of any hospital that attempts to repair their EndoWrists instead of buying replacements.  *Id*.

(2) <u>Intuitive's "supracompetitive price" argument fails</u>:  Intuitive argues that

Rebotix fails to demonstrate "supracompetitive" prices.  Mot. 36.  A "supracompetitive price" is a "price above a firm's marginal cost." Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice, §§ 3.1, 3.1a (4th ed. 2011).  Here, the evidence shows that Intuitive has priced robots more than 150 percent above marginal cost, and EndoWrists at more than 800 percent above marginal cost.  SOF, ¶64.

The "combined price" concern expressed in Intuitive's cited authority does not apply.  Mot. 36-37.  *Metzler* and *Kypta* hold that, when demonstrating supracompetitive pricing, it is not sufficient to show supracompetitive prices for either the tying product alone or the tied product alone, since the other one might be priced below the competitive level resulting in no net supracompetitive pricing.  In *Kypta*, the plaintiff failed to introduce any evidence "regarding the cost of the tied product" (leased property) and thus could not show that defendant priced the tied product above market.  *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285-86 (11th Cir. 1982).  In *Metzler*, "the undisputed evidence establishe[d] that customers did not pay supracompetitive rates for the 'tied product.'"  *Metzler v. Bear Auto. Serv. Equip. Co., SPX*, 19 F. Supp. 2d 1345, 1362 (S.D. Fla. 1998).  Here, Intuitive charges supracompetitive prices for <u>both</u> the tying product (150% above cost) and the tied product (800% above), resulting in net supracompetitive pricing.  Moreover, the anticompetitive effect of supracompetitive "combined pricing" (present here) is only one way to show anticompetitive effects; exclusion from the market (also present

here) is another.  *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010).

(3)  <u>Intuitive's procompetitive justifications argument fails</u>:  Intuitive argues that "Rebotix cannot establish the absence of procompetitive justifications for Intuitive's challenged conduct."  Mot. 37.  This argument fails.

<u>First</u>, because Intuitive's tying arrangement is *per se* illegal, any procompetitive effects are not part of the tying inquiry.  "A claim that a tying arrangement is illegal per se eliminates the requirement that the plaintiff show an actual anti-competitive effect."  *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1503 (11ᵗʰ Cir. 1985). Intuitive's assertion that its tying violation is not a per se violation is incorrect. Supreme Court law holds that, in a "tying" case, "*per se* condemnation [is] appropriate" when, like here, "the seller's share of the market is high" or "offers a unique product" because there is sufficient "likelihood that market power exists and is being used to restrain competition in a separate market." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 17 (1984).

Intuitive argues that (a) its "products" are "patented" and (b) according to *Illinois. Tool Works*, the *per se* framework of *Jefferson Parish* does not apply to patented products.  Mot. 33, n. 9.  Both parts of this argument are wrong.

Intuitive's core products are no longer patented.  Its fundamental patents covering the da Vinci robot and EndoWrists have expired, leaving Intuitive with patent coverage on small advancements and newly developed features.  SOF, ¶5. This is why competitors (TransEnterix and Medrobotics) have now entered the

market, undeterred by Intuitive's patents. P22, 85:20-98:6.

Intuitive also misstates the law. "*Illinois Tool Works* held only that the fact that a tying product is patented does not support a presumption that the seller has market power over that product. … *Illinois Tool Works* … stands only for the proposition that a plaintiff must prove that a holder of intellectual property has either the degree or the kind of market power that enables him to force customers to purchase the tied product. If a plaintiff can do so, then the framework established by *Jefferson Parish* continues to apply." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 322-23 (7th Cir. 2006) (J. Wood, concurring); *In re Cox Enters.* 871 F.3d 1093, 1100 (10th Cir. 2017) (*Ill. Tool Works. Inc.* merely "prohibit[s] courts from inferring market power over the tying product from a seller's patent on that product").

Second, Intuitive's argument also fails under the rule of reason. "The whole point of the rule of reason is to" look to the "logic of a restraint to ensure that it unduly harms competition before a court declares it unlawful." *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021). The rule of reason requires consideration "of the negative effects of the restraint on competition and compar[ing] that with the positive effects on competition stemming from the restraint." *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1213 (11th Cir. 2002). This allows the "fact finder [to] weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021).

The negative effects of Intuitive's practices are textbook. A competitor

(Rebotix) has been unable to operate, and consumers (hospitals) are forced to pay more for products that they do not want.  P2, ¶¶120-126, P26, 62:6-10 ("If it weren't for Intuitive's contractual limitations, [Pullman] hospital [would] use Rebotix's services to the full extent that Rebotix was willing to provide.").

And the purported positive effects Intuitive identifies are non-existent. Intuitive can freely "test the entire system to assess and minimize clinical risk to patients" (Mot. 37) without forcing hospitals to forego repairs of their EndoWrists. Any testing necessarily occurs before an EndoWrist is shipped to a hospital, and evidence demonstrates repaired EndoWrists pose no greater risk to patients.  SOF, ¶¶11, 12, 14.  And Intuitive can continue to offer "warranties" to "guarantee reliability and safety" on both its da Vinci robots and EndoWrists (Mot. 37) without tying the sales of these products together.  For example, because EndoWrist repairs cannot affect the integrity of the robot itself (P68, 136:8-137:9; P67), Intuitive could void an EndoWrist warranty if a hospital elects to repair it while continuing to separately warranty the robot.  Or to be sure, Intuitive could expand its warranty carve-outs to exclude coverage for any robot damaged by a repaired EndoWrist.[9]

## VI.   Rebotix has substantial evidence of unlawful exclusive dealing.

Intuitive repeats its same product and pricing arguments rebutted above.  Mot. 39.  Intuitive also argues that "Dr. Lamb did not analyze whether Intuitive has

---

[9] Intuitive's purported procompetitive justifications are also undermined by the actions of its two competitors in the surgical robot market.  TransEnterix and Medrobotics face the same safety and warranty issues as Intuitive, but they do not impose a contractual requirement tying their robots to purchases of instruments. SOF, ¶17.

engaged in anticompetitive exclusive dealing." *Id.* That Dr. Lamb did not offer an ultimate conclusion on "exclusive dealing" is irrelevant. That is a question for the fact-finder. Dr. Lamb does, however, provide the relevant testimony needed for the fact-finder to draw this conclusion, i.e., detailed analysis for each element of an exclusive dealing claim: (1) a relevant product and geographic market, P2, ¶¶27-53; (2) the exclusion of a significant competitor, *id.*, ¶¶120-123; ¶126; and (3) foreclosure of, or injury to, competition, *id.*, ¶¶133, ¶134, ¶¶139-141.

## V. Intuitive should not be granted summary judgment on its tortious interference claim.

First, at the "summary judgment stage," Intuitive must "advance[] sufficient record evidence for every element of its tortious interference claim." *Superior Consulting Servs. v. Shaklee Corp.*, 2018 U.S. Dist. LEXIS 63550, at *15 (M.D. Fla. Apr. 16, 2018). Intuitive has failed to do so. Intuitive cites no evidence for the "intentional or unjustified interference" or resulting "damages" elements. Mot. 41. This is fatal to its motion.

Second, a "tortious interference claim" cannot be based on a contract that is "void because it is against public policy." *N. Am. Elite Ins. Co. v. Sw. Transp. Servs.*, No. 13-80624-CIV, 2014 U.S. Dist. LEXIS 188626, at *11 (S.D. Fla. Oct. 6, 2014). And substantial evidence demonstrates that Intuitive's contracts with hospitals "are against public policy and void" because they unreasonably "restrain … competition." *Richmond Co. v. Rock-A-Way*, 404 So. 2d 121, 122 (Fla. Dist. Ct. App. 1981).

Third, "[c]ompetition for business does not constitute tortious interference

31

with a business relationship." *Royal Typewriter Co., Div. of Litton Bus. Sys., Inc. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1105 (11th Cir. 1983).  Rebotix is permitted to "advance [its] interest in competing with" Intuitive for customers so long as it does not "employ improper means." *Int'l Sales & Serv. v. Austral Insulated Prods.*, 262 F.3d 1152, 1159 (11th Cir. 2001).

Date: December 8, 2021                  Respectfully submitted,

                                        /s/ Richard Lyon
                                        _____
                                        Richard Lyon
                                        California Bar No. 229288 (*pro hac vice*)
                                        rick@dovel.com
                                        DOVEL & LUNER, LLP
                                        201 Santa Monica Blvd., Suite 600
                                        Santa Monica, California 90401
                                        Telephone: (310) 656-7066

                                        COUNSEL FOR PLAINTIFF
                                        REBOTIX REPAIR LLC