Exhibit P5

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| REBOTIX REPAIR LLC, | )<br>)<br>) Case No. 8:20-cv-02274 |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| INTUITIVE SURGICAL, INC., | ) CONFIDENTIAL INFORMATION<br>) ATTORNEYS' EYES ONLY |
| Defendant. | )<br>)<br>) |

**Expert Report of J. Lawrence Stevens**
**August 30, 2021**

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

## Table of Contents

I.      Introduction ........................................................................................................... 1

II.     Background and qualifications. ......................................................................... 1

        A.   Qualifications and experience ................................................................. 1

        B.   Materials considered in forming opinions. ............................................. 6

        C.   Prior expert testimony ............................................................................ 7

        D.   Compensation. ........................................................................................ 9

III.    Rebotix was not required to seek approval from the FDA (via a 510(k) submission or otherwise) for the services Rebotix performs on EndoWrists ..................................... 10

IV.     Response to the opinions of Ms. Rosecrans ..................................................... 11

        A.   Rebotix is not a manufacturer of a medical device that requires 510(k) clearance. ................................................................................................ 11

             1.   The Interceptor board is not a medical "device" and therefore is not subject to 510(k) requirements. ..................................................... 11

             2.   Rosecrans' "interstate commerce" assertion fails. .......................... 18

        B.   Rebotix is not a remanufacturer of a medical device that requires 510(k) clearance. ................................................................................................ 24

        C.   Ms. Rosecrans' "FDA requirement" opinions are flawed. ................... 34

        D.   Ms. Rosecrans' opinions on a purported third category of "limited use devices" are flawed. ............................................................................... 38

        E.   Ms. Rosecrans' opinions on Rebotix and BPI's interactions with the FDA are flawed. ..................................................................................... 42

        F.   Ms. Rosecrans misconstrues Rebotix's position on substantial equivalence. ........... 48

        G.   Ms. Rosecrans' opinions on Rebotix's communications to customers are flawed. ................................................................................................. 50

        H.   Ms. Rosecrans' opinions on "directions for use" are flawed .............. 52

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

## I.      Introduction.

1.      I am J. Lawrence Stevens.  I have been retained by the firm of Dovel & Luner, LLP on behalf of the Plaintiff, Rebotix Repair LLC ("Rebotix"), to provide my expert opinions regarding the allegations made by Defendant Intuitive Surgical Inc. ("Intuitive") that the services Rebotix performs on EndoWrists require FDA approval, as well as other topics related to this allegation.  I provide opinions responsive to the opinions expressed in the expert report of Heather S. Rosecrans, submitted on behalf of Intuitive.

2.      I have prepared this report to summarize the subject matter and opinions to which I expect to testify.

## II.     Background and qualifications.

### A.      Qualifications and experience.

3.      I have over 40 years of experience with the FDA. I had two long periods of employment with the FDA (1972-1982 and 2000-2011) as well as extensive regulatory work in the private sector (1982-2000, 2011-present).  While at the FDA, I was awarded both the FDA Special Achievement Award by the FDA Office of Criminal Investigations and the FDA Commendable Service Award.

4.      My first decade at the FDA spanned from 1972 to 1982, when I served as Small Business Representative for the FDA in Los Angeles, California.  In this role, I gained significant familiarity with all aspects of the Medical Device Amendments of 1976 and the accompanying regulations.  I provided regulatory guidance to developers of new medical devices; performed on-site visits at manufacturing locations and advised on procedures necessary to meet current Good Manufacturing Practices (GMPs) and Investigational Device Exemption (IDE) requirements; met with Institutional Review Board representatives to advise them on

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

regulatory requirements; served as an FDA spokesperson at government and industry meetings; presented on regulatory requirements for medical device manufacturers; established the first West Coast office in the Small Business Assistance program; and served as a representative of the Center for Devices and Radiological Health, Division of Small Manufacturers Assistance.

5.      From 2000 to 2011, I worked as a Supervisory Investigator, FDA Saint Louis Office (March 2009 – September 2011); the Acting Director of Compliance, FDA Los Angeles District (September 2008 – March 2009); the Director of Import Operations Branch, FDA Los Angeles District (November 2003 to September 2008); Compliance Officer, FDA Los Angeles District (June 2002 - November 2003); and Investigator (Medical Device Specialist), FDA Los Angeles District (November 2000 – June 2002).  Most of my inspections were of high-risk medical device firms that developed and manufactured Class III devices.

6.      As Supervisory Investigator, I directed all FDA operations at the Saint Louis, Missouri office for FDA. My work included planning for investigators, training of investigators, and reviewing inspection and investigation reports for technical and legal requirements. I received an FDA commendation for the development of newly hired investigators. I also trained on Incident Command Systems (ICS) to serve as a leader in a multi-agency response to national incidents.

7.      In my role as Acting Director of Compliance, I directed the activities of seven Compliance Officers; monitored all on-going projects; managed resources to assure timely and accurate review of violative inspections, investigations, and sample collections; negotiated with FDA Centers, Office of Chief Counsel, and the Office of Enforcement regarding legal cases; and chaired meetings with regulated firms regarding requirements necessary to meet FDA legal requirements.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

8.      As the Director of Import Operations, I was responsible for managing the operations of over 100 FDA employees located at offices in San Pedro, Carson, Long Beach, Ontario, and the Los Angeles International Airport.  These employees were responsible for reviewing all FDA-regulated products offered for entry and sale into the United States from foreign sources through the Ports of Long Beach and Los Angeles, and Ontario and Los Angeles International Airports.

9.      As a Compliance Officer, my work assignments were almost exclusively complex Class III medical devices and pharmaceutical inspections and required both risk and legal assessments to formulate regulatory enforcement plans.  I also made investigative determinations on allegations of off-label promotion and performed technical reviews of inspection reports and sample analyses to determine the need for FDA action. While in this position, I authored Warning Letters to pharmaceutical and medical device firms.  The charges cited in the letters ranged from failure to comply with Quality System Regulations and current Good Manufacturing Practices, to the sale of unapproved new drugs and failure to submit a 510(k) Premarket Notification.  I also chaired meetings requested by companies to discuss their regulatory status.

10.      When I served as Investigator, I was a technical specialist for all aspects of Medical Device regulatory compliance. I performed inspections of manufacturers of high-risk medical device firms for regulatory compliance, as well as sponsor/monitor and clinical investigator inspections for Investigational Device Exemption Institutional Review Boards, and Informed Consent compliance.  I was certified in the Quality System Inspection Technique Approach and for knowledge of the Quality System Regulation.  In 2002, I was selected as the New Hire Training Coordinator for the Los Angeles District Domestic Investigations Branch.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

11.     In addition to my experience at the FDA, I have over eighteen years of private sector experience managing regulatory affairs of medical device and pharmaceutical companies. When I first left the FDA in 1982, I joined the Heyer Schulte Division of American Hospital Supply Corporation as a Manager of Regulatory and Clinical Affairs.  There, I was responsible for the regulatory and clinical programs for the company's implantable silicone devices utilized in neurology, cardiology, orthopedics, and plastic surgery.

12.     In 1984, I became the Manager of Regulatory Affairs at Unitek Corporation, a large fully integrated manufacturer of mechanical, electronic and chemical medical devices and pharmaceuticals and a subsidiary of Bristol-Myers Company.  I was responsible for compliance with all regulatory requirements and managed, among other areas, the product complaint department and internal Good Manufacturing Practice Audit program.

13.     From 1986 to 2000, I worked for both start-ups and large Class III medical device corporations, including Baxter Healthcare Corporation and Cordis Webster, Inc., a Johnson & Johnson Company, in both managerial and executive roles involving major responsibility and oversight.  Through these positions, I interacted with personnel in all departments, including clinical departments staffed with physicians and surgeons. I personally directed the clinical development of medical devices, pre-clinical research and quality assurance programs.  I also prepared regulatory submissions and drafted 510(k) and IDE submissions to the FDA.

14.     After I left the FDA in 2011, I founded the regulatory consulting company, One Way Consultants.  Through it, I provide consulting services to FDA-regulated businesses in areas including regulatory guidance on 510(k), IDE and premarket approval submissions; for class III medical devices, and also planning, creating, and auditing quality systems to USA and

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

international standards; clinical plans, protocol development, case report form development, and implementing and managing clinical trials.  I also have represented clients in FDA meetings.

15.     Over the course of my private sector career, I have personally designed quality systems, prepared regulatory submissions (510(k), IDE and premarket approval) and managed 7 multi-center clinical trials for Class III medical devices.

16.     I have given over 250 public presentations to audiences ranging from senior executives, physicians, technical personnel, other medical personnel, major media, and the general public.  I also regularly hold webinars on FDA issues. The attendees of my webinars include regulatory and quality professionals from medical device firms, and some FDA officials. The topics of my webinars have included how to meet with FDA, how to correctly prepare regulatory submissions, and proper design control, in addition to other FDA related topics.

17.     As discussed below, I have previously served as an expert witness in the area of FDA regulation of medical devices.

18.     I am certified in Regulatory Affairs by the Regulatory Affairs Professionals Society of which I remain an active member.  I am also an active member in the American Society for Quality, and the FDA Alumni Association.

19.     I obtained a Bachelor of Arts in Biological Sciences from California State University in 1970 and completed one year of the MBA Program at Golden Gate University, Santa Barbara, CA.

20.     A summary of my education, experience, publications, awards, honors, and presentations are provided in my curriculum vitae, a copy of which is attached hereto as Exhibit 2.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

**B.      Materials considered in forming opinions.**

21.     In forming my opinions, I relied on my extensive experience working for the United States Food and Drug Administration (FDA), as well as my regulatory work, interpreting and applying FDA regulations and actions, while working in the private sector, as set forth further herein, and in my Curriculum Vitae attached to this report.

22.     Within this report (including within the text of the attached Exhibit 1, which is a part of this report), I cite materials I have considered and relied upon in forming my opinions. I also identify those materials in Exhibit 3 (which is intended to be inclusive of what is cited in my report although it is possible that I inadvertently omitted certain materials cited in my report). The citations in this report are provided as examples of evidence I have reviewed and that support my opinions and the basis for my opinions. They do not represent the only materials considered or relied upon in reaching my conclusions – this document would be unduly long if I were to cite every such piece of evidence in each place it played a role in my analysis.

23.     In reaching my opinions in this case, I utilized the same methodology and level of scrutiny that I employed across my four decades of Agency experience, including as an FDA investigator and compliance officer, as well as an industry consultant. My analytical technique is the result of my FDA training and experience both inside and outside the Agency.  All of the opinions expressed herein are offered to a reasonable degree of professional certainty.

24.     If called upon to testify, I expect to utilize demonstrative exhibits relating to the opinions disclosed in this report, and the documents and information that I have reviewed or considered in preparing my report.

25.     If new information becomes known to me, I may modify the content of this report and/or my opinions.

---

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

**C.      Prior expert testimony.**

26.      In the past four years, I have testified as an expert witness at trial or by deposition in the following cases:

- *Medicalgorithmics S.A. v. AMI Monitoring, Inc., d/b/a, Spectocor and Spectorco LLC*, in the Court of Chancery of the State of Delaware, C.A., No. 10948-CB.

  - My expert opinion for the defendant related to a change in a 510(k) product and whether that change required a new 510(k) for the modification.  My involvement in this case included providing an expert report, sitting for a deposition, and providing testimony at trial.

- *Timothy Allen [sic] Yu Allen Timothy Yu Vs Grifols Biologicals,* INC., in the Superior Court of the State of California for the County of Los Angeles, Case No. BC620910

  - Case alleging unfair employment dismissal on the grounds of a "whistleblower" complaint.  The whistleblower alleged that he had discovered a serious breach of FDA Good Manufacturing Practices (GMP) for Pharmaceuticals.   My expert opinion and deposition related to the reported GMP problem and potential FDA concern.  I prepared an expert report for the defendant and was deposed.

- *Nevro Corp., v. Boston Scientific Corporation and Boston Scientific Neuromodulation Corporation,* in the United States District Court Northern District of California, Case No. 3:16-cv-06830-VC

  - This case concerned a patent dispute with a claim that Boston Scientific Corporation did not apply for Premarket approval (PMA) of their product

---

Expert Report of Lawrence Stevens                                                                                    7

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

leading to delay. My expert opinion related to the FDA PMA process, and the data needed to obtain FDA approval. I prepared an expert report and was deposed.

- *Republic Technologies (NA), LLC and Republic Tobacco, L.P., v. BBK Tobacco & Foods, LLP D/B/A HBI International*, in the United States District Court Northern District of Illinois. Case No. 16-cv-3401

  o This was a case involving FDA requirements for tobacco products, tobacco product submissions and FDA policy. I prepared an expert report for the defendant and was deposed.

- *Eva Westmoreland, vs Medtronic, inc., Medtronic USA, Inc., and Jeff Belkowski*, in the United States District Court Eastern District of Missouri, Case No.4:17-cv-01626-AGF

  o I prepared an expert report for the defendant regarding FDA's regulations on PMA approval, and FDA policy on off label use of a device. I was deposed.

- *Sanofi-Aventis US, LLC, v. Mylan Inc. and Mylan Specialty, L.P.; In re Epipen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation* case, in the United States District Court for the District of Kansas, No. 2:17-md-2785, CASE No. 2:17-cv-2452

  o I was retained by Plaintiff to provide rebuttal expert opinions regarding an expert report from the defendant. I provided my opinion regarding a Class I recall. I also commented on the alleged deficiencies of the

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

manufacturing process for a device.  I wrote an expert report and was deposed.

- *Robert Leonard Kieser v.  CR Bard and Bard Vascular Inc*., in the United States District Court for the Western District of Missouri-St. Joseph Division Case No.: 20-06045-CV-SJ-NKL.

    o I was retained by plaintiff's attorney in a personal injury lawsuit alleging a defective device. My expert report centered on FDA compliance for post-marketing surveillance and investigation and reporting of adverse events. I was deposed.

- *The Cleveland Clinic Foundation, Claimant and Counterclaim Respondent, and Transworld  Medical  Devices,  LLC,  Respondent  and  Counterclaimant, and Cleveland  Heart,  Inc.,  Respondent;  American Arbitration Association*, AAA case no. 01-19-00001-4710.

    o I was retained to evaluate factual materials and certain subject matters relating to the medical device developed by the Cleveland Heart Institute designed, as a Class 3 cardiovascular medical device.  Where appropriate, I was asked to offer my expert opinions on subject matter related to the FDA approval of class 3 medical devices.  I wrote an expert report and testified at the arbitration hearing.

### D.    Compensation.

27.    I am being compensated at an hourly rate of $500 for consultation, for my work on this case.  These rates are my standard consulting rates currently.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

28.     My opinions are objective, and compensation for my services is not contingent on my opinion or the outcomes of this action.

## III.   Rebotix was not required to seek approval from the FDA (via a 510(k) submission or otherwise) for the services Rebotix performs on EndoWrists.

29.     I have reviewed the Expert Report by Joshua S. Sharlin, Ph.D. where he sets forth opinions on whether Rebotix's services on EndoWrists require 510(k) approval from the FDA, as well as several related issues.  I attach this report as Exhibit 1.

30      I agree with all of the opinions expressed in Dr. Sharlin's report, beginning at paragraph 20 through paragraph 199 of the report.  I fully adopt the opinions set forth in these paragraphs in Dr. Sharlin's report as my own opinions and expressly incorporate these opinions into my report.[1]

31.     In summary, and for the reasons detailed in Exhibit 1, Rebotix's service does not require 510(k) authorization from the FDA for three main reasons:

- First, 510(k) authorization is not required when devices are not introduced into commercial distribution, and Rebotix has not introduced serviced EndoWrists into commercial distribution. Rebotix is a service provider, and servicing is not regulated by the FDA.

- Second, 510(k) authorization is not required when an entity does not significantly change a device's performance or safety specifications, or its intended use. And Rebotix has not significantly changed a device's performance or safety specifications, or intended use.

---

[1] In several instances in Dr. Sharlin's report, Dr. Sharlin references conversations with Greg Fiegel.  I too have spoken with Mr. Fiegel and confirmed the statements where Dr. Sharlin relies on him.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

- Third, at Intuitive's request, the FDA investigated Rebotix's services to determine whether a 510(k) was required.  And Rebotix then explained their servicing operation to the FDA.  Because the FDA took no action, it can be concluded the agency determined that a 510(k) was not required.

## IV.   Response to the opinions of Ms. Rosecrans

32.     I have reviewed the expert report of Heather Rosecrans where she offers opinions on issues relating to 510(k) clearance and related regulatory requirements.  Ms. Rosecrans' primary opinion is that Rebotix was required to seek 510(k) clearance for its EndoWrist services. I disagree for all of the reasons set forth in Exhibit 1.  In this section of my report, I further respond to Ms. Rosecrans' opinions.

### A.   Rebotix is not a manufacturer of a medical device that requires 510(k) clearance.

33.     Ms. Rosecrans expresses the opinion that Rebotix's interceptor board is a "medical device" that requires 510(k) approval.  Rosecrans ¶¶ 88-106.  I disagree.

#### 1.   The Interceptor board is not a medical "device" and therefore is not subject to 510(k) requirements.

34.     The FDCA defines a "device" as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is:

(A) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,

(B) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

(C) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes."[2]

35.     The Interceptor does not satisfy any of (A), (B), or (C) and is therefore not a medical device.  I address (A), (B), and (C) in turn.

36.     (A) The Interceptor is not "recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them."  21 U.S. Code § 321(A)(h)(1)(A).  The United States Pharmacopeia and National Formulary (USP-NF) is an official publication, issued first by the American Pharmaceutical Association and now yearly by the United States Pharmacopeial Convention, that gives the composition, description, method of preparation, and dosage for drugs. The book contains two separate official compendia -- the USP and the NF. The Interceptor has nothing to do with drugs and would not be identified in the USP-NF.

37.     (B) The Interceptor is not "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals."  21 U.S. Code § 321(A)(h)(1)(B).  For example, a digital thermometer or a stethoscope are medical devices because the intended use of these articles is the diagnosis of a condition.  In contrast, the intended use of the component parts of a thermometer (e.g., the PCB board) or of a stethoscope (e.g., the tubing) is not the diagnosis of a condition.  The PCB board or tubing are therefore not medical devices under this section of the code.  Similarly, an Electronic muscle stimulation (EMS) device or an EndoWrist could be considered medical devices because their intended use is to treat ailments—i.e., an EMS device treats muscle ailments and an EndoWrist

---

[2] 21 U.S. Code § 321(h)(1).

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

treats a variety of ailments (via surgery).  However, the intended use of the PCB board within an EMS device is not to treat ailments and it is thus not a medical device under this section of the code, just as the intended use of an Interceptor board is not to treat ailments and it is likewise not a medical device.

38.      (C) The Interceptor is not "intended to affect the structure or any function of the body of man or other animals."   The Interceptor board does not affect the structure or any function of the body of a man or other animal.  Articles that are intended to affect the structure or function of a body are surgical tools—for example, laparoscopic scissors or EndoWrist scissors.  Again, the Interceptor board is not a surgical tool and it has no effect on the structure or function of the human body.

39.      Moreover, the FDA would not consider the language in 21 U.S. Code § 321(h)(1) referring to a "component, part, or accessory" to encompass the Interceptor board.  The language "component, part, or accessory" does not refer broadly to any "component, part, or accessory," like a screw. Rather, this language refers to "components, parts, or accessories" that themselves meet the requirements of (A), (B), and (C) discussed above.  That is, while these devices may be part of a parent device, they are nonetheless medical devices on their own.  I first demonstrate this with an illustrative example.  I then show how this is confirmed by the Regulations and FDA Guidance documents.

40.      As an example, the FDA would consider an MRI scanning system to be a medical device because it is "intended for use in the diagnosis of disease or other conditions"—i.e., it is used to detect a number of conditions like muscle injuries or aneurysms.  21 U.S. Code § 321(A)(h)(1)(B).  And if that same MRI scanning system included a blood pressure monitor to monitor whether the patient becomes agitated during the scan, that monitor is not only a

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

"component" of the MRI scanning system medical device, but it is also a medical device itself because its intended use is the diagnosis of a condition, i.e., elevated blood pressure.

41.     This stands in contrast to other component parts of the MRI scanning system.  For example, the FDA does not consider the screws, the plastic paneling, and various other components that make up an MRI scanner to be medical devices because, unlike the blood pressure monitor, the intended use of these components is not diagnosis or treatment of an ailment.

42.     Similarly, the FDA considers an EndoWrist to be a medical device because it is an article that is "intended for use in … the cure, mitigation, treatment, or prevention of disease," e.g., to treat an enlarged prostate, or "intended to affect the structure or any function of the body of man," e.g., cut through tissue.  21 U.S. Code § 321(A)(h)(1)(B)-(C).

43.     But the FDA does not consider the component parts of an EndoWrist—e.g., the screws, the cables, the usage counter—to be medical devices because the intended use of these components is not the "the cure, mitigation, treatment, or prevention of disease" or "to affect the structure or any function of the body of man."  Instead, the intended use of a screw is to connect two components.  The intended use of a housing is to hold two components together.  The intended use of a usage counter is to count the number of times an object has been connected to another object.

44.     This distinction is set forth in 21 C.F.R. § 820.1, which makes clear that 21 C.F.R. § 820—i.e. the regulation that sets forth 510(k) requirements—"does not apply to manufacturers of components or parts of finished devices."  21 C.F.R. § 820.1.

45.     Because the Interceptor is a component of a finished device (and not itself a finished device), the 510(k) requirements do not apply to the Interceptor.

---

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

46.     A "Finished device means any device or accessory to any device that is suitable for use or capable of functioning, whether or not it is packaged, labeled, or sterilized."  21 C.F.R. § 820.3(l).

47.     Because an EndoWrist is a device that is suitable for use or capable of functioning, whether or not it is packaged, labeled, or sterilized, an EndoWrist is a finished device.  And because an EndoWrist is a finished device, Intuitive was required to obtain premarket approval before putting EndoWrists on the market.

48.     In contrast, components of EndoWrists that are not "suitable for use or capable of functioning" before they are "packaged" together with the other components of an EndoWrist are not finished devices.  Instead, they are components or parts of finished devices, and therefore 510(k) requirements do not apply to these components.  For example, cables of an EndoWrist are not suitable for use or capable of functioning unless they are packaged together with other components of the EndoWrist.  Similarly, a screw within EndoWrist graspers is not suitable for use or capable of functioning unless it is packaged together with other components of the EndoWrist.  And the Interceptor board is not suitable for use or capable of functioning unless it is packaged together with other components of the EndoWrist.  These are component parts of a finished device (i.e., they are not themselves finished devices), and therefore the 510(k) requirements do not apply.

49.     Moreover, as Ms. Rosecrans acknowledges, FDA Guidance makes clear that the only "components" that can be a device under 21 U.S. Code § 321(h)(1) are "finished device components."  But the Interceptor Board is not a finished device component.

50.     Ms. Rosecrans opines that the "Interceptor board, as installed in an EndoWrist instrument that Rebotix markets and sells to end users, is a finished device component (as

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

opposed to a component of a finished device) in finished form for sale to an end user."

Rosecrans, ¶ 90. Every part of this assertion is wrong.

51.    First, as detailed above, an Interceptor is not in "finished form." Instead, it is in

unfinished form, i.e., not suitable for use unless and until it is packaged with the other

components of an EndoWrist.

52.    Second, Rebotix does not "market and sell" serviced EndoWrists (i.e.,

EndoWrists with Interceptors) "for sale to an end user." Rosecrans, ¶ 90. The evidence in this

case demonstrates that Rebotix does not sell serviced Endowrists. Hospitals maintain ownership

of their EndoWrists at all times during the Rebotix servicing process. See Exhibit 1, ¶¶42.[3]

53.    Third, an Interceptor does not satisfy either requirement of "finished device

component" as set forth in the FDA Guidance that Ms. Rosecrans cites:

- "FDA guidance has explained that 'a finished device component' is 'device in

  finished form [1] held for sale to an end user that is [2] suitable for use or capable of

  functioning, whether or not it is packaged, labeled or sterilized.'" Rosecrans, ¶90

  (quoting FDA, Final Guidance for Industry: Sterilized Convenience Kits for Clinical

  and Surgical Use 3-4 (Jan. 7, 2002)) (emphasis and enumeration mine).

- "FDA stated: 'A [1] finished component is sold to the end user while an [2]

  unfinished component cannot be used by the end user until further manufacturing

---

[3] Moreover, as detailed in paragraphs 33 through 45 of Exhibit 1, the FDA only requires a company to obtain premarket approval (e.g., a 510(k) clearance) if the company holds or offers a device for sale. A company is required to submit a premarket notification only when the "device is being introduced into commercial distribution" or when the "device is one that the person currently has in commercial distribution or is reintroducing into commercial distribution." 21 CFR § 807.81. And 21 CFR §807.3(b) defines "commercial distribution" as "distribution of a device intended for human use which is held or offered for sale." See Exhibit 1, ¶¶35-37. Accordingly, because Rebotix does not hold or offer its serviced EndoWrists for sale, it is not required to obtain premarket clearance.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

steps occur …. <u>Finished components are packaged and labeled for use</u> and are for general sale while unfinished components are usually only sold to other device manufacturers for inclusion in another medical device."  Rosecrans, ¶90 (Content of a 510(k), FDA, https://www.fda.gov/medical-devices/premarket-notification-510k/content-510k (last updated Apr. 26, 2019))

54.     Accordingly, for the Interceptor board to be a "finished device component" it would need to be (1) held for sale to end users, and (2) suitable for use and capable of functioning on its own without being packaged with other components.  Neither (1) nor (2) is present here:

55.     (1) As detailed above and in Exhibit 1, Rebotix does not sell EndoWrists with the installed Interceptor to end users.  Nor is its business model to sell Interceptors to end users.  Instead, hospitals maintain ownership of their EndoWrists during servicing by Rebotix, and Rebotix installs the Interceptor as part of the servicing process.[4]

56.     (2) As detailed above, the Interceptor is not suitable for use by an end user and capable of functioning on its own without being installed in an EndoWrist with the other components parts of the EndoWrist.  A hospital or a surgeon cannot make use of an Interceptor board standing alone any more than it can make use of the cables of an EndoWrist standing

---

[4] Ms. Rosecrans focuses her opinions on the service that Rebotix provides for hospitals in its St. Petersburg facility, which includes addition of an Interceptor and repairs to the EndoWrist. Rosecrans, ¶¶70-71.  I understand that Rebotix has in the past also sold a limited number of Interceptor boards to other companies, for those companies to install during repairs of EndoWrists.  Conversation with Greg Fiegel; Rebotix166109.  However, I understand that Rebotix abandoned this practice and has no plans to continue this practice in the future because it is less profitable than performing the servicing itself.  Conversation with Greg Fiegel. Although Ms. Rosecrans does not address these sales of Interceptor boards, these sales also did not require premarket notification for the other reasons set forth in my report, e.g., the Interceptor boards are components parts, not medical devices subject to FDA regulations, and they are not suitable for use on their own without being packaged as part of an EndoWrist.

---

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

alone.  These components are only useful when assembled together with other component parts of an EndoWrist.

## 2.   Rosecrans' "interstate commerce" assertion fails.

57.     Ms. Rosecrans argues that "Because the Interceptor Board is a Device That Moves in Interstate Commerce, Rebotix is a Manufacturer Required to Obtain 510(k) Clearance."  Rosecrans at page 44, ¶¶92-102.  Ms. Rosecrans further asserts:  "Based on my experience working at FDA, it is common knowledge that medical devices are presumed to be in interstate commerce and therefore subject to FDA jurisdiction." Rosecrans, ¶92

58.     There are two problems with this assertion.

59.     First, as demonstrated above, the Interceptor board is not a "medical device" so the purported "common knowledge" concerning FDA's jurisdiction over "medical devices" is inapplicable.

60.     Second, based on my over 40 years of experience with the FDA, it is common knowledge that the FDA must document actual interstate commerce for any case. In other words, for an individual device, the FDA must make a finding that that particular medical device is in interstate commerce.  Moreover, the FDA is guided by the regulations.  And as detailed above and in Exhibit 1, the controlling regulations do not require a company to seek premarket approval when the company is not holding or offering a medical device for sale, but is instead servicing the medical device owned by the hospital.  21 CFR § 807.81; 21 CFR §807.3(b); Exhibit 1, ¶¶33-45.

61.     My opinion (contrary to the opinion of Ms. Rosecrans) is the consensus opinion held by FDA experts, as demonstrated in the Deutsche Bank report discussed throughout Exhibit 1 that relied on various FDA experts: "our takeaway from these consultants is that 510(k) clearance does not seem to be required for independent service organizations refurbishing used

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

da Vinci instruments so long as they are returned to that same hospital and not re-sold to other centers." Intuitive-00566057.

62.     Ms. Rosecrans fails to reconcile her opinions with this critical fact, i.e., that Rebotix is not in the business of selling products but instead services EndoWrists that the hospitals already own.  Here is the entirety of Ms. Rosecrans analysis on this issue:

> "Rebotix has argued that unlike a manufacturer that repackages and sells EndoWrist instruments, it never takes ownership of the instruments, and thus does not require a 510(k). This argument is not persuasive, because the Interceptor board, which is suitable for use and functions within the EndoWrist instrument, is sold to end users as part of Rebotix's service."  Rosecrans, ¶ 95.

63.     Rather than base her opinion on the facts of this case, Ms. Rosecrans bases her opinion on two fictions: (1) that the Interceptor board is "suitable for use" and (2) "sold to end users as part of Rebotix's services."

64.     First, Interceptors are not "suitable for use" as those terms are understood by the FDA.  Ms. Rosecrans' "suitable for use" assertion refers back to the definition for "finished device component" that she pulled from an FDA guidance document.  *See* Rosecrans, ¶90 (quoting FDA, Final Guidance for Industry: Sterilized Convenience Kits for Clinical and Surgical Use 3-4 (Jan. 7, 2002)).  To be a "finished device component" subject to FDA regulations, the component must be in "finished form" and "suitable for use or capable of functioning" regardless of whether it is "packaged." As demonstrated above, the Interceptor board is not suitable for use and capable of functioning before it is packaged as part of a complete EndoWrist.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

65.     Second, Interceptor boards are not "sold to end users as part of Rebotix's services."  Rosecrans, ¶95.  Ms. Rosecrans cites no support for this assertion.  And it is contrary to the evidence.  Rebotix's business is not selling Interceptor boards or any other component parts to end users as part of Rebotix's services.  Instead, Rebotix charges its customers a set price for the service itself.  Conversation with Greg Fiegel.

66.     Rebotix does not perform an assessment of an EndoWrist, determine which component parts must be replaced to restore it to its original condition, and then submit an invoice to an end user for purchase of those component parts.  *Id.*  Instead, Rebotix performs the service of restoring an EndoWrist back to its original condition, and it charges only for this service regardless of what component parts are required.  *Id.*  There is no charge for component parts, including the Interceptor board.  *Id.*  For example, if a particular EndoWrist requires several replacement components to restore it to its original condition—e.g., (a) a replacement release clip in place of an original release clip, (b) a replacement monopolar pin in place of an original monopolar pin, and (c) a replacement Interceptor board in place of an original board— there is no charge for any of these components.  *Id.*  Similarly, if another EndoWrist only requires replacement of the original board with an Interceptor board, there is no charge for this component.  *Id.*  In either scenario, the cost remains the same, i.e., the standard cost of service.  This is because Rebotix is not selling component parts.  It is selling a service.

67.     Ms. Rosecrans also attempts to support her "interstate commerce" argument by citing 21 U.S.C. § 331(a)-(c), which sets forth certain "prohibited … acts."  But the FDA would not consider Rebotix to perform any of these prohibited acts.  This is made clear by the text of her cited authority, 21 U.S.C. § 331(a)-(c):

        "The following acts and the causing thereof are prohibited:

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

(b) The adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce.

(c) The receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise."[5]

68.    None of these prohibited acts apply here.

69.    First, all three prohibited acts are limited to a "food, drug, device, tobacco product, or cosmetic."  Ms. Rosecrans does not contend that the Interceptor board is a food, drug, tobacco product or cosmetic.  And it assuredly is not.  Moreover, as demonstrated above, the Interceptor board does not meet the FDA's definition of a device.  Accordingly, the FDA would not consider any of these prohibited acts to apply to Rebotix.

70.    Second, Ms. Rosecrans cites to, but ignores, authorities that specifically state that the 510(k) requirement only applies to the "introduction into interstate commerce for commercial distribution." FDCA § 510(k); 21 C.F.R. § 807.81(a) (emphasis added).[6]  And "commercial

---

[5] 21 U.S.C. § 331(a)-(c).

[6] Section 510(k) of the FDCA requires "[e]ach person who is required to register . . . and who proposes to begin introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery," to submit a notification to FDA.  FDCA § 510(k), 21 U.S.C. § 360(k) (emphasis added).  And 21 C.F.R. § 807.81(a) and (a)(2) state that: "[E]ach person who is required to register his establishment pursuant to § 807.20 must submit a premarket notification submission to [FDA] at least 90 days before he proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use which meets . . . the following criteria: . . . (2) [t]he device is

---

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

distribution" requires that the device be "held or offered for sale." See 21 CFR §807.3(b) (defining "commercial distribution" as "distribution of a device intended for human use which is held or offered for sale"). Accordingly, the 510(k) requirement does not apply to a person or company (like Rebotix) that is servicing a device, or shipping a device across state lines for purposes of servicing. It only applies to a person or company (unlike Rebotix) that is holding or offering that device for sale.

71.     Third, all three prohibited acts also require that the product be "adulterated or misbranded." 21 U.S.C. § 331(a)-(c). But Rebotix has not misbranded or adulterated anything.

72.     The FDA most commonly considers a device to be "misbranded" if it includes "false or misleading" labeling. FDA Guidance on Labeling Requirements – Misbranding (https://www.fda.gov/medical-devices/general-device-labeling-requirements/labeling-requirements-misbranding); 21 U.S.C. § 331(a). Ms. Rosecrans does not allege that Rebotix's Interceptor board includes any false or misleading labeling. Rosecrans, ¶¶103-105. Also, because the Interceptor board is simply an internal component of a device that is not visible to an end user (and not itself a medical device), any labeling concerns do not apply.

73.     In "most cases," the FDA considers a device to be "adulterated" if "it includes any filthy, putrid, or decomposed substance, or if it is prepared, packed, or held under unsanitary conditions." FDA General Controls for Medical Devices (https://www.fda.gov/medical-devices/regulatory-controls/general-controls-medical-devices). 21 U.S.C. § 351(a). Ms. Rosecrans does not allege that Rebotix's Interceptor board includes any such substance, nor does she allege that it is prepared under such conditions. Rosecrans, ¶¶103-105.

---

being introduced <u>into commercial distribution</u> for the first time by a person required to register…." 21 C.F.R. § 807.81(a) and (a)(2) (emphasis added).

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

74.     Instead, Ms. Rosecrans asserts that the Interceptor board is "misbranded" and "adulterated" because Rebotix has not received "requisite FDA 510(k) clearance or PMA approval."  Rosecrans, ¶¶103-105.  However, as demonstrated above, Rebotix was not required to seek clearance of approval from the FDA because the FDA does not regulate components of a medical device, and the Interceptor board is a component of a medical device.

75.     Moreover, the FDA only requires clearance prior to commercial distribution, and Rebotix is not in the business of commercially distributing Interceptor boards.  Notably, although Ms. Rosecrans ignores the "commercial distribution" requirement in her analysis of FDA regulations, she does acknowledge it the introductory section of her report setting forth an overview of FDA regulations.  *See* Rosecrans, ¶23 (acknowledging that "Class III devices require PMA review and approval prior to commercial distribution in the U.S."); ¶59 (acknowledging that Section 510(k) clearance is required prior to "the introduction or delivery for introduction into interstate commerce for commercial distribution of a device").

76.     Ms. Rosecrans also incorrectly states that "Rebotix acknowledged at one point that it needed a cleared 510(k) for the Interceptor board and submitted a 510(k) to FDA." Rosecrans, ¶52 (citing to submissions from Rebotix's predecessor company Rebotix LLC). There are several problems with Ms. Rosecrans' statement.

77.     First, Rebotix LLC did not submit a 510(k) for the Interceptor board.  It submitted a 510(k) for an EndoWrist that included an Interceptor board.  Because an Interceptor Board is a component of a medical device (and not itself a medical device), it would not have made sense for Rebotix LLC to submit a 510(k) for an Interceptor board.

78.     Second, as addressed in Exhibit 1, ¶45, n. 3, unlike Rebotix which does not commercially distribute serviced EndoWrists, Rebotix's predecessor company Rebotix LLC did

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

explore the possibility of commercial distribution of serviced EndoWrists and therefore sought 510(k) clearance in an abundance of caution.  Papit depo. tr., 210:9-211:22; Morrison depo. tr. 67:5-10; 75: 16-19 ("But it's important to remember that the business model at the time, you know, for Rebotix LLC was to do this -- this buying and servicing and reselling."); Conversation with Greg Fiegel.  After the business model changed and the decision was made not to sell serviced EndoWrists, the 510(k) was deemed unnecessary and Rebotix withdrew its application. Conversation with Greg Fiegel; Morrison depo. tr. 112:10-25 ("The Rebotix business model was … instead of buying, servicing, and reselling, it was a repair model of owner hospital sends in, Rebotix Repair performs a repair and returns it to that same -- that same hospital.  A repair -- a repair business model or repair company is not required to register with the FDA or receive 510(k) approval to the best of my knowledge.").

79.     Third, even though Rebotix LLC submitted a 510(k), it was not required to do so. As detailed in paragraphs 46 through 167 of Exhibit 1, it was not required to seek 510(k) approval because the repair and servicing process does not significantly change EndoWrists' intended use or their performance and safety specifications.

**B.      Rebotix is not a remanufacturer of a medical device that requires 510(k) clearance.**

80.     Ms. Rosecrans opines that "Rebotix was required to obtain 510(k) clearance as a remanufacturer" of its Rebotix-serviced EndoWrists.  Rosecrans at p. 48; Rosecrans, ¶¶107-138.

81.     Exhibit 1 of this Report sets forth the reasons why I disagree with Ms. Rosecrans. I address additional reasons why Ms. Rosecrans is wrong in this Section of my report.

82.     Ms. Rosecrans opines that "Rebotix causes a significant change in the intended use of EndoWrist instruments" by enabling them to be used beyond the maximum use restriction imposed by Intuitive.  Rosecrans, ¶108.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

83.   As set forth in paragraphs 52 through 71 of Exhibit 1, the intended use of EndoWrists does not include a maximum use restriction, and  Rebotix's services do not significantly change (or change at all) the intended use of Endowrists.

84.   Ms. Rosecrans does not include any opinions that Rebotix's services significantly change (or change at all) the intended use of EndoWrists when the correct definition of the EndoWrists' "intended use" is applied.  Instead, her opinions depend on a flawed definition of intended use.

85.   Ms. Rosecrans opines that "when looking at the Intuitive 510(k) submissions, it is clear that the intended use of the EndoWrist instrument included the usage of the instrument for a limited number of uses" and "Rebotix causes a significant change in the intended use of EndoWrist instruments."  Rosecrans, ¶108.

86.   Ms. Rosecrans asserts that the FDA refers to "[i]ntended use" as the "general purpose of the device or its function, which encompasses the indications for use."  Rosecrans, ¶109 (citing the same Guidelines I rely upon; see Exhibit 1, ¶52).  Ms. Rosecrans then asserts that the "intent is determined by [the manufacturers'] expressions or may be shown by the circumstances surrounding the distribution of the article."  *Id*.  I agree with this principle, which reflects the content of the regulations.  *See* 21 CFR 801.4 ("The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article").

87.   Ms. Rosecrans Ms. Rosecrans' application of this principle, however, flies in the face of accepted practice of the FDA.  The intended use of EndoWrists was long ago established and it cannot now be re-written to serve Intuitive's current purpose in this litigation.  When a company seeks authorization for a device by submitting a 510(k) application, the company is

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

expected to apply the guidance of the FDA and identify the intended use with an explicit expression in its 510(k) application.  When there is an explicit expression of intended use in a 510(k) application, the analysis of what constitutes the intended use ends there, unless the FDA determines that the description of intended use is inaccurate.

88.     When the intended use has been submitted to and accepted by the FDA, there is no need to re-construct a different definition of intended use (e.g. by importing statements made in different sections of the application) because the submission already includes the accepted definition of intended use.

89.     Ms. Rosecrans begins her analysis of intended use by looking to Intuitive's submissions to the FDA for its earliest EndoWrists.  Rosecrans, ¶111 (citing to the 510(k) summaries K965001 and K990144).  However, Ms. Rosecrans overlooks the critical section of these 510(k) summaries—the section where Intuitive actually expresses its definition of intended use:

> **Intended Use:**
>
> The Intuitive Surgical Endoscopic Instrument Control System is intended for precise and accurate control of selected tracoscopic and laparoscopic instruments including, rigid laparoscopes, blunt endoscopic dissectors, and endoscopic retractors, during thoracoscopic and laparoscopic surgical procedures.  It is intended to be used by trained professionals in operating room environments.

Intuitive-00691209 (definition of Intended Use in K96501 510(k)).

> **Intended Use:**
>
> The Intuitive Surgical™ Endoscopic Instrument Control System is intended to assist in the accurate control of Intuitive Surgical™ Endoscopic Instruments including, rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, clip appliers, endoscopic retractors, stabilizers, electrocautery and accessories during laparoscopic surgical procedures.  It is intended to be used by professionals in operating room environments.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

Intuitive-00691204 (definition of Intended Use in K990144 510(k).

90.    Similarly, in the PMA corresponding to K990144 510(k) application, Intuitive reiterated this intended use in its statement of the Indications for Use, and explicitly addressed the intended use of the EndoWrist instruments (as opposed to the overall da Vinci system with which they are used) in the second paragraph below:

> **3.2 INDICATIONS FOR USE**
>
> The Intuitive Surgical™ Endoscopic Instrument Control System (hereinafter referred to as the "da Vinci™ System") is intended to assist in the accurate control of Intuitive Surgical™ endoscopic instruments including: rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, endoscopic retractors, stabilizers, electrocautery and accessories during laparoscopic surgical procedures such as cholecystectomy or Nissen fundoplication.  It is intended for use by trained physicians in an operating room environment.
>
> Intuitive Surgical™ Endoscopic Instruments including scissors, scalpels, forceps/pick-ups, needle holders, and electrocautery are intended for endoscopic manipulation of tissue, including: grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery and suturing.

Intuitive-00474690. [7]

91.    If the intended use of the EndoWrists included a maximum use requirement, then Intuitive would have identified this requirement in its definition of intended use and the corresponding indications for use.  But it did not.

92.    Moreover, if the FDA disagreed with Intuitive's definition—for example, if the FDA maintained that the intended use and indications for use should reflect a maximum use requirement—then the FDA would have rejected Intuitive's definition and set forth a different definition that included a maximum use restriction.  But it did not.  Instead, when it authorized

---

[7] As Ms. Rosecrans observed (Rosecrans, ¶111, n. 138), Intuitive initially submitted a 510(k) for its EndoWrists (K990144) on January 19, 1999.  Intuitive-00692310. On May 19, 1999, the FDA informed Intuitive that it must file a PMA instead. Intuitive-00692185. The FDA then reversed course and converted the PMA back to that 510(k) and cleared the 510(k) on July 11, 2001.  Intuitive-00691205

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

Intuitive's EndoWrists, it set forth an explicit Indications for Use that mirrored Intuitive's own and did not include any maximum use restriction:

> **Indications for Use:**
>
> The Intuitive Surgical™ Endoscopic Instrument Control System (hereinafter referred to as the "da Vinci™ System") is intended to assist in the accurate control of Intuitive Surgical™ endoscopic instruments including: rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, endoscopic retractors, stabilizers, electrocautery and accessories during laparoscopic surgical procedures such as cholecystectomy or Nissen fundoplication. It is intended for use by trained physicians in an operating room environment.
>
> Intuitive Surgical™ Endoscopic Instruments including scissors, scalpels, forceps/pick-ups, needle holders, clip appliers, and electrocautery are intended for endoscopic manipulation of tissue, including: grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery and suturing.

Intuitive-00512047.

93.     Instead of looking to the defined intended use in Intuitive's own submissions to the FDA—i.e., the definition relied upon and agreed to by the FDA—Ms. Rosecrans attempts to change the intended use by importing statements from other sections of Intuitive's submissions, e.g. statements from "device descriptions, architectural specifications, device sketches, user instruction manuals, carton labels and life testing records."  Rosecrans, ¶111 (identifying, for example, references to "reposable" instruments or the "printer circuit board wired to connector 'pins' in the housing … [that] store the number of uses").  This attempt to re-define the intended use based on statements in different sections of the FDA submissions—after Intuitive and the FDA already agreed upon and established the intended use—is contrary to the accepted practice of the FDA.

94.     Moreover, the use counter plays no part in the actual intended use of the device. The intended use describes the general purpose or function of the device—i.e., what medical

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

purpose or function the device serves.  2021 FDA Guidance at 4.  As reflected in Intuitive's own statement of intended use, the general purpose or function of EndoWrists is the manipulation of tissue, including grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery and suturing.  How many times Intuitive believes a device should be used is not relevant to the general purpose or function.

95.     By analogy, the general purpose or function (i.e., the intended use) of running socks is to wick moisture and prevent blisters.  If the maker of the socks asserts that they could wear out after thirty uses (or if it only demonstrates that they wick moisture or prevent blister for 30 uses), that use limit does not become part of the intended function or purpose of the sock.  The intended use remains wicking moisture and preventing blisters.

96.     Similarly, design features (like the inclusion of a usage counter in the EndoWrist) are not part of the intended use when they do not impact the actual purpose or function of the device.  Applying the same analogy, if the socks were equipped with some sort of counter that counted the number of times the socks had been worn, that may be a nice design feature.  But it is not relevant to the general purpose or function of the socks.  The general purpose or function of the socks (i.e., the intended use) is still wicking moisture and preventing blisters.

97.     Moreover, that the maximum use restriction is not part of the intended use is confirmed by the analysis of Intuitive's own regulatory team.  As demonstrated in paragraphs 64 through 69 of Exhibit 1, Intuitive repeatedly considered the issue and repeatedly concluded that extending the number of lives for an EndoWrist does <u>not</u> involve any change to the EndoWrists' intended use.  *See, e.g.,* Intuitive-00552635 ("Extending the number of lives [of the EndoWrist] does not involve any changes to the intended use"); Intuitive-00552718 (same); Intuitive-

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

00552654 (same); Intuitive-00552666 (same); Johnson depo. tr. 73:11-14 ("Intuitive concluded that extending the number of lives does not involve any changes to the intended use").

98.     Ms. Rosecrans' attempt to reconcile her opinion with the contrary analysis of Intuitive's own regulatory team fails at every level.  See Rosecrans, ¶¶119-121.

99.     Ms. Rosecrans' sole explanation for how the regulatory team could have reached a contrary conclusion depends on a flawed analogy.  And the regulatory team rejected this flawed analogy.  She reasons that a change to the maximum use requirement "is analogous to a change in expiration dating" and a new 510(k) is "new 510(k) is likely not required" when an "expiration" is extended "to reflect newly recognized versions of consensus standards." Rosecrans, ¶¶119-120.

100.     First, Ms. Rosecrans fails to demonstrate how a change in expiration dating is analogous to a change in maximum use requirements for EndoWrists.  I am unaware of this analogy or a similar analogy ever having been presented to, much less accepted by, the FDA. And Ms. Rosecrans fails to cite any example of where it has.

101.     Second, the analogy is faulty.  As the FDA Guidance document cited by Ms. Rosecrans explains, "expiration dating" concerns the "date beyond which the product may cease to perform safely or effectively and beyond which the manufacturer states the product should not be used."  FDA Deciding When to Submit a 510(k) for a Change to an Existing Device: Guidance for Industry and Food and Drug Administration Staff (Oct. 25, 2017) at 74.  The focus of an expiration date is on the "date"—e.g., how long the device can remain "sterile" or its "shelf life," i.e., whether a device degrades due to the passage of time.  Id. at 27.  Nothing about EndoWrists' maximum use requirements concern the time a device can remain sterile or its shelf

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

life.  Intuitive purports to justify its maximum use requirements based on number of uses, not the passage of time.

102.     Third, Ms. Rosecrans' reasoning was expressly rejected by Intuitive's own regulatory team.  Ms. Rosecrans relies on the same Guidance that Intuitive's regulatory team relied upon in making their assessment.  *Compare* Rosecrans, ¶119, n. 150 (relying on "FDA Deciding When to Submit a 510(k) for a Change to an Existing Device: Guidance for Industry and Food and Drug Administration Staff (Oct. 25, 2017)" *with* Intuitive-00552716 (Intuitive Non-Filing Justification (NFJ) relying on "FDA Guidance: Deciding When to Submit a 510(k) for a Change to an Existing Device, Issued October 25, 2017").

103.     The Guidance provides a flow chart (with corresponding enumerated questions) for determining whether a change to a device requires 510(k) authorization.

104.     Ms. Rosecrans points to question "B4: Is there a change in packaging or expiration dating?"  See Rosecrans ¶119, n. 150 (citing Guidance at pages 27-28).  Applying her theory, this question is analogous to "Is there a change to the maximum number of uses?" Ms. Rosecrans suggests that the answer to this question is Yes.

105.     But when Intuitive's regulatory team considered the same question, they concluded that the answer was No.

| B.4. Change in packaging or expiration dating? | ☐ Yes | Go to next row |
|---|---|---|
| | ☒ No | Go to B.5 |

Intuitive-00552720.

106.     The regulatory team clearly recognized that increasing the maximum use restriction has nothing to do with a change in expiration dating.  In fact, they reached this

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

conclusion time and time again.  See Johnson depo., Ex. 14 (Non-Filing Justification) (answering

"No" to question B4 in a Non-Filing Justification that concluded that "Extending the number of

lives does not involve any changes to the [EndoWrist's] intended use"); Johnson depo., Ex. 15

(Non-Filing Justification) (same); Ex. 16 (Non-Filing Justification) (same); Ex. 17 (Non-Filing

Justification) (same); Ex. 18 (Non-Filing Justification) (same); Ex. 19 (Non-Filing Justification)

(same).

107.    Ms. Rosecrans' opinions on substantial equivalence also refute her assertion that

the EndoWrists' use counters (and the maximum number of uses they impose) are part of the

intended use of EndoWrists.  Ms. Rosecrans quotes the definition of "substantial equivalence"

from the Safe Medical Devices Act of 1990 (SMDA), which states in relevant part: "'For

purposes of determinations of substantial equivalence . . . , the term 'substantially equivalent' or

'substantial equivalence' means, with respect to a device being compared to a predicate device,

that the device has the same intended use as the predicate device ….]'"  Rosecrans, ¶79 (quoting

SMDA, § 12, Pub. L. No. 101-629, 104 Stat. 4511 (1990)) (emphasis added).  She also asserts

that to "be found 'substantially equivalent,' … any differences in the indications for use between

the device and the predicate must not constitute a new intended use (i.e., the device's intended

therapeutic/diagnostic effect) as determined by FDA review." Rosecrans, ¶42.

108.    Accordingly, under the definitions that Ms. Rosecrans provides, if a device is

"substantially equivalent" to a predicate device, this means that the device has the same intended

use as the predicate device.

109.    And Intuitive represented to the FDA that its EndoWrists are "substantially

equivalent" to (and thus have the same intended use as) as predicate devices with no use

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

limitations in their intended uses.  See Intuitive-00691208 (510(k) K965001); Intuitive-00691203 (510(k) K990144).

110.    For example, in 510(k) K990144, Intuitive represented that its EndoWrists are "substantially equivalent" to the "the Baxter Healthcare Endoscopic Instruments (K931340) and the Deknatel Snowden Pencer Diamond Touch Brand of Endoscopic Instruments (K960400)." Intuitive-00691203.  According to the authority relied upon by Ms. Rosecrans, this is a representation that the EndoWrists have the same intended use as these two predicate devices. Therefore, one could discern whether the intended use of EndoWrists has a maximum use limitation by looking to see whether the intended uses of these predicate devices have use limitations.

111.    As the FDA submissions for these predicate devices show, they do not include any such limitations:

- The "Intended Use" of Baxter Healthcare Endoscopic Instruments (K931340) is as follows: "The forceps, scissors, dissectors, and needle holders are intended for manipulating tissue (grasping and cutting) or holding suture needles during general surgical procedures being performed laparoscopically."  Intuitive-00512095 - Intuitive-00512099 (Baxter 510(k) K931340) at Intuitive-00512098.

- The "Intended Use" of the Deknatel Snowden Pencer Diamond Touch Brand of Endoscopic Instruments (K960400) is as follows: Intended Use - Various endoscopic surgical instruments for use in minimally invasive cardiac procedures including single bypass and multiple bypass (coronary artery bypass grafting (CABG) procedures), and saphenous vein harvesting" Intuitive-00512094 (Deknatel 510(k) K960400).

112.    Moreover, the FDA agreed with Intuitive that EndoWrists are substantially equivalent to (and thus have the same intended use) as these predicate devices that do not have use limitations.  See Intuitive-00691205 (FDA authorization letter for K990144) ("We have reviewed your Section 510(k) notification of intent to market the device referenced above and we have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices ….").

113.    Ms. Rosecrans' intended use opinions suffer another fatal flaw.  Her entire analysis is focused on demonstrating (incorrectly) that the number of uses as set forth in the use counter were part of the intended use for EndoWrists.  But even adopting her flawed premise, the intended use still would not be significantly changed by Rebotix's services.

114.    When Rebotix services an EndoWrist, it does not increase the use counter to a number beyond that at which it was originally set.  Conversation with Greg Fiegel.  Instead, it returns the counter to its original specification. *Id*. For example, EndoWrists typically have an original use limit of ten.  *Id*.  And EndoWrists are typically sent to Rebotix when they only have one use left on the counter.  *Id*.  Upon receiving the EndoWrist, Rebotix inspects and repairs the EndoWrist to ensure that it maintains the performance specifications of a new EndoWrist. Rebotix then likewise sets the counter to its original specification: 10 uses. It does not eliminate the use counter or set it to a different number than the original specifications. It returns the EndoWrist's use counter back to its original setting so it can continue to be used as intended: for the endoscopic manipulation of tissue. After the EndoWrist has been used for ten additional uses, it can then be returned to Rebotix for possible additional servicing.

## C.    Ms. Rosecrans' "FDA requirement" opinions are flawed.

115.    Ms. Rosecrans asserts that EndoWrists were only cleared as "limited use devices" because the FDA "required" that EndoWrists have use limits.  Rosecrans, ¶¶73-76 (relying on a

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

letter from the FDA seeking more information about use limits in Intuitive's submission).  Based on this purported requirement, Ms. Rosecrans opined that "a new 510(k) would be required" if any changes are made to the usage limits.   Rosecrans, ¶¶74-76, ¶112.

116.    First, as demonstrated in Section IV(D) below, the FDA only recognizes two categories of devices: single-use devices or reusable devices.  A device cannot be cleared as a limited use device because there is no third category—no limited device category—recognized by the FDA.  A device can be cleared as either a single-use device or a reusable device.  And EndoWrist were cleared as reusable devices.

117.    Second, whether a 510(k) is required is governed by 21 CFR § 807.81, which concerns commercial distribution, product safety, and intended use.  See Exhibit 1 generally.  It is not governed by the contents of a letter from the FDA requesting more information from an applicant.  And as demonstrated above and in Exhibit 1, an analysis of the requirements of 21 CFR § 807.81 clearly demonstrates that changing the maximum use limitations does not require a new 510(k) under 21 CFR § 807.81.

118.    Third, Ms. Rosecrans' assertion that the FDA "required" usage limits is incorrect. It is not the case that Intuitive sought FDA approval for EndoWrists without usage limits, and the FDA told Intuitive usage limits were necessary.  To the contrary, the decision to add a use counter with maximum use restrictions was made solely by Intuitive.  This is demonstrated both by Intuitive's overall practice of setting usage limits and the specific letter Ms. Rosecrans cites to support her incorrect assertion.

119.    Intuitive intended to impose maximum use restrictions on its EndoWrists (unlike predecessor laparoscopic devices) before it ever interacted with the FDA.  Indeed, Intuitive's original 1995 business plan highlighted this distinction from predecessor laparoscopic

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

instruments as "a major part of the recurring revenue" for Intuitive.  Intuitive-00595673 – Intuitive-00595694 (Intuitive Surgical Devices Business Overview) at 10.

120.    And evidence shows that, when setting the use limits for its EndoWrists, the limits were not driven by FDA requirements or product safety.  Instead, the limits were set by Intuitive's marketing team.  McGrogan depo. tr., 64:5-19; 65:19-25.  After the marketing team sets the target number of lives, Intuitive sets out to demonstrate that its EndoWrists can safely be used up to that target.  McGrogan depo. tr., 45:22 – 46:9.  Even though tests demonstrate that EndoWrists can be safely used for more uses, Intuitive nonetheless maintains the lower limits:

> 9     Q.  Well, there's certainly been instances
> 10   where the instrument being tested passed more lives
> 11   than were actually implemented; right?
> 12     A.  Yes.
> 13     Q.  Now, the instrument could have been set at
> 14   a higher number of lives; right?
> 15     A.  Yes.
> -McGrogan depo. tr., 59:9-15.
>
> 10     Q.  There's certainly some instances where the
> 11   number of lives implemented is different from the
> 12   number of lives proven; right?
> 13     A.  Yes.
> 14     Q.  And the number of lives implemented, those
> 16   are less than the lives proven; right?
> 16     A.  Yes, in some cases.
> -McGrogan depo tr., 62:10-16

121.    Accordingly, when Intuitive's submissions to the FDA reference usage limits, those usage limits were not required by the FDA.  Instead, they were established by Intuitive's marketing team.  And Intuitive provides validation showing that its EndoWrists can be safely used up to those limits determined by Intuitive's marketing team.

122.    Moreover, the FDA letter that Ms. Rosecrans relies upon (Intuitive-00481165 – Intuitive-00481166) and Intuitive's response to that letter (Intuitive-00481167 – Intuitive-

---

00481175) do not demonstrate that the FDA required usage limits. To the contrary, they further show that Intuitive came up with the usage limits and provided validation showing that its EndoWrists can be safely used up to those limits, without regard for whether they could be safely used beyond those limits.[8]

123.   The letter did not state that the FDA believed EndoWrists were unsafe without maximum use restrictions. The letter did not state that the FDA believed maximum use restrictions had anything to do with the intended use of the device. The FDA did not tell Intuitive that, in order to authorize its EndoWrists, Intuitive must add maximum use restrictions.

124.   Instead, the letter noted that <u>Intuitive</u> said the instruments are re-usable for a limited number of uses and requested further information about this statement. Intuitive-00481166 ("On page 12, you state that the instruments are re-usable for a limited number of uses. The instruments are programmed for a limited number of uses to ensure reliability and consistent performance, and have nonvolatile "add-only" memory that the system decrements after each use. Please specify the number of uses for each instrument and describe how the numbers were determined. Please provide data to support the claim.").

125.   And in response, Intuitive simply provided the same information discussed above—the maximum use requirements set by its marketing team (10 uses), and the testing showing that the EndoWrists can be safely used up to those limits. Intuitive explained that "Five samples (one of each grasper instrument type) were life/cycle tested for 10 procedures and

---

[8] Ms. Rosecrans also wrongly suggests that Intuitive did not receive clearance for EndoWrists until "only after Intuitive provided this rationale and data to support the programmed number of uses" in response to the referenced letter. Rosecrans, ¶82. Ms. Rosecrans ignores, however, that the referenced letter, which concerns 510(k) application K013416, was sent on December 12, 2001. This was five months after Intuitive's original EndoWrist 510(k) application (K990144) had already been approved by the FDA on July 11, 2001. Intuitive-00481165-Intuitive-00481166.

successfully passed performance evaluation at end of cycling." Intuitive-00481170. Intuitive's letter did not assert that the life/cycle tests determined that samples were not safe if used beyond that limit. *Id*.

126.     Similarly, if a maker of a traditional laparoscopic instrument seeking 510(k) authorization had told the FDA that its instruments are re-usable for a limited number of uses and programmed for a limited number of uses to ensure reliability and consistent performance, the FDA likely would have requested information about this use limit and how it was determined. And if the maker of the traditional instrument provided life-cycle information showing that the instruments were safe up to the designated number of uses, that would have likely ended the inquiry. But that in no way means that the FDA required the instruments to have a use counter or a maximum number of uses.

127.     In the case of manufacturers of traditional laparoscopic instruments, however, use limits were not part of their business model and they therefore did not include such limitations. They chose to leave the decision of when to repair or dispose of a laparoscopic instrument up to the hospitals and surgeons who use them. None of these business model decisions have anything to do with what the FDA requires.

> **D.     Ms. Rosecrans' opinions on a purported third category of "limited use devices" are flawed.**

128.     Ms. Rosecrans asserts that Rebotix has made three false statements to customers about the categories of devices that the FDA approves. Rosecrans, ¶¶117-118. She alleges that the following three statements from Rebotix are false:

- The FDA "approves 510(k) applications for either single-use devices or reusable devices," REBOTIX061186;

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

- "The decision to validate a reusable device for limited life would be at the sole discretion of the manufacturer," REBOTIX061186; and

- "Intuitive has assumed a category of approved medical device that does not exist within the FDA approval process; a limited reusable medical device (see Hospital Right to Repair attached). The FDA approves two categories and only two; single use medical device and reusable. Intuitive cannot have it both ways." REBOTIX061659.

129.    I disagree with Ms. Rosecrans.  These are all correct statements.  The FDA addresses two categories of devices: single-use devices and reusable devices.  The FDA's website is replete with guidance and articles addressing these two categories of devices.  For example:

130.    <u>Reusable devices</u>: "Reusable medical devices are devices that health care providers can reprocess and reuse on multiple patients. Examples of reusable medical devices include surgical forceps, endoscopes and stethoscopes. … Some examples of reusable medical devices are: Surgical instruments, such as clamps and forceps; Endoscopes, such as bronchoscopes, duodenoscopes, and colonoscopes, used to visualize areas inside the body; Accessories to endoscopes, such as graspers and scissors; Laparoscopic surgery accessories, such as arthroscopic shavers."  https://www.fda.gov/medical-devices/reprocessing-reusable-medical-devices/what-are-reusable-medical-devices.

131.    <u>Single-use devices</u>: "Single-use device: A single-use device, also referred to as a disposable device, intended for use on one patient during a single procedure. It is not intended to be reprocessed (cleaned, disinfected/sterilized) and used on another patient."

---

Expert Report of Lawrence Stevens                                                                                39

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

https://www.fda.gov/media/71405/download ("Labeling Recommendations for Single-Use

Devices Reprocessed by Third Parties and Hospitals; Final Guidance for Industry and FDA").

132.    The key distinguishing feature of "reusable devices," as opposed to "single-use"

devices is the need to reprocesses reusable devices.  "Reprocessing is defined as validated

processes used to render a medical device, which has been previously used or contaminated, fit

for a subsequent single use."  https://www.fda.gov/media/80265/download  (March 17, 2015,

Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling -

Guidance for Industry and Food and Drug Administration Staff (fda.gov) ("2015 Reprocessing

Guidance").

133.    Because of this key difference, FDA Guidance interprets 21 CFR 801.5 and 21

CFR 801.109 as requiring "adequate reprocessing instructions" in the "instructions for use" for

"reusable devices," but not for single-use devices.  2015 Reprocessing Guidance at 2 ("Because

instructions on how to adequately reprocess a reusable device are critical to ensuring that a

reusable device is appropriately prepared for its next lay use and that licensed practitioners can

use the device safely, we interpret adequate reprocessing instructions to be part of providing

adequate directions for use under 21 CFR 801.5 and a condition for exemption from adequate

directions for use under 21 CFR 801.109").

134.    In contrast to the foregoing, But the FDA does not have separate guidance or

regulations governing the purported third category of device (i.e., a limited use device) because

the FDA does not recognize this as a separate category of device.  Indeed, Ms. Rosecrans fails to

cite any FDA regulations or guidance concerning this purported third category of devices.

135.    EndoWrists are reusable devices (not single-use devices).  "A single-use device"

is "intended for use on one patient during a single procedure. It is not intended to be reprocessed

---

Expert Report of Lawrence Stevens                                                          40

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

(cleaned, disinfected/sterilized) and used on another patient."   https://www.fda.gov/media/ 71405/download ("Labeling Recommendations for Single-Use Devices Reprocessed by Third Parties and Hospitals; Final Guidance for Industry and FDA").  EndoWrists, however, are intended for use on multiple patients during multiple surgeries.  And they are intended to be cleaned, disinfected and sterilized, and then used on another patient.

136.    EndoWrists plainly fall into the category of "reusable devices" because they are "devices that health care providers can reprocess and reuse on multiple patients." https://www.fda.gov/medical-devices/reprocessing-reusable-medical-devices/what-are-reusable-medical-device.   Even the selected examples of "reusable devices" identified by the FDA align with EndoWrists: e.g., "Surgical instruments, such as clamps and forceps; Endoscopes … Accessories to endoscopes, such as graspers and scissors; Laparoscopic surgery accessories."  *Id.*

137.    Because EndoWrists are reusable devices (not single-use devices), they are subject to the regulations governing reusable devices.  EndoWrists are not subject to regulations for single use devices, nor are they subject to the non-existent regulations for the non-existent category of limited use devices.

138.    Moreover, because the FDA does not have a set of regulations specific for limited use devices, the FDA has no involvement in the decision to include a use counter to limit uses. The decision to include a use counter imposing maximum use restrictions and to submit testing information showing reliability only up to these use restrictions were therefore made solely by Intuitive (not by the FDA). Similarly, if traditional laparoscopic device manufacturers had made a different business decision and decided to include use counters on their devices and to validate their devices only up to the specified number of uses, they would have been free to do so from a regulatory perspective.  For purposes of market authorization and enforcement, the FDA would

have considered these devices to be reusable devices, regardless of any use counter feature.  And the FDA would apply the regulations applicable to reusable devices.

### E.   Ms. Rosecrans' opinions on Rebotix and BPI's interactions with the FDA are flawed.

139.   Ms. Rosecrans' identifies three interactions between Rebotix (or its distributors) and the FDA that she contends support her conclusion that Rebotix required 510(k) clearance.  Rosecrans, ¶¶122-130.  I address each in turn.

140.   (1) 510(k) submission of Rebotix LLC:  Ms. Rosecrans cites to the 510(k) application of Rebotix's predecessor Rebotix LLC.  Rosecrans, ¶¶123-124.  She asserts that "by filing this 510(k), Rebotix explicitly acknowledged that a 510(k) submission was necessary for any EndoWrist instrument 'repair' process that involves the insertion of the Interceptor board."  Rosecrans, ¶123.  There are two problems with this assertion.

141.   First, Rebotix LLC was not seeking 510(k) approval for the service that Rebotix provides.  That is, they were not seeking authorization to service EndoWrists that hospitals own while never taking ownership of the EndoWrists themselves.  Instead, Rebotix LLC was seeking 510(k) approval at a time when it had plans to market and sell (i.e., commercially distribute) EndoWrists that had been serviced.  Papit depo. Tr., 210:9-211:22; Conversation with Greg Fiegel.  While commercially distributing products can require 510(k) clearance, servicing devices owned by another entity (e.g., a hospital) cannot.  See Exhibit 1, Section 2.3.

142.   Second, simply because Rebotix LLC was pursuing 510(k) clearance does not mean that Rebotix LLC concluded it was "necessary" to do so.  And if Rebotix LLC had reached that conclusion, it would have been a wrong conclusion.  Rebotix LLC could have elected not to seek 510(k) approval because the serviced EndoWrists did not have significantly different intended use or safety and performance specifications than new EndoWrists from Intuitive.  See

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

Exhibit 1, Section 2.4.  Moreover, evidence demonstrates that Rebotix LLC viewed possession of 510(k) clearance as an asset with value, and at that time, Rebotix LLC was in talks to be purchased by Stryker.  Morrison depo. Tr. 105:2-8; 138:7-139:12; Conversation with Greg Fiegel.

143.     Because Rebotix LLC elected to seek 510(k) approval from the FDA, the FDA necessarily began the process of evaluating the sufficiency of the application.  Rebotix LLC withdrew the application midway through the process—because Rebotix LLC recognized a business model shift away from selling serviced EndoWrists would assuredly not require 510(k) authorization—the FDA therefore did not reach any ultimate conclusions on approval.  REBOTIX171076; Conversation with Greg Fiegel.

144.     That the FDA cited deficiencies with the application is not unusual, nor does it imply that the 510(k) authorization would not have ultimately been approved if pursued.  To the contrary, the overwhelming majority of 510(k) applications that are ultimately approved receive deficiency letters requesting further information as part of the back and forth process on the way to approval.  Indeed, in 2015 (the relevant timeframe here), when approximately 85% of 510(k) submissions were approved as "substantially equivalent," approximately 75% of 510(k) submissions included such deficiency requests seeking additional information.  https://www.fda.gov/media/120474/download at page 164.

145.     (2) Bob Overmars' communications with Cal Rabang:  Ms. Rosecrans relies on the communications between Bob Overmars of BPI and Cal Rabang of the FDA as support for her opinion that Rebotix's services require 510(k) clearance.  ¶¶125-128.  As set forth in paragraphs 180-186 of Exhibit 1, Ms. Rosecrans' reliance on these communications is unfounded.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

146.     Moreover, Ms. Rosecrans' statement that Rebotix should have followed up Mr. Rabang's statements under 21 C.F.R. § 10.75 (Rosecrans, ¶128) misses the mark.  The procedure set forth in this section of the Regulations is analogous to an appeal: it allows a person to request "agency review" by a "supervisor" of an FDA "decision" when that decision was made by an "FDA employee other than the Commissioner." 21 C.F.R. § 10.75.  But as detailed in Exhibit 1, ¶¶180-186, the FDA never made a decision here.  Instead, the statements were part of an "informal communication" where the most relevant information was not exchanged, and the statements did not constitute an "advisory opinion" or the "formal position of the FDA." *Id.*, BPI000335-BPI000336.

147.     (3) <u>Rebotix's communications with the FDA</u>: Ms. Rosecrans relies on Rebotix's communications with Jitrenda Virani and Dr. Je Hi An of the FDA as support for her opinion that Rebotix's services require 510(k) clearance.  ¶¶129-130.  As set forth in Section 2.5 of Exhibit 1 (¶¶168-177), these communications do not support Ms. Rosecrans' opinion.  To the contrary, these communications demonstrate that the FDA concluded that Rebotix's services do <u>not</u> require 510(k) clearance.  See Exhibit 1, Section 2.5.  I address here two additional opinions Ms. Rosecrans makes regarding these communications.

148.     Ms. Rosecrans first alleges that "Rebotix's response [to the FDA] was not forthright to the fact that its 'repair' service entailed the insertion of a new board into the EndoWrist instrument and the board would extend the life of the EndoWrist instrument as cleared by the FDA."  Rosecrans, ¶129.  Both parts of this allegation are unfounded.

149.     First, Rebotix was crystal clear that its repair service entailed the insertion of a new board into the EndoWrist.  When explaining its "repairing/servicing" process, Rebotix explained to the FDA: "There is a PCB inside of the instrument that contains a memory device

(off-the-shelf DS2505 IC). This memory device contains the usage counter. The DS2505, which no longer functions for the devices under repair, is replaced by our functional equivalent component." REBOTIX146949. Moreover, the FDA was already made aware that Rebotix added this new board to re-set the use count because Intuitive's letter, which is what prompted the FDA to reach out to Rebotix in the first place, referenced the board: "The EndoWrist Remanufacturers electrically connect a newly-installed third-party circuit board, which circumvents the original Life-Tracking Chip." Intuitive-00552747 (Curet Letter to FDA). Rebotix's response to the FDA confirmed the presence of the new board, making the FDA doubly aware.

150.    Second, Rebotix was crystal clear that it was extending the life of the EndoWrist beyond the limited designated by Intuitive. Again, Intuitive had already made the FDA aware of this feature. Intuitive-00552747 (Curet Letter to FDA) ("The EndoWrist Remanufacturers then leverage these modifications to add lives to the devices beyond the number validated by Intuitive and specified in the devices' labeling"). And Rebotix expressly confirmed this in its response to the FDA. The FDA's email to Rebotix asked: "Are you providing service that may extend the lives of devices beyond the original equipment manufacturer (OEM) stated limit," to which Rebotix responded "Yes." Indeed, if the FDA believed Rebotix's answers were ambiguous or unsatisfactory in any way, it could have (and would have) inquired further. But it did not.

151.    It has now been almost 18 months since Intuitive wrote the FDA, encouraging it to institute enforcement proceedings against Rebotix, and over 16 months since Rebotix provided the FDA with the information that the FDA requested. If the FDA had concluded that Rebotix's services violate FDA regulations, the FDA would have acted by now. From the FDA's silence, it is safe to conclude that, after learning more about Rebotix's services, the FDA

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

determined that Rebotix's services do not violate FDA regulations.  See Exhibit 1, ¶¶168, 175-177.

152.    Moreover, this opinion is also held by other FDA experts consulted in the Deutsche Bank report: it is "safe to believe that Intuitive has brought this to FDA's attention" and according to "our [FDA and regulatory] consultants, if the FDA doesn't act on this information within 3-6 months, it is unlikely the FDA ever will." Intuitive-00566064.

153.    In response, Ms. Rosecrans asserts that the 16 month period of silence after Rebotix provided the requested information to the FDA can be attributed to "shifting resources" and "priorities" due to the Covid-19 pandemic. Rosecrans, ¶130.  This assertion does not make sense.

154.    While the FDA has certainly devoted substantial resources to evaluating treatments and vaccines for Covid-19, the FDA has not shut down all other operations.  The FDA serves a critical function: it is "responsible for protecting the public health by ensuring the safety, efficacy, and security of human … drugs, biological products, and medical devices." https://www.fda.gov/about-fda/what-we-do.  Clearly, the FDA cannot ignore (and has not ignored) all other safety concerns to deal exclusively with covid.  If Rebotix were introducing non-compliant medical devices into surgeries, this is not something the FDA would ignore for 16 months while it dealt with Covid-19.

155.    Moreover, the two points of contact from the FDA that were assigned to follow-up with Rebotix, Jitendra Virani and Je Hi An, are both part of the "FDA's Robotic Assisted Surgery Team" from the "DHT4A: Division of General Surgery Devices."  REBOTIX171223; REBOTIX146953.  This is an entirely different division—staffed with individuals with entirely different expertise—than the teams and employees within the Office of Infectious Disease who

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

would be involved with efforts relating to Covid-19.  *See, e.g.*, https://www.fda.gov/about-fda/cdrh-offices/oht4-office-surgical-and-infection-control-devices-office-product-evaluation-and-quality ("The Division of Health Technology 4A [i.e., DHTA4A] within the Office of Health Technology 4 within CDRH's Office of Product Evaluation and Quality (OPEQ) is responsible for the total lifecycle (TPLC) review of general surgery devices.") (emphasis added).  Engineers from the surgery department like Jitendra Virani and Je Hi An would not be re-assigned to work on matters related to an infectious disease.  It is entirely unreasonable to attribute 16 months of silence from the FDA to Covid-19 when the relevant FDA department and employees have nothing to do with Covid-19.

156.    Ms. Rosecrans asserts that "Dr. Je Hi An's previous suggestion that a 510(k) was needed" is controlling absent some follow-up communication stating that Rebotix does not require a 510(k).  Rosecrans, ¶130 (referencing the following statement in Dr. Je Hi An's preliminary email seeking information from Rebotix: "[b]ased on [the information on Rebotix's website], we believe that a 510(k) is needed before you continue your operation").  Ms. Rosecrans' assertion is contrary to the well-known and accepted practice of the FDA.

157.    First, the statement Ms. Rosecrans cites was preliminary in nature, expressly premised on the very limited information available on Rebotix's website, and accompanied by a request for further information so a proper assessment could be made.  REBOTIX171223 (requesting "a description of [Rebotix's] activities (for example, inspection and recondition of instruments) and an explanation of why a 510(k) is not needed").  If the FDA had sufficient information to conclude whether Rebotix's services required a 510(k), it would not have requested additional information from Rebotix.

---

Expert Report of Lawrence Stevens                                                          47

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

158.    Second, as a former FDA Compliance Officer, I can state with certainty that it is not the FDA's practice to give positive compliance statements.  That is, when the FDA investigates whether a company's activities require FDA clearance, and concludes they do not, the FDA does not send a follow-up letter stating its conclusion.  Instead, the FDA simply declines to pursue the matter further.  And when the FDA declines to pursue the matter further, a person or entity can conclude that the FDA determined that FDA clearance is not required.  In fact, the FDA's silence is the only way a person or entity can know that the FDA is satisfied.

159.    This was confirmed by Intuitive's own Chief Medical Officer, who was the person who originally asked the FDA to investigate Rebotix:

> 18 Q. Some point after the FDA reached
> 19 out to Rebotix, asked for information about
> 20 Rebotix's services, received information from
> 21 Rebotix and then declined to pursue the matter
> 22 further, you would conclude that the FDA
> 23 determined Rebotix's services do not require
> 24 FDA clearance, correct?
> 25 MS. LENT: Object to the form.
> 1 THE WITNESS: Yes.

-Curet depo. tr., 192:18-193:1.

**F.    Ms. Rosecrans misconstrues Rebotix's position on substantial equivalence.**

160.    Ms. Rosecrans alleges that Rebotix has taken the position that, because Intuitive represented to the FDA in its 510(k) summary that EndoWrists are "substantially equivalent" to traditional laparoscopic instruments, that means EndoWrists are "identical" to traditional laparoscopic instruments.  Rosecrans, ¶¶77-80.  Based on my review of the materials, Ms. Rosecrans attacks a straw man.

161.    Neither the deposition testimony (Hamilton depo. Tr. 206:22-207:10) nor the passage from Rebotix's Complaint (¶38) cited by Ms. Rosecrans states that EndoWrists are "identical" to traditional laparoscopic instruments.  Nor are the conclusions in either based on

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

Intuitive's representation that they are "substantially equivalent."  In fact, neither the cited deposition testimony or the cited paragraph from the complaint even reference "substantial equivalence."[9]

162.    Moreover, Ms. Rosecrans ignores the statements in Intuitive's 510(k) where Intuitive explicitly uses the language "essentially identical."  For example, Intuitive told the FDA:

- "The Intuitive Surgical Instruments are essentially identical in terms of shape, size, function and tissue effect to the standard Class I and II endoscopic instruments cited."  Intuitive-00691204.

- "The working ends and elements of the Intuitive Surgical™ Endoscopic Instruments and Accessories are essentially identical in size and shape to the predicate devices referenced."  Intuitive-00691204

163.    Ms. Rosecrans also ignores the extensive reverse engineering and testing of EndoWrists that Rebotix has performed to verify its component parts and materials.  See Exhibit 1, ¶¶100-103.

---

[9] Paragraph 39 of the Complaint alleges: "Because EndoWrists and the traditional instruments are essentially the same, EndoWrists likewise can be used for hundreds of surgeries and last for years, if inspected and repaired as needed between surgeries. However, Intuitive takes active measures to preclude this."  Complaint, ¶38

Mr. Hamilton testified: "Q. So you think they are identical? A. I think with respect to the – the mechanical end, how the instruments work, the actual functioning of the instruments, clearly there is – the robot is turning the wheels. But in terms of everything – the steel, the cables, you know, the electrosurgical connections, yes, their 510(k)s that say that they're essentially identical. And they don't claim any new materials or anything. I mean, so – and we – we can – we don't count on that being identical. That's not an assumption that we make. But I believe it's essentially true because they said it was true and we confirmed with our analysis." Hamilton depo. Tr. 206:22-207:10

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

164.    In sum, Rebotix's conclusions about the similarities between EndoWrists and traditional laparoscopic devices are not based solely on statements of substantial equivalence.

**G.    Ms. Rosecrans' opinions on Rebotix's communications to customers are flawed.**

165.    Ms. Rosecrans asserts that Rebotix's "representations to customers" include inaccurate statements about the purported need for its services to receive FDA clearance. Rosecrans, ¶¶135-138.  And on this basis, she concludes that Rebotix did not "adequately investigate whether a 510(k) was needed."  Rosecrans, ¶135.  I disagree.

166.    I have reviewed the "representations" referenced by Ms. Rosecrans (and the documents that include the representations) and confirmed that they are all accurate and demonstrate that Rebotix performed a proper investigation, and reached the correct conclusion, on whether a 510(k) was needed.

167.    I address each of the three representations identified by Ms. Rosecrans in turn:

168.    <u>Representation (1)</u>: Rebotix stated, "[T]he FDA does not regulate, nor certify repairs."  REBOTIX063657.  This is correct.  As detailed in Exhibit 1, servicing (or repairing) medical devices, as opposed to remanufacturing medical devices, is not subject to FDA regulation.  See Exhibit 1, ¶¶49-50.  Indeed, elsewhere in her report, Ms. Rosecrans appears to recognize this distinction between servicing and remanufacturing.  Rosecrans, ¶¶66-69.

169.    <u>Representation (2)</u>: Rebotix stated, "FDA only classifies devices as single-use or reusable (multiple use). By these definitions the EndoWrist® instruments are classified as multiple-use instruments, servicing these instruments does not meet the definition of a reprocess."  REBOTIX063657.

---

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

170.    As detailed in Section IV(D) above, Rebotix is correct that the FDA classifies devices as either single use or reusable (multiple use) and that EndoWrists are classified as reusable instruments.

171.    Moreover, Rebotix is correct that its EndoWrist servicing does not meet the definition of a reprocess.  The FDA defines Reprocessing" as "Validated processes used to render a medical device, which has been previously used or contaminated, fit for a subsequent single use. These processes are designed to remove soil and contaminants by cleaning and to inactivate microorganisms by disinfection or sterilization."  2015 Reprocessing Guidance (https://www.fda.gov/media/80265/download) at 33.  Hospitals that own the EndoWrists, not Rebotix, are responsible for disinfecting and sterilizing Endowrists for subsequent use.  Gibson depo. tr., 35:20-21; REBOTIX063657; Conversation with Greg Fiegel.

172.    Representation (3): Rebotix stated, "At the Public Workshop – Medical Device Servicing and Remanufacturing hosted by the FDA in Washington, D.C., Dec. 10-11, 2018, the FDA rejected any requests to alter the longstanding right of hospitals to have reusable medical devices repaired at their discretion."  PREREB0060.

173.    Ms. Rosecrans does claim to have attended the workshop or to have any knowledge of what was said at the workshop.  I spoke with Greg Fiegel of Rebotix who did attend the workshop, and he confirmed that the FDA representatives confirmed that the FDA had considered, and rejected, suggestions for new regulations extending FDA relating to the servicing of medical devices.  Conversation with Greg Fiegel.

174.    Moreover, this is further confirmed by (a) the FDA's summary of the workshop on its webpage and (b) the May 17, 2018, FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices that is referenced in the summary.

Expert Report of Lawrence Stevens                                                                51

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

(a) The summary of the workshop on the FDA webpage states:  "Based on the available information, the FDA stated the current available evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing of medical devices that would justify imposing burdensome regulatory requirements at this time."[10]

(b) The May 17, 2018, FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, states: [11]

> - The currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing, including by third party servicers, of medical devices that would justify imposing additional/different, burdensome regulatory requirements at this time;
> - Rather, the objective evidence indicates that many OEMs and third party entities provide high quality, safe, and effective servicing of medical devices;
> - A majority of comments, complaints, and adverse event reports alleging that inadequate "servicing" caused or contributed to clinical adverse events and deaths actually pertain to "remanufacturing" and not "servicing"; and
> - The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system.

175.     In sum, contrary to the assertions of Ms. Rosecrans, Rebotix's determination that its services did not require a 510(k) and its statements to customers explaining this determination are consistent with FDA guidance and regulations.

**H.     Ms. Rosecrans' opinions on "directions for use" are flawed.**

176.     Ms. Rosecrans asserts that Intuitive must include "directions for use" that inform users of EndoWrists of the limited use requirements on the EndoWrists' labeling to "to comply with applicable labeling requirements."  Rosecrans, ¶¶83-87.  Ms. Rosecrans relies on FDA Guidance on Reuse Life and ISO17664 for the proposition that, if a "device is limited by a

---

[10] https://wayback.archive-it.org/7993/20201222125933/https://www.fda.gov/medical-devices/workshops-conferences-medical-devices/public-workshop-medical-device-servicing-and-remanufacturing-activities-december-10-11-2018-12102018.

[11] https://wayback.archive-it.org/7993/20201224084841/https://www.fda.gov/media/113431/download.

HIGHLY CONFIDENTIAL INFORMATION - ATTORNEYS' EYES ONLY

number of processing cycles," e.g., an "end of life," then the labeling or some other mechanism should inform the user how many times the device can be used. *Id*. Ms. Rosecrans suggests (with no support) that Rebotix must also comply with these labeling requirements, and fails to do so. *Id*. This does not make sense.

177.    First, Ms. Rosecrans entire assertion is premised on Intuitive's maximum use restrictions setting forth a limit on the number of processing cycles EndoWrists can withstand. As demonstrated above, that is not how Intuitive determines its maximum use restrictions.

178.    Second, Rebotix does not alter the labeling or directions for use of EndoWrists, and it restores EndoWrists for their original purpose, consistent with that labeling.  If an EndoWrist's label says it should be used ten times, Rebotix restores that EndoWrist to its original condition before it ships it to a hospital so that, upon receipt from Rebotix after servicing, the EndoWrist can safely and reliably be used ten times, consistent with its labeling. Rebotix similarly restores the use count mechanism, with its Interceptor, so the hospital can keep track of these ten uses after it receives the serviced EndoWrist back from Rebotix.  Moreover, Rebotix has performed substantial extended life feasibility testing confirming that the additional processing cycles for the additional uses after servicing will not affect the performance or reliability of the EndoWrist.  See Exhibit 1, ¶¶106-108.

179.    If called upon to testify at trial, I expect to prepare additional demonstrative materials reflecting the opinions set forth in my report.

Executed on August 30, 2021,

J. Lawrence Stevens

Exhibit 1 to Stevens Report

(Sharlin Report)

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REBOTIX REPAIR LLC,

        Plaintiff,

        v.

INTUITIVE SURGICAL, INC.,

        Defendant.

Case No.:  8:20-cv-02274

HIGHLY CONFIDENTIAL
INFORMATION - ATTORNEYS'
EYES ONLY

**<u>Expert Report by Joshua S. Sharlin, Ph. D.</u>**

## Table of Contents

Summary of Opinions ..........................................................................................1

Section 1 – About Dr. Sharlin...........................................................................1

    1.1  Introduction...........................................................................................1

    1.2 Qualifications and Experience. ............................................................2

    1.3. Materials considered in forming opinions. ..........................................4

    1.4 Prior expert testimony.........................................................................5

    1.5  Compensation. ....................................................................................6

Section 2 – Rebotix was not required to seek approval from the FDA (via a 510(k) submission or otherwise) for the services Rebotix performs on EndoWrists...........6

    2.1    Overview of the FDA.......................................................................6

    2.2    History of the 510(k) review process and the development of substantial equivalence. ................................................................8

    2.3    Rebotix was not required to submit a 510(k) because Rebotix has not introduced serviced EndoWrists into commerce. ...........................10

    2.4    Rebotix was not required to submit a 510(k) because Rebotix does not significantly change EndoWrists' intended use or EndoWrists' performance and safety specifications. ...............................................15

        2.4.1    Rebotix's services do not significantly change the intended use of EndoWrists. ...................................................................18

        2.4.2    Rebotix's services do not significantly change the safety and performance specifications of EndoWrists. ......................................24

            2.4.2.1 Intuitive's allegations of a significant effect on effectiveness and safety. ......................................................................................26

            2.4.2.2 No evidence demonstrating that Rebotix's services significantly increase the likelihood of the failures alleged by Intuitive...........27

                2.4.2.2.1  No tests demonstrate that Rebotix-serviced EndoWrists introduce or increase the likelihood of the failures alleged by Intuitive.........................................28

i

2.4.2.2.2  Rebotix has performed substantial testing to ensure that Rebotix-serviced EndoWrists do not introduce or increase the likelihood of the failures alleged by Intuitive. .......................................................... 33

2.4.2.2.3 Hospitals and Intuitive acknowledge that the EndoWrist failures that Intuitive falsely attributes to Rebotix are commonplace in EndoWrists provided directly from Intuitive that have not been serviced by Rebotix. ....................................................................... 39

2.4.2.2.4  The failures alleged by Intuitive are commonplace in analogous laparoscopic instruments that are routinely repaired. ............................ 43

2.4.2.3  No evidence that Rebotix's services significantly affect product safety. ........................................................................ 49

2.5     The FDA already considered whether Rebotix's services require 510(k) approval, and the FDA took no action. .................................................... 64

2.6 Additional opinions........................................................................ 67

    2.6.1   Intuitive's reliance on Cal Rabang's email to support its allegation is unfounded. ............................................................ 67

    2.6.2.  The process of adding the Interceptor during servicing does not require Rebotix to submit a 510(k). .................................................... 69

2.7     Other FDA experts, and Intuitive's own analysis of FDA requirements, agree with my opinion that FDA clearance is not required for refurbished EndoWrists. .................................................. 71

**Summary of Opinions**

1.      I have been asked to evaluate Intuitive's assertion that the service performed by Rebotix on EndoWrists requires 510(k) approval from the FDA, as well as address several related issues.  In my opinion, Intuitive's assertion is unfounded.  Rebotix's service does not require 510(k) approval from the FDA for three reasons.

- First, 510(k) approval is not required when devices are not introduced into commercial distribution, and Rebotix has not introduced serviced EndoWrists into commercial distribution.  Rebotix is a service provider, and servicing is not regulated by the FDA.

- Second, 510(k) approval is not required when an entity does not significantly change the device's performance or safety specifications, or its intended use.  And Rebotix has not significantly changed the device's performance or safety specifications, or intended use.

- Third, at Intuitive's request, the FDA investigated Rebotix's services to determine whether a 510(k) was required.  Because the FDA took no action, it can be concluded the agency determined that a 510(k) was not required.

**Section 1 – About Dr. Sharlin.**

**1.1  Introduction.**

2.      I am Joshua S. Sharlin, Ph.D. I have been retained by the firm of Dovel & Luner, LLP on behalf of the Plaintiff, Rebotix Repair LLC ("Rebotix"), to provide my expert opinions regarding the allegations made by Defendant Intuitive Surgical Inc. ("Intuitive") that the services Rebotix performs on EndoWrists require FDA approval, specifically a cleared 510(k) submission from the FDA, as well as other topics related to this allegation.  I have written this report to

1

summarize the subject matter and opinions to which I expect to testify.

**1.2 Qualifications and Experience.**

3.      The opinions in this report are based on my education, training, and experience

working as an FDA reviewer and as a consultant to FDA-regulated industries for more than 20

years.  I worked at the FDA from 1992 to 1994 as a statistical reviewer and a primary reviewer in

the Center for Veterinary Medicine.  For 27 years, I have worked as a consultant to FDA-

regulated companies and applied my hands-on experience to all aspects of regulatory compliance

regarding clinical trials, including regulatory strategy, study design, trial execution, data

collection, database construction, statistical analysis, interpretation of results, preparing drug and

device submissions, and finally conducting an FDA review.

4.      I have traveled to ten countries (England, France, Sweden, Germany, Belgium,

Switzerland, Italy, Hungary, India, and China) to provide FDA regulatory support to companies

in those locations.

5.      I received a B.S. degree in zoology from the University of Iowa in 1972, an M.S.

degree in physiology from the University of Maryland in 1976 and a Ph.D. in physiology from

the University of Georgia in 1981.  My Ph.D. thesis investigated the effects of aflatoxin, a

naturally occurring carcinogen in the food supply, on reproduction in animals.

6.      In 2006, I was one of two former FDA reviewers hired by Booze Allen to work on

a 6-month contract sourced by the FDA to evaluate over 125 New Drug Application submissions

to determine why some companies were more efficient than others in preparing drug submissions

and why some companies were more proficient than others in working with the FDA to expedite

the drug approval process.

7.      I recently finished a 3-year contract with the Department of Defense (DOD), under

which I advised senior DOD leadership on the most effective regulatory strategies to obtain FDA

approval in 18 projects involving drugs, biologics, and medical devices intended as defenses against biological and chemical weapons. This work included critiquing and improving the regulatory strategy for several vaccines against viruses including Venezuelan equine encephalitis virus, Filovirus, and Adeno Associated virus.

8.      I have audited FDA-regulated companies for Good Clinical Practice (GCP), Good Laboratory Practice (GLP), and Good Manufacturing Practice (GMP) compliance.

9.      I have assisted FDA-regulated drug, biologic, and medical device companies with a range of FDA-related services to support their submissions.  For example, I have audited CROs, sponsors, software vendors and clinical sites for GCP compliance and prepared them for outside audits by either the FDA or potential customers.

10.     I am an expert in writing instructions and procedures for an FDA-regulated environment.  I have written over 40 standard operating procedures (SOPs) on a wide variety of FDA-related technical and regulatory topics.  I have audited companies, CROs and vendors for SOP compliance, and have identified and closed compliance gaps in written instructions and procedures.

11.     I have written or reviewed 14, 510(k) submissions and have attended meetings at the FDA to discuss device submissions and present results of medical device studies.

12.     I have trained tens of thousands of employees from hundreds of FDA-regulated companies on 45 technical and regulatory topics which I developed, including regulatory compliance, drug labeling, and drug safety reporting.

13.     Medical device-related classes I have developed and taught include:

- Writing SOPs Part I: An Introduction

- What Needs to Be in a Product Submission: An FDA Reviewer's Perspective

3

- Survey of FDA Reviewer Training: Understanding Reviewer Strategies, Tools, & Techniques for Approving Your Paper or Electronic Submission

- Good Review Management: FDA's Internal Standards and Expectations of Industry

- Annual Reports: SOPs for Developing Content That Meets FDA Requirements

- Avoiding Statistical Errors in Clinical Trials: Preparing for FDA Review

- New Trends in Clinical Trial Design That Encourage FDA Approval

- Adaptive Design: Why is FDA so Enthusiastic?

- 510(k)s: The 70 Changes FDA Wants

- Annual Reports: SOPs for Developing Content That Meets FDA Criteria

- Adverse Event Reporting SOPs for Medical Devices

14.    My classes on FDA regulatory and technical topics, which have been attended by staff from Intuitive, include:

- What Needs to Be in a Product Submission: An FDA Reviewer's Perspective

- Internal Standards for FDA Reviewers

- Building a Better 510(k): Suggestions from Inside FDA

- Survey of FDA Reviewer Training: Understanding Reviewer Strategies, Tools, & Techniques

- 510(k)s: 70 Changes FDA Wants

**1.3. Materials considered in forming opinions.**

15.    Within this report I cite materials I have considered and relied upon in forming my opinions.  I also identify those materials in Exhibit 1 (which is intended to be inclusive of what is cited in the body of the report although it is possible that I inadvertently omitted certain materials cited in my report).  The citations in this report are provided as examples of evidence I have reviewed and that support my opinions and the basis for my opinions.  They do not represent the only materials considered or relied upon in reaching my conclusions – this document would be

4

unduly long if I were to cite every such piece of evidence in each place it played a role in my analysis.

16.     If called upon to testify, I expect to utilize demonstrative exhibits relating to the opinions disclosed in this report, and the documents and information that I have reviewed or considered in preparing my report.

17.     If new information becomes known to me, I may modify the content of this report and/or my opinions.

**1.4 Prior expert testimony.**

18.     In the past four years, I have testified as an expert witness at trial or by deposition in the following cases:

- Case 24-C-14-002465 in circuit court of Baltimore City.  Deposed on FDA medical device regulatory and submission issues associated with a failed hip implant.

- Case 6:14-cv-01953-ORL28-TBS in United States District Court, Middle District of Florida, Orlando Division.  Deposed on FDA medical device regulatory and submission issues associated with a failed hip implant

- Case 46-1-2014-0319.  State of New York Supreme Court.  Testified on the FDA drug approval process and the predictability of FDA's decisions regarding approval of a new drug.

- Case 07-15624 (14) in the Circuit Court of the 17th Judicial Circuit, In and For Broward County, Florida.  Deposed on the role of an Institutional Review Board (IRB) and the responsibilities of IRB members regarding conduct of a clinical trial and the safety of clinical trial subjects.

- Case 16-2362 in the US District Court, Eastern District of Pennsylvania.  Deposed

on the regulatory responsibilities of drug manufacturers to provide Medication

Guides to patients when they receive a prescription.

- Case 3:16-cv-536-JE in US District Court for the District of Oregon.  Deposed on

  the regulatory issues involving patent infringement of a medical device.

- Case 2017-0459-JRS in the Court of the Chancery of the State of Delaware.

  Deposed on regulatory issues regarding meeting milestones in a merger

  agreement between a small biotech company and a large pharmaceutical company

- Case No 17 CV 5184.  U.S. District Court of Minnesota.  Deposed on regulatory

  issues regarding a home medical device that caused a death.

- Case No 37-2018-00040727-CU-BC-CTL, Superior Court of the State of

  California.  Testified on the regulatory issues associated with a theft of trade

  secrets case.

### 1.5  Compensation.

19.    I am being compensated for my time in this matter at the rate of $475 per hour, and

my compensation is not dependent on the outcome of this litigation.

**Section 2 – Rebotix was not required to seek approval from the FDA (via a 510(k) submission or otherwise) for the services Rebotix performs on EndoWrists.**

### 2.1    Overview of the FDA.

20.    The mission of the FDA is to protect public health by ensuring the safety and

efficacy of human and animal drugs, biological products (e.g., vaccines), and medical devices.

The agency also regulates food and cosmetics.

21.    Three laws that have had a significant impact on the FDA's activities and actions

are:

- The Federal Food, Drug, and Cosmetic Act of 1938, which established the

6

requirement for companies to present evidence for drug safety.

- The Kefauver-Harris Amendments of 1962, which were motivated by the thalidomide tragedy and strengthened drug safety rules and established the requirement for drugs to be effective.

- The Medical Device Amendments of 1976, which applied safety and effectiveness requirements for new medical devices.

22.    There are six centers at the FDA that are mainly responsible for reviewing products.

- Center for Biologics Evaluation and Research;

- Center for Devices and Radiological Health;

- Center for Drug Evaluation and Research;

- Center for Food Safety & Applied Nutrition;

- Center for Tobacco Products; and,

- Center for Veterinary Medicine

23.    The Center for Devices and Radiological Health (CDRH) regulates firms that manufacture, repackage, relabel, and/or import medical devices sold in the United States.

24.    The CDRH organizational structure is subject to change.

- Office of Commissioner

  o   Center for Devices and Radiological Health

  o   Office of Product Evaluation and Quality

25.    The Office of Product Evaluation and Quality and the underlying organizational units are responsible for the following programs that evaluate or clear medical devices for clinical investigations or marketing.

- Premarket Notification (510(k));

- Premarket Approval Applications (PMA);

- Investigational Device Exemptions (IDE);

- Humanitarian Device Exemption (HDE);

- De Novo program; and,

- Product Development Protocol program.

**2.2    History of the 510(k) review process and the development of substantial equivalence.**

26.    While an FDA drug submission must include data and information that shows the drug is safe and effective, most medical devices are approved through the 510(k) process which has a standard of substantial equivalence.

27.    The original FDA statute, the Pure Food and Drug Act of 1906, did not cover medical devices. The replacement of the 1906 law, the Federal Food, Drug, and Cosmetic Act of 1938 specified the same treatment for medical devices and drugs.

28.    The Medical Device Amendments of 1976, passed by Congress on May 28, 1976, established the regulatory framework FDA applies today to medical devices.  It created three classes of medical devices (I, II, and II), added section 510(k), and introduced the term substantially equivalent to the Federal Food, Drug, and Cosmetic Act of 1938.

<table>
<tr><td>
Section 510(k)<br>
Reprinted in this box is section 510(k) of the Federal Food, Drug, and<br>
Cosmetic Act of 1938 added by the Medical Device Amendments of 1976<br><br>
Each person who is required to register under this section and who proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery, report to [FDA]…<br>
(1) the class in which the device is classified under section 513 or if such person determines that the device is not classified under such section, a
</td></tr>
</table>

8

statement of that determination and the basis for such person's determination that the device is or is not so classified, and

(2) action taken by such person to comply with requirements under section 514 or 515 which are applicable to the device.

---

First use of the term substantially equivalent:

Reprinted in this box is section 513(f)(1) of the Federal Food, Drug, and Cosmetic Act of 1938 added by the Medical Device Amendments of 1976

Any device intended for human use which was not introduced or delivered for introduction into interstate commerce for commercial distribution before the date of enactment of this section is classified in class III unless —

(A) the device —

(i) is within a type of device (I) which was introduced or delivered for introduction into interstate commerce for commercial distribution before such date and which is to be classified pursuant to subsection (b), or (II) which was not so introduced or delivered before such date and has been classified in class I or II, and

(ii) is <u>substantially equivalent</u> to another device within such type….

---

29.     The 510(k) clearance process was not designed in 1976 to evaluate the safety and effectiveness of new medical devices but only to assess their similarity to pre-amendment devices.

30.     When the 510(k) approval process was created in 1976 with the passage of the Medical Device Amendments Act, it was intended to serve as a short-term solution for the review and approval of medical devices.  Because the 510(k) process was used for a longer period and for a greater variety of medical devices than originally intended, its consistent use became problematic. In 1986, the FDA published a guidance (Guidance on the CDRH Premarket Notification Review Program 6/30/86 (K86-3) that explained how to determine substantial equivalence in a 510(k) review.  The K86-3 guidance from 1986 identified three questions to answer when determining if a new device is substantially equivalent to its predicate device:

- Does the new device have the same intended use as a predicate device?

- Does the new device have the same technological characteristics, i.e., same

materials, design, energy source, etc.?

- If it has new technological characteristics, could they affect safety or effectiveness?

31.     In November 1990 with the passage of the Safe Medical Devices Act of 1990, substantial equivalence was given a statutory definition.

---

Statutory definition of the term "substantially equivalent":
Reprinted in this box is section 513(i)(1)(A) of the Federal Food, Drug, and Cosmetic Act of 1938 added by the Safe Medical Devices Act of 1990

For purposes of determinations of substantial equivalence under subsection (f) and section 520(l), the term "substantially equivalent" or "substantial equivalence" means, with respect to a device being compared to a predicate device, that the device has the same intended use as the predicate device and that [FDA] by order has found that the device—

(i) has the same technological characteristics as the predicate device, or

(ii) (I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device contains information, including appropriate clinical or scientific data if deemed necessary by [FDA] or a person accredited under section 523, that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and effectiveness than the predicate device.

---

32.     In the sections below, I set forth several reasons why Rebotix was not required to seek FDA clearance by submitting a 510(k) for its EndoWrist services.

### 2.3     Rebotix was not required to submit a 510(k) because Rebotix has not introduced serviced EndoWrists into commerce.

33.     Rebotix was not required to submit a 510(k) premarket notification for its serviced EndoWrists to the FDA because the evidence demonstrates that it has not introduced or reintroduced its serviced EndoWrists into commercial distribution.  Instead, the healthcare establishments (i.e., the hospitals) own the EndoWrists at all times, and Rebotix performs a service for those hospitals.

34.     The FDA recognizes a distinction between providing services on instruments that a

10

hospital already owns and selling new serviced instruments to the hospital.  When a hospital

maintains ownership of the device, and a third party performs a service on that device, 510(k)

approval is not required.  This is made explicit in the controlling FDA regulations and is

commonly understood among FDA consultants and experts.

35.     The regulatory criteria for when a 510(k) premarket notification should be

submitted is set forth in 21 CFR § 807.81.  As relevant here, 21 CFR 807.81(a) sets forth the

criteria for when a party must submit a premarket notification:

§ 807.81 When a premarket notification submission is required.

(a) Except as provided in paragraph (b) of this section, each person who is required to register his establishment pursuant to § 807.20 must submit a premarket notification submission to the Food and Drug Administration at least 90 days before he proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use which meets any of the following criteria:

(1) The device is **being introduced into commercial distribution** for the first time; that is, the device is not of the same type as, or is not substantially equivalent to, (i) a device in commercial distribution before May 28, 1976, or (ii) a device introduced for commercial distribution after May 28, 1976, that has subsequently been reclassified into class I or II.

(2) The device **is being introduced into commercial distribution** for the first time by a person required to register, whether or not the device meets the criteria in paragraph (a)(1) of this section.

(3) The device is one that the person currently **has in commercial distribution or is reintroducing into commercial distribution**, but that is about to be significantly changed or modified in design, components, method of manufacture, or intended use. The following constitute significant changes or modifications that require a premarket notification:

(i) A change or modification in the device that could significantly affect the safety or effectiveness of the device, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process.

(ii) A major change or modification in the intended use of the device.

36.     Accordingly, under 21 CFR § 807.81, a person is required to submit a 510(k)

premarket notification only when the "device is being introduced into commercial distribution"

or when the "device is one that the person currently has in commercial distribution or is reintroducing into commercial distribution."

37.     21 CFR §807.3(b) defines "commercial distribution" as "distribution of a device intended for human use which is held or offered for sale."[1]

38.     Accordingly, if a company purchased EndoWrists, performed services on those EndoWrists, then held or offered those serviced EndoWrists for sale, then that company would be introducing or reintroducing EndoWrists for commercial distribution.  However, if hospitals maintain ownership of their EndoWrists and a company services the EndoWrists that the hospitals own, then that company is never holding or offering EndoWrists for sale.  It is therefore not introducing or reintroducing EndoWrists into commercial distribution.

39.     Instead, the hospital is servicing instruments it already owns.  And the FDA is clear that "Healthcare establishments may directly employ professionals (biomedical and clinical

---

[1] The complete definition, as set forth in 21 CFR §807.3(b), is as follows:

(b) Commercial distribution means any distribution of a device intended for human use which is held or offered for sale but does not include the following:

(1) Internal or interplant transfer of a device between establishments within the same parent, subsidiary, and/or affiliate company;

(2) Any distribution of a device intended for human use which has in effect an approved exemption for investigational use under section 520(g) of the act and part 812 of this chapter;

(3) Any distribution of a device, before the effective date of part 812 of this chapter, that was not introduced or delivered for introduction into interstate commerce for commercial distribution before May 28, 1976, and that is classified into class III under section 513(f) of the act: Provided, That the device is intended solely for investigational use, and under section 501(f)(2)(A) of the act the device is not required to have an approved premarket approval application as provided in section 515 of the act; or

(4) For foreign establishments, the distribution of any device that is neither imported nor offered for import into the United States."

engineers, healthcare technology management professionals, etc.) that perform servicing

activities, including maintenance and repair."  FDA Report on the Quality, Safety, and

Effectiveness of Servicing of Medical Device, May 2018, pages 1-2.

(https://www.fda.gov/media/113431/download).

40.    This same distinction was deemed "important" in an analyst report, discussed

below in Section 2.7, that relied on input from several FDA/regulatory experts.  The report

states: "Importantly, the serviced instruments are always shipped back to the original hospital

(i.e., no reselling) and the instruments are shipped back to the hospital only after verification that

there has been no deviation from the original 'performance or safety specifications.'"  Intuitive-

00566060 (emphasis added).  "[O]ur takeaway from these consultants is that 510(k) clearance

does not seem to be required for independent service organizations refurbishing used da Vinci

instruments so long as they are returned to that same hospital and not re-sold to other centers."

Intuitive-00566057.

41.    The report further states: "FDA consultant underscored that ownership is a key

determinant of regulatory requirements and FDA oversight broadly.  … When a hospital

purchases an instrument from Intuitive, the hospital takes ownership of the device. … So when

the hospital sends the instrument to a third party like Restore Robotics for refurbishment, the

third party is … acting as a contractor providing a service for the hospital. … That is, ownership

of the device never actually changes hands."  Intuitive-00566061.  "Another FDA expert we

consulted fully concurred, noting that once an instrument is purchased it becomes property of the

hospital which is free to 'do whatever it wants with it."  Intuitive-00566061.  "All of our

consultants emphasized that a used instrument that is sent to a third party for repair must be

shipped back only to that same hospital such that there is no change in ownership.  We

13

confirmed with both hospitals and Restore that such is indeed the case here."[2]  Intuitive-00566061.

42.     The evidence in this case demonstrates that Rebotix does not sell serviced EndoWrists.  Ownership of the device never changes hands.  See Papit depo. tr., 153:17-154:2; conversation with Greg Feigel of Rebotix ("Feigel conversation"); REBOTIX068469-REBOTIX068470 (Rebotix marketing document entitled, "Hospital Right to Repair," discussing Rebotix's service of "repairing instruments which [hospitals] purchased and owned").  Hospitals maintain ownership of EndoWrists at all times.  *Id*.  Rebotix services the EndoWrists that a hospital owns and then ships back the serviced EndoWrists to the same hospital.  *Id*.; Gibson depo. tr. 66:25-67:7 ("The repair process is you send us serial number, for example, 123, and we ship you back serial number 123 after the repair process has been performed").  Rebotix is therefore not introducing or reintroducing those EndoWrists into commercial distribution.  And there is thus no requirement that Rebotix seek FDA clearance.

43.     Moreover, the definition of a 510(k) provided by the FDA further demonstrates why there is no need for Rebotix to seek 510(k) approval.  The FDA states: "A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent, to a legally marketed device (section 513(i)(1)(A) FD&C Act) that is not subject to premarket approval."  https://www.fda.gov/medical-devices/premarket-submissions/premarket-notification-510k.

44.     Accordingly, 510(k) submissions are required when there is a "device" that will be "marketed," i.e., a device that will be put on the market.  Here, Rebotix is not putting any device

---

[2] I understand that Restore Robotics was formerly licensed by Rebotix to use Rebotix's technology for EndoWrist repairs and followed the same procedure for repairs as Rebotix. Feigel conversation.  Statements in the Deutsche Bank report about Restore Robotics' EndoWrist repair process are therefore applicable to Rebotix.

on the market.  Instead, it is servicing devices hospitals already own.

45.     This opinion is shared by other regulatory experts.  The same analyst report referenced above concludes that "regulatory experts" view Intuitive's argument that companies like Rebotix require "510(k) approval" as "fundamentally misplaced."  Intuitive-00566062. "One consultant noted that the non-applicability of 510(k) approval is made quite clear by simply considering the FDA's official definition of this process."  Intuitive-00566062 (referring to the same definition for a 510(k) that I quoted above).  "The agency's definition explicitly qualifies application of 510(k) standards to devices intended to be <u>marketed</u>.  Because third parties are providing a <u>service</u> to the hospital and not commercially marketing the repaired instruments, by definition this precludes the obligation of having 510(k) clearance."  Intuitive-00566062 (emphasis original).[3]

### 2.4     Rebotix was not required to submit a 510(k) because Rebotix does not significantly change EndoWrists' intended use or EndoWrists' performance and safety specifications.

46.     In my opinion, Rebotix was not required to submit a 510(k) premarket notification for its services for a second reason: the evidence demonstrates that Rebotix's services do not significantly change EndoWrists' intended use, or performance or safety specifications.

47.     The same section of the CFR quoted above provides in relevant part that "a premarket notification submission is required" when the "device …  that the person currently has in commercial distribution or is reintroducing into commercial distribution … is about to be significantly changed or modified in design, components, method of manufacture, or intended

_____

[3] My understanding is that Rebotix's predecessor company Rebotix LLC did explore the possibility of commercial distribution for serviced EndoWrists and therefore sought 510(k) clearance in an abundance of caution.  Papit depo. tr., 210:9-211:22; Feigel conversation.  After the business model changed and the decision was made not to sell serviced EndoWrists, the 510(k) was deemed unnecessary and Rebotix withdrew its application.  *Id.*

use.  The following constitute significant changes or modifications that require a premarket notification: (i) <u>A change or modification in the device that could significantly affect the safety or effectiveness of the device</u>, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process[,] [or] (ii) <u>A major change or modification in the intended use of the device</u>."   21 CFR 807.81(a)(3).

48.     Accordingly, a company that sells a device in the U.S. market could require 510(k) approval if its process significantly changes (1) the original device's intended use or (2) its performance or safety specifications.  If the process does not significantly change either the device's intended use or its performance or safety specifications, then a 510(k) submission is not required.

49.     This distinction was most recently addressed by the FDA in a document entitled: Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administrative Staff, issued on June 18, 2021 ("2021 FDA Guidance").[4]  The guidance draws a distinction between "servicing" and "remanufacturing," where only the latter can be subject to oversight by the FDA.  2021 FDA Guidance at 3.  "The critical distinction is the categorization [i.e., 'service' vs. 'remanufacture'] of used instruments serviced by third parties for additional use given the significant implications vis-a-vis regulatory oversight."  Intuitive-00566060.  The FDA defines "servicing" and "remanufacturing" as follows:

- "<u>Servicing</u> is the repair and/or preventative or routine maintenance of one or more parts in

---

[4] This document stated that it is a "draft guidance document is being distributed for comment purposes only."  2021 FDA Guidance at 1.  It further states that the "contents of this document do not have the force and effect of law" and "should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited."   2021 FDA Guidance at 2.  Although this document merely provides guidance and is not controlling like the CFR regulations, it is nevertheless a description of the agency's current thinking on the topic.

a finished device, after distribution, for purposes of <u>returning it to the safety and</u> <u>performance specifications</u> established by the original equipment manufacturer (OEM) and <u>to meet its original intended use</u>."   2021 FDA Guidance at 3 (emphasis mine).

- "<u>Remanufacturing</u> is processing, conditioning, renovating, repackaging, restoring, or any other act done to a finished device that <u>significantly changes the finished device's</u> <u>performance or safety specifications, or intended use.</u>"  2021 FDA Guidance at 3 (emphasis mine).

50.    Intuitive agrees that an entity cannot be a remanufacturer, under the FDA's definition, if it does not significantly change the device's safety specifications or intended use

> 20       If a person or entity performs a process
> 21  on a device that does not significantly change the
> 22  finished device's performance or safety
> 23  specifications or intended use, then that person or
> 24  entity is not a remanufacturer; correct?
> …
> 1       THE WITNESS:  Yes, by FDA's definition.

-Johnson depo. tr., 108:20-109:1 (objection omitted).

> 12    Q   If Rebotix demonstrated that its services
> 13  do not significantly change an EndoWrist performance
> 14  for safety specifications or intended use, then
> 15  Rebotix's would not be a remanufacturer, per the
> 16  FDA's definition; correct?
> …
> 20       THE WITNESS:  Yes.

-Johnson depo. tr., 109:12-20 (objection omitted).

51.    As detailed below, based on my review of the evidence and prevailing FDA standards, it is my opinion that Rebotix's services do not significantly change the intended use or the performance and safety specifications.  Moreover, I note that my opinions are consistent with other experts: "We believe da Vinci instruments currently refurbished by Restore Robotics

17

clearly fall under the definition of 'service' as the process these used instruments undergo are intended to return them to 'the safety and performance specifications established by the OEM and to meet its original intended use' and do not involve 'activities that change the intended use.'" Intuitive-00566060 (analyst report based on input from regulatory experts).   In Section 2.4.1 below, I address intended use.  And in Section 2.4.2, I address performance and safety.

### 2.4.1   Rebotix's services do not significantly change the intended use of EndoWrists.

52.     The "intended use" of a device is "the general purpose of the device or its functions, which encompasses the indications for use."  2021 FDA Guidance at 4.

53.     An important source for determining the intended use of a device is looking to how the manufacturer and the FDA described the intended use when the manufacturer first presented the device to the FDA.

54.     Intuitive sought approval for its EndoWrists by submitting a 510(k) premarket notification to the FDA in 1999.  Intuitive's 510(k) included a definition of "Intended Use."[5]

> **Intended Use:**
>
> The Intuitive Surgical™ Endoscopic Instrument Control System is intended to assist in the accurate control of Intuitive Surgical™ Endoscopic Instruments including, rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, clip appliers, endoscopic retractors, stabilizers, electrocautery and accessories during laparoscopic surgical procedures.  It is intended to be used by professionals in operating room environments.

55.     Based on the contents of Intuitive's 510(k) submission, the FDA approved EndoWrists for entry to the market.   Intuitive-00512045-00512407; Johnson depo. tr., 36:19-23. In its letter approving EndoWrists, the FDA reiterated Intuitive's definition of EndoWrists'

---

[5] Along with its 510(k) submission, and as required by the FDA, Intuitive submitted a signed statement attesting that the contents of the submission are truthful and accurate and that no material fact was omitted.  Intuitive-512056; Johnson depo. tr., 18:7-16; 45:1-18.

intended use in the FDA's description of "Indications for Use."

> **Indications for Use:**
>
> The Intuitive Surgical™ Endoscopic Instrument Control System (hereinafter referred to as the "da Vinci™ System") is intended to assist in the accurate control of Intuitive Surgical™ endoscopic instruments including: rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, endoscopic retractors, stabilizers, electrocautery and accessories during laparoscopic surgical procedures such as cholecystectomy or Nissen fundoplication. It is intended for use by trained physicians in an operating room environment.
>
> Intuitive Surgical™ Endoscopic Instruments including scissors, scalpels, forceps/pick-ups, needle holders, clip appliers, and electrocautery are intended for endoscopic manipulation of tissue, including: grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery and suturing.

Intuitive-00512047. Intuitive confirmed that the second paragraph quoted above pertains to Intuitive's EndoWrists. Johnson depo. tr., 37:22-39:17.

56. Accordingly, both Intuitive and the FDA's definitions of the intended use of EndoWrists were the same as traditional non-robotic surgical instruments used in endoscopic surgery. As the FDA stated:

> "Intuitive Surgical Endoscopic Instruments [i.e., EndoWrists] including scissors, scalpels, forceps/pickups, needle holders, clip appliers, and electrocautery are intended for endoscopic manipulation of tissue, including: grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery and suturing." Intuitive-00512047.

57. I understand that, in this litigation, Intuitive contends that by resetting the maximum use counter on EndoWrists back to its original number of uses, Rebotix's services significantly change the intended use of EndoWrists. I disagree.

58. Extending the number of lives an EndoWrist can be used does not significantly change the intended use of EndoWrists. This is confirmed by Intuitive's own submissions to the FDA concerning the intended use of EndoWrists, the FDA's formal statements on the intended

use of EndoWrists, the testimony of Intuitive's own regulatory team, and Intuitive's own internal analysis.

59.     As set forth above, Intuitive's own definition of the Intended Use in its 510(k) submission, and the definition adopted by the FDA, included no mention of a maximum use limitation.  This was confirmed by Mark Johnson, Intuitive's Senior Vice President for Regulatory, who Intuitive designated to provide 30(b)(6) testimony on behalf of Intuitive:

> 25     Q   The Intended Use, as defined by Intuitive
> 1  in this FDA submission, makes no mention of maximum
> 2  use restrictions; correct?
> 3     A   Correct.
>
> -Johnson depo. tr., 30:25-31:3.
>
> 15     Q   Understood.  Turning back to the
> 16  Indications for Use Statement in the enclosure, the
> 17  indications for use for EndoWrists adopted by the
> 18  FDA does not reference any maximum use restrictions;
> 19  correct?
> 20         MS. LENT:  Object to the form.
> 21         THE WITNESS:  Correct.
> 22  BY MR. LYON:
> 23     Q   The Indications for Use Statement
> 24  references scissors; correct?
> 25     A   It does.
> Page 41
> 1     Q   The Indications for Use Statement does not
> 2  state that scissors can be used a maximum number of
> 3  10 times; correct?
> 4     A   Correct.
> 5     Q   The Indications for Use Statement
> 6  references scalpels; correct?
> 7     A   It does.
> 8     Q   Indications for Use Statement does not
> 9  state that scalpels can be used a maximum of 10
> 10  times; correct?
> 11     A   It does not say that, no.
> 12     Q   The Indications for Use Statement does not
> 13  put any limitations on the number of times that the
> 14  scalpels, the scissors, the forceps, the needle
> 15  holders, the clip appliers can be used; correct?
> 16     A   Correct.

-Johnson depo. tr., 40:15-41:16.

60.      I have reviewed the details of Rebotix's services set forth in Rebotix's summary

document "EndoWrist Service Procedure" at REBOTIX162404-REBOTIX162424.  I have also

watched a video showing an exemplary servicing.  REBOTIX 175327.  And I have spoken to

Greg Feigel of Rebotix about Rebotix's services.  Based on my review of Rebotix's services, I

have seen nothing that affects the intended use of the EndoWrists.

61.      Instead, Rebotix inspects the EndoWrists, makes the necessary repairs, and adds

an Interceptor chip to restore the original use count.  These steps ensure that the EndoWrists can

continue to be used for their intended use of endoscopic manipulation of tissue.

62.      For example, Rebotix does not change the intended use of EndoWrist scissors in a

way that precludes them from cutting tissue.  Instead, Rebotix, adjusts, and sharpens the scissors

so that they can continue to cut tissue.  Similarly, Rebotix does not change the intended use of

EndoWrist graspers in a way that precludes them from grasping tissue.  Instead, Rebotix inspects

and adjusts the graspers to ensure that they can continue to grasp tissue.  This is shown, for

example, in Rebotix's EndoWrist Procedure document, which includes the following steps

> **6.4.2.** Aligning and Sharpening:
>
> **6.4.2.1.** Under magnification inspect the alignment of jaws or blades. Each type will have specific ways they mesh and interact. Verify that they perform their grasping or cutting motions fully and correctly. If adjustments are needed, use a small pair of pliers to make the required adjustments.
>
> **6.4.2.2.** Files can be used to correct any misaligned or damaged grasper teeth.
>
> **6.4.2.3.** For scissors, make three cuts, in close proximity, on the TheraBand material. The scissors should cut at least the distal 2/3 of the cutting edges. If insufficient cutting is occurring the cutting edges may be dull. If any of the cuts to not complete cleanly or fully, the cutting edges may be dull or there may be a nick in the cutting edge. If sharpening is needed, use the #6 and #10 cut files to hone the cutting edges as needed. Always remove burs created from sharpening by closing the jaws in a cutting motion on the TheraBand a few times. Always recheck for sharpness on the TheraBand following any sharpening.

21

REBOTIX162422.[6]

63.     Moreover, in its submission to the FDA, Intuitive represented that its EndoWrists "are substantially equivalent in intended use" to other endoscopic devices that do not require any maximum use restrictions.   Intuitive-00512043 (510k summary).  In particular, Intuitive represented that its EndoWrists "are substantially equivalent in intended use" to predicate devices including the Baxter Healthcare and Deknatel Snowden Pencer Diamond Touch endoscopic instruments:

> **Predicate Devices:**
>
> The Intuitive Surgical™ Endoscopic Instruments and Tools are substantially equivalent in intended use and/or method of operation to the following predicate devices:
>
> 1.     Various Class I Exempt and Class II endoscopic electrocautery surgical instruments including the Baxter Healthcare Endoscopic Instruments (K931340) and the Deknatel Snowden Pencer Diamond Touch™ Brand of Endoscopic Instruments (K960400).
> 2.     The Intuitive Surgical™ Endoscopic Instrument Control System and selected instruments (K975001).

Intuitive-00512043 (510k summary); Johnson, 24:21-25:18.  And these endoscopic instrument predicate devices are traditional laparoscopic devices that do not have any maximum use restrictions.  Johnson, 26:20-27:23.

64.     Moreover, the analysis conducted by Intuitive's own regulatory team confirms that changing the maximum number of uses for an EndoWrist is not a significant change in an EndoWrists' intended use that would require a 510(k) submission.

65.     Each time Intuitive makes a change to its EndoWrists, Intuitive performs an analysis of whether a 510(k) submission is required.  Johnson depo. tr., 66:3-20.  When Intuitive

---

[6] I understand that Rebotix repairs the following EndoWrists: scissors, graspers, needle drivers, forceps, cautery hooks, and cautery spatulas.  See REBOTIX068497 (price list for Rebotix's service by EndoWrist type); REBOTIX166019 (sales data for Rebotix's service by EndoWrist type).

determines that a 510(k) submission is not required for a particular change, it creates a Non-

Filing Justification (NFJ) that sets forth the reasons why a 510(k) is not required.   Johnson depo.

tr., 66:3-20.

66.    Recently, for certain EndoWrists, Intuitive changed the maximum use restrictions

for the EndoWrists.  In doing so, Intuitive addressed the question of whether extending the

maximum use requirement (i.e., increasing the number of lives for an EndoWrist) constitutes a

change in an EndoWrists' intended use.

67.    Intuitive concluded that it does not.  In its Non-Filing Justifications, Intuitive

repeatedly wrote: "Extending the number of lives does not involve any changes to the intended

use(s) or instrument design." Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-

00552635; Ex. 15 (Non-Filing Justification) at Intuitive-00552700 (same); Ex. 16 (Non-Filing

Justification) at Intuitive-00552718 (same); Ex. 17 (Non-Filing Justification) at Intuitive-

00552729 (same); Ex. 18 (Non-Filing Justification) at Intuitive-00552654 (same); Ex. 19 (Non-

Filing Justification) at Intuitive-00552666 (same).

68.    And Intuitive confirmed this conclusion at deposition:

> 11    Q   Intuitive concluded that extending the
> 12  number of lives does not involve any changes to the
> 13  intended use or instrument design; correct?
> 14    A   Correct.
>                            - Johnson depo, tr. 73:11-14.

69.    Accordingly, the intended use of an EndoWrist is not affected by an increase in

the maximum number of uses specified for the EndoWrist.

70.    Moreover, even if the number of uses as set forth in the use counter were part of

the intended use for the devices (which they are not), the intended use still would not be

significantly changed by Rebotix's services.  When Rebotix services an EndoWrist, it does not

increase the use counter to a number beyond that at which it was originally set.  Feigel

23

conversation.  Instead, it returns the counter to its original specification.  *Id*.  For example, EndoWrists typically have an original use limit of ten.  *Id*.  And EndoWrists are typically sent to Rebotix when they only have one use left on the counter.  *Id*.  Upon receiving the EndoWrist, Rebotix inspects and repairs the EndoWrist to ensure that it maintains the performance specifications of a new EndoWrist.  Rebotix then likewise sets the counter to its original specification: 10 uses.  It does not eliminate the use counter, or set it to a different number than the original specifications.  It returns the EndoWrist's use counter back to its original setting so it can continue to be used as intended:  for the endoscopic manipulation of tissue.  After the EndoWrist has been used for ten additional uses, it can then be returned to Rebotix for possible additional servicing.

71.    Accordingly, this process falls squarely within the definition of "servicing," which, as set forth above, is intended to return the device to "its original intended use":

> "Servicing is the repair and/or preventative or routine maintenance of one or more parts in a finished device, after distribution, for purposes of <u>returning it to the safety and performance specifications</u> established by the original equipment manufacturer (OEM) and <u>to meet its original intended use</u>."

2021 FDA Guidance at 3

### 2.4.2    Rebotix's services do not significantly change the safety and performance specifications of EndoWrists.

72.    Intuitive alleges that Rebotix's services constitute a change or modification that significantly affects the performance and safety specifications of EndoWrists, as set forth in 21 CFR 807.81(a)(3) (reproduced above).  Johnson depo. tr., 114:5-25; Intuitive-00552745-00552759 (Curet letter to FDA).  As set forth below, I disagree.

73.    FDA Guidance makes clear that when evaluating whether there have been any significant changes to the performance or safety specifications, the "key issue in the interpretation of 21 CFR 807.81(a)(3) is that the phrase 'could significantly affect the safety or

effectiveness of the device.'"  Deciding When to Submit a 510(k) for a Change to an Existing Device; Guidance for Industry and Food and Drug Administration Staff, issued on October 25, 2017 ("2017 FDA Guidance").  That is, the relevant question does not turn on the details of the specifications of the device, but on whether there have been any changes to the device that would significantly affect its safety or effectiveness. [7]

74.    I understand that Intuitive applies this same standard when determining whether it should submit a 510(k) after making a change to one of its EndoWrists:

> 7    Q   If Intuitive determines that performance
> 8  specifications of an EndoWrist are changed, but
> 9  those changes are not expected to significantly
> 10  affect the safety or effectiveness of the device,
> 11  Intuitive believes that a 510(k) is not necessary;
> 12  correct?
> 13          MS. LENT:  Objection.
> 14          THE WITNESS:  That could be correct, yes.
>
> -Johnson depo. tr., 78:7-14.
>
> 10          So changing performance specifications is
> 11  permissible without submitting a 510(k), so long as
> 12  Intuitive can demonstrate that that change is not
> 13  expected to significantly affect the safety or the
> 14  effectiveness of the device; correct?
> 15    A   Each change has to be evaluated, but in
> 16  this particular instances, yes.
>
> -Johnson depo. tr., 79:10-16.

---

[7] I understand that Intuitive has also suggested that Rebotix cannot ensure that it is maintaining original device specifications for EndoWrists because Intuitive does not publish the specifications for its devices.  This suggestion is unfounded.  First, the FDA is not concerned with maintaining exact device specifications.  The focus is on maintaining safety and effectiveness, as set forth in consensus standards.  See above.  Second, it is not necessary to have published specifications from a company to know its specifications.  Instead, this is routinely determined by product analysis, reverse engineering, and consensus standards.  For example, in Intuitive's 510(k) showing substantial equivalence to the predicate device Snowden-Pencer endoscopic instruments, Intuitive did not reference the original specifications published by Snowden-Pencer.  Instead, it analyzed the Snowden-Pencer instruments and relied on its own analysis.  See e.g. Intuitive-00512077- Intuitive-00512083.

75.     For example, for certain EndoWrists, Intuitive itself changed the "performance specifications" from "10 lives to 14 lives," from "10 lives to 15 lives," or from "10 lives to 18 lives."  Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552638; Ex. 16 (Non-Filing Justification) at Intuitive-00552720; Ex. 17 (Non-Filing Justification) at Intuitive-00552732. Despite making these changes, Intuitive concluded that it was not required to submit a 510(k) because "increasing the number of lives for these instruments is not expected to significantly affect the safety or effectiveness of the device."  Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552638; Ex. 15 (Non-Filing Justification) at Intuitive-00552703 (same); Ex. 16 (Non-Filing Justification) at Intuitive-00552720 (same); Ex. 17 (Non-Filing Justification) at Intuitive-00552732 (same); Ex. 18 (Non-Filing Justification) at Intuitive-00552656 (same); Ex. 19 (Non-Filing Justification) at Intuitive-00552669 (same).

76.     Similarly, if Rebotix's services (including resetting the usage counter to increase the number of lives for the instrument) do not significantly affect the safety or effectiveness of the EndoWrist, then a 510(k) would not be required.  As discussed below, the evidence I have reviewed demonstrates that Rebotix's services do not affect the safety and effectiveness of the EndoWrists.

### 2.4.2.1 Intuitive's allegations of a significant effect on effectiveness and safety.

77.     I understand that Intuitive has alleged that, during its servicing, Rebotix makes two changes to EndoWrists that significantly affect the safety and effectiveness of the device: (a) the change to the number of times a Rebotix-serviced EndoWrist can be used and (b) the physical addition of the Interceptor chip that allows the Rebotix-serviced EndoWrist to be used additional times.  Johnson depo. tr., 111:12-17; 114:5-115:1.

78.     Intuitive alleges that these changes can significantly affect the safety and

26

effectiveness of EndoWrists in four different ways, i.e., by causing the following four failures "[1] Unintuitive motion (i.e., instruments do not track well with master manipulators; unexpected motion or stalls); [2] Insufficient grip force; [3] Dull or damaged scissor blades; and [4] Worn/damaged cables." Intuitive-00552745-00552759 (Intuitive letter sent to FDA) at Intuitive-00552748; Pullman depo. tr. Ex. 6 (letter Intuitive sends to hospitals using Rebotix's services) at p. 1; Curet depo. tr., 142:12-143:14.

79.     For Rebotix's services to constitute a significant change to the performance of EndoWrists, as alleged by Intuitive, the Rebotix service would, at minimum, need to introduce or significantly increase the likelihood that these failures occur.  And for Rebotix's services to constitute a significant change to the safety of EndoWrists, as alleged by Intuitive, these newly introduced or increased failures would need to adversely affect patient safety.  I address performance and safety issues, in the context of the FDA guidelines, in the sections that follow.

### 2.4.2.2 No evidence demonstrating that Rebotix's services significantly increase the likelihood of the failures alleged by Intuitive.

80.     Sources of information that the FDA could use to determine whether Rebotix's services significantly increase the likelihood of the four identified failures include any testing demonstrating that Rebotix-serviced EndoWrists introduce or increase the likelihood of these failures, or any reports demonstrating that Rebotix-serviced EndoWrists introduce or increase the likelihood of these failures.

81.     This case presents none of that.  Instead, the evidence shows that:

   a)  Intuitive has performed no testing to demonstrate that Rebotix-serviced EndoWrists introduce or increase the likelihood of EndoWrist failures.

   b)  Rebotix has performed substantial testing to ensure that Rebotix-serviced EndoWrists do not introduce or increase the likelihood of EndoWrist failures.

c) Hospitals and Intuitive acknowledge that the EndoWrist failures that Intuitive falsely attributes to Rebotix are commonplace in EndoWrists provided directly from Intuitive that have not been serviced by Rebotix.

d) The failures identified by Intuitive are not unique to EndoWrists; they are commonplace in analogous laparoscopic instruments that are routinely repaired with no oversight from the FDA.

### 2.4.2.2.1  No tests demonstrate that Rebotix-serviced EndoWrists introduce or increase the likelihood of the failures alleged by Intuitive.

82.     Although Intuitive has alleged that Rebotix serviced EndoWrists increase the likelihood of EndoWrist failures, Intuitive has been unable to identify any actual testing of Rebotix-serviced EndoWrists to support these allegations.

83.     For example, Intuitive wrote a letter to the FDA complaining about Rebotix's services and alleging that Rebotix-serviced EndoWrists could significantly affect the performance of EndoWrists because of the following failures: "[1] unintuitive motion (i.e., instruments do not track well with master manipulators; unexpected motion or stalls); [2] Insufficient grip force; [3] Dull or damaged scissor blades; and [4] Worn/damaged cables." Johnson Ex. 21 (Curet letter to FDA) at Intuitive-00552748.  Dr. Myriam Curet, Intuitive's Chief Medical Officer, was the signatory for the letter.

84.     Dr. Curet testified that she understood the contents of the letter and was confident in its accuracy.  Curet depo. tr., 104:15-24.  When deciding what to include in the letter, Dr. Curet conferred with Mark Johnson, who is Intuitive's head of regulatory.  Curet depo. tr., 123:19-124:6.

85.     Deposition testimony from both Mr. Johnson and Dr. Curet revealed that, despite making these allegations to the FDA, Intuitive was unaware of any testing (or basis) to make

28

these allegations.

86.     Mr. Johnson testified that, although Intuitive was in "possession [of] certain EndoWrists that have been serviced by Rebotix," he was unaware if "Intuitive perform[ed] any testing on the Rebotix serviced EndoWrists."  Johnson depo. tr., 115:3-22; 115:24-116:10; 118:5-12; 119:11-120:9.

87.     Moreover, despite alleging in their letter to the FDA that Rebotix-serviced EndoWrists may exhibit (1) unintuitive motion, (2) insufficient grip force, (3) dull or damaged scissor blades, and (4) worn or damaged cables, Dr. Curet and Mr. Johnson acknowledged that they were unaware of any supporting testing and had no basis to make these allegations.

(1) Unintuitive motion:

        18     Q.   Are you aware of any investigation or
        19  analysis by Intuitive to determine whether Rebotix's
        20  services caused EndoWrists to have unintuitive
        21  motion?
        22     A.   I am not aware.

                        -Johnson depo. tr., 119:18-22.

        15     Q.   You have no basis to assert that
        16  Rebotix is unable to ensure intuitive motion
        17  in EndoWrists based on the services it
        18  performs, correct?
        19        MS. LENT:  Object to the form.
        20        THE WITNESS:  That's correct.

                        -Curet depo. tr., 151:15-20.

(2) Insufficient grip force:

        23     Q.   Are you aware of any investigation or
        24  analysis by Intuitive that Rebotix's services caused
        25  EndoWrist to have insufficient grip force?
        1     A.   I am not aware.

                        -Johnson depo tr., 119:23-120:1.

        6            You have no basis to assert that

7    Rebotix is unable to implement measures in its
8    servicing of EndoWrists to ensure that those
9    EndoWrists have sufficient grip force,
10   correct?
11        MS. LENT:  Object to the form --
12        THE WITNESS:  That's correct.
13      That's correct.

-Curet depo. tr., 151:6-13.


(3) Dull or damaged scissor blades:


6    Q.   Are you aware of any investigation or
7    analysis by Intuitive that Rebotix's services result
8    in EndoWrists having dull or damaged scissor blades?
9    A.   Nope, no.

-Johnson depo. tr., 120:6-9.

11        Q.   Has Intuitive performed any tests
12   of Rebotix repaired EndoWrist to determine if
13   they had dull or damaged scissor blades?
14        MS. LENT:  Object to the form.
15        THE WITNESS:  I don't know.

-Curet depo. tr. 153:11-15.

22        Q.   You don't have any basis to assert
23   that Rebotix can likewise take measures to
24   ensure that its serviced EndoWrists have
25   sufficiently sharp and nondamaged scissor
1    blade, correct?
2        MS. LENT:  Object to the form.
3        THE WITNESS:  That's correct.

-Curet depo. tr., 153:22-154:3.

(4) worn/damaged cables:


2    Q.   Are you aware of any investigation or
3    analysis that Rebotix's services caused EndoWrists
4    to have worn or damaged cables?
5    A.   I am not aware of that.

-Johnson depo. tr., 120:1-5.

30

20      You have no basis to assert that
21  Rebotix does not also take measures to ensure
22  that the cables are not worn, not damaged, and
23  have sufficient tension, correct?
24      MS. LENT:  Object to the form.
25      THE WITNESS:  Correct.

-Curet depo. tr., 163:20-25.

88.    Moreover, Bob DeSantis, Executive Vice President and Chief Product Officer of Intuitive, admitted at deposition that Intuitive has not done any life-testing of Rebotix-serviced EndoWrists to determine whether they perform to Intuitive's specifications and can be safely used in surgery.

19      Intuitive has not performed any instruments
20  refurbished by Rebotix to determine whether or not
21  they perform to in Intuitive's specifications; right?
22    A   We have not done V&V or life testing on their
23  instruments, no.

-DeSantis depo. tr., 244:19-23.

6      Intuitive has not done testing of any kind to
7  determine whether Rebotix's refurbished EndoWrists can
8  safely be used with the da Vinci robot in surgery;
9  true?
10    A   True.  We've not done V&V testing, life
11  testing on their instruments, no.

-DeSantis depo. tr., 245:6-11.

89.    Intuitive's letter to the FDA also alleged that Rebotix's services could "disrupt[] the traceability of these devices, which could make it difficult to identify all affected instruments in a recall situation."  Intuitive-00552749.  But Intuitive revealed during deposition that this allegation is also unfounded.

31

90.     The Rebotix service does not alter the serial numbers of EndoWrists in any way. Gibson depo. tr. 66:25-67:7 ("The repair process is you send us serial number, for example, 123, and we ship you back serial number 123 after the repair process has been performed").

91.     And as Dr. Curet testified at deposition: "Intuitive can trace its instruments by their serial numbers" and "a hospital that has purchased an Endowrist from Intuitive ha[s] access to the serial number of that particular EndoWrist."  Curet depo. tr., 169:21-23; 171:11-14.  Ms. Scoville from Intuitive also testified that Intuitive maintains "system logs [that] include device information, I believe, at the serial number level" and "the information that is provided to Intuitive as part of this traceability process include the identity of the hospital that was using an EndoWrist beyond its maximum designated usages."  Scoville depo. tr. 124:5-125:3. Accordingly, Intuitive's "traceability" concerns are unfounded, and not something that would cause the FDA to question the safety of Rebotix's services.

92.     Intuitive's letter also attached two foreign injunctions—one from a Danish court and one from a German court—precluding the sale of serviced EndoWrists in those respective countries.  These foreign orders would have no impact on any decision by the FDA.  The FDA enforces the regulations set forth in the United States.  Germany and Denmark operate under different legal systems with different laws and different regulatory frameworks.  Indeed, that these foreign orders did not impact the FDA's view of Rebotix is confirmed by the fact that, after Intuitive sent these orders to the FDA and the FDA followed up with Rebotix, the FDA took no action against Rebotix.  See Section 2.5 below.  Moreover, I understand that the orders did not concern Rebotix Repair LLC (the Plaintiff in this case) but instead Rebotix Panama, a now defunct predecessor entity.  Feigel conversation.  It also appears that, unlike the FDA, the foreign courts were not presented with the facts of Rebotix's services.  For example, the Denmark order

was under the misimpression that Rebotix Panama was selling EndoWrists.  See Intuitive-

00552752 (translation of Denmark Order) ("with a view to sale in Denmark").

### 2.4.2.2.2 Rebotix has performed substantial testing to ensure that Rebotix-serviced EndoWrists do not introduce or increase the likelihood of the failures alleged by Intuitive.

93.     In contrast to the lack of testing of Rebotix-serviced EndoWrists by Intuitive, the

record demonstrates that Rebotix has performed substantial testing to ensure that Rebotix-

serviced EndoWrists perform just as safely and effectively as new EndoWrists, and do not

introduce or increase the likelihood of the four identified failures.

94.     Rebotix's testing includes (1) testing of each EndoWrist during the repair process;

(2) material analysis to ensure the materials Rebotix uses in any repair process match the

materials used by Intuitive in new EndoWrists; and (3) extended life-feasibility testing to

confirm that additional cleaning and autoclaving beyond the designated use count did not cause

Rebotix-serviced EndoWrists to fail or perform worse than new EndoWrists.  See, e.g.,

REBOTIX068498-REBOTIX0685121 ("Rebotix Instrument Service: Summary of Quality and

Reliability Measures"); conversation with Greg Feigel.  I address each of (1), (2), and (3) below.

95.     (1) testing during EndoWrist repair process: Before returning an EndoWrist to a

hospital, Rebotix inspects each EndoWrist under magnification and repairs the components as

necessary to ensure the EndoWrist remains as safe and effective as a new EndoWrist.

REBOTIX162404- REBOTIX162424 (EndoWrist Service Procedure); Feigel conversation.  A

typical EndoWrist would be expected to pass the inspection process, and be a candidate for

repair multiple times.  Feigel conversation.  As part of this process, Rebotix takes steps to ensure

that the repaired EndoWrist is no more likely than a new EndoWrist to suffer one of the four

purported failures identified by Intuitive, which I address in (A)-(D) below:

96.     A. worn or damaged cables: The Rebotix repair process includes an inspection of

the cables "under magnification" to determine if there are any "Broken or frayed manipulation cables" or "Broken or damaged Electrocautery cables (Electrosurgical EndoWrist Models Only).") REBOTIX162413. Rebotix does not repair EndoWrists with worn or damaged cables. Feigel conversation. If any wear or damage is observed, Rebotix informs the hospital and the EndoWrist is discarded. Feigel conversation.

97. B. <u>dull or damaged scissor blades</u>: The Rebotix repair process "Inspects the instrument tool end under magnification for ... scissor cutting efficiency." REBOTIX162413 (Repair Service Procedure). The repair service procedure further specifies:

> 6.4.2.3. For scissors, make three cuts, in close proximity, on the TheraBand material. The scissors should cut at least the distal 2/3 of the cutting edges. If insufficient cutting is occurring the cutting edges may be dull. If any of the cuts to not complete cleanly or fully, the cutting edges may be dull or there may be a nick in the cutting edge. If sharpening is needed, use the #6 and #10 cut files to hone the cutting edges as needed. Always remove burs created from sharpening by closing the jaws in a cutting motion on the TheraBand a few times. Always recheck for sharpness on the TheraBand following any sharpening.

162422 (Repair Service Procedure). If an EndoWrist is in a condition where repairs cannot be made to ensure that the scissors are not dull or damaged, Rebotix informs the hospital and the EndoWrist is discarded. Feigel conversation

98. C. <u>unintuitive motion</u>; D. <u>insufficient grip force</u>: Unintuitive motion refers to the scenario when the instruments do not track well with the master manipulators, i.e. the instruments do not feel right to the surgeon operating the instruments. Johnson Ex. 21 (Curet letter to FDA) at Intuitive-00552748. This is caused by misalignments in the manipulation wheels or by cables that lack sufficient tension. Feigel conversation. Similarly, insufficient grip force (i.e., when the jaws of the tool end do not grip tight enough) is likewise caused by misalignments in the manipulation wheels or by cables with insufficient tension. Feigel conversation.

34

99.     Rebotix's repair process inspects both the wheel alignment and the cable tension. See REBOTIX162413 ("5.2.4 Verify that the manipulation wheels move freely in each direction throughout its full intended range of motion. … 5.2.7 Inspect the instrument tool end under magnification for: 5.2.7.1. Broken or frayed manipulation cables. 5.2.7.2. Broken or damaged Electrocautery cables (Electrosurgical EndoWrist® Models Only).  And, when necessary, Rebotix makes adjustments to restore the wheel alignment and cable tension to the original specifications, as determined by analysis of new EndoWrists.  Feigel conversation; REBOTIX162421- REBOTIX162422 (setting forth steps for "Cable Tension Adjustments," including "Align[ment] [of] the 4 manipulation wheels.").  If an EndoWrist is in a condition where repairs cannot be made to ensure intuitive motion and sufficient grip force, Rebotix informs the hospital and the EndoWrist is discarded.  Feigel conversation.

100.    (2) <u>material analysis testing</u>: When considering whether a change or modification could significantly affect the safety or effectiveness," it is important to consider whether there was a "significant change or modification in design, material, chemical composition, energy source, or manufacturing process."  See 21 CFR 807.81(a)(3) ("premarket notification submission" can be required when there is a "change or modification that could significantly affect the safety or effectiveness of the device, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process.").

101.    Rebotix performed tests to ensure that there are no significant changes to the "design, material, and chemical composition" of the materials used in its repairs from the materials used in new EndoWrists. [8]  The purpose of this language is to ensure that the structural

_____

[8] The additional modifications identified in the regulations are not relevant here.  The EndoWrists that Rebotix repairs do not include an energy source and therefore Rebotix does not make any changes to an energy source. REBOTIX162404-REBOTIX162424 (EndoWrist

integrity of the medical device is not significantly affected (for example, by replacing a steel component with a plastic component) and, in the case of materials that come in direct contact with the skin, to ensure that the materials remain biocompatible (i.e., not harmful to living tissue).

102.     When developing its services, Rebotix sent the components that it used in its repair process to IMR Labs to undergo material analysis.  E.g., REBOTIX151919-REBOTIX151922, REBOTIX151966-REBOTIX152018; Feigel conversation. The analysis confirmed that the components Rebotix used were consistent with the materials used by Intuitive in its EndoWrists, which are commonplace in the medical repair industry.  *Id*.  For example, IMR Report Number 201310250E confirmed that the sample sent to IMR was "meets the chemical requirements of UNS-S-17400 for a 17-4 precipitation hardenable chromium-nickel-copper stainless steel."  REBOTIX151919; Feigel conversation.

103.     Moreover, I understand that the only addition to the EndoWrist in the Rebotix service is the Interceptor chip that enables the count reset.  Because the Interceptor is enclosed in the housing of the EndoWrist and does not come into contact with the patient's skin, there was no need to perform biocompatibility testing on the Interceptor.  See Use of International Standard ISO 10993-1, "Biological evaluation of medical devices - Part 1: Evaluation and testing within a risk management process" (if "the device does not have any direct or indirect tissue contact," then "no further biocompatibility information would be needed").  Nonetheless, Rebotix performed biocompatible tests on all components of the Rebotix-serviced device, including the Interceptor in accordance with International Standard ISO 10993-1.  See REBOTIX124432-REBOTIX124447, REBOTIX124467-REBOTIX124705, REBOTIX124718-

Service Procedure); Feigel conversation.  Moreover, Rebotix's services do not include any new "manufacturing" but are instead directed to restoring an EndoWrist to its original condition.  *Id*.

36

REBOTIX124756.

104.    Accordingly, Rebotix reasonably concluded that its services do not make any significant change or modification in design, material, chemical composition, energy source, or manufacturing process for EndoWrists.

105.    The reasonableness of Rebotix's conclusion is illustrated by comparison to Intuitive's own analysis of whether to submit a 510(k) upon adding or changing components of its EndoWrists.  For example, as shown in its Non-Filing Justifications, Intuitive has concluded that the following changes to EndoWrists do not constitute a significant change or modification in design, material, or chemical composition to the device and therefore a 510(k) submission is not required.  See Johnson depo., Exs. 14-19 (Non-Filing Justifications):

change to the housing material:

> 10    Q   Changing the housing material did not
> 11  require 510(k) approval for this EndoWrist; correct?
> 12         MS. LENT:  Objection.
> 13         THE WITNESS:  Correct.

> -Johnson depo. tr., 82:10-13.

> 2     Q   If you go two rows further, it indicates
> 3  for the EndoWrist that is the subject of this
> 4  non-filing justification, that the housing material
> 5  was previously changed from polycarbonate to
> 6  polyphenylsulfone; correct?
> 7    A   Yes.
> 8     Q   The change in material did not require
> 9  510(k) approval; correct?
> 10     A   Correct.

> -Johnson depo. tr., 83:2-10.

change to the pulley component material:

> 2     Q.   The pulley component material was changed;
> 3  correct?
> 4    A.   Yes.
> 5    Q.   That did not require 510(k) approval;

37

6 correct?
7    A.   Correct.

-Johnson depo. tr., 84:2-7.

change to the grip configuration:

4    Q   Changing the grip cable configuration in
5 this EndoWrist did not require 510(k) approval;
6 correct?
7        MS. LENT:  Objection.
8        THE WITNESS:  That's correct.

-Johnson depo. tr., 82:4-8.

change to the cable construction:

20    Q.   Document also indicates that new grip and
21 yaw cable construction with updated nominal tension
22 parameters was changed; correct?
23    A   Correct.
24    Q   That did not require 510(k) approval;
25 correct?
1    A.   Correct.

-Johnson depo. tr., 83:20-84:1.

addition of a new indicator:

16        Adding an end of life indicator to this
17 EndoWrist did not require 510(k) approval; correct?
18        MS. LENT:  Objection.
19        THE WITNESS:  Correct.

-Johnson depo. tr., 82:16-19.

change to the RFID:

21    Q   Updating the RFID did not require 510(k)
22 approval; correct?
23        MS. LENT:  Objection.
24        THE WITNESS:  Agreed, yes.

-Johnson depo. tr., 82:21-24.

106.    (3) extended life feasibility testing:  Rebotix also performed several rounds of

38

extended life-feasibility tests to ensure that EndoWrists could safely be used beyond the
maximum number of sues designated by Intuitive.  REBOTIX156431- REBOTIX156446
(EndoWrist Extended Life Feasibility Study); REBOTIX146770-REBOTIX146781 (Life Test
Worst Case Model Analysis); REBOTIX124268-REBOTIX124431 (Life Testing Protocol and
Report); REBOTIX126238-REBOTIX126390 (Life Testing Protocol and Report);
REBOTIX126788-REBOTIX127430 (Life Testing Protocol and Report); Feigel conversation.

107.    For example, in 2014, Rebotix performed a "study … to determine the feasibility
of safely extending the useful life of EndoWrists to a minimum of 20 uses."  REBOTIX156431-
REBOTIX156446 (EndoWrist Extended Life Feasibility Study). "The devices used for this study
will only be subjected to the stresses of cleaning and autoclaving past the original use of 10 for
OEM expired EndoWrists."  REBOTIX156431; Feigel conversation.  I understand that the
devices were cleaned and autoclaved a total of 22 times.  *Id*.  And there was nothing to indicate
that the Rebotix-serviced instruments performed differently from new EndoWrists from
Intuitive.  *Id*.

108.    In sum, Rebotix has repeatedly tested its serviced-EndoWrists to ensure they
remain as effective as new EndoWrists from Intuitive—both during the early stages when
designing its repair protocol and during each actual repair.

### 2.4.2.2.3 Hospitals and Intuitive acknowledge that the EndoWrist failures that Intuitive falsely attributes to Rebotix are commonplace in EndoWrists provided directly from Intuitive that have not been serviced by Rebotix.

109.    The evidence shows that the four EndoWrists failures that Intuitive attributes to
Rebotix are in fact not introduced by Rebotix's services but are instead commonplace in
EndoWrists received directly from Intuitive.

110.    Representatives from hospitals testified that failures occur regularly in

EndoWrists received directly from Intuitive, i.e., EndoWrists that have not yet reached their

maximum use limit.  These failures include (1) unintuitive motion, (2) insufficient grip force, (3)

dull or damaged scissor blades, and (4) worn or damaged cables.  Moreover, hospital

representatives also testified that they were not aware of any of these failures occurring with

EndoWrists that had been serviced by Rebotix.

Pullman Regional Hospital:

12    Q.  Does Pullman Regional sometimes use
13  EndoWrists for less than a maximum number of uses?
14    A.  Yes.
15    Q.  Do EndoWrists sometimes fail before they
16  reach their maximum usage limit?
17    A.  Yes.
                              -Pullman depo. tr., 41:12-17.


6    Q.  Has your hospital ever rejected an EndoWrist
7.  because the surgeon perceived it to have dull or
8   damaged scissor plates?
9    A.  Yes.
10    Q.  Has your hospital ever rejected an EndoWrist
11  because a surgeon perceived it to have unintuitive
12  motion?
13    A.  Yes.
14    Q.  Has your hospital ever rejected an EndoWrist
15  because a surgeon perceived it to have insufficient
16  grip force?
17    A.  Yes.
18    Q.  Has your hospital ever rejected an EndoWrist
19  because the wires were frayed?
20    A.  Yes.
21    Q.  In any of these instances where you rejected
22  an EndoWrist, for example, for unintuitive motion,
23  dull or damaged scissors, insufficient grip force, or
24  any other reason, had the EndoWrist been used beyond
25  the maximum number of uses imposed by Intuitive?
Page 43
1    A.  No.
2    Q.  Had any of these rejected EndoWrists been
3  serviced by Rebotix?
4    A.  No.

40

```
 5     Q.  Did your hospital or your surgeons ever
 6  reject a Rebotix-repaired EndoWrist because of
 7  perceived unintuitive motion?
 8     A.  No.
 9     Q.  Did your hospital or surgeons ever reject a
10  Rebotix-repaired EndoWrist because of perceived dull
11  or damaged scissor blades?
12     A.  No.
13     Q.  Did your hospital or your surgeons ever
14  reject a Rebotix-repaired EndoWrist because of
15  insufficient grip force?
16     A.  No.
17     Q.  Did your hospital or surgeons ever reject a
18  Rebotix-repaired EndoWrist for any reason?
19     A.  No.
```

-Pullman depo. tr., 42:6-43:19.

111.    The Pullman hospital representative also testified that the hospital tested Rebotix-repaired EndoWrists, and neither the scrub techs (who are responsible for the EndoWrist set-up) nor the surgeons (who used the EndoWrists) could perceive any difference between EndoWrists that had been serviced by Rebotix and new EndoWrists received directly from Intuitive.  See Pullman depo. tr., 37:1-40:25 ("Everybody said they worked just fine.  There was no difference than the non-reprocessed instruments").

Evergreen Hospital

```
20     Q.  Does Evergreen always use its EndoWrists
21  for the maximum number of uses as imposed by
22  Intuitive, or do EndoWrists sometimes fail before
23  they reach their maximum usage?
24     A.  We do not always use them to their maximum
25  usage due to instrument failures.
```

-Evergreen depo. tr., 34:20-25.

```
15     Q.  Has Evergreen Hospital ever rejected an
16  EndoWrist because the surgeon proceeded to have
17  insufficient grip force?
18     A.  Yes.
```

-Evergreen depo. tr., 37:15-18.

41

25     Has Evergreen Hospital ever rejected an
1  EndoWrist because a surgeon perceived it to not
2  respond or feel right in the movements that he is
3  trying to provide to the EndoWrist?
4     MR. BAILEY:  Objection to form.
5     THE WITNESS:  Yes.
6  BY MR. LYON:
7     Q.  Has Evergreen Hospital ever rejected an
8  EndoWrist because a surgeon perceived there to be a
9  problem with the EndoWrist's cables?
10     A.  Yes.
11     Q.  In each of these instances where Evergreen
12  rejected an EndoWrists, have the EndoWrists been
13  used beyond the maximum number of uses imposed by
14  Intuitive?
15     A.  No.

-Evergreen depo. tr., 37:25-38:15.

112.    Moreover, even Intuitive's own Chief Medical Officer testified that she herself has rejected a failed EndoWrist in the middle of surgery due to the jaws not closing properly.

7     Q.  Once you have begun a da Vinci
8  surgery, have you ever replaced one of the
9  EndoWrists mid surgery?
10     A.  Yes.
11     Q.  How many times has that happened?
12     A.  At the most, a handful of times.
13     Q.  The handful of times you have
14  replaced an EndoWrist during a da Vinci
15  surgery, why did you do so?
16     A.  Several times it was because the
17  lives were used up so I couldn't use the -- I
18  couldn't use it.
19     Q.  What else?
20     A.  There is one time where I couldn't
21  get the -- one of the jaws, one of the parts
22  of the jaws to close completely.

-Curet depo tr. 90:7-22.

113.    This failure occurred at "Stanford" or the "VA," where Rebotix has never serviced EndoWrists.  Curet depo tr. 92:25-93:13; Feigel conversation.

114.     Intuitive's head of regulatory, Mark Johnson, estimates that Intuitive opens
approximately "3000 complaint files" per month for its EndoWrists.  Johnson depo. tr., 94:14-18.
And the failures that give rise to these complaints include "frayed cables," "nonintuitive
motion," and "insufficient grip force."  Johnson depo. tr., 94:22-95:10.

115.     Accordingly, the evidence indicates that the failures identified by Intuitive are
commonplace in EndoWrists that Rebotix has never serviced.  And nothing indicates these
failures are either introduced by, or occur at a greater rate after, Rebotix's services.  Moreover, as
I discuss below, the evidence shows that the FDA would not view these sorts of device failures
as presenting a safety concern.

### 2.4.2.2.4  The failures alleged by Intuitive are commonplace in analogous laparoscopic instruments that are routinely repaired.

116.     As detailed below, the evidence in this case demonstrates that:

- the four failures identified by Intuitive are not unique to EndoWrists, but are
commonplace in traditional laparoscopic devices;

- EndoWrists are essentially identical to these traditional laparoscopic instruments
in terms of shape, size, function, tissue effect, functional characteristics, intended
use, safety and effectiveness; and

- these traditional laparoscopic instruments are routinely repaired and used
hundreds of times without oversight from the FDA.

117.     When Intuitive first received clearance from the FDA for its EndoWrists, Intuitive
represented to the FDA that EndoWrists are essentially identical in terms of shape, size, function,
and tissue effect to the endoscopic devices cited as predicate devices:

> **Comparison to Predicate Device(s):**
>
> The Intuitive Surgical™ Instruments are essentially identical in terms of shape, size, function and tissue effect to the standard Class I and II endoscopic instruments cited.

Intuitive-00512044 (Intuitive EndoWrist 510k summary).

> 18    Q    Is it a truthful and accurate statement
> 19  that the EndoWrists are essentially identical in
> 20  terms of shape, size and function and tissue effect
> 21  to the endoscopic instruments cited as predicate
> 22  devices in this FDA submission?
> 23    A   Yes.

-Johnson depo. tr., 31:18-23.

118.    Intuitive also represented to the FDA that design analysis and comparisons, as well as in vitro studies, confirm that the basic functional characteristics of the EndoWrists are substantially equivalent to the predicate devices:

> **In Vitro Test Data:**
>
> Design analysis and comparison as well as in vitro testing confirm that basic functional characteristics are substantially equivalent to the predicate devices cited.

Intuitive-00512044 (Intuitive EndoWrist 510k summary).

> 12    Q    Is it truthful and accurate that design
> 13  analysis and comparisons, as well as in vitro
> 14  studies, confirm that the basic functional
> 15  characteristics of the EndoWrists are substantially
> 16  equivalent to the predicate devices cited in this
> 17  510(k) summary?
> 18    A   Yes.

-Johnson depo. tr., 32:12-18.

119.    Intuitive also represented to the FDA that clinical studies confirmed that EndoWrists are substantially equivalent to predicate devices in terms of safety and effectiveness.

44

> **Clinical Study Data:**
>
> An extensive prospectively randomized and concurrently controlled clinical study was performed to demonstrate substantial equivalence to the predicate devices cited in terms of safety and effectiveness.

Intuitive-00512044 (Intuitive EndoWrist 510k summary).

> 19    Q    Is it truthful and accurate that clinical
> 20  studies were performed to demonstrate substantial
> 21  equivalence between the EndoWrists and the predicate
> 22  devices cited in the 510(k) summary in terms of
> 23  safety and effectiveness?
> 24    A    Yes.
> 25    Q    And it's truthful and accurate that the
> 1  EndoWrists in these production devices has
> 2  substantial equivalence in terms of safety and
> 3  effectiveness?
> 4    A    Yes.

-Johnson depo. tr., 33:19-34:4.

120.    Moreover, predicate endoscopic devices referenced in Intuitive's 510(k) as substantially equivalent to EndoWrists—the Baxter Healthcare Endoscopic Instruments and the Deknatel Snowden-Pencer Endoscopic Instruments—are traditional laparoscopic devices that do not include any maximum use requirements.

> 5    Q    Sure.  Sure.  And the referenced predicate
> 6  devices do not have any maximum use restrictions;
> 7  correct?
> 8        MS. LENT:  Objection.
> 9        THE WITNESS:  Correct.

-Johnson depo. tr., 29:5-9.

121.    Intuitive's 510(k) submission includes numerous images of the traditional laparoscopic devices, like the Snowden-Pencer device, to illustrate how the EndoWrists have

substantially equivalent shape and dimensions to the EndoWrists.  Johnson depo. tr., 46:24-50:2;

Johnson depo., Ex. 4.[9]

122.    I understand that these traditional laparoscopic devices—like the Snowden-Pencer

device—can be repaired hundreds of times.  For example, BPI Medical is in the business of

repairing traditional laparoscopic devices, like the predicate devices cited by Intuitive.  Bob

Overmars, the President of BPI, testified as follows:

> 14     Q.  One of the instruments you indicated you
> 15   repaired is laparoscopic instruments; is that right?
> 16     A.  That's correct.
> 17     Q.  When did you first start repairing
> 18   laparoscopic instruments?
> 19     A.  Over 20 years ago.
> 20     Q.  What is your best estimate of how many
> 21   laparoscopic instruments BPI Medical has repaired?
> 22     A.  Tens of thousands.
> …
> 4     Q.  Is one of the laparoscopic instruments that
> 5   BPI Medical repairs the Deknatel Snowden-Pencer
> 6   Diamond-Touch?
> 7   MR. FOLGER:  Objection to form.
> 8   BY MR. LYON:
> 9     Q.  I didn't hear your response.
> 10     A.  Yes, we do.
>
> -Overmars depo. tr., 96:14-97:10.

---

[9]  Mr. Johnson noted that Intuitive's 510(k) also identifies the "Intuitive Endoscopic Control System and selected instruments" as "predicate devices."  Johnson depo tr. 126:24-127:17; Intuitive-00512043.  Intuitive suggests that the statements of substantial equivalence may be directed to these Intuitive "predicate devices," previously cleared under 510(k) number K965001, which Mr. Johnson testified did have maximum use restrictions.  *Id*.; Intuitive-00512073.  However, the foregoing statements of substantial equivalence in the 510(k) summary—in the statement of Intended Use, Comparison to Predicate Devices, In Vitro Test Data, all of which must be true and accurate—were not restricted to the Intuitive predicate devices but referred generally to the "predicate devices cited," which includes the traditional endoscopic devices with no use restrictions.  Moreover, the Intuitive predicate devices (identified under K965001) likewise did not reference any maximum use restrictions in the description of Intended Use in their own 510(k).  Johnson depo. Ex. 22 at Intuitive-00595700.  Nor did the FDA reference any maximum use restrictions in its Indications for Use, allowing the market entry of these devices. Johnson depo. Ex. 22 Intuitive-00595697.

10     Q.  How many times is a typical laparoscopic
11  instrument used before it's sent to you for repairs?
12     A.  It could be dozens to hundreds.

-Overmars depo. tr., 98:10-12..

123.    Moreover, just like the four failures Intuitive attributes to Rebotix are not caused by repairs of EndoWrists, the same four failures are not caused by repairs of traditional devices. Instead, as with EndoWrists, traditional devices routinely suffer these failures, and the purpose of repair is to prevent these failures from occurring.

10     Q.  How many times is a typical laparoscopic
11  instrument used before it's sent to you for repairs?
12     A.  It could be dozens to hundreds.
13     Q.  What determines if it's dozens or hundreds?
14     A.  There will be lack of grip of the
15  instrument jaws.  There will be dull scissors.
16  There will be broken or failed components.
17     Q.  Are these some of the problems you see in a
18  laparoscopic instrument in need of repair?
19     A.  Absolutely.
20     Q.  Is unintuitive motion one of the problems
21  you commonly see in a laparoscopic instrument in
22  need of repair?
23     A.  Correct.
24     Q.  Is insufficient grip force one of the
25  problems you typically see in a laparoscopic
Page 99
 1  instrument in need of repair?
 2     A.  Correct.
 3     Q.  Is dull or damaged scissor blades one of
 4  the problems you typically see in a laparoscopic
 5  instrument in need of repair?
 6     A.  Correct.
 7     Q.  Is worn or damaged cables one of the
 8  problems you typically see in a laparoscopic
 9  instrument in need of repair?
10        MR. FOLGER:  I'll just object to the form.
11  BY MR. LYON:
12     Q.  Again, I didn't get your answer.  Remember
13  to pause.  Could you repeat your answer for me.  The
14  court reporter may have got it, but I didn't hear
15  it.

47

16    A.  Correct.
17    Q.  Are these the sort of prob -- withdrawn.
18       Do you consider these common problems in
19  laparoscopic instruments that you repair?
20    A.  Yes.

-Overmars depo. tr., 98:10-99:20.

124.    Moreover, although traditional laparoscopic instruments are substantially similar

to EndoWrists and suffer the same problems that Intuitive identifies, the FDA does not regulate

the repair of traditional laparoscopic instruments.

23    Q.  Did BPI Medical ever apply for clearance to
24  repair the laparoscopic instruments?
25    A.  No.
1    Q.  Why not?
2    A.  It's not required.  It's not regulated by
3    the FDA.

-Overmars depo. tr., 96:23-97:3

125.    Mr. Overmars, who I understand has familiarity with both EndoWrists and

traditional laparoscopic instruments, testified that EndoWrists are far more robust and well-made

than traditional instruments.

22       How would you compare how well made
23  EndoWrists are relative to traditional laparoscopic
24  instruments?
25       MR. FOLGER:  I'll still object to the form.
Page 102
1    A.  In our 25 years of experience of repairing
2  endo laparoscopic instruments, the EndoWrist is
3  built like a Hummer and the majority of all other
4  laparoscopic instruments are like Ikea.  The
5  Intuitive EndoWrist is much more robust, much more
6  uniquely designed, and just simply a way better,
7  longer lasting instrument than a traditional
8  laparoscopic instrument.

-Overmars depo tr. 101:22-102:8

126.    Accordingly, EndoWrists would be expected to withstand more uses (not

substantially less uses) than traditional instruments.

48

127.    In sum, this evidence—that predicate devices relied on by Intuitive in its EndoWrist 510(k) as substantially equivalent to EndoWrists are less robust than EndoWrists and yet still repaired hundreds of times without oversight by the FDA—further supports the conclusion that allowing EndoWrists to be used more than the maximum limit designated by Intuitive would not be perceived as providing an increased risk of performance failure by the FDA. This is especially true because the EndoWrists are inspected and repaired as necessary each time the maximum use limit is reset.

### 2.4.2.3  No evidence that Rebotix's services significantly affect product safety.

128.    As demonstrated in Section 2.4.2.2 above, the evidence indicates that Rebotix's services do not diminish the performance or effectiveness of EndoWrists or increase the likelihood of the purported failures identified by Intuitive.  Accordingly, for all of the same reasons identified above, the evidence indicates that Rebotix's services do not present a safety risk.

129.    Moreover, the record demonstrates that the sort of EndoWrists failures that Intuitive attributes to Rebotix's services—which are in fact commonplace in new EndoWrists from Intuitive—would not be viewed by the FDA as presenting a significant safety risk.

130.    For example, when an EndoWrist is exhibiting unintuitive motion, poor grip force, or dull scissors, the surgeon simply swaps out the EndoWrist for another, just like a surgeon would do with a traditional laparoscopic instrument that was exhibiting the same problem.  This was acknowledged by Intuitive's own Chief Medical Officer:

> 23      Q.  When you were performing a da Vinci
> 24   surgery and one of the jaws on the EndoWrist
> 25   were not closed completely, did you stop the
> Page 91
>  1   surgery and replace the EndoWrist?

49

2      A.   It's part of the surgery.  So I
3   just exchanged it like I would if I was
4   exchanging it for another instrument.

-Curet depo. tr., 90:23-91:4.

14      Q.   If a surgeon did perceive an
15   EndoWrist as having unintuitive motion, it
16   could replace that EndoWrist with another one,
17   like you yourself did when a jaw was not
18   closing properly on an EndoWrist, correct?
19          MS. LENT:  Objection.  Form.
20          THE WITNESS:  Yes.

-Curet depo. tr., 145:14-20.

6      Q.   If a particular EndoWrist did have
7   insufficient grip force, a surgeon could
8   replace that EndoWrist with a new EndoWrist
9   like you yourself did when the jaw was not
10   closing properly on an EndoWrist, correct?
11          MS. LENT:  Object to the form.
12          THE WITNESS:  Yes.

-Curet depo. tr., 147:6-12

10      Q.   Have you ever rejected a
11   traditional laparoscopic device, a scissors,
12   because you perceived them to have dull or
13   damaged scissor blades?
14      A.   Yes.
15      Q.   How did you determine that the
16   scissors had dull or damaged scissor blades
17   and decide not to use them in your surgery?
18      A.   I tried to use them, and they
19   didn't work.
20      Q.   What did you do when that happened?
21      A.   I asked for some new ones.
22      Q.   If you were using an EndoWrist and
23   the scissor blades were dull and damaged and
24   did not work, would you likewise replace them
25   with an EndoWrist that had sharp and
Page 153
1   nondamaged scissor blades?
2          MS. LENT:  Objection.
3      Hypothetical.
4          THE WITNESS:  Yes.  Yes.

50

-Curet depo. tr., 152:10-153:4

131.    This was also confirmed during hospital depositions.  For example:

> 10       If an EndoWrist is not performing properly,
> 11   for example, it's showing unintuitive motion,
> 12   insufficient grip force, or dull blades, is it your
> 13   hospital's practice to simply replace that EndoWrist?
> 14       A.  Yes.
> 15       Q.  Similarly, if a traditional nonrobotic
> 16   laparoscopic instrument is not performing properly, is
> 17   it your hospital's practice to simply replace that
> 18   instrument?
> 19       A.  Yes.
> 20       Q.  Are traditional, nonrobotic laparoscopic
> 21   instruments also sometimes rejected by surgeons?
> 22       A.  Yes.

-Pullman depo. tr., 44:10-22.

> 16       Q.  When the cable breaks in an EndoWrist from
> 17   Intuitive, what does the surgeon do?
> 18       A.  I -- generally, it doesn't make it to the
> 19   surgeon.  That is something that's usually
> 20   discovered when the instrument is inspected prior to
> 21   the case beginning.
> 22        If it made it into a patient, at that
> 23   point we would remove the instrument from the field
> 24   and open -- open a replacement.

-Evergreen depo. tr., 34:16-24.

132.    Intuitive's head of regulatory, Mark Johnson, estimates that Intuitive opens

approximately "3000 complaint files" "on an average month" for its EndoWrists.  Johnson depo.

tr. 94:14-18.  And the failures that give rise to these complaint files include "frayed cables,"

"nonintuitive motion," and "insufficient grip force."  Johnson depo. tr. 94:22-95:10.  Of these

3,000 monthly complaint files for EndoWrists, Mr. Johnson estimates that approximately "50 or

60" get reported to the FDA.  Johnson depo. tr., 95:20-96:2.  If the FDA considered these events

51

to constitute a safety risk, the FDA would have taken action against Intuitive.  However, I have

seen no evidence that the FDA has initiated any such action against Intuitive.

133.    I discuss Medical Device Reporting regulations in the following paragraphs:

Medical Device Reporting, MDR: (21 CFR 803)

134.    Reprinted text from the FDA's 2013 guidance, "Medical Device Reporting for

Manufacturers".

> 1.2 What is the purpose of the MDR regulation?
> The MDR regulation provides a mechanism that allows us (the FDA), as well as you (the device manufacturer), to identify and monitor adverse events (deaths and serious injuries) and certain malfunctions involving your medical devices. The goal is to detect and correct problems in a timely manner.  The requirements of the MDR regulation are enforced under the authority of the Food Drug & Cosmetic Act. The enforcement mechanisms include seizure, injunction, civil money penalties, and criminal prosecution.

135.    The three basic requirements of the Medical device Reporting regulations are:

- Submit what are known as MDR reportable events to the FDA for tracking in FDA's MAUDE database.

- Develop, maintain, and implement written procedures for the identification and evaluation of all medical device events (e.g., malfunctions, serious injuries and deaths) to determine whether the event is an MDR reportable event 21 CFR 803.17

- Establish and maintain complete files for all complaints concerning medical device events [21 CFR 803.18]

136.    Intuitive must have written procedures for implementing all requirements in the

Medical Device Reporting regulations, 21 CFR 803.

> Reprinted text from 21 CFR 803.17
>
> Sec. 803.17 What are the requirements for developing, maintaining, and implementing written MDR procedures that apply to me?
>
> If you are a user facility, importer, or manufacturer, you must develop, maintain, and implement written MDR procedures for the following:
>
> (a) Internal systems that provide for:
>
> (1) Timely and effective identification, communication, and evaluation of events that

| Reprinted text from 21 CFR 803.17 |
|---|
| may be subject to MDR requirements,<br><br>(2) A standardized review process or procedure for determining when an event meets the criteria for reporting under this part; and<br><br>(3) Timely transmission of complete medical device reports to manufacturers or to us, or to both if required. |

137.    The definition of an MDR reportable event, i.e., an event that Intuitive, as a manufacturer, must report to the FDA, is set forth as follows:

| Reprinted text from 21 CFR 803.10(c) |
|---|
| (c) If you are a manufacturer, you must submit reports (described in subpart E of this part) to us, as follows:<br><br>(1) Submit reports of individual adverse events no later than <u>30 calendar days</u> after the day that you become aware of a reportable <u>death, serious injury, or malfunction</u>.<br><br>(2) Submit reports of individual adverse events no later than <u>5 work-days</u> after the day that you become aware of:<br><br> (i) A reportable event that requires <u>remedial action to prevent</u> an unreasonable risk of substantial harm to the public health or<br><br> (ii) A reportable event for which we made a written request. |

| Reprinted text from 21 CFR 803.50 |
|---|
| Sec. 803.50 If I am a manufacturer, what reporting requirements apply to me?<br><br>(a) If you are a manufacturer, you must report to us the information required by § 803.52 in accordance with the requirements of § 803.12(a), no later than <u>30 calendar days</u> after the day that you <u>receive</u> or otherwise <u>become aware of</u> information, from <u>any source</u>, that <u>reasonably suggests</u> that a device that you market:<br><br> (1) May have caused or contributed to a death or <u>serious injury</u> or<br><br> (2) <u>Has malfunctioned</u> and this device or a similar device that you market would be likely to <u>cause or contribute to</u> a death or serious injury, if the malfunction <u>were to recur</u>. |

138.    Below are important regulatory definitions that help determine when Intuitive must submit information about an MDR reportable event to the FDA:

| Reprinted text from 21 CFR 803.3(w) |
|---|

---

Reprinted text from 21 CFR 803.3(w)

(w) <u>Serious injury</u> means an injury or illness that:

    (1) Is life-threatening,

    (2) Results in <u>permanent impairment</u> of a body function or permanent damage to a body structure, or

    (3) <u>Necessitates medical or surgical intervention</u> to preclude permanent impairment of a body function or permanent damage to a body structure. Permanent means irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage.

---

Reprinted text from 21 CFR 803.3(k)

(k) <u>Malfunction</u> means the failure of a device to <u>meet its performance specifications</u> or otherwise perform as intended. Performance specifications include all claims made in the labeling for the device. The intended performance of a device refers to the intended use for which the device is labeled or marketed, as defined in § 801.4 of this chapter.

---

Reprinted text from 21 CFR 803.3(w)

(c) <u>Caused or contributed</u> means that a death or serious injury <u>was or may have been attributed to</u> a medical device, or that a medical device <u>was or may have been a factor</u> in a death or serious injury, including events occurring as a result of:

    (1) Failure,

    (2) Malfunction,

    (3) Improper or inadequate design,

    (4) Manufacture,

    (5) Labeling, or

    (6) User error.

---

Reprinted text from 21 CFR 803.3(b)

(b) <u>Become aware</u> means that an <u>employee of the entity</u> required to report has acquired information that reasonably suggests a reportable adverse event has occurred.

---

    139.    Intuitive is required to collect information that is reasonably known.

---

Reprinted text from 21 CFR 803.50

(b) What information does FDA consider "reasonably known" to me?

(1) You must submit all information required in this subpart E that is reasonably known to you. We consider the following information to be <u>reasonably known</u> to you:

---

| Reprinted text from 21 CFR 803.50 |
|---|
| (i) Any information that you can obtain by contacting a user facility, importer, or other initial reporter, <br><br> (ii) Any information in your possession; or <br><br> (iii) Any information that you can obtain <u>by analysis, testing, or other evaluation</u> of the device. |

<u>FDA Regulations Require Intuitive to Analyze and Interpret Information from Complaints
About of their EndoWrist Medical Device</u>

140.    A Complaint Handling is required.  The FDA has a broad definition of a medical device complaint.   Intuitive must report, investigate, and evaluate complaints about their medical devices.

| Reprinted text from 21 CFR 820.3(b) |
|---|
| (b) <u>Complaint</u> means any written, electronic, or oral communication that <u>alleges deficiencies</u> related to the identity, quality, durability, reliability, safety, effectiveness, or performance of a device after it is released for distribution. |

141.    Intuitive must review all complaints about the EndoWrist device to determine if the complaint is reportable under the Medical Device Reporting regulations (21 CFR 803), i.e., the device malfunctioned or caused a death or serious injury.

| Reprinted text from 21 CFR 820.198, Complaint files |
|---|
| (a) Each manufacturer shall maintain complaint files. Each manufacturer shall establish and maintain procedures for <u>receiving, reviewing, and evaluating</u> complaints by a formally designated unit. Such procedures shall ensure that: <br><br> (1) All complaints are processed in a uniform and timely manner, <br><br> (2) Oral complaints are documented upon receipt; and <br><br> (3) <u>Complaints are evaluated to determine</u> whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting. |

<u>FDA Regulations Require Intuitive to Conduct a Complaint
Investigations if a Device Failure Possibly Occurred</u>

55

142. Intuitive must review and evaluate all complaints about their EndoWrist devices.

| Reprinted text from 21 CFR 820.198(b) |
|---|
| (b) Each manufacturer shall review and evaluate <u>all complaints</u> to <u>determine</u> whether an <u>investigation is necessary</u>. When no investigation is made, the manufacturer shall maintain a record that includes the <u>reason no investigation</u> was made and the name of the individual responsible for the decision not to investigate. |

143. Intuitive must investigate all possible failures of their EndoWrist device.

| Reprinted text from 21 CFR 820.198(c) |
|---|
| (c) Any complaint involving the <u>possible failure</u> of a device, labeling, or packaging to meet <u>any of its specifications</u> shall be reviewed, evaluated, and <u>investigated</u>, unless such investigation has already been performed for a similar complaint and another investigation is not necessary. |

<u>FDA Requires Intuitive to Collect Specific Information in a<br>Medical Device Complaint Investigation</u>

144. Intuitive's complaint investigation must determine if there is a connection between the adverse event (e.g., a serious injury) and the performance of their EndoWrist.

| Reprinted text from 21 CFR 820.198(d) |
|---|
| (d) Any complaint that represents an event which must be reported to FDA under part 803 (Medical Device Reporting) of this chapter shall be <u>promptly reviewed, evaluated, and investigated</u> by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by § 820.198(e), records of investigation under this paragraph shall include a <u>determination of</u>:<br><br>(1) Whether the device <u>failed to meet specifications,</u><br><br>(2) Whether the device was being used for treatment or diagnosis; and<br><br>(3) The <u>relationship</u>, if any, <u>of the device to the reported incident</u> or adverse event. |

145. The FDA requires specific information to be recorded in a medical device complaint investigation.

| Reprinted text from 21 CFR 820.198(e) |
|---|
| e) When an investigation is made under this section, a record of the investigation shall be maintained by the formally designated unit identified in paragraph (a) of this section. The <u>record of investigation shall include</u>:<br><br>    (1) The name of the device,<br><br>    (2) The date the complaint was received,<br><br>    (3) Any unique device identifier (UDI) or universal product code (UPC), and any other device identification(s) and control number(s) used,<br><br>    (4) The name, address, and phone number of the complainant,<br><br>    (5) The <u>nature and details</u> of the complaint,<br><br>    (6) The dates and <u>results of the investigation</u>,<br><br>    (7) Any <u>corrective action taken</u>; and<br><br>    (8) Any reply to the complainant. |

146.     To fix the problems with its EndoWrist devices, FDA's Corrective and Preventive

Action (CAPA) regulations require Intuitive to (1) analyze data, (2) investigate cause, (3)

identify action, and (4) verify effectiveness.

<u>FDA Requires Intuitive's Corrective and Preventive Action Procedures Used to Fix any
EndoWrist Problems to Have Four Parts</u>

147.     Establish has a precise meaning in FDA regulations.

| Reprinted text from 21 CFR 820.3 Quality System Regulations, Definitions |
|---|
| (k) <u>Establish</u> means define, document (in writing or electronically), and <u>implement</u>. |

148.     <u>#1 of 4</u>: Analyze data: the FDA requires Intuitive to explore a wide variety of

information and employ statistical procedures to conduct an unbiased examination of data.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>    (1) <u>Analyzing</u> processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data |

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| to <u>identify existing and potential causes</u> of nonconforming product, or other quality problems. Appropriate <u>statistical methodology</u> shall be employed where necessary to detect recurring quality problems; |

149.    <u>#2 of 4</u>: Investigate cause: the FDA requires Intuitive to examine to look beyond the EndoWrist itself for a cause.  Intuitive's rationale for determining if a corrective or preventive action is necessary must be quantitively convincing and based on unbiased facts.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>(2) Investigating the cause of nonconformities relating to product, processes, and the quality system; |

150.    Typical investigation steps:

- Identify problem and characterize.
- Determine scope and impact.
- Investigate data, process, operations, and other sources of information.
- Determine root cause

151.    Examples of root causes

- Training
- Design
- Manufacturing
- Management
- Change Control
- Purchasing/Supplier Quality
- Testing
- Documentation
- Maintenance

58

152.   <u>#3 of 4</u>: Identify action: the FDA expects Intuitive to correct the problem and stop
it from happening again. The corrective action should describe all parties and processes that are
changed.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
| --- |
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>   (3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems; |

153.   <u>#4 of 4</u>:  Verify effectiveness: the FDA wants Intuitive to confirm their solution
worked. Consider collecting additional data after the change(s) are implemented and comparing
the before change vs after change data.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
| --- |
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>   (4) Verifying or validating the corrective and preventive action to ensure that such action is <u>effective</u> and does not adversely affect the finished device; |

| Reprinted text from 21 CFR 820.3 Quality System Regulations, Definitions |
| --- |
| (z) <u>Validation</u> means confirmation by examination and provision of objective evidence that the particular requirements for a specific intended use can be <u>consistently fulfilled</u>. |
| (aa) <u>Verification</u> means confirmation by examination and provision of objective evidence that specified requirements <u>have been fulfilled</u>. |

<u>FDA Requires Intuitive's Corrective and Preventive Action (CAPA) Output to have Four Parts</u>

154.   <u>#1 of 4</u>: Intuitive must implement changes identified to correct the
nonconformance and fix the quality problems. Changes in the EndoWrist can include methods
and procedures and must solve the problem.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
| --- |
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective |

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| and preventive action. The procedures shall include requirements for:<br><br>    (5) <u>Implementing and recording</u> changes in methods and procedures needed to correct and prevent identified quality problems; |

155.    <u>#2 of 4</u>: Intuitive must disseminate the changes internally.  Intuitive's required procedures include communicating the changes to internal staff responsible for their implementation.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action (CAPA) |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>    (6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; |

156.    <u>#3 of 4</u>: Intuitive's management must review and approve changes originating from the CAPA Process.

157.    Management review is a required part of the CAPA process.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (a) Each manufacturer shall <u>establish</u> and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:<br><br>    (7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for management review. |

158.    <u>#4 of 4</u>: The entire CAPA process must be documented.  Documentation is necessary for Intuitive to pass a regulatory audit of their CAPA process used to solve any EndoWrist problems.

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|

| Reprinted text from 21 CFR 820.100 Corrective and preventive action |
|---|
| (b) All activities required under this section, and their results, shall be documented. |

159.    In accordance with the foregoing regulations, if there were adverse events relating to EndoWrists serviced by Rebotix, I would expect there to be submitted MDRs documenting these adverse events.  Moreover, I would expect the MDR to include analysis of whether the adverse event was attributable to Rebotix's services.

160.    As set forth above, the FDA accumulates MDRs in the MAUDE (Manufacturer and User Facility Device Experience) database.  "Each year, the FDA receives several hundred thousand medical device reports (MDRs) of suspected device-associated deaths, serious injuries and malfunctions. The FDA uses MDRs to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of these products. The MAUDE database houses MDRs submitted to the FDA by mandatory reporters (manufacturers, importers and device user facilities) and voluntary reporters such as health care professionals, patients and consumers."  https://www.fda.gov/science-research/data-mining/data-mining-center-devices-and-radiological-health.

161.    I understand that Rebotix has serviced almost 600 EndoWrists for U.S. hospitals, beginning in March 2019.  REBOTIX165988; Feigel conversation.  Both the evidence from this case and my independent investigation show that none of these Rebotix-serviced EndoWrists has resulted in an adverse event reported to the FDA.  For example, I searched the MAUDE database and discovered that there were 131 adverse event records involving EndoWrist devices since 2019 (the first year Rebotix serviced EndoWrists). None of the lengthy narrative descriptions of the 131 adverse events included any content about Rebotix or a refurbished device.

162.    Moreover, my findings are consistent with the testimony of Intuitive's VP of regulatory who I understand was designated to provide testimony on behalf of Intuitive on "Any

determination by Intuitive or the FDA that any repairs or modifications that reset or extend the

number of uses of an EndoWrist instrument violate FDA requirements." Johnson depo., tr. 11:7-

13; Johnson depo., Ex. 1.  Mr. Johnson testified that, although Intuitive regularly submits MDRs

related to EndoWrists failures, he was "unaware" of any "MDR report[s] related to Rebotix

instruments." Johnson depo. tr., 98:13-20; 102:11-21.

163.    Intuitive's letter to the FDA further corroborates my findings.  Rebotix service

records show that the vast majority of its serviced EndoWrists were provided to hospitals prior to

Intuitive's January 29, 2020 letter to the FDA about the purported "public safety concern"

arising from Rebotix's services.  REBOTIX165988; Intuitive-00552745-Intuitive-00552759.  If

there had been any significant safety events (or MDRs) concerning these Rebotix-serviced

EndoWrists, Intuitive would have identified them in its letter.  Both Dr. Curet and Mr. Johnson

testified to this:

> 6    Q   Did Intuitive have any information showing
> 7  that Rebotix's services were unsafe that Intuitive
> 8  decided not to share with the FDA in this letter?
> 9        MS. LENT:  Objection.
> 10       THE WITNESS:  No, I don't believe so.

-Johnson depo. tr., 106:6-10.

> 19        To your knowledge, Intuitive did
> 20  not withhold any information about potential
> 21  public safety concerns caused by Rebotix's
> 22  services from the FDA in preparing this
> 23  letter, correct?
> 24        MS. LENT:  Object to the form.
> 25        THE WITNESS:  Not to my knowledge.

-Curet depo. tr., 110:19-25.

164.    Intuitive's letter to the FDA, however, does not identify any significant safety

events or MDRs.

> 12       Q.  Intuitive's letter to the FDA does

62

13  not identify any specific adverse event
14  submissions attributable to Rebotix's
15  EndoWrist services submitted to the FDA,
16  correct?
17          MS. LENT:  Object to the form.
18          THE WITNESS:  That's correct.

-Curet depo. tr., 115:12-18

165.    Instead, the letter indicates that it has "received EndoWrist Instruments" that have

been serviced by Rebotix through its "complaint process."  Intuitive-00552747.  It later refers

back to these complaints as relating to "dull blades."  Intuitive-00552749 ("Intuitive has seen

firsthand examples of some of the problems described above. For instance, remanufactured

EndoWrist scissors have been returned to Intuitive with dull blades in conjunction with feedback

from the customer that the device did not cut properly.").  As I discussed above, dull blades

appear to be a common problem with EndoWrists and with laparoscopic devices generally.  The

evidence shows that instruments with dull blades are typically replaced, and generally do not

present a significant safety concern.

166.    Moreover, if Intuitive were made aware of a serious safety issue with an

EndoWrist, I would expect there to be a CAPA investigation.  And if the EndoWrist that

prompted the investigation had been serviced by Rebotix, I would expect that to be well

documented in the CAPA investigation.  I understand that Intuitive has initiated several CAPA

investigations for its EndoWrists, but none of these investigations involved an EndoWrist

serviced by Rebotix:

16      Q.   What is your best estimate of the number
17  of CAPAs that Intuitive initiates for its EndoWrists
18  in a given year?
19          MS. LENT:  Objection.
20          THE WITNESS:  Maybe a dozen, something
21  like that.
22  BY MR. LYON:
23      Q.   Has Intuitive ever initiated a CAPA

63

24  investigation for EndoWrists serviced by Rebotix?
25     A.   I don't believe we have launched a CAPA on
1   that, no.

-Johnson depo. tr., 101:5-102:1.

167.    Accordingly, I have not seen any evidence that the FDA would consider to be a

significant safety risk arising from Rebotix's services.

**2.5    The FDA already considered whether Rebotix's services require 510(k)
approval, and the FDA took no action.**

168.    When the FDA becomes aware that a company is engaging in activity that

purportedly violates FDA regulations, the FDA can conduct an inspection to collect information

about that activity to determine if the activity indeed runs afoul of its regulations.  If the FDA

concludes that the company is violating FDA regulations, it will initiate enforcement activities.

As the FDA explains: "The objective of FDA regulatory programs is to assure compliance with

the Federal Food, Drug, and Cosmetic Act (the Act). Specific enforcement activities include

actions to correct and prevent violations, remove violative products or goods from the market,

and punish offenders."   https://www.fda.gov/animal-veterinary/resources-you/types-fda-

enforcement-actions.  "The type of enforcement activity FDA uses will depend on the nature of

the violation. The range of enforcement activities include issuing a letter notifying the individual

or firm of a violation and requesting correction, to criminal prosecution of the individual or

firm." *Id*.

169.    Alternatively, if the FDA concludes that an activity does not run afoul of its

regulations, it takes no further action.  In these instances, the FDA does not provide the company

with any sort of notice of its conclusion.  Generating notices describing what the FDA will <u>not</u>

do are considered unnecessary.  Instead, the FDA's silence implicitly informs the company that

the FDA concluded that the company's activities do not run afoul of FDA regulations.

170.    In my experience, if the FDA does not initiate any sort of enforcement action

within 90 days of being made aware of an allegedly violative activity, it is safe to conclude that

that the FDA concluded the activity is compliant with FDA regulations and it will not initiate any

sort of enforcement activity.

171.    Here, Intuitive wrote to the FDA on January 29, 2020, to inform the FDA that it

believed Rebotix's activities were not compliant with FDA regulations.  Intuitive-00552745-

Intuitive-00552759 (Curet letter).

172.    A few weeks after receiving Intuitive's letter, the FDA contacted Rebotix.  I

understand that on February 20, 2020, and February 28, 2020, Rebotix representatives spoke on

the telephone with Je Ji An of the FDA, during which the FDA requested further information

about Rebotix's services.  Feigel conversation.

173.    On March 6, 2020, and March 19, 2020, Rebotix sent emails to Jitendra Virani,

who was the FDA contact person for this investigation.  *Id*.; REBOTIX174749-

REBOTIX174756.  In the emails, Rebotix explained its view that the term "remanufacturer" in

21 CFR 820.3(w) does not apply to its services.  *Id*.  Rebotix also provided detailed responses to

four questions posed by the FDA.  *Id*.  Rebotix explained that hospitals use Rebotix's services

"to operate the instrument beyond the manufacturer's original recommendation," i.e. to "extend

the lives of the device beyond the original equipment manufacturer (OEM) stated limit."  *Id*.

Rebotix explained that, to do so, Rebotix removes the housing and adds a new functional

equivalent to the usage counter.  Rebotix explained that it evaluates the mechanical components

to determine if the EndoWrist is a candidate for repair.  *Id*.  And Rebotix provided a high-level

overview of the sort of repairs it makes.  *Id*.  Rebotix also agreed to make themselves available

for any follow-up calls to discuss its responses and any other questions the FDA may have about its service. *Id*. The FDA confirmed receipt of Rebotix's emails. *Id*.

174.    I understand that, after receiving Rebotix's emails explaining their services, the FDA did not seek any further information from Rebotix and did not initiate any sort of enforcement proceedings. Feigel conversation. The FDA took no further action. *Id*.

175.    It has now been almost 17 months since Intuitive wrote the FDA, encouraging it to institute enforcement proceedings against Rebotix, and over 15 months since Rebotix provided the FDA with the information that the FDA requested.   If the FDA had concluded that Rebotix's services violate FDA regulations, the FDA would have acted by now.  From the FDA's silence, it is safe to conclude that, after learning more about Rebotix's services, the FDA determined that Rebotix's services do not violate FDA regulations.

176.    Moreover, my opinion is consistent with the views of both Myriam Curet of Intuitive, who wrote the letter to the FDA encouraging the FDA to investigate Rebotix, and with other FDA experts.  Dr. Curet testified as follows:

> 18      Q.  Some point after the FDA reached
> 19  out to Rebotix, asked for information about
> 20  Rebotix's services, received information from
> 21  Rebotix and then declined to pursue the matter
> 22  further, you would conclude that the FDA
> 23  determined Rebotix's services do not require
> 24  FDA clearance, correct?
> 25      MS. LENT:  Object to the form.
>  1    THE WITNESS:  Yes.

-Curet depo. tr., 192:18-193:1.

177.    And, as set forth in the Deutsche Bank analyst report discussed below, it is "safe to believe that Intuitive has brought this to FDA's attention" and according to "our [FDA and regulatory] consultants, if the FDA doesn't act on this information within 3-6 months, it is unlikely the FDA ever will."  Intuitive-00566064.  The analyst report was from February 20,

2020.  No action has been taken by the FDA since.

### 2.6 Additional opinions.

#### 2.6.1   Intuitive's reliance on Cal Rabang's email to support its allegation is unfounded.

178.    I understand that, in May 2018, Bob Overmars of BPI Medical reached out to Cal Rabang of the FDA to inquire about Intuitive's assertion that a 510(k) is required for repairing EndoWrists.  BPI000331- BPI000337.  Mr. Overmars is in the business of repairing laparoscopic instruments and was concerned that, if Intuitive could establish use limits that precluded repairs, then potentially other traditional laparoscopic instruments manufacturers could follow suit. Overmars depo. tr., 51:13-52:11.

179.    Dr. Rabang informed Mr. Overmars that "for the reusable EndoWrist Instruments, if the use-life counter is reset or extended past the number of available use lives, then the device specifications are changed. As such, you would be considered a remanufacturer per 21 CFR 820.3(w)" and "As such, you would be subject to premarket notification (510(k)) requirements defined in 21 CFR 807.81."  BPI000331- BPI000337.

180.    In my opinion, any attempt by Intuitive to rely on Cal Rabang's email to support its 510(k) allegation is unfounded.

181.    First, I note that Dr. Rabang was not providing an opinion on behalf of the FDA. As he wrote in his email to Mr. Overmars, his communication "constitutes an informal communication that represents [his] best judgment at this time but does not constitute an advisory opinion, does not necessarily represent the formal position of the FDA, and does not bind or otherwise obligate or commit the agency to the view expressed."  BPI000335- BPI000336.  Informal opinions, like the view expressed by Mr. Rabang, are often performed without all relevant information and without any detailed analysis.  This is why such views are

accompanied by the statement that it does not represent the opinion of the FDA.

182.    Second, the cursory opinion provided by Dr. Rabang fails to apply the correct standard.   Dr. Rabang states that "if the use-life counter is reset or extended past the number of available use lives, then the device specifications are changed" and a 510(k) is required. BPI000335.  But the test does not turn on whether "device specifications are changed."  The definition of "remanufacturer" makes no mention of changes to device specifications.   Instead, to be a "remanufacturer," a person must "significantly change[] the finished device's performance or safety specifications, or intended use."  21 CFR 820.3(w).  That is, a 510(k) can only be required when a person makes a "change or modification in the device that could significantly affect the safety or effectiveness of the device" or a "major change or modification in the intended use."  21 CFR 807.81(a).

183.    Dr. Rabang expressed no opinion on whether extending the number of lives could significantly affect the safety or effectiveness of an EndoWrist.  And, as demonstrated above, the evidence demonstrates it does not.  For example, Intuitive concluded that "increasing the number of lives for these instruments is not expected to significantly affect the safety or effectiveness of the device."  Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552638.

184.    Similarly, Dr. Rabang expressed no opinion on whether extending the number of lives is a major change or modification to an EndoWrist's intended use.  And, as demonstrated above, the evidence demonstrates it is not.  For example, Intuitive concluded that "Extending the number of lives does not involve any changes to the intended use(s) or instrument design." Johnson depo., Ex. 14 (Non-Filing Justification) at Intuitive-00552635.

185.    Third, Dr. Rabang lacked basic information about Rebotix's services necessary to perform a proper analysis.  For example, the evidence indicates that Mr. Overmars did not provide Dr. Rabang with any details of the repairs Rebotix performs or the measures Rebotix

takes to ensure Rebotix-serviced EndoWrists are just as safe and effective as new EndoWrists. Overmars depo. tr., 111:7-114:19. Nor did he have any reason to believe that Dr. Rabang knew this information. *Id*. Similarly, Mr. Overmars did not inform Dr. Rabang that hospitals maintain ownership of the EndoWrists during the repair process. *Id*. Nor did have any reason to believe that Dr. Rabang knew this information. *Id*.[10]

186. Fourth, when the FDA was actually provided with information about Rebotix services, the evidence demonstrated that the FDA concluded that Rebotix's services do not require a 510(k). See Section 2.5 above.

### 2.6.2. The process of adding the Interceptor during servicing does not require Rebotix to submit a 510(k).

187. Intuitive also asserted to the FDA that the physical process of removing the housing of the EndoWrist to add the Interceptor chip could significantly affect the performance and safety of the EndoWrist, and thus subject Rebotix to 510(k) submissions. Intuitive-00552745-00552759 (Curet letter to FDA) at Intuitive-00552747. In my opinion, the FDA would reject this assertion based on all of the same reasons expressed in my report.

188. First, the process of adding the Interceptor chip does not significantly change the intended use as defined by Intuitive and accepted by the FDA. After the EndoWrist service is complete (█████████████████████████████████████████████████████

█████████████████████████████████████████████), the intended use of the EndoWrist remains

---

[10] Dr. Rabang's lack of information on the Rebotix repair process is further illustrated by his statement that, if "the device is cleaned, disinfected and/or sterilized, then you would be considered a 3rd party reprocessor." BPI000335. If Dr. Rabang were knowledgeable about the Rebotix's services, he would have known that this is not part of the Rebotix process. Hospitals, not Rebotix, are responsible for cleaning and sterilization of EndoWrists. REBOTIX162405; Gibson depo. tr., 35:21. Notably, Intuitive expressed the same lack of knowledge about Rebotix's process when it raised the same flawed sterilization allegation in its letter to the FDA. Intuitive-00552745-00552759 (Curet letter to FDA) at Intuitive-00552749 ("EndoWrist Remanufacturers also may be using non-validated or incompatible cleaning agents and/or disinfection/sterilization processes, which have the potential to damage the instruments.").

the same: endoscopic manipulation of tissue, including grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery and suturing. See Intuitive-00512047; Intuitive-00512044.

189.    Second, the process of adding the Interceptor chip does not significantly change the safety and performance of the EndoWrist.  All Rebotix-serviced EndoWrists have had the Interceptor added.  And Rebotix has performed substantial testing to ensure the safety and performance of these Rebotix-serviced EndoWrists, while Intuitive appears not to have performed any testing on Rebotix-serviced EndoWrists.  For example, although Dr. Curet asserted in her letter to the FDA that Rebotix's removal of the housing to add components (i.e., the Interceptor) "could harm certain components and cause danger to the patient," Intuitive-00552747, she admitted at deposition that she "do[esn't] know whether there's been any testing to analyze whether the act of removing the housing or adding a component by Rebotix harms the EndoWrist device."  Curet depo. tr., 141:14-142:10.  This stands in contrast to the testing by Rebotix (discussed above) demonstrating that it does not cause any harm.

190.    Third, as discussed above, Rebotix informed the FDA about this process, and the FDA subsequently determined that Rebotix's services do not violate FDA regulations.  In its email to the FDA, Rebotix wrote:

> "The devices have their proximal housing removed to allow inspection and repair of the simple cable-pulley system inside. There is a PCB inside of the instrument that contains a memory device (off-the-shelf DS2505 IC). This memory device contains the usage counter. The DS2505, which no longer functions for the devices under repair, is replaced by our functional equivalent component."  REBOTIX174750.

191.    After learning this information, the FDA took no action, indicating that this process did not run afoul of any FDA regulations.

70

**2.7    Other FDA experts, and Intuitive's own analysis of FDA requirements, agree with my opinion that FDA clearance is not required for refurbished EndoWrists.**

192.    In the sections above, I set forth several reasons why Rebotix was not required to seek FDA clearance for its EndoWrist services.  In this section, I show that my opinions are shared by experts in the field and confirmed by Intuitive's own regulatory team.

193.    Through discovery, Intuitive produced an analyst report from Deutsche Bank that analyzes whether EndoWrist repair services, like Rebotix's service, require approval from the FDA.  Intuitive-00566055–Intuitive-00566082.  The report relies on "insights from four regulatory consultants with experience and expertise in the area of third party servicing medical devices" including a "Former staffer within the DCRF division of the FDA," a "Regulatory expert who has worked with various medtech companies in managing hundreds of 510(k) and PMA submissions over decades of industry experience" and "Two regulatory affairs personnel at large medtech companies with significant presence in device refurbishing/reprocessing." Intuitive-00566059.

194.    The conclusions of these experts agree with my own opinions expressed throughout my report.  For example: "Our takeaway from speaking with these consultants is that 510(k) clearance is not [] required for independent service organizations (ISOs) such as Restore Robotics in repairing limited-use da Vinci instruments for hospitals and returning them to the hospital for continued usage."  Intuitive-00566059.  "[A]ll experts agreed that any regulatory action/enforcement is highly unlikely given the FDA's clear comfort around the safety of refurbished devices broadly and the fact that there has been no signal of incremental patient risk to date with repaired da Vinci instruments."  Intuitive-00566057.

195.    Moreover, when Intuitive was investigating implementing a refurbished EndoWrist

71

project of its own, called Project Dragon, Intuitive's regulatory team also reached the conclusion

that FDA approval was not required for refurbished EndoWrists.  Scoville depo. tr., 59:24-25;

57:4-22; Scoville depo., Ex. 3 (January 30, 2017, presentation entitled "Instrument eX: I&A

Refurbishment Feasibility Update") at Intuitive-00423572-Intuitive-00423576.

196.   As part of its diligence for Project Dragon, Intuitive performed a "regulatory

assessment" where it performed a "country by country assessment on ability to sell refurbished

instruments, and requirements to do so."  Intuitive-00423573; Scoville depo. tr., 50:21-53:2.

197.   Earle Canty, a "regulatory leader at Intuitive," who oversaw a team with

"knowledge for working with the FDA and other medical regulatory bodies around the globe,"

provided Intuitive's conclusions on the regulatory requirements for refurbished EndoWrists.

Scoville depo. tr., 47:24-48:24.

198.   As Mr. Canty reported, Intuitive concluded that it was permissible to sell

refurbished EndoWrists anywhere in the United States and clearance or registration with the

FDA is <u>not</u> required:

> 25    Q.  And the United States does not require
> 1  clearance or registration for refurbished
> 2  EndoWrists; correct?
> 3     A.  As I'm seeing on this slide, that appears
> 4  to be Earle's assessment at the time this slide was
> 5  created.
>                          -Scoville depo tr., 51:25-52:5

# Regulatory Assessment

| Country | Allows sale of refurbished product made anywhere? | Only allow sale of refurbished product if refurbishing done in country? | Clearance/ registration required? | Time to complete registration |
|---|---|---|---|---|
| | Yes | No | No | NFI; no timeline. |
| Canada | Yes | No | Yes | Amendment- 6 months. |
| France | Yes | No | Yes | Must be CE Marked; notification after placing on the market. |
| Germany | Yes | No | Yes | Must be CE Marked. |
| India | Yes | No | No | Can change depending on 1. New regulation for medical devices and 2. restriction on importation of used devices ( attempted in summer 2015). |
| China | No | No | | Hospitals are allowed to purchase and use used devices from other hospitals within China. However, companies are not allowed to sell refurbished products. |
| Japan | Yes | No | Yes | Registration required only if facility has not been registered. 1 year or so. |
| Korea | Yes | No | Yes | 6-12 months. Only products with the same information that have been authorized in the Sanitary register (PN and Country). It does not matter if it is remanufactured. |
| Mexico | Yes | No | Yes | N/A |
| Singapore | Yes | No | No | N/A |
| Malaysia | Yes | No | No | N/A |

41                                                da Vinci Surgery

Intuitive-00423574.[11]

199.    If called upon to testify at trial, I expect to prepare additional demonstrative

materials reflecting the opinion set forth herein.

Executed on July 25, 2021, at Stevensville, Maryland.

Joshua Sharlin

Joshua Sharlin, Ph.D.

---

[11] As part of Project Dragon, Intuitive also concluded that, for certain EndoWrists clinical utility
was equivalent or better than new instruments after they had been refurbished. Scoville depo. tr.
105:10-14; Scoville depo., Ex. 7 at Intuitive-00103439.

Exhibit 2 to Stevens Report

(Stevens CV)

**J. Lawrence Stevens, RAC**
**833 E. Rosedale Dr.**
**East Alton, IL 62024**
**314-499-5148 (office)**
**714-473-0863 (mobile)**
**Larry@fdadeviceexpert.com**

**INTRODUCTION:**

Over 20 years of FDA experience encompassing virtually all of the FDA field positions.  Also eighteen years of industry experience as a mid-level manager and senior executive in clinical, regulatory, and quality in the medical device industry.   Personally designed quality systems, prepared regulatory submissions (510(k), IDE and PMA) and managed 7 multi-center clinical trials for class 3 medical devices.  From 1989-1993, was the Industry Representative on the FDA Circulatory Systems panel.  Additionally, a seasoned educator/speaker with over 250 public presentations to audiences ranging from senior executives, physicians, technical personnel, other medical personnel, major media, and the general public.  Holds regular Webinars on FDA Issues, and routinely serves as an Expert Witness in the area of FDA regulation of medical devices.

**WORK EXPERIENCE:**

One Way Consultants, LLC, September 2011 – Present

Services offered to FDA regulated businesses include regulatory guidance on 510(k), IDE and PMA submissions. Also planning, creating, and auditing quality systems to USA and international standards. Creation of clinical plans including protocol development, case report form development, implementing and managing clinical trials. Also, assistance with Design Control to meet FDA requirements and representing clients in FDA meetings.  I am a professional public speaker who can train persons on all aspects of FDA requirements, and practical and successful solutions to FDA problems.

Completed writing  510(k) submissions for electronic devices utilizing laser energy.

I also had a project to assist a foreign firm in obtaining an FDA PMA for a class 3 implantable cardiovascular device.  The first step in this process was to prepare an FDA "Pre Sub" IDE meeting request. The meeting request was accepted by FDA for an in-person meeting to finalize pre-clinical testing and the future clinical evaluation requirements for an IDE for the device.  The meeting was held at CDRH with ODE and CDER staff, and at the meeting, I assisted the client.  The FDA response was favorable and the next step is the preparation of the IDE and another meeting with FDA to discuss the final clinical trial design.

Completed a project to lead a company in resolving quality issues raised in an FDA Warning Letter.  The project involved a review of the issues raised in the Warning Letter and a complete review of the company's organizational structure and resource allocations for Quality Systems. The final report included a recommendation on reorganization needed to meet FDA QSR requirements.  In addition, the firm requested two additional audits to determine effectiveness of corrective actions.   Recently met with the FDA District Office District Director with the firm to discuss corrective actions taken to resolve the letter.  The meeting was successful in FDA saying they would close the Warning Letter.

I have performed audits of quality systems performed upon request to assess compliance multiple International regulatory systems.   A matrix has been developed that covers FDA Quality System Regulation, 21 CFR Part 820; European Standards for Medical Device Sections, European Standard ISO 13485:2016 Medical Devices; Canadian rules Medical Devices Regulations SOR/98-282; and Japan's MHLW Ministerial Ordinance No. 169 Medical Device Manufacturing.  This is more complex audit than an FDA QSR audit, and entails more time to create the written report, but the firm received a report addressing all 4 international requirements.

I worked with a major medical device firm to perform RA/QA/CA due diligence for potential acquisition.   This required more than an FDA audit as it involved detailed analysis of all international regulatory actions, as well as interviewing all key officials and reporting on their background relative to the roles they played in the firm.

Performed multiple audits for two "Virtual" firms developing combination products.  Audited contract firms for design controls, quality systems, and clinical studies, for both the drug component and the device component of the final products.

Performed vendor audits for a major manufacturer of a combination product as mock FDA PAI inspections. This included audits of facilities in England and Germany,

I regularly perform webinars, and also serve as a guest speaker at Regulatory and Quality Conferences (See the resume section on Presentations.)


Expert Witness Activities

I have been engaged as an expert witness on over 45 cases involving the FDA Regulation of Medical Devices. I have been deposed 8 times and testified in court two times.  I have never had a Daubert Motion regarding my qualifications to be an expert witness.


UNITED STATES FOOD & DRUG ADMINISTRATION, November 2000 - September 2011.

Supervisory Investigator, FDA Saint Louis Office, March 2009 – September, 2011

Directed all of the FDA operations at the Saint Louis, MO office for FDA. This included work planning for investigators, training of investigators, reviewing inspection and investigation reports for technical and legal requirements. Received an FDA commendation for development of newly hired investigators. Trained on Incident Command Systems (ICS) to serve as a leader in multiagency response to national incidents.


Acting Director of Compliance, FDA Los Angeles District, September 2008 – March 2009

Directed the activities of 7 Compliance Officers. Monitored all on-going projects, and assured adequate resources to assure timely and accurate review of violative inspections, investigations, and sample collections. Negotiated with FDA Centers, Office of Chief Counsel, and Office of Enforcement regarding legal cases. Chaired meetings with regulated firms regarding requirements necessary to meet FDA legal requirements.

Director, Import Operations Branch -FDA Los Angeles District, November 2003 to September 2008

Responsible for managing the operations of over 100 FDA employees located at offices in San Pedro, Carson, Long Beach, Ontario, and Los Angeles International Airport. It was the responsibility of these employees to review all FDA regulated products offered for entry and sale into the United States from foreign sources through the Ports of Long Beach and Los Angeles, and Ontario and Los Angeles International Airports. Successfully reorganized the branch to optimize personnel efficiencies, regularly chaired Import Broker meetings to gain feedback on their perception of FDA Import Operations. Received a special award from FDA's Office of Criminal Investigation for support the Import Branch provided for development of criminal cases. Acted as the FDA Los Angeles District Director, during the Director's absence.

Compliance Officer, FDA Los Angeles District, June 2002 - November 2003

Perform technical reviews of inspection reports and sample analyses and determine the potential need for further regulatory action by FDA. Work assignments were almost exclusively complex medical device and pharmaceutical inspections and require both risk and legal assessments to formulate regulatory enforcement plans. In my first six months in this position, I authored six Warning Letters. The Warning Letters involved four pharmaceutical, and two medical device firms. Charges cited in the letters ranged from cGMP (QSR), to unapproved new drugs, failure to comply with an OTC Monograph, and failure to submit a 510(k) Premarket Notification.  Also chaired meetings requested by companies to discuss their regulatory status. The meetings involved both Corporate and Private Counsel and senior executives for major device firms.

Investigator (Medical Device Specialist), FDA Los Angeles District, November 2000 – June 2002

Served as a technical specialist in the Los Angeles District for all aspects of Medical Device regulatory compliance. Performed inspections of manufacturers of high-risk medical device firms for both GMP/QSR compliance, as well as sponsor/monitor and clinical investigator inspections for IDE, IRB, and Informed Consent compliance. Certified in the QSIT Approach, and certified for knowledge of the Quality System Regulation. In a 15-month period had two warning letters issued for QSIT inspections, and one recall initiated as a result of a QSIT inspection. Served as a trainer for less experienced investigators for QSIT inspections, Bio-Research Monitoring inspections, food sampling, and recall initiation and monitoring. Selected in January 2002, as the New Hire Training Coordinator for the Los Angeles District Domestic Investigations Branch.

**INDUSTRY EXPERIENCE**

President/Founder, March 1997- November 2000
MEDICAL DEVICE DEVELOPMENT CORPORATION, Fullerton, CA

Founded this consulting firm to advise medical device manufacturers of management responsibility, organizational structures, processes, procedures, and requirements to take a medical device concept to the market. Clients were primarily start-up companies who engaged the services of the firm to provide strategic guidance in the areas of clinical studies, design development, quality systems development, product liability issues, and government approvals (both U.S. and international). Successfully developed strategic plans, and designed and implemented program planning. Services also included preparation of complex regulatory submissions (IDE, 510(k), PMA, Product Dossiers, Product Technical Files). When requested represented the client before FDA, Notified Bodies, Physicians, Investors, Corporate Partners, and Boards of Directors.

Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance, 1995 -1997
CORDIS WEBSTER, INC. a Johnson & Johnson Company, Baldwin Park, CA 91706

Joined the senior staff of the company shortly after the acquisition of Webster Laboratories by Cordis Corporation. Cordis Webster was a mature company manufacturing and developing Class 2 and 3 products for the cardiac electrophysiology market. Successfully reorganized the Clinical and regulatory departments, and developed systems to assure that all clinical studies and regulatory submissions efficiently met development schedules. Developed a strategic plan that allowed the company to amend a PMA to assure that FDA would approve it. Oversaw quality systems development and management that led to a successful FDA PMA inspection and to ISO-9001 certification and CE Marking. Designed and implemented an innovative clinical protocol that was used to support a PMA product that was approved for a $100-million-dollar market.

Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance, 1994 – 1995
CARDIMA CORPORATION, Fremont, CA 94538

Key member of the senior staff of this early stage company developing products for the electrophysiology market. Utilizing team-building efforts, lead the company in a reassessment of priorities allowing for more focus and program accountability. Successfully negotiated with FDA over a complex IDE, to obtain an approval in 30 days. Set up all procedures and plans for a multi- center clinical study.  Interacted with venture capital company representatives in efforts to secure additional financing. Lead the company's ISO/GMP program, and development of management systems to assure efficient operations in an environment of total employee involvement.

Vice President, Regulatory Affairs/Quality Assurance, 1993 - 1994
CARDIAC PATHWAYS CORPORATION, Sunnyvale, CA 94086

As member of the senior management team of this start-up company, developed strategic programs in the development of an integrated system for diagnosis and treatment of cardiac arrhythmias. Directed the implementation of a clinical program to comply with U.S. FDA and European Union requirements. Responsible for overseeing R&D efforts to assure adequate documentation of design control.  Prepared all regulatory submissions for both U.S. and international clinical evaluation and marketing approval of various cardiovascular catheters and diagnostic systems. Personally wrote one 510(k) and two IDE's.

Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance, 1990 - 1993
BAXTER HEALTHCARE CORPORATION, Edwards LIS Division, Irvine, CA 92714

Senior management position responsible for directing all of the quality assurance programs, clinical evaluation programs, and preparation of government regulatory submissions required for marketing medical devices in the United States and throughout the world. Edwards LIS Division was a fully integrated manufacturer of medical devices for vascular surgery and interventional cardiology. Directed implementation of a preproduction quality assurance program significantly improving the product development cycle and product reliability. Effectively reorganized Quality, Regulatory, and Clinical departments to facilitate a company-wide Total Quality Assurance approach. Established an International RA function and established plans for obtaining the "CE" mark in Europe. Certified by Baxter Healthcare Corporation as an examiner for the Baldrige (Baxter) Quality Award.  Attended all FDA Circulatory Systems Advisory Panel meetings as the Industry Representative (four-year appointment by FDA 1989-1993)

Vice President, Regulatory Affairs, Clinical Research and Quality Assurance 1986 - 1990
RETROPERFUSION SYSTEMS, INC., Costa Mesa, CA

Joined the start-up company team to develop an innovative electromechanical medical device to be utilized in interventional cardiology in the treatment of coronary artery disease. Interfaced with design engineers and physicians and oversaw pre-clinical research. Prepared the original Investigational Device Exemption (IDE) application that was approved by FDA in 30 days from the first submission. Set up the clinical evaluation program, implemented and managed an international multicenter clinical evaluation
and prepared the Premarket Approval Application (PMA) which was accepted by FDA for filing in 45 days from the original submission.  Obtained international approvals for export. Organized and staffed the Quality Assurance department, established pre-production QA functions and created procedures to meet Good Manufacturing Practices (GMP) regulations.

Manager, Regulatory Affairs, 1984 - 1986
UNITEK CORPORATION, Subsidiary of Bristol-Myers Company, Monrovia, CA

Responsible for all of the regulatory requirements for this large fully integrated manufacturer of mechanical, electronic and chemical medical devices and pharmaceuticals. Managed the company employee safety program, the environmental health program, product complaint department and internal GMP Audit program. Prepared all regulatory submissions (510(k), IDE, Product Registrations). Member of the strategic planning committee for the company and a key member of all product development teams.

Manager, Regulatory and Clinical Affairs 1982 - 1984
HEYER SCHULTE DIVISION, American Hospital Supply Corporation, Goleta, CA

Responsible for the regulatory and clinical programs for this medium sized manufacturer of implantable silicone devices utilized in neurology, cardiology, orthopedics, and plastic surgery. A member of the project teams that successfully developed and introduced to the market new class II and class III products. Managed the clinical evaluation of two class III devices and the preparation of all regulatory submissions (510(k), IDE, PMA). Performed internal GMP audits and was the liaison with corporate GMP and GLP auditors, and state and federal inspectors.

EARLY FDA EXPERIENCE, 1972-1982

U. S. Food and Drug Administration, Los Angeles, CA
Small Business Representative, July 1979- March 1982

Established the first West Coast office in the Small Business Assistance program, and served as a representative of the CDRH, Division of Small Manufacturers Assistance. Trained by FDA on all aspects of the 1976 Meical Device Law and regultions.   Provided regulatory guidance to developers of new medical devices. Performed on-site visits at manufacturing locations and advised on procedures necessary to meet GMP and IDE requirements. Met with Institutional Review Board representatives to advise them of regulatory requirements. Served as an FDA spokesperson at numerous government and industry meetings, presenting regulatory requirements for medical device manufacturers.

U. S. Food and Drug Administration, Los Angeles, CA
Consumer Affairs Officer, September 1975- June 1979

Directed the consumer, industry, and press information programs for the Los Angeles District.
Prepared and implemented professional education programs for teachers, health educators, nurses, and
physicians. Primary public spokesperson in Los Angeles for all FDA related matters.

U. S. Food and Drug Administration, Los Angeles, CA
Consumer Safety Officer (Investigator) June 1972 - August 1975

Performed inspections and investigations of all product areas regulated by FDA. Specialties included
sterilization and injury/illness investigations. Trained other investigators. Awarded the FDA
Commendable Service Award in 1974 for outstanding performance as an investigator

**EDUCATION**

California State University, Fullerton, Bachelor of Arts, 1970. Biological Sciences

Golden Gate University, Santa Barbara, CA, MBA Program: One year Completed; 1982-83

**AWARDS**

FDA Commendable Service Award, 1974
FDA Special Achievement Award, FDA Office of Criminal Investigations, 2009

**CERTIFICATIONS**

Certified in Regulatory Affairs (RAC) by the Regulatory Affairs Professionals Society, 1991

**APPOINTMENTS**

Member, Board of Directors, National Alliance on Medical Illness, Southern Illinois Division, a non-profit
organization offering assistance to persons or families dealing with mental illness, and advocating on their
behalf.  August, 2011 to present

Industry Representative, FDA Circulatory Systems Advisory Panel, FDA Center for Devices and Radiological
Health, four-year term, ending June 1993.

Instructor, Design Control Seminars, Noblitt & Rueland, 1994 - 2000

## PUBLICATIONS

Abel, J., Stevens JL. What to Expect When You are Inspected. Endovascular Today, 2004 Jan; 3(1):58-60

Stevens JL. Practical Aspects of the Clinical Evaluation of a Medical Device. Medical Device & Diagnostic Industry. 1985 Apr: 7(4):71-75.10/15/2015

Stevens JL. Design Verification. Medical Device & Diagnostic Industry. 1994 Jan:93-97

Stevens JL. Are your internal quality system auditors overlooking deficiencies of FDA significance? Self-published on LinkedIn (2015 Oct. 15)

Stevens JL. Don't use FDA to Rate Your Quality System. Self-published on LinkedIn (2016 Feb. 24) 08/01/2016

Stevens JL. How Do I Know if My Personal Training Program Meets FDA's Expectations? Self-published on LinkedIn (2016 Aug. 1)

Stevens JL. What is happening with FDA's 510(k) Refuse to Accept Policy> Self-publsihed on LinkedIn (2015 Oct. 29).


## PRESENTATIONS:

"Establishing Quality Indicators to Assure GMP/GCP Compliance" lecture, GMP-GCP 2012, GMP & GCP USA, Europe, Japan, Asia Pacific, OMICS Group Conferences, Philadelphia, PA December, 2012

"Conducting Successful FDA Meetings" One Hour Webinar for Biopractice.com., May 2013

"Using Quality Indicators for Successful FDA QSR Management Reviews" One Hour Webinar for Biopractice.com, September, 2013

"Navigating FDA Import Requirements for all FDA Regulated Products" One Hour Webinar for Biopractice.com, July, 2015

"Understanding the Mindset of an FDA Employee" One Hour Webinar for Biopractice.com, October, 2013

"FDA cGMP for Pharmaceuticals – 2104 Expectations" cGMP 2013 Conference, Utrecht, The Netherlands, December, 2013

"FDA and Medical Device Advertising in the 21st Century" One Hour Webinar for Biopractice.com, July, 2014

"FDA Requirements for Good Clinical Practice's and efficient and effective clinical trial" One Hour Webinar for Biopractice.com, September, 2016

"Effective Management Reviews for FDA and Management"  One Hour Webinar for Biopractice.com, November, 2016

"Protecting Patient Privacy"  One Hour Webinar for Biopractice.com, Februrary 2017

"Good Clinical Practice and More!"  One Hour Webinar for Biopractice.com, September, 2017

Premarket and Postmarket Data Collection - A Faster FDA Approval for Medical Devices One Hour Webinar for Biopractice.com, February, 2018

"UDI and GUDID - The Unique Device Identification and the Global Unique Device Identification Database : The FDA Plan and Your Requirements",  One Hour Webinar for Biopractice.com, April 2018

**AFFILIATIONS**

Regulatory Affairs Professionals Society, Member 1982 - Present,
President, Western Section, 1985 - 1986

American Society for Quality, Member 1976 – Present

FDA Alumni Association, Member 2013-Present

# Exhibit 3 to Stevens Report

# (Materials Considered)

**Materials Considered**

- "Agenda for Quarterly Meeting on MDUFA IV (FY 2018-2022) Performance." *FDA*, www.fda.gov/media/120474/download.
- "FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices." *FDA*, wayback.archive-it.org/7993/20201224084841/https:/www.fda.gov/media/113431/download.
- "Labeling Recommendations for Single-Use Devices Reprocessed by Third Parties and Hospitals; Final Guidance for Industry and FDA." *FDA*, www.fda.gov/media/71405/download .
- "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff." *FDA*, www.fda.gov/media/80265/download.
- 15 U.S.C. §§ 52-55
- 1906 Pure Food and Drugs Act
- 2015 Reprocessing Guidance (https://www.fda.gov/media/80265/download)
- 2018 FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices
- Center for Devices and Radiological Health. "OHT4: Office of Surgical and Infection Control Devices, Office of Product Evaluation and Quality." *U.S. Food and Drug Administration*, www.fda.gov/about-fda/cdrh-offices/oht4-office-surgical-and-infection-control-devices-office-product-evaluation-and-quality.
- Center for Devices and Radiological Health. "What Are Reusable Medical Devices?" *U.S. Food and Drug Administration*, FDA, www.fda.gov/medical-devices/reprocessing-reusable-medical-devices/what-are-reusable-medical-devices.
- Commissioner, Office of the. "What We Do." *U.S. Food and Drug Administration*, FDA, www.fda.gov/about-fda/what-we-do.
- Compliance Program Guidance Manual (CPGM) 7382.845, "Inspection of Medical Device Manufacturers," (Feb. 2, 2015), available at https://www.fda.gov/media/80195/download
- *Da Vinci X/Xi Instrument & Accessory Catalog*, Intuitive Surgical, Inc. (Nov. 2020), available at https://www.intuitive.com/en-us/-/media/Project/Intuitive-surgical/files/pdf/xi-x-ina-catalog-nopricing-us-1052082.pdf?la=en&hash=189164507BDFEC40E9DAB44BA10731A5
- Draft Guidance for Industry: Internet/Social Media Platforms: Correcting Independent Third-Party Misinformation About Prescription Drugs and Medical Devices (June 2014), available at https://www.fda.gov/media/88545/download
- FDA General Controls for Medical Devices (https://www.fda.gov/medical-devices/regulatory-controls/general-controls-medical-devices).
- FDA Guidance on Labeling Requirements – Misbranding (https://www.fda.gov/medical-devices/general-device-labeling-requirements/labeling-requirements-misbranding)
- FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices: In accordance with Section 710 of the Food and Drug Administration Reauthorization

Act of 2017 (FDARA), available at https://www.medequipusa.com/wp-content/uploads/2018/05/FDARA-710-3rd-Party-Servicing-Report.pdf
- FDA Staff Manual Guide 1410.406 (November 13, 2018), available at https://www.fda.gov/media/80114/download
- FDA Website, *Content of a 510(k)* (updated Apr. 26, 2019), available at https://www.fda.gov/medical-devices/premarket-notification-510k/content-510k
- FDA Website, *Who Must Register, List and Pay the Fee*, available at https://www.fda.gov/medical-devices/device-registration-and-listing/who-must-register-list-and-pay-fee
- FDA, *Final Guidance for Industry: Sterilized Convenience Kits for Clinical and Surgical Use* (Jan. 7, 2002), available at https://www.fda.gov/media/71358/download
- FDA, *Guidance for Industry and FDA Staff: Deciding When to Submit a 510(k) for a Change to an Existing Device* (Oct. 25, 2017), available at https://www.fda.gov/media/99812/download
- FDA, *Guidance for Industry and FDA Staff: Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling* (May 17, 2015), available at https://www.fda.gov/media/80265/download
- FDA, *Guidance for Industry and Food and Drug Administration Staff: FDA and Industry Actions on Premarket Notification (510(k)) Submissions: Effect on FDA Review Clock and Goals* (October 2, 2017), available at https://www.fda.gov/media/73507/download
- FDA, *Guidance for Industry and Food and Drug Administration Staff: Refuse to Accept Policy for 510(k)s* (September 13, 2019), available at https://www.fda.gov/media/83888/download
- FDA, Guidance for Industry and Food and Drug Administration Staff: The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] (July 28, 2014), available at https://www.fda.gov/media/82395/download
- FDA, *Guidance for Industry: E6(R2) Good Clinical Practice: Integrated Addendum to ICHE6(R1)* (March 2018), available at https://www.fda.gov/downloads/Drugs/Guidances/UCM464506.pdf
- FDA, *Indications for Use Statement* (February 6, 1996), available at http://www.lb7.uscourts.gov/documents/15cv9986.pdf
- FDA, *Public Workshop- Medical Device Servicing and Manufacturing Activities* (Dec. 10-11.2018), available at https://wayback.archive-it.org/7993/20201222125933/https://www.fda.gov/medical-devices/workshops-conferences-medical-devices/public-workshop-medical-device-servicing-and-remanufacturing-activities-december-10-11-2018-12102018
- FDA, *Recognized Consensus Standards*, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfstandards/search.cfm
- FDA, Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug Administration Staff U.S. Food & Drug Admin. (June 24, 2021), available at https://www.fda.gov/media/150141/download
- FDA, Warning Letter to Tenderneeds Fertility LLC (Apr. 13, 2020), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/tenderneeds-fertility-llc-603383-04132020

- FDA, *White Paper: Evaluating Whether Activities Are Servicing or Remanufacturing* (2018), available at https://www.fda.gov/media/117238/download
- U.S. General Accounting Office, *Report to the Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, Medical Devices:FDA's 510(k) Operations Could Be Improved* (Aug. 1988), available at http://archive.gao.gov/d16t6/136821.pdf
- 1 C.F.R. § 801.109
- 21 C.F.R. § 10.75
- 21 C.F.R. § 801.4
- 21 C.F.R. § 801.5
- 21 C.F.R. § 803.3
- 21 C.F.R. § 806.2
- 21 C.F.R. § 807.100
- 21 C.F.R. § 807.20
- 21 C.F.R. § 807.3
- 21 C.F.R. § 807.81
- 21 C.F.R. § 807.81(a)
- 21 C.F.R. § 807.87
- 21 C.F.R. § 807.92
- 21 C.F.R. § 814.20
- 21 C.F.R. § 820
- 21 C.F.R. § 820.1
- 21 C.F.R. § 820.3
- 21 C.F.R. § 821.3
- 21 C.F.R. § 822.3
- 21 C.F.R. § 860.3
- 21 C.F.R. § 860.7
- 21 C.F.R. § 888.9
- 21 C.F.R. Part 50
- 21 C.F.R. Part 803
- 21 C.F.R. Part 806
- 21 C.F.R. Part 807
- 21 C.F.R. Part 810
- 21 C.F.R. Part 812
- 21 C.F.R. Part 820
- 21 C.F.R. Part 821
- 21 C.F.R. Part 822
- 21 C.F.R. Part 866
- 21 CFR § 801.4
- 21 CFR § 803
- 21 CFR § 807.3
- 21 CFR § 807.81
- 21 CFR § 820

- 21 CFR § 820.198
- 21 CFR § 830
- 21 CFR § 807.3(b)
- 21 CFR 801 § 109
- 21 U.S. Code § 321(A)(h)(1)(A)
- 21 U.S. Code § 321(A)(h)(1)(B)
- 21 U.S. Code § 321(A)(h)(1)(B)-(C)
- 21 U.S. Code § 321(h)(1)
- 21 U.S.C. § 321
- 21 U.S.C. § 331
- 21 U.S.C. § 331(a)
- 21 U.S.C. § 331(a)-(c)
- 21 U.S.C. § 351
- 21 U.S.C. § 351(a)
- 21 U.S.C. § 352
- 21 U.S.C. § 360
- 21 U.S.C. § 360(k)
- 21 U.S.C. § 360c
- 21 U.S.C. § 360e
- 21 U.S.C. § 360g-1
- 21 U.S.C. § 360h
- 21 U.S.C. § 360i
- 21 U.S.C. § 360j
- 21 U.S.C. § 360l
- 57 Fed. Reg. 18 (April 28, 1992) (interim rule)
- 59 Fed. Reg. 64
- 62 Fed. Reg. 67012
- 66 Fed. Reg. 3 (Jan. 16, 2001)
- 81 Fed. Reg. 11477
- 81 Fed. Reg. 46696
- 86 Fed. Reg. 33305
- BPI000221
- BPI000331
- BPI000331-BPI000337
- BPI000335-BPI000336
- Deciding When to Submit a 510(k) for a Change to an Existing Device; Guidance for Industry and Food and Drug Administration Staff, issued on October 25, 2017
- Deciding When to Submit a 510(k) for a Change to an Existing Device (#K97-1) (January 10,1997)
- Deposition of Bob Overmars (June 15, 2021)
- Deposition of Chris Gibson (June 22, 2021)
- Deposition of David Mixner (June 10, 2021)
- Deposition of Glenn Papit (June 2, 2021)

- Deposition of Joe Morrison (June 14, 2021)
- Deposition of Mark Johnson (April 29, 2021; June 4, 2021)
- Deposition of Stan Hamilton (June 4, 2021)
- FDCA § 201
- FDCA § 301
- FDCA § 502
- FDCA § 510
- FDCA § 510(k)
- FDCA § 513
- FDCA § 515
- FDCA § 517
- FDCA § 518
- FDCA § 519
- FDCA § 520
- FDCA § 522
- H.R. Rep. No. 94-853
- HE_001317
- HE_001322
- HE_001379
- Intuitive-00018120
- Intuitive-00082056
- Intuitive-00103429-Intuitive-00103451
- Intuitive-00423534-Intuitive-00423578
- Intuitive-00474690
- Intuitive-00478591
- Intuitive-00481165 – Intuitive-00481166
- Intuitive-00481167 – Intuitive-00481175
- Intuitive-00481176
- Intuitive-00481839
- Intuitive-00485158
- Intuitive-00490612
- Intuitive-00490649
- Intuitive-00490685
- Intuitive-00491017
- Intuitive-00491018
- Intuitive-00491019
- Intuitive-00491901
- Intuitive-00492204
- Intuitive-00492277
- Intuitive-00492705
- Intuitive-00492739
- Intuitive-00492744
- Intuitive-00492768

- Intuitive-00492786
- Intuitive-00492796
- Intuitive-00493504
- Intuitive-00493507
- Intuitive-00493508
- Intuitive-00493612
- Intuitive-00494533
- Intuitive-00496074
- Intuitive-00496109
- Intuitive-00496110
- Intuitive-00496132
- Intuitive-00496138
- Intuitive-00496501
- Intuitive-00510907
- Intuitive-00512043-Intuitive-00512047
- Intuitive-00512044
- Intuitive-00512045-Intuitive-00512407
- Intuitive-00512047
- Intuitive-00512048-Intuitive-00512158
- Intuitive-00512094
- Intuitive-00512095 - Intuitive-00512099
- Intuitive-00515501
- Intuitive-00552632-Intuitive-00552651
- Intuitive-00552635
- Intuitive-00552652
- Intuitive-00552652-Intuitive-00552664
- Intuitive-00552654
- Intuitive-00552665-Intuitive-00552681
- Intuitive-00552666
- Intuitive-00552682
- Intuitive-00552697
- Intuitive-00552697-Intuitive-00552715
- Intuitive-00552716-Intuitive-00552727
- Intuitive-00552718
- Intuitive-00552720
- Intuitive-00552728
- Intuitive-00552728-Intuitive-00552743
- Intuitive-00552744
- Intuitive-00552745
- Intuitive-00552745-Intuitive-00552759
- Intuitive-00566055-Intuitive-00566082
- Intuitive-00595673 – Intuitive-00595694

- Intuitive-00595696-Intuitive-00595700
- Intuitive-00691203
- Intuitive-00691204
- Intuitive-00691205
- Intuitive-00691208
- Intuitive-00691209
- Intuitive-00691213
- Intuitive-00691613
- Intuitive-00691658
- Intuitive-00691659
- Intuitive-00691660
- Intuitive-00691662
- Intuitive-00691666
- Intuitive-00691667
- Intuitive-00691710
- Intuitive-00691802
- Intuitive-00691837
- Intuitive-00691839
- Intuitive-00691840
- Intuitive-00691842
- Intuitive-00691843
- Intuitive-00691847
- Intuitive-00691848
- Intuitive-00691857
- Intuitive-00691980
- Intuitive-00692027
- Intuitive-00692185
- Intuitive-00692185
- Intuitive-00692230
- Intuitive-00692310
- Intuitive-00692310
- Intuitive-00692313
- Intuitive-00692314
- Intuitive-00692316
- Intuitive-00692320
- Intuitive-00692321
- Intuitive-00692363
- Intuitive-00692411
- Intuitive-00692433
- Intuitive-00692451
- Intuitive-00692611
- Intuitive-00692643
- Intuitive-00693535

- Intuitive-00694043
- Intuitive-00694522
- Intuitive-00694607
- Intuitive-00694608
- June 15th, 2021, Deposition of Bob Overmars (with accompanying exhibits)
- June 22nd, 2021, Deposition of Chris Gibson (with accompanying exhibits)
- June 2nd, 2021, Deposition of Glenn Papit (with accompanying exhibits)
- June 4th, 2021, Deposition of Mark Johnson (with accompanying exhibits)
- June 7th, 2021, Deposition of Anthony McGrogan (with accompanying exhibits)
- May 24th, 2021, Deposition of Edward W. Harrich (with accompanying exhibits)
- May 26th, 2021, Deposition of Katie Scoville (with accompanying exhibits)
- May 27th, 2021, Deposition of Bob DeSantis (with accompanying exhibits)
- May 27th, 2021, Deposition of Stacey Donovan (with accompanying exhibits)
- May 7th, 2021, Deposition of Myriam Curet (with accompanying exhibits)
- Medical Device Amendments of 1976
- Medical Device Reporting for Manufacturers – Guidance for Industry and Food and Drug Administration Staff
- NRHA-002274
- Premarket Notification 510(k)
- PREREB0060
- PREREB0060.
- Pub. L. No. 101-629 (1990)
- Rebotix Complaint
- Rebotix's Answer and Affirmative Defenses to Intuitive's Counterclaims
- REBOTIX061186
- REBOTIX061659_001
- REBOTIX061660
- REBOTIX063657
- REBOTIX068469
- REBOTIX068497
- REBOTIX068498
- REBOTIX077238_001
- REBOTIX077440_001
- REBOTIX077446_001
- REBOTIX077536_001
- REBOTIX077545_001
- REBOTIX077549_001
- REBOTIX077597_001
- REBOTIX077601_001
- REBOTIX077611_001
- REBOTIX077617_001
- REBOTIX077671_001

- REBOTIX077729_001
- REBOTIX077735_001
- REBOTIX079746
- REBOTIX080925_001
- REBOTIX089521_001
- REBOTIX101000
- REBOTIX122260_001
- REBOTIX124268-REBOTIX124705
- REBOTIX124718-REBOTIX124756
- REBOTIX126238-REBOTIX126239
- REBOTIX126240-REBOTIX126293
- REBOTIX126294-REBOTIX126335
- REBOTIX126336-REBOTIX126390
- REBOTIX126788-REBOTIX127430
- REBOTIX131417_001
- REBOTIX131427_001
- REBOTIX131433_001
- REBOTIX131437_001
- REBOTIX131480_001
- REBOTIX131484_001
- REBOTIX131488_001
- REBOTIX131493_001
- REBOTIX131514_001
- REBOTIX146770-REBOTIX146781
- REBOTIX146948_001
- REBOTIX146949
- REBOTIX146953
- REBOTIX151919-REBOTIX151920
- REBOTIX151921-REBOTIX151922
- REBOTIX151966-REBOTIX152018
- REBOTIX155864
- REBOTIX155894
- REBOTIX156431-REBOTIX156446
- REBOTIX157893
- REBOTIX162404
- REBOTIX162404-REBOTIX162424
- REBOTIX162889
- REBOTIX165979-REBOTIX165998
- REBOTIX166019
- REBOTIX166109
- REBOTIX169166
- REBOTIX169167

- REBOTIX169168
- REBOTIX169360
- REBOTIX169504
- REBOTIX169588
- REBOTIX169683
- REBOTIX169926
- REBOTIX169947
- REBOTIX170053
- REBOTIX170421
- REBOTIX171030
- REBOTIX171058
- REBOTIX171073
- REBOTIX171076
- REBOTIX171076
- REBOTIX171223
- REBOTIX171223
- REBOTIX174749-REBOTIX174756
- REBOTIX175327
- *Remanufacturing of Medical Devices Draft ... - Fda.gov.*
  www.fda.gov/media/150141/download.
- Remanufacturing of Medical Devices: Draft Guidance for Industry and Food and Drug
  Administrative Staff, issued on June 18, 2021
- Safe Medical Devices Act of 1990
- SCL REBOTIX 00002
- SMDA, § 12, Pub. L. No. 101-629, 104 Stat. 4511 (1990)
- WTH000295