## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| REBOTIX REPAIR LLC,<br><br>     Plaintiff/Counterclaim<br>     Defendant,<br><br>v.<br><br>INTUITIVE SURGICAL, INC.,<br><br>     Defendant/Counterclaim<br>     Plaintiff. | Civil Case No. 8:20-cv-2274-VMC-TGW |

### INTUITIVE SURGICAL, INC.'S OPPOSITION TO
### REBOTIX REPAIR LLC'S MOTION FOR SUMMARY JUDGMENT

Defendant and Counterclaim Plaintiff Intuitive Surgical, Inc. ("Intuitive") respectfully submits this Opposition to Plaintiff and Counterclaim Defendant Rebotix Repair LLC's ("Rebotix") Motion for Summary Judgment (ECF No. 108).[1]

### PRELIMINARY STATEMENT

Intuitive's counterclaims are premised on Rebotix's extensive deceptive advertising statements regarding its business of "repairing" EndoWrist instruments ("EndoWrists"). The record demonstrates that Rebotix engaged in a widespread marketing campaign to deceive customers into purchasing a "repair" service that

---

[1] "RBX Br." refers to Rebotix's summary judgment motion and accompanying exhibits. "ISI Br." refers to Intuitive's summary judgment motion and accompanying exhibits. (ECF No. 117.)

Rebotix told them was safe and cost-effective.  Rebotix assured customers that EndoWrists it serviced were "repaired to original specifications" and met "the quality and functional requirements of a new device."  In reality, Rebotix inserted the Interceptor circuit board to override the safe, prescribed and FDA-approved use limits built into S or Si EndoWrists.  Rebotix provided customers EndoWrists that were of lesser quality than Intuitive-manufactured EndoWrists and posed increased risk to patients.  Certain "repaired" instruments failed after further use—as Intuitive warned they would—including one in the middle of surgery.

Rebotix moves for summary judgment *to the extent that* Intuitive's counterclaims are "based on allegations that Rebotix does not comply with FDA regulations" because the FDA purportedly "has not exercised its enforcement authority to make that determination."  (RBX Br. at 1.)  Because these counterclaims do not require interpretation of the Federal Food, Drug, and Cosmetic Act ("FDCA"), Rebotix's motion should be denied.  The lone category of statements at issue that even *refers* to FDA 510(k) clearance entails the purely factual question of whether Rebotix deceived customers that it had reasonably conducted an analysis as to whether clearance is needed, when it failed to do so.

Rebotix's arguments for summary judgment fail for at least four reasons.

*First*, Rebotix is incorrect that Intuitive's counterclaims and affirmative defense are preempted or precluded by the FDCA.  Rebotix asserts that "[w]hether a device or service runs afoul of FDA regulations that govern when FDA clearance is required is a determination that can only be made by the FDA," not "by a judge or

jury." (*Id.* at 11.)  Such a broad preemption standard has no legal support.  As the Supreme Court recognized in *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014), there is no categorical bar to Lanham Act claims where the factfinder may need to interpret or apply the FDCA.  *Id.* at 106.  At most, Rebotix has identified a narrow exception (which may no longer be good law) that does not apply where FDA has informed Rebotix that it cannot sell "remanufactured" EndoWrists without 510(k) clearance.

*Second*, none of Intuitive's challenges to Rebotix's deceptive marketing involves representations regarding "FDA clearance."  Rather, Intuitive alleged—and discovery has demonstrated—that Rebotix deceived consumers about the nature and characteristics of Rebotix's "repair" process, the quality and functionality of EndoWrists "repaired" by Rebotix, the safety of Rebotix's services, purported cost savings, authorization or approval by Intuitive, and Intuitive's own practices. Rebotix does not even address those misrepresentations, further confirming that the Court need not interpret the FDCA to resolve Intuitive's counterclaims.

*Third*, Intuitive's unclean hands defense does not intrude on the FDA's authority.  As an initial matter, Rebotix ignores the fact that one basis for the defense is Rebotix's tortious interference with Intuitive's contracts.  Moreover, Rebotix itself recognized its EndoWrist "repair" process requires 510(k) clearance.  When Rebotix sought that clearance, FDA informed Rebotix that it required additional testing and that marketing its product without clearance would violate the FDCA.  Rebotix abandoned its submission but assured FDA that it would resubmit a 510(k) after it

had completed the required testing.  Rebotix did not do so.  Instead, Rebotix ignored FDA's requirements and offered EndoWrist "repair" without further engagement with FDA.  Thereafter, FDA reiterated to Rebotix that its "repair" process was "remanufacturing" that required 510(k) clearance.

**Fourth**, Rebotix's argument that the record does not contain any evidence of consumer injury or damage to Intuitive arising from Rebotix's deceptive conduct to support a FDUPTA claim is easily rebutted.  Among other evidence of injury, Rebotix customers were deceived into receiving EndoWrists that were inferior to and less safe than genuine Intuitive EndoWrists.  Rebotix also asserts that past lost profits do not constitute damages under the FDUTPA, but that misstates the applicable law, and Intuitive has presented evidence that it suffered $831,954 in such lost profits.

## RESPONSE TO REBOTIX'S STATEMENT OF MATERIAL FACTS

A.1.   Denied.  In 2014, Rebotix, LLC, a predecessor of Rebotix, submitted a 510(k) to FDA for "Re-manufactured EndoWrist instruments," seeking clearance for installation of the same Interceptor technology that Rebotix has used to "repair" EndoWrists.  On December 15, 2015, Rebotix, LLC withdrew its 510(k) submission, noting that it "require[d] additional time in order to address the requests for additional information" and that "it is our intent to resubmit the 510(k) at a later date once the data has been collected and compiled." (ISI Br. at 11 & Exs. 20, 30-33.)

A.1.a.  Admitted.

A.1.b.  Denied.  Multiple FDA experts, including Intuitive's FDA expert, Heather Rosecrans, have concluded that Rebotix's "repair" process requires FDA

510(k) clearance because Rebotix is not a "servicer" engaged in routine maintenance of EndoWrists, but rather is a "manufacturer" or "remanufacturer." (*See infra* Intuitive's Statement of Additional Material Facts ("ISI SOF") ¶¶15-16; ISI Br. at 13-15.)[2]  Rebotix has acknowledged that its "repair" business requires 510(k) clearance. (*See supra* ¶A.1 Response.)

Intuitive denies that Stan Hamilton "has extensive experience with 510(k)s." Hamilton described his 510(k) experience as limited to "hands-on … with teams that took devices through PMAs, 510(k)s" (RBX Br. Ex. 3 at 24:4-14), and testified that his "real expertise is in safety analysis, safety engineering, risk analysis, [and] safety risk management" (*id.* at 22:15-19).

Intuitive denies that Rebotix and Hamilton "determined that Rebotix's services do not require FDA clearance."  Rather than perform an appropriate analysis of whether 510(k) clearance was required, Rebotix and Hamilton ignored FDA instruction that "remanufactured" EndoWrists could not be marketed without 510(k) clearance.  (ISI Br. at 11-12 & Exs. 20, 27-31.)

Intuitive denies that the Deutsche Bank report is reliable or independent.  ████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

---

[2] "ISO SOF" refers to Intuitive's Statement of Additional Material Facts set forth herein.

*(cont'd)*



The report is hearsay and inadmissible for its truth and contains inadmissible expert testimony that Rebotix did not appropriately designate.

A.2.  Denied.  None of Intuitive's counterclaims requires such a determination, only one of the categories of Rebotix's deceptive statements refers to the FDA or 510(k) clearance and the unclean hands defense is not limited to FDA clearance.  (*See infra* ISI SOF ¶29; ECF No. 60 at 24 (First Defense).)

A.2.a.  Admitted.

A.2.b.  Denied.  Intuitive's incorporation by reference of "the previous and subsequent paragraphs" in each section of allegations does not establish that each count is ***dependent*** upon the allegation that "Rebotix informs customers that it has reasonably determined that its services do not require 510(k) premarket review and

---

[3] Intuitive has moved to exclude Mr. Stevens's rebuttal opinions concerning 510(k) clearance, and their accuracy and reliability have been debunked by Ms. Rosecrans.  (*See generally* RBX Ex. 1; ECF No. 116.)  Moreover, it is misleading for Rebotix to proffer Larry Stevens as a rebuttal expert, but then under ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ effectively proffer his opinion a ***second*** time, all the while arguing there is a "consensus view."  (RBX Br. at 5.)

clearance by the FDA."  (*See also supra* ¶A.2 Response.)

A.2.c.  Denied.  (*See supra* ¶A.2 Response.)

A.3.    Denied.  (*See supra* ¶A.1.b Response & *infra* ISI SOF.)

A.3.a. Admitted.

A.3.b. Admitted.

A.3.c. Denied.  When responding to the FDA, Rebotix misrepresented its "repair" offering and omitted critical details, for example falsely claiming that Intuitive's memory chip "no longer functions for devices under repair" and that the Interceptor "replaced [Intuitive's memory chip]."  (RBX Br. Ex. 9; *see also* ISI Br. Ex. 19 at REBOTIX162404, REBOTIX162418-23.)

A.3.d.  Denied.  The letter, which demands a written response by December 16, 2021, is not "confirmation" FDA "ha[s] not made a determination of whether Rebotix is a 'remanufacturer' as defined in the FDCA."  Rather, the letter is consistent with FDA's stated position that 510(k) clearance is required because Rebotix is "remanufacturing" S and Si EndoWrists "[b]y extending the number of uses … of the subject device."  (RBX Ex. 18; *see also* ISI Br. Ex. 30 at REBOTIX171030; ISI Br. Ex. 32 at REBOTIX171062.)

B.1.    Denied.  Hospitals are not the only consumers of Rebotix's "services." (*See, e.g.*, Ex. 3.)

B.2.    Denied.  Rebotix falsely claimed that EndoWrists remained in "perfectly good" condition even after reaching the end of their useful lives (*see, e.g.*, Ex. 4 at REBOTIX041601), and that customers would receive "repaired"

EndoWrists that met original specifications and were safe and effective.. (*See* RBX Ex. 11 at 36:17-20, 161:22-163:12.; RBX Ex. 12 at 22:4-21, 33:11-18, 64:11-66:19.) Instead, customers received EndoWrists that were qualitatively different from Intuitive-manufactured EndoWrists and that neither met Intuitive's specifications nor were appropriately tested by Rebotix. (*See* Ex. 5 at ¶¶11-16, 60-106; RBX Ex. 12 at 120:4-132:€; ISI Br. Ex. 10 (under seal) at 243:25-244:11.)

Rebotix-"repaired" instruments failed when used beyond the prescribed limits, including during surgery. (*See, e.g.*, Exs. 6-12; *see also* Ex. 13 (filed natively) at Tab 2 Rows 15, 17, 18, 24, 44 and 47 (█████████████████████████████████████████████); Ex. 5 ¶¶64-66.)

Consumers also were harmed by not receiving the cost savings promised by Rebotix. Rebotix deceptively compared the cost of a new EndoWrist from Intuitive—containing 10 uses—to the cost of an EndoWrist "repaired" by Rebotix, which provided a value of only 9 uses because customers had to forfeit one use in utilizing Rebotix's services. (*See, e.g.*, ECF No. 60-3 at 1 ("the instrument must arrive with one use left"); *see also* Ex. 14-15.)

Intuitive denies the characterization of its response to Rebotix's Interrogatory No. 16. This interrogatory did not seek evidence of consumer harm, and in any event, was an objectionable contention interrogatory. (*See* RBX Br. Ex. 10 at 18-19.)

Rebotix mischaracterizes the testimony of two customers regarding their interest in Rebotix's services. Pullman Regional's experience with Rebotix was very limited and based on a flawed understanding of Rebotix's services. (*See* RBX Br. Ex.

8

11 at 59:25-60:9, 151:2-154:19.)  The Evergreen Health representative testified that she could not say whether Evergreen would have continued to use Rebotix's services. (*See* RBX Br. Ex. 12 at 54:2-22.)

B.3.    Denied.  When Intuitive learned a hospital was using Rebotix's services, far from just "telling the hospital to stop," Intuitive started a conversation to help the customers understand that "adulterated instruments are being used on the system and that, ***for patient safety [and] ensuring that the system can continue to operate properly***, we ask them to not do that."  (RBX Ex. 13, Vavoso Tr. 213:19-214:8 (emphasis added); *see also* Ex. 16 (FAQ document sent to customers instructing them of the risks of using Rebotix-"repaired" instruments).)

B.4.    Denied.  Intuitive educated customers of the risks of using remanufactured instruments separate and apart from the "warning letter."  (Ex. 16.) The corporate representative for Evergreen Health testified that she could not "say definitively that [Evergreen] would have continued to use [Rebotix-"repaired"] instruments" if Intuitive had not communicated its concerns and identified additional reasons Evergreen may have stopped using Rebotix such as "patient safety issue or something else that arose."  (RBX Ex. 12 at 54:5-22; 55:5-14.)

B.5.    Denied.  Although the corporate designee for Pullman Regional testified about a projection of $62,400 in savings from Rebotix's services, he did not recall how Pullman "came up" with the "ballpark" estimate of 300 annual surgeries on which the projection was based.  (RBX Ex. 11 67:3-68:1.)  Further, customers' cost-savings projections are unreliable to the extent based upon false information

provided by Rebotix.  (*See supra* ¶B.2 Response.)

<u>**INTUITIVE'S STATEMENT OF ADDITIONAL MATERIAL FACTS**</u>

1.      During development of the Interceptor technology, Rebotix's predecessor, Rebotix, LLC, referred to installation of the Interceptor in EndoWrists as "remanufacturing" rather than a "service."  (*See, e.g.*, Ex. 18 at REBOTIX124273; Ex. 19 at REBOTIX124435; Ex. 20 at REBOTIX119844.)

2.      In 2014, Rebotix, LLC submitted a 510(k) for "Re-manufactured EndoWrist Instruments" concerning installation of the same Interceptor technology Rebotix used to "repair" EndoWrists.  (ISI Br. at 11 & Exs. 20, 27-28.)

3.      After receiving a deficiency letter from FDA in June 2015, Rebotix, LLC withdrew its 510(k) and informed FDA "it is our intent to resubmit the 510(k) at a later date once the data has been collected and compiled."  (ISI Br. at 11-12 & Exs. 30-31, 33.)

4.      Rebotix did not consult with FDA or consultants to determine whether its "repair process" required clearance before offering customers EndoWrist "repairs."  (*See* RBX Br. Ex. 3 at 89:3-91:8; ISI Br. Ex. 23 at 222:17-223:10; ISI Br. Ex. 41; Ex. 28 at 144:9-149:19.)

5.      In June 2018, FDA informed BPI Medical ("BPI"), a Rebotix distributor, that if during EndoWrist "repair" "the use-life counter is reset or extended past the number of available use lives, then the device specifications are changed," this would be "remanufactur[ing]" and require 510(k) clearance.  (ISI Br. at 13-14 & Exs. 40-42.)

6.     BPI sent FDA's position to Rebotix, which Rebotix acknowledged but told BPI not to "engage with the FDA" or "respond to [FDA]," asserting that "FDA does not regulate the service of instruments." (*Id.* at 14 & Ex. 41.)

7.     Rebotix shared customer-facing marketing materials with BPI sales representatives in 2019 that represented to hospitals that "FDA does not regulate, nor certify repairs," and that "FDA only classifies devices as single-use or reusable (multiple use).  By these definitions the EndoWrist instruments are classified as multiple-use instruments, servicing these instruments does not meet the definition of a reprocess."  (Ex. 21 at REBOTIX063657.)

8.     In another document Rebotix sent to customers, it claimed that FDA "rejected any requests to alter the longstanding right of hospitals to have reusable medical devices repaired at their discretion."  (*See, e.g.*, Ex. 22 at REBOTIX061584.)

9.     In touting the purported safety of its "repair" process, Rebotix cited a DQS Med report that originally referred to Rebotix as a "remanufacturer."  Before circulating this report to distributors, references to "remanufacturer" were deleted and replaced with "repair," a stark example of Rebotix's ongoing efforts to mischaracterize its remanufacturing so as to suggest it does not require 510(k) clearance.  (*See* ISI Br. Ex. 25 at 187:1-213:8 & Gibson Dep. Exs. 19-21.)

10.    On November 16, 2021, FDA informed Rebotix that it "may be remanufacturing the da Vinci S EndoWrist Instruments … in a manner that potentially violates the FD&C Act," and demanded Rebotix submit a written response to the Allegations of Regulatory Misconduct Team providing (i) the FDA

clearance or approval number for the remanufactured da Vinci S EndoWrist Instruments, (ii) prior submission numbers if previously withdrawn, and (iii) the basis for any Rebotix determination of whether it is required to obtain FDA clearance or approval.  (RBX Br. at 7-8 & Ex. 18.)

11.    Rebotix markets its ability to "repair" and extend the useful life of EndoWrists using the Interceptor, which is installed inside the EndoWrist and overrides use limits on the Intuitive memory chip by "mask[ing] and substitute[ing] the data to and from the [Intuitive memory chip] to the [da Vinci] with the data stored in the Interceptor flash memory."  (ISI Br. ¶¶20-22.)

12.    Rebotix's Interceptor procedure involves "harvesting" the memory chip from the EndoWrist, soldering the memory chip onto the Interceptor and installing the Interceptor into the EndoWrist.  (*Id.*)

13.    Rebotix's "repaired" EndoWrists did not comply with Intuitive's specifications, were not appropriately tested by Intuitive to ensure safe and effective use beyond the prescribed use limits and were not appropriately tested by Rebotix.  (*See supra* ¶B.2 Response; ISI SOF ¶5; Ex. 5 ¶¶82-106.)

14.    Rebotix charged customers to override EndoWrist use limits.  (Ex. 3.)

15.    Intuitive has proffered FDA expert Heather Rosecrans, who has more than 30 years of experience at the FDA in the 510(k) office.  (RBX Ex. 1 ¶1.)

16.    Ms. Rosecrans opines that Rebotix's insertion of the Interceptor into EndoWrists required 510(k) clearance and that Rebotix failed to adequately investigate whether clearance was needed prior to making representations to

customers that its "repair" process did not require clearance.  (RBX Ex. 1 ¶¶88-138.)

17.    Rebotix is not challenging Ms. Rosecrans's credentials or the methodology used to arrive at her opinion that Rebotix's insertion of the Interceptor required 510(k) clearance.

18.    Intuitive's damages expert, Loren Smith, opines that Rebotix earned a gross profit of $527,300 from 2019-2021 from EndoWrist "repairs," and Intuitive's lost profits from these actions is $831,954.  (RBX Ex. 19 ¶¶30, 47, Tables 1-4.)

19.    The corporate designee for Evergreen, a Rebotix customer, testified that the "top three" factors in evaluating whether to do business with a medical device servicing company are "quality of the device, cost of the service, [and] patient safety" (RBX Br. Ex. 12 at 130:14-132:6), and that Evergreen "would not knowingly purchase a service or supply that [it] knew was unsafe" (*id.* at 22:4-21).

20.    Evergreen's designee confirmed that if Rebotix's "repair" process renders EndoWrists inconsistent with Intuitive's instrument specifications, Evergreen would "want to know" if those changes "put a patient's safety at risk."  (*Id.* at 121:8-122:9.)

21.    Evergreen's designee testified that Evergreen "would want to be made aware" of objective risks to patients, including "reports from a company about a device that has the potential to cause harm to a patient."  (*Id.* at 124:10-125:1.)

22.    The corporate designee for Pullman Regional, a Rebotix customer, testified that the hospital would not buy a new product or service that repaired a product if it believed them to be unsafe.  (RBX Br. Ex. 11 at 24:25-25:12; 26:9-12.)

13

23.     Pullman's designee testified that if Rebotix had informed it that it could not return EndoWrists back to original performance or safety specifications "that would have been a factor that would have played in" the decision whether to contract with Rebotix.  (*Id.* at 162:17-163:12.)

24.     In October 2019, Intuitive sent New Hanover Regional Medical Center a letter regarding use of EndoWrists modified by a third party.  (Ex. 23 at REBOTIX174485.)  The letter explained that use "beyond the instrument's determined useful life" may negatively impact "safety, precision and dexterity," and that "[r]efurbishing activities performed by an unauthorized third party" violate the FDCA "when such activities do not bring products to established specifications or when such activities change intended uses."  (*Id.* at REBOTIX174486.)

25.     New Hanover sent Intuitive's letter to Rebotix on October 7, 2019.  (*Id.* at REBOTIX174483.)  Rebotix responded to New Hanover on October 9, 2019, describing the letter as "disingenuous" and stating: "[Intuitive] want[s] you to believe that repairing the EndoWrist will alter the 'intended use' of the instrument . . . because this is what defines the limits of repair.  We DO NOT ALTER the intended use of the instrument."  (*Id.* at REBOTIX174482.)

26.     Other customers forwarded to Rebotix similar Intuitive letters concerning use of reprogrammed EndoWrists.  (*See, e.g.*, Ex. 24.)  Rebotix informed such customers that "[w]e [] 'repair' the EndoWrist and, do nothing to 'modify' the use, purpose or intended use of the device."  (*See* Exs. 25, 27.)

27.     According to Intuitive's counterclaims, "Rebotix does not inform

14

Intuitive customers of the true nature of Rebotix's wholly unauthorized operations, let alone the substantial medical, financial and legal risks that customers face if they use Rebotix's services." (Counterclaims ¶7.)

28.     According to Intuitive's counterclaims, "Rebotix willfully used or practiced [its deceptive marketing] acts in violation of Section 501.204 [of the FDUTPA], and knew or should have known that its acts were unlawful and would damage Intuitive and injure consumers by its deception." (*Id.* at ¶95.)

29.     Intuitive has asserted that the following categories of Rebotix marketing claims and advertising statements are deceptive:

a.     Statements that Rebotix is "merely 'repairing' EndoWrist instruments," which "do not describe the substantial modifications that are actually made by Rebotix." (Counterclaims ¶¶9(a), 51-52, 54, 78(i); ECF No. 60-1, 60-2.)

b.     Statements that Rebotix offers a "'complete repair' of EndoWrist instruments—further conveying a false message that the instruments are broken or defective when they reach their use limit." (*Id.* ¶¶9(b), 51-54, 78(i); ECF No. 60-3.)

c.     Statements that Rebotix-serviced EndoWrists "are not replacement instruments, but rather 'da Vinci manufactured instrument[s] that ha[ve] been repaired to original specifications,'" and that "'meet the quality and functional requirements of a new device.'" (*Id.* ¶¶9(c), 55-57, 78(iv); ECF No. 60-2, 60-3.)

d.     Statements that misrepresent "Intuitive's testing and safety protocols, as well as the safety of Rebotix's services." (*Id.* ¶¶9(d), 57; ECF No. 60-4.)

e.     Statements that do not "adequately convey to customers that

[Rebotix's] services are neither authorized nor approved by, nor otherwise affiliated with, Intuitive." (*Id.* ¶¶10(a), 59-61, 79.)

    f.    Statements misrepresenting Rebotix's qualifications, including that Rebotix "has the specialized training to work on highly technical EndoWrist instruments." (*Id.* ¶¶11, 58, 78(iii).)

    g.    Rebotix's "touting and purported validation of alleged cost savings for customers," which "[l]ack any legitimate basis." (*Id.* ¶¶12, 63-64, 78(vi).)

    h.    Statements that "fail to inform customers and/or affirmatively misrepresent the consequences for customers who use Rebotix's unauthorized services, such as the voiding of customers' warranties and jeopardizing of their service contracts with Intuitive." (*Id.* ¶¶12, 63-65, 78(vii).)

    i.    "[F]alse accusations against Intuitive, including a baseless and inflammatory charge that the usage limits built into EndoWrist instruments are 'arbitrary' and included solely for Intuitive's financial gain." (*Id.* ¶¶13, 66, 78(viii).)

    j.    Statements "informing customers that [Rebotix] has reasonably determined that its services do not require 510(k) premarket review and clearance by the FDA, when in fact Rebotix has not conducted a proper analysis of whether that was the case, nor. . . consulted with the FDA to validate its assertion." (*Id.* ¶¶10(b), 62, 78.)

## LEGAL STANDARDS

    Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of

establishing that there are no genuine issues of material fact that should be decided at

trial.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If there

is a conflict between the parties' evidence, the non-movant's evidence is presumed

true, and all reasonable inferences must be drawn in the non-movant's favor.  *Shotz v.*

*City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

## <u>ARGUMENT</u>

**I.    INTUITIVE'S COUNTERCLAIMS AND AFFIRMATIVE
        DEFENSE ARE NOT PREEMPTED OR PRECLUDED BY THE FDCA**

Rebotix argues that "[w]hether a device or service runs afoul of FDA

regulations that govern when FDA clearance is required is a determination that can

only be made by the FDA," not "by a judge or jury."  (RBX Br. at 11.)  This is a

mischaracterization of the law governing the issues to be decided at summary

judgment and in Rebotix's motions to exclude expert testimony.

Rebotix misleadingly argues that the Supreme Court's decision in *Buckman Co.*

*v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), holds that "private litigation of [FDA's

regulations concerning the marketing and distribution of medical devices] is

'preempted by the FDCA.'"  (RBX Br. at 11 (citing *Buckman*, 531 U.S. at 350).)  As

an initial matter, *Buckman* is an implied preemption case, and thus has no application

to Intuitive's Lanham Act claims (or Rebotix's Sherman Act claims).[4]  Moreover, the

---

[4]  The question of preemption "is whether *state law* is pre-empted by a federal statute, or in some
instances, a federal agency action," whereas the interplay of the FDCA and the Lanham Act

*(cont'd)*

claims in *Buckman* are entirely different than those here.  In *Buckman*, plaintiffs brought state law tort claims alleging that defendant made fraudulent representations ***to FDA*** in obtaining 510(k) clearance.  *Buckman*, 531 U.S. at 346-47.  The Supreme Court held that because FDA is empowered to punish and deter fraud, and the fraud claims existed solely by virtue of FDCA disclosure requirements, plaintiffs' claims were preempted by the FDCA.  *Id.* at 348, 353.  Here, by contrast, the Court is faced with claims authorized by state consumer protection laws (as well as Lanham Act and Sherman Act claims), which, given the allegations, are not preempted by the FDCA.  *See Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 944 (8th Cir. 2011); *Georgia ex rel. Carr v. Elite Integrated Med., LLC*, 533 F. Supp. 3d 1303, 1319 (N.D. Ga. 2021).

Rebotix also ignores settled law that the FDCA and Lanham Act are complementary enforcement schemes with different scopes and purposes.  As the Supreme Court held in *POM Wonderful,* "the Lanham Act protects commercial interests against unfair competition, while the FDCA protects public health and safety."  573 U.S. at 115, 118.  The FDCA does ***not*** preclude parties from "protect[ing] their commercial interests by suing competitors for false advertising, even for products regulated by the FDA."  *Belcher Pharms. LLC v. Hospira, Inc.*, 1 F.4th 1374, 1380-81 (11th Cir. 2021) (interpreting and applying *POM Wonderful*).[5]

---

"concerns the alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute."  *POM Wonderful*, 573 U.S. at 111 (emphasis added).

[5]  Similarly, and as discussed in Intuitive's Motion for Summary Judgment, a determination that Rebotix cannot prove *antitrust injury* is not precluded by the FDCA.  Just as the FDCA and the Lanham Act are complementary and have different scopes and purposes, the same is true for the FDCA and the Sherman Act.  (ISI Br. at 18-23.)

Moreover, Rebotix misplaces reliance on *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010), to argue that a court is precluded from resolving any claim when doing so would "require a court to interpret or apply the FDCA to determine whether the marketing of [the product or service] was deceptive." (RBX Br. at 12-14.)  The exception recognized in *PhotoMedex*, on which the Eleventh Circuit relied in *Hi-Tech Pharmaceuticals, Inc. v. HBS International Corp.*, 910 F.3d 1186, 1199 (11th Cir. 2018), may no longer be good law.  Indeed, Judge Chhabria recently held in related litigation against Intuitive that "*PhotoMedex* is no longer good law" after *POM Wonderful*.  *Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.* ("*SIS*"), No. 21-cv-03496-VC, 2021 WL 5474898, at *6 (N.D. Cal. Nov. 23, 2021).  In any event, Rebotix mischaracterizes the holding in *PhotoMedex*, which only recognized a narrow exception that may apply when private litigation to enforce the Lanham Act "would 'circumvent the FDA's exclusive enforcement authority by seeking to prove that [d]efendants violated the FDCA, ***when the FDA did not reach that conclusion***.'"  *Hi-Tech Pharms.*, 910 F.3d at 1199 (quoting *PhotoMedex*, 601 F.3d at 928) (emphasis added).  As discussed in Section II below, that exception has no application here.

The *SIS* decision is directly on point.  SIS alleged that Intuitive violated the Lanham Act by informing customers that SIS's "repair" business—the same activity at issue here—is contrary to FDA approval.  Judge Chhabria held that even if *PhotoMedex* remained good law, a Lanham Act claim would not be precluded by the FDCA unless there were an issue of duplicative enforcement.  *Id.* at *6-7.

As in *SIS*, this case does not involve duplicative enforcement.  Indeed, "the FDA does not police statements that market participants make about their competitors," let alone police the antitrust laws.  *Id.* at \*7.  It is irrelevant that the Court may need to interpret the FDCA, as "[c]ourts regularly evaluate the lawfulness of a party's behavior under federal regulations.  That the regulations here come from the FDA make no difference."  *Id.* at \*7 n.8.  Thus, even if the Court had to interpret or apply FDA regulations to resolve Intuitive's counterclaims and affirmative defense—which it does not (*see infra* Section II)—*PhotoMedex* (to the extent it has not been overturned) is inapposite and would not bar the Court from interpreting and applying FDA regulations.  *Id.* at \*7.[6]

## II.   INTUITIVE'S COUNTERCLAIMS ARE NOT "BASED ON" AND DO NOT "REQUIRE" ANY "DETERMINATION" CONCERNING FDA REGULATIONS

Rebotix does not argue that Intuitive cannot prove the elements required to establish a Lanham Act false advertising claim.  Instead, Rebotix argues only that "to the extent that" any counterclaim is "based on FDA clearance," it is "preempted by the FDCA and cannot proceed in this Court."  (RBX Br. at 10.)

---

[6]  The other authorities that Rebotix cites to support its preclusion argument, (RBX Br. at 11-12), are likewise Lanham Act cases that present narrow holdings that do not apply to the circumstances here.  *See Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230-32 (3d Cir. 1990) (rejecting Lanham Act claim that "would require [the Court] to usurp administrative . . . responsibility" to provide an "original interpretation" as to whether an ingredient was "active" or "inactive"); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993) ("[P]ermitting [plaintiff] to proceed on the theory that the defendants violated [the Lanham Act] merely by placing their drugs on the market would, in effect permit [plaintiff] to … enforce the [FDCA].");  *Summit Tech., Inc. v. High-Line Med. Instruments Co.*, 922 F. Supp. 299, 305-07 (C.D. Cal. 1996) (rejecting Lanham Act claim alleging defendant failed to disclose the fact of FDA non-approval).

Rebotix's "preemption" argument misstates applicable law and therefore lacks

legal support.  In any event, contrary to Rebotix's contention, none of Intuitive's

counterclaims relies on the FDA's determination of whether Rebotix's "repair"

business requires 510(k) clearance.  Rebotix ignores the allegations in the

counterclaims that are unrelated to the FDA, thus conceding that its motion does not

apply to virtually all the deceptive advertising statements that Intuitive challenges.

Hence, regardless of the FDA-related allegations, Rebotix's motion must be denied.

### A.    Rebotix Is Not Seeking Summary Judgment With Respect to Nine of The Ten Categories of Deceptive Statements Challenged By Intuitive

Rebotix vaguely asserts that it seeks summary judgment on Intuitive's

counterclaims "to the extent they are based on Intuitive's allegations that Rebotix

does not comply with FDA regulations" (RBX Br. at 1), but its motion refers only to

the deceptive statements that its services "do not require 'clearance by the FDA'" (*id.*

at 6, 13, 18).  Of the ten categories of deceptive statements identified in Intuitive's

counterclaims, ***only one*** refers to 510(k) clearance.  (*See* ISI SOF ¶¶27, 29.)  None of

the other nine categories (unmentioned by Rebotix) refers to or requires any

determination of the FDCA or FDA regulations.  (*See id.*)  For example, there is no

reason why the Court or a jury would need to consider issues of FDA enforcement to

conclude that Rebotix deceived customers with its false claims that:  (i) its services

generate tremendous cost-savings (e.g., "$100,000 per year per robot"); (ii) it is

authorized by or affiliated with Intuitive; (iii) its process brings EndoWrists back to

Intuitive's "original specifications"; or (iv) EndoWrist use limits are "arbitrary" and

set by Intuitive solely for Intuitive's financial gain.  (*See id.*)  As such, there is no dispute that Intuitive's false advertising counterclaim will proceed to the jury with respect to at least nine of Rebotix's deceptive statements.

### B.   The Falsity of the Remaining Category of Alleged Deceptive Statements Is Not Contingent On Interpretation of the FDCA

With respect to the one category of deceptive statements that refers to 510(k) clearance, Intuitive does not challenge the falsity of the statement that Rebotix's services "do not require 'clearance by the FDA.'"  (RBX Br. at 13.)  Rather, the counterclaim alleges that Rebotix has deceived customers into believing that Rebotix reasonably analyzed whether clearance is needed.  (*See* ISI SOF ¶29(j).)  The jury can consider and resolve the sufficiency of the steps Rebotix did (or did not) take when informing customers that its "repair" service did not require 510(k) clearance.  That determination does not turn on whether Rebotix's conclusion would have aligned with an FDA determination or the requirements of the FDCA.  *See Belcher*, 1 F.4th at 1380-81; *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 612 (9th Cir. 2016).  For this reason, the authorities cited by Rebotix are inapposite, as is its contention that the statement challenged by Intuitive is a "non-actionable statement[] of opinion."  (RBX Br. at 18.)[7]

---

[7]  *Ameritox, Ltd. v. Millennium Labs., Inc.*, 889 F. Supp. 2d 1304, 1317-18 (M.D. Fla. 2012) (concerning whether defendant's conduct was illegal or not); *Sandoz*, 902 F.2d at 232 (concerning whether an ingredient was labeled as "active" or "inactive" in accordance with FDA standards); *Mylan*, 7 F.3d at 1139 (concerning representations that drugs had been "properly approved by the FDA"); *Summit Tech*, 922 F. Supp. At 305-06 (following *Mylan* to hold a Lanham Act claim alleging the defendant had failed to disclose FDA non-approval could not stand).

The Ninth's Circuit's decision in *PhotoMedex*, even if it remains good law, does not hold otherwise.  There, plaintiff alleged that a competitor misrepresented that its product received 510(k) clearance.  The competitor's lack of 510(k) clearance had been brought to the FDA's attention, and the FDA chose ***not*** to issue a clear statement that the device required a new 510(k) clearance or take any other enforcement action, but subsequently granted clearance when the competitor made a 510(k) submission.  601 F.3d at 922, 928-30.  The Ninth Circuit concluded that "under the particular circumstances of [that] case," a Lanham Act claim is precluded where "the claim would require litigation of the alleged underlying FDCA violation" such that it "would, in effect, permit [plaintiff] to ***assume enforcement power*** which the statute does not allow and require the finder of fact to make a decision that the FDA itself did not make."  *Id.* at 922, 924, 930 (emphasis added).  The Ninth Circuit stressed the narrowness of its holding:  "To be clear, we do not suggest that the Lanham Act can never support private party claims involving FDA approval or clearance of drugs or medical devices.  That is not the case."  *Id.* at 924.  Here, Intuitive does not challenge a statement that Rebotix received 510(k) clearance, and thus there is no potential assumption of the FDA's enforcement power.

There is ample evidence that Rebotix did not engage in a reasonable assessment of whether its "repairs" required clearance.  For example, Rebotix disregarded Rebotix, LLC's recognition that installation of the Interceptor required 510(k) clearance, as well as the FDA's instruction that the "repair" process could not be commercialized or marketed without clearance.  (ISI SOF ¶¶1-3, 15-17; ISI Br. at

11 & Exs. 20, 27-31.)  Rebotix did not consult with either the FDA or outside consultants to determine whether its services required clearance.  (ISI SOF ¶4.)  Similarly, Rebotix also summarily rejected information from BPI that FDA stated 510(k) clearance was required.  (*Id.* ¶¶5-6.)  Rebotix simply began referring to itself as a "servicer" that performs "repairs" in an effort to justify its lack of 510(k) clearance, which is starkly demonstrated by Rebotix's distribution of a doctored testing report that replaced the word "remanufacturing" with "repair" to describe Rebotix's Interceptor technology and business.  (*Id.* ¶¶7-9.)  Based on this record, a jury could conclude that Rebotix did not reasonably analyze whether it required 510(k) clearance, but instead knowingly disregarded critical facts because they were inconvenient—and indeed, fatal—to its business model.

### C.   Events in Related Litigations Do Not Preclude Intuitive's Counterclaims From Proceeding in This Court

Rebotix mischaracterizes events in the *Restore* and *SIS* litigations as somehow prohibitive of the counterclaims in this case (RBX Br. at 15-18), when both cases *bolster* Intuitive's arguments that its counterclaims are not precluded by the FDCA.

*First*, Rebotix argues that in *Restore*, Judge Wetherell dismissed Intuitive's counterclaims "to the extent those claims were based on Restore's statements that its services do not require 510(k) clearance from the FDA."  (RBX Br. at 16.)  Judge Wetherell, however, deemed actionable all but one of Intuitive's counterclaims, which mirror many of its counterclaims here.  *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19-cv-55-TKW-MJF, 2019 WL 8063988, at *4-8 (N.D. Fla. Nov.

24

14, 2019).  The one category of false claims he dismissed pertained to Restore's deceptive marketing that its "service violates none of the standards that could necessitate a 510K [sic]."[8]  *Id.* at *2-3.  Intuitive subsequently re-pled its counterclaim to allege—akin to its counterclaim in this case—that Restore failed to "properly analyze" or "perform[] a sufficient analysis" of whether its services require 510(k) clearance.  That counterclaim was not dismissed in *Restore*.  (Ex. 26 ¶6.)

**Second**, Rebotix incorrectly argues that the argument the court rejected in *SIS* bars the counterclaims here.  (RBX Br. at 16-18.)  In *SIS*, in deference to Judge Wetherell's holding, Intuitive moved to dismiss a false advertising claim regarding its alleged statement that "SIS's services are contrary to FDA approvals of the EndoWrist products."  (*See* RBX Br. Ex. 15 at 11-13.)  That claim is the mirror image of the counterclaim that was dismissed in *Restore*, but as discussed above is fundamentally different from Intuitive's counterclaim in **this** case.  Judge Chhabria rejected Intuitive's argument, reached the opposite conclusion of Judge Wetherell and permitted SIS's Lanham Act claim to proceed.  *SIS*, 2021 WL 5474898, at *6.  The *SIS* decision therefore supports denial of Rebotix's motion for summary judgment.[9]

---

[8]  Judge Wetherell did not hold, as Rebotix contends, that "**any allegation** that the 510(k) statement to the FDA is false is preempted by the [FDCA]."  (RBX Br. at 15 (emphasis added).)  Rather, Judge Wetherell's ruling was limited to the Lanham Act preclusion analysis from *Hi-Tech*.  *See Restore Robotics,* 2019 WL 8063988, at *6-7.

[9]  To the extent the decisions in *Restore* and *SIS* are at odds, Intuitive respectfully submits that Judge Chhabria's analysis is correct.

### III.   INTUITIVE'S UNCLEAN HANDS AFFIRMATIVE DEFENSE DOES NOT INTRUDE ON THE FDA'S AUTHORITY

Rebotix asserts that Intuitive's unclean hands defense fails to the extent that it is based on Intuitive's assertion that "[Rebotix] has acted contrary to applicable FDA regulations." (RBX Br. at 14.) As a threshold matter, part of the unclean hands defense includes the allegation that Rebotix engaged in other misconduct—including tortious interference. (*See supra* ¶¶A.2 & A.2.c Responses.) Rebotix does not challenge this aspect of the defense, nor does it seek summary judgment on Intuitive's tortious interference counterclaim,[10] and thus the affirmative defense must survive summary judgment.

With respect to the portion of Intuitive's unclean hands defense alleging that Rebotix has acted contrary to applicable FDA regulations, Rebotix placed the question of 510(k) clearance at issue by filing its lawsuit. As set forth in Intuitive's motion for summary judgment, Rebotix bears the burden to prove that its business was lawful in order to establish antitrust injury. (ISI Br. at 19-23.) Accordingly, the question of whether Rebotix's business was consistent with FDA regulations—including 510(k) requirements—is directly before the Court in connection with Rebotix's antitrust claims, regardless of whether that issue is evaluated in the context of Intuitive's counterclaims or unclean hands defense.

In any event, contrary to Rebotix's argument that the Court must not invade

---

[10] In fact, as demonstrated in Intuitive's motion for summary judgment, Intuitive is entitled to summary judgment on that counterclaim because the undisputed facts demonstrate that Rebotix intentionally interfered with Intuitive's contractual relationships with its customers. (ISI Br. at 39.)

the purview of FDA or the Department of Justice, the record establishes that FDA has repeatedly informed Rebotix that "repair" of EndoWrists by overriding the use counter is remanufacturing and requires 510(k) clearance, and that Rebotix previously sought—but never received—such approval.  (ISI SOF ¶¶1-3, 10; ISI Br. at 11-12.)[11]  In contrast to the overwhelming evidence that FDA repeatedly told Rebotix or its predecessors or agents that it needed a 510(k), there is not a shred of evidence that FDA ever opined that Rebotix's activities may not require a 510(k).

## IV.   THERE IS A MATERIAL FACT DISPUTE CONCERNING THE CHALLENGED ELEMENTS OF THE FDUTPA COUNTERCLAIM

Rebotix argues that Intuitive has not developed the requisite evidence as to two elements of its FDUTPA claim:  (i) consumer injury; and (ii) that Intuitive suffered actual damages.  (RBX Br. at 19-20.)  Both arguments fail.

### A.   The Record Contains Ample Evidence of Consumer Injury

A consumer is injured when, as a result of a defendant's deceptive practices, the consumer purchases a product that differs from, and is less valuable than, what it expected—e.g., when a product lacks particular features or fails to meet advertised

---

[11]  Rebotix's reliance on *Immuno Vital, Inc. v. Golden Sun, Inc.*, 49 F.Supp.2d 1344, 1359 (S.D. Fla. 1997), is misplaced.  (RBX Br. at 14.)  As detailed above (*supra* Section I), it is dubious whether, following *POM Wonderful*, the line of authorities relied upon by Rebotix and cited in *Immuno Vital* remains good law.  *Immuno Vital*, 49 F. Supp. 2d at 1359.  In any event, the case is distinguishable. There, the court rejected defendant's unclean hands defense based on the allegation that plaintiff placed misbranded goods in commerce in violation of the Federal Trade Commission Act and the FDCA.  *Id.*  Indicating no enforcement steps taken by the FDA or Department of Justice to date, the court held that enforcement of the FDCA "lies exclusively within the federal government's domain." *Id.*  This stands in contrast to the circumstance here, where Rebotix has ignored and circumvented the FDA's enforcement authority.  (ISI SOF ¶¶1-3, 10; ISI Br. at 11-15 & Exs. 27-33, 36-43.)

*(cont'd)*

specifications, including those related to safety.  *See N.C.W.C., Inc. v. Land & Sky Investments, LLC*, No. 6:20-cv-397-Orl-37EJK, 2020 WL 6064597, at *3 (M.D. Fla. May 22, 2020) ("Plaintiffs allege Defendants deliver an inferior product, and that at least one consumer bought Defendants' product, which lacked certain features.  This is sufficient to allege consumer harm." (citation omitted)).[12]  Actual injury requires only that a consumer "did not get what she bargained for."  *Collins v. DaimlerChrysler Corp.*, 894 So.2d 988, 991 (Fla. Dist. Ct. App. 2004); *see also Point Blank Solutions, Inc. v. Toyobo America, Inc.*, No. 09-61166-CIV, 2011 WL 1833366, at *6 (S.D. Fla. May 13, 2011) ("Under FDUTPA, Plaintiffs suffered damages when they purchased something that was not what they were led to believe they were purchasing.")

Here, contrary to Rebotix's arguments, consumers have been injured as a direct result of Rebotix's deceptive acts or practices in at least three ways.  (RBX Br. at 21-22.)[13]  ***First***, consumers received EndoWrists that were qualitatively different from Intuitive manufactured EndoWrists, were not equivalent to original specifications and had not been adequately tested to ensure safe and effective use beyond the Intuitive-prescribed and FDA-approved use limits.  (*See supra* ¶B.2

---

[12]  *See also Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1325-26 (S.D. Fla. 2014).

[13]  Rebotix falsely asserts that Intuitive "did not provide any evidence of actual consumer injury in its answers to Rebotix's interrogatory."  (RBX Br. at 21.)  Intuitive's response explains that customers were deceived by Rebotix's false and misleading statements, which caused them to purchase Rebotix's "repair" service that did not "meet the quality and functional requirements of a new device," or return the device to "original specifications" as advertised.  (RBX Br. Ex. 10 at 13.)  In any event, Rebotix's interrogatory requesting "all evidence" supporting Intuitive's FDUTPA counterclaim was an improper contention interrogatory in direct contravention of the Middle District of Florida Civil Discovery Handbook.  (*Id.* at 19.)

Response.)  Maintaining quality, original specifications and patient safety, however, were critical factors for hospitals that did business with Rebotix.  (*See* ISI SOF ¶¶19-23.)  As a result of Rebotix's deceptive marketing practices, consumers mistakenly believed that the Rebotix-serviced instruments met these criteria.  (*See id.* ¶¶11-13, 19-23; *see also supra* ¶¶A.3.c, B.2 Responses.)  This, in and of itself, constitutes actual injury to consumers.  *See Collins*, 894 So.2d at 990; *Carriuolo*, 72 F. Supp. 3d at 1325-26.

   *Second*, Rebotix-"repaired" instruments suffered failures when used beyond the prescribed limits, including during surgery.[14]  (*See supra* ¶B.2 Response.)  At minimum, consumers experiencing instrument failure were harmed in lost fees paid to Rebotix.  (ISI SOF ¶¶14, 18.)

   *Third*, Rebotix overstated purported consumer cost savings by comparing the cost of a new, 10-use EndoWrist from Intuitive, to the purchase of a "repaired" EndoWrist from Rebotix, which only provided a customer with 9 additional uses.  (*See supra* ¶B.2 Response.)  Correcting Rebotix's deceptive cost comparisons to reflect cost-per-use demonstrates that consumers saved less than Rebotix promised.

   Rebotix (incorrectly) argues that the chain of causation between its misleading statements and a customer's decision to use Rebotix's services would be broken "if a

---

[14]  Any argument that these failures were the result of normal wear and tear as opposed to use beyond the prescribed use limits is a dispute of fact that must be determined by the factfinder. *Ozorowsky v. Bayfront HMA Healthcare Holdings, LLC*, No. 8:20-cv-2564-VMC-AEP, 2021 WL 3725247, at *5 (M.D. Fla. Aug. 23, 2021) (Covington, J.) ("If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor." (citations omitted)).

hospital continued to use Rebotix's services ... and Intuitive then terminated that hospital's sales contract or warranty," as "the hospital would be making its own decision, separate and apart from Rebotix's marketing materials, to continue using Rebotix's repair services." (RBX Br. at 23-24.) The lone authority Rebotix cites to support this argument, *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007), is inapplicable in circumstances, such as here, where the consumer ***stops*** using the deceptively marketed product upon learning its deficiencies. *See Marty v. Anheuser-Busch Cos., LLC*, 43 F. Supp. 3d 1333, 1347 (S.D. Fla. 2014); *In re Bextra & Celebrex Mktg., Sales Pracs. & Prod. Liab. Litig.*, No MDL 05-01699 CRB, 2007 WL 2028408, at *4 (N.D. Cal. July 10, 2007).

In any event, even after Intuitive informed Rebotix's customers of the risks to patient safety and the potential termination of their warranties with Intuitive, Rebotix continued its misinformation campaign. (ISI SOF ¶¶24-26.) As but one example, after New Hanover Regional Medical Center received Intuitive's letter regarding the impact of Rebotix's "repair" on EndoWrist performance and patient safety, Rebotix continued to misrepresent to New Hanover that extending an EndoWrist's useful life did not impact its intended use or regulatory clearances. (*Id.* ¶25.) Accordingly, the chain of causation between Rebotix's deception and consumer harm was never broken, and at the very least, there remains a genuine dispute of material fact that precludes summary judgment regarding this issue.

### B.   Intuitive Has Established Evidence of Actual Damages

Rebotix argues that disgorgement and past lost profits are not "actual

damages" under the FDUTPA, and accordingly, Intuitive lacks evidence of damages necessary to sustain its claim.  (RBX Br. at 27-28.)  But unlike disgorgement, past lost profits are an available remedy under the FDUTPA.  *See, e.g.*, *Restore Robotics,* 2019 WL 8063988, at *6 ("Although future lost profits are not actual damages under FDUTPA, ***past lost profits are***[.]" (emphasis added)); *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1115 (M.D. Fla. 2019) ("[L]ost profits already suffered constitute 'actual damages' for purposes of FDUTPA."); *Glob. Tech Led, LLC v. Hilumz Int'l Corp.*, No. 2:15-cv-553-FTM-29CM, 2017 WL 588669, at *9 (M.D. Fla. Feb. 14, 2017) (while Plaintiff could not recover ***future*** lost profits under the FDUTPA, ***past*** lost profits were an appropriate form of actual damages).

In fact, in a recent case in the Southern District of Florida, the court analyzed this issue and held that "the weight of Florida law holds past lost profits recoverable under [the] FDUTPA."  *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, No. 21-21976-CIV-ALTONAGA/Torres, 2021 WL 4077966, at *4 (S.D. Fla. Sept. 8, 2021).  The court rejected the argument—which Rebotix asserts here (RBX Br. at 29-30)—that past lost profits are "consequential damages."  *Id.* at *6.  The court further held where, as here, there is no contract between the parties giving rise to "oft-used expectancy measure of damages[,]" "[i]t makes considerable sense to permit a corporate-competitor plaintiff to seek lost profits damages[.]"  *Id.* at *7.  The court also noted that outcome was logical "when considered alongside the liberal construction courts must afford the FDUTPA to accomplish its remedial purpose."

31

*Id.*[15]

As Rebotix acknowledges, Intuitive's damages expert presents an analysis of past lost profits (RBX Br. at 28; ISI SOF ¶18), which is an appropriate measure of actual damages under the FDUTPA.  Accordingly, Rebotix's argument must fail.

## CONCLUSION

For the foregoing reasons, Intuitive respectfully requests that the Court deny Rebotix's motion for summary judgment.

DATED:  December 8, 2021                    Respectfully submitted,

/s/ Karen Lent

KAREN HOFFMAN LENT (*Pro Hac Vice*)
MICHAEL H. MENITOVE (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com
michael.menitove@skadden.com


MICHAEL S. BAILEY (*Pro Hac Vice*)
1440 New York Avenue, N.W.
Washington, DC 20005
Tel: (202) 371-7000
michael.bailey@skadden.com

DAVID L. McGEE
Fla. Bar No. 220000
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
Telephone: (850) 432-2451
dlm@beggslane.com

ALLEN RUBY (*Pro Hac Vice*)
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690
allen@allenruby.com

*Counsel for Intuitive Surgical, Inc.*

---

[15]  Intuitive acknowledges this Court's statement in *Britt Green Trucking, Inc. v. FedEx Nat., LTL, Inc.*, No. 8:09-cv-445-T-33TBM, 2014 WL 3417569 (M.D. Fla. July 14, 2014), that "consequential damages in the form of lost profits are not recoverable under FDUTPA."  *Id.* at *12.  But that case involved a breach of contract claim.  Here, there is no contract between the parties, and the reasoning of *Tymar Distribution* and the authorities cited herein demonstrates that Intuitive can seek recovery of past lost profits.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I certify that I caused the foregoing document to be served on the following counsel of record by email:

| | |
|---|---|
| Gregory Dovel | greg@dovel.com |
| Richard Lyon | rick@dovellaw.com |
| Alexander Erwig | alexander@dovel.com |
| David Luikart, III | dave.luikart@hwhlaw.com |

/s/ Karen Lent
KAREN HOFFMAN LENT (*Pro Hac Vice*)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
karen.lent@skadden.com