UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| REBOTIX REPAIR LLC,<br><br>    Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>INTUITIVE SURGICAL, INC.,<br><br>    Defendant/Counterclaim Plaintiff. | Civil Case No. 8:20-cv-2274-VMC-TGW |

**INTUITIVE SURGICAL, INC.'S REPLY IN SUPPORT OF
DISPOSITIVE MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 3.01(d), Intuitive files this reply in support of its motion for summary judgment ("Motion" or "Mot."). As an initial matter, because Rebotix's opposition ("Opp.") does not deny Intuitive's asserted facts, those facts should be deemed admitted. *See Premier Gaming Trailers, LLC v. Luna Diversified Enters., Inc.*, 304 F. Supp. 3d 1270, 1280-81 (M.D. Fla. 2018) (Covington, J.).

**I.     REBOTIX CANNOT ESTABLISH ANTITRUST STANDING**

    **A.     Rebotix Cannot Prove the Legality of Its Business**

Rebotix never obtained 510(k) clearance, despite the regulatory requirements and FDA's repeated admonitions that Rebotix's "repair" business requires such clearance. (SOF ¶¶27-35, 45-49.) Indeed, on November 16, 2021, FDA warned Rebotix "you may be remanufacturing the da Vinci S EndoWrist[s] … in a manner that potentially violates the FD&C Act" and requested that Rebotix provide

information to the "Allegations of Regulatory Misconduct Team." (ECF 108-19.)[1] Given the undisputed facts, Rebotix cannot meet its burden to prove that its business was lawful, dooming its antitrust claims. (Mot. at 18-23.) Rebotix raises four meritless arguments in opposition.

*First*, Rebotix incorrectly argues that "[a] 'finding of antitrust injury cannot be tied to the status of FDA approval'" (Opp. at 13 (citation omitted)), citing inapposite cases where, unlike here, defendants allegedly manipulated the applicable regulatory framework (under the Hatch-Waxman Act) to prevent FDA from approving competitors' generic drugs. *See, e.g.*, *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 804, 807 (D.C. Cir. 2001) (Andrx allegedly conspired to avoid triggering "180-day market exclusivity period, which in turn prevented the FDA from giving final approval" to Biovail's ANDA).[2] Moreover, Rebotix relies on ***motion to dismiss***

---

[1] FDA requested that, by December 16, 2021, Rebotix respond with "[t]he basis for [its] determination of whether or not [it is] required to obtain FDA clearance." (ECF 108-19.) Despite repeatedly arguing throughout this litigation that its "repair" business is legal, including in its opposition (*see* Opp. at 15-16), Rebotix asked for and received a 30 day-extension until January 15, 2022 to respond (*see* Ex. 1).

[2] *See also Bristol-Myers Squibb Co. v. Ben Venue Lab'ys.*, 90 F. Supp. 2d 540, 545 (D.N.J. 2000) ("[B]y suing the generic defendants under the Hatch-Waxman Act, Bristol provoked the automatic moratorium of FDA approval of the generics' ANDAs. For Bristol to insist that its generic competitors have no standing because they are not in the market, when Bristol itself foreclosed their access to it, is meritless."); *Takeda Pharm. Co. v. Zydus Pharms. (USA) Inc.*, 358 F. Supp. 3d 389, 398 (D.N.J. 2018) (Zydus adequately pled antitrust injury by alleging "'FDA indicated to Zydus that it was prepared to approve Zydus' ANDA … [b]ut for [Takeda's] anticompetitive conduct'" (alterations in original) (citation omitted)); *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2009 WL 2751029, at *12 (D.N.J. Aug. 28, 2009) (defendants allegedly "manipulated the regulatory advantages afforded by its … patents to prevent the entry of generic competitors"); *Amgen, Inc. v. F. Hoffmann-LaRoche Ltd.*, 480 F. Supp. 2d 462, 468 (D. Mass. 2007) (although not involving the Hatch-Waxman act, it was undisputed "that FDA approval of [antitrust plaintiff's product] is imminent"). Contrary to Rebotix's argument, *Andrx* expressly recognized that FDA approval was essential to Biovail's claims and affirmed their dismissal. *See* 256 F.3d at 807.

2

decisions, yet courts—including in Rebotix's cited cases—require a higher standard *at summary judgment*. *See Neurontin*, 2009 WL 2751029, at *12 n.35. At summary judgment, courts routinely hold that plaintiffs cannot meet their burden to prove antitrust injury absent evidence that a product had FDA approval. *See, e.g.*, *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 865 (D.C. Cir. 2008) (affirming summary judgment because "plaintiffs have not adduced evidence sufficient for a reasonable juror to find the FDA would have approved Andrx's ANDA in February 2001 but for Biovail's [alleged misconduct]"); *In re Terazosin Hydrochloride Antitrust Litg.*, 335 F. Supp. 2d 1336, 1368-69 (S.D. Fla. 2004) (because the generic drug "ha[d] not even received *tentative* FDA approval … [p]laintiffs cannot show a causal link between the alleged antitrust violation and the alleged antitrust injury of preventing generic entry").

Unlike in the cases it cites, Rebotix does not allege that Intuitive prevented FDA from granting Rebotix 510(k) clearance. Rather, Rebotix, LLC withdrew its 510(k) application in December 2015 after FDA identified deficiencies (SOF ¶¶30, 33), and neither Rebotix, LLC nor Rebotix resubmitted the 510(k) (*id.* ¶34).

*Second*, by arguing that it "will acquire … FDA clearance if needed" (Opp. at 14), Rebotix concedes that if its business requires 510(k) clearance, its operations have been unlawful. Rebotix also cites no evidence that the deficiencies FDA identified in Rebotix, LLC's 510(k) could be remedied. Indeed, before Rebotix, LLC withdrew its 510(k), it highlighted "the magnitude of the [FDA] deficiency letter" and how "it threatened the feasibility of moving forward." (SOF ¶32.)

3

*Third*, Rebotix incorrectly argues that it is a "refurbisher" that does not require 510(k) clearance. Rebotix concedes that it would not be a refurbisher if it "significantly chang[ed] the finished device's … intended use." (Opp. at 15-16.) FDA recently told Rebotix that EndoWrists "*were cleared for a set number of uses*" and that "[b]y extending the number of uses, your activities may be altering the intended use." (ECF 108-19 (emphasis added).) Thus, it cannot reasonably be disputed that Rebotix is not a refurbisher, but a manufacturer or remanufacturer.

Rebotix has failed to point to evidence affirmatively showing that its business was lawful. Rebotix cannot distinguish Rebotix, LLC's 510(k) for "remanufactured" EndoWrists (Opp. at 15) because it was insertion of the Interceptor, not Rebotix's "intent to sell" (*id.* at 3), that required the 510(k). (*See, e.g.*, ECF 117-29 at REBOTIX169926; ECF 117-44.) Rebotix relies on its marketing materials, Dr. Parnell's *rebuttal* report and Dr. Sharlin's *now-withdrawn* report to argue that it "repairs" EndoWrists (Opp. at 15-16 (citing P39, P6, P8)), but none is evidence that FDA would reach a decision contrary to its statements regarding 510(k) clearance. Rebotix also relies on the biased Deutsche Bank report, which is inadmissible hearsay. (*See* Opp. to RBX's MSJ at 5-6.) And Rebotix fails to rebut case law interpreting "held or offered for sale" broadly and encompassing "commercial actor[s] in a commercial setting, using a commercial product." (Mot. at 21-23.)[3]

---

[3] Rebotix misstates evidence to argue that Intuitive believed refurbished EndoWrists do not require a 510(k). (Opp. at 15.) Intuitive concluded that EndoWrists *could not be safely refurbished without component replacement*, which Rebotix does not perform. (P35 at Intuitive-00423566-67.) Moreover, FDA differentiates between the "510(k) holder" (Intuitive) and non-510(k) holders (Rebotix),

*(cont'd)*

4

*Fourth*, Rebotix improperly seeks to shift the burden of proof by misstating that Intuitive seeks a ruling "that Rebotix requires 510(k) clearance." (Opp. at 17.) Not so. Intuitive seeks a ruling that Rebotix cannot meet *its burden* to prove its business was lawful (Mot. at 19-20) because it has no evidence that FDA would reach a conclusion contrary to its officials' statements that Rebotix's business requires 510(k) clearance. (SOF ¶¶28-31, 46-49; ECF 108-19.)

B.  **Rebotix Cannot Establish Antitrust Standing for X or Xi Claims**

Rebotix cannot prove that: (i) its inability to develop technology to override X/Xi use limits is directly attributable to Intuitive; or (ii) it is an "efficient enforcer" of the antitrust laws prepared to override X/Xi use limits. (Mot. at 23-26.)

*First*, Rebotix asserts without support that it need not establish preparedness because there is no separately defined market for X/Xi EndoWrist repair and replacement. (Opp. at 17.) This is a red herring. To establish preparedness, a plaintiff must show "*existing capabilities* that would … allow[] it to serve the market." *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013) (emphasis added); *see also See Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1561-63 (11th Cir. 1987) (plaintiff lacked preparedness where it "was simply unprepared to expand its services"). Rebotix submits no such proof.

*Second*, Rebotix asserts that it need not demonstrate preparedness because doing so "would be a futile gesture." (Opp. at 18.) Alleged futility does not excuse a

---

relieving 510(k) holders from filing *new 510(k)s* in certain circumstances. (Ex. 2 at 5, 7-8). Thus, Intuitive's assessment cannot apply to Rebotix's "repairs."

5

plaintiff from proving "a certain stage of maturity and concreteness" and "performing the most basic preparatory steps," as such an approach "would eviscerate the standing requirement." *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1255, 1259 (10th Cir. 2003); *see also Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737-38 (5th Cir. 2015) ("[A]n overly permissive standing doctrine would allow mere bystanders who lack particularized injury to benefit from another party's antitrust violation."). Rebotix has not made this showing. Moreover, courts routinely hold that antitrust plaintiffs lack standing where insufficient preparedness "flow[s] from obstacles *unrelated* to the alleged anticompetitive conduct." *Sanger*, 802 F.3d at 740 (emphasis added) (collecting cases). As Rebotix concedes, Intuitive has not prevented Rebotix from developing an X/Xi Interceptor. (Opp. at 19.)[4]

## II. REBOTIX CANNOT PROVE A RELEVANT ANTITRUST MARKET FOR ENDOWRIST REPAIR AND REPLACEMENT

### A. Dr. Lamb's Opinions Are Inadmissible

Dr. Lamb's opinions purporting to define a market for EndoWrist repair and replacement are inadmissible because it is undisputed that he (i) failed to consider all customers that Rebotix *could* service when defining the market from Rebotix's perspective and (ii) relied on Stevens's and Parnell's opinions, which should be excluded (*see* ECF 115; ECF 116), to opine that Rebotix's "repairs" are substitutes

---

[4] Rebotix incorrectly argues that preparedness is a question of fact precluding summary judgment. (Opp. at 13, 19 n.5.) Courts routinely grant summary judgment when plaintiffs fail to prove "the existence of a competitor willing and able to enter the relevant market." *See, e.g.*, *Sunbeam*, 711 F.3d at 1273; *Gas Util. Co. of Ala. v. S. Nat. Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993).

6

for Intuitive's new instruments. (*See* Mot. at 27.)

### B. The Market Should Include All Instruments Rebotix Could Repair

Rebotix wrongly argues (i) that the market should not be defined from Rebotix's perspective, but (ii) even from its perspective, the record establishes a market for EndoWrist replacement and repair. (Opp. at 19-21.)

*First*, Rebotix fails to distinguish cases establishing that the relevant market must be defined from Rebotix's perspective. While Rebotix characterizes *Little Rock* and *Stop & Shop* as monopsony cases (*id.* at 20 n.7), each was analyzed under the exclusive dealing framework. *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004). Rebotix misplaces reliance on *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451 (1992), which holds that an "aftermarket" is a relevant market when (unlike here) defendant changes its policies to "lock in" customers to purchasing aftermarket goods. *See id.* at 457-58, 476.

*Second*, Rebotix does not dispute that EndoWrist "repairs" are similar to those performed on laparoscopic instruments by, among others, Benjamin Biomedical, with which Rebotix has a "close relationship" and overlapping personnel. (Mot. at 28.) Rebotix fails to explain how differences between EndoWrists and laparoscopic instruments prevent it from repairing them, thus its argument regarding lack of investment is irrelevant. (Opp. at 21.)

### C. Rebotix Cannot Prove a Separate Market for EndoWrists

Rebotix does not contest that the history of how a product is sold and how

7

comparable products are sold in similar markets is relevant to whether two items are separate products. (Mot. at 29-30). Instead, it argues that (i) separate demand exists for "surgical robots" and "repair and replacement of EndoWrists," and (ii) Intuitive does not bundle da Vincis and EndoWrists. (Opp. at 21-22.) But Rebotix does not dispute that Intuitive's SLSA has always governed the purchase and use of both the da Vinci *and* EndoWrists. (Mot. at 31-32.) When customers sign the SLSA, they acknowledge purchasing a product "made of equipment and of spares—a unit sold over a period where the purchaser of what might be called section A knows that eventually he will be buying complementary section B." *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 694 (9th Cir. 1998).

### III. REBOTIX CANNOT ESTABLISH THAT INTUITIVE HAS ENGAGED IN ANTICOMPETITIVE CONDUCT

#### A. The Rule of Reason Applies

"[T]ying arrangements involving patented products should be evaluated under the [rule of reason] rather than under the per se rule." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006); *see also Restore Robotics, LLC v. Intuitive Surgical, Inc.*, Case No. 5:19CV55-TKW-MJF, 2019 WL 8063989, at *2 n.3 (N.D. Fla. Sept. 16, 2019) (analyzing claims at issue here under the rule of reason); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 487 F. Supp. 2d 861, 879 (E.D. Ky. 2007). Neither of the cases that Rebotix cites involved patented products; both applied the rule of reason—not the *per se* rule—and affirmed summary judgment for defendants. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 n.2, 323 (7th Cir. 2006); *In re Cox*

*Enters*. 871 F.3d 1093, 1100 (10th Cir. 2017).[5]

### B. Rebotix Cannot Establish Any Unlawful Tying Arrangement

Rebotix's opposition fails to rebut Intuitive's arguments that summary judgment is warranted on its tying claims.

*First*, although Rebotix alleges that Intuitive ties da Vinci service and EndoWrists,[6] it does not purport to define a market for da Vinci service (Opp. at 24-26), warranting summary judgment on that claim.

*Second*, Rebotix cannot establish anticompetitive effects because it cannot prove that the combined price of da Vincis and EndoWrists would be lower absent the alleged tying. (Mot. at 36.) Rebotix wrongly argues that *Kypta* and *Metzler* only require a showing that prices were above a competitive level (Opp. at 27);[7] both cases require evidence as to the combined price. *See Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1295 (11th Cir. 1982) ("A determination of *the value of the tied products alone* would not indicate whether the [customer] indeed suffered any net economic harm, *since a lower price might conceivably have been exacted by the [defendant] for the tying product*." (emphases added)); *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d

---

[5] Although arguing, without support, that Intuitive's "core products are no longer patented" (Opp. at 28), Rebotix admits Intuitive has (i) patents on da Vincis and EndoWrists (*id.*) and (ii) "a large portfolio of patents that have enabled it to block competitors…." (ECF 1 ¶17.)

[6] Rebotix now argues servicing is "[an anticompetitive act[]," not the basis of a tying claim. (Opp. at 26.) But Rebotix alleged "tying … servicing of da Vinci[s] to … EndoWrists." (ECF 1 ¶¶32, 63, 69, 72), and it has not pled any other theory of competitive harm encompassing da Vinci service.

[7] Even under this incorrectly stated standard, Rebotix still cannot show anticompetitive effects because Dr. Lamb's opinions regarding supracompetitive pricing are contrary to law because he disregarded Intuitive's total costs, including its significant R&D costs. (ECF 114 at 15-17.)

9

1345, 1362 (S.D. Fla. 1998) (Plaintiffs "cannot prevail on their tying claim unless they show that the defendants' service rates were supracompetitive, *resulting in a higher package price for parts and service*." (emphasis added)).

Rebotix also argues that it can establish "exclusion from the market." (Opp. at 27-28 (citing *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.,* 604 F.3d 1291, 1303 (11th Cir. 2010).)  But *Palmyra*, decided at the motion to dismiss stage, also analyzed how the allegations, if proven, would increase prices.  *Id.* at 1300-03.  At summary judgment, Rebotix cannot rest on its allegations and must establish the combined price would be lower absent the alleged tie.

*Finally*, Rebotix cannot meet its burden to demonstrate the absence of procompetitive benefits from Intuitive's sale of the da Vinci as an integrated system. (Mot. at 37.)  Rebotix does not seriously contend that (i) minimizing clinical risk to patients through testing and (ii) guaranteeing, including through warranties, that the da Vinci is reliable and safe are not procompetitive goals.  Instead, Rebotix incorrectly claims that these benefits could be achieved without bundling.  (Opp. at 30.)  But Rebotix's argument relies on its unproven assertions that Rebotix-"repaired" EndoWrists are safe.  (*Id.*)  Rebotix cannot establish that Intuitive would be able to offer the same procompetitive benefits available via its bundled system if unauthorized products, which change the EndoWrist's "intended use" and lack FDA clearance (*see supra* § I.A), were introduced into the system.

C. **Rebotix Cannot Establish Unlawful Exclusive Dealing**

Dr. Lamb offered no analysis of exclusive dealing at all (Mot. at 38)—his

supposed "detailed analysis" (Opp. at 31) relates only to Rebotix's tying claim. Moreover, Rebotix has not provided sufficient evidence to allow a jury to find a relevant product market for EndoWrist repair and replacement (*see supra* § II), or that the purported exclusive dealing raised prices (*see supra* § III.B).

### IV.  REBOTIX'S ARGUMENTS OPPOSING SUMMARY JUDGMENT ON TORTIOUS INTERFERENCE LACK MERIT

Rebotix is incorrect that Intuitive "cites no evidence" of "intentional or unjustified interference" or "damages." (Opp. at 31.) It is undisputed that Rebotix (1) had knowledge of Intuitive's customer contracts and their terms, and (2) sought to (and did) induce customers to utilize its "repair" service in violation of those terms. (SOF ¶41.)[8] The damage to Intuitive includes the loss of sales to at least 17 customers that breached their contracts with Intuitive to utilize Rebotix's service. (*Id.*) Rebotix is incorrect that Intuitive engaged in any antitrust violations and that its contracts are "against public policy and void." Finally, Rebotix has employed "improper means" to interfere with Intuitive's contracts. Rebotix's deceptive marketing is unlawful and its inducement of breach was "purposeful." *See Collier HMA Phys. Mgmt., LLC v. NCH Healthcare Sys., Inc.*, Case No. 2:18-cv-408-FtM-38MRM, 2019 WL 277733, at *9 (M.D. Fla. Jan. 22, 2019).

DATED:  December 22, 2021                     Respectfully submitted,



/s/ Karen Lent

---

[8] Rebotix also engaged in interference by informing customers that they "should have the right to" use Rebotix's services (D23, 98:18-99:8).  *See, e.g., Westgate Resorts, Ltd. v. Sussman,* 387 F. Supp. 3d 1318, 1356 (M.D. Fla. 2019) (rejecting argument that defendant did not induce breach because "[a]ll [he] did was advise" the breaching parties).

11

| | |
|---|---|
| KAREN HOFFMAN LENT (*Pro Hac Vice*)<br>MICHAEL H. MENITOVE (*Pro Hac Vice*)<br>SKADDEN, ARPS, SLATE,<br> MEAGHER & FLOM LLP<br>One Manhattan West<br>New York, NY 10001<br>Tel: (212) 735-3000<br>karen.lent@skadden.com<br>michael.menitove@skadden.com<br><br>MICHAEL S. BAILEY (*Pro Hac Vice*)<br>1440 New York Avenue, N.W.<br>Washington, DC 20005<br>Tel: (202) 371-7000<br>michael.bailey@skadden.com | DAVID L. McGEE<br>Fla. Bar No. 220000<br>BEGGS & LANE, RLLP<br>501 Commendencia Street<br>Pensacola, FL 32502<br>Telephone: (850) 432-2451<br>dlm@beggslane.com<br><br>ALLEN RUBY (*Pro Hac Vice*)<br>Attorney at Law<br>15559 Union Ave. #138<br>Los Gatos, CA 95032<br>Tel: (408) 477-9690<br>allen@allenruby.com |

*Counsel for Intuitive Surgical, Inc.*

## **CERTIFICATE OF SERVICE**

       I hereby certify that on December 22, 2021, I caused the foregoing to be delivered to the Clerk of the Court to be provisionally filed under seal pursuant to the Court's December 8, 2021 Order (ECF 120). I further certify that I caused the foregoing document to be served on the following counsel of record by email:

| | |
|---|---|
| Gregory Dovel | greg@dovel.com |
| Richard Lyon | rick@dovellaw.com |
| Alexander Erwig | alexander@dovel.com |
| David Luikart, III | dave.luikart@hwhlaw.com |

                                              /s/ Karen Lent
                                        KAREN HOFFMAN LENT (*Pro Hac Vice*)
                                        SKADDEN, ARPS, SLATE,
                                           MEAGHER & FLOM LLP
                                        One Manhattan West
                                        New York, NY 10001
                                        Tel: (212) 735-3000
                                        karen.lent@skadden.com