<pre>
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                         TAMPA DIVISION

REBOTIX REPAIR, LLC,

      Plaintiff /
      Counterclaim Defendant,

v.                                 Case No. 8:20-cv-2274-VMC-TGW

INTUITIVE SURGICAL, INC.,

      Defendant /
      Counterclaim Plaintiff.
_____/
</pre>

**ORDER**

This matter comes before the Court upon consideration of Defendant Intuitive Surgical, Inc.'s <u>Daubert</u> Motion to Exclude the Opinions of Dr. Russell Lamb. (Doc. # 114). Plaintiff Rebotix Repair, LLC has responded. (Doc. # 145). For the reasons that follow, the Motion is denied.

## I.   **Background**

The Court and the parties are well familiar with the background facts and claims in this case, and the Court will not belabor them here. Suffice it to say that this is an antitrust suit initiated by Rebotix, a company that offers a service whereby it "repairs" the EndoWrist surgical implement originally designed and manufactured by Intuitive. The parties hotly contest the relevant antitrust market

definition, Intuitive's alleged monopoly power, and the anticompetitive effects of Intuitive's actions on the relevant market. Rebotix offers the testimony of Dr. Lamb in connection with those issues.

Dr. Lamb is the president and co-founder of an economics consulting firm that provides clients with economic research and quantitative and statistical analyses. (Doc. # 114-2 at 1). He has a Ph.D. in economics and has studied the economics of markets and prices for 30 years. (Id.). In his report, Dr. Lamb reached the following conclusions:

(1)  The market for minimally invasive soft tissue surgical robots ("MIST robots") constitutes a "relevant antitrust product market." The market for MIST robots is the "tying market."

(2)  "The EndoWrist Repair and Replacement Market constitutes a relevant antitrust product market."[1] The EndoWrist Repair and Replacement Market is the "tied market."

(3)  Intuitive possessed monopoly power in the U.S. market for MIST robots and in the EndoWrist Repair

---

[1]  In addition, Dr. Lamb posits that the United States constitutes the relevant geographic market with respect to both identified product markets. Intuitive does not dispute this point.

and Replacement Market during the relevant period. Furthermore, Intuitive used its monopoly power in the market for MIST robots to maintain a monopoly in the related EndoWrist Repair and Replacement Market.

(4) Intuitive's alleged misconduct here was "anticompetitive and resulted in harm to competition in that hospitals had little choice but to pay higher prices for replacement EndoWrist surgical instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as Rebotix."

(Id. at 5).

Now, Intuitive seeks to exclude Dr. Lamb's testimony. (Doc. # 114). Rebotix has responded (Doc. # 145), and the Motion is ripe for review.

## II.  **Discussion**

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to
determine a fact in issue; (b) the testimony is
based on sufficient facts or data; (c) the
testimony is the product of reliable principles and
methods; and (d) the expert has reliably applied
the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Implementing Rule 702, Daubert v. Merrell Dow Pharms.,
Inc., 509 U.S. 579 (1993), requires district courts to ensure
that all scientific testimony or evidence admitted is both
relevant and reliable. See Id. at 589-90. The Daubert analysis
also applies to non-scientific expert testimony. Kumho Tire
Co. v. Carmichael, 526 U.S. 137, 147 (1999). District courts
must conduct this gatekeeping function "to ensure that
speculative, unreliable expert testimony does not reach the
jury under the mantle of reliability that accompanies the
appellation 'expert testimony.'" Rink v. Cheminova, Inc., 400
F.3d 1286, 1291 (11th Cir. 2005).

The Eleventh Circuit "requires trial courts acting as
gatekeepers to engage in a 'rigorous three-part inquiry.'"
Hendrix v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010).
The district court must assess whether:

(1) the expert is qualified to testify competently
regarding the matters he intends to address; (2)
the methodology by which the expert reaches his
conclusions is sufficiently reliable as determined
by the sort of inquiry mandated in Daubert; and (3)
the testimony assists the trier of fact, through

4

the application of scientific, technical, or
specialized expertise, to understand the evidence
or to determine a fact in issue.

Id. The proponent of the expert testimony bears the burden of
showing, by a preponderance of the evidence, that the
testimony satisfies each of these requirements. Id.

Here, Intuitive does not challenge Dr. Lamb's
qualifications or whether his testimony would be helpful to
the trier of fact. It instead focuses on the reliability of
his methodology and its arguments that certain of his opinions
are contrary to law.

Turning to reliability, then, the Court must assess
whether the expert's methodology is reliable. "Exactly *how*
reliability is evaluated may vary from case to case, but what
remains constant is the requirement that the trial judge
evaluate the reliability of the testimony before allowing its
admission at trial." United States v. Frazier, 387 F.3d 1244,
1262 (11th Cir. 2004) (citing Fed. R. Evid. 702, Advisory
Committee Notes (2000)). There are four recognized, yet non-
exhaustive, factors a district court may consider in
evaluating reliability:

(1) whether the expert's methodology has been
tested or is capable of being tested; (2) whether
the technique has been subjected to peer review and
publication; (3) the known and potential error rate
of the methodology; and (4) whether the technique

> has been generally accepted in the proper
> scientific community.

_Seamon v. Remington Arms Co._, 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). A district court can take other relevant factors into account as well. _Id._ (citations omitted).

"If the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." _Frazier_, 387 F.3d at 1261 (citation and internal quotation marks omitted). The Court's analysis as to reliability "focus[es] 'solely on principles and methodology, not on the conclusions that they generate.'" _Seamon_, 813 F.3d at 988 (citation omitted).

Intuitive challenges all of Dr. Lamb's four opinions outlined above. The Court will address each argument in turn.

### 1.   **Relevant antitrust product market for MIST robots**

"Defining the market is a necessary step in any analysis of market power[.]" _U.S. Anchor Mfg., Inc. v. Rule Indus., Inc._, 7 F.3d 986, 994 (11th Cir. 1993). "Defining a relevant product market is primarily a process of describing those

groups of producers which, because of the similarity of their products, have the ability — actual or potential — to take significant amounts of business away from each other." Id. at 995 (citation and internal quotation marks omitted). Eleventh Circuit precedent requires an antitrust plaintiff to proffer expert testimony to establish a relevant product market. Am. Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569, 1579 (11th Cir. 1985) (holding lay testimony insufficient to establish relevant antitrust market).

One of Dr. Lamb's challenged conclusions is that the market for MIST robots is a relevant antitrust product market. In his report, Dr. Lamb stated that:

> [T]here are no economic substitutes for minimally invasive soft tissue surgeries performed with MIST Surgical Robots and that MIST Surgical Robots are a necessary input in performance of those surgeries. In particular . . . other forms of minimally invasive soft tissue surgery (such as traditional laparoscopic surgery) and non-MIST robotic surgeries are not economic substitutes for robotically assisted minimally invasive soft tissue surgeries. Therefore, because there are no economic substitutes for robotically assisted minimally invasive soft tissue surgeries, which are defined by the use of the MIST Surgical Robot (of which da Vinci is the dominant type during the Relevant Period), there are no economic substitutes for MIST Surgical Robots.

(Id. at 18). In reaching this conclusion, Dr. Lamb considered whether other types of surgery – such as laparoscopic or open

surgery – could be economic substitutes for minimally invasive soft tissue surgeries performed with MIST robots, and he determined that they were not. Dr. Lamb reached this conclusion because: (1) there is testimony from a hospital representative that a 5-10% increase in the price of the da Vinci surgical robot would not lead hospitals to perform more traditional nonrobotic surgeries because opting to forego a MIST robot would cause surgeons to leave, patients to go elsewhere, and the hospital to lose revenue; (2) Intuitive has acknowledged that it did not view traditional surgeries as competition for surgeries performed by MIST robots; (3) MIST robots possess different features and offer different benefits to surgeons and patients compared to traditional surgeries; and (4) there are non-clinical benefits to using the MIST robots, such as hospitals being able to attract top surgeons and market their use of the MIST robots to drive revenue. (Id. at 19-29).

Not only that, but in Dr. Lamb's opinion surgical robots that do not perform the same *types* of surgical procedures as the MIST robots are not functional or economic substitutes. (Id. at 29-30). Intuitive executives have testified that no other surgical robots have FDA clearance to perform all the same surgical procedures as the da Vinci. (Id.). Two products

8

compete with da Vincis in the relevant market: the Senhance surgical robot sold by TransEnterix and the Flex surgical robot sold by Medrobotics. (Id. at 30 n.119; Doc. # 114-3 at 90-91). According to Dr. Lamb's research, these two other surgical robots have only a *de minimis* share of the market for MIST robots. (Doc. # 114-2 at 50). An Intuitive executive testified that "in 2020 in the U.S., Intuitive's da Vinci had an installed base between 3,500 and 4,000; TransEnterix's Senhance had an installed base of 15 or less; and Medrobotics' Flex had an installed base between seven and ten." (Id.). Relying on the companies' SEC filings, Dr. Lamb concluded that in 2020, Intuitive's da Vinci robot had a 99.5% market share in the U.S. market for MIST surgical robots, with TransEnterix and Medrobotics together accounting for the other 0.5%. (Id. at 51).

With this background in mind, the Court turns to Intuitive's argument. Here, Intuitive argues that Dr. Lamb's opinion defining a relevant antitrust product market for MIST robots should be excluded because he failed to properly employ his chosen methodology – the small but significant and non-transitory increase in price ("SSNIP") test. (Doc. # 114 at 2-3).

To begin, the SSNIP test measures whether increasing a product's price by a relatively small amount – usually by five to ten percent – results in a substantial number of consumers purchasing an alternative product. F.T.C. v. Whole Foods Market, Inc., 548 F.3d 1028, 1038 (D.C. Cir. 2008). As Dr. Lamb explains in his report, "[i]f the hypothetical monopolist is able to permanently (that is, in a 'non-transitory' way) raise prices for a product or group of products by a 'small but significant' amount . . . without losing so much in sales volume that the increase in price is unprofitable, then that product or group of products constitutes a relevant antitrust product market." (Doc. # 114-2 at 17 n.73 (citing "Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, at § 4.1.1)).

When asked about whether he performed a SSNIP test, Dr. Lamb replied that:

> Well, I conducted a form of SNNIP analysis based on practical indicia. I did not conduct the kind of analysis that sometimes — econometric analysis that's sometimes done in which one looks at econometric measures of cross-price elasticity based on a regression. I did not conduct that. It wasn't necessary to do so in order to define the relevant antitrust product market for the tying product, for the da Vinci surgical robots, but I did talk about the practical indicia with respect to a SNNIP analysis of the relevant market in which

10

the da Vinci surgical robot was bought and sold in
the United States.

(Doc. # 114-3 at 92).

In his expert report, Dr. Lamb wrote that: "Even when
the evidence necessary to perform the hypothetical monopolist
test quantitatively is not available, the conceptual
framework of the test provides a useful methodological tool
for gathering and analyzing evidence pertinent to customer
substitution and to market definition." (Doc. # 114-2 at 17
n.73). Elaborating on this, Dr. Lamb testified that he used
a "nonquantitative approach" to a SSNIP analysis that looked
at "practical indicia of economic substitutability, price
base substitutability, or the lack thereof." (Doc. # 114-3 at
93).

Intuitive argues that, while SSNIP is an accepted
methodology, "Dr. Lamb did not perform the accepted version
of the test, but instead performed his own version based on
'practical indicia' instead of actual pricing data." (Doc. #
114 at 6).

But Rebotix points out that where the market is dominated
by one company – as Intuitive does here by holding a 99
percent market share in MIST robots – and that company does
not frequently change its prices, sufficient price change

data is often unavailable. (Doc. # 145 at 1). It is for this reason that Dr. Lamb conceded he did not include any analysis of pricing data or any calculations regarding cross-elasticity of demand or supply, because "it wasn't necessary to do so." (Doc. # 114-3 at 93-95). Dr. Lamb testified that:

> [S]tudies on cross-price elasticity of demand as an approach to performing quantitative versions of the SNNIP analysis are fraught with problems, particularly when you have a firm with a large degree of monopoly power such as Intuitive has in the market for MIST surgical robots. Those kinds of analyses are often subject to something we call the Cellophane Fallacy, which is that they are measuring a world which is already monopoly-pricing, and so trying to tease out what would happen to the equilibrium when you're already at monopoly equilibrium is problematic. But it wasn't necessary and is not necessary to do a cross price elasticity econometric study to apply a SNNIP framework by looking at practical indicia, as I quoted a few moments ago from Footnote 73 in my report, citing the merger guidelines, and as I talk about it in my report itself.

(Id. at 94).

While Intuitive takes issue with how Dr. Lamb applied (or misapplied) the typical SSNIP test, it appears to the Court that Dr. Lamb did not use a typical SSNIP test because the market at issue did not call for one. As the Eleventh Circuit has explained, while measures of supply and demand elasticities are the "most accurate estimates of relevant markets . . . it is ordinarily quite difficult to measure

cross-elasticities of supply and demand accurately. Therefore, it is usually necessary to consider other factors that can serve as useful surrogates for cross-elasticity data". U.S. Anchor, 7 F.3d at 995; see also McWane, Inc. v. F.T.C., 783 F.3d 814, 829 (11th Cir. 2015) (explaining that econometric analysis of relevant markets is not "always required" and "courts routinely rely on qualitative economic evidence to define relevant markets"). Thus, in addition to the cross-elasticity of demand and supply, the Eleventh Circuit has long looked to the factors (or "practical indicia") set forth by the Supreme Court in Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962), in defining a relevant market or submarket: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." U.S. Anchor, 7 F.3d at 995.

Here, Dr. Lamb used the SSNIP analytical framework from which to build his opinions based on other evidence, like testimony and business records (the "practical indicia" cited in his testimony). And the facts Dr. Lamb considered align with the factors enunciated in U.S. Anchor. For example, Dr.

13

Lamb considered customers' "sensitivity to price changes" when he looked at testimony from hospital administrators that a 5-10% increase in price would not lead them to substitute non-robotic surgeries for surgeries conducted using the da Vinci robot. He also considered MIST robots' distinct characteristics and uses, including the increased dexterity and precision enjoyed by surgeons using MIST robots and the benefits to patients, which include less scarring and a quicker recovery time.

Changing tactics, Intuitive next argues that Dr. Lamb's analysis of "practical indicia" is "devoid of evidentiary support," because Dr. Lamb has no evidence to support his contention that the da Vinci's competitors – the MIST robots made by two other companies – are able to "discipline pricing" for the da Vinci.

As explained above, antitrust plaintiffs must define a relevant product market, which must "encompass the product at issue as well as all economic substitutes for the product." Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1045 (9th Cir. 2008). Including economic substitutes ensures that the relevant product market encompasses the sellers or producers who have the actual or potential ability to deprive each other of significant levels of business. Pistacchio v.

Apple Inc., No. 4:20-cv-07034-YGR, 2021 WL 949422, at *1 (N.D. Cal. Mar. 11, 2021).

Here, Dr. Lamb identified several potential economic substitutes for surgeries performed with MIST robots – such as traditional laparoscopic surgeries and non-MIST surgical robots – but rejected them for various reasons. As detailed in his report, only two other surgical robots (TransEnterix's Senhance robot and Medrobotics' Flex robot) currently have FDA approval to perform minimally invasive soft tissue surgeries in the United States. (Doc. # 114-2 at 30 n.119). And neither of these competitors are FDA approved "for all the same indications" as the da Vinci. (Id.). Even including the Senhance and Flex within the relevant product market, the da Vinci still holds a 99.5% market share in the MIST robot market. (Id. at 50-51). Dr. Lamb explained during his deposition that when there is a "dominant firm in the market with more than 99 percent market share, it's going to take some period of time before the behavior of a new competitor can discipline the prices that dominant firm is going to charge." (Doc. # 114-3 at 124-26, 129-32). And because the Flex and Senhance are still "nascent competitors" with "very little market penetration," "their ability to discipline [prices] . . . has not yet developed." (Id. at 110-11, 121).

15

Still, he included the Senhance and Flex robots within the relevant product market definition because those competitors "are attempting to enter that market and . . . I would expect, if they were able to enter the market and overcome the barriers to entry that are significant there, that they would be able to discipline pricing." (Id. at 108).

The Court finds Dr. Lamb's methodology sufficiently reliable. Any alleged flaws in Dr. Lamb's methodology should be addressed in cross-examination. See Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." (citations and internal quotation marks omitted)).

2.  **Relevant    antitrust    product    market    for
    EndoWrist Repair and Replacement**

Intuitive argues that Dr. Lamb's opinion defining the EndoWrist Repair and Replacement Market should be excluded because (1) defining this market from the supplier's (Rebotix's) point of view is contrary to law; and (2) he relied on the opinions of two other experts – Dr. T. Kim Parnell and Mr. J. Lawrence Stevens – whose own opinions are allegedly inadmissible. (Doc. # 114 at 3-4, 11-13).

In his report, Dr. Lamb concluded that the market for EndoWrist repair and replacement – which Rebotix claims is unlawfully tied to the sales of da Vinci surgical robots – is itself a relevant antitrust product market that is distinct from the market for MIST surgical robots. (Doc. # 114-2 at 32-33). Dr. Lamb concluded that because there are no functional substitutes for the repair and replacement of EndoWrist surgical instruments, there are therefore no economic substitutes either. (Id. at 33). In reaching this conclusion, Dr. Lamb relied on the following evidence: (1) third-party repairs of EndoWrist instruments were viewed by Intuitive and other market participants as a competitive threat to Intuitive's sale of replacement EndoWrists; and (2) in response to the competitive threat posed by third-party repairs, Intuitive investigated the possibility of selling refurbished EndoWrists at a discount from the cost of replacement EndoWrists. (Id. at 33-37).

First, Intuitive's argument that the market must be defined from the perspective of the supplier is incorrect for the reasons explained in the Court's contemporaneous Order on the parties' cross motions for summary judgment. Furthermore, in defining the relevant market from the perspective of the hospital customers, Dr. Lamb relied on multiple, unchallenged

bases to support this opinion: (1) Intuitive and third parties viewed "repair" businesses like Rebotix as a competitive threat to Intuitive's sales of replacement EndoWrists; (2) Intuitive at one point considered selling refurbished EndoWrists to edge repair companies out of competition; and (3) only da Vinci EndoWrists are compatible with da Vinci surgical robots. (Doc. # 114-2 at 32-40).

The Motion is denied as to this point, but Intuitive may raise its challenges to Dr. Lamb's methodology during cross-examination.

### 3. <u>Whether Intuitive has possessed and exercised monopoly power in the relevant markets</u>

A monopolization claim under Section 2 of the Sherman Act is comprised of two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." <u>Morris Commc'ns Corp. v. PGA Tour, Inc.</u>, 364 F.3d 1288, 1293-94 (11th Cir. 2004) (quoting <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 570-71 (1966)). "The first element, monopoly power, is the power to control prices in or to exclude competition from

the relevant market." Id. at 1294 (internal citation omitted).

In his report, Dr. Lamb explains that "monopoly power refers to the ability of a firm to persistently price at a level that is significantly higher than the competitive price." (Doc. # 142-2 at 46). He opines that Intuitive possessed monopoly power in the "tying market" (the market for MIST robots) and, thus, was able to set prices above competitive levels. (Id. at 47). In support of this opinion, he discussed how Intuitive "dominated" the market for MIST robots in the United States, having a 99.5% market share. (Id. at 50-51). In addition, Dr. Lamb cited "significant barriers to entry" into the market for MIST robots, including high costs for customers to switch robots and regulatory hurdles. (Id. at 52). There are also high capital costs for research and development and lengthy time requirements for FDA approval. (Id. at 53-54). And Intuitive's deep penetration of the market means that many surgeons are trained on, and feel most comfortable with, a da Vinci system. (Id. at 55-56).

Importantly, Dr. Lamb also discussed how Intuitive's prices for da Vinci robots "exceeded marginal costs." (Id. at 58). As he explained in his report, "[o]ne measure of market

power is the ability of a firm to price in excess of marginal cost" because, in a competitive market, price equals marginal cost. (Id.). Dr. Lamb cited evidence that Intuitive enjoyed "extremely high profit margins on da Vinci surgical robot sales."[2] (Id. at 60).

Dr. Lamb also opined that Intuitive possessed and exercised monopoly power in the "tied market" (the EndoWrist Repair and Replacement Market), as supported by the fact that: (1) despite in-roads from third parties like Rebotix, Intuitive retained a large market share in the EndoWrist Repair and Replacement Market; (2) Intuitive prevented rivals like Rebotix from competing effectively in this market through its use of restrictive contracts with customers and cease and desist letters; (3) the prices for EndoWrist surgical instruments which Intuitive supplied were set well above marginal costs and at "supracompetitive" levels. (Id. at 65-73).

Intuitive argues that the Court should exclude Dr. Lamb's opinions with respect to Intuitive's monopoly powers in the relevant markets. According to Intuitive, Dr. Lamb's

---

[2] While Dr. Lamb provided precise profit margin percentages in his report, the Court notes that the parties have chosen to redact this information from their motions, and thus the Court will also avoid using precise profit-margin numbers.

opinion that Intuitive exercised monopoly power by charging "supracompetitive" prices is contrary to law in that Dr. Lamb failed to consider Intuitive's total costs (fixed **and** marginal costs). (Doc. # 114 at 4, 15-16).

Federal district courts are split on whether fixed (or sunk) costs should be taken into account, especially in innovation-intensive industries like pharmaceuticals or, as here, high-tech medical devices. Compare In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. CV 14-MD-02503, 2018 WL 563144, at *11 (D. Mass. Jan. 25, 2018) (finding that sunk costs "are relevant to the inquiry because in a market with high fixed costs like the pharmaceutical industry, 'even competitive prices may exceed marginal cost'") with In re Aggrenox Antitrust Litig., 199 F. Supp. 3d 662, 667 (D. Conn. 2016) (rejecting brand manufacturers' sunk costs argument because the fact that "brand manufacturers incur enormous fixed costs developing and marketing new drugs . . . does not mean that the price of the brand drug is not supracompetitive," and stating that the "generally accepted economic means of analyzing the probability that given prices are supracompetitive [is] using price and marginal cost").

The Court need not take a stance on this issue in any event, because Dr. Lamb testified that even taking into

account additional costs like research and development, Intuitive's profit margins are above 20 percent, which is still "quite high." (Doc. # 114-3 at 149-50). Any flaws in his methodology may be explored on cross-examination. The Motion is denied on this ground.

**4.   Whether Intuitive's challenged conduct has produced anticompetitive effects**

In his report, Dr. Lamb states that Intuitive's alleged misconduct (the agreements with hospitals prohibiting repair of EndoWrists, the cease-and-desist letters, the threats to discontinue servicing) "was anticompetitive because it resulted in higher prices for products in the (tied) market than otherwise would have prevailed." (Doc. # 114-2 at 45). According to Dr. Lamb, "hospitals had little choice but to pay higher prices for replacement EndoWrist surgical instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as Rebotix." (Id. at 5).

Intuitive argues that Dr. Lamb's opinion that Intuitive's challenged conduct has caused anticompetitive effects is contrary to law. Specifically, Intuitive claims that the law requires Rebotix to prove that the *combined price*

for a da Vinci robot and EndoWrists was greater than it would have been if they had been sold independently. Dr. Lamb did not analyze this issue. Instead, he opined that some customers would have paid less for Rebotix's services in the "but-for" world (i.e., without the alleged tying arrangement) than they paid to buy new EndoWrists from Intuitive in the actual world. (Doc. # 114 at 4-5).

The Court rejects this argument for the reasons explained in its accompanying summary judgment order.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

Defendant Intuitive Surgical, Inc.'s <u>Daubert</u> Motion to Exclude the Opinions of Dr. Russell Lamb (Doc. # 114) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>10th</u> day of August, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

23